**RICHARD R. BEST**
**REGIONAL DIRECTOR**
**Lara S. Mehraban**
**Judith Weinstock**
**Kevin P. McGrath**
**David Stoelting**
**Brenda Chang**
**Kim Han**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0174 (Stoelting)**
**stoeltingd@sec.gov**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                              **Plaintiff,**<br><br>     **-against-**<br><br>**RICHARD XIA, a/k/a YI XIA, and FLEET NEW YORK METROPOLITAN REGIONAL CENTER, LLC, f/k/a FEDERAL NEW YORK METROPOLITAN REGIONAL CENTER, LLC,**<br><br>                              **Defendants,**<br><br>     **-and-**<br><br>**JULIA YUE, a/k/a JIQING YUE,**<br><br>                              **Relief Defendant.** | **COMPLAINT**<br><br>**21 Civ. _____ (     )**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against Defendants Richard Xia, a/k/a Yi Xia ("Xia"), and Fleet New York Metropolitan Regional Center LLC, f/k/a Federal New York Metropolitan Regional Center, LLC ("Fleet"); and Relief Defendant Julia Yue, a/k/a JiQing Yue ("Yue"), alleges as follows:

## SUMMARY

1.      From 2010 through late 2017, Defendants fraudulently raised more than $229 million by offering and selling limited partnership interests to more than 450 investors. In connection with the offerings, Xia acted by and through Fleet, the General Partner of the limited partnerships that issued the securities.

2.      The Defendants enticed predominantly Chinese foreign nationals to make investments of $500,000 each to fund two large, mixed-use real estate projects that were to be built in Queens, NY. Xia named them the "Eastern Mirage Project," located at 42-31 Union Street, and the "Eastern Emerald Project," located at 112-51 Northern Boulevard. In their offering materials, the Defendants represented that the investor funds would be used to build two five-star hotels, a modern conference center, luxury residences, retail stores, a top-shelf restaurant, vast underground parking garages, and a medical center.

3.      Relying on the Defendants' representations, investors contributed $56 million to the Eastern Mirage Project. Although the offering materials represented that the project would be completed in 2013, today it is an unfinished and empty glass tower. Between 2014 and 2017, investors contributed $173 million to the Eastern Emerald Project. Today, it remains a largely vacant dirt hole surrounded by a concrete wall. *See* Exhibits A and B hereto (photographs of the Eastern Mirage and Eastern Emerald sites taken on September 14, 2021). The funds for the Eastern Mirage Project have been exhausted far short of completion of the project. And only

approximately $77 million is left for construction of the Eastern Emerald Project, far short of the amount the Defendants had estimated would be needed to complete the construction of the project.

4.      The Defendants pitched the investments in the projects as a way for investors to participate in the EB-5 Program administered by the United States Citizenship and Immigration Services ("USCIS"), which allows foreign nationals to qualify for permanent residency if they make a qualified investment of $500,000 or more in a specified project that is determined to create or preserve a certain number of jobs for United States workers.

5.      The terms of the Eastern Mirage and Eastern Emerald offerings were generally the same.  Each investor made a $500,000 capital contribution to a limited partnership; a processing fee of $50,000 was also required.  The investors' funds were required to be loaned to the projects' developers, who were affiliates of Fleet, and used only for project-specific purposes.  Each investor became a limited partner, and the General Partner (Fleet) had complete control over the offerings.  The investors were told that their $500,000 capital contributions would be returned to them when the loan matured.

6.      The primary offering documents were the Private Offering Memoranda ("Offering Memoranda"), which included Limited Partnership Agreements ("LP Agreements"), and Business Plans, which Xia reviewed and approved, and various marketing materials.  These documents contained numerous material misrepresentations and omissions.  *First*, Defendants represented to investors that their $500,000 capital contributions would be used ***only*** for the construction and operation of that specific project.  Instead, Defendants repeatedly misappropriated money from one project and used it for another.  For example, Defendants used approximately $17 million in Eastern Mirage investor funds to purchase the Eastern Emerald

land; and used at least $11.8 million in Eastern Emerald investor funds for Eastern Mirage project construction.  Xia also misappropriated investor funds for personal and other improper expenses.

7.     *Second*, the Defendants represented to investors that the projects would be "funded from a variety of sources," including not only EB-5 funds but also government bonds, loans from banks and a broker-dealer, as well as substantial equity contributions from Xia. These representations were false, which Defendants knew or were reckless in not knowing were not true.  In fact, EB-5 investor money was essentially the only source of funding, which created a significant funding shortfall that Defendants knew or should have known was inevitable.

8.     *Third*, the Defendants told investors that the "Management and Development" team for the projects consisted of Xia and the Racanelli Construction Group, Inc. ("Racanelli"). The Offering Memoranda stated that Racanelli was "one of the region's leading providers of preconstruction planning, project management, design/build, and general contracting services," and that Racanelli, "[s]ince its founding," had completed numerous projects, including "corporate headquarters, industrial complexes, hospitals," and many other types of buildings. The Business Plans and marketing brochures further represented that Racanelli had "six decades" of construction experience.  None of this was true.  In fact, Racanelli was created in 2011 and had no track record other than serving as Xia's in-house construction company.  Moreover, the description of Racanelli's experience was lifted almost verbatim from the website of another construction company, Racanelli Construction Company Inc. (the "Original Racanelli"), whose name and reputation Defendants sought to co-opt by appropriating its name for their construction entity.  While the Offering Memoranda and Business Plans extol Xia as having extensive experience in real estate development, Xia himself had limited experience as a developer—

before Eastern Mirage he had completed construction of only one small apartment building—and he was ill-equipped to manage the construction of the large-scale projects, as Defendants knew or should have known.

9.      *Fourth*, the Defendants told investors that the hotels that were part of the projects would be affiliated with the well-known Westin Hotel chain, which Defendants knew was not true.

10.     *Fifth*, the Defendants intentionally exaggerated the size of the Eastern Emerald Project.  The Defendants told investors that the project would cover more than 1.1 million square feet, but Defendants knew this was false.  Documents submitted to the Department of Buildings in 2015, and signed by Xia, show that Xia only sought approval to build a project of about 350,000 square feet.

11.     *Finally*, the Offering Memoranda stated that there were "no material conflicts of interest between the General Partner and its affiliates on the one hand and the Partnership on the other hand" and that the General Partner "is accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in handling the Partnership's affairs."  As the President, Chief Executive Officer and Managing Member of the General Partner, Xia had a fiduciary duty to the Partnerships.  However, Defendants failed to disclose material conflicts of interest to the investors.  Specifically, Xia, who was on both sides of the agreements, caused the developers of the Eastern Mirage and Eastern Emerald Projects to enter into rental agreements with the entities that own the land for the projects.  The developers have never made any rental payments and have been in default for years: one owes at least $16.5 million and the other owes at least $42.2 million.  Because Xia owns and controls all four entities – the developers and the owners of the land – and can exercise his right to demand payment at any time, Xia has the

unfettered right to trigger the default provisions in the rental agreements that would bankrupt the developers and leave the investors empty-handed. Alternatively, if the projects are sold, Xia could enforce the nearly $60 million in payment obligations the developers owe, which will reduce the amount available for the developers to return to investors.

12.     To further the Defendants' scheme and conceal their conduct, Xia opened more than 150 bank accounts which he controlled and through which investor funds flowed. Although Yue is a signatory or co-signatory (with Xia) on many of these accounts, she appears to act primarily at Xia's direction. Xia has exercised this control to direct numerous transfers between and among these accounts in circular, multi-step transactions that appear to have no legitimate business purpose. Xia directed over $127 million in investor funds to Racanelli and another general contractor he controls. Of that amount, Xia re-directed a total of at least $85.9 million to accounts of other entities he controls. Of the $85.9 million, there are no invoices or other support for approximately $43.6 million of these transfers. Moreover, the invoices from Xia's entities to the general contractors ostensibly supporting approximately $32.2 million of the transfers appear spurious. Additionally, the majority of this money does not appear to have been spent on Project-related expenses.

13.     A total of at least $9.7 million in ill-gotten gains was routed to personal bank accounts for Julia Yue for no legitimate business purpose. This includes $4.1 million she received between January 2012 and January 2019 and an additional $5.6 million she received in April and May 2021.

14.     The investors remain at significant and immediate risk. Since 2018, many investors have been demanding the return of their funds, including through lawsuits. To date, no investor has received his or her capital contributions back. And given that the projects consist of

an unfinished building and a hole in the ground with insufficient funds to complete either project, the prospects for investors to receive their capital contributions back are remote at best.

15.     Moreover, Xia and his companies are currently under significant financial exposure, including from a dozen pending project-related lawsuits brought by EB-5 investors, injured workers, unpaid contractors, ConEdison, and the City of New York.  In May 2021, Xia wrote to some investors to say that he was planning the "termination and dissolution" of one of the limited partnerships.  And in recent months, Xia has offered payments to some investors to settle pending litigations, stating that he may wind up some of the limited partnerships.

16.     About $77 million in investor funds remains in Xia-controlled bank accounts, which is insufficient to repay investors.  Of the investor funds remaining, approximately $18 million were in CDs that matured on September 26, 2021 and are now readily available for Defendants' potential misuse.  The Defendants' actions have jeopardized the investors' prospects for any return of their capital contributions.  And Xia continues to misuse investor funds.  For example, in May 2021, Xia used $10 million of investor funds as collateral to secure a bank line of credit in the name of EEG, and siphoned off $5.6 million off to Yue's personal account (*see supra* paragraph 13).

17.     As a result, the SEC seeks several forms of emergency and preliminary relief, including an asset freeze, the appointment of a Monitor, sworn accountings, and expedited discovery.

## **VIOLATIONS**

18.     By virtue of the foregoing conduct and as alleged further herein, Defendants Xia and Fleet have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15

U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

19.     Yue, the Relief Defendant, has received at least $9.7 million in ill-gotten gains from the Defendants' fraud.

20.     Unless Defendants are restrained and enjoined, they will continue to engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

21.     The SEC brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Sections 21(d) [15 U.S.C. § 78u(d)] and 21A(a) [15 U.S.C. § 78u-1(a)].

22.     The SEC seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules that this Complaint alleges they have violated; (b) ordering Defendants and Relief Defendant to disgorge all ill-gotten gains they received as a result of the violations alleged herein and to pay prejudgment interest thereon; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and (d) ordering any other and further relief the Court may deem just and proper.

23.     To maintain the *status quo* and preserve assets sufficient for Defendants to pay disgorgement, prejudgment interest, and civil money penalties and for Relief Defendant to pay disgorgement and prejudgment interest in accordance with any final judgment of this Court, the SEC further seeks emergency relief during the pendency of this action, including: (a) an asset freeze; (b) the appointment of a Monitor; (c) sworn accountings; and (d) expedited discovery.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this action pursuant to Securities Act Section

22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

25.     Defendants, directly and indirectly, have made use of the means or

instrumentalities of interstate commerce or of the mails in connection with the transactions, acts,

practices, and courses of business alleged herein.

26.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)]

and Exchange Act Section 27 [15 U.S.C. § 78aa].  Defendants may be found in, are inhabitants

of, or transact business in the Eastern District of New York, and certain of the acts, practices,

transactions, and courses of business alleged in this Complaint occurred within this District.

## DEFENDANTS[1]

27.     **Xia**, age 52, a resident of Flushing, NY, is the co-owner, CEO, President, and

Managing Member of Fleet.  Xia attended a university in China where he obtained a degree in

industrial management engineering.  Xia also has a master's degree from the University of

Alabama.  Xia immigrated to the United States in 1996 and became a United States citizen four

years ago.  Xia owns (or co-owns with his wife, Relief Defendant Yue) and controls all the

entities listed in paragraphs 31-48 (the "Xia Entities").

28.     **Fleet**, a New York limited liability company, was formed by Xia on February 5,

2010.  The USCIS, part of the U.S. Department of Homeland Security, approved Fleet for

designation as a regional center in the Immigrant Investor Program on October 7, 2010.  Fleet is

---

[1]     Defendants Xia and Fleet entered into tolling agreements that tolled and suspended the running of any statute of limitations for the period beginning September 10, 2019 through March 9, 2020.

the General Partner for the five limited partnerships listed in paragraphs 31-36.

29.    Xia acted by and through Fleet and, accordingly, Xia's conduct should be imputed to Fleet.

## **RELIEF DEFENDANT**

30.    **Yue**, age 41, a resident of Flushing, NY, is the wife of Xia.  Yue was also the authorized signatory on dozens of bank accounts and she authorized funds transfers and signed lease and loan agreements on behalf of various entities that Xia owns and controls.  *See* Exhibit C (list of Xia-controlled bank accounts and signatories).  It appears that Yue acted primarily at Xia's direction.

## **OTHER RELEVANT ENTITIES**

### **The Limited Partnerships and the Developers (FFG, EEG, and LaGuardia)**

31.    **EMMCO, L.P.** ("EMMCO") is a New York limited partnership formed by Xia on April 9, 2010.  Under a Loan Agreement dated July 14, 2010, EMMCO agreed to loan $8 million in EB-5 investor funds, at 0% interest, to **Fleet Financial Group, Inc.** ("FFG"), a New York corporation owned and controlled by Xia, so that FFG could "develop [and] construct Phase I" of the Eastern Mirage Project, referred to as the "Eastern Mirage Center."  Phase I was supposed to include a "conference center, spa/fitness center, restaurant and parking garage."  Yue signed the Loan Agreement for EMMCO and Xia signed for FFG.

32.    **EMMCO NQMC, L.P**. ("EMMCO NQMC") is a New York limited partnership formed by Xia on December 22, 2010.  Under a Loan Agreement dated June 26, 2013, EMMCO NQMC agreed to loan $35.5 million in EB-5 investor funds, at 0% interest, to FFG so that FFG could "develop [and] construct Phase II" of the Eastern Mirage Project, referred to as the "North Queens Medical Center."  Phase II was supposed to include a "state of the art medical facility."

Yue signed the Loan Agreement for EMMCO NQMC and Xia signed for FFG.

33.     **EMMCO TOWER, L.P.** ("EMMCO TOWER") is a New York limited partnership formed by Xia on June 10, 2011.  Under a Loan Agreement dated December 8, 2014, EMMCO TOWER agreed to loan $12.5 million in EB-5 investor funds, at 0% interest, to FFG so that FFG could "develop [and] construct Phase III" of the Eastern Mirage Project, which was supposed to be a luxury hotel.  Yue signed the Loan Agreement for EMMCO TOWER and Xia signed for FFG.

34.     **EEGH, L.P.** ("EEGH") is a New York limited partnership formed by Xia on December 6, 2013.  Under a Loan Agreement dated December 18, 2013, EEGH agreed to loan $80 million in EB-5 investor funds, at 2% interest, to **Eastern Emerald Group, LLC** ("EEG"), a Delaware limited liability company formed by Xia on December 6, 2013 for the development of the Eastern Emerald Project.  In June 2018, Xia changed the name of EEG to **The Grand Eastern Mirage Group LLC.**  The loan to EEG was supposed to allow EEG to "develop, construct and operate a commercial mixed-use project that includes a 5-star hotel, convention center, parking garage, restaurant and retail space."  Xia signed the Loan Agreement for EEGH and Yue signed for EEG.

35.     An "Amendment No. 1" to the EEGH-EEG Loan Agreement, dated October 21, 2015, increased the loan from $80 million to $110 million.  Xia signed Amendment No. 1 to the Loan Agreement for both EEGH and EEG.

36.     **EEGH II, L.P.** ("EEGH II) is a New York limited partnership formed by Xia on September 10, 2015.  Under a Loan Agreement dated October 18, 2015, EEGH II agreed to loan "up to $80 million" in EB-5 investor funds, at 1% [or 2%] interest, to **LaGuardia Performance Center, LLC** ("LaGuardia"), a Delaware limited liability company formed by Xia on September

25, 2015, for the development of the expansion of the Eastern Emerald Project.  The loan was supposed to allow LaGuardia to "develop, construct and operate the expansion to a 5-star hotel, which will result in an additional 556,398 SF being added to the overall building, an additional 294 5-star luxury hotel rooms, an additional 4 floors added to the building; a performing arts center across 5 floors; as well as additional retail space, restaurant space and parking garage space."  Xia signed the Loan Agreement for EEGH II and Yue signed for LaGuardia.

37.     The EMMCO, EMMCO NQMC and EMMCO TOWER Offering Memoranda stated that the loans mature "five (5) years from the date of the first advance under the loan," which would have been in August 2015 for EMMCO, April 2016 for EMMCO NQMC, and December 2018 for EMMCO TOWER.

38.     The EEGH and EEGH II Offering Memoranda stated that the loans for the Eastern Emerald Project mature "at the date of (1) five (5) years from the date of the last advance under the loan, or (2) the date all EB-5 investors have ceased participating in the EB-5 program, whichever is later."

39.     The borrowers (FFG, EEG, and LaGuardia), which are the developers that Xia also owns and controls, have not made any loan repayments to the limited partnerships.

### Additional Entities Xia Owns, Co-Owns and/or Controls

40.     **Amazon River, LLC** ("Amazon River"), a Delaware limited liability company formed on June 29, 2015, is owned and controlled by Xia.

41.     **Fleet General Insurance Group Inc.** ("Fleet Insurance"), a Vermont corporation created on October 13, 2017, is owned and controlled by Xia.

42.     **JiQing Development, Inc.** ("JiQing Development"), a New York corporation formed on July 28, 2005, is co-owned by Xia and Yue and controlled by Xia.

43.     **Manekineko Group, LLC** ("Manekineko Group"), a New York limited liability company formed on February 3, 2010, is owned and controlled by Xia.

44.     **Perini Group, Inc.** ("Perini"), a New York corporation formed on December 2, 2015, is controlled by Xia.

45.     **Racanelli,** a New York corporation formed on June 21, 2011, is controlled by Xia.

46.     **Shangri-La 9D, Inc.** ("Shangri-La 9D"), **Shangri-La 9F, Inc.** ("Shangri-La 9F"), and **Shangri-La Green, Inc.** ("Shangri-La Green"), New York corporations formed on March 8, 2010, are owned and controlled by Xia.

47.     **Samuel Development Group, LLC** ("Samuel Development"), a New York limited liability company formed on August 3, 2005, is owned and controlled by Xia.

48.     **X & Y Development Group, LLC** ("X&Y"), a New York limited liability company formed on September 20, 2007, is owned and controlled by Xia.  In 2007, X&Y acquired the Eastern Emerald Project land on Northern Boulevard in Queens, NY.

## FACTUAL ALLEGATIONS

**I.     The Securities Offerings and the Structure of the Limited Partnerships**

49.     From early 2010 through late 2017, through five separate offerings, the Defendants solicited EB-5 Program investments in two mixed-use real estate projects: the Eastern Mirage Project and the Eastern Emerald Project.

50.     The EMMCO offering, from August 2010 through January 2014, raised $8 million from 16 EB-5 Program investors.  According to its Offering Memorandum, the EMMCO funds were to "be used to finance Phase I of the Eastern Mirage Project," described as the "Eastern Mirage Center," which was to include a spa and fitness center, a multimedia conference

center, a restaurant, and a public parking garage with 256 parking spaces.  The Offering Memorandum further stated that the Easter Mirage Center "will be completed and be generating income and creating jobs by the third or fourth quarter of 2012."

51.     The EMMCO NQMC offering, from January 2011 through April 2012, raised $35.5 million from 75 EB-5 Program investors.  According to its Offering Memorandum, the EMMCO NQMC funds were to be used "to finance Phase II of the Eastern Mirage Project," consisting of "the North Queens Medical Center [which] will be completed and be generating income and creating jobs by the third or fourth quarter of 2013."

52.     The EMMCO TOWER offering, from December 2011 through January 2014, raised $12.5 million from 25 EB-Program investors.  According to its Offering Memorandum, the EMMCO TOWER funds were to be used "to finance Phase III of the Eastern Mirage Project," consisting of the Eastern Mirage Tower [which] will be completed and be generating income and creating jobs by the third or fourth quarter of 2013."

53.     The EEGH offering, from March 2014 through December 2015, raised $110 million from 220 EB-5 Program investors.  According to its Offering Memorandum, the EEGH funds were to be used "to finance the development, construction and operation" of the Eastern Emerald Project, consisting of "a 498-room 5-star luxury hotel, retail stores (97,180 square feet), and IAC certified international conventional [sic] center (105,964 square feet), a restaurant (11,300 square feet), and a parking garage with 400 parking spaces covering 82,490 square feet."

54.     The EEGH II offering, from October 2015 to October 2017, raised $63 million from 126 EB-5 Program investors.  The Offering Memorandum for EEGH II described a significant "expansion" of the Eastern Emerald Project from the 643,180 square feet in the "original building" to 1,199,578 square feet.  According to the EEGH II Offering Memorandum:

"The completed building will have a total of 792 5-star luxury hotel rooms equal to 730,049 SF across all 29 floors; as well as a 1-story, 105,964 SF convention center; a 5-story, 78,954 SF performing arts center; 136,269 SF of retail space across 6 floors; 57,531 SF of restaurant space across 5 floors; and a 1-story, 90,811 SF parking garage."

55.     Investors in each of the five offerings were solicited with an Offering Memorandum, which included and incorporated the LP Agreement, a Business Plan, and other marketing materials.  Xia reviewed the Offering Memorandum and the Business Plan for each offering.  He had final authority to approve these documents, and he approved them for distribution to investors.

56.     The investments, which were structured as limited partnership "units," are securities.

57.     The Offering Memoranda all stated that the "investors investing under the EB-5 Program will become Limited Partners of the Partnership by (i) completing and delivering the subscription documents, including the Subscription Agreement and the Investor Questionnaire, in the forms attached hereto as Exhibit IV, which may be accepted by the General Partner in its sole discretion, (ii) executing and delivering a counterpart signature page to the Partnership Agreement, and (iii) making a capital investment in the Partnership Agreement in the amount of US$500,000, along with a processing fee in the amount of US$50,000."  The offices of the Partnership and the General Partner were identified in the Offering Memoranda as being located in Flushing, New York.

58.     The Offering Memoranda all stated that the investors' capital contributions are intended to be used for a loan to the respective developer to finance the phase of the project for which the funds were raised.  The Offering Memoranda further provided that the "Borrower

intends to repay the loan at maturity with the proceeds of long term financing or from other sources."

59.     Although the loans from EMMCO, EMMCO NQMC and EMMCO TOWER to Fleet were at zero percent interest, the investors had an expectation of profit.  The Offering Memoranda for the Eastern Mirage offerings provided that "net proceeds (if any) realized from the distribution of profit realized from the Partnership's investment, sale, exchange or other disposition of the business of the Partnership or any portion thereof, will be allocated and distributed 100% to the Limited Partners up to the amount of each Limited Partner's original capital contribution.  Thereafter, such amounts will be allocated and distributed 99% to the General Partner and 1% to the Limited Partners.  Interest income, after deducting Partnership expenses will be allocated and distributed 99% to the General Partner and 1% to the Limited Partners."

60.     The EB-5 funds raised from the EEGH and EEGH II offerings were loaned at 2% interest to EEG and LaGuardia, respectively, for development of the Eastern Emerald Project. The Offering Memoranda for the Eastern Emerald offerings provided that "net proceeds (if any) realized from the distribution of profit realized from the Partnership's investments will be allocated and distributed 90% to the Limited Partners and 10% to the General Partners."

61.     The EB-5 Program investors were passive, and any returns they received would come not from their efforts but from the efforts of Xia, Fleet and other entities Xia controlled.

## II.     Xia Controlled Fleet and the Limited Partnerships

62.     The LP Agreements gave Xia, as the President, CEO and Managing Member of the General Partner Fleet, broad and expansive authority to act on behalf of each Partnership, to represent and bind each Partnership, and "to do any and all things necessary for, incidental to or

connected with carrying out the activities of the Partnership."

63.     The LP Agreements also authorized the General Partner to "raise capital for the Partnership by offering for sale and selling Units," and to "do all things in that regard in the name of and on behalf of the Partnership, including preparing and filing such offering or other documents as the General Partner determines to be necessary or desirable, and all things done by the General Partner are hereby ratified and confirmed."

64.     The LP Agreements for each offering, which were attached as exhibits to the Offering Memoranda, stated that the General Partner has the authority to "represent and bind" the Partnerships; to do "any and all things" regarding the partnerships; and to "make all decisions regarding the Partnerships.  The parties to the LP Agreements were the investors, Fleet, and Xia, who was designated as the "Original Partner."

65.     The Offering Memoranda for each offering further stated that the "General Partner exercises ultimate authority for overall management of the Partnership and is responsible for its day to day operations" and "may retain such other suitable parties to provide services to the Partnership, including, without limitation, legal, consulting, marketing, administration, and accounting services."

## III.    The Defendants' Scheme to Defraud

66.     The Defendants engaged in a scheme to solicit funds from investors and to misappropriate and misuse those funds, and they engaged in manipulative and deceptive acts in furtherance of this scheme, including material misrepresentations and omissions.

67.     The Defendants used the means or instrumentalities of interstate commerce or of the mails in connection with the conduct described herein, including through communications with investors and their agents in China, and with certain of the investors and their agents or

representatives located across the United States.

68.     Xia was actively involved in the solicitation of investors, and he travelled to China to promote the offerings.

69.     During a 2014 trip to China, Xia approved a script drafted by a colleague to be used to promote the Eastern Emerald Project to potential investors.  In a July 25, 2014 email to Xia, the colleague noted that the script was "modified slightly from the version you approved in the spring (to reflect the brochure [Xia Entity Employee A] gave me and ou[r] discussion yesterday).  Please let me know of any changes/corrections you wish to see. . . Here come the remarks."

70.     The "remarks" read, in part (emphasis in original):

I am very pleased to be back in China with an attractive real estate development opportunity to share with you.  On my first visit, great project Eastern Mirage/Westin Hotel . . . track record 100% permanent residency approvals, but no confirmed next project. Now, we have next project.

Boutique Regional Center that works exclusively and hand-in-glove with Fleet Financial Group[.]

Because FNYMRC and Fleet Financial Group are team working solely on NYC real estate developments together, we have deep experience in this field.  Based on this experience, we believe that Eastern Emerald's LaGuardia Convention is a rare and special opportunity in New York.  It is:

> 600,000 sq. foot, mixed use development across the street from LAG that would consist of a 300,000 square foot exhibition center, 200,000 square foot meeting space, 800 hotel rooms – plus restaurants, retail space and a 500 spaces of underground parking[.]

> The project will benefit from the support of community leaders and NY State and the U.S. government in the form of[] $45 million in tax credits[.]

As a potential EB-5 investor you would be an important part of this project, but only a part.  The $75 million investment from 150 investors could comprise less than one-third of the projected $228 million development budget.  (State, Federal govt, a bank and Fleet Financial would all have large stakes, too).

Invest[m]ent mindset – this is a compelling investment opportunity in its own right

71.     Xia replied to the email as follows: "everything is fine except the total eb-5 is now $80 million and total construction cost $233 million."

72.     As shown in greater detail below, nearly all the representations in the script, as well as many in the written materials provided to investors, were false.  Westin Hotel was not involved; Fleet did not have "deep expertise;" the Eastern Emerald Project was not 600,000 square feet; and neither the federal nor state governments, nor any bank, nor even Fleet or FFG had "large stakes."  Moreover, the EB-5 investors were not "only a part" of the project's funding, they were providing substantially all of the funding.

73.     Defendants violated the federal securities laws through multiple means. Defendants made material misrepresentations and omissions to investors about the sources of funding for the projects; the capabilities and experience of Xia and the development team; the projects' affiliation with the Westin Hotel chain; and the size of the Eastern Emerald Project. Defendants also concealed the rental agreements between the developers and the owners of the projects' land, even though these agreements materially impacted the investors' security and ability to recover their investments.  Xia also controlled the flow of funds to benefit himself; and concealed important information from investors.

### A. Defendants' Misappropriated and Misused Investor Funds

74.     Under the Offering Memoranda, the investors' $500,000 capital contributions were to be used only for the particular phase of the project for which the funds were raised.

75.     The Offering Memoranda stated that the "Partnership's Loan will be used to finance [the particular phase] of the project."  Consistent with the Offering Memoranda, the Loan Agreements, in a provision named "Mandatory Use of Proceeds," stated that: "Borrower agrees

that the proceeds of the Loan shall only be used for the development, construction and operation of the Project." The phrase "Project" is defined to mean the Eastern Mirage Center in the EMMCO Loan Agreement; the North Queens Medical Center in the EMMCO NQMC Loan Agreement; the Eastern Mirage Tower in the EMMCO TOWER Loan Agreement; and the Eastern Emerald Project in the EEGH and EEGH II Loan Agreements.

76.     This limitation was material because it assured investors that the funds for one project would not be used for another project that the investor did not contribute to.

77.     On multiple occasions, Defendants misappropriated or misused investor funds.

78.     *First*, Xia's company EEG acquired the Eastern Emerald land on Northern Boulevard in December 2013 for approximately $17 million. Xia, however, fraudulently used funds from Eastern Mirage investors to purchase this land. This misappropriation was accomplished through two series of circuitous bank transfers in June and December 2013. First, in June 2013, $1.7 million was transferred from EMMCO NQMC bank accounts to a FFG account, then to a Racanelli account, and then to an EEG bank account before being transferred to the escrow agent for the seller of the Eastern Emerald land. In December 2013, approximately $15.3 million was transferred from EMMCO TOWER and EMMCO NQMC bank accounts to FFG accounts, then to Racanelli accounts, and then to an EEG bank account, before being transferred to the seller of the Eastern Emerald land. Xia directed all these transfers, either directly or by directing Yue to do so. *See* Exhibit D (chart tracing Eastern Mirage funds cycling through multiple accounts for Eastern Emerald land purchase).

79.     *Second*, Xia used at least $11.8 million in Eastern Emerald investor funds for the Eastern Mirage Project. In early 2014, only approximately $4.25 million of the funds from the Eastern Mirage offering remained. The funds available for construction of the Eastern Mirage

Project were nearly depleted, in part as a result of the 2013 misappropriation of approximately $17 million described in the previous paragraph.  To solve this problem, from 2014 to 2019, Xia used at least $11.8 million of funds raised from Eastern Emerald investors to pay for costs associated with the Eastern Mirage Project.

80.     *Third*, Xia misappropriated investor funds for personal purposes.  In 2012, Xia used approximately $819,809 in EMMCO funds to pay off a mortgage on a building located at 57-35 Lawrence Street, Queens, NY.  As with the other misappropriations, and apparently in an effort to mask the purpose of the transfers, the funds were transferred from an EMMCO account to and through FFG, Racanelli and JiQing Development accounts, before being used to satisfy the mortgage.  The memo on the check states "Loan payoff #18 71-8 57-35 Lawrence."  *See* Exhibit E.

81.     *Fourth*, in July 2015, in a similar pattern of transfers—the investor funds cycled through EEGH, EEG, Racanelli and Amazon River accounts—Xia transferred approximately $2.3 million to an escrow agent for a luxury apartment at One Madison Park in Manhattan. Although the funds were returned to Amazon River in early 2016, Xia did not return the funds to EEG, but allocated the returned funds to accounts of other entities he controlled.  Additionally, the investor funds were not available for the Projects and were at risk during the period of time they were misappropriated.  *See* Exhibit F.

82.     *Fifth,* in January 2021, EEG received a check for $10,968,787.48 from the New York State Comptroller Refund Account, which appeared to be a tax credit for the Eastern Emerald Project.  These funds were deposited into CTBC Bank and used by Xia to purchase a $10 million certificate of deposit in the name of EEG.  In an April 2021 loan agreement signed by Xia, EEG borrowed $10 million from CTBC Bank and used the CD as collateral.  Between

April 30, 2021 and May 25, 2021, $5.6 million of the $10 million loan was transferred into Yue's personal account.  These funds should have been used for the Eastern Emerald Project. The EEGH Offering Memorandum stated that $38 million in "Tax Credits" were a funding source.  However, Xia misappropriated over $5 million of those monies for his personal benefit.

83.     As these transactions show, Xia believed he was entitled to use investor money to benefit himself and he treated EB-5 investor funds as his own money.  Xia stated as much in an email dated June 2, 2020.  At the time, Xia wanted to obtain a residential mortgage from Financial Firm A that offered residential mortgages only to clients.  Financial Firm A required a prospective client to make a minimum deposit.  Xia proposed using an account holding "loan proceeds from my EB-5 entity" to satisfy the minimum, but the firm responded that "if its [sic] EB5 money unfortunately it doesn't work.  It has to be yours personally/ your family's money." Xia replied: "What is the definition of Eb-5 money? It is in the bank account of my entity and I use my property as collateral for it.  If [the firm] lends me money and deposit into my bank account with my hotel as collateral [w]ill it still be considered as [firm] money or [] investor/Deposit money?  I feel it is a loosely defined term to call it eb-5 money…"

84.     Xia also authorized at least $1.6 million in transfers for purposes unrelated to either project.  For example, there were over $840,000 in payments for apartments in Manhattan rented by Yue; at least $76,000 in retail store purchases, including at Amazon, Apple, Best Buy, Macy's, Nordstrom, and Pioneer Home Electronics; approximately $49,760 for food shopping and restaurants, including Whole Foods and Fresh Direct; and over $14,000 in hotel charges, including luxury hotels in Hawaii.

85.     Xia received over $700,000 in payments through a payroll firm from 2011 through 2020, as well as at least $125,000 in other transfers, traceable to investor funds.

**B.  Misrepresentations About The Sources of Funding For The Projects**

86.     The Offering Memoranda stated that the projects would be funded not just through the EB-5 Program investors' funds but through "a variety of sources."  This disclosure was material because having multiple funding sources made the investment appear safe and the prospects of the projects' completion more certain.

87.     In the 2014 pitch script that Xia approved, Xia also emphasized as a key point that investors would only pay "a part of" the project cost because of all the support from governments, banks and others.

88.     Defendants made material misrepresentations regarding non-investor sources of funding, which they knew were false when made.  In fact, nearly all of the funding for both projects came from the EB-5 investors.

89.     The EMMCO, EMMCO Tower and EMMCO NQMC Offering Memoranda all contain the following paragraph:

> The Eastern Mirage Project is intended to be funded from a variety of sources including a bank loan from [Bank A], N.A., a NYC Capital Resource Corp. ("NYCCRC") triple tax-exempt bond financing and EB-5 immigrant investment.  The Eastern Mirage Project is financed by a $9,000,000 bank loan from [Bank A] at an interest rate equal to the sum of (i) 3.25% plus (ii) the 30-day London Interbank Offered Rate (LIBOR).  The Eastern Mirage Project is also being financed by a $17,000,000 triple tax-exempt bond financing authorized under the American Recovery and reinvestment Act of 2009.  The program is administered by the NYCCRC and the NYC Industrial Development Agency, both of which are staffed by the New York City Economic Development Corporation.

90.     The EMMCO Offering Memorandum - which estimated the "current budget for hard construction costs for the Eastern Mirage Project" at $88 million - also stated:

> The Eastern Mirage Project costs are expected to be financed as follows:
>
> | | |
> |---|---|
> | EB-5 Immigrant Investor Capital | (Up to) $57,500,000 |
> | NYCCRC Recovery Zone Facility Bonds | $17,000,000 |
> | [Bank A] Loan | $ 9,000,000 |
> | Other Investment Sources | $14,000,000 |

Total Investment in Project                                           $97,500,000

91.     The EMMCO NQMC and EMMCO TOWER Offering Memoranda repeated the

same Eastern Mirage Project funds sources as in paragraph 89, with two changes.  First, the

$9,000,000 loan was to be from Bank B - not Bank A.  Second, the Offering Memoranda

included the statement that in addition to the $17,000,000 in NYCCRC Bonds, "[u]p to an

additional $12,000,000 in NYCCRC Recovery Zone Facility bond financing is available if

needed."

92.     As Defendants knew, the representations in the three EMMCO Offering

Memoranda about non-EB-5 financing were false or misleading.

93.     Defendants knew that the representations about receiving the NYCCRC bonds

were false.  An allocation of NYCCRC bonds for the Eastern Mirage Project was approved in

2009, but Xia turned down the allocation.  A letter to the NYCCRC from Xia's counsel dated

December 6, 2010 stated that Xia "shall not be seeking to use the allocation of $17,000,000 of

Recovery Zone Facility Revenue Bonds that has been made available to it."

94.     As a result, on December 7, 2010, Xia received a letter from NYCCRC

terminating Eastern Mirage's Recovery Zone Facility bond allocation which also stated that the

bond program would expire on December 31, 2010.  Despite knowing that the NYRCCRC bonds

would not be issued, the Defendants' marketing materials and Offering Memoranda, including

the EMMCO NQMC and EMMCO Tower Offering Memoranda which were dated January 31,

2011, continued to tout the government bonds as a funding source to Eastern Mirage investors.

A reasonable investor would find the representation that the project was backed by government

bonds to be material.

95.     In addition, there was no loan from Bank A when the Defendants stated in the

Offering Memoranda that: "The Eastern Mirage Project is financed by a $9,000,000 bank loan

from Bank A at an interest rate equal to the sum of (i) 3.25% plus (ii) the 30-day London

Interbank Offered Rate (LIBOR)."  In fact, neither Bank A nor Bank B provided a loan to the

Eastern Mirage Project.

96.     The EEGH Offering Memorandum estimated the total projected costs of the

Eastern Emerald Project to be $190 million, and represented the following:

> The Eastern Emerald Project costs are expected to be financed as follows:

| | |
|---|---|
| Loan Proceeds from EB-5 Funds | $80,000,000 |
| Tax Credits | $38,000,000 |
| Loan from [Broker Dealer A] | <u>$72,000,000</u> |
| Total Investment in Project | $190,000,000 |

97.     The EEGH Supplemental Offering Memorandum contained the following

disclosure:

> The total project costs for the Eastern Emerald Project of One Hundred and Ninety Million Dollars ($190,000,000) shall be financed as follows:

| | |
|---|---|
| Loan from New Commercial Enterprise, EEGH, L.P.: | $110,000,000 |
| Brownfield Tax Credit: | $21,200,000 |
| New Market Tax Credit | $18,000,000 |
| Equity from Developer: | <u>$40,800,000</u> |
| TOTAL PROJECT COSTS: | $190,000,000 |

98.     The EEGH II Offering Memorandum set the budget for the expanded "Eastern

Emerald Project II" at $181,413,011, and further stated:

> The Eastern Emerald Project II costs are expected to be financed as follows:

| | |
|---|---|
| Loan Proceeds from EB-5 Funds | $80,000,000 |
| NYS Tax Credits | $17,000,000 |
| Capital Contribution from Developer | $44,413,011 |
| Loan from [Broker Dealer A] | <u>$40,000,000</u> |
| Total Investment in Project | $181,413,011 |

99.     None of these sources contributed funds to the Eastern Emerald Project (with the

possible exception of the Brownfield Tax Credit), which Defendants knew or should have known

at the time the Offering Memoranda was provided to investors.

100.    The EEGH Supplemental Offering Memorandum stated definitively that the New Market Tax Credit "shall" fund $18 million for the Eastern Emerald Project.  Xia, however, not only never received the New Market Tax Credit, he never even seriously pursued it.  Xia merely had his lawyer respond to an inquiry about project funding from USCIS by providing a "letter of interest" dated November 14, 2013 from an employee of Financial Firm B.  Xia had Yue call Financial Firm B and ask for the letter of interest regarding the New Market Tax Credit.  Xia never actually pursued the New Market Tax Credit after obtaining the letter of interest.

101.    The EEGH Offering Memorandum also represented that Broker Dealer A was "expected" to provide a $72 million loan, and the EEGH II Offering Memorandum represented that Broker Dealer A was expected to make a $40 million loan.  However, there was never any loan from Broker Dealer A.

102.    In a September 17, 2017 "Request for Evidence," USCIS wrote to Xia's EB-5 counsel that "[t]he Business Plan does not present evidence that the $40 million loan from [Broker Dealer A]  . . . has been secured or is readily available. . . . The credibility of the project's future would be enhanced with evidence on non-EB-5 funding sources.  Therefore, please submit then following: Projected non-EB-5 funds and their source if applicable (e.g., developers, municipal bonds, loans, etc.); Secure commitment from non-EB-5 investors if applicable (contracts, bonds, loans, letter of confirmation from the lender, other sources, etc.)."

103.    The response from Xia's lawyer said nothing about a $40 million loan from Broker Dealer A.  Instead, the lawyer reported that "LaGuardia Performance Center, LLC has already obtained a construction loan commitment letter dated August 18, 2017 issued by [Broker Dealer B]."  The loan commitment purportedly from Broker Dealer B was $85 million, and the

letter pointed out that if the loan is granted then the project "will be well covered."

104.    Xia's attorney attached the $85 million loan commitment letter from Broker

Dealer B to her letter.  The letter was from Registered Representative A, an employee of Broker

Dealer B, who was identified in the letter as Head of Public Finance, to Xia.  The letter from

Registered Representative A was not authentic.  Although Registered Representative A worked

at Broker Dealer B in August 2017, his title was not "Head of Public Finance."  In addition, the

letterhead used for the purported Broker Dealer B's letter is not authentic.  Moreover, Broker

Dealer B was a small, family-owned broker-dealer that was not in the business of making

construction loans and it never considered making any loan to Xia or his company.

105.    The representations in the EEGH Supplemental Offering Memorandum and in the

EEGH II Offering Memorandum that the "[d]eveloper" - meaning entities controlled by Xia -

was expected to contribute a "capital contribution" or "equity" of $40.8 million and $44.4

million, respectively, were also false.  Neither Xia nor his entities ever contributed such funds to

the projects, and Defendants knew or were reckless in not knowing, at the time these

representations were made, that Xia did not have and could not reasonably expect to have the

financial ability to make anything more than a nominal contribution of his own funds.

According to bank records, the only non-investor funds that Xia and his entities contributed to

the projects totaled approximately $3.5 million.

### C.  Misrepresentations Regarding Xia and the Development Team

106.    For an investor in a real estate project, the experience and track record of the

developer is material.

107.    The Offering Memoranda for the five offerings contain detailed descriptions of

"[t]he Project management and development team."  Xia was described as being "active for ten

years in land acquisition, commercial and residential development, marketing research, value-added strategies, financing, property management and leasing, and other related activities."

108.    The Offering Memoranda for each of the five offerings stated that Racanelli has been "recognized as one of the region's leading providers of preconstruction planning, project management, design/build, and general contracting services."

109.    The Offering Memoranda further stated that "[s]ince its founding, Racanelli has been responsible for building and renovation across a broad range and variety of market segments, completing projects that include corporate headquarters, industrial complexes, hospitals, assisted living facilities, university and college facilities, retail stores, hotels, restaurants, houses of worship, self-storage complexes, condominiums and townhouses."

110.    An Eastern Mirage marketing brochure given to investors stated that the (Xia-owned) development team has "decades of experience from over one hundred successful major projects."  An Eastern Emerald brochure also stated that FFG, the developer of the Eastern Mirage project, has "nearly 20 years of experience in real estate development in the eastern United States" and that it was the winner of several New York real estate awards for green and intelligent building development practices.

111.    Racanelli was also touted in an Eastern Mirage marketing brochure as having been founded "60 years" ago.  Likewise, the Offering Memorandum for the EMMCO TOWER offering and the EMMCO Business Plan provided to investors to submit to USCIS stated that Racanelli was founded "over six decades ago."

112.    The Business Plans for EMMCO NQMC, EMMCO TOWER, EEGH, and EEGH II described Racanelli as having been founded "decades ago."

113.    These representations were false.  In fact, Racanelli was incorporated in 2011, and

it appears that Xia took the Racanelli name from a well-known construction firm and copied - almost word for word - the description in the Offering Memoranda directly from the website of an established company, the Original Racanelli.

114.    In April 2015, the Original Racanelli—which unlike Xia's Racanelli did have six decades of construction experience—sued Xia and Racanelli, alleging that Xia "improperly assumed, utilized, displayed, and disseminated" the Original Racanelli's protected trade name. In December 2015, the parties settled the trademark litigation and Xia agreed to "fully and completely refrain from any and all use of the name Racanelli in any capacity whatsoever," although through a carve-out Xia was permitted to use the name in connection with the Projects.

115.    In December 2015, Perini was incorporated to replace Racanelli as the general contractor.  (The name bears a similarity to Tutor Perini Corp. – another well-known construction company unaffiliated with Xia).  However, Perini consisted of the same individuals who worked under the Racanelli name, and investors were never told that the general contractor had changed.  From January 2016 through October 2017, the Defendants continued to provide EEGH II investors with Offering Memoranda that cited Racanelli.

116.    The Defendants also failed to disclose to investors that he controlled Racanelli and Perini, the purported general contractors for the projects.  The Offering Memoranda did not disclose an affiliation between Racanelli and Xia.  On the contrary, Racanelli is falsely described as an independent company.

117.    Although Racanelli and Perini had Xia Entity Employee A as a nominal person in charge, this person received only about $87,000 through Racanelli and $186,000 through FFG's payroll firm in compensation for over ten years of work.  In fact, Xia controlled both Racanelli and Perini and was himself the *de facto* general contractor.  Indeed, in a February 18, 2014 email

regarding a construction contract between a third party and Racanelli, Xia Entity Employee A asked Xia if she should "ask Julia to sign for [Xia]."

118.    Although Defendants concealed Xia's control of Racanelli and Perini from investors, in numerous court filings as well as a bank signature card, Xia represented himself as the President of Racanelli and the Manager of Perini.  *See* Exhibit G (excerpts from court filings and bank signature cards).

119.    The Offering Memoranda also contained material misrepresentations and omissions of material fact regarding Xia's construction experience and expertise.  Each Offering Memorandum for both projects stated that "Mr. Xia is a New York City real estate developer and President of the General Partner.  Mr. Xia has been active for ten years in land acquisition, commercial and residential development, marketing research, value-added strategies, financing, property management and leasing, and other related activities.  His company, Fleet Financial Group, Inc. specializes in 'green' projects[.]"

120.    The only specific project of Xia's that is mentioned in the Offering Memoranda, however, was "Shangri-La Towers," described as a "mixed-use condominium" development.  The Shangri-La building was actually Xia's first construction project.  With only this limited background in construction prior to embarking on the Eastern Mirage Project, Xia was ill-equipped to handle two projects of the scope and magnitude of the Eastern Mirage and Eastern Emerald Projects, as he well knew.

121.    The insufficient capacity of Xia and his team to complete the large-scale construction projects is apparent from payroll records.  Although Xia created nearly a dozen entities (*see supra* paragraphs 31-48) that received investor funds, all of his companies shared the same personnel and were all paid through the same payroll firm.  Notably, before 2017, only

five people, including Xia and Yue, received payments through the payroll firm.

122.    Current photographs of the Eastern Mirage Project show the building to be empty and still under construction.  And although a Brownfield remediation (addressing contamination from the former occupant of the land) was completed in 2015 at the Eastern Emerald Project site, it is currently still only a largely vacant dirt hole surrounded by a concrete wall.

123.    The Eastern Emerald Project was issued at least 41 violations by the New York City Department of Buildings ("NYCDOB"), 31 of which were for hazardous conditions. Numerous stop-work orders have been issued by the NYCDOB, and there is currently a stop-work order in place.

124.    On January 4, 2019, workers at the Eastern Emerald site—in violation of a stop-work order—were engaged in excavation and caused a support wall along Northern Boulevard to collapse.  According to a NYCDOB report, the activity constituted "illegal work" and "led to the collapse of the sidewalk, half the width of Northern Boulevard, and the loss of gas, water, electrical, and telecommunication services."  The Report stated that Xia was interviewed and "was evasive and unclear as to who was supervising and directing field operations prior to the collapse," and that Xia, among others, "failed to act in a reasonable and responsible manner."

125.    Xia and his entities face significant financial exposure from pending litigation involving ConEdison, which filed a damages lawsuit against EEG, FFG, Perini, Racanelli and the City of New York.  The City of New York subsequently filed a Cross-Claim against EEG, FFG, Perini, Racanelli and Shangri-La Green.

### D.  Defendants Misrepresented the Affiliation With Westin

126.    The Eastern Mirage marketing materials represented that the hotel portion of the project would be a Westin-branded hotel.  Specifically, the marketing materials were

prominently titled: "FNYMRC The New York Westin Project" and claimed that the hotel would be a Westin Element hotel.

127.     The marketing script approved by Xia in 2014 described the Eastern Mirage Project as the "Eastern Mirage/Westin Hotel."

128.     The EMMCO Tower Offering Memorandum also stated that the Eastern Mirage Tower "will encompass the development of the Westin Element Hotel & Condo Apartment building."

129.     Similarly, the marketing materials for the Eastern Emerald Project claimed that Eastern Emerald would contain a Westin Hotel.

130.     These representations about sponsorship or affiliation with Westin were false. Although Xia received a noncommittal "letter of interest" in 2014, no deal with Westin was ever reached and the letter provided no basis for the Defendants to claim that they had a deal. Defendants knew, or were reckless in not knowing, at the time they chose to prominently brand their projects as Westin hotel projects, that they had no reasonable basis to make such representations.

131.     A reasonable investor would regard the affiliation with a major hotel chain as material.  Indeed, Xia received WeChat messages from investors and their agents in 2018 in which they referred to the Eastern Mirage Project as the "Westin project," yet Defendants never disclosed that there was no Westin deal.

**E.  Defendants Misrepresented the Size of the Eastern Emerald Project**

132.     The EEGH II Offering Memorandum stated that the "original building" described in the EEGH Offering Memorandum was 643,180 square feet, and, as a result of the "expansion" described in the EEGH II Offering Memorandum, the square footage would increase to

1,199,578 square feet.  Both representations were false when made, as Defendants well knew.  The size of the square footage and the expansion of the original project gave the impression that the project was on track to being successful.  A reasonable investor would find this material.

133.   The Defendants knew that both square footage numbers were false.  The 2014 "Plan/Work Application" that Xia signed and which was filed with the New York City Department of Buildings only sought permission for a structure of 350,186 feet.  The Defendants' square footage estimate in the EEGH II Offering Memorandum was three times what they had been authorized to build.  Xia never sought or received permission to build structures anywhere near the size of the buildings described in the Offering Memorandum.

### F.  Defendants Failed to Disclose the Highly Material Rental Agreements

134.   The Offering Memoranda stated that there were "no material conflicts of interest between the General Partner and its affiliates on the one hand and the Partnership on the other hand."  The Offering Memoranda further stated that the "General Partner is accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in handling the Partnership's affairs."  As the President, CEO, and Managing Member of the General Partner, Xia had an obligation to exercise good faith and integrity in handling the Partnership's affairs.

135.   The Loan Agreements entered into by each of the limited partnerships required the borrowers—FFG, EEG and LaGuardia—to repay the investor funded loans.  But, the ability of FFG and LaGuardia to repay the loans was seriously impaired by undisclosed side agreements created by Xia.  These side agreements, which are material omissions, are another example of the self-dealing that is a hallmark of Xia's financial arrangements.

136.   On January 1, 2008 (two years before the Eastern Mirage Project's EMMCO

offering), X&Y leased the Union Street property to FFG, Eastern Mirage's developer, under a 99-year land lease requiring annual rent in the amount of $2.5 million for the first three years, and $3.5 million for the next three years, with subsequent increases.  FFG, which has never made a payment and has been in default, currently owes unpaid rent to X&Y of at least $42.2 million under the terms of this lease agreement.  Yue signed the lease agreement on behalf of X&Y and Xia signed on behalf of FFG.

137.     On September 28, 2015, LaGuardia entered into a lease agreement with EEG that requires LaGuardia to pay EEG an annual rent of $3.5 million, which increased to $4.5 million. LaGuardia, which has never made a payment, currently owes unpaid rent of at least $16.5 million to EEG under the terms of this lease agreement.  Xia signed the lease agreement on behalf of both EEG and LaGuardia.

138.     These agreements, which were never disclosed to investors, are highly material. In the event the Eastern Mirage and Eastern Emerald properties are sold, X&Y and EEG would have the right to enforce FFG's and LaGuardia's payment obligations, which significantly diminishes the amount they will have available to repay the investors.  In addition, given that both FFG and LaGuardia have been in default, X&Y and EEG have the right under their loan agreements at any time to foreclose and essentially bankrupt FFG and LaGuardia.  This is a significant risk to investors, who have no recourse against X&Y and EEG under the loan agreements.  Furthermore, these enormous, accrued debts will seriously impair FFG's and LaGuardia's ability to obtain the type of long–term financing that they represented would be obtained to repay the investors their capital contributions.

139.     Xia was on all sides of these secret agreements, which protected his interests to the detriment of the investors.

### G. Xia Directed Funds Through Over 150 Accounts to Conceal his Fraud and to Benefit Himself

140.    Contrary to the Defendants' duty to act "as a fiduciary," Xia managed the $229 million that flowed into bank accounts he controlled in a way to protect and benefit himself at the expense of the investors.  Xia created over 150 accounts in the names of various entities he owned or controlled (*see supra* paragraphs 31-48) and used these bank accounts to engage in numerous, multi-step transactions to commingle investor funds and to hide the actual source of payments.  Through hundreds of transactions that appear to have little or no legitimate business purpose, the investor funds were transferred into and out of over 150 accounts in what amounted to a shell game.

141.    There were continuous and significant fund transfers of investor funds in every conceivable direction for more than seven years, not only from the developer to the purported general contractors (Racanelli and Perini) and then to other entities owned and controlled by Xia, but also between and among the other entities owned and controlled by Xia, and then cycled back to the developers and Racanelli and Perini.  To summarize, from 2012 through January 2019, over $127 million in investors' funds was transferred from the developers to the purported general contractors, and at least $85.9 million was then transferred to other entities that Xia owned and controlled.   Of the $85.9 million, approximately $32.7 million was cycled back upstream to bank accounts of the developers and approximately $1.14 million was then cycled back to bank accounts of the general contractor.

142.    In addition, of the $85.9 million transferred to Xia Entities, approximately $43.6 million were not supported by any invoices.  An invoice from a Xia entity to the payors (Racanelli/Perini) would be expected to show what services were provided, the persons

providing such services, and the payment for each service.  The absence of any invoices for $43.6 million in transfers suggests the transfers were unfounded or had no legitimate business purpose.  Moreover, the invoices that Xia provided for Amazon River, FFG, JiQing Development, Manekineko Group, Samuel Development, Shangri-La Green, Shangri-La 9F, and X&Y to ostensibly support approximately $32.2 million in payments of investor funds to those entities do not appear legitimate.  Notably, these Xia invoices contained lengthy lists of tasks performed and a single amount at the bottom, with no breakdown of how much was billed for each task and who performed these tasks.  The Xia invoices were ostensibly submitted by seven of his entities and were in large round-dollar amounts that did not vary from month to month. These Xia invoices also were strikingly different in form and substance from the many legitimate third-party invoices submitted by outside vendors to Racanelli/Perini.

143.    The multiple transfers between and among the accounts do not appear to have had legitimate business purposes.

**H.  Defendants Concealed Material Information From the Limited Partners**

144.    To hide their scheme from the investors, Defendants failed to disclose to them critical information that might have revealed Defendants' illegal conduct, even though Defendants had an affirmative obligation as fiduciaries to do so.

145.    Defendants failed to disclose to investors in the later Eastern Emerald offerings that they had made numerous misrepresentations and omissions to investors in earlier Eastern Mirage offerings.  During 2015, 2016 and 2017, the EEGH and EEGH II offerings raised $148 million from investors—nearly three times the amount raised in the earlier Eastern Mirage offerings.  Defendants did not disclose to these later investors that Xia had misappropriated Eastern Mirage investor funds and that the Defendants had also made other false and misleading statements.  Given that the Defendants touted the supposed success of the Eastern Mirage

offerings to promote the Eastern Emerald offerings, the fact that the earlier offerings were marred by their numerous false and misleading statements and misappropriations would have been highly material to investors in 2015, 2016 and 2017. The Defendants nevertheless concealed this material information from the Eastern Emerald investors.

146. In addition, the Offering Memoranda stated that "the Partnership will send to each Limited Partner, generally within 90 days after the end of each fiscal year of the Partnership, an accounting report including a balance sheet and statements of income, changes in Partner's equity and cash flows, prepared in accordance with Generally Accepted Accounting Principles, plus a schedule and summary description of the investments owned by the Partnership at year-end and a statement for each LP of its capital account." Defendants did not provide investors with the reports required by the Offering Memoranda as described above.

**I. Yue Received At Least $9.7 Million in Ill-Gotten Gains**

147. Yue received a total of more than $9.7 million in ill-gotten gains for which she has no legitimate claim. From 2012 through January 2019, Yue received a total of $4.1 million from Xia Entities, including Racanelli, sourced by investor funds, and she also received $5.6 million between April and May 2021 from a line of credit that was collateralized with investor funds (*see supra* paragraph 81).

148. Although Yue was an authorized signatory on many bank accounts of the Xia Entities, she acted primarily at Xia's direction.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**
**(Both Defendants)**

149. The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 148.

150.    Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

151.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(Both Defendants)**

152.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 148.

153.    Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of

business which operated or would operate as a fraud or deceit upon other persons.

154.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
**Unjust Enrichment**
**(Relief Defendant)**

155.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 148.

156.    Yue received a total of at least $9.7 million in ill-gotten gains derived from the Defendants' above-referenced violations of the securities laws.

157.    Yue has no legitimate claim to these ill-gotten gains.

158.    Yue obtained the funds under circumstances in which it is not just, equitable, or conscionable for her to retain the funds.

159.    Yue has therefore been unjustly enriched.

### PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter:

### I.

A Final Judgment permanently restraining and enjoining Defendants and each of their respective agents, servants, employees, attorneys and other persons in active concert or participation with each of them who receive actual notice of the injunction by personal service or otherwise, from any ongoing and future violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)],  and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

An Order directing the Defendants and Relief Defendant, and each of their financial and brokerage institutions, agents, servants, employees attorneys-in-fact, and those persons in active concert or participation with them, including the Xia Entities, who receive actual notice of such Order by personal service, facsimile service, or otherwise, to hold and retain within their control, and otherwise prevent, any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment or other disposal of any assets, funds, or other property (including money, real or personal property, securities, commodities, choses in action or other property of any kind whatsoever) of, held by, or under the control of the Defendants and Relief Defendant, whether held in their names or for their direct or indirect beneficial interest wherever situated;

**III.**

An Order directing the Defendants and Relief Defendant to file with this Court and serve upon the Commission, within three (3) business days, or within such extension of time as the Commission staff agrees to, sworn accountings, signed by Xia as to the Defendants and signed by Yue in her capacity of Relief Defendant, under penalty of perjury, setting forth:

(1)     All assets, liabilities and property currently held, directly or indirectly, by or for the benefit of each such Defendant and Relief Defendant, including, without limitation, bank accounts, brokerage accounts, investments, business interests, loans, lines of credit, and real and personal property wherever situated, describing each asset and liability, its current location and amount;

(2)     All money, property, assets and income received by Defendants or Relief Defendant for their direct or indirect benefit, at any time from January 1, 2010, through

the date of such accounting, describing the source, amount, disposition and current location of each of the items listed;

   (3) The names and last known addresses of all bailees, debtors, and other persons and entities that currently are holding the assets, funds or property of such Defendants and Relief Defendant; and

   (4) All assets, funds, securities, and real or personal property received by such Defendants and Relief Defendant, or any other person controlled by them, from persons who provided money to such Defendants and Relief Defendant in connection with the offer, purchase or sale of securities, from January 1, 2010 through the date of such accounting, and the disposition of such assets, funds, securities, real or personal property;

**IV.**

An Order providing that the Commission may take expedited discovery;

**V.**

An Order appointing a Monitor;

**VI.**

A Final Judgment ordering Defendants and Relief Defendant to disgorge all ill-gotten gains and/or unjust enrichment received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

**VII.**

A Final Judgment ordering Defendants to pay civil money penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

## VIII.

Granting any other and further relief this Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated:  New York, New York
        September 27, 2021

_____
RICHARD R. BEST
REGIONAL DIRECTOR
Lara M. Mehraban
Judith Weinstock
Kevin P. McGrath
David Stoelting
Brenda Chang
Kim Han
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0174 (Stoelting)
stoeltingd@sec.gov

**Exhibits to Complaint**

*SEC v. Richard Xia and Fleet New York Metropolitan Regional Center LLC* (E.D.N.Y.)

Exhibit A: Easter Mirage project photos   .   .   .   .   .   .   1

Exhibit B: Easter Emerald Project photos   .   .   .   .   .   2

Exhibit C: Bank Accounts and Authorized Signatories   .   .   .   .   3

Exhibit D: Eastern Mirage Funds Used to Purchase Eastern Emerald Land   .   .   7

Exhibit E: Eastern Mirage Funds Used to Pay Off Lawrence Street Mortgage   .   9

Exhibit F: Eastern Emerald Project Funds Used for One Madison Park   .   .   10

Exhibit G: Attestations by Xia of Affiliations with Racanelli and Perini   .   .   11

COMPLAINT EXHIBIT A
Eastern Mirage Project
42-31 Union St., Queens, NY, Sept. 14, 2021

 

 



COMPLAINT EXHIBIT B
Eastern Emerald Project
112-21 Northern Blvd., Queens, NY, Sept. 14, 2021










COMPLAINT EXHIBIT C
Bank Accounts and Authorized Signatories

| # | Account Name | Bank | Account Number | Account Opened | Authorized Signer from Signature Card | Additional Authorized Signer from Signature Card |
|---|---|---|---|---|---|---|
| 1 | Amazon River LLC | Chase | XXXX-9316 | 10/7/2020 | Julia Yue, Member | |
| 2 | Amazon River LLC | Chase | XXXX-0985 | 10/7/2020 | Julia Yue, President | |
| 3 | Amazon River, LLC | East West | XXXX-6158 | 7/2/2015 | JiQing Yue, LLC - Member | |
| 4 | Amazon River, LLC | HSBC | XXXX-0301 | 11/12/2020 | Julia Yue, Member | |
| 5 | Eastern Emerald Group LLC | East West | XXXX-3379 | 6/26/2013 | Yi Xia, LLC - Member | JiQing Yue, LLC - Member |
| 6 | Eastern Emerald Group LLC | East West | XXXX-6026 | 8/17/2015 | Yi Xia, LLC - Member | JiQing Yue, LLC - Member |
| 7 | Eastern Emerald Group LLC | Popular | XXXX-8140 | 9/23/2016 | | |
| 8 | Eastern Emerald Group LLC | Metro City Bank | XXXX-1312 | 1/25/2017 | JiQing Yue, Member | |
| 9 | Eastern Emerald Group LLC | East West | XXXX-8618 | 1/30/2017 | JiQing Yue, LLC - Member | Yi Xia, Authorized Signer |
| 10 | Eastern Emerald Group LLC | Signature | XXXX-5320 | 3/23/2017 | JiQing Yue, Authorized Signer | |
| 11 | Eastern Emerald Group LLC | Flushing Bank | XXXX-6096 | 10/20/2017 | JiQing Yue, Authorized Signer | |
| 12 | Eastern Emerald Group LLC | East West | XXXX-0433 | 4/27/2018 | JiQing Yue, LLC - Member | Yi Xia, Authorized Signer |
| 13 | Eastern Emerald Group LLC | East West | XXXX-6241 | 4/27/2018 | JiQing Yue, LLC - Member | Yi Xia, Authorized Signer |
| 14 | Eastern Emerald Group LLC | East West | XXXX-4852 | 4/27/2018 | JiQing Yue, LLC - Member | Yi Xia, Authorized Signer |
| 15 | Eastern Emerald Group LLC | East West | XXXX-6702 | 4/27/2018 | JiQing Yue, LLC - Member | Yi Xia, Authorized Signer |
| 16 | Eastern Emerald Group LLC | East West | XXXX-0395 | 4/27/2018 | JiQing Yue, LLC - Member | Yi Xia, Authorized Signer |
| 17 | Eastern Emerald Group LLC | East West | XXXX-7015 | 4/27/2018 | JiQing Yue, LLC - Member | Yi Xia, Authorized Signer |
| 18 | Eastern Emerald Group LLC | CTBC | XXXX-5180 | 6/21/2018 | Julia Yue aka JiQing Yue, Manager | |
| 19 | Eastern Emerald Group LLC | East West | XXXX-1526 | 3/26/2019 | Yi Xia, LLC - Member | Julia Yue, LLC Member |
| 20 | Eastern Emerald Group LLC | East West | XXXX-0633 | 7/29/2019 | Yi Xia, LLC Member | Julia Yue, LLC Member |
| 21 | Eastern Emerald Group LLC | CTBC | XXXX-0808 | 11/3/2020 | Julia Yue, Manager | |
| 22 | Eastern Emerald Group LLC | CTBC | XXXX-9577 | 1/26/2021 | Julia Yue, Manager | |
| 23 | Eastern Emerald Group LLC | CTBC | XXXX-2477 | 4/8/2021 | Julia Yue, VP & Secretary | |
| 24 | Eastern Emerald Group LLC | CTBC | XXXX-3677 | 4/14/2021 | Richard Yi Xia, President | |
| 25 | Eastern Emerald Group LLC | CTBC | XXXX-1217 | 5/21/2021 | Richard Yi Xia, President | |
| 26 | EEGH II, L.P. | East West | XXXX-6968 | 10/15/2015 | Yi Xia, Partner - Limited | JiQing Yue, Partner - Limited |
| 27 | EEGH II, L.P. | East West | XXXX-8568 | 1/30/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 28 | EEGH II, L.P. | East West | XXXX-8996 | 2/15/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 29 | EEGH II, L.P. | East West | XXXX-2025 | 2/15/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 30 | EEGH II, L.P. | East West | XXXX-8925 | 2/16/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 31 | EEGH II, L.P. | East West | XXXX-1060 | 2/16/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 32 | EEGH II, L.P. | East West | XXXX-4698 | 2/23/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 33 | EEGH II, L.P. | East West | XXXX-7373 | 2/23/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 34 | EEGH II, L.P. | East West | XXXX-1450 | 4/20/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 35 | EEGH II, L.P. | East West | XXXX-7891 | 4/20/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 36 | EEGH II, L.P. | East West | XXXX-4971 | 4/20/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 37 | EEGH II, L.P. | East West | XXXX-9701 | 4/20/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 38 | EEGH II, L.P. | East West | XXXX-4638 | 4/20/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 39 | EEGH II, L.P. | East West | XXXX-1159 | 4/20/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 40 | EEGH II, L.P. | East West | XXXX-7766 | 4/20/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 41 | EEGH II, L.P. | East West | XXXX-8684 | 4/20/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 42 | EEGH II, L.P. | East West | XXXX-5398 | 4/20/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 43 | EEGH II, L.P. | East West | XXXX-6210 | 4/20/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 44 | EEGH II, L.P. | East West | XXXX-2316 | 4/23/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |

COMPLAINT EXHIBIT C
Bank Accounts and Authorized Signatories

| | Account Name | Bank | Account Number | Account Opened | Authorized Signer from Signature Card | Additional Authorized Signer from Signature Card |
|---|---|---|---|---|---|---|
| 45 | EEGH II, L.P. | East West | XXXX-2738 | 4/23/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 46 | EEGH II, L.P. | East West | XXXX-2942 | 4/23/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 47 | EEGH II, L.P. | East West | XXXX-0689 | 9/14/2018 | Yi Xia, Partner - Limited | JiQing Yue, Partner - Limited |
| 48 | EEGH II, L.P. | East West | XXXX-1438 | 7/29/2019 | Yi Xia, Limited Partner | Julia Yue, Authorized Signer |
| 49 | EEGH II, L.P. | East West | XXXX-8589 | 7/29/2019 | Yi Xia, Limited Partner | Julia Yue, Authorized Signer |
| 50 | EEGH II, L.P. | East West | XXXX-9767 | 7/29/2019 | Yi Xia, Limited Partner | Julia Yue, Authorized Signer |
| 51 | EEGH II, L.P. | East West | XXXX-6494 | 7/29/2019 | Yi Xia, Limited Partner | Julia Yue, Authorized Signer |
| 52 | EEGH II, L.P. | East West | XXXX-6660 | 3/3/2020 | Yi Xia, Limited Partner | Julia Yue, Authorized Signer |
| 53 | EEGH II, L.P. | East West | XXXX-7677 | 3/3/2020 | Yi Xia, Limited Partner | Julia Yue, Authorized Signer |
| 54 | EEGH II, L.P. | East West | XXXX-8126 | 3/3/2020 | Yi Xia, Limited Partner | Julia Yue, Authorized Signer |
| 55 | EEGH II, L.P. | East West | XXXX-1384 | 3/3/2020 | Yi Xia, Limited Partner | Julia Yue, Authorized Signer |
| 56 | EEGH, L.P. | East West | XXXX-5168 | 12/19/2013 | Yi Xia, Partner - Limited | JiQing Yue, Partner - Limited |
| 57 | EEGH, L.P. | East West | XXXX-5366 | 11/5/2014 | Yi Xia, Partner - Limited | JiQing Yue, Partner - Limited |
| 58 | EEGH, L.P. | East West | XXXX-6208 | 8/14/2015 | JiQing Yue, Authorized Signer | Yi Xia, Authorized Signer |
| 59 | EEGH, L.P. | Cathay | XXXX-8260 | 10/16/2015 | Yi Xia, Managing Member | |
| 60 | EEGH, L.P. | East West | XXXX-3253 | 2/15/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 61 | EEGH, L.P. | East West | XXXX-0778 | 2/15/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 62 | EEGH, L.P. | East West | XXXX-5723 | 2/15/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 63 | EEGH, L.P. | East West | XXXX-5970 | 2/15/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 64 | EEGH, L.P. | East West | XXXX-0893 | 2/15/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 65 | EEGH, L.P. | East West | XXXX-1353 | 2/15/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 66 | EEGH, L.P. | East West | XXXX-4009 | 2/15/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 67 | EEGH, L.P. | East West | XXXX-6748 | 2/16/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 68 | EEGH, L.P. | East West | XXXX-1798 | 2/16/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 69 | EEGH, L.P. | East West | XXXX-9656 | 2/16/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 70 | EEGH, L.P. | East West | XXXX-0851 | 4/27/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 71 | EEGH, L.P. | East West | XXXX-4118 | 4/27/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 72 | EEGH, L.P. | East West | XXXX-5237 | 4/27/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 73 | EEGH, L.P. | East West | XXXX-8071 | 4/27/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 74 | EEGH, L.P. | East West | XXXX-7599 | 4/27/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 75 | EEGH, L.P. | East West | XXXX-5557 | 4/27/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 76 | EEGH, L.P. | East West | XXXX-8000 | 4/27/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 77 | EEGH, L.P. | East West | XXXX-3195 | 4/27/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 78 | EEGH, L.P. | East West | XXXX-0598 | 9/13/2018 | Yi Xia, Partner - Limited | JiQing Yue, Partner - Limited |
| 79 | EEGH, L.P. | East West | XXXX-4254 | 7/29/2019 | Yi Xia, Limited Partner | Julia Yue, Authorized Signer |
| 80 | EEGH, L.P. | East West | XXXX-4658 | 3/3/2020 | Yi Xia, Authorized Signer | Julia Yue, Authorized Signer |
| 81 | EEGH, L.P. ( R ) | East West | XXXX-6828 | 10/9/2015 | Yi Xia, Partner - Limited | JiQing Yue, Partner - Limited |
| 82 | EEGH, L.P. (Operating A/C) | East West | XXXX-6166 | 7/1/2015 | Yi Xia, Partner - Limited | JiQing Yue, Partner - Limited |
| 83 | EMMCO NQMC, L.P. | East West | XXXX-0896 | 12/31/2010 | JiQing Yue, Limited Partner | |
| 84 | EMMCO NQMC, L.P. | East West | XXXX-1282 | 3/30/2011 | JiQing Yue, Partner - Limited | |
| 85 | EMMCO NQMC, L.P. (Escrow Account) | East West | XXXX-1217 | 5/5/2011 | JiQing Yue, Partner-Limited | |
| 86 | EMMCO Tower, L.P. | East West | XXXX-1316 | 6/20/2011 | JiQing Yue, Partner-Limited | Yi Xia |
| 87 | EMMCO Tower, L.P. | East West | XXXX-1795 | 1/23/2012 | Yi Xia, Authorized Signer | JiQing Yue, Authorized Signer |
| 88 | EMMCO, L.P. | East West | XXXX-3048 | 4/14/2010 | Yi Xia, President | JiQing Yue, Secretary |

COMPLAINT EXHIBIT C
Bank Accounts and Authorized Signatories

| | Account Name | Bank | Account Number | Account Opened | Authorized Signer from Signature Card | Additional Authorized Signer from Signature Card |
|---|---|---|---|---|---|---|
| 89 | EMMCO, L.P. | East West | XXXX-1159 | 3/30/2011 | Yi Xia, Partner – Limited | JiQing Yue, Partner – Limited |
| 90 | EW Escrow Inc. | East West | XXXX-3569 | 10/25/2013 | JiQing Yue, President | |
| 91 | Federal New York Metropolitan Regional Center LLC | East West | XXXX-3089 | 2/25/2010 | Yi Xia, Member | JiQing Yue, Member |
| 92 | Fleet Equipment, Inc | East West | XXXX-8899 | 7/3/2017 | Yi Xia, President | JiQing Yue, Authorized Signer |
| 93 | Fleet Equipment, Inc | Chase | XXXX-3335 | 10/7/2020 | Julia Yue, President | |
| 94 | Fleet Financial Group Inc | Chase | XXXX-6665 | 4/28/2006 | Yi Xia, Pres | JiQing Yue, VP |
| 95 | Fleet Financial Group Inc | East West | XXXX-0375 | 7/23/2010 | JiQing Yue, President | Yi Xia, Vice President |
| 96 | Fleet Financial Group Inc | East West | XXXX-1183 | 11/2/2011 | Yi Xia, Vice President | JiQing Yue, President |
| 97 | Fleet Financial Group Inc (III) | East West | XXXX-5085 | 12/13/2013 | JiQing Yue, President | Yi Xia, Vice President |
| 98 | Fleet Financial Group Inc (Payroll A/C) | East West | XXXX-5119 | 8/18/2014 | JiQing Yue, Principal | Yi Xia, Vice President |
| 99 | Fleet General Insurance Group | Flushing Bank | XXXX-1790 | 11/14/2017 | JiQing Yue, Secretary | |
| 100 | Fleet Hospitality Management, Inc | East West | XXXX-0028 | 7/10/2018 | JiQing Yue, President | |
| 101 | Fleet Hospitality Management, Inc | East West | XXXX-4517 | 4/2/2020 | Julia Yue, President | |
| 102 | Fleet Real Estate Group Inc | East West | XXXX-6398 | 7/6/2015 | Yi Xia, President | JiQing Yue, Vice President |
| 103 | JiQing Development, Inc | East West | XXXX-0300 | 7/23/2010 | JiQing Yue, President | |
| 104 | LaGuardia Performance Center LLC | East West | XXXX-2727 | 7/18/2019 | Yi Xia, LLC – Member | Julia Yue, Authorized Signer |
| 105 | LaGuardia Performance Center LLC | East West | XXXX-2677 | 8/5/2019 | Yi Xia, LLC - Member | Julia Yue, Authorized Signer |
| 106 | LaGuardia Performance Center LLC | Popular | XXXX-6909 | 8/9/2019 | Julia Yue, LLC Manager | |
| 107 | LaGuardia Performance Center LLC | Popular | XXXX-6469 | 8/26/2019 | Julia Yue, LLC Manager | |
| 108 | LaGuardia Performance Center LLC | Popular | XXXX-6486 | 8/26/2019 | Julia Yue, LLC Manager | |
| 109 | LaGuardia Performance Center LLC | Popular | XXXX-5042 | 8/26/2019 | Julia Yue, LLC Manager | |
| 110 | LaGuardia Performance Center LLC | Popular | XXXX-9291 | 8/26/2019 | Julia Yue, LLC Manager | |
| 111 | LaGuardia Performance Center LLC | East West | XXXX-4277 | 12/19/2019 | Yi Xia, LLC - Member | Julia Yue, Authorized Signer |
| 112 | LaGuardia Performance Center LLC | East West | XXXX-1004 | 3/3/2020 | Yi Xia, LLC Member | Julia Yue, Authorized Signer |
| 113 | LaGuardia Performance Center LLC | East West | XXXX-7665 | 3/3/2020 | Yi Xia, LLC Member | Julia Yue, Authorized Signer |
| 114 | LaGuardia Performance Center LLC | East West | XXXX-3288 | 3/3/2020 | Yi Xia, LLC Member | Julia Yue, Authorized Signer |
| 115 | LaGuardia Performance Center LLC | East West | XXXX-5737 | 3/3/2020 | Yi Xia, LLC Member | Julia Yue, Authorized Signer |
| 116 | LaGuardia Performance Center LLC | East West | XXXX-4327 | 3/3/2020 | Yi Xia, LLC Member | Julia Yue, Authorized Signer |
| 117 | LaGuardia Performance Center LLC | CTBC | XXXX-0816 | 11/3/2020 | Julia Yue, Manager | |
| 118 | LaGuardia Performance Center LLC | CTBC | XXXX-0899 | 11/3/2020 | Julia Yue, Manager | |
| 119 | LaGuardia Performance Center LLC | CTBC | XXXX-2777 | 11/3/2020 | Richard Yi Xia, President | |
| 120 | LaGuardia Performance Center LLC | Signature | XXXX-9927 | 11/25/2020 | Richard Yi Xia | Julia Yue |
| 121 | Manekineko Group LLC | Cathay | XXXX-3112 | 2/23/2010 | Yi Xia, Member | JiQing Yue, Member |
| 122 | Manekineko Group LLC | East West | XXXX-1225 | 5/7/2011 | Yi Xia, LLC - Member | JiQing Yue, LLC - Member |
| 123 | Manekineko Group LLC | HSBC | XXXX-0913 | 11/13/2020 | Yi Xia, Member | Jiqing Yue, Member |
| 124 | Perini Group Inc | Signature | XXXX-0543 | 12/4/2015 | Xi Verfenstein, President | |
| 125 | Perini Group Inc | East West | XXXX-8998 | 8/23/2017 | Xi Verfenstein, President | |
| 126 | Perini Group Inc | East West | XXXX-9996 | 3/22/2018 | Xi Verfenstein, President | |
| 127 | Perini Group, Inc | East West | XXXX-6786 | 1/5/2016 | Xi Verfenstein, President | |
| 128 | Perini Group, Inc | Chase | XXXX-3397 | 4/16/2021 | Xi Verfenstein, President | |
| 129 | Racanelli Construction Group Inc | East West | XXXX-1555 | 11/2/2011 | JiQing Yue, President | |
| 130 | Racanelli Construction Group Inc | East West | XXXX-5259 | 2/13/2015 | JiQing Yue, President* | |
| 131 | Racanelli Construction Group Inc | Signature | XXXX-0055 | 7/23/2015 | Yi Xia, President | Angela Yu Wei Chen, Manager |
| 132 | Racanelli Construction Group Inc | Signature | XXXX-0063 | 7/23/2015 | Yi Xia, President | Angela Yu Wei Chen, Manager |

COMPLAINT EXHIBIT C
Bank Accounts and Authorized Signatories

| | Account Name | Bank | Account Number | Account Opened | Authorized Signer from Signature Card | Additional Authorized Signer from Signature Card |
|---|---|---|---|---|---|---|
| 133 | Racanelli Construction Group Inc | East West | XXXX-6109 | 8/17/2015 | JiQing Yue, President* | |
| 134 | Racanelli Construction Group Inc (Expense A/C) | East West | XXXX-2660 | 2/19/2013 | JiQing Yue, President* | |
| 135 | Racanelli Construction Group Inc (I) | East West | XXXX-1381 | 7/1/2011 | JiQing Yue | |
| 136 | Racanelli Construction Group Inc (I) (Operating) | East West | XXXX-2538 | 12/6/2012 | JiQing Yue, President* | |
| 137 | Racanelli Construction Group Inc (III) | East West | XXXX-5028 | 12/12/2013 | JiQing Yue, President* | |
| 138 | Racanelli Construction Group Inc (IV) | East West | XXXX-5283 | 9/16/2014 | JiQing Yue, President* | |
| 139 | Racanelli Construction Group Inc (Payroll A/C) | East West | XXXX-4898 | 8/18/2014 | JiQing Yue, President | |
| 140 | Samuel Development Group LLC | East West | XXXX-0235 | 7/13/2010 | Yi Xia, LLC Manager | JiQing Yue, LLC Manager |
| 141 | Samuel Development Group LLC | HSBC | XXXX-0310 | 11/12/2020 | Richard Xia, Member | |
| 142 | Shangri-La 9D Inc | East West | XXXX-5226 | 5/21/2014 | JiQing Yue, President | |
| 143 | Shangri-La 9D Inc | East West | XXXX-8758 | 7/21/2017 | JiQing Yue, President | |
| 144 | Shangri-La 9D Inc | East West | XXXX-9608 | 3/22/2018 | JiQing Yue, President | |
| 145 | Shangri-La 9D Inc | Chase | XXXX-8715 | 10/7/2020 | Julia Yue, President | |
| 146 | Shangri-La 9D Inc | Chase | XXXX-6068 | 10/7/2020 | Julia Yue, President | |
| 147 | Shangri-La 9D Inc | HSBC | XXXX-0875 | 11/12/2020 | Julia Yue, VP | Richard Xia, President |
| 148 | Shangri-La 9F Inc | Cathay | XXXX-2212 | 7/9/2010 | Yi Xia, President | JiQing Yue, Secretary |
| 149 | Shangri-La 9F Inc | East West | XXXX-1977 | 3/13/2012 | JiQing Yue, President | |
| 150 | Shangri-La 9F Inc | HSBC | XXXX-0883 | 11/12/2020 | JiQing Yue, President | |
| 151 | Shangri-La 9F Inc. | HSBC | XXXX-0883 | 11/12/2020 | Julia Yue, President | |
| 152 | Shangri-La Green Inc | Chase | XXXX-6733 | 10/7/2020 | Julia Yue, President | |
| 153 | Shangri-La Green Inc | Chase | XXXX-5612 | 10/7/2020 | Julia Yue, President | |
| 154 | Shangri-La Green, Inc | Cathay | XXXX-3302 | 5/12/2010 | JiQing Yue, President | Yi Xia, Secretary |
| 155 | Shangri-La Green, Inc | East West | XXXX-0268 | 6/21/2010 | Yi Xia, Vice President | JiQing Yue, President |
| 156 | Shangri-La Green, Inc | East West | XXXX-4846 | 9/28/2012 | JiQing Yue, President | |
| 157 | Shangri-La Green, Inc | East West | XXXX-8808 | 7/21/2017 | JiQing Yue, President | Yi Xia, Vice President |
| 158 | Shangri-La Green, Inc | East West | XXXX-9798 | 3/22/2018 | JiQing Yue, President | Yi Xia, Vice President |
| 159 | Shangri-La Green, Inc | HSBC | XXXX-0743 | 11/12/2020 | Julia Yue, VP | Richard Xia, President |
| 160 | The Grand Eastern Mirage Group LLC | HSBC | XXXX-0686 | 7/1/2018 | JiQing Yue, Authorized Signer | |
| 161 | The Grand Eastern Mirage Group LLC | HSBC | XXXX-0708 | 7/5/2018 | JiQing Yue, Authorized Signer | |
| 162 | The Grand Eastern Mirage Group LLC | East West | XXXX-9261 | 3/3/2020 | Yi Xia, Authorized Signer | Julia Yue, Authorized Signer |
| 163 | The Grand Eastern Mirage Group LLC | East West | XXXX-0739 | 3/3/2020 | Yi Xia, Authorized Signer | Julia Yue, Authorized Signer |
| 164 | The Grand Eastern Mirage Group LLC | East West | XXXX-8696 | 3/3/2020 | Yi Xia, Authorized Signer | Julia Yue, Authorized Signer |
| 165 | The Grand Eastern Mirage Group LLC | East West | XXXX-8743 | | | |
| 166 | X & Y Development Group, LLC | East West | XXXX-0367 | 7/23/2010 | Yi Xia, LLC Member | JiQing Yue, LLC Member |
| 167 | Z - Account Name Unknown | Chase | XXXX-5320 | | | |
| 168 | Z - Account Name Unknown | Chase | XXXX-6902 | | | |

* Xi Verfenstein became the sole authorized signer on 9/18/2018

COMPLAINT EXHIBIT D
Eastern Mirage Project Funds Used to Purchase
Eastern Emerald Project Land
**JUNE 2013 TRANSFERS**

**FUNDS FROM INVESTORS**

**EMMCO NQMC LP 1282**
Bal. June 19, 2013:     $14,783,646

6/27  $2,000,000      Total: **$2,000,000**

**EMMCO NQMC LP 0896**
Bal. June 19, 2013:     $19,018

6/27  $2,000,000      Total: **$2,000,000**

**Fleet Financial 1183**
Bal. June 25, 2013:     $99,915

6/27  $490,000
6/27  $420,000      Total: **$1,700,000**
6/27  $490,000
6/27  $300,000

**Racanelli 1555**
Bal. June 25, 2013:     $63,293

6/27  $1,700,000      Total: **$1,700,000**

**Eastern Emerald Group 3379**
Acct. Opened June 26, 2013: $0

**6/27/2013       $1,700,000 Transfer:**
Rothkrug, Rothkrug & Spector, LLP
as Escrow Agent
*attorney for seller of Eastern Emerald property*

7

# COMPLAINT EXHIBIT D
## Eastern Mirage Project Funds Used to Purchase
## Eastern Emerald Project Land
### DECEMBER 2013 TRANSFERS



**FUNDS FROM INVESTORS**
**EMMCO Tower LP 1795**
Bal. Dec 2, 2013:     $10,630,259

| 12/13 | $4,500,000 |
| 12/16 | $5,000,000 |
| 12/17 | $1,050,000 |

**Total:** **$10,550,000**

**FUNDS FROM INVESTORS**
**EMMCO NQMC LP 1282**
Bal. Dec 2, 2013:     $9,568,171

| 12/5 | $500,000 |
| 12/13 | $3,000,000 |
| 12/16 | $2,500,000 |

**Total:** **$6,000,000**

**EMMCO Tower LP 1316**
Bal. Dec 2, 2013:     $5,800

| 12/13 | $4,500,000 |
| 12/16 | $1,500,000 |
| 12/16 | $3,500,000 |
| 12/17 | $1,050,000 |

**Total:** **$10,550,000**

**EMMCO NQMC LP 0896**
Bal. Dec 2, 2013:     $5,018

| 12/5 | $500,000 |
| 12/13 | $3,000,000 |
| 12/16 | $2,500,000 |

**Total:** **$6,000,000**

**Fleet Financial  5085**
Acct. Opened Dec. 13, 2013:   $0

| 12/16 | $3,275,185 |
| 12/16 | $3,366,000 |
| 12/16 | $1,092,000 |
| 12/16 | $1,734,000 |
| 12/17 | $1,032,000 |

**Total:** **$10,499,185**

**Fleet Financial  1183**
Bal. Dec 4, 2013:     $42,868

| 12/16 | $1,720,000 |
| 12/16 | $1,156,000 |
| 12/16 | $1,101,421 |
| 12/16 | $728,000 |
| 12/16 | $528,000 |

**Total:** **$5,233,421**

**Racanelli  5028**
Acct. Opened Dec. 12, 2013:   $0

| 12/17 | $3,300,000 |
| 12/17 | $3,500,000 |
| 12/17 | $3,500,000 |

**Total:** **$10,300,000**

**Racanelli  1555**
Bal. Dec 13, 2013:     $103,990

| 12/17 | $2,353,850 |
| 12/17 | $2,700,000 |

**Total:** **$5,053,850**

| 12/17 | $40,000 |

**Total:** **$40,000**

**JiQing Development 0300**
Bal. Dec 11, 2013:     $142

| 12/18 | $30,000 |

**Total:** **$30,000**

**X&Y Development 0367**
Bal. Dec 16, 2013:   $1,221

| 12/18 | $6,000 |

**Total:** **$6,000**

**Total:     $15,359,850**

**Eastern Emerald Group 3379**
Bal. Dec 1, 2013:     $438

**12/18/2013     $15,360,108 Transfers:**

$14,791,468:An Rich Associates LLC - *Seller of Eastern Emerald Property*

$568,640:  East Coast Abstract - *Title company for the sale*

COMPLAINT EXHIBIT E
Eastern Mirage Project Funds Used to Pay Off
57-35 Lawrence Street Mortgage
MARCH/APRIL 2012 TRANSFERS

**FUNDS FROM INVESTORS**

**EMMCO LP 3048**
Beg. Bal. March 2012:$1,200,752

| 3/30 | $330,000 | | |
| 4/4 | $330,000 | Total: | **$1,160,000** |
| 4/6 | $500,000 | | |

**Fleet Financial 0375**
Bal. March 29, 2012:  $11,130

| 4/2 | $280,000 | | |
| 4/4 | $323,000 | Total: | **$983,000** |
| 4/6 | $380,000 | | |

**Racanelli 1555**
Beg. Bal. April 1, 2012:        $47,559

| 4/6 | $819,810 | Total: | **$819,810** |

**JiQing Development 0300**
Beg. Bal. April 1, 2012:        $1,042

**4/9/2012        $819,810 Transfer**:
Chinatown Federal Savings Bank
*memo:*
*"Loan payoff #18 71-8 57-35 Lawrence"*

9

COMPLAINT EXHIBIT F
Eastern Emerald Project Funds
Used for One Madison Park
JULY 2015 TRANSFERS

**FUNDS FROM INVESTORS**

**EEGH LP 5168**
Beg. Bal. July 1, 2015: $18,365,308

7/1   $3,000,000      **Total: $3,000,000**

**EEGH LP 6166**
Beg. Bal. July 1, 2015: $0

7/1   $3,000,000      **Total: $3,000,000**

**Eastern Emerald Group 3379**
Beg. Bal. July 1, 2015: $263,599

7/6   $2,330,000      **Total: $2,330,000**

**Racanelli 5283**
Beg. Bal. July 1, 2015: $9,800

7/7   $2,328,000      **Total: $2,328,000**

**Amazon River LLC 6158**
Acct. Opened July 2, 2015:   $0

**7/7/2015      $2,325,000 Transfer:**
Michael, Levitt & Rubenstein LLC
as Escrow Agent
(for "One Madison Park 43A")

COMPLAINT EXHIBIT G

# COMPLAINT EXHIBIT G

**SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS**

------------------------------------------------------------------------

**RACANELLI CONSTRUCTION GROUP, INC.,**

-against-

**EASLE SERVICE CORP. and SCOTT EHRLER**

------------------------------------------------------------------------

**VERIFIED COMPLAINT**

**RICHARD XIA,** being duly sworn, deposes and states:

1.      I am the President of Racanelli Construction Group, Inc.

RICHARD XIA

01-10-2013

*(01-10-2013)*

---

**REPLY TO COUNTERCLAIMS**

**RICHARD XIA,** being duly sworn, deposes and states:

1.      I am the President of Racanelli Construction Group, Inc.

RICHARD XIA

Sworn to before me this 31st day of May 2013.

---

**AFFIDAVIT OF RICHARD XIA IN SUPPORT OF PLAINTIFF'S ORDER TO SHOW CAUSE**

**RICHARD XIA,** being duly sworn, deposes and says:

1.      I am the president of the plaintiff, Racanelli Construction Group Inc.

Richard Xia

Signed and sworn before me this 12 day of July 2013

---

**AFFIDAVIT OF RICHARD XIA**

**RICHARD XIA,** being duly sworn, deposes and says:

1.      I am the president of the plaintiff, Racanelli Construction Group Inc.

Richard Xia

Signed and sworn before me this 12 day of March, 2014.

---

**AFFIDAVIT IN SUPPORT**

RICHARD XIA, being duly sworn, deposes and states under the penalties of perjury, as follows:

1.      I am the President of Plaintiff Racanelli Construction Group, Inc.

RICHARD XIA

Sworn to before me this AUGUST 16, 2015

12

# COMPLAINT EXHIBIT G

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------
**RACANELLI CONSTRUCTION CO., INC.,**
**- against -**
**RACANELLI CONSTRUCTION GROUP INC., and RICHARD XIA**

**VERIFIED ANSWER**

RICHARD Y. XIA, duly sworn, deposes and says to be true and correct, under the penalties of perjury, under the laws of the United States of America, the following:

I am an individual Defendant and the President of Defendant Racanelli Construction Group, Inc.

> RICHARD Y. XIA
>
> **Sworn to before me this**
> **10th day of June, 2015**

-----------------------------------------------------------------------------------------------------------------

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF QUEENS**
-----------------------------------------------------------------
**VLADIMIR DEVDARIANI**
**- against -**
**X & Y DEVELOPMENT GROUP, LLC and PERINI GROUP, INC.**

**AFFIDAVIT OF SEARCH CONDUCTED**

**RICHARD XIA,** being duly sworn, deposes and says:

1.   I am the manager of Defendant PERINI GROUP, INC.

> RICHARD XIA
>
> Sworn to before me this
> 5th day of September, 2018

-----------------------------------------------------------------------------------------------------------------

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF QUEENS**
-----------------------------------------------------------------
**X-TREME CONCRETE INC.,**
**-   against –**
**RACANELLI CONSTRUCTION GROUP, INC., X&Y DEVELOPMENT GROUP, LLC**
**and "JOHN DOE NO. 1" through "JOHN DOE NO. 5"**

**AFFIDAVIT OF RICHARD XIA IN OPPOSITION TO**
<u>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**</u>

**RICHARD XIA,** being duly sworn, deposes and says:

2.   In addition, I am also a former member of Racanelli Construction Group, Inc.



> RICHARD XIA
>
> Sworn to me before this
> day of June  2019

13