**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE**
**COMMISSION,**

                    **Plaintiff,**

       **-against-**

**RICHARD XIA, a/k/a YI XIA; and**
**FLEET NEW YORK METROPOLITAN**
**REGIONAL CENTER, LLC f/k/a FEDERAL**
**NEW YORK METROPOLITAN REGIONAL**
**CENTER, LLC;**

                    **Defendants,**

       **-and-**

**JULIA YUE, a/k/a JIQING YUE,**

                    **Relief Defendant.**

---

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT**
**OF ITS *EX PARTE* EMERGENCY APPLICATION**
**FOR A TEMPORARY RESTRAINING ORDER**
**FREEZING ASSETS, APPOINTING A MONITOR**
**AND GRANTING OTHER RELIEF**

Kevin P. McGrath
David Stoelting
Kim Han
Attorneys for Plaintiff
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0174 (Stoelting)
stoeltingd@sec.gov

September 27, 2021

# TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . 3

   I.    The Defendants and the Relief Defendant . . . . 3

   II.   Defendants Raised $229 Million through the
       Sale of Limited Partnership Units. . . . . . 4

   III.  The Partnerships' Loans to the Xia-Controlled Developers . . 5

   IV.  Xia Marketed the Offering to the EB-5 Investors. . . . 7

   V.   Defendants Made False and Misleading Statements to Investors. . 8

       A. Defendants' Misrepresented the Development Team's Experience . 8

       B. Defendants Misrepresented the Projects' Affiliation
          With Westin Hotels . . . . . . . 10

       C. Defendants' Claimed the Eastern Emerald Project Was Three Times
          Bigger Than They Knew It Would Be . . . . 11

       D. Defendants' Made False and Misleading Statements About the Projects'
          Funding Sources . . . . . . . 12

            1.  Eastern Mirage Project's Funding Sources . . 12

            2.  Eastern Emerald Project's Funding Sources . . 14

            3.  Xia Submitted Contrived Letters of Intent in Response to
               USCIS's Inquiries About the Funding Sources . . 15

       E. Defendants Concealed Material Rental Agreements . . . 17

   VI.  Defendants Misused and Misappropriated Investor Funds . . 18

   VII.  Xia Directed the Flow of Funds . . . . . 20

   VIII. Defendants Concealed Material Records and
        Information About Earlier Offerings . . . . . 21

   IX.  No Investors Have Received their Capital Contributions. . . 22

X.     Yue Received Approximately $9.7 Million to Which
       She Has No Legitimate Claim    .        .        .        .        .        .        23

XI.    The Projects Are Unfinished With No Prospect of Completion. .        .        23

XII.   The Maturing CDs .        .        .        .        .        .        .        .        24

ARGUMENT .        .        .        .        .        .        .        .        .        .        25

I.     THE COURT SHOULD FREEZE DEFENDANTS'
       ASSETS UP TO $229 MILLION.        .        .        .        .        .        25

       A.  Standard for an Asset Freeze        .        .        .        .        .        25

       B.  The SEC Is Likely To Succeed on the Merits of Its Claims,
           or at Least Has Shown a Basis to Infer, that Defendants
           Violated the Anti-Fraud Provisions of the
           Federal Securities Laws    .        .        .        .        .        .        25

           1.  Defendants Made Materially False and
               Misleading Statements to Investors   .        .        .        .        26

           2.  Xia Acted with Scienter        .        .        .        .        27

           3.  Investments in the Limited Partnerships
               Are Securities..        .        .        .        .        .        .        28

           4.  Fleet Is Liable For Fraud Based on
               Xia's Conduct and Scienter   .        .        .        .        .        31

       C.  There Is an Imminent Threat of Further
           Dissipation of Investor Funds   .        .        .        .        .        32

II.    THE COURT SHOULD FREEZE RELIEF
       DEFENDANT YUE'S ASSETS UP TO $9.7 MILLION        .        .        33

III.   THE COURT SHOULD GRANT ADDITIONAL
       PRELIMINARY RELIEF TO PROTECT INVESTORS        .        .        34

       A.     The Court Should Appoint a Monitor.        .        .        .        34

           1.  The Need for a Monitor    .        .        .        .        .        34

           2.  M. Scott Peeler Is Qualified To Serve As Monitor        .        .        35

B.  The Court Should Order Defendants and Relief Defendant
to Provide a Sworn Accounting   .       .       .       .       .       .       36

C.  The Court Should Permit Expedited Discovery   .       .       .       .       37

CONCLUSION       .       .       .       .       .       .       .       .       .       37

## TABLE OF AUTHORITIES

**Cases**

*Dooner v. NMI Ltd.*,
725 F. Supp. 153 (S.D.N.Y. 1989).   .   .   .   .   .   .   .   29

*Fischer v. New York Stock Exchange*,
408 F. Supp. 745, 757 (S.D.N.Y. 1976)   .   .   .   .   .   .   26

*Janus Capital Group, Inc. v. First Derivative Traders*,
564 U.S. 135 (2011). ..   .   .   .   .   .   .   .   27

*In re J.P. Jeanneret Assocs.*,
769 F. Supp. 2d 340 (S.D.N.Y. 2011) .   .   .   .   .   .   .   29

*Lorenzo v. SEC*,
139 S. Ct. 1094 (2019).   .   .   .   .   .   .   .   27

*Marini v. Adamo*,
812 F. Supp. 2d 243 (E.D.N.Y. 2011).   .   .   .   .   .   .   29

*Mayer v. Oil Field Sys.*,
721 F.2d 59 (2d Cir. 1983)   .   .   .   .   .   .   .   29

*In re Parmalat Sec. Litig.*,
474 F. Supp. 2d 547 (S.D.N.Y. 2007)   .   .   .   .   .   .   31

*Richter v. Achs*,
962 F. Supp. 31 (S.D.N.Y. 1997)   .   .   .   .   .   .   26

*Rossi v. Quarmley*,
7 F. Supp. 3d 502 (E.D. Pa. 2014), *aff'd*, 604 F. App'x 171 (3d Cir. 2015). .   .   31

*SEC v. Amer. Bd. of Trade, Inc.*,
830 F.2d 431 (2d Cir. 1987) ..   .   .   .   .   .   .   .   34

*SEC v. Bivona*,
No. 16 Civ. 01386 (EMC), 2016 WL 2996903 (N.D. Cal. May 25, 2016)   .   .   34-35

*SEC v. Bremont*,
954 F. Supp. 726 (S.D.N.Y. 1997)   .   .   .   .   .   .   36

*SEC v. Cavanagh*,
155 F.3d 129 (2d Cir. 1998).   .   .   .   .   .   .   .   33, 34

*SEC v. Dawson.*
No. 06-cv-6360, 2007 WL 971173 (E.D.N.Y. Feb. 2, 2007)  .  .  .  .  36

*SEC v. Ginder*,
752 F.3d 569 (2d Cir. 2014) . .  .  .  .  .  .  .  .  26

*SEC v. Hedén*,
51 F. Supp. 2d 296 (S.D.N.Y. 1999)  .  .  .  .  .  .  .  33

*SEC v. Hui Feng*,
935 F.3d 721 (9th Cir. 2019) .  .  .  .  .  .  .  .  30

*SEC v. Illarramendi*,
No. 3:11-cv-78 (JBA), 2011 WL 2457734 (D. Conn. June 16, 2011) .  .  .  33

*SEC v. Kinnucan*,
9 F. Supp. 3d 370 (S.D.N.Y. 2014)  .  .  .  .  .  .  .  31

*SEC v. Liu*,
851 Fed. App'x 665 (9th Cir. 2021)  .  .  .  .  .  .  .  32, 33

*SEC v. Lybrand*,
No. 00 Civ. 1387 (SHS), 2000 WL 913894 (S.D.N.Y. July 6, 2000)  .  .  .  36

*SEC v. Manor Nursing Ctrs., Inc.*,
 458 F.2d 1082 (2d Cir. 1972)  .  .  .  .  .  .  .  31

*SEC v. McNulty*,
137 F.3d 732 (2d Cir. 1998). .  .  .  .  .  .  .  .  25

*SEC v. Morton*,
No. 10 Civ. 1720 (LAK), 2011 U.S. Dist. LEXIS 36487 (S.D.N.Y. Mar. 31, 2011) .  29

*SEC v. Oxford Capital Sec., Inc.*,
794 F. Supp. 104 (S.D.N.Y. 1992)  .  .  .  .  .  .  .  36

*SEC v. Pentagon Capital Mgmt.*,
725 F.3d 279 (2d Cir. 2013) . .  .  .  .  .  .  .  .  25, 26

*SEC v. Ramoil Mgmt., Ltd.*,
2007 U.S. Dist. LEXIS 79581 (S.D.N.Y. Oct. 25, 2007)  .  .  .  .  26

*SEC v. Stanard*,
2009 WL 196023 (S.D.N.Y. Jan. 27, 2009)  .  .  .  .  .  .  26

*SEC v. Stoker*,
865 F. Supp. 2d 457 (S.D.N.Y. 2012)   .   .   .   .   .   .   27

*SEC v. Trabulse*,
526 F. Supp. 2d 1008 (N.D. Cal. 2007)   .   .   .   .   .   .   35

*SEC v. Unifund SAL*,
910 F.2d 1028 (2d Cir. 1990).   .   .   .   .   .   .   25

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946).   .   .   .   .   .   .   .   28-30

*SEC v. WorldCom, Inc.*,
No. 02 Civ. 4963 (JSR), 2002 WL 1788032 (S.D.N.Y. Aug. 2, 2002)   .   .   34

*SEC v. Zubkis*,
No. 97 Civ. 8086 (JGK), 2005 WL 1560489 (S.D.N.Y. 2005)   .   .   .   37

*Smith v. SEC*,
653 F.3d 121 (2d Cir. 2011).   .   .   .   .   .   .   25, 33

*In re Vivendi Universal, S.A. Sec. Lit.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011) .   .   .   .   .   .   31


**Statutes and Rules**

Securities Act of 1933, Section 2(a)(1)   .   .   .   .   .   .   28

Securities Act of 1933, Section 17(a).   .   .   .   .   .   26, 27

Securities Exchange Act of 1934, Section 3(a)(10)   .   .   .   .   28

Securities Exchange Act of 1934, Section 10(b)   .   .   .   .   .   25-27

Securities Exchange Act of 1934, Section 21(d)(5)   .   .   .   .   34

Rule 10b-5   .   .   .   .   .   .   .   .   25-27

Securities Exchange Act, Sections 21(d), 21A [15 U.S.C.

15 U.S.C. § 78c(a)(17)   .   .   .   .   .   .   .   .   26

Plaintiff Securities and Exchange Commission (the "SEC") respectfully submits this memorandum of law in support of its *ex parte* emergency application, by proposed order to show cause, against Defendants Richard Xia, a/k/a Yi Xia ("Xia"), and Fleet New York Metropolitan Regional Center, f/k/a Federal New York Metropolitan Regional Center ("Fleet"), and Relief Defendant Julia Yue, a/k/a JiQing Yue ("Yue"). The SEC seeks an order: (1) freezing the assets of Xia, Fleet, and Yue; (2) appointing a Monitor; (3) requiring a sworn accounting from Xia, Fleet, and Yue; and (4) permitting expedited discovery.

## PRELIMINARY STATEMENT

The SEC seeks emergency relief primarily to prevent Defendants Xia and Fleet, an entity Xia owns and controls, and Relief Defendant Yue, Xia's wife, from dissipating the approximately $77 million that remain from the $229 million Defendants fraudulently raised from over 450 investors in five securities offerings. From April 2010 through October 2017, Defendants raised the funds, based on materially false and misleading statements, in offerings made in connection with the EB-5 Immigrant Investor Program conducted by the United States Customs and Immigration Service ("USCIS"). Xia, acting primarily through Fleet, represented to investors, who were largely Chinese nationals, that the funds raised would be used for two mixed-use real estate projects in Queens, New York—the "Eastern Mirage Project" and the "Eastern Emerald Project."

Xia directed and controlled every aspect of the offerings. To obtain investors' funds, Defendants lied to investors about many material aspects of the offerings. Defendants told investors that their funds would be used only for the particular real estate project to which each investor contributed. Instead, Xia misappropriated funds by taking funds from one project and using them for the other, and he misappropriated funds for his own purposes. To assure

investors that the projects were adequately funded, Defendants told investors that nearly half of the funds for the construction of the two projects would come from sources other than EB-5 Program investors.  Defendants knew, however, that the massive loans and government bonds that they told investors would help finance the projects were illusory.  Defendants further lied about the projects' affiliation with the Westin hotels, misrepresented the qualifications of the development team, as well as the Eastern Emerald Project's size, and concealed from investors two agreements that exposed them to significant risks.

Both projects are essentially at a standstill and have been for years.  As is apparent from recent photographs,[1] the Eastern Mirage Project is an empty glass building with an unfinished interior, while the Eastern Emerald Project—for which Defendants raised $173 million from investors—is essentially a hole in the ground surrounded by a concrete wall.  Defendants do not have the funds either to pay back the investors or to complete the construction of the projects.

Xia is now facing significant financial liabilities from a dozen or more lawsuits brought against him and his companies by investors, sub-contractors, injured workers, ConEdison, and the City of New York.  With his back against the wall, there is a substantial risk that Xia will disburse or seek to conceal some or all of the remaining investor funds—and there is evidence that he may be doing just that.  Xia has been holding much of the remaining investor funds in certificates of deposit, of which approximately $18 million matured on September 26, 2021, and another $10 million of which will mature on November 25, 2021.  Meanwhile, Xia's wife, Relief Defendant Yue, has received $9.7 million in ill-gotten gains, including $5.6 million transferred at Xia's direction to Yue's personal account between April and May 2021.

---

[1] Declaration of Robert Thompson dated Sept. 17, 2021 (Thompson Decl."), Ex. B.

As a result, the requested emergency asset freeze, Monitor appointment, verified accounting and expedited discovery are necessary to protect the remaining investor funds from further dissipation so that they may be distributed to the investor victims of Defendants' fraud if the Commission obtains a final judgment against Defendants.

## STATEMENT OF FACTS

### I.      The Defendants and the Relief Defendant

Defendant Xia, age 52 and a resident of Flushing, New York, is Fleet's owner, president, chief executive officer, and managing member. Declaration of Kim Han ("Han Decl."), Ex. 1 at 15; Ex. 2 at 15; Ex. 3 at 14; Ex. 4 at 12; Ex. 51 at 7; Ex. 52 at 4; Ex. 53 at 4; Ex. 54 at 6; Ex. 55 at 57; Ex. 56 at 57; Ex. 57 at 60. Xia has a degree in industrial management engineering from a university in China and a master's degree in financial economics from the University of Alabama. Xia immigrated to the United States in 1996 and became a U.S. citizen four years ago. Han Decl. Ex. 24 at 4, 6. Xia owns (or co-owns with his wife, Relief Defendant Yue) numerous entities that received investor funds. Han Decl. Ex. 23 at 2, 3.

Defendant Fleet, a New York limited liability company, was formed by Xia on February 5, 2010. Han Decl. Ex. 17 at 19. The USCIS, part of the U.S. Department of Homeland Security, approved Fleet for designation in the EB-5 Immigrant Investor Program on October 7, 2010. Han Decl. Ex. 14. Fleet is the general partner for five limited partnerships that served as the issuer for the five relevant offerings, listed in the table in Section II below. Han Decl. Ex. 1 at 1; Ex. 2 at 1; Ex. 3 at 1; Ex. 4 at 1; Ex. 6 at 1.

Relief Defendant Yue, age 41, is a resident of Flushing, New York, and is Xia's wife. Han Decl. Ex. 24 at 5. Yue was also the authorized signatory on more than 150 bank accounts

that held EB-5 investor funds.[2]  At Xia's direction, Yue authorized numerous bank transfers and signed rental and loan agreements on behalf of entities Xia owned and controlled.  Han Decl. Ex. 24 at 5; Ex. 48 at 58; 63; Ex. 60; Ex. 75; Ex. 77; Ex. 78; Ex. 79.

## II.   Defendants Raised $229 Million through the Sale of Limited Partnership Units.

From early 2010 through late 2017, through five separate EB-5 offerings, Xia solicited EB-5 program investments in two mixed-use real estate projects, the Eastern Mirage Project and the Eastern Emerald Project.  Each of the five offerings sold investors limited partnership "units," as described in the table below:

| Limited Partnership | Amount Raised | # of Investors | Date of Offering | Project |
|---|---|---|---|---|
| EMMCO, L.P. | $8 million | 16 | Aug. 2010–Jan. 2014 | Eastern Mirage Project |
| EMMCO NQMC, L.P. | $35.5 million | 71 | Jan. 2011–Apr. 2012 | Eastern Mirage Project |
| EMMCO TOWER, L.P. | $12.5 million | 25 | Dec. 2011–Jan. 2014 | Eastern Mirage Project |
| **Eastern Mirage Project Sub-Totals** | **$56 million** | **112** | | |
| | | | | |
| EEGH, L.P. | $110 million | 220 | Mar. 2014–Dec. 2015 | Eastern Emerald Project |
| EEGH II, L.P. | $63 million | 126 | Oct. 2015–Oct. 2017 | Eastern Emerald Project |
| **Eastern Emerald Project Sub-Totals** | **$173 million** | **346** | | |
| | | | | |
| **GRAND TOTAL** | **$229 million** | **458** | | |

---

[2] Han Decl. Ex. 19 (list of more than 150 accounts for which Yue is an authorized signer).

Each limited partnership is governed by a Limited Partnership Agreement ("LP Agreement"). Han Decl. Ex. 1 at 1, 30; Ex. 2 at 1, 33; Ex. 3 at 1, 31; Ex. 4 at 1, 30; Ex. 6 at 31. The parties to the LP Agreement are the general partner (Fleet), Xia as the "Original Partner," and the investors, who became limited partners upon completing a subscription agreement and making a $500,000 investment. Han Decl. Ex. 1 at 63; Ex. 2 at 66; Ex. 3 at 66; Ex. 4 at 60; Ex. 6 at 61. The LP Agreements gave Xia broad authority to act on behalf of each partnership, to represent and bind each partnership, and "to do any and all things necessary for, incidental to or connected with carrying out the activities of the Partnership." Han Decl. Ex. 1 at 40; Ex. 2 at 43; Ex. 3 at 41; Ex. 4 at 39; Ex. 6 at 41.

The LP Agreements also authorized Fleet, the general partner, to "raise capital for the Partnership by offering for sale and selling Units" and to "do all things in that regard in the name of and on behalf of the Partnership, including preparing and filing such offering or other documents as the General Partner determines to be necessary or desirable" and stated that "all things done by the General Partner are hereby ratified and confirmed." Han Decl. Ex. 1 at 45; Ex. 2 at 48; Ex. 3 at 46; Ex. 4 at 44; Ex. 6 at 45. Fleet and Xia provided prospective investors with Private Offering Memoranda ("Offering Memoranda"), which stated that the "General Partner exercises ultimate authority for overall management of the Partnership and is responsible for its day to day operations." Han Decl. Ex. 1 at 14; Ex. 2 at 14; Ex. 3 at 13; Ex. 4 at 11; Ex. 6 at 12. The Offering Memoranda state that Xia is the "President and CEO of the General Partner." Han Decl. Ex. 1 at 15; Ex. 2 at 15; Ex. 3 at 14; Ex. 4 at 12; Ex. 89 at 12.

## III.    The Partnerships' Loans to the Xia-Controlled Developers

The five limited partnerships entered into loan agreements with Xia-controlled entities that were supposed to serve as the developers of the projects, as summarized below:

| Date of Loan Agreement | Lender | Amount | Borrower/Developer | Purpose of Loan |
|---|---|---|---|---|
| 07/14/2010 | EMMCO | $8 million | Fleet Financial Group, Inc. ("FFG") | For FFG to "develop [and] construct Phase I" of the Eastern Mirage Project, referred to as the "Eastern Mirage Center," to include a "conference center, spa/fitness center, restaurant and parking garage" |
| 06/26/2013 | EMMCO NQMC | $35.5 million | FFG | For FFG to "develop [and] construct Phase II" of the Eastern Mirage Project, the "North Queens Medical Center" |
| 12/08/2014 | EMMCO TOWER | $12.5 million | FFG | For FFG to "develop [and] construct Phase III" of the Eastern Mirage Project, a luxury hotel |
| 12/18/2013 | EEGH | $80 million | Eastern Emerald Group, LLC ("EEG") | For EEG to "develop, construct and operate a commercial mixed-use project that includes a 5-star hotel, convention center, parking garage, restaurant and retail space" |
| 10/21/2015 | | Increased EEGH loan $110 million | | |
| 10/18/2015 | EEGH II | Up to $80 million | LaGuardia Performance Center, LLC ("LaGuardia") | For LaGuardia to "develop, construct and operate the expansion to a 5-star hotel, which will result in an additional 556,398 SF being added to the overall building, an additional 294 5-star luxury hotel rooms, an additional 4 floors added to the building; a performing arts center across 5 floors; as well as additional retail space, |

| | | | | restaurant space and parking garage space" |
|---|---|---|---|---|

## IV.   Xia Marketed the Offering to the EB-5 Investors.

Xia was actively involved in soliciting investors, and he travelled to promote the offerings.  To assist in soliciting investors, Defendants hired immigration agents in China to promote the offerings and paid the agents finders' fees.

During a 2014 trip to China, Xia approved a script drafted by Walter Verfenstein, an employee, that was intended to be used to promote the Eastern Emerald Project to potential investors.  Han Decl. Ex. 63.  In a July 2014 email to Xia, Walter Verfenstein noted that the script was "modified slightly from the version you approved in the spring (to reflect the brochure [Xi Verfenstein, an employee of Xia entities] gave me and ou[r] discussion yesterday).  Please let me know of any changes/corrections you wish to see. . . .  Here come the remarks."  *Id*.  The "remarks" read in part (with emphasis in the original):

> I am very pleased to be back in China with an attractive real estate development opportunity to share with you.  On my first visit, great project Eastern Mirage/Westin Hotel . . . track record 100% permanent residency approvals, but no confirmed next project.  Now, we have next project….
>
> Boutique Regional Center that works exclusively and hand-in-glove with Fleet Financial Group…
>
> Because FNYMRC and Fleet Financial Group are team working solely on NYC real estate developments together, we have deep experience in this field.  Based on this experience, we believe that Eastern Emerald's LaGuardia Convention is a rare and special opportunity in New York.  It is: 600,00 [sic] sq. foot, mixed use development across the street from LAG [LaGuardia Airport] that would consist of a 300,000 square foot exhibition center, 200,000 square foot meeting space, 800 hotel rooms – plus restaurants, retail space and a 500 spaces of underground parking. . . .
>
> The project will benefit from the support of community leaders and NY

7

State and the U.S. government in the form off [sic] $45 million in tax credits.

As a potential EB-5 investor you would be an important <u>part of this project, but only a part</u>. The $75 million investment from 150 investors could comprise less than one-third of the projected $228 million development budget. (State, Federal govt, a bank and Fleet Financial would all have large stakes, too).

Invest[m]ent mindset – this is a compelling investment opportunity in its own right.

Xia replied to the email about the draft script: "[E]verything is fine except the total eb-5 is now $80 million and total construction cost $233 million." *Id*.

## V.   Defendants Made False and Misleading Statements to Investors.

### A.   Defendants Misrepresented the Development Team's Experience.

Racanelli Construction Co. ("Racanelli") was incorporated in 2011—around the same time Xia began offering investments in the five limited partnerships. Han Decl. Ex. 17 at 27; Statement of Facts § II, *supra*. In numerous court filings as well as on a bank signature card, Xia represented himself as Racanelli's president and also the manager of Perini Group, Inc. ("Perini"), which was incorporated in 2015, and which was a general contractor. *See* Han Decl. Ex. 18 at 60; Ex. 25 at 5; Ex. 26 at 7; Ex. 27; Ex. 28; Ex. 29 at 9; Ex. 30; Ex. 31; Ex. 32. Xia and Racanelli have never had any affiliation with Racanelli Construction Company Inc. ("the Original Racanelli")—a large, well-known construction company that has been in the business for decades. Han Decl. Ex. 35.

The Offering Memoranda list Xia and Racanelli as the "Management and Development" team for the two projects. Han Decl. Ex. 1 at 15; Ex. 2 at 15; Ex. 3 at 14; Ex 4 at 12; Ex. 6 at 13. The Offering Memoranda touted Racanelli as having been "recognized as one of the region's leading providers of preconstruction planning, project management, design/build, and general contracting services." *Id*. The Offering Memoranda further claimed that, "[s]ince its founding,

8

Racanelli has been responsible for building and renovation across a broad range and variety of market segments, completing projects that include corporate headquarters, industrial complexes, hospitals, assisted living facilities, university and college facilities, retail stores, hotels, restaurants, houses of worship, self-storage complexes, condominiums and townhouses." *Id*.

Notwithstanding Racanelli's 2011 founding, the Fleet marketing materials and the Offering Memoranda touted Racanelli's decades of experience in construction. For example, marketing materials provided to prospective investors touted Racanelli as having been founded "60 years" ago and having "three generations of construction experience and nearly a hundred years of outstanding credit as a family-owned business." Han Decl. Ex. 10 at 17; Ex. 7 at 3. The EMMCO Tower Offering Memorandum and the EMMCO Business Plan provided to prospective investors similarly claimed that Racanelli was founded "over six decades ago." Ex. 3 at 14; Ex. 52 at 5. And the Business Plans for EMMCO NQMC, EMMCO Tower, EEGH, and EEGH II similarly described Racanelli as having been founded "decades ago." Han Decl. Ex. 53 at 5; Ex. 54 at 7; Ex. 55 at 57; Ex. 56 at 58; Ex. 57 at 60.

Indeed, the description of Racanelli in the Offering Memoranda—"responsible for building and renovation across a broad range and variety of market segments, completing projects that include corporate headquarters, industrial complexes, hospitals, assisted living facilities, university and college facilities, retail stores, hotels, restaurants, houses of worship, self-storage complexes, condominiums and townhouses"—matches word for word the description of the Original Racanelli on its web site. Han Decl. Ex. 35.

In April 2015, the Original Racanelli filed a lawsuit against Xia and Racanelli alleging that the Original "Racanelli is a third-generation family owned entity that has been conducting business under the trade name of Racanelli Construction Co. for approximately twenty-three (23)

years…[and] has been developing construction projects on Long Island for nearly sixty (60) years." Han Decl. Ex. 36 at 6. The complaint further alleged that Xia "improperly assumed, utilized, displayed, and disseminated [the Original] Racanelli's protected trade name." *Id.* at 8. In December 2015, the parties settled the trademark litigation, and Xia agreed to "fully and completely refrain from any and all use of the name Racanelli in any capacity whatsoever," although a carve-out permitted Xia to use the name in connection with contracts for the EB-5 projects. Han Decl. Ex. 37 at 1.

Before the Eastern Mirage and Eastern Emerald Projects, Xia's first and only construction project was an apartment building, called Shangri-La Towers, completed in 2009, as Xia admitted in a sworn deposition in June 2012. Han Decl. Ex. 34. Meanwhile, FFG was created only in December 2005—about 10 years before the Eastern Emerald Project offerings began. Han Decl. Ex. 17 at 16; Statement of Facts § II, *supra*. Nevertheless, an Eastern Emerald brochure further claimed that FFG had "nearly 20 years of experience in real estate development in the eastern United States." Han Decl. Ex. 13 at 3.

### B. Defendants Misrepresented the Projects' Affiliation With Westin Hotels.

Xia and Fleet never had any agreement with Westin (or any other hotel chain) to place one of its hotels in either of the projects. Xia appears to have had only very preliminary discussions with Westin's parent company, Starwood Hotels and Resorts Worldwide, which sent Xia a letter of interest in April 2014, making clear that Fleet and Xia "should not rely on this letter, or any further discussions regarding this potential transaction as an agreement, offer or commitment by Starwood to enter into any transaction." Han Decl. Ex. 43 at 2.

Nevertheless, the EMMCO Tower Offering Memorandum claimed that the Eastern Mirage Tower "will encompass the development of the Westin Element Hotel & Condo Apartment building." Han Decl. Ex. 3 at 6. The Eastern Mirage Project's marketing materials

similarly represented that the hotel portion of each project would be a Westin-branded hotel. Han Decl. Ex. 7; Ex. 8; Ex. 9; Ex. 10. Specifically, the materials, titled "FNYMRC The New York Westin Project," claimed that the hotel would be a Westin Element hotel. Han Decl. Ex. 8; Ex. 9; Ex. 10. The marketing script Xia approved for use with prospective investors in China referred to the "Eastern Mirage/Westin Hotel" project. Han Decl. Ex. 63 at 1. The marketing materials for the Eastern Emerald Project also claimed that Eastern Emerald would contain a Westin Hotel. Han Decl. Ex. 11 at 3; Ex. 12 at 2.

On July 28, 2017, after most of the EB-5 investor funds had been raised, an immigration agent asked Xia in messages using the WeChat messaging app if the "latest progress reports for Westin hotel project and the Eastern Emerald development project" is ready. Han Decl. Ex. 73 at 4. Xia sent a document in reply, and the agent confirmed receipt and asked if "Westin's" is ready. *Id*. at 5. The agent also asked when "the construction for the Eastern Emerald development project" is estimated to be done. *Id*. Xia said "around 2019," and, in response to a question about when the Westin project construction would be done, Xia responded "[c]onstruction will be done at the end of this year. Will formally open at the beginning of next year." *Id*. at 6. Xia responded to many other WeChat messages about the "Westin project." *Id*.

### C. Defendants Claimed the Eastern Emerald Project Was Three Times Bigger Than They Knew It Would Be.

In 2014, Xia signed the Eastern Emerald Project's "Plan/Work Application" filed with the New York City Department of Buildings, seeking permission for a structure of only 350,186 square feet. Han Decl. Ex. 40; Ex. 41. In a March 2015 Times Ledger article, entitled "Xia's Corona project scales down to hotel", Xia explained that the reason the project was being scaled down and was "no longer a convention center, but a conference hotel[.]" Han Decl. Ex. 49.

Nevertheless, in 2015, the EEGH II Offering Memorandum represented to prospective

investors that "[t]he completion of the [Eastern Emerald] Project will result in a 29-story, 1,199,578 SF [square foot], mixed-use commercial building"—a structure more than three times larger than the one approved by the Department of Buildings.  Han Decl. Ex. 6 at 6-11.  This was purportedly an "expansion" of the "25-story, 643,180 SF structure" project described in the first EEGH Offering Memorandum.  *Id.*

### D.   Defendants Made False and Misleading Statements about the Projects' Funding Sources.

To convey the impression that the projects were well funded and on solid footing, the Offering Memoranda stated that each of the projects "is intended to be funded from a variety of sources." Han Decl. Ex. 1 at 12; Ex. 2 at 12; Ex. 3 at 12; Ex. 4 at 10; Ex. 5 at 9; Ex. 6 at 11.  The Memoranda included tables showing the breakdown of the projected costs and the funding from EB-5 investors and non-EB-5 sources showing that a substantial portion of the projects' costs would come from non-EB-5 sources.  *Id.*  The 2014 marketing script that Xia approved emphasized as a key point that investors would only pay "a part of" the cost given the financial support from governments, banks, and others.  Ex. 63 at 2.

### 1.   Eastern Mirage Project's Funding Sources

The three Eastern Mirage Offering Memoranda (for the EMMCO, EMMCO Tower, and EMMCO NQMC limited partnerships) each represented to prospective investors:

> The Eastern Mirage Project is intended to be funded from a variety of sources including a bank loan from HSBC Bank USA, N.A., a NYC Capital Resource Corp. ("NYCCRC") triple tax-exempt bond financing and EB-5 immigrant investment. The Eastern Mirage Project is financed by a $9,000,000 bank loan from HSBC Bank USA, N.A. at an interest rate equal to the sum of (i) 3.25% plus (ii) the 30-day London Interbank Offered Rate (LIBOR). The Eastern Mirage Project is also being financed by a $17,000,000 triple tax-exempt bond financing authorized under the American Recovery and Reinvestment Act of 2009. The program is administered by the NYCCRC and the NYC Industrial Development Agency, both of which are staffed by the New York City Economic

12

Development Corporation.

Han Decl. Ex. 1 at 1 at 12; Ex. 2 at 12; Ex. 3 at 12.

The EMMCO Offering Memorandum, which stated that the "current budget for hard construction costs for the Eastern Mirage Project" was $88 million, similarly represented:

> The Eastern Mirage Project costs are expected to be financed as follows:
> EB-5 Immigrant Investor Capital             (Up to) $57,500,000
> NYCCRC Recovery Zone Facility Bonds             $17,000,000
> HSBC Loan                                       $9,000,000
> Other Investment Sources                       $14,000,000
> Total Investment in Project                     $97,500,000

*Id.*

The EMMCO NQMC and EMMCO TOWER Offering Memoranda repeated the same four funding sources for the Project, except the $9,000,000 loan was listed as an East West Bank loan, not an HSBC loan, and, with respect to the representation about the $17,000,000 in NYCCRC bonds, a statement was added that "Up to an additional $12,000,000 in NYCCRC Recovery Zone Facility bond financing is available if needed." Han Decl. Ex. 2 at 12-13; Ex. 3 at 12. Each of these three Eastern Mirage Offering Memoranda also unequivocally represented that the project "is financed" by the NYCCRC bonds. Han Decl. Ex. 1 at 12; Ex. 2 at 12; Ex. 3 at 12.

In reality, although an NYCCRC bond allocation was approved, Xia refused the allocation in a letter to the NYCCRC dated December 6, 2010, stating that he "shall not be seeking to use the allocation of $17,000,000 of Recovery Zone Facility Revenue Bonds that has been made available[.]" Han Decl. Ex. 38. NYCCRC sent Xia a letter dated December 7, 2010 informing him of the termination of the Recovery Zone Facility bond allocation for Eastern Mirage and stated that the bond program was expiring on December 31, 2010. Han Decl. Ex. 39.

Nevertheless, the EMMCO Offering Memorandum continued to represent that the

13

NYCCRC bond allocation would be a source of funding, and the EMMCO NQMC and EMMCO TOWER Offering Memoranda, dated January 31, 2011—after Xia knew that the bond program had terminated Eastern Mirage Project's bond allocation—contained the same representation. Han Decl. Ex. 1 at 12; Ex. 2 at 12; Ex. 3 at 12. The vast majority of Eastern Mirage investor funds were received after Xia had declined the bond financing. Han Decl. Ex. 48 at 9, 12-13; 16.

Similarly, although the Eastern Mirage Project Offering Memoranda represented that the project "is financed" by $9 million in loans from East West Bank (EMMCO and TOWER) and East West Bank (NQMC), neither HSBC nor East West Bank ever provided a loan for the Eastern Mirage Projects. Han Decl. Ex. 2 at 12; Ex. 3 at 12.

## 2. Eastern Emerald Project's Funding Sources

The EEGH Offering Memorandum stated that the Eastern Emerald Project "intended to be funded from a variety of sources including a loan from Hapoalim Securities, Tax credits and EB-5 immigrant investment," and the EEGH II Memorandum stated that the project "is intended to be funded from multiple sources . . . of which one source will be EB-5 immigrant investment." Han Decl. Ex. 4 at 11; Ex. 6 at 11.

The estimated projected project cost disclosed in the initial EEGH and Supplemental Memorandum was $190 million, and the EEGH II Memorandum, with its "expansion," disclosed additional costs of $181,413,011.[3] *Id.*

The EEGH Supplemental Offering Memorandum represented the funding sources as including a $110 million "Loan from New Commercial Enterprise, EEGH, L.P.," an $18 million "New Market Tax Credit," and $40.8 million in "Equity from Developer." Han Decl. Ex. 5 at 3.

---

[3] This amount was in addition to the costs set forth in the EEGH Offering Memorandum. As a result, the total costs for the Eastern Emerald Project, including the original and the expansion, were projected to be $371,413,011.

Meanwhile, the EEGH II Offering Memorandum represented that the expanded project "costs are expected to be financed" by a "Capital Contribution from Developer" of $44,413,011 and a "Loan from Hapoalin [sic] Securities" of $40 million. Han Decl. Ex. 6 at 12.

In fact, none of these non-EB-5 sources contributed funds to the Eastern Emerald Project. In particular, the bank records show no capital contributions from either EEG or LaGuardia, the developers. Declaration of Raymond Dookhie dated Sept. 27, 2021 ("Dookhie Decl."), at 6 n.2. According to the bank records, only $3.5 million in non-investor funds was received between December 2011 and January 2019. *Id*.

### 3. Xia Submitted Contrived Letters of Intent in Response to USCIS's Inquires about the Purported Funding Sources.

In September 2014, the USCIS sent Xia's EB-5 counsel a "Request for Evidence." Han Decl. Ex. 69 at 1. The request asked for the "letters of commitment or intent" for the New Market Tax Credit source listed in the Supplemental Offering Memorandum, as well as "the terms" of the $72 million loan from Hapaolim Securities listed as a funding source in the EEGH Offering Memorandum. *Id*.

The year before, Xia appears to have asked Yue to procure a letter of interest for the New Market Tax Credit claim from Sunil Aggarwal ("Aggarwal") of a financial services firm named ThinkForward. In late 2013, Aggarwal received a call from a woman calling on behalf of Xia who requested a letter of interest regarding the New Market Tax Credit. Declaration of Sunil K. Aggarwal dated Sept. 13, 2021, ¶ 5. Aggarwal provided the letter, which was dated November 14, 2013, but then never heard from the woman or from Xia's office again. *Id*. ¶¶ 7-8.

In late 2014, Xia also obtained a very short, purported "letter of intent" from Edward Chan of Hapaolim Securities. Han Decl. Ex. 69 at 69-11. The letter, dated November 15, 2014, and addressed to Yue, expressed only "an indication of our interest to move forward on a loan

commitment for $72 million." *Id*. The letter from Chan began "Dear Ms. Yue" but then stated "I have worked with Ms. Yue in her prior successful EB-5 projects"—and, like the Aggarwal letter, it appears there was no follow-up by Xia after the date of the letter. Aggarwal Decl. ¶ 9.

Xia's EB-5 counsel submitted the Aggarwal and Chan letters to the USCIS in response to the Request for Evidence. Han Decl. Ex. 69.

On September 17, 2017, USCIS sent Xia's EB-5 counsel another "Request for Evidence." USCIS wrote:

> The Business Plan does not present evidence that the $40 million loan from 'Hapaolim Securities'… has been secured or is readily available…. The credibility of the project's future would be enhanced with evidence on non-EB-5 funding sources. Therefore, please submit the following: Projected non-EB-5 funds and their source if applicable (e.g., developers, municipal bonds, loans, etc.); Secure commitment from non-EB-5 investors if applicable (contracts, bonds, loans, letter of confirmation from the lender, other sources, etc.).

Han Decl. Ex. 70 at 2.

In response, Xia's EB-5 lawyer did not provide any documents or information regarding the purported $40 million Hapaolim Securities loan. Han Decl. Ex. 70. Instead, the lawyer claimed that "LaGuardia Performance Center, LLC [the developer] has already obtained a construction loan commitment letter dated August 18, 2017 issued by R. Seelaus & Co., Inc." *Id*. at 3. The lawyer's letter claimed that the projected loan from Seelaus was $85 million and noted that, if the loan were granted, then the project "will be well covered." *Id*. The lawyer's letter appears to have been based on a purported letter from Seelaus signed by Edward Chan— who had also signed the purported 2014 Hapaolim letter of intent addressed to Yue—and who purported to sign the Seelaus letter as the company's "Head of Public Finance." *Id*. at 21; Han Decl. Ex. 69 at 11.

In fact, according to the chief executive officer of Seelaus, Chan was a registered

16

representative who worked at Seelaus in August 2017, but his title was not "Head of Public Finance." Declaration of Annie Seelaus dated Sept. 14, 2021, ¶ 7. Indeed, the Seelaus letterhead in the letter is fake, Seelaus never considered making any loan to Xia, and the letter of intent is not authentic or legitimate. *Id*. ¶¶ 8-10.

        **E.**       **Defendants Concealed Material Rental Agreements.**

        The five limited partnerships loaned the $229 million in offering proceeds to developers affiliated with Xia to complete the projects, and the Offering Memoranda for each project further stated that "[t]he Borrower intends to repay the loan at maturity with the proceeds of long term financing or from other sources." Han Decl. Ex. 1 at 15; Ex. 2 at 16; Ex. 3 at 15; Ex. 4 at 13; Ex. 6 at 14. Each Offering Memorandum stated that there are "no material conflicts of interest" between the general partner (Fleet) and its affiliates and the partnership, and that the general partner "is accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in handling the Partnership's affairs." Han Decl. Ex. 1 at 26; Ex. 2 at 28; Ex. 3 at 26; Ex. 4 at 23; Ex. 6 at 24.

        On January 1, 2008, X&Y, the owner of the Union Street property on which the Eastern Mirage Project was to be built, entered into a 99-year lease agreement with FFG requiring FFG to pay annual rent in the amount of $2.5 million for each of the first three years and $3.5 million for each of the next three years, with subsequent increases. Han Decl. Ex. 48 at 48. Yue signed the lease agreement on behalf of X&Y, and Xia signed on behalf of Fleet. *Id*. at 58, 63. Fleet has never made a payment and owes unpaid rent to X&Y of more than $42 million. *Id*. at 32.

        On September 28, 2015, EEG, the owner of the land on which the Eastern Emerald Project was to be built, entered into a lease agreement with LaGuardia, the developer, that requires LaGuardia to pay annual rent in the amount of $3.5 million, increasing to $4.5 million per year over time. *Id*. at 65, 70. Xia signed the lease agreement on behalf of both EEG and

LaGuardia.  *Id*. at 70.  LaGuardia has never made a payment and owes unpaid rent of at least $16.5 million  to EEG.  *Id*. at 33.

Both of the lease agreements described above significantly  increased the risk that developers would default on the loans to the limited  partnerships, in which the EB-5 investors had invested, given the significant  amount of money the developers owed under the leases.

The Offering Memoranda for each project disclosed only that the "Borrower [the developer] will be the sole obligor"  and that loans are "subject to risks associated with possible default by the Borrower."  Han Decl. Ex. 1 at 22; Ex. 2 at 24; Ex. 3 at 22; Ex. 4 at 19; Ex. 6 at 19.  The Offering Memoranda did not disclose the rental agreements, which substantially increased the risk that the borrowers would default—an omission  that rendered these statements misleading.

Indeed, if the Union  Street and Northern Boulevard properties are sold, X&Y and EEG would have the right to enforce their payment obligations,  which significantly  diminishes  the amount available  to repay the investors.  In addition,  given that both FFG and LaGuardia have been in default, X&Y and EEG have the right under their loan agreements to foreclose and essentially bankrupt FFG and LaGuardia at any time, leaving  investors empty-handed.  Han Decl. Ex. 48 at 52-54,  70.

## VI.    Defendants Misused and Misappropriated Investor Funds.

The Offering Memoranda stated that each investor's $500,000 capital contribution  would be used only for the phase of the particular project for which the funds were raised—that is, either the Eastern Mirage or the Eastern Emerald project.  Han Decl. Ex. 1 at 11; Ex. 2 at 12; Ex. 3 at 11; Ex. 4 at 10; Ex. 6 at 11. The Loan Agreements also stated that the "Borrower agrees that the proceeds of the Loan shall only be used for the development,  construction  and operation  of the Project."  Han Decl. Ex. 75 at 2; Ex. 60 at 2; Ex. 77 at 2; Ex. 78 at 2; Ex. 79 at 2.  The

Offering Memoranda further represented that the general partner must exercise "the good faith required of fiduciaries" and "is accountable to the Partnership as a fiduciary" and "must exercise good faith and integrity in handling the Partnership's affairs." Han Decl. Ex. 1 at 26; Ex. 2 at 28; Ex. 3 at 26; Ex. 4 at 23; Ex. 6 at 6-24.

Yet Xia, Fleet's president, CEO, and managing member, repeatedly misused large amounts of investor funds, in some cases to take investor money for one project and use it for the other project and in other cases for purposes that appear entirely unrelated to the projects. Dookhie Decl. ¶¶ 15-16. For example:

- In 2012, Xia used approximately $819,809 in Eastern Mirage Project investor funds to pay off a mortgage on a building owned by Xia located at 57-35 Lawrence Street, Queens, NY, not related to the Eastern Mirage Project; *Id.* at ¶¶ 30-33.

- In June and December 2013, Xia used $17 million in Eastern Mirage Project investor funds to purchase the land on the Northern Boulevard site of the Eastern Emerald Project; *Id.* at ¶¶ 21-29

- In 2014 through 2016, Xia used up to $11.2 million or more in Eastern Emerald Project investor funds for construction on the Eastern Mirage Project; *Id.* at ¶¶ 36-40.

- In July 2015, Xia transferred approximately $2.3 million to an escrow agent for a luxury apartment at One Madison Park in Manhattan; when the funds were returned in February 2016 after the purchase did not go through, he diverted the funds to other companies he owned; *Id.* at ¶¶ 41-43. and

- In 2021, Xia used investor funds as collateral to establish a $10 million line of

credit and then transferred $5.6 million from the credit line to his wife Yue's personal account. Han Decl. ¶ 4.

In addition, there are over $1.2 million in expenditures traceable to investor funds from accounts controlled by Xia and/or Yue that appear unrelated to the projects. Dookhie Decl. ¶¶ 44-48. These include at least $840,000 in payments for apartments rented in Manhattan by Yue; approximately $46,000 in payments for food and groceries, including Fresh Direct and Whole Foods; approximately $88,000 in retail purchases at Amazon, Apple, Best Buy, Hugo Boss, Nordstrom, Google Glasses, Netflix, NBA.com, and spas; and approximately $50,000 in travel expenses, including luxury hotels in Hawaii. *Id*.

## VII.    Xia Directed the Flow of Funds.

Defendants had a duty to act "as a fiduciary"; however, Xia managed the $229 million that flowed into bank accounts to protect and benefit himself at the expense of the investors. Xia created over 150 bank accounts in the names of various entities he owned or controlled. He used these bank accounts to engage in hundreds of often multi-step transactions—many of which appear to have little or no legitimate business purpose—to commingle investor funds and to hide the actual source of payments.

From 2012 through January 2019, over $127 million in investors' funds were transferred from the developers to the purported general contractors, and at least $85.9 million were then transferred to other entities that Xia owned and controlled. Dookhie Decl. ¶ 19. The offering proceeds were cycled through dozens of bank accounts in the names of the Xia Entities.[4] Of the

---

[4] "Xia Entities" refers to the limited partnerships, the developers (FFG, EEG and LaGuardia), the general contractors (Perini and Racanelli), as well as Amazon River, LLC ("Amazon River"), Fleet General Insurance Group Inc. ("Fleet Insurance"), JiQing Development, Inc. ("JiQing Development"), Manekineko Group, LLC ("Manekineko Group"), Shangri-La 9D, Inc. ("Shangri-La 9D"), Shangri-La 9F, Inc. ("Shangri-La 9F"), and Shangri-La Green, Inc. ("Shangri-La Green"), Samuel Development Group, LLC ("Samuel Development"),

$85.9 million transferred to Xia Entities, approximately $32.7 million were cycled back upstream to bank accounts of the developers and approximately $1.14 million was then cycled back to bank accounts of the general contractor. Dookhie Decl. ¶19.

In addition, of the $85.9 million transferred to Xia Entities, approximately $43.6 million were not supported by any invoices that would provide a justification for the transfers. Dookhie Ex. 3. Moreover, the invoices that Xia provided for Amazon River, FFG, JiQing Development, Manekineko Group, Samuel Development, Shangri-La Green, Shangri-La 9F, and X&Y to ostensibly support approximately $32.2 million in payments of investor funds to those entities contained lengthy lists of tasks performed but, contrary to typical construction invoices, contained only a single amount of money charged at the bottom, with no breakdown of how much was billed for each task and who performed these tasks. The invoices were also in large round-dollar amounts that did not vary from month to month. Dookhie Decl. ¶ 16. And these invoices were strikingly different in form and substance from the third-party invoices submitted by outside vendors who provided services to Racanelli and Perini. Dookhie Decl. ¶16

## VIII.   Defendants Concealed Material Records and Information About Earlier Offerings.

Defendants concealed from investors in the later Eastern Emerald offerings that the Defendants had made numerous misrepresentations and omissions to investors in earlier Eastern Mirage offerings. During 2015, 2016 and 2017, the EEGH and EEGH II offerings raised $148 million from investors—nearly three times the amount raised in the earlier Eastern Mirage offerings. Han Decl. Ex. 48 at 19-22, 29-31. Defendants concealed from these later investors that Xia had misappropriated Eastern Mirage investor funds and also made other false and

---

and X & Y Development Group, LLC ("X&Y").

misleading statements. Indeed, Defendants touted the supposed success of the Eastern Mirage offerings to promote the Eastern Emerald offerings. Han Dec. Ex. 11 at 6; Ex. 12 at 4.

In addition, the Offering Memoranda claimed that "the Partnership will send to each Limited Partner, generally within 90 days after the end of each fiscal year of the Partnership, an accounting report including a balance sheet and statements of income, changes in Partner's equity and cash flows, prepared in accordance with Generally Accepted Accounting Principles, plus a schedule and summary description of the investments owned by the Partnership at year-end and a statement for each LP of its capital account." Han Decl. Ex. 1 at 9-10; Ex. 2 at 9-10; Ex. 3 at 9-10; Ex. 4 at 8-9; Ex. 5 at 8; Ex. 6 at 9. The Defendants did not provide these reports to the investors, which deprived them of critical and material information.

## IX.   No Investors Have Received their Capital Contributions.

To date, none of the 458 investors have received their capital contributions back. In recent years, a number of investors have filed lawsuits against Xia seeking payment. Han Decl. Ex. 72.

In 2018, one of the Chinese immigration agents whom Xia had hired to solicit investors asked Xia via WeChat about "the specific time of when the money will be refunded to each client." Han Decl. Ex. 73 at 15. Xia responded that the funds would be refunded by the end of 2018. *Id*. In April 2018, the agent followed up with Xia again about the refund and wrote, "I have some clients urging and asking about such matter multiple times, and they are more than angry." *Id*. at 16. On May 2, 2018, the agent emailed Xia the questions that investors were demanding answers to:

> 1) when will the money be refunded? 2 Why aren't the projects
> operational yet? What's the overall situation of the project funding? 3. Can
> you explain why the investment was not refunded on time? The loan
> period has been extended for one year. Will there be more of an
> extension? I'll reply the clients by phone calls, not in writing, so you don't

have to worry about anything.

*Id*. at 17.  Xia eventually responded that he would have the office contact the agent.

Nevertheless, the investors did not receive any payments. *Id*. at 19.

## X.      Yue Received Approximately $9.7 Million to Which She Has No Legitimate Claim.

According to Xia, Yue has been primarily a "stay at home mother" for the past fourteen

years but has occasionally helped him with "simple stuff" such as signing "checks for the bank at

[Xia's] instruction."  Han Decl. Ex. 24 at 5. Yet from 2012 through 2019, Yue received

approximately $4.1 million, traceable to investor funds and deposited into her personal account.

Dookhie Decl. ⁋ 49.  Just a few months ago, in May 2021, Yue also received more than $5.6

million, which was transferred into her personal account directly from a line-of-credit account in

the name of EEG, one of the project developers, which Xia established with EEG funds.  Han

Decl. ⁋ 4.

## XI.     The Projects Are Unfinished With No Prospect of Completion.

Current photos of Eastern Mirage show the building to be empty, and the interiors on

every floor appear to be raw, unfinished space. Thompson Decl. Ex. B.  Given that nearly all of

the funds raised for the Eastern Mirage Project have been spent, it appears that Xia has no

possibility of completing this project.  X&Y, JiQing Development, FFG, and Racanelli have also

been found by a New York State court to have negligently caused serious injuries sustained by a

worker at the Eastern Mirage site.  Han Decl. Ex. 65.

The status of the Eastern Emerald Project is even more dire.  At the moment, the site is a

largely a vacant dirt hole surrounded by a concrete wall, with a partial stop-work order in place.

Thompson Decl. at 32-37; Han Decl. Ex. 81 at 1.  Prior to January 2019, the Department of

Buildings had cited the project for 41 violations, of which 31 were for hazardous conditions. Han

Decl. Ex. 80 at 9.

The inexperience of Xia and his management team has resulted in some devastating consequences. Han Decl. Ex. 50 (Jan. 7, 2019 CityRealty.com article "Massive Queens Sinkhole at Future Site of the Shapely LaGuardia Convention Center."); Ex. 80. On January 4, 2019, personnel at the Eastern Emerald site—in violation of a stop-work order—were engaged in excavation and caused a support wall along Northern Blvd. to collapse. Han Decl. Ex. 80 at 2. According to a Department of Buildings report, the activity constituted "illegal work" and "led to the collapse of the sidewalk, half the width of Northern Boulevard, and the loss of gas, water, electrical, and telecommunication services." *Id*. at 2. The report stated that, in an interview about the collapse, Xia "was evasive and unclear as to who was supervising and directing field operations prior to the collapse," and that Xia, among others, "failed to act in a reasonable and responsible manner." *Id. at 11, 25*.

In September 2019, ConEdison filed a suit for compensatory damages for property damage to ConEdison's gas and electric facilities, gas loss, cost of repairs, and replacement facilities. The defendants are EEG, FFG, Racanelli, Perini, and the City of New York. In a cross-claim, the City of New York is seeking an indemnity from EEG, FFG, Racanelli, and Perini to the extent the city is found liable.

## XII. The Maturing CDs

On September 26, 2021, approximately $18 million in three CDs, purchased using investor funds, matured. Declaration of David Stoelting dated Sept. 27, 2021, ¶ 11. On November 25, 2021, another $10 million in CDs will mature. *Id*. Absent a court-ordered asset freeze, these funds will become available to Xia for his own purposes.

## ARGUMENT

## I.     THE COURT SHOULD FREEZE DEFENDANTS' ASSETS UP TO $229 MILLION.

### A.     Standard for an Asset Freeze

Federal courts in SEC enforcement actions have the authority to impose asset freezes as ancillary relief that, "like an attachment," ensures "any funds that may become due can be collected." *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990). The SEC's burden of proof in connection with an asset freeze application is substantially lower than on an application for a traditional preliminary injunction. *Id.* at 1041. To obtain an asset freeze at this stage, the SEC need only show that an inference can be drawn that the party has violated the federal securities laws. *Id.* (freeze order warranted where "there is a basis to infer that" the appellants violated the law); *see also Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011). Here, the SEC's evidence is more than sufficient to meet this standard. As discussed below, the SEC has established not only that there is a basis to infer that Defendants have committed securities fraud but indeed has made a substantial showing of a likelihood of success on the merits.

### B.     The SEC Is Likely To Succeed on the Merits of Its Claims, or at Least Has Shown a Basis to Infer, that Defendants Violated the Anti-Fraud Provisions of the Federal Securities Laws.

To establish liability under Section 10(b) of the Exchange Act and Rule 10b-5, the SEC must prove that a defendant "'(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities.'" *SEC v. Pentagon Capital Mgmt.*, 725 F.3d 279, 285 (2d Cir. 2013) (quoting *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)). Reckless conduct satisfies the scienter requirement. *See, e.g.*, *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998).

For liability under Section 17(a) of the Securities Act, the "[t]he requirements for a violation of Section 17(a) apply only to a sale of securities but in other respects are the same as Section 10(b) and Rule 10b-5, except that 'no showing of scienter is required for the SEC to obtain an injunction under [Section 17] (a)(2) and (a)(3).'" *Pentagon Capital Mgmt.*, 725 F.3d at 285 (quoting *Monarch Funding*, 192 F.3d at 308).[5] A showing of negligence is sufficient to prove violations of Sections 17(a)(2) or (3) of the Securities Act. *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014) (citing cases).[6]

## 1. Defendants Made Materially False and Misleading Statements to Investors.

Through the Offering Memoranda and other communications with prospective investors, Defendants knowingly misrepresented the sources of funding for the projects, qualifications of

---

[5] The SEC must also establish that Defendants "obtain[ed] money or property by means of" material misrepresentations or omissions to prove violations of Securities Act Section 17(a)(2). 15 U.S.C. § 77q(a)(2). Because Defendants obtained over $229 million from investors in connection with their misrepresentations, Dookhie Decl. ⁋ 11, the SEC will likely succeed in proving this element.

[6] To establish violations of Section 17(a), Section 10(b), and Rule 10b-5, the SEC must also satisfy the interstate commerce element. Courts typically use an "exceedingly broad interpretation of this requirement." *Fischer v. New York Stock Exchange*, 408 F. Supp. 745, 757 (S.D.N.Y. 1976). Courts have routinely held that telephone usage satisfies this element. Indeed, "if a single telephone is used to call the defendants to a meeting at which they engage in fraudulent activity," this element is satisfied. *Richter v. Achs*, 962 F. Supp. 31, 33 (S.D.N.Y. 1997); *see also SEC v. Stanard*, 2009 WL 196023, at *25 (S.D.N.Y. Jan. 27, 2009) (Lynch, J.) (telephone call from Bermuda to the U.S. constituted "instrumentality of interstate commerce"). Internet activity also satisfies the interstate commerce element. *See SEC v. Ramoil Mgmt., Ltd.*, 2007 U.S. Dist. LEXIS 79581, at *22 (S.D.N.Y. Oct. 25, 2007) (use of e-mail, as well as postings to the online EDGAR database, satisfied the element). Here, interstate commerce is defined to include communications "between any foreign country and any State," 15 U.S.C. § 78c(a)(17), therefore, Xia's use of the WeChat messaging app—which uses the Internet or telephone lines to convey text messages, *see* https://www.wechat.com/ (last visited Sept. 22, 2021) ("Connecting a billion people with calls, chats, and more")—to communicate with Chinese agents satisfies this element. Therefore, the SEC has shown a likelihood of success in satisfying the interstate commerce element.

the development team, the size of one of the projects, and the projects' affiliation with Westin

hotels, and the manner in which Defendants would handle investor funds.  Defendants also

misappropriated and misused investors' funds.  This conduct qualifies as a "device," " scheme"

or "artifice" to defraud within the meaning of Securities Act § 17(a)(1) and Exchange Act §

10(b).  *Lorenzo v. SEC*, 139 S. Ct. 1094, 1100 (2019).

For purposes of his liability under Rule 10b-5(b), Xia "made" these misstatements

because he had ultimate authority and the statements can be attributed to him.[7]  *See Janus*

*Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011).  Among other things, Xia

had ultimately authority over the misrepresentations in the Offering Memoranda because he was

Fleet's President, CEO and managing member, and Fleet was in turn the General Partner for

each of the five limited partnerships that issued the Offering Memoranda.  Han Decl. Ex. 1 at 15;

Ex. 2 at 15; Ex. 3 at 14; Ex. 4 at 12; Ex. 89 at 12-13; Ex. 51 at 7; Ex. 52 at 4; Ex. 53 at 4; Ex. 54

at 6; Ex. 55 at 57; Ex. 56 at 57; Ex. 57 at 60. In addition,  Xia approved a script that his employee

used to pitch the investments to investors.  Han Decl. Ex. 63.  The misrepresentations can also be

attributed to Xia because the Offering Memoranda touted Xia's role as Fleet's President, CEO,

and Managing Member.  Han Decl. Ex. 1 at 15; Ex. 2 at 15; Ex. 3 at 14; Ex. 4 at 12; Ex. 89 at 12.

### 2.    Xia Acted with Scienter.

In making the material misrepresentations and in engaging in the conduct described

above, Xia acted with scienter.  As described in the Statement of Facts Section V, Xia knew, or

---

[7]    Xia need not have "made" the statements to be held liable under Section 10(b), Rule 10b-5(a) and (c), and Section 17(a).  *See Lorenzo v. SEC*, 139 S. Ct. 1094, 1099 (2019) (holding that those who "do not 'make' statements (as *Janus* defined 'make'), but who disseminate false or misleading statements…can be found to have violated the other parts of Rule 10b-5, subsections (a) and (c), as well as…§ 10(b)…and § 17(a)(1)"); *SEC v. Stoker*, 865 F. Supp. 2d 457, 465-466 (S.D.N.Y. 2012) (collecting cases holding that *Janus* does not apply to Section 17(a)).  Xia caused the Offering Materials and other marketing materials containing material misrepresentations and omissions of material fact to be disseminated.  CITE

at least recklessly disregarded, that the relevant representations in the Offering Memoranda and other marketing materials were false or misleading.  For example, Xia knew that the statements about Racanelli's six decades of experience in the construction business were false, because, as Racanelli's president, Xia knew or recklessly disregarded that it had been founded only in 2011, around the same time that he began selling investments in the Eastern Mirage Project limited partnerships.  Han Decl. Ex. 17 at 27.  Similarly, Xia knew that an Eastern Emerald Project Offering Memorandum falsely claimed that the project's size was three times larger than the size the Department of Buildings had approved, because Xia had signed the project's Buildings application.  Han Decl. Ex. 40 at 4; Ex. 41 at 4.  Xia also knew that, though the Offering Memoranda and marketing materials touted a Westin hotel's inclusion in both projects, Xia had received only a vague letter of interest from Westin's parent company that disclaimed any agreement to do so.  Han Decl. Ex. 43. As a final example, Xia knew that the Offering Memoranda's representations about the use of investor funds were false or misleading, because Xia himself controlled the flow of investor funds, misused and misappropriated funds, and created a complicated system of transferring investor funds through various bank accounts and entities Xia controlled to hide his actions.  And Xia directed the misappropriations because he had ultimate signing authority on the relevant accounts.

### 3.    Investments in the Limited Partnerships Are Securities.

Securities Act § 2(a)(1) and Exchange Act § 3(a)(10) define a "security" to include, among other things, "investment contracts." The Supreme Court has defined that term to mean: (1) an investment of money; (2) in a common enterprise; (3) with an expectation of profits to be derived solely from the efforts of others.  *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946). This definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the

28

money of others on the promise of profits." *Id.* at 299. "A limited partnership interest generally is a security because such an interest involves investment 'in a common enterprise with profits to come solely from the efforts of others.'" *Mayer v. Oil Field Sys. Corp.,* 721 F.2d 59, 65 (2d Cir. 1983) (quoting *Howey,* 328 U.S. at 301). The investments at issue satisfy all three *Howey* factors.

The investments in the limited partnerships satisfy the first *Howey* factor, as investors provided money.

The investments satisfy the second *Howey* factor, because a common enterprise existed, namely each relevant limited partnership. In establishing the common enterprise element, most circuit courts require a showing of either "horizontal" or "vertical" commonality. In the Second Circuit, the common enterprise element can be established by "horizontal" commonality, and district courts within the Second Circuit have also accepted one type of "vertical" commonality, "strict vertical" commonality. *See In re J.P. Jeanneret Assocs.,* 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011) (citing cases); *Marini v. Adamo,* 812 F. Supp. 2d 243, 255-56 (E.D.N.Y. 2011) (strict vertical commonality is sufficient); *SEC v. Morton,* 10 Civ. 1720 (LAK) (MHD) 2011 U.S. Dist. LEXIS 36487, at *48-49 (S.D.N.Y. Mar. 31, 2011) (either horizontal or strict vertical commonality is sufficient). "Horizontal commonality is characterized as the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *See J.P. Jeanneret,* 769 F. Supp. 2d. at 359 (internal quotation marks and citation omitted). "Strict vertical commonality" exists when "the fortunes of [the investors] and the [investment's promoter] are linked so that they rise and fall together." *Dooner v. NMI Ltd.,* 725 F. Supp. 153, 159 (S.D.N.Y. 1989) (citation omitted).

Here, horizontal commonality is satisfied because the EB-5 investors' funds were pooled together for the development of the Eastern Mirage and Eastern Emerald Projects, with profits to be distributed to limited partners on a *pro rata* basis. In addition, strict vertical commonality is satisfied because both the investors and the Defendants' fortunes were linked, in that both were dependent on the successful development of the projects.

The investments satisfy the third *Howey* factor because the EB-5 investors had an expectation of profits to be derived from the efforts of others. *See, e.g., SEC v. Hui Feng*, 935 F.3d 721, 731 (9th Cir. 2019) (affirming district court's grant of summary judgment for the SEC where district court concluded that EB-5 program investments were securities because while, "[w]e do not doubt that the investors' primary reason to participate in the EB-5 program was to gain U.S. visas[,]…[a]n EB-5 investor's interest in a visa is inextricably tied to the financial success of the regional center's project. The EB-5 program by design links the success of the investment to the investor's success in obtaining a visa.").

The EB-5 investors had an expectation of profit. The Eastern Emerald investors had an expectation of profit from the 2% interest to be generated on the loan of their funds to the developer of the Eastern Emerald project. Han Decl. Ex. 4 at 13; Ex. 6 at 14. While the loan to the Eastern Mirage developer was a no-interest loan, the Eastern Mirage investors had an expectation of profit based on the provisions in the Offering Memoranda and LP Agreements discussing how any profit would be distributed (99% to the general partner and 1% to the limited partners)—including a provision discussing the possibility that funds not loaned to the developer would be used for alternative investments that would generate interest income. Han Decl. Ex. 1 at 7, 15, 48-49; Ex. 2 at 7, 16, 51; Ex. 3 at 7, 15, 50. In January 2018, an immigration agent sent

a WeChat message to Richard stating that the investors in the "Westin" project wanted to know whether the project had dividends.   Han Decl. Ex. 73 at 8.

The EB-5 investors further expected that the profits would come from Fleet's and Xia's efforts—not the investors'.  The Offering Memoranda for each limited partnership offering gave Fleet, the limited partnerships' general partner, "ultimate authority" for the partnerships and oversight of their "the day-to-day activities," including the responsibility for managing the Eastern Mirage and Eastern Emerald Projects.  As a result, the EB-5 investors were entirely passive investors. *See Rossi v. Quarmley*, 7 F. Supp. 3d 502, 508 (E.D. Pa. 2014) ("If the participant is a passive investor in the company, his interest can more likely be characterized as an investment contract."), *aff'd*, 604 F. App'x 171 (3d Cir. 2015).

### 4.    Fleet Is Liable For Fraud Based on Xia's Conduct and Scienter.

"[P]rincipals typically are liable for torts and crimes committed by their agents acting within the scope of their authority.  This long has been applied to impose *respondeat superior* liability in federal securities and criminal cases even where the principal itself has committed no primary violation." *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547, 550 (S.D.N.Y. 2007). Corporate entities have been held liable under this principle based on the conduct and scienter of individuals who exercised authority over the entities. *See, e.g., SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972) (imputing individual's scienter to corporate entities after finding that individual "exercised blanket authority" over entities and that those entities were thus his "corporate embodiments"); *SEC v. Kinnucan*, 9 F. Supp. 3d 370, 374 (S.D.N.Y. 2014) (imputing employee's liability to his employer); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 543 (S.D.N.Y. 2011) ("When the defendant is a corporate entity, the law imputes the state of mind of the employees or agents who made the statement(s) to the

corporation.") (citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)).

Under these *respondeat superior* principles, Xia's conduct and scienter should be imputed to Fleet. As described above, Xia owned Fleet and served as its managing member. In addition, Xia acted within the scope of his authority for Fleet in selling the limited partnership interests and managing the limited partnerships and investors' funds, because Fleet was the general partner of each limited partnership, as also described in Facts Section. As a result, Xia's fraudulent conduct should be imputed to Fleet.

### C. There Is an Imminent Threat of Further Dissipation of Investor Funds.

The SEC has shown an immediate threat to the remaining investor funds. Three CDs totaling $18 million dollars matured on September 26, 2021, and those funds are available to Xia. Stoelting Decl. ¶ 11. As recently as April and May 2021, Xia also transferred or directed the transfer of $5.6 million, drawn from a line of credit in the name of EEG and collateralized by EEG funds, to Yue's personal account. Han Decl. ¶ 4. Given the other factors putting the investor funds at risk—including numerous lawsuits against Xia and his companies—it is critical that a freeze be imposed in order to preserve the remaining funds for investors in the event the SEC obtains a final judgment against the Defendants.

Particularly in light of this imminent threat, the Court should enforce a $229 million freeze against both Defendants and accounts in the name of the various Xia entities and assets beneficially held by them. Given that the entire $229 million amount Defendants received from investors was fraudulently raised and given Xia's misappropriation and misuse of investor funds from the outset of the first offering, the Court should freeze all Defendants' assets, which almost certainly do not amount to $229 million. *See SEC v. Liu*, 851 Fed. App'x 665, 669 (9th Cir.

2021) (in EB-5 offering fraud case, on remand from Supreme Court, affirming district court's asset freeze of all defendants' assets, not just the net profits Defendants received, because "any finding of an amount of equitable relief would be premature at this stage of the proceedings").

## II. THE COURT SHOULD FREEZE RELIEF DEFENDANT YUE'S ASSETS UP TO $9.7 MILLION.

"A freeze order can apply to…relief defendants allegedly holding the funds of defendants." *SEC v. Hedén*, 51 F. Supp. 2d 296, 299 (S.D.N.Y. 1999); *see also Smith*, 653 F.3d at 128 (holding that the "plenary powers of a federal court to order an asset freeze" can apply to a relief defendant's assets).

To obtain an asset freeze against a relief defendant, the SEC must show that "it is likely to succeed on the merits" of its claim against the relief defendant. To succeed on the merits, the SEC must show that the relief defendant: "(1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998). The SEC is likely to succeed in proving both of these elements.

The SEC has demonstrated through bank records that approximately $9.7 million was transferred to accounts in Yue's name. The transfers to her account between December 2011 and January 2019 total approximately $4.1 million. Dookhie Decl. Ex. 49. In May 2021, an account in Yue's name received $5.6 million from the CTBC line of credit that Xia established with EEG funds. Han Decl. ⁋4.

Yue does not have a legitimate claim to these funds. As Xia testified during the investigation, Yue is a stay-at-home mother who occasionally helps with "simple stuff" such as signing a transfer form. Han Decl. Ex. 24 at 5. A relief defendant has a legitimate claim to funds only "if [she] has an ownership interest in the funds obtained for value rather than through a gratuitous or fraudulent transfer." *SEC v. Illarramendi*, No. 3:11-cv-78 (JBA), 2011 WL

2457734, at *5 (D. Conn. June 16, 2011) (citing *Cavanagh*, 155 F.3d at 137).  Allowing a defendant's close companions "to claim valid ownership of" fraudulent proceeds they obtained without consideration "would allow almost any defendant to circumvent the SEC's power to recapture fraud proceeds, by the simple procedure of giving [the proceeds] to friends and relatives." *Cavanagh*, 155 F.3d at 137.  As described above in Facts Section, given Xia's testimony about his wife's limited role in the business, Han Decl. Ex. 24 at 5, Yue certainly has no legitimate claim to the $9.7 million in investor funds that she has received.

## III.   THE COURT SHOULD GRANT ADDITIONAL PRELIMINARY RELIEF TO PROTECT INVESTORS.

In addition to the asset freeze requested above, the Court should appoint a Monitor, order Xia, Fleet, and Yue to provide a verified accounting, and permit expedited discovery.

### A.   The Court Should Appoint a Monitor.

#### 1.   The Need for a Monitor

This Court has the authority and discretion to appoint a monitor in order to protect investors and prevent the dissipation of assets. *SEC v. Amer. Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987) (district court's appointment of a trustee or receiver in an SEC action "may be disturbed on appeal only if the district court has abused its discretion").  Section 21(d)(5) of the Exchange Act, 15 U.S.C. § 78u(d)(5), which permits the Court to grant "any equitable relief that may be appropriate or necessary for the benefit of investors," provides a firm statutory basis for the appointment.

Many courts have approved the appointment of monitors to oversee a firm's activities and thus protect against further improper conduct. *See, e.g., SEC v. WorldCom, Inc.*, No. 02 Civ. 4963 (JSR), 2002 WL 1788032, at *1-2 (S.D.N.Y. Aug. 2, 2002) (reaffirming prior orders appointing corporate monitor); *SEC v. Bivona*, No. 16 Civ. 01386 (EMC), 2016 WL 2996903, at

34

*1 (N.D. Cal. May 25, 2016) (granting SEC's motion to appoint an independent monitor to review defendants' financial records "for the purpose of identifying assets, preventing dissipation of funds, and recommending future steps"); *SEC v. Trabulse*, 526 F. Supp. 2d 1008, 1019 (N.D. Cal. 2007) (appointing monitor due to "need for an objective party to oversee [defendant's] conduct as he continues to manage funds").

The proposed monitor in this case would oversee Fleet and the entities owned and controlled by Xia and provide an unbiased and independent assessment of the state of the projects. A monitor is warranted here given the Defendants' rampant misappropriation and commingling of investor funds, mismanagement of the Eastern Mirage and Eastern Emerald Projects, and other fraudulent conduct.

### 2.     M. Scott Peeler Is Qualified To Serve As Monitor.

The SEC conducted a diligent search for a person with the skill and experience required to perform the necessary duties of a monitor and who could do so in a cost-conscious manner. The SEC proposes M. Scott Peeler, a partner in the New York office of Arent Fox LLP, a nationally known law firm. Mr. Peeler has the unique skills and experiences needed to address the different issues facing Fleet. He has experience as a monitor and his firm's Construction Group has experience in the types of construction-related issues this position would require. Han Decl. Ex. 33 (Peeler biographical experience).

As contemplated by the proposed Order Appointing Monitor accompanying this motion, any terms and conditions of the monitor's retention, including all aspects of Mr. Peeler's and Arent Fox's compensation, should be negotiated and agreed to between Mr. Peeler, the SEC, and Fleet and the Xia Entities. Should it be necessary for Mr. Peeler to retain other third party

advisors, he should do so only upon notice to Fleet, the Xia entities and the SEC, with an opportunity to be heard, and an order from this Court authorizing such an engagement.

Given the concerns about Fleet's condition and viability, any monitorship order should also require Mr. Peeler to submit a report to the Court, within 60 days of his appointment, recommending at least one of the following options: continuation of the monitorship, conversion of the monitorship to a receivership, or filing of bankruptcy petitions. Any monitorship order should also require Mr. Peeler to recommend to the Court whether a sale of the Eastern Mirage and Eastern Emerald sites is appropriate.

Mr. Peeler is available to appear before the Court to address any questions the Court might have regarding his qualifications. If the Court wishes to consider other candidates, the SEC is prepared to present them upon the Court's request.

### B. The Court Should Order Defendants and Relief Defendant to Provide a Sworn Accounting.

Courts may impose the equitable remedy of a sworn accounting to provide an accurate measure of all funds obtained as a result of fraudulent activity, as well as an accurate measure of unjust enrichment and a defendant's current financial resources. *See, e.g.*, *SEC v. Lybrand*, No. 00 Civ. 1387 (SHS), 2000 WL 913894, at *12 (S.D.N.Y. July 6, 2000); *SEC v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997); *SEC v. Oxford Capital Sec., Inc.*, 794 F. Supp. 104, 105-06 (S.D.N.Y. 1992); *see also SEC v. Dawson*, No. cv-06-6360 (ADS) (ETB), 2007 WL 9711173, at *6 (E.D.N.Y. Feb. 2, 2007) ("A verified accounting may be proper in cases where the defendant obtains funds improperly from investors.").

A sworn accounting will assist in definitively identifying all funds Defendants Xia and Fleet and Relief Defendant Yue obtained from investors and how much of it they have left. In

addition, an accounting will help determine whether Xia and Fleet have assets currently unknown to the SEC that should be subject to any asset freeze the Court grants.

### C.     The Court Should Permit Expedited Discovery.

The Court should grant the SEC's request for expedited discovery in order to permit the SEC to prepare for a preliminary injunction hearing and to act quickly to obtain other records to identify and preserve investor assets and determine the extent of the fraud. *See* Fed. R. Civ. P. 26(d) (allowing a party to seek discovery "from any source before the parties have conferred as required by Rule 26(f)…when authorized…by court order"); *SEC v. Zubkis*, No. 97 Civ. 8086 (JGK), 2005 WL 1560489, at *3 (S.D.N.Y. June 30, 2005) (noting that the court's temporary restraining order had granted expedited discovery).

### CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court grant the SEC's application for emergency relief.

Dated: New York, New York
        September 27, 2021

                              Respectfully submitted,

                              /s/ David Stoelting
                              _____
                              Kevin P. McGrath
                              David Stoelting
                              Kim Han
                              Attorneys for Plaintiff
                              SECURITIES AND EXCHANGE COMMISSION
                              New York Regional Office
                              Brookfield Place
                              200 Vesey Street, Suite 400
                              New York, New York 10281-1022
                              (212) 336-0174 (Stoelting)
                              stoeltingd@sec.gov