**Version Date: September_______, 2015**

**Name of Recipient** ________________________________

# EEGH, L.P.

## SUPPLEMENTAL OFFERING MEMORANDUM

**NOT TO BE REPRODUCED**

GENERAL PARTNER:

**FLEET NEW YORK METROPOLITAN REGIONAL CENTER LLC formerly known as FEDERAL NEW YORK METROPOLITAN REGIONAL CENTER LLC**

EXHIBIT
5
SEC v. Xia, et al.

EXHIBIT
20
5/30/19 SM

This Confidential Supplemental Offering Memorandum (the "Supplemental Memorandum") sets forth modifications and changes to the original offering (the "Offering") of limited partnership units (the "Units" or "Unit") of EEGH, L.P., a New York State limited partnership (the "Partnership"). The original Offering Documents were prepared and based on the plans and projections for the project as they existed in December 2013. As the development of the plans progressed, the job count increased sufficiently to allow for a greater number of limited partners to invest in the Project which will allow an increased loan to the Project by the Limited Partnership. The increased loan amount by the Limited Partnership will likely result in increased earnings by the Limited Partnership as well as a possible increased financial benefit for the Project as it reduces the amount needed from third party financing. Therefore, in order to take advantage of this opportunity to provide increased financing, this Supplemental Offering Memorandum is prepared to set forth the changes to the original Offering Memorandum. The Units offered hereby will be sold subject to the provisions of the Modified Subscription Agreement (the "Subscription Agreement") containing certain representations, warranties, terms, and conditions of an investment in the Partnership and the Limited Partnership Agreement of the Partnership (the "Partnership Agreement"). Prospective investors who seek to become limited partners of the Partnership ("Limited Partners") should carefully read and retain the Offering Memorandum, this Supplemental Offering Memorandum, the Modified Subscription Agreement and the Partnership Agreement.

**JUST AS WITH THE ORIGINAL OFFERING DOCUMENTS, THIS IS A PRIVATE OFFERING MADE PURSUANT TO APPLICABLE FEDERAL AND STATE "PRIVATE PLACEMENT" EXEMPTIONS. THE UNITS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), NOR HAVE THEY BEEN QUALIFIED, APPROVED OR DISAPPROVED UNDER ANY OTHER FEDERAL OR STATE SECURITIES LAWS. NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY OTHER FEDERAL OR STATE REGULATORY AUTHORITY HAS PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE SECURITIES OFFERED HEREBY MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF BY AN INVESTOR UNLESS THEY ARE REGISTERED UNDER THE SECURITIES ACT AND, WHERE REQUIRED, UNDER THE LAWS OF OTHER JURISDICTIONS, UNLESS SUCH PROPOSED SALE, TRANSFER OR DISPOSITION IS EXEMPT FROM SUCH REGISTRATION. THE OFFERING REMAINS LIMITED TO PERSONS WHO QUALIFY AS "ACCREDITED INVESTORS." THE TERMS OF THIS OFFERING, INCLUDING THIS SUPPLEMENTAL OFFERING MEMORANDUM SHALL BE CONFIDENTIAL.**

## SUMMARY OF CHANGED TERMS

All the terms set forth in the original Confidential Private Offering Memorandum shall remain in force and effect other than the number of limited partners allowed, the amount of funds to be loaned by the limited partnership, and the percentage of funds loaned to the Project by the Limited Partnership. The number of limited partners shall be increased to a total of up to 220 limited partners. The total amount to be loaned by the limited partnership shall be increased to One Hundred and Ten Million Dollars. The total project costs for the Eastern Emerald Project of One Hundred and Ninety Million Dollars ($190,000,000) shall by financed as follows:

| | |
|---|---|
| 1. Loan from New Commercial Enterprise, EEGH, L.P.: | $110,000,000 |
| 2. Brownfield Tax Credit: | $ 21,200,000 |
| 3. New Market Tax Credit: | $ 18,000,000 |
| 4. Equity from Developer | $ 40,800,000 |
| TOTAL PROJECT COSTS: | $ 190,000,000 |

All other terms, including the percentage of collective ownership interest in the limited partnership and the terms relating to the distributions, shall remain the same. However, because of the increased number of Limited Partners, each individual Limited Partnership Interest will be reduced. The Subscription Agreement will also be modified to allow for an increase in Capital Contribution if required pursuant to any changes in statutes. The Modified Subscription Agreement shall be attached hereto as Exhibit A to this Supplemental Offering Memorandum. The Amended Loan Agreement, Promissory Note, and Mortgage which reflect the updated amounts are attached as Exhibit B to this Supplemental Offering Memorandum. The summary of material terms for this modified Offering shall be as follows:

## SUMMARY OF MATERIAL TERMS

The following is a summary of the terms and conditions of an investment in EEGH, L.P. (the "Partnership") which includes the modified terms pursuant to the increased number of Limited Partners. This summary is qualified in its entirety by the information appearing elsewhere herein and in the Limited Partnership Agreement of the Partnership (as it may be amended, modified or supplemented, the "Partnership Agreement"). The description of any document herein is qualified by reference to such document.

**The Partnership**

The Partnership is a New York limited partnership that was formed on December 6, 2013 under the name EEGH, L.P. The Partnership is a new commercial enterprise that intends to finance the development, construction and operation of a

| | |
|---|---|
| | project located in Corona, City of New York, Queens, New York ("Eastern Emerald Project"). |
| **The Offering** | The Partnership is currently offering units of limited partnership interests (the "Units" and each individually, a "Unit") to eligible investors through private placement. See "SUITABILITY." Investors in the Partnership become limited partners ("Limited Partners" and each individually, a "Limited Partner") of the Partnership. All Units are of the same class and no Unit will have any priority over any other Unit. |
| **Investment Objective/Strategy** | The Partnership is a commercial for-profit enterprise formed to finance the Eastern Emerald Project in Corona, City of New York, Queens, New York. The Partnership is designed to comply with the statutory and regulatory requirements of the EB-5 immigrant investor program ("EB-5 Program") administered by the U.S. Citizenship and Immigration Services ("USCIS"), with respect to certain foreign investors. As of the date of this Memorandum, the Eastern Emerald Project is located within a geographic area certified by the New York State Department of Labor as a high unemployment area, qualifying it as a Targeted Employment Area ("TEA") into which the minimum EB-5 Program qualifying investment amount is US$500,000 or as is required by any change in statutes to qualify for the EB-5 Program. There can be no assurance that the Partnership's investment objective will be achieved, and investment results may vary substantially over time. See "INVESTMENT POLICY." |
| **The Eastern Emerald Project** | The Eastern Emerald Project will encompass the development, management and operation of 5-star hotel, convention center, retail space, restaurant and parking garage. The Eastern Emerald Project is intended to be funded from a variety of sources and foreign investor capital under the EB-5 Program. See "EASTERN EMERALD PROJECT." The Eastern Emerald Project is intended to be funded from a variety of sources and foreign investor capital under the EB-5 Program. Please review Business Plan for details as to the amenities and scope of the Eastern Emerald Project. |
| **General Partner** | The Partnership's general partner, Fleet New York Metropolitan Regional Center, LLC, a New York limited liability company formerly known as Federal New York |

| | |
|---|---|
| | Metropolitan Regional Center LLC, (the "General Partner"), exercises ultimate authority over the Partnership and oversees the day-to-day activities of the Partnership. See "MANAGEMENT PROFESSIONALS – The General Partner." |
| **Limited Partners** | Foreign investors investing under the EB-5 Program will become Limited Partners of the Partnership by (i) completing and delivering subscription documents, including the Subscription Agreement and the Investor Questionnaire, in the forms attached hereto as Exhibit IV, which may be accepted by the General Partner in its sole discretion, (ii) executing and delivering a counterpart signature page to the Partnership Agreement, and (iii) making a capital investment in the Partnership in the amount of US$500,000 or such other amount as required by statute to qualify for the EB-5 Program. The Limited Partners and the General Partner are sometimes referred to herein collectively as the "Partners" and each individually as a "Partner." Limited Partners will be equity owners in the Partnership and will engage in policy making activities relating to the Partnership, as well as having all the rights, powers, and duties normally granted to limited partners under the New York Revised Limited Partnership Act, which is based on the Uniform Limited Partnership Act. |
| **Minimum Investment and Capital Contributions** | The minimum initial investment in the Partnership is one Unit. Each Unit is being offered at a price of US$500,000 or as required by statute to qualify for the EB-5 Program. The Partnership is seeking to raise up to US$110,000,000 of capital contributions from the Limited Partners. |
| **Admissions** | After the first closing in which the General Partner has received and accepted subscriptions to the Partnership, the General Partner may hold one or more closings at which the General Partner may, in its sole discretion, admit new Limited Partners. The General Partner has the right, in its sole discretion, to refuse any person's offer to become a Limited Partner. |
| **Use of Capital Contributions** | Capital contributions are intended by the Partnership to be used for a loan to Eastern Emerald Group, LLC for the purpose of financing the Eastern Emerald Project (the "Eastern Emerald Loan"). |

| | |
|---|---|
| **Eligibility** | Each investor in the Partnership must be an "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended (the "Securities Act"), and may be required to meet other suitability requirements as set forth in the subscription documents. The foregoing suitability standards represent the minimum suitability requirements for prospective investors in the Partnership and satisfaction of these standards does not necessarily mean that an investment in the Partnership is a suitable investment for a prospective investor. See "SUITABILITY." |
| **Allocations and Distributions** | Net proceeds (if any) realized from the distribution of profit realized from the Partnership's investments will be allocated and distributed 90% to the Limited Partners and 10% to the General Partners. There are no guaranteed distributions. The General Partner will be entitled to withhold from any distributions (including disposition proceeds) such amounts as are necessary to create, in the General Partner's discretion, appropriate reserves for expenses and liabilities of the Partnership. |
| **Compensation of General Partner and Other Expenses** | The General Partner is entitled to recover expenses incurred in connection with the Partnership and to receive a management fees from the Partnership in the amount of US$7,500 per Unit per annum. Such amounts shall be paid from the cash flow of the Partnership and shall not be deducted from capital investment amounts.<br><br>*Other Expenses.* The Partnership will pay all out-of-pocket expenses, including any fees and expenses of the General Partner, the cost of the preparation of the annual accounting, financial and tax reports to Limited Partners, litigation or other extraordinary expenses, insurance and indemnity expenses and expenses of liquidating the Partnership. These expenses will be paid only from the cash flow of the Partnership. |
| **Withdrawals and Transferability** | Except as expressly provided for in the Partnership Agreement, no Limited Partner will be permitted to withdraw from the Partnership or to withdraw any portion of his or her capital account. In the event a Limited Partner acting in good faith (as determined in the sole and absolute judgment of the General Partner), his I-526 Petition is |

denied by USCIS, or he fails the consular interview process or the USCIS adjustment of status process, the General Partner may, in its sole discretion, offer such Limited Partner an opportunity to voluntarily retire or withdraw from the Partnership.

**Term and Termination**

The Partnership will terminate on January 1 of the year following the year in which all of the Partnership's assets have been realized upon and distributed, except that the Partnership may not be terminated prior to the date on which all the EB-5 investors have ceased participating in the EB-5 program. The latest date on which the Partnership is to dissolve is December 2, 2021.

**Indemnification**

The Partnership will indemnify and hold harmless the General Partner and its directors, officers, members, partners and employees, from and against liabilities arising in connection with the Partnership. Limited Partners will be obligated to return any amounts distributed to them to fund indemnity obligations of the Partnership, but will not be required to contribute additional capital for such purpose.

**Risk Factors; Conflicts of Interest**

Investment in the Partnership is speculative and involves a high degree of risk. Past performance of the General Partner or its principals is no guarantee of the future performance of the Partnership. There is no assurance that the Partnership will be profitable. The risks of an investment in the Partnership include, but are not limited to, the speculative nature of the Partnership's strategies and the charges that the Partnership will incur regardless of whether any profits are earned. See "CERTAIN RISK FACTORS." The General Partner may directly or indirectly manage the assets of other entities that in some respects compete with the Partnership. See "CONFLICTS OF INTEREST."

**Tax Consequences**

The Partnership will be classified as a partnership and not as a corporation for U.S. federal income tax purposes. Based upon the anticipated operations and gross income of the Partnership and the expected number of Partners, the Partnership believes that it should not be treated as a "publicly traded partnership" that is taxable as a corporation. However, there is no assurance that the Internal Revenue Service ("IRS") will agree with the

Partnership or that the facts, law or the IRS's administrative position will not change. If the Partnership is classified as a partnership for U.S. federal income tax purposes, the Partnership will not itself be subject to U.S. federal income tax and each Partner will be required to report separately on its U.S. federal income tax return its distributive share of the Partnership's taxable income or loss, regardless of whether the Partner has received any distributions from the Partnership. Each Partner should consult its own tax advisors in connection with making an investment in the Partnership.

**Reports**

The Partnership will send to each Limited Partner, generally within 90 days after the end of each fiscal year of the Partnership, an accounting report including a balance sheet and statements of income, changes in Partner's equity and cash flows, prepared in accordance with generally accepted accounting principles, plus a schedule and summary description of the investments owned by the Partnership at year-end and a statement for each Limited Partner of its capital account and tax information necessary for completion of its tax returns.

**Amendments**

The Partnership Agreement may be amended from time to time with the consent of the General Partner and by ordinary resolution of the Limited Partners (Limited Partners holding more than 70% of the Units voting affirmatively), unless the proposed amendment will, or is likely to, cause a Limited Partner to suffer an adverse economic effect, in which case the written consent of such Limited Partner is required. The Partnership Agreement may also be amended by the General Partner to correct ambiguities or inconsistencies, provided the proposed amendment does not adversely affect the interest of any Limited Partner, or to incorporate provisions which in the written opinion of counsel to the Partnership are for the protection of Limited Partners.

**Legal Advisors**

Counsel to the Partnership and the General Partner may also serve as counsel to other investment funds sponsored or managed by the General Partner or its affiliates. No independent counsel has been retained to represent the Limited Partners. Each Partner should consult his or her own legal advisors in connection with making an investment in the Partnership. See "LEGAL MATTERS."

**Privacy Notice**

Nonpublic personal information received by the Partnership or the General Partner with respect to the Limited Partners, including the information provided to the Partnership by Limited Partners in the subscription documents, will not be shared with nonaffiliated third parties which are not service providers to the Partnership or the General Partner without prior notice to such Limited Partners unless otherwise required by applicable law. See "EXHIBIT II - Privacy Notice."

## REVISED PROJECT FINANCING TERMS

The Eastern Emerald Project has been specifically selected to meet needs in the surging local business demand and consumer markets. The Eastern Emerald Project is intended to be funded through NYS Tax credit and New Market Tax Credit ("NMTC") financing, loan with Hapoalim Securities, and EB-5 immigrant investment. The program is administered by the NYS Department of Environmental Conservation (DEC) and the Department of Treasury through centerfield Community Development Entity ("CDE").

**Estimated Eastern Emerald Project Costs**

The current budget for the Eastern Emerald Project remains as follows:

| | |
|---|---|
| Land Acquisition Cost | $ 17,000,000 |
| Hard Costs | $122,100,500 |
| Soft Costs | $ 18,315,075 |
| FF&E | $ 27,439,800 |
| Operating Costs | $ 5,144,625 |
| Total Projected Cost of Project | $190,000,000 |

Pursuant to the revision set forth in the Supplemental Offering Documents, the Eastern Emerald Project costs are expected to be financed as follows:

| | |
|---|---|
| Loan Proceeds from EB-5 Funds | $110,000,000 |
| Brownfield Tax Credit | $ 21,200,000 |
| New Market Tax Credit | $ 18,000,000 |
| Equity from Developer | $ 40,800,000 |
| Total Investment in Project | $190,000,000 |

All other terms of this Offering remain as set forth in the Original Confidential Private Offering Memorandum and as set forth in the Limited Partnership Agreement.

I have hereby read and understood the modified terms of the Offering as well as have read and understood the original Private Confidential Offering Memorandum, the Limited Partnership Agreement, Modified Subscription Agreement, and Modified Loan Documents.

**PROSPECTIVE INVESTOR**

Print Name: ______________________________

______________________________
Signature Date

**GENERAL PARTNER**
Fleet New York Metropolitan Regional Center, LLC a New York limited laibility company, formerly known as Federal New York Metropolitan Regional Center, LLC

BY: ______________________________

___________________, Managing Member

# EXHIBIT A

# MODIFIED SUBCRIPTION AGREEMENT

Dear Prospective Investor:

Execution of this Modified Subscription Agreement by you confirms your agreement to be irrevocably bound by the terms of the EEGH L.P. limited partnership agreement (the "Limited Partnership Agreement") (EEGH, L.P. shall be referred to herein as the "Limited Partnership" or "Partnership") and confirms your agreement to comply with the terms and requirements of the EEGH L.P. EB5 Program (the "Program") and which terms are described in more detail in the Limited Partnership Agreement. If the investor's subscription to the Limited Partnership is accepted by the General Partner, this Subscription Agreement, along with the Offering Memorandum, the Supplemental Offering Memorandum, and Limited Partnership Agreement, together will create a binding contract for your participation in the Program.

The Limited Partnership is a commercial for-profit new commercial enterprise formed to finance the Eastern Emerald Project. The Eastern Emerald Project will develop, manage and operate a new 5-star hotel, convention center, retail space, restaurant and parking garage, located in Corona, City of New York, Queens, New York. The Limited Partnership has entered into a loan agreement with Eastern Emerald Group, LLC for an amount of up to US One Hundred and Ten Million Dollars (US$110,000,000). The Limited Partnership has been structured to maximize the possibility that qualifying Investors can eventually obtain U.S. permanent resident status for the Investor and the qualified members of his family under the Alien Entrepreneur Immigrant Visa Category of the U.S. Immigration Act of 1990, 8 U.S.C. section 1101 et. seq.

The Subscription price for one Unit for the Limited Partnership is a Capital Contribution of US Five Hundred Thousand Dollars (US$500,000), or such amount as is required by statute to qualify for the EB-5 Program, along with a Processing Fee of US Fifty Thousand Dollar (US$50,000) (unless another amount is designated by the General Partner as provided in the Offering Documents). As a potential Subscriber to the Limited Partnership, you hereby agree to pay the purchase price for one unit in the Limited Partnership in the following manner:

Prior to consideration for acceptance of your subscription you must do the following:

(a) Complete, execute, and return to the Partnership one copy of the attached Subscription Agreement (the "Agreement"), subscribing for one Unit of the Partnership on a specified date (the "Admission Date");

(b) Execute and return to the Partnership one copy of the Limited Partnership Agreement of the Partnership;

(c) Execute and return to the Partnership one copy of the Acknowledgment of Escrow Agreement including completing and signing one copy of the Form W-8BEN "Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding";

(d) Send one completed and executed set of originals referred to above and any

documentation required thereby to the Partnership by facsimile: 718-228-8818, or e-mail: info@fnymrc.com, and send one completed and executed set of originals referred to above by overnight courier to EEGH, L.P., c/o Fleet New York Metropolitan Regional Center LLC, 136-20 38TH AVE SUITE 10F, NY 11354.

The Partnership will advise each subscriber promptly of its acceptance of any offer to become a limited partner of the Partnership, but Fleet New York Metropolitan Regional Center, LLC, formerly known as Federal New York Metropolitan Regional Center LLC, the general partner of the Partnership (the "General Partner"), has the right in its sole discretion to refuse any subscriber's offer to become a limited partner.

Within thirty (30) days after notification of acceptance of your subscription, you must deposit your full Capital Contribution, and the full Processing Fee of US Fifty Thousand Dollar (US$50,000) (unless another amount is designated by the General Partner as provided in the Offering Documents) into the designated accounts. The full Capital Contribution shall be deposited into the designated escrow account of the Limited Partnership pursuant to the terms of the Escrow Agreement. The Capital Contribution will be held in the Limited Partnership's bank account, or escrow account, until you have received the filing receipt of your I-526 petition. The Processing Fee will be paid directly to the General Partner. Therefore, you must make these payments in United States currency by 2 separate bank-to-bank wire transfers, or two separate certified checks or bank checks. The Capital Contribution will be paid to the Partnership, and will be deposited into the Partnership's Escrow Account, and the separate Processing Fee amount, in the amount of $50,000, will be paid directly to the General Partner. Full payment of both the Capital Contribution and the Processing Fee amount must be received at least one business day prior to the Admission Date. Upon receipt of the entire Processing Fee and the entire Capital Contribution, you will be issued one unit in the Limited Partnership.

IMPORTANT NOTICE: Due to international banking laws, your bank MUST send a SWIFT MT 103 message and complete field 50 ("Ordering Customer") with name, number and address of the account and field 52D ("Ordering Institution") on subscription wires. Your transaction may be delayed or rejected if this information is not provided.

The General Partner reserves the right to request any additional documentation it deems necessary to verify the identity of the investor in order to comply with applicable anti-money laundering laws. Failure to provide the necessary evidence may result in applications being rejected or in the acceptance of applications being delayed. The General Partner and the Partnership and their respective members, partners, directors, officers, employees, agents and other representatives shall be held harmless by an investor against any loss arising as a result of a failure to process a subscription if any information requested by the General Partner or the Escrow Agent has not been timely provided by the subscriber.

The General Partner shall, on behalf of the Partnership, acknowledge all subscriptions upon approval of a subscription by the Partnership. Should a prospective limited partner not receive such an acknowledgement, it is the prospective limited partner's responsibility to contact the

General Partner to ascertain the status of his or her subscription. A prospective limited partner cannot assume that his or her subscription has been approved until he or she receives the General Partner's confirmation stating that the subscription has been approved. If the subscription is not accepted, payment will be returned without deduction or interest.

Within thirty (30) days after notification of acceptance of your subscription, you must also provide an executed legal service agreement with the immigration counsel approved by the General Partner for the processing of your immigration petition unless otherwise agreed to by the Limited Partnership. All fees for legal services shall be made directly to the approved immigration counsel and are separate and apart from the Capital Contribution to be paid to the Limited Partnership as set forth above. However, the execution of a legal service agreement with an approved immigration counsel, and the payment of all sums required by the approved immigration counsel's legal service agreement, must be completed as a condition of acceptance as a Limited Partner.

You shall instruct your immigration attorney, and by executing this Agreement you hereby authorize your immigration attorney, to forward the notice of receipt (Form I-797c) of the filing of your Immigrant Petition By Alien Entrepreneur to the General Partner. Upon receipt of the I-797c, if the Capital Contribution is held in an escrow account, the General Partner will provide the notice to escrow agent, who will immediately release the capital investment amount to the Limited Partnership's operating account in accordance with the terms of the escrow agreement to be used to develop the Project in accordance with the Limited Partnership's business plans. If the Capital Contribution is not held in the escrow account, the Capital Contribution will not be released to be invested into the Project until the General Partner has received the I-797c, or other proof of filing. Until receipt of the notice of filing, your Capital Contribution will be held in the designated account.

Within fifteen (15) business days after you have been notified of the acceptance of your subscription and the issuance of your unit of interest in the Limited Partnership, you shall cause your immigration attorney to begin the preparation and eventual filing of a petition with the USCIS on your behalf by completing and filing with the USCIS an Immigrant Petition By Alien Entrepreneur (Form I-526), along with all required documents and information. Execution of this Agreement will also require you to fully cooperate in providing all information and documentation to your attorney necessary to the preparation and filing of the Immigrant Petition By Alien Entrepreneur, Form I-526. Thereafter, you shall use your best efforts to obtain your Immigrant Visa/Conditional Permanent Resident Status, as well as the approval of your Petition By Alien Entrepreneur to Remove Conditions (I-829) as soon as possible by cooperating fully with the USCIS, providing any additional information and documentation requested by the USCIS in a timely manner, entering the United States as required, and personally attending any interview at such date, time and place as scheduled by the appropriate US Consular or the local district office of the USCIS. You are also advised that the retention of legal representation to file the Petition By Alien Entrepreneur to Remove Conditions (I-829) is entirely your own responsibility and not a part of this Subscription Agreement. Any legal representation to prepare your Immigrant Petitions for the EB-5 immigrant category must be entered into by separate agreement. The terms of the legal representation between you and your attorney will be entirely outside of this Agreement.

As a part of this Subscription Agreement you make the following representations (please place your initials in each blank space to confirm each representation):

_____ I received a copy of the Offering Documents including the Offering Memorandum, Escrow Agreement, and the Limited Partnership Agreement.

_____ I have read and understand the Offering Documents and the Risk Factors associated with the purchase of a Unit and have sought independent professional advice in connection therewith.

_____ The answers I supplied to my Investor Questionnaire are true and correct and I understand that the General Partner is relying on the truthfulness of those responses to determine my acceptance in the Limited Partnership.

____ I am acquiring the Unit for investment, for the my own account and not for the interest of any other person and not for distribution or resale to others, and I will not transfer, assign or otherwise permit any other person to acquire a beneficial interest (including, without limitation, by pledge, option, swap or nominee or similar relationship) in the Unit without the prior written consent of the General Partner. I understand that the Units have not been registered under the Securities Act, and I agree that the this Unit may not be sold, transferred or otherwise disposed of except pursuant to an exemption from registration under the Securities Act and in accordance with this Agreement and the Partnership Agreement. Furthermore, if the Unit is being acquired in reliance upon Regulation S, the New Limited Partner understands that the Unit may not be offered or sold to a U.S. person or for the account or benefit of a U.S. person prior to the expiration of a one-year period from the date of the final closing in which the General Partner receives and accepts subscriptions to the Partnership. I will not assign my Unit in the Partnership or any beneficial interest therein, in whole or in part, to any other person, nor will I be entitled to substitute any other person as a limited partner of the Partnership, except with the prior written consent of the General Partner (which consent may be granted or withheld by the General Partner for any reason in its sole discretion) and pursuant to the provisions of the Partnership Agreement.

____ The Unit is not registered under the Securities Act of 1933, as amended, and I am not a resident of the United States.

____ I am an accredited investor and, as such, am either: (i) a natural person whose individual net worth, or joint net worth with the undersigned's spouse, exceeds US$1,000,000; or (ii) a natural person who had an individual income in excess of US$200,000 in each of the two most recent years or joint income with the undersigned's spouse in excess of US$300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

____ I have attained the age of 21 years and have the legal capacity and competence to execute all necessary documents in connection with this Program and to take all actions required pursuant to those documents.

____ I have and will continue to comply with all the requirements, terms and conditions prescribed by the USCIS in connection with the Non-immigrant and Immigrant Petitions required to comply with the terms of this Program.

___ I am in good health and know of no health impairment which would likely result in my failure to meet the minimum health requirements stipulated under the Immigration Act of 1990, as amended, or any other U.S. Immigration law requirements.

____ I have never been convicted of any criminal offense and know of no material facts which would likely result in my failure to meet the minimum requirements for permanent residency in the U.S.

____ I understand there is no guarantee associated with my investment other than the economics of the project itself.

____ I understand and acknowledge that this Subscription Agreement and the representations and warranties contained herein shall be binding upon my heirs, legal representatives, successors, and assigns. I further acknowledge that I may not assign my rights under this Subscription Agreement or delegate any of my duties without prior written consent by the General Partner of the Partnership.

____ I acknowledge that it has never been represented, guaranteed, or warranted to me by the Partnership, the General Partner, or any of their respective members, partners, shareholders, agents, officers, directors or employees, or by any other person, expressly or by implication, as to: (i) the percentage of profits and/or amount or type of consideration, profit or loss to be realized, if any, as a result of this investment; nor (ii) the past performance or experience on the part of the Partnership's or the General Partner's personnel or that of any of their affiliate, agents or employees or any other person, that will in any way indicate the possible results of an investment in the Partnership. I have not received any general solicitation or general advertising regarding the purchase of an interest in the Partnership and I acknowledge that this Unit has been offered for sale outside the United States and both this Agreement and the Partnership Agreement were executed outside of the United States.

____ I have retained and consulted with competent immigration counsel of my choice in connection with these immigration matters and represent and warrant that I am aware of no ground of inadmissibility which would preclude the issuance of a conditional resident visa/status to either me or my accompanying family members. I understand that for conformity of petitions presented, the Program specifies that I use an immigration counsel approved by the General Partner as my immigration attorney for the processing of my immigrant petition. However, I understand that I am able to have additional legal representation of my own selection to work with the approved immigration counsel or to advise me regarding this Program. I am relying solely on my own selected counsel for all legal advice relating to the processing of my petition and have relied on my own professional advisors for any and all matters connected to this investment, including filing my immigration petitions.

____ I understand that I will be required to supply certain documentation to prepare and file my Immigrant Petition By Alien Entrepreneur (Form I-526) and, in 21 months after the issuance of my conditional residency card, additional documentation will be necessary to apply for my Petition By Alien Entrepreneur to Remove Conditions (I-829) to remove the conditional permanent resident status. I will provide all necessary documentation to my attorney and hereby authorize my representative to supply to the General Partner of the Partnership all information regarding my applications.

____ I acknowledge that if my Immigrant Petition By Alien Entrepreneur (I-526) or my Petition By Alien Entrepreneur to Remove Conditions (I-829) is rejected by the USCIS for any reason, then I shall have no claim against the General Partner, the Partnership, its affiliates, representatives, attorneys, nor any of these parties' officers, partners, members, or employees.

If your Immigrant Petition By Alien Entrepreneur (I-526) is not approved, notwithstanding your good faith best efforts in compliance with the Subscription Agreement and related documents and the USCIS rules, regulations and procedures, then you shall be entitled to a return of the amount of your Capital Contribution, less any partnership distributions paid. There will be no refund of any of the attorneys fees paid. The returned funds will be paid within ninety (90) days of receipt by the General Partner of the request by you for a return, and only if you have received a denial of your Immigrant Petition By Alien Entrepreneur (I-526) that was unrelated to any fault of you in the processing of the petition.

At any time prior to a decision approving your Immigrant Petition By Alien Entrepreneur (I-526), the Limited Partnership has the right to declare a forfeiture if you fail to perform any obligation under the Subscription Agreement; fail to comply with USCIS or other applicable governmental procedures in a timely manner; fail to disclose or falsify any information in connection with the application process for your Immigrant Petition By Alien Entrepreneur (I-526); fail to attend any interview scheduled by the appropriate U.S. Consular Office or the USCIS, as applicable; fail to enter the U.S. as required by the USCIS; or voluntarily withdraw your Immigrant Petition By Alien Entrepreneur (I-526) without good cause, as determined by the Limited Partnership in its sole discretion. Upon the decision of the Limited Partnership to declare a forfeiture pursuant to these provisions, the Limited Partnership will return the amount of your Capital Contribution less any distributions paid. There will be no refund of any attorneys' fees paid. The Limited Partnership will return this amount within ninety (90) days of the Limited Partnership's decision to declare a forfeiture.

You will have no right to withdraw from the Limited Partnership once you have obtained approval for your Immigrant Petition By Alien Entrepreneur (I-526). However, at all times, if the Limited Partnership determines that you do not comply with the purpose and requirements of the Limited Partnership, the Limited Partnership can elect to declare a forfeiture in accordance with the Limited Partnership Agreement. This decision is in the sole discretion of the Limited Partnership.

The Partnership and the General Partner are each hereby authorized and instructed to accept and execute any instructions in respect of the Unit to which this Agreement relates given by you in written form, by facsimile or electronic means. If instructions are given by you by facsimile

or by email, you agree to keep each of the Partnership, the General Partner and each of their respective affiliates, principals, directors, officers, employees, agents and other representatives indemnified against any loss of any nature whatsoever arising to any of them as a result of any of them acting upon facsimile or email instructions. You further understand and acknowledge that neither the Partnership nor the General Partner shall be responsible for any misdelivery or non-receipt of any facsimile or email instruction. Facsimiles or emails sent to the Partnership or the General Partner shall only be effective when actually acknowledged by the Partnership or the General Partner. The Partnership and the General Partner may rely conclusively upon and shall incur no liability in respect of any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons. Please note that messages sent via email must contain a duly signed document as an attachment. In the event that no acknowledgement is received from the General Partner within five (5) days of submission of the instruction, you should contact the General Partner at 136-20 38th Avenue, 10th Floor, Flushing, NY 11354 to confirm receipt of the request by the General Partner.

You acknowledges that the Partnership and the General Partner may disclose to each other, to any service provider to the Partnership or to any regulatory body in any applicable jurisdiction copies of this Agreement and any information concerning the you provided by you to the Partnership or the General Partner, and any such disclosure shall not be treated as a breach of any restriction upon the disclosure of information imposed on such person by law or otherwise.

Privacy Policy of the Partnership and the General Partner. You recognize that non-public information concerning you which is set forth in this Agreement or otherwise disclosed by you to the Partnership, or other agents of the Partnership, such as your name, address, social security number, assets and income, and information regarding your investment in the Partnership (collectively, the "Information") (i) may be disclosed to the General Partner and its attorneys and accountants in furtherance of the Partnership's business and to other service providers such as brokers who may have a need for the information in connection with providing services to the Partnership; (ii) to third parties or financial institutions who may be providing marketing services to the Partnership, provided that such persons agree to protect the confidentiality of the Information and use the Information only for the purposes of providing services to the Partnership; and (iii) as otherwise required or permitted by law or as requested by any regulatory or other governmental authority. The Partnership and the General Partner restrict access to the Information to their employees who need to know the Information to provide services to the Partnership, and maintain physical, electronic and procedural safeguards that comply with U.S. federal standards to guard the Information.

By executing this Agreement, you specifically agrees to keep confidential and not disclose to third parties (other than its tax or other financial advisors under like conditions of confidentiality) any and all information regarding the Partnership, including the Partnership's performance, provided that the confidential treatment required by this paragraph shall not apply to the tax treatment and tax structure of an investment in the Partnership or any transaction entered into by the Partnership, and you may disclose to any and all persons the tax treatment and tax structure of an investment in the Partnership and all materials of any kind (including opinions or other tax analyses) that are provided to the Limited Partner relating to such tax treatment and tax structure.

Electronic Delivery of Reports and Other Communications. At its discretion, the Partnership or the General Partner may provide statements, reports and other communications relating to the Partnership and/or your investment in the Partnership in electronic form, such as by e-mail. You hereby consent to the sending of such statements, reports and other communications regarding the Partnership and its investment in the Partnership (including performance information, contribution and withdrawal activity, annual and other updates of the Partnership's consumer privacy policies and procedures) exclusively in electronic form without separate mailing of paper copies. You acknowledge that e-mails from the Partnership or the General Partner may be accessed by recipients other than the New Limited Partner, may be interfered with, may contain computer viruses or other defects and may not be successfully replicated on other systems. Neither the Partnership nor the General Partner gives any warranties in relation to these matters. Any Limited Partner who has any doubts about the authenticity of an e-mail purportedly sent by the Partnership or the General Partner, should contact the Partnership or the General Partner immediately.

This Agreement shall inure to the benefit of and be binding upon each of the parties hereto, and their heirs and legal representatives. This Agreement shall be interpreted in accordance with the laws of the State of New York and all disputes relating to or arising in connection with this Agreement shall be decided by the courts of the State of New York, to the exclusion of any other court.

I agree to the conditions, obligations, and requirements as set forth in this Subscription Agreement, the Limited Partnership Agreement, and the Offering Memorandum. I agree to pay the US$500,000 Capital Contribution (or such other amount as required by statute to qualify for the EB-5 Program) and the $50,000 Processing Fee to complete my subscription on the conditions set forth above. Such payments shall be made to bank account specified by the Limited Partnership under the terms specified in the aforementioned agreements. I shall not be entitled to any interest earned on my Capital Account. All prices are in U.S. Dollars.

**[Signature Page to Follow]**

**PROSPECTIVE INVESTOR**

Print Name: ______________________________

| | |
|---|---|
| Signature | Date |

**GENERAL PARTNER**
Fleet New York Metropolitan Regional Center, LLC a New York limited laibility company, formerly known as Federal New York Metropolitan Regional Center, LLC

BY: ______________________________

____________________, Managing Member

EXHIBIT B

**Version Date: September___, 201_**

# LOAN AGREEMENT

THIS **LOAN AGREEMENT** ( "Agreement") is entered into as of the __ day of September, 201_ by and between **Eastern Emerald Group, LLC, a Delaware limited liability company** ("Borrower") and **EEGH, L.P., a New York limited partnership** ("Lender"), with reference to the following facts:

Lender is to provide a loan up to $110 million to Borrower. Using the loan proceeds, Borrower will develop, construct and operate a commercial mixed-use project that includes a 5-star hotel, convention center, parking garage, restaurant and retail space in the City of Corona, Queens County, State of New York ("Project").

**NOW, THEREFORE,** in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1
## AMOUNTS AND TERMS OF THE LOAN

**Section 1.1. The Loan**. Lender agrees, on the terms and conditions hereinafter set forth, to make a loan ("Loan") to the Borrower in an amount up to and including ONE HUNDRED AND TEN MILLION DOLLARS ($110,000,000.00) ("Maximum Loan Amount").

**Section 1.2. Advances**. From and after the date hereof, Lender shall advance proceeds of the Loan in increments of $500,000 (each an "Advance") (or such other amount equal to the minimum investment required by statute to qualify for the EB-5 Program) at such times as Lender shall determine in its sole and absolute discretion. At such time as Lender desires to make an Advance, Lender shall give Borrower 3 business days prior written notice of the making of an Advance (an "Advance Notice"), which Advance Notice shall include the amount of the Advance and the date upon which the Advance will be made ("Advance Date"). A business day means any day other than Saturday, Sunday or a public or bank holiday in the State of New York.

**Section 1.3. Interest Payments**. The interest rate is 2% per annum and interest shall be paid at the end of loan term. If Borrower fails to make any payment required pursuant to this Agreement within fifteen (15) days of the due date thereof, and contingent on Lender providing thirty (30) days written notice to Borrower, Borrower shall, in addition to such amount, pay a late charge equal to two percent (2%) of the amount of such payment. The late charge is imposed to defray the expenses of Lender incident to handling such defaulting payment. This shall be in addition to, and not in lieu of, any other remedy Lender may have and is in addition to any fees or charges any agents or attorneys which Lender may employ upon the occurrence of any Default.

**Section 1.4. Maturity Date.** Principal will be due and payable as one lump sum payment at the date of (1) five (5) years from the date of the last advance or (2) the date all EB-5 investors have ceased participating in the EB-5 program, whichever is later ("Maturity Date"). Borrower shall have no right to prepay any of the principal balance owed pursuant to this Agreement.

**Section 1.5. Mandatory Uses of Proceeds**. Borrower agrees that the proceeds of the Loan shall only be used for the development, construction and operation of the Project.

**Section 1.6. Collateral**. As collateral for the Loan, Borrower hereby agrees to give Lender a first priority lien on (a) all general intangibles and other property relating to the Project, (b) all additions and accessions thereto and replacements therefore; and all proceeds of the foregoing, and includes, without limitation, all rights to

payment, including return premiums, with respect to any insurance relating thereto (collectively, "Collateral") which will be evidenced by a Promissory Note and Deed of Trust. If Borrower obtains additional financing for the Project, Lender agrees to subordinate its lien in a reasonable manner except 206 units condominium hotel portion of project .

**Section 1.7.** **Insurance**. Borrower shall maintain full insurance coverage for the Project with Lender named as an Insured, including an ALTA title insurance policy, a Builder's Risk policy, and a comprehensive commercial general liability policy which provides coverage for property damage and loss in the maximum amount of the Loan plus any other amount secured by the Mortgage. If Borrower fails to maintain this insurance coverage, Lender will have the right to obtain its own insurance for the Project and any such costs will be added to the Loan Amount and must be paid by the Borrower within ninety (90) days of notice of the expense incurred by Lender.

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES

**Section 2.1.** **Representations and Warranties of the Borrower**. The Borrower represents and warrants as follows:

(a) Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

(b) The execution, delivery and performance of this Agreement do not contravene any law or any contractual restriction binding on or affecting Borrower.

(c) This Agreement is, when delivered hereunder will be, legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms.

(d) There is no action, suit, proceeding, claim, inquiry or investigation, at law or in equity, before or by any court, regulatory agency, public board or body pending or, to the best of Borrower's knowledge, threatened against or affecting Borrower and/or the Supercenter.

(e) Borrower and all activities of Borrower at the Project comply with all governmental regulations and all Environmental Laws and with all terms and conditions of any required permits, licenses and authorizations applicable to Borrower with respect thereto.

## ARTICLE 3
## AFFIRMATIVE COVENANTS OF BORROWER

So long as the Loan shall remain unpaid, Borrower will comply with the following requirements:

**Section 3.1.** **Sale of Assets**. Borrower will not sell, assign, transfer or otherwise dispose of all or a substantial part of its assets or of any of the Collateral or any interest therein (whether in one transaction or in a series of transactions).

**Section 3.2.** **Consolidation and Merger**. Borrower will not consolidate with or merge into any person, or permit any other person to merge into it or acquire (in a transaction analogous in purpose or effect to a consolidation or merger) all or substantially all of the assets of any other person.

**Section 3.3.** **Indemnity**. Lender shall not be liable or responsible for, and Borrower shall indemnify Lender and its respective affiliates, directors, officers, agents, attorneys and employees (collectively, the "Indemnities") from and against: (a) any claim, action, loss or cost (including reasonable attorney's fees and costs) arising from or relating to (i) any defect in the Property or the Project, (ii) the performance or default of Borrower, Borrower's surveyors, architects, engineers, contractors, or any other person, (iii) any failure to construct, complete, protect or insure the Project, (iv) the payment of costs of labor, materials, or services supplied for the construction of the Project, (v) in connection with the protection and preservation of the loan collateral (including those with respect to property taxes, insurance premiums, completion of construction, operation, management, improvements, maintenance, repair, sale and disposition), or (vi) the performance of any obligation of Borrower whatsoever; (b) any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including reasonable attorney fees and costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any Indemnities in any way relating to or arising out of or in connection with the Project or these loan documents.

## ARTICLE 4
## EVENTS OF DEFAULT

**Section 4.1.** **Events of Default**. If any of the following events ("Events of Default") shall occur and be continuing:

(a) Borrower shall fail to pay any principal, or interest, or any other sums due; or

(b) Borrower shall fail to perform or observe any term, covenant or agreement contained in this Agreement on the Borrower's part to be performed or observed (other than the payment of principal, interest or other monies), if such failure shall remain unremedied for ten (10) days after written notice thereof shall have been given to Borrower by Lender

then at Lender's option in each instance, such obligation or payment shall bear interest from the date due to the date paid at 2% per annum in excess of the rate of interest that would otherwise be applicable to such obligation or payment under this Agreement; (ii) after the Maturity Date, whether by reason of acceleration or otherwise, the unpaid principal balance of this Agreement (including without limitation, principal, interest, fees and expenses) shall automatically bear interest at 4% per annum in excess of the rate of interest that would otherwise be in effect under this Agreement until the Event of Default is fully cured .

**Section 4.2.** **Notice To Lender**. Borrower shall promptly within ten (10) days after Borrower receives knowledge of the occurrence of any of the following events, notify Lender in writing, specifying in each case the action Borrower has taken or will take with respect thereto: (a) any violation of any law or governmental requirement; (b) any litigation, arbitration or governmental investigation or proceeding instituted or threatened against Borrower or the Property, and any material development therein; (c) any actual or threatened condemnation of any portion of the Property, any negotiations with respect to any such taking, or any loss of or substantial damage to the Property; (d) any labor controversy pending or threatened against Borrower and any material development in any labor controversy; (e) any notice received by Borrower with respect to the cancellation, alteration or non-renewal of any insurance coverage maintained with respect to the Property; (f) any failure by Borrower or any contractor, subcontractor or supplier to perform any material obligation under any construction contract, any event or condition which would permit termination of a construction contract or suspension of work thereunder, or any

notice given by Borrower or any contractor with respect to any of the foregoing; (g) any lien filed against the Property or any stop notice served on Borrower in connection with construction of the Project; or (h) any required permit, license, certificate or approval with respect to the Property lapses or ceases to be in full force and effect.

## ARTICLE 5
## MISCELLANEOUS

**Section 5.1. Amendments, Etc.** No amendment or waiver of any provision of this Agreement, nor consent to any departure by Borrower there from, shall in any event be effective unless the same shall be in writing and signed by Lender and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**Section 5.2. Notices, Etc.** All notices and other communications provided for hereunder shall be in writing and mailed or delivered as follows:

| | |
|---|---|
| If to Borrower: | Eastern Emerald Group, LLC<br>112-21 Northern Blvd Corona NY 11368 |
| If to the Lender: | EEGH, L.P.<br>112-21 Northern Blvd Corona NY 11368 |

or, as to each party, at such other address as shall be designated by such party in a written notice to the other party complying with the terms of this section. All such notices and communications shall, when mailed, be effective when deposited in the mails addressed as aforesaid.

**Section 5.3. No Waiver; Remedies.** No failure on the part of Lender to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof; nor shall any single or partial exercise of any right under this Agreement, preclude any other or further exercise thereof or the exercise of any other right. The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law.

**Section 5.4. Costs, Expenses.** Borrower agrees to pay all costs and expenses, if any (including reasonable counsel fees and expenses), in connection with the enforcement of this Agreement, and any other documents to be delivered under this Agreement (or in connection herewith), whether or not suit is filed in connection therewith.

**Section 5.5. Waivers.** **BORROWER ACKNOWLEDGES THAT THIS AGREEMENT CONTAINS WAIVERS OF CERTAIN RIGHTS AND DEFENSES THAT BORROWER WOULD OTHERWISE HAVE UNDER APPLICABLE LAW. BORROWER WARRANTS AND AGREES THAT EACH OF THE WAIVERS AND CONSENTS SET FORTH HEREIN AND THEREIN ARE MADE AFTER CONSULTATION WITH LEGAL COUNSEL AND WITH FULL KNOWLEDGE OF THEIR SIGNIFICANCE AND CONSEQUENCES, WITH THE UNDERSTANDING THAT EVENTS GIVING RISE TO ANY DEFENSE OR RIGHT WAIVED MAY DIMINISH, DESTROY OR OTHERWISE ADVERSELY AFFECT RIGHTS WHICH BORROWER OTHERWISE MAY HAVE AGAINST LENDER OR OTHERS, OR AGAINST ANY PROPERTY, AND THAT, UNDER THE CIRCUMSTANCES, THE WAIVERS AND CONSENTS HEREIN AND THEREIN GIVEN ARE REASONABLE AND NOT CONTRARY TO PUBLIC POLICY OR LAW. IF ANY OF THE WAIVERS OR CONSENTS HEREIN OR THEREIN ARE DETERMINED TO BE UNENFORCEABLE UNDER APPLICABLE LAW, SUCH WAIVERS AND CONSENTS SHALL BE EFFECTIVE TO THE MAXIMUM EXTENT PERMITTED BY LAW.**

______________________
**(initialed)**

**Section 5.6.** **Binding Effect: Governing Law**. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns, Lender and Borrower agree that this Agreement shall be governed by, and construed in accordance with, laws of the State of New York.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first above written.

| "LENDER" | "BORROWER" |
|---|---|
| EEGH, L.P. | Eastern Emerald Group, LLC |
| By:__________ | By:__________ |
| Name: RICHARD XIA | Name:__________ |
| Title: MANAGING MEMBER | Title:__________ |

# PROMISSORY NOTE

$ 110,000,000 Date:________________

FOR VALUE RECEIVED, Eastern Emerald Group, LLC, a Delaware limited liability company ("Borrower") hereby promises to pay to the order of EEGH, L.P. ("Lender"), without offset, in immediately available funds in lawful money of the United States of America, at the Lender's office as defined in the Loan Agreement (as such term is defined herein), the principal sum of US ONE HUNDRED AND TEN MILLION DOLLARS (US$110,000,000) (or the unpaid balance of all principal advanced against this Note, if that amount is less), together with interest on the unpaid principal balance of this Note from day to day outstanding as hereinafter provided.

1. Note; Interest; Payment Schedule and Maturity Date

This Note is the Notes referred to in that certain Loan Agreement (the "Loan Agreement") between the Borrower and Lender, and it is entitled to the benefits thereof and subject to prepayment in whole or part as provided therein. The entire principal balance of this Note then unpaid shall be due and payable at the times as set forth in the Loan Agreement. Accrued unpaid interest shall be due and payable at the times and at the interest rate as set forth in the Loan Agreement until all principal and accrued interest owing on this Note shall have been fully paid and satisfied. Any amount not paid when due and payable hereunder shall, to the extent permitted by applicable Law, bear interest and if applicable a late charge as set forth in the Loan Agreement.

2. Security; Loan Documents

The security for this Note includes a Deed of Trust and Assignments of Rents and Leases from Borrower for the benefit of EEGH, L.P., as beneficiary in its capacity as Lender (which, as it may have been or may be amended, restated, modified or supplemented from time to time, is herein called the "Mortgage"), covering certain property in Queens County, New York described therein (the "Property"). This Note, the Mortgage, the Loan Agreement and all other documents now or hereafter securing, guaranteeing or executed in connection with the loan evidenced by this Note (the "Loan"), are, as the same have been or may be amended, restated, modified or supplemented from time to time, herein sometimes called individually a "Loan Document" and together the "Loan Documents."

3. Defaults.

(a) It shall be an event of default ("Event of Default") under this Note and each of the other Loan Documents if (i) any principal, interest or other amount of money due under this Note is not paid in full when due, regardless of how such amount may have become due; or (ii) there shall occur a Default under the Loan Agreement (as such term "Default" is defined in the Loan Agreement) subject to any applicable notice and cure period contained therein. Upon the occurrence of an Event of Default, Lender shall have the rights to declare the unpaid principal balance and accrued but unpaid interest on this Note, and all other amounts due hereunder and under the other Loan Documents, at once due and payable (and upon such declaration, the same shall be at once due and payable), to foreclose any liens and security interests securing payment hereof and to exercise any of its other rights, powers and remedies under this Note, under any other Loan Document, or at law or in equity.

(b) All of the rights, remedies, powers and privileges (together, "Rights") of Lender provided for in this Note and in any other Loan Document are cumulative of each other and of any and all other Rights at law or in equity. The resort to any Right shall not prevent the concurrent or subsequent employment of any other appropriate Right. No single or partial exercise of any Right shall exhaust it, or preclude any other or further exercise thereof, and every Right may be exercised at any time and from time to time. No failure by Lender to exercise, nor delay in exercising any Right, including but not limited to the right to accelerate the maturity of this Note, shall be construed as a waiver of any Event of Default or as a waiver of any Right. Without limiting the generality of the foregoing provisions, the acceptance by Lender from time to time of any payment under this Note which is past due or which is less than the payment in full of all amounts due and payable at the time of such payment, shall not (i) constitute a waiver of or impair or extinguish the right of Lender to accelerate the maturity of this Note or to exercise any other Right at the time or at any subsequent time, or nullify any prior exercise of any such Right, or (ii) constitute a waiver of the requirement of punctual payment and performance or a novation in any respect.

(c) If any holder of this Note retains an attorney in connection with any Event of Default or at maturity or to collect, enforce or defend this Note or any other Loan Document in any lawsuit or in any probate, reorganization, bankruptcy, arbitration or other proceeding, or if Borrower sues any holder in connection with this Note or any other Loan Document and does not prevail, then Borrower agrees to pay to each such holder, in addition to principal, interest and any other sums owing to Lender hereunder and under the other Loan Documents, all costs and expenses incurred by such holder in trying to collect this Note or in any such suit or proceeding, including, without limitation, reasonable attorneys' fees and expenses, investigation costs and all court costs, whether

or not suit is filed hereon, whether before or after the Maturity Date, or whether in connection with bankruptcy, insolvency or appeal, or whether collection is made against Borrower or endorser or any other person primarily or secondarily liable hereunder. Any judgment on this Note shall bear interest at the highest rate allowed by applicable law.

4. Commercial Purpose

Borrower warrants that the Loan is being made solely to finance a portion of the cost to acquire or carry on a business or commercial enterprise, and/or Borrower is a business or commercial organization. Borrower further warrants that all of the proceeds of this Note shall be used for commercial purposes and stipulates that the Loan shall be construed for all purposes as a commercial loan, and is made for other than personal, family, household or agricultural purposes.

5. Service of Process

Borrower hereby consents to process being served in any suit, action, or proceeding instituted in connection with this Note by (a) the mailing of a copy thereof by certified mail, postage prepaid, return receipt requested, to Borrower and (b) serving a copy thereof upon the registered agent designated and appointed by Borrower as Borrower's agent for service of process. Borrower irrevocably agrees that such service shall be deemed to be service of process upon Borrower in any such suit, action, or proceeding. Nothing in this Note shall affect the right of Lender to serve process in any manner otherwise permitted by law and nothing in this Note will limit the right of Lender otherwise to bring proceedings against Borrower in the courts of any jurisdiction or jurisdictions

6. Heirs, Successors and Assigns

The terms of this Note and of the other Loan Documents shall bind and inure to the benefit of the heirs, devisees, representatives, successors and assigns of the parties. The foregoing sentence shall not be construed to permit Borrower to assign the Loan except as otherwise permitted under the Loan Documents.

7. General Provisions

Time is of the essence with respect to Borrower's obligations under this Note. If more than one person or entity executes this Note as Borrower, all of said parties shall be jointly and severally liable for payment of the indebtedness evidenced hereby. Borrower and all sureties, endorsers, guarantors and any other party now or hereafter liable for the payment of this Note in whole or in part, hereby severally (a) waive demand, presentment for payment, notice of dishonor and of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices (except any notices which

are specifically required by this Note or any other Loan Document), filing of suit and diligence in collecting this Note or enforcing any of the security herefor; (b) agree to any substitution, subordination, exchange or release of any such security or the release of any party primarily or secondarily liable hereon; (c) agree that Lender shall not be required first to institute suit or exhaust its remedies hereon against Borrower or others liable or to become liable hereon or to perfect or enforce its rights against them or any security herefor; (d) consent to any extensions or postponements of time of payment of this Note for any period or periods of time and to any partial payments, before or after maturity, and to any other indulgences with respect hereto, without notice thereof to any of them; and (e) submit (and waive all rights to object) to non-exclusive personal jurisdiction of any state or federal court sitting in the State of New York, and venue in the city or county in which payment is to be made as specified in the first paragraph on Page 1 of this Note, for the enforcement of any and all obligations under this Note and the Loan Documents; (f) waive the benefit of all homestead and similar exemptions as to this Note; (g) agree that their liability under this Note shall not be affected or impaired by any determination that any security interest or lien taken by Lender to secure this Note is invalid or unperfected; and (h) hereby subordinate any and all rights against Borrower and any of the security for the payment of this Note, whether by subrogation, agreement or otherwise, until this Note is paid in full. A determination that any provision of this Note is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Note to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances. This Note may not be amended except in a writing specifically intended for such purpose and executed by the party against whom enforcement of the amendment is sought. Lender is hereby authorized to disseminate any information it now has or hereafter obtains pertaining to the Loan, including, without limitation, any security for this Note and credit or other information on Borrower, or any of its principals, to any actual or prospective assignee or participant with respect to the Loan, to any regulatory body having jurisdiction over Lender, and to any other parties as necessary or appropriate in Lender's reasonable judgment included the USCIS, as further provided in the Loan Agreement. The term "Business Day" shall mean a day on which Lender is open for the conduct of substantially all of its business at its office in the city in which this Note is payable (excluding Saturdays and Sundays). Captions and headings in this Note are for convenience only and shall be disregarded in construing it. THIS NOTE, AND ITS VALIDITY, ENFORCEMENT AND INTERPRETATION, SHALL BE GOVERNED BY NEW YORK LAW (WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES) AND APPLICABLE UNITED STATES FEDERAL LAW.

8. No Usury

It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with applicable state law or applicable United States federal law (to the

extent that it permits Lender to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this Section shall control every other covenant and agreement in this Note and the other Loan Documents. If applicable state or federal law should at any time be judicially interpreted so as to render usurious any amount called for under this Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Loan, or if Lender's exercise of the option to accelerate the Maturity Date, or if any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Lender's express intent that all excess amounts theretofore collected by Lender shall be credited on the principal balance of this Note and all other indebtedness and the provisions of this Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the maximum lawful rate from time to time in effect and applicable to the Loan (the "Maximum Rate") for so long as the Loan is outstanding. The Lender may, in determining the Maximum Rate, take advantage of: (i) the rate of interest permitted by New York Statutes, and 12 United States Code, Sections 85 and 86, and (ii) any other law, rule, or regulation in effect from time to time, available to Lender which exempts Lender from any limit upon the rate of interest it may charge or grants to Lender the right to charge a higher rate of interest than that allowed by New York Statutes.

9. Notices

Any notice, request, or demand to or upon Borrower or Lender shall be deemed to have been properly given or made when delivered in accordance with the Loan Agreement.

10. Dispute Resolution

(a) Arbitration

Except to the extent expressly provided below, any Dispute (as defined below) shall, upon the request of either party, be determined by binding arbitration in accordance with the Federal Arbitration Act, Title 9, United States Code (or if not applicable, the applicable state law).

**11. <u>WAIVER OF JURY TRIAL</u>. WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO ARBITRATE ANY "DISPUTE" (FOR PURPOSES OF THIS SECTION, AS DEFINED ABOVE) AS SET FORTH IN THIS NOTE, TO THE EXTENT ANY "DISPUTE" IS NOT SUBMITTED TO ARBITRATION OR IS DEEMED BY THE ARBITRATOR OR BY ANY COURT WITH JURISDICTION TO BE NOT ARBITRABLE OR NOT REQUIRED TO BE ARBITRATED, BORROWER AND LENDER WAIVE TRIAL BY JURY IN RESPECT OF ANY SUCH "DISPUTE" AND ANY ACTION ON SUCH "DISPUTE." THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY BORROWER AND LENDER, AND BORROWER AND LENDER HEREBY REPRESENT THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY PERSON OR ENTITY TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THE LOAN DOCUMENTS. BORROWER AND LENDER ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF JURY TRIAL. BORROWER FURTHER REPRESENTS AND WARRANTS THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS NOTE AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED BY INDEPENDENT LEGAL COUNSEL SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.**

**THE LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**
**THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES.**

IN WITNESS WHEREOF, Borrower has duly made and executed this Note under seal as of the date first above written.

**BORROWER:**

**EASTERN EMERALD GROUP, LLC,** a Delaware Limited Liability Company

By:____________________
Its:____________________

**RECORDING REQUESTED BY**
AND WHEN RECORDED MAIL TO

EEGH, L.P.
112-21 Northern Boulevard
Queens, NY 11368

# MORTGAGE DEED AND ASSIGNMENT OF RENTS AND LEASES

**This Mortgage Deed,** made this __________ day of ____________, between

**EASTERN EMERALD GROUP, LLC, a Delaware limited liability company**, Mortgagor, whose address is ____________________, and **EEGH, L.P., a Delaware limited partnership**, herein called Mortgagee.

**Witnesses:** For the purpose of securing payment and performance of the Loan Agreement ( **"Loan Agreement"**) and the Promissory Note executed between Mortgagor and Mortgagee, Mortgagor **IRREVOCABLY GRANTS, TRANSFERS AND ASSIGNS TO MORTGAGEE, WITH POWER OF SALE, AND WITH RIGHT OF ENTRY AND POSSESSION,** all estate, right, title and interest in and to:

(a) That property in Queens County, New York, described in Exhibit "A" attached hereto and incorporated herein together with all existing and future easements and rights affording access to it (**"Premises"**);

(b) All buildings, structures and improvements now located or later to be constructed on the Premises (the "**Improvements**");

(c) All existing and future appurtenances, privileges, easements, franchises and tenements of the Premises, including all minerals, oil, gas, other hydrocarbons and associated substances, sulfur, nitrogen, carbon dioxide, helium and other commercially valuable substances which may be in, under or produced from any part of the Premises, all development rights and credits, air rights, water, water rights (whether riparian, appropriative or otherwise, and whether or not appurtenant) and water stock, and any Premises lying in the streets, roads or avenues, open or proposed, in front of or adjoining the Premises and Improvements;

(d) All existing and future leases, subleases, subtenancies, licenses, occupancy agreements and concessions (collectively, "**Leases**") relating to the use and enjoyment of all or any part of the Premises and Improvements, and any and all guaranties and other agreements relating to or made in connection with any of such Leases;

(e) All real property and improvements on it, and all appurtenances and other property and interests of any kind or character, whether described in Exhibit A or not, which may be reasonably necessary or desirable to promote the present and any reasonable future beneficial use and enjoyment of the Premises and Improvements;

(f) All goods, materials, supplies, chattels, furniture, fixtures, equipment, inventory, machinery and articles of personal property, of every kind and character, tangible and intangible (including software embedded therein), now owned or hereafter acquired by Mortgagor now or later to be attached to, placed in or on, or used in connection with the use, enjoyment, occupancy or operation of all or any part of the Premises and Improvements, whether stored on the Premises or elsewhere, including all pumping plants, engines, pipes, ditches and flumes, and also all gas, electric, cooking, heating, cooling, air conditioning, lighting, refrigeration and plumbing fixtures and equipment, all of which shall be considered to the fullest extent of the law to be real property for purposes of this Mortgage Deed;

(g) All building materials, equipment, work in process or other personal property of any kind, whether stored on the Premises or elsewhere, which have been or later will be acquired for the purpose of being delivered to, incorporated into or installed in or about the Premises or Improvements;

(h) All rights to the payment of money, accounts (including any rent concession account), funds, deposit accounts, operating accounts, bank accounts, tenant security accounts, accounts receivable, reserves, deferred payments, refunds, cost savings, payments and deposits, whether now or later to be received from third parties (including all earnest money sales deposits) or deposited by Mortgagor with third parties (including all utility deposits), contract rights, construction contracts, commercial paper, warranties, development and use rights, governmental permits and licenses, development rights, applications, architectural and engineering plans, specifications and drawings, as-built drawings, chattel paper, tangible chattel paper, electronic chattel paper, instruments, documents,

notes, acceptances, bonuses, actions, rights, drafts, general intangibles, payment intangibles, commercial tort claims, letter of credit rights and proceeds, investment property, supporting obligations of every kind and nature;

(i) All insurance policies pertaining to the Premises and all proceeds, including all claims to and demands for them, of the voluntary or involuntary conversion of any of the Premises, Improvements or the other property described above into cash or liquidated claims, including proceeds of all present and future fire, hazard or casualty insurance policies, to the extent permitted by law, and all condemnation awards, to the extent permitted by law, or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding, to the extent permitted by law, and all causes of action and their proceeds for any damage or injury to the Premises, Improvements or the other property described above or any part of them, or breach of warranty in connection with the construction of the Improvements, including causes of action arising in tort, contract, fraud or concealment of a material fact;

(j) All rights and benefits of whatsoever nature derived or to be derived by Mortgagor under and by virtue of any contracts or agreements for the use, occupancy, possession or sale of the Property or any portion thereof (in addition to the Leases described in subsection (d) above), now existing and hereafter executed, together with all such extensions, amendments, modifications, renewals, replacements and guaranties;

(k) All agreements, building permits, surveys, architectural plans and specifications, governmental approvals, licenses, agreements with utility companies, water and sewer capacity reservation agreements and all other consents, approvals and agreements which Mortgagor may now or hereafter own with respect to or in connection with the Property and/or any improvements now or hereafter constructed thereon, but only to the extent such items may be assigned and transferred without violating the terms thereof;

(l) All warranties and guaranties covering any personal property or fixtures now or hereafter located on or placed upon the Property;

(m) To the extent in Mortgagor's possession or control, all plans and specifications (including all site plans and development, landscaping and engineering plans for the Property) now or hereafter existing (except those owned by third parties), which pertain or relate in any manner to the Property or any improvements to be constructed thereon;

(n) All building and other permits, bonds, construction contracts, including any agreements with Mortgagor's architect or engineer, utilities agreements and rights, governmental applications and proceedings, feasibility studies, maintenance and service contracts, management agreements, development agreements, warranties and guaranties, permits and licenses, insurance policies, personal property, easements or rights-of-way agreements, now or hereafter existing, which pertain or relate in any manner to the Property or any portion thereof or to the ownership or operation thereof, but only to the extent such items may be assigned and transferred without violating the terms thereof; and

(o) All books and records pertaining to any and all of the property described above, including computer-readable memory and any computer hardware or software necessary to access and process such memory ("**Books and Records**"); and

(p) All products, proceeds of, additions and accretions to, substitutions and replacements for, and changes in any of the property described above.

**Secured Obligations:** Mortgagor shall promptly pay and perform (or shall cause to be promptly paid and performed) each Secured Obligation in accordance with its terms. "Secured Obligations shall include the following: Payment of the indebtedness evidenced by the Loan Agreement and the Promissory Note executed between the Mortgagor and Mortgagee of even date herewith, and any extension or renewal thereof, in the principal sum of up to $110,000,000.00, or so much thereof as has been advanced, executed by Mortgagor in favor of Mortgagee.

**Assignment of Rents**: Mortgagor hereby irrevocably, absolutely, presently and unconditionally assigns to Mortgagee all rents, royalties, issues, profits, revenue, income, accounts, proceeds and other benefits of the Property, whether now due, past due or to become due, including all prepaid rents and security deposits (some or all collectively, as the context may require, "**Rents**"). This assignment of Leases and Rents constitutes an absolute, irrevocable and present assignment, but Mortgagee hereby confers upon Mortgagor a license ("**License**") to collect and retain the Rents as they become due and payable, so long as no Event of Default, as defined in this Mortgage Deed, shall exist and be continuing. If an Event of Default has occurred and is continuing, Mortgagee shall have the right, which it may choose to exercise in its sole discretion, to terminate this License without notice to or demand upon Mortgagor, and without regard to the adequacy of Mortgagee's security under this Mortgage Deed. Upon termination of the License granted to Mortgagor under this Mortgage Deed as set forth above, Mortgagee has the right, power and authority to collect any and all Rents. Effective upon such termination, Mortgagor may perform any and all of the following acts, if and at the times when Mortgagee in its sole discretion may so choose:

(a) Demand, receive and enforce payment of any and all Rents;

(b) Give receipts, releases and satisfactions for any and all Rents; and

(c) Sue either in the name of Mortgagor or in the name of Mortgagee for any and all Rents.

Mortgagee and Mortgagor agree that the mere recordation of the assignment granted herein entitles Mortgagee immediately to collect and receive rents upon the occurrence and during the continuance of an Event of Default, as defined in this Mortgage Deed, without first taking any acts of enforcement under applicable law, such as, but not limited to, providing notice to Mortgagor, filing foreclosure proceedings, or seeking and/or, except as required by applicable law, obtaining the appointment of a receiver. Further, Mortgagee's right to the Rents does not depend on whether or not Mortgagee takes possession of the Property as permitted under this Mortgage Deed. In Mortgagee's sole discretion, Mortgagee may choose to collect Rents either with or without taking possession of the Property. Mortgagee shall apply all Rents collected by it in the manner provided under this Mortgage Deed. If an Event of Default occurs while Mortgagee is in possession of all or part of the Property and is collecting and applying Rents as permitted under this Mortgage Deed, Mortgagee and any receiver shall nevertheless be entitled to exercise and invoke every right and remedy afforded any of them under this Mortgage Deed and at law or in equity.

Under no circumstances shall Mortgagee have any duty to produce Rents from the Property. Regardless of whether or not Mortgagee, in person or by agent, takes actual possession of the Premises and Improvements, unless Mortgagee agrees in writing to the contrary, Mortgagee is not and shall not be deemed to be:

(a) A "mortgagee in possession" for any purpose; or

(b) Responsible for performing any of the obligations of the lessor under any lease; or

(c) Responsible for any waste committed by lessees or any other parties, any dangerous or defective condition of the Property, or any negligence in the management, upkeep, repair or control of the Property; or

(d) Liable in any manner for the Property or the use, occupancy, enjoyment or operation of all or any part of it except in the event of gross negligence or willful misconduct of Mortgagee.

Mortgagor shall not accept any deposit or prepayment of Rents (excluding security deposits) under the leases for any rental period exceeding one (1) month without Mortgagee's prior written consent. Mortgagor shall not lease the Property or any part of it except in accordance with the provisions of the Loan Agreement.

**Security Agreement**: The parties intend for this Mortgage Deed to create a lien on the Property, and an absolute assignment of the Rents, all in favor of Mortgagee. The parties acknowledge that some of the Property and some or all of the Rents may be determined under applicable law to be personal property or fixtures. To the extent that any Property or Rents may be or be determined to be personal property, Mortgagor as debtor hereby grants Mortgagee as secured party a security interest in all such Property and Rents, including all products and proceeds thereof, and all supporting obligations ancillary to or arising in any way in connection therewith to secure payment and performance of the Secured Obligations. This Mortgage Deed constitutes a security agreement under the Uniform Commercial Code of the State in which the Property is located, covering all such Property and Rents.

This Mortgage Deed constitutes and is effective as a financing statement covering any of the Property which is personal property or otherwise subject to Article 9 of the Uniform Commercial Code. For this purpose, the respective addresses of Mortgagor, as debtor, and Mortgagee, as secured parties, are as set forth in the preamble of this Mortgage Deed. In addition to the foregoing, Mortgagor hereby authorizes Mortgagee to file one or more financing statements. In addition, Mortgagor shall execute such other documents as Mortgagee may from time to time require to perfect or continue the perfection of Mortgagee's security interest in any Property or Rents. As provided in this Mortgage Deed, Mortgagor shall pay all fees and costs that Mortgagee may incur in filing such documents in public offices and in obtaining such record searches as Mortgagee may reasonably require. In case Mortgagor fails to execute any financing statements or other documents for the perfection or continuation of any security interest, Mortgagor hereby appoints Mortgagee as its true and lawful attorney-in-fact to execute any such documents on its behalf. If any financing statement or other document is filed in the records normally pertaining to personal property, that filing shall never be construed as in any way derogating from or impairing this Mortgage Deed or the rights or obligations of the parties under it.

This Mortgage Deed constitutes a financing statement filed as a fixture filing under Article 9 of the Uniform Commercial Code in the State in which the Property is located, as amended or recodified from time to time, covering any Property which now is or later may become fixtures attached to the Premises or Improvements. For this purpose, the respective addresses of Mortgagor, as debtor, and Mortgagee as secured party, are as set forth in the preamble of this Mortgage Deed.

**Rights and Duties of the Parties:** Mortgagor represents and warrants that:

(a) Mortgagor lawfully possesses and holds, and covenants to maintain, lawful, good and marketable fee simple title to all of the Premises and Improvements;

(b) To Mortgagor's knowledge, Mortgagor has, and covenants to maintain, good title to all property including both the Premises and all Improvements thereon;

(c) Mortgagor has the full and unlimited power, right and authority to encumber the Property and assign the Rents;

(d) This Mortgage Deed creates a first priority lien on the Premises except for any encumbrances which have been approved in writing by the Mortgagee;

(e) The Property includes all property and rights which may be reasonably necessary or desirable to promote the present and any reasonable future beneficial use and enjoyment of the Premises and Improvements;

(f) Except for the Permitted Encumbrances, to Mortgagor's current, actual knowledge, Mortgagor owns any Property which is personal property free and clear of any security agreements, liens, security interests, encumbrances, reservations of title or conditional sales contracts, and, to Mortgagor's current, actual knowledge, there is no financing statement affecting such personal property on file in any public office; and

(g) Mortgagor's place of business, or its chief executive office if it has more than one place of business, is located at the addresses specified below.

**Taxes, and Assessments**: Mortgagor shall pay (or shall cause to be paid) all real estate taxes and assessments and charges of every kind upon the Property before the same become delinquent, provided, however, that Mortgagor shall have the right to pay such tax under protest or to otherwise contest any such tax or assessment, but only if (i) such contest has the effect of preventing the collection of such taxes so contested and also of preventing the sale or forfeiture of the Property or any part thereof or any interest therein, (ii) Mortgagor has notified Mortgagee of Mortgagor's intent to contest such taxes, and (iii) Mortgagor has deposited security in form and amount satisfactory to Lender, in its reasonable discretion, and has increased the amount of such security so deposited promptly after Mortgagee's request therefor. If Mortgagor fails to commence such contest or, having commenced to contest the same, and having deposited such security required by Mortgagee for its full amount, shall thereafter fail to prosecute such contest in good faith or with due diligence, or, upon adverse conclusion of any such contest, shall fail to pay such tax, assessment or charge, Mortgagee may, at its election (but shall not be required to), pay and discharge any such tax, assessment or charge, and any interest or penalty thereon, and any amounts so expended by Mortgagee shall be deemed to constitute Secured Obligations hereunder (even if the total amount of disbursements would exceed the face amount of the Note) and shall be secured by this Mortgage Deed and the Loan Documents. Upon written request of Mortgagee, Mortgagor shall furnish to Mortgagee evidence that taxes are paid at least five (5) days prior to the last date for payment of such taxes and before imposition of any penalty or accrual of interest.

**Liens, Charges and Encumbrances:** Mortgagor will not suffer or permit any mechanics' lien, voluntary or involuntary lien, lien, encumbrance, security interest, claim, charge, conditional sale or other title retention document to be filed or otherwise asserted against the Property (or any portion thereof), and will promptly discharge the same in case of the filing of any claims for lien or proceedings for the enforcement thereof, provided, however, that Mortgagor shall have the right to contest in good faith and with reasonable diligence the validity of any such lien or claim provided that Mortgagor posts a statutory lien bond which removes such lien from title to the Property within thirty (30) days after Mortgagor's receipt of notice of the recording of such lien. If Mortgagor shall fail promptly either (i) to discharge any such lien, or (ii) post a statutory lien bond in the manner provided above, Mortgagee may, at its election (but shall not be required to), procure the release and discharge of any such claim and any judgment or decree thereon and, further, may in its sole discretion effect any settlement or compromise of the same, or may furnish such security or indemnity to the applicable insurance company, and any amounts so expended by Mortgagee, including premiums paid or security furnished in connection with the issuance of any surety company bonds, shall be deemed to constitute Secured Obligations secured by this Mortgage Deed and the Loan Documents. In settling, compromising or discharging any claims for lien, Mortgagee shall not be required to inquire into the validity or amount of any such claim.

**Insurance and Condemnation**: Mortgagor shall obtain and maintain (or shall cause to be obtained and maintained) at Mortgagor's sole expense the insurance required to be obtained and maintained pursuant to the Loan Agreement. Upon any foreclosure hereof or transfer of title to the Property in extinguishment of the whole or any part of the Secured Obligations, all of Mortgagor's right, title and interest in and to the insurance policies referred to in this section (including unearned premiums) and all proceeds payable thereunder shall thereupon vest in the purchaser at foreclosure or other such transferee, to the extent permissible under such policies. Mortgagee shall have the right (but not the obligation) to make proof of loss for, settle and adjust any claim under, and receive the proceeds of, all insurance for loss of or damage to the Property, regardless of whether or not such insurance policies are required by Mortgagee, and the expenses incurred by Mortgagee in the adjustment and collection of insurance proceeds shall be a part of the Secured Obligations and shall be due and payable to Mortgagee on demand to the extent permitted by law. Notwithstanding anything set forth herein to the contrary, so long as no Event of Default exists, in the event that the loss or damage is Five Hundred Thousand and No/100 Dollars ($500,000.00) or less, Mortgagor shall have the right to make proof of loss for, settle and adjust any claim under all insurance and make the necessary repairs;

provided that any proceeds will be applied in accordance with this section, Mortgagee shall not be, under any circumstances, liable or responsible for failure to collect or exercise diligence in the collection of any of such proceeds or for the obtaining, maintaining or adequacy of any insurance or for failure to see to the proper application of any amount paid over to Mortgagor. In the event of any casualty to the Property or any portion thereof, any such proceeds received by Mortgagee shall within sixty (60) days following the event of casualty, after deduction therefrom of all reasonable expenses actually incurred by Mortgagee, including reasonable attorneys' fees, at Mortgagee's option be (1) released to Mortgagor in accordance with the rights of Mortgagor, or (2) applied (upon compliance with the terms and conditions set forth herein), to the repair or restoration, either partly or entirely, of the Property so damaged, or (3) applied to the payment of the Secured Obligations in such order and manner as Mortgagee, in its sole discretion, may elect, whether or not due; provided, however, that Mortgagor shall have the right to require the release of such proceeds if Mortgagor can demonstrate satisfaction of the conditions set forth in this Mortgage Deed and any release of such proceeds shall be upon the terms and conditions more particularly set forth herein. In any event, the unpaid portion of the Secured Obligations shall remain in full force and effect and the payment thereof shall not be excused. Mortgagor shall at all times comply with the requirements of the insurance policies required hereunder and of the issuers of such policies and of any board of fire underwriters or similar body as applicable to or affecting the Property.

Mortgagor shall notify Mortgagee immediately of any threatened or pending proceeding for condemnation affecting the Property or arising out of damage to the Property, and Mortgagor shall, at Mortgagor's expense, diligently prosecute any such proceedings. Mortgagee shall have the right (but not the obligation) to participate in any such proceeding and to be represented by counsel of its own choice. To the extent permitted by law, Mortgagee shall be entitled to receive all sums which may be awarded or become payable to Mortgagor for the condemnation of the Property, or any part thereof, for public or quasi-public use, or by virtue of private sale in lieu thereof, and any sums which may be awarded or become payable to Mortgagor for injury or damage to the Property. Mortgagor shall, promptly upon request of Mortgagee, execute such additional assignments and other documents as may be necessary from time to time to permit such participation and to enable Mortgagee to collect and receipt for any such sums. All such sums are hereby assigned to Mortgagee, and shall within sixty (60) days following such taking, after deduction therefrom of all reasonable expenses actually incurred by Mortgagee, including reasonable attorneys' fees, at Mortgagee's option be (1) applied (upon compliance with the terms and conditions set forth in this Mortgage Deed) to the repair or restoration of the Property so affected, or (2) applied to the payment of the Secured Obligations in such order and manner as Mortgagee, in its sole discretion, may elect, whether or not due; provided, however, that if the amount in issue is less than Five Hundred Thousand Dollars ($500,000.00) and does not materially affect the development and operations of the hotel for which the Loan Agreement relates, as long as no Event of Default exists at the time of this damage, Mortgagor shall have the right to require the release of such proceeds to Mortgagor. In any event the unpaid portion of the Secured Obligations shall remain in full force and effect and the payment thereof shall not be excused. Mortgagee shall not be, under any circumstances, liable or responsible for failure to collect or to exercise diligence in the collection of any such sum or for failure to see to the proper application of any amount paid over to Mortgagor. Mortgagee is hereby authorized, in the name of Mortgagor, to execute and deliver valid acquittances for, and to appeal from, any such award, judgment or decree. All reasonable costs and expenses (including but not limited to reasonable attorneys' fees) incurred by Mortgagee in connection with any condemnation shall be a demand obligation owing by Mortgagor (which Mortgagor hereby promises to pay) to Mortgagee pursuant to this Mortgage Deed.

In the event there shall be a casualty loss or a condemnation, and Mortgagor requests or Mortgagee elects to cause the applicable insurance proceeds or condemnation award to be applied to restore, repair or replace the Property ("Restoration"), Mortgagee agrees to disburse such insurance proceeds or condemnation award in accordance with disbursement procedures reasonably acceptable to Mortgagee, including, without limitation, such procedures as are customarily utilized by construction lenders to insure the lien free completion of construction projects. No such insurance proceeds or condemnation award shall be disbursed unless the conditions as set forth herein are satisfied.

**Maintenance and Preservation of Property:**

(a) Mortgagor shall insure (or shall cause to be insured) the Property as required by the Loan Agreement and keep the Property in materially good condition and repair.

(b) Mortgagor shall not remove or demolish the Property or any part of in a material part of the Property, or alter, restore or add to the Property in a material respect, or initiate or allow any change or variance in any zoning or other Premises use classification which affects the Property or any part of it, except as permitted by the construction plans which have been approved by the Mortgagee or required by the Loan Agreement or with Mortgagee's express prior written consent in each instance, which consent shall not be unreasonably withheld, conditioned or delayed.

(c) If all or part of the Property becomes damaged or destroyed, Mortgagor shall promptly and completely repair and/or restore the Property in a good and workmanlike manner in accordance with sound building practices, provided that Mortgagee agrees to disburse to Mortgagor Proceeds or other sums to pay costs of the work of repair or reconstruction under this Mortgage Deed so long as the conditions therein are satisfied.

(d) Mortgagor shall not commit or allow any act upon or use of the Property which would violate, in a material respect: (i) any applicable Laws or order of any Governmental Authority, whether now existing or later to be enacted and whether foreseen or unforeseen; or (ii) any public or private covenant, condition, restriction or equitable servitude affecting the Property. Mortgagor shall not bring or keep any article on the Property or cause or allow any condition to exist on it, if that could invalidate or would be prohibited by any insurance coverage required to be maintained by Mortgagor on the Property or any part of it under the Loan Agreement.

(e) Mortgagor shall not commit or allow waste of the Property, including those acts or omissions characterized under the Loan Agreement as waste which arises out of Hazardous Materials to the extent the same would be reasonably likely to have a material impact on the Property.

(f) Mortgagor shall perform (or shall cause to be performed) all other acts which from the character or use of the Property may be reasonably necessary to maintain and preserve its value to the extent the failure to do so would be reasonably likely to have a material impact on the Property.

(g) If Mortgagor receives a notice or claim from any person that the Property, or any use, activity, operation or maintenance thereof or thereon, is not in compliance with any Legal Requirement in a material respect, Mortgagor will promptly furnish a copy of such notice or claim to Mortgagee. As of the date of this Mortgage Deed, Mortgagor has received no notice and has no current, actual knowledge of any such noncompliance.

(h) Mortgagor shall faithfully abide by, perform and discharge each and every term, condition, obligation, covenant and agreement, which Mortgagor is now, or hereafter becomes, liable to observe or perform respecting the Property to the extent that a failure to do so would materially impair the value or operation of the Property; give prompt written material notice to Mortgagee of any notice of material default received by Mortgagor with respect to any default of Mortgagor under any material contract or agreement comprising or respecting the Property (collectively, the "**Agreements**"), together with an accurate, complete copy of any such notice; at the sole cost and expense of Mortgagor, enforce or secure the performance of each and every material term, obligation, covenant, condition and agreement to be performed by all parties under the Agreements; immediately provide Mortgagee with an accurate, complete copy of any notice of material default by Mortgagor with respect to any of the Agreements, when so sent by Mortgagor.

(i) Until the Secured Obligations shall have been paid and satisfied in full, Mortgagor shall provide Mortgagee with executed copies of all Agreements, assign to Mortgagee any and all subsequent material Agreements covering all or any part of the Property, and make, execute and deliver to Mortgagee, upon demand, any and all instruments that may be necessary or desirable therefor in the sole reasonable judgment of the Mortgagee. The terms and conditions of this Assignment shall, however, apply to any such subsequent Agreements, whether or not such instruments are executed or delivered by Mortgagor.

(j) Mortgagor shall not enter into any Agreement or materially modify, amend, extend, renew or in any way materially alter the terms of any Agreement, nor waive, excuse, condone or in any manner release or discharge any other party thereunder, of or from any obligation, covenant, condition, or agreement by said party to be performed thereunder without Mortgagee's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

(k) Mortgagor agrees that, upon receipt of written notice from Mortgagee of the occurrence of any Event of Default and Mortgagee's election to exercise its rights under this Mortgage Deed, each contracting party to, or Mortgagor or licensor of, any Agreement shall be and is hereby irrevocably directed and authorized by Mortgagor to recognize and accept Mortgagee as owner or as holder of such Agreement, as the case may be, for any and all purposes as fully as it would recognize and accept Mortgagor and the performance of Mortgagor thereunder, and to perform such Agreement for the benefit of Mortgagee in accordance with the terms and conditions thereof, without any obligation to determine whether or not any such Event of Default has in fact occurred.

**Releases, Extensions, Modifications and Additional Security:** From time to time, Mortgagee may perform any of the following acts without incurring any liability or giving notice to any person:

(a) Release any person liable for payment of any Secured Obligation;

(b) Extend the time for payment, or otherwise alter the terms of payment, of any Secured Obligation;

(c) Accept additional real or personal property of any kind as security for any Secured Obligation, whether evidenced by deeds of trust, mortgages, security agreements or any other instruments of security;

(d) Alter, substitute or release any property securing the Secured Obligations;

(e) Consent to the making of any plat or map of the Property or any part of it;

(f) Join in granting any easement or creating any restriction affecting the Property;

(g) Join in any subordination or other agreement affecting this Mortgage Deed or the lien of it; or

(h) Release the Property or any part of it.

**Release:** When all of the Secured Obligations have been paid in full and all fees and other sums owed by Mortgagor under this Mortgage Deed and the other Loan Documents have been received, Mortgagee shall release this Mortgage Deed, the lien created thereby, and all notes and instruments evidencing the Secured Obligations. Mortgagee shall pay any costs of preparation and recordation of such release.

**Compensation; Exculpation**: (a) Mortgagor agrees to pay reasonable fees actually incurred by Mortgagee when the law provides no maximum limit, for any services that Mortgageemay render in connection with this Mortgage Deed, including providing a statement of the Secured Obligations. Mortgagor shall also pay or reimburse all of Mortgagee's costs and expenses which may be incurred in rendering any such services. Mortgagor further agrees to pay or reimburse Mortgagee for all reasonable costs, expenses and other advances which may be incurred or made by Mortgagee in any efforts to enforce any terms of this Mortgage Deed, including any rights or remedies afforded to Mortgagee under this Mortgage Deed, whether any lawsuit is filed or not, or in defending any action or proceeding arising under or relating to this Mortgage Deed, including reasonable attorneys' fees and other legal costs, costs of any Foreclosure Sale and any cost of evidence of title. If Mortgagee, as required by applicable law, chooses to dispose of Property through more than one Foreclosure Sale, Mortgagor shall pay all reasonable costs, expenses or other advances that may be incurred or made by Mortgagee in each of such Foreclosure Sales. In any suit to foreclose the lien hereof or enforce any other remedy Mortgagee under this Mortgage Deed or the Note, there shall be allowed and included as additional indebtedness in the decree for sale or other judgment or decree all expenditures and expenses which may be paid or incurred by or on behalf of Mortgagee for reasonable attorneys' costs and fees (including the reasonable costs and fees of paralegals), survey charges, appraiser's fees, inspecting engineer's and/or architect's fees, fees for environmental studies and assessments and all additional expenses incurred by Mortgagee with respect to environmental matters, outlays for documentary and expert evidence, stenographers' charges, publication costs, and costs (which may be estimated as to items to be expended after entry of the decree) of procuring all such abstracts of title, title searches and examinations, title insurance policies, and similar data and assurances with respect to title as Mortgagee may deem reasonably necessary either to prosecute such suit or to evidence to bidders at any sale which may be had pursuant to such decree the true condition of the title to, the value of or the environmental condition of the Property. All expenditures and expenses of the nature in this Subsection mentioned, and such expenses and fees as may be incurred in the protection of the Property and maintenance of the lien of this Mortgage Deed, including the reasonable fees of any attorney (including the reasonable costs and fees of paralegals) employed by Mortgagee in any litigation or proceeding affecting this Mortgage Deed, the Note or the Property, including probate and bankruptcy proceedings, or in preparation for the commencement or defense of any proceeding or threatened suit or proceeding, shall be reasonable, and shall be immediately due and payable by Mortgagor, with interest thereon at the Default Rate and shall be secured by this Mortgage Deed. Any fees, costs or expenses described herein shall be subject to such limitations as may be imposed by applicable Delaware law.

(b) Mortgagee shall not be directly or indirectly liable to Mortgagor or any other person as a consequence of any of the following: (i) Mortgagee's exercise of or failure to exercise any rights, remedies or powers granted to Mortgagee in this Mortgage Deed; (ii) Mortgagee's failure or refusal to perform or discharge any obligation or liability of Mortgagor under any agreement related to the Property or under this Mortgage Deed; or (iii) Any loss sustained by Mortgagor or any third party resulting from Mortgagee's failure to lease the Property, or from any other act or omission of Mortgagee in managing the Property, after an Event of Default, unless the loss is caused by the willful misconduct and bad faith of Mortgagee. Mortgagor hereby expressly waives and releases all liability of the types described above, and agrees that no such liability shall be asserted against or imposed upon Mortgagee.

(c) Mortgagor will indemnify and hold harmless Mortgagee from and against, and reimburse them on demand for, any and all Indemnified Matters (hereinafter defined). For purposes of this section, the term "**Mortgagee**" shall include the directors, officers, partners, employees and agents of Mortgagee and any persons owned or controlled by, owning or controlling, or under common control or affiliated with Mortgagee and the directors, officers, partners, employees, attorneys, agents and representatives of Mortgagee. Without limitation, the foregoing indemnities shall apply to each indemnified person with respect to matters which in whole or in part are caused by or arise out of the negligence of such (and/or any other) indemnified person. However, such indemnities shall not apply to a particular indemnified person to the extent that the subject of the indemnification is caused by or arises out of the gross negligence or willful misconduct of that indemnified person. Any amount to be paid under this paragraph by Mortgagor to Mortgagee shall be a demand obligation owing by Mortgagor (which Mortgagor hereby promises to pay) to Mortgagee pursuant to this Mortgage Deed. Nothing in this paragraph, elsewhere in this Mortgage Deed or in any other Loan Document shall limit or impair any rights or remedies of Mortgagee (including without limitation any rights of contribution or indemnification) against Mortgagor or any other person under any other provision of this Mortgage Deed, any other Loan Document, any other agreement or any applicable Legal Requirement.

As used in this Mortgage Deed, the term "**Indemnified Matters**" means any and all claims, demands, liabilities (including strict liability), losses, damages (including consequential damages), causes of action, judgments, penalties, fines, costs and expenses (including without limitation, reasonable fees and expenses of attorneys and other professional consultants and experts, and of the investigation and defense of any claim, whether or not such claim is

ultimately defeated, and the settlement of any claim or judgment including all value paid or given in settlement) of every kind, known or unknown, foreseeable or unforeseeable, which may be imposed upon, asserted against or incurred or paid by Mortgagee at any time and from time to time, whenever imposed, asserted or incurred, because of, resulting from, in connection with, or arising out of any transaction, act, omission, event or circumstance in any way connected with the Property or with this Mortgage Deed or any other Loan Document, including but not limited to any bodily injury or death or property damage occurring in or upon or in the vicinity of the Property through any cause whatsoever, any act performed or omitted to be performed hereunder or under any other Loan Document, any breach by Mortgagor of any representation, warranty, covenant, agreement or condition contained in this Mortgage Deed or in any other Loan Document, any default as defined herein, any claim under or with respect to any Lease or arising under the Environmental Indemnity; provided that any Indemnified Matters arising under the Environmental Indemnity shall be subject to the limitations set forth therein. Notwithstanding anything to the contrary herein, in no event shall Mortgagor be liable to, or required to indemnify, Mortgagee for matters arising from or relating to the gross negligence or willful misconduct of Mortgagee. The provisions of this section will survive the repayment of the Secured Obligations, the foreclosure of this Mortgage Deed or conveyance in lieu of foreclosure, the termination of any and all Interest Rate Agreements, the discharge and release of this Mortgage Deed and the other Loan Documents, any bankruptcy or other debtor relief proceeding, and any other event whatsoever provided that any obligations arising under the Environmental Indemnity shall be subject to the survival provisions expressly set forth therein.

(d) Mortgagor shall pay all obligations to pay money arising under this section immediately upon demand by Mortgagee. Each such obligation shall be added to, and considered to be part of, the principal of the Note, shall bear interest from the date the obligation arises at the Default Rate and shall be secured by this Mortgage Deed and the other Loan Documents.

(e) Notwithstanding anything set forth herein to the contrary, unless an Event of Default shall have occurred and be continuing, Mortgagor shall be entitled to assume the defense of any action for which indemnification is sought hereunder to the extent permitted by the Loan Agreement.

**Defense and Notice of Claims and Actions:** At Mortgagor's sole expense, Mortgagor shall protect, preserve and defend the Property and title to and right of possession of the Property, and the security of this Mortgage Deed and the rights and powers of Mortgagee created under it, against all adverse claims of a material nature. Mortgagor shall give Mortgagee prompt notice in writing if any claim is asserted which does or could affect any such matters, or if any action or proceeding is commenced which alleges or relates to any such claim.

**Subrogation:** Mortgagee shall be subrogated to the liens of all encumbrances, whether released of record or not, which are discharged in whole or in part by Mortgagee in accordance with this Mortgage Deed or with the proceeds of any loan secured by this Mortgage Deed.

**Site Visits, Observation and Testing:** Subject to the rights of any tenant of the Property, thereunder, Mortgagee and its agents and representatives shall have the right at any reasonable time to enter and visit the Property for the purpose of performing appraisals, observing the Property, taking and removing soil or groundwater samples, and conducting tests on any part of the Property. Mortgagee has no duty, however, to visit or observe the Property or to conduct tests, and no site visit, observation or testing by Mortgagee, its agents or representatives shall impose any liability on any of Mortgagee, its agents or representatives. In no event shall any site visit, observation or testing by Mortgagee, its agents or representatives be a representation that Hazardous Materials are or are not present in, on or under the Property, or that there has been or shall be compliance with any law, regulation or ordinance pertaining to Hazardous Materials or any other applicable governmental law. Neither Mortgagor nor any other party is entitled to rely on any site visit, observation or testing by any of Mortgagee, its agents or representatives. Neither Mortgagee, its agents or representatives owe any duty of care to protect Mortgagor or any other party against, or to inform Mortgagor or any other party of, any Hazardous Materials or any other adverse condition affecting the Property. Except in the event of any emergency, Mortgagee shall give Mortgagor reasonable notice before entering the Property. Mortgagee shall make reasonable efforts to avoid interfering with Mortgagor's use of the Property in exercising any rights provided in this paragraph.

**Books and Records:** Unless otherwise approved by Mortgagee in writing, all Property that consists of personal property (other than the Books and Records) will be located on the Premises and all Books and Records will be located at Mortgagor's place of business or chief executive office if Mortgagor has more than one place of business.

**Leasing Restrictions:** To the extent prohibited by the Loan Agreement, without the prior written consent of Mortgagee (which consent shall not be unreasonably withheld conditioned or delayed), Mortgagor and Mortgagor's agents shall not (i) enter into any Leases which are in conflict with the parameters set in the Loan Agreement, (ii) modify, amend or terminate any approved Lease, or (iii) accept any rental payment in advance of its due date.

**Maintenance, Repair and Restoration:** In all material respects, Mortgagor will keep the Property (or will cause the Property to be kept, as applicable) in first class order, repair, operating condition and appearance, causing all

necessary repairs, renewals, replacements, additions and improvements to be promptly made, and will not allow any of the Property to be misused, abused or wasted or to deteriorate. Notwithstanding the foregoing, Mortgagor will not, without the prior written consent of Mortgagee (which consent shall not be unreasonably withheld, conditioned or delayed), (i) remove from the Property any fixtures or personal property covered by this Mortgage Deed except such as is replaced by Mortgagor by an article of substantially equal suitability and value, owned by Mortgagor, free and clear of any lien or security interest (except that created by this Mortgage Deed), or (ii) make any structural alteration to the Property other than in accordance with the construction and development plans approved by the Mortgagee or any make other alteration thereto which materially negatively impairs the value thereof. If any act or occurrence of a material nature (including any condemnation or any casualty for which insurance was not obtained or obtainable) shall result in damage to or loss or destruction of the Property, Mortgagor shall give prompt notice thereof to Mortgagee and Mortgagor shall promptly, at Mortgagor's sole cost and expense, secure the Property as necessary and commence and continue diligently to completion to restore, repair, replace and rebuild the Property as nearly as possible to its value, condition and character immediately prior to the damage, loss or destruction.

**Operation of Property:** In all material respects, Mortgagor will operate the Property (or will cause the Property to be operated, as applicable) in a good and workmanlike manner and in accordance with all Legal Requirements and will pay all fees or charges of any kind in connection therewith. Mortgagor will keep the Property occupied so as not to impair the insurance carried thereon. Mortgagor will not use or occupy or conduct any activity on, or allow the use or occupancy of or the conduct of any activity on, the Property in any manner which violates any Legal Requirement in a material respect or which constitutes a public or private nuisance or which makes void, voidable or cancelable, or increases the premium of, any insurance then in force with respect thereto. Mortgagor will not initiate or permit any zoning reclassification of the Property or seek any variance under existing zoning ordinances applicable to the Property or use or permit the use of the Property in such a manner which would result in such use becoming a nonconforming use under applicable zoning ordinances or other Legal Requirement other than in accordance with the approved construction and development plans. Mortgagor will not impose any easement, restrictive covenant or encumbrance upon the Property, execute or file any subdivision plat or condominium declaration affecting the Property or consent to the annexation of the Property to any municipality, without the prior written consent of Mortgagee, to the extent the foregoing would have a material adverse effect on the Property. Mortgagor will not do or suffer to be done any act whereby the value of any part of the Property may be materially lessened. Mortgagor will preserve, protect, renew, extend and retain all material rights and privileges granted for or applicable to the Property. Except as permitted by the Permitted Encumbrances, without the prior written consent of Mortgagee, there shall be no drilling or exploration for or extraction, removal or production of any mineral, hydrocarbon, gas, natural element, compound or substance (including sand and gravel) from the surface or subsurface of the Land regardless of the depth thereof or the method of mining or extraction thereof. Mortgagor will cause all debts and liabilities of any character (including without limitation all debts and liabilities for labor, material and equipment (including software embedded therein) and all debts and charges for utilities servicing the Property) incurred in the construction, maintenance, operation and development of the Property to be promptly paid.

**Financial Matters:** Mortgagor is solvent after giving effect to all borrowings contemplated by the Loan Documents and no proceeding under any Debtor Relief Law is pending (or, to Mortgagor's knowledge, threatened) by or against Mortgagor, or any Affiliate of Mortgagor, as a debtor. All reports, statements, plans, budgets, applications, agreements and other data and information heretofore furnished or hereafter to be furnished by or on behalf of Mortgagor to Mortgagee in connection with the loan or loans evidenced by the Loan Documents (including, without limitation, all financial statements and financial information) are and will be true, correct and complete in all material respects as of their respective dates and do not and will not omit to state any fact or circumstance necessary to make the statements contained therein not misleading. No material adverse change has occurred since the dates of such reports, statements and other data in the financial condition of Mortgagor or, to Mortgagor's current, actual knowledge, of any tenant under any lease described therein.

**Status of Mortgagor; Suits and Claims; Loan Documents:** Mortgagor is and will continue to be possessed of all requisite power and authority to carry on its business and to own, operate and lease the Property. Each Loan Document executed by Mortgagor does not and will not result in the creation of any encumbrance against any assets or properties of Mortgagor, or any other person liable, directly or indirectly, for any of the Secured Obligations, except as expressly contemplated by the Loan Documents or except for any Permitted Encumbrances. There is no suit, action, claim, investigation, inquiry, proceeding or demand pending (or, to Mortgagor's knowledge, threatened) against Mortgagor or, to Mortgagor's knowledge which affects the Property (including, without limitation, any which challenges or otherwise pertains to Mortgagor's title to the Property) or the validity, enforceability or priority of any of the Loan Documents. The loan evidenced by the Note is solely for business and/or investment purposes, and is not intended for personal, family, household or agricultural purposes. Mortgagor further warrants that the proceeds of the Note shall be used for commercial purposes and stipulates that the loan evidenced by the Note shall be construed for all purposes as a commercial loan. Mortgagor's exact legal name is correctly set forth at the end of this Mortgage Deed. If Mortgagor is not an individual, Mortgagor is an organization of the type and (if not an unregistered entity) is

incorporated in or organized under the laws of the state specified in the introductory paragraph of this Mortgage Deed. If Mortgagor is an unregistered entity (including, without limitation, a general partnership) it is organized under the laws of the state specified in the introductory paragraph of this Mortgage Deed. Mortgagor will not cause or permit any change to be made in its name or identity (including its trade name or names), unless Mortgagor shall have notified Mortgagee in writing of such change at least 30 days prior to the effective date of such change, and shall have first taken all action required by Mortgagee for the purpose of further perfecting or protecting the lien and security interest of Mortgagee in the Property. Mortgagor's principal place of business and chief executive office, and the place where Mortgagor keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording including, without limitation, software, writings, plans, specifications and schematics concerning the Property, has for the preceding four months (or, if less, the entire period of the existence of Mortgagor) been and will continue to be (unless Mortgagor notifies Mortgagee of any change in writing at least 30 days prior to the date of such change) the address of Mortgagor set forth at the end of this Mortgage Deed. If Mortgagor is an individual, Mortgagor's principal residence has for the preceding four months been and will continue to be (unless Mortgagor notifies Mortgagee of any change in writing at least 30 days prior to the date of such change) the address of the principal residence of Mortgagor set forth at the end of this Mortgage Deed. Mortgagor's organizational identification number, if any, assigned by the state of incorporation or organization is correctly set forth on the first page of this Mortgage Deed. Mortgagor shall promptly notify Mortgagee (i) of any change of its organizational identification number, or (ii) if Mortgagor does not now have an organization identification number and later obtains one, of such organizational identification number.

**Further Assurances:** Mortgagor will, promptly on any reasonable request of Mortgagee, (i) correct any defect, error or omission which may be discovered in the contents, execution or acknowledgment of this Mortgage Deed or any other Loan Document; (ii) execute, acknowledge, deliver, procure and record and/or file such further documents (including, without limitation, further deeds of trust, security agreements, and assignments of rents or leases) and do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of this Mortgage Deed and the other Loan Documents, to more fully identify and subject to the liens and security interests hereof any property intended to be covered hereby (including specifically, but without limitation, any renewals, additions, substitutions, replacements, or appurtenances to the Property) or as deemed advisable by Mortgagee to protect the lien or the security interest hereunder against the rights or interests of third persons; and (iii) provide such certificates, documents, reports, information, affidavits and other instruments and do such further acts as may be necessary, desirable or proper in the reasonable determination of Mortgagee to enable Mortgagee to comply with the requirements or requests of any agency having jurisdiction over Mortgagee or any examiners of such agencies with respect to the indebtedness secured hereby, Mortgagor or the Property. Mortgagor shall pay all costs connected with any of the foregoing, which shall be a demand obligation owing by Mortgagor (which Mortgagor hereby promises to pay) to Mortgagee pursuant to this Mortgage Deed.

**Fees and Expenses:** Without limitation of any other provision of this Mortgage Deed or of any other Loan Document and to the extent reasonable and not prohibited by applicable law, Mortgagor will pay, and will reimburse to Mortgagee on demand to the extent paid by Mortgagee: (i) all appraisal fees, filing, registration and recording fees, recordation, transfer and other taxes, abstract fees, title search or examination fees, title policy and endorsement premiums and fees, uniform commercial code search fees, judgment and tax lien search fees, escrow fees, attorneys' fees, environmental inspection fees, survey fees, and all other costs and expenses of every character incurred by Mortgagor or Mortgagee in connection with the preparation of the Loan Documents, the evaluation, closing and funding of the loan evidenced by the Loan Documents, and any and all amendments and supplements to this Mortgage Deed, the Note or any other Loan Documents or any approval, consent, waiver, release or other matter requested or required hereunder or thereunder, or otherwise attributable or chargeable to Mortgagor as owner of the Property; and (ii) all costs and expenses, including reasonable attorneys' fees and expenses, actually incurred or expended in connection with the exercise of any right or remedy, or the defense of any right or remedy or the enforcement of any obligation of Mortgagor, hereunder or under any other Loan Document.

**Default and Remedies**: Subject to Borrower's right to obtain a release of the Property in accordance with the Loan Agreement, Mortgagor will be in default under this Mortgage Deed upon the occurrence of any one or more of the following events (collectively, "**Events of Default**;" any one singly, an "**Event of Default**").

(a) Nonperformance of Covenants. Any covenant, agreement or condition herein (other than covenants otherwise addressed in another paragraph of this section) is not fully and timely performed, observed or kept, and such failure is not cured within the applicable notice and cure period (if any) provided for herein, in the Loan Agreement, in the Promissory Note or in such other Loan Document.

(b) Default under other Loan Documents. The occurrence of any Event of Default under the Loan Agreement, Promissory Note, or any other Loan Document which continues beyond any applicable notice and cure period provided in such Loan Document.

(c) Representations. Any material statement, representation or warranty herein, or in any financial statement or any other writing heretofore or hereafter delivered to Mortgagee in connection herewith is false, misleading or erroneous in any material respect on the date as of which such statement, representation or warranty is made, which continues for a period of thirty (30) days after receipt of written notice from Mortgagee, or through its designated agent (except that no notice is required for those related to financial information).

(d) Transfer of the Property. Any sale, lease, conveyance, assignment, pledge, encumbrance, or transfer of all or any part of the Property or any interest therein, voluntarily or involuntarily, whether by operation of law or otherwise, except as may be permitted under (and in such case, in accordance with) the provisions of the Loan Agreement.

(e) Transfer of Assets. Any sale, lease, conveyance, assignment, pledge, encumbrance, or transfer of all or any part of the other assets of Mortgagor, excluding the Property, voluntarily or involuntarily, whether by operation of law or otherwise, except: (i) sales or transfers in the ordinary course of Mortgagor's business; (ii) sales or transfers for which Mortgagor receives consideration substantially equivalent to the fair market value of the transferred asset; and (iii) sales or transfers permitted under any Loan Document.

(f) Transfer of Ownership of Mortgagor. Except as permitted under the Loan Documents, the sale, pledge, encumbrance, assignment or transfer, voluntarily or involuntarily, whether by operation of law or otherwise, of any interest in Mortgagor (if Mortgagor is not a natural person but is a corporation, partnership, limited liability company, trust or other legal entity), without the prior written consent of Mortgagee (including, without limitation, if Mortgagor is a partnership or joint venture, the withdrawal from or admission into it of any general partner or joint venturer) which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding anything contained herein to the contrary, the following shall not be an Event of Default and shall not require Lender's consent: any such change in ownership in Mortgagor that results from a (A) transfer by devise or descent or by operation of law upon the death of a member of Mortgagor or (B) sale, transfer or hypothecation of membership interests in Mortgagor by the current member(s) to an immediate family member (i.e. parents, spouses, siblings, children or grandchildren) of such member (or a trust for the benefit of such persons).

(g) Grant of Easement, Etc. Without the prior written consent of Mortgagee, Mortgagor grants any easement or dedication, files any plat, condominium declaration, or restriction, or otherwise encumbers the Property, or seeks or permits any zoning reclassification or variance, unless such action is expressly permitted by the Loan Documents, or does not materially adversely affect the Property, which encumbrance is not removed or rescinded within thirty (30) days after receipt of written notice from Agent.

(h) Abandonment. The owner of the Property abandons any of the Property.

(i) Default Under Other Lien. A default or event of default occurs under any lien, security interest or assignment covering the Property or any part thereof (whether or not Mortgagee has consented, and without hereby implying Mortgagee's consent, to any such lien, security interest or assignment not created hereunder), or the holder of any such lien, security interest or assignment declares a default or institutes foreclosure or other proceedings for the enforcement of its remedies thereunder.

(j) Intentionally deleted.

(k) Intentionally deleted.

At any time after an Event of Default, Mortgagee shall be entitled to invoke any and all of the rights and remedies described below, in addition to all other rights and remedies available to Mortgagee at law or in equity. All of such rights and remedies shall be cumulative, and the exercise of any one or more of them shall not constitute an election of remedies.

(a) Mortgagee may declare any or all of the Secured Obligations to be due and payable immediately Upon any such declaration, such Secured Obligations shall thereupon be immediately due and payable, and such Interest Rate Agreement shall immediately terminate, without presentment, demand, protest, notice of protest, notice of acceleration or of intention to accelerate or any other notice or declaration of any kind, all of which are hereby expressly waived by Mortgagor. Without limitation of the foregoing, upon the occurrence of a default described in this Mortgage Deed, all of the Secured Obligations shall thereupon be immediately due and payable, without presentment, demand, protest, notice of protest, declaration or notice of acceleration or intention to accelerate, or any other notice, declaration or act of any kind, all of which are hereby expressly waived by Mortgagor.

(b) Subject to the requirements (including procedural requirements) of applicable law, Mortgagee shall, as a matter of right, without notice and without giving bond to Mortgagor or anyone claiming by, under or through Mortgagor, and without regard for the solvency or insolvency of Mortgagor or the then value of the Property, to the extent permitted by applicable law, be entitled to have a receiver appointed for all or any part of the Property and the Rents, and the proceeds, issues and profits thereof, with the rights and powers referenced below and such other rights and powers as the court making such appointment shall confer, and Mortgagor hereby consents to the appointment of such receiver and shall not oppose any such appointment. Such receiver shall have all powers and duties prescribed by

applicable law, all other powers which are necessary or usual in such cases for the protection, possession, control, management and operation of the Property, and such rights and powers as Mortgagee would have, upon entering and taking possession of the Property under subsection (c) below.

(c) Mortgagee, in person, by agent or by court-appointed receiver, may enter, take possession of, manage and operate all or any part of the Property, and may also do any and all other things in connection with those actions that Mortgagee may in its sole discretion consider necessary and appropriate to protect the security of this Mortgage Deed and the Property. Such other things may include: taking and possessing all of Mortgagor's or the then owner's Books and Records; entering into, enforcing, modifying or canceling leases on such terms and conditions as Mortgagee may consider proper; obtaining and evicting tenants; fixing or modifying Rents; collecting and receiving any payment of money owing to Mortgagee; completing any unfinished construction; and/or contracting for and making repairs and alterations. If Mortgagee so requests, Mortgagor shall assemble all of the Property that has been removed from the Premises and make all of it available to Mortgagee at the site of the Premises. Mortgagor hereby irrevocably constitutes and appoints Mortgagee as Mortgagor's attorney-in-fact to perform such acts and execute such documents as Mortgagee in its sole discretion may consider to be appropriate in connection with taking these measures, including endorsement of Mortgagor's name on any instruments.

(d) Mortgagee may cure any breach or default of Mortgagor, and if it chooses to do so in connection with any such cure, Mortgagee may also enter the Property and/or do any and all other things which it may in its sole discretion consider necessary and appropriate to protect the security of this Mortgage Deed and the Property. Such other things may include: appearing in and/or defending any action or proceeding which purports to affect the security of, or the rights or powers of Mortgagee under, this Mortgage Deed; paying, purchasing, contesting or compromising any encumbrance, charge, lien or claim of lien which in Mortgagee's sole judgment is or may be senior in priority to this Mortgage Deed, such judgment of Mortgagee to be conclusive as among the parties to this Mortgage Deed; obtaining insurance and/or paying any premiums or charges for insurance required to be carried under the Loan Agreement; otherwise caring for and protecting any and all of the Property; and/or employing counsel, accountants, contractors and other appropriate persons to assist Mortgagee. Mortgagee may take any of the actions permitted under this section either with or without giving notice to any person. Any amounts expended by Mortgagee under this section shall be deemed Secured Obligations and shall be secured by this Mortgage Deed and the Loan Documents.

(e) Mortgagee may exercise any or all of the remedies granted to a secured party under the Uniform Commercial Code in the State in which the Property is located. Additionally, prior or subsequent to taking possession of any portion of the Property or taking any action with respect to such possession, Mortgagee may: (1) collect and/or sue for the Rents in Mortgagee's own name, give receipts and releases therefor, and after deducting all expenses of collection, including reasonable attorneys' fees and expenses, apply the net proceeds thereof to the Secured Obligations in such manner and order as Mortgagee may elect and/or to the operation and management of the Property, including the payment of management, brokerage and reasonable attorney's fees and expenses; and (2) require Mortgagor to transfer all security deposits and records thereof to Holder together with original counterparts of the Leases. It is the express understanding and intent of the parties that as to any personal property interests subject to Article 9 of the UCC, Mortgagee, upon an Event of Default, may proceed under the UCC or may proceed as to both real and personal property interests in accordance with the provisions of this Mortgage Deed and its rights and remedies in respect to real property, as specifically permitted under Section 9-604 of the UCC.

(f) Mortgagee shall have the right, in one or several concurrent or consecutive proceedings, to foreclose the lien hereof upon the Property or any part thereof, for the Secured Obligations, or any part thereof, by any proceedings appropriate under applicable law. Mortgagee or its nominee may bid and become the purchaser of all or any part of the Property at any foreclosure or other sale hereunder, and the amount of Mortgagee's successful bid shall, to the extent permitted by applicable law, be credited on the Secured Obligations. In addition to the right provided in this Mortgage Deed, upon, or at any time after the filing of a complaint to foreclose this Mortgage Deed, Mortgagee shall be entitled to the appointment of a receiver of the Property by the court in which such complaint is filed, and Mortgagor hereby consents to such appointment. A sale may cover not only the real property but also the personal property and other interests which are a part of the Property, or any part thereof, as a unit and as a part of a single sale, or the sale may be of any part of the Property separately from the remainder of the Property.

(g) Exercise the power of sale contained in this Mortgage Deed and deliver to Mortgagee a written statement of breach, notice of default and election to cause Mortgagor's interest in the Property to be sold, all in accordance with applicable law. If Mortgagee elects to exercise the power of sale contained in this Mortgage Deed, Mortgagee shall deposit copies of this Mortgage Deed and the Notes and such receipts and evidence of expenditures made and secured hereby as may be required. Upon receipt of such notice from Mortgagee, Mortgagee shall cause to be recorded, published or delivered such notices of default and notices of sale as may then be required by law or this Mortgage Deed. Mortgagee shall, and without demand on Mortgagor, after such time as may then be required by law and after recordation of such notice of default and after notice of sale having been given as required by law, sell Mortgagor's interest in the Property at the time and place of sale fixed by it in such notice of sale, either as a whole, or in separate lots or parcels or items as Mortgagee shall deem expedient, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States payable at the time of sale, or as

otherwise may then be required by law. Mortgagee shall deliver to such purchaser or purchasers thereof its good and sufficient deed or deeds conveying the property so sold, without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including, without limitation, Mortgagor, Mortgagee, or any Lender, may purchase at such sale, and Mortgagor covenants to warrant and defend the title of such purchaser or purchasers. Mortgagee and Lenders shall have the right to credit bid at any such sale. Mortgagee may sell not only the real property but also the personal property and other interests which are a part of the Property, or any part thereof, as a unit and as a part of a single sale, or may sell any part of the Property separately from the remainder of the Property.Mortgagee shall not be required to take possession of any part of the Property or to have any of the personal property present at any sale of the Property. Mortgagee may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Mortgagee, including the posting of notices and the conduct of sale, but in the name and on behalf of Mortgagee. If any sale hereunder is not completed or is defective in the opinion of Mortgagee, such sale shall not exhaust the power of sale hereunder, and Mortgagee shall have the right to cause a subsequent sale or sales to be made hereunder. As may be permitted by, but subject to, applicable law, after deducting all costs, fees and Mortgagee shall apply the proceeds of sale (A) first, to payment of all costs, fees and expenses, including reasonable attorneys' fees and expenses incurred by Mortgagee in exercising the power of sale or foreclosing this Mortgage Deed, (B) second, to the payment of the Secured Obligations (including, without limitation, the principal, accrued interest and other sums due and owing under the Notes and the amounts due and owing to Mortgagee and Lenders under this Mortgage Deed) in such manner and order as Mortgagee may elect, and (C) third, the remainder, if any, shall be paid to Mortgagor, or such other persons as may be legally entitled thereto.Mortgagee may, in the manner provided by law, postpone sale of all or any portion of the Property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement or subsequently noticed sale, and without further notice make such sale at the time fixed by the last postponement, or may, in its discretion, give a new notice of sale.

(h) In addition to any other right, with or without a foreclosure, Mortgagee may institute a judicial action for the foreclosure or enforcement of the assignments, liens, and security interests hereof subject to the terms of the Loan Documents and applicable Delaware law. Mortgagee may exercise all rights and remedies contained in any other instrument, document, agreement or other writing heretofore, concurrently or in the future executed by Mortgagor or any other person or entity in favor of Mortgagee in connection with the Secured Obligations or any part thereof, without prejudice to the right of Mortgagee thereafter to enforce any appropriate remedy against Mortgagor. Mortgagee shall have the right to pursue all remedies afforded to a Mortgagee under applicable law or in equity or otherwise, and shall have the benefit of all of the provisions of such applicable law, including all amendments thereto which may become effective from time to time after the date hereof. Subject to applicable Delaware law, every right, power and remedy granted to Mortgagee in this Mortgage Deed shall be cumulative and not exclusive, and in addition to all right, powers and remedies granted at law or in equity or by statute, and the exercise of any such right, power or remedy shall not be deemed a waiver of the right to exercise, at the same time or thereafter, any other right, power or remedy.

(i) Mortgagee, as required by applicable law, shall have the discretionary right to cause some or all of the Property, which constitutes personal property, to be sold or otherwise disposed of in any combination and in any manner permitted by applicable law. For purposes of this power of sale, Mortgagee, as required by applicable law, may elect to treat as personal property any Property which is intangible or which can be severed from the Premises or Improvements without causing structural damage. If it chooses to do so, Mortgagee, as required by applicable law, may dispose of any personal property, in any manner permitted by Article 9 of the Uniform Commercial Code of the State in which the Property is located, including any public or private sale, or in any manner permitted by any other applicable law. In connection with any sale or other disposition of such Property, Mortgagor agrees that the following procedures constitute a commercially reasonable sale: Mortgagee shall mail written notice of the sale to Mortgagor not later than thirty (30) days prior to such sale. Mortgagee will publish notice of the sale in a local daily newspaper of general circulation. Upon receipt of any written request, Mortgagee will make the Property available to any bona fide prospective purchaser for inspection during reasonable business hours. Notwithstanding, Mortgagee shall be under no obligation to consummate a sale if, in its judgment, none of the offers received by it equals the fair value of the Property offered for sale. The foregoing procedures do not constitute the only procedures that may be commercially reasonable. Mortgagor further agrees that if Mortgagee shall be prosecuting one or more foreclosure or other proceedings against a portion of the Property or against any collateral other than the Property, which collateral directly or indirectly secures the Secured Obligations, or if Mortgagee shall have obtained a judgment of foreclosure and sale or similar judgment against such collateral (or, in the case of a foreclosure sale, shall have met the statutory requirements therefor with respect to such collateral), then, whether or not such proceedings are being maintained or judgments were obtained in or outside the state in which the Premises are located, Mortgagee may commence or continue any sale or foreclosure proceedings and exercise its other remedies granted in this Mortgage Deed against all or any part of the Property and Mortgagor waives any objections to the commencement or continuation of a foreclosure of this Mortgage Deed or exercise of any other remedies hereunder based on such other proceedings or

judgments, and waives any right to seek to dismiss, stay the execution of, remove, transfer or consolidate either any action under this Mortgage Deed or such other proceedings on such basis. Neither the commencement nor continuation of proceedings to sell the Property in a sale, to foreclose this Mortgage Deed nor the exercise of any other rights hereunder nor the recovery of any judgment by Mortgagee nor the occurrence of any sale by Mortgagee or any Lender in any such proceedings shall prejudice, limit or preclude Mortgagee's right to commence or continue one or more sales, foreclosure or other proceedings or obtain a judgment against (or, in the case of a sale, to meet the statutory requirements for, any such sale of) any other collateral (either in or outside the state in which the Premises are located) which directly or indirectly secures the Secured Obligations, and Mortgagor expressly waives any objections to the commencement of, continuation of, or entry of a judgment in such other sales or proceedings or exercise of any remedies in such sales or proceedings based upon any action or judgment connected to this Mortgage Deed, and Mortgagor also waives any right to seek to dismiss, stay the execution of, remove, transfer or consolidate either such other sales or proceedings or any sale or action under this Mortgage Deed on such basis. It is expressly understood and agreed that to the fullest extent permitted by applicable law, Mortgagee may, at its election, cause the sale of all collateral which is the subject of a single sale or foreclosure action at either a single sale or at multiple sales conducted simultaneously and take such other measures as are appropriate in order to effect the agreement of the parties to dispose of and administer all collateral securing the Secured Obligations (directly or indirectly) in the most economical and least time-consuming manner.

**Application of Rents and Other Sums**: Mortgagee shall apply any and all Rents collected by it, and any and all sums other than proceeds of a Foreclosure Sale which Mortgagee may receive or collect under this Mortgage Deed, in the following manner:

(a) First, to pay the portion of the Secured Obligations attributable to the costs and expenses of operation and collection that may be incurred by Mortgagee or any receiver;

(b) Second, to pay all other Secured Obligations in any order and proportions as Mortgagee in its sole discretion may choose; and

(c) Third, to remit the remainder, if any, to the person or persons entitled to it.

Mortgagee shall have no liability for any funds which it does not actually receive.

**Additional Provisions:** The Loan Documents fully state all of the terms and conditions of the parties' agreement regarding the matters mentioned in or incidental to this Mortgage Deed. The Loan Documents also grant further rights to Mortgagee and contain further agreements and affirmative and negative covenants by Mortgagor which apply to this Mortgage Deed and to the Property.

**No Waiver or Cure**: Each waiver by Mortgagee must be in writing, and no waiver shall be construed as a continuing waiver. No waiver shall be implied from any delay or failure by Mortgagee to take action on account of any default of Mortgagor. Consent by Mortgagee to any act or omission by Mortgagor shall not be construed as a consent to any other or subsequent act or omission or to waive the requirement for Mortgagee's consent to be obtained in any future or other instance.

If any of the events described below occurs, that event alone shall not: cure or waive any breach, Event of Default or notice of default under this Mortgage Deed or invalidate any act performed pursuant to any such default or notice; or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid and performed and all other defaults under the Loan Documents have been cured); or impair the security of this Mortgage Deed; or prejudice Mortgagee or any receiver in the exercise of any right or remedy afforded any of them under this Mortgage Deed; or be construed as an affirmation by Mortgagee of any tenancy, lease or option, or a subordination of the lien of this Mortgage Deed.

(a) Mortgagee, its agent or a receiver takes possession of all or any part of the Property in the manner provided in this Mortgage Deed.

(b) Mortgagee collects and applies Rents as permitted under this Mortgage Deed, either with or without taking possession of all or any part of the Property.

(c) Mortgagee receives and applies to any Secured Obligation any proceeds of any Property, including any proceeds of insurance policies, condemnation awards, or other claims, property or rights assigned to Mortgagee under this Mortgage Deed.

(d) Mortgagee makes a site visit, observes the Property and/or conducts tests as permitted under this Mortgage Deed.

(e) Mortgagee receives any sums under this Mortgage Deed or any proceeds of any collateral held for any of the Secured Obligations, and applies them to one or more Secured Obligations.

(f) Mortgagee any receiver invokes any right or remedy provided under this Mortgage Deed.

**Powers of Mortgagee:** If Mortgagee performs any act which it is empowered or authorized to perform under this Mortgage Deed, including any act permitted by this Mortgage Deed, that act alone shall not release or change the personal liability of any person for the payment and performance of the Secured Obligations then outstanding, or the lien of this Mortgage Deed on all or the remainder of the Property for full payment and performance of all outstanding Secured Obligations. The liability of the original Mortgagor shall not be released or changed if Mortgagee grants any successor in interest to Mortgagor any extension of time for payment, or modification of the terms of payment, of any Secured Obligation. Mortgagee shall not be required to comply with any demand by the original Mortgagor that Mortgagee refuse to grant such an extension or modification to, or commence proceedings against, any such successor in interest.

Following an Event of Default that remains uncured, Mortgagee may take any of the actions permitted under this Mortgage Deed regardless of the adequacy of the security for the Secured Obligations, or whether any or all of the Secured Obligations have been declared to be immediately due and payable, or whether notice of default and election to sell has been given under this Mortgage Deed.

Moreover, from time to time, Mortgagee may apply to any court of competent jurisdiction for aid and direction in executing and enforcing the rights and remedies created under this Mortgage Deed. Mortgagee may from time to time obtain orders or decrees directing, confirming or approving acts in executing and enforcing these rights and remedies.

**Merger:** The parties to this Mortgage Deed intend that no merger shall occur as a result of Mortgagee's acquiring any other estate in or any other lien on the Property unless Mortgagee consents to a merger in writing.

**Applicable Law:** The creation, perfection and enforcement of the lien of this Mortgage Deed shall be governed by the law of the State in which the property is located. Subject to the foregoing, in all other respects, this Mortgage Deed shall be exclusively governed by the substantive laws of the State of Delaware.

**Successors in Interest.** The terms, covenants and conditions of this Mortgage Deed shall be binding upon and inure to the benefit of the heirs, successors and assigns of the parties.

**Interpretation:** Whenever the context requires, all words used in the singular will be construed to have been used in the plural, and vice versa, and each gender will include any other gender. The captions of the sections of this Mortgage Deed are for convenience only and do not define or limit any terms or provisions. The word "include(s)" means "include(s), without limitation," and the word "including" means "including, but not limited to." The word "obligations" is used in its broadest and most comprehensive sense, and includes all primary, secondary, direct, indirect, fixed and contingent obligations. It further includes all principal, interest, prepayment charges, late charges, loan fees and any other fees and charges accruing or assessed at any time, as well as all obligations to perform acts or satisfy conditions. No listing of specific instances, items or matters in any way limits the scope or generality of any language of this Mortgage Deed. The Exhibits to this Mortgage Deed are hereby incorporated in this Mortgage Deed.

**Waiver of Statutory Rights:** To the extent permitted by law, Mortgagor hereby agrees that it shall not and will not apply for or avail itself of any appraisement, valuation, stay, extension or exemption laws, or any so-called "Moratorium Laws," now existing or hereafter enacted, in order to prevent or hinder the enforcement or foreclosure of this Mortgage Deed, but hereby waives the benefit of such laws to the extent permitted by law. Mortgagor for itself and all who may claim through or under it waives any and all right to have the property and estates comprising the Property marshaled upon any foreclosure of the lien hereof and agrees that any court having jurisdiction to foreclose such lien may order the Property sold as an entirety. To the extent permitted by law, Mortgagor hereby waives any and all rights of redemption from sale under any judgment of foreclosure of this Mortgage Deed on behalf of Mortgagor and on behalf of each and every person acquiring any interest in or title to the Property of any nature whatsoever, subsequent to the date of this Mortgage Deed. The foregoing waiver of right of redemption is made pursuant to the provisions of applicable law.

**Severability:** If any provision of this Mortgage Deed should be held unenforceable or void, that provision shall be deemed severable from the remaining provisions and shall in no way affect the validity of this Mortgage Deed except that if such provision relates to the payment of any monetary sum, then Mortgagee may, at its option, declare all Secured Obligations immediately due and payable.

**Notices:** Any notice, demand, request or other communication which any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed to have been properly given (a) if hand delivered, when delivered; (b) if mailed by United States Certified Mail (postage prepaid, return receipt requested), three Business Days after mailing (c) if by Federal Express or other reliable overnight courier service, on the next Business Day after delivered to such courier service or (d) if by telecopier on the day of transmission so long as copy is sent on the same day by overnight courier to the address provided for such notice or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of

notice. Any notice or demand delivered to the person or entity named above to accept notices and demands for Mortgagor shall constitute notice or demand duly delivered to Mortgagor, even if delivery is refused.

**Future Advances:** The total amount of indebtedness secured hereby may increase from time to time as advances are made to the Project, but the total unpaid principal balance of indebtedness secured hereby (including disbursements that Lenders and Mortgagee may, but shall not be obligated to, make under this Mortgage Deed, the Loan Documents or any other document with respect thereto) at any one time outstanding may be substantially less but the maximum principal amount to be secured shall not exceed One Hundred and Ten Million Dollars ($110,000,000), plus interest thereon, and any disbursements made for the enforcement of this Mortgage Deed and any remedies hereunder, payment of taxes, special assessments, utilities or insurance on the Property, any other protective advances made relating to the Property, and interest on such disbursements and all disbursements by Lenders and Mortgagee pursuant to applicable law (all such indebtedness being hereinafter referred to as the maximum amount secured hereby). This Mortgage Deed shall be valid and have priority to the extent of the maximum amount secured hereby over all subsequent liens and encumbrances, including statutory liens, excepting solely taxes and assessments levied on the Property given priority by law.

**WAIVER OF TRIAL BY JURY:** MORTGAGOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION ARISING IN ANY WAY IN CONNECTION WITH THIS MORTGAGE DEED, THE NOTE, OR ANY OF THE OTHER LOAN DOCUMENTS, THE LOAN OR ANY OTHER STATEMENTS OR ACTIONS OF MORTGAGOR OR MORTGAGEE. MORTGAGOR ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS MORTGAGE DEED AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS DISCUSSED THIS WAIVER WITH SUCH LEGAL COUNSEL. MORTGAGOR FURTHER ACKNOWLEDGES THAT (i) IT HAS READ AND UNDERSTANDS THE MEANING AND RAMIFICATIONS OF THIS WAIVER, (ii) THIS WAIVER IS A MATERIAL INDUCEMENT FOR MORTGAGEE TO MAKE THE LOAN, ENTER INTO THIS MORTGAGE DEED AND EACH OF THE OTHER LOAN DOCUMENTS, AND (iii) THIS WAIVER SHALL BE EFFECTIVE AS TO EACH OF SUCH OTHER LOAN DOCUMENTS AS IF FULLY INCORPORATED THEREIN.

**Inconsistencies:** In the event of any inconsistency between this Mortgage Deed and the Loan Agreement, the terms hereof shall be controlling as necessary to create, preserve and/or maintain a valid security interest upon the Property, otherwise the provisions of the Loan Agreement shall be controlling.

**UCC Financing Statements:** Mortgagor hereby authorizes Mortgagee to file Uniform Commercial Code financing statements to perfect Mortgagee's security interest in any part of the Property. In addition, Mortgagor agrees to sign any and all other documents that Mortgagee deems necessary in its sole discretion to perfect, protect, and continue Mortgagee's lien and security interest in the Property.

**No "Mortgagee-In-Possession" Status:** Neither the assignment of Leases and Rents contained in this Mortgage Deed, nor the exercise by Mortgagee of any of its rights or remedies under this Mortgage Deed shall be deemed to make Mortgagee a "mortgagee-in-possession" or otherwise liable in any manner with respect to the Property, unless Mortgagee, in person or by agent, assumes actual possession thereof. Nor shall appointment of a receiver for the Property by any court at the request of Mortgagee or by agreement with Mortgagor, or the entering into possession of the Property by such receiver, be deemed to make Mortgagee a "mortgagee-in-possession" or otherwise liable in any manner with respect to the Property.

**Attorney's Fees and Costs**: If a lawsuit or legal action of any kind is brought hereon, whether settled or pursued to final judgment, or if an attorney is employed or expenses are incurred, to enforce any provisions of this Agreement, the prevailing party shall be paid by the losing party all of the reasonable attorneys' fees and costs incurred in such legal efforts.

IN WITNESS WHEREOF, Mortgagor has executed this Mortgage Deed as an instrument under seal as of the date first above written.

**EASTERN EMERALD GROUP, LLC**
a Delaware limited liability company

By:______________________
Its:______________________

State of New York )
) .ss
County of ____________ )

On ______________, 201_, before me, ________________________________, A Notary Public, personally appeared _________________________________, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY of PERJURY under the laws of the State of New York that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature ______________________________ (Seal)

## EXHIBIT "A"

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Queens, County of Queens, City and State of New York, more particularly designated on the Tax Map of the City of New York, for the Borough of Queens, as Section 10, Block 1707, Lots 1, 3, 6, 7, 8, 13, 15, 17, 19, 33, 34, 35, 36, 43, and 46.