Name of Recipient ______________________

# EEGH II, LP.

## CONFIDENTIAL PRIVATE OFFERING MEMORANDUM

**UP TO US$ 80 Million, 160 LIMITED PARTNERSHIP UNITS**

**NOT TO BE REPRODUCED**

GENERAL PARTNER:

**FLEET NEW YORK METROPOLITAN REGIONAL CENTER, LLC**

This Confidential Private Offering Memorandum (the "Memorandum") describes an offering (the "Offering") of limited partnership units (the "Units" or "Unit") of EEGH II, LP., a New York State limited partnership (the "Partnership"). The Units offered hereby will be sold subject to the provisions of a subscription agreement (the "Subscription Agreement") containing certain representations, warranties, terms, and conditions of an investment in the Partnership and the Limited Partnership Agreement of the Partnership (the "Partnership Agreement"). Prospective investors who seek to become limited partners of the Partnership ("Limited Partners") should carefully read and retain this Memorandum, the Subscription Agreement and the Partnership Agreement.

**THIS IS A PRIVATE OFFERING MADE PURSUANT TO APPLICABLE FEDERAL AND STATE "PRIVATE PLACEMENT" EXEMPTIONS. THE UNITS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), NOR HAVE THEY BEEN QUALIFIED, APPROVED OR DISAPPROVED UNDER ANY OTHER FEDERAL OR STATE SECURITIES LAWS. NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY OTHER FEDERAL OR STATE REGULATORY AUTHORITY HAS PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE SECURITIES OFFERED HEREBY MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF BY AN INVESTOR UNLESS THEY ARE REGISTERED UNDER THE SECURITIES ACT AND, WHERE REQUIRED, UNDER THE LAWS OF OTHER JURISDICTIONS, UNLESS SUCH PROPOSED SALE, TRANSFER OR DISPOSITION IS EXEMPT FROM SUCH REGISTRATION.**

EXHIBIT 6 SEC v. Xia, et al.

EXHIBIT tabbies 21 5/30/19 SM



Ex. 6-1

THIS OFFERING IS AVAILABLE ONLY TO "ACCREDITED INVESTORS" AS THAT *TERM* IS DEFINED PURSUANT TO THE SECURITIES ACT AND REGULATION D THEREUNDER, SUBJECT TO THE PARTNERSHIP'S RIGHT TO REJECT SUBSCRIPTIONS, IN WHOLE OR IN PART. THE UNITS MUST BE ACQUIRED FOR INVESTMENT PURPOSES ONLY AND ONCE ACQUIRED WILL NOT BE FREELY TRANSFERABLE.

UNITS ARE AVAILABLE ONLY TO PERSONS WILLING AND ABLE TO BEAR THE ECONOMIC RISKS OF THIS INVESTMENT. AN INVESTMENT IN THE PARTNERSHIP IS SPECULATIVE AND ILLIQUID AND INVOLVES A HIGH DEGREE OF RISK. SEE "CERTAIN RISK FACTORS." THE UNITS ARE SUITABLE AS AN INVESTMENT ONLY FOR A LIMITED PORTION OF THE RISK SEGMENT OF AN INVESTOR'S PORTFOLIO.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS UNLAWFUL. THIS MEMORANDUM CONSTITUTES AN OFFER ONLY IF DELIVERY OF THIS MEMORANDUM IS PROPERLY AUTHORIZED BY THE GENERAL PARTNER. THIS MEMORANDUM HAS BEEN PREPARED BY THE GENERAL PARTNER SOLELY FOR THE BENEFIT OF PERSONS INTERESTED IN THE PROPOSED SALE OF THE UNITS. THIS MEMORANDUM IS BEING GIVEN TO THE RECIPIENT SOLELY SO THAT THE RECIPIENT MAY EVALUATE AN INVESTMENT IN THE UNITS DESCRIBED HEREIN. IT MAY NOT BE REPRODUCED OR DISTRIBUTED, IN WHOLE OR IN PART, TO ANYONE ELSE (OTHER THAN THE RECIPIENT'S PROFESSIONAL ADVISORS.)

THE CONTENTS OF THIS MEMORANDUM SHOULD NOT BE CONSTRUED AS INVESTMENT, LEGAL OR TAX ADVICE. IN MAKING A DECISION WHETHER TO INVEST IN THE UNITS, INVESTORS MUST RELY UPON THEIR OWN EXAMINATION OF THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. NUMEROUS FACTORS MATERIAL TO A DECISION WHETHER TO INVEST IN THE UNITS HAVE BEEN PRESENTED IN THIS MEMORANDUM ONLY IN SUMMARY OR OUTLINE FORM IN RELIANCE ON THE FINANCIAL SOPHISTICATION OF THE OFFEREES. EACH PROSPECTIVE INVESTOR IS URGED TO SEEK INDEPENDENT INVESTMENT, LEGAL AND TAX ADVICE CONCERNING THE CONSEQUENCES OF INVESTING IN THE PARTNERSHIP. NO ASSURANCE CAN BE GIVEN THAT EXISTING LAWS WILL NOT BE CHANGED OR INTERPRETED ADVERSELY TO THE PARTNERSHIP OR INVESTORS.

THIS MEMORANDUM CONTAINS CERTAIN "FORWARD-LOOKING STATEMENTS" (AS SUCH TERM IS DEFINED IN THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995), WHICH CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "BELIEVES," "EXPECTS," "MAY," "WILL," "SHOULD," OR "ANTICIPATES" OR THE NEGATIVE THEREOF, OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY, OR BY DISCUSSIONS OF STRATEGY THAT INVOLVE RISK AND UNCERTAINTIES. SUCH FORWARD-LOOKING STATEMENTS INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES, AND OTHER FACTORS THAT MAY CAUSE THE ACTUAL RESULTS, PERFORMANCE, OR ACHIEVEMENTS OF THE PARTNERSHIP TO BE MATERIALLY DIFFERENT FROM ANY FUTURE RESULTS, PERFORMANCE, OR ACHIEVEMENTS EXPRESSED OR IMPLIED BY SUCH FORWARD-LOOKING STATEMENTS. SUCH FACTORS INCLUDE THE TIMING, COSTS, AND SCOPE OF ANY INVESTMENT BY THE PARTNERSHIP, THE REVENUE AND PROFITABILITY LEVELS OF THE PARTNERSHIP, REAL ESTATE VALUATIONS IN THE GEOGRAPHIC AREAS IN WHICH THE PARTNERSHIP INVESTS AND NUMEROUS OTHER FACTORS. CERTAIN OF THESE FACTORS ARE DISCUSSED IN MORE DETAIL ELSEWHERE IN THIS MEMORANDUM. GIVEN THESE UNCERTAINTIES, PROSPECTIVE INVESTORS ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON SUCH FORWARD-LOOKING



Ex. 6-2

**STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE BASED ON CURRENT EXPECTATIONS, AND THE PARTNERSHIP ASSUMES NO OBLIGATIONS TO UPDATE THIS INFORMATION. FUTURE RESULTS ARE IMPOSSIBLE TO PREDICT, AND NO REPRESENTATION OF ANY KIND IS MADE RESPECTING THE FUTURE ACCURACY OR THE COMPLETENESS OF ANY FORWARD-LOOKING STATEMENTS HEREIN.**

All references in this Memorandum to "dollars," "U.S. dollars," and "US$" are to the currency of the United States of America.

Inquiries regarding this Memorandum should be directed to the Partnership at the address of the General Partner listed above. The Partnership will make available to any prospective qualified investor, prior to the closing, the opportunity to ask questions of and receive answers from the Partnership or persons acting on behalf of the Partnership concerning the terms and conditions of the Offering and the business and operations of the Partnership, and to obtain any additional information to the extent the Partnership possesses such information.

This Memorandum contains summaries, believed by the Partnership to be accurate, of certain agreements and other documents which are attached as exhibits hereto. All such summaries are qualified in their entirety by reference to such agreements or documents. This Memorandum does not purport to be all-inclusive or contain all of the information which a prospective investor may desire. The delivery of this Memorandum at any time does not imply that information herein is correct as of any time subsequent to its date.

The offeree, by accepting delivery of this Memorandum, agrees to return it and all related documents to the Partnership if the offeree decides not to subscribe for Units or at any time if the Partnership requests the return of this Memorandum and such other documents.

This Memorandum is subject to modification or withdrawal at any time.

**Table of Contents**


**Page**

SUMMARY OF TERMS .......... 5

THE PARTNERSHIP .......... 10

INVESTMENT POLICY .......... 10

INVESTMENT PROFESSIONALS .......... 12

FEES AND EXPENSES .......... 13

FEES AND EXPENSES .......... 14

FEES AND EXPENSES .......... 14

FEES AND EXPENSES .......... 15

WITHDRAWALS .......... 16

SUITABILITY .......... 16

CERTAIN RISK FACTORS .......... 18

CERTAIN RISK FACTORS .......... 21

CONFLICTS OF INTEREST .......... 23

MISCELLANEOUS .......... 24

LEGAL MATTERS .......... 25

ACCESS TO INFORMATION .......... 25

**EXHIBITS**

I. USCIS LETTER OF APPROVAL

II. PRIVACY NOTICE

III. EEGH II, LP. LIMITED PARTNERSHIP AGREEMENT

IV. SUBSCRIPTION AGREEMENT

# EEGH II, LP.

## SUMMARY OF TERMS

The following is a summary of the terms and conditions of an investment in EEGH II, LP. (the "Partnership"). This summary is qualified in its entirety by the information appearing elsewhere herein and in the Limited Partnership Agreement of the Partnership (as it may be amended, modified or supplemented, the "Partnership Agreement"). The description of any document herein is qualified by reference to such document.

**The Partnership**

The Partnership is a New York limited partnership that was formed on September 10, 2015 under the name EEGH II, LP. The Partnership is a new commercial enterprise that intends to finance the development, construction and operation of an expansion project for a mixed-use commercial building in Corona, Queens County, overlooking Flushing Bay ("Eastern Emerald Project II").

**The Offering**

The Partnership is currently offering units of limited partnership interests (the "Units" and each individually, a "Unit") to eligible investors through private placement. See "SUITABILITY." Investors in the Partnership become limited partners ("Limited Partners" and each individually, a "Limited Partner") of the Partnership. All Units are of the same class and no Unit will have any priority over any other Unit.

**Investment Objective and Strategy**

The Partnership is a commercial for-profit enterprise formed to finance the Eastern Emerald Project II in Corona, City of New York, Queens, New York. The Partnership is designed to comply with the statutory and regulatory requirements of the EB-5 immigrant investor program ("EB-5 Program") administered by the U.S. Citizenship and Immigration Services ("USCIS"), with respect to certain foreign investors. As of the date of this Memorandum, the Eastern Emerald Project II is located within a geographic area certified by the New York State Department of Labor as a high unemployment area, qualifying it as a Targeted Employment Area ("TEA") into which the minimum EB-5 Program qualifying investment amount is US$500,000. There can be no assurance that the Partnership's investment objective will be achieved, and investment results may vary substantially over time. See "INVESTMENT POLICY."

**The Eastern Emerald Project II**

The Eastern Emerald Project II will encompass the development, construction and operation of an expansion to a 5-star hotel, which will result in an additional 556,398 SF being added to the overall building; an additional 294 5-star luxury hotel rooms; an additional 4 floors added to the building; a performing arts center across 5 floors; as well as additional retail space, restaurant space and parking garage space. The Eastern Emerald Project II is intended to be funded from several sources



Ex. 6-5

as set forth in the Business Plan, including foreign investor capital under the EB-5 Program. See "EASTERN EMERALD PROJECT II."

**General Partner**

The Partnership's general partner, Fleet New York Metropolitan Regional Center LLC, a New York limited liability company (the "General Partner"), exercises ultimate authority over the Partnership and oversees the day-to-day activities of the Partnership. See "MANAGEMENT PROFESSIONALS – The General Partner."

**Limited Partners**

Foreign investors investing under the EB-5 Program will become Limited Partners of the Partnership by (i) completing and delivering subscription documents, including the Subscription Agreement, in the form attached hereto as Exhibit IV, which may be accepted by the General Partner in its sole discretion, and a Subscriber Suitability Questionnaire (ii) executing and delivering a counterpart signature page to the Partnership Agreement, (iii) making a capital investment in the Partnership in the amount of US$500,000 (or such greater amount as may be required by the USCIS as a result of changes to U.S. immigration laws and regulations governing the EB-5 Program), and (iv) paying the processing fee in the amount of US$50,000 to the General Partner, unless another amount is designated by the General Partner. (The General Partner, in its absolute discretion, may raise or decrease this minimum requirement for the processing fee in the future.) The Limited Partners and the General Partner are sometimes referred to herein collectively as the "Partners" and each individually as a "Partner." Limited Partners will be equity owners in the Partnership and will engage in policy making activities relating to the Partnership, as well as having all the rights, powers, and duties normally granted to limited partners under the New York Revised Limited Partnership Act, which is based on the Uniform Limited Partnership Act.

**Minimum Investment and Capital Contributions**

The minimum initial investment in the Partnership is one Unit. Each Unit is being offered at a price of US$500,000 (or such greater amount as may be required by the USCIS as a result of changes to U.S. immigration laws and regulations governing the EB-5 Program). The Partnership is seeking to raise up to US$ 120,000,000 of capital contributions from the Limited Partners. However, this amount may be increased or decreased, if, in the General Partner's sole discretion, it is determined that either greater amounts are needed or that such amounts are not needed, yet will also be limited by the number of jobs created by the new commercial enterprise.

**Admissions**

After the first closing in which the General Partner has received and accepted subscriptions to the Partnership, the General

Partner may hold one or more closings at which the General Partner may, in its sole discretion, admit new Limited Partners. The General Partner has the right, in its sole discretion, to refuse any person's offer to become a Limited Partner.

**Application of Capital Contributions**

Capital contributions are intended by the Partnership to be used for a loan to LaGuardia Performance Center, LLC for the purpose of financing the Eastern Emerald Project II (the "Eastern Emerald II Loan").

**Eligibility**

Each investor in the Partnership must be an "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended (the "Securities Act"), and may be required to meet other suitability requirements as set forth in the subscription documents. The foregoing suitability standards represent the minimum suitability requirements for prospective investors in the Partnership and satisfaction of these standards does not necessarily mean that an investment in the Partnership is a suitable investment for a prospective investor. See "SUITABILITY."

**Allocations and Distributions**

Net proceeds (if any) realized from the distribution of profit realized from the Partnership's investments will be allocated and distributed 90% to the Limited Partners and 10% to the General Partner. There are no guaranteed distributions. The General Partner will be entitled to withhold from any distributions (including disposition proceeds) such amounts as are necessary to create, in the General Partner's discretion, appropriate reserves for expenses and liabilities of the Partnership.

**Compensation of General Partner and Other Expenses**

The General Partner is entitled to recover expenses incurred in connection with the Partnership and to receive a management fees from the Partnership in the amount of US$7,500 per Unit per annum. Such amounts shall be paid from the revenue of the Partnership and shall not be deducted from capital investment amounts.

*Other Expenses*. The Partnership will pay all out-of-pocket expenses, including any fees and expenses of the General Partner, the cost of the preparation of the annual accounting, financial and tax reports to Limited Partners, litigation or other extraordinary expenses, insurance and indemnity expenses and expenses of liquidating the Partnership. These expenses will be paid only from the cash flow of the Partnership.

**Withdrawals and Transferability**

Except as expressly provided for in the Partnership Agreement, no Limited Partner will be permitted to withdraw from the Partnership or to withdraw any portion of his or her capital account. In the event a Limited Partner acting in good faith (as

determined in the sole and absolute judgment of the General Partner), his I-526 Petition is denied by USCIS, or he fails the consular interview process or the USCIS adjustment of status process, the General Partner may, in its sole discretion, offer such Limited Partner an opportunity to voluntarily retire or withdraw from the Partnership.

**Limited Partner Decisions**

Approval of Limited Partners is required by ordinary resolution (Limited Partners holding more than 70% of the Units voting affirmatively) with respect to the following matters:

- approving the conditions for the phased funding of Partnership investments
- advising the General Partner in connection with the business of the Partnership, including in connection with the monitoring of Partnership investments
- approving the realization plan in connection with any security given or rights granted to the Partnership in connection with a Partnership investment

**Term and Termination**

The Partnership will terminate on January 1 of the year following the year in which all of the Partnership's assets have been realized upon and distributed, except that the Partnership may not be terminated prior to the date on which all the EB-5 investors have ceased participating in the EB-5 program. The latest date on which the Partnership is to dissolve is September 8, 2025.

**Indemnification**

The Partnership will indemnify and hold harmless the General Partner and its directors, officers, members, partners and employees, from and against liabilities arising in connection with the Partnership. Limited Partners will be obligated to return any amounts distributed to them to fund indemnity obligations of the Partnership, but will not be required to contribute additional capital for such purpose.

**Risk Factors; Conflicts of Interest**

Investment in the Partnership is speculative and involves a high degree of risk. Past performance of the General Partner or its principals is no guarantee of the future performance of the Partnership. There is no assurance that the Partnership will be profitable. The risks of an investment in the Partnership include, but are not limited to, the speculative nature of the Partnership's strategies and the charges that the Partnership will incur regardless of whether any profits are earned. See "CERTAIN RISK FACTORS." The General Partner may directly or indirectly manage the assets of other entities that in some respects compete with the Partnership. See "CONFLICTS OF INTEREST."

**Tax Consequences**

The Partnership will be classified as a partnership and not as a corporation for U.S. federal income tax purposes. Based upon

the anticipated operations and gross income of the Partnership and the expected number of Partners, the Partnership believes that it should not be treated as a "publicly traded partnership" that is taxable as a corporation. However, there is no assurance that the Internal Revenue Service ("IRS") will agree with the Partnership or that the facts, law or the IRS's administrative position will not change. If the Partnership is classified as a partnership for U.S. federal income tax purposes, the Partnership will not itself be subject to U.S. federal income tax and each Partner will be required to report separately on its U.S. federal income tax return its distributive share of the Partnership's taxable income or loss, regardless of whether the Partner has received any distributions from the Partnership. Each Partner should consult its own tax advisors in connection with making an investment in the Partnership.

**Reports**

The Partnership will send to each Limited Partner, generally within 90 days after the end of each fiscal year of the Partnership, an accounting report including a balance sheet and statements of income, changes in Partner's equity and cash flows, prepared in accordance with generally accepted accounting principles, plus a schedule and summary description of the investments owned by the Partnership at year-end and a statement for each Limited Partner of its capital account and tax information necessary for completion of its tax returns.

**Amendments**

The Partnership Agreement may be amended from time to time with the consent of the General Partner and by majority vote of the Limited Partners, unless the proposed amendment will, or is likely to, cause a Limited Partner to suffer an adverse economic effect, in which case the written consent of such Limited Partner is required. The Partnership Agreement may also be amended by the General Partner without a vote of the Limited Partners to correct ambiguities or inconsistencies, provided the proposed amendment does not adversely affect the interest of any Limited Partner, or to incorporate provisions which in the written opinion of counsel to the Partnership are for the protection of Limited Partners.

**Legal Advisors**

Counsel to the Partnership and the General Partner may also serve as counsel to other investment funds sponsored or managed by the General Partner or its affiliates. No independent counsel has been retained to represent the Limited Partners. Each Partner should consult his or her own legal advisors in connection with making an investment in the Partnership. See "LEGAL MATTERS."

**Privacy Notice**

Nonpublic personal information received by the Partnership or the General Partner with respect to the Limited Partners, including the information provided to the Partnership by Limited Partners in the subscription documents, will not be shared with

nonaffiliated third parties which are not service providers to the Partnership or the General Partner without prior notice to such Limited Partners unless otherwise required by applicable law. See "EXHIBIT II - Privacy Notice."

## THE PARTNERSHIP

EEGH II, L.P., a limited partnership formed under the laws of the State of New York on September 10, 2015 (the "Partnership"), is offering by private placement, through this Confidential Private Offering Memorandum (the "Memorandum"), units of limited partnership interests in the Partnership (the "Units") to a selective group of qualified investors. The Partnership's investment objective and strategy with regard to the Units are set forth below, and investors are directed to such materials. The information in this Memorandum is qualified in its entirety by the Partnership's Limited Partnership Agreement (as it may be amended, modified or supplemented from time to time, the "Partnership Agreement"), annexed hereto as Exhibit III and deemed a part of this Memorandum, which should be carefully reviewed before a prospective investor invests in the Partnership. This Memorandum does not set forth all the provisions and distinctions of the Partnership Agreement that may be significant to a particular prospective individual investor partner of the Partnership (a "Limited Partner"). Each prospective Limited Partner should examine this Memorandum, the Partnership Agreement and the Subscription Agreement accompanying this Memorandum in order to assure himself or herself that the terms of the Partnership Agreement and the Partnership's investment program are satisfactory to him or her.

The Partnership is a commercial for-profit enterprise formed to finance the expansion of the Eastern Emerald real estate development project in Corona, City of New York, Queens, New York (the "Eastern Emerald Project II"). The Partnership is designed to comply with the statutory and regulatory requirements of the EB-5 immigrant investor program (the "EB-5 Program") administered by the U.S. Citizenship and Immigration Services ("USCIS") with respect to certain foreign investors. The Partnership will invest in the Eastern Emerald Project II through a loan to LaGuardia Performance Center, LLC for the development, construction and operation of the Eastern Emerald Project II. See "EASTERN EMERALD PROJECT II OVERVIEW."

As of the date of this Memorandum, the Eastern Emerald Project II is situated within a geographic area certified by the New York State Department of Labor as a high unemployment area, qualifying it as a Targeted Employment Area ("TEA") into which the minimum qualifying investment amount for the EB-5 Program is US$500,000.

Fleet New York Metropolitan Regional Center LLC, a New York limited liability company (the "General Partner"), is the sole general partner of the Partnership and is responsible for: (i) managing all of the investments to be made by the Partnership, including making decisions in relation to the acquisition, financing, structuring, monitoring and disposition of the investments, and (ii) providing certain administrative services to the Partnership.

## EASTERN EMERALD PROJECT II

The Partnership will use the capital investment from EB-5 investors to finance the development, construction and operation for an expansion of a mixed-use commercial building in Corona, Queens County, overlooking Flushing Bay which includes a five star hotel, restaurants, retail space, a performing arts center and parking garage. When complete, the hotel will boast 29 floors of 5-star ocean view rooms. Additionally, the performing arts center and restaurant will be operated by the Project, and the retail spaces will be leased out to tenants.

The original building is a 25-story, 643,180 SF structure that includes 498 5-star luxury hotel rooms equal to 346,246 SF across 25 floors, a 1-story 105,964 SF convention center, 97,180 SF of retail space across 1 floor, 11,300 SF of restaurant space across 1 floor, and a 1-story, 82,490 SF parking garage.

The Project will add to the original mixed-use commercial building by expanding on the existing 25 floors, as well as adding an additional 4 stories overall. The expansion will result in an additional 556,398 SF being added to the overall building SF. The expansion will also add an additional 294 5-star luxury hotel rooms equal to 383,803 SF across 29 floors; a 78,954 SF performing arts center across 5 floors; an additional 39,089 SF of retail space across 6 floors; an additional 46,231 of restaurant space across 5 floors; and an additional 8,321 of parking garage space.

The completion of the Project will result in a 29-story, 1,199,578 SF, mixed-use commercial building. The completed building will have a total of 792 5-star luxury hotel rooms equal to 730,049 SF across all 29 floors; as well as a 1-story, 105,964 SF convention center; a 5-story, 78,954 SF performing arts center; 136,269 SF of retail space across 6 floors; 57,531 SF of restaurant space across 5 floors; and a 1-story, 90,811 SF parking garage.

The Eastern Emerald Project II has been specifically selected to meet needs in the surging local business demand and consumer markets. The Eastern Emerald Project II is intended to be funded from multiple sources as set forth in the Business Plan, of which one source will be EB-5 immigrant investment. The program is administered by the NYS Department of Environmental Conservation (DEC) and the Department of Treasury through centerfield Community Development Entity ("CDE").

**Estimated Eastern Emerald Project II Costs**

The current budget for the Eastern Emerald Project II is as follows:

| | |
|---|---|
| Hard Costs | $132,266,130 |
| Soft Costs | $19,552,384 |
| FF&E | $18,375,000 |
| Operating Costs | $11,219,497 |
| | |
| Total Projected Cost of Project | $181,413,011 |

The Eastern Emerald Project II costs are expected to be financed as follows:

| | |
|---|---|
| Loan Proceeds from EB-5 Funds | $ 80,000,000 |
| NYS Tax Credits | $ 17,000,000 |
| Capital Contribution from Developer | $ 44,413,011 |
| Loan from Hapoalin Securities | $ 40,000,000 |
| Total Investment in Project | $181,413,011 |

## MANAGEMENT AND DEVELOPMENT PROFESSIONALS

### The General Partner

The sole general partner of the Partnership will be Fleet New York Metropolitan Regional Center LLC (the "General Partner"). Fleet New York Metropolitan Regional Center LLC is a New York limited liability company (formerly known as Federal New York Metropolitan Regional Center LLC) formed in New York on February 5, 2010. Fleet New York Metropolitan Regional Center LLC is a development and asset management firm exclusively managing real estate assets and developments. It is an affiliate of Fleet Financial Group, a New York corporation incorporated on December 14, 2005.

The General Partner exercises ultimate authority for overall management of the Partnership and is responsible for its day-to-day operations, although the Limited Partners will engage in policy making activities and will have the rights, powers, and duties normally granted to limited partners under the New York Revised Limited Partnership Act. The General Partner has the right to delegate its responsibilities hereunder, including the responsibility of providing certain management, development, administrative and auditing services, to suitable parties who may be reasonably compensated by the Partnership. The General Partner may also retain such other suitable parties to provide services to the Partnership, including, without limitation, legal, consulting, marketing, administration, and accounting services. Furthermore, the General Partner may enter into agreements with such parties on behalf of the Partnership, which agreements may include provisions for the indemnification and exculpation of such parties by the Partnership. The Partnership Agreement provides for the indemnification of the General Partner in connection with the performance of its duties on behalf of the Partnership, provided that such actions do not constitute gross negligence or willful misconduct.

The General Partner shall devote as much time to the activities of the Partnership as it shall determine to be necessary for the efficient conduct of the Partnership. The General Partner may engage or participate in other activities or ventures, whether or not of the same nature as and competing with the activities of the Partnership. No Limited Partner shall be entitled to any profits which the General Partner or any of its affiliates derives from any activities or ventures other than the Partnership, whether or not such businesses or ventures are of the same nature as and competing with the business of the Partnership. The General Partner and its affiliates shall in no way be prohibited from investing in real estate related projects for their own account, including projects in which the Partnership also invests; provided, however, that neither the General Partner nor its affiliates shall buy securities from, or sell securities to, the Partnership. As a result of its other activities the General Partner may have conflicts of interest in allocating time, services and functions among the Partnership and other business ventures. See "CONFLICTS OF INTEREST" below.

Building Awards in December 2009. Mr. Xia earned a BEng in Architectural and Civil Engineering from Harbin Institute of Technology, China. He is an MA and Ph.D candidate in Economics at the University of Alabama.

**Racanelli Construction Group**

Based in Hamilton NJ, Racanelli Construction Group is recognized as one of the region's leading providers of preconstruction planning, project management, design/build, and general contracting services. Since its founding, Racanelli has been responsible for building and renovation across a broad range and variety of market segments, completing projects that include corporate headquarters, industrial complexes, hospitals, assisted living facilities, university and college facilities, retail stores, hotels, restaurants, houses of worship, self storage complexes, condominiums and townhouses.

## FLEET NEW YORK METROPOLITAN REGIONAL CENTER

The Fleet New York Metropolitan Regional Center has been designated by U.S. Citizenship and Immigration Services ("USCIS") as a Regional Center to participate in the EB-5 Program. See the designation approval letter attached as Exhibit I hereto. The regional center will focus on the following industries: medical offices, hotel, restaurant, commercial offices, retail, residential, entertainment and recreation facilities, light industrial / warehouse facilities, and conference and exhibition center facilities. Creation of jobs required under the EB-5 Program will be established using the job calculation methodology approved by USCIS with the regional center proposal.

The geographic area of the Fleet New York Metropolitan Regional Center includes the counties of Queens, New York (Manhattan), Brooklyn and the Bronx. Queens is the largest in area, the second largest in population, and the easternmost of the five boroughs of New York City.

**Social & Environmental Features of Queens County:**

- Queens is home to two City area airports: John F. Kennedy and LaGuardia
- The New York Mets baseball team, the US Open tennis tournament, Flushing Meadows Park, Kaufman Astoria Studios, and Silvercup Studios are located in Queens
- Immigrants comprise 46% of Queens residents
- Queens is home to 49.6% of New York City's Asian population
- Queens is considered one of the more suburban boroughs of New York City.

**Queens County Economic Factors:**

The economy of Queens is based on tourism, industry, and trade. Because the New York metropolitan area has three major airports, the airspace overhead is among the busiest and most regulated in the world. John F. Kennedy International Airport, alongside Jamaica Bay, is the country's busiest airport in terms of international travelers. La Guardia Airport, on the East River, mostly serves eastern North America. Queens has witnessed the rebirth of film production — the return of an industry that had departed decades earlier — notably the Kaufman Studios in Astoria and the Silvercup Studios in Long Island City, where a number of notable television shows are made, including Sesame Street. Several large companies have their headquarters in Queens, including watchmaker Bulova, based in East Elmhurst; internationally renowned piano manufacturer Steinway & Sons in Long Island City; Glacéau,

the makers of Vitamin Water, headquartered in Whitestone; and JetBlue Airways, the low-cost airline based in John F. Kennedy Airport, is located in the neighborhood of Forest Hills. Long Island City is a major manufacturing and back office center. Flushing is a major commercial hub for Chinese American and Korean American businesses, while Jamaica is the major civic and transportation hub for the borough.

## LOAN AGREEMENT

The Partnership will enter into a Loan Agreement with LaGuardia Performance Center, LLC (the "Borrower"). The loan amount will be for a minimum of $500,000 and a maximum of $120,000,000, based upon the number of Units sold in this Offering. Borrower and Lender may amend the Principal of the Loan if Lender is able to raise additional funding from Lender's Investors. In the event that the maximum loan amount is not advanced, the Borrower will arrange alternative financing.

The loan will require semi-annual payments of interest only. The Loan Agreement will provide for simple interest, accruing at a rate of 2% per annum on the amounts advanced during the previous semi-annual period. The loan will mature at the date of (1) five (5) years from the date of the last advance under the loan, or (2) the date all the EB-5 investors have ceased participating in the EB-5 program, whichever is later. The Borrower intends to repay the loan at maturity with the proceeds of long term financing or from other sources.

The Loan Agreement will contain customary terms and conditions, including provisions relating to events of default.

## SUBSCRIPTION, CAPITAL ACCOUNTS, ALLOCATIONS, DISTRIBUTIONS

### Subscriptions

The minimum initial investment in the Partnership is one Unit, which is priced at US$500,000 (or such greater amount as may be required by the USCIS as a result of changes to U.S. immigration laws and regulations governing the EB-5 Program). Each subscriber also needs to pay a processing fee of US$50,000 to the General Partner. After the first closing in which the General Partner has received and accepted subscriptions to the Partnership, the General Partner may hold one or more closings at which the General Partner may, in its sole discretion, admit new Limited Partners. The General Partner has the right, in its sole discretion, to refuse any person's offer to become a Limited Partner.

Capital contributions are permitted only in cash in U.S. dollars.

The General Partner may, in its sole discretion and without notice to the Limited Partners or to any prospective investors, "close" the Partnership at any time by refusing to allow admission of new Limited Partners. If the General Partner at any time closes the Partnership, the General Partner may, in its sole discretion and without notice to the Limited Partners, reopen the Partnership as of any date.

### Subscription Procedure

All prospective Limited Partners must submit to the General Partner a signed Investor Questionnaire, which the General Partner will review to determine whether it will accept the prospective

Limited Partner as a Limited Partner in the Partnership. **THE SUITABILITY STANDARDS PURSUANT TO WHICH THE GENERAL PARTNER MAY ACCEPT A LIMITED PARTNER'S SUBSCRIPTION REPRESENT THE MINIMUM SUITABILITY REQUIREMENTS FOR PROSPECTIVE INVESTORS IN THE PARTNERSHIP AND SATISFACTION OF THESE STANDARDS DOES NOT NECESSARILY MEAN THAT AN INVESTMENT IN THE PARTNERSHIP IS A SUITABLE INVESTMENT FOR A PROSPECTIVE INVESTOR.**

Once the General Partner has determined that a prospective investor may become a Limited Partner, that potential Limited Partner may subscribe for a Unit by (i) transmitting his or her capital investment (in the amount of US$500,000) to the Partnership, (ii) transmitting the processing fee (in the amount of US$50,000) to the General Partner, or such other amount for the processing fee designated by the General Partner, and, (iii) delivering to the General Partner the following fully completed and executed agreements:

(1) Subscription Agreement

(2) Limited Partnership Agreement

**Capital Account Establishment**

A capital account (the "Capital Account") will be established for each Partner, including the General Partner, reflecting each Partner's interest in the Partnership. Each Partner's Capital Account will be credited with that Partner's initial capital contribution. Capital Accounts are further adjusted as provided herein and in accordance with the principles set forth in the Partnership Agreement and Treasury Regulations promulgated under Section 704 of the Internal Revenue Code of 1986, as amended (the "Code").

## FEES AND EXPENSES

**Certain Administrative Expenses of the Partnership**

The General Partner will pay all administrative expenses of the Partnership, which will consist of out-of-pocket expenses reasonably incurred by or on behalf of the Partnership that are directly related to the organization of the Partnership and the marketing and sale of Units, including, but not limited to, legal fees and expenses, sales, marketing and referral expenses, escrow expenses, filing fees, reasonable travel and entertainment expenses, and fees and expenses relating to the production of marketing materials (collectively, "Administrative Expenses"). Administrative Expenses will be paid from the processing fee paid by each Limited Partner for issuance expenses. The General Partner will not be reimbursed for Administrative Expenses in excess of the processing fee.

**Other Expenses of the Partnership**

The Partnership will bear its own ongoing expenses relating to the operations and activities of the Partnership, including, without limitation, management fees, costs of legal, tax, accounting, and other professional advice and the advice of other consultants and experts, out-of-pocket expenses related to the sourcing, due diligence and potential acquisition of Partnership investments, regardless of whether such acquisition is actually consummated, expenses associated with the holding and sale of Partnership investments, and any other expenses relating to the Partnership (including, without limitation, insurance and the costs of any litigation involving the Partnership) (collectively, the "Partnership Expenses"). The Partnership Expenses will be payable from then current interest income, to the extent available, and the General Partner shall advance all Partnership Expenses in excess of the then current interest income. The Partnership will reimburse the General Partner for any advanced Partnership Expenses plus three (3%)

percent annual interest incurred thereon from the Partnership's future interest income and any other Partnership income, to the extent, and as soon as available. These Partnership Expenses shall be paid from the cash flow of the Partnership and shall not be deducted from capital investment amounts.

**Management Fee**

The Partnership will pay an annual management fee to the General Partner in the amount of US$7,500 per year for each Unit issued and outstanding. Such amounts shall be paid from the revenue of the Partnership and shall not be deducted from capital investment amounts.

## WITHDRAWALS

No Partner shall have the right to withdraw any amount or receive any distribution from the Partnership, except as expressly provided in the Partnership Agreement. A Limited Partner may not sell, assign, pledge or transfer his or her Unit without the prior written consent of the General Partner, which the General Partner may grant or withhold in its sole and absolute discretion. Any Units acquired in reliance upon Regulation S may not be offered or sold to a U.S. person or for the account or benefit of a U.S. person prior to the expiration of a one-year period from the final closing in this Offering.

In the event a Limited Partner, acting in good faith (as determined in the sole and absolute judgment of the General Partner), has his/her I-526 Petition denied by U.S. Citizenship and Immigration Services ("USCIS") or fails the consular interview process or the USCIS adjustment of status process, the General Partner may, in its sole discretion, offer such Limited Partner an opportunity to voluntarily retire or withdraw from the Partnership. However, such a retirement or withdrawal will only be permitted if, in the General Partner's reasonable judgment, there would be no material adverse effect on the Partnership or the Partnership's investments or if the Partnership is able to secure alternative financing to replace the amounts to be returned to the retiring or withdrawing Limited Partner. Simultaneously with the permitted retirement or withdrawal of a Limited Partner, (i) the Unit of such retiring or withdrawing Limited Partner will be cancelled; (ii) such Limited Partner's entire equity interest in the Partnership, including any right of such Limited Partner to the return of capital contributions and any right to receive allocations or distributions of income, losses or profits (the "Partnership Interest") of such retiring or withdrawing Limited Partner in the Partnership will thereafter be canceled and terminated, and the Partnership Interests of the remaining Limited Partners will be adjusted pro rata to reflect such cancellation and termination; (iii) such retiring or withdrawing Limited Partner will sell his or her Partnership Interest to the Partnership for an amount equal to $500,000; and (iii) such retiring or withdrawing Limited Partner will not be entitled to receive any other amount or payment from the Partnership for the value of his or her Partnership Interest or his or her capital account in the Partnership.

The Partnership Agreement contains additional rights, terms, conditions and requirements regarding withdrawals, and the summary contained in this Memorandum is qualified in its entirety by reference to the Partnership Agreement.

## SUITABILITY



Ex. 6-16

**Investor Suitability Standards**

Each purchaser of a Unit must bear the economic risk of its investment for an indefinite period of time because the Units have not been registered under the Securities Act of 1933, as amended (the "Securities Act" or the "1933 Act") and, therefore, cannot be sold unless they are subsequently registered under the 1933 Act or an exemption from such registration is available. It is not contemplated that any such registration will ever be affected, or that certain exemptions provided by rules promulgated under the 1933 Act (such as Rule 144) will be available. There is no public market for the Units now, nor is one expected to develop in the future. The Units are being offered in reliance upon the exemption provided in Section 4(2) of the 1933 Act and Regulations S and D thereunder. The Units have not been registered under the securities laws of any state or other jurisdiction and will not be offered in any state of the U.S. except pursuant to an exemption from registration. In addition, the Partnership is not registered under the Investment Company Act of 1940, as amended (the "Investment Company Act"). The Partnership Agreement provides that a Limited Partner may not assign his or her Unit (except by operation of law), nor substitute another person for himself or herself as a Limited Partner, without the prior consent of the General Partner, which may be withheld for any reason. The foregoing restrictions on transferability must be regarded as substantial, and will be clearly reflected in the Partnership's records.

Each purchaser of a Unit is required to represent that the Unit is being acquired for his or her own account, for investment, and not with a view to resale or distribution. The Units are suitable investments only for sophisticated investors for whom an investment in the Partnership does not constitute a complete investment program and who fully understand, are willing to assume, and have the financial resources necessary to withstand the risks involved in the Partnership's specialized investment program and to bear the potential loss of their entire investment in the Partnership.

Each potential investor must qualify as an "accredited investor" within the meaning of Regulation D under the Securities Act.

For purposes of this Offering, an **accredited investor** is one of the following:

1. Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase, exceeds U.S.$1,000,000; or

2. Any natural person who had an individual income in excess of U.S.$200,000 in each of the two most recent years or joint income with that person's spouse in excess of U.S.$300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

In addition, prospective investors who are residents in certain states of the U.S. may be required to meet more demanding suitability standards imposed by the securities laws of those states. Each prospective investor will represent in his or her Subscription Agreement that he or she satisfies the above standards and any standards imposed by the securities laws of the prospective investor's state.

The foregoing suitability standards represent the minimum suitability requirement for prospective investors in the Partnership and satisfaction of these standards does not necessarily mean that an investment in the Partnership is a suitable investment for a prospective investor. In all cases, the General Partner shall have the right, in its sole discretion, to refuse a subscription for Units for any reason or no reason, including, but not limited to, its belief that the prospective investor does not meet the applicable suitability requirements or that such an investment is otherwise unsuitable for that investor.

Each prospective purchaser is urged to consult with his or her own advisors to determine the *suitability* of an investment in the Units, and the relationship of such an investment to the purchaser's overall investment program and financial and tax position. Each purchaser of a Unit is required to further represent that, after all necessary advice and analysis, his or her investment in a Unit is suitable and appropriate, in light of the foregoing considerations.

The method of subscription is described in the subscription documents annexed hereto as Exhibit III.

## CERTAIN RISK FACTORS

THE UNITS OFFERED HEREBY INVOLVE A HIGH DEGREE OF RISK AND THEIR PURCHASE SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN AFFORD TO SUSTAIN A TOTAL LOSS OF THEIR INVESTMENT. THE PARTNERSHIP'S PLANNED OPERATIONS HAVE BEEN UNDERTAKEN COMMERCIALLY ONLY BY COMPETITORS ON A LIMITED BASIS AND THERE CAN BE NO ASSURANCE THAT THE BUSINESS PLAN DESCRIBED HEREIN WILL BE COMMERCIALLY VIABLE. IN ADDITION, ACTUAL RESULTS OF OPERATIONS MAY REQUIRE SIGNIFICANT MODIFICATIONS OF ALL OR PART OF SUCH PLAN. PROSPECTIVE PURCHASERS SHOULD CAREFULLY CONSIDER, AMONG OTHER FACTORS, THE FOLLOWING:

### A. Business Risks

1. Uncertainties Regarding New Business. The Partnership is newly formed and has no operating history. There is no history of investments made by the Partnership and there can be no assurance that any investment made by the Partnership will be successful.
2. Project Risk and Lack of Diversification. The Partnership was established to invest solely in the Eastern Emerald Project II. Therefore, the success of the Partnership is substantially dependent upon the success of the Eastern Emerald Project II. The Partnership does not foresee any diversification of its investments and an adverse development in the Eastern Emerald Project II would have a direct and material impact on the Partnership's financial condition and the Partnership's ability to return capital contributions to the Limited Partners. Accordingly, the Partnership's investments may be subject to more rapid change in value than would be the case if the Partnership were to maintain a wide diversification among industries, geographic areas and types of investments.
3. Construction Risks. The Eastern Emerald Project II is a new construction real estate development project. Construction on real property entails risks that are beyond the control of the owner of the property and the Partnership, such as changes in governmental rules and policies (including zoning rules and policies), the performance of contractors, costs of materials, labor difficulties (including strikes), energy shortages, shortages of material for construction, inflation, adverse weather, adverse subsurface conditions and other factors which could cause costs to exceed current estimates. These risks may increase the costs of construction and may cause, among other things, delays in construction and/or remodeling which affect the ability of the Partnership to generate cash flow and repay its obligations.

4. Dependence on Management. The success of the Partnership depends to a large degree upon the performance of General Partner, its managers, executive officers and key employees. The loss of the services of any of the General Partner's managers, executive officers or other key employees could have a detrimental effect on the business, operating results or financial condition of the Partnership.
5. No Public Market for Units; Restrictions on Transferability. There is no public market for the Units and none will result from this Offering. The sale of the Units is not being registered under the Securities Act, and the Units may not be resold or otherwise transferred unless they are subsequently registered under the Securities Act and qualified under applicable state securities laws or unless exemptions from registration and qualification are available. In addition, the Partnership Agreement provides that a Partner may not assign its Unit (except by operation of law) without the consent of the General Partner, which may be withheld for any reason or no reason. Accordingly, purchasers may not be able to readily liquidate their investment.
6. Financial Projections. The Comprehensive Business plan contains certain five-year financial projections with respect to the Eastern Emerald Project II. The Partnership believes that the assumptions underlying the projections are reasonable. However, the projections are based upon numerous assumptions, the most significant of which relate to the market penetration of and costs associated with the Eastern Emerald Project II. Some of the assumptions may not materialize and unanticipated events and circumstances may occur. For these reasons, actual results achieved during these periods may vary from the projections, and the variations may be material.
7. Lack of Regulatory Oversight. The Partnership does not intend to register as an investment company under the Investment Company Act, in reliance upon an exemption available to privately offered investment companies, and, accordingly, the provisions of the Investment Company Act (which, among other matters, require investment companies to have disinterested directors) will not be afforded to the Partnership or the Limited Partners.
8. Environmental Regulations. Many of the Partnership's operations are affected by federal, state and local environmental regulations and could potentially be interrupted or terminated on the basis of environmental or other considerations. Moreover, the Partnership is potentially subject to significant financial penalties if it violates such regulations. Attempted compliance with such regulations may affect the Partnership's operations and may necessitate significant capital outlays.
9. The Loan. It is expected that the Partnership will invest substantially all of its assets in the loan to the Borrower. The Borrower will be the sole obligor on the loan. The loan will not be guaranteed by any other person or entity. Investments in loans are subject to risks associated with possible default by the Borrower and the legal and other costs incurred in collecting on a defaulted loan.

## B. Immigration Risks

THE PARTNERSHIP MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND CONCERNING WHETHER AN INVESTMENT IN THE PARTNERSHIP WILL MEET THE REQUIREMENTS OF THE EB-5 PROGRAM OR OTHER U.S. IMMIGRATION REQUIREMENTS. NO ASSURANCES CAN BE GIVEN THAT AN INVESTMENT IN THE PARTNERSHIP WILL RESULT IN AN APPROVED IMMIGRANT PETITION OR CONDITIONAL OR PERMANENT RESIDENT STATUS.

AS OF THE DATE OF THIS MEMORANDUM, THE EB-5 IMMIGRANT INVESTOR PROGRAM HAS BEEN EXTENDED ONLY THROUGH SEPTEMBER 30, 2015. THERE IS NO ASSURANCE THAT THE PROGRAM WILL BE EXTENDED AND THUS NO ASSURANCE THAT UNITED STATES PERMANENT RESIDENT STATUS WILL BE OBTAINED.

1. Regulatory Risks. The EB-5 immigrant investor program is subject to regulation by the USCIS and the United States government. There can be no assurance that the laws, regulations and rules relating to the EB-5 program will not be repealed, modified, amended, interpreted or applied in a manner that is materially adverse to the interests of investors and/or the Partnership. Permanent residents who continue to live abroad risk revocation of their conditional or permanent residence status. The process of obtaining permanent resident status involves numerous factors and circumstances which are not within the control of the Partnership. These include an investor's past history and quotas established by the United States government limiting the number of immigrant visas available to qualified individuals seeking conditional or permanent resident status under the EB-5 program.

2. Application Processing Risk. Obtaining permanent resident status through the EB-5 program involves numerous factors and circumstances which are not within the control of the Partnership. These include an investor's past history and quotas established by the United States government limiting the number of immigrant visas available to qualified individuals seeking conditional or permanent resident status, as well as inconsistent and subjective adjudications by the USCIS. The filing of an investor's I-526 Petition with the USCIS should be done only by a qualified U.S. immigration attorney. Once approved, the case will either be forwarded to the U.S. State Department's National Visa Center and then to a U.S. Consulate selected by the investor for processing or, if the investor is already in the U.S., the investor may apply to adjust his or her status to that of conditional permanent resident.

3. EB-5 Program Requirements Risk. The EB-5 program is complex and contains numerous requirements, including the following. There is no guarantee that the EB-5 requirements will be met.

(a) Proving Lawful Source of Funds. As part of the I-526 Petition, an investor must present to the USCIS clear documentary evidence of the lawful source of funds invested and that the funds belong to the investor. Generally, the investor can satisfy the source of funds requirements by submitting documents showing that he or she has a level of income from legal sources that would yield sufficient funds for the investment. All such matters regarding the investor's petition should be discussed with his or her immigration counsel.

(b) Policy making Activities. The EB-5 Program requires an investor to engage in the management of the Partnership through policy making activities pursuant to the rights and duties normally granted to limited partners under the Uniform Limited Partnership Act.

(c) At-risk Investment. An investor's investment must be at risk to qualify for the Program. As part of the application process for permanent residency, each investor must show evidence that he or she has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk.

(d) Job Creation. The Partnership intends that its business will meet the EB-5 Program job creation requirements. However, The Partnership and the General Partner can give no assurance that the USCIS will agree that all required jobs have been created, that an Investor will secure permanent resident status or, even if such status is granted, how quickly it will occur. Moreover, the ultimate decision on the number of jobs actually created by the Project will be made by the USCIS, which is not bound by the conclusions of the economic impact study prepared for the Project.

4. EB-5 Job Allocation. The jobs will be allocated to Limited Partners in a block of 10 jobs per investor based on a "filed first" priority allocation method. 8 C.F.R. 204.6 (g)(2) The priority of Job Allocation to Limited Partners shall be determined by the I-829 filing date of the Limited Partners as indicated in the I-797C filing receipt or other proof of filing. Each Limited partner shall be allocated EB-5 Jobs based on its I-829 Filing Date relative to the I-829 Filing Dates of other Limited Partners. In the case of two or more Limited Partners with an identical I-829 filing date, the jobs to be allocated to these Limited Partners based on such filing date will be allocated among such Limited Partners based on the priority of their I-526 petition filing date.

## C. Tax Considerations

There are various tax risks associated with an investment in the Partnership. The Partnership has been structured as a partnership for U.S. federal income tax purposes. Therefore, the Partnership, as an entity, should not be subject to federal income taxation. The recognition of income, gains and losses to an investor in any year for tax purposes may not correspond to the economic performance of the Partnership. Each Partner, in computing its own U.S. federal income tax liability for a taxable year, will be required to take into account its distributive share of all items of the Partnership's income, gain, loss, deduction or credit for the Partnership's taxable year, regardless of whether such Partner has received any distributions from the Partnership. Each prospective investor should consult its own tax advisors with respect to the federal, state, local and foreign tax consequences of investing in the Partnership. See "TAX CONSEQUENCES".

---

## TAX CONSIDERATIONS

---

The following summary describes certain significant federal income tax consequences to a United States investor of owning a Unit in the Partnership based on the method of operations of the Partnership as described in this Memorandum and in the Partnership Agreement. The summary is based on the Code, as in effect on the date of this Memorandum, the U.S. Treasury regulations promulgated thereunder, rulings of the United States Internal Revenue Service (the "IRS"), and court decisions, each as in effect as of the date of this Memorandum. No assurances can be given that the positions taken by the Partnership on its tax returns will be respected by the IRS or upheld by the courts and there can be no assurance that the applicable tax laws and regulations upon which these positions are based will not be changed in the future, possibly with retroactive effect to the Partnership and the Partners.

THIS SUMMARY IS NECESSARILY GENERAL, AND EACH PROSPECTIVE LIMITED PARTNER IS ADVISED TO CONSULT WITH HIS OR HER OWN TAX ADVISOR WITH RESPECT TO THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF PURCHASING, HOLDING, AND DISPOSING OF A UNIT.

### Federal Taxation

The Partnership has been advised by its counsel that as a partnership, the Partnership will not be a taxable entity for federal income tax purposes. Instead, each Limited Partner will be required to take into account for each fiscal year, for purposes of computing his or her own income tax, his or her proportionate share of the items of taxable income or loss allocated to him or her pursuant to the

Partnership Agreement, whether or not any income is paid out to him or her. The manner in which such items of taxable income or loss are allocated among the Limited Partners is set forth the Partnership Agreement. Such taxable income or loss will be required to be taken into account in the taxable year of the Limited Partner in which the fiscal year of the Partnership ends. A Limited Partner may deduct losses of the Partnership only to the extent of such Limited Partner's adjusted tax basis for his investment in the Partnership. A Limited Partner's adjusted tax basis will generally equal his or her capital contributions to the Partnership increased by his or her allocable share of the Partnership's taxable and tax exempt income and reduced by his or her allocable share of the Partnership's taxable losses and nondeductible expenses and by his or her share of any distributions from the Partnership. Cash distributions that do not exceed a Limited Partner's adjusted tax basis in his or her investment in the Partnership will not be taxable, but will reduce his or her basis for the investment by the amount distributed. Cash distributed in excess of the adjusted tax basis of a Limited Partner's investment will generally be taxable as capital gain.

Although the Partnership will be engaged in for-profit activity in accordance with the EB-5 Program, it is currently anticipated that the activities of the Partnership will be such that the Partnership will likely not be treated as engaged in a trade or business for federal income tax purposes. This issue will be evaluated at the end of each year, based on the actual operations of the Partnership. If the activities of the Partnership are not to be considered trade or business activities with respect to a particular year, it is likely that the expenses of managing the Partnership for such year will constitute "miscellaneous itemized deductions", which will be deductible by an individual Limited Partner only to the extent that his or her share of such expenses, when combined with his or her other "miscellaneous itemized deductions" for such year, exceed a floor of two percent (2%) of his or her adjusted gross income for such year (the "2% Floor"). Further, the amount of "miscellaneous itemized deductions" in excess of the 2% Floor is subject to the overall limitation on itemized deductions currently imposed by Section 68 of the Internal Revenue Code of 1986, as amended (the "Code"). Also, the amount in excess of the 2% Floor will be considered a tax preference item in computing the alternative minimum tax for an individual taxpayer.

The IRS has released final Treasury Regulations expanding previously existing information reporting, record maintenance and investor list maintenance requirements with respect to certain "tax shelter" transactions (the "Tax Shelter Regulations"). The Tax Shelter Regulations may potentially apply to a broad range of investments that would not typically be viewed as tax shelters. Under the Tax Shelter Regulations, if the Partnership engages in a "reportable transaction," the Partnership and, under certain circumstances, a Limited Partner would be required to (i) retain all records material to such "reportable transaction"; (ii) complete and file IRS Form 8886, "Reportable Transaction Disclosure Statement" as part of its Federal income tax return for each year it participates in the "reportable transaction"; and (iii) send a copy of such form to the IRS Office of Tax Shelter Analysis at the time the first such tax return is filed. The scope of the Tax Shelter Regulations may be affected by further IRS guidance. Non-compliance with the Tax Shelter Regulations may involve significant penalties and other consequences. Each Limited Partner should consult his or her own tax advisers as to his or her obligations under the Tax Shelter Regulations.

## Miscellaneous

The discussion contained herein concerning federal tax matters is based on the method of operation of the Partnership described in this Memorandum and the Partnership Agreement and on present provisions of the federal tax laws, the regulations issued thereunder and the cases and rulings interpreting such laws and regulations. There can be no assurance that the positions the Partnership takes on its tax returns with respect to expenses or otherwise will be accepted by the IRS or any other taxing authorities.

Each potential investor is responsible for obtaining his or her own tax advice with respect to the federal, state and local and foreign income and other tax consequences of his or her investment in the Partnership, and no tax advice will be provided by the Partnership or the General Partner now or at any

time in the future. However, as a general rule, a resident alien of the United States will be taxed on all of his or her worldwide income and will be required to file a United States income tax return. In addition, if an alien is not a resident of the United States but has United States source income, he or she generally will be subject to taxation in the United States on such income, and such income may be subject to withholding and reporting on a United States income tax return.

A Limited Partner (and each employee, representative, or other agent of the Limited Partner) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Partnership and any transaction entered into by the Partnership and all materials of any kind (including opinions or other tax analyses) that are provided to the Limited Partner relating to such tax treatment and tax structure.

As promptly as practicable after the end of each fiscal year, the Partnership will send to each Limited Partner a report indicating the amounts representing his or her share of net long-term capital gain or loss, net short-term capital gain or loss, operating profit or loss and other appropriate items of income and deduction for purposes of reporting such amounts for Federal income tax purposes.

The tax consequences of an investment in the Partnership may vary depending upon the particular circumstances of each prospective Limited Partner. Accordingly, each prospective Limited Partner should consult his or her own tax advisers with respect to the effect of an investment in the Partnership on his or her personal tax situation and, in particular, the state, local and foreign tax consequences to him or her of an investment in the Partnership.

**This Memorandum presents only a general and non-specific summary of certain material U.S. federal income tax considerations that may affect a prospective investor's decision regarding the purchase of a Unit. The tax considerations attendant to an investment in the Partnership are complex and vary with a taxpayer's individual circumstances. Each prospective investor should review the tax consequences with his or her own tax advisor.**

**IRS CIRCULAR 230 DISCLOSURE: THIS MEMORANDUM WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF INTERESTS IN THE PARTNERSHIP. TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, THE PARTNERSHIP IS INFORMING PROSPECTIVE INVESTORS THAT THIS MEMORANDUM WAS NOT INTENDED OR WRITTEN BY THE PARTNERSHIP TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER THE CODE. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

## CONFLICTS OF INTEREST

The General Partner, its affiliates and the members of the General Partner's management team may in the future direct, sponsor or manage other entities (including other investment entities) in addition to the Partnership. Such other entities may compete with the Partnership for investment opportunities. The Partnership's legal counsel may act as counsel to the General Partner and its affiliates in connection with such other entities.

The Partnership depends on the General Partner for the operation of the Partnership. The General Partner believes it will continue to have sufficient staff personnel and resources to perform all of its duties with respect to managing the Partnership. However, because some of the officers of the General Partner

may have other duties which may arise in connection with other entities, certain officers may have conflicts of interest in the allocation of responsibilities, services and functions among the Partnership and other entities.

To date, in the opinion of the General Partner, there have been no material conflicts of interest between the General Partner and its affiliates on the one hand and the Partnership on the other hand. The General Partner will attempt to resolve any conflicts of interest between the Partnership and others by exercising the good faith required of fiduciaries, and the General Partner believes that it will be able to resolve any conflicts that may arise on an equitable basis. Depending on the relevant facts and circumstances, however, the resolution of any particular conflict may not be in favor of the Limited Partners. A resolution which is unfavorable to the Limited Partners will result only if the General Partner determines in good faith, bearing in mind its fiduciary duties, that such resolution is the most appropriate response to a particular situation.

The General Partner is accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in handling the Partnership's affairs. Because the issue of the General Partner's fiduciary obligations involves a rapidly developing and changing area of the law, Limited Partners who believe that a breach of fiduciary duty by the General Partner has occurred should consult their own counsel.

In the Partnership Agreement, the Partnership has agreed to indemnify the General Partner and its affiliates against liability for losses incurred by the Partnership resulting from errors of judgment or other acts or omissions, whether or not disclosed, unless gross negligence or willful misconduct is involved, and to reimburse the General Partner for attorneys' fees incurred in defending certain actions, which attorneys' fees may be reimbursed as incurred. Limited Partners may be entitled to a more limited right of action than they would otherwise be entitled absent such limitations in the Partnership Agreement. In the opinion of the Securities Exchange Commission, indemnification for liabilities arising under the Securities Act is against public policy and therefore is unenforceable.

## MISCELLANEOUS

### Limitation of Liability; Indemnification

The Partnership Agreement limits the liability of the General Partner, its affiliates and their respective directors, officers, employees, shareholders and agents (each an "Indemnified Party") to the Partnership and the Partners. The Partnership Agreement also provides for the Partnership to indemnify the Indemnified Parties from and against certain liabilities relating to the Partnership and its affiliates. Certain limitation of liability and indemnification provisions contained in the Partnership Agreement are summarized below. However, reference is made to the terms of the Partnership Agreement for the complete details of the limitation of liability and indemnification provisions summarized below.

To the fullest extent permitted by law, no Indemnified Party will be liable to the Partnership or to any Limited Partner for any liabilities arising in connection with the Partnership. Such limitation of liability will not apply, however, where the Indemnified Party is guilty of gross negligence or willful misconduct. To the extent that the General Partner has duties to the Partnership or to any other Partner under applicable law, the General Partner, to the fullest extent permitted by law, will not be liable to the Partnership or to any other Partner for its good faith reliance on the provisions of the Partnership Agreement. The provisions of the Partnership Agreement, to the extent that they expand or restrict the

otherwise existing duties and liabilities of the General Partner, are agreed by the Partners to modify to that *extent* such other duties and liabilities.

The General Partner may consult with legal counsel and accountants selected by it, and the General Partner will be fully protected and held harmless for any act or omission taken or suffered by it on behalf of the Partnership in reliance upon and in accordance with the advice of such counsel or accountants, provided that such counsel or accountants were selected with reasonable care

The Partnership has agreed to indemnify and hold harmless each of the Indemnified Parties, to the fullest extent permitted by law, from and against any and all claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in settlements, as interest, fines and penalties and for the legal and other costs and expenses of investigating or defending against any claim or alleged claim) that are incurred by any Indemnified Party and arise out of or in connection with the affairs of the Partnership or any of its affiliates, including any mistake in judgment, any act performed or omission made by an Indemnified Party, losses incurred due to mistake, action, inaction, gross negligence or bad faith of any broker or other agent (assuming that such broker or other agent was selected with reasonable care), or the performance by such Indemnified Party of any of the General Partner's responsibilities under the Partnership Agreement; provided that an Indemnified Party shall be entitled to indemnification only to the extent that such Indemnified Party acted in good faith and such Indemnified Party's conduct did not constitute gross negligence or willful misconduct. The satisfaction of any such indemnification and holding harmless shall be from and limited to Partnership assets, and no Limited Partner shall have any personal liability on account thereof beyond the amount of its capital commitment to the Partnership. An Indemnified Party must obtain the written consent of the General Partner (which consent may not be unreasonably withheld) prior to entering into any settlement which would result in an obligation of the Partnership to indemnify such Indemnified Party.

**Confidentiality and Non-Disclosure**

The General Partner is under no obligation to disclose to any Limited Partner any information concerning specific Partnership investments. If requested to do so by a Limited Partner, the General Partner may in its discretion disclose to such Limited Partner information relating to a Partnership investment. Upon receipt of any such information from the General Partner, the Limited Partner shall treat such information as confidential and proprietary and shall not disclose such information to any person, except as required by any regulatory authority, law or regulation or by legal process.

## LEGAL MATTERS

The Partnership does not have counsel separate from the legal advisors to the General Partner. Should a future dispute arise between the Partnership and the General Partner, separate counsel may be retained as circumstances then dictate. In addition, counsel to the Partnership and the General Partner may serve as counsel to other investment funds sponsored or managed by the General Partner or its affiliates. No independent counsel has been retained to represent the Limited Partners.

## ACCESS TO INFORMATION

**Additional Information**

The offices of the Partnership are located at 112-21 Northern Blvd, Corona NY 11368. The offices of the General Partner are located at 136-20 38th Ave Suite 10F, Flushing NY 11354. Prospective investors are invited to review any materials available to the General Partner and reasonably necessary or appropriate to verify the accuracy of any information relating to the Partnership, the operations of the Partnership, this Offering, the General Partner and its affiliates, and any other matters relating to this Offering.

**Reports**

The General Partner furnishes all Limited Partners with annual reports and may, in its discretion, issue quarterly and such other reports as the General Partner deems fit. Each annual report will summarize the status of the activities of the Partnership at the end of the fiscal year and will include a balance sheet as of the end of such fiscal year as well as unaudited statements of income, each Limited Partner's capital account balance, gains and losses and a cash flow statement for such fiscal year, all of which shall be prepared by the Partnership's accountants in accordance with generally acceptable accounting practices as in effect from time to time in the United States. In addition, the General Partner will distribute information to enable the Partners to prepare their respective income tax returns, including, without limitation, a Form K-1 or other appropriate information, although the preparation of the Partners' individual tax returns is the sole responsibility of each Partner.

## PRIVACY NOTICE

The Partnership and the General Partner (collectively, "Offeror") recognize the importance of protecting the Limited Partners' privacy, and Offeror has adopted policies and procedures to maintain the confidentiality and security of the Limited Partners' information.

**Categories of Information Offeror May Collect**

In the normal course of business, Offeror may collect the following types of information:

- Information provided by the Limited Partners in the subscription documents and other forms (including name, address, income and other financial-related information).
- Data about transactions between a Limited Partner and Offeror (such as types of investments made and account status).

**How Offeror Uses Information Collected from Limited Partners**

Any and all nonpublic personal information received by Offeror with respect to Limited Partners, including the information provided to Offeror by a Limited Partner in the subscription documents, will not be shared with nonaffiliated third parties which are not service providers to Offeror without prior notice to such Limited Partners. Such service providers include, but are not limited to, the independent accountants and the legal advisors of the Partnership. Additionally, Offeror may disclose such nonpublic personal information as required by applicable laws, rules and regulations, including, without limitation, any disclosure that may be required to respond to a subpoena and any disclosure that may be required by

the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001 and the rules and regulations promulgated thereunder or under the rules and regulations promulgated by the U.S. Treasury Department's Office of Foreign Assets Control.

The same privacy policy will also apply to former Limited Partners.

For questions about this privacy policy, please contact the General Partner.

**Version Date: December 2013**

**ALL INFORMATION WILL BE TREATED CONFIDENTIALLY**

**SUBSCRIBER SUITABILITY QUESTIONNAIRE**

To Potential Investor:

The information contained herein is being furnished in order to determine whether you qualify for the investment pursuant to Section 3(a)(11) of the Securities Act of 1933 (the "Act") and the New York Corporate Securities Law (the "New York Act"). The General Partners of the EEGH, L.P. (the "Limited Partnership") will rely on the information contained herein for purposes of such determination. The Limited Partnership Units will not be registered under the Act or the New York Act in reliance upon the exemption from registration afforded by Section 3(a)(11) of the Act and the New York Act. This questionnaire is not an offer of Limited Partnership Units or any other securities but is merely information to be provided to determine qualification. If you wish to include your spouse's income and investment experience to be considered for qualification for this program, please designate that portion attributable to your spouse.

If you do not have sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of an investment in the Limited Partnership you will need to retain the services of a Subscriber Representative. If you are using a Subscriber Representative identify the name of the Subscriber Representative here: ____________________________________________

If you have knowledge and experience in financial and business matters so as to be capable of evaluating the relative merits and risks of an investment in the Limited Partnership without use of a Subscriber Representative initial here: _____.

Except as indicated below, any purchase of Limited Partnership Units will be solely for the account of the undersigned, and not for the account of any other person or with a view of any resale, fractionalization, division or distribution thereof.

The undersigned represents that the information contained herein is complete and accurate and may be relied upon by the General Partners of the EEGH, L.P. and the undersigned will notify the General Partners immediately of any material change in any such information occurring prior to submission of the Subscriber's Immigrant Petition By Alien Entrepreneur (Form I-526), with respect to the purchase of Limited Partnership

Units by the undersigned.

INFORMATION REQUIRED OF EACH PROSPECTIVE SUBSCRIBER

1. Name: ______________________________

   Date of Birth: ________________

2. Current Residence Address, Telephone Number and Email Address:

   ______________________________________________

3. Marital Status: ___________________

4. Names and Birthdates of all children under 21:

   ______________________________________________

   ______________________________________________

   ______________________________________________

5. Intended US Residence Address (City and State if known)

   ______________________________________________

6. Employer or Business Association & Position:

   ______________________________________________

7. Business Address & Telephone Number:

   ______________________________________________

8. Business or Professional Education and the Degrees received:

   School Degree Year Received

   ______________________________________________

______________________________________________

9. Identify Gross Family Income from all sources for the following years:

201__ ____________________
201__ ____________________
201__ ____________________

10. Identify your (include spouse) present net worth for the following years:

201__ ____________________
201__ ____________________
201__ ____________________

What percentage of your net worth shown above constitutes liquid assets (cash or assets readily convertible to cash): _____ per cent.

11. Identify types of investments you have made in the last three (3) years (real estate partnerships, research and development joint ventures, stocks, bonds, commodities, etc.) and the amount of the investment.

______________________________________________

______________________________________________

______________________________________________

The answers to the above questions are complete and correct and may be relied upon by the Limited Partnership for the purposes stated above.

IN WITNESS WHEREOF, I have executed this Investor Questionnaire this ____ day of _____________, 201__ and declare under oath that it is truthful and correct.

______________________________
Signature of Prospective Subscriber

______________________________
Print Subscriber Name

# EEGH II, L.P.

---

## LIMITED PARTNERSHIP AGREEMENT

---

EXHIBIT
22
5/30/19 SM

TABLE OF CONTENTS

**ARTICLE 1 DEFINITIONS & INTERPRETATION** .....2
1.1 Definitions. .....2
1.2 Interpretation Not Affected by Headings. .....5
1.3 Number and Gender. .....5
1.4 Date for Any Action. .....5
1.5 Accounting Terms. .....5
1.6 Currency. .....5
**ARTICLE 2 NAME, REGISTERED OFFICE & DURATION OF THE PARTNERSHIP** .....5
2.1 Name. .....5
2.2 Registered Office and Principal Address. .....5
2.3 Fiscal Year. .....6
2.4 Term. .....6
2.5 Organizational Documents and Other Filings. .....6
**ARTICLE 3 PURPOSE OF THE PARTNERSHIP** .....6
3.1 Partnership Purpose. .....6
3.2 Powers. .....6
**ARTICLE 4 POWERS OF THE PARTIES AND MANAGEMENT OF THE PARTNERSHIP** .....6
4.1 Powers of the General Partner .....6
4.2 Specific Powers of the General Partner. .....7
4.3 No Commingling. .....8
4.4 Indebtedness and Guarantees. .....9
4.5 Standard of Care. .....9
4.6 Delegation. .....9
4.7 No Securities Registration .....9
4.8 No Restrictions on Other Business. .....9
4.9 Powers of Limited Partners. .....9
**ARTICLE 5 CAPITAL OF THE PARTNERSHIP** .....10
5.1 Capital. .....10
5.2 Commitments. .....10
5.3 Capital Account. .....10
5.4 No Right to Withdraw. .....10
5.5 No Interest Payable on Accounts. .....10
**ARTICLE 6 UNITS OF THE PARTNERSHIP** .....11
6.1 Partnership Units. .....11
6.2 Unit Certificates. .....11
6.3 Offering Units. .....11
6.4 Admittance as Limited Partner .....12
6.5 Closings. .....12
6.6 Register. .....12
6.7 Inspection of Records .....12
6.8 Cancellation of Original Partner's Unit. .....13
**ARTICLE 7 FEES AND EXPENSES** .....13
7.1 Partnership Expenses. .....13
7.2 Payment of Management Fees. .....13

7.3 Allocation and Payment of Partnership Expenses. ....13
**ARTICLE 8 DETERMINATION AND ALLOCATION OF NET INCOME OR LOSS** ....14
8.1 Determination of Net Income or Loss. ....14
8.2 Allocations of Profits and Losses. ....14
8.3 Computation of Income or Loss for Tax Purposes. ....14
8.4 Allocation of Income or Loss for Tax Purposes. ....14
8.5 Tax Returns. ....14
8.6 No Allocation or Distribution to Original Partner. ....14
**ARTICLE 9 DISTRIBUTIONS** ....14
9.1 Distributions. ....14
9.2 No Distributions in Certain Cases. ....15
**ARTICLE 10 JOB ALLOCATION** ....15
10.1 Job Allocation. ....15
**ARTICLE 11 TRANSFER AND ASSIGNMENT OF UNITS** ....16
11.1 Retirement upon Failure of Visa Process. ....16
11.2 Assignability of Units. ....16
11.3 Transfer by Operation of Law. ....16
**ARTICLE 12 REPRESENTATIONS AND WARRANTIES** ....17
12.1 Representations, Warranties and Covenants of the General Partner. ....17
12.2 Survival of Representations and Warranties. ....17
**ARTICLE 13 LIABILITIES AND INDEMNIFICATION** ....18
13.1 Limitation on Liability. ....18
13.2 Indemnification by Partnership. ....18
13.3 Indemnification by General Partner. ....19
**ARTICLE 14 NO WITHDRAWAL OF GENERAL PARTNER** ....20
14.1 No Withdrawal of General Partner; No Assignment of Interest. ....20
**ARTICLE 15 COMPLIANCE BY LIMITED PARTNERS** ....20
15.1 Compliance by Limited Partners. ....20
**ARTICLE 16 DISSOLUTION** ....20
16.1 Dissolution or Termination. ....20
16.2 No Dissolution in Certain Events. ....20
16.3 Winding Up and Termination of Partnership. ....20
16.4 Provisions Cumulative. ....21
16.5 No Request for Dissolution by Limited Partners. ....21
16.6 Termination of Agreement on Dissolution. ....21
**ARTICLE 17 MEETINGS** ....21
17.1 Meetings of Partners. ....21
17.2 Requisitioned Meetings. ....22
17.3 Delivery of Notice. ....22
17.4 Contents of Notice. ....22
17.5 Place of Meetings. ....22
17.6 Quorum. ....22
17.7 Chairman. ....22
17.8 Voting Rights. ....23
17.9 Conduct of Meetings. ....23
17.10 Limited Partner Resolutions. ....23

17.11 Effect of Resolutions. ....23
17.12 Minute Book. ....23
17.13 Resolution in Lieu of Meeting. ....23
**ARTICLE 18 ACCOUNTING AND REPORTING** ....24
18.1 Books of Account. ....24
18.2 Annual Reports. ....24
18.3 Other Reports. ....24
**ARTICLE 19 NOTICES** ....24
19.1 Notices. ....24
19.2 Change of Address. ....25
**ARTICLE 20 GENERAL** ....25
20.1 Waiver of Accounting. ....25
20.2 Severability. ....25
20.3 Enurement. ....25
20.4 Counterparts. ....25
20.5 Entire Agreement. ....25
20.6 Amendment. ....25
20.7 Jurisdiction. ....26
20.8 Confidentiality. ....26
20.9 No Third Party Beneficiaries. ....26
20.10 Venue. ....27

# EEGH II, L.P.

## LIMITED PARTNERSHIP AGREEMENT

**THIS AGREEMENT**, dated as of the [___] day of [_______], 201_.

**AMONG:**

Fleet New York Metropolitan Regional Center LLC, a New York limited liability company (the "**General Partner**")

- and –

Richard Xia, an individual residing in the state of New York (the "**Original Partner**")

- and –

Each party who from time to time, becomes a limited partner in accordance with the terms of this Agreement (hereinafter individually referred to as a **"Limited Partner"** and collectively with the Initial Limited Partners referred to as the **"Limited Partners"**).

## RECITALS:

A. EEGH II, L.P. (the **"Partnership"**) was formed as a limited partnership under the Revised Limited Partnership Act of New York (the "**Act**") by filing a Certificate of Limited Partnership with the New York State Department of State pursuant to the Section 121-201 of the Act.

B. The Partnership intends to sell Units to investors and to admit as Limited Partners those investors whose subscriptions are accepted by the General Partner. Upon the admittance of the first Limited Partner, the limited partnership interest of the Original Partner will be canceled.

C. This Agreement is being entered into to set forth the terms applicable to the relationship between the Partners and the conduct of the activities of the Partnership.

**NOW THEREFORE** in consideration of the respective covenants and agreements of the parties herein contained and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties agree with each other as follows.

## ARTICLE 1
## DEFINITIONS & INTERPRETATION

### 1.1 Definitions.

For the purposes of this Agreement (including the Recitals hereto), the following terms shall have the meanings set forth below:

**"Accountants"** means such firm of accredited accountants as the General Partner may retain from time to time on behalf of the Partnership.

**"Act"** has the meaning set forth in Recital A.

**"Affiliate"** means, with respect to a person or entity, any other person or entity which directly or indirectly controls, is controlled by or has common control with the first person or entity.

**"Agreement"** means this limited partnership agreement (together with all Schedules hereto), as it may be amended, supplemented or otherwise modified from time to time in accordance with its terms, and "hereto", "herein", "hereof", "herewith" and similar terms refer to such Agreement in its entirety unless a specific provision is stipulated.

**"Business Day"** means a day other than a Saturday, a Sunday or date on which banks in New York, New York are permitted or required by law to be closed.

**"Capital Commitment"** means the amount of capital agreed to be invested in the Partnership by a Limited Partner pursuant to Section 5.2.

**"Capital Contribution"** means, in respect of each Partner at any time, the amount of money that the Partner has actually contributed to the Partnership.

**"Certificate of Limited Partnership"** means the Certificate of Limited Partnership filed under the Act forming the Partnership as a limited partnership under the Act, as such Certificate of Limited Partnership may be amended from time to time pursuant to the Act.

**"Fiscal Year"** has the meaning set out in Section 2.3.

**"GAAP"** means generally accepted accounting principles as in effect from time to time in the United States.

**"General Partner"** means Fleet New York Metropolitan Regional Center LLC.

**"Includes"** and **"Including"** means "includes without limitation" and "including without limitation" respectively.

**"Indemnified Party"** has the meaning set out in Section 12.1.

**"Initial Closing"** has the meaning set out in Section 6.6.

**"Initial Closing Date"** means the date of the Initial Closing.

**"Initial Limited Partners"** means those Limited Partners who acquire their Interests in connection with the Initial Closing.

**"Interest"** means the entire limited partnership interest in the Partnership owned by a Limited Partner at any particular time, including the right of such Limited Partner to any and all benefits to which a Limited Partner may be entitled as provided in this Agreement, together with the obligations of such Limited Partner to comply with all of the terms and provisions of this Agreement. Any reference to the General Partner's Interest means the interest of the General Partner in the Partnership as the general partner thereof.

**"Investment"** means the Partnership's investment, through a loan to finance the development and operation of a commercial project located in Corona, City of New York, Queens, New York.

**"Limited Partner"** means each of the persons shown as limited partners on the record of Limited Partners which the General Partner is required to maintain under the Act, including any person who has been admitted to the Partnership as a substitute or additional Limited Partner in accordance with this Agreement.

**"Liquidating Trustee"** has the meaning set out in Section 15.3.

**"Losses"** means, in respect of any matter, all claims, demands, proceedings, losses, damages, liabilities, deficiencies, costs and expenses arising directly or indirectly as a consequence of such matter, including any amounts paid in satisfaction of judgments, in compromise or settlement, as interest, fines or penalties, all legal and other professional fees and disbursements, and any and all other costs of investigating or defending against any claim or alleged claim, but excluding lost profits.

**"Management Fees"** means a fee payable to the General Partner of $7,500 per year for each outstanding Unit.

**"Meeting Notice"** has the meaning set out in Section 16.3.

**"Meeting Request"** has the meaning set out in Section 16.1.

**"Ordinary Resolution"** means:

(i) a resolution by the Required Percentage of the Limited Partners, in person or by proxy, by votes taken at a meeting of the Partners (or any adjournment thereof) called in accordance with this Agreement; or

(ii) a written resolution signed by the Required Percentage of the Limited Partners that would have been entitled to vote on such resolution at a meeting of the Partners called in accordance with this Agreement.

**"Partner"** means the General Partner and each of the Limited Partners.

**"Partnership"** means the limited partnership formed pursuant to the Act under the name **"EEGH II, L.P."**

**"Partnership Expenses"** means the expenses set out in Section 7.1.

**"Person"** shall be broadly construed and means, without limitation, any individual, partnership, limited partnership, corporation, limited liability company, unincorporated organization or association, trust (including the trustees thereof, in their capacity as such), government (or agency or political subdivision thereof) or other legal or business entity or enterprise.

**"EB-5 Program"** means the EB-5 immigrant investor program established pursuant to the Section 203(b)(5) of the Immigration and Nationality Act or any subsequent statutes which replace or modify Section 203(b)(5) of the Immigration and Nationality Act.

**"Pro Rata Share"** means, when used to describe the share of a Partner of any amount, the portion of that amount which is determined by multiplying that amount by a fraction, the numerator of which is the number of Units at that time registered in the name of the Partner and the denominator of which is the total number of Units then outstanding. When used in Sections 8.1 and 9.1, the denominator of the Pro Rata Share shall be the total number of Units outstanding and held by the Limited Partners.

**"Register"** has the meaning set out in Section 6.7.

**"Required Percentage of the Limited Partners"** means Limited Partners whose aggregate Interests in the Partnership constitute more than seventy percent (70%) of the aggregate Interests held by all Limited Partners.

**"Capital Contribution Amount"** means US$500,000 (or such greater amount as may be required by the USCIS as a result of changes to U.S. immigration laws and regulations governing the EB-5 Program).

**"Subsequent Closing"** has the meaning set out in Section 6.6.

**"Subsequent Closing Date"** means the date of a Subsequent Closing.

**"Tax Act"** means the U.S. Internal Revenue Code and the regulations thereunder.

**"Termination Date"** has the meaning set out in Section 15.1.

**"Unit"** means a unit of Interest in the Partnership.

**"USCIS"** means United States Citizenship and Immigration Services.

**1.2 Interpretation Not Affected by Headings.**

The division of this Agreement into Articles and Sections and the use of headings are for reference purposes only and shall not affect the interpretation of this Agreement. Unless otherwise indicated, any reference in this Agreement to an Article or Section refers to the specified Article or Section of this Agreement.

**1.3 Number and Gender.**

In this Agreement, words importing the singular number include the plural and vice versa, and words importing any gender include all genders and the neutral gender.

**1.4 Date for Any Action.**

If the date on which any action is required to be taken under this Agreement is not a Business Day, then that action shall be required to be taken on the next succeeding Business Day.

**1.5 Accounting Terms.**

Accounting terms not defined herein shall be construed in accordance with GAAP.

**1.6 Currency.**

All dollar amounts are expressed in United States dollars.

## ARTICLE 2
## NAME, REGISTERED OFFICE & DURATION OF THE PARTNERSHIP

**2.1 Name.**

The Partnership shall carry on its activities under the name "EEGH II, L.P." or such other name as the General Partner may determine from time to time. The General Partner shall notify each Limited Partner of any change in the name under which the Partnership carries on its activities within 10 Business Days of such change.

**2.2 Registered Office and Principal Address.**

The registered office and principal address of the Partnership shall be located at 112-51 NORTHERN BLVD, CORONA, CITY OF NEW YORK, NY 11368 or at such other location, in accordance with applicable law, as the General Partner may determine from time to time. The General Partner shall notify each Limited Partner of any change in the principal address of the Partnership within 10 Business Days of such change.

**2.3 Fiscal Year.**

The fiscal year (the "**Fiscal Year**") of the Partnership shall end on the 31st day of December of each calendar year.

**2.4 Term.**

Subject to Article 15, the Partnership shall continue until the Termination Date.

**2.5 Organizational Documents and Other Filings.**

If requested by the General Partner, the Limited Partners shall promptly execute all certificates and other documents consistent with the terms of this Agreement necessary for the General Partner to accomplish all filing, recording, publishing and other acts as may be appropriate to comply with all requirements for: (a) the formation and operation of a limited partnership under the laws of the State of New York; (b) if the General Partner deems it advisable, the operation of the Partnership as an entity or partnership in which the Limited Partners have limited liability in all jurisdictions where the Partnership proposes to operate or in which Limited Partners have addresses of record in the Partnership records; and (c) all other filings which the General Partner determines are necessary or advisable to be made by the Partnership.

## ARTICLE 3
## PURPOSE OF THE PARTNERSHIP

**3.1 Partnership Purpose.**

The Partnership has been formed as a commercial for profit entity for the purpose of making the Investment and conducting all activities ancillary thereto.

**3.2 Powers.**

The Partnership shall have the power to do and to perform any and all things necessary for, incidental to or connected with carrying on the activities of the Partnership.

The foregoing investment guidelines and restrictions shall be subject to the good faith interpretation of the General Partner, which interpretation shall be conclusive, final and binding on the Partnership.

## ARTICLE 4
## POWERS OF THE PARTIES AND MANAGEMENT OF THE PARTNERSHIP

**4.1 Powers of the General Partner.**

Subject to the terms of this Agreement and the provisions of the Act, the General Partner shall have the power and authority to:

(a) carry on the activities of the Partnership and to do any and all things necessary for, incidental to or connected with carrying on the activities of the Partnership; and

(b) represent and bind the Partnership.

Any action taken by the General Partner on behalf of the Partnership shall be deemed to be the act of the Partnership and shall bind the Partnership. No person dealing with the Partnership shall be required to inquire into the authority of the General Partner to do any act, make any decision or execute or deliver any instrument, agreement or document on behalf of or in the name of the Partnership.

**4.2 Specific Powers of the General Partner.**

Without limiting the general powers set forth in Section 4.1, the General Partner is hereby authorized and empowered on behalf and in the name of the Partnership, or on its own behalf and in its own name, or through agents, as it may determine appropriate, subject to the approval of the Limited Partners where required under this Agreement and to any applicable limitations set forth in the Act, to:

(a) The General Partner, in its sole discretion, has the right to increase or decrease the exact number of units offered if the development requires additional funding or if the General Partner determines that such funds are not necessary for the investment.

(b) Investing. Make decisions concerning the investigation, solicitation, origination, selection, development, negotiation, acquisition, management, structuring, restructuring, commitment to and monitoring of and disposition of Investments, including in connection with compliance with the job creation requirements of the EB-5 Program.

(c) Managing Investment, Exercising Rights as Security Holder. Acquire, hold, sell, transfer, exchange, pledge and dispose of Investment, and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Investment, including the voting of securities, the approval of a restructuring of an Investment, participation in arrangements with creditors of the entity with or to whom an Investment has been made, the commencement and settlement or compromise of actions and administrative proceedings with respect to Investment and other similar matters with respect to Investment.

(d) Banking. Open, maintain and close bank accounts and draw checks and other orders for the payment of money and open, maintain and close custody, brokerage and similar accounts.

(e) Staffing. Hire for usual and customary fees consultants, attorneys, accountants and such other agents and employees for the Partnership as it may deem necessary or desirable.

(f) Maintain Regulatory Filings. File such certificates, returns or other documents and comply with all applicable regulatory requirements, and do such other acts as may be necessary or advisable to maintain the status of the Partnership as a limited partnership where deemed appropriate.

(g) Incur Liabilities of the Partnership. Incur liabilities in the name of the Partnership from time to time as the General Partner may reasonably determine, without limitation with regard to amount, cost or conditions of reimbursement of such liabilities.

(h) Commence and Defend Litigation. Commence or defend any action or proceeding in connection with the Partnership and handle and settle any claims by or against the Partnership.

(i) Attend to Tax Matters. Make, in its sole discretion, any and all elections for federal, state, local, municipal and foreign tax matters and make for and on behalf of each Limited Partner in respect of such Limited Partner's Interest any and all elections, determinations, designations or filings of any kind under the Tax Act or other similar laws of the United States, or any state, municipality or foreign jurisdiction.

(j) Engage Professionals. Negotiate contracts, and enter into contracts, with third party providers of services, including accountants and other professionals.

(k) Bind the Partnership and Manage Its Activities Generally. Enter into, execute, maintain, and/or terminate contracts, undertakings, agreements and any and all other documents and instruments in the name of the Partnership, and do or perform all such things as may be necessary or advisable in furtherance of the Partnership's powers, objects, or purposes or to the conduct of the Partnership's activities, including obtaining any insurance coverage, preparing financial statements, income tax returns, information returns and financial and accounting statements and providing Limited Partners with financial statements and other reports, as required by the Partnership or by applicable law, and entering into acquisition agreements to make or dispose of Investment which may include such representations, warranties, covenants, indemnities, guarantees and security as the General Partner deems necessary or advisable.

(l) Admit Limited Partners. Admit new Limited Partners to the Partnership in accordance with Section 6.5.

**4.3 No Commingling.**

Notwithstanding any other provision hereof, the funds and other assets of the Partnership shall not be commingled with the funds or other assets of the General Partner or any other person.

**4.4 Indebtedness and Guarantees.**

Unless approved by the Limited Partners by Ordinary Resolution, the Partnership shall not borrow any funds or act as a guarantor of the obligations of any person.

**4.5 Standard of Care.**

The General Partner shall exercise the same degree of care, diligence and skill that a reasonable person would exercise in similar circumstances.

**4.6 Delegation.**

The General Partner may delegate any or all of its power and authority under this Agreement, including its power and authority to carry on the business of, and to represent, the Partnership. Any such delegation shall not relieve the General Partner of its obligations under this Agreement.

**4.7 No Securities Registration.**

Each Limited Partner acknowledges that the General Partner is not registered as an investment adviser or otherwise under the securities laws of any jurisdiction.

**4.8 No Restrictions on Other Business.**

This Agreement shall not be construed in any manner to preclude any Partner (including in particular the General Partner), any Partner's Affiliates or associates, or any of their respective directors, officers, employees, shareholders, members, partners or agents from engaging in any activity whatsoever permitted by applicable law whether in a related business or otherwise. Moreover, the General Partner may, in the future, organize, manage, and otherwise be involved with joint ventures, additional limited partnerships, or other business entities involved in the same type of business as this Partnership. Neither this Agreement nor any activities undertaken pursuant hereto shall prevent the General Partner from engaging in such activities or require the General Partner to permit the Partnership or any other Partner to participate in any such activities, and as a material part of the consideration for the General Partner's execution hereof and the admission of each Limited Partner to the Partnership, each Limited Partner hereby waives, relinquishes, and renounces any such right or claim of participation.

**4.9 Powers of Limited Partners.**

Limited Partners will engage in policy making activities relating to the Partnership and will have all the rights, powers, and duties normally granted to limited partners under the Act, which is based on the Uniform Limited Partnership Act. In addition to having all of the rights, powers and duties normally granted to limited partners under the Act, Limited Partners will have the rights, as further described in Section 16.11 below, to advise the General Partner in connection with the business of the Partnership, to approve the conditions for the staged funding of an Investment, to advise the General Partner in connection with the monitoring of an Investment, and to approve the realization plan in connection with any rights granted to the Partnership in connection with an Investment.

Notwithstanding the foregoing, no Limited Partner, in his or her capacity as a Limited Partner, shall:

(a) execute any document that binds, or purports to bind, the Partnership or any other Partner;

(b) bring any action for partition or sale in respect of any or all of the assets or property of the Partnership or record or permit any encumbrance in respect of any such property.

## ARTICLE 5
## CAPITAL OF THE PARTNERSHIP

**5.1 Capital.**

The capital of the Partnership shall consist of the aggregate Capital Contributions to the Partnership by the Partners at the relevant time.

**5.2 Commitments.**

The Capital Commitment of each Limited Partner shall equal US$500,000 (or such greater amount as may be required by the USCIS as a result of changes to U.S. immigration laws and regulations governing the EB-5 Program) for each Unit held by such Limited Partner.

**5.3 Capital Account.**

There shall be established for each Partner on the books of account of the Partnership a capital account which shall be credited with each Partner's Capital Contributions. The General Partner shall also credit to the capital account of each Partner the amount of all income of the Partnership allocated to such Partner and shall debit the capital account of such Partner the amount of all losses of the Partnership allocated to such Partner and the amount of any funds or the fair market value of any property (determined on the date of distribution, net of liabilities assumed by such Partner and the liabilities to which such properties are subject) distributed from time to time by the Partnership to the Partner.

**5.4 No Right to Withdraw.**

No Partner shall have the right to withdraw from the Partnership, except as expressly provided in this Agreement.

**5.5 No Interest Payable on Accounts.**

No interest shall be paid to any Partner on any amount in that Partner's capital account.

## ARTICLE 6
## UNITS OF THE PARTNERSHIP

**6.1 Partnership Units.**

The Interests of the Limited Partners in the Partnership shall be divided into and represented by Units issued in accordance with this Agreement, each representing a share of the aggregate Interests of the Partners in the Partnership as determined pursuant to this Agreement.

**6.2 Unit Certificates.**

(a) Certificates. The Partnership may, but shall not be required to, issue certificates to evidence ownership of Units.

(b) Lost Certificates. If a Limited Partner claims that a certificate evidencing his or her Units has been defaced, lost, destroyed or wrongly taken, the General Partner shall cause a new certificate to be issued in substitution for the original certificate if the Limited Partner:

(i) files with the General Partner an indemnity bond (or other form of indemnity or guarantee) in form and amount satisfactory to the General Partner to protect the Partners and the Partnership from any loss, cost or damage they may incur or suffer by complying with the request to issue a new Unit certificate; and

(ii) satisfies such other reasonable requirements imposed by the General Partner, including a requirement to deliver the defaced Unit certificate or a form of proof of loss.

(c) Certificates on Dissolution. Upon the dissolution of the Partnership and distribution to a Limited Partner of the assets to which such Limited Partner is entitled hereunder, any certificate evidencing a Unit issued to such Limited Partner shall become null and void.

**6.3 Offering Units.**

The General Partner may raise capital for the Partnership by offering for sale and selling Units at a price equal to the Capital Contribution Amount. The General Partner may determine the other terms and conditions of such sale and may do all things in that regard in the name of and on behalf of the Partnership, including preparing and filing such offering or other documents as the General Partner determines to be necessary or desirable, and all things done by the General Partner in that regard are hereby ratified and confirmed.

**6.4 Admittance as Limited Partner.**

Upon acceptance by the General Partner of any subscription, which acceptance shall only take place after execution of the Subscription Agreement, Offering Memorandum, Limited Partnership Agreement, and Payment of the required processing fee and Capital Contribution, all Partners shall be deemed to consent to the admission of the subscriber as a Limited Partner and the Partnership may issue Units to such subscriber. Each person becoming a party to this Agreement by executing this Agreement shall be bound by the terms hereof.

**6.5 Closings.**

(a) Initial Closing. The first closing to take place at the time selected by the General Partner when the General Partner has received and accepted subscriptions representing Capital Contributions not less than $500,000 sufficient to meet the needs of the Investment as of the time designated and determined by the General Partner in its sole discretion to close shall be referred to as the **"Initial Closing"**.

(b) Subsequent Closings. One or more closings (each a **"Subsequent Closing"**) may take place following the Initial Closing Date, at which the General Partner may receive and accept subscriptions representing Capital Contributions in accordance with this Article 6.

**6.6 Register.**

The General Partner shall act as the registrar of the Units and shall maintain a record (the **"Register"**) and such other books and records as are necessary or advisable to record the following information:

(a) each Partner's surname, given name and residential address or address for service, including municipality, street and number, if any, and postal code;

(b) the amount of money contributed by the Partner to the Partnership;

(c) the number of Units held by each Partner; and

(d) particulars of any and all transfers, assignments and redemptions of Units.

**6.7 Inspection of Records.**

The Register and any other such books or records shall be kept by the General Partner at the principal address of the Partnership. The General Partner shall make the Register and any other books or records relating to the Partnership or the Partners available for inspection by any Limited Partner during normal business hours upon reasonable written notice.

**6.8 <u>Cancellation of Original Partner's Unit</u>.**

Upon the admittance of the first Limited Partner, the Unit of the Original Partner shall be canceled in consideration of $1.00.

## ARTICLE 7
## FEES AND EXPENSES

**7.1 <u>Partnership Expenses</u>.**

Except as specifically provided otherwise herein, the Partnership will pay all expenses ("**Partnership Expenses**") directly related to its own operations, but only to the extent actually incurred, including:

(a) all expenses of lawyers, accountants, accountants, custodians, professional advisors and service providers retained by the Partnership;

(b) insurance of the Partnership;

(c) expenses relating to litigation or to the enforcement and protection of rights of the Partnership;

(d) all taxes, fees or other similar charges levied against the Partnership; and

(e) all expenses incurred in connection with the fulfillment of statutory or other compliance requirements and in connection with reporting to or communicating with Limited Partners and convening any meeting of Limited Partners.

**7.2 <u>Payment of Management Fees</u>.**

The Partnership shall pay the Management Fees to the General Partner in the amount of $7,500 per annum for each outstanding Unit. Such amounts shall be paid from the revenue of the Partnership.

**7.3 <u>Allocation and Payment of Partnership Expenses</u>.**

Partnership Expenses may be allocated against all revenue derived by the Partnership in a manner reasonably determined by the General Partner; provided, however, that the $500,000 per Unit original capital investment amount will be invested in the Investment and will not be used to pay Partnership Expenses. The General Partner may, on a pro rata basis in accordance with each Partner's Pro Rata Share, withhold from any distributions any amounts necessary to create appropriate reserves for expenses and liabilities, contingent or otherwise, of the Partnership (including any reserve or hold back with respect to liability for representations, warranties and indemnities under a purchase agreement relating to a disposition), as well as for any tax withholdings.

## ARTICLE 8
## DETERMINATION AND ALLOCATION OF NET INCOME OR LOSS

**8.1 Determination of Net Income or Loss.**

The net income or loss of the Partnership for each Fiscal Year shall be determined by the General Partner in accordance with GAAP.

**8.2 Allocations of Profits and Losses.**

Profits or losses of the Partnership shall be allocated 90% to the Limited Partners pro rata in accordance with each Limited Partner's Pro Rata Share, and 10% to the General Partner.

**8.3 Computation of Income or Loss for Tax Purposes.**

The General Partner shall have the right, in computing the income or loss of the Partnership for tax purposes, to (i) adopt a different method of accounting than required by Section 8.1; (ii) adopt a different method of allocation than required in Section 8.2; and (iii) adopt different treatments of particular items and to make and revoke elections on behalf of the Partnership and the Partners as the General Partner deems to be in the best interests of the Limited Partners and in the spirit of this Agreement.

**8.4 Allocation of Income or Loss for Tax Purposes.**

The income or loss of the Partnership for tax purposes for a Fiscal Year shall be allocated to the Partners in the same manner as set out in Section 8.2.

**8.5 Tax Returns.**

Each Partner shall prepare and file such documents as may be required to be prepared and filed under the Tax Act and other similar legislation to which the Partner may be subject and shall include in its computation of the income or loss of the Partnership for tax purposes as may be determined and allocated to it pursuant to this Article 8.

**8.6 No Allocation or Distribution to Original Partner.**

Notwithstanding any other provision of this Agreement, the Original Partner shall not be entitled to receive any allocation or distributions pursuant to Article 8 or Article 9.

## ARTICLE 9
## DISTRIBUTIONS

**9.1 Distributions.**

(a) Annual Distributions. The General Partner shall distribute to the Limited Partners (pro rata in accordance with each Limited Partner's Pro Rata Share) and to the General Partner, annually (subject to Section 9.1(b)

below) on or before April 1st in each year, any net income (determined in accordance with Section 8.1) of the Partnership for the previous Fiscal Year, in accordance with the allocation percentage set forth in Section 8.2, net of any required tax withholdings and any amounts which, in the judgment of the General Partner, such judgment to be in General Partner's sole discretion, are required to meet the ongoing obligations (whether certain or contingent) of the Partnership.

(b) Distributions Following Disposition. Following the disposition by the Partnership of all or any portion of the Investment, the General Partner shall distribute, as soon as practicable, to the Limited Partners (pro rata in accordance with each Limited Partner's Pro Rata Share) and to the General Partner an amount equal to the net proceeds realized from such disposition in accordance with the allocation percentage set forth in Section 8.2, net of any required tax withholding and any amounts, which, in the judgment of the General Partner, are required to meet the ongoing obligations (whether certain or contingent) of the Partnership.

(c) Other Distributions. Subject to the provisions of this Article 9, the General Partner may make such other distributions out of the surplus funds of the Partnership, if any, as it determines, in its sole discretion, to be necessary or desirable, any such distribution to be made in accordance with the allocation percentage set forth in Section 8.2.

(d) No Guaranteed Distributions. There will be no guaranteed distributions.

**9.2 No Distributions in Certain Cases.**

Notwithstanding the foregoing and any other provisions of this Agreement, the Partnership may not, pursuant to the Act, make distributions where such distribution would reduce its assets to an amount insufficient to discharge the liabilities of the Partnership to persons other than its Partners.

## ARTICLE 10
## JOB ALLOCATION

**10.1 Job Allocation.**

The jobs will be allocated to Limited Partners in a block of 10 jobs per investor based on a "filed first" priority allocation method. 8 C.F.R. 204.6 (g)(2) The priority of Job Allocation to Limited Partners shall be determined by the I-829 filing date of the Limited Partners as indicated in the I-797C filing receipt or other proof of filing. Each Limited partner shall be allocated EB-5 Jobs based on its I-829 Filing Date relative to the I-829 Filing Dates of other Limited Partners. In the case of two or more Limited Partners with an identical I-829 filing date, the jobs to be allocated to these Limited Partners based on such filing date will be allocated among such Limited Partners based on the priority of their I-526 petition filing date.

## ARTICLE 11
## TRANSFER AND ASSIGNMENT OF UNITS

**11.1 Retirement upon Failure of Visa Process.**

In the event a Limited Partner, acting in good faith (as determined in the sole and absolute judgment of the General Partner), has his or her I-526 Petition denied by USCIS, or fails the consular interview process or the USCIS adjustment of status process, the General Partner may, in its sole discretion, offer such Limited Partner an opportunity to voluntarily retire or withdraw from the Partnership; provided, however, that such a retirement or withdrawal will only be permitted if, in the General Partner's reasonable judgment, there would be no material adverse effect on the Partnership or the Partnership's investment, or if the Partnership is able to secure alternative financing to replace the amounts to be returned to the retiring or withdrawing Limited Partner. Simultaneously with the permitted retirement or withdrawal of a Limited Partner, (i) the Unit of such retiring or withdrawing Limited Partner will be canceled; (ii) such Limited Partner's Interest, including any right of such Limited Partner to the return of Capital Contributions and any right to receive allocations or distributions of income, losses or profits, will thereafter be canceled and terminated, and the Interests of the remaining Limited Partners will be adjusted pro rata to reflect such cancellation and termination; (iii) such retiring or withdrawing Limited Partner will sell his or her Interest to the Partnership for an amount equal to $500,000; and (iii) such retiring or withdrawing Limited Partner will not be entitled to receive any other amount or payment from the Partnership for the value of his or her Interest or his or her capital account in the Partnership.

**11.2 Assignability of Units.**

(a) A Limited Partner may not pledge, assign, sell, exchange, or otherwise encumber or transfer its Unit, in whole or in part, to any person except by operation of law, nor shall he or she be entitled to substitute for himself or herself as a Limited Partner any other person, without the prior written consent of the General Partner, which consent may be withheld by the General Partner in its sole discretion for any reason or for no reason. Any attempted pledge, assignment, sale, exchange, encumbrance, transfer or substitution not made in accordance with this Section 10.2 shall be void.

(b) In connection with any transfer of a Unit, the transferee, unless otherwise notified by the General Partner, shall provide the Partnership, within thirty (30) days after such transfer (or, in the case of a transferee that acquires a Unit on the death of a Limited Partner, within one year after such death), with the written notice described in Section 3 of Notice 2005-32, 2006-16 I.R.B. 895 (or any successor regulation or administrative pronouncement).

**11.3 Transfer by Operation of Law.**

When a person becomes entitled to a Unit by operation of law, such entitlement will not be recognized or entered in the Register evidencing ownership of the Units until that person:

(a) has produced evidence satisfactory to the General Partner of such entitlement; and

has acknowledged in writing that such person is bound by all of the terms of this Agreement.

## ARTICLE 12
## REPRESENTATIONS AND WARRANTIES

### 12.1 Representations, Warranties and Covenants of the General Partner.

The General Partner represents, warrants and covenants to each Limited Partner that, so long as it is the General Partner, it:

(a) is and will continue to be a duly constituted entity governed by the laws of the State of New York;

(b) is and will continue to be duly registered and qualified to carry on business in each jurisdiction where it is necessary for the General Partner to be so registered or qualified;

(c) has, and will continue to have, the capacity and authority to act as the General Partner;

(d) can fulfill its obligations as General Partner without violating the terms of its certificate of incorporation or bylaws or any agreement to which it is or will be a party or by which it is or hereafter becomes bound or any law or regulation applicable to it;

(e) will devote as much time as is reasonably required to manage the activities and affairs of the Partnership; and

(f) will not dissolve, wind-up or liquidate its business and affairs as long as it is the General Partner of the Partnership.

The General Partner further represents and warrants to each Limited Partner that the Partnership was formed on September 10, 2015, that the Partnership has filed a Certificate of Limited Partnership under the Act, that such Certificate of Limited Partnership has not been withdrawn as of the date hereof and that the Partnership continues as a limited partnership under the Act as of the date hereof.

### 12.2 Survival of Representations and Warranties.

The representations and warranties contained in Section 11.1 shall survive the execution of this Agreement, the Initial Closing and each Subsequent Closing.

## ARTICLE 13
## LIABILITIES AND INDEMNIFICATION

**13.1 Limitation on Liability.**

(a) The General Partner shall be subject to all of the liabilities applicable under the Act; provided, however, that to the fullest extent permitted by law, neither the General Partner nor its Affiliates nor any of their respective directors, officers, employees, shareholders and agents (each, an "**Indemnified Party**") shall be liable to the Partnership or to any Partner for liabilities arising in connection with the Partnership or its Affiliates. Notwithstanding the foregoing, such limitation of liability shall not apply where the Indemnified Party is guilty of gross negligence or willful misconduct. For the purposes of this Agreement, all benefits accruing to an Indemnified Party which is not a party hereto shall be held in trust by the General Partner for such Indemnified Party.

(b) To the extent that, at law or in equity, the General Partner has duties to the Partnership or to another Partner and liabilities relating thereto, the General Partner shall not, to the full extent permitted by law, be liable to the Partnership or to such other Partner for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they expand or restrict the duties and liabilities of the General Partner otherwise existing at law or in equity, are agreed by the Partners to modify to that extent such other duties and liabilities of the General Partner.

(c) The General Partner may consult with legal counsel and accountants selected by it, and any act or omission suffered or taken by it on behalf of the Partnership or in furtherance of the interests of the Partnership in good faith in reliance upon and in accordance with the advice of such counsel or accountants shall be full justification for any such act or omission, and the General Partner shall be fully protected and held harmless in so acting or omitting to act provided that such counsel or accountants were selected with reasonable care.

(d) The General Partner shall be liable for the debts and obligations of the Partnership to the full extent of its assets, but shall be entitled to require the prior exhaustion of the Partnership's assets and shall be entitled to the benefits of the indemnities provided herein.

**13.2 Indemnification by Partnership.**

(a) To the fullest extent permitted by law, the Partnership shall indemnify and hold harmless each of the Indemnified Parties, on an after-tax basis, from and against any and all Losses of any nature whatsoever, whether known or unknown, liquidated or unliquidated, that are incurred by any

Indemnified Party and arise out of or in connection with the affairs of the Partnership or any of its Affiliates, including any mistake in judgment, any act performed or omission made by such Indemnified Party, Losses incurred due to mistake, action, inaction, gross negligence or bad faith of any broker or other agent (assuming that such broker or other agent was selected with reasonable care), the performance by such Indemnified Party of any of the General Partner's responsibilities hereunder or otherwise in connection with the matters contemplated herein; provided that an Indemnified Party shall be entitled to indemnification hereunder only to the extent that such Indemnified Party acted in good faith and such Indemnified Party's conduct did not constitute gross negligence or willful misconduct. The satisfaction of any indemnification and holding harmless pursuant to this Section 12.2(a) shall be from and limited to Partnership assets, and no Partner shall have any personal liability on account thereof beyond the amount of its Capital Commitment. The General Partner shall on a regular basis keep the Limited Partners informed of the status of any claims. An Indemnified Party shall obtain the written consent of the General Partner (which consent shall not be unreasonably withheld) prior to entering into any compromise or settlement which would obligate the Partnership to indemnify such Indemnified Party. The General Partner may, in its sole discretion, cause the Partnership to purchase insurance to insure the Indemnified Parties against claims, including for any breach or alleged breach of their fiduciary responsibilities.

(b) Expenses incurred by an Indemnified Party in defense or settlement of any claim that is subject to a right of indemnification hereunder shall be advanced by the Partnership promptly and prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnified Party to repay such amounts to the extent that it is ultimately determined that such Indemnified Party is not entitled to be indemnified hereunder. No advances shall be made by the Partnership under this Section 12.2(b) without the prior written approval of the General Partner (which shall not be unreasonably withheld).

(c) The right of any Indemnified Party to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which such Indemnified Party may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Indemnified Party's successors, assigns and legal representatives.

**13.3 <u>Indemnification by General Partner</u>.**

Notwithstanding any other provision of this Agreement, the General Partner agrees to indemnify and hold harmless each Limited Partner from all Losses sustained or incurred by such Limited Partner arising out of the failure of any representation or warranty of the General Partner in Section 11.1 to be true and correct in all material respects.

## ARTICLE 14
## NO WITHDRAWAL OF GENERAL PARTNER

**14.1 No Withdrawal of General Partner; No Assignment of Interest.**

The General Partner may not sell, assign, transfer or otherwise dispose of its Interest, and the General Partner shall not have the right to withdraw from the Partnership.

## ARTICLE 15
## COMPLIANCE BY LIMITED PARTNERS

**15.1 Compliance by Limited Partners.**

Each Limited Partner will, on request by the General Partner, immediately execute every certificate or other instrument necessary to comply with any law or regulation of any jurisdiction in the United States for the continuation and good standing of the Partnership or to otherwise carry out the provisions of this Agreement.

## ARTICLE 16
## DISSOLUTION

**16.1 Dissolution or Termination.**

The Partnership shall be terminated and dissolved on (the "**Termination Date**") January 1 of the year following the year in which all of the Partnership's assets have been realized upon and distributed; provided, however, that the Partnership may not be terminated prior to the date on which all the Limited Partners of the Partnership have ceased participating in the EB-5 Program. The latest date on which the Partnership is to dissolve is September 8, 2025.

**16.2 No Dissolution in Certain Events.**

The Partnership will not be dissolved or terminated by the withdrawal, death, incompetence, bankruptcy, insolvency, dissolution, liquidation, winding-up or receivership of, or the admission or withdrawal of, the General Partner or any Limited Partner.

**16.3 Winding Up and Termination of Partnership.**

Upon dissolution of the Partnership, the Partnership shall be wound up and terminated as rapidly as business circumstances will permit. A reasonable period of time shall be allowed for the orderly termination of the Partnership to minimize the normal losses of a liquidation process. The General Partner shall act as, or appoint a, liquidating trustee (the "Liquidating Trustee") of the Partnership. The Liquidating Trustee shall proceed diligently and expeditiously to liquidate the Partnership and to wind up its affairs and, in doing so, shall dispose of the property of the Partnership on commercially reasonable terms (to the extent the Liquidating Trustee determines such sale or other disposition is commercially desirable), as determined by the Liquidating

Trustee in its sole discretion, and shall apply the assets of the Partnership, in kind or by way of cash received on the disposition of property, as follows:

(a) first, to pay and discharge all of the Partnership's debts, obligations and liabilities, including the expenses of its liquidation; and

(b) second, to establish any reserves that the Liquidating Trustee may deem necessary or advisable for any contingent or unforeseen debts, obligations or liabilities of the Partnership.

After the payment of all expenses of liquidation and of all debts and liabilities of the Partnership in such order or priority as provided by law (including any debts or liabilities to Partners, who shall be treated as secured or unsecured creditors, as may be the case, to the extent permitted by law, for sums loaned to the Partnership, if any, as distinguished from Capital Contributions), and after all resulting items of partnership income, gain, loss or deduction are credited or debited to the Capital Accounts of the Partners in accordance with Article 9 above, all remaining Partnership Assets shall be distributed among the partners in accordance with the order and priority set forth in Section 8.2.

**16.4 Provisions Cumulative.**

All provisions of the Agreement relative to the dissolution, liquidation, winding up and termination of the Partnership shall be cumulative to the extent not inconsistent with other provisions herein; that is, the exercise or use of one of the provisions hereof shall not preclude the exercise or use of any other provision hereof to the extent not inconsistent therewith.

**16.5 No Request for Dissolution by Limited Partners.**

Except as expressly provided for in this Agreement, no Limited Partner shall have the right to ask for the partition or dissolution of the Partnership, for the winding-up of its affairs or for the distribution of its assets.

**16.6 Termination of Agreement on Dissolution.**

Notwithstanding the dissolution of the Partnership, this Agreement shall not terminate until the provisions of Section 15.3 have been complied with.

## ARTICLE 17
## MEETINGS

**17.1 Meetings of Partners.**

(a) The General Partner may at any time and from time to time call a meeting of the Partners for the purpose of considering any business set out in a Meeting Notice.

(b) Upon receipt of a request (a "**Meeting Request**") for a meeting of the Partners, the General Partner shall call such a meeting, provided that the Meeting Request:

(i) is made by Limited Partners holding in the aggregate at least 20% of the issued and outstanding Units; and

(ii) contains sufficient detail of the business to be considered at the meeting to permit the General Partner to distribute a Meeting Notice in accordance with Section 16.3.

**17.2 Requisitioned Meetings.**

If the General Partner fails to call a meeting of Partners within 20 Business Days of receipt of a Meeting Request, Limited Partners holding in the aggregate at least 20% of the issued and outstanding Units may call such a meeting to consider any matter set forth in the Meeting Request.

**17.3 Delivery of Notice.**

For each meeting of the Partners, a notice (a "**Meeting Notice**") of such meeting shall be sent to each of the Partners and the Accountants not less than 21 and not more than 50 days prior to the date of the meeting.

**17.4 Contents of Notice.**

A Meeting Notice shall include the date and time of the meeting, the place of the meeting, and a description of each matter of business to be considered at the meeting.

**17.5 Place of Meetings.**

A meeting of the Partners shall be held at a location in New York City, New York that is selected by the person that called the meeting.

**17.6 Quorum.**

Limited Partners holding more than 50% of the votes able to be cast at the meeting of the Partners, present in person or by proxy (which must include at least three Limited Partners present in person), shall constitute a quorum for the transaction of any business at a meeting of the Partners. If no quorum is formed within 60 minutes of the date and time the meeting was to commence, the meeting shall be adjourned for no less than 5 and no more than 21 days and whoever attends the next scheduled meeting shall constitute a quorum.

**17.7 Chairman.**

The General Partner shall appoint the chairman of the meeting who shall not carry a casting vote on any matters.

**17.8 Voting Rights.**

On each question submitted to a meeting of Partners, except as expressly provided herein to the contrary, each Limited Partner shall be entitled to one vote for each Unit that it holds, and, questions shall be decided by Ordinary Resolution. For an approval of an Ordinary Resolution, there must be sufficient affirmative votes of the Limited Partners which total the Required Percentage. Failure to obtain the Required Percentage of votes, results in a denial of the resolution.

**17.9 Conduct of Meetings.**

To the extent that the rules and procedures for the conduct of a meeting of the Partners are not prescribed in this Agreement, such rules and procedures shall be determined by the chairman of the meeting, acting reasonably.

**17.10 Limited Partner Resolutions.**

In addition to having all of the rights, powers and duties of limited partners under the Act, the Limited Partners may, by Ordinary Resolution:

(a) advise the General Partner in connection with the business of the Partnership;

(b) approve the conditions for the staged funding of an Investment;

(c) advise the General Partner in connection with the monitoring of an Investment; and

(d) approve the realization plan in connection with any security given or rights granted to the Partnership in connection with an Investment.

**17.11 Effect of Resolutions.**

A resolution approved or consented to in accordance with this Agreement shall be binding upon each of Partner and his, her or its heirs, executors, administrators, successors and permitted assigns.

**17.12 Minute Book.**

All proceedings of each meeting of the Partners shall be recorded by the General Partner in a minute book, which shall be made available for inspection by each Partner during normal business hours.

**17.13 Resolution in Lieu of Meeting.**

A resolution signed by Limited Partners holding the number of Units required to pass a resolution is as valid and as effective as if it had been passed at a meeting of the Partners called

in accordance with this Agreement.

## ARTICLE 18
## ACCOUNTING AND REPORTING

**18.1 <u>Books of Account</u>.**

The General Partner shall keep and maintain full, complete and accurate books of account and records of the Partnership with respect to the Partnership's activities and financial affairs at the principal address of the Partnership. Such books of account and records shall be retained by the General Partner for a minimum period of seven years or longer if required by applicable law and shall be made available for review by Limited Partners upon reasonable written request.

**18.2 <u>Annual Reports</u>.**

Within 90 days after the end of each Fiscal Year, the General Partner shall send to each person who was a Limited Partner at the end of such Fiscal Year a report summarizing the status of the activities of the Limited Partnership as at the end of the Fiscal Year. The General Partner shall also send therewith a balance sheet, as of the end of such Fiscal Year as well as unaudited statements of income, each Limited Partner's capital account balance, gains and losses and cash flow statement for such Fiscal Year, all of which shall be prepared by the Accountants in accordance with GAAP.

**18.3 <u>Other Reports</u>.**

The General Partner may, in its discretion, send to the Limited Partners quarterly and such other reports as the General Partner sees fit. The General Partner will distribute on an annual basis information to enable the Partners to prepare their respective income tax returns, including, without limitation, a Form K-1 or other appropriate information.

## ARTICLE 19
## NOTICES

**19.1 <u>Notices</u>.**

Any notice, request or other communication required or permitted to be given hereunder shall be in writing and shall be delivered in person (including by courier) or transmitted by telecopy, addressed as follows:

(a) if to the General Partner: Fleet New York Metropolitan Regional Center LLC, 136-20 38th Ave, Suite 10F, Flushing, NY 11354, Attention: Mr. Richard Xia.

(b) if to a Limited Partner, to the address or facsimile number of the Limited Partner appearing in the Register.

Any communication shall be deemed to have been given and received on the day on which it was delivered (or, if such day is not a Business Day, on the next following Business Day).

**19.2 Change of Address.**

A Limited Partner may change its address by giving written notice of such change to the General Partner, and the General Partner may change its address by giving written notice thereof to the Limited Partners.

## ARTICLE 20
## GENERAL

**20.1 Waiver of Accounting.**

Except as may be otherwise required by law, each Partner hereby irrevocably waives any and all rights that it may have to maintain an action for an accounting, partition or similar action in connection with the Partnership or any of the Partnership's property.

**20.2 Severability.**

If any provision of this Agreement is held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remainder of this Agreement shall not in any way be affected or impaired thereby and this Agreement shall be carried out as nearly as possible in accordance with its original terms and conditions.

**20.3 Enurement.**

This Agreement shall be binding upon and enure to the benefit of the parties and their respective heirs, executors, administrators, successors and assigns.

**20.4 Counterparts.**

This Agreement may be executed by facsimile and in any number of counterparts, each of which shall be deemed to be an original and, all of which when taken together, shall be deemed to constitute one and the same instrument.

**20.5 Entire Agreement.**

This Agreement and the instruments and documents referred to herein constitute the entire obligation of the parties with respect to the subject matter hereof.

**20.6 Amendment.**

This Agreement may be amended in writing by the General Partner:

(a) with the consent of the Limited Partners given by Ordinary Resolution; or
(b) without prior notice to or consent from any Limited Partner:

(i) for the purpose of adding to the Agreement (or amending existing provisions) any provisions which, in the written opinion of counsel to the Partnership, are for the protection of the Limited Partners, and

(ii) to cure any ambiguity or to correct or supplement any provisions which, in the written opinion of counsel to the Partnership, are defective or inconsistent with any other provision of the Agreement, provided that, in the written opinion of such counsel, the cure, correction or supplemental provision does not and will not adversely affect the interests of any Limited Partner.

Notwithstanding any provision of this Agreement, no amendment to this Agreement shall be effective without the prior written approval of the General Partner and, in the event that the proposed amendment will, or is likely to, cause a Limited Partner to suffer an adverse economic effect, the written consent of such Limited Partner.

The General Partner shall notify the Partners of the full details of any amendment to this Agreement within 20 Business Days of the effective date of the amendment.

**20.7 Jurisdiction.**

This Agreement shall be governed by and construed in accordance with the internal substantive laws of the State of New York and the federal laws of the United States.

**20.8 Confidentiality.**

Each Limited Partner will maintain the confidentiality of information which is, to the knowledge of such Limited Partner, non-public information furnished by the General Partner to such Limited Partner regarding the General Partner and the Partnership (including (i) information regarding any person in which the Partnership holds, or contemplates acquiring, any Investment and (ii) the identity of any Limited Partner), except (1) to the extent that such information is or becomes generally available to the public other than as a result of disclosure by a Limited Partner, (2) to the extent such information was made or becomes available to a Limited Partner on a non-confidential basis from a source which is not subject to any confidentiality obligation with respect to such information, (3) as otherwise required by governmental regulation or by legal process, and (4) as such Limited Partner furnishes to his or her advisors; provided that such Limited Partner shall be liable to the Partnership and the General Partner for any such advisor's failure to comply with the terms of this Section 19.8.

**20.9 No Third Party Beneficiaries.**

Except as otherwise provided in this Agreement, the parties hereto intend that this Agreement shall not benefit or create any right or cause of action in, or on behalf of, any person other than the parties to this Agreement, and no person other than the parties to this Agreement shall be entitled to rely on the provisions of this Agreement in any action, suit, proceeding, hearing or other forum.

**20.10 <u>Venue</u>.**

Each of the parties agrees that any action or proceeding arising out of or relating to this Agreement may be instituted in the courts of the State of New York, waives any objection which he, she or it may have now or hereafter to the venue of any such action or proceeding, irrevocably submits to the non-exclusive jurisdiction of the said courts in any such action or proceeding, agrees to be bound by any judgment of the said courts and agrees not to seek, and hereby waives, any review of the merits of any such judgment by the courts of any other jurisdiction.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the date first-mentioned above.

**Richard Xia,** as Original Partner

________________________________

**FLEET NEW YORK METROPOLITAN REGIONAL CENTER LLC,** as General Partner

By : __________________________

Name : __________________________

Title : __________________________

PARTNERSHIP AGREEMENT: NEW LIMITED PARTNER SIGNATURE PAGE

Print Name: ______________________________

| | |
|---|---|
| Signature | Date |

# SUBSCRIPTION AGREEMENT

Dear Prospective Investor:

Execution of this Agreement by you confirms your agreement to be irrevocably bound by the terms of the EEGH II, L.P.'s limited partnership agreement (the "Limited Partnership Agreement") (EEGH II, L.P. shall be referred to herein as the "Limited Partnership" or "Partnership") and confirms your agreement to comply with the terms and requirements of the EEGH II, L.P. EB5 Program (the "Program") and which terms are described in more detail in the Limited Partnership Agreement. If the investor's subscription to the Limited Partnership is accepted by the General Partner, this Subscription Agreement, along with the Offering Memorandum, and Limited Partnership Agreement, together will create a binding contract for your participation in the Program.

The Limited Partnership is a commercial for-profit new commercial enterprise formed to finance the Eastern Emerald II Project. The Eastern Emerald II Project will develop, construct and operate an expansion to a 5-star hotel, which will result in an additional 556,398 SF being added to the overall building; an additional 294 5-star luxury hotel rooms; an additional 4 floors added to the building; a performing arts center across 5 floors; as well as additional retail space, restaurant space and parking garage space, located in Corona, City of New York, Queens, New York. The Limited Partnership has entered into a loan agreement with LaGuardia Performing Center, LLC for an amount of up to US Eighty Million Dollars (US$80,000,000), or such other sums as allowed by the Offering Memorandum. The Limited Partnership has been structured to maximize the possibility that qualifying Investors can obtain U.S. permanent resident status for the Investor and the qualified members of his family under the Alien Entrepreneur Immigrant Visa Category of the U.S. Immigration Act of 1990, 8 U.S.C. section 1101 et. seq.

The Subscription price for one Unit for the Limited Partnership is a Capital Contribution of US Five Hundred Thousand Dollars (US$500,000),or such amount as is required by statute to qualify for the EB-5 Program, along with a Processing Fee of US Fifty Thousand Dollar (US$50,000) (unless another amount is designated by the General Partner as provided in the Offering Documents). As a potential Subscriber to the Limited Partnership, you hereby agree to pay the purchase price for one unit in the Limited Partnership in the following manner:

Prior to consideration for acceptance of your subscription you must do the following:

(a) Complete, execute, and return to the Partnership one copy of the attached Subscription Agreement (the "Agreement"), subscribing for one Unit of the Partnership on a specified date (the "Admission Date");

(b) Execute and return to the Partnership one copy of the Limited Partnership Agreement of the Partnership;

(c) Execute and return to the Partnership one copy of the Acknowledgment of Escrow Agreement including completing and signing one copy of the Form



EXHIBIT 23 5/30/19 SA

W-8BEN "Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding";

(d) Send one completed and executed set of originals referred to above and any documentation required thereby to the Partnership by facsimile: 718-228-8818, or e-mail: info@fnymrc.com, and send one completed and executed set of originals referred to above by overnight courier to EEGH II, L.P., c/o Fleet New York Metropolitan Regional Center LLC, 136-20 38TH AVE SUITE 10F, NY 11354.

The Partnership will advise each subscriber promptly of its acceptance of any offer to become a limited partner of the Partnership, but Fleet New York Metropolitan Regional Center LLC, the general partner of the Partnership (the "General Partner"), has the right in its sole discretion to refuse any subscriber's offer to become a limited partner.

Within thirty (30) days after notification of acceptance of your subscription, you must deposit your full Capital Contribution, and the full Processing Fee of US Fifty Thousand Dollar (US$50,000) (unless another amount is designated by the General Partner as provided in the Offering Documents) into the designated accounts. The full Capital Contribution shall be deposited into the designated escrow account of the Limited Partnership pursuant to the terms of the Escrow Agreement. The Capital Contribution will be held in the Limited Partnership's bank account, or escrow account, until you have received the filing receipt of your I-526 petition. The Processing Fee will be paid directly to the General Partner. Therefore, you must make these payments in United States currency by 2 separate bank-to-bank wire transfers, or two separate certified checks or bank checks. The Capital Contribution will be paid to the Partnership, and will be deposited into the Partnership's Escrow Account, and the separate Processing Fee amount, in the amount of $50,000, or such other amount as is designated by the General Partner, will be paid directly to the General Partner. Full payment of both the Capital Contribution and the Processing Fee amount must be received at least one business day prior to the Admission Date. If approved by the General Partner, upon receipt of the entire Processing Fee and the entire Capital Contribution, you will be issued one unit in the Limited Partnership.

IMPORTANT NOTICE: Due to international banking laws, your bank MUST send a SWIFT MT 103 message and complete field 50 ("Ordering Customer") with name, number and address of the account and field 52D ("Ordering Institution") on subscription wires. Your transaction may be delayed or rejected if this information is not provided.

The General Partner reserves the right to request any additional documentation it deems necessary to verify the identity of the investor in order to comply with applicable anti-money laundering laws. Failure to provide the necessary evidence may result in applications being rejected or in the acceptance of applications being delayed. The General Partner and the Partnership and their respective members, partners, directors, officers, employees, agents and other representatives shall be held harmless by an investor against any loss arising as a result of a failure to process a subscription if any information

requested by the General Partner or the Escrow Agent has not been timely provided by the subscriber.

The General Partner shall, on behalf of the Partnership, acknowledge all subscriptions upon approval of a subscription by the Partnership. Should a prospective limited partner not receive such an acknowledgement, it is the prospective limited partner's responsibility to contact the General Partner to ascertain the status of his or her subscription. A prospective limited partner cannot assume that his or her subscription has been approved until he or she receives the General Partner's confirmation stating that the subscription has been approved. If the subscription is not accepted, payment will be returned without deduction or interest.

Within thirty (30) days after notification of acceptance of your subscription, you must also provide an executed legal service agreement with the immigration counsel approved by the General Partner for the processing of your immigration petition unless otherwise agreed to by the Limited Partnership. All fees for legal services shall be made directly to the approved immigration counsel and are separate and apart from the Capital Contribution to be paid to the Limited Partnership as set forth above. However, the execution of a legal service agreement with an approved immigration counsel, and the payment of all sums required by the approved immigration counsel's legal service agreement, must be completed as a condition of acceptance as a Limited Partner.

You shall instruct your immigration attorney, and by executing this Agreement you hereby authorize your immigration attorney, to forward the notice of receipt (Form I-797c) of the filing of your Immigrant Petition By Alien Entrepreneur to the General Partner. Upon receipt of the I-797c, if the Capital Contribution is held in an escrow account, the General Partner will provide the notice to escrow agent, who will immediately release the capital investment amount to the Limited Partnership's operating account in accordance with the terms of the escrow agreement to be used to develop the Project in accordance with the Limited Partnership's business plans. If the Capital Contribution is not held in the escrow account, the Capital Contribution will not be released to be invested into the Project until the General Partner has received the I-797c, or other proof of filing. Until receipt of the notice of filing, your Capital Contribution will be held in the designated account.

Within fifteen (15) business days after you have been notified of the acceptance of your subscription and the issuance of your unit of interest in the Limited Partnership, you shall cause your immigration attorney to begin the preparation and eventual filing of a petition with the USCIS on your behalf by completing and filing with the USCIS an Immigrant Petition By Alien Entrepreneur (Form I-526), along with all required documents and information. Execution of this Agreement will also require you to fully cooperate in providing all information and documentation to your attorney necessary to the preparation and filing of the Immigrant Petition By Alien Entrepreneur, Form I-526. Thereafter, you shall use your best efforts to obtain your Immigrant Visa/Conditional Permanent Resident Status, as well as the approval of your Petition By Alien Entrepreneur to Remove Conditions (I-829) as soon as possible by cooperating fully with the USCIS, providing any additional information and documentation requested by the USCIS in a

timely manner, entering the United States as required, and personally attending any interview at such date, time and place as scheduled by the appropriate US Consular or the local district office of the USCIS. You are also advised that the retention of legal representation to file the Petition By Alien Entrepreneur to Remove Conditions (I-829) is entirely your own responsibility and not a part of this Subscription Agreement. Any legal representation to prepare your Immigrant Petitions for the EB-5 immigrant category must be entered into by separate agreement. The terms of the legal representation between you and your attorney will be entirely outside of this Agreement.

As a part of this Subscription Agreement you make the following representations (please place your initials in each blank space to confirm each representation):

_____ I received a copy of the Offering Documents including the Offering Memorandum, Escrow Agreement, and the Limited Partnership Agreement.

_____ I have read and understand the Offering Documents and the Risk Factors associated with the purchase of a Unit and have sought independent professional advice in connection therewith.

_____ The answers I supplied to my Investor Questionnaire are true and correct and I understand that the General Partner is relying on the truthfulness of those responses to determine my acceptance in the Limited Partnership.

____ I am acquiring the Unit for investment, for the my own account and not for the interest of any other person and not for distribution or resale to others, and I will not transfer, assign or otherwise permit any other person to acquire a beneficial interest (including, without limitation, by pledge, option, swap or nominee or similar relationship) in the Unit without the prior written consent of the General Partner. I understand that the Units have not been registered under the Securities Act, and I agree that the this Unit may not be sold, transferred or otherwise disposed of except pursuant to an exemption from registration under the Securities Act and in accordance with this Agreement and the Partnership Agreement. Furthermore, if the Unit is being acquired in reliance upon Regulation S, the New Limited Partner understands that the Unit may not be offered or sold to a U.S. person or for the account or benefit of a U.S. person prior to the expiration of a one-year period from the date of the final closing in which the General Partner receives and accepts subscriptions to the Partnership. I will not assign my Unit in the Partnership or any beneficial interest therein, in whole or in part, to any other person, nor will I be entitled to substitute any other person as a limited partner of the Partnership, except with the prior written consent of the General Partner (which consent may be granted or withheld by the General Partner for any reason in its sole discretion) and pursuant to the provisions of the Partnership Agreement.

____ The Unit is not registered under the Securities Act of 1933, as amended, and I am not a resident of the United States.

____ I am an accredited investor and, as such, am either: (i) a natural person whose individual net worth, or joint net worth with the undersigned's spouse, exceeds US$1,000,000; or (ii) a natural person who had an individual income in excess of US$200,000 in each of the two most recent years or joint income with the undersigned's spouse in excess of US$300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

____ I have attained the age of 18 years and have the legal capacity and competence to execute all necessary documents in connection with this Program and to take all actions required pursuant to those documents.

____ I have and will continue to comply with all the requirements, terms and conditions prescribed by the USCIS in connection with the Non-immigrant and Immigrant Petitions required to comply with the terms of this Program.

___ I am in good health and know of no health impairment which would likely result in my failure to meet the minimum health requirements stipulated under the Immigration Act of 1990, as amended, or any other U.S. Immigration law requirements.

____ I have never been convicted of any criminal offense and know of no material facts which would likely result in my failure to meet the minimum requirements for permanent residency in the U.S.

____ I understand there is no guarantee associated with my investment other than the economics of the project itself.

____ I understand and acknowledge that this Subscription Agreement and the representations and warranties contained herein shall be binding upon my heirs, legal representatives, successors, and assigns. I further acknowledge that I may not assign my rights under this Subscription Agreement or delegate any of my duties without prior written consent by the General Partner of the Partnership.

____ I acknowledge that it has never been represented, guaranteed, or warranted to me by the Partnership, the General Partner, or any of their respective members, partners, shareholders, agents, officers, directors or employees, or by any other person, expressly or by implication, as to: (i) the percentage of profits and/or amount or type of consideration, profit or loss to be realized, if any, as a result of this investment; nor (ii) the past performance or experience on the part of the Partnership's or the General Partner's personnel or that of any of their affiliate, agents or employees or any other person, that will in any way indicate the possible results of an investment in the Partnership. I have not received any general solicitation or general advertising regarding the purchase of an interest in the Partnership and I acknowledge that this Unit has been offered for sale outside the United States and both this Agreement and the Partnership Agreement were executed outside of the United States.

____ I have retained and consulted with competent immigration counsel of my choice in connection with these immigration matters and represent and warrant that I am aware of no ground of inadmissibility which would preclude the issuance of a conditional resident visa/status to either me or my accompanying family members. I understand that for conformity of petitions presented, the Program specifies that I use an immigration counsel approved by the General Partner as my immigration attorney for the processing of my immigrant petition. However, I understand that I am able to have additional legal representation of my own selection to work with the approved immigration counsel or to advise me regarding this Program. I am relying solely on my own selected counsel for all legal advice relating to the processing of my petition and have relied on my own professional advisors for any and all matters connected to this investment, including filing my immigration petitions.

____ I understand that I will be required to supply certain documentation to prepare and file my Immigrant Petition By Alien Entrepreneur (Form I-526) and, in 21 months after the issuance of my conditional residency card, additional documentation will be necessary to apply for my Petition By Alien Entrepreneur to Remove Conditions (I-829) to remove the conditional permanent resident status. I will provide all necessary documentation to my attorney and hereby authorize my representative to supply to the General Partner of the Partnership all information regarding my applications.

____ I acknowledge that if my Immigrant Petition By Alien Entrepreneur (I-526) or my Petition By Alien Entrepreneur to Remove Conditions (I-829) is rejected by the USCIS for any reason, then I shall have no claim against the General Partner, the Partnership, its affiliates, representatives, attorneys, nor any of these parties' officers, partners, members, or employees.

If your Immigrant Petition By Alien Entrepreneur (I-526) is not approved, notwithstanding your good faith best efforts in compliance with the Subscription Agreement and related documents and the USCIS rules, regulations and procedures, then you shall be entitled to a return of the amount of your Capital Contribution, less any partnership distributions paid. There will be no refund of any of the attorneys fees paid. The returned funds will be paid within ninety (90) days of receipt by the General Partner of the request by you for a return, and only if you have received a denial of your Immigrant Petition By Alien Entrepreneur (I-526) that was unrelated to any fault of you in the processing of the petition.

At any time prior to a decision approving your Immigrant Petition By Alien Entrepreneur (I-526), the Limited Partnership has the right to declare a forfeiture if you fail to perform any obligation under the Subscription Agreement; fail to comply with USCIS or other applicable governmental procedures in a timely manner; fail to disclose or falsify any information in connection with the application process for your Immigrant Petition By Alien Entrepreneur (I-526); fail to attend any interview scheduled by the appropriate U.S. Consular Office or the USCIS, as applicable; fail to enter the U.S. as required by the USCIS; or voluntarily withdraw your Immigrant Petition By Alien Entrepreneur (I-526)

without good cause, as determined by the Limited Partnership in its sole discretion. Upon the decision of the Limited Partnership to declare a forfeiture pursuant to these provisions, the Limited Partnership will return the amount of your Capital Contribution less any distributions paid. There will be no refund of any attorneys' fees paid. The Limited Partnership will return this amount within ninety (90) days of the Limited Partnership's decision to declare a forfeiture.

You will have no right to withdraw from the Limited Partnership once you have obtained approval for your Immigrant Petition By Alien Entrepreneur (I-526). However, at all times, if the Limited Partnership determines that you do not comply with the purpose and requirements of the Limited Partnership, the Limited Partnership can elect to declare a forfeiture in accordance with the Limited Partnership Agreement. This decision is in the sole discretion of the Limited Partnership.

The Partnership and the General Partner are each hereby authorized and instructed to accept and execute any instructions in respect of the Unit to which this Agreement relates given by you in written form, by facsimile or electronic means. If instructions are given by you by facsimile or by email, you agree to keep each of the Partnership, the General Partner and each of their respective affiliates, principals, directors, officers, employees, agents and other representatives indemnified against any loss of any nature whatsoever arising to any of them as a result of any of them acting upon facsimile or email instructions. You further understand and acknowledge that neither the Partnership nor the General Partner shall be responsible for any misdelivery or non-receipt of any facsimile or email instruction. Facsimiles or emails sent to the Partnership or the General Partner shall only be effective when actually acknowledged by the Partnership or the General Partner. The Partnership and the General Partner may rely conclusively upon and shall incur no liability in respect of any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons. Please note that messages sent via email must contain a duly signed document as an attachment. In the event that no acknowledgement is received from the General Partner within five (5) days of submission of the instruction, you should contact the General Partner at 136-20 38th Avenue, 10th Floor, Flushing, NY 11354 to confirm receipt of the request by the General Partner.

You acknowledges that the Partnership and the General Partner may disclose to each other, to any service provider to the Partnership or to any regulatory body in any applicable jurisdiction copies of this Agreement and any information concerning the you provided by you to the Partnership or the General Partner, and any such disclosure shall not be treated as a breach of any restriction upon the disclosure of information imposed on such person by law or otherwise.

<u>Privacy Policy of the Partnership and the General Partner</u>. You recognize that non-public information concerning you which is set forth in this Agreement or otherwise disclosed by you to the Partnership, or other agents of the Partnership, such as your name, address, social security number, assets and income, and information regarding your investment in the Partnership (collectively, the "Information") (i) may be disclosed to the

General Partner and its attorneys and accountants in furtherance of the Partnership's business and to other service providers such as brokers who may have a need for the information in connection with providing services to the Partnership; (ii) to third parties or financial institutions who may be providing marketing services to the Partnership, provided that such persons agree to protect the confidentiality of the Information and use the Information only for the purposes of providing services to the Partnership; and (iii) as otherwise required or permitted by law or as requested by any regulatory or other governmental authority. The Partnership and the General Partner restrict access to the Information to their employees who need to know the Information to provide services to the Partnership, and maintain physical, electronic and procedural safeguards that comply with U.S. federal standards to guard the Information.

By executing this Agreement, you specifically agrees to keep confidential and not disclose to third parties (other than its tax or other financial advisors under like conditions of confidentiality) any and all information regarding the Partnership, including the Partnership's performance, provided that the confidential treatment required by this paragraph shall not apply to the tax treatment and tax structure of an investment in the Partnership or any transaction entered into by the Partnership, and you may disclose to any and all persons the tax treatment and tax structure of an investment in the Partnership and all materials of any kind (including opinions or other tax analyses) that are provided to the Limited Partner relating to such tax treatment and tax structure.

<u>Electronic Delivery of Reports and Other Communications</u>. At its discretion, the Partnership or the General Partner may provide statements, reports and other communications relating to the Partnership and/or your investment in the Partnership in electronic form, such as by e-mail. You hereby consent to the sending of such statements, reports and other communications regarding the Partnership and its investment in the Partnership (including performance information, contribution and withdrawal activity, annual and other updates of the Partnership's consumer privacy policies and procedures) exclusively in electronic form without separate mailing of paper copies. You acknowledge that e-mails from the Partnership or the General Partner may be accessed by recipients other than the Limited Partner; may be interfered with; may contain computer viruses or other defects and may not be successfully replicated on other systems. Neither the Partnership nor the General Partner gives any warranties in relation to these matters. Any Limited Partner who has any doubts about the authenticity of an e-mail purportedly sent by the Partnership or the General Partner, should contact the Partnership or the General Partner immediately.

This Agreement shall inure to the benefit of and be binding upon each of the parties hereto, and their heirs and legal representatives. This Agreement shall be interpreted in accordance with the laws of the State of New York and all disputes relating to or arising in connection with this Agreement shall be decided by the courts of the State of New York, to the exclusion of any other court.

I agree to the conditions, obligations, and requirements as set forth in this Subscription Agreement, the Limited Partnership Agreement, and the Offering Memorandum. I agree

to pay the US$500,000 Capital Contribution (or such other amount as required by statute to qualify for the EB-5 Program) and the $50,000 Processing Fee to complete my subscription on the conditions set forth above. Such payments shall be made to bank account specified by the Limited Partnership under the terms specified in the aforementioned agreements. I shall not be entitled to any interest earned on my Capital Account. All prices are in U.S. Dollars.

**GENERAL PARTNER**

Fleet New York Metropolitan
Regional Center, LLC

BY: ______________________

Name: ____________________

Title: ____Managing Member____

**SUBSCRIPTION AGREEMENT: PROSPECTIVE INVESTOR**

Print Name: ______________________________

| | |
|---|---|
| Signature | Date |