# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

               Plaintiff,

  -against-

RICHARD XIA, a/k/a YI XIA, and
FLEET NEW YORK METROPOLITAN
REGIONAL CENTER, LLC, f/k/a
FEDERAL NEW YORK
METROPOLITAN REGIONAL
CENTER, LLC,

               Defendants,

JULIA YUE, a/k/a JIQING YUE,

               Relief Defendant.

Civil Action No. 21-cv-5350-PKC-CLP

---

## BRIEF IN SUPPORT OF DEFENDANTS'
## MOTION IN LIMINE

---

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND .........................................................................................................1

ARGUMENT ..............................................................................................................6

I.     The Exclusionary Rule Applies to the Current SEC Enforcement
       Proceeding.......................................................................................................6

       A.     The Analytical Framework of the Exclusionary Rule in a Civil
              Proceeding...........................................................................................6

       B.     The Current SEC Enforcement Action Is Analogous to the Civil
              Forfeiture Proceeding in *Currency* to Which the Exclusionary Rule
              Was Found Applicable.........................................................................8

       C.     The Current SEC Enforcement Action Is Analogous to Other Civil
              Proceedings Where the Court Found the Exclusionary Rule
              Applicable .........................................................................................10

II.    The Inspection Was an Illegal and Unconstitutional Administrative Search ........13

       A.     The Inspection Does Not Qualify for the Consent Exception ...................14

              1.     Xia Never Consented to the Inspection .........................................15

              2.     Even if Xia Gave Consent, It Was Tainted by the SEC's
                     Prior Unlawful Conduct................................................................16

              3.     Even if Xia Gave Consent, It Was Involuntary ............................17

       B.     The Inspection Does Not Qualify for the Administrative Search
              Exception ...........................................................................................18

III.   All the SEC's Evidence Obtained Directly or Indirectly from the
       Inspection Should Be Excluded........................................................................19

       A.     The Evidence Obtained by the SEC After the Inspection is Tainted.........20

       B.     The Evidence Obtained From the SEC's Formal Investigation
              Derived From the Inspection ................................................................22

CONCLUSION...........................................................................................................24

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Airbnb, Inc. v. City of New York*,
  373 F. Supp. 3d 467 (S.D.N.Y. 2019).......................................................................................19

*Benjamin v. Stemple*,
  915 F.3d 1066 (6th Cir. 2019) ................................................................................................14

*Brown v. Illinois*,
  422 U.S. 590 (1975)..................................................................................................................23

*City of Los Angeles v. Patel*,
  576 U.S. 409 (2015)..................................................................................................................14

*Houghton v. Culver*,
  452 F. Supp. 2d 212 (W.D.N.Y. 2006) ....................................................................................14

*Ill. v. Rodriguez*,
  497 U.S. 177 (1990)..................................................................................................................16

*Jones v. Latexo Independent School Dist.*,
  499 F. Supp. 223 (E.D. Tex. 1980)......................................................................................6, 12

*Lacasse v. Lorillard Tobacco Co.*,
  No. 04-3737, 2008 U.S. Dist. LEXIS 141145 (E.D.N.Y. Oct. 17, 2008)................................22

*Meserole St. Recycling, Inc. v. City of New York*,
  No. 06-1773, 2007 U.S. Dist. LEXIS 4580 (S.D.N.Y. Jan. 23, 2007) ..............................13, 19

*Murray v. United States*,
  487 U.S. 533 (1988)..................................................................................................................19

*OKC Corp. v. Williams*,
  461 F. Supp. 540 (N.D. Tex. 1978) ...................................................................................10, 11

*Routhier v. Goggins*,
  229 F. Supp. 3d 299 (D. Vt. 2017)...........................................................................................14

*Schneckloth v. Bustamonte*,
  412 U.S. 218 (1973)..................................................................................................................17

*SEC v. Cioffi*,
  868 F. Supp. 2d 65 (E.D.N.Y. 2012) ..................................................................................11, 12

*Segura v. United States*,
  468 U.S. 796 (1984).........................................................................................................8, 21fn. 6

*Tirado v. Commissioner*,
    689 F.2d 307 (2d Cir. 1982)..............................................................................................6

*Treats Int'l Enters., Inc. v. SEC*,
    828 F. Supp. 16 (S.D.N.Y. 1993) ...................................................................................11

*United States SEC v. Collector's Coffee*,
    No. 19-4355, 2021 U.S. Dist. LEXIS 15439 (S.D.N.Y. Jan. 27, 2021) .....................6

*United States v. $19,047.00 in United States Currency*,
    No. 92-8052, 1994 U.S. Dist. LEXIS 17126 (S.D.N.Y. Nov. 30, 1994)..............7, 8, 9, 10

*United States v. Amry*,
    No. 02-612, 2003 U.S. Dist. LEXIS 500 (S.D.N.Y. Jan. 16, 2003) .........................17

*United States v. Arboleda*,
    633 F.2d 985 (2d Cir. 1980)............................................................................................13

*United States v. Barone*,
    721 F. Supp. 2d 281 (S.D.N.Y. 2010)............................................................................17

*United States v. Bellamy*,
    592 F. Supp. 2d 308 (E.D.N.Y. 2009) ...........................................................................21

*United States v. Chatmon*,
    No. 17-246, 2019 U.S. Dist. LEXIS 228142 (W.D.N.Y. Aug. 22, 2019) ..............20

*United States v. Chisholm*,
    No. 07-795, 2009 U.S. Dist. LEXIS 140 (E.D.N.Y. Jan. 5, 2009) .........................15

*United States v. Chuang*,
    897 F.2d 646 (2d Cir. 1990).....................................................................................13, 19

*United States v. Crews*,
    445 U.S. 463 (1980).........................................................................................................19

*United States v. Drago*,
    No. 18-394, 2021 U.S. Dist. LEXIS 133118 (E.D.N.Y. May 6, 2021) ...................20

*United States v. Elliott*,
    50 F.3d 180 (2d Cir. 1996)..............................................................................................13

*United States v. Herron*,
    18 F. Supp. 3d 214 (E.D.N.Y. 2014) .............................................................................14

*United States v. Janis*,
    428 U.S. 433 (1976).............................................................................................. passim

*United States v. Kirsteins*,
No. 87-964, 1989 U.S. Dist. LEXIS 5183 (N.D.N.Y. May 10, 1989)................................6, 11

*United States v. Kolokouris*,
No. 12-6015, 2015 U.S. Dist. LEXIS 109105 (W.D.N.Y. Aug. 14, 2015) ...........................13

*United States v. Lambis*,
197 F. Supp. 3d 606 (S.D.N.Y. 2016)...................................................................................16

*United States v. Lasanta*,
978 F.2d 1300 (2d Cir. 1995)..................................................................................................6

*United States v. Levy*,
217 F. Supp. 3d 643 (E.D.N.Y. 2016) .............................................................................6, 19

*United States v. Nicholson*,
No. 15-6143, 2016 U.S. Dist. LEXIS 78727 (W.D.N.Y. June 15, 2016)..............................16

*United States v. Shrum*,
908 F.3d 1219 (10th Cir. 2018) .............................................................................................23

*United States v. Snype*,
441 F.3d 119 (2d Cir. 2006)...................................................................................................15

*United States v. Sorcher*,
No. 05-799, 2007 U.S. Dist. LEXIS 103818 (E.D.N.Y. Mar. 26, 2007)...............................18

*United States v. Vasquez*,
638 F.2d 507 (2d Cir. 1980)...................................................................................................15

*United States v. Walker*,
965 F.3d 180 (2d Cir. 2020)........................................................................................21fn. 6

*Utah v. Strieff*,
579 U.S. 232 (2016)...........................................................................................21, 21fn. 6

*Wong Sun v. United States*,
371 U.S. 471 (1963)................................................................................................................19

*Zuniga-Perez v. Sessions*,
897 F.3d 114 (2d Cir. 2018)........................................................................................20fn. 5

## FEDERAL STATUTES

12 U.S.C. § 481 .......................................................................................................................13

15 U.S.C. §§ 77t(a), 78u(a).....................................................................................................11

Securities Act of 1933 § 17(a) .................................................................................................6

Securities Exchange Act of 1934 § 10(b) ..........................................................................6

**RULES**

Federal Rules of Evidence Rule 104(a) ...........................................................................1

Rule 10b-5...........................................................................................................................6

**REGULATIONS**

17 C.F.R. § 202.5 ..............................................................................................................13

**CONSTITUTIONAL PROVISIONS**

Fourth Amendment ..................................................................................................... passim

Fourth and Fourteenth Amendments ...............................................................................17

Defendants, Richard Xia, a/k/a Yi Xia, and Fleet New York Metropolitan Regional Center, LLC, f/k/a Federal New York Metropolitan Regional Center, LLC (collectively, "Defendants"), respectfully submit this brief in support of their motion *in limine*, pursuant to Rule 104(a) of the Federal Rules of Evidence, to exclude all the evidence that the Securities and Exchange Commission (the "SEC") obtained directly or indirectly from its inspection of Fleet Financial Group, Inc.'s ("FFG") office on May 21, 2018.

## PRELIMINARY STATEMENT

On May 21, 2018, three examiners from the SEC's Office of Compliance Inspections and Examinations ("OCIE") conducted a warrantless and unconsented inspection of the office of FFG, an entity not registered with the SEC. The inspection was not authorized by statute or regulation and violated Defendants' Fourth Amendment rights. During the inspection, the examiners induced Xia to submit documents without legal counsel. After the OCIE ended its inspection without taking any action, two of the examiners transitioned into the SEC Enforcement Division's formal investigation of Defendants, which started thirteen days after OCIE concluded its examination, and continued to solicit information from Xia and related persons. As a result, the evidence collected by the SEC during the inspection and formal investigation is tainted by its violation of Defendants' Fourth Amendment rights and should be excluded under the exclusionary rule.

## BACKGROUND

Richard Xia ("Xia") owns and controls Fleet New York Metropolitan Regional Center LLC ("Fleet"). (Dkt. 1 ¶ 27.)[1] Julia Yue ("Yue") is the wife of Xia. (*Id*. ¶ 30.) Fleet is a New

---

[1] For purposes of this motion, we accept the allegations of the Complaint as if they were true. This motion raises factual issues that should be resolved by the court after an evidentiary hearing, unless the court determines, after the SEC's response, the material facts are not disputed, and the legal issues can be decided without a hearing.

1

York limited liability company formed by Xia on February 5, 2010. (*Id*. ¶ 28.) On October 7, 2010, the United States Citizenship and Immigration Services ("USCIS") approved Fleet for designation as a regional center, *i.e.*, an organization that sponsors capital investment projects through the EB-5 Immigrant Investor Program (the "EB-5 Program"). (*Id*.; Declaration of Hervé Gouraige ("Gouraige Decl.") Ex. 1 ¶ 21.) The EB-5 Program is administered by the USCIS and allows foreign nationals to qualify for permanent residency if they make a qualified investment of $500,000 or more in a specified project that is determined to create or preserve a certain number of jobs for United States workers. (Dkt. 1 ¶ 4.)

From 2010 to 2017, Defendants offered and sold interests in five limited partnerships (the "LPs") to 458 foreign nationals to fund the construction of two mixed-use real estate projects: the Eastern Mirage Project and the Eastern Emerald Project (collectively, the "Projects"). (*Id*. ¶¶ 1, 2, 49; Dkt. 2-2 at 4.) The foreign nationals contributed these funds (the "EB-5 Funds") to the five LPs to participate in the EB-5 Program, in which Fleet sponsors the two Projects and is the General Partner for the LPs. (Dkt. 1 ¶ 28; Gouraige Decl. Ex. 1 ¶ 23.) FFG, owned and controlled by Xia, was developer of the Eastern Mirage Project. (Dkt. 1 ¶¶ 31–33.) Eastern Emerald Group, LLC ("EEG") and LaGuardia Performance Center, LLC ("LaGuardia"), formed by Xia, were developers of the Eastern Emerald Project. (*Id*. ¶¶ 35–36.)

On May 21, 2018, three OCIE Examiners conducted an unannounced examination (the "Inspection") at FFG's office in Flushing, New York (the "Office"). (Gouraige Decl. Ex. 2 at 2;[2]

---

[2] Marc L. Mukasey, Defendants' then legal counsel, wrote a letter (dated March 4, 2020) to the SEC that described the Inspection. (Gouraige Decl. Ex. 2.) In a response letter dated March 11, 2020, the SEC did not dispute any specific factual descriptions of the Inspection in Mukasey's letter. (*See* Gouraige Decl. Ex. 3.) The SEC only disagreed with Mukasey's characterization of the Inspection, which the SEC claimed was a "Voluntary On-Site Inquiry," based on a Form 2866 signed by Xia. (Gouraige Decl. Ex. 3 at 1.) The SEC's failure to challenge the accuracy of

Declaration of Richard Xia ("Xia Decl.") ¶ 3.) The OCIE, according to the SEC's official description of its function, "manages the SEC's *examination* program." (Gouraige Decl. Ex. 4 at 1 (emphasis added)). "Entities subject to this oversight," according to the SEC, "include brokers, dealers, municipal securities dealers, self-regulatory organizations, transfer agents, clearing agencies, investment companies, and investment advisers." *Id*. No Defendant is included among those subject to compliance examinations as registered persons with the SEC. Xia and his entities are not required to register, and are not registered with, the SEC. (Gouraige Decl. Ex. 5 ¶ I.A; Xia Decl. ¶ 13.)

Xia was not present when the Examiners first entered the Office and gave their business cards to a young office clerk. (Gouraige Decl. Ex. 2 at 2; Xia Decl. ¶¶ 3, 5.) The business cards indicated the Examiners were Javen Zhong ("Zhong"), Edward J. Janowsky ("Janowsky"), and John L. Celio ("Celio"). (Gouraige Decl. Ex. 6.) The Examiners urged the office clerk, a young Chinese lady who could not speak English fluently, to call Xia and tell him to either come to the Office immediately or submit to an interview by phone. (Gouraige Decl. Ex. 2 at 2; Xia Decl. ¶ 3.) Believing that he could not avoid this encounter and under great pressure, Xia drove immediately to the office. (Gouraige Decl. Ex. 2 at 2; Xia Decl. ¶¶ 4–5.)

While Xia was on the way, the Examiners explored the Office and interviewed several employees, including a Korean chef and a technical support person.[3] (Gouraige Decl. Ex. 2 at 2.) After Xia arrived and met the Examiners in the Office's conference room, the Examiners asked

---

the Mukasey letter's factual details of the Inspection lends credence to Xia's account of what happened at the Inspection.

[3] The chef no longer works for Xia after the asset freeze on September 27, 2021 and the IT person, a French national, has since returned to France. (Xia Decl. ¶ 14.)

Xia several leading questions, including: (1) why FFG was using EB-5 Funds[4] to finance its daily operations, (2) whether Xia used EB-5 Funds for personal purposes such as hiring the chef, (3) whether EB-5 Funds were enough for the Projects' development, and (4) whether the New York City Capital Resource Corporation ("NYCCRC") bonds were issued for the Projects. (*Id*. at 3; Xia Decl. ¶ 6.) After the interview, the Examiners left Xia a letter (the "May Letter"), signed by Ronald Krietzman of the SEC, requesting documents listed in the letter's Exhibit A. (Gouraige Decl. Ex. 7; Xia Decl. ¶ 8.) The Examiners went over the May Letter with Xia and circled out some items in Exhibit A that Xia need not produce to the OCIE. (Gouraige Decl. Ex. 7 at 2–3; Xia Decl. ¶ 8.) In response to Xia's question whether he should hire legal counsel, the Examiners told Xia that a majority of the examination subjects simply agreed to OCIE's document requests, that Xia could produce documents himself via the SEC portal, and that hiring legal counsel would be costly. (Gouraige Decl. Ex. 2 at 3; Xia Decl. ¶ 8.)

After the Inspection, the Examiners made several attempts to demand document production from Xia in the absence of legal counsel. On May 22, 2018, Zhong emailed Xia the SEC portal for Xia to submit the requested documents. (Gouraige Decl. Ex. 8.) On May 23, 2018, Celio called Xia without any prior notice; Xia stated that he was in the process of retaining counsel, but Celio insisted asking Xia questions (including the current state of the NYCCRC bond issuance) and encouraged Xia to produce documents on his own, explaining that this would make the whole process quicker. (Xia Decl. ¶ 9; Gouraige Decl. Ex. 2 at 3.) On May 31, 2018, Celio called Xia again, stating that he was trying to get an update from his call with Xia on May

---

[4] Defendants recount the Examiners' questions using their language. In so doing, Defendants do not concede they used "EB-5 Funds." The LPs made loans to the developers. The proceeds of those loans are not "funds" of investors. Defendants are obligated to build the projects consistent with USCIS regulations to assure the investors get their green cards and to repay the loans to the

23, 2018, about Xia's progress in responding to the Examiners' requests. (*Id*. ¶ 10) Xia told Celio that he retained Elaine Greenberg ("Greenberg") from Greenberg Traurig LLP as legal counsel. (*Id*.)

Between June and November of 2018, Greenberg produced documents to the OCIE. (Gouraige Decl. Exs. 9–17.) On November 14, 2018, Celio sent a letter to Greenberg, stating that the OCIE had closed the "Voluntary Inquiry" of FFG. (Gouraige Decl. Ex. 18.) The letter advised that it is not an indication that "further action will not result from the Voluntary Inquiry." (*Id*.) Merely 13 days later, the SEC issued a Formal Order of Investigation ("FOI") for the Division of Enforcement to investigate FFG and Fleet, (Gouraige Decl. Ex. 5), but Greenberg and Xia did not receive the FOI until April 2019 (Xia Decl. ¶ 11). Armed now with the SEC's authority to investigate, doubtless based on the OCIE's compliance examination of nonregistered persons, and to serve subpoenas and compel production of documents and testimony, the Division of Enforcement replaced the OCIE as the lead, with the OCIE Examiners participating in the investigation their examination triggered. The Division of Enforcement served a welter of subpoenas on Xia, Yue, FFG's banks and accountants, on the president of construction companies working on the Projects, Xia's tax-preparer, a consultant engaged by counsel to assist in this investigation, and others unknown to Defendants at this time. (*Id*.; Gouraige Decl. Ex. 19 at 16.)

After more than three years of investigation, on September 27, 2021, the day before Xia was scheduled to have a ground-breaking ceremony for the Emerald Project, the SEC filed a Complaint against Defendants in this Court. (Dkt. 1; Xia Decl. ¶ 4.) On the same day, the SEC obtained an *ex parte* temporary restraining order (the "TRO"), freezing Defendants' and the

---

LPs. When a person gets a bank loan and grants the bank a mortgage on his home to secure the

Projects' general contractors' bank accounts with about $77 million, including funds from Xia's rental properties. (Dkt. 11 at 2.) The SEC brought charges against Defendants under Section 17(a) of the Securities Act of 1933 ("Section 17(a)") (Count I), and Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)") and Rule 10b-5 thereunder (Count II). (Dkt. 1 ¶¶ 149–54.)

## ARGUMENT

## I.    The Exclusionary Rule Applies to the Current SEC Enforcement Proceeding

### A.  The Analytical Framework of the Exclusionary Rule in a Civil Proceeding

"[T]he fourth amendment always stands as a limit on legislative and executive action." *United States v. Lasanta*, 978 F.2d 1300, 1305 (2d Cir. 1995). "The 'exclusionary rule' is the primary means for deterring violations of the Fourth Amendment." *United States v. Levy*, 217 F. Supp. 3d 643, 660 (E.D.N.Y. 2016). "[T]he Supreme Court has not ruled out the possibility of applying the exclusionary rule to exclude illegally obtained evidence from use in a civil proceeding, in the appropriate circumstances." *United States v. Kirsteins*, No. 87-964, 1989 U.S. Dist. LEXIS 5183, at *28 (N.D.N.Y. May 10, 1989); *see also United States SEC v. Collector's Coffee*, No. 19-4355, 2021 U.S. Dist. LEXIS 15439, at *17 n.7 (S.D.N.Y. Jan. 27, 2021) ("[T]he Second Circuit has not ruled out the possibility of applying an exclusionary rule in civil proceedings."). "A test for the exclusionary rule that turns on the civil or criminal character of the proceeding does not comport with an objective of achieving substantial deterrence." *Tirado v. Commissioner*, 689 F.2d 307, 313–14 (2d Cir. 1982); *see also Jones v. Latexo Independent School Dist.*, 499 F. Supp. 223, 237–38 (E.D. Tex. 1980) ("In determining the existence of a fourth amendment violation and effectuating an appropriate response, courts must not be misled

---

loan, the proceeds of the loan are not "bank funds."

by the legal classification of the proceeding in which the violation occurred."). This enforcement case is an appropriate occasion to exclude evidence blatantly illegally obtained based on a ruse. Exclusion is the only effective remedy to impose the principle of legality on an administrative agency to deter abuse of power and authority.

In a civil proceeding, the basic legal framework to determine the applicability of the exclusionary rule is described in *United States v. $19,047.00 in United States Currency* ("*Currency*"), No. 92-8052, 1994 U.S. Dist. LEXIS 17126 (S.D.N.Y. Nov. 30, 1994). In *Currency*, the court considered whether the exclusionary rule should apply in a civil forfeiture proceeding against the claimant's $19,047.00 U.S. currency, which the Government claimed was illegally brought into the U.S. *Id*. at *1–3. The funds were seized from the claimant by several Immigration and Naturalization Service (the "INS") agents in a search which, according to the claimant, violated his Fourth Amendment rights. *Id*. at *8. The *Currency* court applied the following factors in two Supreme Court cases, *Janis* and *Lopez-Mendoza*, and found that the exclusionary rule applied to the civil forfeiture proceeding. *Id*. at *15.

In *Janis*, "[t]he Supreme Court has established a framework for deciding in which types of civil proceedings the rule should apply." *Id*. at *11 (citing *United States v. Janis*, 428 U.S. 433 (1976)). The *Janis* court "balances the social benefits of applying the rule with the cost of exclusion," by finding that the "prime benefit of the rule" lies "in deterring future unlawful police conduct," and the "cost of applying the rule is the potential loss of probative evidence." *Id*. (citing *Janis*, 428 U.S. at 446). "Another important factor identified in *Janis* was the 'intrasovereign' nature of the violation;" that is, "the 'seminal cases' applying the exclusionary rule to civil proceedings involve 'cases in which the officer committing the unconstitutional

search or seizure was an agent of the sovereign that sought to use the evidence.'" *Id*. at \*12–13 (citing *Janis*, 428 U.S. at 455–56).

In Lopez-Mendoza, the Supreme Court considered "two additional factors" in the exclusionary rule analysis before concluding that the rule "should not apply to deportation proceedings." Id. at \*13. The first factor involves public policy: "the presence of [unregistered persons] in this country, without more, constitutes a crime," and, as a result, "applying the exclusionary rule to release these unregistered persons would be against public policy." Id. at \*13–14 (citing I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 1046–47 (1984)). The second factor involves "the unfamiliarity of the participants with Fourth Amendment law:" application of exclusionary rule was disfavored when "[n]either the hearing officers nor the attorneys participating in [deportation] hearings are likely to be well versed in the intricacies of Fourth Amendment law." Id. at \*14 (quoting Lopez-Mendoza, 468 U.S. at 1048).

## B. The Current SEC Enforcement Action Is Analogous to the Civil Forfeiture Proceeding in *Currency* to Which the Exclusionary Rule Was Found Applicable

The current SEC enforcement proceeding, in which the SEC seeks penalties and obtained an asset-freeze order to secure a disgorgement remedy against Defendants for $229 million (an interim device that does not comply with the typical remedies traditionally granted by equity courts), is analogous to the civil forfeiture proceeding in *Currency*. An analysis of the four factors in *Currency* supports the application of the exclusionary rule.

First, on the *Janis* factor for social benefits, the *Currency* court found that, apart from the civil forfeiture proceeding in question, "there is no other proceeding where the sanction [of excluding evidence] can be imposed," as "no criminal charges have been brought against the claimant." *Id*. at \*12. The *Currency* court also noted that the civil forfeiture proceeding "does not require any criminal activity by the parties involved." *Id*. As a result, the *Currency* court

8

concluded that: "If the exclusionary rule is not applied to this kind of civil forfeiture proceeding, there may be no sanction to deter Fourth Amendment violations." *Id*. Here, no criminal proceeding is involved; apart from this SEC enforcement action, which seeks civil penalties and non-equitable disgorgement, the sanction of excluding evidence to restrain administrative overreaching cannot be imposed in any other proceeding to deter Fourth Amendment violations. This factor favors application of the exclusionary rule.

Second, on the *Janis* factor of intrasovereign violation, the *Currency* court found that it favored application of the exclusionary rule, because "agents of the INS seized the currency from the claimant and elicited the alleged admissions" and "[i]t is also the INS which seeks to present the challenged evidence in the forfeiture proceeding." *Id*. at *13. Here, it was the SEC's OCIE Examiners who conducted the Inspection; they did so without any authority to do a compliance examination of non-registered persons. As a Trojan horse, the Examiners elicited admissions and documents from Xia and his employees, who were without legal counsel. The illegally obtained evidence no doubt served as the predicate for the Division of Enforcement to issue, in the SEC's name, the FOI upon which the investigation resulting in this enforcement action was predicated. Now, it is the SEC Division of Enforcement lawyers who seek to use the evidence thus obtained or derived (through investigative subpoenas) from the Inspection in this enforcement action. As discussed in Part III.B, *supra*, two of the Examiners, who conducted the Inspection, participated in the Enforcement Division formal investigation of Defendants. Based on these facts, the intrasovereign factor strongly favors applying the exclusionary rule.

Third, in regard to the *Lopez-Mendoza* public policy factor, the *Currency* court found that "the civil forfeiture in this case does not require any criminal activity by the claimant and the mere possession of the currency is not illegal. Public policy, therefore, does not require that the

defendant-in-rem currency be retained by the Government." *Id*. at *14. Here, Defendants' conduct, including mere possession and use of the $229 million fund lent by the LPs, is not a criminal act. Public policy, therefore, does not disfavor application of the exclusionary rule because the conduct, simpliciter without more, is not a *malum per se*.

Fourth, on the *Lopez-Mendoza* factor for familiarity with the Fourth Amendment, the *Currency* court found that "a civil forfeiture proceeding will be conducted before a United States District Judge or Magistrate Judge. These are judicial officers who have familiarity with the intricacies of the Fourth Amendment." *Id*. at *15. Here, the SEC enforcement action is before a United States District Judge or Magistrate Judge. The parties are represented by competent legal counsel. Therefore, the participants here should be familiar with the Fourth Amendment law, which will not disfavor application of the exclusionary rule.

The above *Janis* and *Lopez-Mendoza* factors favor application of the exclusionary rule.

### C. The Current SEC Enforcement Action Is Analogous to Other Civil Proceedings Where the Court Found the Exclusionary Rule Applicable

In civil cases, which presented similar legal questions, courts supported the application of the exclusionary rule.

In *OKC*, the court applied the exclusionary rule to the evidence that the SEC obtained in an administrative search that the plaintiff claimed to have violated his Fourth Amendment rights. *OKC Corp. v. Williams*, 461 F. Supp. 540, 548 (N.D. Tex. 1978). Citing *Janis*, the *OKC* court reasoned that "[w]hen the officer who commits the unconstitutional search or seizure has no responsibility or duty to, or agreement with the sovereign seeking to use the evidence, 'the deterrent effect of the exclusion of relevant evidence is highly attenuated,'" as "[t]he desired deterrence can only result from excluding evidence from a case in which the officer is an agent of the sovereign seeking to use the evidence." *Id*. (quoting *Janis*, 428 U.S. at 458). Applying the

above reasoning to the challenged SEC search, the *OKC* court noted that "[t]he individuals whom [plaintiff] accuses of violating its Fourth Amendment rights are all officers and employees of the SEC" whose "duty is to the [SEC] alone," and that "[t]he SEC and no other sovereign is now seeking to use the [product of the challenged search] as evidence." *Id*. As a result, the *OKC* court concluded that "[u]nder *Janis* . . . the deterrent impact of applying the exclusionary rule to [the product of the challenged search] in these proceedings is in no way attenuated; its force is not incremental but primal." *Id*. The analysis in *OKC* applies to this case, where an SEC-conducted illegal compliance examination is also challenged in a SEC enforcement action.

In *Kirsteins*, the court held that "the exclusionary rule is applicable to the denaturalization proceeding before" it. *Kirsteins*, 1989 U.S. Dist. LEXIS 5183, at *32. The *Kirsteins* defendant sought to apply the exclusionary rule to a search conducted by the Office of Special Investigations ("OSI") in the Department of Justice. *Id*. The *Kirsteins* court found that "the OSI has no internal regulations designed to prevent violations of suspects' constitutional rights," and that such "absence of any internal regulations" favored "applying the exclusionary rule." *Id*. A similar lack of internal regulations applies to the SEC: "the statute governing SEC investigations and its accompanying regulations 'constrain agency action only minimally.'" *Treats Int'l Enters., Inc. v. SEC*, 828 F. Supp. 16, 18 (S.D.N.Y. 1993); *see also SEC v. Cioffi*, 868 F. Supp. 2d 65, 68–69 (E.D.N.Y. 2012) ("The SEC has broad authority to investigate possible violations of the securities laws." (citing 15 U.S.C. §§ 77t(a), 78u(a))). While courts have held the SEC has broad authority to *investigate* potential violations of the securities laws, it does not have unlimited power to use its OCIE authority to conduct *examinations of registered parties* to seek information from unregistered parties under a pretext that is later used to initiate an investigation.

11

The consequences of this lack of constraint on the SEC's investigative authority are well illustrated here. The Examiners managed to conduct an unannounced and unauthorized administrative warrantless search of FFG, an institution that has never been registered with the SEC. After the Examiners told Xia that their "voluntary" inquiry was over, they transitioned smoothly into the formal investigation, where a different division of the SEC subpoenaed Defendants and many others for an investigation. *See* Part III.B, *supra*. The Examiners cooperated with the staff in the SEC's Enforcement Division responsible for the formal investigation. *See id*. Indeed, one Examiner conducted questioning of a witness during the course of an SEC investigative deposition. *See id*. Clearly, the activities of the Examiners, who belonged to an "Office of Compliance Inspections and Examinations," went beyond inspections and examinations. Defendants can only seek a remedy from the courts to impose some basic constraints on this abuse of governmental power.

In *Latexo*, the court found that a search conducted by school officials against the plaintiff student, which led to the plaintiff's suspension, to be "unreasonable under the fourth amendment." *Latexo*, 499 F. Supp. at 237. The *Latexo* court "[e]xclud[ed] the use of [the] evidence" obtained by the school officials in an unreasonable search "from school disciplinary proceedings," reasoning that this "will directly and effectively deter unconstitutional conduct by these officials." *Id*. at 239. The *Latexo* court noted that "[t]he failure to apply a corollary of the exclusionary rule in this context would leave school officials free to trench upon the constitutional rights of students in their charge without meaningful restraint or fear of adverse consequences." *Id*. Here, failure to apply the exclusionary rule would leave the SEC free to trench upon the constitutional and legal rights of numerous business entities and unregistered

persons with little judicial constraint on the SEC's unbridled use of its investigative authority to keep it within the guardrails established by Congress.

## II.    The Inspection Was an Illegal and Unconstitutional Administrative Search

The Examiners' Inspection was illegal for two reasons. First, they lacked statutory authority to conduct an administrative search without warrant. Congress has effectively granted such authority to some administrative agencies, *e.g*., the Office of the Comptroller of the Currency ("OCC"). *See* 12 U.S.C. § 481 (OCC examiners may present an administrative subpoena to bank officers and demand immediate access to bank records); *United States v. Chuang*, 897 F.2d 646, 647-48 (2d Cir. 1990). It has not granted such authority to the SEC. Although the SEC may conduct a "preliminary investigation" of securities violations, 17 C.F.R. § 202.5, it lacked authority to conduct a compliance examination of unregistered persons; Congress granted the SEC authority only to conduct examinations of registered persons. Despite the lack of legal authority, the OCIE resorted to duplicity, using the appearance of government authority, to gain access to private property and obtain information from Defendants.

Second, as explained below, the warrantless Inspection violated the Fourth Amendment. "Commercial premises, like private homes, are protected under the Fourth Amendment from unreasonable searches and seizures." *Meserole St. Recycling, Inc. v. City of New York*, No. 06-1773, 2007 U.S. Dist. LEXIS 4580, at *8 (S.D.N.Y. Jan. 23, 2007). "In general, the Fourth Amendment prohibits warrantless searches of commercial property for both criminal investigations and administrative inspections." *United States v. Kolokouris*, No. 12-6015, 2015 U.S. Dist. LEXIS 109105, at *55–56 (W.D.N.Y. Aug. 14, 2015). "A warrantless search is '*per se* unreasonable . . . subject to only a few specifically established and well-delineated exceptions.'" *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1996). The burden is on the SEC to show that this illegal Inspection did not violate the Fourth Amendment. *See United States v. Arboleda*, 633

13

F.2d 985, 989 (2d Cir. 1980) ("The movant can shift the burden of persuasion to the Government and require it to justify its search . . . when the search [is] conducted without a warrant."); *United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014) ("On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure. Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence that the search or seizure did not violate the Fourth Amendment.").

### A.  The Inspection Does Not Qualify for the Consent Exception

Even with statutory and regulatory authority for an administrative search, "[a]bsent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *City of Los Angeles v. Patel*, 576 U.S. 409, 420 (2015). The precompliance review allows "a neutral decisionmaker [to] review an officer's demand to search the [property] before [the property owner] faces penalties for failing to comply" with the search. *Id.* at 421; *see also Benjamin v. Stemple*, 915 F.3d 1066, 1069 (6th Cir. 2019) ("The administrative scheme must give the property owner the chance to challenge a warrantless search request before being sanctioned for refusing entry.").

Here, the SEC cannot allege any exigent circumstance that may justify a warrantless search: no alleged conduct of Defendants suggests an intention to destroy evidence, *see Routhier v. Goggins*, 229 F. Supp. 3d 299, 307 (D. Vt. 2017) ("Exigencies include 'the need to prevent the imminent destruction of evidence.'") (quoting *Patel*, 576 U.S. at 460)), and no need was shown to protect or preserve life or avoid serious injury. *See Houghton v. Culver*, 452 F. Supp. 2d 212, 216 (W.D.N.Y. 2006) ("Exigent circumstances include situations in which law enforcement faces a 'need to protect or preserve life or avoid serious injury.'"). Defendants had no

14

opportunity to obtain a pre-compliance review before the unannounced Inspection. The only question is whether Xia gave a voluntary consent to the Inspection. He did not.

### 1.  Xia Never Consented to the Inspection

"[W]hen . . . the government relies on consent to justify a warrantless search, it bears the burden of proving by a preponderance of the evidence that the consent was voluntary." *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006). "[I]f the individual has merely acquiesced in a show of authority, he should not be found to have consented." *United States v. Vasquez*, 638 F.2d 507, 524 (2d Cir. 1980). To satisfy the consent exception, the search must be "conducted pursuant to the consent of an authorized person." *Snype*, 441 F.3d at 131.

Xia, the sole owner of FFG, is the only authorized person to give the SEC a consent to search the Office and to obtain information from employees. Xia did not give such a consent. (Xia Decl. ¶ 5.) The SEC claims that Xia voluntarily consented by signing a Form 2866, which was provided and explained to him by the Examiners. (Gouraige Decl. Ex. 3 at 1.) But this form does not support the SEC's position. Form 2866 is titled "Supplemental Information for Persons Requested to Supply Information Voluntarily to the Commission's Examination Staff," and its plain language states that it is "provided to [the subject of examination] because the [SEC] examination staff has requested that [the subject] voluntarily provide information." (Gouraige Decl. Ex. 20 at 1.) At best, Form 2866 indicates an understanding that the recipient, a registered person, is being requested to grant voluntary consent to provide information for an examination. Nowhere does the form indicate that, by signing the form, the signer grants voluntary consent to a search or request for documents. (*See id*.) Moreover, before Xia signed the form, the Examiners did not tell him that signing the form meant giving voluntary consent. (*See* Xia Decl. ¶ 5.) *See United States v. Chisholm*, No. 07-795, 2009 U.S. Dist. LEXIS 140, at *13 (E.D.N.Y. Jan. 5, 2009) ("Consent to search is 'not to be lightly inferred' and must be 'unequivocal,

15

specific, and intelligently given.'"). In any case, as a nonregistered person, Xia was not subject to the OCIE's authority to conduct compliance examinations of registered entities.

### 2. Even if Xia Gave Consent, It Was Tainted by the SEC's Prior Unlawful Conduct

"[C]onsent obtained after an unlawful search and seizure may be invalidated as fruit of the poisonous tree." *United States v. Nicholson*, No. 15-6143, 2016 U.S. Dist. LEXIS 78727, at *16 (W.D.N.Y. June 15, 2016); *see also United States v. Lambis*, 197 F. Supp. 3d 606, 612 (S.D.N.Y. 2016) ("[T]he procurement of a 'voluntary' consent to search based upon a prior illegal search may taint the consent."). "When consent to search is preceded by an unlawful [Fourth Amendment violation], the evidence obtained from the search must ordinarily be suppressed unless the Government shows both that the consent was voluntary and that 'the taint of the initial [violation] has been dissipated.'" *Lambis*, 197 F. Supp. 3d at 612. "[C]ourts must determine whether the causal link between a prior unlawful search and consent (voluntary though it may have been) to a subsequent search is so tight that the evidence acquired pursuant to that consent must be suppressed." *Id*.

The SEC did not obtain Xia's consent before the Inspection began. Without obtaining any consent from an authorized person, the Examiners unlawfully entered the Office. *See Ill. v. Rodriguez*, 497 U.S. 177, 188–89 (1990) (finding that, if an officer had no reasonable basis to believe that an authorized person gave a consent to enter the premises, "then warrantless entry without further inquiry is unlawful unless authority actually exists"). The Examiners spent nearly two hours in the Office before Xia's arrival, which gave them plenty of time to explore the Office and talk with the chef, an IT person, and the young office clerk. (*See* Xia Decl. ¶ 5.) Notably, in the interview with Xia in the Office's conference room, the Examiners referred to a chef who the Examiners met at the Office. (*Id*. ¶ 6.) Xia hired the chef only four months prior to the search and had never disclosed the hiring to anyone outside his companies. (*Id*. ¶ 7.)

16

Even if Xia gave implied consent after his arrival, that consent had a tight causal link to the Examiners' initial illegal entry and search. Xia did not realize he could ask the Examiners to leave his property. The Examiners urged the young office clerk to call Xia to submit to their inquiries. Like Xia, the office clerk is originally from China, where the government is almost omnipotent; moreover, the office clerk could not even speak English fluently. As a result, she was understandably unable to withstand the pressure exerted by the Examiners, who represented a U.S. government agency. When demanded to call Xia, the office clerk immediately did so, no doubt under considerable pressure. This pressed Xia, who shares a similar cultural background with the office clerk, to drive to the Office immediately under a sense of emergency. (*Id*. ¶ 5.)

### 3.  Even if Xia Gave Consent, It Was Involuntary

"The officials claiming that a search was consensual bear the burden of demonstrating that the search was indeed voluntary." *United States v. Amry*, No. 02-612, 2003 U.S. Dist. LEXIS 500, at *9 (S.D.N.Y. Jan. 16, 2003). "The Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973); *see also United States v. Barone*, 721 F. Supp. 2d 281 n.35 (S.D.N.Y. 2010) ("Consent is voluntary if it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."). In determining whether consent was coerced, "account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Schneckloth*, 412 U.S. at 228.

Xia was at a vulnerable mental state during the Inspection. First, he was not accompanied by counsel at the time. The Examiners even encouraged Xia not to retain legal counsel and submit to their inquiries on his own. (Xia Decl. ¶ 8.) Second, Xia, as a nonregistered person, had no prior experience in dealing with the SEC. (*Id*. ¶ 13.) None of Xia's companies has been registered with the SEC. (*Id*.) Xia was totally unprepared for his interactions with the Examiners.

(*Id*. ¶ 3.) Third, because of Xia's cultural background, he was particularly sensitive and vulnerable to pressures exerted by representatives of a government agency. (*Id*. ¶ 4.) Xia became a U.S. citizen in 2017, a year before the illegal examination. (*Id*.) The Examiners took advantage of Xia's vulnerabilities and knowingly misused their authority, conduct unbecoming a government's treatment of persons within its borders.

### B.  The Inspection Does Not Qualify for the Administrative Search Exception

The administrative search exception to the Fourth Amendment warrant requirement does not apply here for two reasons. To begin, Congress has not granted the SEC authority to conduct administrative searches of nonregistered persons. Next, even if the SEC, including OCIE, had such statutory authority, the exception would not apply in this context. Real estate construction, like insurance, is subject to state and local government regulation. It is unlike banking, securities firms, etc. that are subject to extensive federal regulatory authority.

"For a warrantless inspection to fall within the administrative search exception to the warrant requirement, the commercial premises must be part of a 'closely regulated industry,' assessed based on 'the pervasiveness and regularity of the federal regulation.'" *United States v. Sorcher*, No. 05-799, 2007 U.S. Dist. LEXIS 103818, at *10 (E.D.N.Y. Mar. 26, 2007). "Even where the premises fall within this category, warrantless regulatory inspections are deemed reasonable only where three criteria are met: (1) the regulatory scheme must serve a 'substantial government interest'; (2) 'the warrantless inspections must be necessary to further the regulatory scheme'; and (3) the regulations 'must provide a constitutionally adequate substitute for a warrant,' by 'advis[ing] the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and [by] limit[ing] the discretion of the inspecting officers.'" *Id*. Here, Defendants' commercial premises, as a part of the construction industry, do not represent one of the "historically closely regulated industries," which include

18

"mining, firearms, liquor, and junkyards." *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 485 (S.D.N.Y. 2019); *see also Chuang*, 897 F.2d at 651 ("[B]anking is a 'closely regulated' business."). Even if the construction industry were closely regulated, the Inspection was performed to explore potential securities law violations and unrelated to any construction regulatory purpose. Finally, there was no constitutionally adequate substitute for a warrant, as Defendants had no opportunity to receive a prior notice of the Inspection. *See Meserole St. Recycling, Inc. v. City of New York*, No. 06-1773, 2007 U.S. Dist. LEXIS 4580, at *15 (S.D.N.Y. Jan. 23, 2007) (finding a lack of constitutionally adequate substitute for a warrant when there was "no statute signaling to businesses . . . that they may be subjected to warrantless inspection by the" government). The examination cannot be upheld as a valid administrative search.

### III.   All the SEC's Evidence Obtained Directly or Indirectly from the Inspection Should Be Excluded

"When it applies, the exclusionary rule excludes from evidence both (i) 'primary evidence' obtained as a direct result of an illegal search or seizure; and (ii) evidence later discovered and found to derive from an unlawful search or seizure, the so-called 'fruit of the poisonous tree.'" *Levy*, 217 F. Supp. 3d at 660. The question with derivative evidence is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *see also Murray v. United States*, 487 U.S. 533, 537 (1988) (holding that the exclusionary rule covers evidence "acquired as an indirect result of the unlawful search"); *United States v. Crews*, 445 U.S. 463, 469 (1980) ("[T]he principal issue was whether the unlawful police behavior bore a causal relationship to the acquisition of the challenged testimony."). Because the Inspection was illegal and unconstitutional, the evidence that the SEC

19

directly and indirectly obtained therefrom should be excluded.[5] As a result, the SEC "bears the burden [to prove] that the exclusionary rule is not a proper remedy for the violation of the Fourth Amendment." *United States v. Chatmon*, No. 17-246, 2019 U.S. Dist. LEXIS 228142, at *4 (W.D.N.Y. Aug. 22, 2019); *see also United States v. Drago*, No. 18-394, 2021 U.S. Dist. LEXIS 133118, at *51 (E.D.N.Y. May 6, 2021) ("The burden of proving application of any of the claimed exceptions to the exclusionary rule is on the Government.").

### A.  The Evidence Obtained by the SEC After the Inspection is Tainted

Before the formal investigation began on November 27, 2018, Xia submitted documents, via Greenberg, to the OCIE in direct response to the May Letter. (Gouraige Decl. Exs. 9–15.) During the Inspection, the Examiners specifically pointed out to Xia which items of document listed in the letter's Exhibit A need not be produced. (Gouraige Decl. Ex. 7 at 2–3; Xia Decl. ¶ 8.) Notably, the Examiners made several attempts to persuade Xia into submitting these documents without legal counsel. (Gouraige Decl. Ex. 2 at 3; Xia Decl. ¶ 8.) Such attempts began in the Inspection and continued until Xia indicated that he retained counsel. (Xia Decl. ¶ 10.) Therefore, these submissions were closely and causally connected to the unlawful Inspection, and no intervening events could sever such connections and trigger the attenuation

---

[5] Defendants are not aware of cases addressing a movant's initial burden of proof for a motion *in limine* in an SEC enforcement proceeding. Nevertheless, Defendants propose the Court adopt the prima facie burden of proof requirement, which is used in a motion to suppress evidence in a civil removal proceeding. *See Zuniga-Perez v. Sessions*, 897 F.3d 114, 125 (2d Cir. 2018) ("A petitioner seeking to suppress evidence in a removal proceeding initially bears the burden of coming forward with proof 'establishing a prima facie case.' A petitioner must first provide an affidavit that, taken as true, 'could support a basis for excluding the evidence.' If the affidavit is sufficient, the petitioner is entitled to 'an opportunity to confirm those allegations in an evidentiary hearing.' Once a petitioner makes out a prima facie case, the burden shifts to the Government 'to show why the evidence in question should be admitted.'").

exception to the exclusionary rule.[6] *See Utah v. Strieff*, 579 U.S. 232, 238 (2016) (holding that the attenuation inquiry asks whether "the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'"); *United States v. Bellamy*, 592 F. Supp. 2d 308, 321 (E.D.N.Y. 2009) (holding that the attenuation exception applies "where the connection between the discovery of the evidence and the conduct of the police has 'become so attenuated as to dissipate the taint'").

After the May Letter, the Examiners sent several email inquiries to Xia asking for additional documents. Xia's submissions dated September 21, 2018 were in direct response to Janowsky's September 11, 2018 email inquiry. (Gouraige Decl. Ex. 16.) The following facts suggest the email inquiry's close connection with the Inspection: (1) Janowsky conducted the Inspection; (2) the inquiry's requests were clearly based on the information within Xia's August 30, 2018 submissions[7] that were in direct response to the May Letter; and (3) the email inquiry's temporal proximity with Xia's August 30, 2018 submissions.

---

[6] Xia's retention of counsel for the submissions of documents is not an attenuating intervening circumstance, because it was caused by and not an event independent from the Inspection. *See Strieff*, 579 U.S. at 238 ("The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence, which often has nothing to do with a defendant's actions."); *cf. United States v. Walker*, 965 F.3d 180, 188 (2d Cir. 2020) ("A valid warrant that . . . 'is entirely unconnected with the [unconstitutional conduct]' supports attenuation."). It does not change the fact that the submissions were in direct response to the May Letter, which the Examiners left at the Office in the May 21, 2018 Inspection. *See Segura v. United States*, 468 U.S. 796 (1984) ("Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion.").

[7] In the September 11, 2018 email inquiry, the first request focused on certain specific transactions related to the Eastern Emerald Project; the second and the third requests focused on Xia and Yue's associations with entities involved with the Eastern Emerald Project, especially Racanelli Construction Group, Inc. ("Racanelli") and Perini Group, Inc. ("Perini"). (Gouraige Decl. Ex. 21 at 1–2.) The Examiners were able to identify these transactions and entities based

Xia's submissions dated November 6, 2018 were in direct response to Janowsky's November 1, 2018. (Gouraige Decl. Ex. 17.) Notably, Janowsky admitted that the documents requested in that email "may relate in some manner to items previously requested by the staff." (Gouraige Decl. Ex. 23 at 1.) This shows that this email inquiry was built on, and therefore derived from, the Examiner's prior inquiries causally connected to the Inspection.

### B. The Evidence Obtained From the SEC's Formal Investigation Derived From the Inspection

The SEC's FOI was issued only 13 days after the 2018 Inspection closed. Such temporal proximity supports a causal relationship between the Inspection and the SEC's formal investigation. *See Lacasse v. Lorillard Tobacco Co.*, No. 04-3737, 2008 U.S. Dist. LEXIS 141145, at *27 (E.D.N.Y. Oct. 17, 2008) ("[W]here proximity is 'very close,' temporal proximity alone may suffice to demonstrate causation."). Tellingly, the overlap of personnel between the Inspection and the Enforcement Division in conducting the formal investigation reveals a connection that likely dates to the beginning of the OCIE's Inspection.

Significantly, the Examiners contributed to and directly participated in the formal investigation. Janowsky and Celio attended Xia's investigative deposition ("Xia Deposition") the SEC conducted on May 30, 2019. (Gouraige Decl. Ex. 24 at 2; Xia Decl. ¶ 12.) Though the two

---

on the information in Xia's August 30, 2018 submissions, which were in response to "Item Number 13" of the May Letter asking for "monthly statements for all bank and brokerage accounts into which investor funds . . . have been deposited." (Gouraige Decl. Ex. 7 at 2, Ex. 14.)

In particular, the first request was directed to the underlying purposes of 15 check transfers from EEG's East West ("EW") bank account to several payees. (Gouraige Decl. Ex. 21 at 1.) These check transfers were all recorded in Xia's August 30, 2018 submissions. (Gouraige Decl. Ex. 22 at 34 (Checks 1196 and 1197), 43 (Check 1249), 57 (Check 1351), 76 (Check 1422), 83 (Check 1443), 104 (Checks 1508, 1509, 1514, and 1515), 105 (Check 1521), 133 (Check 1565), 138 (Check 2003), 141 (Check 2005), and 142 (Check 1586).) Yue was the signer on these checks as EEG's representative; Racanelli and Perini are the payees on Checks 1197, 1508, 1509, 1514, 1515, 1565, and 1568. (*Id.*) This likely gave rise to the second and third requests on the payer Yue's associations with the payee entities like Racanelli and Perini.

Examiners did not question Xia directly, they posed their questions to Xia, indirectly via Kim Han ("Han") of the Enforcement Division, who questioned Xia. (Xia Decl. ¶ 12.) At multiple times during Xia's Deposition, Janowsky and Celio wrote something down on a paper, and turned it over to Han. (*Id*.) After taking a look at the paper, Han immediately asked Xia questions; sometimes, Han simply read the question on the paper to Xia. (*Id*.) Also, during multiple breaks in Xia Deposition, Janowsky and Celio were engaged in discussions with Han. (*Id*.)

On December 14, 2019, the SEC conducted an investigative deposition of Mei Yen Wei ("Wei" and "Wei Deposition"), who was an employee of EW Bank. (Gouraige Decl. Ex. 25 at 1, 14:9–11.) This was a part of the SEC's investigation of FFG's possible violations of federal securities laws. (*Id*. at 8:1–9.) Janowsky and Han were both present in Wei's Deposition. (*Id*. at 2.) Janowsky asked Wei at least six questions (*Id*. at 21:25–26:1, 82:6–14; 106:15–18; 125:7–20.) Janowsky's questions focused on Yue's possible associations with Racanelli and Perini. (*Id*. at 82:6–14, 106:15–18; 125:7–20.) Notably, Janowsky previously posed the same question to Xia, in an email inquiry to Xia closely connected to the Inspection. *See* Part III.A & footnote 7, *infra*. Informed by Xia's responses to that question in the email inquiry and Xia's August 30, 2018 submissions (also closely connected to the Inspection),[8] Janowsky was able to formulate questions for Wei, an employee of EW Bank.

Over a year after its commencement, the formal investigation was still receiving input from the illegal Inspection, whose detrimental consequences were not so attenuated as to negate application of the exclusionary rule. *See United States v. Shrum*, 908 F.3d 1219 (10th Cir. 2018)

---

[8] The submissions revealed Yue as the signer of several checks that transferred funds from EEG's EW bank account to Racanelli and Perini, which likely prompted Janowsky to question Wei on Yue's possible associations with Racanelli and Perini. *See* footnote 7, *infra*.

23

("The notion of attenuation . . . 'attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost.'" (quoting *Brown v. Illinois*, 422 U.S. 590, 609 (1975)) (Powell, J., concurring in part)). In other words, the unlawful Inspection was the starting point of the SEC's investigation of Defendants that led to the current litigation.

Even if Xia's submissions constitute intervening circumstances sufficient to trigger the attenuation exception, this alone cannot justify the admissibility of documents that Defendants never submitted to the SEC, including: (1) the letter authored by Edward Chan attached to the Declaration of Annie Seelaus (Dkt. 4 at 3–22); (2) the letter authored by Sunil K. Aggarwal attached to the Declaration of Sunil K. Aggarwal (Dkt. 5 at 3); and (3) some exhibits attached to the Declaration of Kim Han (Dkt. 6 Exs. 7–10, 11–13, 15–16, 18–20, 34–37, 40–45, 47, 49, 50–51, 63–64, 68–71, 73–74, and 80–88). (Xia Decl. ¶ 15.) The burden is on the SEC to explain how it obtained these letters and exhibits independent from the illegal Inspection.

## CONCLUSION

For the foregoing reasons, Defendants' motion *in limine* should be granted.

Dated: January 21, 2022

SILLS CUMMIS & GROSS P.C.

By:   /s/ *Herv*é *Gouraige*
Hervé Gouraige

Sills Cummis & Gross P.C.
One Riverfront Plaza
Newark, N.J. 07102
Tel. No.: (973) 643-5989
E-Mail: hgouraige@sillscummis.com

Attorneys for Defendants