**LARA SHALOV MEHRABAN**
**ACTING REGIONAL DIRECTOR**
**Sheldon L. Pollock**
**Judith Weinstock**
**Kevin P. McGrath**
**David Stoelting**
**Brenda Chang**
**Kim Han**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, New York 10004-2616**
**(212) 336-0174 (Stoelting)**
**stoeltingd@sec.gov**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **AMENDED COMPLAINT** |
| Plaintiff, | **21-cv-05350-PKC-RER** |
| -against- | |
| **RICHARD XIA, a/k/a YI XIA, and FLEET NEW YORK METROPOLITAN REGIONAL CENTER, LLC, f/k/a FEDERAL NEW YORK METROPOLITAN REGIONAL CENTER, LLC,** | **JURY TRIAL DEMANDED** |
| Defendants, | |
| -and- | |
| **JULIA YUE, a/k/a JIQING YUE; XI VERFENSTEIN; and XINMING YU,** | |
| Relief Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC"), for its Amended Complaint against Defendants Richard Xia, a/k/a Yi Xia ("Xia") and Fleet New York Metropolitan Regional Center LLC, f/k/a Federal New York Metropolitan Regional Center, LLC ("Fleet"); and Relief Defendants Julia Yue, a/k/a JiQing Yue ("Yue"), Xi Verfenstein ("Verfenstein"), and Xinming Yu ("Yu") alleges as follows:

## SUMMARY

1.      From 2010 through late 2017, Defendants fraudulently raised more than $229 million by offering and selling limited partnership interests to more than 450 investors.  In connection with the offerings, Xia acted by and through Fleet, the General Partner of the limited partnerships that issued the securities.

2.      The Defendants enticed predominantly Chinese foreign nationals to make investments of $500,000 each to fund two large, mixed-use real estate projects that were to be built in Queens, NY.  Xia named them the "Eastern Mirage Project," located at 42-31 Union Street, and the "Eastern Emerald Project," located at 112-51 Northern Boulevard.  In their offering materials, the Defendants represented that the investor funds would be used to build two five-star hotels, a modern conference center, luxury residences, retail stores, a top-shelf restaurant, vast underground parking garages, and a medical center.

3.      Relying on the Defendants' representations, investors contributed $56 million to the Eastern Mirage Project.  Although the offering materials represented that the project would be completed in 2013, today it is an unfinished and empty glass tower.  Between 2014 and 2017, investors contributed $173 million to the Eastern Emerald Project.  Today, it remains a largely vacant dirt hole surrounded by a concrete wall.  *See* Exhibits A and B hereto (photographs of the Eastern Mirage and Eastern Emerald sites taken on September 14, 2021).  The funds for the

Eastern Mirage Project have been exhausted far short of completion of the project.  And only approximately $77 million is left for construction of the Eastern Emerald Project, far short of the amount the Defendants had estimated would be needed to complete the construction of the project.

4.      The Defendants pitched the investments in the projects as a way for investors to participate in the EB-5 Program administered by the United States Citizenship and Immigration Services ("USCIS"), which allows foreign nationals to qualify for permanent residency if they make a qualified investment of $500,000 or more in a specified project that is determined to create or preserve a certain number of jobs for United States workers.

5.      The terms of the Eastern Mirage and Eastern Emerald offerings were generally the same.  Each investor made a $500,000 capital contribution to a limited partnership; a processing fee of $50,000 was also required.  The investors' funds were required to be loaned to the projects' developers, who were affiliates of Fleet, and used only for project-specific purposes.  Each investor became a limited partner, and the General Partner (Fleet) had complete control over the offerings.  The investors were told that their $500,000 capital contributions would be returned to them when the loan matured.

6.      The primary offering documents were the Private Offering Memoranda ("Offering Memoranda"), which included Limited Partnership Agreements ("LP Agreements"), and Business Plans, which Xia reviewed and approved, and various marketing materials.  These documents contained numerous material misrepresentations and omissions.  *First*, Defendants represented to investors that their $500,000 capital contributions would be used **only** for the construction and operation of that specific project.  Instead, Defendants repeatedly misappropriated money from one project and used it for another.  For example, Defendants used

approximately $17 million in Eastern Mirage investor funds to purchase the Eastern Emerald

land; and used at least $11.8 million in Eastern Emerald investor funds for Eastern Mirage

project construction.  Xia also misappropriated investor funds for personal and other improper

expenses.

7.      *Second*, the Defendants represented to investors that the projects would be

"funded from a variety of sources," including not only EB-5 funds but also government bonds,

loans from banks and a broker-dealer, as well as substantial equity contributions from Xia.

These representations were false, which Defendants knew or were reckless in not knowing.  In

fact, EB-5 investor money was essentially the only source of funding, which created a significant

funding shortfall that Defendants knew or should have known was inevitable.

8.      *Third*, the Defendants told investors that the "Management and Development"

team for the projects consisted of Xia and the Racanelli Construction Group, Inc. ("Racanelli").

The Offering Memoranda stated that Racanelli was "one of the region's leading providers of

preconstruction planning, project management, design/build, and general contracting services,"

and that Racanelli, "[s]ince its founding," had completed numerous projects, including

"corporate headquarters, industrial complexes, hospitals," and many other types of buildings.

The Business Plans and marketing brochures further represented that Racanelli had "six decades"

of construction experience.  None of this was true.  In fact, Racanelli was created in 2011 and

had no track record other than serving as Xia's in-house construction company.  Moreover, the

description of Racanelli's experience was lifted almost verbatim from the website of another

construction company, Racanelli Construction Company Inc. (the "Original Racanelli"), whose

name and reputation Defendants sought to co-opt by appropriating its name for their construction

entity.  While the Offering Memoranda and Business Plans extol Xia as having extensive

experience in real estate development, Xia himself had limited experience as a developer—before Eastern Mirage he had completed construction of only one small apartment building—and he was ill-equipped to manage the construction of the large-scale projects, as Defendants knew or should have known.

9.      *Fourth*, the Defendants told investors that the hotels that were part of the projects would be affiliated with the well-known Westin Hotel chain, which Defendants knew was not true.

10.     *Fifth*, the Defendants intentionally exaggerated the size of the Eastern Emerald Project.  The Defendants told investors that the project would cover more than 1.1 million square feet, but Defendants knew this was false.  Documents submitted to the Department of Buildings in 2015, and signed by Xia, show that Xia only sought approval to build a project of about 350,000 square feet.

11.     *Sixth*, the Offering Memoranda stated that there were "no material conflicts of interest between the General Partner and its affiliates on the one hand and the Partnership on the other hand" and that the General Partner "is accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in handling the Partnership's affairs."  As the President, Chief Executive Officer and Managing Member of the General Partner, Xia had a fiduciary duty to the Partnerships.  However, Defendants failed to disclose material conflicts of interest to the investors.  For example, Xia, who was on both sides of the agreements, caused the developers of the Eastern Mirage and Eastern Emerald Projects to enter into rental agreements with the Xia-owned entities that own the land for the projects.  The developers have never made any rental payments and have been in default for years: one owes at least $16.5 million and the other owes at least $42.2 million.  Because Xia owns and controls all four entities – the

developers and the owners of the land – and can exercise his right to demand payment at any time, Xia has the unfettered right to trigger the default provisions in the rental agreements that would bankrupt the developers and leave the investors empty-handed.  Alternatively, if the projects are sold, Xia could enforce the nearly $60 million in payment obligations the developers owe, which will reduce the amount available for the developers to return to investors.

12.     *Finally,* Xia directed close to $30.177 million in investor funds to Relief Defendants without consideration.  A total of $9.7 million in ill-gotten gains was routed to personal bank accounts for Julia Yue for no legitimate business purpose.  Xia used approximately $5.6 million of the funds routed to Yue's personal bank accounts and an additional approximately $20.477 million sourced directly and indirectly from investor funds for the purchase of three luxurious properties in Long Island.  The three properties were purchased between May and August 2021.  One of these properties is in the name of Relief Defendant Yue, another is in the name of Relief Defendant Verfenstein, and a third is in the name of Relief Defendant Yu.  Yue, Verfenstein and Yu did not provide consideration for the properties held in each of their names.

13.     To further the Defendants' scheme and conceal their conduct, Xia opened more than 150 bank accounts which he controlled and through which investor funds flowed.  Although Yue is a signatory or co-signatory (with Xia) on many of these accounts, she appears to act primarily at Xia's direction.  Xia has exercised this control to direct numerous transfers between and among these accounts in circular, multi-step transactions that appear to have no legitimate business purpose.  Xia directed over $127 million in investor funds to Racanelli and Perini Group, Inc. ("Perini"), the other general contractor on the projects that Xia controls.  Of that amount, Xia re-directed a total of at least $85.9 million to accounts of other entities he controls.

Of the $85.9 million, there are no invoices or other support for approximately $22 million. Moreover, the invoices from Xia's entities to the general contractors ostensibly supporting the transfers appear spurious. Additionally, the majority of this money does not appear to have been spent on Project-related expenses.

14.     The investors remain at significant and immediate risk. Since 2018, many investors have been demanding the return of their funds, including through lawsuits. To date, no investor has received his or her capital contribution back. And given that the projects consist of an unfinished building and a hole in the ground with insufficient funds to complete either project, the prospects for investors to receive their capital contributions back are remote at best.

15.     Moreover, Xia and his companies are currently under significant financial exposure, including more than two dozen pending project-related lawsuits brought by EB-5 investors, injured workers, unpaid contractors, ConEdison, and the City of New York, among others.

16.     In May 2021, Xia wrote to some investors to say that he was planning the "termination and dissolution" of one of the limited partnerships. And Xia has offered payments to some investors to settle pending litigations, stating that he may wind up some of the limited partnerships.

17.     At the time the Complaint was filed on September 27, 2021, approximately $77 million in investor funds remained in Xia-controlled bank accounts, which is insufficient to repay investors. The Defendants' actions jeopardized the investors' prospects for any return of their capital contributions.

18.     On September 27, 2021, in order to maintain the status quo and preserve assets for injured investors, the SEC filed its application for emergency relief. At 6:30 p.m. on September

27, 2021, the Court granted the SEC's application, including an asset freeze, the appointment of a Monitor, expedited discovery, and verified accountings.

19.     Xia violated the asset freeze almost immediately after it was imposed.  On the morning of September 28, 2021, Defendants' counsel was served with a copy of the asset freeze order, among other papers.  On September 29, 2021, Xia transferred $200,000 from a bank account he controlled to one of Yue's personal accounts, and Yue then wired approximately $74,000 to an unaffiliated third-party firm.  Additionally, on September 30, 2021, Xia authorized three wire transfers of approximately $52,000, $67,000 and $172,000 from accounts he controlled to third-party contractors.

20.     A show-cause hearing on the SEC's motion for an Order continuing the current asset freeze and the appointment of a Monitor through the end of this case was held on February 14, 15 and 16, 2022, and post-hearing briefing has been scheduled.  The SEC has also filed a motion for an order extending the scope of the existing asset freeze to include so much of the Kings Point Road, Middle Neck Road and Vanderbilt Drive mansions as were purchased in the names of Relief Defendants Yue, Verfenstein and Yu using monies sourced directly or indirectly from investor funds.

## **VIOLATIONS**

21.     By virtue of the foregoing conduct and as alleged further herein, Defendants Xia and Fleet have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

22.     Unless Defendants are restrained and enjoined, they will continue to engage in the acts, practices, transactions, and courses of business set forth in this Amended Complaint or in

acts, practices, transactions, and courses of business of similar type and object.

23.     Relief Defendant Yue has received at least $4.1 million cash in ill-gotten gains from the Defendants' fraud, and an additional at least $10.62 million in ill-gotten gains that was used to purchase a luxurious home in her name.   Thus, Yue has received a total of approximately $14.72 million, sourced directly and indirectly by investor funds, for which she provided no consideration.

24.     Relief Defendants Verfenstein and Yu also received title to properties on Long Island that were purchased with ill-gotten gains from Defendants' fraud, and did not provide consideration in exchange for the properties.

25.     Specifically, Verfenstein received title to a luxurious residential property on Long Island that was purchased with approximately $11.247 million of ill-gotten gains from Defendants' fraud.

26.     Yu received at least $4.21 million of ill-gotten gains from Defendants' fraud that were used to purchase a $4.3 million residential property titled in Yu's name.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

27.     The SEC brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Sections 21(d) [15 U.S.C. § 78u(d)] and 21A(a) [15 U.S.C. § 78u-1(a)].

28.     The SEC seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules that this Amended Complaint alleges they have violated; (b) ordering Defendants and Relief Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged herein and to pay prejudgment interest thereon; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15

U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and (d) ordering any other and further relief the Court may deem just and proper.

29.     To maintain the *status quo* and preserve assets sufficient for Defendants to pay disgorgement, prejudgment interest, and civil money penalties and for Relief Defendants to pay disgorgement and prejudgment interest in accordance with any final judgment of this Court, the SEC further seeks an order: a) expanding the existing asset freeze to include so much of the three residential properties in the names of Relief Defendants Yue, Verfenstein and Yu as were purchased using funds sourced directly or indirectly from investor funds; and b) continuing the expanded asset freeze and the order appointing a Monitor through the completion of this case.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

31.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

32.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Defendants may be found in, are inhabitants of, or transact business in the Eastern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Amended Complaint occurred within this District.

## DEFENDANTS[1]

33.     **Xia**, age 52, a resident of Flushing, NY, is the co-owner, CEO, President, and Managing Member of Fleet.  Xia attended a university in China where he obtained a degree in industrial management engineering.  Xia also has a master's degree from the University of Alabama.  Xia immigrated to the United States in 1996 and became a United States citizen four years ago.  Xia owns (or co-owns with his wife, Relief Defendant Yue) and/or controls all the entities listed in paragraphs 34, 39-44 and 48-56 (the "Xia Entities").

34.     **Fleet**, a New York limited liability company, was formed by Xia on February 5, 2010.  The USCIS, part of the U.S. Department of Homeland Security, approved Fleet for designation as a regional center in the Immigrant Investor Program on October 7, 2010.  Fleet is the General Partner for the five limited partnerships listed in paragraphs 39-44.

35.     Xia acted by and through Fleet and, accordingly, Xia's conduct should be imputed to Fleet.

## RELIEF DEFENDANTS

36.     **Yue**, age 52, a resident of Kings Point, NY, is the wife of Xia.  Yue was also the authorized signatory on dozens of bank accounts and she authorized funds transfers and signed lease and loan agreements on behalf of various entities that Xia owns and controls.  *See* Exhibit C (list of Xia-controlled bank accounts and signatories).  Yue acted primarily at Xia's direction. According to Xia, as of 2019 Yue had been a stay-at-home mother for the last 14 years who helps him "from time to time" with "simple stuff" related to his businesses.

---

[1]     Defendants Xia and Fleet entered into tolling agreements that tolled and suspended the running of any statute of limitations for the period beginning September 10, 2019 through March 9, 2020.

37.     **Verfenstein,** age 44, a resident of Queens, NY, is the purported owner of Racanelli and Perini, the General Contractors for the Eastern Mirage and Eastern Emerald projects.

38.     **Yu,** age 71, a resident of Sands Point, NY, is Verfenstein's mother.  Yu is the purported President of Impact Environmental Soil Management, Inc., an unincorporated entity with no online presence.

## OTHER RELEVANT ENTITIES

### The Limited Partnerships and the Developers (FFG, EEG, and LaGuardia)

39.     **EMMCO, L.P.** ("EMMCO") is a New York limited partnership formed by Xia on April 9, 2010.  Under a Loan Agreement dated July 14, 2010, EMMCO agreed to loan $8 million in EB-5 investor funds, at 0% interest, to **Fleet Financial Group, Inc.** ("FFG"), a New York corporation owned and controlled by Xia, so that FFG could "develop [and] construct Phase I" of the Eastern Mirage Project, referred to as the "Eastern Mirage Center."  Phase I was supposed to include a "conference center, spa/fitness center, restaurant and parking garage." Yue signed the Loan Agreement for EMMCO and Xia signed for FFG.

40.     **EMMCO NQMC, L.P.** ("EMMCO NQMC") is a New York limited partnership formed by Xia on December 22, 2010.  Under a Loan Agreement dated June 26, 2013, EMMCO NQMC agreed to loan $35.5 million in EB-5 investor funds, at 0% interest, to FFG so that FFG could "develop [and] construct Phase II" of the Eastern Mirage Project, referred to as the "North Queens Medical Center."  Phase II was supposed to include a "state of the art medical facility." Yue signed the Loan Agreement for EMMCO NQMC and Xia signed for FFG.

41.     **EMMCO TOWER, L.P.** ("EMMCO TOWER") is a New York limited partnership formed by Xia on June 10, 2011.  Under a Loan Agreement dated December 8, 2014,

EMMCO TOWER agreed to loan $12.5 million in EB-5 investor funds, at 0% interest, to FFG so that FFG could "develop [and] construct Phase III" of the Eastern Mirage Project, which was supposed to be a luxury hotel.  Yue signed the Loan Agreement for EMMCO TOWER and Xia signed for FFG.

42.   **EEGH, L.P.** ("EEGH") is a New York limited partnership formed by Xia on December 6, 2013.  Under a Loan Agreement dated December 18, 2013, EEGH agreed to loan $80 million in EB-5 investor funds, at 2% interest, to **Eastern Emerald Group, LLC** ("EEG"), a Delaware limited liability company formed by Xia on December 6, 2013 for the development of the Eastern Emerald Project.  In June 2018, Xia changed the name of EEG to **The Grand Eastern Mirage Group LLC.**  The loan to EEG was supposed to allow EEG to "develop, construct and operate a commercial mixed-use project that includes a 5-star hotel, convention center, parking garage, restaurant and retail space."  Xia signed the Loan Agreement for EEGH and Yue signed for EEG.

43.   An "Amendment No. 1" to the EEGH-EEG Loan Agreement, dated October 21, 2015, increased the loan from $80 million to $110 million.  Xia signed Amendment No. 1 to the Loan Agreement for both EEGH and EEG.

44.   **EEGH II, L.P**. ("EEGH II) is a New York limited partnership formed by Xia on September 10, 2015.  Under a Loan Agreement dated October 18, 2015, EEGH II agreed to loan "up to $80 million" in EB-5 investor funds, at 1% (although the Offering Memorandum stated that the Loan Agreement would provide for interest at 2%) interest, to **LaGuardia Performance Center, LLC** ("LaGuardia"), a Delaware limited liability company formed by Xia on September 25, 2015, for the development of the expansion of the Eastern Emerald Project.  The loan was supposed to allow LaGuardia to "develop, construct and operate the expansion to a 5-star hotel,

which will result in an additional 556,398 SF being added to the overall building, an additional 294 5-star luxury hotel rooms, an additional 4 floors added to the building; a performing arts center across 5 floors; as well as additional retail space, restaurant space and parking garage space." Xia signed the Loan Agreement for EEGH II and Yue signed for LaGuardia.

45. The EMMCO, EMMCO NQMC and EMMCO TOWER Offering Memoranda stated that the loans mature "five (5) years from the date of the first advance under the loan," which would have been in August 2015 for EMMCO, April 2016 for EMMCO NQMC, and December 2018 for EMMCO TOWER.

46. The EEGH and EEGH II Offering Memoranda stated that the loans for the Eastern Emerald Project mature "at the date of (1) five (5) years from the date of the last advance under the loan, or (2) the date all EB-5 investors have ceased participating in the EB-5 program, whichever is later."

47. The borrowers (FFG, EEG, and LaGuardia), which are the developers that Xia also owns and controls, have not made any loan or interest repayments to the limited partnerships.

**Additional Entities Xia Owns, Co-Owns and/or Controls**

48. **Amazon River, LLC** ("Amazon River"), a Delaware limited liability company formed on June 29, 2015, is owned and controlled by Xia.

49. **Fleet General Insurance Group Inc.** ("Fleet Insurance"), a Vermont corporation created on October 13, 2017, is owned and controlled by Xia.

50. **JiQing Development, Inc.** ("JiQing Development"), a New York corporation formed on July 28, 2005, is co-owned by Xia and Yue and controlled by Xia.

51. **Manekineko Group, LLC** ("Manekineko Group"), a New York limited liability

company formed on February 3, 2010, is owned and controlled by Xia.

52.     **Perini**, a New York corporation formed on December 2, 2015, is controlled by Xia.

53.     **Racanelli,** a New York corporation formed on June 21, 2011, is controlled by Xia.

54.     **Shangri-La 9D, Inc.** ("Shangri-La 9D"), **Shangri-La 9F, Inc.** ("Shangri-La 9F"), and **Shangri-La Green, Inc.** ("Shangri-La Green"), New York corporations formed on March 8, 2010, are owned and controlled by Xia.

55.     **Samuel Development Group, LLC** ("Samuel Development"), a New York limited liability company formed on August 3, 2005, is owned and controlled by Xia.

56.     **X & Y Development Group, LLC** ("X&Y"), a New York limited liability company formed on September 20, 2007, is owned and controlled by Xia.  In 2007, X&Y acquired the land on Union Street in Queens, NY on which the Eastern Mirage Project is being built.

## **FACTUAL ALLEGATIONS**

**I.      The Securities Offerings and the Structure of the Limited Partnerships**

57.     From early 2010 through late 2017, through five separate offerings, the Defendants solicited EB-5 Program investments in two mixed-use real estate projects: the Eastern Mirage Project and the Eastern Emerald Project.

58.     The EMMCO offering, from August 2010 through January 2014, raised $8 million from 16 EB-5 Program investors.  According to its Offering Memorandum, the EMMCO funds were to "be used to finance Phase I of the Eastern Mirage Project," described as the "Eastern Mirage Center," which was to include a spa and fitness center, a multimedia conference

center, a restaurant, and a public parking garage with 256 parking spaces. The Offering Memorandum further stated that the Eastern Mirage Center "will be completed and be generating income and creating jobs by the third or fourth quarter of 2012."

59.    The EMMCO NQMC offering, from January 2011 through April 2012, raised $35.5 million from 75 EB-5 Program investors. According to its Offering Memorandum, the EMMCO NQMC funds were to be used "to finance Phase II of the Eastern Mirage Project," consisting of "the North Queens Medical Center [which] will be completed and be generating income and creating jobs by the third or fourth quarter of 2013."

60.    The EMMCO TOWER offering, from December 2011 through January 2014, raised $12.5 million from 25 EB-Program investors. According to its Offering Memorandum, the EMMCO TOWER funds were to be used "to finance Phase III of the Eastern Mirage Project," consisting of the Eastern Mirage Tower [which] will be completed and be generating income and creating jobs by the third or fourth quarter of 2013."

61.    The EEGH offering, from March 2014 through December 2015, raised $110 million from 220 EB-5 Program investors. According to its Offering Memorandum, the EEGH funds were to be used "to finance the development, construction and operation" of the Eastern Emerald Project, consisting of "a 498-room 5-star luxury hotel, retail stores (97,180 square feet), and IAC certified international conventional [sic] center (105,964 square feet), a restaurant (11,300 square feet), and a parking garage with 400 parking spaces covering 82,490 square feet."

62.    The EEGH II offering, from October 2015 to October 2017, raised $63 million from 126 EB-5 Program investors. The Offering Memorandum for EEGH II described a significant "expansion" of the Eastern Emerald Project from the 643,180 square feet in the "original building" to 1,199,578 square feet. According to the EEGH II Offering Memorandum:

"The completed building will have a total of 792 5-star luxury hotel rooms equal to 730,049 SF across all 29 floors; as well as a 1-story, 105,964 SF convention center; a 5-story, 78,954 SF performing arts center; 136,269 SF of retail space across 6 floors; 57,531 SF of restaurant space across 5 floors; and a 1-story, 90,811 SF parking garage."

63.     Investors in each of the five offerings were solicited with an Offering Memorandum, which included and incorporated the Limited Partnership ("LP") Agreement, a Business Plan, and other marketing materials.  Xia reviewed the Offering Memorandum and the Business Plan for each offering.  He had final authority to approve these documents, and he approved them for distribution to investors.

64.     The investments, which were structured as limited partnership "units," are securities.

65.     The Offering Memoranda all stated that the "investors investing under the EB-5 Program will become Limited Partners of the Partnership by (i) completing and delivering the subscription documents, including the Subscription Agreement and the Investor Questionnaire, in the forms attached hereto as Exhibit IV, which may be accepted by the General Partner in its sole discretion, (ii) executing and delivering a counterpart signature page to the Partnership Agreement, and (iii) making a capital investment in the Partnership in the amount of US$500,000, along with a processing fee in the amount of US$50,000."  The offices of the Partnership and the General Partner were identified in the Offering Memoranda as being located in Flushing, New York.

66.     The Offering Memoranda all stated that the investors' capital contributions are intended to be used for a loan to the respective developer to finance the phase of the project for which the funds were raised.  The Offering Memoranda further provided that the "Borrower

intends to repay the loan at maturity with the proceeds of long term financing or from other sources."

67.     Although the loans from EMMCO, EMMCO NQMC and EMMCO TOWER to Fleet were at zero percent interest, the investors had an expectation of profit.  The Offering Memorandum for the EMMCO offering provided that "net proceeds (if any) realized from the distribution of profit realized from the Partnership's investments (not including interest) will be allocated and distributed 100% to the limited partners until each Limited Partner has received US$500,000 in distributions.  Thereafter, such amounts will be allocated and distributed 99% to the Limited Partners and 1% to the General Partners.  Interest income, after deducting Partnership expenses, will be allocated and distributed 99% to the Limited Partners and 1% to the General Partner."

68.     The Offering Memoranda for the EMMCO NQMC and EMMCO Tower offerings provided that "net proceeds (if any) realized from the distribution of profit realized from the Partnership's investment, sale, exchange or other disposition of the business of the Partnership or any portion thereof, will be allocated and distributed 100% to the Limited Partners up to the amount of each Limited Partner's original capital contribution.  Thereafter, such amounts will be allocated and distributed 99% to the General Partner and 1% to the Limited Partners.  Interest income, after deducting Partnership expenses will be allocated and distributed 99% to the General Partner and 1% to the Limited Partners."

69.     The EMMCO, EMMCO NQMC, and EMMCO Tower LP Agreements stated that "Interest income earned from Investments and Temporary Investments, net of Partnership expenses, shall be allocated 99% to the General Partner and 1% to the Limited Partners pro rata in accordance with each Limited Partner's Pro Rata Share."  The EMMCO and EMMCO NQMC

LP Agreements also state that "Any funds of the Partnership that are not within 30 days to be invested in an Investment, distributed to the Partners or applied towards the satisfaction of Partnership Expenses or Management Fees shall be invested in Temporary Investments."  The EMMCO, EMMCO NQMC, and EMMCO Tower LP Agreements define Temporary Investments as "short-term investments in (i) short-term debt obligations or accounts denominated in U.S. dollars issued or guaranteed by the government of the United States or a state thereof; or (ii) short term investment issued by a bank operating in the United States."

70.     The EMMCO, EMMCO NQMC, and EMMCO Tower LP Agreements further provided that the General Partner was required to make an annual distribution of any net income received in connection with investments of the partnership for the previous fiscal year, net of any tax withholdings and any amounts which, in the judgment of the General Partner, were required to meet ongoing obligations of the Partnership.

71.     The EB-5 funds raised from the EEGH and EEGH II offerings were loaned at 2% interest to EEG and LaGuardia, respectively, for development of the Eastern Emerald Project. The Offering Memoranda for the Eastern Emerald offerings provided that "net proceeds (if any) realized from the distribution of profit realized from the Partnership's investments will be allocated and distributed 90% to the Limited Partners and 10% to the General Partners."

72.     The EMMCO, EMMCO NQMC and EMMCO Tower Partnerships, as well as the EEGH and EEGH II Partnerships, each earned interest on investor funds retained by the Partnerships prior to being loaned to the developers.  The investors had a reasonable expectation of profit based, in part, on the potential distribution to them of interest, and other potential income, that could be earned on their funds in this manner.

73.     The EB-5 Program investors were passive, and any returns they received would

come not from their efforts but from the efforts of Xia, Fleet and other entities Xia controlled.

## II.     Xia Controlled Fleet and the Limited Partnerships

74.    The LP Agreements gave Xia, as the President, CEO and Managing Member of the General Partner Fleet, broad and expansive authority to act on behalf of each Partnership, to represent and bind each Partnership, and "to do any and all things necessary for, incidental to or connected with carrying out the activities of the Partnership."

75.    The LP Agreements also authorized the General Partner to "raise capital for the Partnership by offering for sale and selling Units," and to "do all things in that regard in the name of and on behalf of the Partnership, including preparing and filing such offering or other documents as the General Partner determines to be necessary or desirable, and all things done by the General Partner are hereby ratified and confirmed."

76.    The LP Agreements for each offering, which were attached as exhibits to the Offering Memoranda, stated that the General Partner has the authority to "represent and bind" the Partnerships; to do "any and all things" regarding the partnerships; and to "make all decisions regarding the Partnerships.  The parties to the LP Agreements were the investors, Fleet, and Xia, who was designated as the "Original Partner."

77.    The Offering Memoranda for each offering further stated that the "General Partner exercises ultimate authority for overall management of the Partnership and is responsible for its day to day operations" and "may retain such other suitable parties to provide services to the Partnership, including, without limitation, legal, consulting, marketing, administration, and accounting services."

## III.    The Defendants' Scheme to Defraud

78.    The Defendants engaged in a scheme to solicit funds from investors and to

misappropriate and misuse those funds, and they engaged in manipulative and deceptive acts in furtherance of this scheme, including material misrepresentations and omissions.

79.     The Defendants used the means or instrumentalities of interstate commerce or of the mails in connection with the conduct described herein, including through communications with investors and their agents in China, and with certain of the investors and their agents or representatives located across the United States.

80.     Xia was actively involved in the solicitation of investors, and he travelled to China to promote the offerings.

81.     During a 2014 trip to China, Xia approved a script drafted by a colleague to be used to promote the Eastern Emerald Project to potential investors.  In a July 25, 2014 email to Xia, the colleague noted that the script was "modified slightly from the version you approved in the spring (to reflect the brochure [Xia Entity Employee A] gave me and ou[r] discussion yesterday).  Please let me know of any changes/corrections you wish to see. . . Here come the remarks."

82.     The "remarks" read, in part (emphasis in original):

I am very pleased to be back in China with an attractive real estate development opportunity to share with you.  On my first visit, great project Eastern Mirage/Westin Hotel . . . track record 100% permanent residency approvals, but no confirmed next project. Now, we have next project.

Boutique Regional Center that works exclusively and hand-in-glove with Fleet Financial Group[.]

Because FNYMRC and Fleet Financial Group are team working solely on NYC real estate developments together, we have deep experience in this field.  Based on this experience, we believe that Eastern Emerald's LaGuardia Convention is a rare and special opportunity in New York.  It is:

600,000 sq. foot, mixed use development across the street from LAG that would consist of a 300,000 square foot exhibition center, 200,000 square foot meeting space, 800 hotel rooms – plus restaurants, retail space and a 500 spaces of

underground parking[.]

The project will benefit from the support of community leaders and NY State and the U.S. government in the form of[] $45 million in tax credits[.]

As a potential EB-5 investor you would be an important part of this project, but only a part.  The $75 million investment from 150 investors could comprise less than one-third of the projected $228 million development budget.  (State, Federal govt, a bank and Fleet Financial would all have large stakes, too).

Invest[m]ent mindset – this is a compelling investment opportunity in its own right.

83.    Xia replied to the email as follows: "everything is fine except the total eb-5 is now $80 million and total construction cost $233 million."

84.    As shown in greater detail below, nearly all the representations in the script, as well as many representations in the written materials provided to investors, were false.  Westin Hotel was not involved; Fleet did not have "deep expertise;" the Eastern Emerald Project was not 600,000 square feet; and neither the federal nor state governments, nor any bank, nor even Fleet or FFG had "large stakes."  Moreover, the EB-5 investors were not "only a part" of the project's funding, they were providing substantially all of the funding.

85.    Defendants violated the federal securities laws through multiple means. Defendants made material misrepresentations and omissions to investors about the sources of funding for the projects; the capabilities and experience of Xia and the development team; the projects' affiliation with the Westin Hotel chain; and the size of the Eastern Emerald Project. Defendants also concealed the rental agreements between the developers and the owners of the projects' land, even though these agreements materially impacted the investors' security and ability to recover their investments.  Xia also controlled the flow of funds to benefit himself; and concealed important information from investors.  In 2021, as part of his scheme, Xia used more than $25 million ultimately sourced, directly and indirectly, from investor funds for the purchase

of three properties on Long Island, which are held in the names of Relief Defendants Yue, Verfenstein and Yu.

86.     Additionally, the EMMCO, EMMCO NQMC and EMMCO TOWER Offering Memoranda stated that the loans mature "five (5) years from the date of the first advance under the loan." Accordingly, these loans should have matured in August 2015 (EMMCO), April 2016 (EMMCO NQMC), and December 2018 (EMMCO TOWER). In March 2017, investors in EMMCO NQMC asked Xia about the calculation of the maturity date. Xia told the EMMCO NQMC investors that the loan would mature in 2018 and 2019 and provided the investors with a copy of a loan agreement dated June 9, 2011. The June 9, 2011 loan agreement contained a "Stated Maturity Date" of March 18, 2017 for the loan. As a result, the investors asked Xia for an explanation as to why they had not yet been repaid. On August 9, 2017, Xia provided the EMMCO NQMC investors a copy of a loan agreement that appears to have been backdated to June 26, 2013. This loan agreement was signed by Yue on behalf of the EMMCO NQMC LP and Xia on behalf of FFG and defined the Maturity Date as: "1) five (5) years form the date of the last advance; or 2) the date all EB-5 investors have ceased participating in the EB-5 Program, whichever is later." Notably, the date listed for the notary "Commission Expiration" was July 19, 2020. Pursuant to New York State's Notary Public Licensing Law, a notary public's term is 4 years. As such, the notarization could only have occurred in or after 2016 – and not in 2013.

   **A. Defendants' Misappropriated and Misused Investor Funds**

87.     Under the Offering Memoranda, the investors' $500,000 capital contributions were to be used only for the particular phase of the project for which the funds were raised.

88.     The Offering Memoranda stated that the "Partnership's Loan will be used to finance [the particular phase] of the project." Consistent with the Offering Memoranda, the Loan

Agreements, in a provision named "Mandatory Use of Proceeds," stated that: "Borrower agrees that the proceeds of the Loan shall only be used for the development, construction and operation of the Project."  The phrase "Project" was defined to mean the Eastern Mirage Center in the EMMCO Loan Agreement; the North Queens Medical Center in the EMMCO NQMC Loan Agreement; the Eastern Mirage Tower in the EMMCO TOWER Loan Agreement; and the Eastern Emerald Project in the EEGH and EEGH II Loan Agreements.

89.     This limitation was material because it assured investors that the funds for one project would not be used for another project that would not be a source of funds to repay the investor's capital contribution.

90.     On multiple occasions, Defendants misappropriated or misused investor funds, including, but not limited to, the examples set out below.

91.     *First*, Xia's company EEG acquired the Eastern Emerald land on Northern Boulevard in December 2013 for approximately $17 million.  Xia, however, fraudulently used funds from Eastern Mirage investors to purchase this land.  This misappropriation was accomplished through two series of circuitous bank transfers in June and December 2013.  First, in June 2013, $1.7 million was transferred from EMMCO NQMC bank accounts to a FFG account, then to a Racanelli account, and then to an EEG bank account before being transferred to the escrow agent for the seller of the Eastern Emerald land.  In December 2013, approximately $15.3 million was transferred from EMMCO TOWER and EMMCO NQMC bank accounts to FFG accounts, then to Racanelli accounts, and then to an EEG bank account, before being transferred to the seller of the Eastern Emerald land.  Xia directed all these transfers, either directly or by directing Yue to do so.  *See* Exhibit D (chart tracing Eastern Mirage funds cycling through multiple accounts for Eastern Emerald land purchase).

92.     *Second*, Xia used at least $11.8 million in Eastern Emerald investor funds for the Eastern Mirage Project.  In early 2014, only approximately $4.25 million of the funds from the Eastern Mirage offering remained.  The funds available for construction of the Eastern Mirage Project were nearly depleted, in part as a result of the 2013 misappropriation of approximately $17 million to purchase the Eastern Emerald land described in the previous paragraph.  To solve this problem, from 2014 to 2019, Xia used at least $11.8 million of funds raised from Eastern Emerald investors to pay for costs associated with the Eastern Mirage Project.

93.     *Third*, Xia used at least $7.8 million of Eastern Mirage investor funds to retire the debt owed under the mortgage of the Eastern Mirage land which is held in the name of Xia's entity, X&Y.

94.     *Fourth*, Xia misappropriated investor funds for personal purposes.  In 2012, Xia used approximately $819,809 in EMMCO funds to pay off a mortgage on a building located at 57-35 Lawrence Street, Queens, NY.  As with the other misappropriations, and apparently in an effort to mask the purpose of the transfers, the funds were transferred from an EMMCO account to and through FFG, Racanelli and JiQing Development accounts, before being used to satisfy the mortgage.  The memo on the check states "Loan payoff #18 71-8 57-35 Lawrence." *See* Exhibit E.

95.     *Fifth*, in July 2015, in a similar pattern of transfers—the investor funds cycled through EEGH, EEG, Racanelli and Amazon River accounts—Xia transferred approximately $2.3 million to an escrow agent for a luxury apartment at One Madison Park in Manhattan. Although the funds were returned to Amazon River in early 2016, Xia did not return the funds to EEG, but allocated the returned funds to accounts of other entities he controlled.  Additionally, the investor funds were not available for the Projects and were at risk during the period of time

they were misappropriated.  *See* Exhibit F.

96.     *Sixth,* in January 2021, EEG received a check for $10,968,787.48 from the New

York State Comptroller Refund Account, which appeared to be a tax credit for the Brownfield

Remediation for the Eastern Emerald Project.  These funds were deposited into CTBC Bank and

used by Xia to open a $10.9 million certificate of deposit account in the name of EEG (the "EEG

CD").  In an April 2021 loan agreement signed by Xia, EEG borrowed $10 million from CTBC

Bank and used the EEG CD as collateral.  Between April 30, 2021 and May 25, 2021, $5.6

million of the $10 million loan was transferred into Yue's personal account, and subsequently

used to purchase the Kings Point Road property in August 2021 (held in Yue's name), as

described infra ¶¶ 167-175.  Another at least $3.95 million of the $10 million loan went to the

Vanderbilt Drive property (titled to Yu) purchased in August 2021, as described *infra* ¶¶ 183-

190.  These funds should have been used for the Eastern Emerald Project.  The EEGH Offering

Memorandum stated that $38 million in "Tax Credits" were a funding source.  However, Xia

misappropriated the majority of the $10 million received from the Brownfield Tax Credit.

97.     As these transactions show, Xia believed he was entitled to use investor money to

benefit himself and he treated EB-5 investor funds as his own money.  Xia stated as much in an

email dated June 2, 2020.  At the time, Xia wanted to obtain a residential mortgage from

Financial Firm A that offered residential mortgages only to clients.  Financial Firm A required a

prospective client to make a minimum deposit.  Xia proposed using an account holding "loan

proceeds from my EB-5 entity" to satisfy the minimum, but the firm responded that "if its [sic]

EB5 money unfortunately it doesn't work.  It has to be yours personally/ your family's money."

Xia replied: "What is the definition of Eb-5 money? It is in the bank account of my entity and I

use my property as collateral for it.  If [the firm] lends me money and deposit into my bank

account with my hotel as collateral [w]ill it still be considered as [firm] money or []

investor/Deposit money?  I feel it is a loosely defined term to call it eb-5 money…"

98.     Xia also authorized at least $1.6 million in transfers for purposes unrelated to

either project.  For example, there were over $840,000 in payments for apartments in Manhattan

rented by Yue; at least $76,000 in retail store purchases, including at Amazon, Apple, Best Buy,

Macy's, Nordstrom, and Pioneer Home Electronics; approximately $49,760 for food shopping

and restaurants, including Whole Foods and Fresh Direct; and over $14,000 in hotel charges,

including luxury hotels in Hawaii.

99.     Xia received over $700,000 in payments through a payroll firm from 2011

through 2020, as well as at least $125,000 in other transfers, traceable to investor funds.

100.     Finally, in 2012, Xia also used at least $7.8 million in investor funds to pay down

the mortgage loan he took out in 2007 to purchase the land for the Eastern Mirage land, which is

held in the name of X&Y.

### B.   Misrepresentations About The Sources of Funding For The Projects

101.     The Offering Memoranda stated that the projects would be funded not just

through the EB-5 Program investors' funds but through "a variety of sources."  This disclosure

was material because having multiple third party funding sources ostensibly willing to invest in

the projects made the projects appear more feasible, the investment safer, and the prospects of

the projects' completion more certain.

102.     In the 2014 pitch script that Xia approved, Xia also emphasized as a key point that

investors would only pay "a part of" the project cost because of all the support from

governments, banks and others.

103.     Defendants made material misrepresentations regarding non-investor sources of

funding, which they knew were false when made.  In fact, nearly all of the funding for both

projects came from the EB-5 investors.

104.    The EMMCO, EMMCO Tower and EMMCO NQMC Offering Memoranda all

contain the following paragraph:

> The Eastern Mirage Project is intended to be funded from a variety of sources including a
> bank loan from [Bank A (Bank B for EMMCO NQMC)], N.A., a NYC Capital Resource
> Corp. ("NYCCRC") triple tax-exempt bond financing and EB-5 immigrant investment.
> The Eastern Mirage Project is financed by a $9,000,000 bank loan from [Bank A] at an
> interest rate equal to the sum of (i) 3.25% plus (ii) the 30-day London Interbank Offered
> Rate (LIBOR).  The Eastern Mirage Project is also being financed by a $17,000,000
> triple tax-exempt bond financing authorized under the American Recovery and
> reinvestment Act of 2009.  The program is administered by the NYCCRC and the NYC
> Industrial Development Agency, both of which are staffed by the New York City
> Economic Development Corporation.

105.    The EMMCO Offering Memorandum - which estimated the "current budget for

hard construction costs for the Eastern Mirage Project" at $88 million - also stated:

> The Eastern Mirage Project costs are expected to be financed as follows:
> EB-5 Immigrant Investor Capital           (Up to) $57,500,000
> NYCCRC Recovery Zone Facility Bonds            $17,000,000
> [Bank A] Loan                                  $ 9,000,000
> Other Investment Sources                       $14,000,000
> Total Investment in Project                    $97,500,000

106.    The EMMCO NQMC and EMMCO TOWER Offering Memoranda repeated the

same Eastern Mirage Project funds sources as in paragraph 105, with two changes.  First, the

$9,000,000 loan was to be from Bank B .  Second, the Offering Memoranda included the

statement that in addition to the $17,000,000 in NYCCRC Bonds, "[u]p to an additional

$12,000,000 in NYCCRC Recovery Zone Facility bond financing is available if needed."

107.    As Defendants knew, the representations in the three EMMCO Offering

Memoranda about non-EB-5 financing were false or misleading.

108.    Defendants knew that the representations about receiving the NYCCRC bonds

were false.  An allocation of NYCCRC bonds for the Eastern Mirage Project was approved in

2009, but Xia turned down the allocation.  A letter to the NYCCRC from Xia's counsel dated

December 6, 2010 stated that Xia "shall not be seeking to use the allocation of $17,000,000 of

Recovery Zone Facility Revenue Bonds that has been made available to it."

109.     As a result, on December 7, 2010, Xia received a letter from NYCCRC

terminating Eastern Mirage's Recovery Zone Facility bond allocation which also stated that the

bond program would expire on December 31, 2010.  Despite knowing that the NYRCCRC bonds

would not be issued, the Defendants' marketing materials and Offering Memoranda, including

the EMMCO NQMC and EMMCO Tower Offering Memoranda which were dated January 31,

2011, continued to tout the government bonds as a funding source to Eastern Mirage investors.

A reasonable investor would find the representation that the project was backed by government

bonds to be material.

110.     In addition, there was no loan from Bank A when the Defendants stated in the

Offering Memoranda that: "The Eastern Mirage Project is financed by a $9,000,000 bank loan

from Bank A at an interest rate equal to the sum of (i) 3.25% plus (ii) the 30-day London

Interbank Offered Rate (LIBOR)."  In fact, neither Bank A nor Bank B provided a loan to the

Eastern Mirage Project.

111.     The EEGH Offering Memorandum estimated the total projected costs of the

Eastern Emerald Project to be $190 million, and represented the following:

The Eastern Emerald Project costs are expected to be financed as follows:

| | |
|---|---|
| Loan Proceeds from EB-5 Funds | $80,000,000 |
| Tax Credits | $38,000,000 |
| Loan from [Broker Dealer A] | $72,000,000 |
| Total Investment in Project | $190,000,000 |

112.     The EEGH Supplemental Offering Memorandum contained the following

disclosure:

> The total project costs for the Eastern Emerald Project of One Hundred and
> Ninety Million Dollars ($190,000,000) shall be financed as follows:
>
> | | |
> |---|---|
> | Loan from New Commercial Enterprise, EEGH, L.P.: | $110,000,000 |
> | Brownfield Tax Credit: | $21,200,000 |
> | New Market Tax Credit | $18,000,000 |
> | Equity from Developer: | $40,800,000 |
> | TOTAL PROJECT COSTS: | $190,000,000 |

113.    The EEGH II Offering Memorandum set the budget for the expanded "Eastern

Emerald Project II" at $181,413,011, and further stated:

> The Eastern Emerald Project II costs are expected to be financed as follows:
>
> | | |
> |---|---|
> | Loan Proceeds from EB-5 Funds | $80,000,000 |
> | NYS Tax Credits | $17,000,000 |
> | Capital Contribution from Developer | $44,413,011 |
> | Loan from [Broker Dealer A] | $40,000,000 |
> | Total Investment in Project | $181,413,011 |

114.    None of these sources contributed funds to the Eastern Emerald Project, nor, with

the possible exception of the Brownfield Tax Credit, was it reasonable for Xia to expect that any

of these sources would contribute funds to the Eastern Emerald Project, which Defendants knew

or should have known at the time the Offering Memoranda were provided to investors.

115.    The EEGH Supplemental Offering Memorandum stated definitively that the New

Market Tax Credit "shall" fund $18 million for the Eastern Emerald Project.  Xia, however,

never received the New Market Tax Credit, and Xia has no documents to prove that he took any

significant steps to actually obtain it.  In 2013, Xia had Financial Firm B prepare a "letter of

interest" regarding the New Market Tax Credit.  At the time, Xia was in China and wanted the

"letter of interest" to show to potential investors.  In 2014, when USCIS asked for proof that Xia

had obtained the New Market Tax Credit, Xia had Financial Firm B tweak the 2013 "letter of

interest" and then Xia had his lawyer provide it to USCIS.  Xia, however, never obtained the

New Market Tax Credit after obtaining the letter of interest.

116.    The EEGH Offering Memorandum also represented that Broker Dealer A was "expected" to provide a $72 million loan, and the EEGH II Offering Memorandum represented that Broker Dealer A was expected to make a $40 million loan.  However, there was never any loan from Broker Dealer A, nor was it reasonable for Xia to expect that any such loan would be made.

117.    In a September 13, 2017 "Request for Evidence," USCIS wrote to Xia's EB-5 counsel that "[t]he Business Plan does not present evidence that the $40 million loan from [Broker Dealer A]  . . . has been secured or is readily available. . . . The credibility of the project's future would be enhanced with evidence on non-EB-5 funding sources.  Therefore, please submit the following: Projected non-EB-5 funds and their source if applicable (e.g., developers, municipal bonds, loans, etc.); Secure commitment from non-EB-5 investors if applicable (contracts, bonds, loans, letter of confirmation from the lender, other sources, etc.)."

118.    The response from Xia's lawyer said nothing about a $40 million loan from Broker Dealer A.  Instead, the lawyer reported that "LaGuardia Performance Center, LLC has already obtained a construction loan commitment letter dated August 18, 2017 issued by [Broker Dealer B]."  The loan commitment purportedly from Broker Dealer B was $85 million, and the letter pointed out that if the loan is granted then the project "will be well covered."

119.    Xia's attorney attached the $85 million loan commitment letter from Broker Dealer B to her letter.  The letter was from Registered Representative A, an employee of Broker Dealer B, who was identified in the letter as Head of Public Finance, to Xia.  The letter from Registered Representative A was not authentic.  Although Registered Representative A worked at Broker Dealer B in August 2017, his title was not "Head of Public Finance."  In addition, the

letterhead used for the purported Broker Dealer B's letter was not authentic.  Moreover, Broker Dealer B was a small, family-owned broker-dealer that was not in the business of making construction loans and it never considered making any loan to Xia or his company.

120.    The representations in the EEGH Supplemental Offering Memorandum and in the EEGH II Offering Memorandum that the "[d]eveloper" - meaning entities controlled by Xia - was expected to contribute a "capital contribution" or "equity" of $40.8 million and $44.4 million, respectively, were also false.  Neither Xia nor his entities ever contributed such funds to the projects, and Defendants knew or were reckless in not knowing, at the time these representations were made, that Xia did not have and could not reasonably expect to have the financial ability to make anything more than a nominal contribution of his own funds. According to bank records, the only non-investor funds that Xia and his entities contributed to the projects totaled approximately $3.5 million.

**C.  Misrepresentations Regarding Xia and the Development Team**

121.    For an investor in a real estate project, the experience and track record of the developer is material, as is the fact that a developer would be steering substantial portions of the investors' monies to entities that he owned and/or controlled.

122.    The Offering Memoranda for the five offerings contain detailed descriptions of "[t]he Project management and development team."  Xia was described as being "active for ten years in land acquisition, commercial and residential development, marketing research, value-added strategies, financing, property management and leasing, and other related activities."

123.    The Offering Memoranda for each of the five offerings stated that Racanelli has been "recognized as one of the region's leading providers of preconstruction planning, project management, design/build, and general contracting services."

124.    The Offering Memoranda further stated that "[s]ince its founding, Racanelli has been responsible for building and renovation across a broad range and variety of market segments, completing projects that include corporate headquarters, industrial complexes, hospitals, assisted living facilities, university and college facilities, retail stores, hotels, restaurants, houses of worship, self-storage complexes, condominiums and townhouses."

125.    An Eastern Mirage marketing brochure given to investors stated that the (Xia-owned) development team has "decades of experience from over one hundred successful major projects."  An Eastern Emerald brochure also stated that FFG, the developer of the Eastern Mirage project, has "nearly 20 years of experience in real estate development in the eastern United States" and that it was the winner of several New York real estate awards for green and intelligent building development practices.

126.    Racanelli was also touted in an Eastern Mirage marketing brochure as having been founded "60 years" ago.  Likewise, the Offering Memorandum for the EMMCO TOWER offering and the EMMCO Business Plan provided to investors to submit to USCIS stated that Racanelli was founded "over six decades ago."

127.    The Business Plans for EMMCO NQMC, EMMCO TOWER, EEGH, and EEGH II described Racanelli as having been founded "decades ago."

128.    These representations were false.  In fact, Racanelli was incorporated in 2011, and it appears that Xia took the Racanelli name from a well-known construction firm and copied - almost word for word - the description in the Offering Memoranda directly from the website of an established company, the Original Racanelli.

129.    In April 2015, the Original Racanelli—which unlike Xia's Racanelli did have six decades of construction experience—sued Xia and Racanelli, alleging that Xia "improperly

assumed, utilized, displayed, and disseminated" the Original Racanelli's protected trade name. In December 2015, the parties settled the trademark litigation and Xia agreed to "fully and completely refrain from any and all use of the name Racanelli in any capacity whatsoever," although through a carve-out Xia was permitted to use the name in connection with the Projects.

130.    In December 2015, Perini was incorporated to replace Racanelli as the general contractor.  (The name bears a similarity to Tutor Perini Corp. – another well-known construction company unaffiliated with Xia).  However, Perini consisted of the same individuals who worked under the Racanelli name, and investors were never told that the general contractor had changed.  From January 2016 through October 2017, the Defendants continued to provide EEGH II investors with Offering Memoranda that cited Racanelli.

131.    The Defendants also failed to disclose to investors that he controlled Racanelli and Perini, the purported general contractors for the projects.  The Offering Memoranda did not disclose an affiliation between Racanelli and Xia.  On the contrary, Racanelli is falsely described as an independent company.

132.    Although Verfeinstein was nominally in charge of Racanelli and Perini, in fact, Xia controlled both Racanelli and Perini and was himself the *de facto* general contractor.  For example, in a February 18, 2014 email regarding a construction contract between a third party and Racanelli, Verfenstein asked Xia if she should "ask Julia [Xia's wife] to sign for [Xia]."

133.    Although Defendants concealed Xia's control of Racanelli and Perini from investors, in numerous court filings as well as a bank signature card, Xia represented himself as the President of Racanelli and the Manager of Perini.  *See* Exhibit G (excerpts from court filings and bank signature cards).

134.    Xia also failed to disclose that Xia-affiliated entities, including Amazon River,

JiQing Development, Manekineko Group, Shangri-La 9D, Shangri-La 9F, Shangri-La Green, Samuel Development, and X&Y could and did perform and/or purport to perform sub-contracting work on the Eastern Mirage and Eastern Emerald Projects.  He also failed to disclose the potential and actual conflicts of interest arising from his role as General Partner of the EMMCO, EMMCO NQMC, EMMCO TOWER, EEGH, and EEGH II Partnerships, the owner of the developers FFG, EEG, and LaGuardia, and his ownership and control of the Xia Entities that were performing or purporting to perform work for the Eastern Mirage and Eastern Emerald Projects.

135.    These potential and actual conflicts of interest included, but were not limited to, lack of arm's-length negotiated contracts for the performance of work on the Projects and lack of independent oversight of the work performed on the Projects under such contracts and the amounts billed for such work.

136.    The Offering Memoranda also contained material misrepresentations and omissions of material fact regarding Xia's construction experience and expertise.  Each Offering Memorandum for both projects stated that "Mr. Xia is a New York City real estate developer and President of the General Partner.  Mr. Xia has been active for ten years in land acquisition, commercial and residential development, marketing research, value-added strategies, financing, property management and leasing, and other related activities.  His company, Fleet Financial Group, Inc. specializes in 'green' projects[.]"

137.    The only specific project of Xia's that is mentioned in the Offering Memoranda, however, was "Shangri-La Towers," described as a "mixed-use condominium" development. The Shangri-La building was actually Xia's first construction project.  With only this limited background in construction prior to embarking on the Eastern Mirage Project, Xia was ill-

equipped to handle two projects of the scope and magnitude of the Eastern Mirage and Eastern Emerald Projects, as he well knew.

138.    The insufficient capacity of Xia and his team to complete the large-scale construction projects is apparent from payroll records.  Although Xia created nearly a dozen entities, the Xia Entities, that received investor funds, all of his companies shared the same personnel and were all paid through the same payroll firm.  Notably, before 2017, only five people, including Xia and Yue, received payments through the payroll firm.

139.    Current photographs of the Eastern Mirage Project show the building to be empty and still under construction.  And although a Brownfield remediation (addressing contamination from the former occupant of the land) was completed in 2015 at the Eastern Emerald Project site, that site is currently still only a largely vacant dirt hole surrounded by a concrete wall.

140.    The Eastern Emerald Project was issued at least 41 violations by the New York City Department of Buildings ("NYCDOB"), 31 of which were for hazardous conditions. Numerous stop-work orders have been issued by the NYCDOB, and there is currently a stop-work order in place.

141.    On January 4, 2019, workers at the Eastern Emerald site—in violation of a stop-work order—were engaged in excavation and caused a support wall along Northern Boulevard to collapse.  According to a NYCDOB report, the activity constituted "illegal work" and "led to the collapse of the sidewalk, half the width of Northern Boulevard, and the loss of gas, water, electrical, and telecommunication services."  The Report stated that Xia was interviewed and "was evasive and unclear as to who was supervising and directing field operations prior to the collapse," and that Xia, among others, "failed to act in a reasonable and responsible manner."

142.    Xia and his entities face significant financial exposure from pending litigation

involving ConEdison, which filed a damages lawsuit against EEG, FFG, Perini, Racanelli and the City of New York.  The City of New York subsequently filed a Cross-Claim against EEG, FFG, Perini, Racanelli and Shangri-La Green.

### D.  Defendants Misrepresented the Affiliation With Westin

143.    The Eastern Mirage marketing materials represented that the hotel portion of the project would be a Westin-branded hotel.  Specifically, the marketing materials were prominently titled: "FNYMRC The New York Westin Project" and claimed that the hotel would be a Westin Element hotel.

144.    The marketing script approved by Xia in 2014 described the Eastern Mirage Project as the "Eastern Mirage/Westin Hotel."

145.    The EMMCO Tower Offering Memorandum also stated that the Eastern Mirage Tower "will encompass the development of the Westin Element Hotel & Condo Apartment building."

146.    Similarly, the marketing materials for the Eastern Emerald Project claimed that Eastern Emerald would contain a Westin Hotel.

147.    These representations about sponsorship or affiliation with Westin were false. Although Xia received a noncommittal "letter of interest" in 2014, no deal with Westin was ever reached and the letter provided no basis for the Defendants to claim that they had a deal. Defendants knew, or were reckless in not knowing, at the time they chose to prominently brand their projects as Westin hotel projects, that they had no reasonable basis to make such representations.

148.    A reasonable investor would regard the affiliation with a major hotel chain as material.  Indeed, Xia received WeChat messages from investors and their agents in 2018 in

which they referred to the Eastern Mirage Project as the "Westin project," yet Defendants never disclosed that there was no Westin deal.

### E.  Defendants Misrepresented the Size of the Eastern Emerald Project

149.    The EEGH II Offering Memorandum stated that the "original building" described in the EEGH Offering Memorandum was 643,180 square feet, and, as a result of the "expansion" described in the EEGH II Offering Memorandum, the square footage would increase to 1,199,578 square feet.  Both representations were false when made, as Defendants well knew. The size of the square footage and the expansion of the original project gave the impression that the project was on track to being successful.  A reasonable investor would find this material.

150.    The Defendants knew that both square footage numbers were false.  The 2014 "Plan/Work Application" that Xia signed and which was filed with the New York City Department of Buildings only sought permission for a structure of 350,186 feet.  The Defendants' square footage estimate in the EEGH II Offering Memorandum was three times what they had been authorized to build.  Xia never sought or received permission to build structures anywhere near the size of the buildings described in the Offering Memorandum.

### F.  Defendants Failed to Disclose the Highly Material Rental Agreements

151.    The Offering Memoranda stated that there were "no material conflicts of interest between the General Partner and its affiliates on the one hand and the Partnership on the other hand."  The Offering Memoranda further stated that the "General Partner is accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in handling the Partnership's affairs."  As the President, CEO, and Managing Member of the General Partner, Xia had an obligation to exercise good faith and integrity in handling the Partnership's affairs.

152.    The Loan Agreements entered into by each of the limited partnerships required the borrowers—the developers FFG, EEG and LaGuardia—to repay the investor funded loans. But, the ability of FFG and LaGuardia to repay the loans was seriously impaired by undisclosed side agreements created by Xia.  These side agreements, which are material omissions, are another example of the self-dealing that is a hallmark of Xia's financial arrangements.

153.    On January 1, 2008 (two years before the Eastern Mirage Project's EMMCO offering), X&Y leased the Union Street property to FFG, Eastern Mirage's developer, under a 99-year land lease requiring annual rent in the amount of $2.5 million for the first three years, and $3.5 million for the next three years, with subsequent increases.  FFG, which has never made a payment and has been in default, currently owes unpaid rent to X&Y of at least $42.2 million under the terms of this lease agreement.  Yue signed the lease agreement on behalf of X&Y and Xia signed on behalf of FFG.

154.    On September 28, 2015, LaGuardia entered into a lease agreement with EEG that requires LaGuardia to pay EEG an annual rent of $3.5 million, which increased to $4.5 million. LaGuardia, which has never made a payment, currently owes unpaid rent of at least $16.5 million to EEG under the terms of this lease agreement.  Xia signed the lease agreement on behalf of both EEG and LaGuardia.

155.    These agreements, which were never disclosed to investors, are highly material. In the event the Eastern Mirage and Eastern Emerald properties are sold, X&Y and EEG would have the right to enforce FFG's and LaGuardia's payment obligations, which significantly diminishes the amount the developer entities will have available to repay the investors.  In addition, given that both FFG and LaGuardia have been in default, X&Y and EEG have the right under their loan agreements at any time to foreclose and essentially bankrupt FFG and

LaGuardia.  This is a significant risk to investors; the EMMCO, EMMCO NQMC, and EMMCO

TOWER investors have no recourse against X&Y and the EEGH II investors have no recourse

against EEG under the loan agreements.  Furthermore, these enormous, accrued debts will

seriously impair FFG's and LaGuardia's ability to obtain the type of long–term financing that

they represented would be obtained to repay the investors their capital contributions.

156.    Xia was on all sides of these secret agreements, which protected his interests to

the detriment of the investors.

### G.  Xia Directed Funds Through Over 150 Accounts to Conceal his Fraud and to Benefit Himself

157.    Contrary to the Defendants' duty to act "as a fiduciary," Xia managed the $229

million that flowed into bank accounts he controlled in a way to protect and benefit himself at

the expense of the investors.  Xia created over 150 accounts in the names of the various Xia

Entities he owned or controlled and used these bank accounts to engage in numerous, multi-step

transactions to commingle investor funds and to hide the actual source and recipients of

payments.  Through hundreds of transactions that appear to have little or no legitimate business

purpose, the investor funds were transferred into and out of over 150 accounts in what amounted

to a shell game.

158.    There were continuous and significant fund transfers of investor funds in every

conceivable direction for more than seven years, not only from the developers to the purported

general contractors (Racanelli and Perini) and then to other entities owned and controlled by Xia,

but also between and among the other entities owned and controlled by Xia, and then cycled

back to the developers and Racanelli and Perini.  To summarize, from 2012 through January

2019, over $127 million in investors' funds was transferred from the developers to the purported

general contractors, and at least $85.9 million was then transferred to other entities that Xia

owned and controlled.   Of the $85.9 million, approximately $32.7 million was cycled back upstream to bank accounts of the developers and approximately $1.14 million was then cycled back to bank accounts of the general contractor.

159.    In addition, of the $85.9 million transferred to Xia Entities, approximately $22 million were not supported by any invoices.  An invoice from a Xia entity to the payors (Racanelli/Perini) would be expected to show what services were provided, the persons providing such services, and the payment for each service.  The absence of any invoices for $22 million in transfers suggests the transfers were unfounded or had no legitimate business purpose.

160.    The invoices that were provided by Amazon River, FFG, JiQing Development, Manekineko Group, Samuel Development, Shangri-La Green, Shangri-La 9D, Shangri-La 9F, and X&Y to ostensibly support payments of investor funds to those entities do not appear legitimate.  Notably, these Xia Entity invoices contained lengthy lists of tasks performed and a single amount at the bottom, with no breakdown of how much was billed for each task and who performed these tasks.  The Xia Entity invoices were ostensibly submitted by seven of his entities and were in large round-dollar amounts that did not vary from month to month.  These Xia Entity invoices were strikingly different in form and substance from the many legitimate third-party invoices submitted by outside vendors to Racanelli and Perini.

161.    The multiple transfers between and among the accounts do not appear to have had legitimate business purposes.

**H.  Defendants Concealed Material Information From the Limited Partners**

162.    To hide their scheme from the investors, Defendants failed to disclose to them critical information that might have revealed Defendants' illegal conduct, even though Defendants had an affirmative obligation as fiduciaries to do so.

163.    Defendants failed to disclose to investors in the later Eastern Emerald offerings

that they had made numerous misrepresentations and omissions to investors in earlier Eastern Mirage offerings. During 2015, 2016 and 2017, the EEGH and EEGH II offerings raised $148 million from investors—nearly three times the amount raised in the earlier Eastern Mirage offerings. Defendants did not disclose to these later investors that Xia had misappropriated Eastern Mirage investor funds and that the Defendants had also made other false and misleading statements. Given that the Defendants touted the supposed success of the Eastern Mirage offerings to promote the Eastern Emerald offerings, the fact that the earlier offerings were marred by their numerous false and misleading statements and misappropriations would have been highly material to investors in 2015, 2016 and 2017. The Defendants nevertheless concealed this material information from the Eastern Emerald investors.

164.    In addition, the Offering Memoranda stated that "the Partnership will send to each Limited Partner, generally within 90 days after the end of each fiscal year of the Partnership, an accounting report including a balance sheet and statements of income, changes in Partner's equity and cash flows, prepared in accordance with Generally Accepted Accounting Principles, plus a schedule and summary description of the investments owned by the Partnership at year-end and a statement for each LP of its capital account." Defendants did not provide investors with the reports required by the Offering Memoranda as described above.

## I.   Transfers to Yue, Verfenstein, and Yu Without Consideration

165.    In 2021, Xia used the $5.6 million transferred to Yue's account from investor sourced funds and an additional approximately $20.477 million sourced directly and indirectly by investor funds to purchase luxurious mansions on Kings Point Road in Kings Point, NY (the "Kings Point Road mansion"); Middle Neck Road in Sands Point, NY (the "Middle Neck Road mansion"); and Vanderbilt Drive in Sands Point, NY (the "Vanderbilt Drive mansion").

166.     Xia funded the purchase of these three properties through direct transfers from accounts holding investor funds, or by borrowing funds and using investor assets as collateral. Xia orchestrated the multi-step loans and transfers that led to the acquisition of the three mansions as described below.  None of these transfers or acquisitions were disclosed to investors.

a.     **Yue and the Kings Point Road Mansion and Other Ill-Gotten Gains**

167.     Yue received a total of $14.72 million in ill-gotten gains for which she has no legitimate claim.  From 2012 through January 2019, Yue received a total of $4.1 million in cash from Xia Entities sourced from investor funds.  In addition, the Kings Point Road mansion, which Xia purchased and put in Yue's name in August 2021, was funded with $10.62 million in investor-sourced funds, including $5.6 million from a line of credit collateralized with an investor-sourced tax credit, that Xia caused to be funneled through a Yue bank account.

168.     The Kings Point Road mansion is 13,000 square feet, with thirteen bathrooms and a basketball court.

169.     On August 13, 2021, Yue became the sole owner of the Kings Point Road mansion, and there is no mortgage or lien on the property.  The purchase price was approximately $14 million, and $10.62 million of this amount can be traced directly and indirectly to investor funds.

170.     At least $10.62 million of the funds used to purchase the property appears to have come from loans Xia obtained in the name of EEG and Fleet Insurance through CTBC Bank.  Fleet Insurance was created by Xia to purportedly provide insurance to the Eastern Mirage and Eastern Emerald projects.  Fleet Insurance bank accounts are funded entirely with Eastern Mirage and Eastern Emerald investor money.

171.     Specifically, on January 26, 2021, a check in the amount of $10,968,787.48 from the State of New York Comptroller Refund Account for the Brownfield Remediation on the Eastern Emerald project (the "Brownfield Tax Credit") was deposited into an EEG account at CTBC Bank.  Prior to the deposit, the account balance was $0.  On April 8, 2021, $10,980,892.92 from this EEG account was used to open the EEG CD.  On April 9, 2021, Xia obtained a $10 million loan from CTBC in the name of EEG (the "EEG Loan"), using the EEG CD as collateral.

172.     The Offering Memoranda given to investors for the EEGH and EEGH II offerings stated that the Brownfield Tax Credit would be used for the Eastern Emerald project.  Instead, in April and May 2021, $5.64 million was drawn from the EEG Loan and transferred into two CTBC EEG accounts.  Of the $5.64 million, $5.6 million was transferred into Yue's personal CTBC account, and then used towards the purchase of the Kings Point Road mansion.  The Yue CTBC account did not have any funds in it other than the deposits from the EEG Loan.

173.     Additionally, on June 8, 2021, Xia and Yue routed $4.59 million of investor funds to CTBC Bank to open an account in the name of Fleet Insurance.  On August 9, 2021, Xia and Yue transferred $4.5 million from the Fleet Insurance account to open a Fleet Insurance certificate of deposit account at CTBC, which Xia used as collateral to obtain a $4.5 million loan from CTBC in the name of Fleet Insurance.  On August 12, 2021, the $4.5 million loan proceeds were transferred to the CTBC EEG account that contained $40,000 from the EEG Loan.  Additionally, between August 12, 2021 and August 13, 2021, $480,000 was transferred into the CTBC EEG account from the EEG CD.  Between August 12, 2021 and August 13, 2021, $5.02 million was wired out from the CTBC EEG account for the purchase of the Kings Point Road mansion.

174.    On August 12, 2021, Xia also obtained the remainder of the funds for the Kings Point Road mansion  purchase from CTBC by obtaining mortgages on the Shangri-La Green Inc., Shangri-La 9F Inc., and Manekineko Group LLC properties

175.    Yue did not provide any consideration in exchange for her receipt of the mansion.

**b.    Verfenstein and the Middle Neck Road Mansion**

176.    On August 30, 2021, Verfenstein became the sole owner of the Middle Neck Road mansion.  The Middle Neck Road mansion sits on 5.3 acres, covers 11,955 square feet, and has thirteen bedrooms.  The property includes a private beach, a tennis court, and a four bedroom "cottage."

177.    Xia obtained the $11.247 million used to purchase the property primarily by taking out a third party loan for $15 million and providing the lender a first priority mortgage on the Eastern Mirage Project property as collateral.  On November 12, 2021 – four days after Xia received discovery requests from the SEC requesting documents and information on any consideration provided by Verfenstein for the Middle Neck Road mansion – Verfenstein formed Yume Sansui LLC and, on December 9, 2021, she transferred title to the Middle Neck Road mansion to Yume Sansui, LLC, an entity for which she is the managing member.  On the same day, Verfenstein, though Yume Sansui, LLC, obtained a $2 million mortgage loan from a lender using the Middle Neck Road mansion as collateral.

178.    Between January 2021 and April 2021, approximately $997,000 of investor funds was transferred from Perini bank accounts to a Chase Bank account in the name of Impact Environmental Soil Management Inc. ("Impact Environmental").  Verfenstein's mother, Yu is listed on the account signature card as the president and sole signatory on the Impact Environmental account, which was opened in January 2021.  In early April 2021, $130,000 was

transferred into the Impact Environmental from a bank account in the name of Verfenstein's father.

179.    On April 9, 2021, $1.11 million was wired out of the Impact Environmental account to a law firm as a down payment for the purchase of the Middle Neck Road mansion. Verfenstein signed the contract of sale for Middle Neck Road mansion in April 2021.

180.    On August 30, 2021, Xia, through X&Y, obtained a $15 million loan from a Bridge Lender.  The loan agreement signed by Xia gives the Bridge Lender a mortgage on the Eastern Mirage property.  The loan agreement also states that the "EB-5 Entities" — defined to include Fleet, EMMCO NQMC, L.P., EMMCO, L.P., EMMCO Tower, L.P. and FFG — do not have "any ownership and/or other interest" in the Eastern Mirage property and that the EB-5 Entities release the Bridge Lender, among others, from any causes of action relating to the $15 million loan.  In addition to signing on behalf of X&Y, Xia also signed the loan agreement on behalf of the EB-5 Entities.

181.    On August 30, 2021, $10.25 million of the loan from the Bridge Lender was used to complete the purchase of the Middle Neck Road mansion.

182.    The funds from the Bridge Lender that were used to purchase the Middle Neck Road mansion were wired directly to the title agent, and never passed through an account of Verfenstein.  Nothing in the documents concerning this transaction shows that Verfenstein provided any consideration for the Middle Neck Road mansion.  And although Verfenstein received compensation for her work as the titular owner of Racanelli and Perini, there is no credible evidence that any of the services she and her companies provided constituted consideration for the Middle Neck Road mansion.

### c.    Yu and the Vanderbilt Drive Mansion

183.    On May 25, 2021, Yu, Verfenstein's mother, became the sole owner of the Vanderbilt Drive mansion.  The purchase price was approximately $4.3 million, and there is no mortgage or lien on the property.  At least $4.21 million was funded by the EEG Loan (see *supra* ⁋ 171) from CTBC Bank and investor funds.

184.    The Vanderbilt Drive mansion sits on 2.21 acres and has 5 bedrooms and 9 bathrooms.  The beachfront property also has an indoor swimming pool and a tennis court.

185.    On April 13, 2021, a check in the amount of $86,365.95 from a Perini account funded by Eastern Emerald EB-5 investor funds was deposited into the Impact Environmental bank account.  On April 14, 2021, $760,000 was drawn down from the EEG Loan into an EEG account and wired into a Perini Signature Bank account with a notation of "property purchase." On April 15, 2021, $400,000 of the $760,000 was wired into the Impact Environmental account from the Perini Signature Bank account.

186.    On April 19, 2021, two wires totaling $433,377.77 were sent from the Impact Environmental account to a TD Bank account in the name of Yu.  On April 21, 2021, $433,777.77 was wired from the TD Bank account to a law office as the down-payment for the Vanderbilt Drive mansion.

187.    Between April 20, 2021 and April 29, 2021, two checks totaling $178,059.98 from a Perini account funded by Eastern Emerald EB-5 investor funds were deposited into the Impact Environmental account.  Additionally, on April 20, 2021, $2.5 million was drawn down from the EEG Loan.  Of that amount, $2.47 million was wired on April 21, 2021 into the Perini Signature Bank account with a notation of "property purchase."  Of that amount, $2.2 million was wired on May 4, 2021 into the Impact Environmental account and $250,000 was wired on

May 21, 2021 to the attorney representing Yu in the purchase of the property.

188.    On May 7, 2021, $2.431 million was withdrawn from the Impact Environmental account and deposited into a Chase account in the name of Yu.  On the same day, $2.43 million was wired from the Yu Chase account into a CTBC account in the name of Yu.  The Yu CTBC account was opened on May 7, 2021 and had no other deposits.  On May 21, 2021, the same day that Yu closed on the Vanderbilt Drive mansion, $2.43 million was wired from the Yu CTBC account to the attorney representing Yu in the purchase of the property.

189.    Additionally, on May 17, 2021 and May 21, 2021, a total of $1.1 million was drawn down from the EEG Loan into an EEG CTBC account.  On May 21, 2021, $1.1 million was wired from the EEG CTBC account to a Perini account.  On May 24, 2021, $1.1 million was wired from the Perini account to the Impact Environmental account and then wired to the attorney representing Yu in the purchase of the property.

190.    Yu has never done any work for Xia or Perini, and neither Yu, nor Impact Environmental, nor Verfenstein provided any consideration for the receipt of the Vanderbilt Drive mansion.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**
**(Both Defendants)**

191.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 190.

192.    Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained

money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

193.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Both Defendants)

194.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 190.

195.    Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

196.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
**Unjust Enrichment**
**(Relief Defendants Yue, Verfenstein and Yu)**

197.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 190.

198.    Relief Defendants Yue, Verfenstein and Yu obtained money and/or property as a result of the violations of the securities laws by Defendants Xia and Fleet, to which the Relief Defendants have no legitimate claim.

199.    Yue, Verfenstein and Yu should be required to disgorge all ill-gotten gains which inured to their benefit, including under the equitable doctrines of disgorgement, unjust enrichment and constructive trust.

### PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter:

### I.

A Final Judgment permanently restraining and enjoining Defendants and each of their respective agents, servants, employees, attorneys and other persons in active concert or participation with each of them who receive actual notice of the injunction by personal service or otherwise, from any ongoing and future violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)],  and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

An Order: 1) continuing the appointment of the Monitor for the duration of this case; and 2) continuing for the duration of ths case the asset freeze imposed by the Court on September 27, 2021, as expanded to include so much of the Kings Point Road, Middle Neck Road, and

Vanderbilt Drive mansions as was purchased in the names of Relief Defendants Yue, Verfenstein and Yu using monies sourced directly or indirectly from investor funds.

**III.**

A Final Judgment ordering Defendants to disgorge all ill-gotten gains and/or unjust enrichment received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

**IV.**

A Final Judgment ordering Relief Defendants to disgorge all ill-gotten gains which inured to their benefit, including under the equitable doctrines of disgorgement, unjust enrichment and constructive trust, with pre-judgment interest thereon;

**V.**

A Final Judgment ordering Defendants to pay civil money penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

**VI.**

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated:  New York, New York
        April 6, 2022

                                   /s/ *David Stoelting*
                                   LARA SHALOV MEHRABAN
                                   ACTING REGIONAL DIRECTOR
                                   Sheldon L. Pollock
                                   Judith Weinstock
                                   Kevin P. McGrath
                                   David Stoelting
                                   Brenda Chang
                                   Kim Han
                                   Attorneys for Plaintiff
                                   SECURITIES AND EXCHANGE COMMISSION
                                   New York Regional Office
                                   100 Pearl Street, Suite 20-100
                                   New York, New York 10004-2616
                                   (212) 336-0174 (Stoelting)
                                   stoeltingd@sec.gov

**Exhibits to Amended Complaint**

*SEC v. Xia, et al.,* 21-cv-05350-PKC-RER (E.D.N.Y.)

Exhibit A: Eastern Mirage project photos    .    .    .    .    .    .    1

Exhibit B: Eastern Emerald Project photos    .    .    .    .    .    2

Exhibit C: Bank Accounts and Authorized Signatories    .    .    .    .    3

Exhibit D: Eastern Mirage Funds Used to Purchase Eastern Emerald Land .    .    7

Exhibit E: Eastern Mirage Funds Used to Pay Off Lawrence Street Mortgage    .    9

Exhibit F: Eastern Emerald Project Funds Used for One Madison Park    .    .    10

Exhibit G: Attestations by Xia of Affiliations with Racanelli and Perini    .    .    11

AMENDED COMPLAINT EXHIBIT A
Eastern Mirage Project
42-31 Union St., Queens, NY, Sept. 14, 2021

 

 



AMENDED COMPLAINT EXHIBIT B
Eastern Emerald Project
112-21 Northern Blvd., Queens, NY, Sept. 14, 2021

 

 

 

AMENDED COMPLAINT EXHIBIT C
Bank Accounts and Authorized Signatories

| # | Account Name | Bank | Account Number | Account Opened | Authorized Signer from Signature Card | Additional Authorized Signer from Signature Card |
|---|---|---|---|---|---|---|
| 1 | Amazon River LLC | Chase | XXXX-9316 | 10/7/2020 | Julia Yue, Member | |
| 2 | Amazon River LLC | Chase | XXXX-0985 | 10/7/2020 | Julia Yue, President | |
| 3 | Amazon River, LLC | East West | XXXX-6158 | 7/2/2015 | JiQing Yue, LLC - Member | |
| 4 | Amazon River, LLC | HSBC | XXXX-0301 | 11/12/2020 | Julia Yue, Member | |
| 5 | Eastern Emerald Group LLC | East West | XXXX-3379 | 6/26/2013 | Yi Xia, LLC - Member | JiQing Yue, LLC - Member |
| 6 | Eastern Emerald Group LLC | East West | XXXX-6026 | 8/17/2015 | Yi Xia, LLC - Member | JiQing Yue, LLC - Member |
| 7 | Eastern Emerald Group LLC | Popular | XXXX-8140 | 9/23/2016 | | |
| 8 | Eastern Emerald Group LLC | Metro City Bank | XXXX-1312 | 1/25/2017 | JiQing Yue, Member | |
| 9 | Eastern Emerald Group LLC | East West | XXXX-8618 | 1/30/2017 | JiQing Yue, LLC - Member | Yi Xia, Authorized Signer |
| 10 | Eastern Emerald Group LLC | Signature | XXXX-5320 | 3/23/2017 | JiQing Yue, Authorized Signer | |
| 11 | Eastern Emerald Group LLC | Flushing Bank | XXXX-6096 | 10/20/2017 | JiQing Yue, Authorized Signer | |
| 12 | Eastern Emerald Group LLC | East West | XXXX-0433 | 4/27/2018 | JiQing Yue, LLC - Member | Yi Xia, Authorized Signer |
| 13 | Eastern Emerald Group LLC | East West | XXXX-6241 | 4/27/2018 | JiQing Yue, LLC - Member | Yi Xia, Authorized Signer |
| 14 | Eastern Emerald Group LLC | East West | XXXX-4852 | 4/27/2018 | JiQing Yue, LLC - Member | Yi Xia, Authorized Signer |
| 15 | Eastern Emerald Group LLC | East West | XXXX-6702 | 4/27/2018 | JiQing Yue, LLC - Member | Yi Xia, Authorized Signer |
| 16 | Eastern Emerald Group LLC | East West | XXXX-0395 | 4/27/2018 | JiQing Yue, LLC - Member | Yi Xia, Authorized Signer |
| 17 | Eastern Emerald Group LLC | East West | XXXX-7015 | 4/27/2018 | JiQing Yue, LLC - Member | Yi Xia, Authorized Signer |
| 18 | Eastern Emerald Group LLC | CTBC | XXXX-5180 | 6/21/2018 | Julia Yue aka JiQing Yue, Manager | |
| 19 | Eastern Emerald Group LLC | East West | XXXX-1526 | 3/26/2019 | Yi Xia, LLC - Member | Julia Yue, LLC Member |
| 20 | Eastern Emerald Group LLC | East West | XXXX-0633 | 7/29/2019 | Yi Xia, LLC Member | Julia Yue, LLC Member |
| 21 | Eastern Emerald Group LLC | CTBC | XXXX-0808 | 11/3/2020 | Julia Yue, Manager | |
| 22 | Eastern Emerald Group LLC | CTBC | XXXX-9577 | 1/26/2021 | Julia Yue, Manager | |
| 23 | Eastern Emerald Group LLC | CTBC | XXXX-2477 | 4/8/2021 | Julia Yue, VP & Secretary | |
| 24 | Eastern Emerald Group LLC | CTBC | XXXX-3677 | 4/14/2021 | Richard Yi Xia, President | |
| 25 | Eastern Emerald Group LLC | CTBC | XXXX-1217 | 5/21/2021 | Richard Yi Xia, President | |
| 26 | EEGHI II, L.P. | East West | XXXX-6968 | 10/15/2015 | Yi Xia, Partner - Limited | JiQing Yue, Partner - Limited |
| 27 | EEGHI II, L.P. | East West | XXXX-8568 | 1/30/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 28 | EEGHI II, L.P. | East West | XXXX-8996 | 2/15/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 29 | EEGHI II, L.P. | East West | XXXX-2025 | 2/15/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 30 | EEGHI II, L.P. | East West | XXXX-8925 | 2/16/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 31 | EEGHI II, L.P. | East West | XXXX-1060 | 2/16/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 32 | EEGHI II, L.P. | East West | XXXX-4698 | 2/23/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 33 | EEGHI II, L.P. | East West | XXXX-7373 | 2/23/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 34 | EEGHI II, L.P. | East West | XXXX-1450 | 4/20/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 35 | EEGHI II, L.P. | East West | XXXX-7891 | 4/20/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 36 | EEGHI II, L.P. | East West | XXXX-4971 | 4/20/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 37 | EEGHI II, L.P. | East West | XXXX-9701 | 4/20/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 38 | EEGHI II, L.P. | East West | XXXX-4638 | 4/20/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 39 | EEGHI II, L.P. | East West | XXXX-1159 | 4/20/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 40 | EEGHI II, L.P. | East West | XXXX-7766 | 4/20/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 41 | EEGHI II, L.P. | East West | XXXX-8684 | 4/20/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 42 | EEGHI II, L.P. | East West | XXXX-5398 | 4/20/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 43 | EEGHI II, L.P. | East West | XXXX-6210 | 4/20/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 44 | EEGHI II, L.P. | East West | XXXX-2316 | 4/23/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |

3

AMENDED COMPLAINT EXHIBIT C
Bank Accounts and Authorized Signatories

| | Account Name | Bank | Account Number | Account Opened | Authorized Signer from Signature Card | Additional Authorized Signer from Signature Card |
|---|---|---|---|---|---|---|
| 45 | EEGH II, L.P. | East West | XXXX-2738 | 4/23/2018 | Yi Xia, Partner - Limited | JiQing Yue, Partner - Limited |
| 46 | EEGH II, L.P. | East West | XXXX-2942 | 4/23/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 47 | EEGH II, L.P. | East West | XXXX-0689 | 9/14/2018 | Yi Xia, Partner - Limited | JiQing Yue, Partner - Limited |
| 48 | EEGH II, L.P. | East West | XXXX-1438 | 7/29/2019 | Yi Xia, Limited Partner | Julia Yue, Authorized Signer |
| 49 | EEGH II, L.P. | East West | XXXX-8589 | 7/29/2019 | Yi Xia, Limited Partner | Julia Yue, Authorized Signer |
| 50 | EEGH II, L.P. | East West | XXXX-9767 | 7/29/2019 | Yi Xia, Limited Partner | Julia Yue, Authorized Signer |
| 51 | EEGH II, L.P. | East West | XXXX-6494 | 7/29/2019 | Yi Xia, Limited Partner | Julia Yue, Authorized Signer |
| 52 | EEGH II, L.P. | East West | XXXX-6660 | 3/3/2020 | Yi Xia, Limited Partner | Julia Yue, Authorized Signer |
| 53 | EEGH II, L.P. | East West | XXXX-7677 | 3/3/2020 | Yi Xia, Limited Partner | Julia Yue, Authorized Signer |
| 54 | EEGH II, L.P. | East West | XXXX-8126 | 3/3/2020 | Yi Xia, Limited Partner | Julia Yue, Authorized Signer |
| 55 | EEGH II, L.P. | East West | XXXX-1384 | 3/3/2020 | Yi Xia, Limited Partner | Julia Yue, Authorized Signer |
| 56 | EEGH, L.P. | East West | XXXX-5168 | 12/19/2013 | Yi Xia, Partner - Limited | JiQing Yue, Partner - Limited |
| 57 | EEGH, L.P. | East West | XXXX-5366 | 11/5/2014 | Yi Xia, Partner - Limited | JiQing Yue, Partner - Limited |
| 58 | EEGH, L.P. | East West | XXXX-6208 | 8/14/2015 | JiQing Yue, Authorized Signer | Yi Xia, Authorized Signer |
| 59 | EEGH, L.P. | Cathay | XXXX-8260 | 10/16/2015 | Yi Xia, Managing Member | |
| 60 | EEGH, L.P. | East West | XXXX-3253 | 2/15/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 61 | EEGH, L.P. | East West | XXXX-0778 | 2/15/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 62 | EEGH, L.P. | East West | XXXX-5723 | 2/15/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 63 | EEGH, L.P. | East West | XXXX-5970 | 2/15/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 64 | EEGH, L.P. | East West | XXXX-0893 | 2/15/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 65 | EEGH, L.P. | East West | XXXX-1353 | 2/15/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 66 | EEGH, L.P. | East West | XXXX-4009 | 2/15/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 67 | EEGH, L.P. | East West | XXXX-6748 | 2/16/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 68 | EEGH, L.P. | East West | XXXX-1798 | 2/16/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 69 | EEGH, L.P. | East West | XXXX-9656 | 2/16/2017 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 70 | EEGH, L.P. | East West | XXXX-0851 | 4/27/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 71 | EEGH, L.P. | East West | XXXX-4118 | 4/27/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 72 | EEGH, L.P. | East West | XXXX-5237 | 4/27/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 73 | EEGH, L.P. | East West | XXXX-8071 | 4/27/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 74 | EEGH, L.P. | East West | XXXX-7599 | 4/27/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 75 | EEGH, L.P. | East West | XXXX-5557 | 4/27/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 76 | EEGH, L.P. | East West | XXXX-8000 | 4/27/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 77 | EEGH, L.P. | East West | XXXX-3195 | 4/27/2018 | Yi Xia, Partner - Limited | JiQing Yue, Authorized Signer |
| 78 | EEGH, L.P. | East West | XXXX-0598 | 9/13/2018 | Yi Xia, Partner - Limited | JiQing Yue, Partner - Limited |
| 79 | EEGH, L.P. | East West | XXXX-4254 | 7/29/2019 | Yi Xia, Limited Partner | Julia Yue, Authorized Signer |
| 80 | EEGH, L.P. | East West | XXXX-4658 | 3/3/2020 | Yi Xia, Authorized Signer | Julia Yue, Authorized Signer |
| 81 | EEGH, L.P. (R) | East West | XXXX-6828 | 10/9/2015 | Yi Xia, Partner - Limited | JiQing Yue, Partner - Limited |
| 82 | EEGH, L.P. (Operating A/C) | East West | XXXX-6166 | 7/1/2015 | Yi Xia, Partner - Limited | JiQing Yue, Partner - Limited |
| 83 | EMMCO NQMC, L.P. | East West | XXXX-0896 | 12/31/2010 | JiQing Yue, Limited Partner | |
| 84 | EMMCO NQMC, L.P. | East West | XXXX-1282 | 3/30/2011 | JiQing Yue, Partner - Limited | |
| 85 | EMMCO NQMC, L.P. (Escrow Account) | East West | XXXX-1217 | 5/5/2011 | JiQing Yue, Partner-Limited | |
| 86 | EMMCO Tower, L.P. | East West | XXXX-1316 | 6/20/2011 | JiQing Yue, Partner-Limited | |
| 87 | EMMCO Tower, L.P. | East West | XXXX-1795 | 1/23/2012 | Yi Xia, Authorized Signer | Yi Xia |
| 88 | EMMCO, L.P. | East West | XXXX-3048 | 4/14/2010 | Yi Xia, President | JiQing Yue, Secretary |

4

AMENDED COMPLAINT EXHIBIT C
Bank Accounts and Authorized Signatories

| | Account Name | Bank | Account Number | Account Opened | Authorized Signer from Signature Card | Additional Authorized Signer from Signature Card |
|---|---|---|---|---|---|---|
| 89 | EMMCO, L.P. | East West | XXXX-1159 | 3/30/2011 | Yi Xia, Partner – Limited | JiQing Yue, Partner – Limited |
| 90 | EW Escrow Inc. | East West | XXXX-3569 | 10/25/2013 | JiQing Yue, President | |
| 91 | Federal New York Metropolitan Regional Center LLC | East West | XXXX-3089 | 2/25/2010 | Yi Xia, Member | JiQing Yue, Member |
| 92 | Fleet Equipment, Inc | East West | XXXX-8899 | 7/3/2017 | Yi Xia, President | JiQing Yue, Authorized Signer |
| 93 | Fleet Equipment, Inc | Chase | XXXX-3335 | 10/7/2020 | Julia Yue, President | |
| 94 | Fleet Financial Group Inc | Chase | XXXX-6665 | 4/28/2006 | Yi Xia, Pres | JiQing Yue, VP |
| 95 | Fleet Financial Group Inc | East West | XXXX-0375 | 7/23/2010 | JiQing Yue, President | Yi Xia, Vice President |
| 96 | Fleet Financial Group Inc | East West | XXXX-1183 | 11/2/2011 | Yi Xia, Vice President | JiQing Yue, President |
| 97 | Fleet Financial Group Inc (III) | East West | XXXX-5085 | 12/13/2013 | JiQing Yue, President | Yi Xia, Vice President |
| 98 | Fleet Financial Group Inc (Payroll A/C) | East West | XXXX-5119 | 8/18/2014 | JiQing Yue, Principal | Yi Xia, Vice President |
| 99 | Fleet General Insurance Group | Flushing Bank | XXXX-1790 | 11/14/2017 | JiQing Yue, Secretary | |
| 100 | Fleet Hospitality Management, Inc | East West | XXXX-0028 | 7/10/2018 | JiQing Yue, President | |
| 101 | Fleet Hospitality Management, Inc | East West | XXXX-4517 | 4/2/2020 | Julia Yue, President | |
| 102 | Fleet Real Estate Group Inc | East West | XXXX-6398 | 7/6/2015 | Yi Xia, President | JiQing Yue, Vice President |
| 103 | JiQing Development, Inc | East West | XXXX-0300 | 7/23/2010 | JiQing Yue, President | |
| 104 | LaGuardia Performance Center LLC | East West | XXXX-2727 | 7/18/2019 | Yi Xia, LLC – Member | Julia Yue, Authorized Signer |
| 105 | LaGuardia Performance Center LLC | East West | XXXX-2677 | 8/5/2019 | Yi Xia, LLC – Member | Julia Yue, Authorized Signer |
| 106 | LaGuardia Performance Center LLC | Popular | XXXX-6909 | 8/9/2019 | Julia Yue, LLC Manager | |
| 107 | LaGuardia Performance Center LLC | Popular | XXXX-6469 | 8/26/2019 | Julia Yue, LLC Manager | |
| 108 | LaGuardia Performance Center LLC | Popular | XXXX-6486 | 8/26/2019 | Julia Yue, LLC Manager | |
| 109 | LaGuardia Performance Center LLC | Popular | XXXX-5042 | 8/26/2019 | Julia Yue, LLC Manager | |
| 110 | LaGuardia Performance Center LLC | Popular | XXXX-9291 | 8/26/2019 | Julia Yue, LLC Manager | |
| 111 | LaGuardia Performance Center LLC | East West | XXXX-4277 | 12/19/2019 | Yi Xia, LLC – Member | Julia Yue, Authorized Signer |
| 112 | LaGuardia Performance Center LLC | East West | XXXX-1004 | 3/3/2020 | Yi Xia, LLC Member | Julia Yue, Authorized Signer |
| 113 | LaGuardia Performance Center LLC | East West | XXXX-7665 | 3/3/2020 | Yi Xia, LLC Member | Julia Yue, Authorized Signer |
| 114 | LaGuardia Performance Center LLC | East West | XXXX-3288 | 3/3/2020 | Yi Xia, LLC Member | Julia Yue, Authorized Signer |
| 115 | LaGuardia Performance Center LLC | East West | XXXX-5737 | 3/3/2020 | Yi Xia, LLC Member | Julia Yue, Authorized Signer |
| 116 | LaGuardia Performance Center LLC | East West | XXXX-4327 | 3/3/2020 | Yi Xia, LLC Member | Julia Yue, Authorized Signer |
| 117 | LaGuardia Performance Center LLC | CTBC | XXXX-0816 | 11/3/2020 | Julia Yue, Manager | |
| 118 | LaGuardia Performance Center LLC | CTBC | XXXX-0899 | 11/3/2020 | Julia Yue, Manager | |
| 119 | LaGuardia Performance Center LLC | CTBC | XXXX-2777 | 11/3/2020 | Richard Yi Xia, President | |
| 120 | LaGuardia Performance Center LLC | Signature | XXXX-9927 | 11/25/2020 | Richard Yi Xia | Julia Yue |
| 121 | Manekineko Group LLC | Cathay | XXXX-3112 | 2/23/2010 | Yi Xia, Member | JiQing Yue, Member |
| 122 | Manekineko Group LLC | East West | XXXX-1225 | 5/2/2011 | Yi Xia, LLC – Member | JiQing Yue, LLC – Member |
| 123 | Manekineko Group LLC | HSBC | XXXX-0913 | 11/13/2020 | Yi Xia, Member | Jicing Yue, Member |
| 124 | Perini Group Inc | Signature | XXXX-0543 | 12/4/2015 | Xi Verferstein, President | |
| 125 | Perini Group Inc | East West | XXXX-8998 | 8/23/2017 | Xi Verferstein, President | |
| 126 | Perini Group Inc | East West | XXXX-9996 | 3/22/2018 | Xi Verferstein, President | |
| 127 | Perini Group, Inc | East West | XXXX-6786 | 1/5/2016 | Xi Verferstein, President | |
| 128 | Perini Group, Inc | Chase | XXXX-3397 | 4/16/2021 | Xi Verferstein, President | |
| 129 | Racanelli Construction Group Inc | East West | XXXX-1555 | 11/2/2011 | JiQing Yue, President | |
| 130 | Racanelli Construction Group Inc | East West | XXXX-5259 | 2/13/2015 | JiQing Yue, President* | |
| 131 | Racanelli Construction Group Inc | Signature | XXXX-0055 | 7/23/2015 | Yi Xia, President | Angela Yu, Wei Chen, Manager |
| 132 | Racanelli Construction Group Inc | Signature | XXXX-0063 | 7/23/2015 | Yi Xia, President | Angela Yu, Wei Chen, Manager |

AMENDED COMPLAINT EXHIBIT C
Bank Accounts and Authorized Signatories

| | Account Name | Bank | Account Number | Account Opened | Authorized Signer from Signature Card | Additional Authorized Signer from Signature Card |
|---|---|---|---|---|---|---|
| 133 | Racanelli Construction Group Inc | East West | XXXX-6109 | 8/17/2015 | JiQing Yue, President* | |
| 134 | Racanelli Construction Group Inc (Expense A/C) | East West | XXXX-2660 | 2/19/2013 | JiQing Yue, President* | |
| 135 | Racanelli Construction Group Inc (I) | East West | XXXX-1381 | 7/1/2011 | JiQing Yue | |
| 136 | Racanelli Construction Group Inc (I) (Operating) | East West | XXXX-2538 | 12/6/2012 | JiQing Yue, President* | |
| 137 | Racanelli Construction Group Inc (III) | East West | XXXX-5028 | 12/12/2013 | JiQing Yue, President* | |
| 138 | Racanelli Construction Group Inc (IV) | East West | XXXX-5283 | 9/16/2014 | JiQing Yue, President* | |
| 139 | Racanelli Construction Group Inc (Payroll A/C) | East West | XXXX-4898 | 8/18/2014 | JiQing Yue, President | |
| 140 | Samuel Development Group LLC | East West | XXXX-0235 | 7/13/2010 | Yi Xia, LLC Manager | JiQing Yue, LLC Manager |
| 141 | Samuel Development Group LLC | HSBC | XXXX-0310 | 11/12/2020 | Richard Xia, Member | |
| 142 | Shangri-La 9D Inc | East West | XXXX-5226 | 5/21/2014 | JiQing Yue, President | |
| 143 | Shangri-La 9F Inc | East West | XXXX-8758 | 7/21/2017 | JiQing Yue, President | |
| 144 | Shangri-La 9D Inc | East West | XXXX-9608 | 3/22/2018 | JiQing Yue, President | |
| 145 | Shangri-La 9D Inc | Chase | XXXX-8715 | 10/7/2020 | Julia Yue, President | |
| 146 | Shangri-La 9D Inc | Chase | XXXX-6068 | 10/7/2020 | Julia Yue, President | |
| 147 | Shangri-La 9D Inc | HSBC | XXXX-0875 | 11/12/2020 | Julia Yue, VP | Richard Xia, President |
| 148 | Shangri-La 9F Inc | Cathay | XXXX-2212 | 7/9/2010 | Yi Xia, President | JiQing Yue, Secretary |
| 149 | Shangri-La 9F Inc | East West | XXXX-1977 | 3/13/2012 | JiQing Yue, President | |
| 150 | Shangri-La 9F Inc | HSBC | XXXX-0883 | 11/12/2020 | Julia Yue, President | |
| 151 | Shangri-La 9F Inc. | HSBC | XXXX-0883 | 11/12/2020 | Julia Yue, President | |
| 152 | Shangri-La Green Inc | Chase | XXXX-6733 | 10/7/2020 | Julia Yue, President | |
| 153 | Shangri-La Green Inc | Chase | XXXX-5612 | 10/7/2020 | Julia Yue, President | |
| 154 | Shangri-La Green, Inc | Cathay | XXXX-3302 | 5/12/2010 | JiQing Yue, President | Yi Xia, Secretary |
| 155 | Shangri-La Green, Inc | East West | XXXX-0268 | 6/21/2010 | Yi Xia, Vice President | JiQing Yue, President |
| 156 | Shangri-La Green, Inc | East West | XXXX-4846 | 9/28/2012 | JiQing Yue, President | |
| 157 | Shangri-La Green, Inc | East West | XXXX-8808 | 7/21/2017 | JiQing Yue, President | |
| 158 | Shangri-La Green, Inc | East West | XXXX-9798 | 3/22/2018 | JiQing Yue, President | Yi Xia, Vice President |
| 159 | Shangri-La Green, Inc | HSBC | XXXX-0743 | 11/12/2020 | Julia Yue, VP | Richard Xia, President |
| 160 | The Grand Eastern Mirage Group LLC | HSBC | XXXX-0686 | 7/1/2018 | JiQing Yue, Authorized Signer | |
| 161 | The Grand Eastern Mirage Group LLC | HSBC | XXXX-0708 | 7/5/2018 | JiQing Yue, Authorized Signer | |
| 162 | The Grand Eastern Mirage Group LLC | East West | XXXX-9261 | 3/3/2020 | Yi Xia, Authorized Signer | Julia Yue, Authorized Signer |
| 163 | The Grand Eastern Mirage Group LLC | East West | XXXX-0739 | 3/3/2020 | Yi Xia, Authorized Signer | Julia Yue, Authorized Signer |
| 164 | The Grand Eastern Mirage Group LLC | East West | XXXX-8696 | 3/3/2020 | Yi Xia, Authorized Signer | Julia Yue, Authorized Signer |
| 165 | The Grand Eastern Mirage Group LLC | East West | XXXX-8743 | | | |
| 166 | X & Y Development Group, LLC | East West | XXXX-0367 | 7/23/2010 | Yi Xia, LLC Member | JiQing Yue, LLC Member |
| 167 | Z - Account Name Unknown | Chase | XXXX-5320 | | | |
| 168 | Z - Account Name Unknown | Chase | XXXX-6902 | | | |

* Xi Verfenstein became the sole authorized signer on 9/18/2018

# AMENDED COMPLAINT EXHIBIT D
## Eastern Mirage Project Funds Used to Purchase
## Eastern Emerald Project Land
### JUNE 2013 TRANSFERS

**FUNDS FROM INVESTORS**

**EMMCO NQMC LP 1282**
Bal. June 19, 2013:     $14,783,646

6/27  $2,000,000  **Total: $2,000,000**

**EMMCO NQMC LP 0896**
Bal. June 19, 2013:     $19,018

6/27  $2,000,000  **Total: $2,000,000**

**Fleet Financial 1183**
Bal. June 25, 2013:     $99,915

6/27   $490,000
6/27   $420,000
6/27   $490,000  **Total: $1,700,000**
6/27   $300,000

**Racanelli 1555**
Bal. June 25, 2013:     $63,293

6/27  $1,700,000  **Total: $1,700,000**

**Eastern Emerald Group 3379**
Acct. Opened June 26, 2013: $0

**6/27/2013      $1,700,000 Transfer:**
Rothkrug, Rothkrug & Spector, LLP
as Escrow Agent
*attorney for seller of Eastern Emerald property*

7

## AMENDED COMPLAINT EXHIBIT D
## Eastern Mirage Project Funds Used to Purchase
## Eastern Emerald Project Land
### DECEMBER 2013 TRANSFERS



AMENDED COMPLAINT EXHIBIT E
Eastern Mirage Project Funds Used to Pay Off
57-35 Lawrence Street Mortgage
MARCH/APRIL 2012 TRANSFERS

**FUNDS FROM INVESTORS**

**EMMCO LP 3048**
Beg. Bal. March 2012: $1,200,752

| 3/30 | $330,000 | |
| 4/4 | $330,000 | Total:  **$1,160,000** |
| 4/6 | $500,000 | |

**Fleet Financial 0375**
Bal. March 29, 2012:  $11,130

| 4/2 | $280,000 | |
| 4/4 | $323,000 | Total:    **$983,000** |
| 4/6 | $380,000 | |

**Racanelli 1555**
Beg. Bal. April 1, 2012:        $47,559

| 4/6 | $819,810 | Total:    **$819,810** |

**JiQing Development 0300**
Beg. Bal. April 1, 2012:        $1,042

**4/9/2012        $819,810 Transfer**:
Chinatown Federal Savings Bank
*memo:*
*"Loan payoff #18 71-8 57-35 Lawrence"*

9

AMENDED COMPLAINT EXHIBIT F
Eastern Emerald Project Funds
Used for One Madison Park
JULY 2015 TRANSFERS

**FUNDS FROM INVESTORS**

**EEGH LP 5168**
Beg. Bal. July 1, 2015: $18,365,308

7/1   $3,000,000    Total: **$3,000,000**

**EEGH LP 6166**
Beg. Bal. July 1, 2015: $0

7/1   $3,000,000    Total: **$3,000,000**

**Eastern Emerald Group 3379**
Beg. Bal. July 1, 2015: $263,599

7/6   $2,330,000    Total: **$2,330,000**

**Racanelli 5283**
Beg. Bal. July 1, 2015: $9,800

7/7   $2,328,000    Total: **$2,328,000**

**Amazon River LLC 6158**
Acct. Opened July 2, 2015:    $0

**7/7/2015    $2,325,000 Transfer:**
Michael, Levitt & Rubenstein LLC
as Escrow Agent
(for "One Madison Park 43A")

AMENDED COMPLAINT EXHIBIT G



**Signature Bank**

# Business Profile and Account Application

This application allows you to open up to four accounts provided the account ownership is the same.

## Section 1. Business Client Profile

**Business Formation:**
- [x] Corporation
- [ ] LP
- [ ] LLP
- [ ] LLC ___ (Please enter tax class
- [ ] Partnership
- [ ] Unincorp. Association
- [ ] Sole Prop.
- [ ] Trust
- [ ] Other:

State: NY   Date Est.: 2011   * Publicly Traded: Exchange_____ Symbol_____ (or Parent

Account Title RACANELLI CONSTRUCTION GROUP INC.

Business Address 136-20 38th Ave.   Room/Floor No. Suite

City FLUSHING   State NEW YORK

## Section 1(c). Signers/Beneficial Owners (Over 20

**Note: Beneficial owners with a 20% or greater interest are requi**
**A copy of a valid photo ID is required for all listed. All the names listed w**

| 1 | Name YI XIA | | SS# 422450496 |
|---|---|---|---|
| | Check all that apply: [x] Officer  [x] Signer  [x] Beneficial Owner | | ID # 820418279 |
| | Title/Role President | % Ownership 100 | ID Type: [x] Driver's Licen |

## Section 3(a). Agreements & Acknowledgements

**AUTHORIZED SIGNERS (SIGNATURE CARD):** I certify that on behalf of the applicant I have
and have received, read, and agree to the above initialed acknowledgements and all applicable agreements in the Signature

Account Title RACANELLI CONSTRUCTION GROUP INC.

1. Print Name YI XIA   Signature _____   Title President   Date 7/22/20

# AMENDED COMPLAINT EXHIBIT G

**SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS**

-------------------------------------------------------------------

**RACANELLI CONSTRUCTION GROUP, INC.,**

-against-

**EASLE SERVICE CORP. and SCOTT EHRLER**

-------------------------------------------------------------------

### VERIFIED COMPLAINT

**RICHARD XIA,** being duly sworn, deposes and states:

1.      I am the President of Racanelli Construction Group, Inc.

RICHARD XIA

01-10-2013
*(01-10-2013)*

### REPLY TO COUNTERCLAIMS

**RICHARD XIA,** being duly sworn, deposes and states:

1.      I am the President of Racanelli Construction Group, Inc.

RICHARD XIA

Sworn to before me this
31st day of May 2013.

### AFFIDAVIT OF RICHARD XIA IN SUPPORT OF PLAINTIFF'S ORDER TO SHOW CAUSE

**RICHARD XIA,** being duly sworn, deposes and says:

1.      I am the president of the plaintiff, Racanelli Construction Group Inc.

Richard Xia

Signed and sworn before me
this 12 day of July 2013

### AFFIDAVIT OF RICHARD XIA

**RICHARD XIA,** being duly sworn, deposes and says:

1.      I am the president of the plaintiff, Racanelli Construction Group Inc.

Richard Xia

Signed and sworn before me
this 12 day of March, 2014.

### AFFIDAVIT IN SUPPORT

RICHARD XIA, being duly sworn, deposes and states under the penalties of perjury, as follows:

1.      I am the President of Plaintiff Racanelli Construction Group, Inc.

RICHARD XIA

Sworn to before me this
AUGUST 16, 2015

12

# AMENDED COMPLAINT EXHIBIT G

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------
**RACANELLI CONSTRUCTION CO., INC.,**
*- against -*
**RACANELLI CONSTRUCTION GROUP INC., and RICHARD XIA**

**VERIFIED ANSWER**

RICHARD Y. XIA, duly sworn, deposes and says to be true and correct, under the penalties of perjury, under the laws of the United States of America, the following:

I am an individual Defendant and the President of Defendant Racanelli Construction Group, Inc.

RICHARD Y. XIA

**Sworn to before me this 10th day of June, 2015**

---------------------------------------------------------------------------------------------------------

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF QUEENS**
---------------------------------------------------------------
**VLADIMIR DEVDARIANI**
*- against -*
**X & Y DEVELOPMENT GROUP, LLC and PERINI GROUP, INC.**

**AFFIDAVIT OF SEARCH CONDUCTED**

**RICHARD XIA,** being duly sworn, deposes and says:

1.    I am the manager of Defendant PERINI GROUP, INC.

RICHARD XIA

Sworn to before me this 5th day of September, 2018

---------------------------------------------------------------------------------------------------------

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF QUEENS**
---------------------------------------------------------------
**X-TREME CONCRETE INC.,**
*-    against –*
**RACANELLI CONSTRUCTION GROUP, INC., X&Y DEVELOPMENT GROUP, LLC and "JOHN DOE NO. 1" through "JOHN DOE NO. 5"**

**AFFIDAVIT OF RICHARD XIA IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**RICHARD XIA,** being duly sworn, deposes and says:

2.    In addition, I am also a former member of Racanelli Construction Group, Inc.

RICHARD XIA

Sworn to me before this 17th day of June  2019

13