Richard Xia
2/7/2022

**Page 1**

1   UNITED STATES DISTRICT COURT
2   EASTERN DISTRICT OF NEW YORK
3
4   SECURITIES AND EXCHANGE        )
    COMMISSION,                    )
5                                  )
            Plaintiff,             )
6                                  )
        v.                         ) Case No.
7                                  ) 21-cv-05350-PKC-CLP
    RICHARD XIA, a/k/a YI XIA, and )
8   FLEET NEW YORK METROPOLITAN    )
    REGIONAL CENTER, LLC, f/k/a    )
9   FEDERAL NEW YORK METROPOLITAN  )
    REGIONAL CENTER, LLC,          )
10                                 )
            Defendants,            )
11                                 )
        -and-                      )
12                                 )
    JULIA YUE, a/k/a JIQING YUE,   )
13                                 )
            Relief Defendant.      )
14  _____)
15
16
17         REMOTE VIDEOTAPED DEPOSITION OF
18                RICHARD XIA
19            Monday, February 7, 2022
20
21
22
23  Reported By:
24  Denise Sankary, RPR, RMR, CRR,
25  Job No. 220207DSA

**Page 2**

1   UNITED STATES DISTRICT COURT
2   EASTERN DISTRICT OF NEW YORK
3
4   SECURITIES AND EXCHANGE        )
    COMMISSION,                    )
5                                  )
            Plaintiff,             )
6                                  )
        v.                         ) Case No.
7                                  ) 21-cv-05350-PKC-CLP
    RICHARD XIA, a/k/a YI XIA, and )
8   FLEET NEW YORK METROPOLITAN    )
    REGIONAL CENTER, LLC, f/k/a    )
9   FEDERAL NEW YORK METROPOLITAN  )
    REGIONAL CENTER, LLC,          )
10                                 )
            Defendants,            )
11                                 )
        -and-                      )
12                                 )
    JULIA YUE, a/k/a JIQING YUE,   )
13                                 )
            Relief Defendant.      )
14  _____)
15
16
17      Remote videotaped deposition of RICHARD XIA,
18  taken on behalf of Plaintiff, beginning at 10:33 a.m.
19  and ending at 5:28 p.m., on Monday, February 7, 2022,
20  before Denise Sankary, Certified Realtime Reporter.
21
22
23
24
25

**Page 3**

1   REMOTE APPEARANCES:
2   On behalf of the Plaintiff:
3       SECURITIES AND EXCHANGE COMMISSION
        KEVIN McGRATH, ESQUIRE
4       DAVID STOELTING, ESQUIRE
        KIM HAN, ESQUIRE
5       New York Regional Office
        200 Vesey Street, Suite 400
6       New York, New York 10281-1022
        Phone: 212-336-0174
7       Email: mcgrathk@sec.gov
        Email: stoeltingd@sec.gov
8       Email: hanki@sec.gov
9
10  On behalf of the Defendants:
11      SILLS CUMMIS & GROSS, P.C.
        HERVE GOURAIGE, ESQUIRE
12      570 Lexington Avenue, Suite 3500
        New York, New York 10022
13      Phone: 212-643-7000
        Email: hgouraige@sillscummis.com
14
15
16  ALSO PRESENT:
17      Kenzie Guerrero, Videographer
18      Nicole Forbes, Paralegal
19
20
21
22
23
24
25

**Page 4**

1                       INDEX
2   WITNESS                        EXAMINATION
3   RICHARD XIA
4       BY MR. STOELTING                     8
5       BY MR. GOURAIGE                    191
6
7                     EXHIBITS
8   No.                            Page
9   Exhibit 1  08/30/21 E-mail exchange between  12
            Thomas Gallagher, Richard Xia and
10          others Subject:  Original Signatures
            for Closing
11
    Exhibit 2  08/30/21 Loan Agreement between  15
12          X&X Development Group, LLC and
            Emerald Creek Capital 3, LLC
13          ECC_0000004 - ECC_0000032
14  Exhibit 3  EEGH, L.P. Supplement Offering   28
            Memorandum
15
    Exhibit 4  04/09/21 CTBC Bank LSD Loan      36
16          Checklist & Approval Form for
            Deferral of Required Loan
17          Documentation (DRD Form)
            CTBC002059 - CTBC002078
18
    Exhibit 5  08/09/21 CTBC Bank LSD Loan      45
19          Checklist & Approval Form for
            Deferral of Required Loan
20          Documentation (DRD Form)
            CTBC003876 - CTBC003910
21
    Exhibit 6  Color Photograph of Kingspoint  54
22          Road house
23  Exhibit 7  Color Photograph of Sands Point  55
            house
24
    Exhibit 8  11/20/14 Letter from Linda Lau   61
25          Response to Request for Evidence

EXHIBIT
35
SEC v. Xia, et al.



Exhibit 9 12/01/17 Letter from Linda Lau    86
    Response to Request for Evidence

Exhibit 10 11/13/13 - 11/14/13 E-mail    111
    string between Sunil Aggarwal and
    Richard Xia Subject: NMTC Letter
    XIA_001416 - XIA_001417
Exhibit 11 11/04/14 - 11/12/14 E-mail    118
    string between Sunil Aggarwal
    and Richard Xia Subject: Fleet
    Financial Group NMTC Tax Credit
    Letter XIA_001447 - XIA_001448
Exhibit 12 11/14/13 Letter from Sunil    121
    Aggarwal to Julia Yue XIA_001436

Exhibit 13 08/18/17 Letter from Edward    127
    Chan to Richard Xia
Exhibit 14 09/25/17 Letter from Edward Chan 137
    to Julia Yue

Exhibit 15 12/21/13 Letter from Edward Chan    140
    to Richard Xia
Exhibit 16 12/23/13 Letter from Edward Chan    142
    to Richard Xia

Exhibit 17 11/15/14 Letter from Edward Chan    146
    to Julia Yue
Exhibit 18 07/24/14 E-mail string between    149
    Water Verfenstein and Richard Xia
    Subject: My remarks for today -
    Draft SEC-WALTERV-E-0000062 -
    SEC-WALTERV-E-0000064
Exhibit 19 Translation of a Declaration    154
Exhibit 20 Declaration of Project Investors  155
Exhibit 21 WeChats    160
Exhibit 22 WeChats    160
Exhibit 23 EMMCO, L.P. Confidential Private 171
    Offering Memorandum Draft Date of
    April 17, 2010

5

Exhibit 24 EMMCO Tower, L.P. Updated    174
    Comprehensive Business Plan
    August 2014
Exhibit 25 07/14/10 Loan Agreement between   178
    Fleet Financial Group, Inc. and
    EMMCO, L.P. FLEET-SEC_000031475 -
    FLEET-SEC_000031480

Exhibit 26 01/31/11 EMMCO, L.P.    184
    Confidential Private Offering
    Memorandum


    *** EXHIBITS BOUND SEPARATELY ***

6

Monday, February 7, 2022
    10:33 a.m. - 5:28 p.m.

    THE VIDEOGRAPHER: We are now on the
record. This is Video Number 1 in the video
deposition of Richard Xia in the matter of
Securities and Exchange Commission, plaintiffs,
against Richard Xia, et al., defendants, and
Julia Yue, relief defendant, pending before the
United States District Court, Eastern District
of New York, Case Number 21-cv-05350-PKC-CLP.
    This deposition is being held remotely via
WebEx videoconferencing on February 7, 2022.
The time is 10:33 a.m. Eastern Time.
    My name is Kenzie Guerrero. I'm the legal
video specialist from the firm of Gradillas
Reporting. The court reporter today is Denise
Sankary in association with Gradillas
Reporting.
    For the record, will counsel now please
introduce themselves and whom they represent.
    MR. STOELTING: For the plaintiff, David
Stoelting, and with me are Kevin McGrath and
Kim Han, and Nicole Forbes, who is a paralegal
is also assisting today.

7

    MR. GOURAIGE: For the defendant, Herve
Gouraige. And I'm the only from my law firm
that's on.
    THE VIDEOGRAPHER: Thank you.
    Will the court reporter please administer
the oath.
    THE COURT REPORTER: Mr. Xia, would you
raise your right hand, please.
    Do you swear the testimony you're about to
give will be the truth, the whole truth, and
nothing but the truth?
    THE WITNESS: Yes, I do.
    THE COURT REPORTER: Thank you.
Thereupon:
    RICHARD XIA
having been first duly sworn, was examined and
testified as follows:
    EXAMINATION
BY MR. STOELTING:
    Q. Good morning, Mr. Xia.
    A. Good morning, David.
    Q. My name is David Stoelting, and I'm one of
the lawyers from the Securities and Exchange
Commission, the plaintiff in this matter, and we're
here today to take your deposition.

8

1    I just want to give a few ground rules
2  before I begin.  If you would please listen to my
3  questions and wait until I'm done asking the
4  question until you respond so we can get a clean
5  record.
6        Is there any reason why you cannot
7  testify -- testify truthfully today?
8    A.  No.
9    Q.  Are you taking any medications that would
10 affect your memory or your ability to testify
11 truthfully?
12   A.  No.
13   Q.  Have you ever heard of a firm called
14 Impact Environmental Soil Management?
15   A.  Yes.
16   Q.  What do you understand Impact
17 Environmental Soil Management to be?
18   A.  It's a soil management company.
19   Q.  Okay.  Could you speak louder?  I'm having
20 trouble hearing you.
21   A.  Yeah, it's a soil management company.
22   Q.  And do you know who owns or controls
23 Impact Environmental Soil Management?
24   A.  I believe it's Xi Verfenstein.
25        THE COURT REPORTER:  I'm sorry?

9

1    A.  Xi Verfenstein.
2        THE COURT REPORTER:  I still didn't get
3  that.
4    A.  Xi -- yeah.  X-I, V-E-R-F-E-N-S-T-E-I-N.
5  BY MR. STOELTING:
6    Q.  Did you know that in early 2021, Perini
7  transferred $997,000 to Impact Environmental Soil
8  Management?
9    A.  No, I do not know.
10   Q.  Did you know that in April '21 -- April
11 2021 that $1,000,000 was wired out of an Impact
12 Environmental Soil Management account to a law firm
13 for a down payment on a property at ███ Middleneck
14 Road?
15   A.  No, I do not know that.
16   Q.  And X&Y Development Group is your company,
17 right?
18   A.  Yes.
19   Q.  And you were the owner of X&Y Development
20 Group, correct?
21   A.  Yes.
22   Q.  And in August '21, X&Y Development Group
23 obtained a 15 million-dollar loan from Emerald Creek
24 Capital, correct?
25   A.  Yes.

10

1    Q.  What was the purpose of that loan?
2    A.  That's a -- that's a payment -- contract
3  payment paid to general contractor for the Eastern
4  Mirage Project.
5    Q.  Okay.  I'm having trouble hearing you.  If
6  you could speak louder and lean closer to whatever
7  microphone you're near, please.
8        MR. MCGRATH:  Yeah, I'm having trouble
9  hearing him also, David.
10   A.  That's for the contract payment to the
11 general contractor who performed the work for the
12 Eastern Mirage Project.
13 BY MR. STOELTING:
14   Q.  Which contractor?
15   A.  Racanelli.
16   Q.  Racanelli?
17   A.  Yes.
18   Q.  Wasn't that 15 million-dollar loan used to
19 purchase the house at ███ Middleneck Road?
20   A.  Whatever was used, it was at the
21 contractor's discretion.
22        THE COURT REPORTER:  I'm sorry, I didn't
23 hear you.
24   A.  Yeah.  Whatever that money has been used
25 at the contractor's discretion.  For me, it's a

11

1  contract payment, and I'm obligated to pay my
2  contractor because the work has been performed.
3  BY MR. STOELTING:
4    Q.  Okay.  My question was more specific.
5        It was, didn't you use the
6  15 million-dollar loan from Emerald Creek to
7  purchase the house at ███ Middleneck Road?
8        MR. GOURAIGE:  Objection to form.
9        I don't think that was his testimony,
10 David.
11 BY MR. STOELTING:
12   Q.  Do you understand the question, Mr. Xia?
13   A.  No.
14   Q.  Okay.  Well, let's --
15        MR. STOELTING:  Can we -- can we pull up
16 what we'll call Deposition Exhibit 1.
17        (Thereupon, marked as Exhibit 1.)
18 BY MR. STOELTING:
19   Q.  Okay.  Do you see this e-mail?
20   A.  Yes.
21   Q.  Okay.  This is an e-mail that you sent on
22 August 30, 2021, correct?
23   A.  I believe so.
24   Q.  And you were e-mailing a lawyer at Kramer
25 Levin --

12

1     MR. STOELTING:  If you could scroll down a
2  little bit, Ms. -- Nicole.
3  BY MR. STOELTING:
4     Q.  Okay.  Do you see the e-mail to you says,
5  "Richard, can you please advise this group what time
6  works for you this afternoon to have the notary
7  arrive at your office?"
8        And you respond, "The earliest possible
9  time, if you could, as I have another closing if I
10  am going to use the fund from this loan."
11       What was this e-mail about?
12    A.  It's about the urgency trying to close the
13  refinance.
14    Q.  Okay.  Could you still -- could you please
15  try to speak loud so the court reporter can hear you
16  so we can get a clean record?
17    A.  Yeah.  It's a e-mail.  I'm urging my
18  attorney to get this refinance cash-out closed
19  sooner.
20       MR. STOELTING:  And if we could, could you
21  go to the top of the e-mail, please,
22  Ms. Forbes.
23  BY MR. STOELTING:
24    Q.  Okay.  And Kramer Levin was your attorney,
25  right?

13

1     A.  Yes.
2     Q.  And Kramer Levin was advising you on the
3  15 million-dollar loan from Emerald Creek Capital,
4  correct?
5     A.  That's right.
6     Q.  And -- and the urgency was the closing on
7  the Middleneck Road house.
8        Isn't that what this e-mail is about?
9        MR. GOURAIGE:  Objection to form.
10       And David, when you say "Kramer Levin was
11  your attorney," you're saying the attorney of
12  Mr. Xia personally or the attorney for Mirage?
13       MR. STOELTING:  Well, let him clarify
14  that.
15       MR. GOURAIGE:  Do you want to ask him the
16  question?
17       MR. STOELTING:  No.
18  BY MR. STOELTING:
19    Q.  Let me ask the question again.
20       Doesn't this e-mail concern the closing of
21  the purchase of the Middleneck Road house?
22    A.  No.
23    Q.  It does not?
24    A.  No.
25       MR. STOELTING:  All right.  You can take

14

1  that down.
2        Could you put up Number 2 -- Exhibit 2,
3  please.
4        (Thereupon, marked as Exhibit 2.)
5        MR. STOELTING:  I'm sorry.  I'm sorry.
6  Number 3.
7     A.  I want to talk to my attorney.
8        Can I go off the record or --
9  BY MR. STOELTING:
10    Q.  Is it a question of privilege?
11    A.  Yes.
12       MR. GOURAIGE:  Do -- do we have a -- a
13  pending question, David?  I don't think there's
14  a pending question.
15       MR. STOELTING:  I mean, I don't have a
16  pending question.
17  BY MR. STOELTING:
18    Q.  Do you want to go off the record, Mr. Xia,
19  to consult with your counsel?
20    A.  Yes.
21       MR. STOELTING:  Okay.  We can go off the
22  record at 10:45.
23       THE VIDEOGRAPHER:  The time is 10:45 a.m.
24  Off the record.
25       (Recess taken.)

15

1        THE VIDEOGRAPHER:  The time is 10:48 a.m.
2  Back on the record.
3  BY MR. STOELTING:
4     Q.  Okay.  Mr. Xia, we've put before you a
5  loan agreement, what I marked as Exhibit 2, loan
6  agreement dated August 30, 2021 between X&Y and
7  Emerald Creek Capital for $15 million.
8        Do you see that?
9        MS. FORBES:  Excuse me, you said 2 before
10  and then you said 3.
11       Is it Exhibit 3, or is it Exhibit 2?
12       MR. STOELTING:  No, the Number 3 just
13  referred to the number of the PDF, but we're
14  marking this as Deposition Exhibit 2.
15       MS. FORBES:  Okay.
16  BY MR. STOELTING:
17    Q.  So Mr. Xia, do you recognize this loan
18  agreement?
19    A.  I don't see it.
20    Q.  We'll put it on the screen in a moment.
21    A.  Yeah, it appears to be the loan agreement
22  we had with Emerald Creek.
23       MR. STOELTING:  Could you scroll down a
24  little bit?
25    A.  I can do that?

16

1    BY MR. STOELTING:
2        Q.  No, no.  We will do it.
3            Now, this is a loan agreement, and you
4    signed on behalf of X&Y Development, correct?
5        A.  I only see a portion of this loan
6    agreement.
7        Q.  No, I'm asking you a question.
8            Do you recall signing this loan agreement
9    on August 30, 2021?
10           MR. GOURAIGE:  Do you want to show him the
11       end agreement, the signature page?
12           MR. STOELTING:  No, I don't, Herve.  I'm
13       asking questions.
14   BY MR. STOELTING:
15       Q.  Do you recall signing this loan agreement
16   on August 30, 2021?
17           MR. GOURAIGE:  Objection.
18       A.  I recall I signed a loan agreement with
19   Emerald Creek on August 30th for --
20           MR. STOELTING:  Okay.  Can we go to page
21       8.  Okay.  Right there.
22   BY MR. STOELTING:
23       Q.  Do you remember what the collateral was
24   that you gave for this loan?
25       A.  It's Eastern Mirage Project.

17

1        Q.  You gave a first priority lien to Emerald
2    Creek Capital, correct?
3        A.  Yes.
4        Q.  And in this portion of the loan agreement,
5    it says -- I'm reading from the middle --
6    "Notwithstanding anything to the contrary and
7    without limiting the foregoing, besides guarantor,
8    no other individual and/or entity has any ownership
9    and/or other interest in the property, including
10   without limitation, Federal New York Metropolitan
11   Regional Center, LLC; EMMCO NQMC; EMMCO, LP; EMMCO
12   Tower, LP; Fleet Financial Group, Inc. and/or any
13   investor in the EB-5 Immigrant Investor Program.
14   And by execution hereof, Federal New York
15   Metropolitan Regional Center, LLC; EMMCO NQMC, LP;
16   EMMCO, LP" -- and I'll just skip over --
17   "collectively, the EB-5 entities, represents,
18   warrants, and confirms to administrative agent and
19   the lenders as of the date hereof that none of the
20   EB-5 entities has any ownership or any other
21   interest in the property."
22           Didn't the partnership have an interest in
23   the Mirage property?
24       A.  This is a document prepared by my counsel.
25       Q.  Which counsel, Kramer Levin?

18

1        A.  Yes.
2        Q.  Did you understand when you signed this
3    that you were representing that none of the limited
4    partnerships and none of the investors have any
5    interest whatsoever in the Mirage property?
6        A.  I gave the EB-5 documents and the
7    description to my counsel.  I rely on my counsel to
8    perform these complicated real estate transactions.
9        Q.  Okay.  But I'm asking for your
10   understanding, not your counsel's understanding.
11           Did you understand when you signed this
12   that you were telling Emerald Creek that none of the
13   limited partnerships and none of the investors have
14   any interest whatsoever in the Mirage property?
15       A.  Like I said, I rely on counsel to do this
16   transaction.
17       Q.  So did you have any understanding at all
18   of what you were signing?
19       A.  It's a loan that closed in four days
20   including weekend, so everything was rushed.
21           THE COURT REPORTER:  Can you repeat that?
22       A.  It was a loan closed in four days, so
23   every -- everything was rushed.
24   BY MR. STOELTING:
25       Q.  Well, you can see sitting -- reading it,

19

1    sitting here today, right, you can see that what the
2    document says is that your -- it represents that
3    none of the partnerships, none of the investors have
4    any interest in the Mirage property, right?
5            MR. GOURAIGE:  Objection to form of the
6        question.
7            You're limiting your question just to this
8        paragraph or the entire loan agreement?
9    BY MR. STOELTING:
10       Q.  You can answer the question, Mr. Xia.
11       A.  I don't know.
12       Q.  Did you read this agreement before you
13   signed it?
14       A.  I don't remember.  It was very rushed to
15   get it done.
16           MR. MCGRATH:  What was the answer?  I
17       didn't hear it, David.
18   BY MR. STOELTING:
19       Q.  Can you repeat your answer?
20           Let me ask the question again.
21           Did you read this agreement before you
22   signed it?
23       A.  I don't remember.
24       Q.  Is it your practice to sign agreements
25   without reading them?

20

Richard Xia
2/7/2022

1    **A.**  No.
2    **Q.**  So it's your practice to read agreements
3  before you signed them, correct?
4    **A.**  I don't remember exactly what happened.
5    **Q.**  But you know you got $15 million, right?
6  That much, you remember?
7    **A.**  Yes.
8    MR. GOURAIGE:  Object -- objection to
9  form.
10   BY MR. STOELTING:
11   **Q.**  And looking at this -- let me just -- do
12 you see in the middle of the page where -- where
13 there's a little I and it says, "None of the EB-5
14 entities has any ownership and/or other interest in
15 the properties"?  Do you see that?
16   **A.**  Yes, I see that.
17   **Q.**  Okay.  And what does that mean to you?
18 What do those words mean?
19   **A.**  I don't even know what EB-5 meant.  You
20 know, what's EB-5?  Do they have a definition of the
21 EB-5 entities?
22   **Q.**  Yes, it's right above.  You see there's a
23 definition of EB-5 entities is right above.
24   It's defined to mean EMMCO NQMC, LP;
25 EMMCO, LP; the financial group, EMMCO Tower; and

21

1  Federal New York Metropolitan Regional Center?
2    **A.**  Yeah, they are not -- they have no
3  ownership.
4    **Q.**  Or other interest.
5    **A.**  I don't understand what that means.
6    **Q.**  All right.
7    MR. STOELTING:  Let's look at -- let's go
8  to page 10.  Right there.  Right there.  Sorry.
9  Scroll back a little bit.  A little bit.  No,
10 sorry.  Go down a little more, please.  Slowly.
11 Slowly.  Slowly.  A little more.  Okay.  A
12 little more.  I think -- I think it's page 10
13 of the document.  Keep going.  Keep going.
14 Okay.  Stop one second.  Let me just -- let me
15 just check one thing.
16   Okay.  We want to go to section 3.1F.
17 Right there.  Right there.  Okay.
18 BY MR. STOELTING:
19   **Q.**  Okay.  So you see it says, "The loan is
20 solely for the business purpose of borrower and its
21 affiliated entities," right?  Do you see that?
22   **A.**  Yes.
23   **Q.**  And the borrower was X&Y, right?  Mr. Xia?
24   **A.**  That's right.
25   **Q.**  Okay.  So this loan was not used for the

22

1  business of X&Y, was it?
2    **A.**  It is.
3    **Q.**  And -- and what business purpose of X&Y
4  was the loan used for?
5    **A.**  To pay the contractor who build the
6  building.
7    **Q.**  Okay.  Are you not aware that $10 million
8  of this loan was used to pay for the ▮ Middleneck
9  Road house?
10   MR. GOURAIGE:  Objection to the form.
11   **A.**  Yeah, I think I answer that before is we
12 have a legitimate contract and the contract to build
13 the building, and this loan is solely for the
14 purpose to pay a long overdue contract payment due
15 to the contractor.  If a contractor want to give
16 this money to buy a house or do anything else they
17 want to do, I have no control about that.
18 BY MR. STOELTING:
19   **Q.**  Do you know who owns ▮ Middleneck Road?
20   **A.**  The contractor, Emerald Creek Project.
21   **Q.**  And what's that contractor's name?
22   **A.**  Xi Verfenstein.
23   MR. STOELTING:  And could you go to the
24 bottom, the signature block at the bottom of
25 this.

23

1  BY MR. STOELTING:
2    **Q.**  And that's your signature, right?
3    **A.**  Yes.
4    **Q.**  Okay.  And when this money was received by
5  X&Y, what did X&Y -- withdrawn.
6    Did you -- you did not know until today
7  that over $10 million of the money borrowed from
8  Emerald Creek was used to pay for the Middleneck
9  Road house?
10   MR. GOURAIGE:  Objection to form.  I think
11   he's already answered that question, too.
12   **A.**  I think it's answered, right?
13 BY MR. STOELTING:
14   **Q.**  Well, I'm asking a different -- a
15 different question.
16   Do you know how Xi Verfenstein came to pay
17 for the Middleneck Road house?
18   MR. GOURAIGE:  Objection to form and
19   foundation of the question.
20   **A.**  I don't understand your question.
21 BY MR. STOELTING:
22   **Q.**  Okay.  Well, you said that Xi Verfenstein
23 is the owner of ▮ Middleneck Road, correct?
24   **A.**  Yes.
25   **Q.**  And I'll represent that the purchase price

24

1    was $11.1 million, and the closing occurred on
2    August 30, 2021, which was the same day that this
3    Emerald Creek loan closed.
4        So does that refresh your recollection of
5    how that house was paid for?
6        MR. GOURAIGE:  Objection to form of the
7    question.  No foundation.  Who paid for it?
8        MR. STOELTING:  Can you -- Denise, can you
9    read my question again, please.
10        THE COURT REPORTER:  Sure.
11        A.  Yeah, I didn't quite understand your
12    question.
13        THE COURT REPORTER:  One moment.
14        (Record read.)
15        A.  All I know is my contractor need this
16    payment, so I just, you know, asked the lender to
17    pay this loan and, you know, to pay my contract.
18    BY MR. STOELTING:
19        Q.  So Ms. Verfenstein asked you to use the
20    funds from Emerald Creek to pay for the Middleneck
21    Road house?
22        MR. GOURAIGE:  Objection to the form of
23    the question.  No foundation.
24        A.  She simply ask for contract payment.
25

25

1    BY MR. STOELTING:
2        Q.  I'm sorry?
3        A.  She simply ask for contract payment which
4    is long overdue.
5        Q.  So at the time this loan closed, did you
6    know that these funds would go toward the purchase
7    of the Middleneck Road house?
8        A.  Yes.
9        Q.  And the purchase of the house -- so you
10    did know that?
11        A.  All I know is I was told to make a payment
12    to her contract.
13        Q.  But you knew at the time that this loan
14    closed that she was going -- or somehow that money
15    was going to be used to pay for this
16    11 million-dollar home, correct?
17        A.  My understanding is she can pay for
18    anything.
19        Q.  And the payment of -- the purchase of the
20    Middleneck Road is not a business purpose of X&Y, is
21    it?
22        A.  No.
23        Q.  So that representation in the loan
24    agreement was not correct, right?
25        MR. GOURAIGE:  Objection to form of the

26

1    question.
2        A.  No.  X&Y paid its own business obligation,
3    somebody who build a 20-story building, and that
4    payment has been supposedly, you know, paid three
5    years ago.  It's just because SEC investigation of
6    everything else, you know, we just cannot get it
7    paid.
8    BY MR. STOELTING:
9        Q.  Okay.  So you -- you thought of this as a
10    payment to Ms. Verfenstein for work she did.
11        Is that what -- your testimony?
12        A.  It's not what -- it's not what I thought.
13    We have a contract we sign in 2011,
14    80 million-dollar contract, it's DOT contract, it's
15    a very risky contract.  They're supposed to build a
16    building, and they build the building, and, you
17    know, the payment is only -- you know, we only gave
18    them $73 million.  So there is another, I think,
19    $15 million overdue.  And based on the progress they
20    made, it's supposed to be minimum $11 million
21    supposed to be paid to the contractor.  That's the
22    business purpose of X&Y to go to the lender, get
23    this loan.
24        Q.  Okay.  Is there anything in these loan
25    agreements that -- that says what you just said?

27

1        MR. GOURAIGE:  Objection to the form of
2    the question.
3        A.  Loan documents only document the loan
4    transaction; they don't document the business
5    transaction.
6    BY MR. STOELTING:
7        Q.  Was Ms. Verfenstein with you at the
8    closing on August 30, 2021?
9        MR. GOURAIGE:  Objection to the form of
10    the question.
11        Which closing are you referring to, David?
12        MR. STOELTING:  The closing of this
13    Emerald Creek loan.
14        MR. GOURAIGE:  Okay.
15        A.  No.
16        MR. STOELTING:  You can -- you can take
17    that down.
18        Could you put up -- could you put up PDF
19    29, and we'll mark that as Exhibit 3.
20        (Thereupon, marked as Exhibit 3.)
21    BY MR. STOELTING:
22        Q.  This is the EEGH, LP supplemental offering
23    memorandum.
24        MR. STOELTING:  Can you go to page --
25

28

1    BY MR. STOELTING:
2        Q.   Do you recognize this?
3        A.   Yes, I do.
4        Q.   Okay.
5            MR. STOELTING:  Could you go to page --
6        page 8.  I don't think there's numbers on the
7        document, but -- a little bit farther down.
8        Keep going.  A little bit farther.  Okay.
9        That's good.  That's good.
10    BY MR. STOELTING:
11        Q.   Okay.  So this is from the EEGH
12    supplemental offering memo, and it says, "Pursuant
13    to the revisions set forth in the supplemental
14    offering documents, the Eastern Emerald Project
15    costs are expected to be financed as follows."
16            And do you see where it says, "Brownfield
17    tax credit $21.2 million"?  Do you see that?
18        A.   Yes.
19        Q.   Okay.  So what this is telling investors
20    is that you plan to get a Brownfield tax credit and
21    use that for the Eastern Emerald Project, correct?
22            MR. GOURAIGE:  Objection.
23    BY MR. STOELTING:
24        Q.   Mr. Xia?
25        A.   Yes.

29

1        Q.   Okay.
2            MR. STOELTING:  You can take that down.
3        A.   No.  I answer you "yes" because you
4        calling my name.  I not answer your question.
5    BY MR. STOELTING:
6        Q.   Oh, okay.  Well, my question was -- and we
7    can put it up if you'd like, but all I was saying
8    was --
9        A.   Yeah, put it back, please.
10            MR. STOELTING:  Okay.  Can you bring
11        back -- there.  Okay.
12    BY MR. STOELTING:
13        Q.   So do you see where it says, "Brownfield
14    tax credit, $21.2 million"?  Is that not saying --
15        A.   That's not the question you were asking
16    me.
17            THE COURT REPORTER:  I'm sorry?
18    BY MR. STOELTING:
19        Q.   Let me ask a new question.
20            This says that the Eastern Emerald Project
21    costs are expected to be financed as follows, and
22    one of the items is 21.2 million-dollar Brownfield
23    tax credit, correct?
24        A.   So that was the offering documents in
25    2014, right?

30

1        Q.   I'm just asking you what it says right
2    here.
3        A.   Yeah, but I'm trying to clarify that the
4    offering documents, because you're reading one
5    paragraph, one sentence in the document prepared in
6    2014, right?
7        Q.   Well, do you recall when it was prepared?
8        A.   You have the document, you know.  I'm
9    sorry.  We're in front of the computer.  If you have
10    the document, we can go back to the first page and
11    see what the date is of the document.  You know,
12    then I can understand your question precisely and
13    answer your question accurately.
14        Q.   All right.  Well, let's just move on.
15            MR. STOELTING:  You can take that down.
16    BY MR. STOELTING:
17        Q.   Mr. Xia, do you recall in January 2021
18    that you received a 10.9 million-dollar check from
19    the New York State -- from New York State for the
20    Brownfield remediation?
21        A.   Yes.
22        Q.   And that was the Brownfield tax credit
23    money, right?
24        A.   I don't know what's your definition.
25            What's your definition of the Brownfield

31

1    tax credit money?
2        Q.   We're here to get your testimony, not
3    mine.
4        A.   Well, I'm trying to understand your
5    question.
6            MR. GOURAIGE:  Objection to form.  I
7        think -- I think the witness is saying there
8        are different components to the tax credit.
9        Which one are you referring to?
10    BY MR. STOELTING:
11        Q.   All right.  Well, let -- let me move on.
12            When you got the 10.9 million-dollar check
13    from New York State in January 2021, what did you do
14    with it?
15        A.   I deposit that into the bank.
16        Q.   And you put in an Eastern Emerald Group
17    account, correct?
18        A.   Yes.
19        Q.   And then you took $10 million of those
20    funds and you put it into a certificate of deposit
21    at CTBC Bank, correct?
22        A.   Yes.
23        Q.   And then you used that $10 million as
24    collateral to borrow $10 million from CTBC, correct?
25        A.   Yes.

32

Richard Xia
2/7/2022

1    Q.   And once you obtained that $10 million
2  using the certificate of deposit as collateral, in
3  April and May 2021, you transferred a little over
4  about 5 1/2 million dollars to an account in your
5  wife's name at CTBC, right?
6    A.   That's right.
7    Q.   And where do you live now?
8    A.   I live in Great Neck.
9        THE COURT REPORTER:  Where?
10  BY MR. STOELTING:
11    Q.   At ███ Kingspoint Road?
12    A.   Yes.
13    Q.   And there's no mortgage on that property,
14  right?
15    A.   No.
16    Q.   It was an all-cash purchase in
17  August 2021, correct?
18    A.   That's right.
19    Q.   And the purchase price was $14 million,
20  right?
21    A.   Yes.
22    Q.   And this is a house with 13,000 square
23  feet and 13 bathrooms and a basketball court?
24    A.   Yes.
25    Q.   And the -- you used some of that

33

1  $10 million, 5.6 million, to pay for the house on
2  Kingspoint Road, correct?
3    A.   I used what money?
4    Q.   The 5.6 million that you transferred to
5  your wife in April 2021, that money was -- that
6  5 1/2 million dollars went toward the purchase of
7  the Kingspoint Road house, correct?
8    A.   Number 1, Eastern Emerald Group is S
9  corporation.  That means my wife's account and
10  Eastern Emerald contract, they're the same.
11       Number 2, I testified before in our
12  Chinese tradition, there is no wife and husband.
13  All accounts, they are -- you know, they are all
14  shared together.
15       And Number 3, the Brownfield tax credit
16  refund, it come back to an LLC.  Eastern Emerald is
17  an LLC.  It is typically a pass-through entity.  So
18  all the money for any other, I guess, Brownfield tax
19  refund, they all direct go back to personal name.
20  Here, just because we are, you know, single-owner
21  LLC, so we don't mind to keep that tax credit in the
22  name of Eastern Mirage Group.
23    Q.   Let me ask the question again.
24       The 5.6 million that you transferred to
25  your wife in April and May 2021, that 5.6 million

34

1  went toward the purchase of the Kingspoint property,
2  correct?
3    A.   I don't consider that money to transferred
4  into my wife's account.
5    Q.   I'm sorry?
6    A.   So the question is no, I don't consider
7  that money was, you know, transferred into my wife's
8  account.  I can say that it's the same entity.  So
9  the answer to your question is no.
10    Q.   Okay.  Wasn't it transferred into an
11  account in the name of your wife, Julia Yue?
12    A.   It's a corporation transferred to the --
13  the --
14    Q.   Your -- the 5.6 million was transferred
15  into an account at CTBC Bank in the name of your
16  wife, Julia Yue, an account on which she held within
17  her name only, correct?
18    A.   Right.
19    Q.   And just to ask one more time, that
20  5.6 million that was deposited into Julia Yue's
21  account in May 2021, those funds were used to
22  purchase the house at ███ Kingspoint Road, right?
23    A.   Right.
24    Q.   So if we could look at PDF 6, and we'll
25  just mark it as the next exhibit.

35

1        (Thereupon, marked as Exhibit 4.)
2        MR. GOURAIGE:  Which exhibit number is
3  this, David?
4        MR. STOELTING:  Are we up to 4?
5        THE COURT REPORTER:  Yes.
6        MR. STOELTING:  Oh, I'm sorry.  I'm sorry,
7  Nicole.  It should be the one PDF 4.  I have
8  the wrong location.
9        All right.  Can you scroll down, and we're
10  looking for the loan agreement.
11        Okay.  Stop.  Just go to the signature.
12  All right.
13  BY MR. STOELTING:
14    Q.   All right.  Is that your signature?
15    A.   Yes.
16    Q.   And if you want to look -- if you want to
17  read any portion of this while we're scrolling
18  through, just say so and we can stop.  I don't want
19  to stop you from reading any portion of it that you
20  want to.
21        MR. STOELTING:  Can you go to page 7 of
22  the PDF.  Okay.  Stop.  Where it says, "loan
23  proceeds."  A little farther down.
24  BY MR. STOELTING:
25    Q.   Okay.  Do you see where it says "loan

36

1  proceeds"?
2      "Use all loan proceeds solely for
3  borrower's business operations, unless specifically
4  consented to the contrary by lender in writing."
5      MR. STOELTING: And then could you go to
6  page 9. A little bit -- sorry. A little bit
7  up.
8  BY MR. STOELTING:
9      Q. Okay. And you see "line of credit."
10     Do you see where it says "line of credit"
11 there?
12     MR. GOURAIGE: Which line are you pointing
13 to, David?
14     MR. STOELTING: It's toward the -- toward
15 the top half of what you're seeing on the
16 screen.
17     MR. GOURAIGE: Oh, I see it. I see it.
18 "Line of credit." Below the first paragraph.
19 BY MR. STOELTING:
20     Q. Yeah, it says, "Lender agrees to make
21 available to borrower a revolving line of credit up
22 to a maximum amount of $10 million. This line of
23 credit may be used for working capital and equipment
24 purchases."
25     Do you see that?

37

1      A. Yes.
2      Q. So did you understand that the lender was
3  agreeing to loan this money only for business
4  purposes, working capital, equipment purchases?
5      MR. GOURAIGE: Object to the form of the
6  question. That's not what the document says.
7  It says, and I quote, "may be used for," end of
8  quote.
9  BY MR. STOELTING:
10     Q. Okay. And Mr. Xia, did you understand
11 that the lender was lending this $10 million to you
12 with these conditions?
13     MR. GOURAIGE: Objection to the form.
14 What are you referring to as "these
15 conditions"?
16 BY MR. STOELTING:
17     Q. That the line of credit may be used for
18 working capital and equipment purchases, and
19 actually, there's one other provision I wanted to
20 highlight on page 20 of the PDF.
21     Okay. And you see where it says, "primary
22 purpose of loan," Mr. Xia?
23     A. Yeah, I'm looking at it.
24     Q. Okay. And you see -- and is that your
25 initials, RX?

38

1      A. Yes.
2      Q. Okay. So you're indicating that the
3  purpose -- that you have a business purpose in
4  making this 10 million-dollar loan, correct?
5      MR. GOURAIGE: Objection to the form of
6  the question. Please read the entire line. It
7  says, "Business (including real estate
8  investment)."
9  BY MR. STOELTING:
10     Q. Mr. Xia, do you understand the question?
11     A. No.
12     Q. Okay. Do you see those three provisions
13 of the loan agreement that I just highlighted?
14     A. Yes.
15     Q. Okay. There's business purposes, working
16 capital, equipment, and then this last page says
17 "Business (including real estate investment)," and
18 you're checking there.
19     So what did you understand that to mean at
20 the time?
21     A. It's a real estate investment for an S
22 corporation home office.
23     Q. Okay. So when you used $5.6 million of
24 this loan to buy a 13,000 square foot, that was a
25 business investment?

39

1      MR. GOURAIGE: Objection to the form of
2  the question.
3      A. I work there every day, and it's an S
4  corporation home office. That's all my
5  understanding, and also part of the real estate
6  investment.
7  BY MR. STOELTING:
8      Q. Okay. And you've referred a number of
9  times to an S corporation.
10     What is the S corporation you're referring
11 to?
12     A. Eastern Emerald Group.
13     Q. The limited partnership?
14     A. Yes.
15     Q. Eastern Emerald Group was the borrower on
16 this loan agreement.
17     A. You're right.
18     Q. Eastern Emerald Group, LLC. Okay.
19     So did you think when you represented to
20 investors that you would use the Brownfield tax
21 credit for the Eastern Emerald Project, that that
22 included buying a 14 million-dollar house?
23     MR. GOURAIGE: Objection to the form of
24 the question.
25     A. The Brownfield tax credit is $84 million.

40

1  It's not just $10 million. And it's a offering
2  document prepared in 2014. It's a forward-looking
3  statement. I think there's probably a certain place
4  in the offering document mention that.
5      THE COURT REPORTER: I'm sorry, what was
6      the last part?
7      A. I think there's a certain place in the
8  offering document mentions that it's a
9  forward-looking statement.
10      And in terms of the real estate financing,
11 you don't put all the money there. I'm not using
12 80 million-dollar tax credit to buy this house; I'm
13 using $10 million. I still have another
14 70 million-dollar issued, which is more than
15 sufficient even though I still consider that forward
16 statement a hold position, because right now we have
17 other viable financial consultants as a general
18 matter. As the developer, I may utilize some other
19 more viable, more beneficial financial consultants
20 to complete the project.
21 BY MR. STOELTING:
22      Q. Is it a benefit to investors for you to
23 spend 5 1/2 million dollars on the Kingspoint Road
24 house?
25      MR. GOURAIGE: Objection to the form of

41

1      the question.
2      A. My investor is an investor to an LT, which
3  is different partnership, and different partnership
4  assets is a promissory note. So the interest of the
5  investors, their promissory note is fully secured.
6  Actually, even for EB-5, it cannot be fully secured,
7  but in my case, the project value is more than that
8  promissory note for the entire time of construction
9  project. Typically, it's supposed to be sufficient
10 at end of the project.
11      So whatever I have done for my investors,
12 I cannot say if I'm the only one, but I can tell
13 you, in my own personal opinion, it's above and
14 beyond most of EB-5 investors operating in the whole
15 nation.
16 BY MR. STOELTING:
17      Q. So the ▪▪▪ Kingspoint Road, that's in the
18 name of your wife, correct?
19      A. Yes.
20      Q. Okay. It's not in the name of an S Corp
21 or Eastern Emerald Group, correct?
22      A. Again, it's S corporation. It's a Chinese
23 tradition. I just want to put it in my wife's name.
24 For so many years hard work I did, I just want to
25 make her happy.

42

1      Q. Do you recall a transfer of about
2  $5 million to CTBC Bank in June 2021 which was
3  deposited in the account in the name Fleet General
4  Insurance Group?
5      A. No.
6      Q. Do you remember in August 2021 acquiring a
7  certificate of deposit in the amount of 4.5 million
8  that was funded by money in the Fleet General
9  Insurance Group account?
10      A. I didn't hear your question clearly.
11      You were mentioning from where, transfer
12 from Fleet General Insurance company account?
13      Q. Okay. Let me -- let me start again.
14      Do you remember $4.5 million was
15 transferred in June 2021 to an account at CTBC Bank
16 in the name of Fleet General Insurance Group?
17      MR. GOURAIGE: Before you answer, Mr. Xia,
18      David, can I just interrupt for a second.
19      If you're moving to a new area, can we
20      take sort of a two-minute personal break?
21      MR. STOELTING: I'm not moving to a new
22      area, but yes, we can -- we can go off the
23      record.
24      MR. GOURAIGE: Just two minutes. Thank
25      you.

43

1      THE VIDEOGRAPHER: The time is 11:37 a.m.
2  Off the record.
3      (Recess taken.)
4      THE VIDEOGRAPHER: The time is 11:41 a.m.
5  Back on the record.
6  BY MR. STOELTING:
7      Q. So I was -- Mr. Xia, I was asking about
8  whether you recall acquiring a certificate of
9  deposit of $4.5 million in August 2021.
10      A. From where?
11      Q. I'm sorry?
12      A. I don't know. I mean, you have to give me
13 more specific information. From where, a CD?
14      Q. Do you recall an entity called Fleet
15 General Insurance?
16      A. Fleet General Insurance Group, right?
17      Q. Yes.
18      A. Yes, I recall that.
19      Q. Okay. That's the company that you own,
20 correct?
21      A. Yes.
22      Q. And do you remember opening an account at
23 CTBC in the name of Fleet General Insurance Group in
24 August -- in August 2021?
25      A. Yes.

44

1    **Q.** And you transferred about 4-point --
2  4 1/2 million dollars into that account and acquired
3  a certificate of deposit at CTBC, correct?
4    **A.** Transfer from where?
5    **Q.** Well, do you remember acquiring the
6  4.5 million-dollar CD in August 2021?
7    **A.** Yes.
8    **Q.** And you used that CD to get a loan for
9  $4.5 million, right?
10   **A.** That's right.
11   MR. STOELTING: If we look at -- it's PDF
12   5.
13   Could you scroll down, please.
14   (Thereupon, marked as Exhibit 5.)
15   MR. GOURAIGE: Nicole, could you enlarge
16   the document, please. I can't see it. Okay.
17  BY MR. STOELTING:
18   **Q.** Okay. Is that your signature?
19   **A.** Yes.
20   MR. STOELTING: Could you keep going.
21  BY MR. STOELTING:
22   **Q.** Do you know whose signature that is,
23  secretary of -- if you could -- secretary of Fleet
24  General Insurance Group?
25   **A.** Yes.

45

1    **Q.** That's your signature? Whose signature is
2  that? That's yours?
3    **A.** Yes.
4    **Q.** Okay. Thank you.
5    MR. STOELTING: Could you keep going.
6    Okay. Keep going. Okay. Stop.
7  BY MR. STOELTING:
8    **Q.** Do you see where it says, "loan proceeds"?
9    **A.** Yes.
10   **Q.** Okay. And it says, "Loan proceeds: Use
11  all loan proceeds solely for borrower's business
12  operations, unless specifically consented to the
13  contrary by lender in writing."
14   MR. STOELTING: And then if you could go
15   to page 8 of the PDF. Okay. All right. Stop.
16  BY MR. STOELTING:
17   **Q.** So this says, "Line of credit,
18  4.5 million."
19   And you see where it says, "This line of
20  credit may be used for working capital"?
21   MR. STOELTING: And then if you could go
22   to page 18 of the PDF.
23  BY MR. STOELTING:
24   **Q.** Okay. And so there it again says
25  "Business (including real estate investment),"

46

1  right?
2    **A.** You're asking me?
3    **Q.** Yes.
4    **A.** What's the question?
5    **Q.** I'm just pointing out where -- well, are
6  those your signatures where it says, "Business
7  (including real estate investment)" under "primary
8  purpose of loan"?
9    **A.** You just point to three parts of this loan
10  agreement.
11   So you're talking about this page right
12  now, right?
13   **Q.** No, I'm just asking if those are your
14  initials.
15   **A.** Yes, it is.
16   **Q.** Okay. So this 4 point -- and this was a
17  business loan, correct?
18   **A.** Yes, it is.
19   **Q.** Okay. And you used this money to buy --
20  toward the purchase of the Kingspoint Road house,
21  correct?
22   **A.** I use this money to give a loan to myself
23  to buy the property.
24   **Q.** So my question was, the $4.5 million that
25  you obtained from CTBC through this business loan

47

1  agreement, you used for the purchase price of
2  Kingspoint Road, right?
3    **A.** No. I don't know why you -- we have such
4  a hard time understand each other. I told you --
5  let me repeat myself second time.
6    This is the loan proceeds from insurance
7  company, and I don't know if you know that the major
8  business activity of a insurance company is to give
9  loan out that generates a return for the insurance
10  funds.
11   So this transaction is a transaction we
12  got a loan from CTBC Bank from insurance company and
13  give a loan to myself to buy property so the
14  insurance company can generate a better return.
15   **Q.** Okay. Well, thank you. That was my
16  question.
17   The loan was used to buy the property is
18  what you said, right?
19   **A.** No.
20   MR. GOURAIGE: Objection. Objection. I
21   don't think that's what he said, David.
22  BY MR. STOELTING:
23   **Q.** Then just tell us what the 4.5 million
24  was -- was used for.
25   **A.** It's a loan for myself.

48

Richard Xia
2/7/2022

1    **Q.** Okay. And then how did you use it?
2    **A.** How I use it --
3        MR. GOURAIGE: Objection to form. Can --
4    can we be clear, David, which transaction
5    you're referring to when you say, "How did you
6    use it?"
7        MR. STOELTING: I'm talking about the
8    $4.5 million that was borrowed from CTBC
9    pursuant to the business loan agreement that we
10   have on the screen now.
11       MR. GOURAIGE: That's -- that's one
12   transaction. I think the witness has just
13   testified that he got a loan from Fleet
14   Insurance Group of 4.5 million, and he used
15   those proceeds of that loan to buy the house.
16       So I -- which -- which -- you're
17   referring -- you're referring to the loan from
18   CTBC to Fleet.
19       THE WITNESS: No, he -- I think he
20   referred to the loan from CTBC to Fleet General
21   Insurance.
22       MR. GOURAIGE: Right.
23   BY MR. STOELTING:
24   **Q.** Let's just start again. Let's just start
25   again.

49

1        You understand on the screen now what
2    we've been talking about is a business loan
3    agreement, right?
4    **A.** That's right.
5    **Q.** And the borrower was Fleet General
6    Insurance Group, correct?
7    **A.** That's right.
8    **Q.** And the lender was CTBC Bank, correct?
9    **A.** That's right.
10   **Q.** Okay. And under this agreement, Fleet
11   General Insurance Group received $4.5 million,
12   right?
13   **A.** Yes.
14   **Q.** And what did Fleet General Insurance Group
15   do with that $4.5 million?
16   **A.** They gave another loan.
17       THE COURT REPORTER: Do what?
18   BY MR. STOELTING:
19   **Q.** To who?
20   **A.** Gave another loan to my personal.
21   **Q.** And is that loan documented?
22   **A.** Of course.
23   **Q.** Okay. And so then you're saying Fleet
24   General Insurance Group turned around and loaned
25   you, Richard Xia, personally, this 4.5 million?

50

1    **A.** Yes, and these consultants --
2        THE COURT REPORTER: I'm sorry, I can't
3    understand what you're saying.
4    **A.** Yes, and we these insurance, I think
5    financial department to make sure that the insurance
6    fund is always been used to give a loan.
7    BY MR. STOELTING:
8    **Q.** Okay. I don't think we've seen a loan
9    agreement between Mr. Xia and Fleet General
10   Insurance Group for 4.5 million.
11       Do you still have a copy of that loan
12   agreement?
13   **A.** Yes, I do.
14   **Q.** Okay. And then when you received the
15   $4.5 million from Fleet General Insurance Group,
16   that's when you used the money toward the purchase
17   of Kings -- Kingspoint Road?
18   **A.** Yes, it is.
19   **Q.** Okay. Did you get any legal advice from
20   any lawyers, the way you were using these -- on the
21   topic -- I'm not asking for the subject of legal
22   advice; I meant the topic of whether the way you
23   used these loan proceeds was consistent with the
24   terms of the loan agreement?
25       MR. GOURAIGE: I will interject here and

51

1    advise the witness, you may answer if you did,
2    yes, but do not answer about the substance of
3    the legal advice you were given, if any.
4        Do you understand my instruction, Mr. Xia?
5        THE WITNESS: Yes, I understand that.
6    **A.** Yes, I did.
7    BY MR. STOELTING:
8    **Q.** And did you follow -- again, I'm not
9    asking for the advice, but did you follow the advice
10   that you were given?
11       MR. GOURAIGE: I will object to that
12   question. It's a privileged communication as
13   to whether or not he followed or rejected the
14   advice or whatever he did.
15   BY MR. STOELTING:
16   **Q.** Okay. Can you identify the lawyer that
17   gave you that advice regarding this loan agreement,
18   just the name?
19   **A.** Which agreement?
20   **Q.** Well, the loan agreement that we have on
21   the screen now.
22   **A.** No, what I'm talking about is the
23   insurance loan were paid to myself, not this loan
24   agreement.
25   **Q.** No, my -- we'll get to that.

52



1    My question was, you -- I thought you
2  testified that you had received legal advice about
3  whether or not it was appropriate to use the
4  4.5 million to then loan it to you personally and
5  then for you to use it toward the purchase of the
6  house.
7    And my question was only, what was the
8  name of the lawyer that gave you that legal advice?
9    MR. GOURAIGE:  Objection to form.
10   **A.**  I -- I don't remember that.
11  BY MR. STOELTING:
12   **Q.**  Was it Brett McCabe?
13   THE COURT REPORTER:  What was the name?
14   MR. STOELTING:  Brett McCabe.
15   **A.**  No.
16  BY MR. STOELTING:
17   **Q.**  So what were the terms of the loan
18  agreement between yourself and Fleet General
19  Insurance Group?
20   **A.**  There is a lot of firms here.
21   **Q.**  Well, is there a period of time within
22  which you have to pay the money back to Fleet
23  General Insurance?
24   **A.**  It's on the agreement.  I don't recall the
25  terms.

53

1   **Q.**  Was that loan agreement executed at the
2  same time the business loan agreement we have on the
3  screen was executed?
4   **A.**  No.
5   **Q.**  No?
6   **A.**  No.
7   **Q.**  So it was later?
8   **A.**  I don't remember specific date of that
9  document.
10   **Q.**  All right.  Well, we'll follow up later
11  and ask for a copy of that and ask that that loan
12  agreement be produced.
13    Are you --
14   MR. STOELTING:  You could -- you could
15  take that down, Nicole.
16    Could you put up PDF 8, and we'll call
17  this Exhibit 5 or 6?
18   THE COURT REPORTER:  It should be 6
19  because the last one, I think, you wanted to
20  mark as 5; is that right?
21   MR. STOELTING:  All right.  Great.  So the
22  next one will be 6.
23   THE COURT REPORTER:  Yep.
24   (Thereupon, marked as Exhibit 6.)
25

54

1  BY MR. STOELTING:
2   **Q.**  Okay.  Is this the Kingspoint Road house?
3   **A.**  Yes, it is.
4   **Q.**  Okay.
5    MR. STOELTING:  And you could take that
6  down.
7    Could you put up Number 9 or PDF 9, and
8  we'll call that Exhibit 7.
9    (Thereupon, marked as Exhibit 7.)
10  BY MR. STOELTING:
11   **Q.**  Do you recognize this house?
12   **A.**  Yes.
13   **Q.**  Okay.  And where is this house?
14   **A.**  This is a house in Sands Point.
15   THE COURT REPORTER:  What?  Where?
16  BY MR. STOELTING:
17   **Q.**  And this is --
18   **A.**  Sands point.
19   THE COURT REPORTER:  Counsel, I'm not
20  understanding.
21   **A.**  Sands point, S-A-N-D-S, P-O-I-N-T.
22   THE COURT REPORTER:  Thank you.
23  BY MR. STOELTING:
24   **Q.**  And this is on ▮ Vanderbilt Drive?
25   **A.**  Yes.

55

1   **Q.**  And who is the owner of this house?
2   **A.**  I believe it's Xi Verfenstein's mom.
3   THE COURT REPORTER:  It's who?
4   **A.**  Xi Verfenstein's mom.
5   THE COURT REPORTER:  Thank you.
6  BY MR. STOELTING:
7   **Q.**  Do you remember we talked about the
8  10 million-dollar loan that Eastern Emerald Group
9  obtained from CTBC?
10   **A.**  Yes, I do.
11   **Q.**  Okay.  And did -- $2.5 million from that
12  loan was used to pay for this Vanderbilt Drive
13  house, correct?
14   **A.**  I don't want to make our deposition into
15  difficult.  I just would need the description of
16  that transaction.  I don't know.  I don't know.
17  Therefore, I would just tell you no.
18   **Q.**  No, my -- my question is, we looked at
19  wire transfer records, and they show $2.5 million
20  from the Eastern Emerald Group loan being used to
21  purchase this house.
22    And did you know that?
23   **A.**  No, that's a business transaction.
24  That's -- number one, it's a Brownfield tax credit.
25  Nothing to do with your so-called EB-5 one.

56

1    Number 2, this is not a house.  Look at
2  the picture.  It's huge elevation difference right
3  now.  And this is a certain fact.  The purpose
4  Verfenstein trying to buy, you know, this place
5  is -- because we had a ground-breaking ceremony
6  instead on September 28, and we -- you know, I was
7  asking them to basically prepare a place to dump the
8  dirt, and she came up with this crazy idea.  Pretty
9  much, she paid for the site, and she can dump all
10 these materials from this project for free.
11    So all of your question, you know, you
12 phrase it totally differently.  I made the payment
13 from Eastern Emerald Group to my general contractor
14 Perini Group, and they decide to buy a certain site,
15 which is very typical in the construction industry.
16 Otherwise, you have to pay for the dumping, you
17 know, that's dirt and everything.  That's humongous
18 of money.
19    So if you're asking me if you use that
20 Brownfield tax credit loan money to buy this house,
21 all I can tell you is no.  This is almost like 25,
22 30 feet elevation different.  Whoever come up with
23 this idea, she's very smart.  Instead of paying
24 those, you know, dumping trucks by truck, you bought
25 the site.  There's a huge elevation difference and

57

1  still, you know, an increase in value, you can split
2  it.  It's a pure business purpose, money wired from
3  my account to Perini account, and that's part of the
4  whole process.
5    Even for my first project, we did a deep
6  foundation.  All the soil had been sold to the park
7  instead of paying for the dumping.
8    Q.  So getting back to that transfer,
9  2.5 million was transferred to Perini is what I
10 think you just confirmed, right?
11    A.  That's right.  You absolutely right.
12    Q.  Was this a business purpose also?
13    A.  Yes.  It's a factual deposition.  At least
14 you reflect at minimum should give us a chance to
15 understand information before you made the
16 conclusion.  We are doing the factual deposition
17 here.  You know, I'm open, transparent.  Whatever
18 the question you ask me, I can answer you, but if
19 you -- you know, every time you just make a
20 conclusion before you even ask for factual
21 information, I'm sorry, all I can tell you is no.
22    MR. GOURAIGE:  Mr. Xia, let me just
23 caution you that your job is to answer the
24 questions that Mr. Stoelting is asking you, so
25 I would just remind you, just refrain from

58

1  giving him advice about characterizing his
2  questions.  Just answer his questions.
3    THE WITNESS:  Okay.  I'm sorry.  You know,
4  it's the third time I been asked the question.
5  Almost like the question is conclusive.
6    A.  Go ahead, sorry.
7  BY MR. STOELTING:
8    Q.  What was your -- you were saying something
9  about excavation, what is -- what was your point
10 about something being excavated having to do with
11 the Eastern Emerald Group loan being used for this
12 purchase of Vanderbilt Drive?
13    MR. GOURAIGE:  Objection to form of the
14    question.
15    A.  Yeah, we still have a lot of dirt in the
16 Eastern Emerald Project site.  In order to, you
17 know, do the work, construction, we have to dig all
18 this dirt and dump into a different dumping site.
19 And here, this is a perfect dumping site because the
20 big different elevations here.  If you just level
21 them, the property value could increase and the --
22 you know, the dump, the soil can be reused.  And
23 that's -- you know, I was asking my general
24 contractor to make sure that by the time he starts,
25 you know, super -- the construction and all the, you

59

1  know, soil needs to be, you know -- needs to be
2  hauled ASAP, and this is part of that arrangement
3  process.  Xi came up with this idea.
4  BY MR. STOELTING:
5    Q.  Okay.  You're going to dump dirt from the
6  Eastern Emerald site at Vanderbilt Drive?
7    A.  That's right.
8    Q.  Where?
9    A.  Huh?
10    Q.  Like, where?  Where the tennis court is?
11    A.  Yes.
12    Q.  So you're going to take dirt from Northern
13 Boulevard, load it into a truck and drive it out to
14 Vanderbilt Drive and dump it where the tennis court
15 is?
16    A.  It's not me; it's the general contractor.
17 You know, they were trying to do a transaction like
18 this.  And as a matter of fact, they already applied
19 the permit and everything.
20    Q.  Did you have to get any approval from
21 Sands Point officials to do that?
22    A.  Yes.  They were doing same thing a long
23 time ago.  They already got the permit, they got
24 the, you know, civil engineering, the survey on the
25 street, and they did the boring, they did the

60

1  design. It's not, you know, like a simple work.
2  It's a long process.
3      MR. STOELTING: Okay. You can take that
4  down.
5      Could you go to -- could you put up PDF
6  11, which we'll mark as Exhibit 8.
7      (Thereupon, marked as Exhibit 8.)
8  BY MR. STOELTING:
9    Q. So Mr. Xia, you had a lawyer assisting you
10  with your communications with USCIS, correct?
11    A. Yes.
12    Q. And her name was Linda Lau, L-A-U?
13    A. That's right.
14      MR. STOELTING: Could we go to page 5.
15  BY MR. STOELTING:
16    Q. Do you see the date on this is
17  November 20, 2014?
18    A. Yes.
19    Q. Okay. And it says, "Response to request
20  for evidence"?
21    A. Yes.
22    Q. And do you remember the USCIS asking you
23  for evidence to back up the things that you were
24  telling investors?
25    A. What do you mean "the things"?

61

1      THE COURT REPORTER: I'm sorry?
2    A. I don't know. What do you mean "the
3  things"?
4      MR. STOELTING: Why don't we move ahead to
5  page -- page 5.
6  BY MR. STOELTING:
7    Q. This is request -- response to Request
8  Number 4. "Per USCIS request, the comprehensive
9  business plan has been updated, and the estimated
10  cost is consistent throughout the filing."
11    A. Yes, I see that. It's not something they
12  asked us to clarify the thing we talked to the
13  investor. It's USCIS request -- ask us to update a
14  comprehensive -- update a comprehensive business
15  plan. It's not a clarification to the thing told
16  investor.
17    Q. Okay. If you could just wait for a
18  question.
19      This -- this is the response from you --
20  from your lawyer on behalf of you to USCIS, correct?
21    A. Yes, a response to the request to update
22  the business plan.
23    Q. Okay. So in the first bullet point it
24  says, "18 million from new market tax credit
25  financing. Please see Exhibit 6."

62

1    A. Yes.
2    Q. Okay.
3      MR. STOELTING: I think we lost the...
4      Can you go to page -- can you scroll down.
5  We need to find the right page. Oh, backwards.
6  The other way. The other way. Okay. That's
7  it. That's it. Okay.
8  BY MR. STOELTING:
9    Q. So you're telling USCIS the $110 million
10  nonEB-5 funds will come from the following sources:
11  18 million from new market tax credit, NMTC.
12      And it's Exhibit 6, and we'll look at that
13  letter in a minute. And then below that, and then
14  it says, "20 million tax credit from New York
15  Brownfields program," and then third bullet point
16  says, "72 million-dollar loan from Hapoalim
17  Securities."
18      And there's Exhibit 9, and we'll look at
19  that letter in a minute also.
20      But the new market tax credit, you never
21  obtained the new market tax credit, correct?
22    A. I don't understand your question.
23      MR. GOURAIGE: Object to the form. When
24  you say "obtained," do you mean actually
25  received the loan proceeds or -- I'm sorry, tax

63

1  credit proceeds?
2  BY MR. STOELTING:
3    Q. Do you understand the question, Mr. Xia?
4    A. No.
5    Q. Did you ever receive $18 million from the
6  New York new market tax credit?
7    A. No.
8    Q. And you never, in fact, received any money
9  at all from the new market tax credit, correct?
10    A. That's right.
11    Q. Okay. And the reference to the
12  72 million-dollar loan from Hapoalim, you never
13  received any loan at all from Hapoalim, correct?
14    A. That's right.
15    Q. Did you ever speak to anyone at Hapoalim?
16    A. Yes.
17    Q. Who?
18    A. Eddie Chan.
19      THE COURT REPORTER: What was that?
20    A. Eddie Chan, E-D-D-I-E, C-H-A-N.
21    Q. Apart from Mr. Chan, did you ever speak
22  with anyone at Hapoalim?
23    A. He's my contact.
24    Q. So my question is, apart from Mr. Chan,
25  did you ever speak to anyone else at Hapoalim?

64

1    A.   No.
2    Q.   Did you ever go through any due diligence
3  process at Hapoalim Securities to obtain a loan?
4        MR. GOURAIGE:  Objection to form.
5    A.   I don't understand your question.
6  BY MR. STOELTING:
7    Q.   Well, let me ask a different one.
8        Did you ever fill out a loan application
9  in order or any paperwork at all in order to submit
10  to Hapoalim Securities?
11   A.   That's just not how real estate financing
12  works.
13       THE COURT REPORTER:  I'm sorry?
14   A.   That's just not how the real estate
15  financing works.  The due diligence document, you
16  submit it to the person and then you take those due
17  diligence documents for the company they working for
18  to work on that.  For the real estate financing, if
19  you look at Emerald Creek deal, they can close in
20  four days.  It's Friday, Saturday, Sunday, and a
21  Monday.
22       So if you're asking me if I have to -- if
23  I have to go through the due diligence process
24  properly, I can tell you I worked with Eddie Chan
25  since 2011 and for recovering of funds and many

65

1  other parts.
2        So he has all my due diligence documents.
3  If you're asking me if I go through the Hapoalim due
4  diligence process, I can tell you yes, because he
5  has all my financial projects due diligence
6  documents.
7    Q.   Well, what documents do you have relating
8  to any proposed or contemplated loan of any amount
9  from Hapoalim Securities?
10   A.   You gave me project information, financial
11  information.  You don't give any Hapoalim
12  information.  It's short of universal information.
13  You present your project.  The lender take a look
14  and they consider if they can give you the loan.
15   Q.   Okay.  Again, I'm trying to find out what
16  documents you have relating to any potential
17  contemplated loan from Hapoalim Securities.
18       MR. GOURAIGE:  Objection to the form.
19   A.   I gave all my financial project
20  information into one person.  If that person working
21  for Hapoalim, working for MR Bill or working for
22  some other company, that's his issue.  My issue is,
23  I present my financial documents in one shot.  I
24  don't prepare different financial documents for
25  different financial institutions, especially if, you

66

1  know, it's the same person who working at different
2  company.
3  BY MR. STOELTING:
4    Q.   Okay.  So is the answer that you don't
5  have any documents at all relating to any
6  contemplated loan from Hapoalim Securities?
7        MR. GOURAIGE:  Objection to form.
8    A.   No.  I have all the documents I provided
9  to the financial representative, Eddie Chan.
10  BY MR. STOELTING:
11   Q.   Did you keep copies of those documents?
12   A.   I just don't recall.  It's too long ago.
13   Q.   Okay.  So you're saying Eddie Chan has the
14  due diligence documents relating to the Hapoalim
15  Securities loan?
16       MR. GOURAIGE:  Objection to form.
17   A.   He has the due diligence documents on my
18  project.  Due diligence documents is not changed
19  from one financial institution to another
20  institution.  Due diligence documents is all the
21  information of so many years working.  We work on
22  the liquidity fund, we working on the Hapoalim, we
23  work on, you know, the paid financing.  We work on
24  many other, but it's all the same due diligence,
25  same documents.

67

1  BY MR. STOELTING:
2    Q.   And what did Mr. -- and at the time,
3  Mr. Chan was working at Hapoalim?
4    A.   What's that?
5    Q.   Did you understand that Mr. Chan was
6  working at Hapoalim?
7    A.   He worked for so many different financial
8  companies, so many -- you know, for the last ten
9  years.  I -- it's hard for me to track, you know,
10  which companies he was working for.
11   Q.   What did Mr. Chan -- what do you remember
12  talking about with Mr. Chan regarding Hapoalim
13  Securities?
14   A.   All we -- you know, he is the facilitator.
15  He's helping me to -- you know, to find these
16  financial instruments so I can do my project.  And I
17  just contact him, ask him:  I need this financing,
18  can you help me to find out, you know, which
19  financial institution can do this?
20       And that's all.
21   Q.   Okay.  My question again was, do you
22  remember any conversations with Eddie Chan about a
23  Hapoalim Securities loan?
24   A.   No, I don't remember.
25       MR. STOELTING:  Let's look at -- move

68

1   ahead a couple of pages.  Go to Exhibit 6.
2   Okay.  All right.
3       Are you able to show the whole letter on
4   the screen?
5       Great.  Thank you.  Okay.
6   BY MR. STOELTING:
7       Q.  So this is the letter that was part of the
8   submission to USCIS in November 2014.
9       Do you recognize this letter?
10      MR. GOURAIGE:  Objection to the reference
11  of the letter -- the -- I'll object to the
12  form.
13  BY MR. STOELTING:
14      Q.  Do you recognize this letter?
15      A.  I remember this letter.  I don't remember
16  exactly how that letter looked like.
17      THE COURT REPORTER:  I can't hear you.
18  BY MR. STOELTING:
19      Q.  Say again.
20      A.  I remember that letter, just I don't
21  remember how exactly that letter looked like.
22      Q.  Okay.  And I think we established when we
23  opened this document this is part of the
24  November 2014 submission to USCIS.
25      Do you know why the date on this is

69

1   November 2013?
2       A.  I remember that was the date they send out
3   this letter.
4       Q.  Do you recall why the letter was dated
5   2013 when it was submitted in November 2014?
6       MR. GOURAIGE:  Objection to form.
7       A.  Yeah, because the letter is not actually,
8   you know, prepared for the USCIS.  The letter was
9   prepared normal course of business.  So I remember
10  it in 2013, you know, we were actively engaged in
11  difference financial adviser for the new market tax
12  credit.  THINKFORWARD financially is not the only,
13  you know, financial institution we were thinking for
14  new market tax credit.  We reached out multiple
15  different like CBOs, you know, couple other
16  financial advisers looking for the tax credit.
17      So that's why, you know, it's in 2013, but
18  by end of 2014 when the USCIS, they're looking to
19  update our financial comprehensive business plan,
20  and we just use the previously prepared letter to --
21  you know, to be part of the package.
22  BY MR. STOELTING:
23      Q.  Okay.  And why was this letter addressed
24  to Julia Yue?
25      A.  I don't remember.

70

1       Q.  And this is -- this is what's called a
2   letter of interest, right?
3       It says in the very first line,
4   "THINKFORWARD is pleased to issue this letter of
5   interest in arranging a New Tax Market Credit
6   financing."
7       A.  Yes.
8       Q.  So apart from obtaining the letter of
9   interest, what did you do to actually obtain a new
10  market tax credit?
11      A.  Oh, we did a lot of work.  We actually did
12  something we call like more than the typical
13  applicant can do.  We -- because most of the new
14  market tax credit allocation needs to be allocated
15  from the CDE, the Community Development Entity.  So
16  every year, the CDE they send a allocation request
17  to Department of Treasury.  Then all applicants need
18  to compete, you know.  They don't really have the
19  direct channel -- direct channel they can apply for
20  the new market tax credit.
21      And for us, you know, we worked with the
22  CBO Financial to actually also not submit -- not
23  only submit to the allocation request for the CDE,
24  we actually submit application to -- to be -- for
25  the -- you know, to be approved as a CDE, and we

71

1   actually got CDE-approved, I think, in the middle of
2   2014.
3       So in that way, it gave all this financial
4   adviser an even stronger, you know, like platform.
5   They can work with us to not just apply for the new
6   market credit for my project; they can apply for
7   other projects.  And in that way, we can have a much
8   better direct channel together.  And I think we
9   spent entire year for 2014, and eventually, we were
10  successfully being certified permanently at the time
11  of treasury, you know, as a -- you know, like
12  approved CDE entity.
13      Q.  I understand you're talking about the CDE,
14  but my question is whether you did anything after
15  November 2014.
16      For example, did you ever apply for the
17  new market tax credit?
18      A.  Yes, we did.
19      Q.  And that would be -- where are those
20  documents?  Where is that application?
21      A.  I think it's in the Department of
22  Treasury, your sister agency.  They have -- I think
23  we were applying for, I don't remember exactly,
24  probably $15 million new market tax credit.
25      Q.  Do you still have a copy of that

72

1  application?
2      **A.**  I'm not sure, but I clearly remember that.
3      **Q.**  And who filled out the application?
4      **A.**  I did.
5      **Q.**  Did anybody help you?
6      **A.**  Yeah.  No, no.  I think, you know, CDE
7  only apply for the CDE application by itself.  We
8  prepare that.
9      **Q.**  Okay.  And again, we've -- we've asked --
10  we've asked for all documents relating to the new
11  market tax credit.  We haven't seen any application,
12  but we'll -- we'll follow up with your counsel after
13  this.
14      **A.**  Yes.
15      **Q.**  Did you receive any -- after you
16  submitted -- did you ever get any response back when
17  you submitted your application?
18      **A.**  Well, for CDE or for the allocation?
19      **Q.**  For the new market tax credit?
20      **A.**  Yeah.  No, we didn't get approved.
21      **Q.**  Okay.  And why not?
22      **A.**  I don't know.  You have to ask them.  I
23  don't know.
24      **Q.**  And how did you learn that you did not get
25  approved?

73

1  actually, he was one of the first financial adviser
2  I notify that right after I got CDE approved because
3  we were talking about, once we have CDE, we can --
4  you know, we can do a lot of work together.  I think
5  I even directly forward him the -- you know, the
6  contract for CDE approval.
7      **Q.**  So you're saying that you did get CDE
8  approval?
9      **A.**  Yes, I did.
10      **Q.**  And do you have a document saying that?
11      **A.**  Yes, I do.  You can check with, you know,
12  the contractor website.  And my entity, Fleet
13  Development Group is still listed there as a -- you
14  know, the contract was approved CDE.  Yeah, I think
15  they also gave us a certificate for that.
16      **Q.**  Then why didn't you get the new market tax
17  credit?
18      **A.**  I was trying.  Right after I got CDE, we
19  fill out application -- even before we get approved,
20  I think we have application.
21      **Q.**  And my question is, if you were approved
22  for a CDE, then why wouldn't you get the new market
23  tax credit?
24      MR. GOURAIGE:  Objection to form.
25      **A.**  CDE only give you application to apply for

75

1      **A.**  I think the Department of Treasury, you
2  know, they send us an e-mail or something saying
3  that, you know, application didn't get approved.
4      **Q.**  So you got an e-mail from the Department
5  of Treasury saying you were not approved for new
6  market tax credit?
7      **A.**  Yes, I think so.  I remember that, yes.
8      **Q.**  And if you have that e-mail, we'll follow
9  up and ask that it be produced.
10      **A.**  Yes, if I can locate that, I can produce
11  that.
12      **Q.**  Okay.  But was Mr. Aggarwal -- was
13  Mr. Aggarwal involved in the application process at
14  all?
15      MR. GOURAIGE:  Objection to form.
16      Which -- which process, the CDE
17      application or for the actual tax credit?
18      MR. STOELTING:  New market tax credit.
19      **A.**  Yeah, we talk about it from November 2013
20  all the way to 2000 -- 2016.  We talk about it for
21  years.
22  BY MR. STOELTING:
23      **Q.**  Okay.  And -- and how -- you talked to him
24  face-to-face or through e-mails?
25      **A.**  Yes, face-to-face, e-mail, phone call, and

74

1  you, you know, limited.  New market tax credit.  It
2  doesn't guarantee any kind of approval.
3  BY MR. STOELTING:
4      **Q.**  Did you ever communicate to investors that
5  you did not get the new market tax credit?
6      **A.**  I don't think I raised more money after
7  that, so I don't know the reasons why should I --
8  and all the new market tax credit, everything like I
9  mentioned before, you know, I mentioned that it's a
10  forward-looking statement in the real estate
11  development process.  The developer is general
12  partner --
13      THE COURT REPORTER:  I'm sorry, I can't
14      understand what you're saying.
15      **A.**  I mean, you know, it's a forward-looking
16  statement when we were raising the money, and if we
17  didn't get it, we actually have a different way to,
18  you know, raise -- to raise those capital.  I didn't
19  need to tell anybody we not raising money anymore.
20      **Q.**  So when -- when was the new market tax
21  credit denied?
22      **A.**  New market tax credit is annual.  Every
23  year, you can apply for that.
24      **Q.**  So when you applied, when did you receive
25  the denial?

76

1    **A.**  The denial?  I think we receive denial in
2  2014, but we were still hoping we could get it in
3  2015.
4    **Q.**  And you applied more than once?
5    **A.**  No, we only apply once.
6    **Q.**  And -- and you got denied -- you said the
7  denial came in 2014?
8    **A.**  I think so, yes.
9    **Q.**  So you kept raising money from investors
10  and you kept receiving investor money in 2015, 2016,
11  and 2017.
12    Did you ever tell those investors that
13  Eastern Emerald Group did not obtain the new market
14  tax credit?
15    MR. GOURAIGE:  Objection to form.
16    In 2014.
17    **A.**  Yes, every year, we were planning to apply
18  for that.
19  BY MR. STOELTING:
20    **Q.**  When you say "we" were applying, what --
21  who was applying?
22    **A.**  Me and my development entity.
23    **Q.**  You mean Eastern Emerald Group LLC?
24    **A.**  Yes.
25    **Q.**  Okay.  Now I'm confused because I thought

77

1  BY MR. STOELTING:
2    **Q.**  And what other consultants did you talk
3  to?
4    **A.**  Many.
5    **Q.**  Okay.  And are there any documents that
6  would show these consultations?
7    **A.**  I'm not sure about that, but I remember
8  every time I find out somebody who had a specialty
9  in the new market tax credit, I was talking to them
10  to ask them to help us to prepare for the new market
11  tax credit, because it's a -- it's a really good
12  financial instrument and help the project a lot.
13    **Q.**  Okay, but can you think of the name of any
14  of them?
15    **A.**  Not right now.
16    **Q.**  All right.  And again, you said you were
17  denied in 2014.
18    And my question was, Eastern Emerald
19  continued to raise money during 2015, '16, and '17,
20  but you never told those investors that you had been
21  denied the new market tax credit, did you?
22    **A.**  If you ask all the applicant of the new
23  tax market credit, everybody get denied.  I think
24  it's 10 percent chance or, you know, 5 percent
25  chance, and so everybody apply every year.

79

1  you said you applied once and were denied, and I
2  thought you just said you applied every year.
3    Which is it?
4    MR. GOURAIGE:  Objection to the form of
5    the question.  I don't think that was his
6    testimony, David.
7  BY MR. STOELTING:
8    **Q.**  Did you apply only once for the new market
9  tax credit?
10    **A.**  We submit application in 2014.  We didn't
11  get approved.  Then we were looking for a financial
12  consultant who can help us prepare the application.
13    **Q.**  Which financial consultant?
14    **A.**  Oh, many.  I think one, we were even
15  trying to asking for all the way to 2019 for the new
16  market tax credit.
17    **Q.**  So when you say you talked to different
18  financial consultants, do you mean THINKFORWARD or
19  other consultants?
20    **A.**  Other consultants.
21    **Q.**  Why didn't you use THINKFORWARD?
22    **A.**  I was talking to them.
23    THE COURT REPORTER:  I'm sorry?
24    **A.**  I was talking to them, too.  I think I
25  talked to them all the way to 2016.

78

1    **Q.**  Okay.
2    **A.**  We are certified CDE.
3    **Q.**  All right.  Let me ask the question again.
4    You never told the investors that you had
5  been denied the new market tax credit, did you?
6    **A.**  You're making me feel like confused.  I
7  only denied for one application.  I haven't been
8  denied permanently.  So I -- I can't understand.
9  You're asking me you're being denied for once or
10  you're being denied forever.  I never had a chance
11  to apply for the new market tax credit.
12    Which question you trying to ask?
13    **Q.**  All right.  Let me just ask one more time
14  and then I'll move on.
15    Do you ever remember at any time
16  communicating to investors that you did not get the
17  new market tax credit?
18    MR. GOURAIGE:  Object to form.  I think if
19    I may just -- I don't mean to try to help the
20    examination, David.  Maybe clear -- you asked
21    him, did he tell investors that he was denied
22    for the 2014 year.  I think that's the
23    confusion.  He thinks you're asking him if he
24    was denied for all times.
25    MR. STOELTING:  Well, at any time, for any

80

Richard Xia
2/7/2022

1    denial.
2        MR. GOURAIGE:  Mr. Xia, do you understand
3    the question?
4        THE WITNESS:  I don't understand the
5    question.
6        A.  For me, I'm always applying for that.  One
7    deny doesn't mean I been denied.
8    BY MR. STOELTING:
9        Q.  All right.  Well, I'll -- I'll move on.
10       What -- what was the reason -- what did
11   you understand the reason was that Eastern Emerald
12   Group was denied new market tax credit?
13       A.  Again, it's their decision.  It's not my
14   decision.
15       THE COURT REPORTER:  I'm sorry?
16       A.  Again, it's their decision.  It's not my
17   decision.  I don't know.
18   BY MR. STOELTING:
19       Q.  Do you know if the communication gave a
20   reason?
21       A.  No.
22       MR. STOELTING:  All right.  Let's move to
23   the next page.
24   BY MR. STOELTING:
25       Q.  This is a letter dated November 15, 2014,

81

1    and again, it was attached to the response to
2    request for evidence dated November 20, 2014.
3        Do you recognize this letter?
4        A.  Yes.
5        Q.  Do you know who wrote it?
6        A.  Eddie Chan.
7        Q.  Is that Mr. Chan's signature?
8        A.  I believe so.
9        Q.  Okay.  Why is the letter addressed to
10   Julia Yue?
11       A.  I don't know.
12       Q.  Do you remember talking to Mr. Chan about
13   this letter?
14       A.  I don't remember.
15       Q.  I'm sorry?
16       A.  I don't remember.
17       Q.  Okay.  Do you remember any conversations
18   or communications with Mr. Chan at all about this
19   letter?
20       A.  No, I don't remember.
21       Q.  Do you know if -- did Mr. Chan tell you
22   that he was authorized to write and send this letter
23   on Hapoalim letterhead?
24       MR. GOURAIGE:  Objection.
25       A.  Why would he tell me that?

82

1        THE COURT REPORTER:  I'm sorry?
2        A.  Why would he tell me that?  I never ask
3    him the question.  I never had thought about that.
4    BY MR. STOELTING:
5        Q.  Well, that was -- that was my question.
6        Did Mr. Chan just sit at his desk and
7    write this letter and give it to you, or did anyone
8    else at Hapoalim know that he had written this
9    letter and given it to you?
10       MR. GOURAIGE:  Objection.
11       A.  I think he gave me this letter.
12       THE COURT REPORTER:  I'm sorry?
13   BY MR. STOELTING:
14       Q.  I'm sorry?
15       A.  I think he gave me this letter.
16       Q.  He gave you the letter, okay.
17       And do you see at the bottom where it
18   says, "Please accept this letter of intent as an
19   indication of our interest to move forward on a loan
20   commitment of 72 million"?  Do you see that?
21       A.  Yes, I see that.
22       Q.  Okay.  And did anything happen after
23   this -- you received this letter in connection with
24   any loan from Hapoalim?
25       MR. GOURAIGE:  Objection to form.

83

1        A.  Yeah, we always talk about the loan, the
2    product finance together.
3    BY MR. STOELTING:
4        Q.  No, I know, but with regard to Hapoalim
5    specifically.
6        For example, did you ever go to the
7    Hapoalim office to talk with anyone about the loan?
8        A.  Me, as a developer, they came to my office
9    through their representatives.  I didn't go to their
10   offices.
11       Q.  So someone from Hapoalim came to your
12   offices?
13       A.  Yes.
14       Q.  You mean Mr. Chan came to your office?
15       A.  Yes.
16       Q.  Did anybody else come with him?
17       A.  I don't remember.
18       Q.  And you never spoke to anybody else at
19   Hapoalim except for Mr. Chan, right?
20       A.  That's right.  I don't remember that
21   exactly.  It happened too many years ago.
22       Q.  Okay.  And you never -- do you have any
23   paper or any documents relating to a
24   72 million-dollar loan from Hapoalim other than this
25   letter?

84

1     A.   I don't know what other document.
2          What is the question?
3     Q.   Well, for example, any other loan
4   agreement, any other communication about a loan, do
5   you have any of that?
6     A.   Again, like I said before, I gave all the
7   information to Eddie Chan.  He was working on that.
8   So all the documents had already been sent to them.
9   I don't have -- I don't recall.  I remember, you
10  know, some type -- some like -- you know, in some
11  other financial institution or even Hapoalim or some
12  other company that reached out to me, but I just
13  don't remember exactly, you know, which company from
14  where, you know, who was contacting.  You know, but
15  I do remember not just Eddie Chan, you know, some
16  other people contact me, but I just cannot recall
17  it.  If you ask me right now, all I can tell you is
18  I don't remember.
19         MR. STOELTING:  All right.  You can -- you
20  can take that down and put up PDF 12, which
21  we'll mark as -- what are we up to?  What's the
22  next exhibit?
23         THE COURT REPORTER:  Should be 9.
24         MR. STOELTING:  So we'll mark this as
25  Exhibit 9.

85

1          (Thereupon, marked as Exhibit 9.)
2   BY MR. STOELTING:
3     Q.   Okay.  So this is December 1, 2017,
4   another response to request for evidence written by
5   your lawyer.
6          MR. STOELTING:  And if you could just
7   scroll down.  Okay.  Stop.  Stop.
8   BY MR. STOELTING:
9     Q.   Okay.  So -- all right.  I have a question
10  about what you're seeing on the screen.  It says,
11  "Second, FNYMRC submits further evidence of
12  supplemental nonEB-5 funding.  It should be noted
13  that LaGuardia Performance, LLC has already obtained
14  a construction loan commitment letter in the amount
15  of approximately 85 million from R. Seelaus &
16  Company.  If the loan is granted, the 84.4 million
17  project funding pointed out will be well covered."
18         And could we -- do you recall getting a
19  loan commitment letter from R. Seelaus?
20    A.   Yes.
21         MR. STOELTING:  Could you scroll down a
22  little more.
23         Can you -- are you able to make it so we
24  can see more of the letter on the screen of the
25  first page?  Okay.

86

1   BY MR. STOELTING:
2     Q.   Do you recognize this?
3     A.   Yes.
4     Q.   Did you receive this in -- around
5   August 2017?
6     A.   I don't remember what date I receive.
7     Q.   Who did you receive it from?
8     A.   Eddie, Eddie Chan.
9     Q.   Okay.  And how did Eddie Chan give it to
10  you?  Did he hand it to you or mail it to you?
11    A.   E-mailed me.
12    Q.   E-mail?
13    A.   Yes.
14    Q.   Do you still have that e-mail?
15    A.   I should.
16    Q.   Okay.  We'll ask for that.
17         Did you ever talk to anybody at R.
18  Seelaus & Company apart from Eddie?
19    A.   No.  You know, another part of the
20  financial investment, whatever communication, you
21  should never bypass that, so -- you know, because
22  everything is commission-based, and that's -- you
23  know, it's almost like a protocol.
24         THE COURT REPORTER:  It's almost what?
25    A.   It's almost a protocol.  You don't go past

87

1   the protocol.  The protocol, you don't go past the
2   person who gave you the connection who gets you into
3   that company.
4   BY MR. STOELTING:
5     Q.   So apart from receiving this letter, what
6   did you do in connection with any loan from R.
7   Seelaus?
8          MR. GOURAIGE:  Objection to form.
9     A.   Yeah, I think they give me a whole bunch
10  of package about, you know, their company and
11  everything.
12  BY MR. STOELTING:
13    Q.   Do you still have those documents?
14    A.   I'm not sure.  I remember they bring a lot
15  of package here, and I was told, you know, I'm their
16  target.  You know, they're trying to do finance for
17  me.  In return, you know, they can ask me to -- they
18  can ask me to open some kind of like money -- money
19  management account.  And I was telling them no, you
20  know, it's investor money, I cannot do that.
21    Q.   Could you repeat that?
22         MR. STOELTING:  Denise, can you read that
23  answer back, please?
24         THE COURT REPORTER:  Sure.
25         (Record read.)

88

Richard Xia
2/7/2022

BY MR. STOELTING:

Q. So who from Seelaus told you that?

A. Eddie, Eddie Chan.

Q. Okay. So Eddie wanted you to open an account at Seelaus?

A. Yeah, he told me he want me to open something like that, money management account. That's why they gave me a lot of their documents, brochure and other material.

Q. So Eddie told you that Seelaus wanted you to open a money management account, and you said, I can't do that because it's investor money.

A. That's right.

Q. Okay. And why couldn't you do that with investor money?

A. Because investor money is -- I think --

THE COURT REPORTER: I'm sorry, I can't hear you.

A. I said I think at that time, you know, the money is still in the fund, and I just can't use any of that LP money to open anything like that.

BY MR. STOELTING:

Q. Do you recall that you did open an account at Seelaus?

A. No. I didn't. I don't know. There's

89

probably a reason, you know.

Q. So what else do you remember happening in connection with the 85 million-dollar loan from Seelaus? Did you talk to Eddie about anything else?

MR. GOURAIGE: Objection to form.

A. I don't remember that.

BY MR. STOELTING:

Q. And you never got a loan from Seelaus, correct?

A. Correct.

Q. And you never filled out any paperwork to get a loan from Seelaus, did you?

A. We're back here talking about the same thing. I gave all due diligence documents to Eddie Chan.

Q. Can you say that again?

A. I gave all my due diligence documents of my project to Eddie Chan.

Q. Okay. But my question was whether -- you -- you never filled out any paperwork in order to obtain a loan from Seelaus, did you?

A. That's the paperwork.

THE COURT REPORTER: What? I'm sorry, what did you say?

A. That's the paperwork. You don't give a

90

different, you know, company different paperwork for the big project.

Q. So you represented to USCIS that this was a loan commitment letter.

Did you think you actually had a loan commitment from Seelaus?

A. Yes, I do.

Q. And what did you -- what's your understanding of why you never got a loan at all?

A. Probably I didn't open an account with them.

Q. What did Eddie tell you?

A. He didn't tell me that.

Q. He never told you?

A. No.

Q. So after you got this loan commitment letter, you never had another conversation with Eddie about the loan?

A. No, I was looking for this loan, but, you know, we have a more better financial option, so if they don't move forward and continue this, I just don't know how I can force them to do this loan for me.

Q. Had --

MR. STOELTING: Could we go off the record

91

for a moment.

MR. GOURAIGE: Sure.

THE VIDEOGRAPHER: The time is 1:03 p.m. Off the record.

(At this time, a luncheon recess was taken from 1:03 p.m. to 2:16 p.m.)

THE VIDEOGRAPHER: The time is 2:16 p.m. Back on the record.

BY MR. GOURAIGE:

Q. Mr. Xia, there was a question from the court reporter about an entity that you referred to, I think it was one that you communicated with about the new market tax credit called CBO Financial.

Is that an entity?

A. Yes.

Q. Okay. And just tell us about your -- what communications did you have with CBO Financial?

A. They're another financial consultant working with us on the new market tax credit.

Q. Okay. And which individual at CBO Financial did you deal with?

A. I don't know that. I don't remember.

Q. You don't remember?

A. No.

Q. Is that a firm based in New York City?

92

1    **A.**  No.
2    **Q.**  Where are they based?
3    **A.**  Maryland.
4    **Q.**  Maryland?
5    **A.**  Yes.
6    **Q.**  And did you ever have any face-to-face
7  meetings with people from CBO Financial?
8    **A.**  Yes, I did.
9    **Q.**  And where?
10    **A.**  They came to my office.
11    **Q.**  Okay.  And do you have any documents
12  relating to your communications with CBO Financial?
13    **A.**  Yes.  I think I already produced that to
14  you.
15    **Q.**  Okay.  Are there any other -- and when did
16  that -- when did you communicate with CBO Financial?
17    **A.**  About the same time we started --
18    THE COURT REPORTER:  I can't hear you.
19  Can you get closer to your mic?
20  BY MR. GOURAIGE:
21    **Q.**  So 2013, 2014?  So 2013, 2014?
22    **A.**  Yes.
23    MR. MCGRATH:  David, yeah, excuse me.  The
24  court reporter is making a good point.  I'm
25  having trouble hearing Mr. Xia.  And during the

93

1  warmup here, he was able to get closer to the
2  microphone.  It was much louder than it is
3  right now.  So I'm wondering if he could do
4  whatever he did before we went back on so we
5  could hear him more clearly.
6    THE WITNESS:  Yeah, I just made it louder.
7  That's better?
8    MR. MCGRATH:  That's much better, thank
9  you.
10    THE WITNESS:  Sorry about that.
11  BY MR. STOELTING:
12    **Q.**  And were you able to -- does that refresh
13  your recollection about any other meetings?
14    **A.**  Yeah, I do have a lot of other meetings,
15  communications, and discussions.  I just don't
16  remember, you know, which entity I was talking.
17    THE COURT REPORTER:  I just don't remember
18  what?
19    **A.**  Which entity I was talking.
20  BY MR. STOELTING:
21    **Q.**  So this morning we were talking about the
22  approximately $12 million that was used towards the
23  Vanderbilt and -- house and the Sands Point house,
24  the Middleneck Road house, and you had said that
25  that payment was considered a payment to

94

1  Ms. Verfenstein; is that correct?
2    **A.**  No.  To her company.
3    **Q.**  To her company.
4    Meaning Perini or Racanelli or both?
5    **A.**  Both.
6    **Q.**  Both, okay.
7    So it was meant to compensate Perini and
8  Racanelli for work that they did as general
9  contractors?
10    **A.**  Yes.
11    **Q.**  And is there -- did you do any
12  calculations to determine that $13 million or a
13  little bit more was the amount of money that she was
14  owed?
15    **A.**  That's right, yes.
16    **Q.**  How did you do that?
17    **A.**  Yes.  The contract was $80 million, and
18  the payment to her company was $73 million.
19    **Q.**  Can you repeat that answer, please?
20    **A.**  Yes.  The total of the GMP contract from
21  the Mirage Project was $80 million, and the total
22  payment to her general contract entity was
23  $73 million.
24    **Q.**  And do you have any paperwork to support
25  that, or did you just do it in your head?

95

1    **A.**  Yeah, we have a contract.  We have a
2  payment record.
3    **Q.**  All right.  If I wanted to look at -- if
4  we wanted you to show how it was that you determined
5  that this money was owed to Ms. Verfenstein, what
6  paper would we look at?  Did she submit an invoice
7  to you for -- for the amount that she was owed?
8    MR. GOURAIGE:  Objection to a compounded
9  question.
10    But if you understand it, Mr. Xia, you can
11  answer it.
12  BY MR. STOELTING:
13    **Q.**  All right.  Let me -- let me ask it -- let
14  me break it apart.
15    Did you receive an invoice from Racanelli
16  or Perini for amounts owed?
17    **A.**  No, I have a contract.
18    **Q.**  Okay.  And you're talking about the
19  original GMP contract from 2010 or 2011?
20    **A.**  Yes.
21    **Q.**  Okay.  And since that time, there was a
22  lot of money paid to Racanelli and Perini, wasn't
23  there?
24    **A.**  That's right.
25    **Q.**  Okay.  And how did you keep track of that

96

Richard Xia
2/7/2022

1  money that was paid to Racanelli and Perini?
2    **A.**  They submit a requisition and we paid --
3    THE COURT REPORTER:  I can't hear you, I'm
4  sorry.
5    **A.**  Yeah, they paid based on the requisition,
6  and until now, I think the total payment is
7  $73 million.
8  BY MR. STOELTING:
9    **Q.**  Okay.  But my question is how did you --
10  what paperwork do you have that shows that?
11    **A.**  All the requisitions I already -- you
12  know, that's requisitions.  I don't know what other
13  paperwork you're referring to.  I told you -- you
14  want know paperwork, right?  You want to know
15  number one, the contract.  I told you the contract.
16  You want to know the payments.  I told you that all
17  the requisitions we actually already provide --
18  produced to the SEC.  I don't know for how many
19  times, but I don't know what other documents.
20    You want a piece of paper, you know, we
21  put all the payment together?  I think even for that
22  we submit numerous times, in the summer at least,
23  how much money has been paid from the Mirage Project
24  to each different entity.
25    **Q.**  I actually don't think we've seen anything

97

1  remotely like that, but let me just ask you:  Over
2  those many years when you made a payment to
3  Racanelli or Perini, how do you record it?  Do you
4  have a general ledger that you keep track of?
5    MR. GOURAIGE:  Objection.
6    **A.**  No, we have, you know, bank statements.
7  We just go by the bank statements.
8  BY MR. STOELTING:
9    **Q.**  Okay.  You don't keep any accounting
10  records in your office, you just keep -- look at the
11  bank statements?
12    **A.**  Yeah, you know, we just do look at the
13  spreadsheet.  Take down all the bank transactions,
14  and that's how we, you know, we tracking the project
15  expenses.
16    THE COURT REPORTER:  That's how we what?
17    **A.**  How we tracking the project expenses.
18    THE COURT REPORTER:  I still can't
19  understand you.
20    **A.**  That's how we --
21    MR. GOURAIGE:  I think -- I think what he
22  said is "that's how we track the project
23  expenses."
24    Is that correct, Mr. Xia?
25    THE WITNESS:  Yes.

98

1  BY MR. STOELTING:
2    **Q.**  Okay.  And somehow you determined that you
3  still owed $13 million to Racanelli and Perini?
4    **A.**  Well, that's been -- that's been a while.
5  Ever since -- it's a long time since we -- it's not
6  somehow.  It's almost like a known issue for a long
7  time already.
8    **Q.**  How long?
9    **A.**  Two years.
10    **Q.**  Two years?
11    **A.**  Yes.
12    **Q.**  Did you ever receive anything in writing
13  from Racanelli and Perini saying, you still owe me
14  10, 11, whatever, $13 million?
15    **A.**  Oh, I've been asking all the time.
16    **Q.**  What?  Sorry?
17    **A.**  I've been asking all the time about those
18  payments.
19    **Q.**  She's been asking you all the time about
20  the payment?
21    **A.**  Yes.
22    **Q.**  Has she ever sent you an e-mail or put
23  anything in writing about the payment?
24    **A.**  I don't remember.
25    **Q.**  And why did you pay it when you did in

99

1  August -- in summer and fall of 2021?
2    **A.**  Because she couldn't wait anymore.
3    **Q.**  Because -- I'm sorry?
4    **A.**  She cannot wait anymore.
5    **Q.**  And is that what she told you?
6    **A.**  Yes.
7    **Q.**  So she was demanding payment?
8    **A.**  That's right.
9    **Q.**  So you're saying Ms. Verfenstein told you,
10  you must pay me this $13 million right -- you know,
11  this year now?
12    **A.**  Yes.
13    **Q.**  And when did she tell you that?
14    **A.**  From that time, I think -- you know, I
15  think it's in 2021.
16    **Q.**  And was this a face-to-face meeting or on
17  the telephone?
18    **A.**  I don't remember.
19    **Q.**  You don't remember.
20    Did she ever tell you this face-to-face?
21    **A.**  Yeah, plenty of times.
22    **Q.**  And was there anyone else present when she
23  told you this?
24    **A.**  I don't remember.
25    **Q.**  And did you ever make any notations or

100

Richard Xia
2/7/2022

1  send anything in writing back and forth about how
2  much money you claimed that she said that you owed
3  her?
4      A.  No, I don't have to do that.  I'm actually
5  trying to get the money to pay her for -- I guess
6  for nine months.
7      Q.  But why do you think that you owed her
8  $13 million when there's no paperwork to support
9  that that you can point us to?
10     MR. GOURAIGE:  Objection.
11     A.  The paperwork is in the requisition and
12 the transaction.  I'm in the building.  I'm actually
13 sitting in the building right now.  The building is
14 95 percent complete, and so I don't need paperwork
15 to tell me I need to make a payment to a contractor
16 to perform his work.  And you right now are able to
17 do the deposition for me cover for work, because I'm
18 sitting exactly in the building right now, and this
19 building, you know, it might have some technical
20 issues with the network, but the building is
21 function, and I'm sitting here.  I know that the
22 building is 95 percent complete.  I need to make a
23 payment based on the progress.  It's 95 percent of
24 the $80 million.
25

                        101

1  BY MR. STOELTING:
2      Q.  I'm sorry?
3      A.  It's 95 percent of the $80 million.  I
4  need to pay her.
5      Q.  What would happen if you didn't pay her?
6      MR. GOURAIGE:  Objection.  Hypothetical
7      question.
8      A.  I don't know.
9  BY MR. STOELTING:
10     Q.  Did Ms. Verfenstein tell you that she
11 wanted -- wanted you to buy her those mansions on
12 Middleneck Road and Vanderbilt?
13     MR. GOURAIGE:  Objection.
14     A.  It's not mansion.  It's just a project.
15 BY MR. STOELTING:
16     Q.  Did she tell you, instead of giving me the
17 cash, I want you to buy me these houses and put them
18 in my name and my mother's name?
19     A.  We explained it this morning.
20     THE COURT REPORTER:  I'm sorry?
21     A.  We explained it in the morning.  It is not
22 a mansion.  This is just a investment project.
23 She's trying to -- you know, to do an investment,
24 and another one is for the dumping site.
25

                        102

1  BY MR. STOELTING:
2      Q.  The dumping site.
3      So if we wanted to find out if you have
4  permission to do dumping in that 4 million-dollar
5  house on Vanderbilt Road, is there an official at
6  Sands Point that would tell us about that?
7      A.  It's not me.  I'm not handling that at
8  all.  It's just based on the information she provide
9  to me.  I -- I knew that.
10     Q.  So you don't know who at Sands Point
11 approved the dumping?
12     A.  I don't know, but I knew that there's a
13 significant paperwork have been done for the dumping
14 project.
15     MR. STOELTING:  Could you read that answer
16     back, please, Denise.
17     THE COURT REPORTER:  Sure.
18     (Record read.)
19 BY MR. STOELTING:
20     Q.  How do you know that?
21     A.  For the amount of the work.
22     Q.  How do you know that?
23     A.  Because she was asking if I knew any civil
24 engineers or engineer that needs to be, you know,
25 hired to do the, you know, surveying work.  That's a

                        103

1  lot of work for the -- you know, for the preparation
2  of, you know, dumping.
3      Q.  Did you get any -- I -- I just want to
4  talk about the payments, the house purchases in the
5  name of Verfenstein and Verfenstein's mother.
6      Did you get any legal advice from any
7  lawyers -- and this is a yes or no question.
8      Did you get any legal advice from lawyers
9  that making that payment -- about making that
10 payment?
11     MR. GOURAIGE:  Objection.
12     Which payment?
13     MR. STOELTING:  The payments that were
14     made.
15     MR. GOURAIGE:  To the contractor?
16     MR. STOELTING:  To support the purchases
17     of the Middleneck Road and Vanderbilt Drive
18     houses.
19     MR. GOURAIGE:  Well, I object to the form
20     of the question.  Payment to support.  I think
21     his testimony has been he paid the contractors
22     for the work they did on the project.
23 BY MR. STOELTING:
24     Q.  Well, do you remember, Mr. Xia, the wires
25 when -- when you closed Emerald Creek, that money

                        104

Richard Xia
2/7/2022

1  was transferred directly to the title company,
2  right?
3          MR. GOURAIGE:  Objection to the form of
4      the question.
5          Who transferred the money?
6  BY MR. STOELTING:
7      Q.  Mr. Xia, do you remember the money being
8  transferred directly to the title company at the
9  Emerald Creek closing?
10     A.  Money was transferred directly from lender
11 to the title closer.
12     Q.  Right.
13     A.  Because it was a last-minute deal.  I have
14 been working on that payment and refinance for, I
15 guess, nine months, and eventually, you know, the
16 refinancing didn't work.  Then I find the Emerald
17 Creek, and they promise they can do it quick.
18         So by the time they can close, it's
19 already the date, you know, for her to basically --
20 to close.  If she doesn't close, she going to lose
21 the down payment.
22     Q.  Well, you knew at the time you made all
23 those transfers that you were a defendant in about
24 12 different lawsuits, right?
25     A.  I'm not aware of the -- what issue you're

105

1  talking about.
2      Q.  Right.  Well, was the reason that you
3  purchased these houses was because you wanted to not
4  have the money sitting in a bank account, that you
5  wanted it to be in an illiquid asset?
6          MR. GOURAIGE:  Objection to the form of
7      the question.
8      A.  No.
9  BY MR. STOELTING:
10     Q.  Well, didn't you think when you did these
11 transactions that somebody would come along and
12 question whether they were legitimate or not?
13     A.  Why?  I'm paying the contractor for a long
14 overdue payment.
15     Q.  So that's my point is, why don't you have
16 any paperwork to support what you're telling us?
17         MR. GOURAIGE:  Objection to form.
18 BY MR. STOELTING:
19     Q.  Why can't you say -- why can't you say:
20 Here's the invoice.  Here's the amount that was
21 owed.  Here's her demand for payment.  None of that?
22         MR. GOURAIGE:  Objection, David.  He's
23     testified there's a contract.  He has
24     requisitions from the contractors.  He has
25     bank statements reflecting payments to the

106

1  contractors.  He knows the balance that is owed
2  to the contractors, and the contractor was
3  making verbal requests to him to pay, so he
4  paid.
5  BY MR. STOELTING:
6      Q.  But you don't have a single -- that's my
7  point.  It's a verbal request, Mr. Xia, and you
8  don't have any -- anything in writing that you can
9  point to to support what you're telling us about why
10 these three purchases were made.
11         MR. GOURAIGE:  Objection.  I object to the
12     form of the question.
13     A.  It's a contractor we have been working for
14 more than ten years for both large projects, and
15 she's successfully completed the project.  And we
16 are doing called design build, and in the
17 construction industry, you have to have a contractor
18 who is willing to work with you and you can trust.
19 You know, if you were, you know, for the -- if
20 there's no trust and the project never complete in
21 the way it's been done right now.
22         So I myself knew that.  I owe her the
23 money, her company the money.  So that's why I was
24 diligently working on that since, actually, I think,
25 in January.  I have been working with the landlord,

107

1  tax fund called -- I don't remember his name.
2  What's the name of that?  And they were trying to
3  provide me with the same kind of bridge financing,
4  but at last minute, it doesn't go through.
5          So it almost took me into a very, very bad
6  situation because, you know, based on my
7  understanding, I have to pay them on time.  So
8  that's why I rush to find a different lender to get
9  it done.  It's not a person you don't know.  It's a
10 person you know that for ten years you work with
11 them build these two big projects.  We don't need to
12 keep sending legal paper to each other.  If not
13 paid, no buildings can be built.  All EB-5 investors
14 are going to lose their money.
15         Right now, my project has sufficient funds
16 to repay EB-5 investors.  Even in the middle of the
17 construction of the second project.  And that's
18 actually agreed, I think, structure to -- you know,
19 to basically you don't need people -- if people just
20 tell you to get paid and you just work hard to get
21 them paid because they're -- you know, that money
22 has been owed.  If I don't pay them, they can lien
23 my property, they can do many things.  But they
24 chose not to do that, so that's why I was eager to
25 pay them ASAP if I could.

108

1    Q.   Isn't it standard practice in the
2  construction industry if the general contractor is
3  owed money for the general contractor to submit an
4  invoice or some request in writing for payment?
5    A.   I did that.  The requisition, I told you,
6  the requisition has been submitted a long time ago.
7    Q.   The requisition, what is that?
8    A.   It's -- in your firm, it's probably called
9  invoice.  In the construction industry, it's called
10  requisition.
11    Q.   And there's a requisition that says you
12  owe $11 million?
13    A.   I don't remember exactly how much is on
14  the requisition, but it's called GMP contract.  Your
15  general contractor took huge risk to guarantee that.
16  So by the time the progress up to 95 percent, then
17  you can pay them that.  You cannot keep sitting
18  there telling them, no, I don't pay you.
19        I have been working very hard to get them
20  paid.
21    Q.   So the GMP, the guaranteed maximum
22  contract, that doesn't mean for 88 million.
23        Is it your testimony that that requires
24  you to pay 88 million to Racanelli?
25    A.   Yes.

109

1    Q.   Whether or not $88 million worth of work
2  was done?
3    A.   Yes.  Everybody taking a risk.  If she end
4  up spending $90 million, she going to lose that
5  $2 million because she guaranteeing.
6    Q.   Did you ever add up all of the money that
7  you did pay to Racanelli and Perini over these
8  years?
9    A.   Yes, I think so.
10    Q.   And where would that calculation be?
11    A.   I submit to SEC numerous times already.
12    Q.   And what is that document called?
13    A.   I think it's invoice and the payment.
14    Q.   Did you ever look at the calculation that
15  the SEC did of the amount of payments that Fleet
16  Financial made to Racanelli and Perini?
17    A.   Yes, I did that, too.
18    Q.   And did you see that the calculation was
19  $127 million?
20    A.   Yes, that's right.
21    Q.   And does that sound correct?
22    A.   That's correct.
23    Q.   So if you paid $127 million to Racanelli
24  and Perini, how do you figure that you still owe
25  another 11 million?

110

1    A.   You're talking about the two projects.
2  Here this is a project of Mirage.  And for that
3  project, they're going to get paid $73 million, and
4  that contract is $88 million.  Perini was general
5  contractor for the second project using Emerald.
6    Q.   All right.  Well, we will -- we'll follow
7  up to see if there's anything -- anything else about
8  that, but I want to try to move on.
9        MR. STOELTING:  Could we -- could we pull
10  up what's PDF 20, and I think we're up to
11  Exhibit 9.
12        THE COURT REPORTER:  10.
13        MR. STOELTING:  10, great, thank you.
14        (Thereupon, marked as Exhibit 10.)
15        MS. FORBES:  PDF 20, correct?
16        MR. STOELTING:  Yes.
17  BY MR. STOELTING:
18    Q.   This is an e-mail from Sunil to you.  And
19  why don't we start at the bottom.  Here we go.
20  Okay.
21        This is an e-mail from you to Sunil
22  Aggarwal, correct?
23    A.   Yes.
24    Q.   And it was sent on November 10, 2013?
25    A.   Yes.

111

1    Q.   And is that the e-mail address you were
2  using, Richard.Y.Xia@fleetfinancialgroup.com?
3    A.   Yes.
4    Q.   So you say, "Sunil, I left you a message.
5  Can you help issue me a 18 million-dollar letter of
6  intent for NMTC of my forthcoming project so I can
7  promote my project in China?  BTW, I am forming my
8  own CDE right now and should get it certified very
9  soon."
10        And then at the bottom it says, "I'm --
11  I'm leaving to China tomorrow and appreciate that
12  you can help me if possible."
13        You were going China to promote Eastern
14  Mirage?
15    A.   No.
16    Q.   Which -- which project?  It says "my
17  project in China."
18    A.   We have so many projects.
19    Q.   So you weren't going to promote Eastern
20  Emerald or Eastern Mirage?
21    A.   No.  We hadn't even bought the land at
22  that time.  I think it's a different project.
23    Q.   Which one?
24    A.   I don't remember.  I -- you know, for the
25  last 10, 15 years, we've been talking about a case

112

Richard Xia
2/7/2022

1  of 10 to 15 different projects.
2      Q.  Well, didn't you want that new market tax
3  credit for Eastern Emerald?
4      A.  Yes, but like I said before, we have many
5  other projects.  We were contemplating negotiating
6  and planning -- we're not just -- eventually, the
7  two projects went through.  It doesn't mean we only
8  have the two projects.
9      Q.  Well, how do you know which -- how do you
10  know you're not referring to Eastern Emerald and
11  Eastern Mirage?
12      THE COURT REPORTER:  Counsel, we just lost
13  his video.
14      MR. STOELTING:  Yeah.
15      THE VIDEOGRAPHER:  Do you want to go off
16  the record?
17      MR. GOURAIGE:  Who's video was lost?  The
18  witness?
19      THE COURT REPORTER:  Yes.
20      THE VIDEOGRAPHER:  He's there.
21      A.  Can I talk to my counsel?
22  BY MR. STOELTING:
23      Q.  You want to talk to your counsel?
24      MR. STOELTING:  Okay.  We'll go off the
25  record.

113

1      THE WITNESS:  Thank you.
2      THE VIDEOGRAPHER:  The time is 2:48 p.m.
3  Off the record.
4      (Recess taken.)
5      THE VIDEOGRAPHER:  The time is 2:52 p.m.
6  Back on the record.
7      MR. GOURAIGE:  Could you put the e-mail
8  again, David?  Could you put up that e-mail
9  again, the series of e-mails that you were
10  using?  And this is Exhibit 10?
11      MR. STOELTING:  Yes.
12      MR. GOURAIGE:  Okay.  David, can I ask,
13  where did the SEC get this e-mail?
14      MR. STOELTING:  You.  We received it from
15  you late Friday night.
16      MR. GOURAIGE:  This past Friday night.  Is
17  it -- I don't see a Bates numbering in it.
18      MR. STOELTING:  Nicole, can you scroll to
19  the bottom.  I think that's the Bates number
20  you put on it.
21      MR. GOURAIGE:  Okay.  I will -- I will
22  follow up on that.  Sorry.
23      Did you have any -- any other questions
24  about this e-mail?
25      MR. STOELTING:  I do.  I do.

114

1      If we go back to the initial e-mail from
2  Mr. Xia to Sunil.
3  BY MR. STOELTING:
4      Q.  So I just want to be clear, the reference
5  to "my project in China" does not refer to Eastern
6  Emerald or Eastern Mirage; is that correct?
7      A.  Yes.  I have five projects that were in
8  negotiation at that time talking to, you know,
9  institutional investors in China and Taiwan to, you
10  know, get those projects done.
11      Q.  Okay.  So you were looking -- you were --
12  you were e-mailing Mr. Sunil about the new market
13  tax credit in connection with something else, not
14  Eastern Mirage or Eastern Emerald?
15      A.  I believe so.
16      Q.  All right.  So let's -- and he says,
17  "Richard, I will prepare the letter and e-mail it to
18  you tomorrow.  Let us meet when you come back from
19  China.  Have a great trip."
20      And then at the top and then above that,
21  you say, "Sunil, I am in China now, and the project
22  is very well-accepted due to our first successful
23  one."
24      So does that refresh your recollection
25  about what projects you're referring to?

115

1      A.  No.  We have multiple different projects.
2      Q.  Okay.  And then at the top is Sunil to you
3  it says, "Hi, Richard.  I will dat the letter today
4  afternoon and then e-mail it to you.  Glad to know
5  the project has been received well."
6      Do you remember getting a new market tax
7  credit letter from Sunil in November 2013?
8      A.  Yes, I think so.
9      Q.  Okay.
10      MR. STOELTING:  All right.  We can close
11  out of that.
12      And then let's look at the e-mail -- Sarah
13  Pan e-mails -- well, withdrawn.
14  BY MR. STOELTING:
15      Q.  Who is Sarah Pan?
16      A.  Former employee.
17      Q.  She doesn't work for you anymore?
18      A.  No.
19      Q.  By the way, on the other e-mail when you
20  say, "I am forming my own CDE right now and should
21  get it certified very soon," did that happen?
22      A.  Yes.
23      Q.  And what was the name of your CDE?
24      A.  Fleet Community Development Group.
25      THE COURT REPORTER:  What was it?

116

1    **A.**  Fleet Community Development Group.
2    BY MR. STOELTING:
3    **Q.**  Fleet Community Development Group?
4    **A.**  Yes.
5    **Q.**  And when you applied for new market tax
6    credit in connection with Eastern Emerald, what was
7    the name of the entity that applied for the tax
8    credit?
9    **A.**  I think it's North Queens Medical Center.
10   **Q.**  North Queens Medical Center.
11        And because you had a CDE, could you apply
12   with your own CDE, or did you have to apply with
13   somebody else's?
14   **A.**  I don't remember if we did use that CDE or
15   we didn't use that CDE.  I think it was in
16   connection with my own CDE.
17   **Q.**  Okay.  So you think that you applied
18   through Fleet Community Development Group?
19   **A.**  Yes.
20   **Q.**  All right.  So back to Sarah Pan.
21        When did Sarah Pan leave Fleet Financial
22   Group?
23   **A.**  A long time ago.  Five, six years.
24   **Q.**  And why did she leave?
25   **A.**  She got married.

117

1    Group submit documentation on behalf of North Queens
2    Medical Center.  It's not denying, it just didn't
3    get approved because each year's allocation is very
4    limited.  It's a very complicated process.  It
5    doesn't mean the project is not qualified, it just
6    means different type of priority.  I'm trying to, I
7    guess, make effort, we're not fortunate to get
8    allocation that year.
9    **Q.**  Okay.  So -- so -- okay.  So looking at
10   Exhibit 11, this e-mail, Sunil e-mails -- I mean
11   Sarah Pan e-mails Sunil saying, "Thank you for --
12   thank you writing this NMTC letter for us."
13        Do you know, is she referring to the one
14   that was written for the other project the year
15   before?
16   **A.**  I don't know.
17   **Q.**  Did you direct Sarah Pan to send this
18   e-mail?
19   **A.**  I believe so.
20   **Q.**  And why did you do that?
21   **A.**  Because I need to update my business plan.
22   **Q.**  Because you wanted the letter of interest,
23   right?
24   **A.**  That's right.
25   **Q.**  And because Sunil had written you a letter

119

1    **Q.**  Okay.  And you see Sarah e-mails Sunil on
2    November 4 and says, "This is Sarah from Fleet
3    Financial Group.  Thank you writing the NMTC letter
4    for us."
5    **A.**  I don't see that.
6    **Q.**  At the bottom.
7    **A.**  No, I don't see nothing.
8        MR. GOURAIGE:  Yeah, I don't think the
9        exhibit is up on the screen.
10       MR. STOELTING:  Yeah, can you pull that
11       up.  It's actually PDF 21, and then we'll mark
12       that as -- as Exhibit 11.  I apologize.
13       (Thereupon, marked as Exhibit 11.)
14       MR. STOELTING:  Okay.  Here we are.  And
15       if you could just scroll to the bottom and then
16       we'll work our way up.
17   BY MR. STOELTING:
18   **Q.**  Did you mention a CDE called Queens
19   Community Development Group or did you -- or was it
20   Fleet Development Community Group?
21   **A.**  Fleet.
22   **Q.**  Fleet.  Okay.  Was there a CD -- Fleet
23   Community -- so did Fleet Development Group deny the
24   application of North Queens Medical Center?
25   **A.**  No, no.  The Fleet Community Development

118

1    of interest for another project, you were just going
2    back to him to prepare one for -- for Emerald -- for
3    Emerald, correct?
4    **A.**  No.  It's a letter of intent showing that
5    he's willing to work for us to apply for the new
6    market tax credit.
7    **Q.**  Right.  That -- that was my question.
8    **A.**  Yes.
9    **Q.**  Let's keep going.
10   **A.**  Yes.  It's not like a different project.
11   It's in general for, you know, whatever the project
12   eventually we decide to move forward.
13   **Q.**  All right.
14       MR. STOELTING:  Let's go up to the next
15       e-mail above.  Just scroll up.  Okay.  Thank
16       you.
17   BY MR. STOELTING:
18   **Q.**  So this is November 7th.  She says, "Dear
19   Sunil, I tried to reach you by phone but didn't get
20   through.  I was wondering if we could get an updated
21   letter from you.  Please let me know."
22       MR. STOELTING:  And then keep scrolling
23       up.
24   **A.**  We need more information.
25

120

1    BY MR. STOELTING:
2        Q.   She says, "Please send me the information
3    of the certified CDE and your RFP response to the
4    municipal lot in Flushing.  We can help you with
5    access to city hall."
6            Do you recall what the certified CDE was?
7        A.   Yeah, that's the CDE -- that's the CDE --
8    yeah, I remember, it's the Fleet Community
9    Development Group, and, you know, we also submit
10   another response, RFP, for the municipal parking lot
11   in Flushing.  That's a different project.  That's
12   one of the five projects we have been working.
13       Q.   Okay.  So the reference to the municipal
14   lot in Flushing has nothing to do with Emerald or
15   Mirage?
16       A.   No.
17           MR. STOELTING:  All right.  You can take
18   that down.
19           And if you could put up PDF 23, and we'll
20   call that Exhibit 12.
21           (Thereupon, marked as Exhibit 12.)
22           MR. GOURAIGE:  I've got 11.
23           MR. STOELTING:  Oh, 11.  Okay, thanks.
24           THE COURT REPORTER:  Wait a minute.
25           MR. STOELTING:  No, I think it is --

                                      121

1            THE COURT REPORTER:  It's 12.
2            MR. STOELTING:  I think it is --
3            MS. FORBES:  12.
4            MR. STOELTING:  It is 12.  Okay.  Can you
5    display the whole page.
6    BY MR. STOELTING:
7        Q.   So can you tell me what this is?
8        A.   I think it's a markup.
9            THE COURT REPORTER:  You think it's a
10   what?
11       A.   A markup, of, you know, that Sunil letter
12   in 2013.
13   BY MR. STOELTING:
14       Q.   Is this in response to the Sarah Pan
15   e-mail from November 2014, this markup?
16       A.   Yeah.  I think that's the markup, yes.
17       Q.   And do you know whose handwriting this is?
18       A.   I do not know.
19       Q.   So this one is -- you know, the Northern
20   Boulevard, that's the Emerald Project, right?
21       A.   Yes.
22       Q.   So this time, it's -- the new market tax
23   credit is specifically being requested or it is
24   pertaining to the Northern Boulevard Emerald
25   Project; is that right?

                                      122

1        A.   That's right.
2        Q.   And why was your name crossed out and your
3    wife's name written in?
4        A.   I don't know.  I don't remember.
5        Q.   Is that -- do you understand that to be
6    Sunil's handwriting?
7        A.   No, I don't know.
8        Q.   You don't know?
9        A.   I don't know.
10       Q.   Why would the -- do you know why it would
11   be addressed to Julia Yue?
12       A.   I do not know.
13       Q.   What was her position with Eastern Emerald
14   Group, LLC?
15       A.   Secretary.
16       Q.   Sorry?
17       A.   Secretary.
18       Q.   Secretary?
19       A.   Yes.
20           MR. GOURAIGE:  Can I just clarify the
21   record?  Is that corporate secretary?
22           THE WITNESS:  Yes.
23   BY MR. STOELTING:
24       Q.   And is this the -- this revised letter,
25   this is the one that we -- incorporating these

                                      123

1    changes was the one that we saw that was sent to
2    USCIS?
3            We can go back if you want.
4            Do you recall?  Do you want to look at the
5    letter that was sent to USCIS?
6        A.   I didn't get your question.  I didn't
7    follow.
8            What's the question?
9        Q.   Okay.  Do you recall this morning we
10   looked at the letter that was submitted to USCIS in
11   that request for evidence?
12           MR. STOELTING:  Why don't we just pull
13   that up.  I forget what the exhibit number is,
14   but it was PDF 11.  And just while we have the
15   markup there -- okay.  We'll come back to it.
16           Do you remember what exhibit this was?
17       A.   What exhibit number?
18           MR. STOELTING:  No, I wasn't -- I was
19   asking Nicole.  I think we marked -- I forget
20   what the number was.
21           MS. FORBES:  8.
22           MR. STOELTING:  8.  Thank you.  Okay.
23           MS. FORBES:  Exhibit 8.
24           MR. MCGRATH:  David, I -- I hope I'm not
25   confusing things, but I have a note.

                                      124

1     Is it possible that the actual letter
2  itself was Exhibit 6?
3        MR. STOELTING:  Oh, okay.  Why don't we --
4  why don't we go there.
5        MR. MCGRATH:  I've got a note that it's
6  Exhibit 6 to the submission.
7        MR. STOELTING:  I think we're almost there
8  anyway, but -- yeah, here we are.
9  BY MR. STOELTING:
10     Q.  Okay.  So this was the letter that was
11  submitted, and just to focus on that date up at the
12  top, November '13 --
13        MR. STOELTING:  Where did our letter go?
14        MR. GOURAIGE:  David, I think -- I think
15  you misspoke.  It's November 14.
16        MR. STOELTING:  No, the year.
17  BY MR. STOELTING:
18     Q.  Mr. Xia, you see the year is 2013?
19        MR. GOURAIGE:  Oh, okay.
20     A.  Yes.
21  BY MR. STOELTING:
22     Q.  Okay.  Is that -- should that have been
23  2014?
24     A.  I don't know.
25     Q.  Well, at the time -- the time you were

125

1  having Sunil do the markup, it was 2014, right?
2     A.  Yes.
3        MR. STOELTING:  So let's go back to the
4     markup, which I think was 11.
5  BY MR. STOELTING:
6     Q.  Okay.  So this markup is being done, as we
7  saw from the e-mail, in November 2014, right?
8     A.  Yes.
9     Q.  Okay.  So was this just an oversight that
10  nobody caught that the year was the year before and
11  that really should have been 2014?
12     A.  I don't know.
13     Q.  Well, did -- did you intentionally want to
14  submit a letter that was backdated to USCIS?
15     A.  I'm not --
16        MR. GOURAIGE:  Object to the question,
17     form of the question.  It presumes the letter
18     was backdated.
19     A.  No.  I have no idea.  I'm not even --
20  yeah, no, I don't know.
21  BY MR. STOELTING:
22     Q.  Well, did you ask Mr. Sunil to keep the
23  date at 2013?
24     A.  No.
25     Q.  Okay.  Do you remember anybody asking

126

1  Mr. Sunil not to change the date from 2013 to 2014?
2     A.  No, I don't know.
3     Q.  Okay.  And can you think of any reason why
4  if the rest of these markups are being done in 2014,
5  why that date would not have been changed to 2014?
6     A.  No.  This is not done by me, so I have no
7  idea.
8     Q.  But you were directing Sarah Pan, right?
9  She reported to you?
10     A.  Yes.
11     Q.  But you don't have any recollection one
12  way or the other of why that date was not changed to
13  2014?
14     A.  No.
15     Q.  All right.
16        MR. STOELTING:  Could we move on to PDF
17     17, and we'll call that -- that will be
18     Exhibit 13.
19        (Thereupon, marked as Exhibit 13.)
20  BY MR. STOELTING:
21     Q.  Okay.  Do you --
22        MR. STOELTING:  And why don't you --
23  BY MR. STOELTING:
24     Q.  This is August 18, 2017.  In the top
25  right, can you see it says, "Re: Loan application.

127

1  Construction financing on the mixed use commercial
2  project located at 112-29 Northern Boulevard,
3  Corona, New York.  Dear, Mr. Xia"?
4        MR. STOELTING:  Can you just scroll down
5     slowly, Nicole, please.
6  BY MR. STOELTING:
7     Q.  So do you -- Mr. Xia, do you recognize
8  this document?
9     A.  Yes, I do.
10     Q.  And did you receive it?
11     A.  Yes, I did.
12     Q.  And where did you receive it -- who did
13  you receive it from?
14     A.  Eddie Chan.
15     Q.  And do you remember if he handed it to you
16  or e-mailed you a copy, or if you, you know, met
17  face-to-face somewhere?
18     A.  I think we've answered the question.
19        THE COURT REPORTER:  I'm sorry --
20     A.  I think we've answer this question, but if
21  you want me to answer it again, I have no problem.
22     Q.  No, this is a different -- this is a
23  different document we haven't seen before.
24     A.  Really?
25        MR. STOELTING:  Can you go -- just go all

128

Richard Xia
2/7/2022

1   the way to the bottom, Nicole.  There we go.
2   Stop, stop.  Okay.  No, sorry, just the
3   signature.  There we go.  Okay.
4   BY MR. STOELTING:
5       Q.  So that's your signature?
6       A.  Yes, that's my signature.
7       Q.  All right.  So just tell me what your
8   understanding was at this time when you signed this
9   document about what this document was.
10      A.  I don't even remember when I signed it,
11  but it's a commitment letter.
12      Q.  So did you think you had a loan commitment
13  of $85 million from Seelaus?
14      A.  Yes, I do.
15      Q.  And is that what Eddie Chan told you?
16      A.  It's on this paper, too.
17      THE COURT REPORTER:  I'm sorry?
18  BY MR. STOELTING:
19      Q.  I see that, but I --
20      A.  It's on this paper, too.
21      Q.  So what did -- what did Mr. Chan tell you
22  about this document at the time you both signed it?
23      A.  It's just a loan commitment letter.
24      Q.  I can see that.
25          What I want to know is, what did Mr. Eddie

129

1       Chan tell you?
2       A.  He told me it's a loan commitment letter.
3       Q.  Nothing more?
4       A.  Nothing.  Everything is on the letter.
5       Q.  So all he said you to is, "this is a loan
6   commitment letter," those words, and then you signed
7   it, and that's the entire conversation you had with
8   him about this?
9       A.  No.  It's five years ago.  I cannot recall
10  the exact conversation we had at that time.
11      Q.  Well, wasn't this -- didn't you think this
12  was really good news, you had an 85 million-dollar
13  loan commitment letter?
14      A.  I have 85 million-dollar commitment letter
15  for all the time.  It's nothing -- it's based on the
16  project value.  Project in the future.  So I don't
17  know how you feel that it's a different value, but
18  it's a -- it's a normal business activity.  It's a
19  loan.  I have to pay them back.
20      Q.  So how did -- how did it come about that
21  you signed this loan commitment letter?
22      MR. GOURAIGE:  Objection to form of the
23      question.
24      A.  I don't understand your question.
25

130

1       BY MR. STOELTING:
2       Q.  Well.  Did Mr. Chan tell you, oh, I think
3   I can get Seelaus to do a loan?  And then did he
4   report back to you, or did he tell you what
5   others -- his supervisors were saying, anything at
6   all that you remember?
7       A.  The financial --
8       THE COURT REPORTER:  I can't understand
9       you, I'm sorry.
10      A.  Nobody tell you that.  In the real estate
11  financial world, you need a commitment letter if you
12  ever -- that's it.  Nobody tell you anything because
13  there's a -- they're the interface.  We only deal
14  with the person we know.  That's it.
15      BY MR. STOELTING:
16      Q.  So did you just tell Chan, I need an 85
17  million-dollar commitment letter, and he said,
18  okay, here it is, and then you both signed it and
19  that was the end of it?
20      MR. GOURAIGE:  Objection to the form of
21      the question.  He's testified extensively about
22      his discussions with Chan earlier.
23      BY MR. STOELTING:
24      Q.  Did you tell Eddie Chan that you needed a
25  loan commitment letter from Seelaus?

131

1       A.  I told him I need a loan commitment.  I
2   need a loan, not the commitment.
3       Q.  And what did he say?
4       A.  He said he was working on it.
5       Q.  Okay.  So when you got this signed 85
6   million-dollar loan commitment from Edward Chan,
7   what happened next in the process?
8       A.  I would say --
9       THE COURT REPORTER:  I didn't hear you.
10      A.  I was expecting we can move forward on
11  this loan.
12      THE COURT REPORTER:  Thank you.
13      A.  Right after I reject their requirement to
14  open an account, I don't think I hear anything from
15  them anymore.
16      THE COURT REPORTER:  I didn't understand
17      that.
18      A.  Right after I reject their requirement to
19  open an account, I don't think I hear anything from
20  them anymore.
21      BY MR. STOELTING:
22      Q.  Okay.  And is that requirement to open an
23  account, is that somewhere in this letter?
24      A.  No.  The corporate requirement, they bring
25  the application form and everything into my office,

132

1  and a lot of marketing material, too.
2      Q.  And you never got any -- you never got any
3  loan at all from Seelaus, correct?
4      A.  Yes.
5      Q.  Yes, meaning you never got a loan?
6      A.  That's right.
7      Q.  And your recollection is you didn't get
8  the loan because you wouldn't open an account at
9  Seelaus, and that was the end of it?
10     A.  I think so.
11     Q.  I'm sorry?
12     A.  I think so.
13     Q.  Okay.  And was Eddie Chan the one that
14  told you that you had to open an account?
15     A.  No.  He just asked me to open an account.
16  He didn't say that you need to open an account.  You
17  will never get this loan.
18     Q.  Okay.  But then why do you think that not
19  opening the account meant you didn't get the loan?
20     A.  I was complaining, and I needed this loan.
21     Q.  All right.  But just going back to this
22  letter, if we could go to the top again, you had a
23  signed loan commitment letter from Edward Chan
24  purporting to be the head of public finance at
25  Seelaus.

133

1      Why didn't you hold Seelaus to the
2  commitment in the letter?
3      A.  I have no time for that.
4      Q.  No time for that?
5      A.  No.
6      Q.  Okay.  Wasn't it -- didn't you need money
7  to finish the project?
8      A.  Yes.
9      Q.  Yeah.  So wasn't this 85 million-dollar
10  loan something that you wanted?
11     A.  That's right.
12     Q.  So if you had a signed loan commitment
13  letter from the firm, why didn't you tell them,
14  please live up to your commitment?
15     A.  Because I knew that if they don't want to
16  do it, there's no way I can force them to do it.
17     Q.  But you have a letter from them saying
18  they do want to do it.
19     MR. STOELTING:  Can you go to the top,
20     please, Nicole.
21  BY MR. STOELTING:
22     Q.  Okay.  It says, "Dear Mr. Xia, it's a
23  pleasure to advise you that with respect to your
24  application covering the above-captioned premises,
25  we have approved the conception financing loan on

134

1  the following terms which, by your acceptance, you
2  agreed to accept from us."
3      So you had a written contract with Seelaus
4  telling you that they have approved the construction
5  financing loan of $85 million.
6      Why didn't you -- why didn't you hold them
7  to their agreement?
8      MR. GOURAIGE:  Objection.  Objection to
9      the question.  I'm not sure we're getting very
10     far with this examination that we've been over
11     extensively now for about the fourth time.
12     Are you suggesting, David, why didn't he
13     sue Seelaus?  I'm not sure the point of the
14     question.
15  BY MR. STOELTING:
16     Q.  I had a question pending, Mr. Xia.
17     MR. STOELTING:  Could we reread my
18     question -- last question, please.
19     THE COURT REPORTER:  Sure.
20     (Record read.)
21     A.  Because I knew that no matter --
22     THE COURT REPORTER:  No matter what?
23     A.  I knew that in the commitment letter,
24  lender always puts enough language there if you
25  wanted to do this loan they can, number one, and

135

1  number two is, I just don't have the time and the
2  energy for that.
3      MR. MCGRATH:  Did the -- did the court
4      reporter hear all of that because I had trouble
5      hearing some of it.
6      THE COURT REPORTER:  Thank you.  I had
7      trouble.
8      MR. MCGRATH:  I heard him say he didn't
9      have time for all that.  I didn't hear what he
10     said before that.
11     THE COURT REPORTER:  Correct.
12     A.  I don't even remember.  What I said is,
13  there's enough language in the letter, I knew that
14  there's no way you can enforce that commitment
15  letter.  If they don't want give you this loan, it's
16  almost no chance.  You know, construction lending is
17  a cooperating business.  If they don't offer you the
18  loan, I just don't know how I can make that happen.
19  BY MR. STOELTING:
20     Q.  But you have a letter here saying they do
21  want to make the loan in writing signed by someone
22  at the firm.
23     Why didn't you talk to someone above
24  Mr. Chan if you thought they were trying to go back
25  on what were the promises in the letter?

136

Richard Xia
2/7/2022

1    **A.** Because when I was complaining, I was told
2    I was the target, and if I didn't open the account,
3    just forget about it.
4        **Q.** All right.
5        MR. STOELTING: Could you pull up PDF 30,
6        and we'll call that Exhibit 14.
7        (Thereupon, marked as Exhibit 14.)
8    BY MR. STOELTING:
9        **Q.** Was Chan the one that told you that, what
10   you just said?
11       **A.** Yes.
12       **Q.** Oh, I'm sorry that -- I think I gave you
13   the wrong number.
14       MR. STOELTING: I'm sorry, it's PDF 18.
15   BY MR. STOELTING:
16       **Q.** Do you recognize this letter?
17   This is a month after the previous one.
18       **A.** No, I have no recollection about this
19   letter at all.
20       **Q.** You don't -- you don't remember seeing
21   this before?
22       **A.** No.
23       **Q.** Is it possible you saw it at the time in
24   September 2017 and just don't remember?
25       **A.** It's possible.

137

1    us to open the account because, you know, they imply
2    that in support of our clients, and also, they
3    provide the profile of their full range of financial
4    services including asset manager. So I guess that's
5    another try, but I really don't recall because, you
6    know, this letter doesn't really --
7        THE COURT REPORTER: I didn't hear the
8        last part.
9        **A.** Because we need the loan, we don't need
10   financial services then, you know, we cannot be
11   their client.
12       THE COURT REPORTER: You cannot be what?
13       **A.** We cannot be their client.
14       THE COURT REPORTER: Thank you.
15   BY MR. STOELTING:
16       **Q.** How long after you signed the August 2017
17   loan commitment letter did Mr. Chan tell you about
18   the requirement to open an account?
19       **A.** I don't know.
20       MR. GOURAIGE: Objection to the word
21       "requirement."
22   BY MR. STOELTING:
23       **Q.** Well, how long was it after you signed the
24   August 2017 letter that Mr. Chan told you about
25   opening -- you know, talked to you about opening an

139

1        **Q.** Okay. So this letter says, "Dear Ms. Yue"
2    -- and I think you had said earlier Julia Yue was
3    the secretary of Eastern Emerald Group, but here
4    she's the vice president.
5        Was she vice president?
6        **A.** No.
7        **Q.** Okay. And the letter says, "Dear Ms. Yue,
8    R. Seelaus is a full-service investment banking firm
9    with the necessary financial expertise,
10   distribution, strength, and capital resources to
11   make capital commitments in support of our clients.
12   As you move forward on the development of Northern
13   Boulevard, we are ready, willing, and able to
14   provide bridge, mezzanine, or take-out financing of
15   up to $72 million."
16       Do you remember getting some sort of
17   letter from Seelaus a month after the commitment
18   letter that was, you know, much -- a much different
19   letter in tone?
20       **A.** Yeah. I think that actually -- I don't
21   remember exactly, but I was -- you know, at that
22   time I was, I think, you know, in support of our
23   client. And then they're talking about, you know,
24   profile of a full range of financial services. I
25   think that's another try. They're trying to induce

138

1    account at Seelaus?
2        **A.** I don't remember that.
3        **Q.** Was it, you know, very close to it or much
4    later?
5        **A.** No, I have no idea. I just remember it's
6    very -- it was a bit of a surprise for me.
7        **Q.** What was a surprise?
8        **A.** They want me to open an account with them.
9        **Q.** Oh. Was the loan commitment letter a
10   surprise?
11       **A.** No, they want me open an account. I was
12   the target. That -- that's what surprised me.
13       MR. STOELTING: Okay. You can close that
14       and go to PDF 14, and that will be Exhibit 15.
15       (Thereupon, marked as Exhibit 15.)
16       MR. STOELTING: Nicole, could you get the
17       whole letter on the screen. There we go.
18       Thank you.
19   BY MR. STOELTING:
20       **Q.** Do you remember this letter from
21   December 21, 2013?
22       **A.** No.
23       **Q.** Do you remember -- do you remember when
24   Mr. Chan worked at Hapoalim Securities before he
25   went to Seelaus?

140

1  A.  You're asking me if I -- can you repeat
2  your question?
3      Q.  Yeah.  Do you remember that Chan worked at
4  Hapoalim Securities before he worked at the Seelaus
5  firm?
6      A.  Yes.
7      Q.  Okay.  And do you remember Chan ever
8  sending you a letter saying that Hapoalim will
9  provide FNYMRC assistance in obtaining financing up
10  to $120 million for the development of Eastern
11  Emerald?
12      A.  Yeah, I don't remember the letter exactly,
13  but he did discount, you know, he provided certain
14  services and why through his company in assistance
15  for us to get the project funded.
16      Q.  Did you -- and did you ever talk to anyone
17  else at Hapoalim other than Eddie Chan?
18      A.  I explain to you before, but, you know,
19  it's a protocol.  You don't go past other people in
20  the same company.
21      Q.  Okay.  Well -- so the answer is no?
22      A.  No.
23      Q.  Okay.  And do you specifically recall
24  being offered -- getting a letter from Mr. Chan
25  offering Hapoalim to assist with obtaining up to

141

1  $120 million loan?
2      A.  No, I was asking them to help me on this
3  financing.  Their goal is to get the fee.  So they
4  want to make sure if they eventually get this loan,
5  they get the fee.  The fee agreement in the last
6  paragraph.  So for financial adviser for the company
7  since their main interest is the service fee.
8      Q.  Do you remember showing anyone this
9  letter?
10      A.  No, I don't remember.
11      Q.  Do you remember showing anyone the Seelaus
12  loan commitment letter?
13      A.  No, I don't remember.
14      MR. STOELTING:  Could you -- could we --
15  Nicole, could you display PDF 15, which we'll
16  call that Exhibit 16.
17      (Thereupon, marked as Exhibit 16.)
18  BY MR. STOELTING:
19      Q.  So this is dated two days after the
20  previous letter.
21      MR. STOELTING:  Are you able to get the
22  whole page in, Nicole?
23  BY MR. STOELTING:
24      Q.  So this is two days after the previous
25  letter, and it says, "Dear Mr. Xia, Hapoalim

142

1  Securities is the U.S. Securities broker-dealer to
2  the Bank of Hapoalim."
3      And then the middle paragraph says, "I
4  have worked with Mr. Xia in his prior EB-5 funding
5  of North Queens Medical Center and Westin Element
6  Hotel, and will now support funding of his new
7  project, Eastern Emerald.  Hapoalim Securities will
8  work exclusively with FNYMRC to achieve a successful
9  EB-5 capital offering.  As an indication of our
10  capital commitment, we will underwrite any portion
11  of the equity offering that is not subscribed for by
12  EB-5 immigrant investors."
13      Do you remember this letter?
14      A.  I remember, you know, we have some
15  communication on that, on the financial arrangement,
16  you know --
17      THE COURT REPORTER:  I'm sorry.  I
18  remember we have some communication on that?
19      A.  Yeah, some financial arrangement, but I
20  don't remember each individual letter.
21  BY MR. STOELTING:
22      Q.  What were the financial arrangements?
23      A.  To get project financing.
24      Q.  And did you pay Mr. Chan for what he was
25  doing for you at Hapoalim and Seelaus?

143

1      A.  I don't remember.
2      Q.  Well, was it your -- I mean, he was doing
3  a lot of work for you, right, getting you these
4  letters?  Was he doing it for free?
5      A.  Nobody doing this for free.  I just don't
6  remember, you know, how much I paid, when I paid,
7  what I paid, I just don't remember.
8      Q.  Okay.  But you did pay him something?
9      A.  Yeah, I think so.
10      Q.  And did you pay him a sort of a regular
11  advisory fee, like sort of a retainer, or was it a,
12  whenever you got a letter like this, you would pay
13  him for the letter?
14      A.  No, this kind of is almost like contingent
15  to the successful financing so they can make a lot
16  of fee.  For small fee, I don't think they're
17  even -- they didn't want to -- you know, all they
18  want is to make sure that -- you know, that
19  eventually we can get it done.  They can make a lot
20  of fee because of the financing.
21      Q.  So this letter says, "Dear Mr. Xia," and
22  then in the middle paragraph says, "I have worked
23  with Mr. Xia."
24      Why would -- do you have any understanding
25  of why he would write you a letter saying that he

144

1  has worked with you?
2      **A.**  He did.  We were working ever since New
3  York City recovery zone facility bond offering.
4          THE COURT REPORTER:  I'm sorry.  We were
5  working ever since New York City?
6      **A.**  Recovery zone facility bond offering.
7  BY MR. STOELTING:
8      **Q.**  No, my question was a specific question
9  about this letter that says, "Dear Mr. Xia," and
10 then the middle paragraph says, "I have worked with
11 Mr. Xia."
12          Why would he send you a -- do you have any
13 understanding of why that letter is to you saying
14 that he works with you?
15     **A.**  Because we did work together.  I don't
16 know.
17     **Q.**  Right, but you know that.  You don't need
18 him to write a letter to you saying "I worked with
19 you."
20         Was this a letter that you -- the purpose
21 was for you to show to other people, other firms?
22     **A.**  I don't know why he put that in there, but
23 it's a fact.
24     **Q.**  What's a fact?
25     **A.**  We worked together before.

145

1      **A.**  Treasury, treasury bonds.
2      **Q.**  Treasury bonds, okay.
3          And so that was he secured you financing
4  on -- to obtain treasury bonds?
5      **A.**  No, he was -- I think he -- he was
6  facilitating, you know, a company transfer of the
7  treasury bond, and then because of the marginal rate
8  is pretty low, so we end up we were using the money
9  and you were making the difference on the interest
10 rate.
11     **Q.**  And when was this?  When did this happen?
12     **A.**  I think that's 2012 or 2011.  I don't
13 remember what year is that.
14     **Q.**  Okay.  Since then, has Mr. Chan secured
15 any financing for you on any project?
16     **A.**  Oh, yeah.  You know, he was educating me
17 on the PACE financing at the beginning.
18         THE COURT REPORTER:  He was educating me
19 on what?
20     **A.**  P-A-C-E, PACE financing.
21 BY MR. STOELTING:
22     **Q.**  P-A-C-E?
23     **A.**  Yeah, P-A-C-E.  C-PACE financing.
24         MR. GOURAIGE:  That should be C-PACE.
25         THE WITNESS:  Yes.  C-PACE financing.

147

1      **Q.**  Okay.
2          MR. STOELTING:  And let's put up the next
3  one, which is PDF 11, which is the 2014 letter.
4  Oh, you know what?  I think I gave you
5  the -- PDF 16, sorry, Nicole.  PDF 16.
6          (Thereupon, marked as Exhibit 17.)
7  BY MR. STOELTING:
8      **Q.**  All right.  I think we saw this earlier,
9  but this is now a year later after the other two
10 letters.
11         Do you -- do you recognize this letter?
12     **A.**  No.
13     **Q.**  All right.  And just to to be clear, you
14 never got any loan at all from Hapoalim Securities,
15 correct?
16     **A.**  That's right.
17     **Q.**  Did Mr. Chan ever -- ever secure any
18 actual financing for you?
19     **A.**  Yes.
20     **Q.**  What?  What was that?
21     **A.**  I think that the financial arrangements he
22 proposed, I think, you know, we tried to rebound and
23 then get the marginal loan.  And the treasury bond
24 that could pay out higher than the marginal rate.
25     **Q.**  The lottery bonds?

146

1  BY MR. STOELTING:
2      **Q.**  Okay.  Is -- have you talked with Mr. Chan
3  about your deposition here today?
4      **A.**  No.
5      **Q.**  When was the last time you talked to
6  Mr. Chan?
7      **A.**  Sorry?
8      **Q.**  When was the last time you spoke with
9  Eddie Chan?
10     **A.**  I think we talk, you know, regularly about
11 financing.
12     **Q.**  Where does he live?
13     **A.**  I don't know.
14     **Q.**  You don't know where he lives?
15     **A.**  I'm sorry?
16     **Q.**  Does he live in New York?
17     **A.**  No, I don't think he's in New York.
18     **Q.**  And where does he live?  Which city?
19     **A.**  Every time, he just tell me he come back
20 from Florida.  I don't know what city he's living
21 in.
22     **Q.**  Did Mr. Chan ever tell you that he
23 received a subpoena in connection with this case?
24     **A.**  No.
25     **Q.**  You didn't know that?

148

1    **A.**  No, I didn't know that.
2        MR. STOELTING:  So let's look at PDF 52.
3    That will be Exhibit 17.
4        MS. FORBES:  This will be Exhibit 18.
5        MR. STOELTING:  Thank you.
6        (Thereupon, marked as Exhibit 18.)
7        MR. STOELTING:  We'll start at the bottom.
8    Let's get this...
9    BY MR. STOELTING:
10   **Q.**  Okay.  This is an e-mail from Walter
11   Verfenstein.
12       Do you know Walter Verfenstein?
13   **A.**  Yes.
14   **Q.**  Who is he?
15   **A.**  He was working -- he was working for me
16   before.
17   **Q.**  And what was he doing for you?
18   **A.**  He was -- I think he was marketing
19   director, you know, of my regional center.
20       THE COURT REPORTER:  Of my what?
21   **A.**  Regional center.  Of my regional center.
22       THE COURT REPORTER:  Okay.
23   BY MR. STOELTING:
24   **Q.**  Okay.  And in that capacity, he went with
25   you to China to market Eastern Mirage, didn't he?

149

1    **A.**  No.  Like I said before, he was more in,
2    you know, communications, in the -- almost like a PR
3    in China.
4    **Q.**  Okay.  But didn't he go to China with you
5    and market Eastern Mirage?
6    **A.**  He go there -- he go there just depending
7    on --
8        THE COURT REPORTER:  I'm sorry, can you
9    repeat that?
10   **A.**  Yeah.  He went there to attend an event.
11   Agents need him to be there to -- to ensue or make
12   new business connections.
13   BY MR. STOELTING:
14   **Q.**  All right.  Well, let's look at this
15   e-mail.  It's July 25, 2014.  And he says, "Good
16   morning, Richard.  I will send you notes from my
17   remarks which I have modified slightly from the
18   version you approved in the spring to reflect the
19   brochure Xixi gave me in out [sic] discussion
20   yesterday.  Please let me know of any
21   changes/corrections you wish to see.  Please tell me
22   if you wish to see me to discuss anytime before
23   2:30.  Otherwise, I will see you in the lobby then.
24   Here come the remarks.  After you get back to me, I
25   will print out a few copies for Julia.  P.S. Thank

150

1    you for sending me to bed last evening."
2        And then the remarks.  One, "I am very
3    pleased to be back in China with an attractive real
4    estate development opportunity to share with you.
5    On my first visit, great project Eastern
6    Mirage/Westin Hotel," and so on.
7        So does that refresh your recollection
8    that you were -- you and Walter were together in
9    China pitching Mirage?
10   **A.**  No.  That's not Mirage 2014.  That's
11   Mirage already been long finish.
12   **Q.**  Or pitching Emerald because he's
13   mentioning Mirage.
14       MR. STOELTING:  Why don't you scroll down
15   a little bit.
16   BY MR. STOELTING:
17   **Q.**  Okay.  So, "Two:  Boutique Regional Center
18   that works exclusively and hand-in-glove with Fleet
19   Financial Group.  Three:  Because FNYMRC and Fleet
20   Financial Group are team working solely on NYC real
21   estate.  600,000 square foot mixed used development
22   across the street from LAG," and so on.
23       And then if we can go up a little bit and
24   get your response, you say, "Walter, everything is
25   fine except the total EB-5 is now 80 million and

151

1    total construction cost 233 million.  Thanks."
2        And that's an e-mail you sent, right?
3    **A.**  Yes.
4    **Q.**  Okay.
5        MR. STOELTING:  And then go all the way to
6    the top.
7    BY MR. STOELTING:
8    **Q.**  Okay.  And then it looks like Walter
9    forwarded it to -- and that's Xi Verfenstein, his
10   wife at the time, right?
11   **A.**  Yeah, that's public immigration agent.
12       THE COURT REPORTER:  That's what?
13   BY MR. STOELTING:
14   **Q.**  I'm sorry?
15   **A.**  That's public immigration agent in China.
16   **Q.**  Okay.  Because immigration agents are the
17   people that helped you promote Mirage and Emerald to
18   actual investors, right?
19   **A.**  No, we have to get then introduced them
20   first before they can, you know, sign the contract
21   and marketing our project, with investor.
22       MR. STOELTING:  Let's look at the --
23   BY MR. STOELTING:
24   **Q.**  By the way, how do you communicate with
25   investors?

152

1    **A.**  You mean during the offering?
2    **Q.**  At any time.
3    **A.**  Before that, we have no connection with
4  the investor.  Only after they become a --
5       THE COURT REPORTER:  I'm sorry, only after
6    they what?
7    **A.**  They become a limited partner, after the
8  money have been raised.  Then they are no longer
9  investor.  They become a business partner of the
10  partnership.  And we communicate with them actually
11  still through agent most of the time.  Only after
12  this litigation started, I guess, you know, they
13  were demanding more direct information from me.  So
14  then we start communicating through WeChat.
15    **Q.**  Okay.  And you've met the monitor, Scott
16  Peeler, right?
17    **A.**  What's the question?
18    **Q.**  You -- you have met -- you know who the
19  monitor is, right?
20    **A.**  Yes, I know.
21    **Q.**  Okay.  And you -- you've been sending
22  messages to investors through WeChat since this case
23  was filed, haven't you?
24    **A.**  I don't consider them investor; I consider
25  them my limited partner.

153

1    **Q.**  Okay.  So you were communicating with your
2  limited partners through WeChat since this case was
3  filed at the end of September 2021, correct?
4    **A.**  Right.
5    **Q.**  And did you know that you were supposed to
6  have the monitor review those messages before they
7  go out?
8    **A.**  No, I do not know that.
9    **Q.**  And have you done that?
10    **A.**  I do not know that.  I don't know that.
11    **Q.**  How often do you communicate with the
12  limited partners through WeChat in the last six
13  months?
14    **A.**  Occasionally.
15    **Q.**  And have you preserved those messages?
16    **A.**  Yes.
17       MR. STOELTING:  Could we look at PDF 49.
18       (Thereupon, marked as Exhibit 19.)
19  BY MR. STOELTING:
20    **Q.**  Do you know what this is?
21    **A.**  Yes.
22    **Q.**  What?
23    **A.**  It's a translation of a declaration.
24    **Q.**  And who -- who prepared that?
25    **A.**  My attorney.

154

1    **Q.**  Which one?
2    **A.**  The one in the deposition.
3       THE COURT REPORTER:  The one what?
4  BY MR. STOELTING:
5    **Q.**  Herve?
6    **A.**  The one in the deposition, yes.
7       MR. STOELTING:  And did you -- Nicole --
8    Herve, did you want to say something?
9       MR. GOURAIGE:  Is this in Chinese?
10       THE WITNESS:  Yes.
11       MR. STOELTING:  Nicole, could you pull up
12    PDF 49, the one in English.
13       MS. FORBES:  You mean 48 because 48 is in
14    English.
15       MR. STOELTING:  Oh, maybe -- maybe you
16    renumbered it.  Sorry, yeah, there's one in
17    English.  I was looking at mine.
18       (Thereupon, marked as Exhibit 20.)
19  BY MR. STOELTING:
20    **Q.**  Okay.  Do you recognize this?
21    **A.**  Yes.
22    **Q.**  All right.  Is this something that you
23  sent to some of your limited partners?
24    **A.**  Yes.
25    **Q.**  Did any of them sign it?

155

1    **A.**  Yes.
2    **Q.**  How many?
3    **A.**  15.
4    **Q.**  And this is something that was prepared by
5  Herve, correct?
6    **A.**  Yeah, I made it clear it's a draft.  You
7  can feel free to change, modify anything, or just,
8  you know, write your own statement.  I'm just doing
9  this to save them time --
10       THE COURT REPORTER:  What?
11    **A.**  I'm just doing this to save time or give
12  them a starting point.
13  BY MR. STOELTING:
14    **Q.**  And did anybody change anything in -- in
15  the draft that signed it?
16    **A.**  Yeah.  All of the 15.  I think some of
17  them write their own declaration.  Some of them just
18  change, modify it a little bit.
19    **Q.**  Okay.
20       MR. GOURAIGE:  Can I just get
21    clarification here?  This is a draft
22    declaration prepared by my firm communicated to
23    limited partners or investors.  And I know we
24    did not produce this to the SEC.
25       The SEC obtained this document from a

156

Richard Xia
2/7/2022



1    recipient?
2    MR. STOELTING:  I mean, we -- Herve, you
3    have this already.  We produced it to you.  We
4    obtained it from -- I can tell you later.  We
5    obtained it from a third party, correct.
6    MR. GOURAIGE:  Okay.
7    MR. STOELTING:  All right.  You can pull
8    that down.
9    Could you put up the one that's called --
10   I have PDF 46, but it's called group chat 2
11   English.
12   BY MR. STOELTING:
13   Q.  Okay.  So is this a WeChat from you to the
14   limited partners, Mr. Xia?
15   A.  Yes.
16   Q.  And this, the English translation was
17   there when we received this, but does that appear to
18   be accurate?
19   A.  I'm not sure about that.
20   THE COURT REPORTER:  I'm sorry?
21   BY MR. STOELTING:
22   Q.  How many -- how many limited partners --
23   how many limited partners are in this WeChat group?
24   A.  I'm not sure about that.
25   MR. STOELTING:  Okay.  Could you scroll

157

1    I don't think you're saying that he has an
2    obligation as general partner to report to
3    investors what third parties are doing with
4    their payments, and I don't think that was his
5    testimony.
6    MR. STOELTING:  No, I'm just asking if
7    there was disclosure made to the limiteds about
8    the house purchases.
9    MR. GOURAIGE:  I object to the question.
10   You can ask him if there were disclosure made
11   by statements to contractors.
12   MR. STOELTING:  Noted.  Noted.
13   BY MR. STOELTING:
14   Q.  Mr. Xia, did you disclose to the limited
15   partners the purchases of the Long Island houses?
16   A.  This has nothing to do with the limited
17   partner.  I don't think I need to disclose anything
18   not related to them.
19   Q.  But you -- so I take it the answer is no,
20   there was no disclosure made?
21   MR. STOELTING:  Can you scroll down,
22   please.
23   MS. FORBES:  This is the bottom of the
24   e-mail -- of the document.
25   MR. STOELTING:  Oh, okay.  Okay.  All

159

1    down a little bit.
2    BY MR. STOELTING:
3    Q.  So did you -- were you telling the limited
4    partners here to -- that they should express what
5    they should tell the SEC about this case?
6    A.  No.  As a general partner, I have
7    obligation to tell them whatever the new develop --
8    about the financing, the litigation, and everything.
9    Q.  Okay.  Well, did you -- in any of your
10   WeChats, did you tell the limited partners about the
11   Long Island house purchases?
12   MR. GOURAIGE:  Objection.
13   A.  Why?
14   BY MR. STOELTING:
15   Q.  You just mentioned that you're the general
16   partner and you have to keep the limited partners
17   apprised of what's going on.
18   So did you disclose to them that nearly
19   $30 million of investor-sourced money was used to
20   purchase three expensive houses on Long Island?
21   MR. GOURAIGE:  Objection.  I object to
22   "investor-sourced money used to purchase
23   houses."  I think his testimony was these were
24   payments to contractors, and the contractors
25   then used them.

158

1    right.  You could -- you could pull that down.
2    And that's marked as Exhibit 19?
3    MS. FORBES:  No, because 49 was 19; 48 was
4    20.  So this is 47, which is 21.
5    (Thereupon, marked as Exhibit 21.)
6    MR. STOELTING:  Okay.  So we're up to 22.
7    MS. FORBES:  The next one will be 22.
8    MR. STOELTING:  Yeah.  So -- okay.  So
9    let's look at PDF 27.
10   (Thereupon, marked as Exhibit 22.)
11   MR. STOELTING:  So I intend to go till
12   5:00 or -- you know, give or take.
13   Does everyone want to take a short break
14   now, or do you want to keep going?
15   MR. GOURAIGE:  Let me ask the witness.
16   Mr. Xia, what do you want to do?
17   THE WITNESS:  I don't understand.
18   MR. STOELTING:  Why don't we go off the
19   record for a moment.
20   THE VIDEOGRAPHER:  The time is 4:12 p.m.
21   Off the record.
22   (Recess taken.)
23   THE VIDEOGRAPHER:  The time is 4:30 p.m.
24   Back on the record.
25

160

Richard Xia
2/7/2022

1  BY MR. STOELTING:
2     **Q.**  Okay.  I wanted to show you one more of
3  the WeChats.
4        MR. STOELTING:  And could you just pull
5  up -- yeah.  So this is 21 or 22?
6        MS. FORBES:  This is 22.
7        MR. STOELTING:  22.  Okay.  Thank you.
8  BY MR. STOELTING:
9     **Q.**  Is this -- Mr. Xia, this is a WeChat
10  communication that you had with the limited
11  partners?
12     **A.**  No.
13     **Q.**  I'm sorry?
14     **A.**  No.
15     **Q.**  No.  Where it says "Richard," is that you?
16     **A.**  That's me, but that's not the way I --
17        THE COURT REPORTER:  I didn't hear you.
18     **A.**  Yeah, it's not the way I communicated with
19  my limited partners.
20        THE COURT REPORTER:  It's not the way I
21  communicated --
22     **A.**  It's not the way I communicated with my
23  limited partners.
24        THE COURT REPORTER:  Thank you.
25

161

1  BY MR. STOELTING:
2     **Q.**  Okay.  Wait.  So where it says the picture
3  and then Richard, that's not you?
4     **A.**  It's me, but, you know, the word,
5  everything has been altered.  It's not the way I was
6  communicating with my limited partners.  The
7  sequence, you know, the -- everything is -- is
8  altered.
9        THE COURT REPORTER:  Everything is what?
10     **A.**  Altered.
11        THE COURT REPORTER:  Altered.
12     **A.**  Changed.
13        THE COURT REPORTER:  Thank you.
14     **A.**  Altered.
15  BY MR. STOELTING:
16     **Q.**  Oh, you mean in the Chinese portion of it?
17     **A.**  Yes.  You know, this is -- WeChat
18  communication is supposed to be back and forth.
19  Here, it's almost like somebody just, you know,
20  selected something and put them together.  I don't
21  know for what purpose, but it's definitely not the
22  way I was communicating with my limited partners.
23     **Q.**  Oh, okay.  But --
24        MR. STOELTING:  Okay.  Can you scroll down
25  a little further and let us see more.  Keep

162

1  going.
2     **A.**  No, definitely not.
3  BY MR. STOELTING:
4     **Q.**  Okay.  But you don't -- you don't deny
5  that these are WeChatss that you sent, you're
6  just -- somehow they're -- all the ones that you
7  sent are together, and whatever the limiteds'
8  responding isn't there; is that it?
9     **A.**  No, once it's changed, it's changed.  How
10  do I know -- if I don't check it, there's no way to
11  know any part.  Right now, all I can see is that the
12  whole sequence, everything has been changed.  No
13  communication.  It's just, you know, everything has
14  been lift over there.  There's no way I can tell if
15  it's -- the -- you know, once it's altered, it's
16  altered.  I cannot tell you now.
17        MR. STOELTING:  Can you keep scrolling
18  down, please.
19  BY MR. STOELTING:
20     **Q.**  So is this -- did you send this document
21  to the investors, to the limited partners?
22     **A.**  Yes, I did.
23     **Q.**  Okay.
24        MR. STOELTING:  Can you keep scrolling
25  down.

163

1  BY MR. STOELTING:
2     **Q.**  Okay.  So this page, are these -- are
3  these statements that you made?
4     **A.**  No.  It's not statements that I made.
5  It's a compilation.  But I'm not even sure that one
6  part has already been altered.  I just have no way
7  to know which part hasn't been changed.
8     **Q.**  So are these WeChatss that you sent?
9     **A.**  Like I said, I'm not sure.
10        MR. STOELTING:  Can you scroll down again.
11  Keep going.
12  BY MR. STOELTING:
13     **Q.**  Okay.  Was there something that you sent
14  to the limited partners, that -- that document?
15     **A.**  No.  Like I said -- like I said, I don't
16  know where this is coming from.
17     **Q.**  Okay.
18        MR. STOELTING:  Keep scrolling down.
19  BY MR. STOELTING:
20     **Q.**  Did you send this document to the limited
21  partners?
22     **A.**  It's not even a full document.  I just
23  don't know which document you're referring to.
24        THE COURT REPORTER:  It's not even a what?
25     **A.**  It's not even a full document.

164

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

BY MR. STOELTING:
1   BY MR. STOELTING:
2       Q.  Have you provided all of your WeChat
3   messages from September -- from going back as far as
4   you can to your attorney?
5       A.  Yeah, I produced everything.
6       Q.  So -- so your attorney has all of your
7   WeChat messages from today going back to however
8   long you have them?
9       A.  Can you repeat that question?
10      Q.  Yeah.  Does -- does your counsel have
11  all -- all of your WeChat messages to limited
12  partners going back for however long you maintain
13  them?
14      A.  Yes.
15      Q.  And let me just put on the record here
16  that per the order appointing monitor, section 6L
17  says that the monitor shall have the authority --
18  the monitor is authored and empowered to -- this is
19  section 11L -- review promptly and approve any
20  investor-wide communications intended to be sent by
21  Xia and the Xia entities to investors.  So we expect
22  going forward, you will abide by that court order.
23      MR. STOELTING:  So can you keep scrolling
24  down to... okay.  Stop there.
25

165

1       A.  Jenny, I think she's investor limited
2   partner.
3       THE COURT REPORTER:  You think what?
4       A.  She's an investor, I think.
5       THE COURT REPORTER:  I still don't
6   understand.
7       A.  She is an investor, business partner.
8       THE COURT REPORTER:  Thank you.
9       MR. STOELTING:  All right.  Scroll down.
10  BY MR. STOELTING:
11      Q.  So is that -- is that -- are these
12  messages that you sent?
13      A.  I'm not sure.
14      Q.  And isn't that photograph there the symbol
15  that you use on your WeChat?
16      A.  It is, but --
17      MR. STOELTING:  All right.  Keep going.
18  So -- stop.  Stop.  If you could go up a little
19  bit.  I'm just -- a little bit.  Okay.  Can you
20  go down a little bit.  Perfect.  Right there.
21  Okay.
22  BY MR. STOELTING:
23      Q.  So I'm just reading the -- well, first of
24  all, my -- answer the question about the photograph
25  of the tower or whatever that is, is that -- that's

167

1   BY MR. STOELTING:
2       Q.  Okay.  Is this something -- is this your
3   writing here?
4       MR. GOURAIGE:  I cannot read that.  Can
5   that be expanded or enlarged?
6       A.  And what's the question?
7   BY MR. STOELTING:
8       Q.  Okay.  Do you recognize this?
9       A.  No.
10      Q.  Did you -- did you send a document called
11  "the proof of funds" dated December 22, '21 to the
12  limited partners?
13      A.  Yes, I did.
14      Q.  Okay.  And why did you do that?
15      A.  They were asking that.
16      MR. STOELTING:  All right.  Could you keep
17  going down to 10.
18  BY MR. STOELTING:
19      Q.  Okay.  So were you sending e-mails from me
20  to the limited partners?
21      A.  No, I didn't.
22      MR. STOELTING:  All right.  Keep going.
23  Okay.  Stop there.
24  BY MR. STOELTING:
25      Q.  Do you know who -- who Jenny is?

166

1   the symbol that you use on your WeChatss, correct?
2       A.  Yes.
3       Q.  Okay.  So I'm just reading the
4   translation, and it says, "It should be noted that
5   the letter that we are now offering investors to
6   sign is not of any substantive benefit to our case.
7   Over the weekend, you will see the actual progress
8   of our case, so there is no need to be silent about
9   it.  I just hope your voices are not suppressed."
10  That's it."
11      Is that an accurate translation of the
12  Chinese?
13      A.  I don't know.
14      Q.  Okay.  Is this -- did you tell investors
15  that the letter that they're being asked to sign is
16  not of any substantive benefit to your case?
17      MR. GOURAIGE:  David, can I ask a couple
18  of questions first?  Whose translation is this,
19  the English translation?
20      MR. STOELTING:  I don't honestly know.
21  It's the way we received them that was already
22  in there.
23      MR. GOURAIGE:  And what letter is being
24  referred to?
25      MR. STOELTING:  That's the question for

168

1   the witness.
2       MR. GOURAIGE:  Well, I guess ask him if he
3   knows what letter is being referred to.
4   BY MR. STOELTING:
5       Q.  Do you know what letter, what -- where it
6   says, "the letter we are now offering investors to
7   sign," does that refer to the declarations?
8       A.  I don't know.  This message has been
9   completely altered.  No context before and after.
10      Q.  Well, just looking at the Chinese
11  characters there, are you able to read it?
12      A.  Yes.
13      Q.  And is the English below it accurate?
14      A.  I don't know.  I don't think so.
15      Q.  Can you translate the Chinese for us?  Can
16  you just read the -- read what's there in Chinese
17  but say it in English, if you can?
18      A.  I cannot.  Chinese is a lot more
19  complicated than just you read it and translate it.
20  This is no context before and after.  This seems
21  this be interpreted differently.
22      Q.  I'm sorry.
23      MR. STOELTING:  Could you -- Denise, could
24  you read back that response.
25      (Record read.)

                    169

1   BY MR. STOELTING:
2       Q.  Okay.  So you're not able to translate
3   this into English?
4       A.  I can, but I need, you know, the
5   communication.  I just cannot just translate
6   something, one paragraph, and I -- I know that
7   everything has been changed in the entire document.
8       Q.  Why -- why can't you just read what it
9   says in English and we have your testimony on the
10  record that it's been changed or altered.
11      A.  So you just want me to read the English,
12  right?
13      Q.  Yeah.
14      A.  Okay.  "It should be noted that the letter
15  that we are now offering investors -- we are now
16  offering investors to sign is not of any substantive
17  benefit to our case.  Over the weekend, you will see
18  the actual progress of our case, so there is no need
19  to be silent about it.  I just hope your voices are
20  not suppressed.  That's it."
21      Q.  Okay.  So that's what the Chinese says in
22  English?
23      A.  No.  You just asked me to read the
24  English.
25      Q.  No, no, I meant I wanted you to read the

                    170

1   Chinese, but translate it for us.
2       MR. GOURAIGE:  I think he answered several
3   times he can't do that without the context.
4       I have a question.
5       Do we have a date on this message?
6       MR. STOELTING:  I don't see a date, but --
7       All right.  You can take that down.
8       And then I would like to look at -- all
9   right -- PDF 27.
10      Actually, Nicole, why don't -- why don't
11  we -- why don't we start with 25, PDF 25.
12      I'm sorry, you got it up.  Sorry.
13      (Thereupon, marked as Exhibit 23.)
14  BY MR. STOELTING:
15      Q.  So this is a private offering memorandum,
16  this is for EMMCO, and there are others for the
17  other limited partnerships:  North Queens Medical
18  Center, Tower, and Eastern Emerald, Eastern Emerald
19  Supplement, and Eastern Emerald EEGH II.
20      So for these six private offering memos,
21  and just I'm going to speak of them altogether --
22      A.  Five.
23      Q.  Sorry?
24      A.  It's five, not six.
25      Q.  Five, okay.

                    171

1       Who is responsible for -- for drafting
2   them?
3       A.  Attorney.
4       Q.  Which attorney?
5       A.  It's a long time ago.  I don't remember
6   that attorney's name.
7       Q.  Was it -- which firm?
8       A.  I think she didn't really have a firm.  I
9   think she is, you know, doing this as an individual.
10  As an individual, not as a firm.
11      Q.  And for all the private offering memos,
12  where did -- where did she find out the information
13  on what to say in -- in the offering memos?
14      A.  She asking me.
15      Q.  Right.  Okay.  So you -- you provided all
16  the information that's in the offering memos; is
17  that fair?
18      A.  I provide her all the information.
19      THE COURT REPORTER:  I'm sorry?
20  BY MR. STOELTING:
21      Q.  And did you have --
22      A.  I provide her all the information.
23      Q.  Okay.  So you provided the information
24  that's in the offering memo to the attorneys; is
25  that right?

                    172

Richard Xia
2/7/2022

1    A.  Yeah, but if I needed some third party
2  information, I will ask them, you know, for that.
3    Q.  Okay.  And were you the one that -- that
4  signed off on the private offering memos when they
5  were done?
6    A.  At that time, I was -- actually, EB-5 is
7  not a security.  In an abundance of caution to make
8  sure there because my offering was, you know, zero
9  interest offering --
10    THE COURT REPORTER:  My offering was what?
11    A.  Zero interest offering.  And I was told,
12  you know, zero interest offering, and there's no
13  profit expectation.  So attorney at that time, I
14  think it's 10, 11 years ago, they're not even sure
15  about this is security at that time.
16  BY MR. STOELTING:
17    Q.  All right.  That wasn't my question.
18    My question was, did you have final
19  authority on approving the private offering memos
20  for the Mirage and Emerald offerings?
21    A.  Yes, I did.
22    Q.  Okay.
23    MR. GOURAIGE:  Can I go back?  I just want
24  to make sure.
25    Mr. Xia, when you testified what you were

173

1    being told and you referred to an attorney, was
2    that statement told to you by an attorney?
3    THE WITNESS:  Yes, I think so.  Yes.
4    MR. GOURAIGE:  I would caution you not to
5    disclose legal advice you were getting from an
6    attorney.  If you got legal advice, you could
7    say yes, you got legal advice, but not to
8    actually disclose the advice.
9    THE WITNESS:  Okay, sorry.
10  BY MR. STOELTING:
11    Q.  So I want to ask some questions about the
12  business plans.
13    MR. STOELTING:  And why don't we just pull
14    up, say, PDF 31.
15    THE COURT REPORTER:  Did you mark the
16    other one?
17    MR. STOELTING:  The other one?  Oh, yeah,
18    that should be 25 or 26?
19    THE COURT REPORTER:  Nicole?
20    MS. FORBES:  So 25 is Number 23; 31 is
21    going to be 24.
22    MR. STOELTING:  Okay.  So the business
23    plan you're pulling up now is Exhibit 24?
24    MS. FORBES:  Yes.  31 will be 24, yes.
25    (Thereupon, marked as Exhibit 24.)

174

1    MR. STOELTING:  Okay.  Could you shrink
2    that a little bit.
3  BY MR. STOELTING:
4    Q.  Okay.  So the business plans -- and we
5  have -- we have business plans for NQMC, Tower,
6  EEGH, and EEGH II.
7    Were you the source for the information in
8  the business plans?
9    A.  No, we have -- they have a lot of third
10  party consultants working on this.
11    Q.  Okay.  Can you identify them?
12    A.  I don't remember exactly.  You know, the
13  business plan need a lot of consultants to acquire
14  the numbers and everything there.
15    Q.  And were you the one that provided the
16  information to the consultants so they knew what to
17  say in the business plan?
18    A.  No, I'm the one who actually ordered a lot
19  of report from them.
20    THE COURT REPORTER:  I'm the one that
21    actually what?
22    A.  Ordered a lot of report and then provide
23  those reports to the business writer, business plan
24  writer.
25    Q.  Okay.  I don't think I understood that

175

1  response.
2    MR. MCGRATH:  Can you -- can you read it
3    back, Denise, if you --
4    THE COURT REPORTER:  Can he restate it?
5    "No, I'm the only one who actually" -- and
6    I don't know if the word is ordered?
7    A.  Ordered.  Ordered.
8    MR. MCGRATH:  Ordered.  Okay.  Ordered.
9    Okay.  A lot of -- go ahead.
10    A.  Business reports from them.
11  BY MR. STOELTING:
12    Q.  Okay.  And then so you provided
13  information to the business plan writer, right?
14    A.  I provided a report, third party report to
15  the business plan writer, yes.
16    Q.  Okay.  And then when the business plan
17  writer was done, you reviewed the business plan and
18  said, you know, this is done, I've -- you know, I
19  have final authority to approve it -- to approve it?
20    A.  They didn't have some, like, formal
21  process like that.  We were just working together,
22  getting it done.
23    Q.  Okay.  And the process was that you would
24  provide information to the business plan writers,
25  and when it was done -- who would decide when it was

176

Richard Xia
2/7/2022

1  done, you?
2      A.   What?
3      Q.   Were you the one that decided when it was
4  done and ready to go out?
5      A.   Yes.
6      Q.   Okay.  And you -- you read all of the
7  business plans, correct?
8      A.   Yes, but not, you know -- you know, I
9  don't think I go through every single word of the
10  business plan.
11      Q.   Okay.  But in terms of deciding when --
12  when the business plans were done, you know, when
13  the writers were done with them, you would look at
14  them and say, okay, these are done, and -- and we'll
15  use them for -- for marketing purposes, right?
16      A.   No.
17      Q.   What did you use --
18      A.   Business plan has never been used for the
19  marketing purpose.
20          THE COURT REPORTER:  I'm sorry, business?
21  BY MR. STOELTING:
22      Q.   What did you use the business plans for?
23      A.   Business plan has never been used for the
24  marketing purpose.
25          THE COURT REPORTER:  Thank you.

177

1  BY MR. STOELTING:
2      Q.   What did you use the business plans for?
3      A.   I think that's part of the requirement.
4  If you look at that pursuant to the matter of HO or
5  CFR, that's part of the requirement.  I don't even
6  know what that means, probably some sort of
7  litigation, and, you know, then you have to provide
8  a business plan.
9      Q.   Do you know if the business plans were
10  ever given to potential limited partners?
11      A.   No.
12      Q.   Is that --
13          MR. GOURAIGE:  Is that no, you don't know?
14          THE WITNESS:  Herve, I know it has never
15  been given to the EB-5 investors.
16          THE COURT REPORTER:  It has never what?
17          THE WITNESS:  It never has been given to
18  the EB-5 investors.
19          THE COURT REPORTER:  Thank you.
20          MR. STOELTING:  Could we look at PDF 35.
21          (Thereupon, marked as Exhibit 25.)
22  BY MR. STOELTING:
23      Q.   This is the loan agreement for EMMCO.
24          MR. STOELTING:  And could you go to the
25      next page.

178

1  BY MR. STOELTING:
2      Q.   Okay.  Do you see section 1.5 where it
3  says, "Mandatory use of proceeds.  Borrower agrees
4  that the proceeds of the loan shall be -- shall only
5  be used for the development, construction, and
6  operation of the project"?  Do you see that?
7      A.   Yes.
8      Q.   Okay.
9      A.   Yes, I do.
10      Q.   So what did you understand that to mean?
11  This is the EMMCO, LP loan agreement.
12      A.   Yes, that loan --
13      Q.   Does that mean -- does that mean that the
14  money that you loaned pursuant to this loan
15  agreement can only be used for the EMMCO project,
16  not any other project?
17      A.   I don't know.  I'm not lawyer.  I cannot
18  interpret something in the legal.
19      Q.   So you don't know -- you don't know
20  that -- for example, you understand that you could
21  not use money raised in the Eastern Mirage Project
22  to pay for the Eastern Emerald Project?
23      A.   My understanding is based on section 4.3
24  in the limited partnership agreement which I act as
25  the general partner, no commingle funds, and that

179

1  portion -- that agreement is between the general
2  partner and the limited partner.  And in that
3  section it states that the partnership assets cannot
4  be commingled with general partner's other assets.
5  And my understanding is in terms of EB-5 offering,
6  the assets of partnership is a promissory note.  And
7  the moment the funds left the bank account of the
8  LP, it's no longer LP assets.  That portion is
9  basically clear thinking that where is the cut line
10  of the EB-5 money?
11          THE COURT REPORTER:  I'm sorry?
12      A.   Where is the cut line of the EB-5 money?
13          THE COURT REPORTER:  I still don't
14  understand.
15          THE WITNESS:  Which part, the last part?
16          THE COURT REPORTER:  The last part.
17      A.   Where is the cut line of the EB-5 money?
18          MR. GOURAIGE:  I think what he's saying
19  is, "where is the cut line of the EB-5 money?"
20      Is that correct?
21          THE WITNESS:  That's right.
22  BY MR. STOELTING:
23      Q.   Okay.  Well, looking at the loan agreement
24  says --
25          MR. STOELTING:  And let's -- can you go

180

Richard Xia
2/7/2022

1    back to the top.
2    BY MR. STOELTING:
3        Q.  So the borrower is Fleet Financial Group,
4    the lender is the limited partnership, project is
5    defined as phase I, meaning conference center, spa,
6    restaurant, parking garage.  $8 million, that's
7    defined as the project.
8        MR. STOELTING:  The Fleet Financial Group,
9    if we could go back to that provision on the
10   next page.
11   BY MR. STOELTING:
12       Q.  So Fleet Financial Group, the borrower,
13   agrees that the proceeds of the loan that it's
14   receiving for the partnership shall only be used for
15   the project, meaning phase I.  That means it won't
16   be used for phase II, phase III, or Eastern Emerald.
17       Is that consistent with your
18   understanding?
19       A.  Where is the definition of the project?
20       Q.  We just read through it.
21       MR. STOELTING:  Can you go back to the
22   top.
23   BY MR. STOELTING:
24       Q.  Do you see where it says, "project is
25   defined as phase I"?

181

1        A.  Okay.
2        Q.  So does that refresh your recollection
3    that under the loan agreement Fleet Financial could
4    not use any of this money for anything except phase
5    I.
6        Couldn't use it for phase II, phase III,
7    or Eastern Emerald, correct?
8        A.  This is the loan agreement between EMMCO
9    and Fleet, it's not the loan agreement between EB-5
10   investor and EMMCO.
11       Q.  Well, Fleet Financial Group is your
12   company, right?
13       A.  Yes.
14       Q.  So when Fleet Financial Group received
15   this $8 million from the lender, did you understand
16   that under the terms of the loan agreement you
17   couldn't use that money for anything except phase I?
18       A.  I think it's a contract obligation.
19       Q.  Correct.  So did you ever use Eastern
20   Mirage money for Eastern Emerald?
21       A.  No, never.
22       Q.  Didn't you use Eastern Mirage funds to
23   purchase the Eastern Emerald land?
24       A.  Again, what's the definition of Eastern
25   Mirage funds?

182

1        MR. STOELTING:  I'm sorry, could you read
2    that answer back.
3        (Record read.)
4    BY MR. STOELTING:
5        Q.  The funds that were loaned from the
6    partnership to Fleet.
7        A.  No.  I personally loan Fleet a lot of
8    money, so if you're talking about EB-5 funds, never;
9    if you're talking about my own funds, and if we're
10   talking about service provide to the project, so not
11   a single dollar EB-5 money have been used for
12   different project.
13       Q.  Okay.
14       A.  Because the EB-5 fund is the fund loaned
15   to the project developer, and that's all promised to
16   the EB-5 investors in the offering, and in our
17   agreement, it's clearly stating the moment the funds
18   left LP account, it's no long LP's assets.
19       Q.  But Fleet Financial Group is bound by the
20   loan agreement, right?
21       A.  To who?
22       Q.  I'm sorry?
23       A.  To whom?  Who is bound?
24       Q.  When Fleet Financial Group receives this
25   loan, it's required to observe the terms of the loan

183

1    agreement, right?
2        A.  Yes.
3        MR. STOELTING:  All right.  Let me -- I
4    want to ask a few questions about one of the
5    offering memos, and then we'll try to wrap up.
6        Why don't we look at the EMMCO Tower
7    offering memo, which it is PDF 27.
8        THE COURT REPORTER:  What number is this,
9    Nicole?
10       MS. FORBES:  PDF 27 is going to be Depo
11   Exhibit 26.
12       THE COURT REPORTER:  Thank you.
13       (Thereupon, marked as Exhibit 26.)
14       MR. STOELTING:  Okay.  Could you go to the
15   page that has little 3, 3I at the bottom.
16   Okay.  All right.  Yeah.  No, all the way at
17   the bottom, the section about compensation.
18   BY MR. STOELTING:
19       Q.  So do you see that it says, "The general
20   partner is entitled to receive expenses incurred in
21   connection with the partnership and to receive
22   reasonable management fees from the partnership
23   which shall be paid from" -- and then carry on to
24   the next page -- "the cash flow of the partnership
25   and shall not be deducted from capital investment

184

1 accounts."
2      So you -- and this same provision is in
3 all of the offering memos, but did you understand
4 that management fees could only be paid from cash
5 flow and could not be deducted from the capital
6 contributions?
7      **A.** Yes.
8      **Q.** Okay. And there was not -- there really
9 was no cash flow, was there, from the partnerships?
10     **A.** Yes, due to construction, no cash flow.
11     MR. STOELTING: Okay. So -- and then if
12     we could look at page 2. All right. Right
13     there. Right there. Okay.
14 BY MR. STOELTING:
15     **Q.** So this says, "The Eastern Mirage Project
16 costs are expected to be financed as follows." And
17 it says, "17 million in recovery zone facility
18 bond," and then at the bottom there's an asterisk
19 and it says, "Up to an additional 12 million in
20 recovery zone facility bond."
21     So this Tower offering memo was circulated
22 from December 11 to January 2014.
23     By this time, you knew that you had
24 already turned down the recovery zone bonds,
25 correct?

185

1      **A.** No, what we turn down is the triple
2 tax-exempt bond.
3      THE COURT REPORTER: What did we turn
4      down?
5      **A.** Triple tax-exempt bond.
6      THE COURT REPORTER: I still don't
7      understand.
8      **A.** Triple tax-exempt bond.
9      THE COURT REPORTER: Counsel?
10     MR. GOURAIGE: I think -- I think what he
11     is saying is we turned down triple -- triple
12     tax-exempt bond.
13     Is that correct?
14     THE WITNESS: Yes, that's right.
15     **A.** And that's just for lower interest rate
16 bond. But the letter we send to the New York City
17 EDC, I think end of 2011, it's clearly indicates
18 that we want to preserve additional 12
19 million-dollar double tax-exempt bonds, but 17
20 million-dollar tax-exempt bonds, you know, even if
21 the interest rate is a little higher.
22 BY MR. STOELTING:
23     **Q.** Okay. But you never received any recovery
24 zone facility bonds, correct?
25     **A.** That's right.

186

1      **Q.** And it says --
2      **A.** Actually, we got letter of credit from
3 Cathy Bank.
4      THE COURT REPORTER: You got a letter of
5      credit from who?
6      **A.** Cathy Bank, C-A-T-H-Y. Cathy Bank. And I
7 submit that letter to the -- they start the whole
8 process, but they never continue on that.
9 BY MR. STOELTING:
10     **Q.** Right. So you never got any of that
11 17 million or the additional 12 million, right?
12     **A.** We don't need it.
13     **Q.** The answer is, you never received it,
14 correct?
15     **A.** If you need it, I believe I can get it
16 because I already got a letter of credit from a
17 bank.
18     **Q.** So let me ask again: Did you ever receive
19 any money from the recovery zone facility bonds?
20     **A.** If we need it, I think we can get it.
21     **Q.** Did you ever receive any money from the
22 recovery zone facility bonds, yes or no?
23     MR. GOURAIGE: Well, I think he's answered
24     the question. I don't think he can answer it
25     in yes or no, David.

187

1      MR. STOELTING: Well, it's a yes or no
2      question, and he's not answering the question.
3      MR. GOURAIGE: He answered it. He said he
4      could get it, but he didn't need it.
5 BY MR. STOELTING:
6      **Q.** Okay. So the answer is no.
7      East West Bank loan $9 million, you never
8 obtained any East West Bank loan for any amount, did
9 you?
10     **A.** Again, if I need it, I can get it.
11     **Q.** Did you ever fill out an application for
12 East West Bank for a 9 million-dollar loan?
13     **A.** Yes, I did.
14     **Q.** And did you receive a 9 million-dollar
15 loan from East West Bank?
16     **A.** If I don't need it, I don't receive it.
17     **Q.** All right. "Other investment sources,
18 14 million," what does that mean?
19     **A.** The land.
20     THE COURT REPORTER: I'm sorry?
21 BY MR. STOELTING:
22     **Q.** Pardon me?
23     **A.** The land. The land value is $14 million.
24     **Q.** Why does it say "other investment
25 sources"?

188

Richard Xia
2/7/2022



1    **A.** Because the land, you can mortgage if you
2    want to cash out money to pay for the -- I'm sorry.
3        **Q.** Can you look at the next page.
4        So the domestic investment and
5    construction loan, 17.7 million, what does that
6    refer to?
7        **A.** That's referring to the construction --
8        THE COURT REPORTER: The what?
9        **A.** Potential construction loan or some other
10   investment.
11   BY MR. STOELTING:
12       **Q.** Okay. But nothing specific?
13       **A.** Nothing. Eventually, I didn't charge my
14   fee. You know, I waive a lot of fee, and I charge
15   something much lower, so it's actually me, my
16   personal and my expertise. My company did provide
17   the financing because we didn't charge that much,
18   you know, as much as the market rate. So that's why
19   we don't need it. If we need it, I'm pretty sure
20   that we can get all of those financing, and for the
21   real estate financing, you don't get all the money
22   up front.
23       You're basically, you know, trying to
24   protect everybody's interest not to incur too much
25   interest payment. Construction doesn't happen

189

1        MR. STOELTING: Okay. Mr. Xia, I have no
2    more questions at this point. We can go off
3    the record.
4        Unless, Herve, you want to follow up on
5    anything?
6        MR. GOURAIGE: I do just want -- want to
7    get one thing clarified.
8        EXAMINATION
9    BY MR. GOURAIGE:
10       **Q.** Mr. Xia, do you remember when you were
11   shown the declaration that was translated in
12   Chinese, you testified that the -- the translation
13   was made by your lawyer? Do you recall that
14   testimony?
15       **A.** No. I did not.
16       MR. GOURAIGE: Okay. Thank you. I don't
17   have any other questions.
18       MR. STOELTING: Okay. We can go off the
19   record.
20       THE VIDEOGRAPHER: If there's nothing
21   further, the time is 5:28 p.m., and we are now
22   off the record.
23       (Time noted: 5:28 p.m.)
24
25

191

1    overnight. You don't build your building overnight.
2    When you build foundation, there's no reason to have
3    the super cycle money parking on your account and
4    start paying the money to the bank or some other
5    financial institution. That's configured to be a
6    very typical normal process to do the real estate
7    financing like something like to pay as -- you know,
8    as it's progressing and -- but you need it if it's
9    there. That's considered to be the best.
10       MR. STOELTING: Can we just look at the
11   next page, please. A little bit. Okay.
12   BY MR. STOELTING:
13       **Q.** So the description there of Racanelli
14   Construction Group, did you provide that language?
15       **A.** Yes, I did.
16       **Q.** Okay.
17       MR. STOELTING: Can we just take a break
18   and let me talk -- let's go off the record for
19   a moment.
20       THE VIDEOGRAPHER: The time is 5:19 p.m --
21   one moment. The time is 5:19 p.m. Off the
22   record.
23       (Recess taken.)
24       THE VIDEOGRAPHER: The time is 5:28 p.m.
25   Back on the record.

190

1
2
3
4        CERTIFICATE OF OATH
5
6
7    STATE OF FLORIDA
8
9
10       I, the undersigned authority, certify
11   that RICHARD XIA appeared remotely before me and
12   was duly sworn on the 7th day of February, 2022.
13       Signed this 8th day of February, 2022.
14
15
16       _____
        DENISE SANKARY, RPR, RMR, CRR
17      Notary Public, State of Florida
        My Commission No. GG 944837
18      Expires: 1/27/24
19
20
21
22
23
24
25

192

Richard Xia
2/7/2022

```
 1          CERTIFICATE OF REPORTER
 2
 3   STATE OF FLORIDA
 4
 5
 6          I, DENISE SANKARY, Registered Merit
 7   Reporter, do hereby certify that I was authorized
 8   to and did stenographically report the foregoing
 9   remote videotaped deposition of RICHARD XIA;
10   pages 1 through 191; that a review of the
11   transcript was not requested; and that the
12   transcript is a true record of my stenographic
13   notes.
14          I FURTHER CERTIFY that I am not a
15   relative, employee, attorney, or counsel of any
16   of the parties, nor am I a relative or employee
17   of any of the parties' attorneys or counsel
18   connected with the action, nor am I financially
19   interested in the action.
20          Dated this 8th day of February, 2022.
21
22          _____
             DENISE SANKARY, RPR, RMR, CRR
23
24
25
```

193