1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
 3   - - - - - - - - - - - - - - X
 4   SECURITIES AND EXCHANGE      :
     COMMISSION,                        21-CV-5350(PKC)
 5              Plaintiff,        :
                                       United States Courthouse
 6       - against -             :     Brooklyn, New York
 7   RICHARD XIA, et al.,        :     February 14, 2022
                                       10:00 o'clock a.m.
 8              Defendants.       :
 9   - - - - - - - - - - - - - - X
10            TRANSCRIPT OF ORDER TO SHOW CAUSE
            BEFORE THE HONORABLE PAMELA K. CHEN
11            UNITED STATES DISTRICT JUDGE.
12   APPEARANCES:
13   For the Plaintiff:       US SECURITIES & EXCHANGE
                                 COMMISSION
14                           New York Regional Office
                             200 Vesey Street, Suite 400
15                           New York, New York 10281-1022
16                           BY: DAVID P. STOELTING, ESQ.
                                 KEVIN P. McGRATH, ESQ.
17                               KIM HAN, ESQ.
18   For the Defendants:     SILLS CUMMIS & GROSS, P.C.
                             One Rockefeller Plaza
19                           New York, New York 10020
20                           BY: HERVE GOURAIGE, ESQ.
21                           TAHER KAMELI, ESQ.
                             17 N. State Street, Suite 1700
22                           Chicago, Illinois 60602
23   Court Reporter:         Charleane M. Heading
                             225 Cadman Plaza East
24                           Brooklyn, New York
25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
```

CMH    OCR    RDR    FCRR

2

```
 1       (In open court.)
 2       THE CLERK:  Civil cause for order to show cause,
 3   docket 21-CV-5350, Securities and Exchange Commission versus
 4   Xia, et al.
 5       Will the parties please state their appearances for
 6   the record starting with plaintiff?
 7       MR. STOELTING:  For plaintiff, David Stoelting.
 8       THE COURT:  Good morning.
 9       MR. McGRATH:  Kevin McGrath.  Good morning,
10   Your Honor.
11       MS. HAN:  Kim Han.  Good morning.
12       THE COURT:  Good morning to all of you.
13       Let me just remind everyone you can stay seated
14   during the proceeding but make sure you use the microphone.
15   Otherwise, the court reporter and I can't hear you with the
16   masks and the plexiglas.
17       All right.  For the defense?
18       MR. GOURAIGE:  Good morning, Your Honor.  Herve
19   Gouraige, Sill Cummis & Gross, representing the defendants.
20       THE COURT:  Good morning.
21       MR. KAMELI:  Your Honor, good morning.  Taher Kameli
22   on behalf of the defendants.
23       THE COURT:  Good morning.  And then I gather you
24   have with you Mr. Xia, is that right?
25       MR. KAMELI:  He's going to be here, Your Honor.
```

CMH    OCR    RDR    FCRR

3

```
 1       THE COURT:  Then who is sitting next to you?
 2       MR. YAN:  Hi.  This is Lin Xuan Yan from Sills
 3   Cummis.
 4       THE COURT:  Good morning to you, Mr. Yan.
 5       Do you want Mr. Xia to sit with you folks?
 6       MR. KAMELI:  Yes.
 7       THE COURT:  Okay.
 8       So we are here for the hearing on the injunction
 9   seeking to continue the asset freeze during the pendency of
10   this case.
11       The parties obviously are familiar with the history
12   of it but I will note that the TRO that I issued was back in
13   September but then, I gather, by agreement of the parties or
14   at least consent of the defense, briefing on it for purposes
15   of the hearing and an injunction were prolonged up until the
16   last couple of weeks.  So that's why we're having the hearing
17   so much after the initial asset freeze and the TRO that I
18   issued.
19       We are going to proceed today, I guess, with the SEC
20   starting with the presentation of witnesses, I gather, as well
21   as documentary evidence.
22       Is that correct, Mr. Stoelting?
23       MR. STOELTING:  Yes, Your Honor, and I believe we
24   had agreement with the defense to allow for the admission of
25   both parties' exhibits.
```

CMH    OCR    RDR    FCRR

4

```
 1       THE COURT:  Okay.  Without having to go through
 2   laying a foundation, et cetera?
 3       MR. STOELTING:  Yes, Your Honor.
 4       THE COURT:  All right.  Is that correct, Mister --
 5   pronounce your last name again for me.
 6       MR. GOURAIGE:  "Gouraige," Your Honor.  May I remain
 7   seated?
 8       THE COURT:  Yes, you may.  Please, everyone should
 9   so you can use the microphone.  Is it "Gouraige"?
10       MR. GOURAIGE:  "Gouraige," Your Honor.
11       THE COURT:  So Mr. Gouraige, does that sound correct
12   to you?
13       MR. GOURAIGE:  That right.
14       THE COURT:  So why don't we start by calling your
15   first witness.
16       MR. STOELTING:  Okay.  SEC calls Richard Xia.  And,
17   Your Honor, we have a set of the exhibit for the witness.  May
18   I place them on the witness stand.
19       THE COURT:  Yes, please do.  Thank you.
20       Mr. Xia, if you'll approach the witness stand.  I'm
21   going to have you remain standing just for a moment on the
22   steps.  Be careful as you enter the box.
23       Raise your right hand.
24       (The witness, RICHARD XIA, was duly sworn by the
25   Court.)
```

CMH    OCR    RDR    FCRR

EXHIBIT
37
SEC v. Xia, et al.

5

1    THE COURT:  All right.  Have a seat.
2    THE WITNESS:  Thank you.
3    MR. STOELTING:  So the exhibits are in binders.
4    Your Honor, would you like me at the podium?
5    THE COURT:  I'd prefer you stay there because I
6  don't think that that's hooked up right now.
7    MR. STOELTING:  Okay.
8    THE COURT:  I know it's a little awkward.
9    And can I keep masks on?
10    THE COURT:  Yes, please do, actually.  Until we're
11  past this part of the surge, everyone should remain masked.
12    You know, I said that about the podium.  Has anyone
13  attempted to use that?  I think it's been disconnected.  Have
14  you attempted to use it?
15    MR. STOELTING:  I haven't.  Let me try.
16    THE COURT:  All right.
17    MR. KAMELI:  Your Honor, just a matter of
18  housekeeping, if I may.
19    THE COURT:  Yes, go ahead.
20    MR. STOELTING:  This works.
21    THE COURT:  Perfect.
22    MR. KAMELI:  Just a matter of housekeeping if I may.
23    THE COURT:  Sorry.
24    MR. KAMELI:  That's all right.  I do have frequent
25  coughs.  It's been with me for 25 years.  It has nothing to do

CMH    OCR    RDR    FCRR

6

1  with COVID.  I just wanted to bring that up in case you guys
2  hear it.
3    THE COURT:  Is that it?
4    MR. KAMELI:  That's it.
5    THE COURT:  You tell that to your colleague sitting
6  next to you on the right there.
7    Okay.  Mr. Stoelting, whenever you're ready, you may
8  inquire.
9    MR. STOELTING:  Thank you, Your Honor.
10  DIRECT EXAMINATION
11  BY MR. STOELTING:
12  Q    Good morning, Mr. Xia.
13  A    **Good morning.**
14  Q    We met a week ago but as you know, my name is David
15  Stoelting and I'm here with Kevin McGrath and Kim Han for this
16  hearing and I'm here today to ask you some questions about the
17  offerings.
18    So just to summarize, you understand there were five
19  limited partnerships that raised money from investors?
20  A    **Yes, I do.**
21  Q    Okay.  So when I say the limited partnerships, I mean
22  EMMCO, L.P., EMMCO NQMC, LP, EMMCO Tower, L.P., EEGH, L.P. and
23  EEGH II, L.P.
24  A    **Yes.  That's correct.**
25    THE COURT:  Let me stop you for one second.  Just

CMH    OCR    RDR    FCRR

7

1  for the court reporter, EMMCO, all caps, EMMCO and then
2  separate word NQMC, and then EMMCO, separate word, Tower and
3  then EEGH all caps and then EEGH II.
4    Are there any other acronyms we should at least
5  alert the court reporter to, Mr. Stoelting, before you go much
6  further?
7    MR. STOELTING:  There's the general partner which I
8  was about to get to which is Fleet New York Metropolitan
9  Regional Center LLC, which we'll refer to as "Fleet" but it's
10  FNYMRC in some of the documents.
11    THE COURT:  FNYMRC.  Are you going to use the
12  acronym FFG, Fleet Financial Group?
13    MR. STOELTING:  Yes.  I'll probably call it Fleet
14  Financial Group or FFG to distinguish it from the general
15  partner.
16    THE COURT:  All right.  You may proceed.
17    MR. STOELTING:  Thank you, Your Honor.
18  Q    So of those five limited partnerships, the general
19  partner is Fleet New York Metropolitan Regional Center LLC,
20  originally named Federal New York Metropolitan Regional Center
21  LLC, correct?
22  A    **Yes, that's correct.**
23  Q    And you are the president and chief executive officer of
24  the general partner, right?
25  A    **Yes, that's right.**

CMH    OCR    RDR    FCRR

8

1  Q    So you control the general partner?
2  A    **Yes, I do.**
3  Q    And you understand that the general partner has a
4  fiduciary duty to the partnership?
5  A    **Yes.**
6  Q    And what do you understand the fiduciary duty that the
7  general partner owes to the partnership to mean?
8  A    **I think that's a legal term but my understanding is I**
9  **have to do the best I can do for the partnership.**
10  Q    Okay.  It means you're supposed to look out for the
11  interests of the limited partners, right?
12  A    **Yes.**
13  Q    And you're not supposed to put your own interests over
14  the interests of the limited partners, correct?
15  A    **That's correct.**
16  Q    Okay.  Now, the money that was raised was raised through
17  private offering memorandums, correct?
18  A    **Yes.**
19  Q    Okay.  And each of those limited partnerships had private
20  offering memoranda, correct?
21  A    **Yes.**
22  Q    And you were involved in preparing those private offering
23  memoranda, right?
24  A    **Yes.**
25  Q    Okay.  And you reviewed them to make sure they were,

CMH    OCR    RDR    FCRR

**9**

1 everything was accurate in them?
2 A  I did review them.
3 Q  Okay.  And you were the person who had final authority on
4 what they said before they were released, correct?
5 A  Yes, I work with the attorney consultant, everybody
6 working together, because ten years ago, it was very new to do
7 the EB-5 offering.
8      THE COURT:  EB-5?
9      THE WITNESS:  Yes, EB-5 offering.  It's a brand new
10 area and, yes, 12 years ago.  And this certainly is the first
11 one for me, yes.
12 Q  So with regard to the private offering memorandums for
13 these five limited partnerships, you were the one ultimately
14 that approved them before they got released to the potential
15 investors, right?
16 A  Yes, I worked with the attorney consultant together to,
17 to prepare that.
18 Q  And the private offering memoranda for all five offerings
19 were substantially similar, correct?
20 A  Yes.  The first three is for the Mirage project and the
21 last one is for Emerald project.  Project is, you know,
22 they're different.
23      THE COURT:  Again, for the court reporter, there are
24 two projects that will be referred to probably, Emerald and
25 then Mirage.
CMH  OCR  RDR  FCRR

**10**

1      Okay.  Go ahead.
2 Q  I'm going to use one of the -- well, you agree that many
3 of the terms of the offering memorandum are the same of all
4 five, right?
5      MR. KAMELI:  Judge, I object as to form.
6      THE COURT:  Sustained.
7 Q  I'd like to use as an example just to pose some questions
8 the private offering memoranda for EMMCO Tower, L.P. which is
9 PX-3 in the binder, the first binder.  So if you could turn to
10 tab 3.
11      Each of these offering memoranda also contained the
12 limited partnership agreement, right?
13 A  That's right, yes.
14 Q  So if you could turn to page, page 31 of Exhibit 3,
15 Plaintiff's Exhibit 3.
16      That's the limited partnership agreement for EMMCO
17 Tower, L.P., right?
18 A  Yes.
19 Q  And that partnership agreement was virtually the same for
20 the other four limited partnerships, right?
21      MR. KAMELI:  I object, Judge.  That's --
22      THE COURT:  Overruled.  The question is -- can you
23 answer that, Mr. Xia?
24      THE WITNESS:  Yes, I can.
25 A  Yes, they are all similar except they're for different
CMH  OCR  RDR  FCRR

**11**

1 project.
2 Q  Could you look at page 41 which is part 4.1 of the
3 limited partnership agreement.
4      It says, I'm reading from Section 4.1:  Subject to
5 the terms of this agreement and the mandatory provisions of
6 the act and powers of the limited partner set forth in 16.11,
7 the general partner shall have the full unrestricted power and
8 exclusive authority to, A, carry on the activities of the
9 partnership and do any and all things necessary for,
10 incidental to or connected with carrying on the activities of
11 the partnership, and represented by the partnership.
12      So the reference to the general partner, that's you,
13 right?
14 A  Yes.  General partner is, is, you know, Fleet New York
15 Metropolitan Regional Center and I am the manage member of
16 that Regional Center.
17 Q  Could you look at page 62 and I'm talking about the
18 number on the bottom right-hand corner.
19      Are you on page 62?
20      THE COURT:  Just so the record is clear,
21 Mr. Stoelting, whenever you're referring to pages in this
22 exhibit, you are referring to the pagination in the lower
23 right-hand corner which actually has the prefix 3, dash, and
24 the page number.
25      MR. STOELTING:  Yes, Your Honor.
CMH  OCR  RDR  FCRR

**12**

1      THE COURT:  And it's continuously numbered in the
2 exhibit but it doesn't match the internal pagination of the
3 document.
4      MR. STOELTING:  Thank you, Your Honor.
5      THE COURT:  Okay.
6 Q  Yes, this is page 3-62 and I want to focus your attention
7 on Section 17.1, books of account.
8 A  Yes.
9 Q  It says:  The general partner shall keep and maintain
10 full complete and accurate books of account and records of the
11 partnership with respect to the partnership's activities and
12 financial affairs at the principal address of the partnership.
13 Such books of account and records shall be retained by the
14 general partner for a minimum period of seven years or longer.
15      Now, did you maintain books of account for the
16 partnership?
17 A  Yes, I do.
18 Q  Okay.  Did you maintain a general ledger for the
19 partnership?
20 A  The partnership is basically a passthrough lending
21 entity.  There's -- actually, by the time the loan proceed,
22 it's been, you know, disbursed to the project developer.
23 There's no more, I guess, activity there.  It just maintain a
24 promise note and I think that's -- but each year, we did
25 provide K-1, K-1 form for each individual investor because all
CMH  OCR  RDR  FCRR

---

**13**

1 the investor, they're, they're, they're referred to as,
2 through the immigration agent and their contact information is
3 sort of trade secret for the immigration agent.
4       So our book and the record and the K-1 form, it's
5 only being provided upon the request and among all these
6 years, all the EB-5 investor through their attorney requested
7 the tax return K-1 which is a part of their requirement to,
8 send it into the USCIS for the green card. So until today,
9 I'm very proud to report to the court and everybody, all the
10 EB-5 investor, they all got their green card and either
11 permanent or temporary, they all got approved. So I think
12 without a good, you know, K-1 and accounting and also the tax
13 return, it's almost impossible for them all got this green
14 card application approved by the USCIS
15       THE COURT: Mr. Xia, focus on the question. The
16 question is do you maintain a general ledger or did you
17 maintain a general ledger for the partnership.
18       THE WITNESS: Yes, I did.
19 Q   And why was that not produced either in this case or
20 during the investigation leading up to the filing of this
21 case?
22 A   I provided the K-1s with the tax return and I explained
23 to you there's no other activity for the partnership after
24 they disbursed the loan proceed to the developer.
25 Q   Okay. You just said that you maintain a general ledger.

CMH   OCR   RDR   FCRR

---

**14**

1 We've asked repeatedly for a general ledger for the
2 partnership for a long time before the case was filed and up
3 until today, we've never seen a general ledger, we've never
4 seen any accounting records, we've never seen any books of
5 account for the partnership. Did those exist?
6       MR. KAMELI: Judge, I object. Asked and answered.
7       THE COURT: Overruled.
8       Do they exist?
9 A   General ledger, like I said, there's no general ledger
10 because there's no activity. Other, K-1 and tax return, we
11 not only provide to SEC, I think we also provide to the, all
12 the investors.
13 Q   Okay. So there's no general ledger. Is there any
14 QuickBooks or any other accounting program by which you kept
15 track of partnership expenditures?
16 A   We used Excel spreadsheet.
17 Q   And who maintains those?
18 A   I maintain them.
19 Q   And were those produced?
20       THE COURT: To the government or to his lawyer?
21 Q   Were they produced to the SEC in connection with this
22 case or any investigation?
23 A   Yes, I provide all the K-1 tax return and all the
24 investors' names and all their, the investment amount and the
25 date they invested into the project.

CMH   OCR   RDR   FCRR

---

**15**

1 Q   Okay. If you could look at Section 17-2 where it says
2 Annual Reports.
3 A   Yes. I produced annual report to both government and for
4 the EB-5 investor upon their request.
5 Q   Okay. When you say annual report, do you mean the K-1s?
6 A   No. We have a separate annual report.
7 Q   Okay. So Section 17.2 says: Within 90 days after the
8 end of each fiscal year, the general partner shall send to
9 each person who was a limited partner at the end of such
10 fiscal year a report summarizing the activities of the limited
11 partnership as at the end of the fiscal year. The general
12 partner shall also send therewith a balance sheet as of the
13 end of such fiscal year as well as an unaudited statement of
14 income, each limited partner's account balance, gains and
15 losses and cash flow statement, all of which shall be prepared
16 by the accountants in accordance with GAAP.
17       Now, that says that you're required to do that every
18 year. You've never done that, have you?
19 A   I just explained to you, the EB-5 investors' contact
20 information is a trade secret of the immigration agent so we
21 don't have their actual contact information for very long
22 time. So all this information only provided upon their
23 requests through their agent, but we did provide them the
24 annual report upon their request and the annual report
25 actually covered what you just mentioned, you know, the

CMH   OCR   RDR   FCRR

---

**16**

1 balance sheet and the income statement.
2 Q   Okay. But 17.2 says the general partner, meaning you, is
3 required to provide all limited partners, even if they don't
4 ask for it, the statement of income, the balance sheet, right?
5       That's what the limited partnership agreement says,
6 right?
7 A   That's right.
8 Q   And you did not do that, did you?
9 A   I only do it if I have their contact information. This
10 EB-5 is a little bit different from the regular, I guess,
11 other type of private offering.
12 Q   Well, you agree the limited partnership agreement is
13 binding on the general partner, correct?
14 A   I agree.
15 Q   And the general partner is supposed to do what the
16 limited, what the limited partnership agreement says the
17 general partner will do, right?
18 A   Right, but only, I guess, up to the, up to the
19 possibility it can be done.
20 Q   Was there some reason that you could not send out balance
21 sheet, income statement and cash flow statements to each
22 limited partner every year as the limited partnership
23 agreement requires?
24 A   Yes. You know, the first project, the Mirage project was
25 considered to be a success in terms of the EB-5 green card

CMH   OCR   RDR   FCRR

19

1  application.  I think more than a hundred EB-5 investors, you

2  know, went through a very small process got their green card.

3      In terms of the immigration agent business, it's

4  more or less a referral business.  So if one people, you know,

5  one person's application is successful, then, you know, his

6  relative, his friend could be a very good referral for the

7  agent.  For that reason, the immigration agent, you know,

8  really guard their contact information like they're trade

9  secret.  They afraid, you know, for my future offering, that,

10  you know, their client can direct or refer their friend to us.

11  So that's the reason for a very long time we just don't even

12  know what, the actual contact information for the investors.

13  We have to go through them.

14  Q   You're saying you don't have contact information for your

15  own limited partners?

16  A   The agent doesn't give us the actual contact information

17  for their client.

18  Q   Okay.  So do you or do you not have contact information

19  for the limited partners?

20  A   Right now, I have a lot of them but, you know, for a very

21  long time, that's a secret, considered to be a trade secret

22  for the agent.

23      THE COURT:  Sorry.  Can I pause you for one second

24  and interject.

25      What do you mean a trade secret for the immigration

CMH   OCR   RDR   FCRR

18

1  agent?  What does that mean?

2      THE WITNESS:  It means if one investor successfully

3  get a green card or anything, naturally, if he has a friend,

4  he has a family member who also an immigrant apply for this

5  and if I know their information, they know me directly, so for

6  the next time, they don't have to go through the immigration

7  agent, they don't have to pay the agent fee for that.  So the

8  agent is --

9      THE COURT:  Protective, you're saying?

10      THE WITNESS:  Yes, they're trying to protect

11  themselves.  So they basically -- for us, even though we are

12  Regional Center and we raise the money, all we provide is our

13  project document and we provide to their attorney, the

14  investor's attorney.  So the attorney put our information and

15  their client's information together and send to the USCIS  so

16  it doesn't go through us.

17      THE COURT:  Let me ask you a question.  Couldn't you

18  have provided all of the information you're required to

19  provide to the limited partners to the agent for dissemination

20  to all of those EB-5 investors?

21      THE WITNESS:  Yes.  If they ask us for that, we

22  definitely provide it.

23      THE COURT:  But you have an affirmative obligation

24  to provide that information to your limited partners and even

25  if you don't have their direct contact information, you had a

CMH   OCR   RDR   FCRR

19

1  means, did you not, to get that information to them as you

2  were required to do?

3      THE WITNESS:  Yes.  We are -- that's another part I

4  try to explain to Mr. Stoelting.  For several years, whenever

5  the investor need those information, they require from us, we

6  provide to them.

7      THE COURT:  But you didn't send it to the

8  immigration office so they could send it to all the investors?

9      THE WITNESS:  We don't try to reach out to the

10  investor, directly contact them, but we were, we were

11  seriously warned by agent we cannot reach out to their

12  clients.

13      THE COURT:  And who was the agent that seriously

14  warned you not to do that?

15      THE WITNESS:  Agent Westlead, Westlead, yes.

16      THE COURT:  Sorry, Mr. Stoelting.  I do have one

17  other question though.  I want to make sure I understand the

18  facts.

19      Are all of the investors for the Mirage and the

20  Emerald projects EB-5 investors?

21      THE WITNESS:  Yes, everybody is an EB-5 investor.

22      THE COURT:  All right.  Go ahead, Mr. Stoelting.

23      MR. STOELTING:  Thank you, Your Honor.

24  Q   Mr. Xia, can you look at page 3-75?  It's the last page

25  of Plaintiff's Exhibit 3.

CMH   OCR   RDR   FCRR

20

1  A   Yes.

2  Q   So that's the -- limited partners sign a subscription

3  agreement when they become limited partners.  Correct?

4  A   That's right.

5  Q   Okay.  And do you see where there's a line for resident

6  address of new limited partner, telephone, facsimile and

7  e-mail?

8  A   Yes.

9  Q   So don't you get the contact information for each of the

10  limited partners at the time they fill out the subscription

11  agreement?

12  A   No, I think a majority of them fill out the information

13  and even they fill out this information, it's, it's not

14  information I guess we can verify.  We try that.  Like I just

15  explain to, you know, to Judge, we tried to reach out to them

16  but we were told by the agent we're not supposed to, it's

17  their business.

18  Q   All right.  Could you look at page 3-46.

19      Do you see section 6.3 called "Offering Units"?

20  A   Yes.

21  Q   Okay.  So that says:  The general partner may raise

22  capital for the partnership by offering for sale and selling

23  units pursuant to the CPOM from time to time at a price equal

24  to the subscription amount.  The general partner may determine

25  the other terms and conditions of such sale and may do all

CMH   OCR   RDR   FCRR

21

1  things in that regard in the name of and on behalf of the
2  partnership including preparing and filing such offering and
3  other documents as the general partner determines to be
4  necessary or desirable.
5      So that's a reference to the offering documents that
6  we just talked about, right, the offering memo?
7  A  Yes, I believe so.
8  Q  Okay.  Could you, could we turn a little bit to the
9  actual offering memorandum.  I want to ask a couple of
10 questions about some information.
11     If you could look at page 2-7 -- actually, I'm
12 sorry.  I meant PX-3-7.  I'm sorry.  We're still on Exhibit 3.
13 So the bottom of 3-7.
14 A  Yes.
15 Q  You see where it says, "Compensation of general partner
16 and other expenses"?
17 A  Yes.
18 Q  Okay.  It says:  The general partner is entitled to
19 recover expenses incurred in connection with the partnership
20 and to receive reasonable management fees from the partnership
21 which shall be paid from the cash flow of the partnership and
22 shall not be deducted from capital investment amounts.
23     So just on management fees, you understood that
24 management fees could only be paid from cash flow and could
25 not be taken from the capital contributions of the investors,

CMH   OCR   RDR   FCRR

23

1  the deposition on February 7, 2022, page 184, 185.
2      Question:  So do you see that it says "the general
3  partner's entitled to receive expenses incurred in connection
4  with the partnership and to receive reasonable management fees
5  from the partnership which shall be paid from" --
6      Then carry on to the next page.
7      -- "the cash flow from the partnership and shall not
8  be deducted from capital investment accounts"?  So you and the
9  same provision is in all the offering memos, but did you
10 understand that management fees could only be paid from cash
11 flow and could not be deducted from the capital contributions?
12     Answer:  Yes.
13     Question:  Okay.  And there was not, there really
14 was no cash flow, was there, from the partnerships?
15     Answer:  Yes, due to construction, no cash flow.
16     You gave those answers to that question?
17 A  Yes, I give answer to that question.
18 Q  Could you look at page 13.  Actually let's look at 3-9.
19     THE COURT:  You are going back to Exhibit 3?
20     MR. STOELTING:  Yes, Your Honor.
21 Q  So are you on tab 3, Mr. Xia?  Are you on Exhibit 3 which
22 is the Tower, EMMCO Tower offering memo?
23 A  You said 3-10, right?
24 Q  No.  No.  In the first binder, Tab 3.
25 A  Yes.

CMH   OCR   RDR   FCRR

22

1  right?
2  A  Yes.
3  Q  Okay.  And there was no cash flow, right?
4  A  Which offering you're talking about?
5  Q  All of them.
6  A  I think the last two offering memorandums, EEGH and
7  EEGH II, we do have a 2 percent interest payment from the
8  project paid to the LP.  And also, because the EB-5, all the
9  EB-5 fund they are available as fund, all this money has been
10 deposit into the bank account that we have been, you know,
11 maintaining for them as a CD deposit for many, many years.  So
12 I think there is an interest and cash flow also coming into
13 this partnership every year.
14 Q  Okay.  Mr. Xia, do you remember you gave a deposition a
15 week ago today?
16 A  Yes.
17 Q  And had you a lawyer with you at that deposition?
18 A  Yes.
19 Q  And you were under oath then?
20 A  Yes.
21 Q  And did you tell the truth that day?
22 A  Yes, I did.
23 Q  Could you look at Exhibit 162, please.  It's in the third
24 binder.
25     So I just want to read in a question and answer from

CMH   OCR   RDR   FCRR

24

1  Q  Okay.  And I'm just -- you see where it says "Reports" at
2  the bottom?  That's the same language that's in the limited
3  partnership agreement, right, about sending the limited
4  partners the balance sheet and income statement?
5      MR. KAMELI:  Counsel, what page was it?
6  A  I don't understand.  You're asking me to turn to the --
7      THE COURT:  Hang on a second.  What page for
8  counsel?
9      MR. STOELTING:  I'm sorry.  3-9.
10     THE COURT:  3-9.
11     MR. KAMELI:  Thank you.  Thank you, Your Honor.
12 A  Okay.
13 Q  And I'm just pointing out that's -- at the bottom, where
14 it says "Reports," that's the same requirement that's in the
15 limited partnership agreement, right?
16 A  That's right.
17 Q  Okay.  Could you look at page 13.
18 A  Yes.
19 Q  And where it says, "The general partner," and the second
20 paragraph says, "The general partner exercises ultimate
21 authority for overall management of the partnership and is
22 responsible for its day-to-day operations."  Right?
23 A  Yes.
24 Q  Okay.  So you understood that at the time at all times?
25 A  Yes.

CMH   OCR   RDR   FCRR

25

1  Q   So that's in the section called "Management and
2  Development Professionals."
3          Could you turn over to the next page, 3-14.
4  A   Yes.
5  Q   Do you see where it says, Racanelli Construction Group?
6  A   Yes.
7  Q   Okay.  So you wanted -- isn't it true that you wanted
8  investors to believe that Racanelli was a company that existed
9  for many, many years?
10 A   What do you mean, I want investor to understand?
11 Q   Well, let me ask a different question.
12         Racanelli Construction Group was created in
13 June 2011, right?
14 A   Yes.
15 Q   But that's not what it says in the offering memo, is it?
16         It says:  Based in Hamilton, New Jersey, Racanelli
17 Construction Group is recognized as one of the region's
18 leading providers of pre-construction planning, project
19 management, design, build and general contracting services.
20 Since its founding over six decades ago, Racanelli has been
21 responsible for building and renovation across a broad range
22 and variety of market segments completing projects that
23 include corporate headquarters, industrial complexes,
24 hospitals, assisted living facilities, university and college
25 facilities, retail stores, hotels, restaurants, houses of

CMH   OCR   RDR   FCRR

26

1  worship, self-storage complexes, condominiums and townhouses.
2          Now, that's language that you put into the offering
3  memorandum, isn't it?
4  A   **Again, that's the language with the consultant, everybody
5  worked together to put them in.  And in New York City, in
6  metropolitan area, there's three Racanelli construction, one
7  in Brooklyn, one in Long Island and the one actually doing,
8  you know, doing the project for us in Flushing area.  So
9  actually it's the Racanelli Construction that started six
10 years ago also chasing us, trying to, you know, trying to get
11 this project since 2009 and all the way to 2011.  So right
12 before they start -- actually, we were trying to use them and
13 they were actually part of our preparing the form application.
14 So, you know, we do have both Racanelli trying to work with us
15 at the time would were planning to deal with the Eastern
16 Mirage project.**
17 Q   Okay.  My question was just whether you were the one that
18 was responsible for this description of Racanelli Construction
19 Group in the offering memo.  And if you could turn back to
20 Exhibit 162.
21         THE COURT:  The deposition?
22         MR. STOELTING:  Which is the deposition, the
23 admissions.
24 A   **Yes.**
25 Q   All right.  This is on page 190 of the deposition

CMH   OCR   RDR   FCRR

27

1  transcript.
2          So the description there in the private offering
3  memoranda of Racanelli Construction Group, did you provide
4  that language?
5          Answer:  Yes, I did.
6          Did you respond to that, answer that question "Yes,
7  I did"?
8  A   **Yes, I did provide descriptions for both Racanelli.  It's
9  right after the first Racanelli change, you know, their price.
10 So we have no choice to work with the second Racanelli and I
11 did provide the description for both, for both Racanelli, and
12 that's why our five memorandum, you can see that four of them
13 actually it's like the description we provided.  This one, I
14 guess, you know, it's, it's -- so I did provide both
15 descriptions for both Racanelli, yes.**
16 Q   So there's only one Racanelli Construction Group in this
17 offering memo.  Why are you saying there's two?
18 A   **Because another company called Racanelli Construction and
19 I provide them to attorney and the consultant and that's how
20 it end to be like that.**
21 Q   Okay.  Could you look at --
22         THE COURT:  Mr. Xia, can I interrupt for a
23 second?  I just have one simple question.
24         What was your relationship with the Racanelli
25 Construction Group that is referenced in this Exhibit 3?  What

CMH   OCR   RDR   FCRR

28

1  was your relationship at the time you put this into the
2  offering memorandum?
3          THE WITNESS:  I build a project back in 2003 and the
4  owner of that, there's a company named Racanelli Development
5  Group, and the owner --
6          THE COURT:  No.  No.  Simple answer.
7          There's a group referenced here that's based in
8  Hamilton.  What was your relationship with that group at the
9  time of this memorandum?  Did you own it?
10         THE WITNESS:  No.  No.
11         THE COURT:  Were you an investor?
12         THE WITNESS:  No, not at that point.
13         THE COURT:  Did you have any control over it?
14         THE WITNESS:  No.
15         THE COURT:  Okay.  Mr. Stoelting, go ahead.  You may
16 have some follow-up.
17         MR. STOELTING:  Thank you.
18 Q   Mr. Xia, can you turn to Plaintiff's Exhibit 35.  It
19 should be in the same binder, the first binder.
20 A   **Thirty-five?**
21 Q   And if you could just keep your thumb in Exhibit 3.
22         So looking at Exhibit 35, this is something that was
23 pulled off the web archives and it is an extract from
24 Racanelli Construction Company's website.  And you see the
25 paragraph that says, Since its founding over six days ago, the

CMH   OCR   RDR   FCRR

29

1  company has been responsible for a broad range, and then it
2  lists the number of items?
3  A   Yes.  Yes.
4  Q   Isn't that the exact same paragraph that's in the
5  offering memo as a description of Racanelli Construction
6  Group?
7  A   No.  All I can tell is I provide -- for the description I
8  provide to attorney is different for the Racanelli
9  Construction Group.
10         Initially, I did go through their website and take
11 their description because Racanelli Construction was actually
12 working with us on this project in, from 2009 all the way to
13 2011.  So we provide this description to the attorney to
14 prepare the offering memorandum and then right before the
15 construction started, they change their price a lot so we
16 started working with the second Racanelli Construction Group
17 and we -- you know, English is not my first language so we
18 look at their original description, we take out the portion we
19 think is not accurate, but by looking at other portion,
20 because the second Racanelli also has a, you know, principal
21 and executives, and they actually cover pretty much the same
22 if not more than this areas.  So that's why we removed the
23 sixty, the six decades ago and just provide that description
24 to attorney and the consultant to prepare the offering
25 memorandum.

31

1  New Jersey in the 2011 private offering memorandum that we
2  were looking at which is Exhibit 3.
3         THE WITNESS:  Yes.
4         THE COURT:  And it's for EMMCO Tower.
5         THE WITNESS:  That's right.
6         THE COURT:  So the question is at the time that this
7  was issued, this private offering memorandum, what was your
8  relationship with Racanelli that's referenced in this
9  memorandum?
10        THE WITNESS:  There's no relationship at all.
11        THE COURT:  You had no control or any other
12 investment type relationship in that entity?
13        THE WITNESS:  That's right.
14        THE COURT:  Okay.  And did you before the offering
15 was made?
16        THE WITNESS:  No.
17        THE COURT:  And after?
18        THE WITNESS:  No.
19        THE COURT:  So at no point in time?
20        THE WITNESS:  No.
21        THE COURT:  How about with respect to these other
22 Racanelli entities that you've referred to, did you have a
23 relationship with them?
24        THE WITNESS:  None of the Racanelli, I didn't have
25 any relationship with them at all.

30

1         THE COURT:  Mr. Stoelting, you can make your
2  argument and I can compare the documents.  I don't think you
3  need to belabor this.
4         I do want to ask you one additional follow-up,
5  Mr. Xia.
6         THE WITNESS:  Yes.
7         THE COURT:  You responded to my question about your
8  relationship with Racanelli.
9         THE WITNESS:  Yes.
10        THE COURT:  That you were not an investor in the
11 company at that point, meaning in 2011 when the private
12 offering memorandum was issued in Exhibit 3.
13        THE WITNESS:  Not at all.
14        THE COURT:  Hang on.  In 2011, were you an investor
15 in Racanelli?
16        THE WITNESS:  No.
17        THE COURT:  Okay.  Did you at some point become an
18 investor in Racanelli?
19        THE WITNESS:  Never.
20        THE COURT:  Why did you say "at that point" then?
21        THE WITNESS:  At that point means, first Racanelli
22 changed the price and then the second Racanelli gave me a
23 better contract price.  I didn't say at what point.
24        THE COURT:  I'm not sure I understand your answer.
25 There's a reference to a Racanelli that's based in Hamilton,

32

1         THE COURT:  Okay.  Mr. Stoelting, go ahead.
2  BY MR. STOELTING:
3  Q   Didn't you identify yourself in numerous court filings as
4  the president of Racanelli Construction Group?
5  A   Yes, I did.
6  Q   Could you look at Exhibit 145 in binder three.
7  A   Yes.
8  Q   So I want to go through these.  Do you have 145 open?
9  A   Yes, I have it open.
10 Q   So the first is a Signature bank account that you're
11 signing it looks like in 2015.
12     Yi Xia is you, correct?
13 A   Yes, that's me.
14 Q   So you're signing this bank form as the president of
15 Racanelli Construction Group, right?
16        THE COURT:  For the court reporter, that was Y-I,
17 right?
18        MR. STOELTING:  Correct.
19        THE COURT:  Go ahead.
20 A   That was not my signature.
21 Q   You're saying that's a forgery?
22 A   Not really.  As I explain to SEC before, it's a bank
23 manager who came to my office trying to open an account,
24 trying to get the business, because we were, you know, doing
25 the large scale project and I just don't know how they end up

33

1  open the account without even letting me know. So I think I
2  explain to SEC back in 2019 I never even aware of this account
3  has been opened and I think this account is always zero
4  balance. Nobody even know there's account like this existing.
5  Q    So is that your handwriting or is it a signature,
6  "President" and the date?
7  A    No.
8  Q    Okay. Turn to the next page.
9         This is a series of documents in a litigation filed
10  in state court called Racanelli Construction Group against
11  Easel Service Corp. and you signed the verified complaint as
12  president of Racanelli Construction Group and you signed
13  numerous filings and sworn affidavits under oath identifying
14  yourself as president of Racanelli Construction Group in that
15  case.
16         You signed all of those under penalty of perjury,
17  right?
18  A    Yes.
19  Q    Okay. Could you look at the next page?
20         THE COURT: Just to confirm, those are your
21  signatures?
22         THE WITNESS: They -- looking at the signature, I
23  know it's probably not my signature.
24         THE COURT: You're disclaiming your signature on
25  those documents where you said under oath you were the

CMH   OCR   RDR   FCRR

34

1  president of Racanelli?
2         THE WITNESS: What happened is I worked with Xi. Xi
3  Verfenstein is the principal of the Racanelli Construction
4  Group and she have some health issue and she could not sit in
5  the deposition. So, you know, we, in my culture, when I work
6  with a female executive together, you know, we do the land
7  deal, I don't want them to basically --
8         THE COURT: Mr. Xia --
9         THE WITNESS: -- have the pressure.
10         THE COURT: Simple question.
11         THE WITNESS: Yes.
12         THE COURT: Is that your signature on page 12 of
13  Exhibit 145?
14         THE WITNESS: It's not my signature but I know
15  that's been prepared, yes.
16         THE COURT: And you represented yourself as the
17  president of Racanelli in that lawsuit under oath?
18         THE WITNESS: Yes, only in the litigation, in the
19  capacity of the litigation.
20         THE COURT: Okay. Go ahead, Mr. Stoelting.
21         MR. STOELTING: Thank you.
22  BY MR. STOELTING:
23  Q    And on the next page, do you remember that Racanelli
24  Construction Group and yourself were sued by Racanelli
25  Construction Company in 2015?

CMH   OCR   RDR   FCRR

35

1  A    Yes.
2  Q    And the reason was the Racanelli Construction Company did
3  not want you to use the Racanelli name, right?
4  A    No, they didn't -- they didn't get the project so they're
5  not happy so they were suing us for that.
6  Q    All right. Could you -- so your recollection is that the
7  original Racanelli had sour grapes over not getting the
8  project and that's why they sued you?
9  A    Yes.
10  Q    Could you look at Exhibit 36, please?
11  A    Yes.
12  Q    And if you could turn to page 36-6.
13  A    Yes.
14  Q    Okay. So this is the verified complaint in Racanelli
15  Construction against Racanelli Construction Group, right?
16  A    That's right.
17  Q    And you were a defendant in that case, right?
18  A    Individually.
19  Q    Yes.
20         Look at paragraph 14. This is -- we're still on
21  Exhibit 36. It says: On June 2011, defendants registered the
22  entity Racanelli Construction Group. Paragraph 15:
23  Defendants also engaged in the business of commercial general
24  construction. And paragraph 16: Upon information and belief,
25  defendants recently but at precise times unknown to Racanelli

CMH   OCR   RDR   FCRR

36

1  began to display, advertise, promote and sell construction
2  services under the name Racanelli Construction.
3         And the claim is for protected trade name, correct?
4  A    Yes.
5  Q    Okay. So the -- and just back to Exhibit 146, there's
6  three more -- there's that case where you signed the answer as
7  president of defendant Racanelli Construction Group and you
8  also identified yourself as a manager of Perini Group as well
9  in another case, right?
10  A    That's only for the purpose of deal with deposition in
11  the litigation. I not really get involved in any of the
12  management function of both company. And I think for this
13  Racanelli-Racanelli action, the attorney who prepared this
14  affidavit send a letter to the government stating that he made
15  a mistake and at the final settlement paper, I think
16  everything has been actually corrected showing that Xi
17  Verfenstein is the president of Racanelli and I only been sued
18  for the sense of, as individual.
19  Q    Well, have you ever gone back to all these cases all
20  these times when you said under oath that you were president
21  of Racanelli and tell the court that you filed a false
22  affidavit?
23  A    It's not false. We are only handling the litigation
24  portion, not the business portion.
25  Q    Okay. So you never advised the court where these were

CMH   OCR   RDR   FCRR

37

1  presented that these affidavits misrepresented your status

2  with Racanelli?

3  A    I don't think I misrepresented to the court. I basically

4  saying that this is also the reason I was handling the

5  litigation part.

6         THE COURT: Mr. Stoelting, I'm going to ask you to

7  stop for a second.

8         I should have asked this at the beginning of the

9  proceeding but are there other witnesses seated here in the

10 courtroom and does either side want to invoke the rule on

11 witnesses and have them sit outside during the testimony of

12 this witness?

13        MR. STOELTING: Your Honor, we do have Mr. Peeler

14 who is the court appointed Monitor is here. And Raymond

15 Dhookie who's a summary witness for us.

16        We would ask that they be permitted to hear this

17 testimony. They're going to testify this afternoon. They're

18 not -- they're more in the nature of expert witnesses. I

19 think it will assist their testimony and aid the Court to have

20 them hear the testimony.

21        THE COURT: All right. That's fine.

22        How about any of the other individuals here, are

23 they witnesses for the defense or anyone else?

24        MR. KAMELI: Judge, Ms. Xi, I believe, is here but

25 that's a witness for the plaintiffs.

CMH   OCR   RDR   FCRR

38

1         THE COURT: What does the plaintiff want to do? I

2  mean it's really up to you. If you want to invoke the rule,

3  I'll excuse everyone who shouldn't be in the courtroom who may

4  be a fact witness.

5         MR. KAMELI: Judge, we may actually call Ms. Xi to

6  the stand also as a rebuttal witness maybe.

7         THE COURT: Okay. I'm going to -- I think she's on

8  the plaintiff's list.

9         MR. KAMELI: She is also on the plaintiff's list.

10        THE COURT: I'll let you control this however you

11 want to but typically, parties want other fact witnesses to be

12 excused to avoid the potential for --

13        MR. STOELTING: Can I just get some clarification

14 from the defense. Is Julia Yue here or Xi Verfenstein?

15        MR. KAMELI: Xi Verfenstein.

16        THE COURT: Who?

17        MR. STOELTING: I didn't realize that she was here.

18 I think it's not appropriate for her to hear testimony.

19        THE COURT: I'm sorry. Julia Yue and who is the

20 other person?

21        MR. KAMELI: Xi Verfenstein.

22        THE COURT: Same person though? We're talking about

23 one individual.

24        MR. KAMELI: One individual for both sides.

25        THE COURT: I'm going to ask Ms. Julia Verfenstein

CMH   OCR   RDR   FCRR

39

1  to leave -- no?

2         MS. HAN: Sorry. Different people. Julia Yue is

3  different from Xi Verfenstein.

4         THE COURT: So who is in the courtroom?

5         MR. KAMELI: Xi Verfenstein or Vergenstein.

6         THE COURT: I think it's Verfenstein. Is she

7  planning on testifying?

8         MR. KAMELI: I don't believe they're planning --

9         MR. STOELTING: We are not calling her, Your Honor.

10        THE COURT: And you're not either?

11        MR. KAMELI: I may call her.

12        THE COURT: Then I'm excusing her from the

13 courtroom.

14        MR. KAMELI: With that in mind, Judge, there's going

15 to be some questions with regards to the economic analysis and

16 the other issues with the financials. I would like to ask if

17 Mr. Dhookie can be excused too.

18        THE COURT: No, it's different. An expert can sit

19 in the courtroom and listen to testimony that may be relevant

20 to their opinion, that's fine, but a fact witness who's

21 testifying to facts that may, you know, whose testimony may be

22 influenced improperly, for example, trying to tailor whatever

23 they're going to testify to when, to the testimony they're

24 hearing, those individuals should be excluded. So that's the

25 rule on witnesses as I'm applying it.

CMH   OCR   RDR   FCRR

40

1         So I'm going to excuse Ms. Verfenstein.

2         MR. STOELTING: Sure.

3         THE COURT: Ms. Verfenstein, if you'll leave the

4  courtroom, please. Thank you.

5         MR. KAMELI: You can stay outside. Not the

6  courthouse.

7         THE COURT: Yes, you just need to sit outside the

8  courtroom. Thank you very much.

9         (Ms. Verfenstein exits.)

10        THE COURT: Okay. Mr. Stoelting, go ahead.

11        MR. STOELTING: Thank Your Honor.

12 BY MR. STOELTING:

13 Q   Mr. Xia, your wife, Julia Yue, was she an employee of

14 Racanelli Construction Group?

15 A    No, but she was helping out with everybody in the same,

16 in the office. We share offices.

17 Q   Okay. Was -- and I'll refer to your wife as Ms. Yue. Is

18 that okay?

19 A    No, pronounce it "Yue."

20 Q   "Yue"?

21        THE COURT: Mr. Xia, if you'll pull the microphone

22 and bend it closer to you, that would be good.

23        THE WITNESS: Sure. Yue.

24 Q   And Ms. Yue, was she an employee of the general partner?

25 A    I don't know how you define employee but she was pretty

CMH   OCR   RDR   FCRR

41

1   much in the same office.

2        THE COURT:  Was she getting paid I think is what you

3   want to know, Mr. Stoelting.

4   Q   But was she getting paid for the work that she did?

5   A   **From where?**

6        **(Continued on next page.)**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

42

1        MR. KAMELI:  Judge, I object.  In what capacity?

2   The general partner was not him it was a corporation.

3        THE COURT:  Rephrase, please.

4   Q   Did the general partnership or any other entity that

5   you own or control pay money to Julia Yue?

6   A   **I don't remember after so many years that even there's**

7   **a pay or most of the reimbursement it's variable.**

8        THE COURT:  Reimbursement for what?

9        THE WITNESS:  Of the services.  She's working in

10  almost like an office manager to buy our supplies or the

11  deliveries, that's her duty.  And we shared an office.  And

12  also, she's -- we hold our office under our individual names

13  so a lot of times the rent get directly paid to her.

14       THE COURT:  Was she listed on your payroll?

15       THE WITNESS:  She was listed for two years.  Then,

16  I guess, then no more.  It was eight years ago or

17  seven years ago.

18       THE COURT:  That was for the general partnership?

19       THE WITNESS:  No, for Fleet Financial Group.

20       THE COURT:  Go ahead.

21  EXAMINATION BY

22  MR. STOELTING:

23  (Continuing.)

24   Q   Did you ever instruct Ms. Yue to sign bank accounts,

25  bank opening records?

43

1   A   **She's working with pretty much everything including the**

2   **banking part, yes.**

3   Q   So if Ms. Yue's Signature is on bank documents, that

4   could only be because you told her to do that?

5   A   **Yes, that's right.**

6   Q   Okay.  And didn't you control the bank accounts for

7   Racanelli Construction Group?

8   A   **No, I did not.**

9   Q   Can you look at Exhibit 141, please.

10   A   **(Complying).  Yes.**

11   Q   If you could turn to -- do you see how there's numbered

12  rows?  And if you could look at the rows beginning at Row

13  129 --

14   A   **Yes.**

15   Q   -- through 139.  So 10 or 11 rows.  Do you see that?

16   A   **I see that, yes.**

17   Q   So those are all the bank accounts at East-West Bank

18  and a couple at Signature in the name of Racanelli

19  Construction Group, Inc., correct?

20   A   **That's correct.**

21   Q   Who does it list as the authorized signer for those

22  accounts?

23   A   **JiQing Yue, my wife.**

24   Q   You are the authorized signer for two of the accounts;

25  correct, the Signature accounts?

44

1   A   **Like I said, I'm not even aware of that Signature**

2   **account.**

3   Q   But for these East-West Bank accounts, I think there's

4   nine of them, your wife, Ms. Yue, is the authorized signer,

5   right?

6   A   **I think, you know, EEGH II that's a CD account, that's**

7   **not an operating account.  That's basically the investment**

8   **fund.  Investor's fund has been held there year after year.**

9   **So that's -- if you look at the date, it's always '17, '18,**

10  **'19 because we did have a large deposit of investor funds.**

11       **So every year, basically, bank let's us renew**

12  **the CD deposit and I was, you know, I'm super busy so I**

13  **dedicated my wife to renew the CD account.**

14   Q   Okay.  Mr. Xia, we're not talking about Eastern Emerald

15  accounts, we're talking about these Racanelli Construction

16  Group accounts?

17   A   **Where?**

18   Q   Row 129 through Row 139 of Exhibit 141.

19   A   **Okay, yeah.  All right.  I see that, yes.**

20   Q   Okay.  And you see Ms. Yue is the authorized signer,

21  correct?

22   A   **It lists her as that, yes.**

23   Q   And she's identified as vice president of Racanelli

24  Construction Group, right?

25   A   **Yeah, but I think I already explained to SEC numerous**

45

1  times it's a bank mistake, it's not us.

2  Q   So you're saying that's a bank mistake?

3  A   Yes.

4  Q   Well, didn't Ms. Yue approve numerous transfers over

5  many years, 2015, 2016, 2017, 2018?

6  A   **When you have, you know, a hundred or $200 million**

7  **deposit in the bank, they consider everything is yours.**

8  **They don't differentiate between the contractor working with**

9  **you.  And so, we're running, you know, a lot of work at the**

10  **same time.  So at the time I think when SEC notified us**

11  **that, we contact the bank, the bank correct those mistakes.**

12      THE COURT:  I'm sorry, what was the mistake?  That

13  account wasn't for Racanelli.

14      THE WITNESS:  Yes.

15      THE COURT:  That she wasn't the vice president?

16  What was the mistake the bank made?

17      THE WITNESS:  The typical account opening process

18  for the bank sometimes because you're --

19      THE COURT:  No, no.  I'm asking when you say there

20  was a mistake, what's erroneous?  What was erroneous about

21  that account opening or about the maintenance of that

22  account?

23      THE WITNESS:  Account opening.

24      THE COURT:  Okay.  But what?  Was who was the

25  account supposed to be for if not for Racanelli.

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*

*Official Court Reporter*

---

46

1      THE WITNESS:  It's supposed to be for Xi

2  Verfenstein.

3      THE COURT:  So you're saying your wife wasn't

4  supposed to be listed as the signatory on that account.

5      THE WITNESS:  That's right.  She's handling a lot

6  of my bank accounts.  So every time if we have a contractor

7  or anybody who want to open an account, she would call them

8  and tell them, I have a contractor and everybody wants to

9  open account.

10      THE COURT:  Hang on.  You're saying it was a

11  Racanelli account but somehow your wife erroneously was

12  listed as the signatory on a Racanelli account?

13      THE WITNESS:  Exactly.

14      THE COURT:  Go ahead.

15  EXAMINATION BY

16  MR. STOELTING:

17  (Continuing.)

18  Q   And this is a mistake that you noticed in the summer of

19  2018 after the -- after you started producing documents to

20  the SEC?

21  A   Yes.

22  Q   Okay.  Could you look at Exhibit 172, please.  It's in

23  Binder 3.

24      Exhibit 172 is a collection of bank transfer

25  slips from East-West Bank and it covers the year 2015, 2016,

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*

*Official Court Reporter*

---

47

1  2017, and 2018.  So if you could actually flip over to the

2  third page or the second, yeah, actually on the first page

3  you see it says, Phone with JiQing Yue, do you see that?

4  A   Yes, I see that.

5  Q   And then, if we turn to the next page, do you see that

6  handwritten notation:  Phone conference, JiQing Yue?

7  A   **That's right, yes.**

8  Q   And then the next page:  Phone conference with Julia.

9  A   Yes.

10  Q   Okay.  And then the next page, October 2015.  Phone

11  conference with Julia.  Then the next page, Phone conference

12  with Julia.  And as we continue to flip through 2015, these

13  bank records show that the bank officials at East-West Bank

14  are contacting your wife to authorize these transfers on

15  behalf of Racanelli Construction Group, right?

16  A   **That's right.**

17  Q   They don't contact Xi Verfenstein?

18  A   **They do.  In my calculation, there is just a lot of**

19  **confirmation with Xi Verfenstein, too.  We were all working**

20  **in the same office and we're, you know, building a very big**

21  **project.  So every single day is, you know, it's everybody's**

22  **constantly in the meeting.  So when the bank called, anybody**

23  **who pick up is open book we know exactly how much we paid to**

24  **the Racanelli and we know how much Racanelli paid to the,**

25  **you know, to the subcontractors.  As you just said, it was**

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*

*Official Court Reporter*

---

48

1  the duty, I have to watch the investors' money carefully.

2  So there's no secret there.  Everybody knows everybody.

3  It's just when the bank call, whoever picks up the phone and

4  verify or, you know, ask for verification from Xi

5  Verfenstein, I don't know.  For me, I have absolutely zero

6  involvement in any of the bank issues.  I'm not even aware

7  of this information until I see it brought up in my

8  deposition.

9  Q   Earlier, you said in Julia's name was on bank records

10  it would only be done at your direction.  So when you

11  directed her to be the authorized signer on 10 different

12  Racanelli Construction Group accounts and not Xi

13  Verfenstein, wouldn't you have expected that the bank would

14  reach out to your wife in order to confirm transactions?

15  A   **I never direct her to the bank Signature for Racanelli**

16  **Company.**

17  Q   So she did it on her own?

18  A   **Nobody knows that until I see and find out.  And the**

19  **bank, we notify the bank, and the bank, if there's, I think**

20  **there is just a document there showing that, you know, we**

21  **authorized Julia or me to open the bank account, bank would**

22  **never correct that mistake by themselves.**

23      THE COURT:  Mr. Stoelting, you can move on.  I got

24  the picture.

25  Q   So looking again at the offering memo, Exhibit 3, there

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*

*Official Court Reporter*

49

```
1   is just a description of your experience, right.  3-14.
2   A   3-14, right.
3   Q   Yes.
4   A   Okay.
5   Q   Okay.  And you see the description of that applies to
6   yourself?
7   A   Yes.
8   Q   Okay.  And it says that you've been active for ten
9   years in land acquisition, commercial and residential
10  investment, marketing research, value added strategies,
11  financing, property management, and leasing and other
12  related activities.  Then there's a reference to
13  Shangri-La Towers.
14          Now, isn't it true that Shangri-La Tower was
15  the only building you had done before Eastern Mirage?
16  A   Yeah, but I'm an engineer.  I've been doing the real
17  estate development related work for more than ten years.
18  Q   Okay.  How long big is Shangri-La Tower?
19  A   80,000 square feet, 65 units.
20  Q   Have you ever done anything remotely on the scale of
21  Eastern Mirage or Eastern Emerald before 2010?
22  A   No, I only came to New York City in 1999.  So, at that
23  time, yes, but when building is not just based on its scale,
24  it's based on the procedure, how you build it.
25  Q   So we established that you control the general partner.
```

*Anthony D. Frisolone, FAPR, RDR, CRR, CRI, CSR*
Official Court Reporter

51

```
1   right?
2   A   That's right.
3   Q   And under the terms of that agreement, LaGuardia owes
4   more than $16 million, right?
5   A   That's right.
6   Q   And aren't -- isn't Fleet Financial Group and LaGuardia
7   Performance Center in default on your obligations?
8          THE COURT:  Let me correct you, Mr. Stoelting.  I
9   think you meant to say that Fleet owes LaGuardia, not
10  LaGuardia owes Fleet.
11         MR. STOELTING:  LaGuardia owes Eastern Emerald
12  Group, I'm sorry, your Honor.
13         THE COURT:  LaGuardia owes money.
14         MR. STOELTING:  Yes.  LaGuardia -- the developers
15  are the ones that owe the money to --
16         THE COURT:  Okay.  Then I think you meant to say
17  X & Y, that's X ampersand and Y owes 42 million to Fleet.
18         MR. STOELTING:  Okay.
19         THE COURT:  Why don't you start over.
20         MR. STOELTING:  Okay.
21  EXAMINATION BY
22  MR. STOELTING:
23  (Continuing.)
24  Q   Fleet Financial Group owes $42 million to X & Y,
25  correct?
```

*Anthony D. Frisolone, FAPR, RDR, CRI, CRI, CSR*
Official Court Reporter

50

```
1   And the developers in the five projects are Fleet Financial
2   Group and Eastern Emerald Group, right?
3   A   That's right, yes.
4   Q   So the developers are the ones that borrow the money
5   from the partnership, right?
6   A   That's right.
7   Q   So the developers have to pay back that money at some
8   point?
9   A   Yes.
10  Q   And you control both developers also, right?
11  A   That's right.
12  Q   You're familiar with the -- and X & Y is another entity
13  you control; is that right?
14  A   That's right.
15  Q   And LaGuardia Performance Center is an entity that you
16  control, right?
17  A   Yes.
18  Q   You are familiar with a lease agreement between
19  Fleet Financial Group and X & Y?
20  A   Yes.
21  Q   And under the terms of that agreement, Fleet Financial
22  Group owes over $42 million to X & Y right now, right?
23  A   Yes.
24  Q   And there's also a lease agreement between
25  Eastern Emerald group and LaGuardia Performance Center,
```

*Anthony D. Frisolone, FAPR, RDR, CRR, CRI, CSR*
Official Court Reporter

52

```
1   A   Yes.
2   Q   Has Fleet ever made a payment on that debt?
3   A   No.
4   Q   And were investors told of that agreement?
5   A   No.
6   Q   So Fleet Financial Group is the entity that also has to
7   pay back to the limited partnership, right?
8   A   That's right.
9   Q   So doesn't that create a risk for Fleet Financial Group
10  not being able to pay back the partnership because of that
11  debt?
12  A   No.  Because in order to enforce any kind of ground
13  lease payment, if there is intention for the people who
14  handle this, inference that payment eventually you have to
15  register that ground lease in the city registry in the ACRIS
16  system.  If it has never been registered, that means the
17  person who handle that deal never actually trying to enforce
18  those payments before EB-5 investor payment.
19         EB-5 investor from day one, they loan the
20  money to the project they also seen a very, very comfortable
21  position.  Like today, the building is worth $177 million,
22  the EB-5 investors only hold only $56 million EB-5 loan.
23  They're in a very comfortable position, it's just very hard
24  to get to.
25         And the let's assume that even $42 million
```

*Anthony D. Frisolone, FAPR, RDR, CRR, CRI, CSR*
Official Court Reporter

53

1  lease payment has been already registered, still, it won't
2  affect any of the EB-5 investment interest at all.
3  Q    Well, if the Union Street -- the Mirage property is
4  sold, X & Y could decide it wanted to collect on that debt,
5  right?
6  A    No, not only if it's registered.  If you don't
7  register, that means you're basically, like, I didn't
8  register that lease means I'm pretty much giving up that
9  right to the EB-5 investor.  Let them get paid back first.
10 Then whatever is left over there, which I know is
11 sufficient, so that's why, for both projects, for both
12 ground lease, I had never, ever intended to register any
13 lease in the last 12 years.
14 Q    So your entities, you own and control X & Y, you own
15 and control Fleet Financial Group, and you own and control
16 the general partner to which you have a fiduciary duty to
17 the investors, isn't that a conflict of interest?
18       THE COURT:  No.  Actually, just because of that, I
19 didn't enforce or even try to enforce or register that
20 lease.  If I'm not a general contractor for EB-5 loan, I
21 then register, you know, my lease in the ACRIS system.  So
22 down the road, if the project is going to be sold or even
23 going to be for any other kind of finance, that lease is
24 going to be in place in front of EB-5 investor's interest.
25 Q    All right.  Those two lease agreement are still in

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

54

1  effect today, right?
2  A    It's in effect but not enforceable before the head of
3  EB-5 investor.
4  Q    All right.  I want to talk about the funding for the
5  project.
6        Now, you repeatedly told investors that the
7  Mirage and Emerald projects would be funded from a variety
8  of sources, right?
9  A    Yes.
10 Q    Okay.  And that's because you knew that it was
11 important to investors if there was banks and governments
12 and other entities contributing to the project, not just
13 limited partner money, right?
14 A    No, that's totally different.  In terms of real estate
15 financing, if you don't get outside financing, it's a dream
16 scenario especially for the EB-5 investor because in their
17 loan agreement, in their offering memorandum, they all agree
18 that if there is any institutional finance in place they're
19 position is going to be automatically subordinate which
20 means they're going to be in a worst position compared to
21 what they have right now.
22       So let's assume if I got any of those
23 financing lists over there and EB-5 investors' interest can
24 be pushed back into, you know, like an inferior position.
25 If there's anything that happen like many other EB-5 s

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

55

1  failures all the EB-5 investors' interest is going to be
2  wiped out.  So that's why I'm very proud in the last ten
3  years, I managed not to incur any institutional finance,
4  means including my own interest in the land lease.  Nothing
5  is ahead of EB-5 investor.  They were in the very, very
6  superior position compared to probably all of other EB-5
7  projects.
8  Q    Thank you.  That was my point is that there was no
9  institutional money that went into either project.  It was
10 all funded by EB-5 investors.
11 A    If I need $15 million I got from Emerald Creek in
12 September 1st to pay the general contractor, they gave me
13 $15 million in four days and including Saturday and Sunday.
14 So the project is in a superior financial position to get
15 financing.  It's very hard not to, you know, get that
16 institutional finance in the first place and that
17 automatically puts EB-5 investor in the second position
18 because I, myself, is single largest investor.  So even for
19 myself, I don't want to put all investors' interest behind
20 institutional finance.  But in order to do that, I have to
21 forgive a lot of the fee, provide a lot of service, for
22 almost no charge.
23 Q    All right.  We'll come back to that $15 million
24 Emerald Creek loan a little later on.  But if you could look
25 back at EMMCO Tower, LP, offering memo which is Exhibit 3.

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

56

1  A    Yes.
2  Q    So looking at 3-5, it says at the very bottom, Page 3
3  of the Eastern Mirage project will be called
4  Eastern Mirage Tower and will encompass the development of
5  the Westin Element Hotel and condo apartment building.  The
6  Eastern Mirage project is intended to be funded from a
7  variety of sources including a bank loan by HSBC Bank, a
8  loan from NYC Capital Resource Corp., and foreign investor
9  capital under the EB-5 program.
10       Now, the reference to NYC Capital Resources,
11 you knew that an investor would find it important that there
12 was a government backing behind the project, right?
13 A    That's right.
14 Q    And if we look at Page 12 of Exhibit 3.  And just I'll
15 note that the date of this offering memo is January 2011.
16 And you see there's a reference to Recovery Zone Facility
17 Bond, 17 million?
18 A    Yes.
19 Q    And underneath it, it says, Up to an additional 12
20 million in Recovery Zone Facility Bond financing is
21 available if needed.
22 A    Yes.
23 Q    And by January 2011, you knew that there would be no
24 Recovery Zone Facility Bond available to the partnership,
25 right?

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

57

1    A    No.  Actually, I provided a letter to the SEC clearly
2    stating that we are rejecting, actually, that's because of
3    Freedom Tower.  We don't get the $17 million bond.  But in
4    the same letter, in the same paragraph, we're asking that
5    New York City EDC to preserve $12 million Double Tax Exempt
6    Bond.  And $17 million bond probably at higher interest
7    rate.  I think I made that letter to the SEC, I think, a
8    couple times already in the same letter we provided to you
9    in that paragraph.  I don't know if you have the letter in
10   front of you, we can just read that paragraph.
11        THE COURT:  Mr. Xia, I think the question simply
12   is:  By the time this January 2011 offering memorandum was
13   issued, didn't you already know that you are not going to
14   get the Recovery Zone Facility Bond because you had rejected
15   it by then.  I think that's the question.
16        THE WITNESS:  Yes.  The answer is, I do not know
17   that.
18   EXAMINATION BY
19   MR. STOELTING:
20   (Continuing.)
21   Q    Could you look at Exhibit 38, please.
22   A    (Complying) 338?
23   Q    38.
24   A    Yes.
25   Q    So Morrison & Cohen was your lawyer, right?

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

59

1    please.
2    A    Yes.
3    Q    This is a letter the very next day, right, December 7,
4    2010, to you?
5    A    Mm-hmm.
6    Q    And this is responding to the extension request
7    regarding the 12 million in just the last paragraph because
8    it -- because the allocation terminated it says,
9    Accordingly, NYCCRC will not consider a request for extend
10   the aforementioned termination date and you are hereby
11   notified that the allocation of bonds for the project has
12   terminated.  Thank you for your interest in the Recovery
13   Zone Facility Bond Program.  Although, we are disappointed
14   that we cannot assist you through this program which is due
15   to expire on December 3, 2010, we sincerely hope that you
16   are able to successfully complete the North Medical Center
17   Project in the future.
18        So why is it that the private offering memo
19   that was given to investors after you got those letters
20   continued to list Recovery Zone Facility Bonds as financing?
21   A    Because we didn't have $12 million and possibility of
22   another $17 million under the bond program.  And we did
23   actually send in the application at the end of 2011.  And we
24   had a letter of credit from the bank.  I, myself, believe
25   that we still had that option available for us.

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

58

1    A    That's right.
2    Q    And this is a letter to the New York City Capital
3    Resource Corporation regarding the Recovery Zone Facility
4    Bond.  And the first sentence says, On behalf of Fleet
5    Financial Group, Inc., I hereby confirm to the New York City
6    Capital Resource Corporation that Fleet shall not be seeking
7    to use the allocation of 17 million of Recovery Zone
8    Facility Revenue Bonds that has been made available to it.
9    Fleet is grateful for the support and assistance that the
10   CRE has extended during the time we have sought to complete
11   a transaction.
12        And the next paragraph says, In turn, Fleet
13   would additionally like to preserve to the extent, and for
14   the duration possible, the allocation of 12.8 million
15   taxable Facility Revenue Bonds?
16        So the first paragraph says, Fleet shall not
17   be seeking the 17 million.  And nevertheless, the private
18   offering memo lists that 17 million.  And then, if we could
19   turn to the next page at 39.
20   A    Do you want me to look at the paragraph right
21   underneath the $12 million bond, Tax Facility Bond, the
22   possibility of completing the transaction for agreed amount
23   including possibility of $17 million under a higher taxable
24   bond allocation.
25   Q    All right.  Thank you.  Could you turn to Exhibit 39,

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

60

1    Q    So you believe that even though you had a letter saying
2    that there would be no allocation from the bond program?
3    A    That's only applying to the Triple Tax Exempt Bond.  We
4    still had a Double Tax Exempt Bond.  And maybe even for a
5    little higher interest rate, we can get additional
6    $17 million.  So that's my understanding.
7    Q    So we -- I want to talk about one of the
8    Eastern Emerald offering memos which is the next Plaintiff's
9    Exhibit 4.
10        If you could look at 4-11.
11   A    Yes.
12   Q    All right.  You see the reference there?  It says the
13   Eastern Emerald Project costs are expected to be financed as
14   follows.  Loan from Hapoalim Securities of $72 million?
15   A    Yes.
16   Q    Okay.  Now, you never received any loan from
17   Hapoalim Securities, right?
18   A    That's right.
19   Q    And how did you come to list that $72 million loan in
20   the offering memorandum?
21   A    Because we have been working with the company on that.
22   It's, you know, at the time, we were preparing the
23   memorandum.  It's a forward-looking statement.  And we, at
24   that, time believed that we'd be able to get financing from
25   Hapoalim Securities.

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

61

1  Q   Okay.  And who did you talk to at Hapoalim Securities?
2  A   **Eddie Chan.**
3  Q   Did you ever talk to anybody at Hapoalim other than
4  Eddie Chan?
5  A   **No.  In the financial industry, you don't get past**
6  **people, your contact person in that company.**
7  Q   Okay.  And did you ever submit a loan application to
8  Hapoalim?
9  A   **I've been working with Eddie Chan ever since the**
10  **recovery bond.  He had all my due diligence documents and**
11  **material.**
12        THE COURT:  The question is:  Did you ever submit
13  an application?
14        THE WITNESS:  I really don't remember that.  But I
15  did give him a lot of my -- for this type of financing, they
16  don't go through a typical residential loan to fill out
17  application.  It all goes to the people who you know and how
18  much they know about your project.
19        THE COURT:  All right.
20  Q   And the person you knew at Hapoalim was Eddie Chan?
21  A   **Yeah, I think that's Eddie Chan's new company.**
22  Q   And he had given you a couple of letters, right, saying
23  that Hapoalim might extend you a loan?
24  A   **That's right.**
25  Q   Did you ask for those letters?

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
Official Court Reporter

62

1  A   Yes, I do.
2  Q   Okay.  Could you look at Exhibit 15, please.
3        THE COURT:  For everybody's benefit, I plan to go
4  to 1:00 o'clock and then take a break for lunch.  So I don't
5  know if anyone needs a break right now.
6        MR. KAMELI:  Good on my side.
7        THE COURT:  Let's keep going.
8  Q   This is a letter to you from the U.S. Citizenship and
9  Immigration Services.  USCIS, right?
10  A   **Yes.**
11  Q   And this is relating to your application seeking
12  approval for the EEGH Project, right?
13  A   **No.  I think it's exemplar application.**
14  Q   This is a letter that you send in June 2015 to USCIS?
15  A   **That's right.**
16  Q   Okay.  Could you -- and the purpose of this letter was
17  to describe to USCIS the EEGH Project, right?
18  A   **I think it's seeking to review and approve business**
19  **plan contemplated by us for the new project.**
20  Q   Could you turn to the third page?
21  A   **(Complying).  Yes, I see it's amended original**
22  **designation because we are taking a new project.**
23  Q   So I want to direct your attention to 15-3?
24  A   **Yes.**
25  Q   Okay.  So that second paragraph at the top?

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
Official Court Reporter

63

1  A   **Yes.**
2  Q   Okay.  You're telling USCIS how you plan on funding the
3  project?
4  A   **Yes.**
5  Q   I am getting the NCE, what is the NCE?
6  A   **NCE is, it's a new -- I don't remember.**
7  Q   New Commercial Enterprise?
8  A   **Yeah.**
9  Q   Okay.  And the NCE was EEGH, right?
10  A   **No.  I don't remember if the Eastern Emerald Group or**
11  **EEGH.**
12        MR. KAMELI:  Judge, I object as to the statement
13  that counsel saying you were saying to USCIS.  This document
14  was signed by USCIS, not by THE WITNESS.
15        THE COURT:  But the question is:  Did he provide
16  this information?  That's the question.
17        So understood that way, Mr. Xia, did you provide
18  the information that's reflected in this letter
19  describing --
20        THE WITNESS:  Yes, I think, yes.
21        THE COURT:  Okay.
22  Q   So you see where it says, The project will receive
23  additional funding from Hapoalim Securities, $72 million,
24  right?
25  A   **That's right.**

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
Official Court Reporter

64

1        THE COURT:  Again, that's what you told CIS?
2        THE WITNESS:  Yes.  That was my plan, yes.
3        THE COURT:  Okay.
4  Q   Well, that's more than a plan.  That says you will
5  receive it; right, that's definite?
6        MR. KAMELI:  Judge, I object.  There is no
7  indication that those words were written.
8        THE COURT:  Overruled.  That's the question.
9        Did you tell USCIS that NCE was going to -- will
10  loan that $80 million?
11        THE WITNESS:  Yes, I did.
12        THE COURT:  Okay.  Go ahead.
13  Q   Could you turn to Plaintiff's 6 which is the EEGH II
14  offering memo.  And if you could turn to Page 6-12.
15  A   **(Complying).**
16  Q   Are you on 6-12?
17  A   **Yes.**
18  Q   So this says the Eastern Emerald Project are expected
19  to be financed as follows.  Lists $40 million approximately
20  from Hapoalim Securities, right?
21  A   **Yes.**
22  Q   And you never received a $40 million loan from
23  Hapoalim, did you?
24  A   **The project hasn't been finished.  I don't know yet.**
25  **But until now, I did not.**

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
Official Court Reporter

65

1  Q  Okay.  And you never filled out a loan application, you
2  never did due diligence, you never had any conversation with
3  anyone at Hapoalim apart from Eddie Chan about obtaining
4  either a 72 million or a $40 million loan, did you?
5  A  **That's just not the how it works in the financing.**
6  Q  So the way it works is you talk to Eddie Chan and say,
7  I need a letter saying that I'm going to get a loan.  He
8  gives you the letter.  You list it in offering memos and
9  USCIS, that's how it works?
10        MR. KAMELI:  I object as to the form of the
11  question.
12        THE COURT:  Sustained.
13  Q  Let's look at Exhibit 150, please.
14  A  **Yes.**
15  Q  Okay.  So this is a letter that Mr. Chan provided you
16  in December 2013?
17  A  **Yes.**
18  Q  Okay.  And it says the purpose of this letter is to
19  confirm that Hapoalim Securities will provide FNYMRCcertain
20  services, advice, and assistance in obtaining financing in
21  the amount of up to $120 million.
22        If you could look at the next, Page 151 is
23  another letter, and this is two days after Exhibit 150
24  saying, Dear Mr. Xia, and then it describes the bank.
25        Why did you get a letter on December 21, 2013,

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

66

1  and then another letter on December 23, 2013?
2  A  **I don't really remember what happened here at the time.**
3  Q  Do you know, looking at the December 23rd letter,
4  Exhibit 151?
5  A  **Yes.**
6  Q  It's a letter to you, but the second paragraph says, I
7  have worked with Mr. Xia and his prior successful...
8        Do you know why Mr. Chan wrote you a letter
9  saying he has worked with you?
10        MR. KAMELI:  I object as to the speculation.
11  Answer if you know.
12        THE COURT:  Overruled.  Only if you know.
13        THE WITNESS:  Yeah.
14        THE COURT:  In other words, was there a discussion
15  about it?  Do you know the why the letter was created?
16        THE WITNESS:  No, it's eight years, nine years
17  ago.  I really don't remember.
18  Q  And then if you could look at Exhibit 152.
19  A  **Yes.**
20  Q  Okay.  This was a letter from Mr. Chan to your wife in
21  November 2014.  And the last paragraph says, Please accept
22  this letter of intent as an indication of our interest to
23  move forward on a loan commitment of $72 million.
24        Do you know why this letter was written?
25  A  **I don't remember that.**

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

67

1  Q  Okay.  Do you recall why it was addressed to your wife?
2  A  **No, I don't remember it.**
3        THE COURT:  Did you ask Mr. Chan to produce either
4  151 or 152?
5        THE WITNESS:  In between 2013 and '14, we were
6  very actively pursuing many different projects and working
7  with different, I guess, institutional investors and also
8  talking to the seller.  And I guess we were, at that time,
9  need a record of different letter and to show that we were
10  working with these financial institution which is willing to
11  provide us financing for a given project.  I think that's
12  the reason for that.
13        THE COURT:  You asked for the letters to be given
14  to you so you can provide them to financial institutions you
15  might be getting loans from.
16        THE WITNESS:  No, the, you know, for the
17  institutional investor in Asia and some other place, you
18  probably need something like that.  But I don't remember
19  exactly why this letter has been issued at that time period.
20        THE COURT:  I'm sorry to keep interrupting,
21  Mr. Stoelting.
22        But given to what you testified to before about
23  your wife only helping out for a couple of years with one of
24  your companies, why would she be getting a letter attesting
25  to her prior experience?

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

68

1        THE WITNESS:  Because my company I'm around very,
2  I think, a lot of institutional investors they're trying to
3  understand it, the owner structure of my project.
4        THE COURT:  The owner structure of your project.
5  So was your wife an owner?
6        THE WITNESS:  She was not an owner.  I always
7  trying to make sure that your wife, you know, is part of the
8  deal.  And I think a lot of times, even from my company, why
9  is her last name my last name, first letter.
10        THE COURT:  Go ahead, Mr. Stoelting.
11        MR. STOELTING:  Okay.
12  EXAMINATION BY
13  MR. STOELTING:
14  (Continuing.)
15  Q  One last question on Exhibit 152.
16        This last paragraph says, Please accept this
17  letter of intent as an indication of our interest to move
18  forward with the $72 million loan.  But after this letter in
19  November 2014, did anything happen with regard to
20  Hapoalim Securities?
21  A  **No, nothing happened.**
22  Q  So if we could look at Plaintiff's 5 at 3, this is the
23  EEGH supplemental offering memo.
24        THE COURT:  It's dated September 2015 or does
25  anyone --

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

1    MR. STOELTING:  Yes, Your Honor.  Yes.

2    THE COURT:  Okay.  Go ahead.

3    Q   So if we looked at 5-3.  And you see there it says,

4    toward the top, The total project costs for Eastern Emerald

5    Project of $190 million shall be financed as follows.  There

6    are four items, one of which is New Market Tax Credit for

7    $18 million, right?

8    A   That's right.

9    Q   Okay.  And you never received the New Market Tax

10    Credit, did you?

11    A   We were trying to make a condition.

12    Q   The question is, you never received the New Market Tax

13    Credit, did you?

14    A   No.

15    Q   And I just want to look at a couple of e-mails about

16    that.

17        If we could look at Exhibit 173 in the third

18    binder.

19        Do you have Exhibit 173 in front of you?

20    A   Yes.

21    Q   So, looking at the e-mail, the e-mail that you send on

22    November 10, 2013, to Sunil Aggarwal.

23        Do you see that?

24    A   Yes.

25    Q   You say, Sunil, I left you a message.  Can you help

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

1    issue me an 18 million letter of intent for NMTC of my

2    forthcoming project so I can promote my project in China?

3        And then, the next day, Mr. Aggarwal responds:

4    Richard, I will prepare the letter and e-mail it to you

5    tomorrow.  Let us meet when you come back from China.  Have

6    a great trip.

7        So your Honor in China when you e-mailed

8    Mr. Aggarwal, right?

9    A   That's right.

10    Q   And you respond to him on the 14th:  I am in China now

11    and the project is very well accepted due to our first

12    successful one.  When you get a chance please see if you

13    could e-mail me the NTMC letter.

14        And then, on November 14th:  Hi, Richard.

15    Attached is the letter for the NMTC Program.  Does this

16    work?

17        You see on the opposite page there's the

18    letter dated November 14, 2013?

19    A   Yes.

20    Q   Okay.  So that's the letter that Mr. Aggarwal e-mailed

21    to you on November 14, 2013, when you were in China, right?

22    A   That's right.

23    Q   Okay.  And you wanted to use that letter to show

24    potential investors Eastern Emerald to tell them that you

25    have the New Market Tax Credit, right?

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

1    A   Yeah, I'm planning to use the New Market Tax Credit.

2    Yes.

3    Q   Okay.  So when you say, I'm in China now and the

4    project is very well accepted.  That's referring to the

5    Eastern Emerald Project, right?

6    A   I don't remember exactly what project is that.

7    Q   Okay.  But you wanted that New Market Tax Credit letter

8    of intent because you were in China meeting with potential

9    investors in Eastern Emerald, right?

10    A   No.  I think we always talked with an agent.  We don't

11    have direct contact with the investor.

12    Q   Well, did you want the New Market Tax Credit to be able

13    to show the immigration agents that you had funding?

14    A   No.  They do their due diligence.  They were asking me

15    what's your plan for the finance of that project.

16    Q   So you see in your original e-mail to Aggarwal on

17    November 10th.  You say, Can you help me issue an

18    $18 million letter of intent for NMTC my forthcoming project

19    so I can promote my project in China; right?

20    A   That's right.

21    Q   Okay.  So he did send you that letter of intent while

22    you were in the China, and do you recall using the letter of

23    intent that you received from Mr. Aggarwal to show people

24    that you were going to obtain, or were trying to obtain,

25    this tax credit?

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

1    A   I think I talked with the agent about the plan, yes.

2        THE COURT:  I'm sorry.  The language says, To

3    promote my project in China.

4        THE WITNESS:  Yes.

5        THE COURT:  Who in China were you promoting it to?

6        THE WITNESS:  We don't have a direct information

7    on the investor.  So China has a business called Immigration

8    Agent.  So we talked to a different immigration agent.

9        THE COURT:  U.S. immigration agent in China?

10        THE WITNESS:  No, the immigrant agent for any

11    country -- Canada, England, all the countries.  So they have

12    a special license.  So they have to put -- and then they

13    start to do the due diligence for the project and then they

14    start recommending --

15        THE COURT:  Mr. Xia, I'm just asking you when you

16    said I want to promote my project in China, who were you

17    meeting with in China to promote the project to that you

18    needed this letter of intent for?

19        THE WITNESS:  The agent to do the due diligence.

20        THE COURT:  What agent?

21        THE WITNESS:  Immigration agent.

22        THE COURT:  For what country?

23        THE WITNESS:  They handle all the countries around

24    the whole world.

25        THE COURT:  Some general immigration agent who

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

73

1    works with many different countries?

2        THE WITNESS:  That's right, yes.

3        THE COURT:  And you're saying one of those offices

4    exists in China, or is it a Chinese immigration?

5        THE WITNESS:  Chinese immigration.

6        THE COURT:  I see.  Okay.  You're saying they act

7    as a broker of some sort, right.

8        THE WITNESS:  That's right, yes.  Not an agent, my

9    English is not my first language, so we always call them

10   immigration agent but they're a broker.

11       THE COURT:  For the Chinese government, not for

12   any other western government?

13       THE WITNESS:  No, they're not even for Chinese

14   government, they're just a business.

15       THE COURT:  Okay.  Go ahead.

16   EXAMINATION BY

17   MR. STOELTING:

18   (Continuing.)

19   Q    Mr. Xia, when you communicate with immigration agents

20   in China, isn't the ultimate purpose to attract investors

21   and limited partners into the project?

22   A    I have to pass their due diligence process first.  Then

23   they decide if they can recommended my project to, you know,

24   their client.

25   Q    When you communicate with immigration agents, the

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

74

1    purpose is to attract people to invest and become limited

2    partners, right?

3    A    I hope that immigrant agent can recommend my project to

4    their client.

5    Q    You gave information to the agents about the projects,

6    right?

7    A    That is right, yes.

8    Q    So anything the agents repeat, they could only have

9    learned from you; right?

10   A    That I don't know for sure.  But all I can do is

11   provide all the information about my project to them.

12   Q    Could you look at, well, after that -- after

13   Mr. Aggarwal e-mailed you that letter of intent when you

14   were in China, did anything happen when you came back from

15   China in the next few months with Mr. Aggarwal?

16   A    Actually --

17       MR. KAMELI:  Judge, I object as to "anything."

18       MR. STOELTING:  Let me revise the question.

19   Q    Once you got the letter of intent, you were in China.

20   When you returned from China, did you follow up with

21   Mr. Aggarwal?

22   A    Yes, I did.  And I worked with -- I had been working

23   with him since 2010, so we always talk about New Market Tax

24   Credit and the CDE.  So, actually, right after I come back

25   from China, I send the application for the CDE to the

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

75

1    Department of Treasury and we got approved.  And the CDE is

2    very important qualification to apply for the New Market Tax

3    Credit.  And I was actually planning to apply for the New

4    Market Tax Credit for both projects, for Mirage and Emerald.

5    Q    So do you remember, and we haven't seen any of these

6    communications, but do you remember a year later in

7    November 2014, your office reached out to Mr. Aggarwal again

8    and asked him to revise that letter of intent?

9    A    Yeah, I remember that.  I also remember before that,

10   right after I got the CDE certification, I was very happy

11   and I sent that e-mail directly to Mr. Aggarwal asking him

12   to have a meeting and continue this New Market Tax Credit

13   discussion.

14   Q    Okay.  So just back to November 2014 when you reached

15   out and asked him to revise the letter of intent.  That was

16   because USCIS was asking for some evidence that you actually

17   had this tax credit or could obtain it, right?

18   A    That's right.  But everything had been working in the

19   context.  You have previous communication understanding a

20   due diligence.  Did you prove letter looks likes.  If you

21   look at the whole e-mail chain communication, you understand

22   that it's always the topic of discussion and the interest

23   for us to work together on this New Market Tax Credit.

24   Q    Okay.  Could you taking a look at Exhibit 174, please.

25   A    Yes.

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

76

1    Q    Okay.  So this is the November 4th e-mail from

2    Sarah Pan and you're copied.  And the e-mail as to Sunil.

3    Thank you for writing the NMTC letter, I was wondering,

4    could you make the name and address as marked up on the attached

5    and make it as to date, please.  And then, on the other

6    side, is a markup of the 2013 letter; right?

7    A    Yes, that's right.

8    Q    Do you know whose handwriting is on there?

9    A    No.

10   Q    And why did you want to -- and this was Ms. Pan was

11   acting at your direction, right?

12   A    Yes.

13   Q    She was an employee?

14   A    Yes.

15   Q    Of Fleet?

16   A    That's right.

17   Q    Okay.  So why did you want to change the name to Julia

18   when you had received the 2013 letter?

19   A    I don't remember that.

20       THE COURT:  Referring to the defendant's wife?

21       MR. STOELTING:  Yes.

22       THE COURT:  Okay.

23   Q    And then if you could look at 175.

24       This is another November 11, 2014, and you see

25   at the top there's an e-mail from Mr. Aggarwal to Sarah Pan

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

77

79

1  and you.  He says, Attached is the NMTC letter.  Please
2  check the first name of the recipient.
3          Do you see that?
4  A   Yes.
5  Q   Okay.  And then, on the opposite, the next page is the
6  letter itself?
7  A   Yes.
8  Q   Okay.  And so, you see the date up as 2013, right?
9  A   That's right.
10 Q   Okay.  So that's a mistake, correct, it should have
11 been 2014?
12 A   I don't know that.
13 Q   You don't know that?
14 A   No.
15         (Continued on the next page.)
16
17
18
19
20
21
22
23
24
25

1  190 million, with 80 million EB-5 funds from up to 160
2  investors.  The 110 million non-EB-5 funds will come from the
3  following sources.
4          The first bullet point is new market tax credit and
5  you're citing to -- it includes the letter that we just saw
6  from Mr. Aggarwal.  Right?
7  A   Yes.
8  Q   Okay.  And this says, "will come from the following
9  sources."
10         So that's expressing certainty, right?
11 A   I don't know.  You know, it's a real estate development
12 process.  New York City is probably the most unpredictable
13 market and anything you think is for sure today maybe not
14 happen tomorrow, but I don't know how you interpret that
15 "will."
16         THE COURT:  The question is were you attempting to
17 represent to USCIS that you were getting this funding --
18         THE WITNESS:  Yes.
19         THE COURT:  -- by using the word "will"?
20         THE WITNESS:  Yes.
21         THE COURT:  Go ahead.
22 Q   And you see the third bullet point refers to the
23 74 million Hapoalim securities loan and then if you flip a
24 couple of pages, there's that November 14th letter that we
25 just saw?

78

1  BY MR. STOELTING:  (Continuing)
2  Q   Well, the letter is being sent -- you asked Mr. Aggarwal
3  to revise it.  The original e-mail from Sarah Pan actually
4  says, "Make it as to date, please," but when he sends it back,
5  he changes everything except the date.  So is that 2013 a typo
6  or did she tell Mr. Aggarwal to leave the date as 2013?
7  A   I really have no recollection.
8  Q   Okay.  And then you provided this letter to USCIS in
9  November 2014, correct?
10 A   I don't remember that.
11 Q   Could you look at Exhibit 69?
12 A   Yes.
13 Q   Okay.  Do you have Exhibit 69?  This is a letter to USCIS
14 from a lawyer named Linda Lau, correct?
15 A   That's right, yes.
16 Q   And Linda Lau is your attorney?
17 A   That's right.
18 Q   So you approved this letter before it went out?
19 A   Yes.
20 Q   Could you look at the third page where it says, "Response
21 to request No. 4"?
22 A   Yes.
23 Q   It says:  Per USCIS request, the comprehensive business
24 plan has been updated, Exhibit 5, and the estimated cost is
25 consistent throughout the filing.  The total project cost is

80

1  A   Yes.
2  Q   So this letter to USCIS dated November 20, 2014, the
3  reason you solicited -- the reason you asked Sunil Aggarwal to
4  revise the 2013 letter was so that you could include it with
5  this package to USCIS, is that right?
6          MR. KAMELI:  Judge, I object as to form.
7          THE COURT:  Overruled.
8          Do you understand the question?
9  A   Can you repeat it?
10 Q   Yes.  The reason that you asked Mr. Aggarwal to revise
11 this 2013 letter and November '14 letter was because you
12 wanted to include it in this response to request to USCIS, is
13 that right?
14 A   I don't remember but it looks like that's the reason,
15 yes.
16 Q   And would that also be the reason having seen this
17 document that you asked Edward Chan for this letter that's on
18 69-11?
19 A   Yes, I think so.
20 Q   Okay.  Could you turn to Exhibit 70.
21 A   Yes.
22 Q   Okay.  So this is December 2017.  This is another
23 response to request for evidence and it's signed by Linda Lau.
24 She was, again, your lawyer at this point?
25 A   Yes, I think it's, yes, request updated business plan,

81

1  yes.
2  Q    Okay.  And if you look at the third page, 70-3, the
3  paragraph that starts "Second."
4        It says:  Second, FNYMRC submits further evidence of
5  supplemental non-EB-5 funding.  It should be noted that
6  LaGuardia Performance Center has already obtained a
7  construction loan commitment letter in the amount of
8  approximately $85 million from R. Seelaus & Co., Inc.  If the
9  loan is granted, the 84.4 million project funding pointed out
10  in the RFE notice will be well covered.
11        And then you see the loan commitment letter attached
12  as an exhibit starting on 70-6?
13  A    Yes.
14  Q    Okay.  So by this time, this letter was sent to you by
15  Edward Chan again, right?
16  A    Yes.
17  Q    And he had switched from Hapoalim to R. Seelaus, right?
18  A    That's right.  Yes.
19  Q    Okay.  And did you ask him to give you a loan commitment
20  letter so that you could provide it to USCIS as evidence of
21  non-EB-5 funding?
22  A    He always my go-to person for the financing.  If I need a
23  financing a loan that's, you know, he's the, I always call him
24  to see if there's anything he can pair me up.
25  Q    All right.  Mr. Chan never actually succeeded in getting

CMH   OCR   RDR   FCRR

82

1  you any loan at any time, did he?
2  A    He did.
3  Q    When was that?
4  A    That's, you know, that's interactive marginal loan and
5  also I think in last year, we were in process to get a pace
6  loan.
7  Q    A what loan?
8  A    Pace loan.
9  Q    Pace loan?
10  A    Yes.
11  Q    Okay.  But in terms of a loan for your projects, Eastern
12  Emerald or Eastern Mirage, he never got you a loan for either
13  of those projects, right?
14  A    I'm lucky enough I don't really, you know, need that loan
15  until the end of the project.  So this project is still in
16  the, in the middle of development so I haven't really got into
17  the stage that I need the loan.
18  Q    So if we can look at this loan commitment letter dated
19  August 2017.
20        MR. KAMELI:  What exhibit is this?
21        MR. STOELTING:  It's on 70-6.
22  A    Yes.
23  Q    And if we could -- so it says:  Dear Mr. Xia, it is a
24  pleasure to advise you, sometimes herein called the borrower.
25  With respect to your application covering the above-captioned

CMH   OCR   RDR   FCRR

83

1  premises, we have approved construction financing the loan on
2  the following terms.
3        Then if you could flip forward to page 70-1, is that
4  your signature?
5  A    Yes.
6  Q    You're signing on behalf of the borrower, LaGuardia
7  Performance, correct?
8  A    That's right.
9  Q    So if we could go back to page 70-6.  All right.  There's
10  a reference to, with respect to your application covering the
11  above referenced premises.
12        You never filled out an application for a loan for
13  Seelaus, did you?
14  A    I don't remember.  I think there's applications somewhere
15  but I don't --
16  Q    Okay.  Well, we haven't seen it.  It's not on your
17  counsel's exhibit list for this hearing.
18        Do you, did anything -- so when you got this loan
19  commitment letter saying that you have been approved for an
20  $85 million loan, did anything happen after the date of this
21  letter with regard to Seelaus?
22  A    Yes.  I think after that, they let me open an
23  appropriate account with them.
24  Q    Who told you that?
25  A    Edward Chan.

CMH   OCR   RDR   FCRR

84

1  Q    But you never got this $85 million loan, right?
2  A    Until now, I still have the $77 million cash in the
3  account so I don't -- even I need that loan maybe at a later
4  stage, but there's no reason for me to incur this financing
5  right now.
6  Q    Did you ever talk to anyone at Seelaus other than Eddie
7  Chan?
8  A    We don't bypass our contact.
9  Q    So the answer is no?
10  A    Yes.
11  Q    Okay.  And you must be aware at this point that the chief
12  executive officer of R. Seelaus & Company has described this
13  letter as fraudulent, right?
14  A    Yes.
15  Q    Okay.  So at the time that you, that Mr. Chan gave you
16  this letter, did you know that it was not authorized by the
17  owners of Seelaus?
18  A    I do not know that.  My experience is the senior
19  executive in the bank and financial institution, you know, if
20  they issue me a letter, I should consider that, the letter
21  from the company.
22  Q    Do you have any reason to think that Mr. Chan would give
23  you a letter that, extending a loan commitment that was not
24  authorized by his superiors?
25  A    No, I don't know their internal procedure.

CMH   OCR   RDR   FCRR

85

1  Q    Did Mr. Chan ever tell you that he was giving you this

2  letter but that nobody else at Seelaus knew about it?

3  A    **No. I was complaining there's no activity after that and**

4  **I was told the reason is because I didn't open that brokerage**

5  **account visa.**

6        THE COURT:  Mr. Stoelting, I'm going to ask another

7  question.

8        Did you ever give any money to Mr. Chan in

9  connection with the letters he provided to you?

10        THE WITNESS:  No.

11        THE COURT:  You never paid him any money?

12        THE WITNESS:  I paid him money.  For the last ten

13  years, I paid him some money but not directed for the letter

14  at issue.  It's always for the work we were planning to do

15  together.

16        THE COURT:  But you paid him for work, for work you

17  were planning to do together but didn't do?

18        THE WITNESS:  We were planning to form a REIT using

19  my project.  I paid him for the, you know, for the legal fee

20  and many other fees, but I did pay him the fee, yes.

21        THE COURT:  How much in total did you pay him?

22        THE WITNESS:  I think in the recover loan process, I

23  think I paid him $57,000 and for the REIT, I think I paid to

24  attorney $100,000 to draft the REIT document.

25        THE COURT:  And what about to Mr. Chan?

                    CMH   OCR   RDR   FCRR

86

1        THE WITNESS:  Mr. Chan, I think for pace financing

2  in 2021, I paid him $50,000 for that process.

3        THE COURT:  Okay.  All right.  Go ahead,

4  Mr. Stoelting.

5  Q    I think you said that you had complained when nothing

6  happened with regard to the Seelaus loan, is that right?

7  A    **That's right, yes.**

8  Q    You complained to Mr. Chan?

9  A    **Not complain.  We just talk about that, you know, because**

10  **he brought me the package and ask me to open account with**

11  **Seelaus.**

12  Q    So why didn't you open the account?

13  A    **Because the money at that time is still, is still**

14  **considered the EB-5 investor money, I cannot open a brokerage**

15  **account because that's not, you know, complied with our**

16  **offering memorandum and agreement.**

17        THE COURT:  I'm sorry.  Can we go back for a second.

18        If the head of Seelaus is claiming that the letter

19  you got from Mr. Chan was fraudulent and never approved by

20  supervisors, how is it that you have this brokerage account or

21  open line of credit as you described it from that institution?

22        THE WITNESS:  I was told later on.

23        THE COURT:  By whom?

24        THE WITNESS:  By Eddie Chan, I was the target

25  because I, you know, I raised $175 million for the second

                    CMH   OCR   RDR   FCRR

87

1  project and they were trying to ask me to open a brokerage

2  money management account at Seelaus.

3        THE COURT:  Target of what?

4        THE WITNESS:  Target to open an account because I

5  have a large deposit in the bank and they want me to move

6  those money into Seelaus.

7        THE COURT:  But do you have some paperwork that

8  shows that you have a brokerage account there?

9        THE WITNESS:  No, I never opened that account.

10        THE COURT:  Oh, I see.

11        Go ahead, Mr. Stoelting.

12  Q    So looking again at Exhibit 5 which is the EEGH offering

13  memo on page 5-3?

14  A    **Yes.**

15  Q    And you see number 2 there is Brownfield tax credit,

16  21.2 million?

17  A    **Yes.**

18  Q    So you finally did get a Brownfield tax credit, right, in

19  January 2021?

20  A    **Yes, the first part of that, $18 million tax credit, yes,**

21  **I got it.**

22  Q    And that was a little above $10 million, right?

23  A    **Close to $11 million.**

24  Q    Right.  And you did not use that money for the project as

25  is represented in the offering memo, did you?

                    CMH   OCR   RDR   FCRR

88

1  A    **As I said before, we still have a $77 million cash and**

2  **this Brownfield tax credit, we never see that it's the first**

3  **11 or the last $11 million, you know, profit type revenue to**

4  **use for the project.  For use the financing, we use the money**

5  **as we need.  So if I have $8 million and I don't need it right**

6  **now, I can use my next or next, you know, Brownfield tax**

7  **credit for the project.  The project doesn't need this money**

8  **at this moment.**

9  Q    Okay.  So my question was the EEGH offering memo lists

10  Brownfield tax credit as a source of funding for the Eastern

11  Emerald project.  You got a 10 million, $11 million Brownfield

12  tax credit in January of 2021.

13        What did you use that money for?  You didn't use it

14  for the project, did you?

15  A    **I used part of that for the project, not all of it.**

16  Q    Didn't you use it to buy a $10 million certificate of

17  deposit at CTBC bank?

18  A    **Yes, that's always my practice, to deposit it in the bank**

19  **as a CD.**

20  Q    Okay.  And then you used that $10 million certificate of

21  deposit to borrow, to borrow $10 million, right?

22  A    **Yes, that's right.**

23  Q    And then you used that cash to buy the $14 million or the

24  $11 million estate on Middle Neck Road, right?

25        MR. KAMELI:  I object as to vague.  Is it 11 or 14?

                    CMH   OCR   RDR   FCRR

89

1   A   I had worked for five years to get Brownfield tax credit.
2   That's my earned money and I still keep it there and get a CD
3   loan to buy my wife a house, a mansion as you said, but I just
4   don't know.  You know, this Brownfield tax credit, I have --
5   you know, after our work really to go for $4 million and
6   this moment, if I don't use that CD as a collateral to buy a
7   house, it's still going to be seeking on the same account
8   because we don't need this tax credit at the moment and I
9   believe that by the time he needs that, there's additional
10  more type credit come back.
11        THE COURT:  Let's just be clear, the CD though is
12  the collateral for the house, is that correct?  That you
13  bought your wife?
14        THE WITNESS:  The CD is the collateral for the loan.
15        THE COURT:  To get the house?
16        So if you default, the CD will be the collateral
17  that will be collected on?  No.
18        THE WITNESS:  No.  If I default, the house would be
19  the collateral.
20        THE COURT:  Okay.  Go ahead.
21  Q   Okay.  We'll come back to that later.
22        One other -- you know, we looked at the Tower POM.
23  There's a reference to the Westin hotel, Westin Element hotel.
24        Now, there was never any deal entered into with
25  Westin hotel, was there?

CMH   OCR   RDR   FCRR

90

1   A   We hired counsel to negotiate a franchise agreement and
2   hotel management agreement back in 2013, no, 2011, and in
3   order to have the counsel representing us to, for the
4   negotiating with Starwood, Starwood general counsel actual
5   waived interest conflict because this counsel had been working
6   with Starwood for four months.
7        I think we were very seriously pursuing working with
8   the Starwood to get, you know, to sign the franchise agreement
9   and the hotel management agreement and eventually, because,
10  you know, we changed the program with the New York State,
11  trying to do a transient hotel and that's why, you know, late
12  2014 and after 2014, I think Starwood starting, start selling
13  themselves I think by 2016 or '17, they sold themselves to
14  Marriott.
15        So we have been very diligently working with them
16  and we even hired counsel and the hotel consultant to do the
17  negotiation with them.
18  Q   Okay.  But that's all that happened, right?
19  Negotiations.  There was never any deal, there was never any
20  understanding, there was never any term sheet, right?
21  A   I even got their franchise agreement and design standard.
22  That's why the counsel can work on it.  Counsel cannot just
23  working on it a term sheet.  They working actual franchise
24  agreement because of the program change.
25  Q   So could we -- I want to look at Exhibit 8, please.

CMH   OCR   RDR   FCRR

91

1   Q   Do you have the Exhibit 8 in front of you?
2   A   Yes.
3   Q   So this is, this is some promotional material.
4        What is WSLK?
5   A   That's agent I just mentioned.  They're the wholesale
6   agent who basically be in charge of all the retail agent in
7   Taiwan and China.
8   Q   Okay.  And Westlead, did you give information to them
9   about the Eastern Mirage and Eastern Emerald projects?
10  A   Yes, I did.
11  Q   Do you see at the first page there, it's called the
12  Westin New York project?
13  A   Yes.
14  Q   And then on the next page, 8-2?
15  A   This is a translation.  This is not the original
16  document, right?
17  Q   Correct.  It was in Chinese, we had it translated and
18  there's a certificate.  If you look at the last page, there's
19  a certificate of translation accuracy attached.
20  A   Okay.
21  Q   So if we can go back to 8-2?
22  A   Sure.
23  Q   Okay.  So point 5 says:  A commercial real estate project
24  that is flourishing during a recession having won a $9 million
25  loan from East West Bank.

CMH   OCR   RDR   FCRR

92

1        There was never a $9 million loan from East West
2   Bank, was there?
3   A   I did get a letter from East West Bank.
4   Q   You never received a $9 million loan from East
5   West Bank or the project never received a $9 million loan from
6   East West Bank, did it?
7   A   Initially they don't need that $9 million loan.
8   Q   All right.  Could you turn to 8-5 where it says:  Project
9   funding structure.  Total project investment of $68 million.
10  Then it says:  $9 million in loans from East West Bank already
11  received.  And then there's a pie chart and it says, 17
12  million in government loans, 25 percent.
13        So those are false statements, aren't they?
14  A   This is not the information, the document I gave to them.
15  This is document marketing material prepared at the wholesale
16  agent.
17  Q   Well, where would the agent get information about the
18  Mirage and Emerald projects if not from you?
19  A   All I told them, I told them at that time is Recovery
20  Zone Facility bond issued by the New York City EDC and how
21  different country and different agent interpret that, I just,
22  I honestly, I don't even know that until now.
23  Q   Well, did you ever, did you ever tell any of the agents
24  that they were saying things that were not true in their
25  promotional materials?

CMH   OCR   RDR   FCRR

93

1  A    They don't give us this marketing material. I, I never
2  saw this document before.
3  Q    Okay. Didn't you continue to refer to the project as the
4  Westin project even up until recently?
5  A    No, I never. You know, the offering is only 2010 and
6  '11. After that, we don't even need the money for this
7  project anymore, but for agent who representing multiple
8  different immigration project, sometimes they give a code
9  name. They call this project Westin project. That project is
10  Marriott project. I have no control about how, you know,
11  agent code, give a code name to different project.
12  Q    Well, you knew -- you knew, right, that investors were
13  calling it the Westin project because they thought that Westin
14  was part of the, part of the project which was not true,
15  right?
16  A    Westin brand, I don't know if it still existing anymore
17  at this time after, you know, they been sold to Marriott.
18  Q    Could we look at Exhibit 73, please. These are WeChat
19  communications that you were involved in and we had it
20  translated from Chinese. There's a certificate of accuracy
21  attached.
22       So if you can look at 73-4. At the bottom, there's
23  a message that says: At Richard. Are the latest progress
24  reports for Westin hotel project and the Eastern Emerald
25  development project ready?

94

1        And then look at page 7. So that was on July 28,
2  2017. And then on December 11, 2017, on 73-7, there's two
3  other messages referring to: Are the latest progress reports
4  for Westin hotel project and Eastern Emerald project ready?
5        Your response -- that's your response that's sort of
6  red ball there where it says, "Should be ready soon"?
7  A    Yeah.
8  Q    Okay.
9  A    Even on the first page, they're asking for the 3-1. So
10  we're basically giving them a progress report and nowhere on
11  that report actually mention Westin. It's just for the agent
12  because he's handling multiple different project. So almost
13  like it just give a name on it. It's not like any -- I don't
14  think it contain any marketing purpose and by 2017, all the
15  funds had already been raised.
16  Q    Okay. But when you got the WeChat, several WeChats
17  asking you about the latest progress reports on the Westin
18  hotel project, you do not respond saying, Oh, I have to tell
19  you, Westin is not part of the deal anymore. Instead, you
20  say, Should be ready soon, will send to you today.
21        Can we look at 73-8?
22  A    No. I told them long time ago, they knew that it's not
23  like this, this is the first time they mentioned it's just a
24  code name.
25  Q    So you're saying you did tell investors that Westin would

95

1  not be part of the project?
2  A    Yes, I was very proud of that because we also got hotel
3  Hilton and Hilton term sheet and we got a Linden trying to
4  create like a new brand for us. So I told them all about the
5  potential good, you know like, position we are negotiating
6  with all these hotel brand. They knew that.
7  Q    Okay. And then --
8  A    I think it's part of the progress report. I think we had
9  prepared a report for them too.
10  Q    But maybe I guess these investors did not get the
11  message, because in January 2018, another one saying:
12  Richard, clients want to know whether Westin project have
13  dividends.
14        And then on the next page, 73-9 --
15  A    Again, they're a broker. They're agent.
16  Q    Agents. But on 73-9, it's another WeChat about the
17  investors of Westin project are following investment fund
18  update.
19        So when you saw all these WeChats, why didn't you
20  just tell them, Look, to be clear, Westin is not part of this
21  project?
22  A    I told them before even this message.
23  Q    Okay. So I guess these people just did not get that
24  message then.
25        MR. KAMELI: Judge, I object as calling for

96

1  speculation --
2        THE COURT: Sustained. Sustained.
3  Q    You used WeChat to communicate with the agents and
4  investors about the project, right?
5  A    That's right.
6  Q    And what kind of device do you use for your WeChats, a
7  phone?
8  A    Yes.
9  Q    And what kind of phone?
10  A    It's iPhone.
11  Q    And is it the same, the one you were using in 2018, is it
12  the same one you have today?
13  A    No.
14  Q    Okay. Do you have a WeChat account?
15  A    What do you mean, WeChat account?
16  Q    Well, the court ordered you to produce all your WeChat
17  messages and what we received was some screenshots and,
18  apparently, they have some audio recordings in them that
19  counsel has told us he cannot retrieve so we wanted to find a
20  way to obtain those.
21        Do you preserve or download your WeChats with
22  investors anywhere?
23  A    No.
24  Q    Do you sometimes make audio recordings through WeChat?
25  A    What do you mean, audio recording?

97

1   Q   A voice recording.

2   A   Yes.

3   Q   Okay. And when do you do that?

4   A   I don't understand your question.

5   Q   When do you make audio recordings as part of

6   WeChat communications?

7   A   I don't know. Sometimes I'm just, I just don't want to

8   type, type a letter. I just don't want to type or just too

9   easy. I'm just too easy, yes.

10  Q   Okay. So moving on, so of the five different offerings,

11  they were each targeted to different projects, right?

12  A   No. First three is for one project and, you know, for

13  different, and the second one, the last two is the second

14  project for different phase.

15  Q   Well, the first one was phase one and then the medical

16  center and then Tower. Those were the first three offerings,

17  right?

18  A   Yes, the first project.

19  Q   And so the investors who invested in the Eastern Mirage

20  project understood that their money would be used for the

21  Eastern Mirage project, right?

22  A   Yes.

23  Q   Okay. And you knew that were you not supposed to use

24  money raised from the Eastern Mirage investors for the Eastern

25  Emerald project, right?

CMH   OCR   RDR   FCRR

98

1   A   That's right.

2   Q   Okay. So that would be, that would be wrong, wouldn't

3   it?

4   A   It depends on how the money is being used.

5   Q   Well, for example, if you use money raised from Eastern

6   investors, Eastern Mirage investors for the Eastern Emerald

7   project, that would not, that would not be fair to the Eastern

8   Mirage investors, right?

9   A   You mean the money raised in the LP, right?

10  Q   Yes.

11  A   The money being used after the money has been disbursed

12  from the LP, right?

13  Q   Well, right. So when the developer receives the money --

14  A   The loan.

15  Q   -- receives the loan proceeds, right, the developer is

16  supposed to use those loan proceeds only for that particular

17  project for which the money was loaned to the developer,

18  right?

19  A   The developer is only supposed to use that money to build

20  that project.

21  Q   Okay. Let's look at one of the loan agreements just to

22  nail down that point.

23      So if we can look at Exhibit 77. This is the loan

24  agreement and all of the loan agreements were similar

25  structure, right?

CMH   OCR   RDR   FCRR

99

1   A   That's right, yes.

2   Q   Okay. So this is the loan agreement between Fleet

3   Financial Group and EMMCO Tower, L.P. in which the partnership

4   loans 12.5 million to the borrower and the borrower is Fleet

5   Financial Group. Right?

6   A   That's right.

7   Q   Okay. So if you could turn to the next page. Well,

8   actually, I wanted to point out one other thing on the first

9   page.

10      You see it says: Lender is provide a loan up to

11  12.5 million to borrower. Using the loan proceeds, borrower

12  would develop and construct phase three of commercial mixed

13  use project, also Eastern Mirage Tower. Then that's defined

14  to mean project.

15      Do you see that?

16  A   Yes.

17  Q   Okay. And then if we look at the next page, Section 1.5.

18  Section 1.5:  Mandatory use of proceeds. Borrower agrees that

19  the proceeds of the loan shall be used only for the

20  development, construction, operation of the project.

21      Do you see that?

22  A   That's right.

23  Q   Okay. Are you aware of any times when money was used,

24  money that was raised for one project was instead used on

25  another project?

CMH   OCR   RDR   FCRR

100

1   A   No.

2   Q   Could you look at Section 1.6.

3   A   Yes.

4   Q   The collateral. As collateral for the loan, borrower

5   hereby agrees to give lender a first priority lien on all

6   general intangibles. And then B:  All additions and

7   accessions thereto.

8       So that reference to a first priority lien, was

9   there ever a lien given to the lender?

10      MR. KAMELI:  Judge, I object to the form. That

11  doesn't mean first priority.

12      THE COURT:  Let's hear from the witness.

13      The question is so that reference to the first

14  priority lien, was there ever a lien given to the lender. Do

15  you understand the question?

16      THE WITNESS:  Yes.

17      THE COURT:  Okay. Can you answer that?

18      THE WITNESS:  Sure.

19      THE COURT:  Go ahead.

20  A   Yes. That's the first priority lien on general

21  intangibles.

22  Q   Okay. My question is whether there was ever a UCC filing

23  recording a lien to protect the lenders' interests?

24  A   I don't know how to give a first priority lien on general

25  intangible property attached to the project until it is

CMH   OCR   RDR   FCRR

101

1    complete.
2    Q    So for either project, has there ever been a first
3    priority lien given to the lender, meaning any of the five
4    limited partnerships?
5    A    I think USCIS doesn't allow you to have a priority lien
6    on the tangible property because that become part of the
7    repayment guarantee.  So all half million dollar EB-5 investor
8    need to invest, need to be always at risk until they got the
9    permanent green card and that's why, I think, no lien
10   agreement was prepared by immigration attorney trying to meet
11   the requirement to protect the investors, that interest to
12   get, you know, to get their green card.
13   Q    What was the name of the immigration attorney that
14   prepared this loan agreement?
15   A    Linda Lau.
16   Q    Linda Lau?
17   A    Linda Lau.
18   Q    But in answer to my question, the bottom line is there
19   was never a first priority lien filed under the UCC, correct?
20   A    I don't know UCC, no.
21   Q    Okay.  So wasn't $15 million in Eastern Mirage funds used
22   to purchase the Eastern Emerald land on Northern Boulevard in
23   2013?
24   A    No.  The money --
25   Q    Did you --

CMH    OCR    RDR    FCRR

102

1    A    The money that was used is the -- money never went --
2    loans to the developer.  Then developer gave to the general
3    contractor to build the project.  And the money used for that
4    purchase is the service my entities provided for half the
5    price of the market after the previous contractor walk away
6    from the project.  So we step in, we save the project, and
7    that's the service value after we successfully complete the
8    foundation work which is one of the, the foundation work.
9        So for your question, I'm trying to understand that
10   how you define the investor money because we did provide
11   services and we do have a 20-story building standing there
12   today and it appraised at $177 million value.
13   THE COURT:  I think you're overthinking this
14   question.  The simple question is were funds that were paid
15   for the project, the Mirage project, obtained for that
16   purpose, were they used to build or assist in building the
17   Emerald project including, I guess, buying the land for that
18   project.
19   THE WITNESS:  So it is not me.  If another developer
20   or contractor complete their work, do they allow to use that
21   money to do other things?
22   THE COURT:  No.  No.  You're controlling all this
23   money, right, as the head of the GP and also of these, of the
24   limited partnerships.  Correct?
25   So the money that was obtained to fund the Mirage

CMH    OCR    RDR    FCRR

103

1    project, at any point, did you authorize it to be used to buy
2    the land for the Emerald project?
3    THE WITNESS:  I'm the GP and LP.  We fund the money
4    into the developer and the developer fund the money to the
5    general contractor.
6    THE COURT:  Okay.  Stop.
7    So did you fund a developer who was working on the
8    Mirage project with money from the Emerald -- I'm sorry, vice
9    versa.
10   Did you take money that was supposed to be used for
11   the Mirage project to fund the developer who was working on
12   the Emerald project?
13   THE WITNESS:  I didn't use the money, any of the
14   Mirage money in the developer --
15   THE COURT:  Any of the what money?
16   THE WITNESS:  The developer -- the loan proceed, the
17   loan proceeds from the, from the LP.  The LP gave $56 million
18   loan to Fleet Financial Group as the developer and developer
19   pay all this money to the general contractor to build the
20   project.
21   THE COURT:  Mr. Stoelting, perhaps you should ask
22   the question because I don't know enough of the details to pin
23   this down.  I'm not satisfied with the answer or that we've
24   gotten an answer yet so ask again.
25   Q    Okay.  We've sort of mapped out the transfers.  If we can

CMH    OCR    RDR    FCRR

104

1    look at Exhibit 96.  This was an attachment to the complaint
2    so maybe you've had a chance to look at it already.
3        So looking at Exhibit 96 which is a two-page
4    document, you see there's two sets of transfers in June 2013
5    and then in December 2013.
6        You recall that the land on Northern Boulevard for
7    the Emerald site was purchased in December 2013?
8    A    Yes, that's right.
9    Q    Okay.  So this maps out the transfers in June 2013 from
10   EMMCO NQMC, L.P. to EMMCO, another NQMC account and then Fleet
11   Financial and then Racanelli and then finally to Eastern
12   Emerald Group 379 account to the escrow agent as attorney for
13   the seller of the property.  Then on the next page, the
14   December 13th transfers show the transfers in a similar
15   pattern, from the EMMCO, two EMMCO accounts, and then through
16   Fleet Financial and then to Racanelli and then to JiQing
17   Development and X&Y, and the total is 15.3 million that is
18   applied toward the land purchase.
19       Do you have any reason to think that this recitation
20   of these transfers is not accurate?
21   A    It's accurate.
22   Q    Okay.  So doesn't this show that 15.3 million of Mirage
23   funds, because the chain starts with EMMCO, funds from
24   investors, EMMCO is a Mirage project, and yet the money ends
25   up getting used toward the purchase of the Emerald land?

CMH    OCR    RDR    FCRR

105

1   A    But behind all this money flow, there's a 33,000 square
2   feet deep foundation about 65 feet deep, had been completed
3   for the fraction of the other contractor's price and this
4   money flow does not reflect that value and the services
5   created by general contractor team is my entities.
6        So if you just look at the money flow, of course, I
7   agree, it looks like that, but behind this is actual solid,
8   dirt has been loaded out, concrete has been poured, foundation
9   has been complete, so that's real services has been provided
10  into this project.  Even something when I agree to money, I
11  promise to the investor, you know, we need to build this
12  project, and when you have somebody who can build this project
13  for a reasonable price instead of very high price, and behind
14  all this money flow, in a year or two year before this, I was
15  working with all these people day and night.  So that's
16  reflect the value we created in the process for this project.
17       THE COURT:  Mr. Xia, do you think it's consistent
18  with your fiduciary obligation to the investors in the Mirage
19  project to take their funds and use them to build the Emerald
20  project?
21       THE WITNESS:  No.  It go back to Racanelli.  They
22  change the price overnight for $19 million.  So we have no
23  choice.  I hired people, I worked in the design, we complete
24  the foundation for $8 million, and we did it because I'm the
25  owner.  I have rental income.  I don't need to collect money

CMH   OCR   RDR   FCRR

106

1   every month.
2        THE COURT:  I'm going to stop you.  These
3   explanations don't really get at the question that I'm asking
4   you.  I'm going to skip that question because I don't think
5   you meant to say no, you weren't observing your fiduciary
6   obligation.
7        The simple question is did you knowingly, did you
8   know that funds that came from investors in the Mirage project
9   were being used, even if you think it was for a good purpose
10  or to save money or to achieve some greater good, did you know
11  that you were using Mirage investor -- sorry -- Emerald
12  investor funds to do work on the Mirage project?  Simple as
13  that.  Did you know that?
14       THE WITNESS:  Money --
15       MR. KAMELI:  It's backwards.
16       THE COURT:  Well, I think the funds came from -- I'm
17  sorry.  The funds came from Mirage and did you know that they
18  were being used for the Emerald project?  That's all.  Simple
19  question.  Did you know that?
20       Whatever you think the rationale was, did you know
21  that funds were being taken from the Mirage investors and
22  being used for the Emerald project?
23       THE WITNESS:  No, I don't think that's the case.
24       THE COURT:  You don't think that that was the case?
25       THE WITNESS:  No.

CMH   OCR   RDR   FCRR

107

1        THE COURT:  Even though you say that this exhibit,
2   96, accurately describes the flow of money?
3        THE WITNESS:  Yes, but flow of money doesn't reflect
4   the actual work has been done.  If you provide the services,
5   build the project, after that, it's still considered to be a
6   Mirage fund?
7        THE COURT:  If it ends up building the Emerald
8   project.
9        THE WITNESS:  You're right.
10       THE COURT:  You're saying it's no longer Mirage
11  investor funds?
12       THE WITNESS:  Yes.  I provided the services and
13  build something for a much better price.  After that, the
14  money I made out of this process is still considered to be
15  Mirage funding.
16       THE COURT:  Well, there's no doubt, there's no
17  dispute that the money at the start came from funds from
18  Mirage investors, correct?
19       THE WITNESS:  That's right.
20       THE COURT:  Okay.  And that was roughly $15 million,
21  right?
22       THE WITNESS:  That's right.
23       THE COURT:  In the end, it was used, and this is
24  undisputed as well, to help or to pay for work done on the
25  Emerald site, correct?

CMH   OCR   RDR   FCRR

108

1        THE WITNESS:  No.  First pay for the work done from
2   the Mirage site, Mirage site --
3        THE COURT:  Right.
4        THE WITNESS:  -- with me as a contractor.
5        THE COURT:  Okay.  But if this flow chart isn't
6   incorrect, at some point, some of these funds get used for the
7   Emerald site as well for work on the Emerald site, correct?
8        THE WITNESS:  Yes, but after I performed the work.
9        THE COURT:  Understood.
10       So your reasoning is that so long as the work got
11  done on the Mirage site, it was okay to use any other funds
12  from the Mirage investors to work on the Emerald site; that's
13  your view of it, correct?
14       THE WITNESS:  My view is I borrowed the money and,
15  you know, I build that part of the work.
16       THE COURT:  What part of the work?
17       THE WITNESS:  The Mirage work.
18       THE COURT:  So once the Mirage work is done, you can
19  take whatever is left of those investor funds and put it in
20  another project?  Is that your view or is that consistent you
21  think with your fiduciary duty to the Mirage investors?
22       THE WITNESS:  Yes.  If I don't do that, other people
23  perhaps charge double so the investor money might lose more.
24       THE COURT:  So even though the Mirage investors
25  didn't know that you were taking whatever was left over from

CMH   OCR   RDR   FCRR

109

1  their investors fund for another project, you think that that
2  was your fiduciary duty to the Mirage investors?
3  THE WITNESS:  Yes, because I charged half, yes.
4  THE COURT:  Go ahead, Mr. Stoelting.
5  BY MR. STOELTING:
6  Q    And just to be clear, the Emerald, Eastern Emerald money
7  didn't start coming in until 2014, right?
8  A    That's right.
9  Q    So you wanted to buy that property on Northern Boulevard.
10  That was the, the Mirage money was the only money available to
11  you so that's why you had to use it, right?
12  MR. KAMELI:  Judge --
13  Q    Because there was no Eastern Emerald money in 2013?
14  THE COURT:  Let's take a break.  You can reask that
15  question when we start again.  This witness has certainly been
16  on the stand for a long time.  So, folks, I'll give you an
17  hour.
18  Mr. Xia, you can step down.
19  I do want to talk about timing, folks, because I
20  don't think I appreciated when we set aside this day for the
21  hearing that there would be this many potential witnesses.
22  So let me ask the SEC first, how many of the nine
23  witnesses you've listed do you intend to call?
24  MR. STOELTING:  Your Honor, just two more.  Apart
25  from Mr. Xia, we have Mr. Peeler, the Monitor, and

CMH    OCR    RDR    FCRR

110

1  Mr. Dhookie, a summary witness, and I will, I'll try to finish
2  up as quickly as I can after lunch.
3  THE COURT:  No, of course, but then the other side
4  has the right to cross-examine if they want to or perhaps more
5  in the vein of redirect.
6  All right.  So the defense, do you intend to call
7  any of the witnesses on your list which is somewhat
8  duplicative -- not really.
9  Ms. Verfenstein, is she going to be called?
10  MR. KAMELI:  She may and Mr. Freeman are going to be
11  called but I believe, Judge, the way they are going, the whole
12  day is going to be spent with Mr. Xia.  I mean, I'm not
13  done -- I haven't started asking questions.
14  THE COURT:  How long do you anticipate questioning
15  Mr. Xia?
16  MR. KAMELI:  Two to three hours.
17  THE COURT:  All right.  Well, folks, we should think
18  of another day then that we're going to have to carry this
19  over to eventually.
20  Please, Mr. Kameli, let's not retread everything
21  that's been said on direct.  I understand that you may want
22  him to clarify or supplement some of his answers on direct.
23  I'll obviously give you free rein.  So that does seem like
24  it's going to take us to the end of the day.  Over lunch, talk
25  amongst yourselves.  See if you can come up with some other

CMH    OCR    RDR    FCRR

111

1  dates so that we can continue.
2  MR. KAMELI:  Is Your Honor available tomorrow?
3  THE COURT:  I don't know.  I think we've got a
4  number of things scheduled.
5  All right.  So we're going to reconvene tomorrow.
6  Let's start earlier though subject to the court reporter's
7  availability.  Let's say 9:30.  And now we're going to take a
8  break at noon because I've got a sentencing until 2:00 because
9  it might take a little time and then we'll reconvene at 2:00
10  and go the rest of the day.
11  So with that, I'll see you folks at 2:15.
12  (Luncheon recess.)
13
14
15
16
17
18
19
20
21
22
23
24
25

CMH    OCR    RDR    FCRR

112

1  AFTERNOON SESSION
2
3  (In open court.)
4  (Parties present.)
5  (Witness takes the witness stand.)
6  THE COURT:  Have a seat, folks.  Mr. Xia, you are
7  reminded that you are still under oath.
8  THE WITNESS:  Yes.
9  THE COURT:  Mr. Stoelting, go ahead.
10  MR. STOELTING:  Thank you, your Honor.
11  EXAMINATION BY
12  MR. STOELTING:
13  (Continuing.)
14  Q    Mr. Xia, we were talking about Plaintiff's 96.  Do you
15  have that in front of you?
16  A    Yes.
17  Q    So I should, I think this morning I was quantifying the
18  amount of Mirage funds that went to purchase the Emerald
19  land at 15, it actually should include the 1.7 million on
20  the first page with 15.3 on the second page which totals
21  $17 million of Mirage funds that went to the purchase of the
22  land, that Eastern Emerald land.
23  So just looking at the way these funds arrived
24  at would eventually transfer to the seller, you see the
25  final transfer come from Racanelli accounts?

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*

113

1   A   Yes.

2   Q   Okay.  And you had said that you had said you had no

3   control over Racanelli, correct?

4   A   No, I have no control over Racanelli.

5   Q   But at this time in 2013 was when Ms. Yue, your wife,

6   was the authorized signer on these two Racanelli accounts,

7   right?

8   A   She's not.

9   Q   Well, we could go back to the exhibit that shows that

10  she was authorized to sign on these Racanelli East-West

11  accounts ending in 5028 and 1555.

12          Do you remember looking at that exhibit this

13  morning?

14  A   Yes.  But nobody knows that.

15  Q   I'm sorry.

16  A   We didn't know that.

17  Q   You didn't know that?

18  A   No.

19  Q   So when East-West Bank was calling your wife over and

20  over and over over a period of four years asking her to

21  authorize transfers out of the Racanelli account that we saw

22  on Exhibit 172, I believe, that didn't tell you that she was

23  the only person that was authorized to make transfers out of

24  the Racanelli account?

25  A   No, you can look at the deposition.  No, in 2019 that

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

114

1   was in the deposition with SEC.  I'm not aware of this

2   **situation at all.  At that time, I only know there was one**

3   **account in 2019 and I still remember during the deposition I**

4   **was shown ten or I don't know how many accounts there but I**

5   **just don't know that at all.  I don't typically even get**

6   **involved into the bank transactions because of the work I'm**

7   **doing.**

8   Q   Well, what deposition are you talking about?

9   A   **The 2019 deposition.**

10  Q   The SEC investigative testimony?

11  A   **That's right, yes.**

12  Q   Okay.  Well, looking back at Exhibit 96, weren't you

13  the ones directing these transfers?

14  A   **No, I was the one who performed the services and didn't**

15  **collect the money.  So by the time I need to buy the land, I**

16  **want my service money paid to me.  I perform all the**

17  **services.  I believe that from the point I performed the**

18  **services, it's no longer loan proceeds or EB-5 money.**

19  Q   The question I'm asking is:  These are all bank-to-bank

20  transfers, right?

21  A   **That's right.**

22  Q   So why -- can you explain the rationale for cycling the

23  funds through four different accounts?  From the EMMCO

24  account to another EMMCO account and then to a

25  Fleet Financial account and then to Racanelli.  And then,

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

115

1   finally, to the seller for the 15.3 in December and to the

2   same thing in the June 23rd.  Why not just transfer directly

3   from the EMMCO Tower directly to the seller?

4   A   **No, the first EMMCO Tower, I think, is a savings**

5   **account and then it goes to a checking account.  Then, as a**

6   **loan, given to developer.  And then developer paid to the**

7   **contractor for the fee they already performed previously**

8   **given the last year or two because I am the, you know, the**

9   **largest investor into the project.**

10          **So I typically don't ask them for the fee**

11  **until it's necessary.  Then Racanelli paid the overdue fee**

12  **to my entities and that's money we earned by performing a**

13  **lot of valuable services.  And from that point, either me or**

14  **a third-party, they perform the services that earn the money**

15  **they use the earned money to buy the land.**

16  Q   And why would Racanelli spend 15 -- transfer

17  $15 million to buy the Eastern Emerald land?

18  A   **Because we would step in as a subcontractor to perform**

19  **all the foundation services and Racanelli owe us those**

20  **moneys.**

21  Q   Owed who the money?

22  A   **Owe my entity who performed the services for the**

23  **project.**

24  Q   Which entity?

25  A   **X & Y.  And as there's a couple of, you know, we have**

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

116

1   **four entities perform services for the project at that time.**

2   Q   And are there invoices and documents, documenting all

3   the services that you are describing?

4   A   **Yes.**

5   Q   And where are those invoices?

6   A   **It's already been produced to the SEC.**

7   Q   Okay.  So all invoices have been produced to the SEC,

8   right?

9   A   **That's right.**

10  Q   Could you look at PX-114, Plaintiff's Exhibit 114.

11  A   **(Complying).**

12  Q   You got 114 in front of you?

13  A   **Yes.**

14  Q   Okay.  And you're familiar with 57-35 Lawrence Street?

15  A   **Yes.**

16  Q   That's an apartment that you owned?

17  A   **That's an apartment I built, I developed.**

18  Q   Okay.  And there was a mortgage on that property,

19  right?

20  A   **Yes.**

21  Q   Okay.  And you see this chart shows payment from EMMCO,

22  LP to Fleet Financial to Racanelli to JiQing and then loan

23  payoff based of $819,000 in April 2012?

24  A   **Yes.**

25  Q   Do you have any reason to doubt that this accurately

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

117

1  describes these transfers?
2         MR. KAMELI:  Counsel, what exhibit was that?
3         MR. STOELTING:  114.
4  A   No, there's no doubt about that.
5  Q   So why were Eastern Mirage investor funds used to pay
6  off the mortgage on a building that you owned that's not
7  related to the project?
8  A   It's actually related.  If you look at the mortgage,
9  when I complete a building, there's no mortgage on it, it's
10 free and clear.
11        In 2010, before the EB-5 money came into the
12 project, I actually mortgaged my own property for $900,000
13 and send all the money for the project development and the
14 construction design.
15        On top of that, JiQing Development is another
16 entity who performed a lot of valuable services but never
17 actually take the money until two years later because that
18 loan interest was too high.  It's taken at the time after
19 the deep financial crisis.  So we decided to take the
20 service value to pay off that mortgage.
21        So from the beginning to the end, those monies
22 had been used for the project, plus services to provide into
23 the project.
24 Q   Services that who provided?
25 A   JiQing Development.

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

119

1  transfer of investor money directly from the limited
2  partnership to pay off a mortgage on 57-35, right?
3  A   No, I disagree.  The yellow box is the investor money,
4  no doubt.  And then from yellow box to Fleet Financial is
5  loan proceeds and from Fleet Financial to Racanelli.  It
6  becomes a service that Racanelli provides through my entity,
7  JiQing Development.  JiQing provide a lot of services
8  detailed in those invoices and accumulated expenses by that
9  time I believe it's a lot more than this.
10        But we are -- as I said before, we have a lot
11 of skin in the project, so we try not to take the money if
12 we don't need that.  So all the service value we just park
13 there, and by the time the mortgage interest rate is really
14 too high, and it's already insured at that time, but we have
15 we have no choice to pay them back.
16        The timing was we were running the project.  A
17 lot of time we only have a very short time period of just
18 trying to meet the bank requirements to pay off the
19 mortgage.  It doesn't mean, like, the services hadn't been
20 provided.
21 Q   So there should be invoices from JiQing Development to
22 Racanelli that would justify a transfer of $819,000?
23 A   Yes.  Actually, more than that, yes.  The service value
24 is a lot more than that.
25 Q   So when you say employees of JiQing, you have a number

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

118

1  Q   JiQing Development.  And who works for
2  JiQing Development?
3  A   At that time, I don't remember but JiQing Development
4  does provide all the invoices in that time period to SEC
5  during the investigation time period.
6         THE COURT:  Can I clarify your testimony?
7  So it's your testimony that the property you owned
8  you mortgaged it for $900,000 to get money for the Mirage
9  project.
10        THE WITNESS:  That's right, yes.
11        THE COURT:  And is there a paper trail that shows
12 that?
13        THE WITNESS:  That's right.
14        THE COURT:  And was that produced to the SEC?
15        THE WITNESS:  Yeah, on the bank records, it's very
16 clear.  The money comes out, take out the closing fee.  Then
17 gave to the Fleet Financial Group and Fleet paid the
18 designer, paid for the contractors, paid for everything.
19        THE COURT:  For the Mirage project?
20        THE WITNESS:  For Mirage project.
21        THE COURT:  Go ahead, Mr. Stoelting.
22 EXAMINATION BY
23 MR. STOELTING:
24 (Continuing.)
25 Q   This chart isn't reflecting it's reflecting the

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

120

1  of entities, right?  There's Manekineko, there's
2  Amazon River, Shangri-La 9F, Shangri-La Green.  All those
3  entities that you own and control, right?
4  A   Yes.
5  Q   Okay.  And all those entities have the same employees,
6  right?
7  A   Not necessarily.
8  Q   Well, you don't have separate employees for JiQing,
9  separate employees for Manekineko, separate employees for
10 Amazon River.  Everybody works for all of them, isn't that
11 right?
12 A   No.  JiQing is actually the development company who
13 developed that 57-35 Lawrence Street condo building and they
14 do have their own employee contractor labor to build that
15 building.
16 Q   All right.  Could we look at Exhibit 71, please.  Do
17 you have Exhibit 71 in front of you?
18 A   Yes.
19 Q   So this is an e-mail between you and Paula Arroyo of
20 Goldman Sachs.
21        You know Ms. Arroyo?
22 A   Yes.
23 Q   Okay.  And you had negotiations or discussions with
24 Goldman Sachs over several years, correct?
25 A   Yes.  They provided the loan terms and we're trying to

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

121

1  also work on the financing together, yes.

2  Q    But you never actually got any loan from Goldman Sachs,

3  did you?

4  A    They were very interested in providing me the loan for

5  the project.  But after SEC got the term sheet and send

6  their subpoena over, they stopped contacting me.

7  Q    So it's the SEC's fault you never got a loan from

8  Goldman Sachs?

9  A    No, it's not SEC's fault.  I'm just stating a fact

10  because when Goldman Sachs people visit my project, they

11  were very excited back in 2018.  They were telling me, we

12  were planning to give you $40 million bridge loan.  And at

13  the moment you got the C of O, we were planning on providing

14  you a $160 million loan.

15         And as part of the examination I provided all

16  my terms sheets including Goldman Sachs and many other

17  lenders.  But right after I provide that, I was told that,

18  you know, SEC send subpoena off to all of these financial

19  institutions.  So virtually all possible financial

20  institutions stopped picking up my call.

21         MR. STOELTING:  One moment.

22  Q    I just want to review this e-mail quickly.  If you

23  could turn to the last page.  Just for the record, the

24  redactions in this e-mail were on the e-mail when we

25  received it pursuant to an investigative subpoena from

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*

*Official Court Reporter*

122

1  Goldman Sachs.

2         So there's an e-mail from you to Paula Arroyo

3  and it says, I am buying something for my parents.

4         Does that refer to an apartment at

5  Madison Park in Manhattan?

6  A    No.

7  Q    All right.  So let's flip to the next page.

8         THE COURT:  What were you trying to buy for your

9  parents?

10         THE WITNESS:  It's a house in Long Island.

11         THE COURT:  Where in Long Island.

12         THE WITNESS:  In Sands Point.

13         THE COURT:  Okay.  So you were trying to get a

14  loan from Goldman for a house for your parents in

15  Sands Point?

16         THE WITNESS:  That's correct.

17         THE COURT:  According to the e-mail, it says you

18  wanted to us the EB-5 investment money; is that correct?

19         THE WITNESS:  No.

20         THE COURT:  All right.  Well, go ahead.  I just

21  read ahead in the e-mail.

22  A    No.

23  Q    So just working through these e-mails.

24         Then Ms. Arroyo responds:  Hi, Richard.  On

25  June 22, 2020, I think it can be done but Goldman is not the

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*

*Official Court Reporter*

123

1  best answer since we only do residential mortgage for

2  clients these days.

3         And then you respond on June 22nd:  If you

4  mean deposit client, we can be your client, too.

5         And then she responds:  Our minimum is 25

6  million at Goldman.  It doesn't have to be cash, it can be

7  stocks, bonds, other securities.  Ironically, for a larger

8  commercial real estate loan we could be more flexible on

9  minimums.  But for a smaller mortgage, we'd have to stick

10  with our normal number.  We would, of course, love to open

11  an account with you, please let me know.

12         And then you respond:  That should be okay.

13  Has it to be personal account or a company account.

14         And then she says:  If it's a company owned by

15  you, that is okay.

16         Then you say:  Sure, I can do that.

17         And then, on the first page, still on

18  June 22nd.  Ms. Arroyo:  Okay.  And one more question, is it

19  an operating company, highly transactional or more of an

20  investing entity.

21         And then you respond:  It is my development

22  company.  This is just not much transaction at all.  It, us,

23  the loan proceeds from my EB-5 entity to my development

24  company, and it's been sitting on my development entity

25  account for years.

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*

*Official Court Reporter*

124

1         And then she responds, Ms. Arroyo.  If it's

2  EB-5 money, unfortunately, it doesn't work.  It has to be

3  yours personally/your family's money.

4         And then your response is:  What is the

5  definition of EB-5 money?  It is in the bank account of my

6  entity and I use my property as collateral for it.  If GS

7  lends me money and deposit into my bank account with my

8  hotel as collateral, will it still be considered as GS money

9  or GS investor deposit money?  I feel it is a loosely

10  defined term to called it EB-5 money.  It has belonged to my

11  entity and I deposit them all into different bank.  It does

12  not seem to be called EB-5 money from their perspective.

13  Maybe GS has a different standard I'm not aware.

14         That's an e-mail you sent on June 22, 2020?

15  A    Yes.

16  Q    Following up on your earlier testimony, I thought you

17  said that JiQing employees did work that, in connection with

18  the Lawrence Street mortgage, represented compensation for

19  work done by JiQing employees.  Is that your testimony?

20  A    Yes.

21  Q    Okay.  How many employees does JiQing Development have?

22  A    I don't remember, it's too long time ago.

23  Q    I just want to read an excerpt from your deposition

24  last Monday on June 27th.

25         I want to read an excerpt from your

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*

*Official Court Reporter*

125

1   investigative testimony, not your deposition, which was in
2   June 2019.
3           This is on Page 66 and 67 of the transcript.
4           "QUESTION:  Who owns JiQing Development?"
5           "ANSWER:  I own it."
6           "QUESTION:  I'm sorry."
7           "ANSWER:  I own it."
8           "QUESTION:  And where is that company
9   located?"
10          "ANSWER:  That company is in the Lawrence --
11  57-35 Lawrence Street."
12          "QUESTION:  When was it established?"
13          "ANSWER:  It's probably 2004."
14          "QUESTION:  And does it have separate
15  employees?"
16          "ANSWER:  No."
17          "QUESTION:  Separate contractors?"
18          "ANSWER:  Yeah, there's FAA consultant.  All
19  different, all different type of consultant."
20          "QUESTION:  Do you receive a salary from
21  JiQing Development?"
22          "ANSWER:  No."
23          "QUESTION:  Does your wife?"
24          "ANSWER:  No."
25  Did you give those answers to those questions in

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*

*Official Court Reporter*

126

1   your investigative testimony?
2   A   Yes, I did.  But after that deposition, I came back and
3   checked the record.  I find out JiQing Development actually
4   have H1 employee and has a project manager which I didn't
5   remember by the time I'm making, you know, I'm giving the
6   deposition.
7           But now I'm sitting here answering your
8   questions, JiQing Development did have employee and they had
9   to sponsor, I think, a designer for an H1 visa.  And they
10  have a project manager and I think they have a couple of
11  contractors who build that project because at that time I
12  just don't remember it clearly.
13  Q   What was the document that you looked at after the
14  testimony that told you that?
15  A   I just looked at the rider and find out that
16  JiQing Development sponsor H1 employee and also have a
17  contractor project manager, contractors, yes.
18  Q   A project manager?
19  A   Yes.
20  Q   But your testimony is that JiQing does not have
21  employees and you said no.
22          Did that -- so you're saying now they did have
23  two employees?
24  A   Yeah, minimum.  Because I was going to that
25  deposition --

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*

*Official Court Reporter*

127

1           MR. KAMELI:  Objection as to what period of time.
2   This is going on from 2012 to 2019 when he was deposed and
3   we're sitting in 2022.
4           THE COURT:  Why don't you clarify timeframe.
5           I think the company was created in 2004; is that
6   right?
7           THE WITNESS:  That's right, yes.
8           THE COURT:  And for how long did it have an
9   employee, from the beginning or later?
10          THE WITNESS:  In the middle.  When
11  JiQing Development started building the project and
12  JiQing Development got involved into the Mirage project,
13  they're providing some development design services.  And
14  that's why they hired a couple of employees to provide that
15  services and one of them need an H1 for visa sponsorship.
16  Q   So those two employees are the ones that build close to
17  a million dollars in fees that was used to pay off that
18  mortgage?
19  A   I don't know how to answer that question.  They do have
20  employees, just two employees, and they were consultant and
21  contractor.  And I am named person also working for that
22  part, too.
23  Q   All right.  Could we look at Exhibit 6, please.  It's
24  the EEGH offering memo.  Would you look at Page 6-11.
25          So this says, this talks about you see, you

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*

*Official Court Reporter*

128

1   have Page 6-11 in front of you?
2   A   Yes.
3   Q   Okay.  So you see the second paragraph that says the
4   original building is a 25-story, 640,180 square foot
5   structure?
6   A   Yes.
7   Q   Then the fourth paragraph down said, The completion of
8   project will result in a 29-story, 1,199,578 square foot
9   mixed-use commercial building.  Do you see that?
10  A   Yes.
11  Q   So you were planning on increasing the size of the
12  Emerald project to over 1.1 million square feet is what this
13  is disclosing, right?
14  A   That's right, yes.
15  Q   Would you look at Plaintiff's Exhibit 40.
16          THE COURT:  Do you have Exhibit 40 in front of
17  you?
18          THE WITNESS:  Yes.
19  Q   Do you recognize this?
20  A   Yes.
21  Q   This is the planned work application, right?
22  A   This application I submitted as architect of record of
23  the Emerald project to apply for the architectural plan
24  review.  Yeah, it has my seal and the signature.
25  Q   Right.  And so, that's on Page 40-4, right, that's your

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*

*Official Court Reporter*

129

1 signature?

2 A   That's right.  My signature under my, yeah, yeah.

3 Q   Okay.

4 A   My engineer's seal, yes.

5 Q   And, on the other page, is property owner's statement
6 and signatures.  Eastern Emerald Group looks like JiQing Yue
7 signed this document, also?

8 A   Yes, JiQing Yue.  Yeah, my wife.

9 Q   So if you could look at Page 40-3?

10 A   Yes.

11 Q   You see on the top left where it says, "Zoning
12 Characteristics"?

13 A   Yes.

14 Q   And you see where it says, "Proposed Totals"?

15 A   That's right.

16 Q   And that's 350,186 square feet, right?

17 A   That's right.

18 Q   So that's what you were telling the Department of
19 Buildings was the size of the Eastern Emerald project at
20 that time?

21 A   No, that's totally different concept.  As you just
22 pointed out, zoning characteristics.  So the area indicating
23 over here, as a professional, I can tell you is a looming
24 square footage, it's not building square footage.  Zoning
25 square footage in the definition of the New York City

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

130

1 Building Department's website you can check it doesn't
2 include any floor area underground.  Also, it doesn't
3 include any area, not more than 50 percent enclosed, and any
4 mechanical space, any roof, terrace, won't be counted.

5        So, in the real building, the building square
6 footage is going to be sometimes two times, much bigger than
7 the zoning square footage.  Zoning is a benchmark for the
8 design standard, that's number one.  Number two, if you look
9 at Page 40-2 and then next to it, it shows, Proposed
10 11-story new building.  That's in the year 2014 and we are
11 doing the Brownfield remediation.  The contamination soil is
12 down to the bottom of the 50 feet from the ground level.  In
13 order to dig down to that depth, me, as a professional, we
14 submit our application to the building department for, as of
15 right building, in order to get a permit so we can complete
16 or start the Brownfield excavation work.

17        As a matter of fact, in June 2014, we also
18 submitted a request to New York City City Planning and also
19 to the BSA, Board of Standards and Appeals, request an
20 increase to looming FAR to 15 and the land size is 72,000
21 square feet.  If you times 72 by 15, that's exactly
22 one million square feet even for the zoning square footage.
23 And I think I already submit all this information to SEC and
24 here, it's just because I am a design professional so I can
25 have my project move quicker by filing application, then we

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

131

1 can start doing the foundation.

2        So that's the whole scenario and beneficial to
3 understand why the zoning square footage we list as 350,000
4 square feet, but on my offering memorandum it lists as
5 one million square foot.

6 Q   But even including all the things you're saying, the
7 mechanical, there's no way you get anywhere close to one
8 million square feet, do you?

9 A   No, that's not the answer.  The answer is the building
10 square footage can be more than this.  But, at the same
11 time, as I make that statement I made to the investor, we
12 did submit the application to the New York City City
13 Planning and the Board of Standards request increase to 15
14 of the land size.  That equivalent to 1.07 or 1.2 million
15 square feet, zoning square footage.

16 Q   When was that application submitted?  When?

17 A   Starting from June 2014 and all the way, I think,
18 because that's my plan that all the way in 2015, '16 we're
19 trying to negotiate with New York City City Planning to get
20 a higher FAR and a higher zoning square footage.

21        In the meantime time, because of this
22 application, we can proceed with the Brownfield remediation
23 because Brownfield is mainly underground work, it won't
24 affect anything above ground.

25 Q   All right.  Could you look at Plaintiff's Exhibit 42.

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

132

1        So this is another plan work for the
2 Eastern Emerald site and this one, if you look at 42-5, is
3 dated May 2021?

4 A   Yes.

5 Q   Okay.  And you see the proposed total is 382,367 square
6 feet on Page 42-3?

7 A   Yes.

8 Q   So from 2014 to 2021, the square footage of the
9 Eastern Emerald site didn't really increase except slightly
10 from 350,000 to 382,000, right?

11 A   That's right.

12 Q   And if we look at -- I just want to look about when the
13 investor money was coming in on Plaintiff's 48.

14        This is Plaintiff's 48, this is the Paul
15 Ribodeau report prepared by the defendant's expert during
16 the investigation.  And it sets out all of the -- how much
17 -- it sets out all the money received from each investor and
18 all five offerings, and I just wanted to focus on Emerald.

19        So if you look at 48-18?

20 A   Yes.

21 Q   Okay.  So I see the initial planned work we looked at
22 with 350,000 square feet was 2014.  So you see this all
23 investor money coming in during 2014, 2015.  And then if you
24 continue on to 48-25:  2016, 2017, 2018, 2019.

25        So all those investors were -- all those

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

133

1    Eastern Emerald investors were putting money in based on the
2    representation of 1.1 million square feet, right?
3    A    That's right.
4    Q    And then could you look at Plaintiff's 49.  So this is
5    an article from March 2015 from the Times-Ledger.  It says
6    that Xia's Corona project scales down to hotel.  And then it
7    quotes you as saying in the fourth paragraph, The reason we
8    scaled down because we're trying to take more
9    consideration about the existing traffic in the area.  It's
10   no longer a convention-- said Fleet Financial Group
11   President Richard Xia said.  It's no longer a convention
12   center but a conference hotel that will still take advantage
13   of the proximity.  Xia could not go into any great detail on
14   the specifics of the Eastern Emerald Hotel because, "The
15   project is still in its early design phase."
16          Is that an accurate quote?
17   A    Yes, that's an accurate quote.
18   Q    So, in 2014, you were scaling down the project, you
19   weren't increasing the square footage; right?
20   A    No, scaling down doesn't mean scaling down the square
21   footage because that's a part of the reason.
22          Initially, we were asking for 15 FAR.  That
23   means more than one million square feet, zoning square
24   footage.  Then we got a strong opposition from the
25   community.  Their main concern was the building was too

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*

*Official Court Reporter*

134

1    high, it was blocking the water view.
2          So that's part of the portion we were trying
3    to explain to the community.  We won't take, you know, their
4    concern into consideration to scale down from 29-story to a
5    25-story and not provide the convention services because of
6    the traffic.  But the square footage, I think, in 2015 we
7    are still pursuing that 15 FAR.  All the way I think to 2016
8    to '17.
9          And that's why I was trying to explain to the
10   Court and SEC before, the real estate development is highly
11   unpredictable in New York City.  And we were -- we have done
12   lot of work with the City Planning these -- Board of
13   Standards and Appeals for 8 FAR for, eventually, like a 5
14   FAR or commercial.  It's a very difficult negotiation
15   process where I'm trying to balance these community concerns
16   and view.
17          So, eventually, in 2021, we got the special
18   height permit.  We got height but we didn't get the variance
19   for the zoning.  But like I was explaining to you before,
20   underground portion is a 73,000 square feet site.  We're
21   already doing excavation down to 55 feet, that's almost like
22   five stories.  Five stories times 73,000 square feet.
23   Underground square footage is already close to additional
24   400,000 square feet plus the zoning forget about, you know,
25   the enclosed mechanical space.  Just add zoning 330, that

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*

*Official Court Reporter*

135

1    already gives you a 780,000 square feet building.
2          As of August 13, 2021, my drawing was already
3    fully approved by building department.  And that building
4    site, I can tell you right now, is 910,000 square feet,
5    building square footage above ground and below ground.  Even
6    though zoning was still showing 380.  That's a typical
7    design which I, as a design professional, I'm very confident
8    the number put it on the application is for the zoning
9    purpose.
10          The real building, even though we didn't get
11   15 FAR, 8 FAR, I can tell you right now it's very close to
12   the promise I made to my investors five years ago.
13   Q    Okay.  And that increase was obtained in August 2021
14   you said?
15   A    August 13, 2021.  We got the BSA height permission
16   approved by the end of 2020 and got the final certificate of
17   completion of the Brownfield by the end of 2022.
18          So, from there, eight months.  You can ask any
19   design professional, it's pretty hard to approve a 910,000
20   square foot building and we got it done.  Actually, as a
21   matter of fact, the day we came to this court,
22   September 27th, next morning is my ground breaking ceremony
23   for my building we planned for a month.  I was very exciting
24   to actually being able to delivery this building after so
25   many years of negotiation, after the pandemic, and after the

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*

*Official Court Reporter*

136

1    explosion on Northern Boulevard.
2          So that's why real estate development is
3    highly unpredictable.  If you look at the memorandum in
4    five, seven years ago I'm sure there's a lot of different
5    issues we have to deal with along the way.
6    Q    Some your entities acted as subcontractors on both
7    projects?
8    A    Yes.  Architect of record of record and principal for
9    this two-rung design approval for Emerald project.
10   Q    So the subcontractors would be Samuel Development,
11   X & Y Development, Shanri-La Green, Shanri-La 9D,
12   Shangri-La 9F, JiQing Development, Amazon River,
13   Manekineko Group?
14   A    Yes, that's right.
15   Q    Those are all entities that you own and control?
16   A    Yes, but, you know, you're talking about 10 years or
17   12 years.  Some of the entities provide services during, you
18   know, like 2010, 2015.  And some of the entities provide
19   services in, like, 2015, 2018.  So it's not like at any
20   given time I have an entity provide a service to the
21   project.  It's, you know, everything we're talking about is
22   10, 12 years development history for both projects, yes.
23   Q    And do any of those entities maintain general ledgers?
24   A    We use Excel spreadsheet.  I don't know how you call
25   it.  We basically using Excel spreadsheet to maintain the

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*

*Official Court Reporter*

137

1  record of our business.
2  Q    Okay.  So each one of these entities would have a
3  separate spreadsheet for the last ten years showing each
4  payment in and payment out?
5  A    Yes.  Yeah, we have it.  We have it.  We have to rely
6  on the bank statement and spreadsheet to attract a project
7  and business expenses.
8  Q    And which employee maintains the spreadsheets?
9  A    It's mainly, you know, it's mainly me.  And I have
10  basically converted them into Excel spreadsheet.  And
11  that's, you know, my business is relatively simple.  We're
12  just doing, you know, project development and we don't have
13  investors, owners into the project.  It's almost like a
14  warehouse.  As long as I can control the gate, interior-wise
15  we don't need a very complicated system to track those
16  expenses.
17  Q    So you personally maintain these Excel spreadsheets?
18  A    Yeah, you know, every month the bank statements.  One
19  of my majors is computer information systems.  So I can
20  convert them quickly into the Excel and compile them
21  together and just look at the number I know.  And also, I'm
22  fully involved into every details of the, you know, each
23  entity's business.  So I already know that, you know, very
24  much into all the details.
25  Q    So the workers for that do the work for all of your

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

138

1  entities, how do you pay them?
2  A    I pay them through ADP.
3  Q    Don't you pay them in cash and you buy them lunch?
4  A    On the construction job site that's typical.  You have
5  to buy lunch for technical and, you know, like technical
6  laborers, yeah.
7  Q    So you pay the workers primarily in cash, right, at the
8  end of day?
9  A    No.
10  Q    No?
11  A    No.
12  Q    Didn't you tell the monitor, Scott Peeler, that you pay
13  the clerk, cash and buy them lunch?
14  A    The workers need to have lunch.  We just gave them --
15  but that's a very typical on the construction site.  I'm not
16  paying them for the -- I'm just giving them money so they
17  can buy lunch.
18  THE COURT:  The question is:  How do you pay their
19  salaries for their work, in cash?
20  THE WITNESS:  No.
21  THE COURT:  You claim you pay them through ADP?
22  THE WITNESS:  ADP, yeah, all my employees I pay
23  through ADP.
24  THE COURT:  Do you have records for that?
25  THE WITNESS:  Yeah.

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

139

1  THE COURT:  Did you produce those to the monitor,
2  Mr. Peeler?
3  That's not a difficult question.  Did you give
4  your ADP records for your all of your entities to
5  Mr. Peeler?
6  THE WITNESS:  You're asking me.  ADP records, I
7  gave to the SEC.  And Scott Peeler, I don't know if he had
8  ever asked me for that.
9  THE COURT:  Go ahead, Mr. Stoelting.
10  EXAMINATION BY
11  MR. STOELTING:
12  (Continuing.)
13  Q    So you don't recall telling Scott Peeler you pay your
14  workers in cash?
15  A    No.  I was telling them in order to maintain the job
16  site, maintain the workers working in a good spirit, we gave
17  them lunch money.  And sometimes, we give them the money to
18  buy more stuff.  So it's on the job site there's
19  nothing -- you need a lot of things we call petit cash every
20  pay.  People cannot pay wait for the concrete and pump truck
21  and many, many things.
22  THE COURT:  I just want to make sure your
23  testimony under oath on the record is clear.
24  You're denying that you pay your workers for all
25  these different subcontracting entities in cash as their

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

140

1  salary, you're denying that?
2  THE WITNESS:  That's right.
3  THE COURT:  You say you pay them through ADP and
4  you take out appropriate taxes for them, et cetera?
5  THE WITNESS:  Yes.
6  THE COURT:  Okay.  And you claim also that you
7  gave those records, the ADP payroll records, for all your
8  entities to the SEC so they should have them.
9  THE WITNESS:  They should have the ADP records.
10  THE COURT:  Did you give them to them?
11  THE WITNESS:  I don't remember if they asked me
12  for that.  Yeah, I gave to Scott Peeler, too, the ADP
13  payroll records because my employees was, you know, the I
14  got the asset freeze, ADP still pay my employees for half
15  month, $50,000.  But because my account is frozen, ADP
16  didn't get money from my payroll account.
17  THE COURT:  But before the freeze, you're saying
18  ADP paid payroll for your workers?
19  THE WITNESS:  That's right.
20  THE COURT:  And you're saying to the extent you
21  may have said to Mr. Peeler that you gave cash for lunches
22  to the workers on site, is your testimony under oath only
23  that you gave cash that you could buy lunch on site.
24  THE WITNESS:  That's right.
25

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

141

1    THE COURT:  All right.  Go ahead.
2  EXAMINATION BY
3  MR. STOELTING:
4  (Continuing.)
5    Q    Do you recall if the Excel spreadsheets that you
6  talked -- that you described, were they produced to the SEC
7  at any time during the investigation, or after this case was
8  filed?
9    A    Yeah, I was -- I think in the beginning of 2018, I was
10  producing all those Excel spreadsheets.  Then the
11  instruction I got from SEC is they don't want any, I guess,
12  product we made we.  They just want the bank account.  We
13  don't want to any see other product.  And then we start
14  producing all the bank statements and everything to the SEC.
15    Q    So you're saying that someone from the SEC told you we
16  don't want the Excels, we just want the bank records?
17    MR. KAMELI:  Judge, I object.  That's not what he
18  said.
19    THE COURT:  That's the question.  Is that what
20  you're saying?
21    THE WITNESS:  Yes, that's from my counsel.  I was
22  told they don't like to see the Excel spreadsheets they like
23  the bank statements.
24    (Continued on the following page.)
25

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

---

142

1  (Continuing)
2  BY MR. STOELTING:
3    Q    So the people that you paid through ADP, were they
4  employees of Fleet Financial Group?  Is that -- isn't that how
5  you had that in your ADP records?
6    A    That's correct, yes.
7    Q    Okay.
8    So we have Exhibit 74, which is the ADP summary that
9  we have in the record.
10    So this summarizes the ADP records through
11  September 2020, beginning in 2011 with Fleet Financial Group
12  because this was being filed publicly, we redacted the names,
13  but is that your testimony, that those 33 names are the
14  employ -- every employee that worked for you from 2011 through
15  2019 doing this work?
16    A    Yes, that's the employee and W2, yes.
17    Q    And there were no other employees that you paid off the
18  books?
19    A    No, we have 1099.  Independent contractor employees
20  working, you know, part-time.
21    Q    And are those employees paid through ADP?
22    A    No, it's a 1099 employee.
23    Q    Okay.
24    So you just write them checks?
25    A    That's correct, yeah.

VB    OCR    CRR

---

143

1    Q    So you see JiQing Yu was paid $50,000 in 2012?
2    A    Yes.
3    Q    Okay.
4    And did she do work?  Was that compensation for work
5  she did or why was that money paid to her?
6    A    Yeah, I think at that time she was helping me a lot and
7  you see that year I only paid $17,000 salary.
8    Q    Okay.
9    And if we wanted to look back and see what work she
10  was doing, are there any records relating to that?
11    A    You mean her work?
12    Q    Yes.
13    A    I'm not sure I can, but here it was on the 11th and the
14  12th, there was a lot of work in that time for the project,
15  yeah.  Her project was starting at that time, to do the
16  construction.
17    Q    If you could look at Exhibit 92, please.
18    THE COURT:  I am sorry.  Before we get off of this
19  exhibit, though, who is Qiu Xia?  You have $710,000.
20    THE WITNESS:  That's me.
21    THE COURT:  Oh, I am sorry.  That is right.  That is
22  your name.
23    So in total you have paid yourself 710,000 over the
24  last ten years?
25    THE WITNESS:  Ten years.

VB    OCR    CRR

---

144

1    THE COURT:  And then your sister, the person
2  identified as your sister, got 309 --
3    THE WITNESS:  Yes.
4    THE COURT:  What did she get paid for?
5    THE WITNESS:  She is a civil engineer, working with
6  me all the time.
7    THE COURT:  And which company does she work for?
8    THE WITNESS:  Mainly for the Fleet and sometimes, I
9  guess, she's working -- she's working on my property
10  management company for the condo ideal.  She help me to manage
11  the board, you know, condo board.  As the president of the
12  condo board, she is handling a lot of data work for the condo.
13    THE COURT:  Okay.
14    And then above her is somebody who is listed as a
15  possible relative of yours.  Do you know who that is?
16    THE WITNESS:  That's my father.
17    THE COURT:  And he got paid 222,000.  What did he
18  do?
19    THE WITNESS:  Over ten years, yes.
20    THE COURT:  What kind of work did he do?
21    THE WITNESS:  She's a, you know, in China.  She's a
22  very senior electrical engineer.
23    THE COURT:  Your father?
24    THE WITNESS:  Yeah, my father.
25    THE COURT:  In China?

VB    OCR    CRR

145

```
1       THE WITNESS:  No, in here, right now.
2       THE COURT:  Oh.
3       THE WITNESS:  He came here -- before he came here,
4   she was -- he was senior electrical engineer, and she's, you
5   know, in charge of hundred thousand people in the company.
6       THE COURT:  Right.  But what is he doing here for
7   your company?
8       THE WITNESS:  Because my building is always trying
9   to do a --
10      THE COURT:  Stay close to the microphone.
11      You are claiming that your father did some work
12  relating to carbon emissions design.
13      THE WITNESS:  Electrical system.  Electrical system.
14  My building is, you know, it's a time building.  You go in and
15  the building can recognize you and the voice can show -- and
16  we use geothermal.  We use a battery system for emergency
17  generator and we actually, the curtain wall is a solar panel,
18  curtain wall.  So there's a very fancy, complicated electrical
19  system which my father is probably one of the best consultant
20  I can rely on to get this.
21      THE COURT:  All right.  Go ahead.
22      THE WITNESS:  Yeah.
23  BY MR. STOELTING:
24  Q   What is your father's name?
25  A   Guanyu Xia.
```

VB    OCR    CRR

146

```
1   Q   Can you spell that?
2   A   G-U-A-N-Y-U, X-I-A.
3   Q   Can you spell your sister's name?
4   A   Qiu Xing Xia.  Q-I-U, X-I-N-G, X-I-A.
5   Q   All right.
6       If you could look at Exhibit 92, please.
7       So this is a summary chart prepared by Raymond
8   Dhookie and it summarizes several things, but one of the
9   columns is payments to your affiliates.
10      If you look at section 3 Racanelli accounts to Xia
11  affiliates.  And you see on the far right there was
12  $25 million in payments to those affiliates for which there
13  was no invoice.  And you testified earlier that you had
14  provided the SEC with all of the invoices.
15      Can you explain why there would be 25 million paid
16  to Xia affiliates, presumably as subcontractors, for which
17  there is no invoice?
18  A   Yeah.  I think we identified each of -- I produced three
19  batch invoices in regarding to my affiliate entity back in
20  2019 from, I think, August to September.  And those total
21  amount of those invoice we calculate is $59 million.
22      Then in, I think in 2020, November 10th, 2020, and
23  my counsel told me she working things.  Counsel identified
24  more, you know, affiliated invoices and she produced, I guess
25  in November 10th, 2020, to SEC.  And they actually, I think,
```

VB    OCR    CRR

147

```
1   provide us those invoices with a Bates number on it.  And I
2   think those invoice total over $32 million.
3       So if you add the first 59, plus the 32, as I think
4   it's a well more than the $25 million invoices, you know,
5   Mr. Dhookie list over here.
6       I don't know what happened to those invoice has been
7   produced, but on our end, we did produce -- we did provide our
8   invoices and our services has been called.
9       THE COURT:  I am sorry.  Which counsel are you
10  referring to?  Not the attorneys sitting here.
11      THE WITNESS:  No.
12      THE COURT:  So your prior counsel.
13      THE WITNESS:  Prior counsel.
14      THE COURT:  The one that --
15      THE WITNESS:  Marc Mukasey.
16      THE COURT:  The one that withdrew on the day that
17  complaint was filed?
18      THE WITNESS:  That's right.
19      THE COURT:  All right.  Go ahead.
20      The SEC knows better if they were in communication
21  with that lawyer.
22      MR. STOELTING:  Yeah -- it was actually, Your Honor,
23  it was about three weeks after the case was filed that Mukasey
24  withdrew.
25      THE COURT:  All right.
```

VB    OCR    CRR

148

```
1       MR. STOELTING:  So.
2   Q   Would you look at Exhibit 59.
3       Do you have Exhibit 59 in front of you?
4   A   Yes.
5   Q   This is the building loan and security agreement between
6   EMMCO and NQMC and Fleet Financial Group, right?
7   A   Yeah, but -- okay.
8   Q   Okay.
9       And if you look at the next page.
10  A   Yes.
11  Q   I want to direct your attention to the page 59-7.
12      Do you see where it says:  Stating maturity date
13  March 18, 2017?
14  A   I don't see it.  Where is it?
15  Q   On 59-7 where it says:  Stated maturity date?
16  A   Yes.
17  Q   Okay.
18      So the maturity date is the date the money has to be
19  paid back, right?
20  A   That's right.
21  Q   And I bet if you turn to the next page, 59-8, so this
22  says:  Repayment.  Borrower shall repay the entire outstanding
23  principal balance of the note in full on the maturity date,
24  together with any other amounts due and owing under the loan
25  documents.
```

VB    OCR    CRR

149

1    So this was a $30 million loan.

2    Was this loan paid back on -- in March 2017?

3    A    No.  This loan agreement was prepared at that time and

4    the counsel who representing all the EB-5 investor and he's

5    not sure about that if this loan agreement is going to satisfy

6    the USCIS requirements.

7    So eventually he decide, you know, basically do not,

8    you know, he don't use this loan agreement and we ask Linda

9    law office to prepare another loan agreement to make sure that

10    it will be exactly satisfy all the USCIS requirements to make

11    sure all the EB-5 investors can get green card.

12    So this is the previous version of loan agreement.

13    Q    All right.

14    Could you turn to Exhibit 60, please.  Okay.

15    So is this the new version of the NQMC loan

16    agreement?

17    A    Yeah, I believe so.

18    Q    Okay.

19    And you see the maturity date in section 1.4 on the

20    bottom is different, right?  It says:  The principal will be

21    due and payable as one lump sum.  Payment after date of 15

22    years of the date of the last advance, or the date all EB-5

23    investors have ceased participating in the program, whichever

24    is later.

25    So that's much different from the one we just looked

VB    OCR    CRR

150

1    at, right?

2    A    That's right.

3    Q    Okay.

4    So if we could look at the last page.  And this

5    purports to be executed on June 2013, correct?  On the first

6    page?

7    A    Yes.

8    Q    If you could look at the last page.

9    A    Yes.

10    Q    So there's your signature on behalf of the borrower and

11    your wife signed on behalf of the lender, right?

12    A    That's right.

13    Q    Okay.

14    And do you see the notary signature?

15    A    Yes.

16    Q    Okay.

17    And it says:  Commission expires July 19th, 2020?

18    A    Yes.

19    Q    Do you know how often notary publics are to renew their

20    license?

21    A    No.

22    Q    So I'll just represent it's every four years.  So if

23    her -- if this person's commission expires in 2020, then it

24    must have been renewed in 2016.

25    So how do you account for -- I mean, was this

VB    OCR    CRR

151

1    document signed in 2016 and not 2013?

2    A    I don't remember when was this loan agreement signed, but

3    in order for EB-5 investors get a green card, this loan

4    agreement got to be signed before they are going for their

5    green card application.

6    And the paragraph you just indicated that showing

7    that even on the -- on the paragraph it shows that the

8    investor has longer time to get their money back.  But in

9    order to satisfy the USS requirement also to make sure that

10    every participating EB-5 investor can eventually get their

11    green card, it's their main investment purpose.  We cannot

12    give out -- actually cannot pay back this loan until everybody

13    gets a permanent green card.  Because this loan, this loan is

14    not a loan from EB-5 investor to the LT.  This loan is the

15    from LT to the developer.

16    So because of the USS has risk requirement, the LT

17    cannot be dissolved and each individual EB-5 investor is

18    actually it has to be actual investor here.  So there's no

19    base for them to get the money back.  Even the loan has been

20    repaid into the LT.

21    And that's the reason this term to be carefully

22    prepared in the immigration consult to make sure that LT won't

23    be able to dissolve before everybody get a green card.  If the

24    LT is dissolved, because that's only, you know, possible way

25    to pay investor back.  If it's been dissolved before that,

VB    OCR    CRR

152

1    then the remaining investor, they can lose their qualification

2    to get permanent green card.

3    Q    Okay.

4    I think my question was just whether this was

5    executed in 2016.  But focusing on this notary public.  Do you

6    know this person, Guoyu Wang?

7    THE COURT:  Spell that for the court reporter.

8    MR. STOELTING:  G-U-O-Y-U, W-A-N-G.

9    THE COURT:  Wang is the second name?

10    THE WITNESS:  Yes, I know him.

11    THE COURT:  Him or her, did you say?  Do you know

12    him or her?

13    THE WITNESS:  Him.  Him.

14    THE COURT:  And that was the notary on both of these

15    agreements, 59 and 60.

16    THE WITNESS:  Yes.

17    BY MR. STOELTING:

18    Q    All right.

19    Did you ever ask Ms. Wang --

20    THE COURT:  If her notary signature was still valid?

21    Q    -- if her notary signature was valid and if she, you

22    know, must have signed this in 2016, if it expires in 2020?

23    A    Yes.  I think the investor had the lawsuit filed and the

24    one time he was in my office and asking about this, and he

25    looked at that.  He said these numbers, he says it's probably

VB    OCR    CRR

153

1  just mistake. I didn't really know. That's something he was
2  telling me. He told me it's a mistake.
3  Q   Well, isn't -- you are referring to the lawsuit by one of
4  the NQMC investors who wanted to be paid on the original
5  maturity date, right?
6  A   Yes, that's right.
7  Q   Okay.
8      And that litigation is still ongoing, right?
9  A   I don't know. If they're did -- I don't know.
10     THE COURT: I am sorry. Let me make sure I
11 understand.
12     What was a mistake? The date he put on the
13 expiration of his notary or --
14     THE WITNESS: Yeah, that's something he told me.
15     THE COURT: So what did he say?
16     THE WITNESS: I don't remember how, you know, the
17 conversation go. I don't -- I was asking him is there lawsuit
18 here. They are, you know, trying to say that we're and
19 particular change the date of maturity date, but I said, you
20 know, the notary is a big issue here and that's what he said
21 he looked at that.
22     THE COURT: Again, I am trying to understand.
23     So the loan agreement purports to be signed on the
24 26th of June 2013. Is that what you are saying happened? Was
25 this signed on June 26th, 2013?

VB    OCR    CRR

154

1      THE WITNESS: I think so. Because, you know, the
2  investor they need this loan agreement for their vacation,
3  yeah.
4      THE COURT: Even though the notary filled in the
5  expiration of his notary authority as 2020, you are saying it
6  had to have been 2016? And he got it wrong by four years?
7      THE WITNESS: I, for me, I didn't know even this
8  portion.
9      THE COURT: All right.
10     Go ahead.
11 BY MR. STOELTING:
12 Q   So Mr. Xia, we've talked a bit about your wife and her
13 role, and I think what you said today is that she did work in
14 the office regularly with you and Ms. Verfenstein?
15     MR. KAMELI: Objection as to time period.
16 Q   Say from 2013 to 2019?
17 A   No. That I think is, you know, from 2011 to 2013 and
18 '14, I guess, in that time range.
19 Q   Okay.
20     And after 2014 it changed?
21 A   Yeah.
22 Q   So when East West Bank was calling her every other month
23 for a four-year period from 2015 to 2018, she was taking those
24 calls at home?
25 A   I don't know. I mean, I -- for me, when I need to make a

VB    OCR    CRR

155

1  payment, I just call her and most of the time I don't direct
2  get involved in any of this, in her action with the bank.
3      THE COURT: For your company.
4      THE WITNESS: That's right.
5      THE COURT: And is it your testimony that even
6  though you said it was the bank's mistake when they listed
7  your wife as a signator for ten different Racanelli accounts,
8  you and she never talked about the fact that she is getting
9  all these calls asking her to authorize payments out of that
10 account? You had no idea that was happening even though,
11 according to you, that was all a big mistake.
12     THE WITNESS: The first time I know is 2018 and
13 before that, I have no idea even how the bank verified the
14 transaction confirmations. We are all in the same office.
15 She working has office for her company in my office and we
16 share an office.
17     THE COURT: Okay. Never mind. Never mind.
18     Go ahead, Mr. Stoelting.
19 BY MR. STOELTING:
20 Q   Well, could you look at Plaintiff's Exhibit 49 -- I'm
21 sorry, Exhibit 138, please.
22     So do you have Exhibit 138 in front of you?
23 A   Yes.
24 Q   This is a summary prepared by Mr. Dhookie summarizing
25 payments to JiQing Yu?

VB    OCR    CRR

156

1      Do you have any reason to question these numbers?
2  A   No.
3  Q   Okay.
4      So the approximately $4 million that was paid to her
5  from 2014 to 2019 from the Xia related entities, did she do
6  anything to earn that money or were they just payments?
7  A   Yeah, I did look at the tax record because I built the,
8  you know, condo and rental property before EB-5 project. And
9  lot of these entities, they are holding commercial or
10 residential condo, and every year they actually report the
11 rental income on their tax return.
12     So I check all my entities' tax return from 2011 to
13 2018, not including '19. Records show that the rental income
14 generated by all these commercial holdings, about $6 million.
15 And I think those is -- because my entity is not just the
16 entity who provided services to the EB-5 project. They are
17 all have a, you know, like a rental property and have rental
18 income every year.
19     I think, you know, the money who transfer to my
20 wife's account during all those years is, it's a rental income
21 we received and reported. It's not like other EB-5 project.
22 The only money who flow into the probably is EB-5.
23     Here, before that EB-5 project started, we have a
24 ten-year -- we developed buying the rental property, doing,
25 you know, many things. So those, after I check the record, it

VB    OCR    CRR

157

1  show that roughly from 2011 to 2018 is roughly $6 million
2  rental income.
3          And Fleet Financial, I explained before, is using
4  all these owned by me and my wife individually.  So every
5  month we still have a mortgage.  We have to pay for that.  And
6  we have to apply the rental to pay for the mortgage.
7  Q   So all of these accounts had investor money in them, all
8  of these affiliate accounts, correct?
9  A   Yeah, because they provide the services, yes.
10 Q   Okay.
11         So this $4 million was being transferred to accounts
12 that your wife -- in your wife's name was initially or
13 originally EB-5 investor money, right?
14 A   No.  The original money itself is more than $6 million.
15 Q   You mean -- well, rental from tenants of apartments that
16 you own?
17 A   Yes.  Not -- this company also owned rental property.
18 Commercial rental property, too.  So each month they collected
19 rental income, too.
20 Q   Okay.
21         But just so I'm clear, this is not payment for work
22 for your wife.  It's just transfers to accounts in her name;
23 is that correct?
24 A   That's right.  And she didn't use those money either.
25 She used those money to pay off the mortgage on all this

VB    OCR    CRR

158

1  property.
2          THE COURT:  But just so I am clear, all of those
3  accounts were also used to keep or hold investor EB-5 investor
4  money as well.
5          THE WITNESS:  No.
6          THE COURT:  None of these accounts that are on the
7  top part of that exhibit?
8          THE WITNESS:  No.
9          This account is the company who working in the
10 project as a subcontractor that provide the services to the
11 general contractor on the project.  They're not holding EB-5
12 money.  They're just --
13         THE COURT:  But isn't the person called Federal
14 New York Metropolitan Regional Center, isn't that an EB-5
15 project?
16         THE WITNESS:  That's the general partner.  General
17 partner.
18         THE COURT:  General who?
19         THE WITNESS:  General partner of the LT.
20         THE COURT:  Right.
21         But didn't you say earlier that investor money went
22 into that general partnership fund?  It started there and then
23 you said it was passed through and went to other entities?
24         THE WITNESS:  The fund, they only go to like the
25 EMMCO account.

VB    OCR    CRR

159

1          THE COURT:  EMMCO.
2          THE WITNESS:  EMMCO.  E-M-M-C-O, EMMCO.
3          THE COURT:  Oh, EMMCO.
4          THE WITNESS:  Or EEGH account.  It doesn't go to the
5  general partner account.  The investment money doesn't go
6  there.  Investment money only go to the partnership account.
7          THE COURT:  Let me ask -- this is the SEC's
8  document.
9          Am I incorrect in interpreting the first account
10 that is identified as the general partnership account from --
11 into which EB-5 investor money went?  Because this is a
12 summary document; is that right?
13         Mr. Stoelting?
14         MR. STOELTING:  Oh, I'm sorry.
15         THE COURT:  In other words, is it the SEC's position
16 that these first five accounts are listed at the top of
17 Exhibit 38 held EB-5 investor money for either of the projects
18 that are at issue here?
19         MR. STOELTING:  Yes.
20         THE COURT:  Okay.  And which one?
21         MR. STOELTING:  I don't think -- well, all five.  I
22 don't think we're -- I think those are account numbers there.
23         THE COURT:  But the witness is denying that.  So I
24 am just trying to get at what his testimony is just to make
25 sure I understand.

VB    OCR    CRR

160

1          You are saying, Mr. Xia, that none of these five
2  accounts listed at the top ever held any EB-5 investor money.
3          THE WITNESS:  No.
4          THE COURT:  Assuming you know which accounts these
5  are.
6          THE WITNESS:  Yeah.  I know five funds.  EMMCO is
7  one.  EMMCO NQMC is two.  The third one is EMMCO --
8          THE COURT:  Let me just stop you.
9          You have many more than five accounts, right?  What
10 you testified to before is that the money started, I thought,
11 as a general partnership account, and then got funneled to all
12 different accounts, including some of these Racanelli
13 accounts, et cetera, as you saw fit to do various projects
14 beyond just the project that they were invested for.
15         So what I am trying to get at is, is it your
16 testimony that there was never any EB-5 investor money in any
17 of these first five accounts that the SEC said held at least
18 some investor money?
19         THE WITNESS:  All my --
20         THE COURT:  Yes or no.
21         THE WITNESS:  No.
22         THE COURT:  Are you saying that none of these five
23 accounts at the top of this exhibit held any EB-5 investor
24 money?
25         THE WITNESS:  No.

VB    OCR    CRR

161

1    THE COURT:  Okay.
2        So Mr. Stoelting, go ahead ask the follow-up, if you
3    want.
4        MR. STOELTING:  Okay.
5    BY MR. STOELTING:
6    Q    So in terms of the payors that you said were rental
7    income streams, Fleet Financial Group did not own any
8    apartment buildings who were generating rental income, right?
9    A    That's right.  But the Fleet Financial Group is using the
10   office me and my wife individually owned.  So each month we
11   have obligation to pay the bank mortgage, and my wife have to
12   collect the rental income every month to pay the mortgage.  I
13   think it's only $8,000 per month to pay for the mortgage and
14   the management, Fleet, for the commercial condo.
15       So that's the reason Fleet Financial pay my wife
16   every month because, you know, those office condo is
17   individually owned.
18   Q    So you are taking the investor money held by Fleet
19   Financial Group and paying it to your wife as rental income on
20   Fleet's office space.
21   A    No.  Fleet Financial doesn't hold investor money.  We,
22   you know, every single dollar we raised from EB-5 investors,
23   they all sent into a designated account, you know, those LT
24   account.  And I have a Paul Roboto, the forensical accountant,
25   certify that every single dollar we raised through EB-5

VB    OCR    CRR

162

1    process has been properly deposited into those accounts and
2    has been sent to developer.  Not a single penny has been
3    diverted in that -- through that fund.
4        And then not all the entities you listed here have
5    ever received any EB-5 funds directly from any investors.  I
6    don't know why you are holding a position all these entities
7    having investment funds.  There's no single transfer from
8    investor to any of these accounts.
9    Q    So you're saying all of the accounts listed in
10   Exhibit 138, even the Racanelli accounts, never held investor
11   funds?
12   A    Number one, Racanelli is a contractor.  Number two, the
13   Racanelli can never receive investment -- investor funds
14   directly.  That makes them, if anybody EB-5 investor send
15   money directly into this account, they won't be even able to
16   apply for their green card.
17   Q    No, but doesn't the money get transferred from the
18   partnership to the developer to Racanelli and then to
19   subcontractors?  Isn't that the way it was supposed to work?
20   A    Yeah.  That's the construction process.
21   Q    So all of these entities are ones that you've already
22   said were subcontractors doing work on the projects.  So all
23   of these entities, including the Shangri-Las, X & Y, Fleet,
24   received money that can originally be sourced back to
25   investors, right?

VB    OCR    CRR

163

1    A    No.  I think by the time they provide the services it
2    becomes the money that they earned.  It's no longer investor
3    money.
4    Q    So is that getting back to what you are telling the
5    Goldman Sachs partner about who knows what EB-5 money is?
6    A    Yeah.  If you look at the limited partner agreement 4.3,
7    no commingling.  It clearly seems like the EB-5 funds cannot
8    be commingled with the general partners fund, assets.
9        And for LP, the assets is -- you know, the moment
10   the money sent to the developer at the loan to access become a
11   promissory note.  So that's loan proceeds that the developer
12   borrowed.  And when the developer paid to the general
13   contractor, it's a contracting amount for the services they
14   performed.  That's why there's a building there.
15       And when the general contractor pay to my entity who
16   step in to provide some speciality construction services,
17   that's money my entity earned.  And so it's either my entity
18   of certified contractor they earned that money.  It's no
19   longer EB-5 money.
20   Q    Okay.  Well, let's move on.
21       So Exhibit 63, please.
22       THE COURT:  I want to make sure I understand this,
23   Mr. Xia.
24       Your view is that the minute you took money that was
25   investor money and loaned it to one of your entities, it was

VB    OCR    CRR

164

1    no longer investor money, even if no services were provided
2    for it.  Just a loan to one of these entities.  You used the
3    word loan, you did not use the word payment for services.
4        That is your position.  It is no longer investor
5    money.  It loses its character once you loan it to one of your
6    development companies.
7        THE WITNESS:  My position is the moment that the
8    service is provided, it's no longer EB-5 money.
9        THE COURT:  But you called it a loan.  You said the
10   minute it is loaned to one of the entities.  That is not a
11   payment for services, that is a loan.
12       THE WITNESS:  There's two-steps.  The first step is
13   from fund to developer, there's a loan.
14       THE COURT:  Fund, the general partnership which
15   holds all the investor money, to your development company.  Is
16   that the loan you call that.
17       And the minute it become the loan, or is loaned, you
18   are saying it is no longer investor money.
19       THE WITNESS:  It's loan proceeds.
20       THE COURT:  Okay.  Go ahead, Mr. Stoelting.
21   BY MR. STOELTING:
22   Q    Are there any loan agreements with regard to these loans?
23   A    Oh, yes.  We were just talking about all this loan
24   agreement.  That's a loan agreement from the LP, from the fund
25   to developer.  We were just talking about the signature.  We

VB    OCR    CRR

165

1  were just talking about the notary date.  That's the loan
2  agreement.
3  Q    Okay.
4       But there's no -- I'm sorry.
5       THE COURT:  No.  I want to ask a follow-up, sorry.
6       And then the minute the money becomes loan money to
7  the developer, do you have any responsibility to the investors
8  to report what is done with that money?
9       THE WITNESS:  Yes, I do.  Because based on the loan
10 agreement, those money need to be used to build the project.
11 Which I did.  I gave all the money to the general contractor
12 who provide the services.
13      THE COURT:  Even though some of that money was now
14 going to a different project?
15      THE WITNESS:  No.
16      THE COURT:  Well, you did say that earlier.  You
17 testified before the lunch break that some of the Mirage money
18 that was not used, I guess, you thought for the project went
19 to the other project.
20      THE WITNESS:  No, only after the subcontractor
21 earned that money after the general contractor.
22      THE COURT:  But again, it originated with the Mirage
23 investors.
24      Did you report -- you did not report to the Mirage
25 investors that you used some of that money for the Emerald

                    VB    OCR    CRR

166

1  project, correct?
2       THE WITNESS:  No, but that's a services we provided.
3       THE COURT:  Okay.  All right.
4       Go ahead.  I am repeating myself.  Go ahead.  It is
5  all right.  Go ahead.  Your lawyer can ask a follow-up if he
6  wants.
7  BY MR. STOELTING:
8  Q    So we were going to move on to Exhibit 63.
9       THE COURT:  Let me ask one question.
10      Since Mr. Xia's testimony is running long, and I
11 admit I am contributing to that, we do have at least two
12 individual expert witnesses who are waiting here.  I hate to
13 bring them back tomorrow.  Is there any chance we can get
14 their testimony done by 5:30 today?  We can interrupt Mr. Xia
15 and resume, if you want.
16      We have got a few, Mr. Stoelting, because I would
17 hate to have them sit here again tomorrow or come back
18 tomorrow.
19      MR. STOELTING:  One moment.
20      THE COURT:  Yes.
21      (Pause in the proceedings.)
22      MR. STOELTING:  Your Honor, I appreciate the
23 thoughtfulness.  I think that our choice would be to finish
24 with Mr. Xia this afternoon and they can come back tomorrow,
25 if necessary.

                    VB    OCR    CRR

167

1       THE COURT:  I understand.  I understand also that
2  his testimony may be relevant to theirs.
3       So go ahead.
4       MR. KAMELI:  Judge, with that in mind, can we at any
5  point after the two setup questioning, we can have five
6  minutes break?
7       THE COURT:  Yes.  That is fine.  Go ahead.
8       You mean you want it now?
9       MR. KAMELI:  No, I'm okay.
10      MR. STOELTING:  Now or -- well.
11      THE COURT:  Why don't you take the five minutes now.
12 We will get going again a little bit after 4:00.
13      MR. STOELTING:  Thank you.
14      THE COURT:  All right.  Thank you.
15      ALL:  Thank you.
16      (Recess taken.)    (In open court.)
17      (Judge PAMELA K. CHEN enters the courtroom.)
18      THE COURT:  I remind you, Mr. Xia, you are under
19 oath and Mr. Stoelting, you can continue.
20      MR. STOELTING:  Thank you, Your Honor.
21 BY MR. STOELTING:
22 Q    Exhibit 63 is an e-mail sent to you on July 25th, 2014,
23 by Walter Verfenstein?
24 A    Yes.
25 Q    Okay.

                    VB    OCR    CRR

168

1       And Walter Verfenstein was working with you at the
2  time on pitching the Mirage and EMMCO projects to investors?
3  A    He was working with me to negotiate these Chinese
4  immigration broker.
5  Q    Okay.
6       And Walter Verfenstein was the husband at the time
7  of Xi Verfenstein, right?
8  A    Yes, that's right.
9  Q    Okay.
10      And they are divorced now?
11 A    Yes, I believe so.
12 Q    Okay.
13      So looking at his July 25th, 2014, e-mail, he says:
14 Good morning, Richard.  I will send you notes for my remarks
15 which I have modified slightly from the version you approved
16 in the spring to reflect the brochure Shi-Shi she gave me with
17 our discussion yesterday.  Please let me know of any changes,
18 corrections you wish to see, and please tell me if you wish to
19 see me to discuss any time before 2:30.  Otherwise, I will see
20 you in the lobby then.
21      Here come the remarks.  After you get back to me, I
22 will print out a few copies for Julia.  PS.  Thank you for
23 sending me to them last evening?
24      So you were in China with Walter Verfenstein in
25 July 2014?

                    VB    OCR    CRR

169

1    A    Yes, I think.  Based on this e-mail, yes.

2    Q    Okay.

3         And he sent you his draft remarks and says:  One, I
4    am very pleased to be back in China with an attractive real
5    estate development opportunity to share with you.  On my first
6    visit, great project Eastern Mirage, Westin Hotel, Mayor
7    Economic Development Council, but no track record.

8         And then there's a number of bullet points.  And I
9    want to look toward the bottom on the second page, 63-2.

10        It says:  The project will benefit from the support
11   of community leaders and New York State and the
12   U.S. Government in the form of 45 million in tax credits.

13        And then the next line says:  As a potential EB-5
14   investor, you would be an important part of this project, but
15   only a part.  The 75 million investment from 150 investors
16   could compromise less than one-third of the projected
17   228 million development project.  State, Federal Government, a
18   bank and Fleet Financial would all have large stakes, too.

19        So that's the notes Walter sent you for his remarks.

20        And then do you see your response?  It says:
21   Walter, everything is fine except the total EB-5 is now 80
22   million and total construction costs 233 million.

23        Do you see that?  It's on page 63-1.

24   A    Yeah.

25   Q    Okay.

VB    OCR    CRR

170

1         So the part I read about EB-5 investors would only
2    be a third of the overall amount raised, that was an important
3    point that you were making to investors; that you did have
4    other partners.

5         It says:  State, Federal Government, a bank and
6    Fleet Financial all have large stakes, too.

7         So that part of that remarks was not accurate, was
8    it?

9    A    I think it's accurate.  What part is not accurate?

10   Q    Okay.  Well, the State and Federal Government and the
11   bank does not have a large stake in the project, does it?
12   Financial stake?

13   A    For me the stake is providing the Brownfield tax credit.

14        THE COURT:  Brownfield tax credit.

15        THE WITNESS:  Brownfield tax credit.

16   A    And Federal Government is providing the sole geothermal
17   tax credit.  And I think that's my understanding for the
18   funding of this project.

19   Q    The Federal Government provided what?  Geothermal tax
20   credit?

21   A    Yeah, geothermal, solar and the battery tax credit.

22   Q    All right.

23        When did you receive that tax credit?

24   A    It's in the process.  We are applying for it and while we
25   are doing the designs, and that's part of the consideration.

VB    OCR    CRR

171

1    Q    So you're applying for it now?

2    A    In order to apply for that, we have to complete the
3    design.  We have to have a electrical mechanical -- number
4    one, you have to have architectural design complete.  Then you
5    can start applying for those various deals in the tax credit.

6    Q    Okay.

7         But in July 2014 when Walter Verfenstein sent you
8    these remarks for your approval, there was no state, Federal
9    bank and Fleet Financial did not have any large stakes in the
10   project, correct?

11   A    We were planning to apply all this credit.

12   Q    All right.

13        And then when your response to Walter says:
14   Everything is fine, so you were -- by saying that, you meant
15   that you were okay with his draft remarks that he sent you.

16   A    Yeah, it's -- it's -- it's the e-mail, yes.

17   Q    So I think we talked about Fleet Financial Group being
18   the developer on the Mirage project, right?

19   A    That's right, yes.

20   Q    And Fleet Financial Group was the developer for all three
21   Mirage offerings, right?

22   A    Fleet Financial Corp. is the developer who received the
23   lien from those three offering, from those three LP.

24   Q    So Fleet Financial Group is heavily involved with the
25   Eastern Mirage project in that capacity, right?

VB    OCR    CRR

172

1    A    Yes.  And also Emerald, too.

2    Q    So do you remember signing a sworn affidavit saying that
3    Fleet Financial Group has nothing at all to do with the Mirage
4    project?

5    A    No, I don't remember.

6    Q    Actually, in January 2021?  I am going to hand you a copy
7    now.

8         MR. STOELTING:  May I, Your Honor?

9         THE COURT:  Yes.  Go right ahead.  I am sorry.

10        MR. STOELTING:  This is not in the binder.

11   Q    So you are familiar with this litigation, Freddy Guartan?

12   A    No.  It's handled by general counsel, I'm not really
13   natural with this.

14   Q    Okay.

15        Well, this says Richard Xia being duly sworn deposes
16   and says:  I am a member of X & Y, one of the defendants'
17   located at 4231 Union Street?

18        THE COURT:  Remember; the court reporter.

19   Q    So 4231 Union Street is the Eastern Mirage site, correct?

20   A    Yes, that's right.

21   Q    And so the definition of subject premises is the Eastern
22   Mirage site, right?

23   A    Yes, Eastern Mirage site.

24   Q    So if you could look at paragraph 12.  And actually, if
25   we could look at your signature on the last page first.

VB    OCR    CRR

173

1    That's your signature?

2    A    Yes.

3    Q    Okay.

4        You signed it in January of 2021?

5    A    Yes.

6    Q    Okay.

7        So paragraph 12 says:  Consequently, Fleet has no

8    day-to-day interaction with the construction processes at the

9    subject premises, nor the means and methods employed thereon

10   by either the general contractor entities or subcontractor

11   entities.

12       And then paragraph 13 says:  In fact, aside from the

13   approval and payment of funds and requisitions submitted by

14   the Perini and Racanelli entities, Fleet has no real

15   involvement with the construction at all.

16       14 says:  As such, neither X & Y nor Fleet oversee

17   the construction processes, nor do these entities supervise,

18   direct or control any subcontractors working at the

19   premises -- such a premises.

20       So those are all statements that you signed under

21   oath in the context of this litigation, right?

22   A    That's true.

23       Fleet is a developer and they don't really get

24   day-to-day interaction with the construction process.  If

25   there's any specific construction tree in the working to be

VB    OCR    CRR

174

1    done, it's always one of my affiliate entity and the work is

2    the general contractor.  As a subcontractor, we rarely get

3    involved into those day-to-day construction work.

4    Q    Okay.

5        But it's not correct, is it, to say that Fleet has

6    no real involvement with the construction at all.

7        That's not true, is it?

8    A    Fleet, that's true.  Fleet is a developer.  But our

9    construction work is handled by general contractor.  If

10   certain tree, we feel like my affiliate entity can provide a

11   better services for better price, and then all those

12   construction work, design work has been, you know, conducted

13   through those -- my affiliate entities to do the actual work.

14   Construction work.

15       THE COURT:  What about X & Y?  Is it true that X & Y

16   has nothing to do with the construction at the Mirage site?

17       THE WITNESS:  XY only get involved at the beginning

18   of 2011-'12.  At year 2021, the building is almost finished,

19   so there's really not too much because XY was mainly doing the

20   underground work.

21       So there's no more underground work for the Mirage

22   project at that time period.

23   Q    So I mean, this doesn't carve out any time periods.  But

24   didn't X & Y receive substantial payments for construction

25   work on the project?

VB    OCR    CRR

175

1    A    That's right.  For the foundation work.  And I think the

2    curtain wall work.

3    Q    So this was a case where there was a worker, Freddy

4    Guartan was injured on the site?

5    A    I'm not really familiar with this.  We have a

6    construction general counsel and he's pretty much handling

7    everything.

8    Q    Is that Brendan Cain?

9    A    That's right, yes.

10   Q    So you don't know what Freddy Guartan -- you don't know

11   the reason that he sued you and all your companies?

12   A    No, I'm not really familiar with, you know, this worker.

13   Q    Well, it says that he claims he was injured at the Mirage

14   site.

15       Does that refresh your recollection?  I'm just

16   reading from your recollection.

17   A    No, no.  I have no idea about how this worker get

18   injured.

19   Q    All right.

20       And you're familiar with another, Mr. Damian who was

21   also injured and brought a lawsuit against you for the Mirage

22   project?

23   A    No.  For the construction site, we got a lot of this type

24   of lawsuit all the time.  One time, you know, one worker, just

25   because, you know, he's not happy, he's in, I guess, you know,

VB    OCR    CRR

176

1    dismissed and he filed injury lawsuit.  And so we are really

2    concentrated on developing those project.

3        So, I -- that's why I just delegate into general

4    counsel who specialize this type of litigation to handle this.

5        THE COURT:  Mr. Xia, I want to make sure I

6    understand your testimony.

7        I thought you previously testified that each of

8    these entities whose identified in this lawsuit, Perini,

9    Racanelli, X & Y, were your affiliates.  Companies you own; is

10   that right?

11       THE WITNESS:  No, Perini is not nine.

12       THE COURT:  All right.

13       What about Racanelli and X & Y.

14       THE WITNESS:  Racanelli is not my entity.  X & Y is

15   my affiliate.

16       THE COURT:  All right.

17       And this individual, Mr. Guartan, spelled,

18   G-U-A-R-T-A-N, you are saying he did not work for you?

19       THE WITNESS:  No.  I think from the lawsuit he's

20   working for employee of the third-party defendant, NYC

21   Greenpoint in the reading in the paragraph 5.

22       THE COURT:  All right.

23       Go ahead.

24       MR. KAMELI:  What is this exhibit number?

25       MR. STOELTING:  That was not marked as an exhibit.

VB    OCR    CRR

177

1 THE COURT: So why don't we give it a number.

2 Why don't we call it 177.

3 BY MR. STOELTING:

4 Q All right.

5 I'd like to look at Exhibit 135, please.

6 Okay. Do you have Exhibit 130?

7 A Yes.

8 Q 135? Okay?

9 A Yes.

10 Q Okay.

11 So we've been talking about invoices. This is a

12 summary of the invoices that we received and there's a summary

13 there on 46-2. These are all affiliates of yours where it

14 says: Invoice from; is that correct? That column?

15 A Yeah, I believe that's invoice that we produced in 2019.

16 Q Okay.

17 So if we look at -- I just want to go through this,

18 46-3?

19 A Yes.

20 Q Okay.

21 So Amazon River was -- then GEM refers to the

22 Eastern Emerald Project, right?

23 A That's right.

24 Q It was renamed Grand Eastern Mirage?

25 A That's right.

VB    OCR    CRR

179

1 BY MR. STOELTING: (Continuing)

2 Q And if we look at 46-6, Fleet Financial Group, from

3 January 2016 to December 2016, is receiving $125,000 every

4 single month from Perini.

5 A Yes.

6 Q So why is -- and then we'll just go quickly.

7 The next page is 2011, JiQing Development is getting

8 120,000 every month for years. 46-8 is Manekineko getting

9 30,000 and 45,000 in 2012. 46-9, Samuel Development getting

10 150,000 every month during 2011, 2012. 46-10, Shangri-La 9F

11 getting 120,000 and 80,000 every month from Racanelli.

12 Shangri-La Green on 46-11, and then X&Y.

13 So why -- these regular payments every month of

14 round numbers, why are those payments being made in that

15 fashion?

16 A Because that's agreement. We provide a flat fee

17 services. It's almost like a general counsel, you know, fee

18 or I have a lot of other contractors, designing company. They

19 provide you flat fee services, means they have to handle

20 everything in regarding to that, the type of scope.

21 Q Is that a written agreement, the flat fee agreement?

22 A Yes. It's, you know, for certain portion of that

23 services, we just agreed to provide flat fee services.

24 Q When you say "we agreed," who do you mean?

25 A Me and the general contractor.

CMH    OCR    RDR    FCRR

178

1 Q Okay.

2 So it looks like Perini is paying $150,000 twice on

3 the last day of every month starting in January of 2016

4 through December 2018, and that number was reduced to $80,000

5 per month for a total of $9.7 million.

6 And looking at 46-5, Amazon River.

7 Do you see those monthly amounts from January 2014

8 through December 2015, 150,000, 120,000 per month?

9 A Yes.

10

11 (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VB    OCR    CRR

180

1 Q Ms. Verfenstein?

2 A Yes.

3 Q So she agreed with you that she would pay, Racanelli and

4 Perini would pay your companies this amount every single month

5 to all these separate entities?

6 A Yes, all the services. You know, we have to give them

7 pretty much all the services without chance to get change

8 order.

9 Q And is that an agreement that's in writing or just an

10 oral understanding between the two of you?

11 A It's initially in writing and, gradually, once it's

12 working well, it become just, I think, a memo to memorize

13 services need to be provided for certain time period.

14 Q I'm sorry. Could you -- you said that there was

15 something in writing or not?

16 A Yes. Initially, there was something in writing. Then

17 once the product moving well and the product has been built in

18 a way, like, the cost, it's significantly lower than this

19 similar other project, everybody was happy because it's much

20 easier to manage the budget for both of us.

21 Q Well, I'm looking at -- I mean, we attached some of the,

22 a selection of the invoices starting at 46-15 through 46-34

23 and you see these invoices, it doesn't list -- okay.

24 Let's look at 46-15. It just lists 150,000. It

25 doesn't say the people that did the work, it doesn't say how

CMH    OCR    RDR    FCRR

184

1    long it took them to do the work. It doesn't apportion the
2    dollar amounts to particular tasks. It just lists different
3    things and then the round number at the bottom.
4          Don't construction invoices typically list the
5    people that did the work and break down the cost per task?
6    A    Yes, typically it's that, but I have actually provide a
7    lot of third-party invoice from third-party contract designer.
8    Once you can know each other, get familiar with each other,
9    you know, then people start trying to provide a flat fee,
10   round number invoice because it's, it's really hard to track
11   down the hours and minutes, if you have both understanding
12   that the best way to make money is to build the project in a
13   very efficient way and for a reasonable cost.
14         The invoice you point out, actually, I go back in my
15   e-mail, for the invoice, 46-16. In your opinion, it's not
16   clear, but I do have, I guess, seven e-mail. I think I had
17   provided that, you know, basically, support, let's say, is
18   that, is the meeting with the lawyer and the City planning, I
19   did have the e-mail. I did went to, you know, Xi facility to
20   visit the conference center in January of 2016. There's many
21   other meeting actually happened to be documented on this and I
22   think I'm going to provide you -- I think I already provided
23   it to you but summary.
24         So you can see that it's real work, take a lot of
25   time, even though the invoice is one line but the Xi visit, it

CMH   OCR   RDR   FCRR

---

183

1    on 135.
2    A    135? 135, right?
3    Q    Correct, yes.
4    A    Okay.
5    Q    And it's the page that has 46-6 on the bottom right.
6    A    Yes.
7    Q    Okay. So you see there's Fleet Financial Group was
8    submitting invoices to Perini Group?
9    A    That's right.
10   Q    And was paid 1.5 million?
11   A    Yes.
12   Q    So does that refresh your recollection that Fleet
13   Financial Group did do work?
14   A    Yes, they did work for the captive insurance company
15   they're forming to provide general insurance coverage for
16   Perini Group.
17   Q    So Fleet Financial Group was providing insurance
18   coverage?
19   A    Yes. Fleet Financial Group actually form a captive
20   insurance company and the, licensed in Vermont to do the
21   captive insurance coverage for the contractor working on its
22   own project. That's why it's called captive insurance
23   company. Fleet Financial is the parent company.
24         That's, you know, much better compared to a
25   third-party insurance company whose only interest is not to,

CMH   OCR   RDR   FCRR

---

182

1    took me a morning flight there and an evening flight back. It
2    arranged by Linden who's also interest in working with us on a
3    hotel and the application meeting and we have a special
4    consultant in the meeting.
5          So there's a lot of hours and time, you know, we
6    spent on it and I feel like the end result of the project
7    showing that the cost and the value, you know, the value is
8    lot more than the cost. It shows that service we provided is
9    actually beneficial to the investor which include me as an
10   investor too.
11   Q    Well, you're saying Ms. Verfenstein agreed to this
12   arrangement?
13   A    Yes, she had.
14   Q    And what oversight did she provide to make sure that
15   these services were really being provided?
16   A    We're only working on this project so the result of the
17   whole work is fully transparent to each other. We both
18   understand that the scope and the goal we have to achieve.
19   Q    All right. Could you look at Exhibit 136. Actually,
20   just one more question on 135.
21         Do you recall when we were discussing that affidavit
22   you signed in that litigation, you said Fleet Financial Group
23   doesn't actually do work, construction work?
24   A    That's right.
25   Q    So if you could look at 46-6. Do you see -- we're still

CMH   OCR   RDR   FCRR

---

184

1    you know, to try to not to honor the claim. Here, you know,
2    that's incur services, Fleet Financial provided that, and the
3    Perini Group actually had been taking advantage of this
4    captive insurance to get a license and the permit from the New
5    York City Building Department.
6          THE COURT: I'm sorry. I'm trying to understand
7    this testimony.
8          So you're saying that Fleet charged Perini $150,000
9    every month to insure Perini?
10         THE WITNESS: No. For first 2016, I think that's a
11   year, they formed captive insurance company to provide
12   insurance coverage for Perini Group.
13         THE COURT: They're providing the insurance?
14         THE WITNESS: Yes, that's right.
15         THE COURT: At the rate of $150,000 a month?
16         THE WITNESS: That's the time, flat fee arrangement
17   spend to talk to the consultant, get the license. And they
18   were actually talking to not just Vermont. They were talking
19   to Cayman Island, you're talking to many other authority who
20   can issue the license for the captive insurance company and.
21   The working is not for different consultants for years to
22   actually get that. The captive insurance company is set up.
23   Then Perini doesn't need to go out and pay more money to buy
24   the general insurance.
25         THE COURT: Is there an invoice that corresponds to

CMH   OCR   RDR   FCRR

185

1  each of those monthly --
2          THE WITNESS:  Yes, that's all been provided.
3  Actually, I think it's -- yes, all been provided.
4          THE COURT:  And it's indicates its for consultative
5  services about insurance and other things?
6          THE WITNESS:  Exactly.  And eventually they did get
7  insurance license.  It's called Fleet General Insurance Group.
8          THE COURT:  And sorry, who owns Perini?  I
9  apologize.
10          THE WITNESS:  Xi Verfenstein.
11          THE COURT:  I see.  Go ahead.
12  Q   So if you could just look for a moment at Exhibit 136.
13          THE COURT:  Can I digress for one minute?
14          MR. STOELTING:  Yes.
15          THE COURT:  Xi Verfenstein, are you any relationship
16  to her?
17          THE WITNESS:  No, she's contractor.
18          THE COURT:  No, but you don't have any personal
19  relationship with her?
20          THE WITNESS:  No.
21          THE COURT:  She's not related to you or your wife?
22          THE WITNESS:  No.
23          THE COURT:  Okay.  Go ahead.
24  Q   And Perini Group was formed after the Racanelli
25  litigation was settled, right?

186

1  A   That's right, yes.
2  Q   Okay.  And isn't there another large construction company
3  called Tudor Perini?
4  A   Yes.
5  Q   So is that, did you pick that Perini Group -- there's
6  nobody named Perini in Perini Group, is there?
7  A   I don't understand your question.
8  Q   Okay.  There's nobody with the last name Perini that is
9  in any way involved with Perini Group, right?
10  A   I don't know.
11  Q   You don't know?
12  A   I don't know.
13          THE COURT:  Well, how big is Perini?
14          THE WITNESS:  What?
15          THE COURT:  Xi Verfenstein's company, how many
16  employees does it have?
17          THE WITNESS:  I don't know.  During the years, I
18  think it's 20.  Every year, they have another employee.
19  Q   Well, did she select the name "Perini" because it was
20  similar to the large well-known firm Tutor Perini?
21          MR. KAMELI:  Judge, I object, speculation.
22          THE COURT:  Sustained.
23  Q   Do you know why the name Perini Group was selected?
24  A   No, I don't know.
25  Q   Are you aware of the larger construction firm, the

187

1  international construction firm called Tutor Perini?
2  A   I heard that name but I'm not really familiar with their
3  business at all.
4  Q   Okay.  So did you ever ask Ms. Verfenstein, after you got
5  through the Racanelli litigation, after using the name of
6  another more well-established firm, why she would select the
7  name of another construction, why she would pick a name that
8  is also connected with another larger construction firm?
9  A   I, you know, all I can, I can tell you is, it's probably
10  in our culture, we, when we start a new business, we like to
11  select a name which is seasoned in this industry so that --
12  because we think that the name sometimes can affect a lot of
13  other things.  So, typically, in Chinese, we are, we're trying
14  to select lucky word to name the company or a company
15  name that has been tested before.
16          So I have no idea why she named that but I can tell
17  you it's a general understanding because the business is so,
18  so risky and sometimes, you do need a good name has been
19  tested for a long time to make sure that, you know,
20  eventually, there is anything happen, you know, we can survive
21  that.  I guess that's part of the reason when we, you know,
22  name the company in Chinese, we are typically select I really
23  like your work.  I think it's more close to American culture
24  if you know somebody's name is good, like a David, right, you
25  might use David.  Obviously a lot of other David too.

188

1          THE COURT:  Mr. Stoelting, can we move on from this?
2  This is not really relevant.
3          MR. STOELTING:  Yes.
4  Q   I just want to look for a moment at Exhibit 136 on the
5  issue of invoices.  These are some third party invoices.
6          Just you look at the first one.  Do you see how it
7  breaks down the time for each task?
8  Q   136?
9  Q   It's the invoice from 5D Architecture.
10  A   Yes.
11  Q   Okay.  And then you just look at the next page, and you
12  can see how there's some, you know, each task is broken down.
13  There's some handwriting on it showing its been scrutinized.
14          Is this a more typical kind of construction invoice
15  that breaks down the tasks?
16  A   There's two different type of invoice.  One for the
17  construction project.  If you're long term, repeating
18  services, people tend to go a flat fee or either, you know,
19  either way to do the invoice.  If it's a one-time services or
20  short-term services, typically they go very much details.
21          I think we do have some other invoices.  Also, if
22  you look at this 47-15, you see that it's from third-party
23  contractor, Extreme Concrete, and the description, just one
24  word, Excavation, and the fee is a round number.  So I think
25  it's really depends on, because that company I remember they

189

1   provide a service, repeat the service for excavation, concrete
2   for more than a year and it's a contractor, you know, we know
3   for a long time.
4           So those parts, the services can be drastically
5   different in terms of the format and description because end
6   of the day, construction, you have real building or real
7   excavation work.  It's there.  So you don't really purely rely
8   on the invoice to check the work has been done.  You can go
9   there, look how much excavation has been done, how many yard.
10  So that's, I guess, for a given type different type of
11  services, different type of contractor, they have maybe some
12  probably different style of invoices.
13  Q   So if we could, I want to move on for a second and just
14  go to Exhibit 55 which is what was your court ordered
15  accounting.
16  A   Yes.
17  Q   This was the accounting that you provided in response to
18  the court order to do that, right?
19  A   That's right.
20  Q   And how was it prepared?
21  A   I just prepared it based on my knowledge, my
22  understanding and my spreadsheet.
23          MR. KAMELI:  Is it 55 or 155?
24          MR. STOELTING:  155.
25          MR. KAMELI:  Thank you.

                    CMH   OCR   RDR   FCRR

190

1   Q   And you prepared it by yourself?
2   A   Yes.
3   Q   So I just want to --
4           MR. STOELTING:  We can mark this as 178.
5           THE COURT:  Is this something else?
6           MR. STOELTING:  This is the affirmation of Mr. Xia
7   that was filed along with the accounting.
8           THE COURT:  All right.
9           MR. KAMELI:  What happened to 177?  You said you
10  were going to call this 178?
11          MR. STOELTING:  177 was the other declaration we
12  just marked.
13          THE COURT:  This is 178.
14          (Plaintiff's Exhibit 178 so marked.)
15  Q   I just want to ask you about paragraph 2.
16          MR. STOELTING:  So I guess we'll mark this as 178?
17          THE COURT:  Yes.  Go ahead.
18          MR. STOELTING:  Okay.
19  Q   Paragraph 3, I'm sorry.  So it says:  The accounting and
20  the information in the accounting has not been prepared,
21  substantiated, authenticated, verified or vetted in whole or
22  in part by any accountant, lawyer or other professional
23  service provider.
24          Do you know why that provision was put in your
25  affirmation?

                    CMH   OCR   RDR   FCRR

191

1   A   That's prepared by my counsel.
2   Q   But so is that true, that your accountant -- no lawyer
3   even looked at it to make sure it was accurate, no accountant
4   looked at it, your tax preparer didn't look at it, none of
5   your work colleagues, nobody looked at it except you?
6   A   It was in a rush.  I was ordered to produce, I think, in
7   three days including weekend.  I was really working hard to
8   get it done, but I believe it's 100 percent true.
9   Q   Did you specifically not want your lawyers or your
10  accountants or anyone else to review it before it was filed?
11  A   No, I sent to my lawyer.  This has actually been filed
12  through lawyer, I guess.
13          THE COURT:  No, but to review it.  Did you ask
14  anyone to review it?
15          THE WITNESS:  Yes.  I think when it's initially
16  being prepared, I share with the SEC attorney and they gave a
17  lot of comments and then I, you know, modified, revised it and
18  then I was told SEC attorney was happy about that, then we
19  filed it.
20          THE COURT:  No, but you signed the affirmation
21  saying no lawyer or accountant reviewed it.  Now you're saying
22  someone did review it and suggest changes to it?
23          THE WITNESS:  That's the same lawyers, the Marc
24  Mukasey firm.
25          THE COURT:  No, my question to you is you signed

                    CMH   OCR   RDR   FCRR

192

1   something saying no lawyer reviewed it.  Is that inaccurate?
2           THE WITNESS:  I didn't pay attention for that part.
3   I was just in a rush to prepare that and they told me to sign
4   this and that's all I can tell you.
5           THE COURT:  Go ahead, Mr. Stoelting.
6   Q   So is it -- it's true, correct, that none of the Mirage
7   or Emerald investors have been paid back their capital
8   contributions?
9   A   Not until now but I did send a letter in May 2021 telling
10  all the EB-5 investor in the EMMCO that we're ready to
11  dissolve the partnership and pay them back because condition
12  met, the last EB-5 investor filed an application for three
13  years already, and I was actually ready to pay them back after
14  August the 26th.
15  Q   Okay.  But you do understand that investors do want their
16  capital contributions back, right?
17  A   Yes, we had, we even have agreement, I think.  They were
18  trying to ask me, you know, but right now, because of the
19  asset freeze, we cannot honor that agreement.
20  Q   I think you mentioned at some point the explosion at the
21  Eastern Emerald site in early 2019.  Can we look at
22  Exhibit 80.
23          Okay.  So Exhibit 80 is the construction safety
24  engineering unit inspection report and I just want to read a
25  couple of portions.

                    CMH   OCR   RDR   FCRR

193

1         If you look at page 80-2?
2    A    Yes.
3    Q    It says:  Support of excavation wall collapsed.  On
4    January 4, 2019, the New York City Department of Buildings
5    conducted an inspection of 112-51 Northern Boulevard in
6    response to a partial collapse of the support of excavation
7    system along Northern Boulevard and determined that unlawful
8    continuation of construction under a stop work order took
9    place.  The work was found to have been conducted contrary to
10   the design specifications of the permit and missing critical
11   structural components.  Additionally, the work took place
12   without special inspections and without the mandated site
13   safety personnel.
14         The illegal work resulted in a significant collapse
15   of the 40-foot deep SOE system soil nail wall along Northern
16   Boulevard.  The failure of the SOE system led to the collapse
17   of the sidewalk half the width of Northern Boulevard and the
18   loss of gas, water, electrical and telecommunications service.
19         What is SOE?
20   A    It's a support of excavation.
21   Q    Okay.  And were you aware that the DOB report concluded
22   that there was illegal work taking place that led to the
23   collapse of the wall?
24   A    No.  I think this report, it means -- it says do not
25   produce to public, only through FOIA or subpoena.  So we never

CMH   OCR   RDR   FCRR

194

1    knew there was a report like this existing before.  And also,
2    if you look at the disclaimer, the conclusion, recommendation
3    analysis, for the New York City Department of Building
4    consideration only and reflect operation as of the date of
5    this report.
6         And this is the report produced by my, at my
7    counterclaim against Con Edison in New York for $25 million
8    because we have a forensic engineer company called Thornton
9    Tomasetti.  They are probably one of the best forensic
10   engineer firm.  They issued the report concluding that the
11   failure of the safety line and the current high pressure gas
12   line.  And so I think we also provided a report to SEC a long
13   time ago in regarding to this question about the collapse of
14   this Northern Boulevard portion.  There's a huge sinkhole
15   underneath and we have, I think, two very reputable forensic
16   engineer company issue the report.  They all agree it's a
17   safety line failure of all this, you know, incident.
18         (Continued on next page.)
19
20
21
22
23
24
25

CMH   OCR   RDR   FCRR

195

1         THE COURT:  Can I ask a question?  Regardless of
2    whether you got the report, were you aware if there was a stop
3    order at that site at that time?
4         THE WITNESS:  Yes, I am aware of that.
5         THE COURT:  Were you aware that construction
6    continued even though there was a stop order?
7         THE WITNESS:  No, there is no construction.
8    Actually, on the day of the collapse, the DOB send me an
9    e-mail which we still have that telling the contractor the
10   stop work order is going to be lifted.  So everything had been
11   with the people who was on site preparing for the next day's
12   work and the inspection.
13         THE COURT:  Go ahead.
14   EXAMINATION BY
15   MR. STOELTING:
16   (Continuing.)
17   Q    Could you turn to page --
18         Well, the litigation that you are referring to said
19   the City of New York and Con Edison brought a lawsuit against
20   you and your companies related to this explosion and then your
21   companies filed a counter suit, correct?
22   A    Yeah, New York City was trying to settle, you know, the
23   counterclaim and only thing preventing it is they were going
24   to ask the insurance company Fleet General Insurance to pay
25   for their legal fees.  I think that's the only dispute we are

Anthony D. Frisolone, FAPR, RDR, CRR, CRI, CSR

196

1    negotiating right now.
2    Q    All right.  Could you look at Page 80-10.  So you see
3    at the top, site Safety Personnel Failures, a list of
4    various violations at the site prior to the collapse.  And
5    then, the third bullet point down, says the contractor,
6    Perini Group, Inc. performed work contrary to a stop work
7    order.
8         Were you aware of that?
9    A    Which one?  I didn't follow.
10   Q    The third bullet point down on 80-10 where it says, The
11   contractor, Perini Group, Inc., performed work contrary to a
12   stop work order.
13   A    Yeah, this is just allegation.  I think our
14   construction general counsel has looked at the majority of
15   these citation dismissed.  And some of the citations, if you
16   can take look.  Inadequate site safety coordination logbook.
17   And there is, I think, we provided, I think, like, a
18   one-page letter to explain that I think most of this
19   violation has been dismissed at OATH court and compared to
20   other large construction sites, the citation here, number
21   one, is very, I guess, reasonable, actually, even less than
22   most of other sites.  And number two, if you look at the
23   actual citation, it's some of this is really, you know, not
24   as serious as other job sites.
25   Q    So I want to ask you a question about the next page,

Anthony D. Frisolone, FAPR, RDR, CRR, CRI, CSR

197

1  80-11.

2  A   Yes.

3  Q   The second bullet point says, Initial interviews were

4  conducted to determine what construction activities occurred

5  prior to collapse.  Richard Xia and Jack Prescott, P.E.,

6  were questioned regarding the deviations between permitted

7  design documents and the as-built construction.

8       Mr. Prescott stated he was very familiar with

9  the site.  Mr. Xia and Mr. Prescott were evasive and unclear

10  as to who was supervising and directing field operations

11  prior to the collapse.

12       Do you remember that interview?

13  A   No.

14  Q   Could you look at Page 81?

15       THE COURT:  Before you go on, look further down on

16  Page 11.  Do you see where it says, The DOB, I assume the

17  Department of Buildings, Richard Xia and Gramercy determined

18  that the torn remnant soil nail walls to either side of the

19  collapse, as well as additional areas of sand inside the

20  Northern Boulevard partially excavated site, were imminently

21  hazardous and likely to fall in an uncontrolled manner.

22       Is that an accurate statement?  Did you and others

23  determine that that site was immediately or imminently

24  hazardous?

25       THE WITNESS:  Yes.  It's imminently hazardous

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

198

1  because there is a punch hole in the middle because of

2  explosion.  After the wall had been punched in the middle,

3  there is a huge arch on the top, it's very dangerous so we

4  decided to take that down.

5       THE COURT:  Okay.  Go ahead.

6       MR. STOELTING:  Thank you, Judge.

7  EXAMINATION BY

8  MR. STOELTING:

9  (Continuing.)

10  Q   You could look at Exhibit 81.  So this is a list of

11  penalty or complaints about the site inspection dates and

12  stop work order complaints.

13       Is there a stop work order right now for the

14  Emerald site?

15  A   Yes, it is.  The stop work order doesn't mean stop all

16  activity on the job site.  And for every stop work order

17  that's issued by the Buildings Department, there is a

18  condition.  As long as you can fix a condition, they're more

19  than happy to come back and do the reinspection and lift

20  that stop work order.  And given everything that happened to

21  now, we know we're under asset freeze and I guess, you know,

22  we cannot effectively correct the condition listed on the

23  stop work order.  So that's the reason there is still

24  partial stop work order on the property right now.

25  Q   So I have one more area to cover and then I'll

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

199

1  hopefully wrap up in the next 20 minutes or so.

2       THE COURT:  Okay.  You only have 20 minutes.

3       MR. STOELTING:  Okay.

4  Q   This morning, you said a number of times that you

5  didn't need financing, that you were very proud that you

6  didn't have any bank financing because those lenders might

7  get ahead of the investors.

8       So if that's the case then why were you trying

9  continuously to get bank financing from either Goldman Sachs

10  or those letters from Eddie Chan?

11  A   Because, you know, I didn't get -- trying to get any

12  letter from those bankers until 2018.  And by 2018, in my

13  understanding, like I said, I don't have a direct contact

14  information with all the investors.  So, in my

15  understanding, most, if not all, the investors they were

16  supposed to be paid back because they all got green card.

17       So I started looking for the financing, and in

18  the meantime, and to pay my contractor for the retainage I

19  owe to her.  So I was looking for the finance and, in the

20  meantime, I reached out to the agent and asked them, give me

21  a summary, who, you know, where are they and they need to

22  sign the document to dissolve the partnership.

23       Then I find out there actually are a couple of

24  investors still in the application process because of the

25  U.S.'s bank laws and that's why after we got out of

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

200

1  partnership we had to stop.  And, as a matter of fact, I got

2  a $79 million loan term from Banco Popular.  And they were

3  actually very interested to close quickly with me.  But for

4  me, you know, I'm also the investor for the project.  Paying

5  interest without really spending this money to pay back the

6  investor doesn't really, you know, reflect the best

7  financial arrangement for the project.  So that's why I

8  didn't, you know.

9       THE COURT:  I'm sorry, can we stop again?  The

10  question was why did you seek loans from others if, as you

11  said, you didn't need any money that the project --

12       THE WITNESS:  I wanted to pay back the investors.

13       THE COURT:  You needed loans to pay back the

14  investors.

15       THE WITNESS:  In 2018-19.

16  Q   You mentioned a $79 million loan from which bank?

17  A   Popular.

18  Q   Popular?

19  A   Banco Popular.

20  Q   Banco Popular?

21  A   Yes.

22  Q   That loan never closed?

23  A   Yeah, because the investor deadline is actually last

24  year, I think, in August of 2021.

25       THE COURT:  Did you say posed or closed?

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

201

1       MR. STOELTING:  Banco Popular, that loan never

2  closed.

3       THE COURT:  Okay.

4       THE WITNESS:  Even I closed I still cannot pay

5  them back so I didn't close it.

6       MR. STOELTING:  Okay.

7       THE COURT:  Hang on.  I want to make sure I

8  understand.

9       So you didn't have -- you don't have enough funds

10  to repay the investors?

11       THE WITNESS:  No.  The Mirage project, total EB-5

12  funds was $56 million.  The loan itself is $79 million.

13       THE COURT:  So for the Mirage prong, you're

14  saying -- say that again?

15       THE WITNESS:  The Mirage project, total EB-5 loan

16  is for$56 million.  And the loan from Banco Popular is

17  $79 million.

18       THE COURT:  But you haven't closed on that.

19       THE WITNESS:  I didn't close because the timing is

20  I still have investors who didn't get permanent green card.

21  I have to wait for them to get green card before I could

22  dissolve the limited partnership.

23       THE COURT:  Is that necessary to get the loan?

24       THE WITNESS:  No, that's necessary to dissolve

25  that to pay back the investors to dissolve the LP.

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

---

202

1       THE COURT:  Go ahead, Mr. Stoelting.

2  EXAMINATION BY

3  MR. STOELTING:

4  (Continuing.)

5  Q   Didn't you turn down the loan that Banco Popular was

6  offering you a couple of years ago?

7  **A   That's right.  That's when I turned them down, yes.**

8  Q   Why?

9  **A   Because I find I still have investors in the pipeline**

10  **waiting for the green card.**

11  Q   Okay.  So I want to actually talk about something that

12  came up earlier about these house purchases.  And we talked

13  about the Brownfield tax credit.  You got a check for almost

14  $11 million in January of last year, right?

15  **A   Yeah, that's right.**

16  Q   Okay.  And you took that money and you bought a

17  $10 million CD at CTBC bank?

18  **A   That's right.**

19  Q   Okay.  And then you used that as a collateral to get a

20  $10 million loan?

21  **A   That's right.**

22  Q   And so, you had cash.  So I just want to ask

23  before we get to how you actually used that cash and other

24  money.

25       In the summer of last year, and if we could

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

---

203

1  look at the Monitor's report which is Exhibit 160.

2       So this is the Monitor's report that was filed

3  on January 28, 2022, and I just direct your attention to

4  Page 25.

5       Are you on Page 25?

6  A   Yes.

7  Q   So you see at the top it said, Defendants failed to pay

8  New York City property taxes for the Eastern Mirage.  This

9  resulted in back taxes and interest in the sum of $796,521.

10       Do you see that?

11  **A   That's right, yes, I see that.**

12  Q   And building violations issued before the asset freeze

13  totaling over $625,000, right?

14  **A   That's right.**

15  Q   And then, if you look at Exhibit A, which

16  is -- it's -- if we move forward a few pages to Exhibit A,

17  it's a two-page list of pending actions.  Do you see that?

18  A   Yes.

19  Q   Okay.  So that's 36 pending actions, you know, right

20  now, they were all pending last summer, right?

21  **A   I think some of the actions, yes, after SEC action,**

22  **right.**

23  Q   Okay.  Well, the date they were filed is the date that

24  they were filed.  There was at least a dozen or more actions

25  pending last summer.  So you were aware of all these

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

---

204

1  potential liabilities, right?

2  **A   It's all handled by my general counsel.**

3  Q   No, my question is:  You were aware of all these

4  lawsuits pending against you last summer; correct?

5  A   Yes.

6  Q   Okay.

7  **A   We had the last construction site project is always in**

8  **litigation.**

9  Q   So when you got that $10 million in cash, you put that

10  toward the Kings Point Road house at ██ Kings Point Road,

11  and the house on Vanderbilt Drive; correct, that loan in the

12  name of Eastern Emerald Group?

13  **A   No, that's not my property.**

14  Q   Let's just talk about Kings Point Road.  We have in

15  Exhibit 156, we have some photos of this property?

16  A   Yes.

17  Q   So how many bedrooms in this house?

18  **A   I don't remember.  Six or five.**

19  Q   How about 18?

20  **A   18 bedrooms?**

21  Q   This is the house you're living in now?

22  **A   No, there's no 18 bedrooms.**

23  Q   Okay.  But are you living at ██ Kings Point Road now?

24  A   Yes.

25  Q   And why did you use that money that derived from the

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

205

1  Brownfields remediation to pay back the building violations,
2  to pay back those taxes, instead of it sinking it into this
3  house on Kings Point Road?
4  **A    I have been working on financing since January 2021,**
5  **and we were actually very close to getting that loan closed.**
6  **So by the time you close that bridge loan, typically, the**
7  **title company clear everything using the loan proceeds.**
8          THE COURT:  A bridge loan for what?
9          THE WITNESS:  Bridge loan for the Mirage project,
10  and the two trying to pay back the investors.
11          THE COURT:  That doesn't answer the question of
12  why you didn't use a 10 or 11 million you got via the tax
13  credit, at least I don't think it does.
14          THE WITNESS:  Yeah, but that's the same money,
15  same funding.  You have two funding, and you are planning to
16  use one funding and use another funding for the investors.
17          THE COURT:  But you didn't get a bridge loan, so
18  you had this money available to you and you bought a CD so
19  you could buy a mansion.
20          THE WITNESS:  I put money --
21          THE COURT:  The question is why?  Why did you
22  think that that was an appropriate use of that money that
23  was used to advertise as part of the funding for the Mirage
24  project and not actually apply it to the Mirage project?
25          THE WITNESS:  The funding results is for the

*Anthony D. Frisolone, FAPR, RDR, CRR, CRI, CSR*

*Official Court Reporter*

206

1  project, it's a Brownfield.  But we're talking about the
2  Mirage project.
3          MR. STOELTING:  It was the 10 million related to
4  Emerald.  It was in Emerald offering memos that we looked at
5  earlier today?
6          THE WITNESS:  That's right.  But it's the Emerald
7  project because we completed a Brownfield we're entitled to
8  to receive $84 million, not just $10 million, $20 million
9  based on offering document.  So we never earmarked the first
10  $10 or $20 million for the project.  Actually, project
11  doesn't really need that money at that moment.  We do have
12  sufficient funding to continue the construction for Emerald
13  project.
14          THE COURT:  Let me understand Mr. Stoelting's
15  question.
16          Were you asking, Mr. Stoelting, why he didn't use
17  that money to retire some of the debt owed for the Emerald
18  project or for the Mirage project?
19          MR. STOELTING:  Well, it was the Emerald investors
20  who were the ones that were told in an offering memo that
21  there's going to be Brownfield money?
22          THE COURT:  Recovered.
23          MR. STOELTING:  And I'm going to use it for the
24  project, that's what he said.
25          THE COURT:  Right.  Go ahead, yes.

*Anthony D. Frisolone, FAPR, RDR, CRR, CRI, CSR*

*Official Court Reporter*

207

1          MR. STOELTING:  So when the money finally
2  materializes, you take it and you buy this house for your
3  yourself in Kings Point, Long Island, so how did you justify
4  that?
5          THE COURT:  As opposed to using it for what?
6          MR. STOELTING:  As opposed to using it for what
7  the investors were told which I will use this Brownfield
8  tax credit toward the project.
9          THE COURT:  For the Emerald project.
10          MR. STOELTING:  For the Emerald project, right.
11  There's a big empty space on that corner of
12  Northern Boulevard.  You're out looking for financing and
13  you finally get this $10 million tax credit you've been
14  waiting for and it's used for this purpose.
15          THE WITNESS:  I have $77 million cash on my
16  account for the Emerald project.  I can use that money to
17  pay the violation and everything.
18          THE COURT:  But you're not.
19          THE WITNESS:  No, a lot of those violations need
20  to go through the appeal and go to the Court it's not just
21  at the time.  Actually, it approves by the end of the year
22  2021, the City gives a special program for all unpaid
23  violations they give you 60 percent deduction.  It proves to
24  be a very, you know, like, it's a good decision.
25          THE COURT:  Let me ask you a question.  You

*Anthony D. Frisolone, FAPR, RDR, CRR, CRI, CSR*

*Official Court Reporter*

208

1  reference this 77 million, right?
2          THE WITNESS:  Yes, on my bank account.
3          THE COURT:  Which account is that in?
4          THE WITNESS:  That's, like, for LaGuardia
5  Performance Center and Eastern Emerald Group.
6          THE COURT:  Say that again slower.
7          THE WITNESS:  LaGuardia Performance Center and the
8  Eastern Emerald Group, that's part of the sworn accounting.
9  I don't know why, you know, the Brownfield.  The Brownfield
10  is we provide the five years hard work services, and
11  eventually, when we complete the Brownfield remediation, we
12  were nominated for big Brownfield award.  And the New York
13  State chose to give us the incentive because we, as a
14  volunteer, go in to clean up very tough, you know,
15  contamination.
16          THE COURT:  We don't need to -- hang on a second.
17          Let me ask you another question just to make sure
18  the record is clear.
19          I thought earlier when asked why you used 10
20  million this way, or 11 million, you said something about a
21  170 million.  This is not correct, right, you were referring
22  again to the 77 million.
23          THE WITNESS:  Yes, $77 million.
24          THE COURT:  That's why you think it was okay for
25  you to use the Brownfield recovery money for a CD that you

*Anthony D. Frisolone, FAPR, RDR, CRR, CRI, CSR*

*Official Court Reporter*

209

1  could use to collateralize a loan for your own house because
2  you have enough money you would say --
3       THE WITNESS:  To continue the project.
4       THE COURT:  But not to complete it?
5       THE WITNESS:  In my mind, in my way, I think I can
6  complete that because I have another $70 million Brownfield
7  coming back, not just this 10 million.  And I don't need
8  that, you know, those 10 million right now.  Even --
9       THE COURT:  Let me ask you another question.
10      Do you believe that the 10 million, though, at
11  some point should go back to the investors because right now
12  it's tied up in the CD, correct?
13      THE WITNESS:  Yes.
14      THE COURT:  Do you believe that the money should
15  go back to the investors, the 10 million, along with all the
16  other Brownfield recovery money; or, do you believe that all
17  of that you could keep if you ended up you didn't need it
18  for the project.
19      THE WITNESS:  That's money I earned through my
20  work.
21      THE COURT:  Okay.  All right.  Go ahead
22  Mr. Stoelting.
23      MR. STOELTING:  I just want to quickly cover the
24  other two houses.
25  EXAMINATION BY

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

210

1  MR. STOELTING:
2  (Continuing.)
3  Q    So if you could look at Exhibit 157 and some photos of
4  the ▓▓ Middle Neck Road house.
5  A    Which exhibit?
6  Q    It's 157.  Now, to finance the Middle Neck Road house,
7  you took out a loan from Emerald Creek Capital and gave
8  Emerald Creek a first priority lien on the Emerald Mirage
9  property, right?
10 A    That's right.
11 Q    And when you did that, you represented to Emerald Creek
12 that the limited partnerships, Fleet Financial Group, all
13 the investors had no interest in the Eastern Mirage
14 property, right?
15 A    **In the land because the loan has been taken out of the**
16 **X & Y Development Group.  We just went through the loan**
17 **agreement.  The first party of the lien is all intangible.**
18 Q    So my question is just to obtain that loan from
19 Emerald Creek, you represented to them in the loan agreement
20 that the general partner, the limited partnerships,
21 Fleet Financial Group do not, quote, Have any ownership
22 and/or other interest, unquote, in the property.  And the
23 EB-5 entities actually release the lenders from any cause of
24 action relating to the loan, right?
25 A    **As I explained that to you last week, it was done in**

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

211

1  **four days including Saturday and Sunday.  I provide all**
2  **information to the counsel and every document has been**
3  **prepared by legal counsel based on the information I**
4  **provided to them.**
5  Q    And Emerald Creek now has a first priority lien on the
6  Eastern Mirage property, right?
7  A    **On the land.  X & Y gave us that.  X & Y is land owner.**
8  Q    Okay.  Just, again, Emerald Creek has a first priority
9  lien on the Eastern Mirage property, right?
10 A    **Yes.**
11 Q    Okay.  And they gave you $15 million and you used
12 $11 million of that to buy this house on Middle Neck Road
13 which is pictured in Exhibit 157, right?
14 A    **No, that's the money I paid to the contractor who has**
15 **been owed for her services for three years.**
16 Q    Okay.  But this money was wired directly to the title
17 agency at the closing $10.2 million directly from the lender
18 to the title agency, right?
19 A    **Yeah.  Like I explain -- yes.  As I explained before,**
20 **it's a contractor once they provide the services it's still**
21 **Eastern Mirage project, that's money they earned.  I didn't**
22 **just, you know, follow their instruction to get the --**
23 **because we have a contract for $80 million.  We only paid**
24 **them only $73 million.  And so, the difference is**
25 **$15 million.  I got this loan, I just paid to the**

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

212

1  **contractor, the contractor direct me to for purchase for**
2  **some other part, I just follow the instruction.**
3  Q    Okay.  So this is, this house is in the name of Xi
4  Verfenstein, Middle Neck Road?
5  A    **Yes.**
6  Q    And we went through this last time.
7       You don't have any documents from her saying
8  you owe me $11 million, pay me somehow.  There's no paper in
9  existence, is there?
10 A    **I think as requisition I produced to the SEC three**
11 **years ago shows that the money has been owed and there's a**
12 **huge amount of retainage that needs to be paid.**
13 Q    Okay.  We'll have to work that out later.  There's one
14 more house I want to talk about which is Exhibit 158.
15      This is the house on Vanderbilt Road.  And
16 this was purchased for 4.3 million last summer, and this was
17 funded by the Eastern Emerald Group loan that could be
18 traced back to the Brownfields tax credit money.  And this
19 house is in the name of Xi Verfenstein's mother?
20      MR. KAMELI:  I object.  Which credit?  It was the
21 loan.
22      MR. STOELTING:  The Eastern Emerald Group loan.
23 The Vanderbilt house is in the name of Xi Verfenstein's
24 mother, correct?
25      THE WITNESS:  That is correct.

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

213

1    THE COURT: Okay.

2    Q    Okay. Have you bought new houses in Glen Cove,

3    Long Island?

4    A    **No.**

5    Q    Have you bought a house on Forest Drive in Long Island?

6    A    **Forest Drive is my parents.**

7    Q    Is that a house that you purchased recently?

8    A    **No, last year.**

9    Q    When?

10   A    **I think right after the pandemic. That is the one I**

11   **was asking Goldman Sachs to give me a mortgage on it.**

12   Q    How did you pay for the Forest Drive house?

13   A    **I think I got a mortgage.**

14   Q    Did you monetize any investor assets as collateral for

15   that purchase?

16   A    **No.**

17   THE COURT: Who did you get the mortgage from?

18   Goldman?

19   THE WITNESS: No, from Cathay Bank.

20   THE COURT: And what did you use, if anything, for

21   collateral for that loan.

22   THE WITNESS: The house.

23   THE COURT: So just a straight mortgage?

24   THE WITNESS: Straight mortgage.

25   THE COURT: And what's the value of the mortgage?

*Anthony D. Frisolone, FAPR, RDR, CRR, CRI, CSR*
Official Court Reporter

214

1    THE WITNESS: 1.5.

2    THE COURT: Million?

3    THE WITNESS: Million, yes.

4    THE COURT: Okay.

5    (Continued on the next page.)

*Anthony D. Frisolone, FAPR, RDR, CRR, CRI, CSR*
Official Court Reporter

215

1    (Continuing)

2    MR. STOELTING: Just one moment, Your Honor.

3    THE COURT: While you are doing that, I am going to

4    ask just a follow-up question relating to this Brownfield

5    remediation issue.

6    You said several times that you feel that you have

7    earned or you earned the 10 or $11 million credit from the

8    Brownfield recovery fund. And you, at various times, talked

9    about work, it sound like you gave or your company did to

10   remediate the property; is that correct?

11   THE WITNESS: That's correct.

12   THE COURT: Okay.

13   To the extent that money had to be expended for that

14   remediation effort, where did that money come from? How was

15   that paid for?

16   THE WITNESS: It's coming from my money and the EB-5

17   money.

18   THE COURT: "It is my money and EB-5 money."

19   THE WITNESS: The loan -- the loan from EB-5.

20   THE COURT: Right. So it came from investor money.

21   THE WITNESS: Yes.

22   THE COURT: And yet you feel like you are entitled

23   to keep all of that credit.

24   THE WITNESS: I didn't take that credit. I just

25   used that as the collateral to borrow loan.

VB    OCR    CRR

216

1    THE COURT: But in response to my question, are you

2    intending to return that $10 million that was used to get the

3    CD to the investor funds to pay the investors on the Mirage

4    property -- or sorry, the Emerald property, to refund their

5    investment or to give them any profit?

6    THE WITNESS: After you complete the Brownfield, the

7    New York State look at your work. They are happy about your

8    work so they gave you your tax credit on your company's types

9    of account. If you don't have types of liability, you can

10   request refund on that tax credit.

11   THE COURT: But all of these things, I mean, you did

12   just say that the remediation, though, was funded in part,

13   sounded like probably in large part by investor money.

14   So why wouldn't that go back to them in terms of the

15   benefit of that tax credit to the company, which is where

16   their funds reside?

17   THE WITNESS: When you get green card, by the time

18   they got the green card, the building already finished. So

19   there's, you know, at that time, like I did before --

20   THE COURT: Wait. We are talking about Emerald,

21   right? That is not -- it is not finished.

22   THE WITNESS: It's not finished. But by the time

23   they got -- because if they don't get green card, there's no

24   reason for them to ask for their money back.

25   THE COURT: Well, no. They just want their money

VB    OCR    CRR

217

1  back, even if they get the green card.  Am I missing
2  something?  It seems human nature, $500,000 is a lot of money.
3       So I hear you say that once a project is done and
4  everyone gets their green card, you could close the project
5  and pay everybody back, but you have not done that with
6  respect to the Emerald project, right?
7       THE WITNESS:  I can do it.  I'm ready to do it.
8       THE COURT:  Right.
9       But the question are you going to return the 10
10  million to part of the fund for the Emerald project, given
11  that it was advertised as having that as one source of funds
12  and that EB-5 monies were used for the remediation.
13       THE WITNESS:  That's a source for complete the
14  construction, not the source fund to repay them.
15       THE COURT:  Okay.
16       All right.  I will not belabor this.
17       Go ahead, Mr. Stoelting.  We should finish up.
18       MR. STOELTING:  I have a couple more questions.
19       THE COURT:  Yes, go ahead.
20  BY MR. STOELTING:
21  Q    What was the purchase price of your parents's home on
22  Forest Drive?
23  A    $2.4 million.
24  Q    And how was the down payment made?
25  A    From their savings.
                    VB   OCR   CRR

218

1  Q    I'm sorry?
2  A    From their personal savings.
3  Q    Okay.
4       Now, were there any other houses that you've
5  acquired in the past few years that we haven't already talked
6  about?
7       MR. KAMELI:  Object.  Few years?
8       THE COURT:  Why don't you put a year, 2018?
9       MR. STOELTING:  Okay.  Fine.
10  Q    Since from 2018 until today, are there any other houses,
11  pieces of property, real estate, that you or your companies
12  have acquired that we've not talked about today?
13  A    Ever since 2013, I bought these in Emerald project and in
14  2007 I bought Mirage project.  I didn't acquire any of -- any
15  other rental property than any of these.  And these purchase
16  for my parents is purely because of the pandemic.  They have
17  been staying the apartment for the entire year.  They cannot
18  just come out.
19       So that's why, you know, I try my best to talk to
20  all the banker, and try to find the finance for them so they
21  can have a proper, I guess, working environment.
22  Q    All right.
23       Thank you, Mr. Xia.  That was all.  That's all I
24  have.
25       THE COURT:  All right.  Thank you.
                    VB   OCR   CRR

219

1       So why don't we have -- why don't we conclude
2  today's proceedings.
3       You can step down, Mr. Xia.
4       And we have start tomorrow with examination by
5  Mr. Xia's counsel.
6       The only thing I will say is I did want to ask a
7  couple questions before I turn the floor over to you tomorrow
8  morning, but I will take until tomorrow, given the hour.
9       MR. KAMELI:  As you wish.
10       THE COURT:  So 9:30, everyone be here ready to go so
11  be here a little early and get set up.
12       MR. KAMELI:  Quick question.
13       Do you believe that in case we go to Wednesday, you
14  are available?
15       THE COURT:  I do not plan to go to Wednesday.  So I
16  do not really want to talk about that.  It would really create
17  a problem for my schedule.
18       So we have all day tomorrow, except for a couple
19  hours.  I do not see why we cannot get this done.
20       MR. KAMELI:  Certainly hope so.
21       THE COURT:  Let me check with Mr. Stoelting.
22       How long do you think your two witnesses will be
23  after Mr. Xia?  Let's assume at the moment he takes up the
24  morning.
25       MR. STOELTING:  I will let my colleagues -- two
                    VB   OCR   CRR

220

1  hours each?  Oh, two hours for both?
2       MR. McGRATH:  Two hours for both.
3       MR. KAMELI:  I thought you indicated 12:00 to 2:00
4  you are not available.  So in the morning that we'll finish
5  with Mr. Xia and then in the afternoon, they take about two,
6  three hours.  I really need to have that.
7       THE COURT:  We will see.  I would be shocked if you
8  have two or three hours worth of testimony to ask, since we
9  have covered a lot of ground, but let's see where we are after
10  that and then I will hear from the experts.  And if we need
11  more time, we will figure that out.
12       MR. KAMELI:  Yes, Your Honor.
13       THE COURT:  Okay.
14       MR. KAMELI:  Thank you.
15
16       (Matter adjourned to February 15, 2022 at 9:30 a.m.)
17
18              oooOooo
19
20
21
22
23
24
25
                    VB   OCR   CRR

222

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2
 3   - - - - - - - - - - - - X

     SECURITIES AND EXCHANGE        :
 4   COMMISSION,                              21-CV-5350(PKC)

 5            Plaintiff,            :
                                              United States Courthouse
 6        - against -              :          Brooklyn, New York

 7   RICHARD XIA, et al.,           :         February 15, 2022
                                              9:30 o'clock a.m.
 8            Defendants.           :

 9   - - - - - - - - - - - - X

10           TRANSCRIPT OF ORDER TO SHOW CAUSE
             BEFORE THE HONORABLE PAMELA K. CHEN
11           UNITED STATES DISTRICT JUDGE.

12   APPEARANCES:

13   For the Plaintiff:       US SECURITIES & EXCHANGE
                              COMMISSION
14                            New York Regional Office
                              200 Vesey Street, Suite 400
15                            New York, New York 10281-1022

16                        BY:  DAVID P. STOELTING, ESQ.
                              KEVIN P. McGRATH, ESQ.
17                            KIM HAN, ESQ.

18   For the Defendants:      SILLS CUMMIS & GROSS, P.C.
                              One Rockefeller Plaza
19                            New York, New York  10020

20                        BY:  HERVE GOURAIGE, ESQ.

21                            TAHER KAMELI, ESQ.
22                            17 N. State Street, Suite 1700
                              Chicago, Illinois  60602

23   Court Reporter:          Charleane M. Heading
                              225 Cadman Plaza East
24                            Brooklyn, New York

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
```

                    CMH    OCR    RDR    FCRR

223

```
 1       (In open court.)

 2       THE COURT:  We are ready to start.

 3       What did you want to put on the record,

 4   Mr. Stoelting?

 5       MR. STOELTING:  Your Honor, yesterday, I asked

 6   Mr. Xia some questions about payments to Xia entities by

 7   Racanelli and Perini and the invoices that purport to

 8   correspond to those payments and Mr. Xia said, I asked him

 9   about production of invoices to the SEC and he talked about

10   producing invoices and he said in November of 2020,

11   Verfenstein produced invoices to the SEC during the

12   investigation.

13       So as a result of that testimony, we went back and

14   there was indeed a production in November 2020 from

15   Ms. Verfenstein of invoices to the SEC and, unfortunately, so

16   we reviewed them last night and have, as a result, amended

17   some of the exhibits to the Dhookie declaration.

18       THE COURT:  Okay.

19       MR. STOELTING:  And we have revised exhibits today

20   and I believe it's going to change at least one of the numbers

21   that was in the complaint and we had previously indicated to

22   the Court we'd be amending the complaint soon.

23       THE COURT:  Right.

24       MR. STOELTING:  So those numbers would be reflected

25   in the exhibits that we prepared last night based on those
```

                    CMH    OCR    RDR    FCRR

224

```
 1   invoices.

 2       THE COURT:  Did you provide the amended information

 3   that's going to go into Mr. Dhookie's report to the defense?

 4       MR. STOELTING:  Yes, we gave copies of the amended

 5   exhibits today or this morning to Mr. Kameli and we had also a

 6   week ago actually produced the November 2020 invoices to the

 7   defense but for some reason just didn't correspond and --

 8       THE COURT:  -- incorporate them into your own expert

 9   evaluation?

10       MR. STOELTING:  Yes.

11       THE COURT:  Okay.  And when Mr. Dhookie testifies,

12   we'll get a copy of that as well, the amended numbers.

13       MR. STOELTING:  Yes.  We have copies for the Court

14   and the witness and everyone.

15       THE COURT:  All right.  Thanks for letting me know.

16       (The witness, RICHARD XIA, having been previously

17   sworn, resumed the stand.)

18       THE COURT:  Now, before I let Mr. Kameli begin,

19   Mr. Xia, I want to refer you to Exhibit 59 and if you look at

20   what's marked as page 59-22 of that exhibit, it's a signature

21   page for this purported loan agreement, I think.

22       THE WITNESS:  Yes.

23       THE COURT:  Now, the signatory for EMMCO, so EMMCO

24   NQMC is Walter Verfenstein, correct?

25       THE WITNESS:  That's right, yes.
```

                    CMH    OCR    RDR    FCRR

225

```
 1       THE COURT:  What was Mr. Verfenstein's position with

 2   respect to -- although it says, actually.  I shouldn't ask

 3   that question but it says executive director.  Was that

 4   correct at the time that this agreement was filed -- sorry,

 5   not filed -- signed?

 6       THE WITNESS:  Yes, that's right.

 7       THE COURT:  So tell me how you know Mr. Verfenstein

 8   then.  How is it he became the executive director of EMMCO

 9   which is one of your companies?  EMMCO NQMC, I should have

10   been clear.

11       THE WITNESS:  At that time, he was just working with

12   us for all the EB-5, like, communication visa, either the EB-5

13   investor or some other institutional investor.  So he's

14   working with us at the time.

15       THE COURT:  Okay.  This is now two thousand and --

16       THE WITNESS:  2011?  I don't remember -- yes, 2011.

17       THE COURT:  So in 2011, Mr. Verfenstein was working

18   with you to recruit or solicit EB-5 investors in China?

19       THE WITNESS:  No.  In 2011, all my investor at that

20   time go through what we call wholesale broker.  So this is

21   interaction with the wholesale broker and even this loan

22   agreement is for the, you know, purpose of the wholesale

23   broker need to submit green card application for the EB-5

24   investor so we were asking, we were asked to prepare a loan

25   agreement and so they can put that into, into the application.
```

                    CMH    OCR    RDR    FCRR

226

1    THE COURT: I'm not sure what you mean by a
2  wholesale broker. A wholesale broker of what?
3    THE WITNESS: Wholesale broker to refer EB-5
4  investor to that project.
5    THE COURT: So Mr. Verfenstein was a wholesale
6  broker for EB-5 investors?
7    THE WITNESS: No. He's working in my company
8  communicating with the wholesale broker.
9    THE COURT: Okay. So he was the executive director
10  of EMMCO NQMC in 2011?
11    THE WITNESS: In 2011, yes.
12    THE COURT: Okay. And what was his job?
13    THE WITNESS: His job?
14    THE COURT: What did he do other than --
15    THE WITNESS: Communicating with the wholesale
16  broker.
17    THE COURT: That was his sole responsibility?
18    THE WITNESS: Yes.
19    THE COURT: And so as part of that, was he supposed
20  to solicit? Because I think there was testimony yesterday
21  that he was with you in China. Was he supposed to solicit or
22  recruit EB-5 investors in China?
23    THE WITNESS: We always go through broker. So main
24  work is talking to the broker and to let them accept our
25  project information and so they can refer, because

CMH   OCR   RDR   FCRR

227

1  Mr. Verfenstein doesn't even speak Chinese so almost no way
2  for him to directly communicate with the potential EB-5
3  investor.
4    THE COURT: But what about his wife, Xi Verfenstein,
5  she's Chinese, correct?
6    THE WITNESS: She's Chinese but she's not with us.
7  It's just Mr. Verfenstein and me.
8    THE COURT: But, obviously, you were communicating
9  in Chinese with brokers there?
10    THE WITNESS: That's right, we communicate with
11  Chinese broker, yes.
12    THE COURT: Now, you testified yesterday about these
13  brokers. These are individuals who recruit Chinese investors
14  in companies such as yours, is that right?
15    THE WITNESS: That's right. It's a business go by
16  trust and the long term relationship. So most of their client
17  had some previous, I guess, business of other transactions
18  with the retail broker and so the retail broker need to be
19  responsible for a lot of their immigration demand need. So
20  that's why, even I go there, talk with the potential investor,
21  they translate.
22    THE COURT: Let's go back then to Verfenstein. You
23  said in 2011, he was the executive director for your NQMC
24  company. How long had you known him at that point?
25    THE WITNESS: I know him for a very long time at

CMH   OCR   RDR   FCRR

228

1  that time. I think I know him since 2006 or '7, yes.
2    THE COURT: And how did you first meet him?
3    THE WITNESS: I think in, in their wedding ceremony.
4    THE COURT: "Their" meaning Xi and Walter's wedding
5  ceremony?
6    THE WITNESS: That's right.
7    THE COURT: So who did you know, Xi Verfenstein?
8    THE WITNESS: Yes. Xi Verfenstein is the architect,
9  project architect of my first project in 2003 and '4 at that
10  time.
11    THE COURT: Okay. And how did you know her then in
12  2003 or '4? How did you come to work with her as your
13  architect?
14    THE WITNESS: I hired her company. I think at that
15  time, she was working for architectural firm Lin and
16  Associates.
17    THE COURT: What "and Associates"?
18    THE WITNESS: Lin, L-I-N, and Associates. And Lin
19  Associates did Chinese consulate in New York, that building,
20  and they did a second tower, a very nice building in Flushing.
21  So I was impressed by their firm and I went to their firm and
22  Xi Verfenstein was assigned to be a project manager of my, you
23  know, my develop.
24    THE COURT: And thereafter, she became the owner of
25  Perini, not the real Perini but a different Perini. Correct?

CMH   OCR   RDR   FCRR

229

1    THE WITNESS: That's years later on, ten years
2  later.
3    THE COURT: And did you work with her to help her
4  set up Perini?
5    THE WITNESS: No, it's her company. I didn't help
6  her to set up any company.
7    THE COURT: Okay. But by 2011, her husband is the
8  executive director of your EMMCO NQMC limited partnership,
9  right?
10    THE WITNESS: That's right, yes.
11    THE COURT: And you're working closely with Xi
12  Verfenstein on all of the projects we've been talking about,
13  the Mirage and Emerald, is that right?
14    THE WITNESS: That's correct, yes.
15    THE COURT: And I think as we saw yesterday, a lot
16  of money was sent from investor -- I should say EB-5 investor
17  money from these two projects did flow to Perini amongst other
18  entities, is that correct?
19    THE WITNESS: That's correct, yes, but for the
20  services they provide.
21    THE COURT: Okay. Then turning to Exhibit 71, this
22  is an e-mail exchange between you and Ms. Paula Arrojo who was
23  at Goldman Sachs and I want to refer you to the top of that
24  exhibit which is your response to something Ms. Arrojo wrote.
25    In it, you say, "What is the definition of EB-5

CMH   OCR   RDR   FCRR

230

1  money?" And then you write, "It is in the bank of my entity
2  and I use my property as collateral for it."
3       What entity were you referring to?
4       THE WITNESS: I'm talking about the developer, the
5  development entity, like the Fleet Financial or Eastern
6  Emerald Group.
7       THE COURT: So you're referring to either Eastern
8  Emerald Group LLC or LaGuardia Performance Center LLC, those
9  being your two development companies?
10      THE WITNESS: Yes, and Fleet Financial Group too.
11      THE COURT: So Fleet Financial Group meaning the
12 general --
13      THE WITNESS: Mirage -- no. Fleet Regional Center.
14 It's the general partner.
15      THE COURT: The general partnership?
16      THE WITNESS: Uh-huh.
17      THE COURT: Okay. And that is the general
18 partnership that received all of the investor money and then
19 redistributed it, is that correct?
20      THE WITNESS: No.
21      THE COURT: No?
22      THE WITNESS: No. Regional Center sponsor, you
23 know, multiple different project and every project is
24 sponsored the form of fund called LP, either EMMCO, LP or
25 EEGH, L.P. So that's the entity received the money.

CMH   OCR   RDR   FCRR

231

1       The EB-5 investor, even we call them EB-5 investor,
2  they're the investor to that fund. It's almost like a bank.
3  So EB-5 investor is investor who put money into that bank,
4  that LP, and that bank gave a loan to the developer which is
5  either EEGH or LaGuardia.
6       THE COURT: Okay. So I'm going to stop you there.
7  You're getting far afield. Let's go back to which entity you
8  were referring to in this e-mail.
9       THE WITNESS: Okay.
10      THE COURT: You gave me three different options. Do
11 you know which one you were referring to when you said "my
12 entity"?
13      THE WITNESS: Eastern Emerald Group and LaGuardia
14 Performance Center.
15      THE COURT: So you were referring to two different
16 groups?
17      THE WITNESS: Yes, for two different phase of the
18 project.
19      THE COURT: So when you said, "It is in the bank
20 account of my entity," you were referring to both Eastern
21 Emerald Group and LaGuardia Performance Center?
22      THE WITNESS: That's right, they're my entity.
23      THE COURT: And you're saying, "I use my property"
24 meaning --
25      THE WITNESS: The land.

CMH   OCR   RDR   FCRR

232

1       THE COURT: Well, hang on.
2       -- the funds in those bank accounts as collateral
3  for the house that you were seeking to get a loan for?
4       THE WITNESS: No. That's a part -- I said once the
5  EB-5 loan get into my entity which is Eastern Emerald Group or
6  LaGuardia, I use the property in the EEGH and the LaGuardia as
7  the collateral for that loan, for the loan from EB-5.
8       Let's call EB-5 a bank. EB-5 bank give me a loan
9  and I promise I'm going to pay them back. So, basically, if I
10 don't pay them back, my property can be foreclosed by the EB-5
11 bank. So that's a lending relationship between the LP and my
12 company.
13      THE COURT: When you say "property" then, you're
14 referring to what?
15      THE WITNESS: The real property.
16      THE COURT: What real property?
17      THE WITNESS: The land and the potential building
18 that's going to be built on that.
19      THE COURT: Sorry. Are we talking about the home
20 you were trying to buy or are we talking about a commercial
21 development property?
22      THE WITNESS: The project to be built because EEGH
23 owned that land and EEGH is going to own the potential
24 building. Those right now is the collateral for the EB-5
25 bank.

CMH   OCR   RDR   FCRR

233

1       THE COURT: So when you said "property," you mean
2  either the Eastern Emerald Group property or the LaGuardia
3  Performance Center property?
4       THE WITNESS: Yes, that's right.
5       THE COURT: And you were saying you would use that
6  as collateral --
7       THE WITNESS: -- to get the EB-5 loan.
8       THE COURT: Okay. And why were you raising that
9  with Ms. Arrojo because she was saying we can't take EB-5
10 money?
11      THE WITNESS: Yes, because -- like, EB-5 money, once
12 it's in the EB-5 bank, that's EB-5 money. The moment EB-5
13 money leave the EB-5 bank which is LP to my properties, my
14 entities, my entity basically has obligation to pay them back.
15 If I don't pay them back, the building is going to belong to
16 the EB-5 bank.
17      So that's why in my, from my perspective, I borrowed
18 the money from the bank. It could be EB-5 bank. It could be,
19 you know, JP Morgan Chase. Once they give me that loan and I
20 use my property and my building as the collateral, I believe
21 that's already become a loan proceed. It's no longer EB-5
22 investor money.
23      THE COURT: Yes, you said that yesterday.
24      THE WITNESS: Yes.
25      THE COURT: All right. One last question. In the

CMH   OCR   RDR   FCRR

234

1  next sentence, you say, "If GS," Goldman Sachs, "lends me
2  money and deposit into my bank account with my hotel as
3  collateral, will it still be considered as GS money or GS
4  investor/deposit money?"
5      When you refer to "my hotel," what were you
6  referring to there?
7      THE WITNESS:  I'm referring to the hotel I built
8  over in that picture, that hotel.
9      THE COURT:  So you're pointing at a board but it
10  says, "Union Street Project."
11      THE WITNESS:  Yes, that's the project I built.
12      THE COURT:  Where is that located?
13      THE WITNESS:  That's the Mirage project.
14      THE COURT:  That's the Mirage project.
15      So you're saying you were going to use the Mirage
16  project as the collateral for this loan you wanted to get from
17  Goldman Sachs?
18      THE WITNESS:  No.  I just gave an example.
19      THE COURT:  I see.
20      THE WITNESS:  Yes, I just gave example.  Because I'm
21  saying you're Goldman Sachs.  You'll let lend me the money.
22  It's same thing like EB-5 bank lend me the money.  So if
23  Goldman Sachs lent me the money, I deposit and I use the hotel
24  as the collateral, would you still consider that loan proceed
25  is still Goldman Sachs money or the investor to the Goldman

CMH   OCR   RDR   FCRR

235

1  Sachs money?  That's the analogy.
2      THE COURT:  I understand what you're saying.  Okay.
3  I think I understand.
4      THE WITNESS:  Yes.
5      THE COURT:  So, in other words, you were trying to
6  find out from her if she agreed with your idea that once the
7  money was lent from the general partnership to one of your
8  development groups, was it no longer, I guess, considered EB-5
9  money.
10      THE WITNESS:  That's right.
11      THE COURT:  And I assume she disagreed with you?
12      THE WITNESS:  She just never got back to me.  I
13  didn't know at that time they already got subpoena so I guess
14  she did not want to touch it.
15      THE COURT:  Thanks.
16      I appreciate your indulgence, Mr. Kameli.  Your
17  witness.
18      MR. KAMELI:  Thank you, Judge.  Are you able to see
19  this white board?
20      THE COURT:  I can see it.
21      MR. KAMELI:  Is it okay if I draw something or do
22  you want me to bring it closer?
23      THE COURT:  It depends on how big you draw.
24      MR. KAMELI:  Okay.
25      THE COURT:  But I see it.

CMH   OCR   RDR   FCRR

236

1      THE WITNESS:  Can I --
2      THE COURT:  You are going to draw on it?  Okay.
3      MR. KAMELI:  Yes.
4      THE COURT:  I'm talking to the witness.  It looks
5  like he wants to step down.
6      You may be better off putting it in the center.  You
7  are going to draw on it, Mr. Kameli?
8      MR. KAMELI:  I am.
9      THE COURT:  And the witness is going to stay put on
10  the box?
11      MR. KAMELI:  Yes.  Judge, do I have your permission
12  to take my jacket off?
13      THE COURT:  Yes.  Go ahead.
14  CROSS-EXAMINATION
15  BY MR. KAMELI:
16  Q   Mr. Xia, yesterday you ** were a witness to SEC's case.
17  You testified about your involvement with two projects, do you
18  remember?
19  A   Yes.
20  Q   There was a Mirage project and there was an Emerald
21  project, yes?
22  A   Yes.
23  Q   Let's talk about Mirage this morning and I'm going to
24  draw some.  I'll try to speak loudly so you can hear.
25      You talk about a Regional Center, right?

CMH   OCR   RDR   FCRR

237

1      THE WITNESS:  That's right.
2  Q   There is a company called Regional Center and for today's
3  purposes, we're going to put the Regional Center, "RC."
4  Right?
5  A   Yes.
6  Q   Regional Center is a company that's designated by the
7  United States company to raise money through EB-5 money,
8  right?
9  A   Yes.
10  Q   Did you seek the authorization from the United States
11  Government in 2010?
12  A   Yes.
13  Q   And is that one of the exhibits from SEC and for today's
14  purposes, we're going to call it Exhibit No. 14.
15      THE COURT:  Are we switching to defense exhibits
16  now?
17      MR. KAMELI:  No, Judge.  We're on SEC exhibits.
18      THE COURT:  Okay.
19  Q   On October 7, 2010, you were designated by the United
20  States Government, Federal New York Metropolitan Regional
21  Center LLC to raise money through EB-5, correct?
22  A   That's right.
23      THE COURT:  Go a little slower, Mr. Kameli, for our
24  court reporter.  Just go a tad slower.  Or maybe just for me.
25      MR. STOELTING:  I just assume this is background but

CMH   OCR   RDR   FCRR

238

1  it's been just a series of leading questions so far.
2      THE COURT:  That's fine.  Let's just do it as
3  efficiently as possible.  If there's something that's
4  objectionable in terms of a leading question, feel free to
5  object.
6      MR. KAMELI:  I'm trying to make it as fast as
7  possible.
8      THE COURT:  I understand but obviously there's some
9  limits as to how much you can lead the witness.
10      MR. KAMELI:  Yes, Judge.
11  Q  So in 2010, this company was designated and through that,
12  Federal Metropolitan Regional Center became a general partner
13  in a company called EMMCO, LP, correct?
14  A  **Yes, that's right.**
15  Q  The EB-5 investors would put that money in the company?
16  A  **Yes.**
17  Q  So that's an investment they would make in the company,
18  right?
19  A  **That's right.**
20  Q  They become limited partners?
21  A  **Yes.**
22  Q  And in total, $8 million was raised, right?
23  A  **Yes.**
24  Q  According to that documentation provided, all that money
25  was raised in 2010-2011, correct?

CMH    OCR    RDR    FCRR

239

1  A  **That's right.**
2      MR. STOELTING:  It's actually E-E-M-C-O.
3      MR. KAMELI:  E-M-M-C-O.
4  Q  Then there was a second corporation made, LP that again,
5  they were the general partner, they were LP, the same idea the
6  regional the foreign investors would invest money here, right?
7  A  **That's right, yes.**
8  Q  The total of $35.5 million was raised, correct?
9  A  **It's about that amount, yes.**
10  Q  Then we have the third company called EMMCO Tower for a
11  total of $12.5 million, correct?
12  A  **Yes, the number is right.**
13  Q  All these were supposed to lend the money to a project
14  called earn Mirage, right?
15  A  **Yes.**
16  Q  Okay.  And this is the loan you're talking about?
17  A  **That's right, yes.**
18  Q  All right.  So --
19      THE COURT:  I'm sorry.  When you say this is the
20  loan you're talking about, what are you referring to?
21      MR. KAMELI:  There's a loan -- I'm going to go back
22  to the documentation.
23      THE COURT:  Careful.  You're definitely reaching the
24  limit of leading the witness.
25  Q  Mr. Xia, I'm going to bring your attention to Exhibit

CMH    OCR    RDR    FCRR

240

1  No. 3, SEC Exhibit 3, Plaintiff's.
2  A  **Yes.**
3  Q  What's the name of the general partner on page 3-1?
4  A  **EMMCO Tower.**
5  Q  The name of the LP is EMMCO Tower, right?
6  A  **Yes.**
7  Q  Who is the general partner?
8  A  **It's Federal New York Metropolitan Regional Center.**
9  Q  What was the purpose of this LP being established?
10  A  **To raise the EB-5 money.**
11  Q  And only EB-5 investors or other investors also, U.S.
12  investor?
13  A  **Only EB-5 investor.**
14  Q  So people that were investing in this company in order to
15  obtain EB-5 permanent residency, right?
16  A  **Right, they're trying to get green card.**
17  Q  Allow me to take you to page 3.7, 3.5.
18  A  **Yes.**
19  Q  In the third paragraph, "Investment Option Strategy," you
20  talk about the EB-5.  And each person had to invest how much?
21  A  **Half million.**
22  Q  Did they have to pay any kind of administrative fee?
23  A  **Yes.**
24  Q  How much?
25  A  **50,000.**

CMH    OCR    RDR    FCRR

241

1  Q  So before --
2      THE COURT:  Pause for one second.  The third
3  paragraph is named "Investment objective and strategy."
4      MR. KAMELI:  Yes, Your Honor.
5      THE COURT:  I have a live transcript so I just want
6  to make sure that it's corrected where necessary because each
7  of these terms may make a difference.
8      So that's the name of the third paragraph.  Go on.
9      MR. KAMELI:  Thank you, Judge.
10  Q  So besides the $500,000, each investor had to pay $50,000
11  for administrative fee?
12  A  **Yes, that's correct.**
13  Q  Did that administrative fee belong to --
14      THE COURT:  Who did it belong to.
15  Q  Who did it belong to?
16  A  **Regional Center, general partner.**
17      THE COURT:  I'm sorry.  Where does it say $50,000 on
18  this page?
19      THE WITNESS:  On the next page, on the limited
20  partner portion, in the third paragraph.
21      THE COURT:  Yes.  Under limited partners, it says:
22  There will be a capital investment of 500,000 along with a
23  processing fee, okay, of 50,000.
24      THE WITNESS:  That's right.
25      THE COURT:  So it's not in the paragraph that we're

CMH    OCR    RDR    FCRR

242

1  looking at on 3-5.
2      THE WITNESS:  3-6.
3      MR. KAMELI:  So, Judge, 3-6 under "Limited Partner."
4      THE COURT:  Under "Limited Partner."
5      Just go a little slower because I'm having trouble
6  understanding every word you're saying.  Go ahead, Mr. Kameli.
7      MR. KAMELI:  I will go slower, Judge.
8  Q   And Mr. Xia, let me take you to page 3-11, second
9  paragraph.  And in that paragraph, the second sentence, third
10  sentence starts with, "The partnership is designed."
11      Do you see that?
12  A   Which paragraph, third paragraph?
13  Q   The second paragraph where it says, "The partnership is a
14  commercial for-profit enterprise"?
15  A   Okay.
16  Q   The third sentence, the third line says:  The partnership
17  is designed to comply with this statutory and regulatory
18  requirements of the EB-5 immigrant investor program.
19      THE COURT:  Go ahead.
20  Q   "Administered by the United States Citizenship and
21  Immigration Services, USCIS, with respect to certain foreign
22  investors."
23      Do you see that, sir?
24  A   Yes, I see that.
25  Q   What was your understanding about comply with the EB-5

        CMH   OCR   RDR   FCRR

243

1  requirement?
2  A   It's to help those investor to get green card.
3  Q   Is that by creating jobs?
4  A   Yes.
5      THE COURT:  Could you repeat your answer, what did
6  you say?  What does "comply" mean to you?
7      THE WITNESS:  To help the EB-5 investors get a green
8  card --
9      THE COURT:  Okay.
10      THE WITNESS:  -- through the job creation.
11      THE COURT:  All right.
12  Q   And in reality, in this PPM, did you mention about
13  immigration and investment together?
14  A   I think it's immigration is the main purpose here.
15  Q   Allow me to take you to page 3-22.
16      Did you notify the investors about the immigration
17  risks of their investment?
18  A   Yes, I did.
19  Q   And are you referring to page 3-22 and 3-23?
20  A   That's right, yes.
21  Q   And let me also take you to page 3-37 which is part of
22  the operating agreement.  In the operating agreement of this
23  limited partnership, on the top of the page of 3-37, it says,
24  "Immigration act."
25  A   Yes.

        CMH   OCR   RDR   FCRR

244

1  Q   Okay.
2      MR. STOELTING:  Can I just clarify?  This is a
3  limited partnership agreement, not an operating agreement.
4      MR. KAMELI:  Limited partnership.  Thank you, sir.
5      THE COURT:  Okay.  Go ahead.
6  Q   And then on page 3-38, in the limited partnership
7  agreement, it talks about program which is the seventh
8  definition being defined that talks about the EB-5 immigrant
9  investment program.  Do you see that, sir?
10  A   On which paragraph, 3-37 or 3-38?
11  Q   Page 3-38.
12  A   Okay.  Which paragraph?
13  Q   Where it says "program," the word "program."  It's the
14  definition of program?
15  A   Okay.  Yes, I see that, yes.
16  Q   Very good.  So did you write this offering memorandum
17  based on immigration and investment or just investment?
18      MR. STOELTING:  Objection.
19      THE COURT:  Sustained.
20  Q   Based on your understanding, sir, what was your
21  understanding about individual investing in this program, what
22  was their main goal if you know?
23  A   Green --
24      THE COURT:  Sustained.  Calls for speculation.
25  Q   Allow me to take you to page 3-11, second paragraph

        CMH   OCR   RDR   FCRR

245

1  again.
2  A   Yes.
3  Q   Sixth line.  It says:  The partnership will invest in the
4  Eastern Mirage project through a loan to Fleet Financial
5  Group, a New York corporation.  Do you see that?
6      THE COURT:  Hang on one second.  I'm trying to find
7  it.  Second full paragraph.  Okay, go ahead.
8  Q   The paragraph that start with, "The partnership."  Sixth
9  line at the end, it says:  The partnership will invest in the
10  Eastern Mirage project through a loan to Fleet Financial
11  Group, Inc., a New York corporation.
12  A   That's on page 3-11?
13  Q   Yes.
14  A   Okay.
15      THE COURT:  3-11, second full paragraph, about
16  two-thirds of the way down in the paragraph.
17      All right.  Do you see that Mr. Xia?
18      THE WITNESS:  Yes, I see that.
19      THE COURT:  All right.  Go ahead.  Question.
20  Q   So this is the loan -- so, basically, this is the EMMCO
21  Tower to give a loan to Eastern Mirage through the developer
22  who is called Fleet Financial?
23      THE COURT:  I'm sorry.  You're drawing Fleet, Fleet
24  Financial Group.  Is that what you're drawing there?
25      MR. KAMELI:  Yes, Your Honor.

        CMH   OCR   RDR   FCRR

246

1    THE COURT:  Okay.
2    MR. KAMELI:  Based on this document, that's the one
3 that's accepting the loan.
4    THE COURT:  How about his testimony?
5    Mr. Xia, is that a correct diagraming of the flow of
6 the loan money?
7    THE WITNESS:  Yes, that's exactly what I was trying
8 to explain to the Court and to everybody.
9    THE COURT:  Okay.
10    THE WITNESS:  Those three entity, they're almost
11 like Goldman Sachs, JPMorgan.  EB-5 investor is almost like
12 the investor to the bank, not to the project.  So the bank
13 gave a loan to the project through Fleet Financial Group or
14 other developers.
15    THE COURT:  Okay.  Understood.
16    Go ahead.
17 Q    Under the EB-5 law, there is a company called new
18 commercial enterprise, NCE.  Which one is the NCE and which
19 one is the JCE, job creating entity?
20 A    All those LPs, they're the NEC.
21 Q    So under the EB-5 law, new commercial enterprise which is
22 called NCE are the LPs?
23 A    Yes.
24    THE COURT:  In your view.
25    THE WITNESS:  Yes.
CMH    OCR    RDR    FCRR

247

1    MR. STOELTING:  Objection.
2 A    Under the immigration law, we are required to create the
3 NCE because the EB-5 investor need to put their money at risk
4 all the time so they cannot give a loan to NCE so they had to
5 be an at-risk investor into the NCE.
6 Q    Exhibit 3, what you're looking at, is that an offering
7 memorandum for the NCE?
8 A    That's right.
9    MR. STOELTING:  Objection.
10 A    For the NCE, yes.
11    THE COURT: And you're pointing at EMMCO Tower.
12    MR. KAMELI:  I'm looking at the EMMCO Tower, LP.
13    THE COURT:  Okay.
14 Q    Under the immigration law, do you know which entity is
15 the job creating entity?
16    THE COURT:  I'm not sure why I'm accepting his
17 testimony about the law but I'll accept his belief about it,
18 if that's what you're asking.
19    MR. KAMELI:  Yes, Your Honor.
20 A    Yes.  My understanding is that Fleet Financial Group is
21 the job creation entity.
22 Q    So Fleet Financial is the job creating entity.  So it's
23 called JCE.
24    Are all the jobs need to be created by that company?
25 A    Yes.  That's the company who received the loan and the
CMH    OCR    RDR    FCRR

248

1 purpose of that loan is to, number one, to build the project.
2 Number two, to job creation can be used for all the NCE
3 investor to apply for their immigration benefit which is a
4 green card.
5 Q    Mr. Xia, please take a look at page 3-5, the first
6 paragraph heading called "The partnership."
7 A    Yes.
8 Q    It says:  The partnership is a new commercial enterprise
9 that intends to finance the real estate development project
10 known as Eastern Mirage project through a loan to a real
11 estate management and development company affiliated with the
12 Federal New York Metropolitan.
13    Do you see that, sir?
14 A    Yes, I see that.
15 Q    That's loan -- in the white board that I was showing,
16 shows loan from LP to the Fleet Financial Group summarizes the
17 relationship mentioned in that paragraph?
18 A    As a typical real estate finance deal, Fleet
19 Financial Group as a developer receive a loan from the NCE,
20 almost like it received the loan from any other construction
21 lender.
22 Q    Since we don't want to waste the time of the Court, there
23 are, two other offering memorandums have been provided by the
24 plaintiffs in Exhibit 1.  Please take a look at it.  It's
25 EMMCO, L.P.?
CMH    OCR    RDR    FCRR

249

1 A    Yes.
2 Q    Exhibit 2 is EMMCO NQMC, L.P.?
3 A    E-M-M-C-O.
4 Q    EMMCO, NQMC.  And the function of the LPs mentioned in
5 paragraph, in Exhibit 1 and Exhibit 2 is also to provide loan
6 to Fleet Financial?
7 A    Yes.  Actually, it's all the same structure, all five
8 offering memorandum from all five LP, they all function as the
9 lender to give loan to projects.
10 Q    Very good.
11    So what was the function of Fleet Financial Group
12 now?  So the money went from LP to Fleet Financial Group, the
13 job creating entity.  What was the function?  What was it
14 supposed to do now?
15 A    Fleet Financial is a developer.  You know, just like the
16 developers that was doing for all other project, they just
17 need to get the loan to build a project.  Here, the good part
18 is because this loan is sponsored by the Regional Center who's
19 designated by the USCIS as a job create entity, so all the
20 job, indirect, direct job created through this project, even
21 whether we buy material, buy concrete around this project,
22 those job can be counted towards eventually job creation for
23 the green card applicant.
24 Q    How did you accomplish that job creation?
25 A    To build that project.
CMH    OCR    RDR    FCRR

250

1  Q    How did you do that?  Did you hire someone?  Did you hire
2  a company to do that?
3  A    Yes, I hired the general contractor.
4  Q    So Fleet Financial goes ahead and hires a general
5  contractor.  What was the name of that general contractor?
6  A    It's called Racanelli Construction Group.
7  Q    Racanelli.  Did Racanelli hire other companies to help to
8  create the jobs that build the building?
9  A    Yes.  It's a pretty big project.  It need a lot of
10  subcontractors to complete it.
11  Q    And some of those subcontractors, the companies and the
12  enterprises belonged to you, correct?
13        MR. STOELTING:  Objection.
14        THE COURT:  Overruled.
15  A    Yes, it's belong to me, yes.
16  Q    All right.
17  A    But we didn't go in trying to be a subcontractor.  We
18  have --
19  Q    That was not my question, sir.
20  A    Okay.  Sorry.
21  Q    So there are other companies that provided services for
22  Fleet Financial to build Eastern Mirage and some of them are
23  your entities, correct?
24  A    That's correct.
25  Q    Did some of those entities that provided service get aid

CMH   OCR   RDR   FCRR

251

1  by the general contractor?
2  A    Yes.
3  Q    All right.  So let's go back to the Exhibit 3 for a
4  second.  Exhibit 3, page 3-5.
5  A    Yes.
6  Q    The paragraph, "The partnership"?
7  A    Okay.
8  Q    Please read the last sentence that starts with "The
9  Partnership," the last sentence?
10  A    The partnership did not own the project but will provide
11  funding for the project's job creating activities.
12  Q    So you're explicitly notified the investors of the LP
13  that they won't own Eastern Mirage, right?
14  A    They are not the project, they're the investor to the
15  loan lending entity and that's part of the operation --
16  Q    Mr. Xia, there is no question on the floor.
17        I would like to direct your attention to page 3-13.
18        THE COURT:  3-13.
19  Q    3-13, under the heading, "The general partner," second
20  paragraph.
21  A    Yes.
22  Q    It says that -- please read what it says.
23  A    "The general partner" --
24        THE COURT:  How about I read it.
25        The general partner exercises ultimate authority for

CMH   OCR   RDR   FCRR

252

1  overall management of the partnership and is responsible for
2  its day-to-day operations, although the limited partners will
3  engage in policy-making activities and will have the rights,
4  powers and duties normally granted to limited partners under
5  the New York revised Limited Partnership Act.
6        Did you want anything else, Mr. Kameli?
7        MR. KAMELI:  Not for now, Judge.  Thank you.
8  Q    So were you responsible, Mr. Richard, Mr. Xia, in regards
9  to running and operating the LP?
10  A    Yes.
11  Q    And did you -- and allow me to take your attention also
12  to continuation of that paragraph.
13        MR. KAMELI:  If I may, Judge, may I read it?
14        THE COURT:  Yes, go ahead.  Just do so slowly.
15        MR. KAMELI:  As you wish.
16  Q    The general partner -- and we are looking at seventh
17  line.
18        The general partner may also retain such other
19  suitable parties to provide services to the partnership
20  including without limitation legal, consulting, marketing,
21  administration and accounting services.
22        Do you see that, sir?
23  A    Yes.
24  Q    Based on that power given to the general partner, we go
25  back to Exhibit 59 that Her Honor was asking questions about

CMH   OCR   RDR   FCRR

253

1  this morning.
2        Did you hire Walter Verfenstein in order to assist
3  you to --
4        THE COURT:  Sustained as to form.
5  Q    Did you hire Walter Verfenstein?
6        THE COURT:  Verfenstein.
7  A    Yes, I hired him.
8  Q    Okay.  And he was hired for EMMCO NQMC, L.P., correct?
9  A    Yes.
10        THE COURT:  E-M-M-C-O.
11  Q    I'm going to bring your attention to the same page, 313.
12  A    Yes.
13  Q    Last paragraph:  The general partner shall devote as much
14  time to activities of the partnership as it shall determine to
15  be necessary for the efficient conduct of the partnership.
16  The job partner may engage or participate in other activities
17  or ventures whether or not of the same nature as and competing
18  with activities of the partnership.  No limited partner shall
19  be entitled to any profit within the general partner or any of
20  its affiliate services from activities or venture other than
21  the partnership.
22  A    Yes.
23  Q    Mr. Xia, were these subcontractors that provided, that
24  were part of your organization that you were the owner of,
25  those, affiliates of the general partner or not?

CMH   OCR   RDR   FCRR

254

1  A    **It's my affiliated.**
2  Q    Your affiliate?
3  A    **Yes.**
4  Q    And the general partner was the Regional Center that we
5  talked about earlier?
6  A    **Yes.**
7  Q    Okay.
8        THE COURT:  I didn't understand that answer.  What
9  does it mean, "my affiliated"?  What do you mean when you say
10  that?
11       THE WITNESS:  I mean I'm the main person of all
12  those entities.
13       THE COURT:  Right.  So you're the main person of all
14  the LPs and of Fleet Financial, right?
15       THE WITNESS:  Yes, and the subcontractors too.
16       THE COURT:  Right.
17       So what's your question again?  I'm not sure I
18  understand.
19       MR. KAMELI:  I established, Judge, that these
20  companies are affiliates of the general partner which was
21  mentioned in the LP that they can provide services, that he's
22  notifying people, he's notifying that he's going to be
23  involved.
24       THE COURT:  Okay.  So that's your argument.  I
25  understand.  So you're saying essentially because --

CMH   OCR   RDR   FCRR

255

1        THE WITNESS:  I was the managing member of general
2  partner.
3        THE COURT:  Because you're what?
4        THE WITNESS:  I'm the managing member of the general
5  partner.
6        THE COURT:  So all of these companies are your
7  affiliates?
8        THE WITNESS:  Yes, through the general partner, yes.
9        THE COURT:  Okay.  Go ahead.
10       MR. KAMELI:  Affiliates of the general partner,
11  Judge.
12       THE COURT:  Understood.
13  Q    Again, on page 314, top paragraph:  The general partner
14  and its affiliates shall in no way be prohibited from
15  investing in real estate related projects for their own
16  account including projects in which the partnership also
17  invests.
18  A    **Yes.**
19  Q    Do you see that?
20  A    **I see that.**
21  Q    Did you notify the investors in this document that the
22  project management, that you are the president and CEO of the
23  general partner?
24  A    **Yes.  I note that, yes.**
25  Q    And is that in page 3-14?

CMH   OCR   RDR   FCRR

256

1        THE COURT:  I was going to say how about we ask him
2  where it is but go ahead, let's look at 314.
3        THE WITNESS:  Okay.
4        THE COURT:  And why don't you tell us where on this
5  page you do that.
6  Q    Where did you mention that?  Is that the second
7  paragraph?
8        THE COURT:  Mr. Kameli, please, you really are
9  testifying at this point.
10       Mr. Xia, where on page 3-14 do you notify the
11  investors that you're the president and CEO of the general
12  partnership?
13       THE WITNESS:  On the next paragraph, the project,
14  the management and the development team.  It shows Richard Xia
15  as the president of the project.
16       THE COURT:  I'm sorry.  You have to read a little
17  slower.
18       .so in the paragraph that's headed "Richard Xia,
19  president and CEO of the general partner," that's where you're
20  reading from?
21       THE WITNESS:  That's right, yes.
22       THE COURT:  Okay.  Go on, Mr. Kameli.
23       MR. KAMELI:  Thank you, Judge.
24  Q    Let me take your attention to page 3-15.  It talks about
25  the loan agreement, the bottom of the page.

CMH   OCR   RDR   FCRR

257

1        Based on that -- the second, look at the second
2  paragraph, please?
3  A    **Yes.**
4        (Continued on next page.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CMH   OCR   RDR   FCRR

258

1    CROSS-EXAMINATION (Continued)
2    BY MR. KAMELI:

3    Q    Did you notify the investors that the loan will be repaid
4    to them?
5    A    The loan is going to be repaid through the L.P., the EB-5
6    bank.  It's not to the investment fund to repay to the
7    investor.
8    Q    Is that where it says the borrower intends to repay the
9    loan at maturity with the proceeds of long-term financing or
10   from other sources.
11        What did you mean by that?
12        What do you mean by long-term financing or other
13   sources?
14   A    Just like what I was trying to do since 2018.  You know,
15   you go to the bank and ask the bank give us, you know,
16   cash-out loan or refinance loan, so I can use that proceeds to
17   pay back the L.P., and the L.P., if by that time, all EB-5
18   investor got their green card, we can dissolve the L.P and
19   based on the percentage of their investment, they can get
20   their capital back.
21   Q    So that was your intention at the time?
22   A    Yeah.  That was my intention at the time.
23   Q    Was that ever your intention to sell the building, the
24   mirage project and pay the L.P.s back?
25   A    No.  Never.  I was -- I was very passionate about that

Avery Armstrong, Official Court Reporter

259

1    project I built.  It's almost like my baby.  So I was -- it
2    was always my intention to do the best on the project, and I'm
3    sure the value is there right now.  So I think always with my
4    expertise, with my pureness, the value is going to greatly
5    surpass the loan we borrow from EB-5 L.P., and I have never
6    had doubt to pay that loan back to the L.P. and the L.P.
7    should have a sufficient money to distribute back into after
8    they got the green card.
9        THE COURT:  Can I ask one question for clarification
10   since I'm staring at your chart, Mr. Kameli.
11        When the witness is testifying or Mr. Xia, when you
12   say L.P. -- hang on.  Don't point Mr. Kameli, but I was going
13   to ask -- does it include EMMCO Tower?  Is that an L.P. --
14   A    That's right.  It's very often.
15        THE COURT:  Can I just ask you, Mr. Kameli, why does
16   it say L.P. and G.P. then?
17        MR. KAMELI:  Limited partner and general partner.
18        THE COURT:  Right.  But those are two different
19   things.  So I guess I'm confused now.
20        Why did you write GP along with LP?
21        MR. KAMELI:  Because the EB-5 investors are the
22   limited partners and Mr. Xia's partner is the general partner.
23        THE COURT:  Right.  But EMMCO Tower is not the
24   general partner, for example.  I just want to make sure I
25   understand your diagram.

Avery Armstrong, Official Court Reporter

260

1        MR. KAMELI:  This is the EMMCO Limited Partner.
2    Within that limited partnership, the EB-5 investors are the
3    limited partner and his company is a general partner.
4        THE COURT:  Oh, I see.  So EMMCO Tower then is what,
5    a limited partner or general partner, Mr. Xia?
6        THE WITNESS:  EMMCO Tower is a name of L.P. and it's
7    still the same structure.  EB-5 investor is a limited
8    partner --
9        THE COURT:  Hang on.  You've got to go much slower.
10   Remember, we have a brand new court reporter to the case, so a
11   lot of these terms --
12        THE WITNESS:  Okay.  EMMCO Tower is the name of the
13   L.P., and for that L.P., EB-5 investor is still limited the
14   partner and the regional center, my regional center is still
15   the general partner of that L.P.
16        THE COURT:  Okay.  Again, I'm just trying to
17   understand this diagram, but all right.  Go ahead.
18        So when you say the loan is going to be repaid to
19   the L.P. for purposes of the Mirage project, you're talking
20   about EMMCO Tower?
21        THE WITNESS:  EMMCO Tower, EMMCO NQMC -- and also
22   EMMCO Tower and EMMCO NQMC.  E-M-M-C-O.
23        THE COURT:  So Avery, whenever you hear E-M-M-C-O or
24   something that sounds like that, that's what we're referring
25   to, okay.

Avery Armstrong, Official Court Reporter

261

1        Go ahead.
2    Q    So just to follow up with Her Honor's questions, fleet
3    Financial is the borrower, correct?
4    A    That's correct.
5    Q    When the time comes to pay the loan back, this loan,
6    Fleet Financial will give the loan back to EMMCO Tower L.P.,
7    correct?
8    A    Yes.  He have to.
9    Q    To the corporation?
10   A    That's right.
11   Q    Then the partnership.  Then the partnership has to
12   disperse the money according to its agreement, the partnership
13   agreement?
14   A    Yes.  Everybody got a green card.  If not everybody get a
15   green card, the person who's remaining in the application
16   process, it will lose their you united benefit to get
17   permanent green card.
18   Q    We're going to come to that.
19        Mr. Xia Page 317, 3-17 of Exhibits 3 of Plaintiff,
20   it says about fees and expenses.
21        Do you see that?
22   A    Yes.  I see that, yes.
23   Q    In the middle of the paragraph, it says administrative
24   expenses will be paid from the 50,000-dollar processing fee
25   paid by each limited partner for issuance expenses.

Avery Armstrong, Official Court Reporter

**262**

1    Do you see that, sir?

2    A    Yes.  I see that.

3    Q    Okay.  So I'll go back to our diagram.  I'm looking at

4    EMMCO L.P.'s an example.

5    A    Yes.

6    Q    The EB-5 investor was putting $500,000 as an investment

7    into the limited partnership, correct?

8    A    They have to do that, yes.

9    Q    And they had to pay $50,000 extra, correct?

10   A    Yes.  That is part of the offering.

11   Q    Who did that 50,000-dollar belong to?  Who was that going

12   to?

13   A    General partner.

14   Q    So did any of the -- as far as you know, did any of the

15   EB-5 investors in EMMCO L.P. pay the 50,000-dollar also to the

16   partnership, to the limited partnership?

17   A    They only paid to the general partner.

18   Q    Let me rephrase the question.

19        The $500,000 from the EB-5 investor would get wired

20   to the limited partnership account, correct?

21   A    That is correct.

22   Q    Do you know if the limited -- if the EB-5 investors

23   sometimes wire the $50,000 to the partnership also?

24   A    Yes.  They always wire those money together.

25   Q    Okay.  So in this --

**263**

1    THE COURT:  Sorry, limited partnership?

2    MR. KAMELI:  The limited partnership.

3    THE COURT:  Okay.

4    Q    The EMMCO L.P. that needed to raise $8 million equal to

5    16 investors, right?

6    A    Yes.

7    Q    Do you know if they received from those 16 investors,

8    more than $8 million?

9    A    Yes.  They received also the administration fee.

10   Q    And that administrative fee belonged to, as you

11   mentioned, belonged to the general partner, correct?

12   A    That's right.  Yes.

13   Q    And the general partner was the regional center, the

14   Federal Fleet Regional Center?

15   A    Yes.

16   Q    So at that moment, the partnership would either -- the

17   partnership would have paid the $50,000 or a portion of it to

18   the regional center, right?

19   A    Yes.

20   Q    For its expenses?

21   A    That's right.

22   Q    But the $500,000 was transferred to the Fleet Financial,

23   correct?

24   A    Yes.  I have a forensic accounting report showing that

25   exact every single dollar of EB-5 investor fund has been

**264**

1    transferred to the borrower.

2    THE COURT:  Fleet Financial Group.

3    A    Fleet Financial Group and Eastern Emerald Group.

4    Q    While we're at it, why don't we look at that, as you

5    mentioned.  Let me take you to Plaintiff Exhibit 48.  Allow me

6    to bring your attention to --

7    THE COURT:  It's in the same book.

8    A    Okay.  Yes.

9    Q    Allow me to bring your attention to page 48-9?

10   A    Yes.

11   Q    There is a little chart that on top it says the schedule

12   of capital investments EMMCO

13        Do you see that, sir?

14   A    Yes.  I see that.

15   Q    And it shows --

16   THE COURT:  What does it show?

17   Q    What does it show?

18   A    It shows the capital investment from the EMMCO investors.

19   Q    And what is the total deposit amount?

20   A    It's $8 million.

21   Q    And the processing fee?

22   A    $813,421.16.

23   Q    So basically the investors have sent their $500,000 to

24   their limited partnership, and $50,000?

25   A    Yes.  From each of them.

**265**

1    Q    And let me take you to Page 4810, 48-10.  And 48-11.

2        On the top it says the schedule of loan advances

3    from EMMCO to FFG?

4    A    Yes.

5    Q    What does FFG stand for?

6    A    Fleet Financial Group, the borrower.

7    Q    And does this chart show --

8    THE COURT:  What does it show?

9    THE WITNESS:  This chart show all the EB-5 loan that

10   has been disbursed to the borrower's account.  It shows

11   that -- actually, more than $8 million, EB-5 fund has been

12   disbursed into the developer account which is on Page 48-11,

13   $8,439,911.43.

14   THE COURT:  And the borrower is?

15   THE WITNESS:  Borrower is Fleet Financial Group is

16   the job creation entity for all these investors.

17   Q    And who authorized these transactions for the money to be

18   transferred from the EMMCO L.P. to Fleet Financial Group?

19   A    I authorized it.

20   Q    So based on this document, besides $8,439,911.43 was

21   transferred to Fleet Financial Group also, right?

22   A    Yes.  Based on the forensic accounting report, yes.

23   THE COURT:  Can I ask you one question.  Does that

24   mean that the processing fee was also transferred to the -- to

25   Fleet Financial Group instead of being sent to the --

266

```
1        THE WITNESS:  Regional center.
2        THE COURT:  Yes.
3        THE WITNESS:  Yes.  We treat -- if project -- if the
4   project need money, we just send everything available to the
5   project.
6        THE COURT:  So contrary to what you testified to
7   before, the processing fee didn't go to the general
8   partnership, but it went to the Fleet Financial Group, Inc.
9   Entity that you controlled?
10       THE WITNESS:  It's supposed to send there.  But
11  because I'm also the investor of the project, so we basically
12  gave up that fee to support the project, you know, for
13  additional funding.
14       THE COURT:  Okay.  Go ahead, Mr. Kameli.
15  Q   And in Pages 489 -- 48-9, all the way to page --
16  A   Thirty-two.
17  Q   -- 48-31, these are the transactions that basically the
18  movement of money from various limited partnerships where
19  investor -- where the EB-5 investors invested money to the
20  project, correct?
21  A   Yes.  That's how the EB-5 has been disbursed into the job
22  creation entity of both project.
23  Q   Mr. Xia, do you have Defense Exhibit booklet, sir?
24  A   Yes, I have it.
25  Q   Allow me to invite you to take a look at Defense Exhibit
```

268

```
1   Plaintiff's Exhibit 3.
2   A   Okay.  Yeah, I'm here.
3   Q   Let's go to Page 3-17.
4   A   Yes.
5   Q   At the bottom of the page.
6   A   Yes.
7   Q   It says the partnership will bear its own ongoing
8   expenses relating to operations and activities of the
9   partnership, including, without limitation, management fee,
10  cost of legal, tax, accounting, and other professional advice.
11       Who has been paying for all the expenses of the
12  partnership to do accounting, dealing with legal issues, or
13  anything else?
14       THE COURT:  Which partnership?
15       MR. KAMELI:  We are talking, Judge, Exhibit Number
16  3, which is --
17       THE COURTROOM DEPUTY:  Plaintiff's 3?
18       MR. KAMELI:  Plaintiff's 3 which is EMMCO Tower L.P.
19  A   I'm sorry, what's your question.
20  Q   Who has been paying all the expenses of the partnership?
21       THE COURT:  You've got to be clear, the EMMCO Tower
22  L.P. partnership.
23  A   Yeah, they are essentially the same structures, same --
24       THE COURT:  Who's paying those expenses in the
25  reference on Page 3-72, plaintiff's exhibit.
```

267

```
1   Number 31.  The first page, the report where it shows the name
2   of the writer is not mentioned, but in Page 32 shows Paul M.
3   Ribaudo, R-I-B-A-U-D-O, is the CPA.
4        Was that individual hired by you, sir?
5   A   He's been hired by my preview counsel.
6   Q   For what purpose?
7   A   For the purpose to examine my bank statement and other
8   record, to identify my, you know, my personal capital
9   contribution to the project before, the first EB-5 loan,
10  taking into my account and also to examine if all of the EB-5
11  loan proceed has been sent to the developer based on the
12  document requirement.
13  Q   So based on this document, Page 26, it was his opinion
14  that --
15       THE COURT:  Is this going to be relevant to his
16  testimony? Because otherwise, you could just point it out to
17  me.
18       MR. KAMELI:  Judge, based on his opening, he
19  mentioned that all of the EB-5 moneys from limited partnership
20  was actually -- went to the job-creating entity which is the
21  development group, Fleet Financial for the Mirage project, and
22  in the second page, it also -- he also mentions that to the
23  Eastern Emerald Group.
24       THE COURT:  All right.
25  Q   Mr. Xia, let's go back to Exhibit 3 again.  I'm sorry,
```

269

```
1   A   I think it's Fleet Financial Group.
2        THE COURT:  FFG?
3   A   Yes.  FFG, yes.
4   Q   So FFG is paying the expenses -- if there are any
5   expenses for the limited partnership that, FFG is paying,
6   correct?
7   A   Yes.
8   Q   Have you ever charged a management fee for EMMCO Tower
9   L.P.?
10  A   No.  Never.
11       THE COURT:  Meaning, him personally?
12  Q   You personally, Mr. Xia?
13       THE COURT:  Okay.
14  A   No.
15  Q   Has the general partner, Federal New York Metropolitan
16  Regional Center, LLC ever charged a management fee for EMMCO
17  Tower L.P.?
18  A   For the entire time period -- at the entire time period
19  of this construction, we didn't charge any fee until right
20  now, we are preparing to pay off all these EB-5 investor back,
21  and we're consulting with lawyer and accountant trying to
22  decide if that management fee can be paid out of the capital
23  repayment to the investor.
24  Q   Right.
25       (Simultaneous Crosstalk.)
```

270

1  Q   Mr. Xia, let me bring your attention about the management
2  fee to Page 2 -- Exhibit 2 of Plaintiff's -- Page 239 -- 2-39.
3  A   Yes.
4  Q   Do you see the word, management fee?
5  A   Yes.
6  Q   Please read that.
7       THE COURT:  Hang on.  So the record is clear, this
8  is part of the EMMCO NQMC Limited Partnership agreement.
9       Okay.  Go ahead.
10 A   Yeah.  It's management fee means a fee payable to the
11 general partner of $7,500 per year for each outstanding unit.
12 Q   So for EMMCO NQMC, L.P., the management fee is a few
13 payable to the general partner of 7500 per year for each
14 outstanding unit, correct?
15 A   Yes.  That's correct.
16 Q   What does it mean by each outstanding unit?
17 A   Each EB-5 investor subscribe of one unit of the limited
18 partnership.
19 Q   Since the writing of the offering memorandum in Exhibit 2
20 on January 31, 2011, for EMMCO NQMC L.P., has the general
21 partner, Federal New York Metropolitan Regional Center, LLC,
22 ever charged the limited partnership a management fee?
23 A   No.  Not until before we were planning to do the
24 dissolution of the limited partnership.
25 Q   Has EMMCO NQMC L.P. ever paid to Federal New York

271

1  Metropolitan Regional Center, LLC any management fee?
2  A   No.
3  Q   Allow me to take you to Exhibit Number 1 of Plaintiff's.
4  It is an offering memorandum for EMMCO, L.P.
5  A   Yes.
6  Q   Which was offered on April 17th, 2010.
7  A   That's right.
8  Q   We're going to Page 1-36.
9  A   Yes.
10 Q   Where it says management fees.
11 A   Yes.
12 Q   Please read.
13 A   Yes.  It has the same language like the other offerings,
14 management fees means a fee payable to the general partner of
15 $7,500 per year for each outstanding unit.
16 Q   Did EMMCO L.P. ever pay Federal New York Metropolitan
17 Regional Center, LLC a management fee since 2010?
18 A   No.
19 Q   Mr. Xia, you don't see the same management fee language
20 for Exhibit Number 3.
21     Let's go to Exhibit Number 3, please.
22 A   Yes.
23 Q   Let me bring your attention to 3-37.
24 A   Yes.
25 Q   And again, Exhibit Number 3 is the offering memorandum of

272

1  EMMCO Tower L.P.?
2  A   That's right.
3  Q   And this memorandum, the management fee means reasonable
4  fees payable to general partner.
5       It doesn't have a number 7500; do you see that?
6  A   Yes.
7  Q   Okay.  But regardless of what it says about the
8  management fees definition, did EMMCO Tower L.P. ever pay
9  Federal New York Metropolitan Regional Center a management
10 fee?
11 A   No.  Never.
12 Q   Okay.
13     MR. KAMELI:  Judge, would you like me to repeat
14 myself again?  The same thing is going for four and five.  I
15 don't want to waste time.
16     THE COURT:  No.  You don't need to repeat it.
17     MR. KAMELI:  Thank you, Judge.
18     But I believe the only difference is at four and
19 five, there is a number of how much the management fee should
20 be.
21     THE COURT:  Okay.  So do you want to just point it
22 out?
23     MR. KAMELI:  Yes.
24     THE COURT:  What's the page reference?
25     MR. KAMELI:  I shall let you know.

273

1       It's Page 4-36.
2       THE COURT:  So this is Plaintiff's Exhibit 4 and
3  Page 4-36.
4       MR. KAMELI:  Yes, Your Honor.  It's the EEGH L.P.
5  offering memorandum where it says management fee is a payable
6  to now partner of $7,500 per year, and that offering
7  memorandum was issued December of 2013.
8       For EEDH II L.P. which is Exhibit 6 of plaintiff's.
9  Page 6-37 indicates management fee is, again, $7,500 per year
10 fee for the general partner for each member.
11      Judge, either I can ask him questions about the
12 definitions that are in the document or I can bring it to your
13 attention.
14      THE COURT:  I think that would be better, unless he
15 has an understanding that's relevant to the state of mind.
16      MR. KAMELI:  Judge, it's just going to talk about
17 the responsibilities that he had and the actions that he had
18 taken later on, I'm going to bring it back.
19      But mainly it's about the general partnership's
20 duties and obligations under each operating agreement.
21      THE COURT:  I can't tell if asking him any questions
22 about that is relevant.  Only can you.  But ask whatever you
23 want to.
24      If it's just -- if you're just going to have him
25 read the paragraphs from the agreement, you can just point

274

1    those out to me later.

2            MR. KAMELI:  Yes, Judge.  I shall do that.

3            THE COURT:  Okay.

4            MR. KAMELI:  Let me just make a note for myself.

5    Q    Mr. Xia, let's go to page -- Exhibit 3, again.  Page

6    326 -- 3-26.

7    A    Yes.

8    Q    This is about the conflict of interest section.  I'm

9    going to bring your attention to the first part.  I'm going to

10   read it for you.

11           The general partner, its affiliates, and the members

12   of general partner's management team, may be, in the future,

13   direct sponsor or manage other entities, including other

14   investment entities in addition to the partnership.  Such

15   other entities may compete with the partnership for investment

16   opportunities, the partnership legal counsel may act as

17   counsel to the general partner and its affiliate in connection

18   with such other entities.

19           THE COURT:  Again, so the record is clear, we're

20   talking about Plaintiff's Exhibit 3.

21   Q    So this is in regards to EMMCO Tower L.P.?

22   A    Yes.

23   Q    And the same language exists in other offering

24   memorandums?

25   A    That's correct.

Avery Armstrong, Official Court Reporter

276

1    this offering memorandum was written on January 31, 2011, --

2    again, we're talking about Exhibit 3 which is for EMMCO Tower

3    L.P. -- it shows -- third paragraph -- it says, to date in the

4    opinion of general partner, there have been no material

5    conflicts of interest between the general partner and its

6    affiliates on the one hand, and the partnership on the other

7    hand.

8            Do you see that, sir?

9    A    Yes.  I see that.

10   Q    In January of 2011, did you actually believe that there

11   were no conflict of interest between the general partner that

12   you owned and the developer or any other entities that you

13   owned working for the project?

14   A    Can you repeat the question?

15           MR. KAMELI:  Can you read that?

16           THE COURT:  I'll re-read it.

17           In January of 2011, did you actually believe that

18   there were no conflicts of interest between the general

19   partner that you owned and the developer, or any other

20   entities that you owned working for the project?

21   A    Yes.  I believed that from that date until today.  I

22   never doubt that.

23           THE COURT:  Never doubt what?

24           THE WITNESS:  Never doubt there's any, you know,

25   interest conflict between my entities and the EB-5 investor.

Avery Armstrong, Official Court Reporter

275

1    Q    And what was your understanding in regards to this

2    paragraph?

3    A    General partner may working in the different entities for

4    the project.

5    Q    Okay.

6            THE COURT:  Could you explain that.

7            What do you mean?

8            THE WITNESS:  So general partners and entities may

9    work in the different part of the project.

10           THE COURT:  Again.  Could you clarify.

11           When you say general partnership, you're referring

12   to which entity?

13           THE WITNESS:  To regional center.

14           THE COURT:  Okay.  And the regional center can do

15   what?

16           THE WITNESS:  Regional centers, other entities may

17   work, in the future, work in the project.

18           THE COURT:  So you mean the regional center could

19   work on the project?

20           THE WITNESS:  Regional center's affiliate entities.

21           THE COURT:  The affiliated entities to the regional

22   center can work on this project?

23           THE WITNESS:  That's right.

24           THE COURT:  Okay.  Go ahead.

25   Q    And on the third paragraph, when this article -- when

Avery Armstrong, Official Court Reporter

277

1            THE COURT:  Okay.  Go ahead.

2    Q    So as you're sitting here, you're indicating that your

3    interest is alone, but you are talking about the entities, the

4    developer, Fleet Financial Group, and the subcontractors that

5    you owned, their interest is aligned with the lender which is

6    the L.P.s?

7    A    Yes.  The only way we can get their green card, get their

8    money back, is to get the project built, and so you know, then

9    they can codify, number one, job creation, number two, their

10   money, you know, can be repaid through a loan, refinance.  And

11   for me, I put all my money into this project, all my time,

12   so -- and I didn't even enforce any lien rights for my leads

13   from payoff my capital contribution into the project.  So I'm

14   100 percent align my interest with all these investors, and I

15   believe that I also have the expertise and the knowledge to

16   build this project for, you know, reasonable -- actually very

17   reasonable cost.  You know, certain percent of the market

18   price.

19           THE COURT:  Mr. Xia, do you believe that your

20   interest were aligned with respect to profit sharing with your

21   investors?

22           THE WITNESS:  There's no profit sharing.  They gave

23   me the loan.  It's almost like the bank gave me the loan and I

24   guarantee to pay them back for the interest.  Here the EB-5

25   bank gave me a loan, I'm guaranteeing them for green card, and

Avery Armstrong, Official Court Reporter

278

1  in return for that guaranteeing -- I guarantee their
2  principle. Means, end of the day, if I fail, I have to, you
3  know, pay them back for the money. So there's no profit
4  sharing here. They're not acting as a investor into my
5  project.
6        THE COURT: What about interest?
7        THE WITNESS: There's no interest. The preview
8  interest is the green card.
9        THE COURT: So in your view, the only things that
10 the EB-5 investors were entitled to were a green card and the
11 return of their $500,000 investment?
12       That's all that you owed them as the fiduciary of
13 all the these entities?
14       THE WITNESS: That's right. I think they even send
15 a letter to you about saying they want a green card --
16       (Court reporter interrupts for clarification.)
17       THE WITNESS: I think because the second project, a
18 lot of EB-5 investors still in the process -- they didn't get
19 green card yet, I think their attorney feel that they
20 basically sending a letter to Your Honor telling you, we want
21 green card, because they invest five years, six years. They
22 need their green card. If you dissolve this project right
23 now, I lose all my money and EB-5 people lose all their green
24 card.
25       In my WeChat group, I produced to the SEC --

279

1        THE COURT: Okay. Let's move on.
2        It's not responsive to my question.
3        Go ahead Mr. Xia -- Mr. Kameli.
4        MR. KAMELI: Judge, I can bring it to your attention
5  or ask him questions with regard to the ownership and the
6  interest.
7        THE COURT: All I can say to you as a guide is if
8  all you're going to do is have him read something you can read
9  to me, don't ask him any questions.
10       MR. KAMELI: Judge, on Page Exhibit 3 again, 3-5.
11       THE COURT: Plaintiff's Exhibit 3?
12       MR. KAMELI: Yes, Your Honor. Under the partnership.
13       THE COURT: Go ahead.
14       MR. KAMELI: It says the partnership will not own
15 the development project, but will provide funding for the
16 project's job-creating activities.
17       THE COURT: What I meant was if all you're going to
18 is read something to me, do it later.
19       We have the witness on the stand.
20       MR. KAMELI: Sorry, I thought you wanted me to do it
21 now.
22       THE COURT: No, no.
23       MR. KAMELI: I apologize.
24       THE COURT: Again, only if it's a setup to a
25 question you want to ask him, you can read it, but otherwise,

280

1  you don't need to read it to me while he's on the stand.
2        MR. KAMELI: Sure. Yes, Your Honor.
3  Q   Mr. Xia, plaintiff's counsel asked you yesterday in
4  regards to accounting and bookkeeping.
5        Do you remember, sir?
6  A   Yes, I do.
7  Q   And he was talking in regards to EMMCO Tower L.P. which
8  was Exhibit 3, that's what he was talking about.
9        Do you remember that?
10 A   Yes.
11 Q   Okay. I'm looking at EMMCO L.P., EMMCO Tower L.P., and
12 EMMCO NQ --
13       THE COURT: NQMC.
14 Q   NQMC. As the general partner, have you filed taxes for
15 each one of these limited partnerships since their inception?
16 A   Yes, I did.
17 Q   Have you provided the K-1 for each partner -- for each
18 limited partner?
19 A   Yes. Upon their request.
20 Q   Okay. And do you know in the K-1 report, whether the K-1
21 shows the profit and loss statement -- does it show whether
22 the partnership had loss or profit the previous year?
23 A   Yes.
24 Q   Okay.
25       THE COURT: And when you say you produce it upon

281

1  their request, who is their? Who are they?
2        THE WITNESS: The agent, the immigration agent.
3        THE COURT: And when you say the immigration agent,
4  are you talking about the person in China?
5        THE WITNESS: Yes the person in China, the brokers.
6  Q   So in reality, let's talk about these brokers. Her Honor
7  asked some questions yesterday about this.
8        How many provinces are in China?
9        THE COURT: Oh, my gosh. I don't think we have to
10 have a geography lesson.
11       Is this important?
12       MR. KAMELI: Judge, it is important to show that who
13 the immigration agents are and how the system in China works
14 in regards to -- based on the policies of China in regards to
15 getting individuals to invest in other countries or
16 immigration to other countries.
17       THE COURT: Well, let's just talk about his
18 experience. I don't think he's in the position to talk about
19 the entire system, but he can tell me about whatever's
20 relevant from his experience about that entire system.
21       MR. KAMELI: Sure.
22 Q   Mr. Xia, in regards to locating EB-5 applicants in China,
23 did you speak with certain immigration agents?
24 A   Yes, in China.
25 Q   And when we say immigration agents, are these government

282

1  agents in China?
2  A   **No, they're not.**
3  Q   Are they US Government agents located in China?
4  A   **No.**
5  Q   Are these just regular private companies?
6  A   **That's right.**
7  Q   Do these people have --
8       THE COURT:  You know -- okay -- none of these are
9  non-leading questions and plus we covered this already.  So if
10  you want to ask him something open-ended that's relevant, go
11  ahead.
12      What do you want me to know from him about this
13  system?
14      MR. KAMELI:  Judge, I want you to know that he did
15  not have that much power --
16      THE COURT:  Hey, hey.  That was actually somewhat
17  rhetorical.  I don't want you to answer the question.
18      In other words, tell me about how you went about
19  recruiting people, EB-5 investors in China.
20      THE WITNESS:  The EB-5 broker or we call them agent,
21  they're very powerful in China, because there is a lot of --
22  not just US -- a lot of other countries also trying to
23  competing for the capital can be contribute to, you know, to
24  their economy.  So we, one there, we're -- you know we're --
25  sometimes I have to travel 30 days -- 30 cities in 30 days.

283

1  Sometimes morning, I'm in one city and noon, I'm in another
2  city, and afternoon, I'm in a different city -- three city --
3  and meet them at airport.  So it's a very tough market, you go
4  there.  And if they're even willing to meet you, the agent,
5  you'll feel lucky.  So it's not, you know, we go there, we're
6  welcomed.  It's -- you know, we have to go through the due
7  diligence and go through the friend.  It's not easy.
8       THE COURT:  All right.  Let me ask you what I think
9  your counsel may want to emphasize.  You mentioned yesterday
10  that the investor's contact information is a trade secret of
11  these agents, and quite frankly, I didn't quite understand
12  what you were saying, because I thought you were talking about
13  government agents.
14      But is it your testimony that these brokers or
15  agents in China protect the --
16      THE WITNESS:  I have no say about their business.
17      THE COURT:  Let me ask you though, are you able to
18  request the contact information from these brokers for these
19  EB-5 investors so that you can comply with some of your
20  reporting requirement?
21      THE WITNESS:  I'm committing a suicide.  If I
22  request that, they're going to stop referring the investor to
23  me, so I cannot deal with them.
24      THE COURT:  You said at some point though you did
25  get investor's contact information.

284

1       How did you get that?
2       THE WITNESS:  After this lawsuit started, the agent
3  stop keeping those investor as a secret, because now
4  everything go public.
5       THE COURT:  So when was the first lawsuit?
6       THE WITNESS:  I think 2019.
7       THE COURT:  And that was the only way you were able
8  to get the contact information for the EB-5 investors for the
9  Mirage and the Emerald projects?
10      THE WITNESS:  I had some during the years, but 2019
11  is the year, actually you know, a lot of the investors that,
12  you know, come in to meet, because some of agents, they're no
13  longer in the business.  I even get the direct come to my
14  office because they have no information they can finance
15  either.
16      THE COURT:  Okay.  Go ahead, Mr. Kameli.  I'm sorry
17  I took over, but I assume that's part of what you wanted me to
18  hear.
19      MR. KAMELI:  Absolute, Judge.
20      THE COURT:  And if there's anything else, go ahead
21  and ask.
22      MR. KAMELI:  Yes, Your Honor.
23  Q   Mr. Xia, please go to Exhibits Number 7.
24      THE COURTROOM DEPUTY:  Plaintiff's?
25      THE COURT:  Plaintiff's?

285

1       MR. KAMELI:  Actually Plaintiff's Exhibit 8.
2  Q   Plaintiff's Exhibit 8.  And we're going to be talking
3  about Plaintiff's Exhibit 8 all the way to Plaintiff's Exhibit
4  Number 13.
5       Would you kindly review those for a second.  Well,
6  more than a second.
7  A   **Yes.**
8  Q   Are these the marketing materials for your projects?
9  A   **It looks like, yes.**
10

11      (Continued on the following page.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

286

1  CROSS-EXAMINATION
2  BY MR. KAMELI:  (Continued.)
3  Q    On Exhibit 8 on top it shows WSLK, on the first page,
4  page 8.8-1.  Do you see that?
5  A    Yes, I see that.
6  Q    Is that one of your companies?
7  A    No.
8  Q    Do you know who they are, what they do?
9  A    That's the company -- it actually used to be a very
10  powerful EB-5 broker company.  They're not even in the
11  mainland China, they're in Taiwan.  And this company called
12  West Link.  And I think the last two letter representing
13  another company because they combine together.  First one is
14  West Link, second one I think is Mercer Link (ph.) and so
15  eventually they call themselves West Link.
16  Q    Okay.  And we see West Link on Exhibit 8, page 8-1, and
17  on Exhibit 9, 9-1.  Are these materials -- the contents of 8
18  and 9, the Exhibit 8 and 9, were they written by you, sir?
19  A    No.
20  Q    Did you have any control over writing these materials?
21  A    No.  They're -- like I said, they are the wholesale
22  broker, so they basically prepare this material and I think
23  coordinate with other retail broker in the mainland China.  So
24  their main function -- they're not even directed, you know,
25  recruit the EB-5 investor.  So they are providing all this

Andronikh M. Barna, Official Court Reporter, RPR, CRR

287

1  supporting material and the services to the retail broker in
2  the mainland China across, you know, the whole country.
3  Q    So basically you send your offering memorandum to them
4  and --
5       THE COURT:  Sustained.
6       How does this process work?
7       How does WSLK get your information to produce the
8  marketing materials?  If you know.
9       THE WITNESS:  Yes.  They basically coordinate our
10  operation for the retail broker, who directly interact with
11  this EB-5 investor.  So their part work is mainly prepare all
12  this marketing material and everything then distribute into
13  the retail broker.
14       THE COURT:  And how does the retail broker get the
15  information about your projects?
16       THE WITNESS:  Retail broker just signs agreement to
17  the wholesale broker, then get information from them.  I'm not
18  even allowed to touch the retail broker because that's his
19  business.
20       THE COURT:  But in order to recruit people to invest
21  in your projects, you have to send the information about the
22  projects to someone.  So, who do you send it to?
23       THE WITNESS:  Yeah.  I send it to the wholesale
24  broker.
25       THE COURT:  Okay.  So the wholesale broker is not

Andronikh M. Barna, Official Court Reporter, RPR, CRR

288

1  the retail broker?
2       THE WITNESS:  No.  Wholesale only deal with the
3  retail.  They don't deal with investor directly.
4       THE COURT:  Okay.  So you send information about
5  your projects to the wholesale broker?
6       THE WITNESS:  Yes.
7       THE COURT:  And is WSLK one of those or they are
8  just a marketing company?
9       THE WITNESS:  They make money by each individual, I
10  guess, investors referred by retail broker.
11       THE COURT:  But, okay, who is the wholesale broker
12  you send your information to?
13       THE WITNESS:  This guy, the West Link.
14       THE COURT:  Okay.  So you send it to West Link?
15       THE WITNESS:  Yes.
16       THE COURT:  Who produces materials?
17       THE WITNESS:  They produce this material.
18       THE COURT:  All right.
19       THE WITNESS:  Put them all together.
20       THE COURT:  Based on information you provide them?
21       THE WITNESS:  Yes.
22       THE COURT:  Okay.  Go ahead.
23  BY MR. KAMELI:
24  Q    And the same thing goes for -- what about Exhibit No. 10,
25  Plaintiff's Exhibit No. 10, was this material prepared by you,

Andronikh M. Barna, Official Court Reporter, RPR, CRR

289

1  sir?
2  A    No.
3  Q    Do you know if this is one of the wholesale or retail
4  brokers?
5  A    Yes.  I think it's a wholesale broker, yes.
6  Q    Okay.
7       THE COURT:  Which wholesale broker?
8  A    West Link.
9  Q    That's the same one?
10  A    Yeah.  We only have one wholesale broker.
11  Q    Okay.  So exhibit number -- the documents in
12  Exhibit No. 11 of plaintiff and Exhibit No. 12 of plaintiff,
13  and 13, were all prepared by the same wholesale broker you
14  mentioned?
15  A    Thirteen, no.  Thirteen is probably different.  By the
16  time for the second project, we do not have a wholesale broker
17  anymore, so we directly work with a retail broker.  Yeah, so
18  12 and 13, I think it's prepared by the retail broker.
19  Q    Mr. Xia, before 2010, when you were designated by the
20  U.S. Government in October of 2010, what was your occupation?
21  A    A real estate developer.
22  Q    Okay.  When did you start becoming a real estate
23  developer?
24  A    I think in 2002 or 2003.
25  Q    And you mentioned that in your testimony, in your direct,

Andronikh M. Barna, Official Court Reporter, RPR, CRR

290

1  your testimony to the government, that you set up Shangri-La,
2  there was a project called Shangri-La, right?
3  A  Yes, that's right.
4  Q  Was that your first project, sir?
5  A  Yes, yeah, that's my first project.
6  Q  When did you start that?
7  A  It's 2002 or 2003, yeah.
8  Q  Is that how you got to know Ms. Xi...
9       THE COURT:  Verfenstein.
10 Q  Verfenstein?
11 A  Yes, that's right.
12 Q  And how long did it take you to finish that project?
13 A  I think by 2007 we were pretty much finished and 2008 we
14 are -- I think we got the TCO, yeah.
15 Q  How many units are in that building?
16 A  65.
17 Q  65?
18 A  65, yeah.
19 Q  Did you sell all of those units?
20 A  No.  I sell only up to the construction loan and I kept
21 other unit as a rental, the remaining unit as a rental.
22 Q  Where is that property at?
23 A  That's in 140-22 Beech Avenue, Flushing, New York.
24 Q  And how many units do you own in that building now?
25 A  Right now I own probably half of our commercial units and

Andronikh M. Barna, Official Court Reporter, RPR, CRR

292

1       MR. KAMELI:  Per year.
2  A  I did the calculation from all those rental from 2011 to
3  2018.  On my tax return, it's about $6 million.
4  Q  Prior to 2010, did you own any other rental property?
5  A  Oh, yeah, I own another, probably like --
6       THE COURT:  Another what like that?
7  A  Another ten rental properties, I think.
8  Q  And were they all in the state of New York?
9  A  Yes.  They all actually in Flushing.
10      I build another condo.  That condo, I think it's
11 seven units.  I own six of them.  Yeah.
12 Q  Mr. Xiu, allow me to take your attention to Defense
13 Exhibit 84, please.
14      Are you there, sir?
15 A  Yes, I'm here.  Yes.
16 Q  Let's go to page 1, which is the summary sheet.
17      And this document that's Exhibit No. 84, what is it?
18 A  Yes, it's a summary of how many -- affiliate entities'
19 rental income from 2011 to 2018.
20 Q  Okay.  We were talking about Shangri-La, correct?
21 A  That's right.
22 Q  There are two Shangri-Las here.  Three, actually.
23 Shangri-La 9D, Inc.; 9F, Inc.; and Green, Inc.
24      Do you see that?
25 A  That's right.  Yeah, I see that.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

291

1  I own, I think, four or five residential rental units.
2  Q  When you say half of commercial units, what do you mean?
3  How many is that?
4  A  I mean, we have a -- we actually have a three-floor
5  commercial unit and I own one-and-a-half floor.
6  Q  Define the units to me.  Like, is that one big --
7  A  Because right now I think they're all combined into one
8  tenant.  Before, I think it's seven, seven units.  Now it's
9  become one unit because of, you know, the tenant's business
10 getting -- you know, grow, growing better and better, so it
11 basically take over other units rented by the other tenant.
12 When other tenant left, they just combined more and more units
13 into one, one big unit.
14 Q  What about in 2010, how many units, how many commercial
15 units did you own in that building?
16 A  I think at that time it's ten.  Ten units.
17 Q  You had ten commercial units?
18 A  Yes, commercial units.
19 Q  And how many residential at the time?
20 A  I think five.  If I remember, it's five.
21 Q  From the total amount of rents that you get in that
22 location, in Shangri-La, whatever is left in 2010, how much
23 was your rental income?
24 A  That portion, I'm --
25      THE COURT:  Per year?  Per month?  What are you --

Andronikh M. Barna, Official Court Reporter, RPR, CRR

293

1  Q  Okay.  What are the differences between these three?
2  A  This own different part, different units in the building.
3  Q  Okay.
4  A  Actually, the two other companies, Manekineko and Samuel
5  Development, also own I think residential and a commercial
6  unit in the building.
7       THE COURT:  For the court reporter, the spelling of
8  Manekineko --
9       THE WITNESS:  Manekineko.
10      THE COURT:  -- is M-a-n-e-k-i-n-e-k-o.
11      THE WITNESS:  Yes.
12 Q  When you say "the building," it's the Shangri-La project,
13 right?
14 A  Yes, it's the Shangri-La only; yes.
15 Q  And you mentioned that you finished that project in 2007,
16 correct?
17 A  Yeah, 2007 or 2008; yeah.
18 Q  Is that in -- either one of those dates, that's the time
19 that you got the certificate of occupancy?
20 A  That's right, yes.
21 Q  Okay.  So based on this document -- well, these are the
22 rental incomes that you were mentioning that you're obtaining?
23 A  Yeah.  Yeah, this is the summarization of my rental
24 income reported on tax return in those years for the
25 Shangri-La building.  And yeah, that doesn't in -- because I

Andronikh M. Barna, Official Court Reporter, RPR, CRR

294

1 have another probably ten or eleven rental property owned on
2 personal name.  I think that part, each year from January,
3 it's roughly half-million-dollar rental income, too.
4 Q    Okay.  When you say they generate about half -- $500,000
5 income per year, is that prior to 2010 or at what year?
6 A    All years.  I didn't sell any of them, so every year.
7 And that's how I can contribute, you know, 8-, $9 million
8 before EB-5 loan coming in.  And for all these years, I -- you
9 know, me and my wife, we pretty much treat the project like
10 our own project, we just keep putting our rental income into
11 the project.
12 Q    When you say contribute, let me just -- let me take you
13 to Defense Exhibit No. 7, please.
14      Do you see that, sir?
15 A    Okay.
16 Q    Who prepared this document?
17 A    I don't know.  Probably agent.  I don't know.
18 Q    Who is that?
19 A    Seven is marketing material, right?
20 Q    Oh, no.  Defense.
21 A    Oh, defense?  I'm sorry.
22 Q    Yes.
23 A    Okay.  Yeah.
24 Q    Do you know who prepared this document?
25 A    I worked with my first counsel to prepare this based on

Andronikh M. Barna, Official Court Reporter, RPR, CRR

295

1 the bank record, yeah.
2 Q    Based on the bank records.
3      And it shows here that there was a personal loans
4 contribution before 7/2010.
5      Do you see that, sir?
6 A    Yes.
7 Q    Which is for about $8.8 million, right?
8 A    Yeah, that's the time -- I think we received the first
9 half-million-dollar EB-5 loan in August of 2010, so that's why
10 Paul Ribaudo was hired by my first counsel to prepare my
11 personal capital contribution into the project before we
12 receive the first EB-5 loan.
13 Q    And all the document -- all the information -- this
14 summary is basically backed by the bank statements that are
15 mentioned also in Exhibit 7, correct?
16 A    Yeah, because Paul Ribaudo doesn't really want to count
17 the direct payment to the employee who was actually at that
18 time, you know, because we only have one project.  But he said
19 I don't know if that employee is exclusive working on the
20 project, so he didn't count those salaries, $600,000 paid to
21 the employee as my personal capital contribution.  But he did
22 identify $8.8 million direct payment in regarding to other
23 project related payment and the cost.  That's -- so that's why
24 $8.8 million, we put a notation there that it's a Berdon
25 report.  That refer to that forensic accountant who prepared

Andronikh M. Barna, Official Court Reporter, RPR, CRR

296

1 -- that's his company name -- who prepared that report.
2      THE COURT:  Mr. Kameli, ask an open-ended question.
3      How were these numbers arrived at?  You said you
4 worked with your accountant.  What information did you provide
5 him that went into this summary?
6      THE WITNESS:  Number one, the number we just talked
7 about, that's from the accountant report, expert report,
8 $8.8 million.  And it's other expenses.  I just provided the
9 cancelled check and the name of the employee and the
10 contractor working during that time period.
11      THE COURT:  What are the other documents in this
12 exhibit then?  If you know.  Page 3, just look at him, what
13 else is in Exhibit 7, Defense Exhibit 7?
14      THE WITNESS:  Bank statement, cancelled check.
15      THE COURT:  And what about all these checks?  What
16 are they again?
17      THE WITNESS:  The canceled check.  Bank statement
18 and canceled check.
19      THE COURT:  And what do these checks represent?
20      THE WITNESS:  Representing the payment to the
21 project related cost, like the architect working on the
22 project, the contractor, the supplier.
23      THE COURT:  All in connection with the Eastern
24 Mirage Project?
25      THE WITNESS:  That's right.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

297

1      THE COURT:  That you paid?  Or who paid?
2      THE WITNESS:  I paid.
3      THE COURT:  Out of your personal account?
4      THE WITNESS:  Yes.  A lot of them are out of my
5 personal account.
6      THE COURT:  What about Samuel Development Group?
7      THE WITNESS:  Yeah, that's my affiliate entity.
8      THE COURT:  Your affiliated entity, as is X & Y
9 Development Group?
10      THE WITNESS:  That's right.
11      You know, Samuel Development build Shangri-La Tower.
12 That's a commercial building -- a residential building.
13      THE COURT:  All right.  Go ahead, Mr. Kameli.
14      MR. KAMELI:  Yes.
15 BY MR. KAMELI:
16 Q    So this was prepared just to show that your contribution
17 to --
18 A    The Mirage Project.
19 Q    The Mirage Project?
20 A    That's right, yeah.
21 Q    I'm going to take you to exhibit -- Defense Exhibit 8.
22      THE COURT:  Hang on.
23      For the court reporter, there was a reference to
24 Berdon.  That's a person.  B-e-r-d-o-n.
25      Can I ask you a question, though, Mr. Kameli.  There

Andronikh M. Barna, Official Court Reporter, RPR, CRR

298

1  is a reference to Berdon's report, page 18.
2      MR. KAMELI:  Yes, Judge.
3      THE COURT:  And where is that?
4      MR. KAMELI:  Judge, that comes in --
5      THE COURT:  Is that a separately marked exhibit?
6      MR. KAMELI:  It is, Judge.  Well, it is part of Paul
7  Ribaudo's DX-31.  That's where it is, Defense Exhibit 31.
8      THE COURT:  Okay.  All right.  Go ahead.
9      MR. KAMELI:  No, Paul's report, part of it is in
10  Defense Exhibit 31 and parts are in Plaintiff's Exhibit 48.
11      THE COURT:  Okay.  Going on to Defense Exhibit 8?
12      MR. KAMELI:  Eight.  Yes, Judge.
13      THE COURT:  All right.
14  BY MR. KAMELI:
15  Q   Mr. Xia, on top of this page is a summary of capital
16  contribution of forgiven fees for Eastern Emerald Project.
17      Do you see that, sir?
18  A   Yeah, I see that.
19  Q   If we take the ground lease, there is a portion there
20  ground lease, $6.5 million.
21      Do you see that?
22  A   Yes, I see that.
23  Q   What is that referring to?
24  A   That was the ground lease we were discussing yesterday
25  from the LaGuardia Performance Center to the Eastern Emerald

Andronikh M. Barna, Official Court Reporter, RPR, CRR

299

1  Group.
2  Q   Did you get paid for that?
3  A   No.
4  Q   And there are forgiveness fees, management fees.  What
5  are those?
6  A   Those are the fee we just mentioned; that's the $7500 per
7  investor per year for the Emerald Project and also for
8  LaGuardia Performance Center Project.
9  Q   Okay.  So if you take those two items, ground lease and
10  forgiveness fees, out, on the middle of the page it says total
11  personal loans, $12.5 million and change.
12      Do you see that?
13  A   Yes.
14  Q   Okay.  There is an interest income of Eastern Emerald
15  Group?
16  A   That's right.
17  Q   What is that?
18  A   That's just the cash flow for the last deposit of either
19  the loan proceed or the EB-5 fund deposited in the bank, yeah.
20  Q   Okay.  And those are the amounts that belong to the
21  general partner?
22  A   If there is a cash flow, then the general partner is
23  entitled to receive that management fee.
24      THE COURT:  How was this summary prepared, if you
25  know?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

300

1      THE WITNESS:  The same way.  Part of that is a
2  Berdon report, the forensic accountant report.
3      THE COURT:  B-e-r-d-o-n.
4      THE WITNESS:  Yeah.
5      And part of them is a bank statement.
6      THE COURT:  That you provided to whom?
7      THE WITNESS:  To my expert.
8      THE COURT:  To your expert?
9      THE WITNESS:  To my attorney.
10      THE COURT:  To your attorney?
11      THE WITNESS:  Yes.
12      THE COURT:  And which attorney?
13      THE WITNESS:  Mark Casey.
14      THE COURT:  Mr. Casey, the prior attorney?
15      THE WITNESS:  Yes, prior attorney.
16      THE COURT:  Okay.  All right.  Go ahead.
17  Q   And if you see this, Mr. Xia, in Exhibit 8, starting at
18  page 5 or 6, there are canceled checks.  And these checks were
19  provided to back up this summary, right?
20  A   Yes, that's right.
21  Q   Okay.  All right.
22  A   Yes, that shows the money deposit into the project; yes.
23  Q   So you speak with -- let me take you to Defense Exhibit
24  No. 31.  We talked about this document before, which is
25  prepared by Paul Ribaudo, correct?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

301

1  A   Yes.  That's the Berdon report.  The Paul Ribaudo working
2  in the Berdon, the company called Berdon.
3  Q   Let me take you to page 19.  Paragraphs 77 and 78 in
4  page 19 of Exhibit 31 of defense.
5  A   Yes.
6  Q   It basically says, "It's my opinion with reasonable
7  certainty that RX loan advances for the benefit of X & Y for
8  at least $8.868,464 as of July 31st, 2010."
9      Do you see that, sir?
10  A   Yes, I see that.
11  Q   So you mentioned that why we are looking at July 31st and
12  prior to that.  What was the reason for it?
13  A   Yes, that's before a single dollar EB-5 money hit into my
14  account, that's I think the cut line, the date.  That's why,
15  you know, we select this day as the date of this report.
16  Q   Okay.  And that Exhibit 31 has so many attachments to it.
17  Were these attachments provided by you to Mr. Ribaudo?
18  A   No.  The attachment, I think, is a -- it's been prepared
19  by Mr. Ribaudo, yeah.
20  Q   That was prepared by Mr. Ribaudo?
21  A   Yes.
22      THE COURT:  Could you clarify, who is Mr. Ribaudo
23  versus Mr. Berdon?
24      THE WITNESS:  Berdon is the company that Ribaudo
25  working for.  So we call that report Berdon report, prepared

Andronikh M. Barna, Official Court Reporter, RPR, CRR

302

1   by Mr. Ribaudo.
2        THE COURT:  Okay.  And can someone spell Ribaudo for
3   the record?
4        I mean, unfortunately the entire report is not here
5   and even the first page is not here, nor the last page.
6        Oh, wait.  Here we go.  Page 29 of 32.  Ribaudo is
7   spelled R-i-b-a-u-d-o.
8        Okay.  Go ahead.
9        MR. KAMELI:  And, Judge, in page 2 and page 1, it
10  does talk who Berdon is; Berdon, LLP.
11       THE COURT:  It does what?
12       MR. KAMELI:  Page 1 of the same exhibit, it shows
13  Berdon, who Berdon is, and what's the relationship, paragraph
14  1.
15       THE COURT:  Okay.  I am just noting that this report
16  starts with the table of contents.  It does not have even a
17  cover page.
18       Okay, I got it.
19       MR. KAMELI:  Thank you.
20       THE WITNESS:  This is an SEC production.
21       MR. KAMELI:  Yes.  SEC is Exhibit 48.  It shows the
22  cover letter and the table.
23       THE COURT:  Okay.
24  BY MR. KAMELI:
25  Q    Mr. Xia, we are going to talk about your relationship

303

1   with Westin.  Allow me to take you to Exhibit 21, Defense
2   Exhibit 21.
3   A    Yes.
4   Q    The name on the -- name of the individual sending
5   this e-mail to you is John Salvatore, right?
6   A    That's right.
7   Q    And that is being spelled as S-a-l-v-a-t-o-r-e?
8   A    That's right.
9   Q    Did you reach out to Mr. Salvatore or he reached out to
10  you?  What happened?  How did that relationship start?
11  A    I was referred to a lady.  Actually, her name is on the
12  e-mail, CC part.  Her name is Melinda.  Melinda is a senior
13  executive in Interstate Hotels & Resorts, and that's a hotel
14  management company.  And we were discussing the Westin Element
15  is probably, you know, fit into the profile of my first-coming
16  hotel.  So Melinda reach out to John Salvatore, who at that
17  time is the senior director for Starwood Global Development
18  Group, and that's how the whole conversation was initiated.
19  Q    And before sending this letter to you, did you have a lot
20  of conversation with them?  Did you provide information?
21  A    Yes, we did.  We have a lot of discussion.  And I think
22  we actually visit the project site and we talking about -- we
23  were discussing about our vision, our concept.  And after
24  that, you know, he send out an e-mail to us.
25  Q    And based on this e-mail, it says, "We are very

304

1   interested in moving forward with you on this project"?
2   A    Yes.
3   Q    Do you know what he -- what was your understanding about
4   "this project"?
5   A    The Mirage Project.
6   Q    To do what?  To --
7   A    To branding and to the franchise agreement.  That's the
8   purpose we reach out to the Starwood at that time.
9   Q    And then in -- let me take you to Defense Exhibit No. 24.
10       There is an e-mail from you to Steve that has some
11  attachments to it.  Do you remember what those attachments
12  were?
13  A    Yes.  That's -- I think that's the Element -- Westin
14  Element franchise agreement and also the pro forma prepared by
15  Interstate Resorts & Hotels by Melinda.  And also, I think
16  there's hotel management agreement prepared by them.
17  Q    Okay.  Let me take you to page 25.  Oh, I'm sorry.  I'm
18  sorry, Exhibit 25 of defense.
19  A    Yes.
20  Q    It's a retainer agreement from a law firm.  Why did
21  you -- did you hire this law firm?
22  A    Yeah.  I was working with that law firm, trying to
23  finalize franchise agreement and the hotel management
24  agreement.
25  Q    And the name of the law firm is Vincent L. Petraro,

305

1   P-e-t-r-a-r-o, PLLC.
2        MR. STOELTING:  Are you on Exhibit 25?
3        MR. KAMELI:  Yes.  Oh, I'm sorry, 26.  26.
4        THE COURT:  Sorry, Mr. Kameli.
5        With respect to Exhibit 24 though, just to go back
6   for a minute, the individual you were sending materials to,
7   this is not a Starwood representative, but this is some hotel
8   consultant?
9        THE WITNESS:  Yeah.  Because my attorney tell me
10  that law firm who was preparing -- who was preparing to
11  finalize that agreement and they need a hotel consultant to
12  give them more specific advice on a lot of particular terms in
13  the agreement regarding the hotel operation.
14       THE COURT:  Finalize the agreement with who?
15       THE WITNESS:  Starwood.
16       THE COURT:  Starwood.  Okay.
17       THE WITNESS:  Yes.  And if you look at the second
18  paragraph, that counsel is telling Richard, my colleague who
19  work on our hotel deal, Eitan Tabak work on some deals for
20  Starwood during the four-month period in 2007 at his old firm.
21  So, you know, she's trying to ask the general counsel to
22  Starwood to waive that interest conflict, which they did.  So
23  that's why I think, you know, she said, "I actually know the
24  general counsel to Starwood.  I met her a year ago at my
25  office.  She's the one whom the labor letter should be sent.

306

1 John will just send it to her. I will draft it and send to
2 you for your review."
3      THE COURT: So the record is clear, what was the
4 person's name? Eitan?
5      THE WITNESS: Eitan Tabak. That's an attorney.
6      THE COURT: Eitan who?
7      THE WITNESS: T-a-b-a-k.
8      THE COURT: What page are you on?
9      THE WITNESS: I'm on 23, Exhibit 23.
10     THE COURT: Oh, you are in exhibit -- okay, hang on
11 a second. I was at 24.
12     THE WITNESS: Sorry.
13     THE COURT: Wait a second.
14     THE WITNESS: Yeah, 24 is the consultant, you
15 know --
16     THE COURT: Hang on. Hang on.
17     I'm sorry, Mr. Kameli, did you ask him about
18 Exhibit 23?
19     MR. KAMELI: No, Judge. I skipped.
20     THE COURT: Okay. So that is an e-mail exchange in
21 November 2010. And then I was speaking about the April 2011
22 e-mails that are in Defense Exhibit 24, which you did ask him
23 about. And so I just want to confirm that -- Mr. Xia, what
24 were you sending again and what was the purpose of the
25 attachments you were sending?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

307

1      THE WITNESS: Yes, that's the e-mail I send to the
2 hotel consultant that recommended by Eitan Tabak, the counsel
3 who representing me. I send him all this information,
4 material forwarded by -- to me by Starwood and Interstate
5 Hotels & Resorts.
6      THE COURT: Okay. And then the spelling for Eitan
7 Tabak is E-i-t-a-n.
8      THE WITNESS: T-a-b-a-k.
9      THE COURT: Okay, P-a-b-a-k.
10     THE WITNESS: T, like Tom. T-a-b-a-k.
11     MR. KAMELI: Judge, it is in Exhibit 23, in the
12 middle of the paragraph.
13     THE COURT: Yes, I see it. E-i-t-a-n T-a-b-a-k,
14 like Tabak.
15     THE WITNESS: Yes.
16     THE COURT: Okay. And so Exhibit 24 is still in
17 connection with a possible Starwood hotel?
18     THE WITNESS: Yes.
19     THE COURT: A franchise agreement?
20     THE WITNESS: Franchise agreement, the pro forma and
21 the hotel management agreement.
22     THE COURT: And the what?
23     THE WITNESS: Hotel management agreement.
24     THE COURT: Okay. Now we're on Exhibit 25?
25     MR. KAMELI: Yes.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

308

1      THE COURT: And this is now some e-mails back in
2 November 10, 2010. This is about Starwood waiving the
3 conflict?
4      THE WITNESS: That's right.
5      THE COURT: Okay. But now we are backward in time
6 from April 2011?
7      THE WITNESS: Yes, that's right.
8      THE COURT: Okay. Go ahead, Mr. Kameli.
9 BY MR. KAMELI:
10 Q    And on Exhibit 26 of Defense, Law Offices of Vincent
11 Petraro, who are they?
12 A    They are the BSA counsel, the Board of Standards and
13 Appeals counsel who represent us in front of the New York City
14 Board of Standards and Appeals to change the usage of the
15 hotel from extended hotel into a transit hotel and also we're
16 trying to increase the building height after we got the
17 special permit from the FAA.
18 Q    And why did you need to do that?
19 A    I'm trying to increase the value and do a better design
20 and, end of the day, after paybacks, you know, give a better
21 chance to cash out and pay back EB-5 investor.
22 Q    And you hired this person, the attorney?
23 A    Yes, I hired him.
24 Q    And then there is a check for $2,000 there also on the
25 last page. Do you see that?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

309

1 A    That's right. That's initial retainer, yes.
2 Q    So what happened to that request of zoning change?
3 A    It took a while. You know, it take three years. But by
4 2014, we were successful in getting permission from the
5 New York City BSA and they grant us our request to increase
6 the building height from 14-story to 20-story and also give us
7 a special variance, we can offer it a transit hotel in Eastern
8 Mirage Project.
9 Q    Do you consider Westin as a transit hotel?
10 A    Westin Element initially proposed it's an extended stay
11 hotel. And we were always hoping we can get into a transit
12 hotel, which is Westin hotel, so that's why, you know, we
13 initiated this application.
14 Q    And then what is the document in Exhibit 27?
15 A    That's a BSA decision, BSA decision for Mirage Project.
16 It took us three years. A lot of community works, you know,
17 numerous hearing, public hearing, and, you know, many round of
18 communication with the New York City BSA. But eventually, in
19 June 17, 2014, the BSA render their resolution, which you can
20 see on the first paragraph, the decision of the building. You
21 know, they basically opposed that because it's -- you know,
22 it's different from the price of regular zoning requirement.
23 But BSA is agency who can grant us a special permit and a
24 variance on those two noncompliant zoning request, and they
25 did that.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

310

1  Q   So this was July of 2014?

2  A   July 2014, yes.

3  Q   Let me take you back to -- let me take you forward to

4  Exhibit 28.

5  A   Okay.

6  Q   And these are defense exhibits.  Defense Exhibit 28.

7      Do you see that, sir?

8  A   Yes, I see that.

9  Q   That's a letter from John Salvatore from Starwood Hotels.

10 Is that the same contact that you had in 2010?

11 A   That's right, same contact.

12 Q   And there is a -- this letter was written by Xi?

13 A   Yeah.  Xi Verfenstein, yes.

14 Q   Okay.  Yes, it shows in the bottom, Xi Verfenstein.

15     And why did you guys reach out to John again, if you

16 know?

17 A   Because after we signed the term sheet, she was -- you

18 know, she's also our main architect and she's dealing with

19 Starwood, our kind of design requirement, the size of the

20 unit.  There's many special requirement for their, you know,

21 branding, brand standard.  So I think she was reaching out

22 to -- and she's also, you know, working with the BSA counsel,

23 because the BSA process is highly involved with a lot of, you

24 know, plan and proposed plan has a red flag, and that's why

25 she, you know, facilitates BSA hearing and asking John to send

Andronikh M. Barna, Official Court Reporter, RPR, CRR

311

1  a letter in case we, you know, we do -- our request for the

2  transit hotel can be granted.

3  Q   And what happened?

4  A   Yeah.  John, he's very happy because the transit hotel

5  can probably make more money for their company, so he has no

6  issue to just send us a letter to support our BSA application.

7  Because I think at that time we were in the final part of the

8  hearing with the New York City, so New York City want to know

9  that if I grant you this application, will the -- you know,

10 the brand or hotel proprietor is going to, you know, like it.

11 Q   And then what happened to that relationship with Westin?

12 A   Yeah.  They send the supporting letter and I think then,

13 you know, we were attending a couple of hotel conference.  And

14 then John left Starwood because the Starwood had put itself on

15 the market for sale and John, I think, you know, he left the

16 company.

17

18     (Continued on the next page.)

19

20

21

22

23

24

25

Andronikh M. Barna, Official Court Reporter, RPR, CRR

312

1  BY MR. KAMELI:  (Continuing)

2  Q   And you had no other communication with anyone else?

3  A   No, because their company is no longer there and so I

4  think after that, you know, we have no choice.  We were

5  negotiating with the Hilton and the Hilton is actually, it

6  also very interested in and they were trying to give me two

7  brand, one is Marriott -- no.  I think yes.  No.  Marriott,

8  Marriott try to give us a Marriott Marquis for Eastern Emerald

9  project and for, I think, Hilton try to give us material for

10 Mirage and Hilton for Emerald, and they actually giving us, I

11 think, a term sheet, try to pay us $3 million to secure deal

12 with us.

13 Q   So --

14 A   And Linden is also very interested into our project.

15 Linden had meeting with us and eventually they even decide to

16 create a new brand for our two hotels.

17     THE COURT:  Mr. Kameli, we're at the noon hour and

18 we're going to stop in a moment.

19     I want to ask you, Mr. Xia, when did you switch from

20 Starwood to these other hotels in terms of exploring other

21 options?

22     THE WITNESS:  I think after they sold the company.

23     THE COURT:  When was that?

24     THE WITNESS:  I think 2015.

25     THE COURT:  Do you know approximately when?

CMH   OCR   RMR   CRR   FCRR

313

1      THE WITNESS:  2015, 2016.

2      THE COURT:  You said you don't even remember the

3  year?

4      THE WITNESS:  He didn't tell us when he's been to,

5  he's planning to leave because this merger for their own

6  business.  We just don't get things back from them.

7      THE COURT:  I'm just trying to pin down when it was

8  clear that Starwood would not be an option.

9      THE WITNESS:  We didn't know that, I think, until

10 Starwood formally announce they sell the brand to other

11 companies.  We didn't know exactly what year.  I think it's

12 2017 or '16.  I don't know.

13     THE COURT:  Did you want to ask anything else,

14 Mr. Kameli, before we break?

15     MR. KAMELI:  One more question with regard to

16 Westin.

17     THE COURT:  Yes.

18 Q   Mr. Xia, let me take you to Plaintiff's Exhibit 43.

19     MR. KAMELI:  So Judge, may I approach Mr. Xia so I

20 can show him this?

21     THE COURT:  Yes.

22 Q   Did you find it?

23 A   Yes.  43, right?

24 Q   43.  Mr. Xia, have you seen this letter before?

25 A   No.

CMH   OCR   RMR   CRR   FCRR

314

```
1    Q   Okay.
2         MR. KAMELI:  Judge, I have no further questions,
3    just a moment, about Westin before the break.
4         THE COURT:  That's fine.  Let me ask one question of
5    Mr. Xia.
6         Exhibit, Plaintiff's Exhibit 43.
7         THE WITNESS:  Yes.
8         THE COURT:  You see that it's an e-mail from someone
9    named Randy Neches from Marriott to Kim, first name, Han,
10   H-A-N, last name.
11        THE WITNESS:  Yes.
12        THE COURT:  Do you know Kim Han?
13        MR. KAMELI:  Judge, that's --
14        THE COURT:  Oh, I'm so sorry.  So sorry.
15        Sorry, Ms. Han.  I had forgotten that.  That's the
16   problem when you don't speak much.  Stoelting and company
17   should let her examine someone.
18        All right, let's take our break now, folks.  We'll
19   reconvene at 2:00 because I've got some other matters in the
20   interim.
21        MR. KAMELI:  Can I ask one question with regards to
22   our timing?
23        THE COURT:  Yes.  Let's go off the record.
24        (Luncheon recess.)
25
             CMH   OCR   RMR   CRR   FCRR
```

315

```
1                  AFTERNOON SESSION
2         (In open court.)
3         THE COURT:  Are you folks ready to restart?  That.
4         MR. STOELTING:  Your Honor, can I ask one question?
5         THE COURT:  Okay.
6         MR. STOELTING:  There was a reference earlier about
7    doing it on the papers and if there's going to be post-hearing
8    briefing, then we certainly can address things there that
9    might be more, you know, than having to make points on the
10   record with a witness and a document.  If we know there's
11   going to be briefing, it could shorten --
12        THE COURT:  -- the presentation.
13        MR. STOELTING:  -- the time we spend with witnesses.
14        THE COURT:  Well, actually, that's a good question.
15   There are a few things similar to that I want to talk about.
16        So, first of all, Mr. Kameli, as I said to you when
17   we went off the record before the lunch break, I'll give you
18   as much time as you need for your examination and presentation
19   of evidence, but I do want to remind you that you don't need
20   to ask the witness to read documents into the record unless
21   you want to ask questions about what's being read or the
22   documents or if reading the document into the record is
23   necessary to establish the context for the questions so
24   perhaps if we can skip some of the pure reading of the
25   documents into the record.
             CMH   OCR   RDR   FCRR
```

316

```
1         Mr. Stoelting, this just goes into the question you
2    just asked which is post-hearing briefing and your view is
3    that if there's going to be post-hearing briefing where the
4    parties can reference and avoid having them read into the
5    record, that might speed things up.  I would appreciate that
6    kind of briefing but I recognize that that will take a little
7    bit of time.  However, I was going to advise the parties that
8    I want you folks to order a copy of the transcript on an
9    expedited basis, two weeks or less, and share the cost because
10   I'm going to need that for my decision.
11        I think it makes sense for the parties to submit
12   something in writing and then the question becomes what's a
13   reasonable time frame and I think it makes even more sense if
14   you think, at least on the SEC side, it will shorten the need
15   to present everything in this hearing because, again, I don't
16   need you to read documents into the record.
17        MR. STOELTING:  Certainly, after this morning, there
18   were a number of points to, you know, address points that were
19   made by Mr. Xia that would just be answerable from documents
20   and I don't think it's a good use of time to say see what the
21   partnership agreement says, that's what it says, and that
22   things like profit, duties of the general partner, that kind
23   of thing, I think, could be resolved better in post-hearing
24   briefing and may cut short of the need.
25        THE COURT:  I think that's right and the parties
             CMH   OCR   RDR   FCRR
```

317

```
1    have done that already to some extent but when you argue
2    certain aspects of the offering memos to make a point, you can
3    just do that on paper.  For example, this paragraph states
4    this or discloses this or qualifies this, you can make that on
5    the papers.
6         So if you folks are amenable to post-hearing
7    briefing, we could shorten the purely record based
8    presentation.
9         MR. KAMELI:  I know, Judge.  I think that's going to
10   help out but the question is how much time are we going to
11   have.  I mean, there's so much documents and I will be okay
12   with the post-hearing briefing as long as Your Honor allows us
13   to do some, appear in front of you for some arguments too.
14        THE COURT:  Yes.  I mean, I think, we can build that
15   all in.  I would give you roughly two weeks to put together
16   your post-hearing briefing.
17        MR. KAMELI:  How long will it take to get the
18   transcript?
19        THE COURT:  Depends on how much you want to pay.
20        MR. STOELTING:  We will order it expedited.  I
21   thought we had already done that but I apologize.  I thought
22   we had a contract with court reporters but we'll definitely
23   order it.
24        THE COURT:  Let's go off the record.
25        (Discussion off the record.)
             CMH   OCR   RDR   FCRR
```

318

1    THE COURT: Back on.

2    I think everyone has an interest in moving this

3    along because the freeze will extend until I get the final

4    briefing and then, obviously, I'll rule on it quickly.

5    Now, bear in mind, I'll probably start putting

6    together a decision based on what I have in front of me

7    already, but I obviously won't finalize it until I read

8    everyone's submissions and if you want to have a chance to

9    argue orally, we can set that for right after you submit, you

10    know, submit your respective post-hearing briefing.

11    MR. KAMELI: Yes.

12    THE COURT: But it won't be responsive, right? Each

13    side will submit on the same day.

14    MR. STOELTING: That's fine.

15    THE COURT: In the interest of time.

16    MR. KAMELI: Okay.

17    THE COURT: So with that, let's go ahead and have

18    Mr. Xia take the stand again.

19    Let me make one procedural observation that I

20    allowed the SEC when they called Mr. Xia to treat him as a

21    hostile witness for the obvious reason that he is a defendant

22    and so Mr. Stoelting basically used a cross-examination form.

23    Technically, Mr. Kameli you're doing cross but since

24    this is your witness, I am asking you to make it more

25    open-ended especially because you had also indicated you might

CMH    OCR    RDR    FCRR

319

1    want to call Mr. Xia. So notwithstanding the posture or the

2    procedure, and while this is technically cross, you really

3    ought to use more open-ended questions and let the witness

4    speak for himself and not overly lead. Okay?

5    MR. KAMELI: Yes, Your Honor. I just want to let

6    you know that this morning, I was treating him as

7    cross-examination, not my witness but their witness. I

8    understand.

9    THE COURT: Just be mindful because I don't -- I

10    mean, I appreciate you leading him if we're just summing up on

11    things that have gone before to get us to the next question

12    but the important information, if there's important

13    information to get from him that he hasn't testified to

14    before, I'd like to spontaneously offer that up.

15    MR. KAMELI: Yes, Your Honor.

16    THE COURT: Okay.

17    (The witness, RICHARD XIA, having been previously

18    sworn, resumed the stand.)

19    CROSS-EXAMINATION (Continued)

20    BY MR. KAMELI:

21    Q    Mr. Xia, allow me to bring to your attention Plaintiff's

22    Exhibit 96, please.

23    THE COURT: This is the plaintiff's exhibit, did you

24    say?

25    MR. KAMELI: Yes, Your Honor.

CMH    OCR    RDR    FCRR

320

1    THE COURT: Okay.

2    Q    Are you familiar with that document, sir?

3    A    **Let me get it. 96, right?**

4    Q    Yes, 96?

5    A    **Yes.**

6    Q    Very good. I'm going to ask you some questions about

7    that exhibit by showing Her Honor again some of the

8    relationships between the parties.

9    This morning we did talk about the LPs and the

10    relationships with Eastern Mirage, sir, correct?

11    A    **That's correct, yes.**

12    Q    Very good. And in reality, good thing we didn't erase

13    it. This is what we had this morning.

14    On Exhibit 96, Plaintiff's Exhibit 96, it shows that

15    movement of money around?

16    A    **Yes.**

17    Q    From bucket to bucket. You see that, sir?

18    A    **Yes.**

19    Q    And it shows the bucket number one is EMMOC NQMC, L.P.,

20    and it says 1282. I imagine that's a checking account number?

21    A    **Yes, that's correct.**

22    Q    So it shows that money was moved from the limited

23    partnership to another account of EMMCO NQMC L.P., 0896.

24    That's probably another checking account, do you agree?

25    THE COURT: If you know.

CMH    OCR    RDR    FCRR

321

1    A    **I believe it's the same. 1282 is the four digit of the**

2    **savings account. 0896, I think, is checking account.**

3    Q    So the first two transactions, first two tables here in

4    Exhibit 96 are the banking accounts that belong to the limited

5    partnership of EMMCO NQMC, correct?

6    A    **That's right.**

7    Q    Is that, is that a limited partnership, by that I mean

8    EMMCO NQMC, where the EB-5 investors deposit their $500,000?

9    A    **Yes. Yes.**

10    Q    Okay. And you mentioned the first one is a savings

11    account?

12    A    **Yes, that's always our practice, when, to get some**

13    **savings interest. So the majority of the money is going to be**

14    **kept in the saving account as long as they can so unless it's**

15    **absolutely necessary, it's all stay there, yes.**

16    Q    And it shows on 6/27 of 2013, $2 million was moved from

17    saving account of the limited partnership to account number

18    0896. Do you see that, sir?

19    A    **Yes, I see that.**

20    Q    And then the same date, June 27, 2013, $1.7 million

21    gets -- I'm sorry, same day, $2 million gets deposited

22    into Fleet Financial Group, Incorporated, right?

23    A    **That's right.**

24    Q    Is that part of the loan proceedings that's based on the

25    agreement and based on --

CMH    OCR    RDR    FCRR

322

1    THE COURT:  No, no, this is where you ask:  What
2  exactly was that transfer for.
3    A    It's the loan proceed from the LP account into the
4  developer account, from the NCE to the GP account as part of
5  the loan of the job creation and the project construction.
6    Q    So it goes to the Fleet Financial Group and based on this
7  document, Exhibit 96, about $1.7 million goes from Fleet
8  Financial Group to Racanelli.  Do you see that, sir?
9    A    Yes.
10   Q    What was the purpose of such transfer from Fleet
11  Financial Group to Racanelli?
12   A    That's the money go to Racanelli for the services the
13  general contractor provide to the project, to build the
14  project.
15   Q    By "project," you mean Eastern Mirage, correct?
16   A    Yes, Eastern Mirage project.
17   Q    Okay.  Now, you do see that --
18    THE COURT:  Hang on a second, Eastern Mirage or
19  Eastern Emerald?
20    THE WITNESS:  Mirage.
21    THE COURT:  Okay.  Go ahead.
22   Q    Now, on the same document, you see that, on 6/27/2013,
23  $1.7 million goes from Racanelli to Eastern Emerald Group
24  account.
25   A    That's correct.

CMH    OCR    RDR    FCRR

---

323

1    Q    You see that, sir?
2    A    Yes.
3    Q    What was the reason of such transfer from Racanelli to
4  Eastern Emerald account?
5    A    That was the payment of my affiliate entity provide that
6  services for.  And, you know, since we have rental income, we
7  never really enforce that payment.  We just provide the
8  invoice.  So at that time, I think the outstanding balance
9  from my entity -- because in 2013, the project is already
10  complete the foundation and its well in the progress to move
11  up vertically.  And all the service money, we typically just
12  put the invoice there unless we, and it's necessary, we ask
13  for payment but most of time, we just trying to preserve the
14  cash in the project as long as we can.
15    So by that time, we're trying to buy the land.
16  Since I already contribute all my rental income, pretty much
17  every penny into the project, and so we had to have the
18  service money to be paid to us so in order to buy the land
19  because end of the day, you know, my occupation is I'm a real
20  estate developer.  I do -- I buy land for a living.  So if I
21  already put all the money into the project, at that time, I
22  need my service to be reimbursed to us.
23    Q    Mr. Xia, let me ask you a question.  You explained, you
24  tried to explain but there's so many companies, entities,
25  services, so let me ask you questions to clarify that.

CMH    OCR    RDR    FCRR

---

324

1    You mentioned the $1.7 million that moved from
2  Racanelli to Eastern Emerald Group was based, was a payment
3  for services.  Who provided services to Eastern Mirage for
4  Racanelli to make such payments, sir?
5    THE COURT:  No, no, wait.  The first question is who
6  provided the services and to whom.
7    A    Yes.  X&Y Development Group provide the foundation
8  services to the general contractor Racanelli.  XY
9  Development --
10   Q    Let me ask you to go one by one.
11   A    Yes.
12   Q    So X&Y provided services to project.  What project, sir?
13   A    Eastern Mirage project.
14   Q    To Eastern Mirage.  Okay.  Go ahead.
15   A    Yes, for the foundation, because, originally, they
16  different contractor, they walk away, so XY.  And also the
17  curtain wall, curtain wall, the same thing.  You don't really
18  need to get curtain wall until the building get up.
19    THE COURT:  Are you saying "curtain law" or "curtain
20  wall"?
21    THE WITNESS:  Curtain wall.
22   A    And the curtain wall has a lot of design coordination.
23  Our curtain wall, actually, you know, we got the glass and so
24  there's a lot of coordination at that time even though the
25  building, you know, still going up.  And also, I think, the

CMH    OCR    RDR    FCRR

---

325

1  design, architectural design, architectural record,
2  engineering record, we did a lot of record, we did a lot of
3  design.
4    THE COURT:  Can we stop for a second?
5    THE WITNESS:  Sure.
6    THE COURT:  Which payment are we talking about?
7    MR. KAMELI:  $1.7 million.
8    THE COURT:  There's two of them.  One is from Fleet
9  to Racanelli and one is from Racanelli to Eastern Emerald.  So
10  which one are you asking about?
11    THE WITNESS:  The second one.
12    MR. KAMELI:  I was asking about Racanelli to Eastern
13  Emerald.  I want to know why that money was transferred from
14  Racanelli to Eastern Emerald.
15    THE COURT:  First he said it was for services
16  provided by X&Y in connection with the Mirage project.
17    THE WITNESS:  And the JiQing Development.
18    THE COURT:  The JiQing Development.
19   Q    So X&Y services and JiQing Development, they provide
20  services for the Mirage project, is that what you're
21  testifying?
22   A    In the subcontract, yes.
23   Q    And they sent invoices to Mirage to get paid?
24   A    Yes, they did.
25   Q    Okay.  Who did they send the invoices to?

CMH    OCR    RDR    FCRR

326

1  A  They send to Racanelli.

2  Q  To Racanelli, asking for certain amount of payments for

3  the services they provided, correct?

4  A  That's right.

5  Q  Okay. Did Racanelli pay for those services?

6  A  It's delayed. Everything is delayed. Payment was

7  delayed.

8  Q  Okay. But do you know why the money was moved from

9  Racanelli to Eastern Emerald in June 27, 2013 for

10  $1.7 million?

11  A  I knew, yes.

12  Q  And what was the reason for that, sir?

13  A  It's for the service payment. It's long overdue.

14  Q  Service payment made by whom to whom?

15  A  From Racanelli to my affiliated entities.

16  Q  So Racanelli provided services to your entities?

17  A  No. Racanelli provide the service to Eastern Mirage

18  project.

19  Q  Okay. So was Racanelli paying that invoices to X&Y and

20  JiQing Development?

21  A  There's outstanding balance here.

22  Q  So how come this money didn't go to X&Y and JiQing and

23  went to Eastern Emerald?

24  A  Because that's, the only reason they ask for the payment

25  is trying to, first, you know, put a down payment for the land

CMH   OCR   RDR   FCRR

327

1  purchase. So we --

2        THE COURT: For Eastern Emerald?

3        THE WITNESS: For Eastern Emerald.

4  A  We were in a rush. We were trying to directly have the

5  payment go to the entity who purchase Eastern Emerald land.

6        THE COURT: So hang on a second so the testimony is

7  clear.

8        Mr. Xia, are you saying that the June 27th payment

9  of or transfer of 1.7 million from Racanelli to Eastern

10  Emerald Group was for the purpose of making a down payment on

11  the land for the Eastern Emerald project?

12        THE WITNESS: First it's a service that need to be

13  paid, yes.

14        THE COURT: First it's what?

15        THE WITNESS: A service value that need to be paid a

16  long time ago.

17        THE COURT: Okay. But you also said it had to do

18  with the down payment on the land for the Eastern Emerald

19  project, right?

20        THE WITNESS: Yes, that's the purpose we were asking

21  for payment. Because, you know, we -- like I said, all my

22  money is in the project. So if I buy the land, I want my

23  service money that has been long overdue to pay.

24        THE COURT: So, in other words, the money was sent

25  to Eastern Emerald Group because your entities, X&Y and

CMH   OCR   RDR   FCRR

328

1  JiQing --

2        THE WITNESS: JiQing Development he, yes.

3        THE COURT: Were owed money in connection with the

4  Mirage project so instead of paying those entities directly,

5  you just sent the money to the Eastern Emerald Group because

6  you need to make a down payment for the land on that project?

7        THE WITNESS: That's right, yes.

8        THE COURT: But you viewed it as payment for

9  services rendered on the Mirage project by your affiliates?

10        THE WITNESS: Yes. We have an outstanding balance

11  at that time, yes.

12        THE COURT: Okay. I got it.

13  Q  Allow me to bring your attention to Exhibit 96,

14  Plaintiff's Exhibit 96, page 7-2. Do you see that, sir?

15  Q  96, right?

16  A  Yes. It's the back.

17  A  Okay.

18  Q  You see there are two transfers, the first one says,

19  EMMCO Tower, L.P.?

20  A  Yes.

21  Q  Tower L.P. The money moves from one account of EMMCO

22  Tower, L.P. to another account of EMMCO Tower, L.P. in

23  different dates. Do you see that?

24  A  Yes, I see that.

25  Q  Okay. For a total of $10.5 million, the money goes from

CMH   OCR   RDR   FCRR

329

1  one account at EMMCO Tower, L.P. to another. Do you see that?

2  A  Yes.

3  Q  And then about 10, $10.5 million gets transferred from

4  EMMCO Tower to Fleet Financial Group between December 16, 2013

5  to December, between December 13, 2013 to December 17, 2013.

6  Do you see that, sir?

7  A  Yes.

8  Q  And then the money again moves from Fleet Financial which

9  was a developer. Correct?

10  A  That's right.

11  Q  Goes to Racanelli?

12  A  Yes.

13  Q  Between the 12/16 of 2013 and 12/17 of 2013. Do you see

14  that, sir?

15  A  I see that, yes.

16  Q  And then from Racanelli, again, it goes to Eastern

17  Emerald Group 3379 account, do you see that?

18  A  Yes.

19  Q  So we see one set of transactions that at the end,

20  10.3 million is given to Eastern Emerald Group, do you see

21  that?

22  A  Yes, I see that.

23  Q  And then there's another set of transaction about the

24  same time, the same path, with different account numbers for

25  amounts of 5, almost $5 million, 5.5 million, $5,050,000. Do

CMH   OCR   RDR   FCRR

330

1   you see that, sir?

2   A   Yes, I see that.

3   Q   In those transactions, why was the money moving from

4   Racanelli to Eastern Emerald Group?

5   A   This, counsel, the same reason because it's time to buy

6   the land and we are just, you know, reaching out to the

7   general contractor, trying to collect all those unpaid

8   invoices for the services of, my entity provided for the,

9   Eastern Mirage project.

10  Q   Okay.  All those services that you provided that you owed

11  money, the invoices of those had been provided to the

12  plaintiffs, right?

13  A   Yes, all the invoice has been fully submitted in writing

14  in 2019.

15       THE COURT:  Are we talking about the invoices that

16  have monthly payments, those invoices?

17       MR. KAMELI:  There were batches of invoices that

18  were provided years ago so those are the ones we're talking

19  about, yes, Your Honor.

20       THE COURT:  Are those the flat fee --

21       MR. KAMELI:  Some are flat fee, some are different,

22  yes, Your Honor.

23       THE COURT:  Okay.  All right.

24  Q   Sir, I'm going to bring your attention to an exhibit,

25  Plaintiff's Exhibit No. 114.

331

1        Are you familiar with that exhibit, sir?

2   A   Yes.

3   Q   Again, it has transfers.  We're going to go back to the

4   board.  It says the transfer, this is a transfer in March and

5   April of 2012 from EMMCO, L.P., for an amount of total

6   $1,160,000, that moves to Fleet Financial Group.

7        Do you see that, sir?

8   A   Yes, I see that.

9   Q   What was the reason for that transfer?

10  A   It's the loan disbursement from the NCE, from the lender

11  to the borrower, Fleet Financial Group.

12  Q   And you see that about $983,000 was moved between

13  April 2nd to April 6 of 2012 from Fleet Financial to

14  Racanelli.  Do you see that, sir?

15  A   I see that, yes.

16  Q   What is the reason for that transfer?

17  A   That's for the service payment to Racanelli of the Mirage

18  project construction.

19       THE COURT:  Mr. Kameli, he testified to all of this

20  yesterday.  I mean, I have it in my notes on the exhibit.

21       MR. KAMELI:  Judge, I'm just going to follow up to

22  something else in addition.

23       THE COURT:  All right.  Go ahead.

24       MR. KAMELI:  I'm trying to establish that.

25  Q   And it goes down to JiQing Development for $819,000?

332

1   A   That's right.

2   Q   What did JiQing Development use that money for, the

3   $819,000 transfer?

4   A   They're asking for the payment in order to pay off the

5   mortgage, JiQing Development cash out two years ago for the

6   project.

7   Q   So at the bottom of this, it says, loan payoff,

8   5735 Lawrence, right?

9   A   That's right.

10  Q   I'm going to bring your attention to Defendants'

11  Exhibit 57.  Defendants' in the other book.

12  A   Yes.

13  Q   I want you to take a look at Exhibit No. 57, 58 and 59,

14  please, of defense.

15       On Exhibit 57, do you know what this document is,

16  sir?

17  A   Yes.  That's the loan closing document two years ago from

18  that big payment for JiQing Development to mortgage, to

19  mortgage our own condo building for I think a $900,000 loan to

20  gave to the project.

21  Q   So the dates of this document on top, it says,

22  Preparation date 11/16/2010.  Do you see that, sir?

23  A   I see that, yes.

24  Q   And the mortgage amount is $900,000?

25  A   Yes.

333

1        THE COURT:  Could you clarify what project we're

2   talking about just so it's clear.  Which project?

3        THE WITNESS:  For Mirage project.

4        THE COURT:  The Mirage?

5        THE WITNESS:  Yes.  At that time, we only had the

6   Mirage project.

7        THE COURT:  Okay.

8   Q   And Exhibit No. 58, Defense Exhibit No. 58, what does

9   this document show?

10  A   That shows the closing statement.  It shows the closing

11  of the $900,000 loan proceed, how much, you know, has been

12  really disbursed into borrower's account after deduct all the

13  type of charge or some property tax or I guess the escrow, all

14  those type of closing costs.  So, yes.

15  Q   Okay.  And then document 59, it shows, that's a bank

16  account and it shows the money was disbursed to that bank

17  account, right?

18  A   Yes, JiQing Development, the deposit.  Same number I

19  think in the closing statement.

20  Q   Yes.  So what did JiQing use that money for begin?

21  A   If you look at the page after, JiQing actually used those

22  money directly, I think all of them go into the project

23  development for, gave to the Fleet Financial and the, you

24  know, who is also providing services for the project.

25       Yes, the second page you can see the number

334

1  $690,000.

2  Q    Yes.

3  A    Then further down, from Shangri-La Green going to XY

4  Development Group and payoff some expenses.  Then go to, you

5  know, eventually -- what is that.  Yes, November 8th, $660,000

6  has been deposited into the Fleet Financial Group account.

7  That's in 2010 because at that time, we don't really have EB-5

8  fund available.  Even we know that we're asking agent to bring

9  the EB-5 investor but the project is in a very critical

10  moment.

11        I found this many times.  You know, we treat a

12  project like our own project even though we don't record this

13  mortgage and lien for the project, but I have no issue to use

14  my other personal project to cash out and to support the

15  project because that, you know, that's my best interest.  I

16  have no reason not to do that.

17        And if you look at all the check has been issued,

18  it's all project related and all this expenses.  So that's,

19  that's the purpose.  JiQing got this, cash out mortgage our

20  own property.  And those money actually -- but EB-5 come in in

21  2010, 2011.  I think it can be reimbursed but we chose not to

22  do that, not to incur additional unnecessary mortgage on it

23  until, I think, the loan is matured, we had no choice, and we

24  just pulled the invoice value and paid that loan off.  But at

25  the end of the day, everything is for the, for the project,

CMH    OCR    RDR    FCRR

335

1  for the project.

2  Q    Mr. Xia, let me -- I'm trying to use the time

3  efficiently.  Let's move to Defense Exhibit 73.  Are you

4  there, sir?

5  A    Yes.

6  Q    What is this document?

7  A    That's application to the New York City Building

8  Department for, I think, Emerald project architectural

9  approval.

10  Q    And you were asked questions about, I believe, this

11  document yesterday by the plaintiffs.  Do you recall that,

12  sir?

13  A    Yes, I did.

14  Q    Let me bring your attention to the third page.  It says,

15  on paragraph 12C, it says proposed total square footage is

16  350,186.  Do you see that, sir?

17  A    Yes, that's right.

18  Q    And then, I'm going to ask you -- you were asked

19  yesterday about some questions in regards to how would this

20  356, 350,000 square feet equal to 1 million square footage

21  that you have mentioned in the PPM, in the offering, in the

22  offering memorandum.  Let me bring your attention to

23  Exhibit 76.

24        THE COURT:  Defense?

25  Q    Are you there, sir?

CMH    OCR    RDR    FCRR

336

1        THE COURT:  Is it defense exhibit?

2        MR. KAMELI:  It is Defense Exhibit 76, yes.

3  A    Yes.

4  Q    What is this document?

5  A    This is a document I prepare for New York City City

6  Planning for the proposed building.

7  Q    And how do we determine based on this document how many

8  square footage the building is going to be?

9  A    In the New York City, using a factor we call floor ratio,

10  floor to area ratio -- floor means how many square footage you

11  can build and area means the size of the land, to control the

12  envelope of the development -- and that floor ratio shows it's

13  going to directly determine how big the building is to be.

14        The project itself is R-6, you know, we can see who

15  overlay.  So based on the New York City City Planning zoning

16  code, the floor ratio is the 4.8.  So if you times 72,000

17  square feet of the land, be that 4.8, 350,000 square feet,

18  zoning purpose square footage building.

19  Q    Hold on a second.  So the 72,000 is the lot area?

20  A    Yes.

21  Q    Is that what you have on the last page of Exhibit 76?

22  A    Yes.

23  Q    On top, it says lot area 72 --

24  A    -- 955, yes.

25  Q    995?

CMH    OCR    RDR    FCRR

337

1  A    Yes.  That's area.

2  Q    And then you mentioned a different number also.  Four --

3  A    4.8.

4  Q    4.8?  Where do you see that?

5  A    That's not on this document.  This is for proposed.  I

6  just, you know, dating R-6, this is zoning district R-6.

7  That's the last line on the first page on the, you know, upper

8  right corner, zoning district, primary R-6, that's for

9  overlay.  So that gave you, I can't remember, but it's a 4.8.

10  So if you use the 73,000 square feet times 4.8, you're going

11  it roughly get 350,000 square feet zoning square foot

12  building.

13  Q    Hold on a second.  Is that how you came up, how you came

14  up with the number --

15  A    Yes.

16  Q    -- of 350,000 square feet of the proposed, proposed total

17  that shows on Exhibit, Defense Exhibit No. 73, page 3?

18  A    That's right.  That's in 2014.  We were in the process of

19  the Brownfield.  So I need an application to, you know, to

20  start the foundation work.

21        Without a design, the DOB would never allow you to

22  do the foundation work.  So taking advantage of -- I, myself,

23  as a professional, I can submit the application as of right

24  to, you know, to get to the Brownfield work start immediately

25  instead of having to wait for the City Planning and everybody

CMH    OCR    RDR    FCRR

338

1  Q   review your proposal.  You see this one, it shows proposed C-6
2      equivalent.
3  Q   Where are you showing us?
4  A   On the same color.
5  Q   And that is Defense Exhibit 76, page 4?
6  A   Yes -- page 1.
7  Q   Page 1.  It shows on page 4, too, right?
8  A   Yes.  You see that right below the primary R-6 zoning,
9      you see proposed C-6 equivalent.  That means a different
10     zoning category, Commercial-6.  And we are proposing to the
11     City Planning trying to converted our R-6 zoning with the C-2,
12     that's for over a C-6 zoning, they're trying to get that.
13 Q   Yes, sir.
14 A   And in the New York City Planning zoning code, zoning
15     regulation C-6, if you look at the last page of this exhibit,
16     it shows the total FAR, this is estimate zoning FAR if you
17     look at the last column on the last page.
18 Q   Allow me to -- hold on.  So you're referring to Exhibit,
19     Defense Exhibit 76, last page, last sentence that says,
20     Total 15?
21 A   Total 15, but if you look up, you see that it's estimated
22     zoning FAR.
23 Q   In that column?
24 A   Yes, in that column.
25 Q   Yes.

CMH    OCR    RDR    FCRR

340

1  Q   Okay.  And is that --
2  A   That's actually the first bucket of excavation they did
3      for the site.  So I, I still remember that, yes.
4  Q   So Mr. Xia, the page by page as we go forward, it shows
5      the work that was done on the Eastern Mirage and Union Street
6      in New York, Flushing, right?
7  A   That's right.  If you look at the second page, the
8      picture on the, you know, on the far left, the company name
9      called Peterson, that's the company at the beginning excavate.
10     You know, we try tried a lot of different contractors.  That's
11     the contractor who performed two weeks' work.  Then they just
12     walk away because they're, you know, everybody is trying to --
13         THE COURT:  Mr. Kameli, can you move this along?
14         MR. KAMELI:  I shall, Judge.  I shall.
15         THE COURT:  Because there's a lot of pictures in
16 this exhibit that appear to have a completed building with an
17 interior so why don't you have Mr. Xia identify the pictures
18 in this exhibit that show the construction to date if that's
19 what you want to show.
20         (Continued on next page.)
21
22
23
24
25

CMH    OCR    RDR    FCRR

339

1  A   So the total is 15.
2  Q   Yes.
3  A   So if you take the same formula, the 72,000 square foot
4      land, times 15, that's well more than 1 million square foot
5      and that is the planning where we send to, you know, why we
6      are doing the Brownfield.
7  Q   I got you.  Okay.  So 1.091 million square feet that you
8      estimated Eastern Emerald is going to be is based on this
9      calculation?
10 A   That's right.  Yes.
11 Q   Okay.
12 Q   And if you look at the first page --
13 A   Mr. Xia, I'm good.  Thank you.
14 A   Okay.
15 Q   Mr. Xia, I'm going to bring your attention to Exhibit,
16     Defense Exhibit No. 82.
17 A   Yes.
18 Q   The first page says, Union Street Project.
19 A   That's right.
20 Q   And then it shows that these are the pictures of what the
21     project was and the progress of the project, correct?
22 A   That's right.  That's the Eastern Mirage project.
23 Q   On the second page, it shows the start of the project.
24     Do you remember what year that was?
25 A   I think that's in the year 2011 or '12, yes.

CMH    OCR    RDR    FCRR

341

1  BY MR. KAMELI:  (Continuing)
2  Q   Mr. Xia, is that the picture of -- unfortunately, there's
3      no page number on that.
4      Is that a picture of what it looks like today?
5  A   Yes.  Yes.  I think last summer.
6          THE COURT:  So there are no numbers, unfortunately,
7  on the exhibit.
8          MR. KAMELI:  Judge, it's very small.  It shows 19 --
9  it shows 20.
10         THE COURT:  Oh, I see it.  Yes.
11         So it says Page 20 in the lower right-hand corner.
12         MR. KAMELI:  Yes.
13         THE COURT:  And the pictures beyond that are
14 projections or --
15         THE WITNESS:  No.  That's a real picture from the
16 model room, and this is actual model room, and we have all the
17 material, marble, everything in the building.
18 Q   Let's go page by page.  Be careful.
19     Page 21, do you see that, sir?
20 A   Yes.
21 Q   Is that the current picture?
22 A   Yes, that's the current picture.
23 Q   And Page 22, is that what you call the model room?
24 A   Yes.  The model room picture, yes.
25 Q   How about Page 23?

CMH    OCR    RDR    FCRR

342

1  A    Yes. It's another model room.

2       THE COURT: These are already built?

3       THE WITNESS: Yes. Already built.

4  Q    But Page 24, the pictures on the bottom of the page, they

5  are projections?

6  A    Yes. Starting from Page 24, that's actually the picture

7  on our website. Right now, it's EASTERNMIRAGEHOTEL.COM.

8       THE COURT: It's on their website.

9       THE WITNESS: Yes. That's hotel website.

10 Q    So let me take you forward to Page 28. And then you're

11 starting the new set of documents called Northern Boulevard

12 project.

13      Do you see that, sir?

14 A    That's right here.

15      THE COURT: That's the Emerald project?

16 Q    That's the Emerald project?

17 A    Yes.

18 Q    Now, this is just a rendering, right, the pictures on

19 that page?

20 A    Yes. That's the design. It has been fully approved by

21 the building department. That's the plan we planned to built.

22 Q    And starting at Page 2, all the way to Page 8, are the

23 work that has been done or was getting done on the project,

24 right?

25 A    Yeah, that's called the Brownfield, because there is the

Avery Armstrong, Official Court Reporter

---

344

1       Did I miss this? Did you mishear that?

2       MR. KAMELI: The loan in Lawrence was used for the

3  project.

4       THE COURT: What project?

5       THE WITNESS: Mirage.

6       MR. KAMELI: The Mirage project.

7       THE COURT: So loan for the Lawrence Street property

8  was used for the Mirage project?

9       MR. KAMELI: He testified that it was obtained and

10 then it was lent to the project, to Eastern Mirage in 2010

11 before any EB-5 money coming in.

12      THE COURT: I see.

13      MR. KAMELI: And those were the exhibits, Judge,

14 that we showed. I believe they were Defense Exhibits 57

15 through 59. Those were the mortgage documents of Lawrence

16 that it showed up -- that the proceeds went to Fleet for the

17 construction for the development of the Eastern Mirage.

18      THE COURT: Okay. Thank you.

19      MR. KAMELI: Yes, Judge.

20 Q    Mr. Xia, these are the documents I handed to you, defense

21 Exhibit 86, 87, and 88.

22      Are these the forensic engineering documents you

23 were referring to yesterday?

24 A    Yes. Yes.

25 Q    Okay. And this firm was hired by you?

Avery Armstrong, Official Court Reporter

---

343

1  one foot soil contamination in the ground water. And the

2  ground water is about 55 feet deep. So in order to take out

3  all the contamination, you see page three, we have to

4  initially to build the foundation wall and do excavation, then

5  we can start cleaning the contamination down to the bottom.

6       THE COURT: Next question.

7  Q    And then, Mr. Xia, you explained to us that there was an

8  explosion in Northern Boulevard, right?

9  A    That's right, yes.

10 Q    And you mentioned also that they were reports, or

11 engineering report about who's fault it was or what the issue

12 was, correct?

13 A    That's correct. In the third-party forensic engineering

14 report.

15 Q    Okay. I'm going to hand over some documents to you that

16 is not part of the exhibits, but I'm going to give a copy to

17 counsel too.

18      That's eighty-seven, 86, and 88.

19      MR. KAMELI: Judge, may I approach?

20      THE COURT: Yes, go ahead.

21      MR. KAMELI: Eighty-six, 87, and 88.

22      THE COURT: Mr. Kameli, maybe you can clarify, I

23 think your client just testified that the loan related to the

24 Lawrence Street property is somehow related to one of the

25 projects?

Avery Armstrong, Official Court Reporter

---

345

1  A    Yes. They're hired by us.

2  Q    What was the reason for hiring this firm?

3  A    We're trying to get a third-party independent analysis

4  for the -- you know, to analyze the collapse on Northern

5  Boulevard.

6  Q    So what was the -- the document speaks for itself, but

7  what was the finding -- what is your understanding of the

8  finding?

9  A    Yeah, if you look at the --

10      (Court reporter interrupts for clarification.)

11      THE COURT: Thornton Tomasetti report.

12 T-O-M-A-S-E-T-T-I. Exhibit 88.

13 Q    Sir, you're referring to Exhibit 88, Page 3?

14 A    Yes. Page 2 and 3, yes.

15 Q    Okay.

16 A    At the bottom, at the last paragraph, it's --

17 Q    Of what page, sir?

18 A    On the second page, Page 205.

19 Q    Okay.

20 A    Last paragraph. It shows that the SOE doesn't show --

21      (Court reporter interrupts for clarification.)

22      THE COURT: Let me read it out loud.

23      The SOE does not show signs of a punching failure,

24 parenthetical, (where one soil nail pulls through the concrete

25 liner wall). Instead, the middle of the wall appears to have

Avery Armstrong, Official Court Reporter

346

1  been pushed out. See Figure 2.

2  A    Yes. And on Page 3, the second paragraph -- the first

3  paragraph, it's amount of debris in the soil --

4        THE COURT: You know, let me read these.

5        The amount of debris and soil which pushed out

6  through the failure, does not visually match the volume of the

7  void left behind post-collapse. This strongly suggests that

8  there may have been a void behind the wall pre-collapse, which

9  would have impacted the strength of the nails.

10       Did you want to red the third paragraph too, Mr.

11  Xia?

12       THE WITNESS: Yes.

13       THE COURT: The water main in the collapsed areas

14  show signs of long-term corrosion. In addition, the soils

15  around the water pipes are discolored, indicating a water leak

16  preexisting the collapse.

17       Mr. Kameli, these might be things that you can just

18  introduce later.

19       MR. KAMELI: Yes. Thank you, Judge.

20       Mr. Xia, thank you.

21  Q    Mr. Xia, I'm going to be talking to you about the

22  Brownfield tax credit that we talked about yesterday, that you

23  received about $10 million.

24  A    Yes.

25  Q    Now, this Brownfield tax credit, what project did you

347

1  work for and what project it was sent to?

2  A    It's Eastern Emerald project and the company Eastern

3  Emerald Group, signed agreement to the DEC --

4        (Court reporter interrupts for clarification.)

5  A    -- New York State DEC, the Department of Environmental

6  Conservation.

7        THE COURT: Regarding Brownfield remediation?

8        THE WITNESS: Yes?

9  A    -- because there's contamination. So the State trying to

10  give the developer incentive, ask them to basically sign a

11  volunteer agreement to go in to clean the preexisting

12  contamination.

13       THE COURT: All right. Mr. Kameli, next question.

14  Q    And this was for Eastern Emerald, right?

15  A    Yes.

16  Q    Okay.

17       MR. KAMELI: Judge, I've got to draw something for

18  you. I just want to make sure he understands. It's a point,

19  that we're trying to make that what this money is coming from

20  and whether that was the EB-5 money or not.

21       THE COURT: Okay.

22  Q    So Mr. Xia, we're going to be talking, again, about the

23  L.P.'s and where the investors coming in for the Eastern

24  Emerald.

25       One of the L.P.s is called EEGH, correct?

348

1  A    That's right.

2  Q    And the other one is called EEGH II?

3  A    -- GH II.

4  Q    Is that the way that the EB-5 investors become a limited

5  partner in the EEGH L.P.?

6  A    Yes.

7  Q    How much money was raised -- how much EB-5 was raised for

8  EEGH L.P.?

9  A    $110 million.

10  Q   110 million. And how much for EEGH II L.P.?

11  A    I think it was $63 million.

12  Q   Sixty-three. Based on the offering documents, this money

13  was being lent to the job-creating entity.

14       What was the name of the developer?

15  A    Eastern Emerald Group, LLC.

16  Q   Eastern Emerald Group?

17  A    Yeah. LLC.

18  Q   LLC. And this is for the Eastern Emerald project, right?

19  A    That's right.

20  Q   Now --

21  A    The EEGH II lent to the La Guardia Performance Center.

22  Q   So EEGH II -- so the money from EEGH is being lent to

23  this group, correct?

24  A    That's right.

25  Q   Eastern Emerald. The money from EEGH II is being lent to

349

1  La Guardia Performance Center?

2  A    That's right.

3  Q    Both of these companies that received the money, they

4  were planning to -- they are planning to build Eastern

5  Emerald, right?

6  A    Yeah, they're going to be built, Eastern Emerald project.

7  Q    So why do you have two different developers for different

8  borrowers?

9  A    Because there's two sections. One section is hotel and

10  residential another section is we're designing some sort of

11  movie studio or theater.

12  Q   So but both of these which are Eastern Emerald Group and

13  La Guardia Performance Center are building a building on

14  Northern Boulevard address that Eastern Emerald is sitting,

15  correct?

16  A    That's correct.

17  Q   Okay. Who was the contractor on this, general

18  contractor?

19  A    Initially, it's Racanelli instruction group from the

20  Brownfield. And after the Brownfield, that completed, then

21  the Perini Group.

22  Q   So the GC was Perini and Racanelli, correct?

23  A    That's correct.

24  Q   And just like the Mirage project, they had subcontractors

25  too, right?

350

1  A   That's right.

2  Q   And did you own any of the subcontractors that provided

3  service to this project?

4  A   Yeah.  We were specializing in the deep foundation.

5  That's the most, you know, risky part.

6       THE COURT:  And that was Racanelli or something

7  else?

8       THE WITNESS:  No.  We have -- Racanelli is doing the

9  Brownfield, and we were -- after the Mirage project, we

10 realized that the deep foundation were probably only handled

11 by my entities for reasonable price.

12      THE COURT:  And what was that entity?

13      THE WITNESS:  It was a Shangri-La Green and

14 Shangri-La 9B.

15      THE COURT:  9B?

16      THE WITNESS:  9D like David.

17      THE COURT:  D.  Okay.  Go ahead.

18 Q   So Shangri-La D, those two properties -- the two entities

19 about Shangri-La 9D and the other is?

20 A   Green.

21 Q   Green.  They provided services for the deep foundation?

22 A   Excavation, yes.

23 Q   Okay.  And so the EB-5 money moved from the L.P.s to the

24 developers, to Racanelli or Perini, paid the subcontractors,

25 correct?

Avery Armstrong, Official Court Reporter

352

1  Q   Okay.  What did you do with that $10 million that came

2  from a non-EB-5 source?

3       THE COURT:  Sustained.

4       You introduced -- I mean, go ahead.

5       What did you do with the $10 million tax credit

6  check?

7       MR. KAMELI:  Judge, I can -- it was covered

8  yesterday.  I can stop.

9       THE COURT:  It sounds -- unless you want to ask him

10 some follow up, but this is exactly what we went over

11 yesterday.

12      MR. KAMELI:  If you give me one minute.

13      THE COURT:  Yeah.  I'm not preventing you.

14      If there's something else you want to ask him, go

15 ahead.

16 Q   So that $10 millions went to a CD, sir?

17 A   Yes.

18      (Court reporter interrupts for clarification.)

19      THE COURT:  CD, certificate of deposit.

20 Q   And did you obtain a loan against it?

21 A   Yes.  I obtained a credit line.

22 Q   Okay.  You covered the rest yesterday, so we don't need

23 to go over it.

24      THE COURT:  Unless you want to show the pictures of

25 the house.

Avery Armstrong, Official Court Reporter

351

1  A   That's right.

2  Q   There was a $10 million tax credit check, right?

3  A   Yes.

4  Q   When did that check arrive?

5  A   I think January 2021.

6  Q   Who was the issuer of that check?

7  A   It's -- I think it's the Department of Finance of New

8  York State.

9  Q   And what was the reason for that check being issued?

10 A   Because we got the certificate of completion and that's a

11 reward to the project developer, and the most of time, those

12 reward is claimed directly on developer's personal tax return,

13 because that money was, you know, it's mean to send back to

14 the developer as a personal incentive.

15 Q   And --

16 A   Here.

17 Q   Allow me.

18      The issuer was the Department of Finance of the

19 State of New York?

20 A   Yes.  I think so, yes.

21 Q   The issuer of that $10 million check was not EEGH L.P.,

22 correct?

23 A   No.

24 Q   And that $10 million did not come from EEGH II L.P.?

25 A   No.  Not at all.

Avery Armstrong, Official Court Reporter

353

1       Go ahead, sorry.  I don't mean to be glib.  We

2  should all live like that.  Okay.

3       Mr. Xia, when did you receive the SEC subpoena?

4  A   I got the examination, I believe, in February -- no,

5  May 8, 2018, and I got a formal order of investigations

6  subpoena in April 2019.

7  Q   Okay.  Did you testify with SEC?

8  A   Yes.  I went to SEC first and then I spent the whole day

9  until 6:00, 7:00 o'clock.

10 Q   And that was in June 2019, correct?

11 A   Yes.  June 2019, yes.

12 Q   At the time you were being investigated by SEC since

13 2018, you were in charge of both projects for Eastern Emerald

14 and Eastern Mirage, correct.

15 A   That's right.  I was in full charge of that.

16      THE COURT:  What did you say?

17      THE WITNESS:  In full charge.

18 Q   During that time from 2018, when you got no -- got to

19 know that you were being investigated by SEC, did you transfer

20 any money of the Eastern Emerald or Eastern Mirage outside of

21 the country?

22 A   No.  Never.

23 Q   Did you try to hide where the money is?

24 A   No.  Never.

25 Q   Did you try to buy or hide the money -- did you try to

Avery Armstrong, Official Court Reporter

354

1  hide the money under fictitious names?

2  A    Never.

3  Q    During the time that SEC was investigating, from 2018

4  until 2021, were you holding the money of Eastern Mirage or

5  Eastern Emerald in CDs?

6  A    Yes.  They're all in CDs.  Even before the investigation,

7  they always in the CD.  Year after year renewal.

8  Q    Did anyone of those CDs mature in 2019?

9  A    Yes.  I think that $18 million in SEC complaint happened

10  to mature I think in August 2019 right after the SEC subpoena.

11  Q    So I didn't get that.

12       So you got -- the SEC started investigating you in

13  2018, correct?

14  A    That's correct.

15  Q    There was a CD that matured in July of 2019, is that what

16  you said?

17       (Court reporter interrupts for clarification.)

18       THE COURT:  The question was, there was a CD that

19  matured in July of 2019, is that what you said?  Question

20  mark.

21       Did you say that you had a CD that matured in

22  July 2019?

23       THE WITNESS:  That's right.  That CD was typically

24  one year and has been deposited, I think, in July 2018 and it

25  matured in July or August of 2019.

Avery Armstrong, Official Court Reporter

355

1       THE COURT:  Okay.  Hang on.  Can we start this whole

2  line again.

3       When, Mr. Xia, did you first learn that you were

4  being investigated by the SEC?  What month and what year?

5       THE WITNESS:  In May 2018 SEC went into my office,

6  but at that time it's called examination.

7       THE COURT:  Okay.  So that's when you first learned

8  you were being investigated and then you got a formal subpoena

9  request about a year later?

10       THE WITNESS:  That's correct.  In April 2019.

11       THE COURT:  Okay.  And now talking about the CD.

12       You had a CD that matured when?

13  A    I had the CD being deposited in July 2018 and matured it

14  in August, I guess, 2019.

15       THE COURT:  Okay.  Go ahead.

16  Q    And you testified under oath with SEC in June of 2019,

17  correct?

18  A    Yes.

19  Q    That CD that got matured, how much was that?

20  A    It's $18 million.  I think another one is probably around

21  the same amount, $20 million.

22  Q    And when did the $20 million CD that you're talking about

23  got matured in 2000 -- what year was that?

24  A    That's 2019 too.  I think it's October 2019.

25  Q    Okay.  So one CD matured for $80 million in August of

Avery Armstrong, Official Court Reporter

356

1  2019, one got matured for $20 million in October of 2019,

2  correct?

3  A    That's correct.

4  Q    What did you do with those CDs when they got matured?

5  A    I just deposit them into the bank, get the -- get another

6  25-month CD.

7  Q    So you redeposit it in the CD for 25 months maturation,

8  right?

9  A    Yes.  That's --

10       (Court reporter interrupts for clarification.)

11       THE COURT:  That's exactly the CD deposit?  Go

12  ahead.  Did you say in the company?

13       THE WITNESS:  Matured in the complaint, the SEC

14  complaint, $18 million CD matured on September 26 which I

15  deposit after I got the formal investigation for a deposit for

16  25 months.

17       THE COURT:  Can I ask you a question, and I

18  apologize if you asked this, Mr. Kameli, where did the funds

19  come from for those two CDs, the two that have matured?

20       THE WITNESS:  Those is loan proceed from the EB-5

21  lender, yes.

22       THE COURT:  Both of them?

23       THE WITNESS:  Yeah, both of them.

24       THE COURT:  And they've both been converted into

25  CDs?

Avery Armstrong, Official Court Reporter

357

1       THE WITNESS:  Yes.  Always, because construction

2  progress doesn't take a lot of payment at one shot.  So it's

3  always progress payment.  So we have a huge balance and we

4  maintained in the bank account for many years.

5       THE COURT:  Okay.  All right.  Go ahead.

6  Q    And these CDs are in who's name?

7  A    They're in, I think La Guardia Performance Center's name.

8  Q    In La Guardia Performance Center.

9       So these are -- the CDs that you're referring to are

10  the Eastern Emerald CDs, correct?

11  A    That's correct.

12  Q    And you keep the CDs under the name of La Guardia

13  Performance Center LLC which is the actual borrower --

14  A    Yes.

15  Q    -- of the proceeds of EEGH II L.P, correct?

16  A    Yes.

17  Q    And what do you do with the interest on the CDs?

18  A    I use it for the construction.

19  Q    Of what?

20  A    Of the Emerald project.

21       Okay.  Greet.  Well, Mr. Xia, we are standing in --

22  today's is 15th of February, 2022.  You are a defendant in a

23  lawsuit and --

24  A    With SEC.

25  Q    With SEC as a plaintiff.

Avery Armstrong, Official Court Reporter

358

1    How do you propose that we go forward?
2    THE COURT: If you can answer that question, go for
3    it.
4    MR. KAMELI: It's a good question, Judge.
5    A    It's tough. I mean, for me, you know, I came to New York
6    City in 1999, and you know, today and in the courtroom, as a
7    defendant of SEC action, but in the meantime, I'm developing
8    1 million square foot project. It's a quick process, even
9    Goldman Sachs, when they bidded on my project --
10    THE COURT: When they raided?
11    THE WITNESS: No, when they bidded.
12    THE COURT: Oh, bidded on my project.
13    THE WITNESS: Yes. It was in 2019.
14    A    They were telling me you're really, working really super
15    hard, because you're trying to do job, you know,
16    three-generation job in one generation. And that made me, I
17    think moving forward, I feel like there's -- I thought I can
18    do everything myself, but it doesn't seem to be -- even I want
19    to do, but I can't do that. But I might need -- I don't even
20    have the time. So I might need more professional people who
21    can help me down the road and outside consultant working with
22    me together because the project is just simply too big.
23    Q    So at this point, if I ask you to go back to 2010 and
24    think about the things that would have been different, what
25    would they be?

Avery Armstrong, Official Court Reporter

359

1    What would you have done differently?
2    A    I probably would hire more experience, I guess, CFO, and
3    probably outside company who can help me to monitor the whole,
4    you know, EB-5 fund and the construction process, that way I
5    -- that way I don't have to put myself into a situation,
6    because you know, I typically -- I have four different majors.
7    I do things a little bit different in my entire career. I was
8    trying to challenge the traditions to standard. Let's have
9    item B doing something and doing right now, but in the
10    meantime, I think -- you know, I also, you, know appreciate
11    the federal program EB-5 and everything it help me, it help a
12    lot of investors, and I realize that there's more
13    responsibility, not just, you know, my own project, my own
14    profit, even though I knew that I'm not doing anything bad to
15    the investor, but at the end of the day, I'm -- I'm in United
16    States and I'm taking advantage of all these, you know, help I
17    got, so I need to probably do more to make sure that it meet
18    the standard, so you know, people don't just look at what I'm
19    doing here, feel that, you know -- because as far as SEC,
20    other financial regulators, they also very important in
21    maintaining national security market, financial market. So
22    for them, they have no time to look into all these details,
23    they just base on, you know, some indication like the money
24    transfer and everything. Certainly it make people feel that
25    it's not up to their understanding. So I'm trying to merge my

Avery Armstrong, Official Court Reporter

360

1    own practice and trying to feet -- if I'm trying to work these
2    other program, like for the Brownfield project, for the
3    refund, we went for the state audit, because they audit every
4    single Brownfield request for the Brownfield tax credit. And
5    we're moving to a stage we're really trying to make the
6    company more compliant with existing standard for all these
7    programs.
8    Q    In order to move forward, there is -- based on the
9    reports that were provided, I believe, by -- I believe it was
10    either Mr. Dhookie or the monitor in this case, there is
11    $73 million in the Eastern Emerald account.
12    A    Yes.
13    Q    In order to move forward, will you be okay to transfer
14    that money to an independent third party and any loan
15    proceedings that is coming into the construction, to be -- to
16    be handled by a third party?
17    A    No problem at all. It's -- you know, even it's done
18    before. It's always for other project. And I prefer right
19    now to all the dot and unless there are issues, I think it's a
20    way to go. You know, without -- I think this action, of
21    course, for me it's a nightmare. You know, my wife and my
22    whole family and what we went through this, we can never
23    imagine, because for me, I look out the window, I said, I
24    released the $229 million. I spent $150 million for both
25    projects. Right now one building is almost done, another one

Avery Armstrong, Official Court Reporter

361

1    is Brownfield. But based on the appraisal value, it's the
2    $330 million for the best scenario. Even for the worst
3    scenario, it's still worth more than I think $230 million.
4    And all EB-5 fund is fully secured, no risk. Plus, I still
5    have a $77 million on my account. But just because of, you
6    know, probably I move too quick. There's a lot of -- you
7    know, I have no accounting software. It's so hard for me to
8    explain everything to SEC, to the examiner, to the regulator.
9    But at the end of the day, you know, I only risk
10    $229 million. The total project value is $400 million. So it
11    got to be somebody added the value to all this work. But
12    without the more -- a good CFO, other consultant, I just
13    cannot --
14    (Court reporter interrupts for clarification.)
15    A    I'm being forced into the federal court and I'm under the
16    asset freeze for four and five months. I have 18 very good
17    employees for me to do the work now. Only five of them left,
18    still there because they're all H-1 workers and my -- you
19    know, my -- everything -- I take full responsibility, because
20    I think I should, you know, hire a good, you know, like, a
21    CFO, accounting company.
22    Now you're proposing to use the third party to
23    wash -- I feel like it's a good relief for me. I'd rather to
24    have another eye look at the EB-5 fund, because I'm confident
25    I can create the value, I can protect the investor, at the end

Avery Armstrong, Official Court Reporter

362

1    of the day.  But procedure-wise, I need to really do better.
2    Q    Fair enough.  And do you have every intention to pay back
3    the EB-5 investors?
4    A    Of course.
5    Q    Do you have every intention to work hard to get the
6    permanent residency of the Eastern Emerald investors?
7    A    I made a promise to myself the day I start EB-5 program,
8    I will never do it like other EB-5 operator.  I won't put the
9    first mortgage ahead of the EB-5 investor.  Even my own money
10   I put in, I won't report it.  My own lease, I won't report it.
11          (Court reporter interrupts for clarification.)
12   A    My own lease, my own money, capital contribution.  It's
13   not easy to do it for the project like this size.  So I try
14   every single chance, not -- you know, to save the money to
15   perform the service of charting the project until, you know,
16   now I'm very proud of -- we don't have first mortgage until
17   September 1st for both project value $330 million, no
18   institutional finance.  EB-5 people is there forever as the
19   first priority to get their money paid back.
20   Q    Mr. Xia, this is an investment program that deals with
21   people's lives, green cards, permanent residency moving from
22   one country to another country.
23   A    Yes.
24   Q    For Eastern Mirage, was your project able to obtain their
25   permanent residency?

363

1    A    For everybody.  Only a few people because of the backlog,
2    but about among 112 investors, I think more than a hundred did
3    not only got the green card.  They got citizenship, and their
4    parents already got green card.
5          (Court reporter interrupts for clarification.)
6    A    So that represent more than 100 family and their life.  I
7    realize how important is that, so that's why I keep doing the
8    best I can do for the project to make sure, number one, they
9    got the green card and job can be created, and I have to build
10   that building.  Number two is the value is there.  I can pay
11   them back with no issue.
12   Q    Mr. Xia, for Eastern Emerald project, more than 300 EB-5
13   investors are relying on that project in order to get their
14   permanent residency?
15   A    That's right.
16   Q    Because the jobs have to be created, the building has to
17   be built, you understand that?
18   A    Yes, because --
19   Q    Do you understand that?
20   A    Yes.  I understand that.
21   Q    And you are determined to build that building?
22          MR. STOELTING:  Objection.
23          THE COURT:  Sustained.  Sustained.
24          MR. KAMELI:  I have nothing further, Judge.
25          (Continued on the following page.)

364

1          THE COURT:  (Continued.)  Okay.  Let me ask you one
2    question in the same vein.
3          Mr. Xia, I assume you are aware of the monitor's
4    report which was filed on January 28, 2022 in which the
5    monitor sets forth various scenarios as possible ways to
6    ensure that the investors are repaid and that all the other
7    debts are paid on these projects, and one of them is to sell
8    the Eastern Emerald Project -- actually, I might have -- I
9    have that backward, actually, I think.  Or selling both
10   projects, according to the monitors, is the only scenario that
11   would generate sufficient funds to repay all the investors and
12   resolve outstanding debts and likely future costs.
13         Have you read the report?
14         THE WITNESS:  Yes.  I read the report, yes.
15         THE COURT:  And what is your response to that
16   finding and suggestion?
17         THE WITNESS:  Number one, the other scenario, other
18   than sell those project, they didn't take into consideration
19   of my current project value and my other finance.  So the
20   current project is a pre-loan as $177 million for the Eastern
21   Mirage Project and as completion is $200 million.  So those
22   subs is not there to make the numbers.  And for the use -- and
23   I think Mr. Peeler basically saying that you have to pay back
24   out EB-5 investors for $229 million, then you have to build
25   the building.  I think it's kind of overlap.  Either I pay

365

1    back out EB-5 investor or I build the building.  I don't have
2    to do both for the purpose to protect the EB-5 investor.  So I
3    think there is a sort of, I guess...
4          THE COURT:  Double counting?
5          THE WITNESS:  Yes, double counting.  More
6    communication I think can make, you know, that part even more
7    clear.
8          But, you know, let's look at the picture.  I am
9    almost, you know, been caught in the middle of a stress test
10   like the bank.  Because typically you will need the building
11   complete like the Mirage, but if it's almost complete, you can
12   get the value to almost $200 million with, you know, combined
13   investment only 150.  So right now I've been caught in the
14   middle with sudden frozen and one project hadn't -- you know,
15   on the eve of the groundbreaking ceremony of the work
16   structure and even at this moment, based on Mr. Peeler's
17   report, I'm still able to --
18         THE COURT:  It is P-e-e-l -- oh, you got it.
19   Perfect.
20         THE WITNESS:  I'm still able to survive it.  I am
21   still actually protecting the EB-5 investor fund to the most I
22   can do.  It's a stress test.  It's not a normal situation.
23   Normal situation is, I should have developed a second project
24   like I developed on the first project.  If the first project I
25   can develop into $200 million value, so, Your Honor, you can

366

1  imagine, by the time I complete the second project, I have
2  more experience and I am already improving my accounting and
3  audit and everything and I technically improve my construction
4  and the design, the technique.  So I think by the time the
5  second project going up, it should have given -- number one,
6  give all these investor green card, because they need the
7  project going forward.  Number two, the value is going to be
8  like the first project, more than enough to pay back all these
9  investors.  Actually, I am very confident with the Brownfield
10  tax refund, with the 77 million on my account, I can complete
11  everything.  If you allow me to do this, I can show you, there
12  won't be any institution lender in front of the EB-5 investor.
13  They often be -- got their green card and they already spend
14  six years waiting for their green card.  Some people living
15  here, the child doesn't even speak Chinese anymore.  So they
16  were -- you know, they were calling me, telling me the project
17  is more important, the green card is more important than the
18  half-million dollars.
19         THE COURT:  Let me ask you.  Hang on.  Let's go back
20  to the Brownfield tax return.  There is more tax credit money
21  coming, yes?
22         THE WITNESS:  That's right.
23         THE COURT:  But the 10 million, you've acknowledged
24  you kept that as what you thought you had earned.  Is it your
25  plan, if you are allowed to continue with the project, to keep

367

1  the rest of the Brownfield tax credit money?
2         THE WITNESS:  Like I said, I have a tracking record
3  using my own money to support the project.  This Brownfield, I
4  didn't use that.  It's still there.  It's a CD.
5         THE COURT:  Right.  But you do not sound like you
6  are going to return that.  This is what I asked you I think
7  yesterday.
8         THE WITNESS:  No, I -- no.  Yesterday I am trying to
9  answer, because my English is not that good.  I am trying to
10  tell you I already did that without Your Honor even asking me
11  for the Mirage Project.  So what's the reason right now if the
12  project really need the money, I cannot do it?  You know, for
13  Lawrence Project, I cash out $800,000.  For Shangri-La
14  Project, I cash out, in 2015, another $800,000.  I just put
15  them into the project.  I didn't record any lien, anything
16  ahead of EB-5 investor.  I treat every people -- I was trying
17  to build up some sort of, you know, like a --
18         THE COURT:  Well, listen.  I appreciate the fact
19  that you acknowledge that your accounting, it leaves a lot to
20  be desired because the way you have moved money around, I
21  think creates, quite frankly, a very strong appearance that
22  you are misusing money and certainly not doing it in a
23  transparent way, so I think that is part of the reason that
24  you are here.  But I am not going to belabor this and have you
25  answer to that.

368

1         Mr. Stoelting or SEC, do you have anymore questions?
2         MR. STOELTING:  Could we take a five-minute break?
3         THE COURT:  Yes, let's take five minutes and
4  hopefully we can get Mr. Xia off the stand soon.
5         Five minutes, Mr. Xia.  Take a break.
6         (Recess taken.)
7         THE COURT:  So I failed to this morning, but I will
8  remind you, Mr. Xia, that you are still under oath.
9         All right.  Mr. Stoelting, whenever you are ready.
10         MR. STOELTING:  Thank you, Your Honor.
11  REDIRECT EXAMINATION
12  BY MR. STOELTING:
13  Q    Mr. Xia, when you were being asked questions about
14  Plaintiff's Exhibit 96, which was the use of 17 million of
15  Mirage funds to purchase the Eastern Emerald land -- can you
16  pull up Exhibit 96?
17         THE COURT:  Plaintiff's Exhibit 96?
18         MR. STOELTING:  Plaintiff's 96.
19  A    Yes.
20  Q    And you were asked questions about the transfers from
21  Racanelli to Eastern Emerald Group?
22  A    Yes.
23  Q    And you testified that those were payments for work done
24  by X & Y?
25  A    Yes and --

369

1         **THE COURT:  Ji-Qing.**
2  A    -- Ji-Qing.
3  Q    And Ji-Qing?
4  A    Yes.
5  Q    Okay.  Could you look at Exhibit 1- -- this is all mixed
6  up now.
7         Could you look at Exhibit 113, please?
8  A    Yes.
9  Q    It's page 24-6.
10  A    Okay.
11  Q    Okay.  Do you see the check toward the top, Check 1400 in
12  the amount of 2,353,850?
13  A    Yes.
14  Q    Okay.  You see where it says "for"?
15  A    Yes.
16  Q    What does it say?
17  A    "For loan."
18  Q    Okay.  And then underneath that is Check No. 1391 in the
19  amount of 2,700,000?
20  A    Yes.
21  Q    And what does it say there?
22  A    It's for loan.
23         Because at that time, it's my accountant advice to
24  use the invoice as a collateral to borrow that loan.
25  Q    And if you could look at page 24-5, the other portion of

370

1  funds, that $3,300,000, Check 93.
2  A   Yeah, that's the same --
3  Q   And that says it's for a loan as well?
4  A   Yes, the invoice. It's invoice loan.
5  Q   Okay. And if you could look at page 24-7.
6  A   Yes, it's the same.
7  Q   Okay. Those are the December 17th, the 3.5 and the
8  3.5 million, Check 91 and 92, and those are -- it also, on
9  both checks, says "for loan," correct?
10 A   Yes. That's under the advice of the accountant at that
11 time.
12 Q   Now, is that -- could you look at Exhibit 110?
13 A   Yes.
14 Q   Page 21-7.
15 A   Mm-hm. 21-7, right? Yes.
16 Q   If those were payments for work done, wouldn't there be a
17 requisition number referenced on the check?
18 A   No. Typically, we don't do the requisition number on it,
19 but I saw the requisition number on this one, yeah.
20 Q   Well, this says it was for a loan, right? It wasn't --
21 did not indicate anything on the check saying that it was
22 compensation for work done, correct?
23 A   No. This is Fleet Financial Group. The payment is to
24 the general contractor, Racanelli, and that's a requisition.
25 And I think those payment is from Racanelli paid to the

372

1  suggesting -- I think even in my 2019 deposition, the
2  accountant suggesting to do a loan against those service value
3  instead of get them paid. So the service value is more than
4  -- at that time, is a lot more than the -- you know, the fund
5  that we need to be paid, so we can use that -- I think it's a
6  typical practice for a business to use unpaid invoice as a
7  collateral to get loan. But, in essence, that service has
8  been provided. The invoice has been provided, but it hasn't
9  been paid.
10 Q   Do you remember the name of the accountant at Blue-Ribbon
11 that told you that?
12 A   Yeah. I think I provide that to the SEC two years ago
13 already.
14 Q   Can you give us the name now?
15 A   His name is Ari, but he is...
16 Q   Do you remember at the start of the day Judge Chen asked
17 you some questions and you were saying that EB-5 is just like
18 a bank and you called it the EB-5 bank?
19 A   Yes, I did.
20 Q   Okay. And you said if the lender defaults or if the
21 borrower defaults, then the borrower just takes the project,
22 right?
23 A   That's right.
24 Q   That's what you said? Okay.
25 A   Yes.

371

1  subcontractor. And typically, subcontractor doesn't submit
2  the full requisition, like, you know, the general contractor
3  gave to the owner, they only provide the invoice.
4  Q   Well, why does it say loan?
5          MR. KAMELI: Judge, I object. It was asked and
6  answered.
7          THE COURT: Overruled.
8          One more time. Go ahead.
9          These are different checks. We are talking about
10 the ones on page 21-9 of Exhibit 110? I do not know which
11 ones you are onto now.
12          Oh, you are still on Exhibit 113?
13          MR. STOELTING: Well, it's 113.
14          I don't think I got a clear answer to the question
15 of why these checks say loan on them.
16          THE COURT: He did say his counsel advised him.
17          MR. STOELTING: Okay.
18 Q   Did you say your counsel or your accountant?
19 A   Accountant.
20          THE COURT: Oh, I am sorry, I heard counsel.
21 Accountant, okay.
22 Q   And which accountant?
23 A   Blue-Ribbon.
24          Because we have an outstanding balance there. We
25 were really not, you know, trying to -- so the accountant was

373

1  Q   But that's not the reality of this transaction, is it?
2  Because the borrowers borrowed in the -- let's say Mirage from
3  Fleet Financial Group, right?
4  A   Yes.
5  Q   So if Fleet Financial Group doesn't pay, the borrowers
6  only have recourse against Fleet Financial Group, right?
7  A   That's right.
8  Q   And if Fleet Financial Group doesn't have any assets,
9  then the lenders, the partnership, is out of luck, right?
10 A   No. Fleet Financial has a land lease for 99 years and
11 the Fleet Financial also own the improvement portion of the --
12 you know, not just land, the improvement portion of the
13 Eastern Mirage Project, which is actual building. And I think
14 for Eastern Mirage investor, even though their lien is
15 intangible, that means the moment the hotel into the
16 operation --
17          THE COURT: Hang on.
18          Even though the lien is intangible, is that what you
19 are saying?
20          THE WITNESS: Yes.
21          THE COURT: Okay.
22          THE WITNESS: Intangible assets.
23 A   And the moment the Eastern Mirage hotel go into the
24 operation, all the, you know, operation income, rental and
25 everything, it's subject to EB-5 investors' foreclosure. And

374

1  that's a real -- you know, that's a real need, the real source
2  of, you know, develop --
3  Q   All right. Mr. Xia, can I just stop you for a moment?
4  A   Sure.
5  Q   That wasn't my question at all.
6      The owner of the Eastern Mirage land is X & Y,
7  correct?
8  A   That's right.
9  Q   And Fleet Financial Group owes $40 million to X & Y right
10 now, right?
11 A   That's right.
12 Q   So if Fleet Financial Group doesn't fulfill its payment
13 obligation to the lender, Fleet Financial Group is already in
14 debt for $40 million. X & Y -- if you decide to put Fleet
15 Financial Group into bankruptcy, you could do that tomorrow,
16 right, because they owe X & Y $40 million and they're in
17 default on that payment obligation?
18 A   Yeah, but --
19 Q   So how is Fleet Financial Group, which is technically
20 insolvent right now, in a position to pay back 56 million to
21 the Mirage -- to the lenders, the limited partners?
22 A   Because Fleet Financial never, ever registered that
23 lease, so in -- really, let's assume EB-5 investor trying to,
24 through their general contractor, foreclose to get their
25 payment for the project and the Fleet Financial has no

Andronikh M. Barna, Official Court Reporter, RPR, CRR

376

1      THE COURT: Well, that is the question.
2      Do the LPs or investors, in your mind, have any kind
3  of secured interest?
4      THE WITNESS: Yes, the security on the intangible
5  income, rental income, operating income, yes.
6  Q   Okay. And that's nothing that filed with UCC, correct?
7  A   No.
8  Q   Okay. So you said that you have done -- we've heard you
9  say a number of times all the things that you've done to
10 protect the investors, but you were the one that decided to
11 give Emerald Creek a first priority lien on the Mirage
12 property, didn't you?
13 A   That's right, but --
14 Q   And that's something that the investors did not have,
15 right?
16 A   I have to pay the --
17 Q   And doesn't that mean that in the event of bankruptcy,
18 Emerald Creek would be paid 100 percent on their loan before
19 the investors ever saw a penny, right?
20 A   But that property worth $177 million. We are talking
21 about $15 million mortgage I used to pay the general
22 contractor. And any type of foreclosure, any type of you,
23 know, auction sale is going to render enough money to pay back
24 the EB-5 investor. Maybe not -- you know, I don't get that
25 much, but I actually hold that until September 1st of 2021.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

375

1  document to show it to the court, they have that right to
2  collect those rent. It's basically agreement. I guess just
3  bottom from my heart, I knew that, but I never record that. I
4  cannot go to the court and tell the Judge, look, you know, I
5  have agreement and it has been recorded, now I can enforce my
6  right. As a developer, as a designer, I gave up all my right
7  to the EB-5 investor. Everybody is talking about EB-5
8  investor is vulnerable. If you look at the whole situation, I
9  am a lot more vulnerable because I put all my time, money into
10 that. Nowhere in the whole transaction I was trying to even
11 record one piece of paper to make sure that, you know, some
12 day like today our, you know, EB-5 people want to go to the
13 court, sue me. I have no protection. I'm totally
14 unprotected. All I know is, I have a confidence to create
15 $177 million. End of the day, no matter what, I can pay off
16 everybody. I can still take some, you know, additional profit
17 I created to pay everybody, to pay my family. I'm not trying
18 to use any legal instrument to protect anybody. I only use my
19 belief to trying to -- I guess to get all the EB-5 investor
20 the best protection I can get to them.
21 Q   So the investors, the limiteds are unsecured, right?
22 A   What?
23 Q   The investors have no security, right, the lenders?
24     MR. KAMELI: Judge, I object. It's a
25 mischaracterization of the documents, the exhibits.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

377

1  By that time, in May 2021, I already send the letter to each
2  individual investor of the NQMC to tell them, you know, I'm
3  ready to pay you guys back, just give me your contact
4  information, your account information so we can wire the money
5  back. So I was fully intended to pay everybody by the time,
6  you know, they're supposed to be paid back. And I knew that
7  the value is there. It's a sufficient value. I never count
8  on my own portion, but for the third-party obligation, I have to
9  honor that. I have no choice.
10 Q   Well, you did have a choice in whether or not you wanted
11 to give Emerald Creek a first lien position, something the
12 investors do not have on the property, right? That was your
13 choice to do that, right?
14 A   It's not there yet. Back in 2018, for the term sheet I
15 produced to the SEC -- you already know that. In 2018,
16 four years ago, Popular Bank is willing to give $79 million
17 loan, bridge loan. So imagine four years later. There's
18 sufficient amount of money because EB-5 loan is only
19 $56 million. Even you add that 15, it's only 71. Back in
20 2018, it's already $79 million loan. And the 2019, Goldman
21 Sachs told me, if you have a T sale, I give you $160 million
22 right away. I knew the value is there. I knew the EB-5
23 investor is fully protected. I didn't register anything on my
24 own, that's it. The only part I got that mortgage is to pay
25 the general contractor who work with me hand in hand in the

Andronikh M. Barna, Official Court Reporter, RPR, CRR

378

1  last ten years to build both project.  I didn't do anything
2  for myself.
3  Q    So I'm just trying to move along.
4        You had talked about all the interest that you were
5  collecting from the CDs, right, that you put investor money in
6  CDs that was generating a lot of interest?  And I think we saw
7  one of -- maybe one of the charts your counsel showed, showed
8  all the interest that was being generated?
9  A    Yes.  A couple million dollars, yes.
10 Q    And that's interest that you are receiving as the
11 developer, correct?
12 A    No.  Every single penny I receive, I use for the project.
13 And it's not -- that's why by the time I need to buy a new
14 land, I have to take my service value, because I didn't really
15 put those money -- if you look at the bank record, that couple
16 of million dollar interest direct go into the project as
17 project expenses.
18 Q    Okay.  But the question is, those CDs were being held in
19 accounts that were in the name of the developer, right?
20 A    Yeah, in the developer.  And some of this in the -- I
21 think in the L.P., too.
22 Q    Okay.  But those CDs were long-term investments, right?
23 A    No.  It's typically one year.
24 Q    One year.  But --
25 A    Only time I did two-year is the 2019, after -- you know,

379

1  because at that time, I know the financial market, the rate
2  going to be lower, so I take a 25-month to get a really nice
3  CD rate, 2.25 percent.
4  Q    So my question is, the partnership, the general partner
5  could have decided to hold that money in accounts in the name
6  of the partnership, correct, rather than advancing that money
7  to the developer, which would have allowed the limited
8  partners to make a profit on that interest, right?
9  A    I don't understand the question.
10 Q    Well, let's look at one of the loan agreements, which is
11 Exhibit 78.
12 A    Okay.  Plaintiff?
13 Q    Plaintiff's 78.  Sorry.
14 A    Yes.
15 Q    So this is on the first page of the loan agreement.  This
16 is Eastern Emerald Group and EEGH, L.P.
17 A    Yes.
18 Q    So Section 1.2 says, "From and after the date hereof,
19 lender shall advance proceeds of the loan in increments of
20 $500,000 each, each in advance at such times as lender shall
21 determine in its sole and absolute discretion.  At such times,
22 as lender desires to make an advance, lender shall give
23 borrower three business days prior written notice of the
24 making of an advance."
25       So the lender here is the partnership and you, as

380

1  general partner, have the authority to make the decision about
2  when money is advanced to the borrower, correct, under this
3  provision?
4  A    That's right, yes.
5  Q    Okay.  So when you are making the decision about when to
6  advance funds and it's a CD you know is just going to sit
7  there for a year collecting interest, if you decide to let
8  that CD sit in the partnership account, the interest that's
9  generated would accrue and be profits to the limited partners,
10 correct?
11 A    You're right, but only under the typical financial
12 transaction.  Again, you know, it's my -- you know, I have a
13 responsibility to get these things done better, but in the
14 same time, in the same token, for SEC, you know, this is not a
15 typical financial transaction, it's EB-5.  So in order for
16 each individual investor to qualify for their green card, the
17 money cannot be sitting in the L.P. account for too long.
18 They had to be lended because this is NCE, the job need to be
19 created.  So all these investor --
20       THE COURT:  Sorry.  For the court reporter, "this is
21 NCE," capitals.
22       THE WITNESS:  Yes.
23 A    The money need to be disbursed into JCE, to job created
24 entities, otherwise it's going to affect those investors'
25 green card application.  At the end of the day, the USCIS,

381

1  see, their money always sitting in the NCE account.  That
2  means there is no job has been created because the JCE didn't
3  get the money.  So as a general partner, I have considered
4  their best, most important interest, which is a green card.
5  And as investor already indicate, that they don't care about
6  that interest, that, you know, .2 percent, you know, 5, you
7  know, 2 percent.  They have a great opportunity to make
8  investment.  The only thing they need from this investment is
9  a green card.
10 Q    All right.  Well, I think a lot of the investors would
11 disagree with you about that, not wanting their $500,000
12 back --
13 A    I can pay them back, no problem.
14 Q    -- but I'm not going to argue about that.
15       THE COURT:  Let's not argue.  Let's move on, please.
16       MR. STOELTING:  So I just have one -- this was an
17 area that came up yesterday.  I just have a few questions on
18 the ADP payroll document, that yesterday it was in redacted
19 form and we've unredacted it.
20       THE COURT:  Okay.
21       MR. STOELTING:  I just wanted to cover that.
22       THE LAW CLERK:  This is Plaintiff's Exhibit 179?
23       MR. STOELTING:  I'm sorry?
24       THE LAW CLERK:  Plaintiff's Exhibit 179?
25       MR. STOELTING:  I think that's what we're up to.

382

1    Why don't we call it 180, just to be sure.
2    THE LAW CLERK:  It should be 179.
3    MR. STOELTING:  Oh, I'm sorry.
4    May I approach?
5    THE COURT:  Yes, go ahead.
6    THE WITNESS:  Thank you.
7    BY MR. STOELTING:
8    Q    So you recall yesterday when we showed you this document
9    in redacted form and I had asked you questions about the
10   workers that you use for the subcontractors for your companies
11   to do the work over the years and you had said you paid them
12   all ADP -- through ADP; is that correct?
13   A    Yeah.  For the project related work, yes.
14   Q    Okay.  So you don't -- so is this all of the workers that
15   you've used since June 2011 through 2019 to do the labor on
16   both projects on behalf of your affiliates?
17   A    No.  The labor is typically paid through their own
18   company.  Because for the construction project, they're
19   typically -- you know, the person who hire the labor has their
20   own company, and so those -- you know, you just make payment
21   to those company and they handle the payroll for their worker
22   on the job.
23   Q    Wait.  So when Samuel Development and Shangri-La D get
24   paid all those millions of dollars we've seen being paid to
25   Samuel Development and Shangri-La D, who are those workers

Andronikh M. Barna, Official Court Reporter, RPR, CRR

383

1    that are doing that work?  Are those people listed here?
2    A    No, that's not.  This is mainly for the development part.
3    Q    So how can we find out who those workers are?  And what
4    company do they work for?  And where do we see it in any
5    records?
6    A    I think it's on the 1099 record and also on the bank
7    record, you can see those workers that been doing the work.
8    Q    It would be in the 1099s issued by Fleet?
9    A    No.  By Samuel.
10   Q    By Samuel.  So Samuel, Manekineko, Shangri-La, they all
11   issue their own 1099s?
12   A    Yeah.  They perform the work, yes.  They -- you know,
13   they perform a lot of work, tons of work.
14   Q    Okay.  So every person who did work for which the money
15   was flowing from Racanelli and Perini, if we go back and get
16   those 1099s, we find out who all those people are?
17   A    Definitely.
18   Q    Okay.  And who are the people here on the far left?
19   A    This is for the development site, for, you know, design
20   development.
21   Q    Well, let's start at the top.
22   Anthony Antonelli?
23   A    Yeah.  I think that, you know, he's equipment manager.  I
24   hired him from Hayward Baker.  And I think he -- you know,
25   after the contractor, subcontractor walked away.  And he has a

Andronikh M. Barna, Official Court Reporter, RPR, CRR

384

1    46-year experience.  I hired him direct from Kansas, and he
2    drive to New York overnight and we start doing the excavation
3    and the drilling.  He's a very experienced drilling -- driller
4    and equipment manager.  He used to work in Hayward Baker in
5    Pennsylvania.
6    THE COURT:  Are you saying Higher Bakery?
7    THE WITNESS:  Yeah, it's S-a-y-e-r B-e-c-k-e-r.
8    [sic].  It's a very famous underground contractor company.
9    And Anthony Antonelli used to be an equipment manager over
10   there for many years.
11   Q    What about Ken -- okay.
12   Yuren is sort of your financial person, right?
13   THE COURT:  Hang on.
14   Spelling?
15   MR. STOELTING:  Y-u-r-e-n.
16   A    No.  She's handling the development portion.  She's a --
17   you know, she hold a master degree from John Hopkins, Hopkins
18   Business School, for real estate development.
19   Q    Okay.  What about Q-i-s-u?
20   A    Where is it?
21   THE COURT:  Two below Yuren.
22   A    Q-i?
23   Q    S-u, comma --
24   THE COURT:  S-u is the last name.  Q-i is the first
25   name, Qi.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

385

1    THE WITNESS:  Oh, okay.
2    A    Yeah.  She was handling, I think, the construction
3    management.  She hold a master degree in, I think, the
4    construction management.
5    THE COURT:  Mr. Stoelting, can I stop you for a
6    second?  I am sorry.
7    These are all employees of which company,
8    Shangri-La?
9    THE WITNESS:  Fleet.
10   THE COURT:  Fleet.  FFG?
11   THE WITNESS:  Yes.
12   THE COURT:  Okay.
13   Q    Do the subsidiaries, Shangri-La, Samuel, Manekineko,
14   Amazon, X & Y, do they have separate accounts at ADP?
15   A    No.  ADP has a requirement to have a certain employee
16   together so they can provide a better medical benefit.  So we
17   basically pool all this high-level technical stuff into
18   Fleet Financial Group and whenever they need to do the work
19   for those entities, they just perform work for those entities.
20   So we have a centralized payroll to maintain the best
21   possible, you know, employee benefit for them.
22   Q    So are there payroll records for Manekineko, Samuel,
23   Amazon River, X & Y and the Shangri-Las?
24   A    I think some of them, they have the payroll record, but
25   not all of them.  But they do have a employee -- a 1099

Andronikh M. Barna, Official Court Reporter, RPR, CRR

386

1  employee because the construction work, especially for the
2  subcontractor work, it's vary a lot.  You don't maintain like
3  a long-term employee for those specialty work.  We are almost
4  like a SWAT team, to go in if there is contractor work away
5  or, you know, some other emergency situation.  Our main
6  purpose is still doing the development and doing, you know,
7  design, coordination and those portion of the work.
8          MR. STOELTON:  All right.  One moment, Your Honor.
9          (Pause.)
10          THE COURT:  Okay, folks.  Let's get going.  It is
11  4:30.
12  Q    Okay.  So are you the one that decides who works for the
13  subcontractors, which individual does this work?
14  A    Yeah.  I am the one, yes.
15  Q    Okay.  So Racanelli doesn't select those people, right,
16  the people that do the work for your affiliates?
17  A    No.  They have their own employee.
18  Q    And when you say you are assembling a SWAT team, do you
19  just go out and select people for individual assignments that
20  come up or do you have your stable of people that do work that
21  you draw on over the years?
22  A    It depends on the type of work need to be done quickly.
23  Q    All right.  And so every one of those people would
24  have -- would be represented by a 1099 form sent out by the
25  affiliates, right?

387

1  A    That's right, yes.
2  Q    Okay.  And are those records still maintained by your
3  affiliates?
4  A    I'll check.  I'll check that, yeah.
5  Q    Okay.  And the -- your hotel, I've actually been on the
6  website of EasternEmeraldHotel.com.  When you look at it, it
7  looks like it's open and you can make a reservation, but the
8  hotel is not operational, right?
9  A    Yeah.  We were planning to have it open, but, you know,
10  everything stopped, yeah.
11  Q    And those pictures we saw, it was called the model room.
12  That means that's the model room.  It means there's one room
13  that's finished in the hotel.  It looks like that, right?
14  A    No.  We have a couple of -- you know, the typical process
15  is you have the -- you know, the manufacturer could be your
16  model room.  Once you select that model room, they're going to
17  fabricate all the furniture, all the panel, everything.  And
18  right now I have a 20 -- I think 26 container prefabricated
19  furniture in the building.  It's just, you know, we just
20  cannot put them on.  But I'm sure that once it's on -- because
21  each room, the marble is finished, the plumbing is sign off,
22  electrical sign off.  All we need is to put -- all this
23  furniture which is already prefabricated, we just need to
24  install them on the wall and that hotel is going to go into
25  the operation.  And also, for the medical office building,

388

1  it's a corner share, so basically we don't need to finish
2  anything.  The tenant or the buyer, eventually they're going
3  to do their own customized finish.  So for the medical office
4  portion, it's pretty much done.  And for the hotel, the marble
5  is there, the wood floor is there, the seating is done, the
6  lighting is done, even the night work, the work -- can show
7  everything is finished.  We just need to put the last piece on
8  and the hotel can go into the operation.
9  Q    Okay.  So I think I just -- my last question.
10          So for the $14 million home that you bought in
11  August 2021 on Kings Point Road, on the loan documents you
12  indicated that the purchase of that home was for business
13  purposes.  Was that true?
14  A    Yes.  You know, that's a business credit line gave to the
15  Eastern Emerald Group.  And the Eastern Emerald Group, the
16  owner is S corporation, as I already explained to you before
17  last week.  And for that S corporation, they get a loan from
18  the credit line to buy a home office.  Because for
19  S corporation, you know, essentially where you work is also,
20  you know, the place you live.  And that's why it's been -- you
21  know, an S -- all those information has been fully disclosed
22  to the bank.
23          THE COURT:  I'm sorry.  The question though is, it
24  is not being used for a business purpose, it is your home; is
25  it not?

389

1          THE WITNESS:  It's my home.  But also, you know, the
2  Eastern Emerald Group is --
3          THE COURT:  Paying for it?
4          THE WITNESS:  -- an S corporation.
5          THE COURT:  Okay.  Go on, Mr. Stoelton.
6          I think you have your answer.
7  Q    Okay.  And the house is in the name of your wife,
8  correct, not Eastern Emerald Group?
9  A    It's S corporation, so the owner --
10          THE COURT:  No.  The title, whose name is it in,
11  your wife's?
12          THE WITNESS:  My wife's.
13          THE COURT:  Okay.  Go on.
14          MR. STOELTON:  Thank you, Mr. Xia.
15          THE COURT:  I just have a couple of followup
16  questions.
17          Shangri-La 9D, did they do any work on the Emerald
18  Project?
19          THE WITNESS:  Yes, they did.
20          THE COURT:  What kind of work did they do?
21          THE WITNESS:  Foundation.
22          THE COURT:  And are there invoices for the work they
23  did?
24          THE WITNESS:  Oh, yeah, on foundation work.  And
25  they hire a lot of labor, did a lot of work for Emerald

390

1  Project.
2       THE COURT:  But they also did work on the rental
3  property that is your personal rental property?
4       THE WITNESS:  They're not doing the work.  They're
5  basically just holding -- they're just on the title of the
6  rental property.
7       THE COURT:  I see.
8       THE WITNESS:  They're not doing the work there.
9  They own those properties.
10      THE COURT:  I see.
11      And the same with Shangri-La Green?
12      THE WITNESS:  Yes.  Every entity own commercial --
13  either commercial or residential unit.
14      THE COURT:  So they own your separate commercial
15  residential property and they also do work or did work on the
16  Emerald Project?
17      THE WITNESS:  That's right.
18
19
20      (Continued on the next page.)
21
22
23
24
25

Andronikh M. Barna, Official Court Reporter, RPR, CRR

391

1       THE COURT:  Go ahead, Mr. Stoelting.  Are you done?
2       MR. STOELTING:  I'm finished.  We can call our next
3  witness.
4       THE COURT:  Yes.
5       Did you have anything else, Mr. Kameli?
6       MR. KAMELI:  Yes, on the last question that counsel
7  asked.
8       THE COURT:  Keep your voice up.
9       MR. KAMELI:  Just one question.
10      THE COURT:  Go ahead.
11 RECROSS-EXAMINATION
12 BY MR. KAMELI:
13 Q  Mr. Xia, counsel just asked you, I believe, about the
14 $15 million loan that was obtained.  There was a $15 million
15 mortgage from Emerald Creek Capital?
16 A  Yes.
17 Q  Did any portion of that loan go to purchase your personal
18 residence?
19 A  No.
20 Q  Okay.  It just happened the name of the lender is Emerald
21 Creek Capital, right?
22 A  That's right.
23 Q  It has nothing to do with Eastern Emerald project?
24 A  No.
25 Q  And the proceeds of Emerald Creek Capital for $15 million

CMH    OCR    RDR    FCRR

392

1  went to pay Racanelli, in order to the contractors on the
2  Eastern Mirage, right?
3  A  Contractor paid, yes.
4  Q  But it was for business purposes?
5  A  Yes, that's correct.
6  Q  Thank you.
7       THE COURT:  All right.  You can step down, Mr. Xia.
8       THE WITNESS:  Okay.  Thank you.
9       (Witness excused.)
10      MS. HAN:  We call Raymond Dhookie.
11      THE COURT:  Mr. Dhookie, I assume you know the
12 drill.
13      (The witness, RAYMOND DHOOKIE, was duly sworn by the
14 Court.)
15      THE COURT:  Please have a seat.
16      Go ahead.  You may inquire.
17      MS. HAN:  Thank you, Your Honor.
18 DIRECT EXAMINATION
19 BY MS. HAN:
20 Q  Mr. Dhookie, where do you work?
21 A  I work at K2 Integrity.
22 Q  And what type of company is K2 Integrity?
23 A  It's an investigation advisory services firm based in
24 New York.
25 Q  How long have you worked there?

CMH    OCR    RDR    FCRR

393

1  A  A little over two years.
2  Q  What is your position at K2?
3  A  Managing director with the investigations and dispute
4  advisory services practice.
5  Q  What are your duties and responsibilities?
6  A  So I conduct audits on behalf of clients in a wide range
7  of industries including real estate and construction.
8  Q  Where were you before K2?
9  A  I was at KPMG.
10 Q  How long were you at KPMG?
11 A  A little over 20 years.
12 Q  What was your position at KPMG?
13 A  It was, I started as a senior associate and I left as a
14 director within the forensic practice.
15 Q  And what were your duties and responsibilities?
16      THE COURT:  You can pull the microphone closer but
17 you can't move the seat.
18 A  So I led, I led client engagements including forensic
19 accounting, regulatory compliance, again, for clients in
20 various different industries.
21 Q  What kind of industries?
22 A  Wide ranging, real estate, construction being one of
23 them.  I also did a lot of financial services clients, some
24 industries as well and retail.
25 Q  And where were you before KPMG?

CMH    OCR    RDR    FCRR

394

1  A    I was a fraud investigator with the District Attorney's
2  Office in Manhattan.
3  Q    And what did you do as a fraud investigator at the
4  Manhattan District Attorney's Office?
5  A    I prepared forensic analysis as part of the prosecution
6  of criminal cases.
7  Q    And, I'm sorry, how long were you at the DA's office?
8  A    About two and a half years.
9  Q    Where were you before that?
10  A    I was at the New York City Department of Investigation.
11  I was a financial auditor.
12  Q    And what were your duties and responsibilities at the
13  Department of Investigation?
14  A    So we conducted audits on behalf of the City of New York
15  dealing with contractors that did business for the City of New
16  York.
17  Q    And how long did you do that for?
18  A    About two and a half years.
19  Q    What's your educational background?
20  A    I, I have a Bachelor of Arts degree from Queens College,
21  City University of New York, and I minored in economics.
22  Q    Are you a Certified Public Accountant?
23  A    Yes, I'm a CPA licensed in New York.
24  Q    And when did you get that license?
25  A    I think it was in 2000.

CMH   OCR   RDR   FCRR

396

1  it's typically on behalf of the owner and developer.
2  Q    Approximately how many matters have you worked on that
3  involved reviewing financials related to a construction
4  project?
5  A    I would say a good number.  More recently, this being the
6  third one at K2.  Before that, I'd probably say over, over
7  ten.  You know, I can't put my hand on an exact number but
8  over ten at KPMG.
9  Q    Did there come a time when you were retained by the SEC
10  in this matter?
11  A    Yes.  My firm, I received a contract award from the SEC
12  in November of 2020.
13  Q    And what were you asked to do?
14  A    So I was asked primarily to conduct a funds flow analysis
15  of the funds moving across the various different entities
16  including the developer, the contractor, the Xia affiliates,
17  and then to other third parties.  Specifically, I was asked to
18  prepare charts to that extent and then also to, where
19  possible, identify where there was potential unusual flow of
20  funds or unusual transactions.  I was also asked to determine
21  if there were any potential, the uses of the funds, if they
22  were for project related cost from the various entities.
23       I'm trying to think of what else.  That's pretty
24  much it, unusual funds or transfers between the entities.
25  Q    Were you also asked to determine whether the flow of

CMH   OCR   RDR   FCRR

395

1  Q    Are you a member of any professional or industry
2  organizations?
3  A    Yes.  I'm a part of the AICPA which is the American
4  Institute of Certified Public Accountants.
5  Q    And have you attended any trainings or given any
6  trainings in the accounting area?
7  A    So as a CPA, I'm required to obtain 120 hours of CPE
8  credits, that's continuing professional education credit,
9  every three years.  As part of that, I've taken a number of
10  classes or courses or I attended a number of training programs
11  in the area of forensic accounting regulatory compliance.
12  I've also instructed, developed and instructed a number of
13  programs, training programs, on behalf of clients and also at
14  conferences and the like.
15  Q    And these trainings were in the area of accounting?
16  A    Correct.  They're forensic accounting.
17  Q    And have you had any experience working on matters
18  involving financials relating to construction projects?
19  A    Yes.  So one of my area of focus is in, as I mentioned,
20  real estate and construction and as part of that, I'm
21  typically hired by clients to serve as an integrity monitor on
22  some large scale construction projects and as part of that, I
23  typically oversee the entire project from design through
24  completion conducting sort of forensic oversight, cost
25  auditing, those types of things as part of the project.  And

CMH   OCR   RDR   FCRR

397

1  funds was consistent with normal practices in construction, in
2  connection with construction projects?
3  A    Yes.  Yes.  That was one of, that was one of the, in the
4  category of unusual.
5  Q    And did you, after your review and analysis, did you
6  submit a declaration with Exhibits 1 through 51 in connection
7  with this matter?
8  A    Yes, I did.
9  Q    I'm going to direct your attention to Exhibit 149.
10       THE COURT:  Plaintiff's?
11       MS. HAN:  Plaintiff's Exhibit 149.
12  A    Yes, I'm there.
13  Q    Is that the declaration that you submitted?
14  A    Yes.
15  Q    And if you could take a look at Plaintiff's Exhibits 90
16  through 140 and let us know if those are the exhibits that you
17  submitted in connection with this matter.
18       MR. KAMELI:  Exhibits?
19       MS. HAN:  90 through 140.
20       THE COURT:  Is there any dispute that these are?  We
21  can just move this along because that's 50 exhibits.  Do you
22  really want him to page through every single one?
23       So I'll assume Exhibits 90 through 140 were ones
24  that you reviewed --
25       THE WITNESS:  Yes.

CMH   OCR   RDR   FCRR

398

1    THE COURT: -- in preparing your declaration.

2    THE WITNESS: Yes, Your Honor.

3    THE COURT: All right. Let's move on.

4    MS. HAN: Thank you, Your Honor.

5  Q    What were the records that you reviewed for your

6  analysis?

7  A    Sure. They were primarily bank statements and canceled

8  checks from the, I think, approximately 95 accounts which I

9  think I included in one of the exhibits in my declaration. I

10 also reviewed available agreements between the parties,

11 requisitions, invoices, to the extent that they were

12 available. Yes, those, I think, are primarily the documents

13 that I looked at.

14 Q    And in your review of the bank records, in addition to

15 canceled checks, did you also review deposits and transfers

16 and wires and withdrawals?

17 A    Yes. Yes.

18 Q    So all the supporting documentation for those bank

19 records?

20 A    Correct.

21    THE COURT: Ms. Han, stay closer to the microphone.

22 I'm having a little trouble hearing you.

23    MS. HAN: Sorry.

24 Q    And when you say the contracts between the parties that

25 were available, did you review the contract between Racanelli

CMH    OCR    RDR    FCRR

399

1  and Fleet Financial Group, Racanelli Construction Group and

2  Fleet Financial Group?

3  A    Correct.

4  Q    Did you also review the contract between Racanelli and

5  Eastern Emerald Group?

6  A    Racanelli and Eastern Emerald Group? Yes, yes, I did.

7  Q    So I'm not going to walk you through your whole report.

8  I'm just going to focus on a couple of items in your report.

9    I'm going to direct your attention to Exhibit,

10 Plaintiff's Exhibit 91.

11 A    Yes.

12 Q    And is this a list of the bank accounts that you

13 reviewed?

14 A    Correct.

15 Q    And the "date from" and "date to" columns, what does that

16 reference?

17 A    So that refers to the bank statements that were available

18 or that were sent to me by the SEC.

19 Q    And how did you go about analyzing those records?

20 A    So the, the information from the bank statements was put

21 into a, an Excel workbook and from that, we, I did my analysis

22 to show that the, you know, the information that we entered

23 around the payees, the deposits, et cetera.

24 Q    I'm going to ask you to take a look at Plaintiff's

25 Exhibit 92.

CMH    OCR    RDR    FCRR

400

1    In preparing for today's hearing, did you, did you

2  make any amendments to the charts that you created, that you

3  have previously submitted?

4  A    Yes, I did.

5  Q    And is there, did you amend, create an amended chart to

6  Plaintiff's Exhibit 92?

7  A    Yes, I did.

8    MS. HAN: Your Honor, if I could just approach.

9    THE COURT: Do you want to provide an amended 92?

10    MS. HAN: Or we could make this 180.

11    THE COURT: Let's put it in the slot of 92 so it

12 doesn't get confusing. So amended 92.

13    MS. HAN: Right. And we've previously given defense

14 counsel a copy.

15    THE COURT: Okay.

16    MS. HAN: If I can just approach the witness.

17    THE COURT: Yes, please do.

18    MR. KAMELI: Are you just taking the previous 92

19 out?

20    THE COURT: That's what I would suggest unless the

21 SEC doesn't want us to do that.

22    MR. KAMELI: Judge, I believe it's going to make

23 some confusion about the report so this would be 92-A.

24    THE COURT: Okay. Why don't we make it 92-A.

25    (Plaintiff's Exhibit 92-A so marked.)

CMH    OCR    RDR    FCRR

401

1  Q    And is this the amended chart that you created to

2  Exhibit 92?

3  A    Yes.

4  Q    And what amendments did you make?

5  A    So there were a couple of clerical -- in preparing for

6  this hearing, there were a couple of clerical errors that I

7  identified that I don't think, well, they don't change the

8  numbers on the charts, but they affect the numbering.

9    So in the, for items 1 A-B-C-D, I think previously

10 it says A-C-D-E, and so I corrected that to say 1 A-B-C-D.

11 Also, in the first, I'm sorry, the second column, previously

12 it indicated that the starting point for the funds analysis

13 was 2012 implying that it was January '12 and beyond. In

14 rereading my declaration, I realized that for one of the

15 accounts for Fleet Financial Group, we had some statements for

16 December of 2011 and as a result, I thought it was fair to

17 update that date to say December 2011 and onwards.

18 Q    And I think you had just indicated but did you also

19 confirm with the bank records that you had that the numbers

20 did not change even though you changed the date from 2012 to

21 December 2011?

22 A    Correct. My analysis did not change because in the

23 analysis, and in the declaration, it also specified that the

24 starting point was December of 2011 onwards. So there was

25 nothing that changed in the numbers on, at least in that

CMH    OCR    RDR    FCRR

402

1  column, if you will, so the starting point.

2          There were some other changes.  I don't know if you

3  want me to describe those as well but I did make some other

4  changes.

5  Q    Go ahead.

6  A    So based on Mr. Xia's testimony from yesterday, the SEC

7  sent me some additional invoices for the Xia affiliates.  So I

8  had a little bit of a late night but I, you know, I took those

9  invoices into consideration and as a result of that, the

10  number of the transfers unsupported by invoices, the second to

11  last column on this exhibit, the new exhibit, the numbers for

12  Item Number 3, 3C -- no, I'm sorry, 3 -- let me get this

13  right.

14          THE COURT:  I think I can see the differences.

15          THE WITNESS:  Okay.

16          THE COURT:  But the total number went down.

17          THE WITNESS:  Correct.  So what this means is that

18  the number previously recorded for unsupported invoices was

19  previously 43 million 606 and change, that went down to 22

20  million 098 and change.

21          THE COURT:  Okay.

22  Q    Okay.  And what is the total of, what is the total

23  amount -- I'm sorry.

24          Going to the first section, can you please describe

25  what is shown in the first section of this chart?

CMH   OCR   RDR   FCRR

403

1  A    So the chart itself is supposed to describe my analysis

2  of what I call the downstream transfers, meaning that the

3  transfers from the Fleet Financial Group and Eastern Emerald

4  Group, the developer accounts, to the Racanelli and Perini

5  accounts, in section 1, specifically over different chunks of

6  periods of time.  That's in section 1.

7  Q    And between 2012 and 2019, was the total amount that goes

8  from either Fleet Financial Group or Eastern Emerald Group to

9  Racanelli or Perini?

10  A    So 2011 to 2013, it was primarily Fleet Financial Group

11  to Racanelli which is approximately 52 million.

12  Q    And from 2014 -- I'm sorry.

13          What is the total amount between December 2011 and

14  January 2019 that goes from Fleet Financial Group or Eastern

15  Emerald Group to Racanelli or Perini?

16  A    So I think you mean 2014 to 2019, that second column,

17  right, just to clarify?  Okay.

18  Q    The total amount.

19  A    Right.

20          So that second column which is the total of all EEG

21  and FFG transfers to Perini and Racanelli was a total of

22  approximately 75 million, bringing the total transfer over the

23  entire period to 127.

24          I get what you were saying now.  Sorry.

25          THE COURT:  You know, Ms. Han, unless there's some

CMH   OCR   RDR   FCRR

404

1  reason to read all these, I can read the chart, it's pretty

2  self-explanatory, but if there's anything that's not obvious,

3  feel free to ask him follow-up questions.

4          MS. HAN:  Okay.  I'm going to skip ahead.

5  Q    And you indicated, you testified that in your review of,

6  that you reviewed invoices or requisitions from Racanelli and

7  Perini?

8  A    Yes, I did.

9  Q    Did you make any observations when you were reviewing

10  those invoices?

11  A    Yes.  So with respect to section 1 of this chart,

12  generally, there were requisitions that supported all of these

13  payments from the developers to Racanelli.  In looking at the

14  requisitions, I thought that, that they were incomplete, first

15  and foremost.

16  Q    I'm just going to stop you for a second just to clarify.

17          The requisitions that you're referring to, are they

18  the requisitions to Racanelli or Perini, the general

19  contractor, to the developer?

20  A    Correct.

21  Q    Okay.

22  A    That were purportedly submitted to, to the --

23  Q    Developers?

24  A    -- developer.  Correct.

25  Q    And what did you notice when you were reviewing these

CMH   OCR   RDR   FCRR

405

1  invoices or requisitions?

2  A    So the first thing I noticed, I thought that they were

3  incomplete in that typically when a requisition is submitted,

4  there would be a Form 702 which was the top schedule which is

5  a summary, an executive summary, if you will, of all of the

6  costs that were incurred during a particular billing period

7  which is typically a month.

8          Supporting that, at a minimum, you would have a

9  Form 703 which is effectively a, a schedule of values or a

10  breakdown of all of the costs that were incurred during that

11  particular period and it's typically by, say, a particular

12  work package or a scope of work or a, a trade, if it's an MEP

13  trade, and then subsequently you would have a breakdown of

14  subcontractors and things like that.  It will provide a level

15  of detail that a developer would be able to understand what

16  the project budget was and then be able to understand that

17  during this period, that the costs that were incurred or the

18  percentage of the work that was completed, they would be able

19  to use that information to then justify paying the amount

20  that's due on that requisition in a given month.

21          So that schedule is missing.  So that was my first,

22  that sort of you know -- without that, I don't, I don't think

23  that I could be able to assess whether the work that was being

24  billed for during that period of time, that I would be able to

25  assess the level of work that was performed or billed, being

CMH   OCR   RDR   FCRR

406

1  billed for at least. So that was one thing that I noticed
2  that was missing.
3  Q    And I'm just going to stop you for a second.
4        The requisitions and invoices that your, that you
5  reviewed, were these the Form 702s that you just referred to?
6  A    No.
7  Q    They're not the 702s?
8  A    No. I'm sorry. Sorry. Can you repeat the question?
9  Q    Sure.
10 A    My apologies.
11 Q    The requisitions and/or invoices from Racanelli or Perini
12 to Fleet Financial Group or Eastern Emerald Group that you
13 just referred to, that you reviewed, were these the, were
14 these Form 702s that you just described?
15 A    Correct, yes, they were. They're the typical
16 requisitions and that's what threw me off. So that
17 requisitions are Form 702s.
18 Q    Okay. So you, the requisitions that you reviewed were
19 the Form 702s that were submitted?
20 A    Correct.
21 Q    And when you say they were missing 703s, that's a
22 separate form?
23 A    Correct. So I'm referring -- the AIA, the American
24 Institute of Architects has these standard forms that are
25 pretty much used by the industry and 702s and 703s are sort of

CMH   OCR   RDR   FCRR

407

1  like the bare minimum on large scale projects like this. So
2  you would expect to see those two forms that are being
3  submitted together and typically, the architect, the engineer,
4  they would submit these forms together in a packet.
5        So it was just odd that that was missing from the
6  package.
7        THE COURT: Can I just ask you a clarifying
8  question?
9        THE WITNESS: Sure.
10       THE COURT: Were there no Form 702s or 703s or the
11 forms that were provided as requisitions were incorrectly
12 filled out?
13       THE WITNESS: There were no 703s, Your Honor.
14       THE COURT: Okay. So no detailed description of
15 costs?
16       THE WITNESS: Correct.
17       THE COURT: Were there 702 summary forms?
18       THE WITNESS: Correct. There are 702s for all of
19 the payments that were made.
20       THE COURT: Okay. So when you say incomplete,
21 you're referring to the lack of 703s?
22       THE WITNESS: Correct.
23       THE COURT: And what about the 702s, were those
24 filled out properly or completely?
25       THE WITNESS: They were filled out, Your Honor.

CMH   OCR   RDR   FCRR

408

1  They were signed off --
2        THE COURT: Okay.
3        THE WITNESS: -- by various parties.
4        THE COURT: Got it. Okay.
5  Q    Did you notice anything about the 702s that you reviewed?
6  A    Yes, I did.
7        There was -- I thought it was highly unusual that
8  there would be, in some cases, there were multiple
9  requisitions that were submitted in one particular month for
10 the same project. Typically, there's a lot of work that goes
11 into preparing a 702, as I mentioned, with all the details and
12 all the analysis, gathering all the subcontractor costs so it
13 was odd that there were multiple requisitions in a particular
14 month.
15       I also noticed that the requisitions, a great
16 majority of them were in round dollar amounts which I thought
17 was highly unusual as well. In preparing requisitions, there
18 are lots of, you know, additions and subtractions and
19 multiplications, you know, for taking into account retainage
20 and it would be odd, after doing all of that math, that you
21 come up to an exact round dollar amount for a particular
22 requisition month over month. I mean, maybe it happens once
23 or twice. You know, it's, that's, you know, strange, but to
24 see it consistently in a number of these entities, I thought
25 it was odd to see that and highly unusual, I would say.

CMH   OCR   RDR   FCRR

409

1  Q    And is it -- are you saying that it's highly unusual
2  because it contains, like, calculations that include, like, a
3  percentage of the retainage which gets subtracted from, for
4  example, the bill that's due?
5        MR. KAMELI: Objection. Leading.
6        THE COURT: Sustained. I actually have no idea what
7  any of that means, to be honest. Can I ask a question? I
8  apologize to interrupt.
9        You were here when there was testimony by Mr. Xia
10 about invoices that were all round numbers because of a flat
11 fee billing approach. Do you recall hearing that testimony?
12       THE WITNESS: Yes.
13       THE COURT: Is that akin to a requisition, I guess,
14 in a way?
15       THE WITNESS: Your Honor, I think Mr. Xia was
16 referring to the invoices from the Xia affiliates.
17       THE COURT: Right. That is -- well, you referenced
18 how unusual it was to have requisitions that were in round
19 numbers. Is it unusual to use that kind of monthly round
20 number regular billing between a, let's say a subcontractor or
21 some kind of company to a GC?
22       THE WITNESS: It's highly unusual for a GC, a GC's
23 requisition which is made up of multiple components including
24 all the subcontractor payments, for that to be a round dollar
25 amount, you know, consistently over a period of time. And it

CMH   OCR   RDR   FCRR

410

1    also, I would say, Your Honor, in looking at the agreement
2    here, it's a, what's called a GMP cost-plus agreement.  In
3    that type of billing method, it involves a lot of calculation
4    of the costs.
5            THE COURT:  Right, and then the plus.
6            THE WITNESS:  The markup --
7            THE COURT:  Right.
8            THE WITNESS:  -- percentage.
9            So when you take all of those factors into
10   consideration, it's highly unusual that that math would be a
11   round dollar amount that's due.
12           You know, so I thought it was unusual.  Frankly, I
13   thought the change order amount that was in there was
14   submitted as a plug to get to the round dollar amount but
15   that's, you know, just speculation on my part.  You know, I
16   don't know if that's true or not but it looked like it was a
17   plug to get to that round dollar amount.
18           THE COURT:  Okay.  Go ahead.
19           (Continued on next page.)
20
21
22
23
24
25
            CMH   OCR   RDR   FCRR

411

1            MR. KAMELI:  Judge, may I ask to strike that.
2            THE COURT:  I'm going to disregard that.  But I
3    understand why he's making that guess, because of the
4    unusualness of all the round numbers.  So I'll take that for
5    what it's worth.
6            Ms. Han, go ahead.
7    BY MS. HAN:  (Continuing)
8    Q    And separate and aside from the requisition from
9    Racanelli and Perini to developers, did you also review
10   invoices from the Xia entities?
11   A    Yes, I did.
12   Q    And did that include JiQuing Development, Manekineko
13   Group, Samuel Development Group, X & Y Development Group,
14   Amazon River, Fleet Financial Group, and Shangri-La 9F?
15   A    Yes.  I think what I did was I scheduled a 92A, a
16   readvised schedule or exhibit, I list all of the entities that
17   received funds from Racanelli and Perini, and that's where I
18   tried to -- of the funds that they received, I tried to
19   identify where there were invoices that could be mapped to
20   those payments.  It didn't always map exactly.  But yes, those
21   are the invoices that I reviewed, as well.
22   Q    And did you make any observations about the invoices from
23   the Xia entities?
24   A    Yes, I did.  So there were some -- you know, highly
25   unusual things there, as well.

412

1            Well, first there was a scenario with the missing
2    invoices.  I think we were able to find some of those.  So
3    it's less now, but there are still some that are missing.
4    The -- a good majority of these invoices are, you know, these
5    large round dollar amounts, and you know, when you read the
6    task, I think, it's hard to ascertain whether the value of the
7    work that was being performed, just based on what was being
8    presented in the invoice.  And so, you know, typically, you
9    would see, in a professional-service-type environment where
10   you have workers that are performing construction management
11   services, you would typically see a breakdown of the number of
12   professionals that worked, the hourly rate that they're being
13   paid, and by extension, the fees that are due on a given
14   month.  So that was not there on a good majority of these
15   invoices.
16           I will say that for some of the entities, there was
17   a lot of detail that you could probably guess that there was
18   some substantive work that was doing, but a good majority of
19   them, it was very difficult to understand what was the value
20   of the work that was being performed.
21           There was some -- I think there were some other
22   things, as well.  I think, you know, for me, in looking at the
23   frequency at which these invoices were coming in, it was sort
24   of like rapid fire.  And so I thought it was highly unusual to
25   see that, you know, in some cases, there were four invoices

413

1    that were being submitted in a given month by one of these
2    entities in very large round dollar sums, and like I said,
3    with very little backup.  You know, I think, you know you --
4    Q    Mr. Dhookie, I'm just going to direct your attention to
5    Plaintiff Exhibit 135.
6            Is this the chart that you prepared --
7    A    Sorry, I'm getting there.  Apologies.
8            Yes.  Yes, yes, yes.  I'm there now.
9    Q    Is this a chart that you prepared showing the invoices
10   and amounts for the various Xia affiliate entities invoices?
11   A    Yes.
12   Q    I'm going to direct your attention to what's on the
13   bottom.  It says 46-3 of exhibit -- Plaintiff Exhibit 135.
14   A    Yes.
15   Q    Is this an example of what you were describing earlier of
16   the rapid fire and multiple invoices?
17   A    Yes.  This is -- you know, seeing two invoices to --
18   sorry, seeing two invoices to the -- for the same project, the
19   same contractor, you know, over the same period, and then
20   consistently seeing that over a period of time, it just
21   seems -- it seemed highly unusual.
22   Q    And I'm going to direct your attention to 46-12.
23           THE COURT:  Just to make sure I understand that when
24   you're looking at, when you say rapid fire, these are actually
25   two large amounts on the same day, in many instances, correct?

414

1    THE WITNESS:  They're dated the same day, Your
2  Honor.  I don't know that they're submitted -- I mean that
3  they're happening in the same day.  But they're submitted the
4  same day, yes.  That's why I thought it was -- you'll see
5  2222 --
6    THE COURT:  But they're purportedly separate
7  requests?
8    THE WITNESS:  Yes.  And separate documents or
9  invoices.
10    THE COURT:  All right.
11 Q   And directing your attention to the page number 46-12 of
12 Plaintiff Exhibit 135.
13 A   Yes.
14 Q   Is this another example of what you were describing
15 earlier?
16 A   Yes.  I think this was more unusual than the preview one
17 in that now you have four on the same day, dated the same day.
18    MR. KAMELI:  What number?
19    MS. HAN:  Plaintiff Exhibit 135, and it's Page
20 46-12.
21    MR. KAMELI:  Thank you.
22 Q   And at the back of this exhibit starting on 46-15, are
23 these a couple of -- or are these some sample invoices that
24 you reviewed for the Fleet entities?
25 A   Yes.

Avery Armstrong, Official Court Reporter

416

1    THE COURT:  Right.
2 Q   And just to be clear, Exhibit 135 does not include the
3  additional invoices that you were sent yesterday?
4 A   Correct.
5 Q   And did you also, in your review and analysis of records
6  in this case, did you also review invoices from third-party
7  entities?
8 A   I did.
9 Q   I'm going to direct your attention to Plaintiff
10 Exhibit 136.
11 A   Yes.
12 Q   Were these some of the third-party entity invoices that
13 you reviewed some of?
14 A   Yes.  These are a sample of them.
15 Q   And when did you notice about these invoices that were
16 different from the invoices from the Xia entities?
17 A   Yes.  This is what I was referring to before.  You know,
18 when you have architectural engineering site invoice like on
19 47-1, you would see, you know, a rate, you would say a date,
20 and then you would see a quantity, typically reflected in the
21 hours that were worked on the various different tasks, and
22 then a total billing, and then, you know, usually, depending
23 on the rates, you would see this sort of not rounded amount.
24 And then if you skip, you know, towards the back-end, to say,
25 47-7, same thing.  This is for -- this is for -- I don't know.

Avery Armstrong, Official Court Reporter

415

1 Q   For the Xia entities.  I apologize.
2 A   I'm sorry, I agreed with you.  Yes, for the Xia.
3    THE COURT:  So for my edification, is an invoice
4  different than a requisition?
5    THE WITNESS:  Yes, Your Honor.  These are what --
6  these invoices would be added together and submitted as a
7  component of a requisition or payment package, and a payment
8  package is typically done by a general contractor, and they
9  would take all of the invoices from the various
10 subcontractors, accumulate them, and that's where the 703 --
11 I'm sorry, if I'm giving you too much -- but that's where the
12 703 comes in handy, because it allows you to track all of this
13 against the budget, if you will.
14    THE COURT:  And then the general contractor submits
15 the requisition to the developer?
16    THE WITNESS:  Correct.
17    THE COURT:  Okay.  Perfect.  Go ahead.
18    THE WITNESS:  But again, these were provided
19 separately, Your Honor.  They were not provided together in
20 that package.  That's why it was confusing.  These were
21 separately submitted.
22    THE COURT:  They weren't submitted as part of the
23 Form 702?
24    THE WITNESS:  Correct.  Or at least not to my
25 knowledge.

Avery Armstrong, Official Court Reporter

417

1  Sorry.  Roux Associates which was I think they were --
2    THE COURT:  R-O-U-X.
3    THE WITNESS:  R-O-U-X, yes.  Thank you, Your Yonor.
4 A   They were providing some type of consulting service on
5  the project I think in connection with the Brownfield
6  remediation.  And so, here again, you have these various
7  professionals that were working on the types of tasks and the
8  types of tasks that they were doing, and the rates and hours,
9  et cetera.
10 Q   And directing your attention to 47-2 and 47-3.
11    Are there notations on those invoices?
12 A   Yes.  This is when you -- typically, when in doing an
13 audit of these projects, you would see a lot of this where the
14 general contractor is working with the subcontractors and
15 negotiating or arguing about how much work was done during a
16 given period, and they typically reflect that negotiated
17 amount on the face of the invoice in the events that there are
18 changes or disagreements.
19 Q   Did you notice any notations in the Xia affiliate
20 entities' invoices when you were reviewing them?
21 A   Not to my recollection, no.
22 Q   I'm going to ask to you take a look at Plaintiff's
23 Exhibit 93.
24 A   Yes.  I'm there.
25 Q   And can you just describe what this chart is showing.

Avery Armstrong, Official Court Reporter

418

1    A    Sure.  This is -- this was intended to -- one of the
2    things I was asked to do was try to identify any type of
3    unusual transfers.  And I thought these were unusual in that
4    they were transfers from the Xia affiliates, to the developer,
5    Fleet Financial Group in number two, and then in number one,
6    these were Xia affiliates to the contractors, Racanelli and
7    Perini.
8             And again, in sort of just in my own experience, you
9    know, if these are, in fact, subcontractors, you would not
10   see -- you know, in the event that there's a dispute, you
11   would not see, like, sort of these payments back to developer,
12   back to a general contractor.  They're typically reflected as
13   potential credits for future work.  So these don't look like
14   credits.  And so it sort of begs the question, well, why would
15   these affiliates make these transfers to -- back to the
16   developer.  And so I thought they were -- again, without
17   having any more information, they look very unusual to me.
18   Q    And when you say, it would usually be reflected as a
19   credit, where would that be reflected?
20   A    So if -- again, if these entities were -- if they were
21   subcontractor, they would typically, you know, reflect that as
22   a -- if they were due a certain amount for a period of time
23   and they wanted to return money or they didn't do some work
24   and they had to return some money, they would deduct what they
25   were owed, deduct that amount from what they're owed on, say,

419

1    the next following month's invoice.  So as opposed to making a
2    payment back to the general contractor or the developer, they
3    would give them a credit on their next month's bill.
4    Q    So just to make sure I understand, they would reflect it
5    in the following month's invoice that --
6    A    Correct.
7    Q    -- there was a credit that was due to the general
8    contractor or the developer?
9    A    Correct.  Correct.  If that's the case.
10   Q    And did you also do an analysis whether some of the money
11   that was going through the accounts, whether it came from
12   non-investor sources?
13   A    Yes, I did.
14   Q    And I'm going to direct your attention to Plaintiff's
15   Exhibit 95.
16   A    I'm there.
17   Q    During -- while you were preparing for this hearing, is
18   this one of the charts that you amended to reflect --
19   A    Yes, I did.
20   Q    Okay.  I'm just going to --
21        MS. HAN:  Your Honor, if I could just approach.
22        THE COURT:  Yes.
23        MS. HAN:  And Your Honor, we're just going to call
24   it 95A since it's an amended chart.
25        THE COURT:  Okay.

420

1         MR. KAMELI:  Why?  Mine is the same.
2    Q    Mr. Dhookie can you describe what's been amended in the
3    chart?
4    A    Yes.  I think I mentioned earlier that there was a
5    clerical error in the date ranges that I was using in the
6    header of these columns.  And so the new chart, the 95A should
7    read December 2011 as a start date, as opposed to the original
8    which said 2012, implying a January '12 start date.
9    Q    And did that affect the numbers that are otherwise listed
10   in this chart?
11   A    No.
12   Q    And what was the total number of non-investor funds that
13   you saw coming into the various accounts you reviewed?
14   A    So the total that I came up with was approximately
15   3.5 million.  During this period of time, obviously.
16   Q    Between December 2011 and January 2019?
17   A    Correct.
18   Q    And what did you include in this number?
19   A    So I think -- you know, I don't have an exhausted list in
20   my head right now, but what I put on the chart were some of
21   the types of items that would be included in the analysis.
22   And so you know, where -- it's effectively anything that was
23   not -- was sort of not what I would classify as potentially
24   investor funds.  And so anything else, any other type of
25   payments that these entities receive including rent, cash, you

421

1    know, tax credits, miscellaneous items.  You know, it's sort
2    of a wide range of things that -- everything but EB-5 investor
3    funds.
4    Q    And I'm going to direct your attention to Plaintiff
5    Exhibit 94.
6         In preparing for the hearing, did you also amend
7    this chart?
8         THE COURT:  Sorry, can we go back for a one second.
9         Mr. Dhookie, the upshot of Plaintiff Exhibit 95A is
10   that the amount of non-investor funds is large or small?
11   Small, I guess.
12         In other words, would you expect to see more
13   investor funds in all of these different accounts?
14         THE WITNESS:  So Your Honor, the purpose of this
15   chart was to -- over this period of time, you know, one of the
16   things that I was trying to do is to understand what was the
17   totality of moneys that were coming into these various
18   different accounts, and if any -- if there were any funds
19   coming in from sources other than the EB-5 investors.
20         THE COURT:  I see.
21         THE WITNESS:  So in other words, that these entities
22   were receiving rent payments, or you know, other funds into
23   these accounts, you know, what was the quantity or the value
24   of those deposits from other sources.
25         THE COURT:  And why do you want to know that?

422

1   What's the relevance?

2   THE WITNESS:  So the relevance is that if I'm trying

3   to analyze how much of the EB-5 investor funds are flowing

4   through these various accounts, I want to -- it's always my

5   intention to try to understand if there are funds being

6   commingles.  Meaning, that if I can trace the source of the

7   funds from one entity all the way through, it helps to

8   understand that those funds are not being added to or

9   multiplied by other forms of deposits into these accounts.  So

10  this was an attempt to sort of take out or understand what is

11  the maximum sort of other funds coming in during this period

12  of time --

13  THE COURT:  To isolate the EB-5 fund?

14  THE WITNESS:  To isolate the EB-5 funds correct, or

15  EB-5 deposits.

16  THE COURT:  Okay.  Got it.

17  Q   Directing your attention now to Plaintiff's 94.

18  Is this another chart that you amended in your

19  preparation for this hearing?

20  **A   Yes.**

21  MS. HAN:  Your Honor, if I could just approach.

22  THE COURT:  Yes.

23  Q   And what did you change -- how did you amend this chart?

24  **A   Yes.  Again, here it was the clerical correction, again,**

25  **on the second column.  I changed it, the start date to**

423

1   **December 2011 as opposed to 2012.**

2   Q   And did any of the numbers change as a result of that

3   extra month?

4   **A   No.  No, they did not.**

5   Q   And just to be clear, when you amended the date to

6   December 2011, that's just to reflect the extra month of bank

7   records from Fleet Financial Group?

8   **A   Right.  Yes.  That's the --**

9   Q   From one of the Fleet Financial Group accounts?

10  **A   Yes.  But also, to be clear, that the analysis of the**

11  **funds covered that entire period, just the chart didn't**

12  **correctly state the start date of my analysis.**

13  Q   Got it.  And can you explain what this chart is showing?

14  **A   Sure.  These are the downstream payments from the**

15  **developer and contractors, to third parties for what, in my**

16  **estimation, appeared to be for what I call project-related**

17  **costs or construction costs.**

18  Q   And what else did you include -- or how did you

19  come -- withdrawn.

20  MS. HAN:  Just for the record, this is Exhibit 94A.

21  I wasn't sure if I made that clear earlier.

22  Q   What did you include in the numbers of this chart?

23  How did you go about creating this chart?

24  **A   So for each of the entities that are identified on the**

25  **left column, I did an analysis of the payee names, and you**

424

1   **know, using sort of professional judgment and some internet**

2   **research, I was able to isolate what I think would be, you**

3   **know contractor-type costs or construction-type costs for**

4   **vendors, payments to these individuals, other than the Xia,**

5   **sort of affiliate type payments who were the third parties**

6   **that were being paid, essentially, for construction-related**

7   **costs.  I also included any individual that I saw in the event**

8   **that they were potentially laborers that were being paid by**

9   **check.**

10  Q   And just to be clear, starting with the first section, is

11  this payments to third-party entities or individuals from

12  Fleet Financial Group, Racanelli Perini, or Eastern Emerald

13  Group -- sorry, I -- I'm going to start over.

14  In the first section, are these payments from Fleet

15  Financial Group, Racanelli Perini, and Eastern Emerald Group

16  to third-party entities or individuals that are potentially

17  construction-related?

18  **A   Yes.**

19  Q   And between December 2011 and January 2019, what was the

20  total amount that went out from those entities to third-party

21  entities or individuals?

22  **A   There were 54.9 million, approximately.**

23  Q   I'm sorry, just for the first section.  From --

24  **A   I'm sorry.**

25  Q   From Fleet Financial Group, Racanelli Perini, or Eastern

425

1   Emerald Group?

2   **A   It's approximately 45.6 million.**

3   Q   And then in the second section, what does that section --

4   can you explain what that section shows?

5   **A   Sure.  These are also, again, payments to third parties,**

6   **for what appeared to be project-related costs.**

7   Q   And are these payments from the Xia entities that are

8   listed in that section?

9   **A   Correct.**

10  Q   And when you were calculating that amount, did you

11  similarly also include the payments to any individuals?

12  **A   Yes, I did.**

13  Q   And what was the total amount from the Xia entities that

14  were paid to third-party entities or individuals for possible

15  construction-related expenses?

16  **A   Approximately 9.3 million.**

17  Q   And then can you describe what the third section shows?

18  **A   Sure.  This was an analysis of -- from the Fleet**

19  **Financial Group and Racanelli Group, what I was able to**

20  **identify as payroll-related payments.**

21  Q   And does that include the ADP payments?

22  **A   Correct.**

23  Q   I'm going to direct your attention to -- if you could

24  keep that Exhibit 94A open, I'm going to direct your attention

25  to Exhibit 92, Plaintiff's Exhibit 92.

426

1   A    Yes.  Yes, I'm there.

2   Q    I'm just going to direct your attention to, for example,

3   3D and 3K.  3D, what is the total amount -- I'm sorry, 3C,

4   what is the total amount that Shangri-La Green received from

5   Racanelli between 2012 -- I'm sorry, December 2011 and

6   January 2019?

7   A    3C, approximately 10.7 million.

8

9            (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

427

1   DIRECT EXAMINATION

2   BY MS. HAN:  (Continued.)

3   Q    And do you also see 3-J?

4   A    3-J?

5   Q    Perini to Shangri-La Green?

6   A    Yes.  3-J, there were approximately 9.9 million.

7   Q    So that totals roughly about 20 million?

8   A    Correct.

9   Q    And then going back to 94-A.

10  A    Yes, I'm there.

11  Q    On 2-D, what was the total amount from Shangri-La Green

12  that was paid to third-party entities or individuals for

13  probable construction related costs?

14  A    To the Shangri-La Green, that was 2.9 million third-party

15  costs.

16           MS. HAN:  Your Honor, because the charts are in

17  evidence, I am not going to go through any of the other lines

18  because --

19           THE COURT:  That is fine.  At some point someone

20  will explain to me.  I think I get the gist, but yes, we do

21  not need to have him read all the lines on the chart.

22           MS. HAN:  Okay.

23           THE COURT:  Unless you want to ask him what, if any,

24  conclusions did you draw from it.

25           MS. HAN:  I actually did want to ask that.

428

1            THE COURT:  Okay.

2            MS. HAN:  Thank you, Your Honor.

3            THE COURT:  That is fine.

4   Q    And what, if any, conclusions did you draw from that,

5   Mr. Dhookie?

6   A    Sure.  So in looking at the billing, as I mentioned

7   before, there were sort of fast-paced billing from some of

8   these entities and the descriptions were sort of these

9   high-level vague, vague descriptions in some cases and it

10  lacked that level of detail.  What I was trying to understand

11  is, maybe if I were to take a look at some of the underlying

12  expenditures for these entities it would help me understand,

13  you know, what type of work they were doing during this period

14  of time, meaning what are -- who are they paying and for what

15  purpose.  And so this chart was intended --

16           THE COURT:  "This chart."  Which one?

17           THE WITNESS:  I'm sorry.  94-A.

18  A    The probable project related costs was intended to

19  describe, for each of the entities that received payments from

20  Racanelli and Perini, each of these Xia affiliates that

21  received payments from Racanelli and Perini, what were their

22  out-of-pocket sort of expenditures, if you will, in connection

23  -- during the same period of time, right, I should say.  And

24  so what I notice for an entity like Shangri-La 9D, it did

25  have, you know, a -- you know, a good chunk of costs.  It was

429

1   like 3.5 million.  And so -- you know, so I said, okay, that's

2   one.  But, you know, some of the other entities, as you go

3   through this list and you put it in the aggregate, you have 68

4   million that was being paid to these Xia entities and, in

5   totality, when you look at their underlying out-of-pocket

6   costs, it was 9.3 million.

7            THE COURT:  And the 68 million comes from the other

8   exhibit, 90 --

9            THE WITNESS:  Yes, sorry, 92 -- I'm sorry,

10  Your Honor.  I'm flipping back and forth.

11           So 92-A, you see that Section 3 --

12           THE COURT:  Right.

13           THE WITNESS:  -- Racanelli and Perini to the Xia

14  affiliates paid a total of 68.1 million.  And for those, those

15  entities, those same entities, they made out-of-pocket

16  payments of 9.3 million.

17           THE COURT:  I see what you are saying.  Okay.

18           THE WITNESS:  And, you know, one of the -- you know,

19  again, in an attempt to try to understand all of their

20  underlying costs, I also looked at the payroll for Fleet

21  Financial Group in that if you were to take all of the payroll

22  amounts listed on 94-A, which is the 3.97 -- 3.792 million

23  that was paid by Fleet and you add that to the 9.3 million in

24  third-party costs, it would be about 12 or 13 million of

25  out-of-pocket costs against a $68 billion billing.

430

1    THE COURT:  Okay.

2    BY MS. HAN:

3    Q    And in your review of records, did you see any payroll

4    records such as ADP records for any of the other Xia

5    affiliates, such as Shangri-La Green or Shangri-La 9D?

6    A    **No.  No, I did not.**

7    Q    And in 92-A, what is the total amount that was paid from

8    the developer entities to Racanelli or Perini?  So paid from

9    Fleet Financial Group or Eastern Emerald Group to Racanelli or

10   Perini?

11   A    **That was a total of 127 million, approximately.**

12   Q    And in 94-A, what was the total amount that was paid

13   from -- withdrawn.

14       Mr. Dhookie, I'm going to direct your attention to

15   Plaintiff's Exhibit 126.

16       THE COURT:  I just want to get a sense of timing.

17   It is about 5:35.  The court reporters have very kindly agreed

18   to go to 6:00, but if you think you have a lot more to go,

19   maybe we should just start tomorrow.

20       How much more do you think you have on direct?

21       MS. HAN:  Can we start tomorrow?

22       THE COURT:  All right.  Why don't we do that.

23       Do you have an estimate of how long, though?

24       MS. HAN:  Maybe about 40 minutes to an hour.

25       THE COURT:  Okay.  And then your next witness is how

431

1    long?

2        MR. MCGRATH:  Less than hour, Your Honor.

3        THE COURT:  Okay.

4        MR. MCGRATH:  30, 40 minutes.

5        THE COURT:  Okay.  So bear in mind, we are going to

6    start, though, in the afternoon.  I think we said 2:00 p.m.

7        How long do you think your cross of these witnesses

8    will be, Mr. Kameli?

9        MR. KAMELI:  It's a pleasure speaking with him soon.

10       But it will be probably about an hour or so with

11   Mr. Dhookie.

12       And with our great monitor, probably it's going to

13   be 30 minutes to an hour.

14       THE COURT:  Okay.  So maybe two hours for cross and

15   two and a half hours for direct between the two witnesses.

16       MR. KAMELI:  Judge, we have Mr. Freeman, also, on

17   our side.

18       I'll buy dinner tomorrow night.

19       THE COURT:  Very nice of you.  No, I really do not

20   want this to drag into a fourth day, folks.

21       We can go off the record now.

22       (Off the record.)

23       THE COURT:  So, folks, what we are going to do is, I

24   am going to be optimistic about my morning conference which

25   starts at 10:00.  I am hoping it will be over by noon, so we

432

1    will start this at noon.  No break for lunch, so eat before

2    you come and then we will go for the rest of the day and get

3    this done.

4        How long is Mr. Freeman going to be?

5        MR. KAMELI:  On our side, 30 minutes.

6        THE COURT:  Okay.  Do you folks have an idea of how

7    long the cross of Mr. Freeman will be?

8        MR. STOELTING:  We only just received a couple of

9    his reports and his resumé a few days ago.  We don't really

10   know much about him at all, but probably not very long.

11       THE COURT:  All right.  Okay.  So we will see you

12   folks tomorrow at noon.  We will start again.

13       You can step down, Mr. Dhookie.  Thank you.

14   Although -- yes, let's do that.  Let's do that.  I can't save

15   you a trip.

16       All right.  Thank you, everyone.  We will see you

17   tomorrow.  Be ready to go at noon.

18       The only thing is, you may have to condense your

19   materials because we are going to have some folks here in the

20   morning.  So if you want to leave your things here, that is up

21   to you, just push them down to the back end of the conference

22   table because we are going to have another civil matter.

23       MR. KAMELI:  Okay.  I can move them on this side?

24       THE COURT:  Yes, in the back end and further away

25   form the bench.

433

1        MR. KAMELI:  Thank you, Your Honor.

2        THE COURT:  And then when you come in, we may still

3    be in the midst of it, so you might have to wait.

4        MR. KAMELI:  Yes, Your Honor.

5        THE COURT:  Okay.  Have a good night, everyone.

6        MR. STOELTING:  Thank you, Your Honor.

7        MR. KAMELI:  Thank you.  You, too,

8

9        (Matter adjourned to Wednesday, February 16, 2022 at

10   12:00 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

434

```
 1                    I N D E X

 2

 3   WITNESSES:

 4

 5     RICHARD XIA

 6        CROSS-EXAMINATION BY MR. KAMELI          236

 7        REDIRECT EXAMINATION BY MR. STOELTING    368

 8        RECROSS-EXAMINATION BY MR. KAMELI        391

 9     RAYMOND DHOOKIE

10        DIRECT EXAMINATION BY MS. HAN            392

11

12

13                    EXHIBITS:

14        Plaintiff s Exhibit 92-A         400

15

16

17

18

19                    *      *      *      *

20

21

22

23

24

25


               CMH    OCR    RDR    FCRR
```

435

```
  1                    UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF NEW YORK
  2
      - - - - - - - - - - - - - - - X
  3
      SECURITIES AND EXCHANGE        :
  4   COMMISSION,                         21-CV-5350(PKC)
                                     :
  5             Plaintiff,
                                     :    United States Courthouse
  6        - against -                    Brooklyn, New York
                                     :
  7   RICHARD XIA, et al.,                February 16, 2022
                                     :    12:00 o'clock p.m.
  8             Defendants.
                                     :
  9   - - - - - - - - - - - - - - - X

 10          TRANSCRIPT OF ORDER TO SHOW CAUSE
            BEFORE THE HONORABLE PAMELA K. CHEN
 11           UNITED STATES DISTRICT JUDGE.

 12   APPEARANCES:

 13   For the Plaintiff:        US SECURITIES & EXCHANGE
                                   COMMISSION
 14                             New York Regional Office
                                200 Vesey Street, Suite 400
 15                             New York, New York 10281-1022

 16                             BY: DAVID P. STOELTING, ESQ.
                                    KEVIN P. McGRATH, ESQ.
 17                                 KIM HAN, ESQ.

 18   For the Defendants:       SILLS CUMMIS & GROSS, P.C.
                                One Rockefeller Plaza
 19                             New York, New York 10020

 20                             BY: HERVE GOURAIGE, ESQ.

 21                             TAHER KAMELI, ESQ.
                                17 N. State Street, Suite 1700
 22                             Chicago, Illinois 60602

 23   Court Reporter:           Charleane M. Heading
                                225 Cadman Plaza East
 24                             Brooklyn, New York

 25   Proceedings recorded by mechanical stenography, transcript
      produced by computer-aided transcription.


            CMH      OCR      RDR      FCRR
```

437

1  left off before Mr. Dhookie takes the stand was to continue
2  and then maybe we can think about it after the hearing but
3  your suggestion is great.  Your suggestion is great and I
4  welcome it on behalf of Mr. Xia and I would love to speak with
5  them.  If we can take 20 minutes, 30 minutes to see if we can
6  come up with it, because I believe there's a meeting of the
7  minds, Judge.
8       THE COURT:  I only want to do this if both sides
9  really think you can come up with an agreement because,
10 otherwise, we have very patient witnesses who have been
11 waiting to testify.  So I'm inclined at least to complete
12 Dhookie's testimony and also have the Monitor testify today
13 and then if you folks wants to take a break before the defense
14 puts on a witness, I'm fine with that, we can adjourn to
15 another date.
16      I had hoped actually that before I saw you just now
17 that perhaps you might have used, you know, last night or this
18 morning to talk but if not, let's at least get the other
19 witnesses on the stand in case, I mean, unless you are going
20 to tell me it's certain that you'll come to some agreement, I
21 think we should hear from these last two witnesses for the
22 SEC.
23      MR. STOELTING:  Judge, I think the best thing is to
24 just complete the hearing and then see what happens.  Our door
25 has always been open to these sorts of discussions and we have

            CMH      OCR      RDR      FCRR

436

1       (In open court.)
2       THE COURT:  Folks, let get started.
3       Before we begin, I want to check in with the parties
4  to see if there was any progress made on some type of
5  agreement because after the conclusion of yesterday's hearing,
6  and after hearing Mr. Xia express some recognition that he
7  might need help with accounting and perhaps would agree to
8  have someone monitor his accounts and help him with all those
9  decisions, it seemed to me a path forward might be, for the
10 period that this case is pending, having some sort of monitor
11 control over the accounts and maybe that would allow the
12 projects to continue.
13      I know the current monitor had opined the best way
14 to proceed was perhaps sell the properties, but it seems to me
15 if, in fact, Mr. Xia has other funding, which I don't know if
16 that's been revealed to anybody yet, and there's some way to
17 complete the projects but with some additional stewardship
18 over the funds and how the disbursements are made and some
19 regularity imposed on these transfers to subcontractors or
20 other, the GC, the developers, et cetera, maybe that's the
21 best thing, rather than going through what is going to be
22 another day of hearings and then briefing after that.
23      So have you folks talked any further since I saw you
24 last night?
25      MR. KAMELI:  Not since last night, Judge.  What we

            CMH      OCR      RDR      FCRR

438

1  had those discussions, we will continue to have those
2  discussions, but I think the best thing to do is complete the
3  hearing today and see what happens.
4       THE COURT:  All right.  Well, at least let's get
5  through the SEC witnesses and then the defense has one
6  potential witness, Mr. Freeman.  Right?
7       MR. KAMELI:  Yes, Your Honor.
8       THE COURT:  Okay.  Let's have Mr. Dhookie back up on
9  the stand and we'll continue with the hearing.
10      Go ahead.
11      MR. GOURAIGE:  Your Honor, before, may I approach
12 the mic?
13      THE COURT:  Yes.
14      MR. GOURAIGE:  Your Honor, before we start, I had
15 one question.
16      You may recall that we had filed a pre-motion
17 conference letter and the Court had adjourned it until the
18 hearing.  I just wanted to inquire as to what Your Honor's
19 intent was with respect to that issue.
20      THE COURT:  Well, the proposed motion to dismiss?
21      MR. GOURAIGE:  Yes.  Yes.
22      THE COURT:  We can have that discussion perhaps
23 after we finish the hearing.  At this point, we could set a
24 schedule for briefing that and those two things are separate.
25      MR. GOURAIGE:  Okay.

            CMH      OCR      RDR      FCRR

439

1     THE COURT:  So let me finish the hearing and then

2  we'll discuss that as well.

3     MR. GOURAIGE:  Thank you.

4     THE COURT:  All right.  Thank you.

5     (The witness, RAYMOND DHOOKIE, having been

6  previously sworn, resumed the stand.)

7     THE COURT:  Mr. Dhookie, as I said before, you're

8  still under oath.

9     THE WITNESS:  Understood.

10    THE COURT:  And remember to use the microphone.

11    Ms. Han, you may continue.

12    MS. HAN:  Thank you, Your Honor.

13  DIRECT EXAMINATION (Continued)

14  BY MS. HAN:

15  Q   Mr. Dhookie, I'm going to direct your attention back to

16  Exhibit 92-A.

17    THE COURT:  You have to stay close to the

18  microphone.

19    MS. HAN:  Apologies.

20    THE COURT:  Be mindful of your voice.  The

21  microphone moves so if you want to stand closer.

22    MS. HAN:  Thank you.

23  Q   So Plaintiff's Exhibit 92-A.

24  A   Yes, Ms. Han, I'm there.

25  Q   In the column that's "Transfers Unsupported By Invoices,"

CMH   OCR   RDR   FCRR

---

440

1  were there more invoices from some of the Xia entities that

2  are not included in this chart?

3  A   Yes, Ms. Han.

4  Q   Can you explain why you did include them?

5  A   So the analysis that's, that was, that I prepared was

6  based on the payments by these entities during the period of

7  time that's described here, so from December 11th to January

8  of '19.  So the point of this analysis was to show for the

9  payments that were in the bank statements, if those payments

10  had any supporting documents, and so that was the purpose of

11  this analysis.  It wasn't to describe all of the invoices but

12  if these payments were made on these dates had support.

13  Q   And were there also invoices from 2011 for which you

14  didn't have bank records for?

15  A   Correct.  So there were invoices that predated this

16  analysis for at least, I think, one entity and that was X&Y

17  Development, I believe.

18  Q   Out of the total amount that was received by Racanelli or

19  Perini from Fleet Financial Group and Eastern Emerald Group,

20  that total amount that's on 92-A, that's 127.3 million, out of

21  that total amount, if you could take a look at Exhibit 94-A.

22  A   Yes, I'm there.

23  Q   How much did Racanelli or Perini pay out to third-party

24  entities or individuals for probable project related costs?

25  A   So based on my analysis, that was approximately

CMH   OCR   RDR   FCRR

---

441

1  45.6 million over the period of December 11th to January 2019.

2  Q   Actually, when you look at that total, that total

3  references payouts from Fleet Financial Group, Racanelli,

4  Perini and Eastern Emerald Group, is that correct?

5  A   Yes.  Yes, Ms. Han.

6  Q   So the total paid out from Racanelli and Perini to

7  third-party entities or individuals, how much is that?

8  A   It's approximately 36.4 million.

9     MR. KAMELI:  Just one clarification, Judge.  Are we

10  looking at 92-A?

11    THE WITNESS:  94-A.

12    THE COURT:  94-A.

13  Q   So just to clarify, is it 36.6 million that went from

14  Racanelli and Perini to third-party individuals?

15  A   Correct, approximately 36 million, yes, Ms. Han.

16  Q   And you testified yesterday that you had experience

17  working on reviewing financials for construction related

18  projects?

19  A   Correct.

20  Q   Can you just describe the type of work that you did on

21  those matters?

22  A   So as part of my work, I'm responsible for reviewing what

23  we call cost auditing for subcontractor payments and

24  typically, I'm hired by the developer or the owner of a

25  particular project to audit the costs that are submitted by

CMH   OCR   RDR   FCRR

---

442

1  the contractors and the subcontractors as part of those

2  projects.

3  Q   And what is it that you do when you audit those?

4  A   It involves reviewing the requisitions and any supporting

5  documents that are provided based, in support of those

6  requisitions primarily.  And there are also a number of other

7  things we do in terms of site visits and inspection of the

8  work that was performed, et cetera, but it's primarily, the

9  starting point for our work is always the requisitions that

10  are submitted.

11  Q   And what is it that you look for when you're reviewing

12  those requisitions, when you're doing the audit?

13  A   Sure.  We reviewed the information that's submitted in

14  the package which is, a payment requisition contains a number

15  of components including a, you know, as I mentioned yesterday,

16  a Form 702 which is, it's an executive summary of the

17  requisition, a Form 703 which provides a second level of

18  detail, you know, of the trade costs typically or the

19  packages, the costs organized by, you know, packages and in

20  some instance, there are change orders where, you know, an

21  owner or a developer typically demands to see all of the

22  supporting documents for those change orders so you would see

23  a lot more detail.  It would be a, all of the invoices that

24  were provided, all the tickets that support those invoices.

25    There's quite a bit of information that would be

CMH   OCR   RDR   FCRR

443

1 submitted as part of the payment package that would be subject
2 to review and the auditing would entail validation of those
3 costs by way of looking at some, some type of supporting
4 document, reviewing the tickets, reviewing, you know, in some
5 cases, we would interview workers, et cetera, contractors and
6 so on. But that's, generally speaking, how we conduct the
7 audit.
8 Q    Thank you.
9      I'm going to direct your attention to Plaintiff's
10 Exhibit 176.
11 A    Yes, I'm there.
12 Q    And is this the Eastern Mirage contract between -- I'm
13 sorry.
14      Is this the contract between Racanelli and Fleet
15 Financial Group for the Eastern Mirage project that you
16 reviewed?
17 A    Correct.
18 Q    And you testified yesterday about a GMP contract. What
19 does "GMP" stand for?
20 A    Sure. It's a guaranteed maximum price contract.
21 Q    And in this contract, what was the guaranteed maximum
22 price for the Eastern Mirage project?
23 A    There were several components but the total was
24 $88 million.
25 Q    And when you say there were several components, was there

CMH   OCR   RDR   FCRR

444

1 a guaranteed maximum price for each component that totaled the
2 88 million?
3 A    Yes, there was. There's a breakdown by -- there were
4 three components. Give me a second here to get my bearings.
5      So there was 16.8 million GMP on what's called the
6 Eastern Mirage center, there was a 40 million GMP for the
7 North Queens Medical Center and there was a 31.2 million for
8 the Eastern Mirage Tower.
9 Q    And I believe you testified yesterday about cost plus.
10 Is that reflected in this contract?
11 A    Sure. So the payment terms can vary but in this
12 particular contract, the payments, the payment terms were that
13 the guaranteed maximum price is based on a, the contractors'
14 actual cost, plus a 15 percent markup for labor, equipment,
15 and the cost for materials and so on.
16 Q    Subject to the guaranteed maximum price?
17 A    Correct, subject to, so not to exceed that amount of
18 guaranteed maximum price.
19 Q    And just to be clear, are you referring to section,
20 Article 1.1.1 through 1.1.3?
21 A    Correct.
22 Q    And do each of those three paragraphs have substantially
23 the same terms, cost plus 15 percent?
24 A    Correct.
25      MS. HAN: Your Honor, if I may approach the witness?

CMH   OCR   RDR   FCRR

445

1      THE COURT: Yes.
2 Q    Mr. Dhookie, I'm going to ask you to take a look at
3 Plaintiff's Exhibit 181.
4      Do you recognize these documents?
5 A    Yes.
6 Q    And what do you recognize them as?
7 A    So these are the, these are the payment applications that
8 I, or a couple of the payment applications that I mentioned
9 yesterday, the AIA Form 702s. The first one here
10 is relating to the EMMCO project, EMMCO, period to 11/05/2011.
11 Q    And what is the original contract sum?
12 A    That is 16.8 million.
13 Q    And are these the, some of the 702s that you testified
14 about yesterday?
15 A    Yes.
16 Q    And can you just walk us through -- you mentioned
17 yesterday that the payment due amounts were round numbers?
18 A    Correct.
19      So line 10 of this requisition -- these are
20 requisitions that I mentioned typically come in on a monthly
21 basis and line 10 represents the payment that's due for the
22 period to, so up to that period of time, the billing for up to
23 that period of time. So that, that payment due here is
24 $230,000. And all of the lines above is a description of how
25 the calculation is performed to get to that amount of 230,000.

CMH   OCR   RDR   FCRR

446

1      And so line number 1, it starts with the original
2 contract value which is based on the agreement that's signed.
3 You would then add the net change by change orders. This is a
4 cumulative total of all the change orders that were issued for
5 the contract to date. That's line, line 2. And that would
6 sum to the new or revised contract to date, meaning that those
7 change orders caused the original contract value to increase
8 to beyond the original amount. So in this case, it increased
9 by $72,500.57. Those are the cumulative change orders.
10      Thereafter, there's a calculation for the total
11 completed and stored to date which reflects all of the, all of
12 the costs that were incurred by the contractor, in this case,
13 Racanelli Group, all the costs that they incurred to date.
14 You would then identify the change orders for the current
15 month or the current period, I should say, and that would give
16 you your total earned for that month.
17      Then you would subtract the retainage which is a
18 typical, it's usually specified in the contract, how much the
19 owner or the developer is allowed to retain from the
20 contractor. And, again, this would be the multiplier here of
21 the percentages from the total earned and that would give you
22 a total retained on line 7. You would do subtraction from the
23 total earned, minus the retainage, and you would also minus
24 all of the previous certificates for payment and you would get
25 to a current payment due of $230,000.

CMH   OCR   RDR   FCRR

447

1    I think the point that I was trying to make
2  yesterday, Ms. Han -- I'm sorry.  Do you want me to stop?
3  Q    Go ahead.
4  A    I think the point that I was trying to make yesterday is
5  that you have additions, subtractions, multiplications, and
6  you get to a round dollar amount.  I thought it was highly
7  unusual for this to be an exact round dollar amount after
8  taking into consideration all those calculations.
9  Q    And I think you testified -- did you testify yesterday
10 that you saw this on more than one occasion?
11 A    Yes, I did.
12 Q    And if you could just flip, flip to the next page.  What
13 is the date on that requisition?
14 A    It's a little hard to see but I believe it says 11/07/11.
15 Q    Which is two days after the first requisition you just
16 testified about?
17 A    Correct.
18 Q    And was there a change order in this, in this requisition
19 as well?
20 A    Yes, there was.
21 Q    And what was that change order?
22 A    So the change, line number 5, the change order this month
23 was, it looks like $17,286.95.
24 Q    And what was the current payment due on this requisition?
25 A    It's $370,000.

CMH    OCR    RDR    FCRR

448

1  Q    And then what is, on the third page, what is that period
2  to?
3  A    November 21, 2011.
4  Q    And was there also a change order for this requisition?
5  A    Yes.  The change order this month was, it looked like, it
6  looks like $18,333.80.
7  Q    And what was the current payment due?
8  A    Again, it looks like $250,000.
9  Q    And so it is fair to say that all three of these
10 invoices, all three of these requisitions are for
11 November 2011?
12 A    Yes.
13 Q    And is there anything unusual about all three of these
14 requisitions?
15 A    Well, I think that, you know, as I mentioned yesterday, I
16 thought it was unusual to have the current payment due for the
17 requisitions to be a round dollar amount.
18     I also thought that having three requisitions for
19 the same, the same project which is, on these requisitions,
20 the project here is EMMCO and it's from the same contractor,
21 right, all three are the same contractor, same.  Three
22 requisitions from the same contractor for one month, it seemed
23 unusual given these requisitions typically, you know, to
24 support, you know, a total cost that, for the current period.
25 Usually a significant amount of effort goes into preparing

CMH    OCR    RDR    FCRR

449

1  these requisitions so most contractors choose to do it on a
2  monthly basis.
3  Q    And did you see any Form 703 supporting documents for
4  these requisitions?
5  A    No, I did not.
6       MS. HAN:  Your Honor, if I may approach the witness
7  again.
8       THE COURT:  All right.
9  Q    Mr. Dhookie, I'd like you to look at Plaintiff's
10 Exhibit 182.
11 A    Yes, I have it.
12 Q    Do you recognize these documents?
13 A    Yes.
14 Q    And what are these documents?
15 A    These are a sample of the requisitions from Racanelli to
16 Fleet Financial Group for the EMMCO NQMC project it looks like
17 for the period November of 2013.
18 Q    And how many requisitions were submitted for
19 November 2013 in this exhibit?
20 A    Sorry.  Just bear with me a second.  I'm trying to find
21 it here.
22     (Pause.)
23 A    It looks like eight.
24 Q    And were there change orders in each of the requisitions?
25 A    Yes.

CMH    OCR    RDR    FCRR

450

1  Q    And is that unusual, to have a requisition change each
2  month, have a change order in every month -- sorry -- to have
3  a change order amount in each requisition for multiple
4  requisitions in one month?
5  A    It's not unusual, Ms. Han.  You can have change orders --
6  depending on what's happening on the project, you can have
7  multiple change orders in a particular month.
8  Q    Was there anything unusual about there being eight
9  requisitions that were submitted in one month, in
10 November 2013, specifically for the EMMCO NQMC project?
11 A    Yes.  I think the -- it just seems highly unusual to have
12 this many requisitions for that same project in one particular
13 month for the reasons that I mentioned previously.  Typically,
14 this would be done, you know, it would be one requisition
15 describing all of this.
16 Q    And, again, did you see any 703s to support the
17 requisition amount in these invoices?
18 A    No.
19       MS. HAN:  Your Honor, if I could just approach.
20       THE COURT:  Yes.  If you have a lot of these, why
21 don't you approach him all at once to speed this up a little
22 bit.
23       MS. HAN:  Okay.
24     (Pause.)
25       THE COURT:  So why don't you let us know what you

CMH    OCR    RDR    FCRR

451

1  just handed out, Plaintiff's Exhibit numbers.
2      MS. HAN:  183, 184, 185 and 186.
3      THE COURT:  All right.
4  Q   And Mr. Dhookie, if you could just take a look at
5  Plaintiff's Exhibits 183, 184, 185 and 186.
6  A   **Yes.**
7  Q   Are these additional sample Form 702 requisitions that
8  you reviewed in your analysis?
9  A   **Yes.**
10 Q   And Plaintiff's Exhibit 183, does that relate to the
11 EMMCO Tower project?
12 A   **Correct.**
13 Q   And Plaintiff's 184, does that relate to the Eastern
14 Emerald project?
15 A   **Correct.**
16 Q   And who's the contractor on Plaintiff's 184?
17 A   **Racanelli Construction Group.**
18 Q   And Plaintiff's Exhibits 185 and 186, what project are
19 those for?
20 A   **These are also for the Eastern Emerald project.**
21 Q   And who are these requisitions from?
22 A   **These are from Perini Group.**
23 Q   And did you see any Form 703s supporting these 702s?
24 A   **No, I did not.**
25 Q   Mr. Dhookie, if I can direct your attention to

CMH   OCR   RDR   FCRR

453

1  **EMMCO investor funds remaining.**
2  Q   And is that reflected on the right-hand side of your
3  chart, the 4.25 million?
4  A   **Correct.**
5  Q   And on the, going to the left side of the chart, you have
6  a line that says, Eastern Emerald Brownfield Remediation
7  Payments?
8  A   **Yes.**
9  Q   And it's pointing to the two lines that are going down to
10 two Racanelli boxes?
11 A   **Correct.**
12 Q   And in those two Racanelli boxes, there is a reference to
13 "CH" and then four numbers.  What is that a reference to?
14 A   **So these are two of the Racanelli checking accounts,**
15 **5028, the last four digits of those account numbers for**
16 **Racanelli accounts.**
17 Q   Okay.  And then can you describe -- can you explain the
18 line on the far left of the chart that goes to Racanelli 5028?
19 A   **Yes.  So these were, these -- there were requisitions**
20 **from Racanelli to Eastern Emerald Group, the developer.  So**
21 **Racanelli, being the contractor, submitted requisitions to**
22 **Eastern Emerald Group and the Eastern Emerald Group made**
23 **payments to Racanelli in the amount of 2.3 million for those**
24 **requisitions.**
25 Q   And then you have a line from Racanelli going down that

CMH   OCR   RDR   FCRR

452

1  Plaintiff's Exhibit 126.
2  A   **Sorry.  Can you say that number one more time?**
3  Q   Sure.  126.
4  A   **Sure.  Yes, I'm there.**
5  Q   And do you recognize this chart?
6  A   **Yes, I do.**
7  Q   Did you prepare this chart?
8  A   **Yes, I did.**
9  Q   Can you just explain to us what this chart is intended to
10 show?
11 A   **So this was, this chart represents my analysis of where I**
12 **identified funds that were, for the Eastern Emerald project**
13 **that were used for the Eastern Mirage project.**
14 Q   And when you say funds for the Eastern Emerald project,
15 were they funds from Eastern Emerald investors?
16 A   **Correct.  These were, these were -- the starting point**
17 **for this analysis was the Eastern Emerald Group LLC account**
18 **which was primarily funded by the, funds from the EB-5 L.P.**
19 **accounts or limited partnership, limited partner accounts.**
20 Q   And in the beginning of 2014, approximately how much of
21 Eastern Mirage funds, Eastern Mirage investor funds were
22 remaining?
23 A   **So I think there were approximately 4 million, I believe,**
24 **of the -- yes, correct.  So in January of 2014, there were**
25 **approximately 4 million of Eastern Mirage or I should say**

CMH   OCR   RDR   FCRR

454

1  says, Direct Payments of Eastern Mirage Project Related Costs
2  with Eastern Emerald Funds?
3  A   **Yes.**
4  Q   And it goes -- how did you make a determination that that
5  2.3 million was related to Eastern Mirage project costs?
6  A   **So one of the things that I did as part of the funds flow**
7  **analysis was to trace the proximity of the inflows into the**
8  **accounts to the then payments that were made to third parties.**
9      **So in this case, the 2.39 million that Racanelli**
10 **received in account number 5028, when the payments came in,**
11 **there were -- and these were multiple payments, that they were**
12 **not, you know, these were not, these are not total amounts.  As**
13 **the payments were coming in, there were subsequent**
14 **disbursements to third parties which, which, you know, seemed**
15 **to be these contractors, suppliers and the like and based on**
16 **an analysis of the names of those parties and some research on**
17 **the internet, I was able to, to make, to use professional**
18 **judgment to say that those costs that are being incurred**
19 **appear to be for the Eastern Mirage project and -- I'm**
20 **sorry -- yes, the Eastern Mirage project and not being used**
21 **for Brownfield remediation which is relating to the Emerald**
22 **project.**
23     **So in this case, it looks like Racanelli was billing**
24 **Eastern Emerald Group for Brownfield remediation in connection**
25 **with the Eastern Emerald project, but the payments and the**

CMH   OCR   RDR   FCRR

455

1  subcontractor payments were relating to the Eastern Mirage
2  project.
3  Q    And how were you able to tell that the entities that were
4  being paid was for Mirage costs, likely Mirage costs and not
5  Emerald costs?
6  A    So the contractors and the payments -- the contractors
7  that were being used or paid, it didn't seem likely that they
8  would be performing work on the Emerald project because the
9  Emerald project had no structure in place.  It was a, you
10 know, just some foundation, you know, that was poured at this
11 point in time and the contractors here, they were to, I think,
12 when those -- I think they're a window contractor.  I think in
13 my declaration, I have a list, but they're windows, air
14 conditioning --
15 Q    I'm going to direct you to your declaration which is
16 Plaintiff's Exhibit 149, paragraph 39.
17 A    Sorry.  Say that number again, please?
18 Q    Sure.  Plaintiff's Exhibit 149.
19 A    Yes.  Thank you.
20        (Pause.)
21 A    Yes, I'm there.
22 Q    Paragraph 39.
23 A    Yes, I'm there.
24 Q    And are these the entities that you identified as
25 potential or likely Eastern Mirage costs?

CMH    OCR    RDR    FCRR

457

1  I think they do, again, windows and door installation.  And
2  SASS International, I think they do ornamental metal ceilings.
3        Once again, none of these costs to me seems like
4  they would be first and foremost relating to Brownfield
5  remediation type services, for one, and, two, that they
6  wouldn't be relating to the Emerald project at all.  It is
7  more likely that these are costs incurred for the Mirage
8  project.
9  Q    And going down the middle, you identified on the bottom
10 another 9.5 million that went to what you identified as
11 potential Eastern Mirage costs.
12 A    You are going back to -- sorry?
13 Q    I'm sorry.  Going back to Plaintiff's Exhibit 126.
14 A    Yes, I'm there.
15 Q    In the middle box leading down, there's another
16 9.5 million?
17 A    Yes.
18 Q    Were these costs similar to the ones that you just
19 described that was contained in your declaration?
20 A    Yes.
21 Q    And just to go back for a second, what's a curtain wall?
22 A    So it's the panels that are effectively hung on the side
23 of a building.  So it's like hanging a curtain but they're
24 prefabricated panels and so there would be metal structures
25 that are pinned to the concrete on the side of the building

CMH    OCR    RDR    FCRR

456

1  A    Yes.  Yes.  The -- yes.
2  Q    And that's the chart that is included with paragraph 39.
3  The total in that chart is 2.3 million approximately?
4  A    Correct.
5  Q    And what are some of the types of entities that you
6  identified?
7  A    Sure.
8        So the payee names on the payments were -- the first
9  one here is Daikin Applied Americas, Inc., which, again,
10 looking at the internet research, they provide air
11 conditioning related systems.  Again, thinking back to what
12 was happening on the Emerald project at that time, there was
13 no, there was no need for air conditioning units or air
14 conditioning services.  Fleet Plumbing & Heating, same thing.
15 They provide boiler and heating repair.  Again, that, the
16 Eastern Emerald project didn't have a boiler.
17       New York Hoist who they're doing, they provide
18 hoists and, again, you know, these seem to be, you know, you
19 wouldn't necessarily need a hoist on a project that's not
20 elevated.  Pak Trans Air & Sea.  This looks like to be ocean
21 freight shipments.  Again, you know, it didn't seem likely to
22 me that that related to that project.  I think, you know, just
23 looking at the next one down, Shanghai Curtain Wall, again,
24 there's no curtain wall on the Emerald site.  Total Metal
25 Resources, they offer architectural metal work.  BP Altitude,

CMH    OCR    RDR    FCRR

458

1  and these panels would be hung and then secured on the side of
2  the building.
3  Q    Okay.  I'm going to direct your attention to Plaintiff's
4  Exhibit 138.
5  A    Yes, I'm there.
6  Q    And what does this chart show?
7  A    This was an analysis of payments to JiQing Yue from the
8  entities that are identified in the left-hand column over the
9  period 2011 to January 2019.
10 Q    And when you say payments made to JiQing Yue, what do you
11 mean?
12 A    So these were checks or other forms of transfers to,
13 where the payee name was listed as JiQing Yue from the various
14 different accounts.
15       THE COURT:  The defendant's wife, Mr. Xia's wife?
16       THE WITNESS:  Yes, yes Your Honor, the defendant's
17 wife.
18 Q    And what was the total from the Xia-related entities that
19 were made to Ms. Yue?
20 A    That's approximately 4 million.
21 Q    And were there also payments from Perini and Racanelli
22 accounts?
23 A    Yes.  That's approximately 121,000.
24       MS. HAN:  Thank you, Mr. Dhookie.  I don't have any
25 further questions at this time.

CMH    OCR    RDR    FCRR

459

1    THE COURT:  Thank you, Ms. Han.

2    Your witness, Mr. Kameli.

3  CROSS-EXAMINATION

4  BY MR. KAMELI:

5  Q    Mr. Kameli, good afternoon.

6  A    **Good afternoon.**

7  Q    Thank you for the great report you made and I'm going to

8  ask you questions with regards to the whole thing and if you

9  allow me, I'm going to use drawings so hopefully it will help

10  us all understand.

11  A    **Sure.**

12  Q    Mr. Dhookie, were you hired in this case by SEC?

13  A    **Yes.**

14  Q    Independent contractor?

15  A    **Yes.**

16  Q    You or your firm is not working for SEC in any capacity,

17  right?

18  A    **No.**

19    THE COURT:  Go a little slower.

20  Q    And you did not receive any documents, any kind of bank

21  statements from 2011; that's what you testified, correct?

22  A    **Well, with the exception of one account where there was**

23  **some bank statements for December 11th of, December of 2011**

24  **and that was for the Fleet account.**

25    **So most of the bank accounts that I reviewed were**

CMH    OCR    RDR    FCRR

460

1  **from 2012 and beyond.  The Fleet account, there were some**

2  **statements from 2011, December 2011.**

3  Q    Have you prepared any other -- have you worked for SEC in

4  any other case?

5  A    **No, not that I can recall.**

6  Q    How long did it take you to prepare this report?

7    THE COURT:  You're referring to this declaration?

8    MR. KAMELI:  Yes.  I believe it's Exhibit 148.

9    THE COURT:  I want to clarify.  I think there are a

10  number of other charts that he prepared.  Are you including

11  those?

12    MR. KAMELI:  The whole report covers some exhibits

13  so the exhibits are covered with the report.

14    THE COURT:  Okay.

15  A    **Sorry.  148 is the declaration from Mr. Thompson.**

16  Q    Counsel brought your attention to the exhibit, your own

17  declaration.

18  A    **Yes.  I think that's Exhibit 149.**

19  Q    149.  So Exhibit 149, it included with some other

20  exhibits to it, right?

21  A    **Correct.**

22  Q    And those exhibit that was in your declaration have been

23  separated in this, in these exhibits, correct?

24  A    **Correct.**

25  Q    And I believe those are the ones that you have covered

CMH    OCR    RDR    FCRR

461

1  previously with counsel's questions?

2  A    **Right.**

3  Q    Okay.

4    THE COURT:  Your question is how many hours?

5    MR. KAMELI:  Yes, how many hours.

6  Q    How many hours did you work to compile all this

7  information, review the information SEC gave you and then

8  prepare this document?

9  A    **I don't have an exact number but I would say hundreds of**

10  **hours.**

11  Q    Were you the only one working on this or in this report

12  or you have assistants to help you?

13  A    **I had assistants.**

14  Q    Okay.  I'm going to go back to some of the exhibits that

15  you already covered and we're going to start with some of the

16  charts.

17  A    **Sure.**

18  Q    Let me bring your attention to Exhibit No., SEC's Exhibit

19  No. 91.

20    And I'm sure you are familiar with the difference

21  between the limited partnerships and the developers, right?

22  A    **Yes.**

23  Q    So in Eastern Emirate -- not Eastern Emirate -- Eastern

24  Mirage, there are three limited partners that they gave a loan

25  to the developer?

CMH    OCR    RDR    FCRR

462

1    MR. STOELTING:  Partnerships.

2  Q    Partnerships, that they gave the loan to Fleet Financial,

3  right?

4  A    **Correct.**

5  Q    And in Eastern Emerald, there were two limited

6  partnerships that they gave loans to the developer in that

7  case?

8  A    **Correct.**

9  Q    All right.  So looking at this Exhibit 91, from line 13,

10  where it says EEGH II, L.P., there's a number next to it?

11  A    **Correct.**

12  Q    All the way to line 33, all of those accounts belong to

13  one limited partnership, correct?

14  A    **Correct.**

15  Q    And is this one of the partnerships that EB-5 investors

16  sent their money into?

17  A    **Yes.**

18  Q    And you were able to identify different amounts entering

19  into this, the limited partnership accounts, correct?

20  A    **Correct.**

21  Q    So there are 20 accounts basically dedicated to EEGH II,

22  L.P., correct?

23  A    **Correct.**

24  Q    Do you know the reason for these accounts?  Do you know

25  why the accounts were made?

CMH    OCR    RDR    FCRR

463

1    A    Not really.  All I could say is they look like they were
2    CD accounts, some were CD accounts, some were, I don't -- some
3    were checking accounts, some were money market accounts.  I
4    try to, you know, identify where, you know, where we had,
5    like, a definitive name.
6    Q    But you agree with me that there were entries, there were
7    deposits into these accounts, number 13 to 33, and the exit
8    was only going to Fleet Financial.  Do you agree?
9         THE COURT:  For all 20 accounts?
10   Q    For all --
11   A    So I would say that there funds flow from these accounts
12   to the Eastern Emerald Group accounts among, you know -- I
13   can't say that I can recall all of them but, yes, there were
14   funds flow from these accounts to Eastern Emerald Group.
15   Q    Okay.  So some of these accounts, you agree with me, that
16   they're CDs, that they matured, the account was closed, a new
17   account was established, that same money went to that new
18   account, do you agree?
19   A    Generally speaking, yes.
20   Q    There were no payments to any contractors from these 20
21   accounts, do you agree?
22   A    Not that I can recall.
23   Q    So if the money did not flow between EEGH II, L.P.
24   account to EEGH II, L.P. account, the only other recipient
25   would have been FFG, correct?

        CMH    OCR    RDR    FCRR

464

1         MS. HAN:  Objection.
2         THE COURT:  Yes, that doesn't make sense.  You said
3    if money did not flow --
4         MR. KAMELI:  That's fine, Judge.  I'll clarify.
5         THE COURT:  Yes.  Please do.
6         MS. HAN:  Mr. Kameli, I believe you mean Eastern
7    Emerald Group for the EEG accounts, not FFG.
8         MR. KAMELI:  Sure.
9         THE COURT:  Why don't you clarify?
10        MR. KAMELI:  I shall.
11        THE COURT:  I appreciate that you like to draw
12   things but couldn't just ask the question again without
13   drawing it?
14        MR. KAMELI:  Judge, it's going to be difficult.
15   These are different companies, moving components.  I think
16   there's a few things I want to bring to your attention and may
17   be helpful.
18        THE COURT:  All right.
19        MR. KAMELI:  I know I have bad handwriting but I
20   try.
21   Q    So we have EEGH II, L.P. accounts, right?  There are so
22   many different accounts.  In this example, in this Exhibit 91,
23   we have, you have dedicated 13 to 33, line item 13 to line
24   item 33, to EEGH II, L.P., right?
25        So sometimes there was a CD account, correct, and

        CMH    OCR    RDR    FCRR

465

1    when the CD matures, it would go to another CD account, right?
2    A    Right.
3    Q    Okay.  But then if that CD again matures, it would go to
4    another account.  You agree?
5    A    Correct.
6    Q    At one point, the money would have been only sent to
7    Eastern Emerald developer, right?  You want the exact name?
8         THE COURT:  Well, is it correct that the money only
9    went to the Eastern Emerald account, developer account?
10        THE WITNESS:  Some of the monies went there, I would
11   say.  I don't know if all of the monies went there.
12   Q    Well, I would really like to know because --
13   A    I think I have -- I don't remember the number of the
14   chart right now.
15        THE COURT:  Maybe Ms. Han knows.
16   A    I have it in my declaration, Mr. Kameli.
17   Q    Yes.
18   A    I identified where the amount of funds from these
19   accounts that went to the Eastern Emerald Group account and
20   so --
21   Q    Which was 88 point some million dollars?
22   A    I think that number is correct.
23   Q    Yes.  But you didn't find the money from EEGH II
24   accounts, all 20, to go to any other third party except
25   Emerald?

        CMH    OCR    RDR    FCRR

466

1    A    Yes.  I can't recall specifically but 88 million went
2    there and I think the majority of the money that came into the
3    accounts stayed amongst the Eastern Emerald Group LP accounts,
4    correct.
5    Q    The reason I'm asking you this question is it shows that
6    there are 95 accounts that you reviewed in Exhibit 91, you're
7    referring to 95 different accounts, so I'm just trying to find
8    out how many different transactions were around these
9    accounts.  That's all.
10        So this is 20 accounts for EEGH and if you paid
11   attention, sir, line item 34, all the way to line item 56
12   which covers about 22 accounts, belong to a company, a
13   partnership called EEGH LP.
14   A    Correct.
15   Q    With different account numbers again, right?
16        THE COURT:  All different accounts.
17   Q    Yes, sir?
18   A    Yes.
19   Q    And, again, these were, some of them were CDs, they
20   matured, they went to another account and so on, right?
21   A    Right.
22   Q    And that eventually from EEGH LP, the money was lent to
23   Eastern Emerald Group or LaGuardia Performance Center LLC?
24   A    Correct.
25        MS. HAN:  Counsel, I think you mean EEGH funds may

        CMH    OCR    RDR    FCRR

467

1  have gone to Eastern Emerald Group and EEGH II funds may have
2  gone to LaGuardia.
3        THE COURT:  You have to speak up.  Also you're
4  helping the clarification of the question but, ultimately, the
5  answer has to come from the witness.
6        So did you hear that?
7        THE WITNESS:  Yes, I did.
8        That's correct.  Ms. Han is right, the order is
9  reversed.  It's the two for the LaGuardia Performance Center.
10       MR. KAMELI:  That's fine.
11       THE WITNESS:  And the one for the Eastern Emerald
12 Group.
13 Q   So EEGH, L.P., the money went to Eastern Emerald Group,
14 right?
15 A   **Right.**
16 Q   EEGH II, L.P., the money went to LaGuardia Performance
17 Center, right?
18 A   **Correct.**
19 Q   Okay.
20       THE COURT:  Are you saying all of it went there or
21 the vast majority?
22 A   **I think the best -- so, again, I think in my deposition,**
23 **I identified the amounts that went to those accounts but those**
24 **are primarily the places that they went to.**
25       (Continued on next page.)
          CMH    OCR    RDR    FCRR

468

1  CROSS-EXAMINATION
2  BY MR. KAMELI:  (Continued)
3  Q   Where else did it go to?
4  A   **Well, it stated -- some of it stayed in the accounts.**
5  Q   Some of it stayed in the accounts?
6  A   **Yeah.**
7  Q   Okay.  So after 2019 -- I believe you reviewed the
8  documents until 2019 or 2020, correct?
9  A   **January 2019.**
10 Q   Okay.  So some amount stayed in the limited partnerships
11 and you don't know what happened to that after 2019?
12 A   **Correct.**
13 Q   Okay.  But between January -- between December 2011 to
14 January 2019, what you reviewed, the only recipient of the
15 funds of EEGH, L.P. was Eastern Emerald Group, correct?
16 A   **Primarily, correct.**
17 Q   Help me out.  What does primarily mean?
18 A   **It means that, again, like I said in my declaration, the**
19 **amounts that I could say that went there, went there.**
20 Q   Right.  But did you identify any other entity or person
21 receiving money from EEGH, L.P.?
22 A   **No, I did not.**
23 Q   Okay.  The same goes for EEGH II, L.P., all the money
24 went to, eventually, LaGuardia Performance Center LLC,
25 correct?
          Andronikh M. Barna, Official Court Reporter, RPR, CRR

469

1  A   **Again, the all --**
2  Q   The only recipient --
3  A   **Primarily.  Primarily.  I would prefer to say primarily.**
4  **Funds went primarily to that entity, to the LaGuardia**
5  **Performance Center.**
6  Q   And you didn't find any other recipient?
7  A   **No, I did not.  I did not see any other recipients.**
8  Q   So I am not going to draw again, but the same thing goes
9  for EEMCO, L.P., right?
10       Let's go through your chart.
11       In your chart, Exhibit 91, you have line item 58 all
12 the way to line item 64 in regards to different limited
13 partnership accounts which basically funded the Fleet
14 Financial Group development, correct?
15 A   **Right.  Correct.**
16 Q   Okay.  Do you recall if any -- if the funds within those
17 limited partnership accounts primarily went to Fleet Financial
18 Group?
19 A   **Correct.**
20 Q   Okay.
21 A   **Yes.**
22 Q   So basically your line items, 13 all the way to 64, which
23 I believe would be 51 accounts, they all belong to limited
24 partnership accounts, correct?
25       THE COURT:  54 or 64?
          Andronikh M. Barna, Official Court Reporter, RPR, CRR

470

1  A   **64? Can you clarify?**
2  Q   Line sixty --
3  A   **Clarify.**
4        THE COURT:  64?
5        MR. KAMELI:  64.  Line 64.
6        THE COURT:  13 to 64 are all for LLP accounts, or
7  limited partnership accounts.
8        MR. KAMELI:  Limited partnership accounts.
9  A   **So say the question again?  I'm sorry, Mr. Kameli.**
10 Q   As you wish.  As you wish.
11       Do you agree, sir, that line item -- from line item
12 13 of SEC's Exhibit 91 all the way to line item 64, those
13 accounts belong to limited partnership accounts?
14 A   **Correct.**
15 Q   And there are different partnerships that we discussed
16 already, correct?
17 A   **Correct.**
18 Q   Okay.  So from 95 accounts that you reviewed, sir, 51
19 belong to these limited partnerships, correct?
20 A   **Correct.**
21       MS. HAN:  I think your math might be off.
22       THE COURT:  That is all right.  Keep going.  The
23 math is irrelevant.  Please continue.
24       MR. KAMELI:  Very well.
25 Q   So the money goes to the developer account, right?
          Andronikh M. Barna, Official Court Reporter, RPR, CRR

473

1     So I'm just going to get rid of -- I'm going to get
2  rid of this for a second and we going to continue.
3     It works out fine.
4     MR. KAMELI:  Judge, we're getting there.  I can
5  assure you we're going to be done today.  But I think it is
6  important to do something to visualizing it for you so we get
7  to the bottom of it.
8     THE COURT:  So far it has not done much to
9  supplement my understanding, but keep going.
10     MR. KAMELI:  No problem, Judge.  You will see it
11  soon.
12  Q   So then we have the --
13     MR. KAMELI:  That's all good.  That's okay.
14  Q   Then we have, sir, a developer which has been identified
15  as to Fleet Financial Group.
16  A   **Correct.  Yes.**
17  Q   Right?
18     And Fleet Financial Group -- let's just talk about
19  Mirage for a second.  Fleet Financial Group gets the money and
20  then he disburse it to general contractor or other payments,
21  correct?
22  A   **Correct.**
23  Q   Okay.  Now, in most of your testimony you indicated that
24  the money went to a company called Racanelli, correct?
25  A   **Correct.**
                Andronikh M. Barna, Official Court Reporter, RPR, CRR

473

1  general contractor and the general contractor pays the
2  subcontractor for services, that money belongs to the
3  subcontractor, correct?
4  A   **Hypothetically, yes.**
5  Q   Okay.  And the subcontractor can do whatever it wants
6  with that money, you agree?
7     THE COURT:  No.
8     I'm sorry, I am answering that question.
9     No, a subcontractor cannot do anything they want
10  with it.
11     MR. KAMELI:  Judge, if the --
12     THE COURT:  Well, you know, they cannot commit --
13  they cannot do stuff like purchase an illegal firearm.  The
14  question is kind of silly.
15     Your point is, do they own that money?
16  Q   Do they own that money in this case?
17  A   **Yes.**
18     THE COURT:  Hypothetically speaking.
19  Q   Hypothetically, they own that?
20  A   **Hypothetically speaking, correct.**
21  Q   And with that money that they own, if they decide they
22  can do another contract, they can enter into a another
23  contract and spend money for it, right?
24  A   **Hypothetically speaking, yes.**
25  Q   The owner can grab the money and go by a car, agree?
                Andronikh M. Barna, Official Court Reporter, RPR, CRR

472

1  Q   Okay.  From Racanelli, the money was disbursed to
2  different entities, which some of them belong to Mr. Xia?
3  A   **Correct.**
4  Q   And do you agree with me that when the money rightfully
5  is transferred for any reason to a contractor who has provided
6  service, that money belongs to that contractor now?
7     MS. HAN:  Objection.
8     THE COURT:  Sustained as to "rightfully," but
9  rephrase.  I mean, you are saying it always belongs to the
10  contractor.  You want him to assume it is rightfully going to
11  them.
12     MR. KAMELI:  Correct.
13     THE COURT:  So that answers itself, no?
14     MR. KAMELI:  Well, Judge, if -- he's a CPA, Judge,
15  so I'm trying to get to the bottom of the fact that --
16     THE COURT:  No, but your question assumes the
17  answer.  That is the problem I am having.
18     MR. KAMELI:  I will rephrase it.
19     THE COURT:  Okay.
20  Q   The general contractor provides for services -- the
21  subcontractor provides for services?
22     MS. HAN:  Objection.
23     THE COURT:  No, you are saying if a contractor
24  provides services.
25  Q   If a subcontractor provides services and invoices the
                Andronikh M. Barna, Official Court Reporter, RPR, CRR

474

1  A   **Mm-hm.**
2  Q   Okay.  And at the same time, the subcontractor, in this
3  case, can lend the money to another project if it wants,
4  correct?
5  A   **Correct.**
6  Q   Have you been familiar with cases or have you seen any
7  kind of transactions that the money is owed to the
8  subcontractor, but the subcontractor asks the general
9  contractor to pay a third party?
10  A   **Very rare.**
11  Q   Okay.
12  A   **I don't think I've seen any, actually.**
13  Q   Well, you have been involved with construction, you said,
14  right?  Development?
15  A   **Yes.**
16  Q   So have you seen cases, for example, that the
17  subcontractor buys concrete from Company A and asks the
18  general contractor to pay Company A, another subcontractor,
19  for the concrete that they purchased?
20  A   **Yes.  There are sometimes direct payments, yes.**
21  Q   Direct payments?
22  A   **Yeah.**
23  Q   So the subcontractor can say that, listen, even though
24  you, general contractor, have to pay me, go ahead and pay
25  Company X directly, right, and use it against my invoice?
                Andronikh M. Barna, Official Court Reporter, RPR, CRR

475

1    MR. MCGRATH:  I didn't hear an answer.

2  A    **Yes, there are sometimes direct payments that the**

3  **contractor could make to a supplier, but those are typically**

4  **written and agreed upon.**

5  Q    Well agreed upon, it could be agreement can be written,

6  can be orally, you agree?

7  A    **I agree.**

8  Q    Okay.  So in this case, if a subcontractor in this case

9  provides services, can tell Racanelli to pay Eastern Emerald

10  directly, correct?

11  A    **I guess it's possible, yes.**

12  Q    It is possible.  All right.  All right.

13    THE COURT:  You are not testifying.

14    MR. KAMELI:  I was just repeating what he said.

15    THE COURT:  Yes.  Okay, go ahead.

16  Q    All right.  Mr. Dhookie, allow me to -- well, you know,

17  when you were talking about -- before I go forward, when you

18  were talking about the EB-5 investors, the investors' money,

19  you were just referring to EB-5 investors, right, in your

20  report?

21  A    **Yes.  Yes.**

22  Q    Okay.  So if an amount other than EB-5 investors' money

23  comes to the developer, that is not the money that came from

24  the limited partnership, so, therefore, it's not EB-5

25  investors' money, you agree?

477

1  simply showing where all the money went out of Racanelli and

2  Perini, some of it went upstream and then some of it went

3  downstream.

4    MR. KAMELI:  No, Judge.  That's another exhibit.

5  That's another exhibit.

6    THE COURT:  Oh.  Am I misinterpreting these boxes?

7  A    **Yes, so these are payments out from -- initially from the**

8  **developer.**

9  Q    Yes.

10  A    **Fleet Financial Group and Eastern Emerald Group to**

11  **Racanelli and Perini.**

12  Q    Okay.

13  A    **Which are sort of out flows, if you will.**

14    **The second, Box No. 2, represents Racanelli and**

15  **Perini back up to the developer or to the developers.**

16    **So I guess you could say that potentially it's an**

17  **upstream thing.**

18  Q    So it should be upstream, right?  So it's not part of the

19  money -- $17 million should be deducted from your final

20  numbers?

21    MS. HAN:  Objection.

22  Q    Well --

23  A    **I'm sorry.  I don't know --**

24  Q    No problem.

25  A    **I'm trying to explain that these are payments out from**

476

1  A    **Correct.**

2  Q    Okay.  Let me take your attention to Exhibit 92, SEC's

3  Exhibit No. 2, please.  92.  92-A, because it was amended.

4  A    **Yes, I'm there.**

5  Q    You there?

6    Now, Mr. Dhookie, in this case -- in this exhibit,

7  you are referring to downstream transfers, right?

8  A    **Yes.**

9  Q    And those downstream transfers basically talks about any

10  money that flowed from the developers to the general

11  contractor in the -- in Section 1, correct?

12    Do you see Section 1-A?

13  A    **Yes.  Yes, Section 1.  Yes, I'm there.**

14  Q    So Section 1 is all the money that went from the

15  developer to the general contractor, correct?

16  A    **Correct.**

17  Q    Now, Section 2, it's the money that went actually

18  upstream.  It went from Racanelli back to the developer.  Why

19  is that here, sir?

20  A    **Because this represents payment out from Racanelli to**

21  **Eastern Emerald Group, which is not a -- so the payments down**

22  **from the developer, EEG to Racanelli and Perini, are the --**

23  **I'm sorry.  Give me a second.**

24  Q    Take your time.

25    THE COURT:  If I understand your chart, you are

478

1  these entities.

2    THE COURT:  No.  His point, I suspect, is that your

3  first block shows money going from FFG/EEG to Racanelli and

4  Perini and then your next block shows money going from

5  Racanelli/Perini back up to Fleet and EEG, so why didn't you

6  subtract the 17 million that went back to FFG and EEG from the

7  total that went to Racanelli and Perini from those entities?

8    THE WITNESS:  Your Honor, I think I was trying to

9  show how the funds were being used.

10    THE COURT:  Right.

11    THE WITNESS:  And so for me, it was important to

12  split the Racanelli and Perini into two buckets.  So if

13  Racanelli and Perini received 127 million, how did they then

14  use those funds and split it up into two buckets?  So --

15    THE COURT:  Your task was not to actually decide the

16  total amount in the first block of how much money actually,

17  when you do the downstream and then the upstream, Racanelli

18  paid to -- sorry, that FFG and EEG paid, in some sense, to

19  Racanelli and Perini?

20    THE WITNESS:  Correct.  So if you look at the total

21  number on the bottom -- and now it's coming back to me

22  Mr. Kameli.

23    MR. KAMELI:  Yes, sir.

24    THE WITNESS:  Throughout this entire analysis is to

25  understand how the funds were used -- how the funds received

479

1    were used.  And so in this case, what I'm trying to say is
2    that of the 52 million that Racanelli and Perini received, how
3    did they then use those funds.  Right?
4          MR. KAMELI:  Yes.
5          THE WITNESS:  And then it was to show that of the 52
6    million in this instance, 17.8 went to either Fleet Financial
7    Group or Eastern Emerald Group.
8          THE COURT:  Back to them?
9          THE WITNESS:  Back to them or where did the
10    remainder if it go.  And it went to the Xia related entities
11    here.
12          MR. KAMELI:  Okay.
13          THE COURT:  But while we are here, let me ask you a
14    question.
15          Did you testify earlier that the fact that the money
16    flowed back to them was unusual?  Sorry, from Racanelli to
17    Perini back to FFG and EEG?
18          THE WITNESS:  Correct.  Correct.
19          THE COURT:  Okay.  Go ahead.
20          THE WITNESS:  So I thought this was unusual as well.
21          And I guess what, Mr. Kameli, I think you're asking,
22    my chart was to explain how the funds were being used.
23          MR. KAMELI:  Correct.
24          THE WITNESS:  And so that's why I put it as a
25    downstream payment.

Andron kh M. Barna, Official Court Reporter, RPR, CRR

480

1    BY MR. KAMELI:
2    Q    So based on -- we talked about the $17 million
3    yesterday --
4    A    **Right.**
5    Q    -- in other people's testimony.  But this $17 million
6    didn't go to one of Mr. Xia's affiliates?
7    A    **Correct.**
8    Q    Okay.  So when you say at the -- again, I'm in Chart 92,
9    in Exhibit 92, the last part where it says "transfers
10    unsupported by invoice," so you were not looking for any kind
11    of invoice from Mr. Xia's entities, right?
12    A    **I was looking for an invoice that would support the**
13    **payment back to EEG or Fleet Financial Group.**
14          THE COURT:  As well as from Racanelli to the
15    affiliates?
16          THE WITNESS:  Correct.
17    A    **And so in this case, I was able to find, you know, some**
18    **of the invoices for -- so, in other words, if -- you know, my**
19    **attempt was to say, okay, if these entities were disbursing**
20    **these monies for -- what were they disbursing these monies**
21    **for?**
22    Q    Yes.
23    A    **And so in the case of the Xia affiliates, I tried to**
24    **identify if there was any invoices that were presented.**
25    Q    Yes.

Andron kh M. Barna, Official Court Reporter, RPR, CRR

481

1    A    **And I did the same thing for the Racanelli and Perini,**
2    **you know, payments to EEG or Fleet Financial Group.  And**
3    **again, there weren't any -- I didn't find any records to**
4    **support those transfers.**
5    Q    Sure.  But you did agree with me that it is sometimes
6    okay for the direct payment to be made to a third party from a
7    subcontractor who has actually performed services, correct?
8    A    **Correct.**
9    Q    Okay.  So you agree with -- so in this case -- I'm
10    looking at again 92, paragraph 2, A and B.
11          In this case, the money -- here is Racanelli, here
12    is EEG, this is Emerald and here is FFG.
13          So, Racanelli sent to EEG $17 million, correct?
14    A    **Correct.**
15    Q    Racanelli had subcontractors that belonged to Mr. Xia's
16    -- Mr. Xia that they provided services both for EEG and FFG,
17    correct?  You follow those invoices?
18          MS. HAN:  Objection as to form.
19          THE COURT:  Well, I am going to sustain.
20          I mean, do you want him to -- I mean, it is
21    compound.
22          Are you asking him to say did he find enough
23    evidence that the affiliates did perform work for Racanelli to
24    justify the payments?  In other words, did you find enough
25    invoices or whatever it is you looked for?

Andron kh M. Barna, Official Court Reporter, RPR, CRR

482

1          (Pause.)
2          THE WITNESS:  Oh, I'm sorry.  I apologize.
3          THE COURT:  Mr. Dhookie, were you listening?
4          THE WITNESS:  Ca you repeat it, please?
5          THE COURT:  Yes.
6          Why don't you ask your question again, Mr. Kameli.
7          MR. KAMELI:  Sure.
8          THE COURT:  Because it was certainly compound and I
9    think you are asking him to endorse your theory, but I do not
10    think that is what he testified to.
11    Q    You saw invoices from Mr. Xia's affiliate companies,
12    correct?
13    A    **Correct.**
14    Q    Which for our discussion we call them "subcontractors
15    Xia," right?
16          Subcontractors provided services for the general
17    contractor Racanelli, correct?
18          MS. HAN:  Objection.
19          THE COURT:  Hang on a second.
20          That is the question.  Can you say whether or not --
21    that is the question you are being asked.  Did the
22    subcontractors, based on the evidence you saw, provide
23    services to Racanelli?
24          THE WITNESS:  So --
25          MS. HAN:  Objection.

Andron kh M. Barna, Official Court Reporter, RPR, CRR

483

1    THE WITNESS:  Sorry, Your Honor.

2    THE COURT:  Well, can you tell that?

3    THE WITNESS:  So I think that's one of the reason --
4  it's difficult for me to call them subcontractors.  I mean,
5  from looking at the invoices, there were invoices that were
6  presented by these entities to Racanelli, right?  And so, you
7  know, if you were to -- or if one were to assume that they
8  were working on a project, and, you know, I'm not assuming
9  that, you know, and they were doing legitimate work, then
10 potentially there would be a subcontractor.

11   THE COURT:  I guess he is asking you did they
12 provide work.

13   The question is, do you have enough information so
14 that you can say that -- whatever you want to call these Xia
15 affiliates, could you tell if they provided the work to the
16 Racanelli developer?  Or, I'm sorry, general contractor.

17   THE WITNESS:  I don't think I have enough
18 information, Your Honor, to say whether or not these entities
19 are providing services for this project.

20   THE COURT:  Okay.  So, Mr. Kameli, you can ask him
21 to assume it if you want, but that is not his testimony.

22   MR. KAMELI:  That's fine.  We're gonna go to that,
23 Judge.

24   In that case, let's talk about the invoices.  Would
25 you like me to bring every single one of the invoices that you

484

1  reviewed and we go through that?  I can do that.

2    THE COURT:  No, I do not want you to do that.  You
3  can show him a couple, if you would like, to prove a point,
4  but you do not need to -- he gave his testimony.  If you want
5  to cross him on the invoice and why he says that is not
6  enough, you can do that.

7  BY MR. KAMELI:

8  Q    Mr. Dhookie, were you hired by the SEC to review every
9  invoice and tell this Court whether they are accurate or not?
10 Is that what your scope of work was?

11 A    **No, I don't think that was what I was hired to do.**

12 Q    Okay.

13 A    **I think I was hired to quantify, you know, what was**
14 **provided, right, and present the numbers on the chart that**
15 **represent what value of the invoices were provided.**

16 Q    So as you're sitting here, after many hours of working on
17 this case, you cannot testify whether those invoices -- that
18 the invoices that were provided to you, each line item was
19 correct or incorrect, correct?

20 A    **Can you repeat that question?**

21 Q    Yes, yes.

22   There were invoices provided to you with detailed
23 explanation, correct?

24   MS. HAN:  Objection.

25 A    **I --**

485

1    **MR. KAMELI:  We can go through it.**

2    THE COURT:  Well, I have seen them.  I do not know
3  what you want him to say.

4    MR. KAMELI:  Judge, I believe he has to.  And he's
5  now testifying about the accuracy of those invoices.

6    THE COURT:  No, Mr. Kameli.  He is saying that he
7  cannot, based on what he was given, tell you whether or not
8  work was performed.  You keep insisting that as an assumption
9  in your question if work was performed by them, and he is just
10 saying I do not know if work was performed.  If you want to
11 ask him a hypothetical, fine, but he is just not in a position
12 based on the evidence he has.  And obviously he was not there,
13 so he does not know whether or not the work was actually
14 performed.  And let me just add, he certainly opined that
15 these invoices or the requisitions were not in a standard
16 format.  That he has said.  So I do not think you should keep
17 digging into this because this evidence is not helpful to you,
18 as far as I am concerned.

19 BY MR. KAMELI:

20 Q    Mr. Dhookie, assuming that the work was done by Xia's
21 entities.

22 A    **Okay.**

23 Q    Based on your previous testimony that the party can ask
24 the general contractor to pay directly to someone else --

25 A    **Correct.**

486

1  Q    -- Xia's entities could have asked Racanelli to make the
2  payment to a third party, correct?

3  A    **It's possible.**

4  Q    Okay.  And such possibility could have existed of the
5  payment from Racanelli to EEG for $17 million?

6  A    **Correct, it's possible.**

7  Q    Okay.  Your Exhibit 92 was amended to 92-A yesterday,
8  correct?

9  A    **Correct.**

10 Q    I believe $32.5 million worth of invoices was provided to
11 you.  Do you remember that, sir?

12   The new $32.5 million worth of invoices was provided
13 to you two nights ago, correct?

14 A    **Correct.**

15 Q    But your number on Exhibit 92-A only changed from
16 $25.8 million to 4.2 million.  That is about $21.6 million,
17 correct?

18 A    **The 4.2 million represents the amount that we still don't**
19 **have invoices for that I still can see invoices for.**

20 Q    Okay.

21 A    **I think to -- I mean, I -- oh, sorry.  Yeah, that's --**

22 Q    So my question is that, why the other $10 million
23 invoices was not considered?

24 A    **So in this chart, as I mentioned I think earlier to**
25 **Ms. Han, that the chart -- again, my analysis was based on**

487

1  what were the funds that were disbursed if I could identify a
2  matching or corresponding support for these disbursements.
3  Q    Yes.
4  A    And so in the first analysis, it was to list out the
5  payments and then, thereafter, find invoices that could
6  support these.  And so in the first production, second
7  production and most recent production, you know, the analysis
8  was updated to reflect for these specific entities, what
9  invoices did they provide to support these specific payments.
10 Because I think I said to you, my analysis was a point in
11 time.  So the payments started in say December of '11 to
12 January of '19, what payments were made and whether there is
13 support for those payments.
14 Q    Okay.  And those payments, the $10.6 million that was not
15 considered, was outside of the timeline?
16 A    Correct.
17 Q    Okay.
18 A    But I think I also said, Mr. Kameli, that there were
19 additional invoices that were provided.
20 Q    You did mention that.
21 A    Yes.  Yes, I did.
22 Q    Yes.  So there were a batch of invoices for $32.5 million
23 and there was another batch for $58 million, total?
24     MS. HAN:  Objection.
25 A    I don't remember the specific amounts, but I could --

488

1      MR. KAMELI:  That's fine.  I withdraw.
2  A    If you showed them to me, I could --
3  Q    I appreciate it.  That's fine.
4      Mr. Dhookie, on Exhibit 93, SEC's Exhibit 93, it
5  says "loan payment upstream transfers," right?
6  A    Sorry.  Give me one second.
7  Q    Take your time, sir.
8  A    So these were the -- from -- again, from these entities,
9  what were the upstream payments to -- in the first instance,
10 number one, were to Racanelli or Perini.  And then the second
11 instance, it was to Fleet Financial Group.
12 Q    So the amounts of 32 million, 32 point --
13 32,762,912 has then gone upstream, right?
14 A    Correct.
15 Q    And paid back to the project, correct?
16     THE COURT:  When you say "the project," what do you
17 mean?
18     MR. KAMELI:  I will rephrase it.  I will rephrase
19 it.
20 Q    It has been paid back to either FFG or Racanelli,
21 correct?
22 A    I don't know what the "back" means.
23 Q    No problem.
24     There were some payments -- in the previous exhibit,
25 you mentioned that the money was coming from Racanelli to

489

1  Xia's affiliates, correct?
2  A    Correct.
3  Q    And Racanelli originally got the money from FFG or EEG,
4  correct?
5  A    Correct.
6  Q    All right.  So now based on Exhibit 93, on the first part
7  you are mentioning Xia's affiliate accounts to Racanelli and
8  Perini.  So now from -- in my chart, from these little
9  circles, the money is going up to Racanelli, correct?
10 A    Correct.
11 Q    And then on the second part you say -- from 2-A to 2-I,
12 you are mentioning some payments going back from Xia's
13 affiliates directly to FFG accounts, correct?
14 A    Correct.
15 Q    All right.  I am sure you have heard about the loan on
16 invoice, correct?
17 A    Correct.  Yes.
18 Q    So when you get an -- when the subcontractor or someone
19 who provides services, they can invoice you and then the
20 general contractor can pay the money but not as a payment, as
21 an income, but as a loan, right?
22 A    Wait.  Can you explain that again?
23 Q    Sure.  Sure.
24     An invoice gets generated from the subcontractor,
25 sent to the contractor, the contractor pays a loan against the

490

1  invoice.  You heard about those situations, right?
2  A    I'm not -- I can't say that I have, but -- at least
3  it's not clicking in my head right now.
4  Q    That's okay.  But you have heard about the loan on
5  invoice, right?
6      MS. HAN:  Objection.
7      THE COURT:  Go ahead.  Have you heard of the concept
8  loan on invoice?  Yes or no, that is all.
9  A    Not to my recollection, no.  I don't -- I don't have it
10 specifically in my head right now, Mr. Kameli.
11 Q    Are you familiar with the idea called factoring?
12 A    Factoring, yes.  Yes.
13 Q    Okay.  Factoring, you get the payment on the invoice that
14 is due in the future, correct?
15 A    Correct.
16 Q    But you agree with me that factoring can also -- with the
17 payment that is made, could be looked at as a loan that has to
18 be paid back, correct?
19     MS. HAN:  Objection.
20     THE COURT:  Sustained.  Sustained.
21     You can keep explaining, but I think he is saying he
22 is not familiar with that.
23     MR. KAMELI:  That's fine, Judge.
24 Q    Let me take you to Exhibit 94-A of SEC.
25     You were mentioning project related costs for a

491

1      total of $54 million?

2   A    **Correct.**

3   Q    Almost $55 million, correct?

4   A    **Correct.**

5   Q    Do you know the square footage of Mirage?

6   A    **I don't have the exact number, no.**

7   Q    Based on your experience, do you know how much it costs

8      to build a concrete and steel building in the County of

9      Queens?

10  A    **No, I couldn't say that I do.**

11  Q    I thought you had some experience in construction.

12  A    **I do have some experience in construction from auditing**

13     **construction contracts, not constructing.**

14  Q    In your previous experiences that you had with auditing,

15     do you recall that -- how much per square footage in the past

16     two years, in case you have -- let me strike that.

17         Have you audited any developer company in the past

18     two years?

19  A    **Yes.**

20  Q    Have they been located in the City of New York?

21  A    **Yes.**

22  Q    Do you know in those company -- in auditing those

23     companies, how much per square foot they build a building with

24     concrete and steel?

25  A    **No, I -- that's not my area of expertise.  My auditing is**

492

1     **primarily based on the review of the financial records,**

2    **Mr. Kameli, and so we have design forensic engineers that**

3    **typically would look at the square footage calculation and I**

4    **would work with them to understand any issues.  But from my**

5    **view, it's just auditing the records themselves.**

6   Q    Yes, sir.

7         Let me take you to 95-A.  That's SEC's exhibit.

8         You have here non-investors fund deposits, total

9      $3.5 million, correct?

10  A    **Correct.**

11  Q    And does that consider the amount of the administrative

12     fees that were paid to the -- Xia's entities?

13  A    **I could tell you what this analysis is based on.**

14  Q    Please, sir.

15  A    **If that would help.**

16  Q    Yes.

17  A    **So one of the things that I was trying to understand is**

18     **that during this period of time, if these entities had -- you**

19     **know, how much monies were coming into these entities that**

20     **were, you know, from other sources, meaning other than the**

21     **parties that are involved here, right, like Racanelli,**

22     **Perini --**

23  Q    Yes.

24  A    **-- and the known entities --**

25  Q    Yes.

493

1   A    **-- and if there were other sources of income into**

2     **these bank accounts during this period of time.**

3   Q    Okay.

4   A    **And so these were the types of classification of the**

5     **payments that were coming into these accounts during this**

6     **period of time.**

7   Q    Yes.

8   A    **And they included the items that are listed here.**

9   Q    Okay.  Are you familiar with the reports of the company

10     called Berdon, LLP?

11  A    **Yes.**

12  Q    And do you recall the person who worked on that from

13     Berdon, LLP?

14  A    **Yes.  That was Mr. Ribaudo.**

15  Q    Ribaudo.

16  A    **The Ribaudo report.**

17  Q    And your report does not cover any part of Mr. Ribaudo's

18     report, correct?

19  A    **I do reference some things from the Ribaudo report.**

20  Q    But you only focus from January -- from December of 2011

21     until January of 2019, correct?

22  A    **Correct.**

23  Q    And the calculation that Mr. Ribaudo had done was mainly

24     before July of 2010 about how much contribution Mr. Xia had,

25     right?

494

1   A    **Correct.**

2   Q    And you have no opinion about that exhibit, about that

3     report?

4   A    **No, I -- I mean, no.  I think the report stands --**

5   Q    By itself?

6   A    **-- for itself.**

7         MR. KAMELI:  Okay.  Judge, may I have a few minutes?

8         THE COURT:  Yes.

9         MR. KAMELI:  Thank you.

10        (Pause.)

11  Q    Mr. Dhookie, may I take your attention to Exhibit 135,

12     please?  That's SEC's Exhibit 135.

13  A    **Yes, I'm there.**

14  Q    So these are the -- these are some of the invoices that

15     were provided by Xia's entities and they were, they got paid.

16     And you talked about them yesterday and today with counsel,

17     correct?

18  A    **Correct.**

19  Q    You with me, sir?

20  A    **Correct.  Correct.  Yes.**

21  Q    So let me bring your attention to exhibit -- to Page No.

22     3, which it says 46-3.

23  A    **Yes.**

24  Q    You mentioned that it was a little bit odd that on, for

25     example, 1/31/2016 there were two invoices for $150,000 that

495

1    was produced and was paid, correct?
2 A   **Correct.**
3 Q   And the same pattern goes down to different pages and
4 different payments, correct?
5 A   **Correct.**
6 Q   Is it possible that the same company provides two
7 different services and therefore provides two different
8 invoices?
9 A   **Can you repeat that? Sorry.**
10 Q   Absolutely, sir.
11 A   **I just want to make sure I hear you correctly.**
12 Q   For example, on 1/31/2016. I'm referring to page 46-3.
13 A   **Yes, I'm there.**
14 Q   Yes.
15 A   **Okay.**
16 Q   The first line, it says Amazon River, LLC. Invoice from
17 Amazon River, LLC.
18 A   **Mm-hm.**
19 Q   Invoice to Perini Group, amount of $150,000.
20 A   **Yes.**
21 Q   And there is a line item under that with a different
22 invoice number.
23 A   **Correct.**
24 Q   The same amount, $150,000, right?
25 A   **Mm-hm.**

Andronikh M. Barna, Official Court Reporter, RPR, CRR

496

1 Q   It is possible for Amazon River, LLC to provide two
2 different services to Perini and therefore charge two
3 different $150,000 invoices, correct?
4 A   **It's possible.**
5 Q   Okay. And if a subcontract -- strike that.
6       There is nothing wrong with subcontractors just to
7 work on a flat fee basis with the contractor, correct?
8       THE COURT: When you say "wrong," what do you mean?
9       MR. KAMELI: Unusual in developing industry, in
10 construction industry.
11 A   **There may be instances where a subcontractor would work**
12 **on a fixed fee basis. There are instances like that.**
13 Q   Correct.
14       For example, I will put the wall up for $2 million.
15 If it costs me 1.5 million, good for me. If it costs me
16 $2.4 million, bad for me. Correct?
17 A   **Right.**
18 Q   And usually in those kind of flat fee contracts, not many
19 detailed invoices are provided, correct?
20       MS. HAN: Objection.
21       MR. KAMELI: Well, if he knows.
22       THE COURT: Sustained.
23       If you can answer that question, if you have seen
24 such instances.
25 A   **Wow. It's a wide --**

Andronikh M. Barna, Official Court Reporter, RPR, CRR

497

1       THE COURT: I am going to disregard the question.
2       Let's move on.
3 A   **Mr. Kameli -- I'm sorry. Go ahead.**
4 Q   That's fine.
5       THE COURT: You do not need to answer. You do not
6 need to engage in hypotheticals. We had the person here who
7 was issuing all of these invoices.
8 Q   Let me take you to Exhibit 136. Please take a look at
9 Exhibit 40 -- page 47-15. There is an invoice from a company
10 called Extreme Concrete.
11 A   **Yes.**
12 Q   You don't believe that company belongs to Mr. Xia, right?
13 A   **Not -- I haven't seen any connections. No, I don't**
14 **believe so.**
15 Q   And there is a line item that says excavation, $51,000
16 flat. Do you see that?
17 A   **Correct.**
18 Q   You don't see any kind of more details into that?
19 A   **No.**
20 Q   And based on your experience, you believe that's an
21 accurate invoice, correct?
22 A   **I don't --**
23       THE COURT: You have no reason to doubt that?
24 A   **I don't -- I'm sorry, I --**
25 Q   That's fine.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

498

1 A   **Yeah, I don't have any -- I don't know if it's accurate**
2 **or not, Mr. Kameli, is what I'm saying. I don't know if this**
3 **is an accurate invoice or a made up invoice. I can tell you**
4 **that an invoice was presented by Extreme Concrete for**
5 **excavation and it --**
6       THE COURT: Let me ask you a question.
7       Based on your experience, did you find it suspicious
8 or conspicuous that it was a flat fee amount for that work as
9 an invoice?
10       THE WITNESS: It seems unusual that it would be just
11 this one line item, Your Honor, honestly. For me, a
12 subcontractor that would be providing excavation, it's amount
13 of dirt that will be removed from a particular site. It's
14 hard to believe that they would charge 51,000, just a
15 one-liner like that. It's typically we're going to remove X
16 cubic yards of dirt from a particular site and it would be a
17 rate per cubic yard because they have to dump that. So it's
18 usually -- so the invoice itself is a bit questionable in my
19 mind because of the level of detail that's shown in here.
20 Q   And allow me to take you to defense Exhibit 35, please.
21 A   **Give me a second, Mr. Kameli. I'm getting there.**
22 Q   As you wish, sir.
23       Would you like me to help you?
24 A   **No, that's okay.**
25       **Yes, I'm there.**

Andronikh M. Barna, Official Court Reporter, RPR, CRR

499

1  Q   Would you please take a look at these invoices that were
2  provided by Extreme Concrete.
3       Page 1, it says mobilization, $120,000.  Do you see
4  that sir?
5  A   Yes, I do.
6  Q   One line.  And it keeps going to the other pages.
7       Please go to the end of that exhibit.
8  A   Yes.
9  Q   Do you also see the frequency of the invoices on top?
10      We can review it together if you would like, but
11 they are almost every two weeks or every month.  Do you see
12 that, sir?
13 A   Yes, I do.
14 Q   So for Eastern Emerald Project or Eastern Mirage Project,
15 there were other companies like Extreme Concrete that they
16 were charging one-line items, correct?
17 A   Correct.
18 Q   You see it, right.
19      And these are not small amounts.  They're 120,000,
20 65-, $51,000 payments.  Do you see that?
21 A   Correct.
22 Q   And allow me to take you also to Exhibit 36, Defense
23 Exhibit 36.  It's the first exhibit from the second book.
24 A   Sorry, give me a minute.  I'm getting there.
25      Here we go.  I'm there.

500

1       Well, not quite there yet.
2       Okay.  Yes, I'm there.
3  Q   Do you see an invoice from a company called Thornton
4  Tomasetti.
5       MR. KAMELI:  For the purpose of the record,
6  T-o-m-a-s-e-t-t-i.
7  A   Yes, I do.
8  Q   And there is an invoice there, April 15, 2021.  Line
9  item, $100,000, $60,000, 130.  One line?
10 A   Yes.  Yes, sir.
11 Q   Allow me to invite you to go to the second page, back of
12 it.
13 A   Yes.
14 Q   Do you see that, sir?
15 A   Yes.
16 Q   So that's the second invoice that they have given for the
17 same amount, right?
18 A   Yes.
19 Q   And please go to Exhibit 37 while you're at it.
20      You see the same thing, one line item?
21 A   Sorry, which one are you on now?
22 Q   Is Exhibit 37, sir.
23 A   Yes.
24 Q   Okay.
25 A   Well, they're -- yes, there's one line, $3500.

501

1  Q   Okay.  Now, you also testified in regards to Form 702 and
2  703, correct, sir?
3  A   Yes.
4  Q   And the SEC showed you some exhibits today from 181 all
5  the way to 187 -- 6.  You saw those, right?
6  A   Yes.
7  Q   Now, change order in a big project like Eastern Mirage is
8  usually normal, correct?
9  A   You would see change orders in large projects, yes.
10 Q   Right.
11      And do you agree with me that usually contractors
12 put aside about 5 percent additional amount as a contingency
13 for change orders?
14 A   Yes, contingencies can be built into a contract, the
15 amounts range.
16 Q   Correct.
17 A   It varies.
18 Q   But usually 5 percent change order in a big project is
19 normal; do you agree with me?
20 A   I couldn't say --
21 Q   That's fine.
22 A   -- specifically.
23      But I could tell you that there are contingencies
24 and there are allowances that would be set aside.
25 Q   Sure.  So in Exhibit 181 of SEC, there is a -- on Line

502

1  No. 5 -- do you have it, sir?  Those are loose papers.
2  A   Yes.  Yes, I'm there.  I inserted it in the binder.
3  Q   Oh, I see.  I see.  Okay.  Good for you.
4       You see there is amount certified, $230,000?
5  A   Yes.
6  Q   And on Line 5 it says change order, 10,733?
7  A   Wait.  Sorry.  Can you repeat the last question?
8  Q   As you wish.
9  A   The prior question.
10 Q   Sure.  The amount certified is $230,000, right?
11 A   That's the current payment due.
12 Q   Current payment due, correct.
13      And there is a change order of 10,733?
14 A   Correct.
15 Q   So that's about 5 percent change in the amount, correct?
16 A   About that, yes.
17 Q   About that?
18 A   Yes.
19 Q   And the same thing goes for Exhibit 182.  On a 3 --
20 $300,000 payment, there is an $8,200 change order?
21 A   Sorry, which one?
22 Q   Exhibit 182.
23 A   Oh.  8,000, yes.  Correct.
24 Q   So and again, that one is less than 5 percent.  That's
25 about 4 percent, correct?

503

1  A   Okay.

2  Q   So these are normal -- do you agree with me that they are

3  normal in the construction industry?

4       MS. HAN:  Objection.

5       THE COURT:  Overruled.

6       Can you answer that?

7  A   Change orders are normal.  It's normal to have change

8  orders.

9  Q   All right.

10 A   Yes.

11 Q   Let's go, please, to Exhibit 176 of SEC.

12 A   Sorry, which one?

13 Q   176.

14 A   Yes.

15 Q   That's a contract between Fleet Financial Group, the

16 developer, and Racanelli, correct?

17 A   Correct.

18 Q   And you testified to some items of that earlier.

19     Let me take your attention to paragraph 1.1.4.

20 A   Yes.

21 Q   That paragraph says that the total guaranteed maximum

22 price of the work in its entirety shall not exceed

23 $88 million, correct?

24 A   Correct.

25 Q   So to your knowledge, does that mean that no matter what,

Andronikh M. Barna, Official Court Reporter, RPR, CRR

504

1  Racanelli has to bring this building to certificate of

2  occupancy for $88 million?

3       MS. HAN:  Objection.

4       THE COURT:  Are you asking him to interpret the

5  contract?

6       MR. KAMELI:  No.  I'm asking him, based on his

7  knowledge of someone who is a CPA and an expert and has worked

8  in development and construction, what a GMP price means.

9  A   Yes, there is a -- it's agreed that the contract price

10 will not exceed that amount.

11 Q   Okay.  So if Racanelli can finish the project for

12 $70 million, there is -- it is still entitled to $88 million,

13 correct?

14     MS. HAN:  Objection.

15     MR. KAMELI:  Well, Judge --

16     THE COURT:  Overruled.

17     The question is, is that how you interpret this, I

18 guess.

19     And you can redirect, Ms. Han.

20 A   Yeah, I think that the maximum price not to exceed, but

21 it also specified that it should be a cost-plus contract,

22 meaning that it's cost plus that markup to get to that

23 percentage.

24 Q   During your -- during preparing this report, did you ever

25 ask SEC to give you more documentations for clarification?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

505

1  A   Yes, I did.

2  Q   Do you recall when?

3  A   There were some situations where we didn't have certain

4  bank statements; you know, I would ask for the bank

5  statements.  And so there was a lot of back and forth.  I

6  don't remember all the specifics, but there were back and

7  forth regarding, you know, whether we had information for

8  certain gaps of time periods and so on.

9       So, for example, in the 2011 period, you know, I had

10 asked if we had any additional bank statements, and the

11 response was that the bank didn't have those records and they

12 didn't have them from any other sources.

13 Q   Okay.  Let me take you to your report, page 39.  I don't

14 know what exhibit that is.

15     MS. HAN:  I'm sorry, what was that?

16     MR. KAMELI:  His report, page 39.

17     MS. HAN:  149.

18     MR. KAMELI:  149?

19     Exhibit 149 of SEC.

20     THE COURT:  You are looking for Plaintiff's 149?

21     THE WITNESS:  Yes.

22     MR. KAMELI:  I mean, it's your report, so...

23     THE WITNESS:  Oh.  I got it.  I got it.

24     Did you say 149?

25     MR. KAMELI:  Yes.  Your report.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

506

1       THE WITNESS:  Yes, I got it.  Thank you.

2       MR. KAMELI:  You got it?  Okay.

3       THE CLERK:  Mr. Kameli, please make sure to use

4  microphone.  Those are the round things on the table.

5       MR. KAMELI:  Yes, yes, yes.

6       THE CLERK:  And stop muting them, please.  Thank

7  you.

8       MR. KAMELI:  And stop what?

9       THE CLERK:  It was on mute.  I'm telling you not to

10 mute them.  Leave them on.

11      THE COURT:  Your microphone, right?

12      MR. KAMELI:  Well, if I want to talk to them, I

13 can't do that?  I can't mute them?

14      THE CLERK:  You can let us know.  But then when you

15 start talking again and we can't hear you you need to unmute

16 --

17      THE COURT:  You need to unmute.

18      THE CLERK:  -- so you have to let us know.

19 BY MR. KAMELI:

20 Q   You testified earlier in your testimony that there were

21 some items that were purchased for -- you believe that they

22 were purchased for Mirage Project with the Emerald Project's

23 money, correct?

24 A   Correct.

25 Q   And those items are mentioned in your report, page -- in

Andronikh M. Barna, Official Court Reporter, RPR, CRR

507

1 paragraph 39. Do you see that, sir?

2 A   Yes.

3 Q   Now, you mentioned that you called every single one of

4 these companies or you did a search on the internet to see

5 what the -- what they provide services for, correct?

6 A   Correct.

7 Q   Okay. Did you actually call any one of these companies?

8 A   No, I did not.

9 Q   So you don't know whether these companies received any

10 kind of advance payments for future services?

11 A   I don't know the answer to that question.

12 Q   Okay. All right. And based on your knowledge, none of

13 these companies belong to Mr. Xia, right?

14 A   Not that I am aware of.

15 Q   And the companies we're talking about are in the chart

16 that you provided in paragraph 39 of your report, sir?

17 A   Correct.

18 Q   Okay. Now, in regards to the payments when you bring up

19 the Forms 702 and 703, right, these are the forms with the

20 AIA, right?

21 A   Yes.

22 Q   And the AIA, not every development project uses AIA

23 contracts, correct?

24 A   Yeah, I -- I would say -- let me answer it this way,

25 Mr. Kameli.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

509

1 don't need to use the 702 or 703 forms, correct?

2 A   No, I wouldn't say that. I would say that the parties

3 can agree to use a standard AIA contract if they want to.

4 They could choose to use AIA forms if they used to. What I am

5 saying is that most in the industry use the -- for the payment

6 requisitions, so you understand what I was testifying to --

7 Q   Yes, sir.

8 A   -- for the payment process, generally speaking, most in

9 the industry use the AIA Form 702 and 703 at a minimum.

10 Q   Most of the industry?

11 A   Most. Most of them.

12

13       (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Andronikh M. Barna, Official Court Reporter, RPR, CRR

508

1 Q   Yes, sir.

2 A   Many, many contracts for sizable projects use these forms

3 as the standard practice.

4 Q   And do you agree with me that the AIA contracts are very

5 much one-sided and sometimes one-sided towards the contractor

6 and many developers do not like to use them? Do you agree

7 with me?

8       MS. HAN: Objection.

9 A   I don't know if I would be able to answer that question.

10      THE COURT: Overruled.

11 Q   Okay. And if you don't use the AIA contract, therefore,

12 you don't need to use AIA 702 or 703 forms, correct?

13      THE COURT: What do you mean by "need"? I do not

14 understand that.

15      MR. KAMELI: Judge, there is a contract based on

16 AIA, and usually AIA contract is used with 702 and 703 forms.

17      THE COURT: No, but I am just asking you what you

18 are asking the witness. When you say you do not need to use

19 them, what exactly do you mean? Is there a legal requirement?

20      MR. KAMELI: No. The relationship between developer

21 and general contractor.

22      THE COURT: Just rephrase it.

23      MR. KAMELI: I shall rephrase.

24 Q   If the developer and the general contractor don't sign an

25 agreement based on AIA contract, they -- those two parties

Andronikh M. Barna, Official Court Reporter, RPR, CRR

510

1 BY MR. KAMELI: (Continuing)

2 Q   It is possible for one project, one developer and one

3 general contractor not to use 702 and 703, correct?

4 A   It's possible.

5 Q   Okay.

6       MR. KAMELI: Judge, may I just take one minute?

7       THE COURT: Yes.

8       (Pause.)

9       MR. KAMELI: I have no further questions, Judge.

10      THE COURT: Any redirect?

11      MS. HAN: Yes, Your Honor.

12      THE COURT: Remember to use the microphone.

13      MS. HAN: Yes, Your Honor.

14 REDIRECT EXAMINATION

15 BY MS. HAN:

16 Q   Mr. Dhookie, I direct your attention to Plaintiff's

17 Exhibit 92-A.

18 A   Yes. I'm there.

19 Q   Specifically as to Section 2.

20 A   Yes.

21 Q   Between 2011 and 2013, was Eastern Emerald Group a

22 developer that Racanelli had a contract with or was, did

23 Eastern Emerald Group -- did Racanelli -- was Eastern Emerald

24 Group a developer between 2011 and 2013 for which Racanelli

25 was receiving payments from?

CMH    OCR    RDR    FCRR

511

1  A    No.  Eastern Emerald was a -- sorry.  Go ahead.

2  Q    No, go ahead.

3  A    Eastern Emerald Group was the developer of the Eastern

4  Emerald project in, starting in around 2014 and later.

5  Q    And directing your attention to Section 1, Eastern

6  Emerald Group did not receive any funds from Racanelli -- I'm

7  sorry -- Racanelli did not receive any funds from Eastern

8  Emerald Group from 2011 to 2013?

9  A    Correct.

10 Q    And then directing your attention to Section 3.

11 A    Yes, I'm there.

12 Q    When you were reviewing the invoices from the Xia

13 entities, I believe you indicated that they were in round

14 number amounts?

15 A    Correct.

16 Q    And so when you were looking at the payments to see if

17 they were supported by invoices, were you matching up invoices

18 to payments or were you trying to -- how did you arrive at the

19 number -- how did you make the determination of whether the

20 transfers were supported by invoices?

21 A    So, so I tried to match the payment that was made by

22 Racanelli or Perini to a Xia affiliate entity and there wasn't

23 really this sort of one-to-one match and so my, my analysis

24 was, sort of taken as a whole, during this period of time,

25 what were the total of payments to that entity and quantifying

CMH   OCR   RDR   FCRR

---

512

1  all of the invoices from that entity to Racanelli or Perini

2  for that same period of time and show if there were

3  differences or no invoices in the totality that covered those

4  payments.

5         So there was no one-for-one match, if that's your

6  question, but I was assuming if those invoices were submitted,

7  that that, those were the invoices that were paid so it was an

8  assumption.

9  Q    So just to be clear, for example, in number 3A, there

10 were 16 -- were there roughly $16.9 million in payments from

11 Racanelli to X&Y Development?

12 A    Correct.

13 Q    And so if you, if you were reviewing the invoices and you

14 saw $18 million in invoices, you assume -- the 16 million,

15 when you say there were no transfers that were unsupported by

16 invoices, what is that referring to?

17 A    So, again, I think, yes, there were a lot more

18 X&Y Development invoices than these payments covered so,

19 again, I, you know, I made the assumption that at least these

20 amounts were, had support.

21 Q    And by "had support," do you mean that there were

22 invoices but you weren't matching one for one?

23 A    Correct.  If you -- yes.  I was saying that if there were

24 invoices potentially that would support these payments or

25 could be matched to these payments, that, you know, I gave the

CMH   OCR   RDR   FCRR

---

513

1  benefit of the doubt, if you will.

2  Q    And you testified earlier that it's possible for a

3  subcontractor to direct a payment directly to I believe

4  Mr. Kameli's example was a concrete, a company for concrete?

5  A    Yes.  It's possible that they could direct a payment to

6  another party.

7  Q    And how many times have you seen that happen in your

8  review of construction related, in your review of audits of

9  construction matters?

10 A    It's rare, it's rare to see that.  Usually, it's this

11 concept called a split payment.  It's mostly where I see it

12 where the -- it's not the direction but it's more so that the,

13 the developer doesn't really or the owner doesn't trust the

14 subcontractor to make the payment to the third party so they

15 would typically split the thing.  So it's rare that you would

16 see that type of scenario, Ms. Han, is what I'm saying and

17 when you do see it, it's usually in the context of a split

18 payment or the owner paid the costs directly.

19 Q    And going to, directing your attention to Plaintiff's

20 Exhibit 176.

21 A    Yes.

22 Q    If Racanelli's cost to complete plus 15 percent is less

23 than 88 million, are they entitled to demand $88 million

24 anyway based on this contract?

25        MR. KAMELI:  Judge, I object.  The contract speaks

CMH   OCR   RDR   FCRR

---

514

1  for itself.

2         THE COURT:  No.  You asked him the same exact

3  question but go ahead.

4         MR. KAMELI:  Mine was different.

5         THE COURT:  Go ahead.

6  A    Yes.  The contract says that it's up to that amount but

7  if you read the term, it says it's a cost plus the markup.

8  Q    And if the cost plus the markup is less than 88 million,

9  are they entitled to 88 million anyway?

10 A    Not necessarily, no.

11        MS. HAN:  I have no further questions.

12        THE COURT:  Thank you, Ms. Han.

13        Recross?

14 RECROSS-EXAMINATION

15 BY MR. KAMELI:

16 Q    Based on the same Exhibit 176, if the cost of the project

17 is $90 million, the maximum the project would pay is

18 $88 million, correct?

19 A    Correct.  I mean -- sorry, sorry, Mr. Kameli.  I mean the

20 parties can agree to additional change orders or things like

21 that to increase the value and so there can be instances where

22 the guaranteed maximum price is actually increased and this is

23 specifically in the instance where there are change orders.

24 Q    And Mr. Dhookie, you agree with me that the relationship

25 between the general contractor and the developer is just a

CMH   OCR   RDR   FCRR

515

1 relationship that can be changed with a contract, the contract
2 gets amended and change orders can be provided, correct?
3         MS. HAN:  Objection.
4         THE COURT:  If you can answer that question.
5 **A    There usually, and I think in here also, there are terms**
6 **that say how the contract can be increased, Mr. Kameli, so and**
7 **one of the areas if there are changes in field conditions that**
8 **would warrant change orders, that would mean that there would**
9 **be potentially an increase in scope and, therefore, an**
10 **increase in the guaranteed maximum price.**
11 Q    And usually the length of time to, for the developer to
12 come up with the money to pay the general contractor warrants
13 a general contractor price increase, correct?
14         MS. HAN:  Objection.
15         THE COURT:  Sustained.  He's not an expert in the
16 construction industry.  You had Mr. Xia on the stand before.
17 These are not appropriate questions for this forensic
18 accountant.
19         Anything else, Mr. Kameli?
20         MR. KAMELI:  No, Your Honor.
21         THE COURT:  Let me just make one comment with
22 respect to the questions of this witness.
23         As much as I respect your expertise, I'm not relying
24 on his testimony about what Exhibit 176 means when it says
25 guaranteed maximum price or recovery.  To me, it is

CMH    OCR    RDR    FCRR

516

1 straightforward.  It means you're guaranteed the maximum
2 amount of that, but not if you didn't actually earn up to that
3 amount or the costs don't equal that.  So it doesn't mean
4 someone is guaranteed to get 88 million no matter how much
5 they provide in terms of services or what the costs are.
6         So I'm disregarding Mr. Dhookie's testimony, with
7 all due respect, about what he thinks that provision means and
8 I think the only potential relevance is whether or not his
9 interpretation affected his analysis and I didn't hear
10 anything to that affect.  So I don't consider him an expert
11 for that purpose.
12         In fact, I want to make sure as a housekeeping
13 matter that the SEC is offering Mr. Dhookie as a forensic
14 accounting expert in the context of the construction industry?
15         MS. HAN:  Yes, Your Honor.
16         THE COURT:  All right.  Is there any objection to me
17 qualifying Mr. Dhookie as such?
18         MR. KAMELI:  No, Your Honor.
19         THE COURT:  Okay.  So you are so qualified for
20 purposes of this hearing and the testimony you've given.
21         I do want to ask you just one question, Mr. Dhookie.
22         You testified in sum and substance that general
23 contractors and subcontractors are not required to use 702 and
24 703 forms, correct?
25         THE WITNESS:  Correct.

CMH    OCR    RDR    FCRR

517

1         THE COURT:  But the content of those forms, should
2 those, pursuant to industry standards or, I guess, pursuant to
3 whatever standards of review you apply, should the contents be
4 provided, whatever is in those forms, whatever the format is?
5 Sorry.  I worded that very poorly.
6         In essence, even if you don't use the 702 or 703
7 forms, is the point that the contents in those forms should be
8 conveyed between the subcontractor to the GC whenever they're
9 asking to be paid?
10         THE WITNESS:  Yes, Your Honor.  I think especially
11 in a scenario where the contract is saying that it's a
12 guaranteed maximum price, it is industry standard to -- in
13 order for a contractor to commit to something like that, they
14 would break this down, you know, in many different ways and if
15 a 703 was not used, there would be a detailed cost breakdown
16 of all the trades that would be working on this project, all
17 the scopes of work that would be included and normal sort of
18 construction practice is, and financial reviews of those
19 construction practice is that to be able to, in order for a
20 subcontractors to be paid, it's necessary to understand where
21 are they in the grand scope of things.  So if the total
22 contract price is, let's say it's not 60, 40 million, are we
23 coming close to that 40 million or not.
24         So just normal business practice dictate that you
25 would need to do that level of analysis and provide that level

CMH    OCR    RDR    FCRR

518

1 of detail to, in the case, the general contractor but the
2 owner would be asking for this and wanting this every month.
3         THE COURT:  To justify the payment?
4         THE WITNESS:  To justify and to see that there, you
5 know, these costs are being incurred and so on.  So regardless
6 of the form, I think the fact that the 702 is being used here,
7 chances are, you know --
8         THE COURT:  It should be accompanied by a 703.
9         THE WITNESS:  They go hand in glove.
10         THE COURT:  Okay.  Thank you very much.
11         Did anyone want to ask any follow-up based on what I
12 asked Mr. Dhookie?
13         MS. HAN:  No, Your Honor.
14         MR. KAMELI:  Yes.
15         THE COURT:  Go ahead.
16         MR. KAMELI:  On my side, I thought he was an expert
17 in forensic accounting, not an expert in how the construction
18 industry works.
19         THE COURT:  No, he's talking about the accounting
20 side of it.  In other words, when he says he looks at records
21 provided by general contractors, subcontractors, developers
22 such as those involved here, he expects to see, he said, 702s
23 and 703s.  You cross-examined him about whether those were
24 necessary or required.  He said no.  I just want to ensure
25 that the record is clear though that the information contained

CMH    OCR    RDR    FCRR

519

1  in those forms is still what he expects to see as part of what
2  the construction industry does in terms of accounting which is
3  what he's been qualified to testify about.
4      MR. KAMELI:  Judge, with that in mind, I'm going to
5  ask some questions, if I may.
6      THE COURT:  Yes, please.
7  BY MR. KAMELI:
8  Q    Mr. Dhookie, those information about the forms is usually
9  informing the general contractor or the developer how much
10 work has been done on the project, correct?
11 A    It's --
12     THE COURT:  What work; is that your question?
13     MR. KAMELI:  Sure.
14 A    It informs a number of things.  It's the -- it usually
15 quantifies the amount of invoices that they have received, the
16 costs that they have received on the project.
17 Q    Yes.
18 A    That's primarily, from a financial perspective, that's
19 primarily what those forms do is they quantify all those
20 amounts and they're used to then bump that up against the
21 project budget, if you will, which are the amounts laid out
22 here and what was sort of agreed by the parties up front, the
23 detailed breakdown.  So from a financial perspective, it's
24 used for that purpose, as a budget to actual, if you will.
25 Q    Just to make sure that the project doesn't run out of

CMH   OCR   RDR   FCRR

520

1  money, correct?
2  A    No.  I mean the owner wants to know what's incurred,
3  what's the actual costs that are being incurred.
4  Q    Exactly.  If the owner wants to know, correct?
5  A    The owner or the contractor or the developer, all the key
6  parties to the contract are typically looking at that
7  information.
8  Q    But in this case, Xia's affiliates were the ones
9  providing the invoice and the owner is Xia himself so he knows
10 how much work is being done, is that right?
11     MS. HAN:  Objection.
12     THE COURT:  Sustained.  Sustained.  Let's move on.
13 You can make that argument but it's not going to be a winner
14 so let's move on.
15     MR. KAMELI:  Okay.  I'm good.
16     THE COURT:  Okay.  You can step down.  Thank you
17 very much, Mr. Dhookie.
18     (Witness excused.)
19     THE COURT:  Let's call the next and hopefully final
20 witness, right, for the SEC, who has been a very patient
21 witness.
22     You've been here.  Come forward, sir.
23     MR. McGRATH:  The SEC calls Scott Peeler.
24     (The witness, SCOTT PEELER, was duly sworn/affirmed
25 by the clerk.)

CMH   OCR   RDR   FCRR

521

1      THE CLERK:  Please state your name for the record.
2      THE WITNESS:  Good afternoon.  My name is Scott
3  Peeler, P-E-E-L-E-R.
4      THE COURT:  Good afternoon.
5      You may proceed.
6      MR. McGRATH:  Thank you, Your Honor.
7  DIRECT EXAMINATION
8  BY MR. McGRATH:
9  Q    Good afternoon, Mr. Peeler.
10 A    Mr. McGrath.
11 Q    Are you the court appointed monitor?
12 A    I am as of September 27, 2021.
13 Q    Can you very briefly describe your background and
14 training particularly focusing on your experience as a monitor
15 and your experience in dealing with construction related
16 matters?
17 A    Certainly.  Well, first, I am the head of our firm's
18 white collar government investigations, compliance and
19 monitoring practice group.  I was appointed by the New York
20 State Department of Financial Services a few years ago in
21 coordination with various federal and state government
22 agencies to be the monitor of the tenth largest bank in the
23 world at that time and my team and I have had significant
24 involvement in the construction industry and I'm happy to
25 explain that in detail.

CMH   OCR   RDR   FCRR

522

1  Q    Can you just give a very high level summary of what you
2  and your team's experience in the construction field is?
3  A    Sure.  Sure.  So members of my team relevant to this
4  matter specifically, I brought as part of it Martin Bloom,
5  B-L-O-O-M, and Andrew Ross, R-O-S-S, both of whom are partners
6  and chair our firm's construction group and between them, they
7  have decades in the construction industry, in the practice.
8  Also part of this team is Stavros, S-T-A-V-R-O-S, and the last
9  name is Karageorgiou, K-A-R-A-G-E-O-R-G-I-O-U.  Stavros is an
10 attorney, he's a certified construction manager and he's a
11 master electrician and between all of those individuals, we
12 have significant construction experience, litigation,
13 regulation and matters such as this.
14 Q    Is it fair to say that you were assigned a number of
15 powers and duties as part of the monitorship order?
16 A    Yes.
17 Q    What were your first priorities after you were appointed
18 as a monitor in terms of carrying out those duties and
19 responsibilities?
20 A    Well, the order that Your Honor signed on September 27th
21 of last year makes quite clear a number of powers.
22     Our focus almost immediately turned to
23 paragraph 11(b), as in "boy," simply because within 60 days of
24 our appointment which would put it somewhere near the end of
25 November, we were going to be required to issue a report of a

CMH   OCR   RDR   FCRR

523

1  fairly significant consequence, specifically, the viability of
2  the projects, the cost to complete them and as it's worded
3  specifically, whether or not one or both the projects should
4  be completed or sold.
5      So our work, while I can get into detail of what we
6  specifically did, was prioritized by that deadline and the
7  significance of the task at hand.
8  Q   And what were the first steps that you and your team took
9  to carry out those responsibilities?
10 A   I think the first thing we actually did was we reached
11 out to Mr. Xia's counsel at the time, Marc Mukasey, Bob
12 Frenchman and I believe it's Robert Caruso, Bob Caruso, all at
13 the firm of Mukasey Frenchman, and began to discuss
14 specifically our appointment and what we were going to be
15 requiring and we were codifying the requests which was,
16 actually became a document demand from us pursuant to the
17 order that the Court issued on September 27th and was given to
18 counsel on October 7th.  We also began to discuss the need for
19 cooperation and we were encouraged by what we heard at first.
20 Q   When you say you were encouraged by what you heard at
21 first, what were you told at first that gave you that
22 encouragement?
23 A   Counsel for Mr. Xia and then later Mr. Xia himself
24 indicated that they were pleased at our appointment, they were
25 pleased with our construction experience, they believed it was

CMH   OCR   RDR   FCRR

524

1  what was needed and that would help us perform our tasks well,
2  efficiently and they welcomed our appointment and promised
3  complete cooperation.
4  Q   I'm going to direct your attention to Exhibit 161,
5  Plaintiff's 161, please.  You have a binder there.
6  A   I do.  Just one moment, please.  161?
7  Q   Yes.
8  A   Yes, it appears to be my report.
9  Q   And attached as Exhibit A to that report, is there a
10 letter dated November 27, 2021 to Marc Mukasey?
11 A   Yes, this is the actual document demand that I referenced
12 earlier.
13 Q   And if you could just quickly direct your attention to
14 the document demand and specifically starting on page 7 which
15 is entitled "Specific Documents, Data and Information
16 Requested," I'm certainly not going to ask you to read through
17 all of this but is it fair to say that the following pages of
18 this letter contain an extensive series of document requests?
19 A   They do, all of which are relevant and, in my view,
20 required by the order issued by the Court and the powers given
21 to the monitor through that order.
22 Q   Thank you.
23 A   May I make a slight correction?  I see here from the cc
24 list, I gave the wrong first name for Mr. Caruso.  It's
25 actually Ken, K-E-N.

CMH   OCR   RDR   FCRR

525

1  THE COURT:  We won't tell him.
2  THE WITNESS:  Thank you.
3  Q   And going back to the letter itself, October 7, 2021, I
4  think you indicate that you were requesting a follow-up
5  meeting after they've had a chance to review the document
6  request?
7  A   Yes.
8  Q   Did any follow-up meeting occur with the Mukasey firm?
9  A   There were conversations and e-mails but it was not long
10 thereafter that they informed us that they were being
11 replaced.
12 Q   And what firm did you next speak to in connection with
13 your duties?
14 A   For approximately a week, I think in my mind, it's
15 approximately seven days in the middle of October of last
16 year, we spoke to lawyers from WilmerHale.
17 Q   Do you recall how long they were in the case or
18 representing --
19 A   Within -- I'm sorry.
20 Q   -- Mr. Xia?
21 A   I think it was approximately a week to ten days.
22 Q   Did you have any discussions with them about requests for
23 documents?
24 A   The conversations with them referenced it but it was more
25 about their status, they were indicating that they were coming

CMH   OCR   RDR   FCRR

526

1  in, there were ongoing discussions about whether or not that
2  would be finalized, and we were also discussing what was
3  becoming a pressing matter that had been transferred from
4  Mukasey Frenchman to them which is our engagement letter.
5  Q   Okay.  And at some point, the WilmerHale firm indicated
6  that they would not be representing Mr. Xia, is that correct?
7  A   That's correct.
8  Q   And did another law firm appear at that point in time?
9  A   Yes, Sills Cummis, and specifically Herve Gouraige.
10 Q   Do you remember when that was approximately?
11 A   This would be in the second half of October.  In my mind,
12 it's approximately the, it's near the end of October but I
13 don't have the exact date to memory.
14 Q   And at the time that Mr. Gouraige and his firm started
15 communicating with you on behalf of Mr. Xia, do you recall
16 what the, what documents, if any, had been produced in
17 response to your document demand?
18 A   There were few.  Up to that point, what we had received
19 were the well submissions, but they were a far cry from what
20 we needed to do the work that at that time was still scheduled
21 to be completed by the end of November.  So as the time was
22 pressing, so did our need to coordinate and to begin to
23 actively obtain the documents we needed.
24 Q   And did you have any conversations with Mr. Gouraige
25 about those pressing deadlines?

CMH   OCR   RDR   FCRR

527

1  A    We did.  We were also scheduling a walkthrough.  So at
2  the same time, we were talking about two different things.
3  One were the documents that we needed specifically.  We began
4  with Mukasey Frenchman and then, again, in more substance,
5  with Mr. Gouraige.  We spoke specifically about targeting the
6  requests and accepting them on a rolling basis and
7  specifically pointing out those requests we needed first and
8  foremost to do the work required in 11(b) and those
9  conversations continued.  And as I said, we also began to talk
10  about a walkthrough of both projects.
11  Q    And at a very general level, what were the particular
12  types of documents that you were indicating that you
13  particularly needed to comply with the Judge's requirement
14  that you submit the 11(b) report?
15  A    They were, anything, they were specific kinds of
16  documents relating to financing and costs to complete, the
17  status of the work that had been done, what had it had cost so
18  far, by whom, under what arrangements, anything that was
19  relevant specifically to the question of what would be the
20  cost to complete and what potential and actual assets were
21  available for those purposes.
22  Q    Okay.  At some point around this time, did you have a
23  conversation with Mr. Xia directly?
24  A    Yes.  I've spoken to Mr. Xia three times.
25  Q    So just focusing on the first occasion, can you describe

CMH   OCR   RDR   FCRR

528

1  the circumstances under which that all occurred?
2  A    Yes.  It was on October 22nd of last year.  Mr. Xia
3  called my cellphone which I was surprised by.
4  Q    Did you speak with him?
5  A    I did.
6  Q    Can you tell us what was said during that call?
7  A    Yes.  Primarily, he called to talk about two things with
8  me.  Number one is at that time and I mentioned earlier our
9  engagement letter had been pending and had now cycled through
10  a variety of counsel and he called to tell me that he was
11  going to sign it, his wife was going to sign it and that it
12  will be executed and sent to me later that day.  He also
13  expressed what I indicated earlier that his lawyers indicated
14  to me which he was pleased with our construction experience
15  and seconded the idea that he was pleased with our
16  appointment, promised complete cooperation and thought that
17  with our experience, we could do the work that was necessary
18  to be done.
19  Q    Okay.  Now, you indicated that you were trying to
20  schedule a site visit.  Did you and your team subsequently
21  visit the Eastern Mirage and Eastern Emerald construction
22  sites?
23  A    We did on November 3rd of last year.
24  Q    Who from your team went?
25  A    Stavros Karageorgiou, Mark Bloom, Alexander Coppola,

CMH   OCR   RDR   FCRR

529

1  C-O-P-P-O-L-A, myself.
2  Q    Who did you meet there?
3  A    We met with Mr., primarily with Mr. Xia himself and Brett
4  McCabe who had been identified to us, and I had several
5  conversations with him at the time, as the general counsel for
6  defendants Fleet.
7  Q    Okay.  Which site did you visit first?
8  A    Mirage, the Mirage site.
9  Q    And what was our understanding as to what the Eastern
10  Mirage project was supposed to consist of at that time?
11  A    We walked through the building from top to bottom and the
12  top floor is, has space that has been earmarked as a high end
13  restaurant with stunning views of the water, of LaGuardia and
14  the City of Manhattan.  There were also going be spaces
15  dedicated for private residences.  There were also spaces
16  designated for hotel rooms.  There was space designated for
17  potential medical offices and there was a grand lobby and a
18  parking deck below.
19  Q    Okay.  And what did the walkthrough actually consist of?
20  What did you do?
21  A    We were looking -- and I should also mention that at the
22  time, the Court actually, we had requested and the Court
23  appointed J.S. Held as an expert.  We had members of the
24  J.S. Held present as well.  So we were all walking through it
25  together.

CMH   OCR   RDR   FCRR

530

1          J.S. Held had been instructed to look at it for what
2  would be necessary to document and to begin the work of
3  assessing had been done and what was going to be needed to
4  assess what yet must be completed.
5          We were walking through and I was specifically
6  allowing Mr. Xia and Mr. McCabe to, on one level, walk us
7  through it as they envisioned it, as it was planned to be, and
8  to explain to us a variety of subjects and we had
9  conversations throughout the walk down the 20 floors.  We
10  didn't walk through every floor.  We walked through
11  representative floors of each of the types of floors we just
12  described.
13  Q    And just generally, what did you observe in connection
14  with the walkthrough starting at the top working your way down
15  to the bottom visiting various floors?
16  A    That it was in a state of construction meaning the
17  building is complete in the sense of there, there are the
18  floors and it is -- from top to bottom, there is a
19  construction, there is an envelope, there is a roof and then
20  on each of the floors, there's a variety of different levels
21  of construction that were being done depending on the purpose.
22          So some rooms and areas were more complete than
23  others.  The restaurant space was what I would call, there
24  were -- it hadn't been sheetrocked yet but you could see the
25  division of rooms within the space.  And as you went down

CMH   OCR   RDR   FCRR

531

1  through different floors, again, you would see different
2  levels of completeness and I think Mr. Xia and Mr. McCabe
3  walked us through all of that.  So we saw rooms that were yet
4  to be complete and others that were either completed or almost
5  completed.
6  Q    Did you observe any work going on at the building or at
7  the project site during your visit?
8  A    People were present at that time.  I myself did not
9  observe work being done.
10 Q    When you say people were present, what did you understand
11 or did you make any observations as to who they were or what
12 they were doing there?
13 A    I can only make an assumption if you'd like me to.  In
14 other words, they were not identified and we did not talk with
15 them.  My presumption --
16         MR. KAMELI:  Objection as to assumption.
17         THE COURT:  Well, I'll hear what your assumption is
18 and explain why you assumed what you did.
19 A    They were on site.  I believe that they either were
20 people who were -- and they ended up, they were certainly
21 familiar with the site so certain people were opening gates
22 and/or doing different tasks.  I'm not sure I would call that
23 construction-related work, but I assume that they were on
24 site, as familiar and were part of the labor force that had
25 been used before the freeze had been put in place.

                CMH   OCR   RDR   FCRR

532

1          THE COURT:  Can I ask one question?
2          THE WITNESS:  Of course.
3          THE COURT:  Was the site secure?  In other words,
4  did you have to be let in --
5          THE WITNESS:  Yes.
6          THE COURT:  -- by somebody with the construction
7  company?
8          THE WITNESS:  My recollection is that there, that,
9  yes, Your Honor, there is a, either a chain end or a gate and
10 I remember walking in through what I think would be sort of a
11 driveway down to the parking level before sort of walking up
12 and then seeing what is scheduled to be the lobby and then we
13 rode all the way up and worked our way down.
14         THE COURT:  So I assume part of your assumption
15 about the people who were there being affiliated with the
16 construction company was that no one should be on site unless
17 they were let in.
18         THE WITNESS:  That was part of my presumption, yes,
19 Your Honor.
20         THE COURT:  Okay.  Go ahead.
21 Q    The building wasn't open to the public?
22 A    It was not.
23 Q    And was there any stop work orders in place with respect
24 to Eastern Mirage project at the time of your site visit?
25 A    Yes.

                CMH   OCR   RDR   FCRR

533

1  Q    Did you ask Mr. Xia or Mr. McCabe who these individuals
2  were or what they were doing there?
3  A    Not specifically at that time, no.
4  Q    Did you subsequently?
5  A    Yes, we had several conversations soon thereafter because
6  there were stop work order violations that were being issued
7  by the Department of Buildings and we noticed, and J.S. Held
8  pointed out to us through the work they were doing subsequent
9  to our walkthrough on site documenting the site and what would
10 be, what it would cost to complete the work there, they saw a
11 number of hazardous conditions that we, that they flagged to
12 us and I immediately flagged to Mr. Xia and his counsel and
13 asked for a mediation plan because I was deeply concerned
14 knowing that violations were being issued, meaning work was
15 being done, people were on site, and there were hazardous
16 conditions on location.
17 Q    So do I understand from your testimony that after the
18 site visit on November 3rd, J.S. Held went back to the site on
19 other occasions and made certain observations and reported
20 them back to you?
21 A    That's right.  They were doing an extensive, not just a
22 walkthrough, they were documenting through photographic
23 evidence and specific hands-on observation really every square
24 foot of that building from top to bottom.
25 Q    How often did J.S. Held visit the site?

                CMH   OCR   RDR   FCRR

534

1  A    There were several days and it was all coordinated
2  through counsel and Mr. Xia.
3  Q    And what were the safety concerns that J.S. Held reported
4  back to you?
5  A    There were a number of, there were a number that were,
6  that were flagged to us.  Some were what I would call
7  electrical concerns.  There were potential for fire hazard and
8  there were other areas where there wasn't a railing or the
9  ability, if a person were to walk off on edge, they could fall
10 and suffer a significant injury.
11 Q    When you say there were electrical concerns, can you be a
12 little more specific, if you recall?
13 A    Sure.  And, again, there was a document and e-mail that
14 was sent to Mr. Gouraige about all of this following up on
15 conversations related to this dated November -- I'm sorry --
16 that was on, yes, that was November 24th of last year.
17         There were sockets that were plugged in that could
18 be fire hazards.  There were electrical panels and the way the
19 wiring were running that could also lead to electrocution
20 and/or fires.  And, again, I do remember specifically that
21 there were fall hazards without proper railings that could
22 lead to serious injury.  All of this were flagged and we asked
23 for a mediation plan.
24 Q    Approximately when did you ask Mr. Gouraige for a
25 remediation plan?

                CMH   OCR   RDR   FCRR

535

1  A    Verbally beforehand and then it was codified in an e-mail

2  to make sure that he and his client can see in writing exactly

3  what it was.  We enumerated these specifically and an e-mail

4  was sent on the 24th of November last year.

5  Q    Did you give any sort of deadline or indicate when you'd

6  like to get that plan back from them?

7  A    I specifically said it was extremely urgent, I needed it

8  as soon as possible because, and I flagged also the fact that

9  there were, the Department of Buildings was issuing violations

10  and it wasn't the first time, as I found out, for violations

11  of the stop work order.

12        So he, Mr. Xia, in my opinion, was aware that people

13  were on site, they were conducting work and there were

14  hazardous conditions there.  I also brought this up more

15  recently, and we can discuss this as I'm sure we will, in my

16  report.  Later there became an issue with the insurance which

17  made this even more concerning to me which is -- it was

18  concerning before that issue.  It only became even more so,

19  bold and underlined, if you will, when I found out about a

20  potential problem with the insurance.

21  Q    How many times -- well, between the day you issued the

22  request verbally and then in writing to today, have you ever

23  gotten a plan of remediation back from Mr. Xia?

24  A    No, and I said specifically that I would be open to any

25  plan of remediation and going to the Court for a release of

536

1  funds to the extent necessary to remediate those situations

2  for sure.  And no, I've not received anything.

3  Q    Going back to the onsite visit that you were at --

4  A    Yes.

5  Q    -- did you have any conversations with Mr. Xia during or

6  at the end of that visit regarding the status of the project?

7  A    Throughout the visit, meaning we were walking together

8  throughout the visit and it took several hours to, for him to

9  show me, the visit.  So, yes, multiple conversations

10  throughout the course of that visit.

11  Q    And let me just focus you specifically on whether you had

12  a discussion with him regarding how far along the project was

13  in terms of percent of completion and cost of completion.

14  A    Yes.  Mr. Xia was quite clear with me about those points

15  numerous times.  The number he used was 95 percent and his

16  estimated cost to complete at that time was $3 million.  Over

17  the course of other conversations, that number was a range

18  between 3 and 5, but that day, I think he was very clear with

19  me that he could do it for $3 million.

20  Q    And based on your personal observations during the

21  walkthrough, did you have any reaction as to whether his

22  95 percent complete estimate was in the ballpark or not?

23  A    I did and I specifically spoke to him at the time and

24  Mr. McCabe and said that it was difficult for me to understand

25  how they could say the number 95 percent but most

537

1  specifically, how they believed that they could accomplish the

2  work for $3 million and that I invited any evidence to support

3  that contention.  That was the first of many times I asked for

4  anything to support the contention of either the state of

5  completeness and/or the cost to complete.

6  Q    And why did you have some questions or concerns about

7  whether the project appeared to be 95 percent complete?

8  A    Well, there were a number of places where -- I think

9  Mr. Xia wanted me to believe and was expressing it, quite

10  frankly, numerous times and as I think he testified earlier in

11  these proceedings, he had purchased an enormous amount and

12  were sitting in a variety of boxes or crates of a variety of

13  materials that were on site and they simply needed be

14  installed.

15        He wanted me to sort of believe that with that in

16  place and the work that was required, it was almost done, but

17  it was obvious to me that 95 percent wasn't the correct number

18  and it was also obvious to me from my experience that the

19  number of $3 million based upon any range of construction

20  that's legitimate in New York City at this time and the work

21  that was to be completed, I told them at the time I did not

22  think that was right and that I, but I was very open to

23  hearing and seeing any evidence that would support that

24  contention.

25  Q    Did Mr. Xia from that day to today ever give you any

538

1  backup information to support his claim that it would only

2  cost 3 to 5 million to complete the Eastern Mirage project?

3  A    Despite numerous requests through his counsel right up

4  until the filing of this report, I have yet to receive any

5  evidence to support the number that was said to me numerous

6  times.

7  Q    Did you also visit, did you and your team also visit the

8  Eastern Emerald site on November 3rd?

9  A    That same day.  We went from Mirage, we drove over to

10  Emerald and examined that site as well.

11  Q    Okay.  Can you just briefly summarize what you observed

12  there and what the site visit there consisted of?

13  A    Yes.  If you go to the site and, again, it is secured.

14  You go inside the location and it is a very large plot of

15  land.  It has been dug significantly and there is some

16  retaining walls or curtain walls that are there supporting the

17  foundation at this time but, in essence, what you're looking

18  at, Your Honor, is a very large substantial dug hole and

19  that's why in my report, I called it initial phases of

20  construction.

21        (Continued on next page.)

22

23

24

25

539

DIRECT EXAMINATION

BY MR. MCGRATH:  (Continued.)

1  Q   Did JS Held go back to that site after November 3rd?

2  A   It's my understanding they did, although their primary
work was really at Mirage.

3  Q   Did you or your team observe any work going on at the
Eastern Emerald site on the day of the visit?

4  A   There were other individuals on site.  My recollection is
certainly more than ten individuals were on site at that time,
which again I noticed and thought it was odd given the
stop-work order situation, but that's right.

5  Q   So there was a stop order in place at the Eastern Emerald
site as well?

6  A   That's my understanding.  And again, violations have been
issued subsequent to that for violating that stop-work order,
is my understanding.

7  Q   When you said there were individuals on site, this is a
big hole in the ground, correct, so where were they on site?

8  A   They were around -- again, there's a slope as you go into
-- there's sort of a primary gate that's locked and chained.
And as you go in, there's sort of a slope going down and then
it gives you a vista view of sort of what you're looking at
from one of the corners, and so they were in and around that
location when we were there.

9  Q   Did you have any discussions with Mr. Xia on that

Andronikh M. Barna, Official Court Reporter, RPR, CRR

540

occasion or afterwards about whether work was being done on
the Eastern Emerald site despite the stop-work order?

3  A   We didn't discuss the stop-work order specifically.  He
had his iPad with him and he showed me sketches and renderings
of what Eastern Emerald would be.  And as he had previously at
the other walkthrough, at the Mirage site, he was emotional.
He was talking specifically about what the projects meant to
him, how important it was that he be allowed to finish them
and he was proud of the work.  He repeated numerous times to
me that he was proud as the owner, the developer, the
architect and engineer, that, in essence, his life's blood
were these projects.

13 Q   Did he give you any estimated cost to complete the
Eastern Emerald Project at that time?

15 A   Not at that time.

16 Q   Subsequently?

17 A   Well, we've had multiple conversations -- well, we had
multiple attempts to have conversations.  I asked repeatedly
for information that was relevant to the cost to complete for
a number of reasons.  Unlike Mirage, we're dealing with, in
essence, a hole in the ground.  The plan set that he was using
most recently was 65 percent complete and, in essence, we were
trying to find different ways to determine a cost to complete
of a building that was not yet truly started.

25 Q   Did JS Held ever report back to you regarding any safety

Andronikh M. Barna, Official Court Reporter, RPR, CRR

541

concerns they had with respect to the Eastern Emerald Project?

2  A   Not about the Emerald Project, no.

3  Q   Safety concerns related to the Mirage?

4  A   Mirage, yes, as I described earlier.

5      THE COURT:  Do you have water in front of you?

6      THE WITNESS:  I do.  Thank you, Your Honor.

7      THE COURT:  All right.

8  Q   So after the site visit on November 3rd, did there come a
time where you or your team set up a meeting at Mr. Xia's
offices?

11 A   Yes.

12 Q   What led up to -- did your team request that meeting?

13 A   We did.

14 Q   What led up to your team requesting that meeting at his
offices?

16 A   We were working extremely hard.  The deadline at that
time was I believe the 28th of November, the walkthrough was
on the 3rd, and the documents we had received to date were
missing most of what we thought was absolutely essential and
necessary.  So, coordinating with Mr. Gouraige and then with
Mr. Xia directly, with Mr. Gouraige's consent, we were
discussing what we needed, and there was a series of e-mails
going back and forth with Mr. Xia copying Mr. Gouraige about
what we had and what we were missing.  As we got closer, over
the course of the first week of November, it was clear to us

Andronikh M. Barna, Official Court Reporter, RPR, CRR

542

that there were still major holes, that what we were receiving
wasn't what we needed in several cases and other things we
still hadn't received and the calendar was working against us,
so at some point I simply said to my team and to Mr. Xia we
needed to meet with him in person, in his office, to go
through what we had and he perhaps he did not have.

7  Q   Who attended that meeting?

8  A   The meeting took place on the 11th of November.  Present
was Stavros Karageorgiou, Alexander Coppola from my team, and
an individual named Michael.  And his name Abiaoun, which is
A-b-i-a-o-u-n.  And Michael Abiaoun from JS Held.  So three
individuals were present with Mr. Xia in his office.  We had
coordinated this through Mr. Gouraige and right up until the
meeting we weren't sure whether or not Mr. Gouraige or one of
his associates would be present.  It turned out that they were
not.

17 Q   So who was present?  Was Mr. Xia present?

18 A   He was.

19 Q   Anybody else on his behalf?

20 A   No.

21 Q   Brett McCabe wasn't there?

22 A   No.

23 Q   And did your team report back to you regarding the
outcome of the meeting, the success, the failure of the
meeting, what was accomplished?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

543

1   A   Yes, they did.

2   Q   Can you give us a brief summary of what you learned

3   happened at the meeting?

4   A   Yes.  There were a series of conversations about, again,

5   primarily documents that we felt we absolutely had to have to

6   do the work.  At that time it was due in approximately three

7   weeks from that moment.  And in the course of that

8   conversation and discussions relating to his -- the workforce

9   doing the work on Mirage and trying to pin down the laborers

10  on site and the cost to complete and, again, some of the

11  numbers that were being used, Mr. Xia made a number of

12  statements relating to those individuals that gave me pause.

13  Q   Let me focus you first on the document end of this.

14      What, if anything, did Mr. Xia say or did your team

15  learn from their meeting there regarding what documents

16  existed and didn't exist?

17  A   Well, the conversation the day before this meeting and in

18  this meeting, Mr. Xia made a number of statements.

19  Specifically, I recall the following:

20      Number one, he indicated that there was no general

21  ledger or accounts payable system whatsoever.

22      Number two, he had said to us that Excel -- that for

23  him to enter numbers onto a spreadsheet was a waste of time,

24  that his entire business model was about efficiencies and

25  avoiding those sorts of things and that those things were a

Andronikh M. Barna, Official Court Reporter, RPR, CRR

544

1   waste of time and a waste of his energy, that his memory was

2   all we needed, that he had all the things we needed from his

3   memory.

4       And he went on to describe again a number of things

5   that I was, quite frankly, stunned at that point.  Just

6   hearing those things alone, for any business or concern

7   whatsoever, let alone a business that is receiving investor

8   funds and/or is in a highly regulated industry like the

9   construction industry in New York City, those statements were,

10  quite frankly, deeply troubling to me at that time.

11      He then went on to discuss how the workers onsite

12  were paid.

13  Q   What did he say about that?

14  A   He indicated that his -- we were aware, he told us, that

15  he owned a number of rental properties outside of the projects

16  we're discussing in this matter, approximately 17; that

17  routinely his wife would go around and collect that rent in

18  cash, that she wouldn't count that cash; and that based upon

19  his assessment of the level of work that was being done at the

20  Mirage site specifically, he would tell her how much cash to

21  pay individual workers, laborers on site, which she would do.

22  Q   Did you ask whether Mr. Xia had any payroll records to

23  document the payments to the workers for his different, quote,

24  subcontractor affiliates?

25  A   We did.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

545

1   Q   What did he tell you?

2   A   He indicated that he based his assessments of how much to

3   pay the workers based upon, in essence, a specific job or a

4   floor or a task that would have a certain value to it; that

5   the workers on site would have time cards and that based upon

6   his review of those time cards, that's how he would determine

7   how much his wife should pay those workers in cash.  When we

8   asked for those time cards, none were produced.

9   Q   Did you ever receive any payroll records from Mr. Xia

10  relating to the work that was done through his affiliate

11  entities?

12  A   No.  I should say that when Mr. Xia was on the stand the

13  other day, he began to talk about ADP records which relate to

14  his -- what he calls his employees, which are a different

15  group of individuals.

16  Q   Are you referring to the payroll records for the Fleet

17  company?

18  A   Yes.

19  Q   And is it your understanding -- is your understanding

20  those are office workers or pick-and-shovel type workers?

21  A   No, those are more of the engineers.  They are more --

22  and again, I think as Mr. Xia testified, I think those are

23  individuals from more the office workers, and they are two

24  different groups of people.  We were focused on the laborers

25  on site because we're focusing on cost to complete and how

Andronikh M. Barna, Official Court Reporter, RPR, CRR

546

1   that workforce is.  Of course, he was very much telling us

2   about the efficiencies, the cost efficiencies, the time

3   efficiencies and that one of the ways he generally said that

4   he could get the job done for such a cheap price, a low price,

5   was using his workforce.  So we were asking questions about

6   who they were, how they were compensated.  And that's what he

7   also talked about, one of the ways he compensated them was

8   with food.

9   Q   So did you ever see any records that Mr. Xia maintained

10  to document those payments to the, I'll call them,

11  pick-and-shovel workers?

12  A   The cash payments, no.

13  Q   Did you ask Mr. Xia or did you or your team ask Mr. Xia

14  if he took any steps to verify the legal employment status of

15  any of these workers for the subcontractors, his affiliates?

16  A   We did.  And of course that's another concern that I

17  have, is how they're being compensated, whether or not -- the

18  way they're being compensated and/or --

19      THE COURT:  Taxes?

20  A   Or involved taxes, as well as a variety of other factors,

21  including potential wage -- I don't want to use a pejorative

22  term, but there was a concern about how they're being paid,

23  that it's very important that city, state and federal law

24  governs.  I'm concerned about underreporting.  I'm concerned

25  about -- any time I hear the word cash, there are a number of

Andronikh M. Barna, Official Court Reporter, RPR, CRR

547

1  concerns that become very relevant to me.  And I reference
2  this vaguely and broadly because I also have a concern about
3  whether or not several of those workers that are working for
4  such relatively low cash payments and food, whether some of
5  them or all of them are legally residing in this country.
6        THE COURT:  It also goes to the cost to complete.
7        THE WITNESS:  It does.
8        THE COURT:  Compliance.
9        THE WITNESS:  And that's why we were asking.
10       THE COURT:  Okay.
11  Q    Did you ever see any records indicating that Mr. Xia was
12  complying with his federal, state and local tax obligations
13  regarding these employees?
14  A    We did not.
15  Q    Did you ask for those records?
16  A    We did.  I think Mr. -- if I may, I think Mr. Xia takes
17  the position -- I think he tried to explain to us that those
18  are not his employees.  Our concern was he was paying -- he
19  was directing payments to them both in cash and in food and
20  treating them like his employees regardless of what term he
21  used.
22  Q    Well, if they weren't employees of Mr. Xia's affiliates,
23  did he explain whose employees they were?
24  A    No, he did not.
25  Q    So at this point in time we're talking about late

548

1  November now.  When was your report due?
2  A    That was the 11th -- to be specific, that was the 11th of
3  November and at that time the report was due on the 28th of
4  November.
5  Q    Okay.  And what was the status of the record and document
6  production at that point in time?
7  A    Well, we were hearing specifically that a number of
8  documents we needed and expected to find in any business, let
9  alone one like this, we hadn't seen and Mr. Xia was saying
10  simply never existed, so we began to work on other alternative
11  ways to perhaps go about finding reliable ways to move forward
12  on the tasks at hand.
13  Q    And at some point did the deadline for your report get
14  extended?
15  A    Yes.  At the consent of both parties, it was pushed back
16  by an additional 60 days to the date of January 28th, the date
17  I filed it.
18  Q    And did you have any conversations with Mr. Xia's counsel
19  after the deadline was extended regarding how you could take
20  advantage of that situation?
21  A    Yes.  I was projecting, even at that time, that financing
22  absent third -- acceptable third-party financing --
23       THE WITNESS:  And by "acceptable," I mean to the
24  Court, Your Honor.  I mean to you, the SEC and to me, the
25  monitor.

549

1  A    Absent third-party -- acceptable third-party financing,
2  it was becoming very clear to me that based upon even
3  preliminary numbers from cost to complete from JS Held that an
4  undesirable outcome might be the only way to protect the
5  investors financially.
6  Q    All right.  Well, let me ask you specifically.  After the
7  deadline for your report was extended, did you have any
8  discussions with Mr. Gouraige regarding that as an opportunity
9  to obtain the documents that were missing?
10  A    To work on the documents, to work on financing.  And more
11  specifically, for Mr. Xia finally to engage with me again on a
12  number of extremely important topics, that I felt I needed to
13  hear from him directly about a number of important topics.  I
14  wanted to present to him numbers as I was getting them to hear
15  if he had anything else to offer me, to give me additional
16  context or had any potential legitimate objections to
17  information and if he could provide any information that would
18  be helpful to my work.  And I also wanted to talk about a
19  number of what I call speculative situations that without
20  his -- without his information, it would be very difficult for
21  me to quantify.
22  Q    So you were making requests to actually sit down and meet
23  with Mr. Xia again?
24  A    Repeatedly.  And more and more urgently as time was
25  pressing through December and January.

550

1  Q    And what were the responses to your request for these
2  urgent meetings?
3  A    They were denied.
4  Q    Did he tell you why?
5  A    Mr. Gouraige repeatedly told me that Mr. Xia was not
6  willing to meet with me right up and until the next time we
7  met, which I learned on a Saturday before Martin Luther King
8  Day, that Mr. Xia was finally willing to meet with me on the
9  17th of January, approximately ten days until the report was
10  due to be filed.
11  Q    Okay.  And we'll get to that meeting a little bit later.
12  A    Sure.
13  Q    But prior to that, had you been providing any information
14  to Mr. Gouraige and Mr. Xia via him regarding your developing
15  understanding of what it would cost to complete the Mirage
16  Project?
17  A    As I learned numbers, even when they were preliminary, I
18  would pass them on to Mr. Gouraige in hopes that he would get
19  -- and my understanding is that he was sharing them with
20  Mr. Xia and again my urgent request to meet with them both and
21  to talk about these issues because the deadline was
22  approaching.  And again, I wanted to give them every
23  opportunity to look at them in detail, to ask me questions and
24  for me to ask them questions and try to understand exactly how
25  to best approach this matter.

551

1  Q    And what was your working number or range of number for

2  the completion of the Mirage Project at this point in time

3  that you were conveying over to Mr. Xia through his counsel?

4  A    At that time, I was estimating between 15- and

5  $20 million, which were the preliminary numbers.  They ended

6  up, as you saw in my report, coming down somewhat when we

7  finally looked through it and went through it with a

8  fine-tooth comb.  At that time, I was indicating that it could

9  be as much as 15- to $20 million to finish Mirage.

10 Q    So you said that there was actually a meeting on Martin

11 Luther King Day.  Was that an in-person meeting or remote?

12 A    It was done remotely through Microsoft Teams.

13 Q    And prior to them -- you said they agreed to the meeting,

14 they gave you notice that Mr. Xia was willing to meet with you

15 just two days before that meeting?

16 A    On a Saturday morning.  It was a Saturday morning early

17 e-mail from Mr. Gouraige indicating that Mr. Xia was, in fact,

18 willing to meet.  There had been e-mails prior to that where

19 Mr. Xia had indicated through Mr. Gouraige that they were

20 willing to meet on a number of preconditions.  I had responded

21 both orally and through phone calls with Mr. Gouraige, as well

22 as in writing, that many of the preconditions were not within

23 my control, time was passing, and that, quite frankly, I

24 thought it was in his client's interest to meet with me

25 without any preconditions and I asked him to reconsider.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

552

1  Q    What were the preconditions that they were asking you to

2  agree to before Mr. Xia would sit down and talk to you?

3  A    I don't recall all of them, but there were a number that

4  actually were involving this matter and really were in the

5  control of the parties, not the monitor whatsoever.

6  Q    Do you remember any of them?

7  A    I don't want to mis -- I'm sorry, I don't have them in my

8  memory.  I apologize.  I knew that they -- but what I can

9  recall quite specifically was they were not only outside of my

10 power, they were not going to be able to be feasible within

11 the time we had.  And I didn't understand why there was a

12 reluctance to meet with me without preconditions that had

13 nothing to do with the terms of talking to me or relating to

14 any concerns Mr. Xia did or didn't have about talking to me

15 and under what circumstances.  They had more to do with what I

16 would call litigation and/or the matter as a whole.

17 Q    Did you relate in any way to the SEC agreeing to certain

18 things?

19 A    I remember, quite frankly, that a number of them would

20 have required the SEC's consent, which is part of what I was

21 saying, it's outside of my power.

22 Q    And that was unrelated to the actual circumstances of

23 your meeting?

24 A    Correct.  It seemed to me that Mr. Xia was trying to

25 extract certain concessions or certain litigation-related

Andronikh M. Barna, Official Court Reporter, RPR, CRR

553

1  events that had nothing to do with my job, my meeting, or my

2  deadline that was fast approaching.

3        THE COURT:  Let me stop you for one second.

4        THE WITNESS:  Sure.

5        THE COURT:  When you say consent, SEC's consent,

6  consent to what?

7        THE WITNESS:  It was a -- again, I'm so sorry,

8  Your Honor.  If I had the e-mail handy, I would be happy to

9  walk through it.  I recall specifically that the first e-mail

10 responding to came from Mr. Gouraige and had a number of

11 points --

12       THE COURT:  Preconditions?

13       THE WITNESS:  -- that most of which really fell

14 within the SEC's purview relating to dates, deadlines and a

15 variety of things that I had no control over.

16       THE COURT:  Let me ask you both to slow down.

17       THE WITNESS:  Oh, my apologies.

18       THE COURT:  Yes.  We have a great court reporter who

19 has been keeping up with you, but --

20       THE WITNESS:  I am so sorry.

21       MR. MCGRATH:  Sorry, Your Honor.

22       THE COURT:  No, not at all.  You obviously have it

23 all in your head, so go.

24       MR. MCGRATH:  Thank you.

25 BY MR. MCGRATH:

Andronikh M. Barna, Official Court Reporter, RPR, CRR

554

1  Q    So how long did the meeting actually take when you sat

2  down on Martin Luther King Day and had a WebEx with Mr. Xia?

3  A    It lasted approximately two hours, to my recollection.

4  Q    And who was present on your side and who was present with

5  Mr. Xia?

6  A    From my side, it would be myself, Mark Bloom and

7  Alexander Coppola.

8        Then on the -- Mr. Xia was present, Mr. Gouraige was

9  present and his associate, Mr. Linde, was present on that

10 call.

11 Q    And can you just generally summarize what happened during

12 that meeting?

13 A    Yes.  At that time, I had a working draft of an Excel

14 spreadsheet that had all of the relevant numbers that were

15 later contained in my report.  And I walked through -- which

16 again, we can go through in detail, but in essence, all of the

17 numbers that later ended up being in the report were laid out

18 on an Excel spreadsheet that we shared on the screen and

19 walked through in detail, allowing, number one, for the

20 counsel and Mr. Xia to see them, to ask questions or to

21 comment upon them.

22 Q    And what, if any, response were you getting from Mr. Xia

23 to what you were presenting to him?

24 A    There were some numbers that he had -- he raised issues

25 or concerns with, but when asked for specifics to back up

Andronikh M. Barna, Official Court Reporter, RPR, CRR

555

1  those, he wasn't able at that time.  And I can discuss what
2  happened in the roughly -- the approximately ten days that
3  transpired following this meeting relating to some of those
4  concerns where certain documents -- and these are all noted in
5  my report, Your Honor, where Mr. Xia provided to me in the ten
6  days after that meeting documents, they're noted in my report
7  specifically.
8  Q     Would it be fair to say that you were making a
9  presentation of your tentative findings in the report?
10 A     I was.
11 Q     And what was the purpose of you sharing those tentative
12 findings with him?
13 A     It's what I had wanted to do throughout, is one of the
14 primary tasks.  I believe the role of the monitor is to
15 provide to everybody, to both parties, the information and to
16 give all the parties the opportunity to share any information
17 that they think is relevant or perspectives that should be
18 heard before I were to issue any finding or any written
19 document whatsoever.
20 Q     Okay.  And did you ask Mr. Xia questions during that
21 meeting?
22 A     There were some, but it was -- I think the balance of
23 that meeting was mostly us trying to walk through the
24 presentation and Mr. Xia would make certain comments.  In
25 other words, it really didn't get to an area where we were

556

1  able to do, what I recall, a meaningful Q&A.  It was much
2  more -- I believe in what was only productive for that day,
3  was much more of a presentation to Mr. Xia and his counsel,
4  the things that I had been forecasting for Mr. Gouraige orally,
5  this was sort of putting it up on the screen and seeing it.  I
6  also recall that despite the fact that I was willing to share
7  that document, Mr. Xia could be heard taking photographs of
8  the images that were on a screen.
9  Q     Okay.  At any point during that meeting, did you express
10 any frustration to Mr. Xia?
11 A     I did.
12 Q     What prompted that?
13 A     Mr. Xia often would begin to talk about something we were
14 specifically looking at and there would be a lot of time being
15 spent in what I could describe best as a circular commentary
16 that was either irrelevant or it wasn't helpful to the matter
17 at hand, and that was repeating itself over and over again.  I
18 think at some point I commented upon that to Mr. Gouraige.  I
19 think Mr. Gouraige tried to get Mr. Xia to focus on what we
20 were doing.  And as that did not happen, again I expressed the
21 fact that I thought Mr. Xia was not fully engaging with me and
22 that I was trying to walk him through this and that I was
23 frustrated by that.
24 Q     Okay.  Now, after you made this presentation, did Mr. Xia
25 and his counsel ever get back to you before the report was

557

1  actually filed with any substantive comments, corrections,
2  suggestions, reactions?
3  A     So they provide -- I think over the course of the next --
4  again, this is approximately ten days until the report is due.
5  So what we received was a variety of things and, again, this
6  is noted in our report.
7        I think specifically I can recall that there is one
8  investor that Mr. Xia brought to our attention, that he had
9  documentary evidence to suggest that this investor, in 2019,
10 on April 1st of 2019, this investor, this EB-5 investor had
11 asked for a refund of her $500,000.  And there appeared to be
12 a contract, as well as some canceled checks, to indicate that
13 that 540,000 -- so specifically, $500,000 for the investment
14 and 40,000 of the $50,000 processing fee -- was being
15 refunded.  I indicated that that would be under review, that I
16 simply could not make contact with that individual and/or her
17 counsel in the limited time that I had, but that I would
18 continue to follow that up as we did.
19       More specifically, I also recall that Mr. Xia,
20 through his counsel, sent to us a blueprint for the
21 Emerald Project because, of course, he had seen that the range
22 we were using was between 333-and-a-half million dollars to
23 $400 million to -- as the cost to complete for Emerald.  And
24 in response, he sent us really two documents.  One was a
25 blueprint that appeared to have been submitted and approved by

558

1  the New York City Department of Buildings for I believe what
2  was a seven -- a smaller building, a different building than
3  the one that he had been using more recently.  And he sent me
4  a one-page PDF which purported to be the cost to complete that
5  different blueprint from 2017 to be $133 million.  I noted to
6  counsel, to Mr. Gouraige at that time, that I found it
7  interesting that the number that -- the idea that a one-page
8  PDF would be sufficient for me to be able to assess what it
9  was based upon -- I asked for any backup documentation, none
10 was provided -- and that I noted that the $133 million figure
11 was almost $200 million to the penny less than the number he
12 had seen we were using that had come from JS Held.
13 Q     So was that one-page PDF helpful to you in any way in
14 assessing the likelihood that he could complete the project
15 for 133 million?
16 A     It was not.
17       I also asked when it had been created and by whom.
18 Neither question was ever answered.
19 Q     Did you ask for any followup or backup to that estimate?
20 A     I did.  And while -- none was provided in the time before
21 the report was issued and none has been provided in the
22 approximately 20 days since the report has been filed.
23 Q     So as you sit here today, you still haven't gotten any
24 backup from Mr. Xia's estimate of $133 million to complete --
25 A     No.

559

1   Q    -- the Emerald Project?

2   A    **Based upon conversations that happened at the back of the**

3   **room yesterday, I think that's part of what Counsel wants to**

4   **try to do now.  As I've indicated, I am open to anything, but**

5   **I've also flagged whether or not -- that the ability for him**

6   **to change the plan so substantially wouldn't raise other legal**

7   **issues either to the investors and/or to other city, state**

8   **regulators and/or other potential laws as well.  I still have**

9   **not received any responses to my concern that this may be --**

10  **this may not be legally possible without incurring other**

11  **liabilities.**

12  Q    Okay.  So you ended up filing your report on January 28,

13  2022, correct?

14  A    **I did.**

15  Q    And that's Docket 53 and we've marked it as Exhibit 160.

16       Could you just turn to that report, please?

17  A    **Yes.**

18  Q    I don't plan to go through the entire report with you, I

19  just want to focus on a couple of areas to either expand or

20  update the information.

21  A    **Of course.**

22  Q    So let me first direct your attention to page 10.

23  A    **Yes.  This relates to the cost to complete Mirage, I**

24  **believe.**

25  Q    Yes.  And particularly, there is a section there on

560

1   page 10 entitled -- well, go to the top of that page.  You

2   will see there is a sentence that says, "Based on these

3   methodologies, JS Held determined that Eastern Mirage is

4   approximately 80 percent complete."

5   A    **Yes.**

6   Q    And based upon your review of their report, their

7   analysis, your personal observations there, do you have any

8   opinion as to whether that project, now that you had all the

9   information that's been developed, is closer to 80 percent

10  complete or Mr. Xia is 95 percent complete?

11  A    **I am absolutely convinced that the methodologies that**

12  **were used which are described in the report, and I'm happy to**

13  **discuss if you'd like, are sound, well documented and**

14  **completely accurate.**

15  Q    Now, the next section on page 10 I'd like to focus your

16  attention on is sub a, Fleet's historical labor.

17  A    **Yes.**

18  Q    And it says estimated 13,908,773.  Do you see that?

19  A    **I do.**

20  Q    And it says, "JS Held used defendants' current workforce

21  model to calculate this estimate.  Xia represented that he was

22  able to secure favorably low labor costs from the general

23  contractor and subcontractors."

24       Do you see that?

25  A    **I do.**

561

1   Q    And then it goes on to say, "JS Held calculated this

2   number based on various construction documents provided by the

3   defendant, many of these documents, however, lack specific

4   details and updated costs relevant to this analysis."

5        Do you see that?

6   A    **I do.**

7   Q    And then right after that you say, "The monitor has

8   reservations about using this model."

9        What are your reservations about using a model based

10  on Mr. Xia's claimed workforce and his claimed workforce

11  costs?

12  A    **I am concerned about how they're paid.  I am concerned**

13  **about how taxes are or are not being properly documented and**

14  **accounted for, I am concerned about their residency status.**

15  **Those things.  And I am concerned about safety conditions on**

16  **site.**

17  Q    And again, on page 11, footnote 46, which relates back to

18  the section I just read, it says, for example, "Defendants

19  provided a job cost report that lacked necessary details to

20  verify the legitimacy of the subcontractor's cost to complete.

21  Some of the necessary details that were missing included the

22  identities of various subcontractors, vendors and other

23  entities."

24       Do you see that?

25  A    **I do.**

562

1   Q    Have you subsequently received any documentation from

2   Mr. Xia that would identify who these people were?

3   A    **No.  They would be like an -- the document we're**

4   **referencing here is an example in 46 I remember looking at.**

5   **It's called cost to complete and it's broken out by**

6   **categories, but it's not identified by subs.  It's simply an**

7   **Excel spreadsheet with numbers without the detail to back it**

8   **up.**

9   Q    So, you sat here and you heard Mr. Xia testify at the

10  hearing over two days, correct?

11  A    **I did.**

12  Q    And you heard his testimony that he claims that he's

13  entitled to millions of dollars that were transferred to his

14  entities because his subsidiary affiliates were performing

15  construction related work on the Mirage and Emerald Project;

16  you heard that testimony?

17  A    **I did.**

18  Q    Have you seen any documents that would back up the claims

19  that this work was actually done and in the amount that it was

20  billed?

21  A    **No.**

22  Q    Have you asked for documentation that would allow you to

23  verify one way or another whether the services that the

24  invoices that he sent and the monies that he received were

25  justified by work actually performed?

563

1   A    Yes, my team and I.  So when I say "I," I want to be very
2   clear, it's my team and it's JS Held, my expert group, asked
3   about all of these things, yes.
4   Q    And you haven't received it?
5   A    No.
6   Q    Now go to page 12, please.
7        There's an estimate there for the cost to complete
8   the Emerald Project?
9   A    Yes.
10  Q    And it says, "JS Held estimates the total cost to
11  complete Eastern Emerald to be $333,496,777."
12  A    I do.
13  Q    Do you see that?
14       Now, have you seen any documents where Mr. Xia
15  himself had given an estimate to complete Emerald that was
16  equal to or in excess of this amount?
17  A    Yes, and several of them are referenced in the report.
18  He, in some documents, had indicated that the cost to complete
19  Emerald was $357 million.  He indicated to the individuals,
20  his lawyers who were assisting him with his tax credit, that
21  it would cost $400 million.  And again, there were numbers of
22  examples of those, which is why in the end I decided to use --
23  it's interesting that our expert, JS Held, was actually the
24  lowest one of all of those; and I used that as the low and I
25  used 400 million as the high in my various scenarios.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

564

1   Q    Can you turn to page 13, please?
2   A    Yes.
3   Q    So it says here, the first full paragraph, "To calculate
4   this estimate," referring to JS Held's estimate to complete
5   Emerald, "additionally plan to utilize historical cost
6   information from Eastern Mirage to establish pricing for
7   similar items of work.  Despite multiple requests, however,
8   defendants failed to provide documents required for this
9   approach, including estimates, vendor and subcontractor quotes
10  and customary project specifications.  Additionally, the
11  architectural plans in the plan set were only 65 percent
12  complete and did not include structural drawings."
13  A    Yes.
14  Q    And then did it surprise you or did you have any reaction
15  when you learned that in 2021, the Eastern Emerald Project
16  only had architectural plans that were 65 percent complete?
17  A    I certainly was concerned about what the investors knew.
18  That certainly crossed my mind at the time.
19  Q    What do you mean by that?
20  A    Well, what had been promised and where we were.
21  Q    Okay.  And then footnote 52 on page 13, you say, "For
22  example, defendants provided a foundation and structural
23  subcontract issued to Perini with the scope of work and
24  schedule of values lacking sufficient detail to identify
25  specific scopes of work and associated costs.  Defendants also

Andronikh M. Barna, Official Court Reporter, RPR, CRR

565

1   provided the reference guaranteed maximum price contract
2   issued to Racanelli for Eastern Emerald Project construction
3   in the amount of 357,714,000."
4        Do you see that?
5   A    I do.
6   Q    And it says "but no detail or breakdown included."
7        Have you ever seen any breakdown or detail as to how
8   they got to that number?
9   A    No.
10  Q    Or any support for the work that was billed to Perini?
11  A    No.
12  Q    Foundation or structural work?
13  A    No.  And that's another reason why again I kept insisting
14  that a meeting would be helpful.  Because as we go through
15  these, to the extent Mr. Xia wanted to point out any documents
16  to support these things, I wanted to make sure he had every
17  opportunity to do so.
18  Q    Okay.  All right.  Just turn to page 15, please.
19  A    Yes.
20  Q    There's section entitled "Potential Eastern Emerald Tax
21  Credits."
22  A    Yes.
23  Q    And it's a very detailed discussion of what tax credits
24  have been received and what potential tax credits Mr. Xia and
25  his entities may be eligible for; is that a fair statement?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

566

1   A    It is.
2   Q    Is there any way that you can predict right now or
3   ballpark how much of these potential tax credits he will
4   actually be entitled to?
5   A    There are two different kinds.  $35 million of the
6   potential tax credit would require the building of
7   Eastern Emerald to be completed and operational by 2025.  The
8   remaining 37 million and change would be based upon the
9   ongoing audits that are going on by New York State about the
10  cost and the work done and whether or not he is entitled to
11  those payments as he was the original $11 million that were --
12  that was discussed in the first two days of this hearing.
13  Q    Okay.  And his tax returns are undergoing audit right
14  now?
15  A    A number are under audit, that's right.
16  Q    So it's difficult to determine how much, if any, tax
17  credits will ultimately result?
18  A    Yes.  As I indicated in my report, I used zero as the low
19  and I used the complete amount of approximately $72.8 million
20  as the high because at this time I am unable to determine the
21  likelihood of how much and when any of those numbers would
22  actually be realized.  So I called it a potential -- I broke
23  down actual assets and distinguished those from potential
24  assets.  This is one of them.
25  Q    Okay.  Can you turn to page 17 of the report, please?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

567

1    A    Yes.

2    Q    There's a discussion on pages 17 through 19 of project

3    appraisals and valuations.  Do you see that?

4    A    I do.

5    Q    Is it fair to say that in this section you go through a

6    more detailed summary of various appraisals that had been done

7    for the value of the Emerald and the Mirage projects in

8    various states as it is completed and some other iterations?

9    A    There were a total of five, three appraisals that were

10   done for the Mirage Project and two that were done for Eastern

11   Emerald.  We looked at them all very carefully.

12   Q    All right.  And again, I'm just going to summarize and I

13   am not going to represent that this is a complete summary of

14   what's in here, but --

15   A    Sure.

16   Q    -- is it fair to say that with respect to the

17   Mirage Project, that the as-is appraisal values range from

18   approximately 140 million to 177 million?

19   A    As is, that's correct.

20   Q    And that the as-completed appraisals for Mirage range

21   from approximately 153 million to 200 million?

22   A    To 200.8 if my rec -- by my recollection.  That's right.

23   Q    And then turning to the Eastern Emerald appraisals again.

24   A    Yes.

25   Q    And just summarizing the information that's set forth in

568

1    much more detail in your report.

2    A    Yes.

3    Q    But is it a fair summary to say that the Emerald as-is

4    appraisals range from approximately 51.2 million to 59

5    million?

6    A    Yes, but I think I -- as I do in my report, I think it's

7    important to recognize that that was the best apples to apples

8    comparison we could do with the two appraisals done on

9    Emerald, one by Cushman & Wakefield and the other by a firm

10   called BBG, whose total numbers varied by approximately

11   $100 million.  The best apples to apples as-is valuation we

12   could find from the two appraisals are the exact numbers you

13   just said for the land as it currently sits.  When we looked

14   at why BBG had given a total of number of closer to -- well,

15   approximately $156 million, it largely had to do with them

16   crediting all of the remaining tax credits as if they would

17   definitely be realized and some of the costs for the

18   improvement that Mr. Xia had testified to that he had done on

19   site.

20   Q    And again, you set forth and identify in your report

21   certain caveats and certain, you know, potential variations on

22   how to do the appraisal, but at a very high level, do you have

23   any concerns about whether or how much weight you can give to

24   the appraisals that were done by those entities to make a

25   determination and a recommendation by you at this point in

569

1    time?

2    A    Yes.  The primary caveat that's there for these or any of

3    the appraisals in writing, and quite clear, is that the

4    information provided by Mr. Xia was complete and accurate in

5    2019 and the summer of 2021 and that does give me some pause.

6    Q    Okay.  Do you have a recommendation as to whether any

7    appraisals should be done going forward here?

8    A    Yes.  Pending the conversations that I believe are going

9    to occur between the parties and Your Honor's instructions, I

10   do believe that it would be helpful for a variety of scenarios

11   to obtain a current market valuation as-is with all of the

12   facts available to an appraiser.  We have identified a group

13   that would be independent and can do that work for a flat fee

14   that if it would be advisable, Your Honor, we would be pleased

15   to put an order forward for their attention.

16   Q    Thank you.

17        THE COURT:  Thank you.

18   Q    Can I turn your attention to page 20 of the report, the

19   section entitled "Current and Potential Liabilities"?

20   A    Yes.

21   Q    Did you and your team try to identify all current and

22   potential liabilities that the Mirage and Emerald projects

23   were subject to?

24   A    We did.

25   Q    And how comfortable are you that you've identified all

570

1    such potential and current liabilities to date?

2    A    I would be hard-pressed to say that I am 100 percent

3    complete that they've all been identified.  This is our -- as

4    I hope you can see from the report, it's an extensive amount

5    of work done over the course of four months under difficult

6    circumstances and some of these things came up at odd

7    difficult times.  I can discuss that in detail, but, in other

8    words, the way this information has been forthcoming and/or

9    discovered does not make me comfortable that everything that's

10   there has been identified.

11   Q    Okay.  And I just want to focus you on two particular

12   subcontractors that you had identified as having outstanding

13   bills.

14   A    Sure.

15   Q    And this is on page 20 of your report.

16   A    Yes.

17   Q    Specifically, there is an entity called SKF Electrical?

18   A    Yes.

19   Q    That apparently was owed approximately 1.74 million from

20   Perini.

21   A    Yes.

22   Q    And an entity called Great City Plumbing that was owed

23   approximately 2.142 million.

24   A    That's right.

25   Q    Was there some effort by your team to speak to those

571

1  entities to verify the outstanding liabilities and did
2  anything occur in response to those inquiries to raise some
3  questions in your mind?
4  A    There were a number of attempts to speak to them.  And to
5  be clear, this liability of approximately $3.8 million was
6  part of the numbers that we shared with Mr. Xia and his
7  counsel in the meeting we described on Martin Luther King Day
8  on January 17th.  So in the ten days -- part of what was
9  provided in the ten days between that meeting and the report
10 being due, we received two liens of waiver on January -- dated
11 January 20th that purported to indicate that none of this
12 money was actually owed, that the two subs -- we were told
13 these documents indicated that these subs were, in essence,
14 indicating that they were whole and that this $3.8 million
15 could be removed from my report, but I had concerns about some
16 of the things we saw.  And in the conversations that have
17 happened since my filing of the report, they continue to have
18 me concerned.
19 Q    And what were those concerns?
20 A    Well, at first they got some of the parties wrong.  So,
21 in other words, between Racanelli and Perini, one of the lien
22 waivers was from the wrong party, quite frankly.  The waiver
23 was being issued by the wrong one, which seemed to me to be
24 odd.  The timing of January 20th, three days after our
25 meeting, seemed to be suspicious.  And when we've asked those

Andronikh M. Barna, Official Court Reporter, RPR, CRR

572

1  individuals at each of those subs to provide -- we had the
2  invoices, so we simply said show us the payments that
3  correspond to these that lead you to issue a lien of waiver,
4  they still have been unable to do so.
5  Q    How did these documents get to your attention?  How were
6  they conveyed to you, these liens of waiver?
7  A    They were sent through counsel.
8  Q    Okay.
9       THE COURT:  Mr. Gouraige?
10      THE WITNESS:  I believe it was actually his
11 associate who sent them to us, but yes, it was that law firm.
12 Q    And the term lien of waiver, does that mean that there
13 was a lien in place before this happened?
14 A    Let's just say also that the type of document and what it
15 purported to be also leaves something to be desired.  It was
16 being presented to us as proof that would be sufficient for us
17 to consider the monies not owed.  I am not ready to make the
18 determination that as they sit, they either are accurate or
19 that that document would, in fact, reflect that state of
20 events.
21 Q    Okay.  And you also identify in your report quite a
22 lengthy list of lawsuits that are pending against Mr. Xia and
23 various of his entities, correct?
24 A    Yes.  I believe it was an exhibit to lay them out
25 specifically, everything we've identified up through the

Andronikh M. Barna, Official Court Reporter, RPR, CRR

573

1  filing of this report.
2  Q    And those lawsuits contain claims that are being brought
3  against Mr. Xia and his entities and some counterclaims that
4  they are bringing against the parties that have sued him,
5  correct?
6  A    That's right.
7       And it was compiled specifically because under the
8  monitorship order, that's part of my duties, is to be aware of
9  and I have certain powers relating to the resolution,
10 settlement of any and all of those potential -- those
11 litigations that are ongoing.
12      I also was assessing them-- and we had a separate
13 section of our Excel spreadsheet for what we called
14 speculative, right?  And so Mr. Xia certainly wanted me to
15 understand the counterclaims and the value of those
16 counterclaims, just as, in essence, we tried to quantify if
17 the plaintiffs in those matters were successful, what the
18 liability would be.  And in the end, like any litigation, the
19 outcome is highly speculative and, therefore, we did not
20 include those as a potential liability or an asset.  It's just
21 too speculative.
22 Q    And because it's too speculative, does that make it more
23 difficult for you to determine ultimately what liabilities
24 these projects will have?
25 A    Certainly.  They could be -- the plaintiffs could be

Andronikh M. Barna, Official Court Reporter, RPR, CRR

574

1  successful.  There could be -- there's so many possible
2  outcomes of those or any other litigations and there are -- as
3  you can see from the exhibit, they are numerous.
4  Q    So are you aware that the defendants have sort of taken
5  the position and raised with us the possibility that the SEC's
6  request to freeze $229 million which reflects the money that
7  the EB-5 investors made to Mr. Xia and the partnerships that
8  were over-secured on that because the as-is appraisals plus
9  the amount of money on hand is in excess of that?
10 A    I am aware of it.
11 Q    And what is your position on whether the investors or the
12 SEC are over-secured based on the appraisals and the amount on
13 hand minus the current identified and potential liabilities
14 and the way you get to the appraisals that are cited in your
15 report?
16 A    Sure.  So if I may, I'll try to do this efficiently as I
17 can.
18      I think the first you need to consider which are
19 liquid assets versus illiquid assets.  And so for me, why we
20 separated them into the report in different ways was, in
21 essence, at the time the report was issued, we had only
22 done -- we only asked the Court for permission to pay one --
23 and again, my apologies, Your Honor, for the timing of it.  I
24 can get into why it was the way it was at the end of the year,
25 but in terms of the back taxes, we were made aware of a

Andronikh M. Barna, Official Court Reporter, RPR, CRR

575

1  circumstance and needed to move quickly to try to avoid
2  additional penalties.  But, in essence, that was the only
3  expenditure that's drawn down so far.
4          We've worked very hard to protect those assets as
5  they currently exist.  So the total number as identified is
6  approximately $79.9 million in what I would call liquid assets
7  available to be spent.
8          The first -- the next thing you need to do is to
9  look at what expenses will be coming from that within the next
10  six months to -- next 6 to 12 months.
11         As you can see from my report, there are going to be
12  additional taxes that are going to be due in July.  There are
13  going to be a variety of interest payments relating to Eastern
14  Emerald and/or CTBC.  There are going to be my fees.  There
15  are going to be -- there's a number of things that are going
16  to be -- insurance, which we haven't discussed but are
17  addressed in this report, that need to be dealt with I believe
18  quite urgently.  And using Mr. Xia's numbers as a captive
19  insurance company, he's quoting one and a half million dollars
20  for the premiums to be extended simply for general liability
21  and potentially some new builders risk insurance.  To get it
22  from an independent third party, I estimate would be more.
23         So when you begin to add up what are likely to draw
24  down from that number, in my estimation that number will be
25  reduced between 10 and 15, if not $20 million, in the upcoming

577

1  (Continuing)
2  A    Then the assessment of the value of the two properties,
3  which you've discussed in the appraisals section, have a
4  number of caveats; those are illiquid assets.  They do have
5  the caveat that all of the information that was provided by
6  Mr. Xia is complete and accurate, which again gives me pause.
7  Their timing gives me pause.  And that's another reason why I
8  believe that you would need a current, with everything on the
9  table, valuation before a decision such as this.  A decision
10  relating to any change of the current status, the asset
11  freeze, and/or providing additional control to Mr. Xia about
12  the assets.
13         I also have to reiterate the lack of controls, the
14  lack of accounting, the failure to pay taxes, the failure to
15  deal with building violations, the number of things that --
16  leaving aside all the complaints in the allegation, things
17  that my team and I have observed in the course of four months,
18  I am basing it on that alone, leads me to have significant
19  concerns and reservations about Mr. Xia getting control over
20  those assets.
21  Q    Okay.  Thank you.
22         So let me just focus you on the insurance issue for
23  a minute.
24  A    Sure.
25  Q    And again, you have a very detailed section in there

576

1  months.  So the number of 79.9 should actually be much closer
2  to 15- to $20 million less, to be conservative.
3
4          (Continued on the next page.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

578

1  regarding the insurance, but -- and there's some nuances there
2  that, frankly, I'm not sure I understand.
3  A    That's fine.
4  Q    But in simple terms, right now, is the Mirage building --
5  what's builder's risk insurance?
6  A    Well, there's two types of insurances; general liability
7  insurance, which is what Mr. Xia and his Captive Insurance
8  Company, which he testified to the other day, had issued and
9  we received in December through counsel, mid-December, as I
10  recall, mid to the second half of December, two notice of
11  cancellations from his own Captive Insurance Company on the
12  Mirage project, for what's known as general liability
13  insurance.
14         They were undated and, in essence, we were presented
15  with a proposal to if we authorized $1.5 million, we could --
16  in essence, they could provide coverage for the period from
17  the lapse forward, meaning there would be no gap in coverage
18  according to Mr. McCabe and other counsel for Mr. Xia, but we
19  could also apply our second type of insurance that had been
20  contractually -- he had been contractually obligated to obtain
21  and had not previously by Emerald Creek Bank, and which we
22  believe is in the best interests of the investors to have
23  builder's risk.
24         So builder's risk is what would happen if there were
25  an earthquake or a fire.  So imagine a circumstance in which

579

1  Mirage, as it currently stands at 80 percent complete, were
2  somehow damaged by an event.  Currently, there is no builder's
3  risk insurance whatsoever, and Mr. Xia had not secured it on
4  his own, and only began to price it out when Emerald Creek
5  required it as part of the $15 million loan for which there's
6  been testimony about here in the past few days.
7  Q    So to put it in simple terms, that as we sit here today
8  if the building at the Eastern Mirage site is damaged or
9  destroyed, there's absolutely no insurance to make up for
10  that; is that correct?
11  A    That's our understanding, and that understanding also
12  comes from conversations with counsel for Mr. Xia.
13  Q    I'm sorry.
14        And to your knowledge, has there ever been builder's
15  risk insurance on the building at the Mirage project?
16  A    No.  Quotes have been supplied and there is a proposal
17  that is before us to -- they've asked us to come to the Court
18  to, in essence, allow what is the equivalent of approximately
19  $1.5 million, which is outlined in the report, so that
20  Fleet -- the Captive Insurance Company, Fleet, along with
21  three other insurance companies on the builder's risk, could
22  provide the insurance that Mr. Xia contractually obligated
23  himself to do as part of the $15 million loan.
24  Q    Okay.
25        But that's not in place now?

VB   OCR   CRR

580

1  A    No, it's not.
2  Q    And just, again, without getting into the weeds on this,
3  the Fleet General Insurance Group, is that the entity that
4  you've referred to as the Captive Insurance Company?
5  A    I -- I do.  The Vermont-based insurance company that
6  Mr. Xia testified to, I believe, yesterday.
7  Q    And who owns that company?
8  A    Mr. Xia and the defendants.  Yes, my understanding.
9  Q    Do you know whether that company has any assets?
10  A    I'm not aware of if it currently has any assets, no.  I
11  don't know.
12  Q    And do I understand your testimony to be that there was
13  some sort of general liability insurance that the Captive
14  Insurance Company issued to what, the Mirage developer?
15  A    That's correct.
16  Q    Okay.
17        And were there any assets that the Captive Insurance
18  Company had that it could use to satisfy any claim if there
19  was a claim under the general liability insurance policy?
20  A    What we were -- I am so sorry.
21  Q    I think -- do you understand the question?
22        THE COURT:  The question was:  And were there any
23  assets that the Captive Insurance Company had that it could
24  used to satisfy any claim if there was a claim under the
25  general liability insurance policy.

VB   OCR   CRR

581

1  A    So what we were told and what we were trying to examine
2  was whether premiums had been paid previously on the Captive
3  Insurance, which would be an assess that could be used by that
4  Captive Insurance Company for general liability, which is
5  distinguished from builder's risk in the sense if somebody's
6  injured on premises, that's more of a general liability,
7  whereas builder's risk is for sort of damage or catastrophic
8  loss of the value.  I'm extremely worried about the lack of
9  builder's risk as well.
10        On one level you can say there's a stop work order
11  and if conditions were safe, I still -- I think you need both
12  types of insurance, but if there were a catastrophic loss, the
13  value, whether it's 140, 177, or whatever number we came up
14  with, it's entirely at risk right now.
15        THE COURT:  So if -- you have to dumb this down for
16  me a little bit.
17        THE WITNESS:  Sure.
18        THE COURT:  Your recommendation is that the
19  defendants should get --
20        THE WITNESS:  Builder's risk.
21        THE COURT:  -- builder's risk, right, I understand
22  that, even though there are stop orders because that protects
23  the building from going up in a ball of fire.
24        THE WITNESS:  Correct.
25        THE COURT:  And being rendered valueless.

VB   OCR   CRR

582

1        But the general liability insurance -- I am sorry, I
2  missed it.  What is the status of it?  You said you --
3        THE WITNESS:  No.  According to Mr. Xia and his
4  counsel, it's in lapse.  It provides two notice of -- in
5  essence, they indicated without reason and undated document
6  for general liability is in default.
7        THE COURT:  So money has to be spent.  I mean, I
8  guess it could be tied to when work resumes, right?
9        THE WITNESS:  It could be.  Although, again, I note
10  and what I've indicated to his counsel numerous times is, we
11  have people on-site.  Mr. Xia is aware of it.
12        THE COURT:  Right.
13        THE WITNESS:  It's unsafe and now we have an
14  insurance issue, all of which gives me -- and the building
15  violations.  I think there was a building violation issue for
16  a violation of the stop work order the week the report was
17  due.
18        THE COURT:  All right.
19        And have you estimated, and I apologize if I missed
20  it, how much it would cost to get both types of insurance?
21        THE WITNESS:  We were in the process of talking to
22  independent insurance companies to look at completely
23  independent arm's length.  We should have those in the next
24  few days.
25        THE COURT:  A ballpark, though?  Do you have any

VB   OCR   CRR

583

1  sense?
2          THE WITNESS:  Not enough for me to say out loud,
3  Your Honor.
4          THE COURT:  Okay.
5          THE COURT:  More than the number that's been
6  provided by Mr. Xia and his counsel at the 1.5, but I don't
7  know more than that and I wouldn't want to speculate.
8          THE COURT:  Okay.  Thank you.
9          THE WITNESS:  Sure.
10  BY MR. McGRATH:
11  Q    And again, I certainly don't profess to be an insurance
12  expert either, but just a couple more questions on this.
13  A    Sure.
14  Q    Because I think it's relevant.
15       You indicated that the Emerald Creek entity had
16  requested that there be general insurance -- general liability
17  insurance and builder's risk insurance taken out on Mirage to
18  secure the $15 million loan that had been given to Mr. Xia?
19  A    Yes, because as we heard yesterday, I believe, Mr. Xia
20  provided a first priority lien to Emerald Creek as security
21  for the $15 million loan.  Therefore, the bank insisted on
22  certain conditions, one of which was that the building be
23  properly insured, both with general liability and with
24  builder's risk insurance, at a certain level that's codified
25  in their agreement.

VB    OCR    CRR

584

1  Q    Right.
2        And isn't that requirement that the X & Y entity and
3  Mr. Xia get the insurance made out to them?
4  A    I don't have that to memory, I'm sorry.  I believe that's
5  correct, but I don't have that to memory.
6  Q    Okay.
7        If that's correct --
8  A    Yes.
9  Q    I think that --
10         THE COURT:  Do not talk over each other.
11         MR. McGRATH:  Sorry.
12  Q    If you go to page 22 of your report, the last paragraph,
13  second sentence says:  To secure the loan, Emerald Creek
14  required Xia/X & Y Development to maintain general liability
15  and acquire builder's risk insurance.  Do you see that?
16  A    I do.
17  Q    Okay.
18        So it's one thing for X & Y development to have the
19  builder's risk, but that X & Y is not the developer, correct?
20  A    Right.
21  Q    That's not the entity that owes the money back to the
22  general and limited partnerships and the investors, right?
23  A    That's my understanding, right.
24  Q    So even if that insurance was gotten out of the name of
25  X & Y Development, that wouldn't necessarily provide any sense

VB    OCR    CRR

585

1  of safety or confidence in the investors that if the building
2  goes down developer, FSG would have the money to pay them
3  back, right?
4  A    That's correct.  This is an agreement between Emerald
5  Creek and the parties here and only made relevant to what
6  we're doing and the issues you're raising because of the lien
7  that was provided by Mr. Xia to obtain the $15 million loan
8  we've heard about.
9  Q    Okay.  One more question on this.
10        The Captive entity, Fleet General Insurance Company.
11  I asked you a little earlier about what, if any, assets they
12  had.  I think you indicated they might have gotten some
13  premiums, but do self-insured entities typically take out some
14  type of protection themselves through reinsurance agreements
15  to make sure there's sufficient assets available to satisfy
16  any claims that may arise?
17  A    Yes.  That's -- we have -- yes, the answer is yes.
18  That's a standard protocol and procedure for insurance
19  companies, correct.
20  Q    And do you have any knowledge that Mr. Xia's Captive
21  Insurance Company ever obtained any such coverage as backup to
22  make sure that if there was a claim against that Captive
23  Insurance Company, there would actually be sufficient assets
24  for them to honor their obligation?
25  A    That's -- that's correct.  That is another significant

VB    OCR    CRR

586

1  risk that they didn't do what's standard there and that gives
2  me significant pause, and another reason why I wish we have
3  not moved forward with the proposal, but forward by Mr. Xia
4  and his counsel to come to the Court for an Order of $1.5.
5  Q    Okay.
6        Just moving along to page 23 --
7  A    Yes.
8  Q    -- please.
9        Loans to be repaid.  And specifically, footnote 87.
10  You identify that there's certain additional loans that appear
11  to be outstanding in the names of SG IC, Manekineko, that's
12  M-A-N-E-K-I-N-E-K-O, Group, Shangri-La Group Green, Inc., and
13  Eastern Emerald Group.
14        Do you see that?
15  A    Yes.
16  Q    Do you have any more information you can share with us as
17  to the nature of those loans, the amounts, what the status of
18  them are?
19  A    We've been in consultation with CT BC Bank and continue
20  to believe that the numbers that these loans are, in fact,
21  properly assessed and will need to be repaid.  We're in
22  conversations right now about both interest and how to resolve
23  those outstanding loans at the present time.
24  Q    Okay.
25        So I think I've used an acronym FGIC and it should

VB    OCR    CRR

587

```
 1   be FGIG.  So I apologize for that.
 2           All right.  Page 24.
 3   A    Yes.
 4   Q    Give me one second here.
 5           I think I can skip over that.  I think I've covered
 6   your concerns over document and financial management systems.
 7           Okay.  Page 26, please.  Just the section that deals
 8   with:  Estimated funds required to complete the project.
 9   A    Yes.
10   Q    And again, just at a very high level, is it fair to say
11   that you have estimated for Mirage that the estimated cost to
12   complete could be a low range of roughly 33.7 million to
13   55.8 million?
14   A    The cost to complete Mirage?  The cost to complete
15   Mirage, I believe, is 13.9 to $16.7 million, is what I believe
16   is the range of the cost to complete based upon three
17   different models that GSL used.
18   Q    Oh, I'm sorry.  I'm actually looking at the bottom.
19           If you go to page 26.
20   A    Yes.
21   Q    You've got the estimated cost to complete --
22   A    Oh, I see.
23   Q    We are going to talk over each other again in the effort
24   to move along, but let's slow down.
25   A    Yes.
```

588

```
 1   Q    I can direct your attention to the very bottom number?
 2   A    Yes.
 3   Q    Total estimated cost to complete, and that takes into
 4   account not only the actual cost to complete the building, but
 5   all the other associated unpaid liabilities, et cetera,
 6   correct?
 7   A    To the best of our abilities, that is correct.
 8   Q    All right.
 9           And again, just to do this in a summary fashion for
10   now, the estimated -- total estimated cost to complete Eastern
11   Mirage you estimate to be a range of 33.7 million roughly to
12   55.8 million?
13   A    Yes.
14   Q    And on the next block there, total estimated cost for
15   Emerald is --
16           THE COURT:  Roughly 334 to 400 million.
17           THE WITNESS:  Yes.
18   Q    Yes, 334,413 to 400 plus million, correct?
19   A    That is correct.
20   Q    All right.
21           And again, has Mr. Xia, since this report was filed,
22   given you any documentation or explanation as to why those
23   numbers are not accurate or the range of numbers not accurate?
24   A    I don't believe he contended that they were not accurate.
25   I think he presented to me an older building plan and a
```

589

```
 1   one-page summary .pdf that if those were acceptable, would
 2   change the number up above by approximately $200 million,
 3   which I'm in no way is suggesting is correct or accurate.  I'm
 4   simply trying to answer the question you've asked.
 5   Q    Okay.
 6           And lastly, sort of a big picture section of this
 7   report, page 29 through 33.  You set out four potential
 8   scenarios going forward, correct?
 9   A    Yes.
10   Q    One is sell both Mirage and Emerald.  The second one is
11   complete Mirage, sell Emerald.  The third is the reverse.  And
12   the fourth is to just build them both, correct?
13   A    Yes.  In an infinite number of possibilities, we felt
14   that this would be the most helpful to the Court based upon
15   the 11B assessment and the time allotted to us.
16   Q    Right.
17           And fair to say that scenario one, which is that you
18   sell both projects, is the one at least based on your analysis
19   as of the time of the report, is the one that is the most
20   economically feasible absent significant third-party
21   financing?
22   A    I believe that caveat is the most important part of that.
23   Of course this option comes with some negatives as well.  But
24   in terms of it is the only option of the four scenarios that
25   absent financing allows us to repay the investors the
```

590

```
 1   $229 million and to settle what we know to be and have been
 2   able to determine to be standing and the debts that will come
 3   do.
 4   Q    And again, I don't think -- and obviously the Court can
 5   correct me if I'm wrong -- but I don't think that we need you
 6   to make any definitive recommendation today on what the right
 7   solution is.  That's not really the purpose of this hearing.
 8   A    Yes.
 9   Q    But is it fair to say that if the Court were to consider
10   scenarios two, three or four, they would all require
11   substantial third-party financing?
12   A    Absolutely.  Ranging -- and they actually range in the
13   number which is there, I think from scenario two through
14   scenario four, the deficits that would be incurred by those
15   are estimated under the best case scenarios between 50 million
16   to $500 million.
17           So the answer to that question is yes, to a varying
18   degree, based upon which scenario the amount of financing
19   would be required.
20   Q    Okay.
21           And as you sit here today, has Mr. Xia or his team
22   presented you with any viable, realistic, third-party
23   financing that would be sufficient to carry out either
24   scenarios two, three or four?
25   A    I'm thinking carefully about the adjectives you are you
```

591

1  are using in your question. They have presented two potential
2  financing options, but I would not describe them at this stage
3  to fit the adjectives you just used.
4  Q   All right.
5       And without getting into the details, the two
6  financing options that you just alluded to in your testimony,
7  is it fair to say that those related more to a way to replace
8  the asset freeze with some alternative financing, as opposed
9  to it being financing that be sufficient to build the
10  projects, given the cost that you've identified it may take?
11  A   Yes. The first of the two, without getting into too much
12  detail, just to broadly cover them --
13      THE WITNESS:  And I will avoiding the name if I may,
14  Your Honor, simply because that's, it's been my understanding
15  from Mr. Xia's counsel, that there's confidentiality
16  surrounding these negotiations.
17  A   But the first was, in essence, as I described it broadly,
18  a proof of funds that; that this lender would put $229 million
19  in an account to be held through a period of time. There was
20  a draft term sheet that was presented, a variety of meetings
21  and conversations about what that did and did not purport to
22  do went on.
23      And then as those conversations were unfolding,
24  counsel for Mr. Xia reached out to, I believe, both the SEC
25  and myself with an urgent request to look at a second option

VB   OCR   CRR

592

1  that was presented to us as both time sensitive, extremely
2  urgent, and was presented to me as at that time the favored
3  approach. That was a different lender that was willing to put
4  forward $177 million under a draft agreement that I saw a copy
5  of.
6       And in a meeting with -- the SEC were present, I was
7  present and counsel for Mr. Xia was present to discuss -- they
8  insisted on a meeting right away, which I think was done
9  relatively quickly. We walked through the draft and flagged
10  several concerns, one of which was the argument, in essence,
11  was 177 million plus tax credit plus assets on hand would be
12  sufficient to pay back the investors. The problem with that
13  argument was that the very things that were being added to the
14  $177 million were secured and referenced as collateral in the
15  agreement itself.
16      When this was pointed out to counsel during the
17  call, along with a number of other issues, including the fact
18  that this financial institution had only been founded in April
19  of last year under some unique circumstances, to put it
20  vaguely or mildly, counsel began to shift back to the
21  potential of the first option that I'd referenced earlier. At
22  that point, my last recollection of what was what transpired
23  was a request from Mr. Stoelting and/or the SEC in general, to
24  have a conversation with the principal at that first
25  financing. We were told they would get back to us and that

VB   OCR   CRR

593

1  request has been pending since, my best recollection, the
2  middle of December.
3  Q   Okay. All right. Again, thank you for that.
4       THE COURT:  Can I ask a point of clarification?
5       THE WITNESS:  Yes.
6       THE COURT:  The first scenario involved, you said,
7  $229 million to be held in an account for a period of time.
8       THE WITNESS:  Yes.
9       THE COURT:  But pardon my ignorance --
10      THE WITNESS:  No.
11      THE COURT:  -- to be used --
12      THE WITNESS:  No.
13      THE COURT:  No.
14      So what's the purpose? Is it collateral or --
15      THE WITNESS:  The best it was presented and, please,
16  I do want to be fair, it's a discussion that has been
17  evolving.
18      THE COURT:  Right.
19      THE WITNESS:  But as I recall what was being
20  presented was it was going to be there in the event that the
21  SEC were successful in any of its litigations that the amount
22  of money would be available and held in this account.
23      THE COURT:  To repay investors or --
24      THE WITNESS:  That's the argument, but that was what
25  was also missing from the agreement. There was nothing in the

VB   OCR   CRR

594

1  agreement that I would actually allow, should that event
2  occur, the SEC to access those funds.
3       THE COURT:  Right.
4       THE WITNESS:  It was purely what I call a proof of
5  funds. This is one of the issues we were discussing.
6       THE COURT:  Right.
7       THE WITNESS:  When the second one was brought up,
8  then it was sort of deflated and came back to the first. And
9  we've been in this mode ever since.
10      THE COURT:  Okay.
11      THE WITNESS:  I discussed this at great length with
12  Mr. Gouraige in the weeks -- especially in the weeks in
13  January leading up to the report, because the lack of
14  financing was going to be critical, highly relevant to which
15  options would be available to us and there had been this lack
16  of action.
17      I do believe that counsel is exploring those and
18  other options, but I really suggested that that was going to
19  be essential to the question of 11B, and I was frustrated that
20  we hadn't been able to move farther by the time I filed my
21  report.
22      THE COURT:  Now Mr. McGrath, you may be asking this
23  question next, but during Mr. Xia's testimony there was some
24  reference to two outside funding sources. I don't know if you
25  were here for that testimony --

VB   OCR   CRR

595

1    THE WITNESS:  I'm not sure.
2    THE COURT:  -- but do you know whether or not his
3  reference to those two outside funding sources were the two
4  options you just mentioned?
5    THE WITNESS:  I'm so sorry, Your Honor.  I couldn't
6  say that with any amount of certainty.
7    THE COURT:  All right.
8    But these are the only two other options or
9  alternative financing options that have been raised with you
10  by Mr. Xia and his attorney.
11    THE WITNESS:  That's correct.
12    I should say that there has been a reference to a
13  potential third that may be presented.
14    THE COURT:  Okay.
15    THE WITNESS:  In the near future.
16    THE COURT:  And when was that referenced?
17    THE WITNESS:  Well, there were references in
18  January that did not materialize, and then again yesterday
19  afternoon at the end of the proceedings.  Mr. Gouraige was
20  sharing with both the SEC and myself that that might be in the
21  offing.
22    THE COURT:  All right.  Thank you.
23    THE WITNESS:  Yes.
24  BY MR. McGRATH:
25  Q   So just two more questions, I hope, on this line.

VB   OCR   CRR

597

1  Q    -- where you were raising questions regarding the proof
2  of funds concept, the second proposal that they asked for an
3  urgent meeting on, you were present with the SEC and counsel
4  for Mr. Xia, correct?
5  A   I was.
6  Q    And would it be fair to say that both the SEC and you had
7  concerns and questions regarding the concept and the logic
8  behind the offer?
9  A   Yes, absolutely.
10  Q    And in response to those questions and concerns that were
11  raised, Mr. Gouraige said he'd get back to us?
12  A   Mr. Gouraige did say that, as did Mr. Schwartz, who was
13  also on the phone.
14  Q    And afterwards, instead getting back to us with
15  substantive responses to those questions and concerns, did
16  they then switch back to the first scenario?
17  A   That's correct.
18  Q    And that's when we said, all right, let us talk to this
19  person and see who he is and what's behind all of this and get
20  some explanations straight from the horse's mouth?
21  A   Yes.
22  Q    And that's -- we've never gotten any response.
23  A   Correct.
24  Q    All right.
25    Now in your report -- just the last question on your

VB   OCR   CRR

596

1    So what you called the proof or what they called the
2  proof of funds scenario.
3  A   Yes.
4  Q    Is it fair to say that you understood it that the idea
5  there wasn't that that money was going to be used to finance
6  any project going forward, but was going to be put in place in
7  the event that if the SEC prevailed in its claims and got an
8  escortment order up to $229 million, in theory, at least, they
9  were claiming that money would somehow be available to satisfy
10  that judgment.
11  A   That is what it would -- that's what --
12  Q    Presented --
13  A   -- presented by counsel, correct.
14  Q    So -- but it wasn't money that was going to be available
15  to build the projects.
16  A   Correct.
17  Q    And when you and the SEC asked counsel for the
18  opportunity to talk to the individual behind this offer, we
19  never heard back from them, did we?
20  A   That request has been pending since -- in fact, my best
21  recollection since the middle of December.
22  Q    And the second scenario that came up after we -- after
23  you -- let's put in terms of discussions you were a party
24  to --
25  A   Yes.

VB   OCR   CRR

598

1  report.
2  A   Yes.
3  Q    You've indicated in your report that -- and this is in
4  the last page, page 34 -- you identify serious questions about
5  the defendant's continuing role in the management and/or
6  disposition of the projects.
7    Do you see that?
8  A   I do.
9  Q    And you've sat here the last two days and you've heard
10  Mr. Xia's testimony, correct?
11  A   I have.
12  Q    Have those serious concerns that you had when you filed
13  those reports either dissipated, increased or stayed the same?
14  A   No, they have -- I'm sorry.  I apologize.
15  Q    I gave you three options.
16    THE COURT:  Multiple choice.
17    THE WITNESS:  Correct.  I realized I answered as a
18  binary, when it wasn't.
19  A   They have not dissipated.
20    Mr. Xia's actions, I've tried to be as detailed as I
21  can, both in my report and in my testimony today, give me
22  significant concern about his continued management of the
23  assets and the roles.  I referenced -- I thought long and hard
24  about how to write what I wrote on page 34, and I describe it
25  as walking up to the water's edge of an outcome I've

VB   OCR   CRR

599

1  disparately tried to avoid, and I have not yet made a decision
2  on how to proceed, which has allowed me to enter the
3  monitorship order for good cause shown to ask the Court to
4  convert this to a receivership.  That is not because the
5  concerns don't rise to a level of making that request.
6       The only hesitation that I have at this point is the
7  potential collateral consequence that would have to a number
8  of investors, specifically I am concerned of the over 300
9  individuals on the Emerald project.  If I were to become the
10  receiver, I really need clarity on what, if anything, that
11  would do to their green card applications.
12       And I've heard different answers to that and one of
13  the things that I'm also actively working on, and have asked
14  for investors' counsel assistance in this.  I've asked for the
15  defendants' counsel for assistance with this, the SEC's
16  assistance, and if the Court can help me as well trying to get
17  as accurate an answer as I can on what collateral consequences
18  any of these scenarios or options that are available would do
19  to the investors.  I think that's critically important
20  information before I ask for an ultimate determination.
21       THE COURT:  Can I ask you a related question.
22       THE WITNESS:  Sure.
23       THE COURT:  What about selling the properties?  Do
24  you know what impact that would have on --
25       THE WITNESS:  I'm fairly certain -- I do know that
                    VB   OCR   CRR

600

1  one.  And again, the reason I did not make a recommendation,
2  Your Honor, and I phrased it the way I did --
3       THE COURT:  Right.
4       THE WITNESS:  -- is because I'm almost certain, if
5  not entirely certain, that that would end the possibility for
6  those investors to get their green card.  And I really do
7  believe in constant conversations with many of their lawyers,
8  and some of them directly, that both being made financially
9  whole and the green card are very important to the investors
10  as a whole.
11  BY MR. McGRATH:
12  Q   Can I just ask a couple of follow-ups on that?
13  A   Sure.
14  Q   And then I have just a couple questions on your second
15  report and then I will be done.
16  A   Of course.
17  Q   Are you aware of the fact that there's actually a very
18  lengthy backup in approval for green cards at USCIS?
19  A   I am aware of it.
20  Q   Do you have any sense of how many years backed up they
21  are on --
22  A   I --
23  Q   -- securing applications?
24  A   Forgive me.  I do apologize.
25       I believe it's as much as ten years, is what I've
                    VB   OCR   CRR

601

1  heard.
2  Q   Okay.
3       And do you have any understanding as to whether the
4  EB-5 program has ceased to work going forward or any sort of
5  diminution in that program?
6  A   I don't have clarity.  I'm sorry.  I don't have enough
7  clarity on that to answer it here today.
8  Q   Okay.
9       Have you spoken directly with any USCIS agents or
10  employees specifically regarding what could happen here under
11  either the four scenarios that you've outlined in your report?
12  A   That's our next -- it's literally on the list, our task
13  list, for after the report is filed.  We're in the process of
14  assessing that.  I have spoken to counsel for investors,
15  numerous counsel for investors.  Again, I've spoken and
16  flagged this for counsel for Mr. Xia and, I believe, the SEC.
17  We have also discussed this, but USCIS directly, I have not
18  yet.
19  Q   Okay.
20       So you don't have any real sense yet as you sit here
21  today as to whether, even if the Eastern Emerald Project were
22  to go forward and get built, whether at that time the
23  investors will be in a position to get green cards, given
24  whatever the circumstances are at USCIS, either in terms of
25  backlog or the currency of that program?
                    VB   OCR   CRR

602

1  A   Those are significant concerns to me, yes.
2  Q   And the fact is you really don't know one way or another,
3  right now at least?
4  A   That's fair.
5  Q   The likelihood that they would get those green cards even
6  if Emerald Project was complete; fair to say?
7  A   I cannot say that with any certainty, no.
8  Q   Okay.
9       Just a couple quick questions and then I'll be done.
10  A   Sure.
11  Q   So you also, after you filed your 10B report, you filed a
12  first quarterly status report?
13  A   Yes.  The order requires me to do that on a quarterly
14  basis.
15  Q   Okay.  That's docket 55 and Plaintiff's Exhibit 161.
16       I was going to go through some of these with you but
17  the report speaks for itself.  I just want to point to one
18  particular section, which is paragraph 11L on page 4 of that
19  report.
20       MR. KAMELI:  What exhibit, sir?
21       MR. McGRATH:  This is 161.
22  A   I'm sorry.  You said it was on page 4?
23  Q   Yes.  Page 4, paragraph 11L.
24  A   I'm so sorry.  I'm on Plaintiff's Exhibit 161, which is
25  my quarterly status report.  What is listed as page 4.  I'm
                    VB   OCR   CRR

603

1  not sure I'm seeing that number.

2        THE COURT:  I do not think that is right either.

3        MR. McGRATH:  May I approach the witness,

4  Your Honor, to see what he's looking at?

5        THE COURT:  I have the attachment, page 4.

6        THE WITNESS:  Oh, yes.  That may be.  Oh, yes, I

7  believe it is.  I'm so sorry.  Yes, I apologize.  I, too, was

8  looking at the -- yes, I'm there now.  I apologize for the

9  confusion.

10       MR. McGRATH:  That's all right.  Sorry about that.

11       THE COURT:  I am blaming Mr. McGrath.

12       THE WITNESS:  I'm in good company at least.

13       MR. McGRATH:  I'll take it.

14  BY MR. McGRATH:

15  Q    Okay.

16       So page 4.

17  A    Yes.

18  Q    The very last paragraph, 11L.  It says:  Defendant has

19  not provided the monitor with any investor-wide communications

20  intended to be sent by Fleet and the Xia entities to

21  investors.

22       Do you see that?

23  A    I do.

24  Q    Was he required to do so under the monitorship order?

25  A    It is clearly enumerated that that is an affirmative

VB    OCR    CRR

604

1  obligation that Mr. Xia has, and I have subsequently learned,

2  not only did we not receive any, but there are extensive

3  communications that have occurred since I've been appointed

4  the monitor.

5  Q    Did you have any follow-up conversations with Mr. Xia or

6  his counsel after you learned that he had been sending

7  investor communications without running them by you first as

8  required by the Court's order?

9  A    Not yet.

10  Q    Okay.

11  A    Other than the document, meaning the document was sent,

12  it was docketed and it's been sent to counsel.  I have not yet

13  had a chance to speak to them.  I think both parties were

14  largely preparing for these proceedings.

15       THE COURT:  Do you know what format those

16  communications took?

17       THE WITNESS:  I heard from individual investors

18  about some that may have occurred, but I haven't seen them, so

19  again it would be --

20       THE COURT:  But are they formal or are they WeChats?

21       THE WITNESS:  I think they range.

22       THE COURT:  Okay.  All right.

23  BY MR. McGRATH:

24  Q    And just to finish up.

25       The monitorship order required Mr. Xia and his

VB    OCR    CRR

605

1  entities to, quote, fully cooperate with you, correct?

2  A    It absolutely does.

3  Q    And in your opinion, has Mr. Xia fully cooperated with

4  you?

5  A    No, and as I say in my report, his failure to -- I think

6  the way I phrased it and I thought long and hard about how to

7  phrase it -- the failure to timely engage with the monitor,

8  even in protected circumstances that were in his own interest,

9  is of significant concern.  Not only because he was required

10  to do so under the Court's order, it also gives me pause

11  about, again, giving him control of the projects or the

12  assets.

13       MR. McGRATH:  I have no further questions.  Thank

14  you, Mr. Peeler.

15       And my apologies to the court reporters for speaking

16  too fast.

17       THE COURT:  No, no.  You were fine.

18       I have just one question just about the typewritten

19  records, because as you can tell, I have the realtime.

20       There was a reference to backlog with respect to the

21  EB-5 investors immigration status.  But I think the initial

22  question might have a typo, either that or it is one of those

23  shortcuts you use.  The word came out as incompetent.

24       (Pause in the proceedings.)

25       THE WITNESS:  And again, my apologies.

VB    OCR    CRR

606

1        THE COURT:  No, no, I was looking for it.  That is

2  why.  Because I missed what he said and then I heard the word

3  backlog used later.

4        Do you want to take a few minutes, Mr. Kameli,

5  before, 4:30 to take a break, or are you ready to go?

6        MR. KAMELI:  No, Judge, if we can take it 4:30.

7        THE COURT:  You sure?  Okay.

8        Hopefully you are not going to go more than an hour

9  with this witness.

10       MR. McGRATH:  No.

11       THE COURT:  Okay.  Be ready to go at 4:30?

12       ALL:  Thank you.

13       (Recess taken.)

14       THE COURT:  So let's go back on the record now.

15  Mr. Kameli, are you ready?

16       MR. KAMELI:  I am, Your Honor.

17       THE COURT:  All right.

18       MR. KAMELI:  Just some housekeeping.  Mr. Freeman is

19  here and he's our witness.  He is sitting in courtroom.

20       THE COURT:  He is an expert so that is fine.

21       Let me ask you some questions about time.

22       We are at 4:30.  How long do you intend to question

23  Mr. Freeman?

24       MR. KAMELI:  I think about eight hours.  Not today.

25  30 minutes?  40 minutes?  It should be okay.

VB    OCR    CRR

607

1    THE COURT:  No, but I --
2    MR. KAMELI:  I'm sorry, I was talking
3  cross-examination.
4    Freeman, maybe 30 to 40 minutes.
5    THE COURT:  It is already 4:30.  So let's go and see
6  where we are.  If you can do 30 and then another 30, that
7  would be great.  Maybe I can impose on our court reporters to
8  go to 6:00?
9    (Pause in the proceedings.)
10    THE COURT:  Okay.  Let's go.  Let's move this
11  forward.
12  CROSS EXAMINATION
13  BY MR. KAMELI:
14  Q    Mr. Peeler, good afternoon.
15  A    Good afternoon, Mr. Kameli.
16  Q    Thank you so much for your explanation about your report.
17  I appreciate it.  I just have some questions in regard to the
18  charts that you provided.
19    And do you have your report with you?
20  A    Yes, I believe it's Plaintiff's Exhibit 160.
21  Q    Thank you.  It's really an honor to have an attorney on
22  the stand because you help us out too with the exhibits.
23  A    I have been there, shall we say.
24  Q    So what's the exhibit number again?
25  A    I believe it's Plaintiff's Exhibit 160.

VB    OCR    CRR

608

1  Q    And that's the one we're talking about?
2  A    Yes.  I think you are asking me to look at -- you said
3  charts, so I am assuming you're asking me to start with
4  scenario one on page 29?
5  Q    You know what, let's go to -- yeah, page 29.  Scenario
6  number one.
7  A    Sure.
8  Q    You indicated that the low value of the $149 million and
9  the 177 million, they come actually from the reports of the
10  third-parties, correct?
11  A    They come from the appraisals.
12  Q    From appraisal.
13    And which appraisal are you talking about?
14  A    So there were three appraisals done on the Mirage
15  Project.
16  Q    Yes.
17  A    The low number was from 2019 from Cushman & Wakefield.
18  Q    Yes.
19  A    The high number of 177, that one comes from Blake and
20  Associates.
21  Q    Was that 177 or 200?
22  A    Well, you're referencing two different numbers.
23  Q    Okay.  Please.
24  A    There is an as-is number.
25  Q    Yes.

VB    OCR    CRR

609

1  A    Which ranges from 149 to 177.
2  Q    Okay.
3  A    And then some of the appraisals deal with an as-completed
4  number based upon certain assumptions that have been provided
5  to them by Mr. Xia.
6  Q    Got it.
7    But as-is number was 177?
8  A    Correct.  And the 200.8 million you're referencing, it
9  ranges from 153, I believe, to 200.8 million.  Those are based
10  upon an as-completed number by the three different appraisals,
11  but that range.
12  Q    And the Blake reports that you're talking about, which is
13  Defendants' Exhibit Number 42, that report was actually
14  ordered by a private lender to Emerald Creek, correct?
15  A    Relating to a request from your client.
16  Q    Correct.
17  A    Yes.
18  Q    But it was ordered by a bank.
19  A    Well, each of the cases -- that is my understanding.
20  Q    Okay.
21    In your scenario one, you are indicating in the
22  expense sheet, in the liabilities, an amount in the mid-range,
23  $34 million as a loan.
24    Do you see that, sir?
25  A    So you're looking -- just to be clear.

VB    OCR    CRR

610

1  Q    Yes.
2  A    We're looking under the estimated funds required section.
3  Q    Yes, sir.
4  A    You're looking at the loans for Eastern Mirage ranging
5  from 15 to $34 million.
6  Q    That is correct.
7  A    Yes.
8  Q    Now the $34 million you indicated that coverage that
9  $15 million that is owed to Emerald Creek, correct?
10  A    That's right.
11  Q    And there's a possibility of $19 million more of loans to
12  third-parties, correct?
13  A    That's right.
14  Q    Have you identified every single one of those?
15  A    Yes, and I believe I testified earlier that I've been
16  having conversations with CTBC.
17  Q    Yes.
18  A    Another financial institution, and that it's my current
19  belief, it's still being finalized, is that the number is the
20  $34 million meaning the $15 million to Emerald Creek and
21  potentially ranging up to the $34 million.
22  Q    Okay.
23    And you testified earlier that the need for
24  completing Mirage -- and I'm looking at your report,
25  page 23 -- 26.

VB    OCR    CRR

611

1  A    Yes.

2  Q    It is about $13.9 million for the low cost and the high

3  is 16.7, correct?

4  A    Those are the ranges we used, correct.

5  Q    But then you said that loans to be repaid $15 million.

6       Do you see that, sir?

7  A    That's the low number.

8  Q    Correct.  But you don't need to pay the loans in order to

9  complete the Mirage project, right?

10  A    Right now the investors are at risk because of a decision

11  that was taken to give a first priority lien on the Mirage

12  project.  So my assumption is that that should be cleared as

13  part of the liabilities and that's why the $15 million on the

14  low number.

15  Q    Sure.  But in reality, just to complete the building, to

16  bring it to Certificate of Occupancy, you need maximum

17  $16.7 million, correct?

18  A    That's why the first line of the -- of this section is

19  cost to complete Eastern Mirage and the ranges that are there.

20  Q    Yes.

21  A    With, as I said earlier in the report, there are three

22  models which give us a range of between 13.9 and

23  $16.7 million.

24  Q    So the cost to complete, do you need to bring the

25  building to Certificate of Occupancy?

VB    OCR    CRR

612

1  A    To finish the work that was promised to the investors as

2  designed and to complete Mirage.

3  Q    Okay.

4       So again, we are looking at page 26.  Your second

5  chart, estimated cost to complete Eastern Mirage.

6       You agree with me that if we don't pay the loans to

7  be repaid, still we can finish the project and still we can

8  get to the Certificate of Occupancy, correct?

9  A    If that's the only goal we have.

10  Q    But that would be the cost to complete.

11  A    That's why it's one section of this little Roman ii on

12  page 26.

13  Q    Okay.

14       So if there is financing that covers your cost to

15  complete Eastern Mirage for, let's say, between 13 to 16.7,

16  also, to pay the unpaid significant invoices for board also,

17  pays for unpaid building violations, also, pays the insurance.

18  We bring down the financing and keep the loans to be repaid as

19  is, we can still get to the Certificate of Occupancy, correct?

20  A    That's a highly speculative question.  I'm sorry.  I

21  think I've been clear in what the report says and how to

22  interpret it.

23  Q    I understand that.  But my question is that the City of

24  New York does not care if there is a loan on -- if there is a

25  lien on the building to a lender in order to provide the

VB    OCR    CRR

613

1  Certificate of Occupancy, correct?

2  A    I'm sorry.  I am not qualified to discuss what the City

3  of New York believes or thinks.

4  Q    Okay.

5       What is your understanding of the cost to complete,

6  sir?

7  A    The first line of this is the cost to complete using

8  three models that are outlined in the report in earlier pages.

9  The $13.9 million is using the defendants' current work force

10  and I have suggested that that is of some significant concern

11  to me.

12       The more likely number is the $16.7 million range,

13  in essence, the 16-and-a-half to $16.7 million range would be

14  the cost to complete the building that sits before us.

15  Q    So as you are sitting here, independently, you cannot

16  verify any numbers about how much it is needed to complete

17  this building.

18  A    I have retained, directed and consulted with an expert

19  company who is, and the numbers before you are reflected in

20  that chart.

21  Q    The numbers that that expert company provided is

22  everything in this chart, page 26, except the loans to be

23  repaid, correct?

24       MR. McGRATH:  Objection to form.

25  A    Yeah, that's not what I said.

VB    OCR    CRR

614

1       THE COURT:  Go ahead.  Clarify it, please.

2       THE WITNESS:  Yes.

3  A    The number I was referencing from JS Held is the 13.9 to

4  16.7 number.  That is what I was referring to, not the

5  entire -- the entirety of A, romanette ii.

6  Q    Right.

7       The financing that you are hoping Mr. Xia to obtain

8  would be -- to finish Mirage -- is the number between 33

9  million to $55 million, correct?

10  A    That's the -- that's not related to financing, that's

11  related to the total estimated cost to complete with known

12  liabilities relating to that project, Mirage, ranges from 33

13  to $55 million.

14  Q    So if you were about to go and find the financing, you're

15  looking for a financing in that range in order to finish

16  Mirage, correct?

17  A    I'm sorry.  I'm not going to agree with that statement as

18  you phrased it.

19  Q    Okay.

20       In order to bring Mirage to get the Certificate of

21  Occupancy, how much money do we need?

22  A    I believe what I've stated and what the report shows is

23  that it would take between -- I believe it would take

24  approximately $16.7 million to do the work, and if we were to

25  clear the other liabilities known to be associated with the

VB    OCR    CRR

615

1  Mirage project, it would range in the numbers you see
2  reflected in A romanette ii on page 26 of the report.
3  Q   So that's a range.
4  A   It is.
5  Q   Okay.
6  A   I tried to provide ranges to be as fair as I could
7  throughout.
8  Q   All right.
9      Do you believe Mirage is a viable project?
10     MR. McGRATH:  Objection to form.
11     THE COURT:  Sustained.
12     That is too vague a question.
13     MR. KAMELI:  I understand.
14 Q   Have you had a chance to see how many direct or indirect
15 jobs were created by building -- by process of building Mirage
16 as is?
17 A   I'm not sure I can quantify it to an exact number, but I
18 have seen and I'm aware of the fact that jobs were created.
19 I'm also aware that the -- that green cards were awarded to
20 investors in Mirage, and one of the requirements would be that
21 a certain number of jobs were, in fact, created from that
22 project.
23 Q   Very well.
24     And do you know of when you say green cards, are you
25 talking about the conditional permanent residency or the

VB   OCR   CRR

616

1  unconditional permanent residency?
2  A   So my understanding -- and I definitely want to state
3  that clearly.  It's my understanding --
4  Q   I understand.
5  A   -- is that the Mirage investors have received permanent
6  green cards based upon their application, the EB-5 program.
7  They are at different stages, but it's my understanding of the
8  situation that exists before us today.
9  Q   But is it your understanding also that there may be one
10 individual or one investors for each limited partnership still
11 pending obtaining their permanent residency?
12 A   There's a number of one-offs that I'm assessing, how
13 about if I say it like that?
14 Q   Fair enough.
15     And I'm so glad that I saw in your report, and I
16 believe it was page 8, where you said that:  In assessing the
17 viability of the projects, the monitor continues to make the
18 investors' interests his highest priority.
19     That was like you said.  And page 8, it is the first
20 paragraph.
21 A   Yes, I'm quite aware.  I wrote it with intent.
22 Q   Yeah.
23     So -- and you mentioned that Eastern Emerald's EB-5
24 investors are one of your concerns.  Their permanent residency
25 conditions, right?

VB   OCR   CRR

617

1  A   I believe there are two primary issues that I have that I
2  believe represent the best interests of those investors.  The
3  two that I flagged are that they be made financially whole as
4  promised, and that they have every opportunity under the EB-5
5  program to attain their green cards.
6  Q   And the only way for those for the Eastern Emerald EB-5
7  investors to obtain their permanent residency is for jobs to
8  be created by building the building, correct?
9      MR. McGRATH:  Objection to form.
10     THE COURT:  Sustained.
11     He did testify about this earlier.  At least what
12 his understanding is.  He is not an immigration expert.
13     THE WITNESS:  Correct.
14 Q   Mr. Peeler, let me take you to your report, page 20 --
15 29.
16 A   Yes, that's scenario one.
17 Q   So by selling the property today, by selling both
18 projects today, the surplus value would be $30 million to
19 $119 million.  That's a range.
20 A   Based upon our assessments and the numbers you see before
21 you, that's correct.
22 Q   Okay.
23     And that's after paying almost every liability,
24 every EB-5 investor back, and that's how much it's going to
25 be.

VB   OCR   CRR

618

1      MR. McGRATH:  Objection to form.
2      You said every liability.
3      MR. KAMELI:  Well, yes, I did.
4      MR. McGRATH:  Known liability.
5      THE COURT:  Can you answer that question?
6      THE WITNESS:  I believe I qualified it earlier when
7  I indicated that to the best of our abilities, these reflect
8  the liabilities that have been able to be identified in our
9  first four months of work, and I indicated that I cannot be
10 certain that this represents all as your question presupposes.
11 Q   Very well.
12     THE COURT:  Because you do not know about all the
13 liabilities.
14     THE WITNESS:  Correct.
15     And I certainly hold open the possibilities that
16 there are others.
17 Q   But in this report, you are talking about at least the
18 loans that needs to be repaid.
19 A   There are a number of liabilities that are assessed in
20 this report and in this -- and each of the scenarios.
21 Q   Yes.
22     Please go to page 33 of your report, scenario four.
23 A   Yes.
24 Q   You have the deficit of $517 million to $532 million if
25 the project -- both projects are completed, correct?

VB   OCR   CRR

619

1   A   Scenario four is our best attempt to assess what would be
2   the financial situation if both projects, Mirage and Emerald,
3   are completed, correct.
4   Q   You indicated that the highest amount for -- the highest
5   appraised value for Mirage as is, is $177 million, correct?
6   A   I did.  And that's correct.
7   Q   And there was a report also that if it's built, it's
8   going to be able to be completed, the valuation would be
9   around $200 million, correct?
10  A   200.8 with the caveats and exceptions I noted earlier,
11  that's right.
12  Q   Yes, sir.
13      And do you believe that by building Emerald, if
14  Emerald is completed, it will bring some value and the
15  appraisal value is going to be, hopefully, higher -- some
16  value and the appraisal value should be equal to the
17  completion cost, at least, correct?
18  A   Yes.  And I'd like to say that I found it interesting
19  yesterday when your client was on the stand, that when I
20  believe someone asked, it may have been, Your Honor, asked him
21  about his thoughts around my report, he made two statements
22  that I was able to determine, one of which was factually
23  incorrect when he said I didn't account for the value of the
24  property of the 177.  As you can see in each of the scenarios,
25  I did.

VB    OCR    CRR

620

1       And the other is referencing the fact that I failed
2   to account for what your question asks about, which is, if
3   Mirage is completed, there would be revenue potentially
4   generated by medical offices, hotels, and a variety of other
5   things.  The reason I found it interesting that he was
6   critiquing my report is one of the reasons I flagged as
7   needing desperately to speak to him, given the speculative
8   nature of all the changes that have occurred over time on what
9   Mirage will be and where things stand today, it is
10  insufficient for me to look at reports and marketing materials
11  from years ago.  I needed to speak to him accurately about the
12  current situation and, again, how to estimate values of
13  occupancy rates, tenancy rates, rentals of properties and the
14  profit that may be obtained by the restaurant is so
15  speculative that without the cooperation and assistance of
16  your client, there was no way I could feasibly include it.
17      But I agree with the tenor of your question.  Is it
18  something conceptual?  I do.  And I flagged it to counsel for
19  Mr. Xia as an area I'm willing to engage with, but got no
20  cooperation from your client.
21  Q   So basically your scenario number four only shows the
22  amounts that's going to be -- it only shows the amounts that
23  we need to pay the investors back, we need to -- the amount
24  that he said is needed to construct the buildings and bring it
25  to Certificate of Occupancy.  Yet, it does not show the future

VB    OCR    CRR

621

1   value of each project, correct?
2   A   For the reasons I just said.  There are two scenarios,
3   scenario three and four, which I was unable to -- well, each
4   of the scenarios, potentially, except selling them, all would
5   have the potential for future value that, again, I rank as
6   highly speculative and without additional information it was
7   impossible for me to include in this 11B report.
8       THE COURT:  Mr. Kameli, just note that I am not
9   going to accept challenges to the report based on your client
10  not having provided the expert with the information.  So I
11  would not proceed down this path.
12      If he is telling you that he needed more
13  information, and you did not give it to him, I do not want to
14  hear any challenges to the report only including certain
15  factors and not others.
16      MR. KAMELI:  Sure.
17
18      (Continued on following page.)
19
20
21
22
23
24
25

VB    OCR    CRR

622

1   BY MR. KAMELI:  (Continuing)
2   Q   On page 34, the recommendation that you're making?
3   A   Yes.
4   Q   The recommendation you're making is based on the events
5   and what you have seen in the past, correct?
6   A   It's based upon the work that I've done since
7   September 27th of last year.
8   Q   Yes.  And you indicate that, issue number one, lack of
9   basic accounting and standard business practices, correct?
10  A   That is a general characteristic of a variety of things
11  that we've talked about in my testimony, correct.
12  Q   Sure.  So for the future, we need accounting system,
13  correct?
14  A   You're asking about what remediations and compliance
15  protocols should be put in place?
16  Q   I am, sir.
17  A   Yes.  I would say that those, and, again, I flagged that
18  to counsel some time ago, would be absolutely of paramount
19  importance to me.
20  Q   Okay.  And when you said standard business practices,
21  what do you mean by that?
22  A   I believe that any business concern in this state,
23  jurisdiction or wherever we'd like to discuss, especially in a
24  highly regulated industry as the construction industry is in
25  New York City, one would expect to have an accounts payable

CMH    OCR    RDR    FCRR

623

1  system, one would expect to have a general ledger, one would
2  expect to be able to produce invoices and other financial
3  records, one would expect not to have 102 bank accounts.  I
4  can go on.
5          The point is when I say standard business practices,
6  I think I'm talking about basic fundamental accounting and
7  financial proceeding, processes that are even more so required
8  when you're accepting investor money.
9  Q    Payment of taxes is important, of course, that's what
10 you're mentioning?
11 A    I believe it is a legal obligation.
12 Q    Am I right?
13 A    Yes.
14         THE COURT:  I think that goes beyond the standard
15 business practice.  It's the law.
16         THE WITNESS:  That's the law, yes.
17 Q    The next one is secure and adequate insurance, right?
18 A    Yes.  I've heard your client say repeatedly that he has
19 the investors' interests in mind and he wants to complete the
20 projects and yet, the project sits uninsured and what brought
21 it to my attention was the captive insurance company issuing
22 undated documents telling me that there was no insurance.
23 Q    And the recommendation that you're making in case of your
24 scenario four, you're saying that insurance for Mirage is
25 about $853,000 and insurance for Mirage is $630,000.  To get

CMH   OCR   RDR   FCRR

624

1  the insurances, the project, the investors are secure and the
2  building is secure, correct?
3          MR. McGRATH:  Objection.
4          THE COURT:  I don't know what "secure" means but you
5  do have to go slower.
6          MR. KAMELI:  The amounts.
7          THE COURT:  Well, I did sustain an objection but
8  does the meaning "secure," is that something you can answer?
9          THE WITNESS:  I believe Mr. Kameli's asking me if we
10 were to, if Mr. Xia were to obtain the proper level of
11 insurance for the properties, would that remediate one of the
12 issues that I have flagged here.
13 A    to the extent that is your question, yes, however you
14 indicated a number in a previous chart.
15         The report makes clear but I would like my testimony
16 also to be clear that the numbers that appear here were what
17 Mr. Xia through his counsel provided us to, to us, rather, as
18 the cost to obtain the insurances for each project.  It is not
19 my recommendation.  If it were, I would have already made it
20 to the Court that we proceed with those numbers.  I am in the
21 process of obtaining arms' length insurance which I expect to
22 be higher than that number, to be clear.
23 Q    Thank you.
24 A    Sure.
25 Q    Do you know approximately how much the building

CMH   OCR   RDR   FCRR

625

1  violations are?
2  A    I believe the report identifies over $600,000 in pending
3  building violations currently assessed against both projects.
4  They continue to amount week by week.  One of the difficulties
5  my team has is that even when we were drafting this report,
6  the numbers were changing the week we were finalizing this
7  report.
8  Q    Okay.  You talked about some tax credits, that one kind
9  of a tax credit stays with the property and one is going to be
10 wiped out in case that the property is sold or the title is
11 transferred.
12 A    I believe I identified as one, the $35 million tax
13 credit, maximum potential tax credit could be transferable is
14 what I believe I say in my report whereas the 37 million and
15 change would not be.
16 Q    Okay.  And you said that the building has to be finished
17 by year 2025 if we talk about Eastern Emerald, right?
18 A    That's Eastern Emerald and that is correct for one of the
19 two types of the tax credit I just referenced, that's correct,
20 and the report makes clear which that is.
21 Q    Sure.
22         MR. KAMELI:  Judge, may I have a few minutes?
23         THE COURT:  You really need to wrap this up.  So
24 far, what you've had him do is repeat what's in your report.
25 If you want the witness to go on, you need to wrap this up in

CMH   OCR   RDR   FCRR

626

1  five minutes or so.
2          MR. KAMELI:  I'm good, Judge.
3          THE COURT:  Any redirect?
4          MR. McGRATH:  No, Your Honor.
5          THE COURT:  Thank you very much, Mr. Peeler,
6  especially for sticking around for three solid days.
7          THE WITNESS:  It's a pleasure, Your Honor.
8          THE COURT:  That's all the SEC witnesses, right?
9          MR. STOELTING:  Yes, Your Honor.  We rest.
10         THE COURT:  So let's have Mr. Freeman come up.  Do
11 you want to call him up?
12         MR. KAMELI:  Yes.
13         THE COURT:  Mr. Freeman, if you'll approach the
14 stand and remain standing for one moment.
15         THE CLERK:  Raise your right hand.
16         (The witness, JACK FREEMAN, was duly sworn by the
17 Clerk.)
18         THE CLERK:  Thank you.  Please have a seat and then
19 state and spell your name for the record.
20         THE WITNESS:  My name is Jack Freeman,
21 F-R-E-E-M-A-N, Jack is J-A-C-K.
22         THE COURT:  All right.  Mr. Freeman, you can pull
23 the microphone closer to you.  Just make sure you speak slowly
24 and clearly.
25         Your witness, Mr. Kameli.

CMH   OCR   RDR   FCRR

627

1      MR. KAMELI:  Thank you, Judge.

2   DIRECT EXAMINATION

3   BY MR. KAMELI:

4   Q   Mr. Freeman, good evening.  Are you employed?

5   A   **Could you repeat that?**

6   Q   Are you employed?

7      THE COURT:  Use the podium like everyone else or use

8   the microphone at your table.

9      MR. KAMELI:  Yes, Judge.  Is it better?

10     THE COURT:  Yes.  You can sit if you like.

11  Q   Mr. Freeman?

12     THE COURT:  You said are you employed and the answer

13  was?

14     THE WITNESS:  Yes.

15     THE COURT:  All right.

16  Q   And where do you work?

17  A   **I work for Capalino Company.**

18  Q   And what does Capalino do?  What kind of work do they do?

19  A   **They do a variety of work.  They do real estate**

20  **consulting.  They do public agency approvals.  They do**

21  **government relations.**

22     MR. KAMELI:  And, Judge, we're looking at Exhibit 44

23  for your reference.

24     THE COURT:  All right.

25     MR. KAMELI:  Defense Exhibit 44.  That is basically

                CMH    OCR    RDR    FCRR

628

1   information about Mr. Freeman and his chart.

2      THE COURT:  Could we get a spelling of Capalino?

3      THE WITNESS:  Capalino, C-A-P-A-L-I-N-O.

4      THE COURT:  Thank you.

5   Q   And how long have you been working for them?

6   A   **I've been working for them for approximately 3 1/2 years.**

7   Q   And prior to that, where were you working?

8   A   **I was working -- I had two real estate companies.  One**

9   **did construction management and the other did economic and**

10  **financial analysis.**

11  Q   And how long did you work for those companies?

12  A   **The companies were started in 1982.**

13  Q   Did you own those companies?

14  A   **Yes.**

15  Q   And what primarily did those companies work in?

16  A   **Could you repeat that?**

17  Q   Yes.  What was the function of those companies that you

18  mentioned?

19  A   **One company did primarily financial analysis and economic**

20  **analysis of real estate projects.  The other did project**

21  **management of construction projects.**

22  Q   When you say financial analysis of real estate projects,

23  what do you mean by that?

24  A   **I mean looking at what a particular site might be capable**

25  **of producing in the sense of highest and best use, looking at**

                CMH    OCR    RDR    FCRR

629

1   **projects that were already proposed and what their potential**

2   **income was and what the potential value of the projects were.**

3   **And a significant part of the practice was in obtaining public**

4   **approvals for zoning or other matters that were useful in**

5   **creating additional value for the properties.**

6   Q   And did you work with, for any projects within the City

7   of New York?

8   A   **Many.**

9   Q   And you indicated also about the construction financing.

10  A   **No, I didn't say construction financing.  I said project**

11  **management of construction projects.**

12  Q   Project management.  And what do you mean by that?

13  A   **Many of the clients I had were people who were investors**

14  **or not-for-profit institutions that were building a property**

15  **for the first time and I was, as a third party, looking at**

16  **their interests in terms of the construction of the project.**

17  Q   And have you been a developer yourself?

18  A   **Yes, I have been a developer of both market rate and low**

19  **income affordable projects.**

20  Q   How many projects have you developed?

21  A   **Probably about six.  I don't do that anymore so it's**

22  **history, as it were.**

23  Q   And are you familiar with the project called Eastern

24  Emerald?

25  A   **Yes.**

                CMH    OCR    RDR    FCRR

630

1   Q   And where is that project located?

2   A   **It's located on Union Street in Flushing, New York,**

3   **Queens.**

4   Q   Eastern Emerald?

5   A   **Eastern Emerald is Northern Boulevard.**

6   Q   And are you familiar also with the project called Eastern

7   Mirage?

8   A   **Yes, Mirage is located on Union Street in Flushing.**

9   **Sorry.**

10  Q   And how did you become -- how did you get to know those

11  projects?

12  A   **The Fleet Company was our client and we helped them**

13  **obtain Board of Standards and Appeals zoning variance for the**

14  **Mirage project and my company, Capalino, helped them with**

15  **public agency and intergovernmental relationships for the**

16  **Emerald project and they had asked us to help them with a**

17  **zoning variance for the Emerald project and we didn't get that**

18  **far on it because it was substantially unbuilt.**

19  Q   What year did Fleet become your client?

20  A   **I would say for the Mirage project, maybe 2015.**

21  Q   And when you say "my client," are you referring that they

22  were the client of Capalino or --

23  A   **No, they were my client, my separate companies.**

24  Q   But then they became a client of Capalino, right?

25  A   **Yes, that's correct.**

                CMH    OCR    RDR    FCRR

631

1  Q    And what exactly was your involvement with the Mirage
2  project?
3  A    We did the -- the Board of Standards and Appeals is a
4  quasi-judicial body and they require five separate findings
5  that need to be made in order to grant a variance.  Each of
6  them has to be made and three of them deal with the economic
7  and financial character of the project.  So that's what I do.
8  Q    Okay.  And did you have a chance to review the financials
9  of the Mirage project?
10 A    Well, I did them for, for the purposes of obtaining the
11 variance, yes.
12 Q    What exactly did you do?
13 A    We looked at the -- the first thing you have to do for a
14 variance is to help establish that there's something that's
15 unique about the site and as a result of that unique
16 condition, there's an economic hardship.  So we analyzed the
17 project to determine whether or not it had an economic
18 hardship.  That involves essentially a valuation process that
19 looks at what the income is, looks at what the costs are, and
20 makes a determination as to whether the value of the project,
21 based on its income, can support the costs, that it would be a
22 feasible project.  With the additional costs of site
23 conditions, that isn't always the case.
24 Q    And when did you do this analysis?
25 A    I believe that the variance was obtained in 2016 so we

CMH   OCR   RDR   FCRR

632

1  did the analysis between 2015 and 2016.
2  Q    And based on that analysis you did, was the project
3  feasible at the time?
4        MR. STOELTING:  Objection to form.
5        MR. McGRATH:  Objection to the form of the question.
6  A    It was only --
7        MR. McGRATH:  Objection to form.
8        THE COURT:  Hang on.  Overruled.  I'll hear the
9  answer.
10       THE WITNESS:  Excuse me?
11       THE COURT:  Sorry.  Repeat your answer.
12 A    It was only feasible if the variance was obtained.
13       THE COURT:  And when you say "feasible," what do you
14 mean?
15       THE WITNESS:  Feasible means that the project will
16 support the cost of development based on the income that it
17 would make.
18       THE COURT:  Okay.  So, in other words --
19       THE WITNESS:  The value is determined by the income
20 and the value has to be equal to the cost to be a feasible
21 project.
22       THE COURT:  Can I ask you one question?  You
23 mentioned that you prepared the financials to determine if
24 there was an economic hardship.  Did I hear you correct?
25       THE WITNESS:  Demonstrate, yes.

CMH   OCR   RDR   FCRR

633

1        THE COURT:  And if you demonstrate an economic
2  hardship, you can get a variance?
3        THE WITNESS:  If you demonstrate a hardship which
4  has a quantifiable element, in other words, if the hardship is
5  going to cost X amount of dollars, then you need to get a
6  variance to increase the value of the project to pay those
7  costs.  So you have a problem and you have to come up with a
8  solution and the variance is a solution.
9        THE COURT:  And were you hired by Mr. Xia or FFG, I
10 guess, to prepare this analysis to try to support a request
11 for a variance?
12       THE WITNESS:  Yes.
13       THE COURT:  Based on a hardship?
14       THE WITNESS:  Yes.
15       THE COURT:  Okay.  All right.
16 Q    And what was the result of that?
17 A    They got the variance.  And I'm sorry, the actual dates
18 that we did it were a little earlier.  They were between
19 December 2012 and probably 2014.
20 Q    And what was the hardship based on?
21 A    It's several factors.  It was a very irregular site.  It
22 required that the building be pushed tight and raised higher
23 than it would normally be at the site where, a regular
24 rectangular-shaped site.  It had some subsurface conditions as
25 well.  I don't establish those conditions.  There's a team of

CMH   OCR   RDR   FCRR

634

1  people including attorneys who deal with looking at what the
2  uniqueness is, engineers and architects who establish what
3  the, what the exact character is and construction experts who
4  determine the cost.
5  Q    And the reason that you were trying to get the variance
6  changed.  What was the reason for that?
7  A    Well, to pay the costs of the hardship.
8  Q    Okay.
9        THE COURT:  In other words, without the variance,
10 the project wouldn't have been --
11       THE WITNESS:  Would not have been feasible.
12       THE COURT:  Okay.
13 Q    And how did you -- have you done any work on the Eastern
14 Emerald project?
15 A    We did preliminary work on Eastern Emerald along the same
16 lines but Eastern Emerald was a little complicated because it
17 also has, it was true of the Mirage project as well, but they
18 were both in a zone where the FAA has to establish a change in
19 height so you don't have airplanes crashing into the building.
20 So it's a series of permits that are required and we never got
21 to the zoning variance completion on the Emerald site.
22 Q    Sure.  And in the past few weeks, have you had a chance
23 to look at the sources and uses and financial analysis, have
24 you had a chance to look at the source and uses of Eastern
25 Mirage project?

CMH   OCR   RDR   FCRR

635

1   A    Yes.
2        MR. McGRATH:  Objection to the form of the question.
3   I'm not sure what he's referring to.
4        THE COURT:  Well, let's hear his answer first and
5   then he can explain what he's referring to.
6        So, yes, and then what are you talking about?
7        THE WITNESS:  Yes.  We looked at what the costs of
8   completing the project were, cost of building the project --
9        THE COURT:  Can you pull the microphone closer?
10       THE WITNESS:  We looked at the costs of the project
11  which would be uses of funds and we looked at what the sources
12  of funds available were to pay those costs.  So that answers,
13  I think answers the question.
14  Q    It does.  And I'm going to refer to -- there is a book.
15       MR. KAMELI:  Judge, may I approach to show the
16  booklet to him?
17       THE COURT:  Yes, sure.  Do you want the defense
18  binder?
19       MR. KAMELI:  Yes, Your Honor.
20       THE COURT:  What numbers?
21       MR. KAMELI:  44, Your Honor.
22  Q    I'm showing you what is marked as Exhibit No. 44 for
23  defense.  Please take a look at it for a few minutes, a few
24  seconds, not minutes.
25       Are you familiar with those documents, sir?

CMH   OCR   RDR   FCRR

636

1   A    Yes.
2   Q    Allow me to take you to page 5 where it says, Eastern
3   Mirage.  There's a table which says, Eastern Mirage.  Do you
4   see that, sir?
5        THE COURT:  My copy doesn't have page numbers on it
6   after 3.
7   A    Yes.  I don't have page numbers either but I do see --
8   you said, Mirage?
9        MR. KAMELI:  Judge, it's a table.
10       THE COURT:  Okay.  Is the first heading "All
11  Sources"?
12       MR. KAMELI:  It says, heading, "Eastern Mirage, 4231
13  Union Street, February 14, 2022."
14       THE COURT:  Well, that's on every page.  So what
15  does it say below that?
16       MR. KAMELI:  Below that, it says, "Source and uses."
17       THE COURT:  Yes.  And below that?
18       MR. KAMELI:  "All sources Emerald pre-cap
19  15 million."
20       THE COURT:  So I think we're all on the same page.
21  Okay, Mr. Freeman.
22       THE WITNESS:  Okay.
23       THE COURT:  All right.
24  Q    So you, did you prepare this table, sir?
25  A    Yes.

CMH   OCR   RDR   FCRR

637

1   Q    And based on this report, based on this table, all the
2   sources that you need to finish and complete the project for
3   Eastern Mirage is $157 million, right?
4   A    Yes.
5        MR. McGRATH:  Objection.
6   A    Yes.
7        THE COURT:  Hold on.  Hold on.
8        All right.  Go ahead.  Overruled.
9   Q    So the sources you have here, would you explain that
10  table for us?
11  A    Sure.  The sources are sources of capital.
12  Q    Yes.
13  A    There's an Emerald pre-capital of 15 million.  There's an
14  EB-5 loan of 57,500.  There's a C-PACE reimbursement loan.
15  C-PACE is a City program that provides long-term loans for
16  projects which will be, create sustainable development.
17  There's a referenced Cirrus loan which would be a construction
18  loan.  Then there's a developer's fee.  And that all totals up
19  to 157.
20  Q    Let's talk about this C-PACE reimbursement loan.  Would
21  you explain what that is?
22  A    The C-PACE reimbursement loan is, as I said, this is a
23  New York program which provides long-term loans.  I think
24  they're 40 years or so.  That are used to create projects
25  which are, are basically environmentally beneficial projects.

CMH   OCR   RDR   FCRR

638

1   Q    Okay.  And do you believe Eastern Mirage is qualified to
2   get that loan?
3   A    It should be.
4   Q    Define "it should be."  I mean, what are the criteria --
5   A    I don't administer the program.
6   Q    But based on your experience, is that a loan that Eastern
7   Mirage could be qualified for?
8   A    Yes.
9        MR. McGRATH:  Objection.
10       THE COURT:  Sustained.  I don't know if he has
11  expertise.  He just said he's not sure.  So someone explain
12  exactly what the criteria are.
13       Do you know, sir?
14       THE WITNESS:  I can't speak in detail to that.
15  Q    Okay.  And then you mentioned there is a Cirrus loan of
16  $30 million.
17  A    Yes.
18  Q    Do you know anything about that loan?
19  A    That is a part of a larger loan, a total of $177 million,
20  that is under discussion by Fleet with a lender, Cirrus, and
21  that's the allocation of a portion of that loan to the Eastern
22  Mirage project.
23  Q    It's not -- there is no commitment from the lender at
24  this point, correct?
25  A    No, there's no commitment.

CMH   OCR   RDR   FCRR

639

1    THE COURT:  Do you know if this loan would be in
2  front of the EB-5 investors, have priority over it?
3    THE WITNESS:  I don't.
4    THE COURT:  You don't know?
5    THE WITNESS:  I don't know.  I would think that it
6  would be treated as a construction loan so it's a regulated --
7  if it's a loan, it would be subject to the benefits of being a
8  lender and, generally speaking, they will want a priority
9  position.
10    THE COURT:  Okay.  One other question.  How is it
11  you know about this purported Cirrus loan?  Where did you get
12  that information?
13    THE WITNESS:  Discussions with the --
14    THE COURT:  Mr. Xia?
15    THE WITNESS:  Yes, Mr. Xia.
16    THE COURT:  Go ahead.
17  Q    Then there is a table for the uses of the loan.  Do you
18  see that, sir?
19  A    **Yes.  Uses of funds are, I mean --**
20  Q    Uses of funds.  Sorry.
21  A    **This is kind of simplified but, basically, you have to**
22  **pay the cost of acquisition, you have to pay the cost of**
23  **construction, there are development related soft costs,**
24  **there's furniture, fixtures and equipment which are**
25  **substantial for hotel projects like the Mirage project, and**

CMH    OCR    RDR    FCRR

640

1  **then there's a developer's fee.  Since developers work on a**
2  **fee basis, it's a contingent fee.  So all of those things**
3  **would be what the capital from the sources of funds would be**
4  **used for.  The total would be $147,460,000.  So that --**
5  Q    Do you believe by obtaining a Cirrus loan for
6  $30 million, the project will be completed?
7  A    **Yes.**
8    THE COURT:  Sir, can I ask you, Mr. Kameli, are you
9  qualifying this gentleman as some kind of expert?
10    MR. KAMELI:  No, Judge.  He's been working with the
11  project and he knows the financials of the project.  He knows,
12  he's been around, he was working with the
13  project for the past year or so.  He's someone that knows
14  about this project, not an expert, per se.
15    THE COURT:  But you're asking him his opinion about
16  is this viable, can they get a loan, all these things.  I mean
17  on what basis should I accept any of his testimony?  You asked
18  about do you think that the Eastern Mirage project would
19  qualify for a C-PACE loan.
20    MR. KAMELI:  As a consultant to the project.  He's
21  been consulting the project in the past, since 2015 at least.
22    THE COURT:  All right.  Go ahead.
23  A    **So what was the question?**
24  Q    There was no question.  You answered it.
25    Allow me to bring your attention to the table called

CMH    OCR    RDR    FCRR

641

1  Eastern Emerald.  It says, Eastern Emerald 112-12 Northern
2  Boulevard.  Do you see that, sir?
3  A    **Yes.**
4  Q    Underneath that, there is a table called "Sources"?
5  A    **Yes.**
6    THE COURT:  Can I ask you one question.  Is he
7  consulting on that project also?
8    MR. KAMELI:  He testified, Judge, that he was
9  working on that project also.
10    THE COURT:  Also the Eastern Emerald?  I'm sorry.
11  Maybe I missed it.  I thought you were not.  Go ahead.
12    THE WITNESS:  No, I was working on Eastern Emerald
13  since about 2016.
14    THE COURT:  Okay.
15  Q    And would you explain the "Sources" table to us, please?
16  A    **Sure.  We try to make these tables so that they can be**
17  **looked at consistently.  It's got capital sources.  A C-PACE**
18  **loan is identified.  Then there are two sources of capital**
19  **that do not apply to the Mirage project which is a Brownfield**
20  **tax credit which is something that occurs in two parts.  One**
21  **is a remediation portion and then there's a tangible property**
22  **credit which is something that you only get upon completion of**
23  **the building.  Then there is another tax credit for solar**
24  **battery and geothermal and then there's the balance of the**
25  **Cirrus loan and then there's available cash on hand.**

CMH    OCR    RDR    FCRR

642

1  Q    And just for clarifying the record, the Cirrus loan, it's
2  not a commitment from them yet, right?
3  A    **No, it's not a commitment from them as far as I know.**
4  Q    And the Brownfield tax credit, site location credit, has
5  that been earned?
6  A    **The Brownfield tax credit --**
7    MR. McGRATH:  Objection.
8    THE COURT:  Overruled.
9  A    **-- has been earned for the site preparation portion and**
10  **that was a, I think that is something like a $49 million**
11  **component of which they have earned that and I think, I'm not**
12  **sure exactly how much but probably about 11 million of that**
13  **has been paid out already.  The balance will be paid out.**
14  **It's been approved.  It's been audited.  The process is**
15  **something where once you complete the work, the State**
16  **Department of Environmental Conservation reviews it, qualifies**
17  **it and then payments are made.  So the credit is something**
18  **that has been obtained although only a portion of it has been**
19  **paid out so far by DEC.**
20    **The solar battery and geothermal tax credit is**
21  **another tax credit and then the Cirrus loan portion for this**
22  **is $147 million and the other portion of $30 million is what**
23  **is in the Eastern Mirage.**
24  Q    The tangible property credits that you mentioned for
25  $35 million --

CMH    OCR    RDR    FCRR

643

1   A   Yes.

2   Q   -- that's when the building gets completed, right?

3   A   You cannot get the -- the tangible property is the

4   building.

5   Q   Right.

6   A   So you have to complete the building and at that point,

7   you then can complete your tax credit work and get the tax

8   credit.

9       For a project of this size, the tax credit maximum

10  is about $35 million and they wouldn't be able to get more

11  than that.  In other words, even though the cost of the

12  project would be much greater than what the credit is for,

13  even though the cost of the project is much greater, the

14  program, tax credit program tops out at $35 million.

15  Q   Then you have a table underneath your "Sources" that

16  says, "Use of funds."  Do you see that?

17  A   Yes.

18  Q   And where did you get these numbers, the construction

19  costs, the soft costs and building violations?

20  A   Well, the sources -- uses of funds are acquisition costs.

21  That was when they acquired the property.  That's recorded --

22  Q   Yes.

23  A   -- in the deed.

24      The construction cost is the estimated cost of the

25  project.  They had a cost estimator do estimates for them.

CMH   OCR   RDR   FCRR

644

1       The soft costs are soft costs which are part of the

2   information that has been generated by Fleet.  Building

3   violations are, I think, similar to what was in the Monitor

4   report.

5       And furniture, fixture and equipment for this

6   project would be high.  It's $45,875,000 and it goes to all of

7   the components of the project so it would be for the hotel

8   rooms, it would be for all of the miscellaneous other uses

9   going on in the building and they would all require expenses

10  and what's called "Furniture, fixtures and equipment."

11      (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CMH   OCR   RDR   FCRR

645

1   DIRECT EXAMINATION

2   BY MR. KAMELI: (Continued.)

3   Q   Let me take you to your last chart where it says Eastern

4   Emerald and it has Eastern Emerald and Eastern Mirage tables.

5       Do you see that, sir?

6   A   Yes.

7   Q   In that chart, you're talking about -- you're saying all

8   use -- in the second table, you're talking about all

9   uses/monitor and in the fourth table also you have all

10  uses/monitor.

11      Do you see that, sir?

12  A   Yes.

13  Q   What do you mean by all uses/monitor?

14  A   Well, this table took as the -- took the information out

15  of the monitor's report.  And I think we took out the -- the

16  monitor provided a range of potential costs and I think we

17  selected the mid range for most of it.  But they're from the

18  monitor report, so that's why it says monitor.

19      MR. KAMELI:  Judge, may I approach for a second?

20      THE COURT:  Yes.

21  Q   I am going to show you what has been marked as SEC's

22  Exhibit 160, sir.

23  A   Okay.

24  Q   Please take a look at it.

25  A   Okay.  It's the monitor's report.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

646

1   Q   That's the monitor's report you're talking about?

2   A   Yes.

3   Q   And please talk a look at page 33 of that report.

4   A   33?

5   Q   Yes, sir.

6       Do you see that, sir?

7   A   Yes.

8   Q   When you said that you looked at the monitor's report

9   table, is that the table you were looking at?

10  A   I believe so.

11  Q   So under the all uses/monitor, you have cost to complete,

12  $366 million and some change.

13      Do you see that?

14  A   Yes.  That's what -- that's in the mid range of the

15  monitor report.

16  Q   And you're referring to the table in page 33 of the

17  monitor's report, right?

18  A   Yes.  Right.

19  Q   Then you have insurance for 639,750.

20      Do you see that?

21  A   Yes.

22  Q   Did you get that from the monitor's report also?

23  A   Yes.

24  Q   And the building violation, 277,432?

25  A   Also from the monitor's report.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

647

1  Q    So these are the costs that the monitor dedicates to the
2  Eastern Emerald Project to get completed, correct?
3  A    **Yes.**
4  Q    And your sources now, the Brownfield tangible property
5  credit has been taken out in here.
6        Do you see that?
7  A    **Yes, I see that.**
8  Q    And why is that?
9  A    **I think we pushed it over to the side there because it**
10 **was not something that was in hand.  There is a time frame on**
11 **that as well, so work has to be completed at a certain point**
12 **in time, so.**
13 Q    So you're talking about the total sources to be
14 page 388,000 -- 388 million point five, correct?
15 A    **Sources, three eighty eight five hundred, yes.**
16 Q    Okay.  And then the Eastern -- for the Eastern Mirage,
17 you're also talking about the expenses that says all
18 uses/monitor?
19 A    **Yes.**
20 Q    There is an amount for cost to complete, 15.3 million.
21       Do you see that?
22 A    **Yes.**
23 Q    Did you get that from the monitor's report?
24 A    **Yes.**
25 Q    Is that the mid range?

648

1  A    **I have to -- yes, it would be mid range.  It's in the mid**
2  **range, 15,307,200.  That's on page 33 of the monitor's report.**
3  Q    And then there are other four items:  Insurance, building
4  violations, loan, pending invoices.
5        Did you get those from the monitor's report also?
6  A    **Yes, I did.**
7  Q    So in total, you're indicating the total sources for
8  Mirage and Emerald is $435 million --
9  A    **Yes.**
10 Q    -- in your report?
11       And total use for Mirage and Emerald is about
12 $402 million.
13       Do you see that?
14 A    **Yeah, four-hundred-two eight-thirty-five.**
15 Q    So you believe that by obtaining, based on your financial
16 analysis of the project with the -- the total cost for both
17 projects would be $435 million at this point?
18 A    **Yes.**
19 Q    $402 million, correct, the total cost?
20 A    **Four-hundred-two eight-thirty-five.**
21 Q    And you believe there is a source and financing viable
22 for the project to obtain for $435 million at this point?
23 A    **Yes.**
24 Q    And of course if that's Cirrus loan to be completed,
25 correct?  There's a caveat to that?

649

1  A    **If you get a Cirrus loan.**
2  Q    If you get a Cirrus loan.
3        But if you get any kind of financing for
4  $177 million, right?
5  A    **Any kind.**
6        MR. KAMELI:  I have no further questions, Judge.
7        THE COURT:  You can go ahead, but I do have one
8  question for you, sir, before I let the SEC counsel ask you
9  questions.
10       Have you ever met Mr. Peeler, the monitor?
11       THE WITNESS:  No.
12       THE COURT:  Were you ever asked to meet with
13 Mr. Peeler?
14       THE WITNESS:  No.
15       THE COURT:  Were you ever asked to discuss with him
16 these alleged sources of outside funding for the project, all
17 these loans or credits, et cetera?
18       THE WITNESS:  No.
19       THE COURT:  Okay.
20       All right.  Go ahead Mr. --
21       THE WITNESS:  I think we're consistent with things
22 that was said in the monitor report, though.
23       THE COURT:  All right.  Go ahead.
24 CROSS-EXAMINATION
25 BY MR. McGRATH:

650

1  Q    Good evening, Mr. Freeman.  My name is Kevin McGrath.
2  A    **Okay.**
3  Q    I'm an attorney with the Securities and Exchange
4  Commission.
5        I just have a few questions for you.
6  A    **Sure.**
7  Q    So did I understand you to say that you assisted the
8  Eastern Mirage developer in getting a hardship variance on
9  that project?
10 A    **Yes, I did.**
11 Q    And what year was that?
12 A    **The work was done probably between 2012 and 2014.  The**
13 **variance might have been granted a year beyond that as a**
14 **bureaucratic delay.**
15 Q    And what company were you working for at the time that
16 you assisted him in getting that hardship variance?
17 A    **I was working for one of my companies, Freeman Frazier &**
18 **Associates.**
19 Q    I don't see that listed on your resumé.  The resumé
20 that's been provided indicates that from 2006 through 2017,
21 you worked on the New York City Board of Standards and
22 Appeals.
23 A    **No, I was not --**
24 Q    Let me just finish.
25       -- as vice chairman and commissioner.

651

1   A   No. You're looking at the resumé of Susan Hinkson.
2        THE COURT: Yes. I was just going to ask that, why
3   is Ms. Hinkson-Carling's resumé in your report?
4        THE WITNESS: She's my office supervisor and she's
5   involved in the background on this.
6        THE COURT: So this is her experience that is set
7   forth in this exhibit, not yours?
8        THE WITNESS: I had a separate resumé there and my
9   experience was set forth.
10       THE COURT: It is on the very first page, I think.
11  It is in letter form; is that right?
12       THE WITNESS: Yes.
13       THE COURT: The very first page of Exhibit 44, that
14  is Mr. Freeman's resumé.
15  Q   And why is it that we have a resumé, a detailed resumé of
16  the different work experience year by year for your associate,
17  but we don't have one for you?
18  A   This is -- the format we use are different.
19  Q   Okay. All right. Let me ask you to -- again, these
20  pages aren't numbered, so I will try to direct you to the
21  right page. I am looking at a page that's got
22  Eastern Emerald, Eastern Mirage and it says February 14, 2022.
23  And then the next line down says sources and uses,
24  Eastern Emerald. Let me know when you get to that one. And
25  the first line is the C-PACE log.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

652

1        THE COURT: That is either page 4 or 5, I think, if
2   you count the pages.
3        Isn't that right, Mr. --
4        THE WITNESS: Well, the fourth page would be
5   something that is Eastern Emerald. And then the page after
6   that in the book I'm looking at is Eastern Mirage.
7        THE COURT: Actually, six pages. Count out six
8   pages and you will get there.
9        THE WITNESS: The sixth page is both somewhat
10  combined, Eastern Emerald and Eastern Mirage.
11       THE COURT: Is that what you are looking at, Mr. --
12       MR. McGRATH: Yes, yes.
13       THE COURT: Yes. Okay.
14       THE WITNESS: Okay. We're on the same page.
15       MR. McGRATH: Thank you.
16  BY MR. McGRATH:
17  Q   So the very first line under Eastern Emerald says all
18  sources and the first line is the C-PACE loan, $85,500,000,
19  correct?
20  A   Yes.
21  Q   That loan has not been awarded to Mr. Xia or any of his
22  entities as we sit here today, has it?
23  A   That's correct. You're correct.
24  Q   Do you know whether it's even been applied for?
25  A   I don't know.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

653

1   Q   So you have no idea whether he's going to get this loan
2   or not, do you?
3   A   The character of this loan is that there's very little
4   discretion involved on the part of the administering agencies.
5   If you -- if you fill out the paperwork correctly and if the
6   project qualifies, then the loan is mostly what we would call
7   as of right.
8   Q   You said if the project qualifies, correct?
9   A   Yes.
10  Q   And you don't know whether this project, in its current
11  state, qualifies for that loan or not, do you?
12  A   I believe that it would.
13  Q   Based on what?
14  A   Based on my reading of what the loan can be used for,
15  what the objectives of the loan are and what the administering
16  agency requires of a project to qualify.
17  Q   Have you obtained a C-PACE loan for anyone, in your
18  experience?
19  A   No. My firm has, but I have not.
20       THE COURT: Can I pause you for one second, sir?
21       THE WITNESS: Yes.
22       THE COURT: In preparation for your testimony --
23  actually, let me go back for a minute.
24       What was your goal in preparing this exhibit? What
25  were you told you were supposed to do?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

654

1        THE WITNESS: My goal in preparing this exhibit was
2   to see whether or not there were sufficient sources of capital
3   to pay for the project.
4        THE COURT: And was it solely because you were asked
5   to put together this report that you looked at some
6   information about the C-PACE loan?
7        THE WITNESS: Yes. For both Mirage and for Eastern
8   Emerald.
9        THE COURT: So prior to being asked to prepare this
10  report, you had not done that for either project?
11       THE WITNESS: This would not -- for the
12  Mirage Project, this would not be required to make the
13  Board of Standards and Appeals variance case and we have not
14  worked sufficiently on Eastern Emerald to get to that point.
15       THE COURT: Okay.
16       THE WITNESS: So --
17       THE COURT: And one last question, I am so sorry.
18       Were there a number of documents you looked at or
19  web sites that you looked at to produce this report?
20       THE WITNESS: I looked at the monitor's report, I
21  looked at the experience that we had had on both of these
22  projects for Fleet, and I looked at what -- I mean, there's
23  very little here that's difficult to find out; the website for
24  the C-PACE program is pretty clear and my firm has experience
25  in doing C-PACE loans, so it was on a sense that they would be

Andronikh M. Barna, Official Court Reporter, RPR, CRR

655

1  eligible for a C-PACE loan.
2        THE COURT:  But you have never prepared one?
3        THE WITNESS:  I have never prepared.
4        THE COURT:  And I believe a moment ago when I asked
5  you what the criteria were, you said you did not know what the
6  criteria were for qualifying for a C-PACE loan.
7        THE WITNESS:  I know generally, but not
8  specifically.
9        THE COURT:  And what is the general criteria?
10       THE WITNESS:  You have to have a project that
11 provides a sustainable and environmentally sound development
12 for the city.
13       THE COURT:  Okay.
14 Q    Okay.  And Mr. Freeman, you testified that you had done
15 work on behalf of the Eastern Emerald project since 2016?
16 **A    Eastern Emerald, yes, since 2016.**
17 Q    And between 2016 and today, they never asked you to apply
18 for the C-PACE loan on behalf of that project, did they?
19 **A    You apply later on down the road when your project is**
20 **more complete.**
21 Q    But what does that mean, more complete?
22 **A    Right now the Eastern Emerald is basically a large hole**
23 **in the ground with foundations and piles and protective**
24 **construction.**
25 Q    Right.  And at what point is it your understanding, based

Andronikh M. Barna, Official Court Reporter, RPR, CRR

656

1  on your knowledge of the C-PACE loan process, at what point
2  they would be eligible to apply for the loan based on the
3  status of the building?
4  **A    There is no building there, so --**
5  Q    No, I know.  You just testified that they couldn't apply
6  for the loan yet because it's just a hole in the ground.  It's
7  still a hole in the ground, isn't it?
8  **A    It's a hole in the ground.**
9  Q    So they still can't apply for the C-PACE loan, based on
10 what you just said?
11 **A    They can't apply for the C-PACE loan yet.**
12       THE COURT:  But at what portion of the building or
13 the project has to be done in order to apply for a C-PACE
14 loan?
15       THE WITNESS:  I don't know that.
16       THE COURT:  Okay.
17 Q    So you have no idea then when they would even be in a
18 position to apply for that loan, do you?
19 **A    I personally, no.**
20 Q    Okay.  Now, you said that -- you've got an indication
21 here of $38 million for the Brownfield tax credit?
22 **A    Yes.**
23 Q    And did you testify that that's already been approved?
24 **A    Yes.**
25 Q    Did you read the monitor's report on this issue of the

Andronikh M. Barna, Official Court Reporter, RPR, CRR

657

1  tax credit?
2  **A    No, I didn't.**
3  Q    I'm sorry?
4  **A    For that, that's for the environmental cleanup portion of**
5  **the Brownfields program and they've already gone through the**
6  **process with the Department of Environmental Conversation.**
7  **They had an audit, they had an approved amount of money, and**
8  **it's in the process of being paid out based on the DEC audit.**
9  Q    Have you read the monitor's report where he discusses the
10 potential tax credits that the project would be eligible for?
11 **A    No, I haven't.**
12 Q    Do you have an understanding that certain of the tax
13 returns for Mr. Xia are under audit right now?
14 **A    No.**
15 Q    You didn't know that?
16 **A    No.**
17 Q    Do you have any understanding that that might affect the
18 amount of Brownfield tax credit he or his companies might
19 receive?
20 **A    I -- in my limited experience on Brownfields, I'm not**
21 **sure how that would affect the DEC's determination that the**
22 **hazardous material has or has not been removed from the site**
23 **based on their program.**
24 Q    Okay.  So similarly, the solar battery and geothermal tax
25 credit, you list $15 million there?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

658

1  **A    Yes.**
2  Q    Has that been approved and given to Mr. Xia in --
3  **A    I can't answer that.  I don't know.**
4  Q    Okay.  You mentioned a Cirrus loan of $177 million.  I
5  think you answered a question from Mr. Xia's counsel that
6  there's actually no loan commitment by --
7  **A    So --**
8  Q    Let me just finish the question.
9  **A    Sure.**
10 Q    There's actually no loan commitment in connection with
11 that loan, correct?
12 **A    At this time, that's correct.**
13 Q    Have you spoken to the lender?
14 **A    Yes.**
15 Q    Who is the lender?
16 **A    Cirrus.**
17 Q    No, who at the lender, at Cirrus?
18 **A    Oh, who is the lender?**
19 Q    Who did you speak with at Cirrus?
20 **A    I don't recall his name.  We had several conference calls**
21 **where the loan was discussed.**
22 Q    Okay.  But there's no written commitment letter at this
23 time?
24 **A    A commitment letter is a very specific kind of thing and**
25 **there is no commitment letter at this time.**

Andronikh M. Barna, Official Court Reporter, RPR, CRR

659

1  Q   Okay. So you can't represent to this Court that you know
2  that he's, Mr. Xia or his entity, is going to get a loan from
3  Cirrus, can you?
4  A   **I can't say with any certainty that they're going to.**
5  **From what I've read of the documents that they provided and**
6  **the conversations we had on conference calls, they had a**
7  **serious intent to provide a loan.**
8  Q   Mr. Freeman, when were you first asked to prepare these
9  documents?
10  A   **We have had numerous conversations with counsel for Fleet**
11  **and I would say we've been involved for about a month**
12  **relatedly, as you see.**
13  Q   Okay. But I asked you specifically when you were asked
14  to prepare these documents that we have been referring to here
15  today as opposed to any general discussions you've had with
16  counsel.
17  A   **I would say two weeks ago.**
18  Q   Okay. And how much have you been paid for your services?
19  A   **I haven't been paid yet.**
20  Q   Do you expect to be paid?
21  A   **We have a retainer with the company.**
22  Q   What is the retainer?
23  A   **The retainer is about $8500 a month for a three-month**
24  **period.**
25  Q   Do you have any other business that you are doing with

660

1  Mr. Xia?
2  A   **Not at this time.**
3  Q   Have you done business with him in the past, aside from
4  the retainer?
5  A   **Yes. I've already testified to that.**
6  Q   And approximately how much money have you earned from
7  your prior business dealings with Mr. Xia?
8  A   **I couldn't tell you off the top of my head because most**
9  **of it is ten years ago. So I would say generally, on one**
10  **project probably about $20,000 and on the other project**
11  **probably about half of that.**
12  MR. McGRATH: I don't have any further questions,
13  Your Honor.
14  THE COURT: Thank you.
15  Any redirect?
16  MR. KAMELI: Yes, Judge.
17  REDIRECT EXAMINATION
18  BY MR. KAMELI:
19  Q   Mr. Freeman, please take a look at page 16 of the
20  monitor's report.
21  Do you see that, sir?
22  A   **I have to get to it.**
23     **Okay, page 16.**
24  Q   The first line, it says -- the second line, "The credits
25  available for 2016 through 2018 tax years are currently under

661

1  audit and 2019 and 2020 tax returns have not yet been filed."
2  Do you see that?
3  A   **Yes.**
4  Q   Do you know what, if you know, he means by that?
5  A   **I have no idea.**
6  MR. McGRATH: Objection.
7  THE COURT: Overruled.
8  A   **Basically, the credit is a credit against the income tax**
9  **of either the corporate entity or the individuals involved, so**
10  **you have to demonstrate -- to get the credit, you have to have**
11  **the tax return and if your tax liability is less than the**
12  **credit, then the government writes you a check.**
13  MR. KAMELI: Okay. I have no further questions.
14  THE COURT: All right. Thank you very much.
15  No recross?
16  MR. McGRATH: No.
17  THE COURT: All right. You may step down. Thank
18  you very much, Mr. Freeman.
19  THE WITNESS: Okay.
20  THE COURT: Any other witnesses?
21  THE WITNESS: Do I leave this paperwork here?
22  THE COURT: You can just leave that where it is.
23  THE WITNESS: Sure.
24  (Witness excused.)
25  MR. KAMELI: Judge, may I take one minute?

662

1  THE COURT: Yes, go ahead.
2  (Pause.)
3  Okay, folks, we have about 15 minutes. What do you
4  want to do, Mr. Kameli?
5  I think they are thinking of recalling Mr. Xia,
6  perhaps. I do not know.
7  We are not going past 6:00, folks. I am just
8  telling you that.
9  While they are doing that, off the record -- or on
10  the record, does the SEC intend to recall Mr. Peeler?
11  MR. STOELTING: No.
12  THE COURT: All right. I just noticed he was
13  sitting there.
14  MR. STOELTING: No. I just had a couple of
15  housekeeping points and I think we're finished.
16  THE COURT: Yes. I think we were going to touch on
17  the motion to dismiss, but maybe we will just deal with that
18  separately.
19  MR. KAMELI: Judge, we rest.
20  THE COURT: All right. So, two things: One is, I
21  had promised Mr. Gouraige that we would discuss the PMC letter
22  with regard to the motion to dismiss, but before I get to
23  that, I do want to put on the record, because I know there is
24  sometimes a time lag between when I issue the written decision
25  in connection with a factual hearing like this and the hearing

663

1    itself.
2        I have to be very frank with you, that I found so
3    much of Mr. Xia's testimony unbelievable and incredible and
4    proven demonstrably false by records and other testimony. I
5    am concerned, quite frankly, about his conduct in this case,
6    not only what was reported by the monitor in terms of candor
7    and cooperation, but even just in the hearing before me. So I
8    really think the defense should think long and hard about
9    trying to come up with some negotiated resolution of this
10   because I do not see this going well for Mr. Xia.
11       And the one thing I think is true about what he said
12   is that he cares about these projects. That is clear to me.
13   And I actually think that he has skills, engineering or other
14   skills, and he has tried to bring to fruition two projects,
15   but everything I have heard really gives me serious concern
16   about the safety of the investors' money and the use of the
17   money as if it was his own piggy bank. It's clear to me that
18   Mr. Xia thinks that once the money is loaned from the GP to
19   the developers, it loses its character as investor money and
20   it is just his money to do with it whatever he wants. Now,
21   Mr. Xia may believe it is more efficient to pay people in cash
22   and not comply with any laws, tax laws, labor laws,
23   immigration laws, but that is not the basis upon which he is
24   going to be allowed to run these businesses. So that, to me,
25   is almost grounds here for why there has to be some controls

664

1    here.
2        Now, I am not skipping over the legal issues. I
3    know that the SEC has to prove at least an inference of
4    violation of securities laws in order to show likelihood of --
5    or an inference, rather, in order to keep the freeze going,
6    but -- and I know that the defense is focused on things like
7    materiality and the representations. And one of your
8    arguments is that even if there was misappropriation of funds
9    that happened after the offerings, that that would not be
10   sufficient to give rise to a finding of an inference of a
11   securities violation. I disagree with that only because those
12   misappropriations and everything that has been presented to me
13   show that there is only a loose familiarity with the truth
14   when it comes to what Mr. Xia says to the public and to others
15   and, quite frankly, to me in court here. Perhaps he is guided
16   by his own sense of what is right, I do not know, or what he
17   believes is true, but much of what I heard, I reject as
18   incredible.
19       And one example, and it may seem trivial, is the
20   fact that he insisted that somehow the bank made a mistake
21   with almost a dozen different accounts that were in the name
22   of Racanelli, where his wife was a signatory, and somehow that
23   was a bank error even though she was continually authorizing
24   withdrawals from that account. And then there is other
25   evidence that money went directly from her to the many

665

1    entities that have been discussed. The fact that Mr. Xia
2    would sit here and tell me that just speaks to me volumes
3    about what he is willing to say, for whatever his reason is,
4    good or bad.
5        And so I do want to make a very clear statement on
6    the record that I found much of what Mr. Xia said incredible,
7    aside from the fact that he cares deeply about these projects.
8    But it is abundantly clear to me, at a minimum, that his
9    handling of all the assets that were given to him from the
10   government, from the investors has just been completely
11   inappropriate and does amount to misappropriation. I
12   understand that that is different than knowing falsehoods for
13   purposes of advertising, but I think there has been a lot of
14   evidence about that as well, but that is an ultimate
15   determination I would make.
16       I say this to you on the defense side because I
17   really want you to think about what is best for these
18   projects, because it is clear to me that Mr. Xia cares about
19   them, I think you ought to talk with the SEC and the monitor,
20   whom so far has been given the back of the hand, it seems to
21   me, in terms of providing the monitor useful information to
22   find a way out of this problem, this problem or this morass
23   that might salvage these projects.
24       The last bit of evidence that I saw from
25   Mr. Freeman -- seemed like a nice man -- it is ridiculous.

666

1    I'm sorry, I do not even know how to tell you how meritless
2    any of it is. It is all just rank speculation. And he
3    admitted he did not know about the criteria for these loans,
4    he was not involved in some of these discussions about the
5    loans with regard to Mr. Xia. I reject entirely any
6    suggestion that these amounts of money are available.
7        Moreover, none of this was provided to the monitor
8    even though he repeatedly asked to sit down with Mr. Xia and
9    his lawyer and try to figure out if there was alternative
10   funds. I think Mr. Peeler and even the SEC has tried their
11   best to work with Mr. Xia to find a way forward for these
12   projects while protecting the investors and following the law.
13
14
15       (Continued on the next page.)
16
17
18
19
20
21
22
23
24
25

667

1  (continuing)
2      THE COURT:  So I am not ruling yet on this, but I am
3  giving you a pretty unblemished view of what I have concluded
4  sitting here for the last two-and-a-half or almost three-days
5  listening to Mr. Xia's testimony primarily, and the few other
6  witnesses, including Mr. Peeler and Mr. Dhookie, all of which,
7  quite honestly, it is in the record.  I do not even know how
8  we -- you know, I do not know how Mr. Xia can look away from
9  this and think it is all fine -- and look at it and think it
10  is all fine.
11      I also want to say about the motion to dismiss, and
12  I apologize I have detoured a bit, is that all of the issues
13  in your proposed motion to dismiss are going to be addressed
14  if I end up having to write on the preliminary injunction.
15  You are not raising anything different in your proposed motion
16  to dismiss than you have argued in defense or in opposition to
17  the preliminary injunction.  It is all the same argument.
18  Lack of materiality, set down each of these arguments.  So the
19  EB-5 unit is not security.  That has been raised as an
20  opposition point.  I will deal with that.
21      The allegations in the complaint do not establish a
22  scheme to defraud.  Obviously, I have to deal with that if I
23  am going to find any inference of securities violation.  The
24  alleged misrepresentations are not material, again, something
25  I have to address in this hearing context and this motion

VB    OCR    CRR

668

1  context.
2      And the statute of limitations.  That was also
3  argued in opposition to the motions *in limine* -- I am sorry,
4  the preliminary injunction motion.
5      So, Mr. Gouraige, in answer to your question, I do
6  not see why there is going to be or there is a need for
7  separate briefing.  It has been briefed, as far as I am
8  concerned.
9      MR. GOURAIGE:  Your Honor, I hear you loud and clear
10  and I've -- obviously, I have a client I need to talk with and
11  to advise the Court in how we will proceed with that and I
12  will do that promptly.
13      I do want to make one observation, if I may,
14  Your Honor.  And I accept in good faith all the comments the
15  Court has just made.
16      I think it's probably a bit unfair to say that we
17  have given the back of the hand to the monitor.  I can tell
18  the Court, based on my personal experience, in addition to
19  representing Mr. Xia in this case, I have devoted a
20  substantial amount of time to trying to develop financing
21  ultimately to benefit both the investors and Mr. Xia.  Indeed,
22  this afternoon when I stepped out of the courtroom at
23  3:00 p.m., I had a conference call with a major potential
24  lender who I'm told is very curiously interested in the Mirage
25  project.  And I couldn't do that call tonight, but I hope to

VB    OCR    CRR

669

1  do it tomorrow.
2      THE COURT:  Talk to the monitor then.  My only
3  complaint really is about the fact that it is undisputed that
4  the monitor pressed you and your client to sit down with him
5  to try to talk about a myriad range of issues, one of them
6  being alternate sources of financing.  And I think you would
7  agree that so far that have not really been any meaningful
8  conversations except about option one and option two and then
9  there was supposed to be some follow-up about that, which I
10  can see why, since option one did not make any sense to me
11  because it did not discuss access to the $270 million.
12      So I am not saying you are not trying, Mr. Gouraige.
13  I am just saying so far it has not happened and it has been
14  three full months since, you know, you have been representing
15  him.  I think longer, actually, I think.  But let's assume it
16  was November.  And none of this has really happened.  And all
17  of a sudden I get this report saying, oh, there are all these
18  sources of money.  It is just not credible.
19      MR. GOURAIGE:  If I may, Your Honor.
20      I agree with the Court it has not happened.  There
21  have been discussions.  It has been -- and I can represent,
22  based on my own experience, enormously difficult, enormously
23  difficult because of the circumstances of the case.  The
24  lender that I introduced Mr. Xia to had one meeting.  They've
25  been to the project and they wanted to talk with me today

VB    OCR    CRR

670

1  about the case.
2      Inevitably, the problem is the lenders will back off
3  because there has to be a resolution of the asset freeze,
4  which is why those two proposals -- the first proposal was not
5  a lending proposal.  It was really an alternative security for
6  the asset freeze.  And Mr. Freeman talked about this serious
7  proposal.  That was the proposal that the monitor testified
8  that when it was first suggested, it was inadequate.  In fact,
9  the monitor was very adamant.  The numbers just did not add up
10  and we agreed.  We said let's take it back.  We'll go back to
11  the drawing board.  Now we've now come up with another serious
12  lender that seems to be interested.
13      At the end of day when I speak with that lender, and
14  I will find out what they are interested in, I am sure the
15  problem is going to be a resolution of the asset freeze, which
16  is why we have worked so hard to try to resolve it.
17      THE COURT:  Well, you can say that to me but
18  remember, it has been almost four months since I scheduled a
19  show cause hearing.  And I am not faulting you personally, but
20  you agreed to an almost three-month delay and now you are
21  saying that somehow it is because there is no resolution yet
22  that it is impairing Mr. Xia's ability to find a funder.
23      I think the quickest way to deal with that is to
24  work with the SEC and the monitor and sit down with the
25  potential lender and come up with a structured plan for that

VB    OCR    CRR

671

1  to happen because I am trying to tell you, I do not think it
2  is going to go well for your client in terms of the asset
3  freeze being continued on your preliminary injunction.
4        Instead, because everything I have seen points to a
5  pretty clear need to ensure that the assets do not get
6  dissipated.  And, quite honestly, the only question, the only
7  reason I am not ruling from the bench is I want to look at
8  this issue about the representations because a lot of it have
9  to do with the offerings, and the PONs.  And so -- but for
10 that, and I will take a second look at all of the evidence, it
11 is clear to me that this is really a nightmare of a situation
12 that is heading for disaster, financial disaster, because of
13 how Mr. Xia handled everything.
14       If there is going to be some agreement, there are
15 going to have to be all sorts of accounting practices and
16 standard business practices put in place and the law has to be
17 complied request.
18       But the quickest way to get there, to get that
19 financing, is to sit down with the SEC and the monitor and see
20 if you can all get to the table before I issue a ruling that
21 is really going to make it difficult.
22       MR. GOURAIGE:  I understand.  And I appreciate the
23 Court's comments.
24       THE COURT:  Okay.
25       Mr. -- go ahead.
                    VB    OCR    CRR

673

1  rule.
2        MR. KAMELI:  Yes.
3        MR. McGRATH:  Thank you, Your Honor.
4        I just want the record to be clear that the asset
5  freeze is continuing --
6        THE COURT:  That is correct.
7        The asset freeze continues until I issue a ruling
8  about the pending motion for preliminary injunction.
9        MR. STOELTING:  Thank you.
10       THE COURT:  All right.
11       Thank you, everyone.
12       ALL:  Thank you.
13       THE COURT:  Stay safe.  Hang on folks.
14       MR. STOELTING:  One last point, Your Honor.
15       THE COURT:  Yes.
16       MR. STOELTING:  The amended complaint that we had
17 indicated would be filed this week, will likely be filed next
18 week.
19       THE COURT:  Take as much time as you need while you
20 are discussing possible resolution.
21       MR. STOELTING:  All right.
22       THE COURT:  Thank you very much.
23       (Matter concluded.)
24
25                    oooOooo
                    VB    OCR    CRR

672

1        MR. KAMELI:  May I suggest something.
2        Based on what you just heard, I heard yesterday that
3  you were saying that we are going to get three weeks to
4  respond or to file any documents, any kind of closing
5  statements, if you will.
6        THE COURT:  If you want that, that is why I am
7  trying to save you, to save yourself that time and effort.
8        MR. KAMELI:  Judge, I would like to, if it's
9  possible and if the SEC agrees, maybe we can just postpone
10 that maybe for one week to see what we can do next week, this
11 coming week, in the next seven days, to talk to them, to talk
12 to the monitor, and maybe we can resolve this issue before we
13 take your time away by setting down issue and reading them the
14 transcript, everything else, to make an opinion.
15       THE COURT:  Excellent suggestion, Mr. Kameli, and I
16 am looking at my court reporter because I want her to be able
17 to go home.
18       What I propose is a week from now you folks let me
19 know what the status is, and if there is going to be
20 post-trial briefing, suggest a mutually-agreeable schedule and
21 we will take it from there.  Or let me know if you come to
22 some resolution, all right?
23       Happy to meet with you again to talk about anything,
24 but tonight we are going to end and you folks use your best
25 efforts to come up with a solution, if you can.  If not I will
                    VB    OCR    CRR

674

1                    I N D E X
2
3  WITNESSES:
4
5    RAYMOND DHOOKIE
6        DIRECT EXAMINATION BY MS. HAN (Cont d)      439
7        CROSS-EXAMINATION BY MR. KAMELI             459
8        REDIRECT EXAMINATION BY MS. HAN             510
9        RECROSS-EXAMINATION BY MR. KAMELI           514
10   SCOTT PEELER
11       DIRECT EXAMINATION BY MR. McGRATH           521
12       CROSS-EXAMINATION BY MR. KAMELI             607
13   JACK FREEMAN
14       DIRECT EXAMINATION BY MR. KAMELI            627
15       CROSS-EXAMINATION BY MR. McGRATH            649
16       REDIRECT EXAMINATION BY MR. KAMELI          660
17
18
19
20              *    *    *    *
21
22
23
24
25
              CMH    OCR    RDR    FCRR