**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **21-cv-05350-PKC-RER** |
| **-against-** | |
| **RICHARD XIA, a/k/a YI XIA, and FLEET NEW YORK METROPOLITAN REGIONAL CENTER, LLC, f/k/a FEDERAL NEW YORK METROPOLITAN REGIONAL CENTER, LLC,** | |
| **Defendants,** | |
| **-and-** | |
| **JULIA YUE, a/k/a JIQING YUE; XI VERFENSTEIN; and XINMING YU,** | |
| **Relief Defendants.** | |

### PLAINTIFF'S POST-HEARING MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION FREEZING ASSETS AND APPOINTING A MONITOR PENDING FINAL JUDGEMENTS

Kevin P. McGrath
David Stoelting
Kim Han
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-053 (McGrath)
mcgrathk@sec.gov

April 13, 2022

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................1

RELEVANT PROCEDURAL HISTORY.............................................................................1

SUMMARY OF THE EVIDENCE FROM THE SHOW-CAUSE HEARING .....................3

   I.   Xia Made Numerous Materially False and Misleading Misrepresentations........................4

      A.  Xia's Misrepresentations Regarding Racanelli Construction Group.......................4

      B.  Xia's Misrepresentation Regarding Independent Funding Sources.........................5

          1.Xia's Misrepresentations Regarding the $17 Million Recovery Zone Facility Bond Source of Financing ............................................................6

          2.Xia's Misrepresentations Regarding the Purported $72 Million and $40 Million Hapoalim Loans and a Purported $85 Million Loan from Seelaus 6

          3.The New Market Tax Credit...................................................................10

          4.Xia's Misrepresentations Regarding the Brownfield Tax Credit .............11

          5.Xia's Misrepresentations Regarding the Westin Hotels and East West Bank .......................................................................................................12

  II.   The Investments Are Securities Including Because Investors Had a Reasonable Expectation of Profit.........................................................................................................13

 III.   Xia Misappropriated Investor Proceeds Earmarked for One Project For The Other And For His Personal Benefit........................................................................................................14

      A.  Xia Misappropriated Investor Proceeds from One Project for the Other Project ..14

      B.  Xia Diverted $819,810 in Eastern Mirage Investor Proceeds to Pay Off a Mortgage on the 57-35 Lawrence St. Property He Owned....................................15

      C.  Fraudulent Payments From Racanelli and Perini to Xia Affiliates........................16

          1.Invoices From Xia's Entities Purporting To Show that Work Was Done Are Either Missing or of Questionable Legitimacy ...................................16

          2.The Requisitions from Racanelli and Perini were Unusual .......................17

3.The Circular, Multi-Step Flow of Funds Amongst Accounts Was Unusual .........................................................................................18

IV.    Xia Cannot Be Entrusted To Complete The Projects Or Handle Investors' Money .........19

    A.  Xia Admitted That He Had a Fiduciary Duty to Put the Investors' Interests Above His Own Interests, Yet He Has Repeatedly Failed to Do So.................................19

    B.  Xia Failed to Disclose Material Conflicts of Interest to Investors........................21

    C.  Xia has Repeatedly Refused to Cooperate with the Monitor, Who Has Uncovered Further Evidence of Xia's Mismanagement ...........................................................22

    D.  The Scope of the Freeze and the Continuing Need for the Monitor .....................25

**CONCLUSION** ......................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011)......................................................................3

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990).......................................................3

**Statutes and Regulations**

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).....................................................2

Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a) ..................................................2

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this post-hearing memorandum of law in further support of its motion for a preliminary injunction pending the entry of final judgments: 1) freezing assets of defendants Richard Xia ("Xia") and Fleet New York Metropolitan Regional Center ("Fleet"), and assets of Relief Defendant Julie Yue ("Yue"); and 2) appointing a Monitor. This brief is intended to supplement the SEC's papers by summarizing the evidence from the show-cause hearing.[1]

## PRELIMINARY STATEMENT

The three-day show-cause hearing strengthened the already compelling record—which includes extensive and undisputable evidence of Xia's misappropriation of investor funds—for a preliminary injunction. At the hearing, the evidence further established that Xia, among other things, reviewed and approved the Private Offering Memoranda ("POMs"); that he inserted the false description of Racanelli Construction in the POMs; that other than obtain questionable "letters of interest" he did not obtain critical third-party financing described in the POMs; and that he diverted millions of dollars of investor proceeds to his own companies through convoluted, illogical and undocumented or insufficiently supported transactions. In addition, the evidence regarding Xia's failure to maintain critical insurance on the Projects, his refusal to address the barrage of building code violations, and his failure to maintain even a rudimentary system of recordkeeping show that the oversight of the Monitor must be continued. And Xia's mendacious testimony at the hearing left his credibility in tatters. The SEC has more than

---

[1] The SEC incorporates by reference its Memorandum of Law in Support of its *Ex Parte* Emergency Application for a Temporary Restraining Order Freezing Assets, Appointing a Monitor and Granting Other Relief (Dkt. 2-2) ("SEC Opening Brief") and the documents and exhibits filed in connection therewith (Dkt. No. 2-3 and Dkt. Nos. 3 through 7); and its Reply Memorandum of Law in Response to Defendants' Brief Opposing the Court's Show-Cause Order (Dkt. 48) ("SEC Reply Brief").

satisfied the burden of proof needed to justify the Court issuing a preliminary injunction, including an asset freeze.

## RELEVANT PROCEDURAL HISTORY

On September 27, 2021, the SEC filed its Complaint and an application for a temporary restraining order.  In support of its application, the SEC submitted voluminous documentary evidence that the Defendants engaged in a fraudulent scheme in which they raised over $229 million from EB-5 investors to construct the Eastern Mirage and Eastern Emerald Projects (collectively, the "Projects") based on materially false and misleading statements and omissions in five limited partnership offerings; that the Defendants misappropriated investor funds; that Xia's wife, Yue, received approximately $9.7 million of ill-gotten gains without consideration; that insufficient investor funds are left to complete the Projects; and that a Monitor is necessary to ensure that Xia does not misappropriate and mismanage the remaining investor funds.

That day, the Court granted the SEC's application and found that the SEC has shown a likelihood of success in establishing that the Defendants violated Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]; that the Defendants and Relief Defendant Yue received ill-gotten gains; and that the Defendants and Relief Defendant may dissipate or transfer from the Court's jurisdiction assets that could be subject to an order of disgorgement or imposing civil penalties. Order to Show Cause (Dkt. 11).  Also on September 27, the Court entered an Order appointing Scott Peeler ("Peeler") as a Monitor (Dkt.11-1).

The Court conducted a show-cause hearing on February 14, 15, and 16, 2022, and the evidence admitted at the hearing provided further support for the Court's initial findings.  At the end of the hearing, while reserving decision, the Court noted that it found much of Xia's

testimony "unbelievable and incredible and proven demonstrably false by records and other testimony." Hrg. Tr. 663. The Court also stated that it had "serious concern about the safety of the investors' money and the use of the money [by Xia] as if it was his own piggy bank." *Id*. The Court also stated: "[I]t is abundantly clear to me, at a minimum, that [Xia's] handling of all the assets that were given to him from the government, from the investors has just been completely inappropriate and does amount to misappropriation." *Id*. 665.

On April 6, 2022, the SEC filed an Amended Complaint (Dkt. 98) adding two additional Relief Defendants—Xi Verfenstein, and her mother, Xinming Yu—based on their receipt of ill-gotten gains that Xia diverted to purchase mansions in their names. On that date, the SEC also filed a motion (Dkt. 99) to expand the asset freeze to include those mansions, as well as a mansion that Xia purchased in Yue's name using ill-gotten gains.

## SUMMARY OF EVIDENCE FROM THE SHOW-CAUSE HEARING

In SEC enforcement actions, federal courts have the authority to impose asset freezes as ancillary relief that, "like an attachment," ensures "any funds that may become due can be collected." *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990). The SEC's burden of proof in connection with an asset freeze application is substantially lower than on an application for a traditional preliminary injunction. *Id.* at 1041. To obtain an asset freeze at this stage, the SEC need only show that an inference can be drawn that the party has violated the federal securities laws. *Id.* (freeze order warranted where "there is a basis to infer that" the appellants violated the law); *see also Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011). *See* SEC Opening Brief at 25-26 for standards to establish liability for the charged offenses.

As the evidence at the evidentiary hearing established, the SEC has more than met its burden for the Court to issue a preliminary injunction freezing Defendants' and Relief Defendant

Yue's assets and appointing a Monitor.  The SEC summarizes below the key evidence adduced

at the hearing.

## I.    Xia Made Numerous Materially False and Misleading Misrepresentations.

### A.    Xia's Misrepresentations Regarding Racanelli Construction Group.

Xia admitted that he was involved in preparing the POMs that were used to raise $229

million from the EB-5 investors; that he reviewed and approved the POMs; and that he had final

authority over their contents.  Hrg. Tr. 8-9.

Xia also admitted that he provided the language describing the purported experience of

the Racanelli Construction Group ("Racanelli") in the POMs.  *Id.* 26-27.  He further admitted

that he copied the description of Racanelli, which was created in June 2011, from the website of

the Racanelli Construction Company ("Original Racanelli").  *Id.* 25; 28-29; *compare* PX 35

Original Racanelli website company description *with e.g.* PX 3 (EMMCO Tower POM) at 14.

Thus, the representation in the POMs that Racanelli had 60 years of construction experience was

knowingly false based on Xia's own admissions.[2]

Xia was further caught in a lie at the hearing when he testified about this issue.  Xia

testified falsely, in response to the Court's question, that he had no relationship with Racanelli.

Hrg. Tr. 28.  But he then had to promptly concede that he had in fact identified himself as the

owner of Racanelli, which was ostensibly owned by his business associate Xi Verfenstein

("Verfenstein"), in numerous court filings.  *Id.* 31-32; *see also* PX 145 (examples of Xia

identifying himself in court filings as President of Racanelli).  Xia claimed he only did so

---

[2] At the hearing, Xia fabricated a story that, at the preliminary stage before construction began, he was
working with the Original Racanelli but switched to the newly formed one when the Original Racanelli
changed its prices.  Hrg. Tr. 27. There is no evidence to support this story, and the lawsuit that the
Original Racanelli filed against Xia for trademark infringement makes no mention of this. Racanelli
Construction Co. Inc v. Racanelli Construction Group Inc. & Richard Xia 2:15-cv-4334 (EDNY 2015).

because Verfenstein had "some health issue" and "could not sit in the deposition."  Xia also admitted that he identified himself as Perini's manager in an affidavit in another case for the same reason.  Hrg. Tr. 33-36.  Xia tried to explain away his admissions regarding his positions at Racanelli and Perini as "only in the litigation," *Id.* 34, apparently taking the position that his sworn affidavits to multiple courts were false.

Xia further admitted that his wife's name was on bank account signature cards at his direction.  *Id.* 42-43.  Xia initially denied that he controlled the Racanelli bank accounts, but when confronted with PX 141(lines 129-138) —which showed nine bank accounts for Racanelli, opened between 2011 and 2015, listing his wife Yue as the sole authorized signatory (and as President on eight accounts)—Xia claimed it was a mistake by the bank that he did not discover until after the SEC Exam staff made voluntary document requests in 2018.  Hrg. Tr. 44-46; 48.  Xia refused to back off this claim even when shown bank records (PX 172 - bank transfer slips), that Yue had authorized scores of money transfers from these Racanelli bank accounts just in the period 2015-2018 alone.  Xia implausibly claimed to be unaware of the fact that his wife authorized all these transfers from the Racanelli bank accounts, even though he admitted he would direct her to make payments on behalf of his companies.  Hrg. Tr. 113-114; 154-155.

Xia's control over Racanelli is further demonstrated by the fact that Verfenstein, the nominal head of Racanelli, had no authority over any of the Racanelli bank accounts from Racanelli's formation in 2011 until 2018.  Instead, the Racanelli bank accounts were all in Yue's name, who acted, as Xia admitted, at Xia's direction.

### B.    Xia's Misrepresentations Regarding Independent Funding Sources.

Xia also made numerous representations in the POMs that the Projects would receive millions of dollars of financing from independent sources.  *See, e.g.,* PX 1 at 12; PX 2 at 12; PX

3 at 12; PX 4 at 11; PX 5 at 3; PX 6 at 12. As Xia knew, these representations were material. Hrg. Tr. 56. In July 2014, Xia approved notes for an investor presentation that an associate, Walter Verfenstein (Xi Verfenstein's then husband), was going to give potential investors in China. PX 63. The notes emphasized the importance of non- EB-5 funding:

> The project will benefit from the support of community leaders and NY State and the U.S. government in the form off (sic) $45 million in tax credits. As a potential EB-5 investor you would be an important <u>part of this project, but only a part</u>. The $75 million investment from $150 investors could comprise less than one-third of the projected $228 million development budget. (State, Federal govt, a bank and Fleet Financial would all have large stakes, too.)" (emphasis in original).

PX 63 at 2. As the notes show, a reasonable investor would consider it important to know, in deciding whether to invest in the Projects, that reputable, experienced third parties had decided that the Projects were worth extending money to and that there would be sufficient funds to meet the construction budgets set forth in the POMs. Yet, as discussed below, Xia did not obtain independent financing for either Project—aside from a $10.97 million Brownfield Tax Credit that he misappropriated to use as collateral to purchase mansions in the name of his wife and Xi Verfenstein's mother.

        **1.**       **Xia's Misrepresentations Regarding the $17 Million Recovery Zone Facility Bond Source of Financing**

From 2011 onwards, Xia caused the distribution to prospective investors of the Eastern Mirage POMs, which claimed that the Project costs were expected to be financed by $17 million in Recovery Zone Facility Bonds. PX 1 at 12; PX 2 at 12; PX 3 at 12. However, Xia's attorney had already sent a letter, dated December 6, 2010, informing the New York City Capital Resource Corporation ("NYCCRC") that Xia's company Fleet Financial Group ("FFG"), the developer of the Eastern Mirage Project, would not be seeking to use the $17 million allocation. PX 38. Moreover, the NYCCRC sent Xia a letter the next day stating that FFG's time to seek the $17 million allocation had already passed and added that the Recovery Zone Facility Bond

Program was expiring on December 31, 2010.  PX 39.  Xia's testimony that this representation was not misleading because he intended to apply for a different type of bond allocation in the future (Hrg. Tr. 56-60) does not cure his misrepresentations regarding the $17 million in Recovery Zone Facility Bonds.

> **2.      Xia's Misrepresentations Regarding the Purported $72 Million and $40 Million Hapoalim Loans and a Purported $85 Million Loan from Seelaus**

The EEGH POM, dated December 2013, represented that the Project costs "are expected to be financed" by a "Loan from Hapoalim Securities" of $72 million (PX 4 at 11).  In September 2014, the U.S. Citizenship and Immigration Services ("USCIS") sent a letter to Fleet seeking support for, among other things, the purported $72 million loan.  *See* PX 69.  In response, Xia's attorney submitted a letter, dated November 15, 2014, from Edward Chan, a long-time Xia business associate, on Hapoalim letterhead.  *Id.* at 11.  The letter purported to be a "letter of intent as an indication of our interest to move forward on a loan commitment for $72 million." PX 152. The letter was addressed to Xia's wife Julia Yue, yet referred to her in the third person.  *Id.*

Yet Xia admitted he never talked to anyone at Hapoalim other than Chan, that he didn't recall submitting a loan application to Hapoalim, and that he never obtained a loan from Hapoalim.  Hrg. Tr. 60-61.  Xia also admitted that he had asked Chan for this letter and the letters (PX 150; 151) referenced below.  *Id.* 61-62.  In his deposition, Chan did not remember if anyone at Hapoalim reviewed this letter before he sent it and did not recall if he ever gave a copy of it to anyone at Hapoalim.  PX 170 at 114; 118; 120-121.[3]

---

[3] Chan had previously apparently provided Xia (1) a letter, dated December 21, 2013, that purported to offer Hapoalim Securities' services, including "advice" in obtaining up to $120 million for the development of the Eastern Emerald Project (PX 150) and (2) just two days later, a letter dated December 23, 2013, ostensibly offering Hapoalim's assistance in "underwriting any portion of the equity offering

The EEGH II POM represented that the Project costs "are expected to be financed" by a "Loan from Hapoalin (sic) Securities $40 million." PX 6 at 12. The USCIS sent a letter to Xia's EB-5 counsel on September 13, 2017, noting the lack of evidence that the $40 million loan from Hapoalim Securities "has been secured or is readily available" and requested evidence of a "secure commitment." PX 70 at 2. In response, on December 1, 2017, Xia did not provide any evidence supporting the representation of a $40 million loan from Hapoalim but instead submitted a later dated August 18, 2017 on purported R. Seelaus & Co. letterhead claiming to make a loan commitment of $85 million to Xia on behalf of LaGuardia Performance Center. PX 70 at 6-21. The letter was again signed by Chan who was then working at R. Seelaus & Co. However, Seelaus & Co. never considered making a loan to Xia, and the letter of intent was not legitimate. PX 147, PX 169 at 70-72.

In her deposition, Annie Seelaus, the Chief Executive Officer at Seelaus & Co. since 2015, testified that she oversees the firm's day-to-day operations. PX 169 at 8-11; 18. She testified that all outgoing letters must be approved by compliance or one of the business heads; that only the Chief Compliance Officer, the Chief Financial Officer, and the human resources associate can authorize a letter going out on Seelaus & Co. letterhead. *Id*. at 29-30; 41-42.

Seelaus & Co. searched Chan's email and Bloomberg correspondent archives and did not locate any correspondence with Xia. *Id*. at 35. Chan did not have the authority to commit Seelaus & Co. to a loan of any amount, and no one at Seelaus & Co. authorized Chan to send out the August 8, 2017 letter. *Id*. at 101. Seelaus testified that a loan like the one described in the

---

that is not subscribed for by EB-5 immigrant investors, subject to market conditions." PX 151. In his deposition, Chan claimed not to recall the letters. PX 170 at 94-95; 98-102; 107. These letters—making inconsistent offers just two days apart—do not appear authentic, and neither letter constitutes an offer of a $72 million loan by Hapoalim Securities to Fleet that would have justified Xia's representation in the EEGH POM. In any event, Xia never followed through on either "offer." Hrg. Tr. 60.

letter is something Seelaus "did not nor would ever [do]," *id*. at 70, and that her firm "doesn't make loans," has never made a loan, and does not even have $85 million in assets. *Id*. at 71.[4]

Meanwhile, Chan was "not aware of anyone at Seelaus approving this letter," and did not recall speaking with anyone at Seelaus about the $85 million loan to Xia. PX 170 at 136; 140. Chan had "no recollection whatsoever" as to why Xia did not go ahead with the $85 million loan. *Id*. at 149. Chan also signed a September 25, 2017, letter to Yue (PX 154) that contradictorily purported to offer "bridge, mezzanine, or take-out financing up to $72 million for each phase of the EB-5 project." *Id*. at 153. Chan did not know if the $85 million loan had been withdrawn when the second letter was sent and was not sure why the second letter was sent. *Id*. at 154-155. Chan was "not aware if anyone at Seelaus knew that this letter was sent out." *Id*. at 155.

As for Xia, he was unable to recall whether he even applied for the Seelaus loan (Hrg. Tr. 83); admitted he never spoke to anyone at Seelaus except Chan (*id.* 84); and admitted he never received this loan (*id.*). Xia claimed he did not take advantage of the purported $85 million loan because "I still have $77 million cash in the account so I don't –even need that loan maybe at a later stage, but there's no reason for me to incur the financing right now.'" *Id.* 84. However, if this were the case, there would have been no reason for Xia to sign an $85 million loan commitment in 2017. The logical inference is that Xia asked Chan to provide this purported loan commitment to deceive the USCIS and investors that he had viable alternative sources of funding the Eastern Emerald Project when he knew in fact that he did not.

The evidence therefore shows that Xia engaged in a pattern of knowingly directing Chan to concoct phony loan commitment letters that Xia then presented to USCIS to support representations in the POM regarding the purported $72 million, $49 million and $85 million

---

[4] In addition, Chan's August 18, 2017 letter (PX 153) was not on Seelaus & Co.'s correct letterhead, PX 169 at 38-39; 67, and misstated Chan's title, *id*. at 54, 58.

loans.  The evidence further shows that Xia asked Chan to provide him with these letters and that Chan created these letters without obtaining approval from anyone at Seelaus & Co. or Hapoalim.  Xia admitted that he never spoke with anyone at these companies other than Chan, that he could not recall submitting any loan applications, and that he never followed up on any of these loans commitments.  Finally, Chan had no motive to make up these phony letters on his own.  Indeed, the fact that Xia never followed through on any of these loan offers is telling evidence that he knew the loan commitment letters were not authentic.

### 3.    The New Market Tax Credit

The EEGH Supplemental POM dated September 2015 represented that the $190 million cost of the Eastern Emerald Project "shall be financed as follows: [including] New Market Tax Credit $18,000,000." PX 5 at 3, 9.  On November 10, 2013, when Xia was in China marketing the Projects, he emailed Sunil Aggarwal, the Managing Director of a company called ThinkForward Financial Group, and asked: "Can you help issue a $18 million letter of intent for NMTC of my forthcoming project so I can promote my project in China?"  PX 173 at 3.

On November 14, 2013, Xia again emailed Aggarwal stating:  "I am in China now and the project is very well accepted due to our first successful one. When you get a chance, please see if you could email me the NTMC (sic) letter…."  *Id.* at 2.  Aggarwal responded by sending Xia, on November 14, 2013, a "letter of interest in arranging a New Market Tax Credit Financing transaction for the [Eastern Emerald Project]," which referenced an "Allocation Amount" conveniently "estimated to be $18 million," matching the amount Xia had asked Aggarwal to include in the letter. *Id.* at 3-4.  When shown this email exchange at the show-cause hearing, Xia first admitted that he requested this letter to market the Eastern Emerald Project to Chinese investors, then tried to deny it, then admitted it.  Hrg. Tr. 69-72.

In November 2014, one of Xia's FFG employees, at his direction, asked Aggarwal to revise the letter of intent because the USCIS had asked for evidence that Xia had obtained the New Market Tax Credit.  PX 174; Hrg. Tr. *Id.* 75-76.  Aggarwal prepared a revised letter of intent, addressing it to Yue, rather than Xia, but keeping the November 2013 date.  PX 175. Xia's attorney provided this letter to USCIS on November 20, 2014.  PX 69 at 9.  Xia's attorney's letter—which Xia approved before it was sent (Hrg. Tr. 78) —stated that "[t]he $110 million non-EB-5 funds [for the Eastern Emerald Project] will come from the following sources: $18 million from New Market Tax Credit, [and referenced the attached Aggarwal letter of intent]…."  PX 69 at 5.  Yet Xia never obtained the New Market Tax Credit.  The New Market Tax Credit letters of interest that Xia solicited are further evidence of Xia's pattern of obtaining such letters of interest, not to actually pursue and obtain third-party financing, but to deceive investors and the USCIS into believing that he had such alternative sources of financing.

#### 4.    Xia's Misrepresentations Regarding the Brownfield Tax Credit

Xia obtained the approximately $11 million Brownfield Tax Credit in January 2021 and admitted that he did not use it for the Eastern Emerald Project, as he had represented he would do in the Eastern Emerald POMs (*see, e.g.*, PX 5 at 3).  Hrg. Tr. 87-88.  Xia claimed that the project did not need the money then.  *Id.*  Xia admitted he used the Brownfield Tax Credit to obtain a $10 million certificate of deposit ("CD") and then used the CD to obtain a $10 million loan to partially fund the purchase of the Kings Point Road mansion in his wife's name.  *Id*. at 88-89.  At that time, Xia had substantial unpaid tax bills and outstanding NYC Department of Buildings fines.  *Id.* 207-209; PX 160.[5]  In response to the Court's question, Xia falsely stated

---

[5] Detailed evidence of Xia's misappropriation in 2021 of over $30 million of dollars of investor funds earmarked for the Projects to purchase three mansions in the name of his wife, Verfenstein, and Verfenstein's mother is set forth in the SEC's Brief in Support of its Motion to Extend the Asset Freeze. Dkt. 99.

that if he defaulted on the loan, the CD would not be used as collateral.  *Id.* 89; PX 85 at 2 (the CD is collateral).

     **5.**    **Xia's Misrepresentations Regarding the Westin Hotels and East West Bank**

The Eastern Mirage Tower POM dated January 31, 2011, represented that the Eastern Mirage Tower phase of the project "will encompass the development of the Westin Elemnet (sic) Hotel & Condo Apartment building." PX 3 at 5-6.  When asked to concede that he never entered into a deal with Westin, Xia avoided giving a direct answer.  But his claim that he was continuing to negotiate with the chain and its successor implicitly conceded that there was no deal in place in 2011 when he made this representation and that there still is no deal.  Hrg. Tr. 89-90.

Despite the absence of any deal with Westin, the marketing materials used to lure Chinese investors continued to refer to the Eastern Mirage Project as the Westin New York Project and referenced a 101-room, upscale Westin business hotel.  *See, e.g.,* PX 8 at 1, 5-6, 9. The same materials also claimed that the project had "already received" "9 million dollars in loans from East West Bank," PX 8 at 5, but the project never received any loans from East West Bank.  Hrg. Tr. 92.   Xia again claimed he had a letter from the bank but did not need the funds. *Id.*  Xia claimed these materials were prepared by WSLK, who he described as the wholesale agent in charge of all the retail investor recruiting agents in Taiwan and China, but Xia admitted that he provided information to WSLK about the Eastern Mirage and Eastern Emerald Projects. *Id.* 91.

Nevertheless, Xia effectively claimed that any false statements in the document were not his fault, that he had no control over the marketing materials WSLK used, and that he never saw the document before.  *Id.* 92-93.  However, as evidenced by instant messages in the form of

"Wechats" sent to him as late as June 2017, Xia's agents in China and the investors continued to refer to the Eastern Mirage Project as the "Westin hotel project" without correction by Xia.  PX 73 at 4; 7; 8; 9.  Although Xia appeared to claim he previously told them Westin was not part of the deal (Hrg. Tr. 94-95), that claim contradicted his earlier testimony that he was still negotiating with Westin and is not credible given the repeated, continuing reference to the Westin hotel project by the agents who were seeking Chinese investors for Xia.

In addition, as late as July 2014, Xia approved notes for an investor presentation that Walter Verfenstein was going to give potential investors in China and that referred to the Eastern Mirage Project as the "Eastern Mirage/Westin Hotel" project.  PX 63 at 1.

## II.    The Investments Are Securities Including Because Investors Had a Reasonable Expectation of Profit.

The SEC's Opening Brief at 28-31; and Reply Brief at 3-5, explained why the investments are securities.  Additional evidence was introduced at the hearing to rebut Defendants' argument that the investments are not securities because investors did not have an expectation of profit.  In particular, Xia admitted that the partnerships had cash flow in terms of the 2% interest payments to the EEGH and EEGH II partnerships from their loans to the developers and that the partnerships earned interest on their investment of funds before they were loaned to the developer.  Hrg. Tr. 22.  In fact, all of the partnerships earned money on the investment of investors' monies before the money was loaned to the developers.  See PX 140 (showing over $3 million in interest earned by the various partnerships).  In addition, the July 2014 Verfenstein email with notes that Xia approved for discussion with potential Chinese investors also highlighted the investment aspect of the Projects by stating:  "Investment mindset – this is a compelling investment opportunity in its own right." PX 63 at 2.

III.    **Xia Misappropriated Investor Proceeds Earmarked For One Project For The Other And For His Personal Benefit.**

    A.    **Xia Misappropriated Investor Proceeds from One Project for the Other Project.**

Xia admitted that the developer for each project was only supposed to use the loan proceeds received from investors in that project for that project. Hrg. Tr. 97-98; *see also, e.g.,* PX 77 (Fleet-EMMCO Tower L.P. Loan Agreement) at 2, Section 1.5. Yet the documentary evidence demonstrates that over $17 million from Eastern Mirage investors were transferred to the Eastern Emerald developer, Eastern Emerald Group, Inc. ("EEG"), through a convoluted series of transactions. PX 96. The transactions occurred within one day in one instance and essentially five days in the second instance, and the transfers were used by EEG to buy the Eastern Emerald land. *Id.* Xia controlled the bank accounts for all of the entities through which the monies flowed. PX 141.

Despite the clear documentary evidence—whose accuracy Xia did not dispute (Hrg. Tr. 104)—Xia denied that $17 million in Eastern Mirage investor loan proceeds were used to purchase the land for the Eastern Emerald Project. *Id.* 101-109. He claimed in substance that his entities earned the money from building the Eastern Mirage Project and that Xia then applied those funds to purchase the Eastern Emerald Project land. *Id.*

Xia's claim is belied by the evidence. First, only $6,000 used to buy the land was paid to one of his entities. PX 96 at 2 (transfer from Racanelli to JiQing to X&Y to EEG). The remaining $17,053,850 was not paid to any of Xia's ostensible construction entities but instead went directly from Eastern Mirage investors to Fleet to Racanelli to EEG. PX 96. Second, there is no documentary evidence that these monies were payments for work performed by any Xia entities on the Eastern Mirage Project. Indeed, the checks from Racanelli to EEG bear a notation

14

of "loan." PX 106 at 7; PX 110 at 9. Third, the speed with which the monies were transferred from Eastern Mirage Investors to EEG belies any claim that these were moneys earned in the ordinary course of business by Xia construction entities. Xia did not report to the Eastern Mirage investors that proceeds from their loan to Fleet were used to purchase land for the Eastern Emerald Project. Hrg. Tr. 165-166.

Separately, between 2014 and 2019, Xia also misappropriated at least $7.5 million of Eastern Emerald investor money to fund the construction of the Eastern Mirage Project. Hrg. Tr. 452-458; PX 126; PX 149 at 11, ¶ 38.

**B.    Xia Diverted $819,810 in Eastern Mirage Investor Proceeds To Pay Off a Mortgage on the 57-35 Lawrence St. Property He Owned.**

As summarized in PX 114, between March 30, 2012, and April 9, 2012, Xia caused $819,810 to be transferred from the EMMCO LP bank account to Fleet, then on to Racanelli, and then on to JiQing Development to pay off a mortgage on a condominium apartment building Xia owned at 57-35 Lawrence Street in Queens, NY. Xia admitted the PX 114 accurately reflected the relevant bank transfers. Hrg. Tr. 116-117. JiQing Development was the development company that developed the 57-35 Lawrence Street property. *Id*. 120. In his investigative testimony in June 2019, Xia testified that JiQing Development did not have separate employees. *Id*. 124-125. At the hearing, Xia claimed that he subsequently refreshed his recollection that JiQing Development had two employees who performed design work for the Eastern Mirage Project. *Id.* 126. When asked if those two employees performed almost $1 million in services to support the transfers used to pay off the 57-25 Lawrence Street mortgage, Xia testified: "I don't know how to answer that question." *Id*. 126-127.

### C.    Fraudulent Payments From Racanelli and Perini to Xia Affiliates.

#### 1.    Invoices from Xia's Entities Purporting To Show that Work Was Done Are Either Missing or of Questionable Legitimacy

Ray Dookhie—a Certified Public Accountant since 2000 (*id.* 394), and a Managing Director at K2 Integrity (*id.* 392-393)—was qualified by the Court as an expert in construction forensic accounting. *Id.* 516. Dookhie testified that there are no invoices for approximately $22 million in payments to the Xia entities (*id.* 402; PX 92A), and the documentation supporting the remainder of the payments fell far below industry standards in providing details of the services rendered. In addition, the invoices from the Xia entities did not match the payments made to the Xia entities. Hrg. Tr. 511- 512. And the majority of the invoices were large, round dollar amounts, and Dookie testified that "it's hard to ascertain [ ] the value of the work that was being performed, based on what was being presented in the invoice." *Id.* 412; *see also, e.g.,* PX 46 at 3 (Xia's affiliate Amazon River LLC invoices to Perini totaling $9,720,000, consisting of monthly, round numbered invoices ranging of $80,000 to $200,000 between January 2016 through December 2018, for work on the Eastern Emerald Project).[6]

Dookhie testified that typically you would see a breakdown of the number of professionals that worked on the project, the hourly rate they were being paid, and by extension the fees due on a given month. Hrg. Tr. 412; *see also, e.g.,* PX 136 (examples of detailed construction invoices). Yet such documents did not exist for "a good majority" of the invoices. *Id.* 412.

It was also highly unusual that, in some cases, "there were four invoices that were being submitted in a given month by one of these [Xia entities] in very large round dollar sums" with

---

[6] Although Xia claimed he and Verfenstein had a flat fee arrangement (*id.* 177-179), there is no documentary evidence of any contracts between the Xia entities and Racanelli and Perini, flat fee or otherwise.

very little backup.  *Id.* 412– 413.  Dookhie also observed that there were no notations on the Xia entities' invoices and requisitions reflecting the typical back-and-forth adjustments that general contractors and sub-contractors normally engage in.  *Id.* 417.

### 2.    The Requisitions from Racanelli and Perini Were Unusual

Dookhie testified that, in large scale projects such as the Eastern Mirage and Eastern Emerald Projects, the American Institute of Architects ("AIA") Forms 702 and 703 are "the bare minimum," and one would expect to see these two forms being submitted together in a packet. *Id.* 406-407.  Dookhie testified that "they go hand in glove."  *Id*. 518.  The 702 is a "summary" of "all of the costs incurred during that particular billing period which is typically a month."  *Id*. 405.  The 703s contain a detailed breakdown of all the costs incurred during that particular period and provide the basis for the developer to understand the actual costs incurred, the percentage of the work completed, and the justification for payment.  *Id*. 405.

Here, the 703s were missing.  *Id*. 405.  Without the 703s, there was no way for Dookhie to assess whether the work billed for a particular time period was performed.  *Id*.  Dookhie testified that, especially when dealing with guaranteed maximum price contracts, such as the ones here, "it is industry standard to…[provide] a detailed cost breakdown of all the trades that would be working on this project…, [and] it's necessary to understand where are they in the grand scope of things."  *Id*. 517-5182.

He further testified that a lot of work typically goes into preparing requisitions and that it was "highly unusual" that there were multiple requisitions submitted per month.  *Id*. 408; 448-449; PXs 181-186.  He also noted that it was highly unusual and unlikely that so many requisitions contained exact, round number payments due, given that the totals would typically

be comprised of multiple, varying amounts for the underlying work and materials billed.  Hrg. Tr. 408.

### 3.    The Circular, Multi-Step Flow of Funds Amongst Accounts Was Unusual

Dookhie testified that the flow of funds between the EEG, FFG, Racanelli, Perini and the other Xia entities was also unusual.  Specifically, there were transfers from the Xia entities purportedly performing subcontracting work back up to FFG, the developer, and transfers from these Xia entities back up to the general contractors, Racanelli and Perini.  PX 93.  In Dookhie's experience, you would not typically see funds flowing from purported subcontractors back to the developer and the general contractors.  Hrg. Tr. 418.  He was unable to identify any justification for this flow of funds.  *Id.*

Dookhie also testified, in summary, that out-of-pocket costs can provide a benchmark to assess the amount of work a subcontractor entity actually did.  He found it unusual that the Xia purported subcontracting entities received $68.1 million from Racanelli and Perini but only had out-of-pocket costs, including payroll, of $13 million.  *Id*. 428-429; PX 92A, 94A.[7]

## IV.    Xia Cannot Be Entrusted To Complete The Projects Or Handle Investors' Money.

It is critical that the asset freeze and appointment of the Monitor be continued (through a preliminary injunction) to protect the investors' interests.  Xia has made clear his belief that, once the investors' money is loaned to the developers, he can do what he wants with it—even though the offering documents clearly limit the use of investor proceeds to construction of the Project for which the monies were raised.  Hrg. Tr. 277-278 ("They gave me the loan. It's almost like the bank gave me the loan and I guarantee to pay them back for the interest."); *see also* PX

---

[7] Xia also caused FFG to bill Perini $1.5 million in 2016 for the research and formation of another Xia entity: a captive insurance company, Fleet General Insurance Group ("FGIG"), that was set up to provide insurance to Perini. PX 135 at 46-6; Hrg. Tr. 183-185.

71 (June 22, 2020 email from Xia to bank seeking to use EB-5 money as collateral for a personal loan: "What is the definition of EB-5 money? It is in the bank account of my entity and I use my property as collateral for it;" "It is belong to my entity and I deposit them into all different bank.").

### A.    Xia Admitted That He Had a Fiduciary Duty to Put the Investors' Interests Above His Own Interests, Yet He Has Repeatedly Failed to Do So.

Xia admitted that he knew that, as the general partner to the Partnerships, he had a fiduciary duty to the limited partners and that that meant he was supposed to look out for the interests of the limited partners and not put his own interests above the interests of the limited partners. Hrg. Tr. 8. Xia also admitted that none of the investors have been paid back yet. *Id.* 192. He further admitted that the investors want their capital contributions back. *Id.* Yet there is troubling evidence that Xia created a fraudulent loan agreement that extended the date by which his developer entity, FFG, was obligated to repay the Eastern Mirage investors.

The EMMCO NQMC POM stated that the loan from the EMMCO NQMC investors to the developer FFG would mature "five (5) years from the date of the first advance under the loan"—ostensibly in April 2016. PX 2 at 16; PX 48 at 11. In March 2017, a group of EMMCO NQMC investors asked Xia about the maturity date of the loan. *See* Tang et al. v. Fleet New York Metropolitan Regional Center et al., Ind No 655822/2019 (Sup. Co. NY) (Dkt. 80 p. 9 at para 43). Xia told the investors that the loan would mature in 2018 and 2019 and provided the investors with a copy of the Building Loan and Security Agreement. PX 59. That loan agreement—which Xia signed on FFG's behalf and Walter Verfenstein signed on EMMCO NQMC's behalf on June 9, 2011—had a "Stated Maturity Date" of March 18, 2017. PX 59 at 7. Xia admitted the loan was not paid back on March 18, 2017. Hrg. Tr. 148.

When the investors asked Xia why they had not been paid back, Xia produced a revised loan agreement that contained a loan maturity date of "(1) five (5) years from the date of the last advance; or (2) the date all EB-5 investors have ceased participating in the EB-5 program, whichever is later." PX 60 at 1. Xia signed this revised loan agreement on behalf of FFG, his wife Yue signed it on behalf of EMMCO NQMC, and the agreement has a purported signature date of June 26, 2013. PX 60 at 6.

Xia claimed that revised loan agreement was prepared because his attorney was not sure the original loan agreement would satisfy the USCIS. Hrg. Tr. 149. However, the revised loan agreement appears to be fraudulently backdated. The date listed for the notary expiration "Commission Expiration" was July 19, 2020. Pursuant to New York State's Notary Public Licensing Law, a notary public's term is four years. As such, the notarization could only have occurred after July 19, 2016, not in 2013.

Xia testified, in response to the Court's questions, that the notary told Xia he must have made a mistake in the notary's commission expiration date. Hrg. Tr. 152-154. However, this testimony appears to be false. The same notary witnessed both the original loan agreement (PX 59 at 22) and the revised loan agreement (PX 60 at 6). In 2011, the notary's commission expired on July 19, 2012. PX 59 at 22. The stamp he used to notarize the revised loan agreement is consistent with a stamp he used after 2016 and inconsistent with the stamp he used before 2016.[8] The Court should draw the only plausible inference from these facts: Xia created the revised loan agreement after 2016 and backdated it to 2013 to defraud the EMMCO NQMC investors and the court overseeing the investors' lawsuit against him, Fleet and FFG.

---

[8] The post-July 19, 2016 stamp has no space between "July 19," and "2020," and the J in July clearly lines up differently between the two stamps. *Compare* PX 59-22 [pre-2012] and PX 182 [pre-2016] stamp *with* PX 60-6 and PX 183 [post-2016 stamp].

**B.    Xia Failed to Disclose Material Conflicts of Interest to Investors.**

Xia admitted that he controlled FFG, the developer of the Eastern Mirage Project; EEG and LaGuardia Performance Center ("LaGuardia"), the developers of different portions of the Eastern Emerald Project.  Xia also admitted he owned and controlled Samuel Development, X&Y Development Group, LLC ("X & Y"), Shangri-La Green, Shangri-L9D, Shangri-La 9F, JiQing Development, Amazon River, and Manekineko Group.  Hrg. Tr. 136.  And, although Xia falsely denied this, the evidence shows that he also controlled Racanelli and Perini, the general contractors for the Projects.  PX 145; PX 141.

Xia's ownership and/or control of every entity involved in the construction created numerous actual and potential conflicts of interest that were not disclosed to investors in the POMs.  For example, as the owner of the Xia entities purporting to perform the subcontracting work on the Projects, Xia had an incentive to maximize the profits generated by those entities, at the expense of the developer and ultimately the limited partnerships.  In addition, in his role as the developer and General Partner, Xia had a duty to oversee the expenditure of monies by the General Contractor to the subcontractors; yet he was conflicted in this oversight role by his ownership of the subcontracting entities.  Xia failed to disclose this conflict to investors.  *See* PX 1 at 26; PX 2 at 28; PX 3 at 26; PX 4 at 23; PX 6 at 23.

Xia further admitted that FFG owed X&Y over $42 million in rent for the land on which the Eastern Mirage Project sits.  Hrg. Tr. 50-53.  Xia had an undisclosed conflict of interest given that he owned both the developer and the company leasing the land to the developer.  He therefore had an incentive to maximize the amount of rent owing to X&Y to the jeopardy of the developer and ultimately the investors if there were insufficient funds to repay the investors because of the rent charged by Xia's X&Y company.

21

**C.    Xia Has Repeatedly Refused to Cooperate with the Monitor, Who Has Uncovered Further Evidence of Xia's Mismanagement.**

Pursuant to the Court's Order appointing him as a Monitor, Peeler filed a Report (Dkt. 53) on January 28, 2022, setting forth his assessment of the status and viability of the Projects.  At the hearing, Peeler testified that, although Xia initially "promised complete cooperation," (Hrg. Tr. 523-24; 528), Xia repeatedly failed to comply with the Monitorship Order and engage productively with the Monitor; the Monitor also testified to multiple instances of Xia's serious mismanagement of the Projects, as discussed below.

Peeler conducted a walkthrough of the Projects on November 3, 2021, together with personnel from Peeler's retained consulting firm J.S. Held, Xia and Xia's in-house lawyer.  They "walked through the [Eastern Mirage] building from top to bottom."  *Id.* 528-529.  Various people were on site doing work even though stop orders were in place.  *Id.* 532-533.[9]

After the walkthrough, J.S. Held told Peeler that they observed "a number of hazardous conditions."  *Id.* 533.  Peeler immediately asked Xia and his counsel for a mediation plan because he was "deeply concerned" about the "hazardous conditions on location," including "electrical concerns," a potential for fire hazard, and areas with no safety railings.  *Id.* 533-534.  .  Peeler told Xia it was "extremely urgent" that these issues be resolved.  Xia knew that "people were on site, they were conducting work and there were hazardous conditions there."  *Id.* 535.  Xia never provided a plan of remediation.[10]  *Id.* 535-536.

---

[9] Peeler also visited the Eastern Emerald site that day.  He described the site as "essentially a very large substantial dug hole" and noted that there were more than ten persons working on the site, which he thought was "odd" given that stop-work orders were in place.  *Id.* 538-39.

[10] Peeler also expressed concern about the lack of sufficient insurance.  Xia's own captive insurance company, FGIG, sent a notice of cancellation for the general liability insurance, and for the Eastern Mirage site there was no builder's risk insurance, which would have provided coverage for damage from events including fire and earthquakes.  *Id.* 578-579.

On October 7, 2021, Peeler sent Xia a document request.  PX 161, Ex. A.  By the end of October, Peeler had received a few documents, but "they were a far cry from what we needed." Hrg. Tr. 526.  Peeler asked for a meeting with Xia and his team, which took place on November 22, 2021.  *Id.* 543.  Through that meeting, Peeler learned that "there was no general ledger or accounts payable system whatsoever"; that "Xia felt…that for him to enter numbers onto a spreadsheet was a waste of time"; and "that his memory was all we needed, that he had all the things we needed from his  memory."  *Id.* 543-544.  Peeler was "stunned":  "[F]or any business or concern whatsoever, let alone a business that is receiving investor funds and/or is in a highly regulated industry like the construction industry in New York City, those statements were, quite frankly, deeply troubling to me at that time."[11]  Id. 544.

In December and early January 2022, Peeler made repeated attempts to meet with Xia to discuss a number of urgent matters.  *Id.* 549.  These requests were denied.  *Id.* 550.  Xia finally agreed to meet remotely on January 17, 2022, ten days before the Monitor's Report was due.  *Id.* Peeler tried to walk through his tentative findings with Xia, but felt:  "Xia was not fully engaging with me and . . . I was frustrated by that."  *Id.* 551-556.

Xia told Peeler that the Eastern Mirage Project was 95% complete and the cost to complete it was $3 million.  *Id.* 536.  Peeler felt that it was "obvious" that Eastern Mirage was not 95% complete and that $3 million was too low (he estimated it would take approximately $ 15- 20 million to complete; *id. 551*), but asked Xia for evidence to support Xia's contention.  *Id.* 539.  JS Held estimated that Eastern Mirage was only approximately 80% complete. *Id.* 560.

---

[11] Xia admitted that, as the General Partner, he was required to "keep and maintain full complete and accurate books and records of account," and that he did not keep a general ledger.  *Id.* 12-14.

Peeler made numerous requests, but Xia never provided any support for his estimated cost to complete Eastern Mirage. *Id.* 538.

Peeler also repeatedly asked Xia for information on the cost to complete the Eastern Emerald Project. *Id.* 540. Peeler estimated that it would cost $333 million to $400 million to do so. *Id.* 557. After the January 17, 2022 meeting, Xia sent Peeler a blueprint for the Eastern Emerald Project that had been submitted to NYC DOB and a one-page pdf for a smaller building with a $133 million estimate for the cost to complete it. *Id.* 558. Peeler asked Xia for the backup for Xia's estimate, but Xia never provided any. *Id.* 558-559.

Peeler also repeatedly asked Xia for documentation to support the work Xia's entities allegedly performed and the monies they were owed; again, none was provided. *Id.* 562-563.

The Monitor Order also required Xia to provide investor-wide communications to the Monitor, which Xia never did. *Id.* 603-604. Peeler testified that "[Xia's] failure to timely engage with the monitor, even in protected circumstances that were in his own interest, is of significant concern. Not only because he was required to do so under the Court's order, it also gives me pause about, again, giving him control of the projects or the assets." *Id.* 605.

Xia told Peeler that his wife routinely collected the rent in cash from his 17 rental properties, and that he told her how much cash to pay the construction workers.[12] *Id.* 544. Xia also stated that he paid workers based on time cards filled out on site; but Xia failed to comply with Peeler's request to produce the time cards. *Id.* 545-546. Peeler was also concerned that payroll taxes were not being paid and that immigration status was not being checked.[13] *Id.* 546-

---

[12] Xia denied telling Peeler that he paid workers at the construction sites in cash, aside from lunch money. *Id.* 137-140. However, Xia has failed produce evidence how these workers were paid.

[13] The Monitor's Report also noted that Defendants failed to pay New York City property taxes in January and July 2021, resulting in back taxes and interest owed of $796,521. PX 160 at 25. Defendants also failed to pay over $625,000 in fines for building violations. *Id.*

547.

**D.    The Scope of the Freeze and the Continuing Need for the Monitor.**

Peeler does not believe the investors are over-secured.  *Id.* 574.  There were only $79.9 million in liquid assets at the time of his hearing testimony, and there are loan and tax payments due, plus insurance costs, that could conservatively reduce that amount by $15 million to $20 million.  *Id.* 575-576.  Peeler also testified that you cannot put much reliance on prior appraisals of the Projects' value given that they relied on information that Xia provided.  *Id.* 568-569.  Peeler believes that new, independent appraisals are needed to assess the true value of the Projects.  *Id.* 569.

Peeler further testified:  "[T]he lack of controls, the lack of accounting, the failure to pay taxes, the failure to deal with building violations,…all the complaints in the allegation, [and] things…I have observed…leads me to have significant concerns and reservations about Mr. Xia getting control over those assets."  *Id.* 577.

Finally, Xia's unapologetic misappropriation in the past year of over $30 million of investor monies earmarked for the Projects to purchase three mansions for his wife, Verfenstein, and Verfenstein's mother are alone a compelling reason to continue the asset freeze and appointment of the Monitor.

## CONCLUSION

For the reasons set forth above and in the SEC's Opening and Reply Briefs, the SEC respectfully requests that the Court enter a preliminary injunction continuing the asset freeze and the appointment of the Monitor until final judgments are entered in this case.

Dated:  New York, New York
           April 13, 2022

Respectfully submitted,

/s/ *Kevin P. McGrath*

_____

Kevin P. McGrath
David Stoelting
Kim Han
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-0533 (McGrath)
mcgrathk@sec.gov