

# Second Quarterly Status Report to the Court Pursuant to Monitor Order Paragraph 22

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Securities and Exchange Commission v. Richard Xia, a/k/a Yi Xia; and Fleet New York Metropolitan Regional Center, LLC, f/k/a Federal New York Metropolitan Regional Center, LLC, Defendants,

and

Julia Yue, a/k/a Jiqing Yue; Xi Verfenstein; and XinMing Yu, Relief Defendants

21-cv-05350-PKC-LCP

## Introduction

The Monitor submits this second quarterly status report in accordance with Paragraph 22 of the Order Appointing Monitor ("Monitor Order"),[1] for the period ending on March 31, 2022 ("Second Quarter"). Since his last report, the Monitor continued to focus on the most significant, time sensitive, and urgent needs of the Projects and investors while working diligently to minimize costs.[2]

## Paragraph 11(b) Report and Order to Show Cause Hearing

The Monitor filed his Paragraph 11(b) Report regarding the status of Eastern Emerald and Eastern Mirage (collectively, the "Projects") on January 28, 2022 (the "11(b) Report").[3] Following that submission, the Monitor prepared for, attended, and testified on February 16, 2022 at the Order to Show Cause Hearing.[4]

## EB-5 Questions

During the Monitor's testimony, he expressed concern regarding Richard Xia's ("Xia") proposed changes to the Eastern Emerald Project to the extent they might create various legal issues and/or put the Eastern Emerald investors' visa eligibility at risk.

The Monitor subsequently began and continues productive conversations with United States Citizenship and Immigration Services ("USCIS") attorneys to discuss this issue and what impact, if any, various courses of action would have on investors' applications for permanent green cards. Based on those conversations, the Monitor now believes that should it become necessary, his appointment as the receiver for the Projects would not negatively impact any pending applications.

---

[1] *See* ECF No. 11-1.
[2] The Monitor's services will be further detailed in his upcoming Fee Application to this Court.
[3] *See* ECF No. 53.
[4] *See* Transcript of Order to Show Cause Hearing at 521-626, ECF No. 84-3.

The Monitor also notes that on March 15, 2022, President Biden signed an omnibus appropriations bill that included reauthorization of the EB-5 Program. The Monitor's team is actively reviewing whether and how the newly reauthorized Program impacts the investors.

**Additional Priority Items**

The Monitor continued to focus on protecting the investors' interests in the Projects and assets. These efforts included: (i) reviewing the status of insurance on the Projects and seeking coverage and competitive rates for Comprehensive General Liability and Builder's Risk insurance from independent carriers; (ii) addressing outstanding violations and penalties the New York City Department of Buildings ("DOB") assessed against the Projects; (iii) vetting third-party financing Xia proposed for the Projects and identifying other potential funding sources to help pay for Project-related needs; and (iv) investigating the impact of certain loans Xia and/or the Xia Entities obtained in exchange for collateralizing investor assets and the Projects.

### Insurance Coverage

As described more fully in a motion soon to be filed with the Court, the Monitor believes it is in the best interests of the investors – and all parties – that insurance on the Projects be secured as quickly as possible. The Monitor worked diligently to obtain proper insurance coverage from independent, third-party insurance providers that sufficiently addresses the current needs of the Projects.[5] This process has been time consuming due to several factors, including but not limited to: (a) Xia and his former counsel's failure to provide timely information and to meaningfully assist our efforts; (b) the continuing, large number of violations issued against the Projects by the DOB; (c) continuing work on the Projects despite multiple stop work orders from the DOB, the

---

[5] As a captive insurance company, Fleet General Insurance Group, Inc. ("FGIG") was not an acceptable option for many reasons, including but not limited to the allegation that its account was used to facilitate the purchase of a mansion. *See* SEC Amended Complaint ¶ 173, ECF No. 98.

possibility that insurance coverage had lapsed, and known hazardous conditions on site which have yet to be remediated despite multiple requests by the Monitor; and (d) a lack of interested independent insurance companies.[6] Another complication has been that Builder's Risk insurance is typically secured at the beginning of a project, and it is highly unusual for a policy to be issued at the late stage of construction at Eastern Mirage. As a result, insurance carriers needed to conduct time-consuming, supplementary due diligence before determining whether to provide coverage quotes.

For each Project, the Monitor reviewed with willing third-party insurance professionals the risks involved and what coverage they recommended. Only in the last few days have we obtained sufficient proposals independent of the Defendants to recommend a course of action to the Court.[7]

### Payment of Property Taxes

The Monitor applied to the Court at the Securities and Exchange Commission's ("SEC") and Defendants' request in December 2021 for an Order unfreezing investor funds to the extent necessary to pay past due and current New York City real estate taxes.[8] As stated in that motion, future New York City real estate property tax payments are due every six (6) months.[9] The Monitor will soon be applying to the Court for the release of funds for both Projects to pay New York City real estate property tax payments that are due in June 2022.

In connection with Eastern Mirage, the Loan Agreement ("Loan Agreement"), dated as of August 31, 2021, between Emerald Creek Capital 3, LLC ("Emerald Creek") and X&Y

---

[6] Many insurers were unwilling to issue policies on the Projects given the DOB's identification of "hazardous conditions" and Xia's failure to correct them. *See* Transcript of Order to Show Cause Hearing at 534:1-535:14, ECF No. 84-3. The Monitor notes that such DOB violations continue – the most recent of which was issued against Eastern Mirage on April 13, 2022.

[7] The Monitor will soon be applying to the Court with a detailed proposal for insurance coverage for the Projects.

[8] *See* ECF No. 36, and 11(b) Report § II.E.(i), ECF No 53.

[9] *See* ECF No. 36 ¶ 20.

Development Group, LLC ("X&Y"), requires Emerald Creek to pay the property taxes from an escrow account Emerald Creek maintains.[10] Under the terms of the Loan Agreement, the sum of $1,170,000.00 ("Tax Escrow") was deposited into an escrow account called the Reserve Account ("Reserve Account"). (*See* Loan Agreement § 1.33 and § 2.5(b)). The Loan Agreement authorizes Emerald Creek to "release [from] the Tax Escrow as needed to cover any such payments as they become due with respect to the Property." (Loan Agreement § 2.5(b)). The Monitor will be applying to the Court to grant Emerald Creek permission for the release of funds for New York City real estate property tax payments that are due in June 2022.

### Project Violations and Safety Issues

The Monitor continues to review and work to resolve violations issued against the Projects by the DOB. He and his team routinely communicate with Defendants regarding the violations. Specifically, the Monitor identified certain New York City Environmental Control Board ("ECB") judgments[11] that qualified under New York City's Fine and Interest Reduction Enabling Recovery (FAIRER) Program. Initially, Xia supported the Monitor's proposed motion to this Court to release funds to pay these violations at a much-reduced rate. Shortly thereafter, Xia communicated to the Monitor that he would no longer support the proposed motion. Thus, the Monitor and his team began direct communications with the DOB and the City's Law Department and are in negotiations to resolve a significant number of these violations under favorable financial terms.

### CTBC Loans

The Monitor continues to work with CTBC Bank ("CTBC") regarding the loans it issued to Xia and certain Xia Entities that appear to be in default. The Monitor is aware of five (5) loans,

---

[10] *Id.*, Declaration of M. Scott Peeler ("Peeler Decl.") Ex. A., ECF No. 36-1.
[11] ECB judgments are based on violations the DOB issues against properties that fail to comply with New York City's Building Code or Zoning Regulations. The ECB provides administrative hearings for certain violations issued by New York City agencies, renders judgment, and collects penalties.

totaling roughly $20 million, that CTBC issued to Xia/Xia Entities at various points throughout 2021.

According to CTBC, there are approximately $6 million in real estate loans secured by Rental Income. This $6 million is comprised of three (3) real estate loans that were issued to (a) Shangri-La Green, Inc.; (b) Shangri-La 9F, Inc.; and (c) Manekineko Group, LLC.[12] Upon information and belief, these properties were purchased by Xia prior to 2010. The Monitor has not been able to determine whether Xia has been using investor funds to pay outstanding debts and/or liabilities on those properties.

There are approximately $14 million in term certificate of deposit ("TCD") loans. The Monitor believes the two (2) CD accounts used to obtain the TCD loans are investor funds. Additionally, as alleged in the SEC's Amended Complaint, Xia used the proceeds of these loans to purchase two (2) properties, 5 Vanderbilt Drive for $4,337,778 and 144 Kings Point Road for $14,000,000.[13]

a) <u>Eastern Emerald Group LLC ("EEG") TCD Loan</u>: The CD account in the name of EEG contains the tax credit funds that New York State issued to EEG for its Brownfield remediation work. The TCD loan linked to the EEG CD was for $10,986,000 and matured on April 8, 2022. The use clause indicates that the loan is for "working capital and/or future investments."

b) <u>Fleet General Insurance Group, Inc. TCD Loan</u>: The Monitor also has reason to believe the CD account in the name of FGIG contains investor funds. The Monitor has asked Xia and his counsel on multiple occasions to explain the origin of these funds. The TCD loan linked to the

---

[12] The Monitor is also aware that there may be an outstanding mortgage issued by Cathay Bank on at least one of these properties.
[13] *See* SEC Amended Complaint ¶¶ 96, 173, ECF No. 98.

FGIG CD was for $4,500,000 and matures on August 9, 2022. The use clause indicates that the loan is for "working capital."

The Monitor continues active discussions with CTBC and Defendants, and discussions to resolve this matter are ongoing.[14]

### Potential Third-Party Financing

The Monitor previously reported that the Defendants proposed two different third-party sources of potential financing and provided draft documents outlining the proposed draft terms for each option.[15] In response, the Monitor and the SEC raised various issues and questions regarding these proposals and the entities behind them. Those questions have not yet been answered, and the Defendants have now begun discussing a third potential source of financing. Those conversations are ongoing, and the Monitor is awaiting additional information from Defendants. It is not yet clear whether such financing is viable.

### Defendants' Payment Requests

As identified in the First Quarterly Status Report, Defendants forwarded for the Monitor's review various requests for payments to employees.[16] Xia provided the Monitor with limited information to support his requests. The Monitor asked Xia to provide supporting documentation, such as job descriptions, dates of employment, proof of work authorization, credentials and prior experience, benefits provided, employment contracts, and relationship to Xia or Yue. The Monitor has yet to receive any of these materials.

---

[14] The Monitor is gravely concerned that interest continues to be charged and the investor funds referenced above are at risk.
[15] *See* 11(b) Report § II.E.(v), ECF No. 53.
[16] *See* First Quarterly Status Report, ECF No. 55.

**Status Relating to Paragraphs 8 through 14**[17]

The Monitor reviewed documents and information – to the extent Defendants made them available – pertaining to Paragraphs 8 through 14 of the Monitor Order.[18]

**Paragraphs 8-10 (Documents)**.  The Monitor's efforts to obtain documents and information from Defendants, and the challenges Defendants and their counsel presented, are detailed in the 11(b) Report, the First Quarterly Status Report, and in the Monitor's testimony at the Order to Show Cause Hearing. Due to the challenges, the Monitor demanded the completion of the document production, together with an affidavit from Xia and other Defendants on or before February 28, 2022 that declares under penalty of perjury that for each enumerated request, everything in his/their possession, custody, or control has been produced to the Monitor. Xia provided the declaration, in which he represented that he provided the Monitor with documents from the sections I(1)(d), III(D)(2), III(D)(3), and III(D)(5) of Monitor's First Request for the Production of Documents/Information. Upon review, the Monitor determined that Xia had not provided the necessary documents to satisfy those sections. The Monitor again asked Xia to review his documents and materials and provide information sufficient to satisfy these requests as soon as possible. Xia has yet to provide any additional information.

**Paragraph 11(a) (Finances)**. The Monitor continued to review the finances and operations of Fleet and the Xia Entities – to the extent Defendants provided relevant information. This included necessary but time-consuming efforts to collect and analyze the revenue generated by the rental properties Xia and the Xia Entities own (the "Rental Properties"). To that end, the Monitor focused on creating a comprehensive list of the properties, including, but not limited to, for each

---

[17] Monitor Order Paragraph 15 describes the timely access to which the Monitor is to be provided documents and information.

[18] *Id.*

7

property: (i) the monthly and annual rental income; (ii) the associated costs; (iii) method(s) of collecting and using the rental income since September 27, 2021; (iv) method(s) of collecting and using the rental income between January 1, 2021 and September 27, 2021; (v) the appraised value; (vi) owner(s) and date purchased; (vii) all outstanding debt; and (viii) all creditors and lien holders. On March 18, 2022, counsel for Xia provided a summary of many of the requested materials, including expected revenues and expenses on an annual and monthly basis of each Rental Property, mortgages on each Rental Property, and information on other properties associated with Xia. The Monitor continues to review that information for completeness.

**Paragraph 11(b) Report**. As described above, the Monitor reported on the status of the Projects, and made his recommendations regarding same, in Sections II and IV of the 11(b) Report.

**Paragraph 11(c) (Corporate Transactions)**. The Monitor's review of the limited historical corporate transactions by Fleet or the Xia Entities – to the extent Defendants provided relevant information – is summarized in Section II of the 11(b) Report.

**Paragraph 11(d) (Historical Compensation)**. Defendants provided the Monitor only with certain historical compensation of Fleet's former Chief Legal Officer, Bret McCabe.[19]  The Monitor was unable to verify this information. Defendants did not provide the Monitor with the historical compensation of any other executive officers or affiliates of Fleet and the Xia Entities.

**Paragraph 11(e) (Numerous Law Firms)**. Since the Court appointed the Monitor on September 27, 2021, Xia has been represented by *at least* five (5) law firms: Sullivan & Cromwell LLP, Mukasey Frenchman LLP, WilmerHale, Sills Cummis & Gross P.C., and Kameli & Associates. Most recently, the Monitor was contacted by attorneys from Schulte Roth & Zabel LLP, who indicated that Xia would like to provisionally retain them.

---

[19] On February 10, 2022, the Monitor was informed that Bret McCabe would no longer serve as Fleet's Chief Legal Officer.

The Monitor is aware of unpaid and outstanding invoices from these attorneys and others representing the Xia Entities that now exceed $2.6 million. The Monitor is deeply concerned that Xia's pattern of replacing counsel without payment is a delay tactic in this litigation which continues to impede and make inefficient the work of the Monitor and his team.

**Paragraph 11(f) (Financial Statements)**. The Monitor's review of financial statements of Fleet and the Xia Entities – to the extent Defendants provided relevant information – is detailed in Section II of the 11(b) Report.

**Paragraph 11(g) (Meeting Minutes)**. Defendants have not provided the Monitor with any meeting minutes of the Boards of Directors of Fleet and the Xia Entities.

**Paragraphs 11(h)-(i) (Litigations)**. The Monitor's review of litigation involving Fleet and the Xia Entities is summarized in Exhibit A to the 11(b) Report.[20] An additional class action suit, *Jin, et al. v. Xia, et al.*, was filed against Xia, Yue, and multiple Xia Entities in this Court on February 18, 2022.[21]

**Paragraph 11(j) (Leases)**. Defendants have not provided the Monitor with any (proposed) material changes to material leases or real estate holdings of Fleet and the Xia Entities.

**Paragraph 11(k) (Insurance Information)**. After careful review of the insurance information provided by Defendants, the Monitor determined that the Projects were not adequately insured by either Commercial General Liability ("CGL") or Builder's Risk insurance. It appears that X&Y (owner of Eastern Mirage) and EEG (owner of Eastern Emerald) initially obtained CGL insurance through FGIG, a Vermont entity created and controlled by Defendant Xia, to provide

---

[20] Peeler Decl. Ex. A, ECF No 53-1.
[21] *See Jin v. Xia*, Case No. 1:22-cv-00740-WFK-VMS (E.D.N.Y.).

9

CGL insurance for the Projects.[22] Using a captive insurance company,[23] Xia's plan was to self-insure the Projects using investor funds to pay premiums.[24]

It does not appear that the Defendants ever secured Builder's Risk insurance on the Projects.[25] In December 2021, Defendant Xia provided the Monitor with undated and potentially inadequate cancelation notices of the CGL policies for the Projects issued by FGIG.[26] Nevertheless, the Monitor immediately raised questions and concerns regarding the possibility that any insurance coverage might have lapsed and sought additional information from Defendants. In response, Defendants eventually submitted a proposal to release $1,493,471.85 in frozen funds to pay the annual premiums that would continue the CGL insurance and to procure $75 million of Builder's Risk insurance. The Monitor noted with concern that of that amount, $1,088,250.00 would be paid to FGIG, an entity controlled by Defendant Xia. After careful consideration, including certain allegations raised in this Enforcement Action that Defendant Xia used and/or transferred investor funds to pay Xia Entities (which include FGIG), and observations of the Monitor and his team, the Monitor decided not to proceed with Defendants' request for the release of those funds.

The Monitor's efforts to obtain proper insurance coverage from independent, third-party insurance providers is discussed below as it falls outside the scope of Paragraph 11(k).

---

[22] *See* SEC Amended Complaint ¶ 170, ECF No. 98.
[23] A captive insurance company is a wholly owned subsidiary insurer that provides risk-mitigation services for its parent company or a group of related companies.
[24] *See* 11(b) Report § II.F.iii, ECF No. 53.
[25] It appears that Defendants first began to pursue possible Builder's Risk insurance in late 2021 when in connection with a $15 million loan transaction, Emerald Creek required it because Defendant Xia provided the bank a first priority lien against Eastern Mirage.
[26] *See* Transcript of Order to Show Cause Hearing at 623:18-22, ECF No. 84-3.

10

**Paragraph 11(l) (Investor Communications)**. Defendants have not provided the Monitor with any investor-wide communications intended to be sent by Fleet and the Xia Entities to investors.

**Paragraph 12 (Internal Controls)**. Defendants have not provided the Monitor with a summary report on the internal controls regarding the cash assets of Fleet and the Xia Entities.

**Paragraph 13 (Valuation Reports)**. Defendants provided five valuation reports regarding the Projects to the Monitor.[27]

**Paragraph 14 (Annual Budget)**. Fleet and the Xia Entities have not provided the Monitor with their annual budget.

---

[27] *See* 11(b) Report. § II.E.(iv), ECF No. 53.