UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

-against-

RICHARD XIA, a/k/a YI XIA, and
FLEET NEW YORK METROPOLITAN
REGIONAL CENTER, LLC, f/k/a FEDERAL
NEW YORK METROPOLITAN REGIONAL
CENTER, LLC,

                Defendants,

-and-

JULIA YUE, a/k/a JIQING YUE;
XI VERFENSTEIN; and XINMING YU,

                Relief Defendants.

21-cv-05350-PKC-RER

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION TO EXTEND THE ASSET FREEZE TO
CERTAIN ASSETS OF RELIEF DEFENDANTS
XI VERFENSTEIN AND XINMING YU**

Kevin P. McGrath
David Stoelting
Kim Han
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-0533 (McGrath)
(212) 336-0174 (Stoelting)
(212) 336-5677 (Han)
stoeltingd@sec.gov

May 11, 2022

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................................ii

PRELIMINARY STATEMENT......................................................................................................... 1

ARGUMENT........................................................................................................................................ 3

    I.    Verfenstein Has No Legitimate Claim to the Middle Neck Road Mansion ..................... 3

        A.    Certain Facts Cast Serious Doubt on the Requisitions' Authenticity ................................ 3

        B.    Even If Taken at Face Value, The Requisitions Do Not Show That Verfenstein Provided $11 Million Worth of Services ................................................................................ 4

    II.    Yu Has No Legitimate Claim to the Vanderbilt Drive Mansions....................................... 7

CONCLUSION................................................................................................................................... 10

# TABLE OF AUTHORITIES

*CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187 (4th Cir. 2002)..........................................4, 6

*FTC v. Bronson Partners, LLC*, 674 F. Supp.2d 373 ( D. Conn. 2009) ............................................7

*SEC v. End of the Rainbow Partners, LLC*, 17-cv-2670-MSK-NYW, 2019 WL 8348323 (D. Col. Nov. 25, 2019) .........................................................................................................................7

*SEC v. Infinity Group Co.*, 993 F. Supp. 324 (E.D. Pa. 1998).........................................................7

Plaintiff Securities and Exchange Commission (the "SEC") respectfully submits this reply memorandum of law in support of its motion filed April 6, 2022 (Dkt. 99-102, "Motion") to freeze certain assets held in the name of Relief Defendants Xi Verfenstein ("Verfenstein") and Xinming Yu ("Yu").[1] For the reasons set forth below, the Court should grant the Motion.[2]

## PRELIMINARY STATEMENT

Relief Defendants Verfenstein and Yu argue that they are entitled to enjoy the mansions that Defendant Richard Xia ("Xia") bought for them in 2021 with nearly $15 million in misappropriated investor assets. Verfenstein claims that her mansion on Middle Neck Road was merely payment that Xia owed her for work she did on the Eastern Mirage Project. And Yu (Verfenstein's mother) claims that her mansion on Vanderbilt Drive was not paid for with ill-gotten gains and that, in any event, Verfenstein earned the money that was used to pay for that property.

These arguments are after-the-fact, unsupported concoctions. They fail to mask the reality that Xia's all-cash purchases of these mansions using investor assets and funds was a maneuver by Xia to secure an unwarranted benefit for himself and his trusted lieutenant Verfenstein, who has worked at Xia's side for the past decade on both Projects and is mired in litigations arising from Xia's conduct.

---

[1] The Motion also seeks to freeze a mansion held in Relief Defendant Julia Yue's name. Her opposition to the SEC's Motion and the SEC's post-hearing brief is due today, and the SEC's replies will be filed on May 18, pursuant to the Court's docket Orders dated May 9.

[2] This brief uses the short forms set forth in the Motion. In addition, "SEC Br." means the SEC's brief in support of Plaintiff's Motion to Extend the Asset Freeze to Certain Assets of Relief Defendants Julia Yue, a/k/a Jiqing Yue, Xi Verfenstein and Xinming Yu dated April 6, 2022 (Dkt. 100); "SEC Ex." refers to the exhibits filed in support of the Motion at Dkt. 101 (1-37) and 102 (38-70); and "Opp. Br." means Relief Defendant's Xi Verfenstein and Xinming Yu's Memorandum of Law in Opposiiton to Plaintiff's Motion to Extend the Asset Freeze to Certain Assets dated May 4, 2022 (Dkt. 120).

Verfenstein's and Yu's opposition fails to set forth any credible defense that they have a legitimate claim to the mansions held in their names. Verfenstein claims that Xia has owed her $11 million for at least two years and that Xia extinguished the debt by titling the Middle Neck Road property in her name. If there were any truth to this defense, then there would be documents clearly establishing both the debt and the agreement to pay the debt with the property. There are, however, no such documents.

Yu's argument that she has a legitimate claim to the Vanderbilt Drive mansion is even more specious. Yu claims that ill-gotten gains were not used to purchase the Vanderbilt Drive mansion because Xia had the right to use the $10 million Brownfield Tax Credit as he chose because he might in the future receive additional credits. Xia, however, plainly had told investors the Tax Credit would be used for the Eastern Emerald Project, not to buy a $4.1 million home for his General Contractor's mother. In addition, Verfenstein and Yu's claim that they earned the money used to buy the Vanderbilt Drive property has no evidentiary support and is contracted by the evidence showing Xia paid for the property with the EEG Loan.

An asset freeze is needed over these valuable properties in order to protect the investors' interests. Without a freeze, the mansions could be sold or mortgaged and investors would have no recourse to the funds if the SEC ultimately obtains judgments against Verfenstein and Yu. Indeed, one of the properties has already been impaired: in late 2021, Verfenstein took out a $2 million mortgage on the Middle Neck Road property, and then denied doing so in her February 2022 deposition. SEC Br. at 13, 18. A freeze is needed to prevent further dissipation or sales of these assets. In short, neither Verfenstein nor Yu have a legitimate claims to the mansions in their name. The SEC's Motion for an asset freeze over these properties should be granted.

# ARGUMENT

## I. Verfenstein Has No Legitimate Claim to the Middle Neck Road Mansion.

Verfenstein's argument that she has a legitimate claim to the Middle Neck Road mansion focuses on her deposition testimony and on certain purported invoices called "requisitions." Opp. Br. at 5 ("Verfenstein produced invoices (called 'requisitions') supporting her claim that she was owed over $11 million."). Verfenstein produced these requisitions, also referred to as Forms 702, to the SEC for the first time on February 18, 2022. Opp. Br. at 6. These requisitions cover a fourteen-month period from March 2018 through May 2019, SEC Ex. 45, and Verfenstein claims that her testimony and these requisitions show her legitimate claim to the Middle Neck Road mansion.[3] These arguments have no merit for several reasons.

### A. Certain Facts Cast Serious Doubt on the Requisitions' Authenticity.

*First*, the manner in which Verfenstein produced the requisitions casts serious doubt on their authenticity. As she admits, she produced the requisitions now at issue for the first time on February 18, 2022, after the SEC had deposed her and Xia *and* after the show-cause hearing had concluded. Opp. Br. at 6. Verfenstein seems to argue that she had these requisitions all along and had not produced them until late February 2022 because the SEC had never requested them before. Opp. Br. at 6. In fact, the requisitions were within the scope of *three* document subpoenas the SEC had served on Verfenstein in June 2019 and October 2021. SEC Br. at 16-17. Although Verfenstein and Xia had produced some requisitions in response to those requests, neither of them produced the ones that Verfenstein now relies on until February 18, 2022.[4]

---

[3] Verfenstein and Yu accuse the SEC of "trying to inflame passions" by referring to the Middle Neck Road and Vanderbilt properties as "mansions." Opp. Br. at 4. As the photographs of the properties show, this description is appropriate. SEC Exs. 33 (Middle Neck Road photos), 34 (Vanderbilt Drive photos).

[4] Verfenstein claims, with regard to the requisitions, that the SEC makes "the bald allegation that the documents are forgeries" and then quotes from Lewis Carroll's *Alice in Wonderland*. Opp. Br. at 9 &

*Second*, the lack of evidence that Xia ever received these "requisitions" casts further doubt on their authenticity. There is no evidence that Verfenstein ever sent the requisitions to Xia or that Xia ever received them: Verfenstein has provided no transmittal email or other documentary evidence that she ever sent the requisition forms to Xia. And Xia—who received an April 2019 investigative subpoena and November 2021 and February 2022 document requests calling for the requisitions—never produced copies of any of these requisitions.

*Third,* if the requisitions were authentic records of a good-faith transaction between legitimate parties acting at arm's length, some form of written documentation acknowledging the $11 million debt and the use of the Middle Neck Road mansion as the payment mechanism would exist. Yet there is no such document, which is fatal to Verfenstein's arguments. *See CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 190 (4th Cir. 2002) (funds received by relief defendant did not constitute "payment for services" because relief defendant "produced no documentary evidence to support this claim").[5]

### B. Even If Taken at Face Value, The Requisitions Do Not Show That Verfenstein Provided $11 Million Worth of Services.

As an initial matter, the requisitions do not provide sufficient detail to determine whether Verfenstein provided any legitimate services. As the SEC's construction accounting expert Raymond Dookhie testified at the hearing, a Form 702 is merely an "executive summary" and does not state what work was actually performed and who did the work; that detailed breakdown is contained in a document called a Form 703. *See* SEC Br. at 15-16. Verfenstein discounts this

---

n.9. The SEC, however, did not describe the requisitions as "forgeries"; instead, the SEC stated that the requisitions "do not appear authentic" and "should be given little to no weight." SEC Br. at 17, 23.

[5] Verfenstein minimizes her legal exposure by claiming she and Xia faced only "unspecified litigation." Opp. Br. at 16. The litigations, however, were not "unspecified." *See* SEC Ex. 57 (list of pending actions against Xia or his entities and Verfenstein's entities).

4

expert testimony, Opp. Br. at 8 n.7, but offers no evidence that contradicts it. Here, no Forms 703 have been produced, so the Forms 702 remain unsubstantiated and should not be relied upon to support Verfenstein's claim that she provided consideration. SEC Br. at 15. Moreover, Xia did not directly pay Verfenstein for the money she claims to have earned and there is no evidence of any satisfaction of payment for a specific debt owed, which further indicates that the real estate transactions were not legitimate payments for services rendered or consideration provided. SEC Br. at 15.

The insufficient detail in the requisitions Verfenstein relies upon is also underscored by the 2011 contract Verfenstein signed that governed her work on the Eastern Mirage Project. SEC Ex. 58. The requisition forms that Verfenstein relies on do not comply with the documentation required in the 2011 contract she and Xia signed. Article 15 of the contract requires Verfenstein to prepare a "Payment Request Schedule," detailing the work to be done, and an "Application for Payment" that should be prepared "[o]nce every two weeks" and must include an affidavit listing all subcontractors and all work done by each subcontractor, among other information. SEC Ex. 58 at 34-37. In addition, payment of any retainage to the General Contractor requires a separate "Application for Final Payment," and the contract lists extensive information required to be provided. *Id.* Verfenstein has not produced any of the documentation required by Article 15 of the contract. Therefore, the requisitions are inadequate under the contract and do not provide the level of detail required to show that she performed legitimate services under the contract.

Yet even if the Court were to take the dollar amounts on the requisitions at face value, they still do *not* state that Verfenstein is owed $11 million "for [Verfenstein's] roughly decade of

5

work on the project."[6] Opp. Br. at 5. On the contrary, these requisitions cover only a fourteen-month period from March 2018 through May 2019. SEC Ex. 45. And the requisitions clearly state that "the Contractor is entitled to payment of the AMOUNT CERTIFIED" and that this amount, as of the date of the last requisition in May 2019, is only $4,649,562.56. SEC Ex. 46 at 10. The line item for "Current Payment Due" also shows that only $4.6 million is owed, not $11 million. *Id*.

Since the requisitions Verfenstein relies on only call for a payment of $4.6 million—a point she fails to acknowledge—she appears to justify her claim that Xia owed her $11 million by adding "retainage" to the amounts the requisitions say are due. Opp. Br. at 7 (quoting Verfenstein's 2022 deposition testimony: "I have about $7 million, $7.7 million left of retainage he's supposed to pay me. Plus unpaid, so roughly $11 million he owes me."). But Verfenstein points to no documents to support her claim that Xia was required to pay any retainage to Verfenstein. Although the requisitions contain a line item for "retainage"—which totaled only $2.7 million as of May 2019—the requisitions do not say that *any* of the retainage is actually due and owing. SEC Ex. 45. And as noted above, any request by Verfenstein for payment of retainage required her to submit an Application for Final Payment, which was not done. SEC Ex. 58 at 34-37.

Courts have rejected claims of relief defendants who argued that the funds they received were payment for services when the claim was not supported by documents. In *Kimberlynn Creek Ranch*, 276 F.3d 187, 192 (4th Cir. 2002), for example, a relief defendant testified that

---

[6] In their depositions, which took place the week before the show-cause hearing, both Xia and Verfenstein testified that the $11 million debt arose from the difference between the $88 million they said was "guaranteed" and the actual amount Racanelli billed. SEC Br. at 14, 22. The Court, however, appeared skeptical of this argument at the hearing. *Id.* at 22. Verfenstein now has abandoned this argument as "irrelevant" and relies solely on the requisitions. Opp. Br. at 17.

funds he received were "payment for services he rendered" to the defendants. *Id*. The district court rejected this argument because the relief defendant "produced no documentary evidence to support this claim," and because the court "discredited" the relief defendant's testimony. *Id*. As a result, the district court ordered an asset freeze and the Fourth Circuit affirmed. *Id*. at 193. Similarly, in *SEC v. Infinity Group Co.*, 993 F. Supp. 324, 331 (E.D. Pa. 1998), the relief defendant received funds from a defendant and claimed that "she rendered consideration in the form of administrative and clerical services" to the defendant. The court rejected this claim because the relief defendant had not "produced evidence" to support her claim. *Id*. *See also SEC v. End of the Rainbow Partners, LLC*, 17-cv-2670-MSK-NYW, 2019 WL 8348323, at *7 (D. Col. Nov. 25, 2019) (relief defendant failed to show legitimate claim to investor funds transferred to her because "there is nothing in the record to substantiate the amount of payment due to [the relief defendant] for such tasks, such as invoices or pay stubs").

The caselaw Verfenstein cites does not support her arguments. She relies on *FTC v. Bronson Partners, LLC*, 674 F. Supp.2d 373, 392 (D. Conn. 2009), to support her argument that Verfenstein has a "legitimate claim" to the Middle Neck Road property because "Verfenstein was paid for the work she did." Opp. Br. at 16. In *Bronson*, however, the evidence of payment for services was straightforward: the relief defendant was an employee of a company, received a salary from the company, and was paid to handle shipping and delivery. As a result, the court found that the monies paid to the employee were "for services performed . . . [and] were legitimately paid in consideration for [the relief defendant's] services." *Id*. In contrast here, even if the requisitions are taken at face value—despite the serious questions as to their authenticity—they do not establish that Verfenstein provided services entitling her to $11 million in compensation from Xia or the Projects.

7

## II. Yu Has No Legitimate Claim to the Vanderbilt Drive Mansion.

In order to show a legitimate claim to the Vanderbilt Drive mansion, Yu must show that she provided some consideration or value in exchange for the property. Yu, however, makes no such claim. Instead, she makes a variety of arguments, none of which comes close to supporting Yu's assertion of a legitimate claim.

Yu first argues that the funds used to purchase the Vanderbilt Drive mansion were not ill-gotten gains from Xia's fraud because there was nothing improper about Xia using the $10 million New York State Brownfield tax credit to purchase the Vanderbilt Drive property. Opp. Br. at 11-12 (Eastern Emerald Offering Memoranda "doesn't say that the first such dollar in such credits" would be used for the Project). Eastern Emerald investors, however, were told without qualification that the project "shall be financed" in part by the "Brownfield Tax Credit" in the amount of $21.2 million. Dkt. 6-5 at 3 (EEGH, L.P. Supp. Offering Memoranda). Nothing in the Offering Memoranda can be interpreted to mean that "the first such dollar" of the tax credit (Opp. Br. at 11-12—or any dollar of the tax credit—could be used at Xia's discretion for his own personal use or that of his business partners. And a contrary interpretation would make no sense: why would investors invest in the Project if they knew that the "Brownfield Tax Credit" disclosed in the Offering Memoranda as a funding source could be used by Xia to purchase a mansion for his General Contractor's mother? Xia's use of the $10 million tax credit to purchase these mansions when the Eastern Emerald Project had limited funds left was a misappropriation of investor funds and part of his scheme to defraud.

Next, Yu argues that "Impact Environmental and Ms. Verfenstein legitimately earned the money." Opp Br. at 18. But Yu says nothing about how and when Impact Environmental earned the money, and there is no documentary evidence that Impact Environmental performed any

work at all. Yu refers vaguely to "a contract between Perini (as the general contractor) and Eastern Emerald Group," Opp. Br. at 13, but have not offered any such contract into evidence. On the contrary, the evidence shows only that Xia chose to transfer some of the ill-gotten gains through an Impact Environmental bank account. *See* Exs. 69, 70; Opp. Br. at 10 (Verfenstein and Yu concede that "there is no dispute as to the source of the funds" that Xia used to acquire the Vanderbilt Drive mansion and that SEC Exhibit 69 accurately shows the flow of funds).

Finally, Verfenstein and Yu criticize the SEC for quoting Verfenstein's testimony that Vanderbilt Drive was purchased "for dumping purposes" and claim that the SEC misconstrued Verfenstein's testimony about "contaminated soil." Opp. Br. at 13-14 ("The SEC mocks Ms. Verfenstein's testimony" regarding the dirt). In doing so, Verfenstein and Yu point to a different portion of Verfenstein's hearing testimony, while ignoring the portion of Verfenstein's and Xia's hearing testimony that the SEC cited in its moving brief. SEC Br. at 18-19. In fact, the SEC accurately quoted Verfenstein's and Xia's detailed hearing testimony about the purported "dumping" purpose of the Vanderbilt Drive mansion.[7] And the SEC accurately described the dirt-dumping justification as "preposterous," because it defies common sense that anyone would acquire waterfront property in an exclusive area of Long Island in order to dump dirt from a formerly contaminated site.[8]

---

[7] Verfenstein testified in her deposition that Vanderbilt Drive was purchased "for dumping purpose[s]"; about her plan to "dump the soil"; she referred to Vanderbilt Drive as a "dumping site" and "dumping land" and had "great potential for dumping"; and that it was "purchase[d] for a dumping site." SEC. Ex. 36 at 55, 61, 64, 118, 123, 124. Similarly, Xia in his deposition described Vanderbilt Drive as a "dumping site"; stated that Verfenstein "can dump all these materials" from the Eastern Emerald project at Vanderbilt Drive, which he described as a "perfect dumping site." SEC Ex. 35 at 57, 59, 102, 103.

[8] Verfenstein and Yu complain at length about what they call a "procedural absurdity." Opp. Br. at 3. Apparently, they believe that the SEC knew about Xia's acquisition of the mansions at the time this case was filed on September 27, 2021, and decided to wait to file the instant motion until April 6, 2022. This is not true. In fact, the SEC uncovered the purchases through analysis of bank and real estate records uncovered *after* the filing of the original Complaint. The SEC also served extensive discovery on Xia and Verfenstein relating to the mansions, which took several months. Although the Verfenstein and Yu

# CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court, pending a final judgment in this case, issue an order: (1) with respect to Verfenstein, freezing the Middle Neck Road mansion up to $11.25 million; and (2) with respect to Yu, freezing the Vanderbilt Drive mansion up to $4.21 million.

Dated: New York, New York
       May 11, 2022

                                    Respectfully submitted,

                                        /s/ David Stoelting

                                Kevin P. McGrath
                                David Stoelting
                                Kim Han
                                Attorneys for Plaintiff
                                SECURITIES AND EXCHANGE COMMISSION
                                New York Regional Office
                                100 Pearl Street, Suite 20-100
                                New York, New York 10004
                                (212) 336-0174 (Stoelting)
                                stoeltingd@sec.gov

---

sarcastically describe the time that the SEC took to develop the evidence regarding Xia's purchases of the three mansions as "a leisurely Sunday stroll through the park rather than an ambulance rushing to the emergency room," Opp. Br. at 2, the SEC was careful to analyze all available evidence and filed the Amended Complaint and the motion to expand the asset freeze as expeditiously as possible.