UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

-against-

RICHARD XIA, a/k/a YI XIA; and
FLEET NEW YORK METROPOLITAN REGIONAL
CENTER, LLC, f/k/a FEDERAL NEW YORK
METROPOLITAN REGIONAL CENTER, LLC;

Defendants,

-and-

JULIA YUE, a/k/a JIQING YUE, XI VERFENSTEIN,
and XINMING YU,

      Relief Defendants.

21 Civ. 5350 (PKC)

## DECLARATION OF M. SCOTT PEELER

I, M. Scott Peeler, pursuant to 28 U.S.C. § 1746, declare as follows:

  1.  I am a member of the bar of this Court and have served as the Court-Appointed Monitor in the above captioned matter since September 27, 2021.

  2.  I make this Declaration in connection with the SEC's Reply to Defendants' Post-Hearing Memorandum of Law in Opposition To Plaintiff's Motion For Preliminary Injunction Freezing Assets and Appointing a Monitor Pending Final Judgment ("Opposition Memo") (*see* ECF No. 124).

3. In their Opposition Memorandum, Richard Xia ("Xia"), and Fleet New York Metropolitan Regional Center, formerly known as Federal New York Metropolitan Regional Center ("Fleet") ("Defendants") allege that the Monitor has had a "deleterious" effect on the real properties at issue in this matter, located at 42-23 Union Street, Queens, New York 11355 ("Eastern Mirage") and at 112-21 Northern Boulevard, Queens, New York 11368 ("Eastern Emerald") (collectively, the "Projects").[1]

4. Defendants accuse the Monitor of rejecting various requests for payment, leaving the Eastern Mirage construction site unsecured and unprotected, imposing a cumbersome process designed to prevent work on either Project, and conducting discovery on behalf of the SEC. Based upon my personal knowledge, I respond to Defendants' specific allegations.[2]

**Payroll**

5. In Xia's (unsigned) Declaration, he alleges that Defendants repeatedly asked the Monitor to permit payment of payroll and other regular business expenses, but those expenses were never paid.[3]

6. Related to payroll, on December 28, 2021, Defendants' then counsel Hervé Gouraige provided me with: (i) a payroll invoice and related documentation issued by Automatic Data Processing, Inc. ("ADP") to Fleet Financial Group, Inc.; (ii) three invoices for employee

---

[1] ECF No. 124 at 23.
[2] *Id.* While Xia and his counsel have always been aware that the Monitor and SEC share relevant information, the allegation that the Monitor conducts discovery on the SEC's behalf is simply false. The Monitor Order empowers the Monitor to collect information to fulfill the Monitor's duties. *See* Monitor Order ¶ 3 ("Fleet and the Xia Entities shall grant the Monitor access to all non-privileged books, records, and account statements for the entities and assets listed on Schedule 1; and (2) cooperate fully with requests by the Monitor reasonably calculated to fulfill the Monitor's duties, including, but not limited to, making available any officer, employee, or outside advisor that the Monitor deems relevant to executing his or her duties."). All my requests for information have been in furtherance of attempting to fulfill my duties as the Monitor.
[3] ECF No. 124 at 23; Declaration of Richard Xia in Support of Defendants' Post-Hearing Memorandum of Law ("Xia Decl.") ¶¶ 2, 5 & 6 and Exs. 1, 4 & 5, ECF No. 126. .

2

benefits; and (iii) an undated list of seventeen (17) named employees, their positions, and salary and asked me to assess them for payment. After conducting a thorough review of the documents provided, I was unable to make a recommendation regarding what if any payroll payments to make due to insufficient information provided by Defendants. I repeatedly told Hervé Gouraige and subsequently Taher Kameli that I was open to seeking the Court's approval for these payments if Defendants provided me with certain relevant information including whether any of these employees had a relationship with Xia other than employer/employee and what necessary service/function/work they performed during the pay-period(s) in question. To date, that information still has not been provided to the Monitor.

7. In addition, on or about March 4, 2022, I spoke with Peter Di Sciascio who identified himself as ADP's counsel. Mr. Di Sciascio represented that ADP paid Defendants' payroll in September and was seeking reimbursement. I immediately discussed this with Hervé Gouraige and subsequently with Taher Kameli and again reiterated that if Xia would send me the requested information, I would assess and move quickly to avoid unnecessary litigation. To date, I have not received a response to my request.

**Other Business Expenses**

8. Xia's Declaration also claims that Fleet incurred $4,537,260.29 in payroll and other regular business expenses on the Eastern Mirage and Eastern Emerald projects, but those expenses were never paid.[4]

---

[4] ECF No. 124 at 23; Xia Decl. ¶ 3 and Exhibit 2.

9. Prior to this filing, the chart that allegedly supports this figure had not been previously presented or discussed with the Monitor or his team, and most of these pre-Asset Freeze expenses were also not presented or documented to me.[5]

10. As made clear in prior filings, reports, and my testimony, I repeatedly invited Xia and his former counsel, most especially Hervé Gouraige and Taher Kameli, to meet with me to discuss a number of topics, including but not limited to payroll and any outstanding payments.[6] Just before the 11(b) Report was due to be filed, Xia indicated he was finally willing to meet, and we did so on January 17, 2022.

11. At that meeting, my team and I met with Xia and Hervé Gouraige to provide Xia with the opportunity to rebut and/or provide relevant information to ensure the accuracy and completeness of the 11(b) Report.[7] One of the categories we discussed was any "current and potential liabilities" against the Projects. We presented these in an Excel spreadsheet that was shown to Xia and Hervé Gouraige during the meeting. It enumerated the liabilities we had identified, and we discussed each of them line-by-line.[8] At no time during or following that meeting did Xia or any of his counsel indicate that our 11(b) Report failed to include the $4,537,260.29 in pre-Asset freeze expenses he now claims is owed.

12. In addition, during that conversation, we discussed with Xia $3,883,152.60 in what appeared to be unpaid invoices J.S. Held identified for work supposedly completed by third parties on the Eastern Mirage Project. In response, Xia stated in substance that he did not owe money to

---

[5] This chart appears to reflect expenses that were incurred between June 1, 2021 and August 31, 2021 (i.e. before the Asset Freeze).
[6] *See* 11(b) Report § II.G.(iii), ECF No. 53.
[7] *See id.*
[8] The chart was displayed on Microsoft Teams, and Xia took photographs of it using his phone despite my willingness to provide him a copy of it following the meeting.

4

anyone, and on January 20, 2022, Hervé Gouraige and Linxuan Yan[9] confirmed Xia's position in writing. In addition, they forwarded us documents that purported to show that Xia did not owe this almost four million dollars to third parties.

13. Upon information and belief, some of the items in Xia's chart provided to us also appear inaccurate and inconsistent with Xia's position based upon representations by his prior counsel. For example, his chart asserts that $65,937.50 for each month of June, July, and August 2021 is outstanding in insurance expenses. However, Hervé Gouraige and Taher Kameli represented that insurance premiums on the Projects were paid through near the end of 2021. Further, although Xia had not paid property taxes in January or July of 2021 – the failure of which required back tax payments and penalties of $796,521.16 – I unilaterally prepared a motion for the payment of taxes on both Projects, which the Court approved on January 3, 2022.[10]

14. I also note that the line items for "Attorney," totaling over $240,000, are non-specific.

15. To the extent the "Attorney" line item refers to fees allegedly owed Bret McCabe, my team and I were presented evidence of what appeared to be a previously negotiated six-figure or seven-figure flat fee arrangement plus expenses.[11] We encouraged Defendants to propose a more reasonable fee arrangement for Mr. McCabe, and this topic, including various possible

---

[9] Mr. Yan is an associate at Sills Cummis and worked extensively with Mr. Gouraige on this matter.

[10] *See* ECF No. 38.

[11] The documentation presented by Hervé Gouraige included a signed Declaration of Mr. McCabe stating that he had a flat-fee arrangement between himself and Xia of $1 million a year – or $83,300 a month – plus expenses. When I asked for documents supporting that contention, I was subsequently provided a signed engagement letter dated January 15, 2019 indicating the $1 million a year compensation for Mr. McCabe was to be paid as $500,000 in salary and $500,000 in deferred equity. When I inquired about the difference between the Declaration and the engagement letter, Mr. Gouraige told me that the arrangement changed to $1 million in salary following the asset freeze. In any event, the figures presented by Xia in Exhibit 2 to his Declaration do not match either fee arrangement.

resolutions, was discussed extensively with Xia's former counsel. To date, no alternative solution has been presented.

16. If the "Attorney" line item refers to other attorneys, we have calculated that the amounts due and owing for prior legal services are as high as $2.6 million.[12] The topic of how Xia and Defendants plan to deal with this ever-increasing figure, exacerbated by his changing counsel numerous times, has been repeatedly addressed with every counsel for Xia and referenced as recently as in the Monitor's Second Quarterly Report.[13]

17. Defendants also allege that ConEdison sent a shut-off notice for failure to pay past due electricity charges at Eastern Mirage. The first notification of ConEdison threatening or actually turning off electricity at Eastern Mirage was this filing.

**Insurance**

18. In these filings and Xia's Declaration, Xia claims that Fleet requested that the Monitor approve payment for insurance on the Eastern Mirage and Eastern Emerald Projects, but these premiums for insurance were never paid.[14] Defendants further allege that there is no insurance in place on either Project.

19. The topic of insurance has been and continues to be one of our top priorities. After careful review of the insurance information provided by Defendants in December 2021, I determined that the Projects were not adequately insured.[15] It appeared that Defendants initially obtained Commercial General Liability ("CGL") insurance for the Projects through Fleet General

---

[12] That figure includes $849,370.46 in unpaid fees for this matter (not including any unpaid fees to Kameli & Associates) and $1,805,199.89 in unpaid fees for other matters involving the Defendants. These figures were only able to be determined by my team communicating with numerous law firms and getting unpaid invoices and total accounts receivables in arrears.
[13] See ECF No. 115 at 7-8.
[14] ECF No. 124 at 23; Xia Decl. ¶¶ 4, 5, 6 and Exs. 3, 4, 5.
[15] See ECF No. 115 at 9-10.

6

Insurance Group, Inc. ("FGIG"), a Vermont entity created and controlled by Xia, to provide CGL insurance for the Projects. Using this captive insurance company, Xia's plan was to self-insure the Projects using investor funds to pay premiums.[16]

20. Xia never obtained Builder's Risk insurance and appears to have only begun to investigate it when Emerald Creek required Builder's Risk coverage of at least $75 million for Eastern Mirage in order for Xia to obtain a $15 million loan.

21. In December 2021, through Hervé Gouraige, Xia provided us undated and potentially inadequate cancelation notices of the CGL policies issued by FGIG. I immediately raised questions and concerns regarding the possibility that any insurance coverage might have lapsed and sought additional information from Defendants. In response, Defendants eventually submitted a proposal to release $1,493,471.85 in frozen funds to pay annual premiums, but I noted with concern that of that amount, $1,088,250.00 would be paid to Xia's company, FGIG. After careful consideration and with full transparency to all parties, I decided not to proceed with Defendants' request for the release of those funds at that time. I made it clear that I would work to source alternative, comparable, independent insurance for the Projects and determine whether such coverage would be possible and at what cost.

22. Since that time, my team and I have been working to obtain insurance coverage from independent, third-party insurance providers.[17] These efforts have been time-consuming, difficult, and made harder by several factors including but not limited to (a) Xia's failure to provide me timely information and to meaningfully assist our efforts; (b) the continuing, large number of violations issued against the Projects by New York City's Department of Buildings ("DOB"); and

---

[16] *See* 11(b) Report § II.F.(iii), ECF No. 53.
[17] *See id*.

(c) Xia allowing work to continue despite multiple stop work orders, the possibility that insurance coverage had lapsed, and known hazardous conditions on site which Xia failed to remediate despite multiple requests by the Monitor.[18]

23. In addition, Builder's Risk insurance is typically secured at the beginning of a project, and it is highly unusual for a policy to be issued at the late stage of construction at Eastern Mirage. This fact required insurance providers to conduct time-consuming supplementary due diligence before determining whether to provide premium quotes.

24. Nevertheless, on or about April 21, 2022, we received quotes for comparable insurance coverage (CGL for both projects and $75 million of Builder's Risk insurance on Eastern Mirage) at a substantially better price than Defendants proposed in January. This coverage (a) was priced at <u>hundreds-of-thousands</u> dollars less than Defendant's proposal; and (b) did not involve any premiums to FGIG whatsoever. We updated all parties and immediately began getting the policy documents in order/drafted and prepared a motion to release the necessary funds.

25. The policy documents and draft motion were provided to Xia, Taher Kameli, and the SEC. All parties gave their consent to proceed, and while we were finalizing the motion, we learned on or about April 27, 2022 that one of the insurance companies had new concerns and might not be willing to proceed.[19] We began a series of urgent conversations and negotiations – first to see if that company might still be willing to continue – and then to find substitute coverage. Several times we came close, and on or about May 12, 2022, I was informed that the broker found

---

[18] Many insurance companies were unwilling to issue policies on the Projects given the DOB's identification of "hazardous conditions" and Xia's failure to correct them. These violations continue as recently as a few weeks ago.
[19] This company had quoted the first of three layers of Builder's Risk insurance necessary for the $75 million in coverage.

8

a new insurance company. We are in negotiations with that company now and are prepared to proceed with the filing the of the motion the moment we have necessary coverage assured.

**Berm Maintenance and Project Security**

26. Defendants claim that (a) Eastern Mirage is unsecure,[20] vandals regularly gain entry and damage the building and its contents,[21] environmental factors have also caused damage;[22] and (b) throughout February 2022, the New York City Department of Buildings ("DOB") sent multiple emails to Defendants about the berm maintenance required at the Eastern Emerald Project construction site of which Fleet's attorney notified the Monitor.[23]

27. My team and I were first alerted to the berm maintenance issue on February 22, 2022 when Hervé Gouraige sent me a series of emails involving Xia, Bret McCabe, and the DOB. These communications showed that for several months, certain status reports of the berm conditions at Eastern Emerald were incomplete, and/or not produced in a timely fashion to DOB. By February, DOB demanded the overdue report or, in the alternative, to backfill Eastern Emerald to grade. I asked whether Xia had the necessary report and/or for his proposed plan to resolve this issue.

28. On February 28, 2022, Hervé Gouraige forwarded me communications between Xia and Matthew Millner at DOB which presented as if the berm maintenance issue had been satisfied through Xia sending DOB the requested berm maintenance report. In addition, Xia wrote in that email, "subcontractor is doing it and they will submit an invoice once it is fully

---

[20] *See* ECF No. 124 at 23.
[21] *See id*.
[22] *See id*.
[23] ECF No. 124 at 23; Xia Decl. ¶¶ 7-10, 12 and Exs. 6-11.

9

completed…they will send proposal to coordinate and maintain it regularly per DOB request." I responded the following morning, "Thank you. Please keep me informed on this."

29. The topic of berm maintenance was not discussed again until Taher Kameli, Steven Burke,[24] and my team were discussing alternative insurance coverage in or about April 2022. Prior counsel represented that the berm maintenance was in fact occurring, and they wanted to ensure that the alternative CGL policy covered this work. They also requested that the CGL policy cover other ongoing work required by the city, including site security and weatherizing. At no time did they tell me or my team that there were any issues with site security or damage caused by weather. We had multiple conversations with prior counsel on these points and did in fact ensure that all of these services were covered by the alternative CGL policy.

**Cost-to-Complete the Eastern Mirage Project**

30. Defendants' claim that the reason work has not been able to proceed on Eastern Mirage is due to a "petty and inconsequential disagreement" between Xia (who believes that the Project is 95% complete and needs only $3 to $5 million to complete)[25] and the Monitor (who believes that Mirage is only 80% complete and requires between $13 and $17 million to complete).[26]

31. First, the Monitor's 11(b) Report, the testimony on February 16, 2022, and the numerous meetings and discussions by the Monitor with prior counsel support the conclusions reached by the independent expert J.S. Held that it will require $13.9 to $16.7 million to complete Eastern Mirage.[27] Second, this difference is neither petty nor inconsequential as it relates to a

---

[24] Mr. Burke is an associate at Kameli & Associates.
[25] *See* ECF No. 124 at 23.
[26] *See id.*
[27] *See* 11(b) Report §; Transcript of Feb. 14, 2022 Order to Show Cause Hearing 536:14-537:24.

substantial sum of investor funds. Third, the Defendants have never presented the Monitor with a budget for completion of Eastern Mirage and a plan for funding that work – rather, our discussions have been around finding a funding source and arrangement that would allow for both Projects to be completed. And while prior counsel have submitted preliminary proposals to ostensibly fund the completion of both Projects, two presented by Hervé Gouraige and Matt Schwartz contained inadequate detail and raised enough substantive concerns that Defendants dropped the proposals after the Monitor and the SEC raised these concerns and sought additional information. A third proposal was partially presented and was still being vetted by Mr. Kameli when he was relieved as counsel. Thus, Defendants' claim that it is the Monitor's or the SEC's fault that construction has not proceeded is simply incorrect.

**Unnecessary and Burdensome Changing of Counsel**

32.   As the Court is aware, with the Notices of Appearance filed by Robert Altchiler, Benjamin Y. Kaufman, and Mark Rifkin on or about May 3, 2022, Defendants will have been represented by six different law firms since I was appointed approximately seven-and-a-half months ago.[28]

33.   This frequent changing of counsel is causing significant impediments to the resolution of outstanding issues, many of which are identified in the Monitor's Second Quarterly Report.[29] In addition, this repeating pattern results in another serious cause of concern: ever-growing, unpaid legal fees.

---

[28] The five previous law firms are Sullivan & Cromwell LLP, Mukasey Frenchman LLP, WilmerHale, Sills Cummis & Gross P.C., and Kameli & Associates. In addition, in March Xia was going to hire Pillsbury Winthrop Shaw Pittman LLP and in April, Schulte Roth & Zabel, LLP. I had numerous time-consuming meetings, discussions, and phone calls with various attorneys from both firms based upon Xia's representations.
[29] *See* ECF No. 115 at 7-8.

34. Xia's repeated replacement of counsel has impeded the ability of my team to resolve issues efficiently and effectively in the interests of the investors. With each new law firm, valuable time and resources are spent familiarizing them with key facts and ongoing negotiations. In many cases, issues that have been close to a potential resolution begin anew and costly delays occur.

35. I welcome the opportunity to discuss any of these or other issues with the Court at its convenience.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 18, 2022
New York, New York

s/ M. Scott Peeler<br>
M. Scott Peeler<br>
Court Appointed Monitor