UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

    -against-

RICHARD XIA, a/k/a YI XIA, and
FLEET NEW YORK METROPOLITAN
REGIONAL CENTER, LLC, f/k/a FEDERAL
NEW YORK METROPOLITAN REGIONAL
CENTER, LLC,

                Defendants,

    -and-

JULIA YUE, a/k/a JIQING YUE;
XI VERFENSTEIN; and XINMING YU,

                Relief Defendants.

21-cv-05350-PKC-RER

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF'S MOTION TO EXTEND THE ASSET FREEZE TO CERTAIN ASSETS OF THE RELIEF DEFENDANTS

                Kevin P. McGrath
                David Stoelting
                Kim Han
                Attorneys for Plaintiff
                SECURITIES AND EXCHANGE COMMISSION
                New York Regional Office
                100 Pearl Street, Suite 20-100
                New York, New York 10004-2616
                (212) 336-0533 (McGrath)
                (212) 336-0174 (Stoelting)
                (212) 336-5677 (Han)
                stoeltingd@sec.gov

May 18, 2022

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT ..........................................................................................................................2

    I.    The Asset Freeze Should Be Sufficient to Cover Defendants' and Relief Defendants' Potential Disgorgement Liability of $229 Million plus Prejudgment Interest and a Civil Penalty..................................................................................................................2

    II.   The Assets Currently Frozen Are Insufficient to Cover the Potential Disgorgement, Prejudgment Interest and Civil Penalty ...............................................................5

CONCLUSION.......................................................................................................................7

## TABLE OF AUTHORITIES

**Cases**

*Liu v. SEC,* 140 S. Ct. 1936, 1940 (2020)..................................................................................3

*SEC v. Ahmed*, 123 F. Supp. 3d 301 (D. Conn. 2015).................................................................4

*SEC v. Liu*, 851 Fed. Appx. 665 (9th Cir. 2021).........................................................................4

*SEC. v. Maillard,* No. 13–CV-5299 VEC, 2014 WL 1660024 (S.D.N.Y. Apr. 23, 2014)..............5

*SEC v. Unifund SAL*, 910 F.2d 1028, 1041-42 (2d Cir. 1990).......................................................5

**Rules and Regulations**

Exchange Act Section 10(b) ........................................................................................................3

National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283 ("NDAA").......3

Rule 10b-5....................................................................................................................................3

Securities Act Section 17(a)(1)....................................................................................................3

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this reply brief in response to the Memorandum of Law in Opposition to Plaintiff's Motion to Expand Asset Freeze filed on May 11, 2022 (Dkt. 124, "Defs. Br."), by Defendants Richard Xia ("Xia") and the Fleet New York Metropolitan Regional Center, LLC (together, "Defendants").[1]

## PRELIMINARY STATEMENT

Defendants' brief opposes the SEC's motion to expand the asset freeze to cover the three mansions that Xia purchased in 2021 with approximately $30 million misappropriated from the EB-5 investors. Defendants, however, do not dispute any of the facts that form the basis for the SEC's motion to expand the freeze. With respect to the Kings Point Road mansion that Defendant Xia resides in with his wife, Relief Defendant Yue, Defendants do not dispute that Xia misappropriated $10.6 million of investor funds in order to purchase the Kings Point Road Mansion and then put it in Yue's name, as set forth in SEC Exhibit 68 (Dkt. 102-31). Defendants also do not argue that Yue provided any consideration or value for the Kings Point Road property. And Yue herself has not submitted any brief opposing the SEC's motion to extend the asset freeze as to the Kings Point Road mansion held in her name. Nor do Defendants dispute any of the evidence in the SEC's motion papers relating to the Middle Neck Road and Vanderbilt Drive mansions held in the names of the other Relief Defendants.

Instead, Defendants offer one argument in opposition to the SEC's motion: "the existing asset freeze is more than adequate protection for any measure of relief." Defs. Br. at 6. Defendants claim that the amount of monetary relief the SEC may obtain in this case is far less than the value of their frozen assets. Defendants are wrong. Investors have invested at least

---

[1] On April 6, 2022, the SEC filed its Amended Complaint (Dkt. 98) and Motion to Extend the Asset Freeze as to Certain Assets of Relief Defendants Julia Yue, Xi Verfenstein and Xinming Yu (Dkt. 99, 100, 101, 102). On May 4, 2022, Verfenstein and Yu filed a separate opposition (Dkt. 120, 121) to the SEC's motion, and the SEC filed its reply on May 11, 2022 (Dkt. 128).

1

$229 million in Defendants' two real estate projects—all of which the SEC may obtain in disgorgement under the existing statute of limitations, if it proves its claims against Defendants—but less than $79 million in cash remains. The value of the frozen, illiquid real estate assets is too uncertain to justify denial of the motion at this early stage. The three mansions, purchased in 2021 for a combined total of $30 million using investor funds or assets, may be necessary to make Defendants' victims whole if the SEC prevails in this case, as the SEC's hearing evidence demonstrates it is likely to do.

## ARGUMENT

**I.     The Asset Freeze Should Be Sufficient to Cover Defendants' and Relief Defendants' Potential Disgorgement Liability of $229 Million plus Prejudgment Interest and a Civil Penalty.**

Starting in 2010 through late 2017, Xia raised approximately $229 million from more than 450 EB-5 investors through five offerings. As set forth in the SEC's post-hearing brief, Xia obtained these funds through a fraudulent scheme and through numerous material misrepresentations and omissions. Dkt. 103. Yet Defendants incorrectly claim that "only $63 million [was] invested by…investors for whom the SEC has asserted timely claims." Defs.' Br. at 5. In reality, the $229 million potential disgorgement amount all falls within the applicable ten-year statute of limitations.

Defendants argue that they cannot be liable for disgorgement of more than the $63 million they obtained from investors in the EEGH II offering commenced in approximately October 2015 (plus approximately $2.8 million in interest earned after deducting management fees). Defendants claim that all of the offerings prior to that one fall outside a purported five-year statute of limitations. However, a ten-year statute of limitations actually applies to the SEC's claims for disgorgement with respect to Defendants' violations of Exchange Act Section

2

10(b) and Rule 10b-5 thereunder and Securities Act Section 17(a)(1), as described more fully in the SEC's reply brief in response to Defendants' opposition to the SEC's post-hearing brief (citing National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283 ("NDAA")).

The NDAA established a ten-year statute of limitations for the SEC's claims. The SEC filed its Complaint on October 27, 2021. Ten years prior to that is October 27, 2011, and a six-month tolling agreement with Defendants pushes the statute of limitations back to March 27, 2011. All but eight investors invested after that date, *see* Dkt. 6-48 at 9, 12-13, 16, 18-22, 29-31 (schedules prepared by Xia's expert Paul Ribaudo showing receipt of capital contributions in each offering by the EB-5 investors, which total $229 million), and the approximately $225 million illegally obtained by Defendants after March 27, 2011 (based on Dkt. 6-48 above) fall within the statute of limitations for purposes of disgorgement.

Defendants next argue that their purported business and project expenses totaling approximately $80 million should be subtracted from the disgorgement amount, Defs.' Br. at 4-5, citing to *Liu v. SEC,* which held that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under [15 U.S.C.] § 78u(d)(5)." 140 S. Ct. 1936, 1946 (2020). But Defendants misunderstand *Liu*'s "net profits" requirement in the context of temporary and preliminary asset freezes pending a final judgment. The proceedings in the *Liu* case itself makes this clear.

In *Liu*, the Supreme Court vacated the district court's earlier ruling and remanded for a determination of the appropriate disgorgement award in light of the Court's decision. *Id.* at 1950. After remand, the district court continued the preliminary injunction that froze all of the defendants' assets, and the Ninth Circuit affirmed. *SEC v. Liu*, 851 Fed. Appx. 665 (9th Cir.

3

2021). Just like Defendants do here, the defendant in *Liu* "contend[ed] that the district court should have calculated an amount of net profits disgorgement before entering the asset freeze." *Id*. The Ninth Circuit disagreed and held that "any finding of an amount of equitable relief would be premature at this stage of the proceedings" because a district court is not required "to make a finding as to the amount of equitable remedies prior to a final judgment." *Id.* at 669. In response to the defendant's argument that the asset freeze improperly froze all of his assets, not just net profits, the Ninth Circuit noted that district courts enjoy broad latitude when determining the scope of an injunction. *Id*. Given that disgorgement had not yet been determined, the Ninth Circuit held that "it would be impossible to tailor this injunction solely to those assets that are net profits from the use of investor funds." *Id*.

The Ninth Circuit's rationale applies equally here. At this early stage of the case. Defendants' claims about their business expenses are largely irrelevant to the issue of the appropriate scope of the asset freeze. Defendants claim about $150 million in "project-related expenses" and they argue that the asset freeze should be lowered by that amount. Defs. Br. at 4-5. The Defendants, therefore, ask the Court to determine the amount of the equitable relief of disgorgement *before* liability has been determined and in this early stage of this case. As the Ninth Circuit found, for the Court to make "[a]ny finding of an amount of equitable relief would be premature at this stage of the proceeding." *Id.*[2]

The asset freeze, moreover, should be sufficient to cover not just disgorgement but also prejudgment interest and a civil penalty and, if they are ordered, the interest and penalty should be substantial. *See, e.g., SEC v. Unifund SAL*, 910 F.2d 1028, 1041-42 (2d Cir. 1990); *SEC v. Ahmed*, 123 F. Supp. 3d 301, 312 (D. Conn. 2015); *SEC v. Maillard,* 13–CV-5299, 2014 WL

---

[2] Moreover, there are substantial factual and legal questions as to how much, if any, of these costs, even if substantiated, should be subtracted when the Court calculates disgorgement following a finding of liability.

4

1660024, at *4 (S.D.N.Y. Apr. 23, 2014) ("[T]he SEC is entitled upon an adequate showing. . . to an asset freeze sufficient to preserve its disgorgement remedy as well as assets necessary to pay civil monetary penalties.").

## II. The Assets Currently Frozen Are Insufficient to Cover the Potential Disgorgement, Prejudgment Interest and Civil Penalty.

Defendants claim that "the current asset freeze covers assets with a fair market value of *more than $337 million* and *current equity of approximately $285 million*." Defs. Br. at 3 (emphasis in original). Yet again Defendants fail to support their claim.[3] The Eastern Mirage and Eastern Emerald projects are illiquid assets whose value is unclear. As stated in the Monitor's report, the appraisals of the Eastern Mirage and Eastern Emerald project properties are based "in significant part" on information provided by Defendants and on certain "Extraordinary Assumptions," which include: "(i) construction will be completed in accordance with the approved plans provided by Xia; (ii) the budget provided by Xia is sufficient to complete the work; (iii) the costs incurred and status of the Projects as provided by Xia are accurate and complete; (iv) all potential Brownfield tax credits will be realized; and (v) construction will be completed in a timely manner." Dkt. 53 at 17. The Monitor's report concluded that, "while the appraisals are helpful for certain limited purposes, these qualifications present on-going concerns." *Id*. Additionally, as he testified at the hearing, the Monitor does not believe that the investors are over-secured. Dkt. 101-37 at 574 (hearing transcript).

---

[3] Page 2 of Defendants brief contains a chart of unknown origin which purports to explain their numbers. None of the numbers in the chart, however, can be verified because the sources cited by the Defendants for the chart do not appear correct. The Defendants cite to "Exhibit D" and "Dkt. 19 at 5-8," but the Defendants' filing does not contain any "Exhibit D" and neither does Dkt. 19 contain a page numbered "5-8."

5

Further reducing its value, Defendants have also encumbered the Eastern Mirage property with a $15 million lien—$10.25 million of which were used to purchase the Middle Neck Road mansion, as detailed in the SEC's moving brief. Dkt. 100 at 13.

Defendants also argue that a "realistic" estimate of Defendants' frozen assets is "more than $400 million" with the inclusion of approximately $27.8 million of Site Preparation Tax Credits that Defendants claim the Eastern Emerald Project has "earned" and $35 million of credits that Emerald "may" earn if the project is completed by 2025. Defs.' Br. at 2-3. In support, Defendants cite to the Monitor's quarterly report, Dkt. 53. *Id*. at 4-5. The Monitor's report, however, does not state that the Eastern Emerald Project has earned $27.8 million in Site Preparation credits. Instead, the Monitor's report states that tax credits of $10.9 million have been issued[4] and that, while $37.8 million remains possible for 2016 to 2020 tax years, the 2016 through 2018 tax years are under audit and the 2019 and 2020 tax returns have not been filed. Dkt. 53 at 15-16. As such, the Monitor concluded that he "cannot determine whether some or all of the potential $37,840,599 in Site Preparation credits will become available." *Id*. at 16. Because neither of these credits are concrete or guaranteed, they should not be included in the current calculation of frozen assets.

Finally, the value of the non-project real estate assets listed in Xia's Financial Statement, Dkt. 19, relies solely on Xia's word as to the value of the properties. Moreover, many of these illiquid real estate assets are encumbered with liens. Dkt. 19.

As a result, the current asset freeze does not, as Defendants claim, "vastly exceed[ ] Defendants' potential liability." Defs.' Br. at 5. A freeze over all three mansions is necessary to

---

[4] As detailed in the SEC's Motion to Extend the Asset Freeze, Dkt. 100, Xia used the $10.9 million as collateral for a loan whose proceeds Xia used towards the purchase of two mansions in the names of Yue and Yu, respectively.

6

preserve the *status quo* as to these assets, pending the outcome of this litigation, for the benefit of Defendants' investor victims.[5]

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court grant the SEC's motion to extend the asset freeze, as set forth in its moving papers.

Dated: New York, New York
May 18, 2022

Respectfully submitted,

/s/ David Stoelting
_____
Kevin P. McGrath
David Stoelting
Kim Han
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-0174 (Stoelting)
stoeltingd@sec.gov

---

[5] Defendants accuse the SEC of engaging in "[d]erision and jealousy," "meaningless name-calling" and "cynical vitriol" for referring to the 26-room, 13,000-square foot Kings Point Road property, which includes a basketball court, as a "mansion." The photos, however, show that the word "mansion" is an accurate description. *See* Dkt. 101-32 (36 photos of Kings Point Road property).

7