UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          Plaintiff,<br><br>    -against-<br><br>RICHARD XIA, a/k/a YI XIA; and<br>FLEET NEW YORK METROPOLITAN REGIONAL CENTER, LLC, f/k/a FEDERAL NEW YORK METROPOLITAN REGIONAL CENTER, LLC;<br><br>          Defendants,<br><br>    -and-<br><br>JULIA YUE, a/k/a JIQING YUE, XI VERFENSTEIN, and XINMING YU,<br><br>          Relief Defendants. | 21 Civ. 5350 (PKC) |

### MOTION FOR APPROVAL OF RELEASE OF FUNDS
### FOR INSURANCE COVERAGE

  M. Scott Peeler, a partner at ArentFox Schiff LLP and the duly appointed Monitor in this action (the "Monitor"), hereby submits this Motion, with the consent of the SEC and the Defendants solely for the relief sought,[1] seeking the Court's authorization and the release of certain funds from frozen accounts of Defendants or the Xia Entities solely for the purpose of procuring insurance coverage for the construction projects located at 42-23 Union Street, Queens, New York

---

[1] Defendants informed the Monitor that they do not consent to or agree with any of the comments or characterizations in the motion papers, solely to the relief sought.

1

11355 ("Eastern Mirage")[2] and at 112-21 Northern Boulevard, Queens, New York 11368 ("Eastern Emerald") (collectively, the "Projects") as follows:

> i. **Commercial General Liability Insurance for Eastern Mirage.** A Commercial General Liability Policy in the amount of One Million Dollars ($1,000,000) each Occurrence, Two Million Dollars ($2,000,000) general aggregate limit, issued by Atlantic Casualty Insurance Company. There are $92,526.80 in premiums owed to Atlantic Coast Risk Services for one year of coverage. An Excess Liability Policy in the amount of Five Million Dollars ($5,000,000) each Occurrence and Five Million Dollars ($5,000,000) annual aggregate limit issued by StarStone National Insurance Company. There are $19,882.00 in premiums owed to Atlantic Coast Risk Services for one year of coverage.
>
> ii. **Commercial General Liability Insurance for Eastern Emerald.** A Commercial General Liability Policy in the amount of One Million Dollars ($1,000,000) each Occurrence, Two Million Dollars ($2,000,000) general aggregate limit, issued by Peleus Insurance Company. There are $40,027.04 in premiums owed to Atlantic Coast Risk Services for one year of coverage. An Excess Liability Policy in the amount of Five Million Dollars ($5,000,000) each Occurrence and Five Million Dollars ($5,000,000) annual aggregate limit issued by StarStone National Insurance Company. There are $9,924.00 in premiums owed to Atlantic Coast Risk Services for one year of coverage.

## A. THE NEED FOR COMMERCIAL GENERAL LIABILITY INSURANCE[3]

1. In order to properly mitigate certain risks associated with construction projects, it is standard practice to ensure valid, reliable, and adequate Commercial General Liability ("CGL") insurance (as well as other types of insurance when a project is active) is in place.[4] CGL insurance coverage is intended to protect an insured from bearing financial responsibility for unexpected and accidental damage to people or property. It protects covered parties from third-party claims for personal injury, wrongful death, and property damage arising from the construction project or property. It does not insure against faulty workmanship in the work product itself but rather faulty

---

[2] The Mirage Property is also known as 42-31 Union Street, Queens, New York 11355, but the New York City Department of Finance property tax records identify the address as 42-23 Union Street.

[3] As discussed in detail below, the Monitor is working on obtaining Builder's Risk insurance for Eastern Mirage. *See infra*, ¶ 12. Due to its preliminary stage of construction and until such time as its future is determined, we are not seeking a Builder's Risk policy for Eastern Emerald at this time.

[4] *See* Sarah B. Biser et al., 33 N.Y. Prac., New York Construction Law Manual § 10:6, Coverage (2d ed. 2021) (outlining the basic types of coverages maintained by most architects/engineers and contractors, including CGL).

workmanship in the work product which creates a legal liability by causing bodily injury or property damage to a third-party.

2. Based upon information and belief, there is a significant risk that the Projects are not currently covered by CGL insurance.[5]

3. It appears that X&Y Development Group, LLC ("X&Y") and Eastern Emerald Group LLC ("EEG") initially obtained CGL insurance through Fleet General Insurance Group, Inc. ("FGIG"), a Vermont entity created and controlled by Defendant Xia ("Xia"), to provide CGL insurance for the Projects.[6] Using this captive insurance company,[7] Xia's plan was to self-insure the Projects using investor funds to pay premiums.[8]

4. In December 2021, Xia provided the Monitor with undated and potentially inadequate cancelation notices of the CGL policies for the Projects.[9]

5. The Monitor immediately raised questions and concerns regarding the possibility that any insurance coverage might have lapsed and sought additional information from Defendants. In January 2021, Defendants submitted a proposal to release $1,493,471.85 in frozen funds to pay the annual premiums that would continue the CGL insurance and to procure $75 million of Builder's Risk insurance. The Monitor noted his concern that of that amount, $1,088,250.00 would be paid to FGIG, an entity controlled by Xia.

6. After careful consideration, including certain allegations raised in this Enforcement Action that Xia used and/or transferred investor funds to pay Xia Entities (which include FGIG),

---

[5] *See* Transcript of Order to Show Cause Hearing at 578:4-584:4, ECF No. 84-3. Despite requests for clarity on this point since December of last year, prior counsel for Defendant Xia confirmed as recently as the last week of April that FGIG policies have lapsed but can be reestablished with the payment of the requisite premium.
[6] SEC Amended Complaint ¶ 170, ECF No. 98.
[7] A captive insurance company is a wholly owned subsidiary insurer that provides risk-mitigation services for its parent company or a group of related companies.
[8] *See* Monitor 11(b) Report § II.F.(iii), ECF No. 53.
[9] *See* Transcript of Order to Show Cause Hearing at 623:18-22, ECF No. 84-3.

and observations of the Monitor and his team, the Monitor decided not to proceed with Defendants' request for the release of those funds at that time.

7. Following that decision, the Monitor's team began working to obtain proper CGL and Builder's Risk insurance coverage from independent, third-party insurance providers that sufficiently addresses the current needs of the Projects.[10]

8. Those efforts, however, have been complicated by several factors, including but not limited to: (a) Xia's failure to provide timely information, and to meaningfully assist our efforts; (b) the continuing, large number of violations issued against the Projects by New York City's Department of Buildings ("DOB"); (c) Defendants continuing to work on the Projects despite multiple stop work orders, the possibility that insurance coverage had lapsed, and known hazardous conditions on site which he failed to remediate despite multiple requests by the Monitor; and (d) a lack of interested independent insurance companies.[11]

## B. THE NEED FOR BUILDER'S RISK INSURANCE

9. It does not appear that the Defendants ever secured Builder's Risk insurance on the Projects.[12] Builder's Risk insurance covers physical loss or damage during construction. Traditionally, a Builder's Risk policy covers the insured against damage or loss to the project in the event of natural disasters, such as fires and storms, and certain other unforeseen circumstances.

---

[10] Another reason the Monitor has concerns about using FGIG are the allegations that its account was used to facilitate the purchase of a mansion. *See* SEC Amended Complaint ¶ 173, ECF No. 98.

[11] Many insurers were unwilling to issue policies on the Projects given the DOB's identification of "hazardous conditions" and Xia's failure to correct them. *See* Transcript of Order to Show Cause Hearing at 534:1-535:14, ECF No. 84-3. The Monitor notes that such DOB violations continue – the most recent of which was issued against Eastern Mirage on April 13, 2022.

[12] It appears that Defendants only began to pursue possible Builder's Risk insurance when as part of a $15 million loan, Emerald Creek Capital, LLC ("Emerald Creek") required it because Defendant Xia provided the lender a first priority lien against Eastern Mirage.

4

Most policies cover a construction project before it is ready for use or occupancy and terminate when the construction is completed and/or a certificate of occupancy is issued.

10. Builder's Risk insurance is typically secured at the beginning of a project, and it is highly unusual for a policy to be issued at the late stage of construction at Eastern Mirage.

11. As such, insurance carriers needed to conduct time-consuming supplementary due diligence before determining whether to provide premium quotes.

## C. CURRENT STATUS AND RECOMMENDATION

12. For each of the Projects, the Monitor reviewed with willing third-party insurance professionals the risks involved and what coverage they recommended. Only recently has the Monitor obtained sufficient proposals independent of the Defendants to recommend a course of action to the Court.

13. On or about April 21, 2022, the Monitor received quotes for CGL for both Projects and Builder's Risk Policies for Eastern Mirage at a substantially better price than Defendants proposed to the Monitor.[13] This coverage (a) was priced at hundreds-of-thousands of dollars less than Defendants' proposal; and (b) did not involve any premiums to FGIG. The Monitor updated all parties and began preparing a motion to release the necessary funds.

14. The policy documents and draft motion were provided to Xia, his prior counsel (Taher Kameli and Steven Burke), and the SEC. All parties gave their consent to proceed. As the Monitor was finalizing the motion, however, one insurance carrier rescinded its offer due to its concern for the elevated risk involved.[14]

15. The Monitor began a series of urgent conversations and negotiations – first to see if that insurance carrier would be willing to continue and then to find substitute coverage. On or

---

[13] *See supra*, ¶ 6.
[14] This company quoted the first of three layers of Builder's Risk insurance necessary for the $75 million in coverage.

about May 12, 2022, the Monitor was informed that the insurance broker found a new insurance carrier that was willing to provide the first layer of Builder's Risk insurance. The Monitor and his team are in negotiations with that carrier now and will proceed with the filing of that motion the moment the necessary coverage is assured in writing.

16. The Monitor did not want to delay on securing CGL insurance and all parties agree it is in the best interest of the investors to proceed at this time. The offers for the CGL policies are set to expire on or around June 17, 2022.

### D. PROPOSED ANNUAL CGL INSURANCE COVERAGE

17. As detailed below, the Monitor recommends that CGL insurance coverage of up to $5,000,000 for each Project is secured for a premium of $162,359.84 for one year of coverage.

*Proposed Coverage for Eastern Mirage*

18. Atlantic Casualty Insurance Company (A VIII) is offering to provide a CGL Policy to X&Y for Eastern Mirage of $1,000,000 each occurrence and $2,000,000 general aggregate limit. There is an annual premium of $92,526.80, inclusive of taxes and fees. StarStone National Insurance Company is offering to provide an Excess Liability Policy[15] of $5,000,000 for an annual premium of $19,882.00, inclusive of taxes and fees.

19. The insurer may require access to the Eastern Mirage property to conduct an inspection after the Policy is issued. The insurer may then require Defendants to comply with the insurer's requests to adhere to applicable codes, regulations, and laws.

20. This Policy does not cover prior construction or construction that occurs during the term of the Policy, but it would cover maintenance, repair, and safety work as required by the DOB. Also covered would be non-employee and non-contractor personal injury claims and

---

[15] Excess liability insurance adds an extra layer of protection for losses that exceed the limits of the main CGL policy.

property damage claims arising from the work in place and the current conditions of the Projects. For example, if an unrelated person walks by the site or breaks into the site and is injured, or if the work damages neighboring property, then the Policies would cover those events.

### *Proposed Coverage for Eastern Emerald*

21. Peleus Insurance Company is offering to provide a CGL Policy to Eastern Emerald Group LLC of $1,000,000 each occurrence and $2,000,000 general aggregate limit. There is an annual premium of $40,027.04, inclusive of taxes and fees. StarStone National Insurance Company is offering an Excess Liability Policy of $5,000,000 in exchange for an annual premium of $9,924.00, inclusive of taxes and fees.

22. The insurer may require access to the Eastern Emerald property to conduct an inspection after the Policy is issued. The insurer may then require Defendants to comply with the insurer's requests to adhere to applicable codes, regulations, and laws.

23. Like the CGL Policy for Eastern Mirage, this Policy does not cover prior construction or construction that occurs during the term of the Policy, but it would cover maintenance and safety repair work, as required by the DOB. Also covered would be non-employee and non-contractor personal injury claims and property damage claims arising from the work in place and the current conditions of the Project.

WHEREFORE, the Monitor respectfully requests that the Court grant the Monitor's Motion and issue an Order:

a. Directing Xia, on behalf of X&Y, for the Eastern Mirage Project, to sign pages 4, 8, 15, and 16 of Exhibit A to obtain a CGL Policy, no later than five (5) business days from the date of the Order, in the amounts of One Million Dollars ($1,000,000) each Occurrence, Two Million Dollars ($2,000,000) general aggregate limit, issued by Atlantic Casualty Insurance Company for premiums of $92,526.80 for one year of coverage paid to Atlantic Coast Risk Services.

b. Directing Xia, on behalf of X&Y, to sign pages 4, 10, and 17 of Exhibit B for the Eastern Mirage Project, to obtain an Excess Liability Policy, no later than five (5)

    business days from the date of the Order, in the amounts of Five Million Dollars ($5,000,000) each Occurrence, and Five Million Dollars ($5,000,000) annual aggregate limit, issued by StarStone National Insurance Company for premiums of $19,882.00 for one year of coverage paid to Atlantic Coast Risk Services.

c. Directing Xia, on behalf of EEG, for the Eastern Emerald Project, to sign 4, 8, 16, 19 and 20 of Exhibit C to obtain a CGL Policy, no later than five (5) business days from the date of the Order, in the amounts of One Million Dollars ($1,000,000) each Occurrence, Two Million Dollars ($2,000,000) general aggregate limit, issued by Peleus Insurance Company for premiums of $40,027.04 for one year of coverage paid to Atlantic Coast Risk Services.

d. Directing Xia, on behalf of EEG, for the Eastern Emerald Project, to sign 4, 10, 17, and 18 of Exhibit D to obtain an Excess Liability Policy, no later than five (5) business days from the date of the Order, in the amounts of Five Million Dollars ($5,000,000) each Occurrence, and Five Million Dollars ($5,000,000) annual aggregate limit, issued by StarStone National Insurance Company with premiums of $9,924.00 for one year of coverage paid to Atlantic Coast Risk Services.

e. Directing Defendants to have X&Y pay $112,408.80, the funds required to satisfy all premiums due for one year, to Atlantic Coast Risk Services from Defendant's Eastern Emerald Group LLC account, ending in 0808, no later than five (5) business days from the date of the Order and provide contemporaneous proof of payment to the Court, SEC, and the Monitor.

f. Directing Defendants to have EEG pay $49,951.04, the funds required to satisfy all premiums due for one year, to Atlantic Coast Risk Services from Defendant's Eastern Emerald Group LLC account, ending in 0808, no later than five (5) business days from the date of the Order and provide contemporaneous proof of payment to the Court, SEC, and the Monitor.

Dated: May 25, 2022            Respectfully submitted,

                                                       ARENTFOX SCHIFF LLP

                                                       By: s/ M. Scott Peeler
                                                          M. Scott Peeler
                                                          1301 Avenue of the Americas, 42nd Floor
                                                          New York, New York 10019
                                                          Tel: (212) 484 3900
                                                          Fax: (212) 484-3990
                                                          scott.peeler@afslaw.com

                                                          *Court Appointed Monitor*