**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE
COMMISSION,

                            Plaintiff,

        v.

RICHARD XIA, a/k/a YI XIA, et al.,

                         Defendants,

        and

JULIA YUE, a/k/a JIQUING YUE, et al.,

                    Relief Defendants.

No. 21-cv-05350-PKC-RER

**JURY TRIAL DEMANDED**

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**<u>THEIR MOTION TO VACATE OR MODIFY ASSET FREEZING ORDER</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND .............................................................................................. 3

LEGAL ARGUMENT ....................................................................................................... 7

    A.      The SEC is Not Entitled to Freeze More than $229 Million in Assets .......................... 7

    B.      Defendants Must be Given Credit for $318 Million in Reasonable
             Business Expenses They Have Incurred ..................................................................... 10

    C.      The Freeze Order Must Be Reduced Because Nearly All of the
             SEC's Claims Are Time-Barred ................................................................................. 17

CONCLUSION ................................................................................................................. 24

# TABLE OF CITATIONS

## CASES
Page(s)

*Aristidou v. Aviation Port Services., LLC*,
No. 18-CV-4040 (MKB) (RER),
2020 U.S. Dist. LEXIS 31348 (E.D.N.Y. Feb. 21, 2020)...........................................10

*Benthos Master Fund, Ltd. v. Etra*,
No. 1:20-cv-03384 (AJN) (KHP),
2022 U.S. Dist. LEXIS 45144 (S.D.N.Y. Mar. 14, 2022) .........................................10

*Bowen v. Georgetown University Hospital*,
488 U.S. 204 (1988)..............................................................................................19, 22

*Charas v. Sand Technology Systems International, Inc.*,
90 Civ. 5638 (JFK),
1992 U.S. Dist. LEXIS 15227 (S.D.N.Y. Oct. 7, 1992) .......................................13, 14

*Chemical Bank v. Arthur Andersen & Co.*,
726 F.2d 930 (2d Cir.),
 *cert. denied*, 469 U.S. 884 (1984) ..............................................................................13

*Diaz v. Johnson & Johnson*,
No. 19-CV-6929 (LJV) (MWP),
2021 U.S. Dist. LEXIS 137083 (W.D.N.Y. July 22, 2021).........................................21

*In re Enterprise Mortgage Acceptance Co. Securities Litigation*,
391 F.3d 401 (2d Cir. 2004)...................................................................19, 20, 22, 23

*Kokesh v. SEC*,
137 S. Ct. 1635 (2017)................................................................................................18

*Landgraf v. Usi Film Products*,
511 U.S. 244 (1994).........................................................................................19, 22, 23

*Liu v. SEC*,
140 S. Ct. 1936 (2020).......................................................................................*passim*

*Marine Bank v. Weaver*,
455 U.S. 551 (1982).....................................................................................................13

*SEC v. Callahan*,
No. 12-CV-1065 (ADS) (AYS),
2015 U.S. Dist. LEXIS 178114 (E.D.N.Y. Dec. 24, 2015) ....................................15, 24

*SEC v. Cioffi*,
   868 F. Supp. 2d 65 (E.D.N.Y. 2012) ..................................................................17

*SEC v. Curative Biosciences*,
   No. 8:18-cv-00925-SVW,
   2020 U.S. Dist. LEXIS 246382 (C.D. Cal. Oct. 22, 2020)....................................11

*SEC v. Drexel Burnham Lambert, Inc.*,
   837 F. Supp. 587 (S.D.N.Y. 1993)......................................................................22

*SEC v. Genovese*,
   553 F. Supp. 3d 24 (S.D.N.Y. 2021)....................................................................11

*SEC v. Microtune, Inc.*,
   783 F. Supp. 2d 867 (N.D. Tex. 2011) ................................................................18

*SEC v. Sason*,
   433 F. Supp. 3d 496 (S.D.N.Y. 2020)..................................................................18

*SEC v. Unifund Sal*,
   910 F.2d 1028 (2d Cir. 1990)....................................................................15, 16, 24

*SEC v. Zandford*,
   535 U.S. 813 (2002)............................................................................................13

*Superintendent of Insurance v. Bankers Life & Casualty Co.*,
   404 U.S. 6 (1971)................................................................................................13

*United Housing Foundation, Inc. v. Forman*,
   421 U.S. 837, 852 (1975)....................................................................................13

*United States v. O'Hagan*,
   521 U.S. 642 (1997)............................................................................................13

*United States v. Zaslavskiy*,
   No. 17-CR-647(RJD),
   2018 U.S. Dist. LEXIS 156574 (E.D.N.Y. Sep. 11, 2018).....................................13

*United States SEC v. Ahmed*,
   No. 3:15cv675 (JBA),
   2018 U.S. Dist. LEXIS 242717 (D. Conn. Mar. 26, 2018)...........................15, 16, 23

*Weingarten v. United States*,
   865 F.3d 48 (2d Cir. 2017)........................................................................19, 22, 23

## STATUTES & RULES

Fed. R. Civ. P. Rule 37 ................................................................................................9

National Defense Authorization Act for Fiscal Year 2021,
Pub. L. No. 116-283, codified in part at 15 U.S.C. § 78u(d)(8)(A) ("NDAA") ................... *passim*
   Section 6501 .........................................................................................................20
   Section 6501(b) .....................................................................................................20

Sarbanes–Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745
codified in part at 28 U.S.C. § 1658(b) ..............................................................19, 20
   Section 804(1) .................................................................................................19, 20

Securities Act of 1933, 15 U.S.C. § 77a, *et seq.* ("Securities Act")
   15 U.S.C. § 77q(a) ("Section 17(a)") ............................................................3, 13

Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*
   15 U.S.C. § 78j(b) ("Section 10(b)") .........................................................3, 13, 18

28 U.S.C. § 2462 .....................................................................................................18

17 C.F.R ¶ 240.10b-5 ("Rule 10b-5") ........................................................................3

Defendants, Richard Xia ("Xia") and Fleet New York Metropolitan Regional Center, LLC ("Fleet"), and Relief Defendant Julia Yue ("Yue"), by and through their undersigned counsel, hereby submit this Memorandum of Law in Support of Their Motion to Vacate or Modify Asset Freezing Order.

## INTRODUCTION

On September 27, 2021, the SEC sought a temporary restraining order (the "Asset Freezing Order") freezing Defendants' assets "***up to the amount of $229 million***." ECF Nos. 2, 2-1, and 8 ¶ 2(a) at 2 (emphasis added). In presenting their one-sided version of the facts, the SEC claimed that an order freezing Defendants' assets ***up to the amount of $229 million*** was "necessary . . . to protect this Court's ability to award equitable relief in the form of disgorgement of illegal profits from securities law violations and ***civil*** penalties." ECF No. 8 at 4 (proposed TRO) (emphasis added). The Court entered the Asset Freezing Order at 6:30 p.m. that day, freezing Defendants' assets "***up to the amount of $229 million***" – exactly as the SEC asked. ECF No. 95-1, ¶ 2(a) at 2 (emphasis added). Despite the cap in the Asset Freezing Order (which the SEC requested), the SEC now claims to hold ***nearly $774 million in frozen assets*** – including approximately $76 million in cash, $585 million in "as-is" real property on Union Street and Northern Boulevard in Queens, $84 million in earned tax credits, approximately $11 million in Defendants' two pre-EB-5 income-producing properties, and more than $18 million in Mr. Xia's personal real estate.

At a settlement conference with the Court on June 28, 2022, Defendants asked the SEC to consent to release just the pre-EB-5 properties from the Asset Freezing Order. Had the SEC consented to Defendants' modest request, it still would hold ***$763 million*** in frozen assets – more than ***three times*** as much as the total amount contributed by the EB-5 visa investors in both projects and ***$534 million more*** than was frozen by the Asset Freezing Order. The SEC has refused Defendants' request, stubbornly insisting it is entitled to freeze ***all*** of Defendants' assets despite

1

the cap in the Asset Freezing Order. Plainly, the SEC is not entitled to freeze Defendants' assets *above* the cap of $229 million provided for – at the SEC's request – in the Asset Freezing Order (ECF No. 95-1, ¶ 2(a) at 2).

Moreover, under controlling Supreme Court precedent in *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020), which requires the SEC to credit Defendants for their reasonable business expenses, the SEC is not entitled to *any* asset freeze at all because Defendants already have incurred reasonable expenses *far above* the total amount contributed by all the EB-5 visa investors in both projects. As discussed below and shown in detail in the accompanying Declaration of Michael Amideo ("Amideo Decl."), the independent financial analyst retained to reorganize and standardize Defendants' internal financial controls and business recordkeeping practices, ***Defendants have contributed more than $65.4 million of their own cash to both Projects***: $35.8 million to the Mirage Project and $29.6 million to the Eastern Emerald Project. In addition to their cash contributions, ***Defendants have deferred more than $97.4 million in professional fees and rent to which they are contractually entitled***: $70.7 million for the Eastern Mirage Project and $26.7 million for the Eastern Emerald Project. Before the Asset Freezing Order was entered, ***Defendants incurred nearly $308 million in reasonable business expenses for both Projects***, including ***$108 million in hard costs*** for Eastern Mirage and ***$139 million in hard costs*** for Eastern Emerald. They have incurred $141.5 million for the Eastern Mirage Project and $165.3 million for the Eastern Emerald Project. To date, Defendants have incurred a ***net loss*** on both projects.

Despite losing *Liu* in the Supreme Court, the SEC concealed these facts from the Court in seeking an asset freeze "up to the amount of $229 million." The asset freeze ***does not give Defendants any credit to which they are entitled for those reasonable business expenses***. To say nothing of the SEC's arrogant insistence on ***ignoring*** the cap of $229 million in the Asset Freezing

Order, when Defendants' reasonable business expenses are taken into consideration – as they must be under *Liu* – the Asset Freezing Order should be vacated, or certainly modified to reflect Defendants' reasonable business expenses already incurred on both Projects.

Following three years of investigation, the SEC did not even attempt to estimate the reasonable expenses or net profits earned when it sought its extraordinary *ex parte* relief which froze **all** of Defendants' assets and put a halt to two major construction projects directly harming the "investors" the SEC claims to protect. If the SEC properly accounted to the Court for Defendants' ***$308 million in costs for both Projects*** as it should have under *Liu*, the Asset Freezing Order never would have been entered. By now, the Eastern Mirage Project – which was at least 80% complete when the Asset Freezing Order was entered – would have been finished, the 20-story mixed-use building would be leased and producing revenue, and all those EB-5 visa investors would have been repaid. And work on the Eastern Emerald Project would be well underway.

Finally, nearly all of the SEC's claims against Defendants were ***time-barred and extinguished*** under the applicable five-year statute of limitations long before the SEC commenced this action and long before Congress extended the statute of limitations in 2021. At most, as shown below, the SEC has timely claims for only 84 investors in one of the five partnerships at issue. If it is not vacated entirely, the Asset Freezing Order should be modified to reflect the fact that most of the SEC's claims are untimely.

<u>**FACTUAL BACKGROUND**</u>

After investigating Defendants' business activities for three years, the SEC commenced this civil enforcement action on September 27, 2021, accusing Defendants of violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. ¶ 240.10b-5. ECF No. 1. The alleged violations relate to the way Defendants have operated the partnerships

responsible for two real estate projects in Queens – the Eastern Mirage Project at 42-31 Union Street and the Eastern Emerald Project at 112-21 Northern Boulevard – with $228.5 million raised from 457 EB-5 visa investors seeking permanent residency in the United States. *Id.*

On that same day, the SEC filed an emergency *ex parte* application seeking an order appointing a monitor and a temporary restraining order freezing Defendants' assets "***up to the amount of $229 million***." ECF Nos. 2, 2-1, and 8 ¶ 2(a) at 2 (emphasis added). In seeking the Asset Freezing Order, the SEC presented a heavily skewed, one-sided version of the facts and argued that an order freezing Defendants' assets ***up to the amount of $229 million*** was "necessary . . . to protect this Court's ability to award equitable relief in the form of ***disgorgement*** of illegal profits from securities law violations and ***civil penalties***." ECF No. 8 at 4 (proposed TRO) (emphasis added).

The Court granted the SEC's emergency *ex parte* application and entered the Asset Freezing Order at 6:30 p.m. that same day, freezing Defendants' assets "***up to the amount of $229 million***" – capping the asset freeze exactly as the SEC requested. ECF No. 95-1, ¶ 2(a) at 2 (emphasis added). In doing so, the Court implicitly accepted the SEC's *ex parte* argument that freezing Defendants' assets ***up to the amount of $229 million*** would protect the Court's ability to award any disgorgement of illegal profits and impose any civil penalties that the SEC might be able to achieve if it prevails on the merits. ECF No. 95-1 at 4 (emphasis added).

Before the Asset Freezing Order was entered, ***Defendants had already contributed more than $31.6 million of their own cash to both Projects***.[1] Amideo Decl., ¶ 9 and Ex. A § 1. In

---

[1] The SEC has made much of the fact that Mr. Xia withdrew $14 million from the Projects to purchase a family home in Oyster Bay – hardly the best way for an alleged fraudster to abscond with allegedly ill-gotten gains. In fact, Defendants have contributed ***three times more in cash*** than Mr. Xia withdrew to buy the home. Undoubtedly, Mr. Xia was entitled to that payment for the years of service he already had provided to both projects. Moreover, it is noteworthy that Mr. Xia

addition to contributing cash to both Projects, Defendants also paid ***$16.7 million in cash*** to acquire the land at 42-31 Union Street for the Eastern Mirage Project[2] and ***$17 million in cash*** to purchase the land at 112-21 Northern Boulevard. *Id*. at ¶¶ 10-14 and Ex. A § 1. Defendants' ***$65.3 million*** in total cash and land contributions were ***in addition*** to the $228.5 million received from the EB-5 visa investors. *Id*. at ¶¶ 9-14 and Ex. A § 1.

Defendants also have incurred significantly more reasonable business expenses for the Eastern Mirage and for Eastern Emerald Projects than just their cash contributions. Before the Asset Freezing Order was entered, ***Defendants had incurred a total of more than $247 million in hard business costs for both Projects***. Amideo Decl., ¶ 18 and Ex. A § 2.

In addition to the $16.7 million in cash Defendants paid for the land on Union Street, they also spent $91.3 million for construction costs[3] and $16.7 million in deferred developer costs for the Eastern Mirage Project.[4] Amideo Decl., ¶¶ 18-19 and Ex. A § 2. Leaving apart the ground lease rent they have deferred, Defendants' hard business expenses incurred to date, including $16.7 million in cash paid for the land and $91.3 million for construction, are $108.1 million for the

---

had been negotiating the purchase of the home ***for years*** before buying it in 2021 and that he signed the sales contract a month ***before*** receiving the SEC's Wells notice advising him that the SEC's staff had "made a preliminary determination to recommend that the Commission file an enforcement action against" him. *See* Declaration of Mark C. Rifkin in Support of Defendants' Motion to Vacate or Modify Asset Freeze ("Rifkin Decl.") filed herewith, ¶¶ 5-6 & Ex. C thereto.

[2] The land on Union Street on which the Eastern Mirage Project is built is owned by E&Y Development Group ("E&Y") and is leased to Fleet for 99 years. To date, Defendants have not received any rent for the land; they have deferred $53.9 million in land lease payments to which E&Y is contractually entitled. *See* Amideo Decl., ¶ 12 and Ex. A § 2.

[3] Defendants have nearly completed construction of the 348,000 square foot, 20-story building at a cost of just $262.36 per square foot, just one-half of the average direct cost of approximately $500 per square foot for construction in New York City. *See* Rifkin Decl., Ex. A at 250.

[4] Defendants have deferred a total of $70.6 million in rent ($53 million) and developer fees ($16.7 million) on the Eastern Mirage Project to which they are entitled. *See* Amideo Decl., ¶¶ 12, 16 & 17. The $70.6 million in deferred rent and developer fees on the Eastern Mirage Project is ***five times more*** than the $14 million Mr. Xia withdrew to purchase the Long Island home.

Eastern Mirage Project. *Id.* ¶¶ 18-19 and Ex. A § 2. Defendants received only $56 million from the EB-5 visa investors for the Eastern Mirage Project. Their hard expenses ***exceed*** the amount contributed by the Eastern Mirage investors by ***$52.1 million***. *Id.* at ¶ 21 and Ex. A § 3.[5]

Likewise, in addition to paying $17 million in cash for the land on Northern Boulevard,[6] Defendants also have incurred $104.5 million in site improvement costs[7] and $17.5 million in deferred developer costs.[8] Amideo Decl., ¶¶ 18-19 and Ex. A § 2. Thus, Defendants' hard business expenses incurred to date are $139.0 million for the Eastern Emerald Project. *Id.* at ¶¶ 18-19 and Ex. A § 2. They received $172.5 million from EB-5 visa investors for the Eastern Emerald Project. Of that sum, $75.8 million remains on deposit at CTBC. *Id.* at ¶ 10. Thus, after excluding the cash on hand, Defendants' hard business expenses ***exceed*** the amount contributed by the Eastern Emerald EB-5 visa investors and used for project-related expenses[9] by $42.3 million. *Id.* at 21 and Ex. A § 3.[10]

---

[5] Adding the additional deferred developer fees of $17.5 which Defendants claim for the Eastern Mirage Project, their total reasonable business expenses for Eastern Mirage are $124.8 million. *See* Amideo Decl., ¶¶ 16 & 18. These total expenses exceed the amount contributed by the EB-5 visa investors by $68.8 million.

[6] Defendants paid $17 million in cash to acquire the property on Northern Boulevard for the Eastern Emerald Project. Amideo Decl., ¶ 11 and Ex. A § 1.

[7] Defendants have spent $104.5 million for clean-up of the site contamination, for which they earned $84 million in Brownfield tax credits. Amideo Decl., ¶ 18 and Ex. A § 2. The Brownfield tax credits belong to Defendants, who have contributed them to EEGH and EEGH II. Id., Ex. A § 5.

[8] Pursuant to the Private Offering Memorandum for EEGH, Defendants are entitled to management fees of $11.7 million to date. Pursuant to the Private Offering Memorandum for EEGH II, they are entitled to management fees of $5.6 million to date. Amideo Decl., ¶ 15; Rifkin Decl., Ex. C § 7.2.

[9] Excluding the $74.9 million still on deposit at CTBC from the $172.5 million paid by the EB-5 visa investors leaves the sum of $97.6 million capital contributed and used by the EB-5 visa investors.

[10] Adding the additional deferred developer fees of $9.5 million which Defendants claim for the Eastern Emerald Project, their total reasonable business expenses for Eastern Emerald are $148.3

The real estate for both Projects recently was appraised by Colliers International Valuation & Advisory Services, a division of Colliers, a publicly traded and highly respected international commercial real estate and investment advisor, for a potential lender for both Projects. Copies of the two Colliers appraisal reports are attached as Exhibits A and B to the accompanying Rifkin Decl. Colliers has determined three different appraised values for each property: the "as-is" market value, the "as completed" value, and the "stabilized" value. Those appraised values[11] are as follows:

|  | Eastern Mirage | Eastern Emerald | Combined Value |
| --- | --- | --- | --- |
| As-Is Value | $314,600,000 | $270,200,200 | $584,800,000 |
| As Completed Value | $318,000,000 | $632,600,000 | $950,600,000 |
| Stabilized Value | $345,950,000 | $680,900,000 | $1,026,850,000 |

The appraisals were prepared by one of the nation's most highly respected independent consultants acting for a sophisticated commercial lender prepared to invest hundreds of millions of dollars in both Projects. They were not prepared by or for Defendants; nor were they prepared in connection with any litigation. The SEC disputes these valuations; in fact, the SEC disputes *any* valuation of the real property. After three years of investigating Defendants before commencing suit and after a year of litigation, the SEC cannot – or more likely, it *will not* – place any value on the real estate.

## LEGAL ARGUMENT

### A. The SEC is Not Entitled to Freeze More than $229 Million in Assets

The Asset Freezing Order expressly caps the amount of assets that have been frozen. It

---

million. *See* Amideo Decl., ¶¶ 17-18. Net of the cash still on hand, these total expenses exceed the amount contributed by the EB-5 visa investors by $51.8 million.

[11] Colliers has appraised values on two assumptions: one assuming that the planned residential properties are held as rental properties and the other that the residential properties are sold as condominiums. For purposes of this memorandum, Defendants conservatively include only the appraisals based upon the rental assumption, which yields slightly lower appraised values.

provides that Defendants' assets are frozen only "***up to the amount of $229 million.***" ECF No. 95-1, ¶ 2(a) at 2 (emphasis added). That is ***exactly the cap proposed by the SEC*** when it sought the Asset Freezing Order. ECF No. 8 at 4 (proposed TRO). Nonetheless, the SEC insists it is entitled to freeze ***all*** of Defendants' assets as though the cap were not in the Asset Freezing Order.[12]

By even the most conservative estimates – those provided by the Monitor – the SEC froze ***at least $317 million in assets***: (i) $80,919,508.43 in cash; (ii) Brownfield tax credits of between $18,920,299.50 and $37,840,599.00; (iii) tangible property credits of between $17,500,000 and $35,000,000; (iv) real estate on Union Street in Queens with an "as-is" value between $149,000,000 and $177,000,000; and (v) real estate on Northern Boulevard with an "as-is" value between $51,000,000 and $59,000,000. *See* Monitor's Report to the Court Pursuant to Paragraph 11(b) of the Monitor Order, dated January 28, 2022 (ECF No. 53), at 27-28. Significantly, the Monitor did ***not*** include any of Defendants' pre-EB-5 rental properties, which have a combined value of approximately $11 million, in its list of "current and potential sources of funds and assets which could be used to complete the projects, pay legitimate costs and expenses, and reimburse the investors." *Id*. at 13-28. Those pre-EB-5 rental properties were disclosed by Mr. Xia in his sworn Affidavit of Richard Xia Regarding Court-Ordered Accounting filed on October 18, 2021. ECF No. 19-1 (filed under seal). Nonetheless, the Monitor chose not to include them in the assets

---

[12] The SEC originally claimed it was entitled to freeze ***all*** the Defendants' assets because the cap in the Asset Freezing Order pertained ***only to liquid assets*** (by which they mean cash), not to real estate – which, after three years of investigation and nearly a year of litigation, the SEC apparently believes has ***no value whatsoever***. Such limiting language does not appear in the Asset Freezing Order. Alternatively, the SEC claims it is entitled to ignore the cap in the Asset Freezing Order because the sum of $229 million – which it proposed – is insufficient to cover Defendants' potential liability for disgorgement plus civil fines and penalties. It does so without considering either the limit on its ability to obtain disgorgement under *Liu* (by ignoring the enormous costs Defendants have incurred to date) or the limit on its ability to recover civil fines and penalties. In fact, the SEC never will be able to recover anything even close to $229 million in this case.

he listed as available to complete the projects, pay legitimate costs and expenses, and reimburse the investors.

According to the appraisals recently prepared by Colliers for the C-PACE lender, the SEC actually holds ***nearly $774 million in frozen assets***:

- Approximately $75.8 million in cash on hand (as to which there is no dispute)
- $84 million in Brownfield Tax Credits (which are already earned)
- $314.6 million for the "as-is" value of the Union Street property (including the nearly complete 20-story mixed-use building)
- $270.2 million for the "as-is" value of the Northern Boulevard property (including the substantial site preparation work)
- $11 million in pre-EB-5 rental properties
- $18 million in personal real estate

Rifkin Decl., Exs. A & B; Amideo Decl., ¶ 10. Under any measure – whether the Monitor's ultra-conservative estimates or the more recent professional appraisals prepared for a potential lender by a highly respected independent appraiser are used – the SEC is ***grossly over-secured*** and substantially in violation of the express cap in the Asset Freezing Order.

The SEC denies the values in both the Monitor's report and those from Colliers. However, the Monitor's conservative estimates and Colliers's appraised values are the ***only*** valuations of the real estate before the Court. ***SEC has not put any value of its own on the properties***. The SEC insists that both properties are subject to the Asset Freezing Order, but ***it will not recognize any value in either property***. If the SEC demands that the properties are subject to the Asset Freezing Order, it must recognize that the properties have value. On the other hand, if the SEC refuses to recognize that the properties have ***any*** value, then it should agree to release those "worthless" properties to Defendants forthwith. The SEC cannot have it both ways.

It is beyond dispute that all parties are bound by the Court's orders. Indeed, Federal Rule of Civil Procedure 37 permits a court to sanction a party who refuses to comply with its orders.

*Aristidou v. Aviation Port Servs., LLC*, No. 18-CV-4040 (MKB) (RER), 2020 U.S. Dist. LEXIS 31348, at *34 (E.D.N.Y. Feb. 21, 2020). A party "cannot pick and choose which aspects of a Court order he wishes to comply with." *Benthos Master Fund, Ltd. v. Etra*, No. 1:20-cv-03384 (AJN) (KHP), 2022 U.S. Dist. LEXIS 45144, at *34 (S.D.N.Y. Mar. 14, 2022). Like any other party, the SEC cannot choose which terms of the Asset Freezing Order it wants enforced and which it deems superfluous. This is certainly no less so – and perhaps more so – when the party proposes the very terms with which it later refuses to comply.

Presumably, when the SEC sought the Asset Freezing Order – which it said was "necessary . . . to protect this Court's ability to award equitable relief in the form of disgorgement of illegal profits from securities law violations and civil penalties" – and proposed the cap of "***up to the amount of $229 million***," ECF No. 8 at 4 (emphasis added), it was satisfied that $229 million was sufficient protection. The SEC got exactly what it asked for: the Court froze Defendants assets "up to the amount of $229 million." The SEC is bound by the terms of the Asset Freezing Order just as Defendants are bound by it. The SEC can no more ignore its terms than Defendants could.

The Court should enforce compliance with the Asset Freezing Order and release all of Defendants' frozen assets to the extent they exceed the amount of $229 million.

### B. Defendants Must be Given Credit for $318 Million in Reasonable Business Expenses They Have Incurred

In *Liu*, 140 S. Ct. at 1940, the Supreme Court held that an SEC disgorgement recovery may ***not*** exceed the wrongdoer's "net profits." In that case, the defendants solicited nearly $27 million from foreign investors, promising that the bulk of the proceeds would be used to build a cancer-treatment center. *Id*. at 1941. They spent nearly $20 million on marketing expenses and salaries, not to build the medical center. *Id*. "Only a fraction of the funds were put toward" construction. *Id*. at 1942. The district court ordered disgorgement of the ***full amount*** the defendants raised from

the investors and imposed civil penalties, which the Ninth Circuit affirmed. *Id*. at 1942. The Supreme Court vacated the decision, holding that "Congress prohibited the SEC from seeking an equitable remedy in ***excess of a defendant's net profits from wrongdoing***." *Id*. at 1946 (emphasis added).

Consistent with *Liu*, a "disgorgement award may not 'exceed the gains made upon any business or investment,' ***[after] excluding legitimate business expenses***." *SEC v. Genovese*, 553 F. Supp. 3d 24, 47 (S.D.N.Y. 2021) (quoting *Liu*, 140 S. Ct. at 1949-50) (emphasis added). To ensure that disgorgement orders fall within the traditional contours of equitable relief, the Supreme Court directed district courts to deduct "legitimate business expenses" from the award. *SEC v. Curative Biosciences*, No. 8:18-cv-00925-SVW, 2020 U.S. Dist. LEXIS 246382, at *15 (C.D. Cal. Oct. 22, 2020).

The SEC recognizes – and implicitly concedes – the limit on its ability to obtain disgorgement. The SEC said the Asset Freezing Order was "necessary . . . to protect this Court's ability to award equitable relief in the form of disgorgement ***of illegal profits*** from securities law violations and ***civil*** penalties." ECF No. 8 at 4 (proposed TRO) (emphasis added). "Profit" is the amount by which revenue exceeds expenses. When expenses exceed revenue, as is the case here, there is a net ***loss***, not a net profit.

The SEC commenced this action more than a year ***after*** losing *Liu* in the Supreme Court. Despite the clear holding in *Liu* – which the SEC lost – despite conceding that its disgorgement claim is limited just to Defendants' "illegal profits," and after three years of exhaustive investigation, the SEC did ***not*** account for Defendants' legitimate business expenses and made ***no showing*** of Defendants' "net profits" from the Eastern Mirage and Eastern Emerald Projects. Indeed, the SEC did not even ***attempt*** to do so. The cap of $229 million in the emergency *ex parte*

relief the SEC sought and obtained – "freezing Defendants' assets ***up to the amount of $229 million***" – is simply the total amount contributed by the EB-5 visa investors in both projects. That is not the measure of disgorgement or anything close to it.

That Defendants have paid $318 million in reasonable business expenses – including $48.6 million in cash which they contributed to both Projects and $97.4 million in deferred rent, fees, and other compensation to which they are contractually entitled – to build the 20-story mixed-use building on Union Street and to clean and prepare the construction site on Northern Boulevard does not fit the SEC's theory of the case. The SEC has tried to convince the Court that Defendants lacked both the ability and the intention to complete either construction project. Despite the SEC's effort, however, the Court recognized that Defendants care greatly to complete both Projects and have demonstrated their ability to do so. Tr. Feb. 16, 2022 at 663:11-17.

The innovative and nearly completed 20-story mixed-use building on Union Street is direct and persuasive evidence of Defendants' intention and ability to complete the work. Significantly, in its "as-is" appraisal of the Union Street property, Colliers has put a value of $46.8 million on the land at 42-31 Union Street. *See* Rifkin Decl., Ex. A at 255. The as-is valuation of the land strongly supports the reasonableness of Defendants' $17 million in acquisition costs for the Union Street property. Colliers also put a value of $267.7 million on the building alone (which it estimates to be approximately 90% complete). *See id*. The as-is valuation of the building likewise strongly supports the reasonableness of Defendants' $91.2 million in construction costs for the Eastern Mirage Project.

Similarly, in its "as is" appraisal of the Northern Boulevard property, Colliers has put a value of $101,750,000 on the land at 112-21 Northern Boulevard. *See* Rifkin Decl., Ex. B at 226. The as-is land valuation reflects the enormous amount of clean-up and excavation work

Defendants have performed at the site. The land valuation and the $84 million of Brownfield tax credits together strongly support the reasonableness of Defendants' $17 million in acquisition cost and their $112 million in remediation costs for the Eastern Emerald Project.

The SEC cannot ignore any of these facts just because they do not fit its fanciful narrative.

Apart from the fact that the EB-5 visa investments at issue in this case are ***not*** securities (and thus ***not*** subject to the SEC's enforcement authority)[13] and the fact that the alleged misconduct was ***not*** "in connection with" the purchase of any securities (and thus ***not*** actionable under the federal securities laws),[14] the SEC did ***nothing*** to demonstrate that it was entitled to freeze up to

---

[13] In all enforcement actions, the SEC must first demonstrate that the federal securities laws are applicable. That means the alleged wrongdoing "must involve a 'security.'" *See United States v. Zaslavskiy*, No. 17-CR-647(RJD), 2018 U.S. Dist. LEXIS 156574, at *12 (E.D.N.Y. Sept. 11, 2018). In *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852 (1975), the Supreme Court held that a security must involve "the presence of an investment in a common venture ***premised on a reasonable expectation of profits*** to be derived from the entrepreneurial or managerial efforts of others." (Emphasis added.) Like the shareholder-tenants in *Forman*, who sought decent housing at an affordable price, the EB-5 visa applicants in this case invested primarily to qualify for permanent residence through the EB-5 program, not to earn a profit. Therefore they are ***not*** investors in "securities" subject to liability under either Section 17 of the 1933 Act or Section 10(b) of the 1934 Act. They had no reasonable expectation of profit from their "investments," and those investments are not securities. Because they are not securities, the SEC has no claim against Defendants. *See* 15 U.S.C. § 77q(a) ("unlawful for any person in the offer or sale of any ***securities*. . .") (emphasis added); 15 U.S.C. § 78j(b) ("unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any ***security*. . .") (emphasis added).

[14] When it enacted the federal securities laws, Congress "did not intend to provide a broad federal remedy for all fraud." *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982). Instead, those statutes only apply to misrepresentations that are made "in connection with" a securities transaction. *See SEC v. Zandford*, 535 U.S. 813, 819 (2002) (misappropriation of cash); *United States v. O'Hagan*, 521 U.S. 642, 656 (1997); *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 8 (1971) (misappropriation of cash). To satisfy the "in connection with" requirement, the alleged misrepresentation or omission must pertain to the securities themselves. Allegations of fraud merely involving the securities do not satisfy the requirement. *See Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir.), *cert. denied*, 469 U.S. 884 (1984).

In *Charas v. Sand Tech. Sys. Int'l, Inc.*, 90 Civ. 5638 (JFK), 1992 U.S. Dist. LEXIS 15227, at *22-23 (S.D.N.Y. Oct. 7, 1992), the Southern District dismissed a 10b-5 claim, holding:

> The misdeeds allegedly committed by Defendants generally bear no connection to the sale of Sand's securities. . . . The Amended Complaint alleges that Shattner and Ritchie

$229 million of Defendants' assets. The SEC simply – and lazily – used that sum as the cap because it was the total amount invested by the EB-5 visa applicants in both Projects. The SEC did not, as *Liu* requires, give Defendants credit for ***any*** of the reasonable business expenses they have incurred to date to bring both real estate development projects to fruition.

Even a cursory review of Defendants' records would have shown the SEC that ***Defendants already have contributed more than $48.6 million in cash to both Projects*** – $19.1 million to the Mirage Project and $29.6 million to the Eastern Emerald Project – ***above*** the $229 million received from the EB-5 investors. The SEC would have seen that, before the Asset Freezing Order was entered, ***Defendants already incurred more than $318 million in project costs for both Projects***: $162 million for the Eastern Mirage Project and $156.7 million for the Eastern Emerald Project. The SEC concealed these facts from the Court when it sought to freeze Defendants' assets "up to the amount of $229 million." Because the SEC made no effort to disclose any of Defendants' expenses to the Court, the Asset Freezing Order ***does not give Defendants any credit to which they are entitled for those reasonable business expenses***, which substantially ***exceed*** the amount of $229 million contributed by the EB-5 visa investors.

The SEC refuses to acknowledge that Defendants have incurred any reasonable business expenses on either Project. The SEC ignores the fact that Defendants purchased the land on Union Street and have nearly completed construction of a state-of-the-art, 20-story building there – which

---

deprived Sand of corporate opportunities and ***misused corporate funds***, but does not allege that securities were sold based upon a representation that Sand would be investing in these (stolen) opportunities. Further, while Plaintiffs allege that Ritchie took funds from Sand beginning in 1985 for "***unsupported personal expenses***," they fail to link that alleged activity to the sale of Sand securities that occurred two years later. . . . That is insufficient to satisfy the "in connection with" requirement of Rule 10b-5.

*Id*. (emphasis added).

would be complete, operating, and generating revenue today but for the asset freeze – at a cost of more than $156.7 million. The SEC also ignores the fact that Defendants purchased the land on Northern Boulevard and have performed substantial site remediation and foundation work for the construction project at a cost of nearly $161.2 million.

After all those costs are properly accounted for and Defendants are given the credit to which they are entitled for their reasonable business expenses of $318 million – as they must be under *Liu* – no disgorgement may be awarded in this case. That is, even if the SEC had claims against Defendants under the federal securities laws (which it does not), and even if the SEC could prove those claims (which it cannot), at the end of the day, the SEC ***cannot*** prove it is entitled to the equitable remedy of disgorgement because ***Defendants have earned no profit from either Project***. To the contrary, they have incurred a ***net loss of nearly $90 million*** on both Projects. If the SEC could prevail on the merits – which Defendants vigorously dispute – this case will yield ***zero in disgorgement*** after Defendants' $318 million in reasonable business expenses are deducted, as they must be under the Supreme Court's controlling decision in *Liu*.

The Asset Freezing Order should be no larger than Defendants' potential liability. *See SEC v. Unifund Sal*, 910 F.2d 1028, 1042 (2d Cir. 1990) (freeze order must be proportional to "relief 'of the same character as that which may be granted finally'") (quoting *De Beers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945)); *SEC v. Callahan*, No. 12-CV-1065 (ADS)(AYS), 2015 U.S. Dist. LEXIS 178114, at *7 (E.D.N.Y. Dec. 24, 2015) (quoting *SEC v. Banner Fund Int'l*, 211 F.3d 602 (D.C. Cir. 2000)) (amount that may be frozen must take into account the amount defendant may be required to disgorge); *United States SEC v. Ahmed,* No. 3:15cv675 (JBA), 2018 U.S. Dist. LEXIS 242717, at *6 n.3 (D. Conn. Mar. 26, 2018). In *Unifund*, an insider trading case, the Second Circuit held that the SEC was not entitled to an Asset Freezing

Order that exceeded the SEC's potential recovery of disgorgement and civil fines and penalties. 910 F.2d at 1042.

The asset freeze should have been no greater than an amount necessary to cover Defendants' potential liability to the 84 EEGH II investors after March 27, 2016, – the only timely claims in the SEC's action against them. Each "investor" in both the Eastern Emerald and Eastern Mirage Projects contributed $500,000 to one of five limited partnerships. *See* ECF No. 98, ¶ 5 at 3. Even accounting for the modest 2% gross interest on their "investments" provided for in the offering memorandum for the EEGH II limited partnership,[15] and after deducting their annual $7,500 management fees (leaving apart their proportionate share of the construction expenses), the total expected return for the 84 EEGH II visa investors will be $43.9 million upon maturity of their loans in 2025, including repayment of the $42 million originally invested, for a paltry expected gross profit of just $1.9 million (or $22,500 each for the 84 investors).[16] That equals a gross return of only 4.5% after nine years, or just 0.5% annually. In addition, after deducting their proportionate share of the construction expenses – even just those expenses already incurred to date – the total expected amount to be returned to the 84 investors in 2025 would be ***less than the amount they invested***. Plainly, the current Asset Freezing Order grossly exceeds Defendants' potential disgorgement liability to those EEGH II EB-5 visa investors after accounting for the miniscule return they "invested" for and the business expenses the partnership has incurred to date.

---

[15] *See* Rifkin Decl., Ex. C at 14.

[16] The total expected return at maturity for those 84 investors is calculated as follows:

    $ 42,000,000 invested
    + $7,560,000 (9 years of interest @ 2%)
    $ 49,560,000
    - $ 5,670,000 (9 x $7,500 annual management fees for 84 investors)
    $ 43,890,000

*See also* Amideo Decl., Ex. A § 7 (calculating return through July 31, 2022).

Moreover, the SEC's authority to seek civil fines and penalties is not unlimited. It may seek disgorgement of any ill-gotten gains and, in addition, it may seek penalties ranging from $5,000 to $100,000 for individual defendants and from $50,000 to $500,000 for entity defendants, depending on the nature of the violation. *See SEC v. Cioffi*, 868 F. Supp. 2d 65, 70 (E.D.N.Y. 2012) (citing 15 U.S.C. § 78u(d)(3)(B)). The maximum potential penalty may be increased to the "gross amount of pecuniary gain" by the defendant in any case where it exceeds the fixed penalty. *Id*. The SEC has provided no justification for its extraordinary demand for imposition of penalties of $5 million from Mr. Xia and $28 million from Fleet in *addition* to "disgorgement" of $229 million from both Defendants. Given that the amount of disgorgement should be zero in this case, the SEC should not recover any civil fines or penalties from either Defendant.

The SEC should not be heard to argue that the additional protection in the Asset Freezing Order is needed for civil fines and penalties. The SEC previously told the Court it was necessary to freeze Defendants' assets ***only*** "***up to the sum of $229 million***" to protect the Court's ability to award disgorgement of illegal profits and civil penalties. *See* ECF No. 8 at 4 (proposed TRO). The SEC cannot backtrack from its own explicit representation simply because it is now being made to comply with *Liu*.

C.    **The Freeze Order Must Be Reduced Because Nearly All of the SEC's Claims Are Time-Barred**

Finally, even if the SEC could somehow show it is entitled to recover any disgorgement from Defendants under the demanding "net profit" standard of *Liu*, the Court must reduce the amount of the asset freeze because ***nearly all of the claims are time-barred***.[17]

---

[17] Defendants first raised this issue in their TRO response brief, filed on May 11, 2022. ECF No. 124.

Like every other litigant, the SEC is subject to statutes of limitation that extinguish stale claims. For the entire time it investigated Defendants, the SEC was subject to a strict five-year statute of limitations under which it cannot maintain any "action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise . . . unless commenced within five years from the date *when the claim first accrued*." 28 U.S.C. § 2462 (emphasis added).[18] "[D]isgorgement actions must be commenced within five years of the date the claim accrues." *Kokesh v. SEC*, 137 S. Ct. 1635, 1639 (2017) (construing 28 U.S.C. § 2462).

For the five sets of EB-5 loans at issue, the five-year statute of limitations commenced and expired as follows:

| Issuer | Date of Offering | Date Statute of Limitations Expired |
|---|---|---|
| EMMCO | August 3, 2010 | August 3, 2015 |
| EMMCO NQMC | January 26, 2011 | January 26, 2016 |
| EMMCO TOWER | December 21, 2011 | December 21, 2016 |
| EEGH | March 31, 2014 | March 31, 2019 |
| EEGH II | October 18, 2015 | October 18, 2020 |

All but the SEC's claims based on the EEGH II offering are untimely and were long ago barred by the applicable five-year statute of limitations, and many of the EEGH II visa investments were made outside the five-year limitations period as well.

In their reply brief in support of the TRO, the SEC invokes the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283 ("NDAA"), which established a ten-year statute of limitations for SEC disgorgement claims and other equitable claims based on certain

---

[18] The Section 10(b) claim "accrue[d] when the allegedly false or misleading statement was made." *SEC v. Microtune, Inc.*, 783 F. Supp. 2d 867, 888-89 (N.D. Tex. 2011) (citations omitted). The Section 17(a) claim likewise accrued when the "defendant's allegedly fraudulent conduct occurs." *SEC v. Sason*, 433 F. Supp. 3d 496, 507-08 (S.D.N.Y. 2020) (citing *Gabelli v. SEC*, 568 U.S. 442, 448 (2013)).

securities law violations. ECF No. 132 at 4-5 (citing 15 U.S.C. §§ 78u(d)(8)(A)(ii) and (B)). The SEC argues that the NDAA revived their already-extinguished claims.

The NDAA cannot be given retroactive effect to resurrect already extinguished claims. "[T]he resurrection of ***previously time-barred claims*** has an ***impermissible*** retroactive effect." *In re Enterprise Mort. Acceptance Co. Sec. Litig.*, 391 F.3d 401, 410 (2d Cir. 2004) (emphasis added). Citing *Landgraf v. Usi Film Prods.*, 511 U.S. 244 (1994),[19] and *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988), the Second Circuit held:

> Extending the statute of limitations retroactively "increase[s] [a defendant's] liability for past conduct" . . . by increasing the period of time during which a defendant can be sued. This effect is particularly prevalent in the context of claims that have already expired. Resurrection of such claims puts defendants back at risk at a point when defendants reasonably believe they are immune from litigation, stripping them of a complete affirmative defense they previously possessed and may have reasonably relied upon.

*Enterprise,* 391 F.3d at 410 (citations omitted). That reasoning applies exactly to this case, where the SEC seeks to invoke the NDAA to resurrect claims that were expired.[20] The Second Circuit's decision in *Enterprise* is on point and controlling.

The SEC attempts to distinguish *Enterprise* on the threadbare basis that it concerned the retroactivity of the Sarbanes-Oxley Act, which extended the statute of limitations for *private* securities law claims, rather than the NDAA. *See* ECF No. 132 at 4-5. In Section 804(1) of the Sarbanes-Oxley Act, Congress provided that that new statute of limitations "shall apply to all proceedings addressed by this section that are commenced on or after the date of enactment of this

---

[19] In *Landgraf*, the Supreme Court held that the Constitution "flatly prohibits retroactive application of penal legislation," and that "[r]etroactivity is not favored in the [civil] law." 511 U.S. at 266.

[20] Courts routinely recognize a difference between merely extending a filing period for live claims and revoking an already-vested statute of limitations defense. *Weingarten v. United States*, 865 F.3d 48, 57-58 (2d Cir. 2017) (collecting cases). This case falls in the latter category.

Act." *Enterprise*, 391 F.3d at 406 (citing Pub. L. No. 107-204 § 804, 116 Stat. 745, 801 codified in part at 28 U.S.C. § 1658(b)). The SEC attempts to distinguish Section 804(1) of the Sarbanes-Oxley Act from Section 6501 of the NDAA, which provides that the new limitations period "shall apply with respect to any action or proceeding that is pending on . . . the date of enactment." *See* ECF No. 132 at 7 (quoting NDAA § 6501(b)). The SEC says that language makes the NDAA retroactive.

Plainly, Section 6501(b) of the NDAA is virtually identical to Section 804(1) of the Sarbanes-Oxley Act. There simply is no difference between the phrase "commenced on or after the date of enactment of this Act" in the Sarbanes-Oxley Act and the phrase "pending on . . . the date of enactment" in the NDAA. An action that is commenced "on . . . the date of enactment" is "pending on . . . the date of enactment." The Second Circuit's refusal to give "impermissible retroactive effect" to § 804(1) of the Sarbanes-Oxley Act applies fully and completely to the virtually identical language in § 6501 of the NDAA.[21]

The SEC knows well that Section 6501 does *not* apply retroactively. Indeed, the SEC *admits* that "Section 6501(b) does *not* revive a 'time-barred'" cause of action." ECF No. 132 at 6 (emphasis added). Then, oddly, the SEC argues that the NDAA nonetheless "expands the scope of the SEC's disgorgement remedies in actions like this one that are brought after the NDAA's enactment." *Id*. The SEC does not even attempt to explain that obvious inconsistency.

The SEC is not saved by two tolling agreements between the SEC and Defendants Xia and Fleet, which suspended the running of all applicable tolling for six months, beginning on

---

[21] Of course, this action was not commenced until September 27, 2021, and thus was *not* "pending on . . . the date of enactment" – which, according to the SEC, is what gives the NDAA its allegedly retroactive effect.

September 10, 2019, through March 9, 2020.[22] The six-month tolling agreements did not ***revive*** the SEC's already-expired claims.

A tolling agreement does not revive an already extinguished claim. *Diaz v. Johnson & Johnson*, No. 19-CV-6929-LJV-MWP, 2021 U.S. Dist. LEXIS 137083, at \*9 (W.D.N.Y. July 22, 2021) (tolling agreement did not revive already untimely claim).[23] The tolling agreements here confirmed that result:

> nothing in this agreement shall affect any applicable statute of limitations defense or any other time-related defense that may be available to [the tolling parties] before the commencement of the tolling period or be construed to revive any proceeding that may be barred by any applicable statute of limitations or any other time-related before the commencement of the tolling period.

*See* Declaration of Mark C. Rifkin in Support of Defendants' Post-Trial Memorandum (ECF No. 125), ¶¶ 2-3 and Exhibits A and B (ECF Nos. 125-1 & 125-2). The tolling agreements expressly preserved Defendants' vested statute of limitations defense to the SEC's claims as to four of the five loans at issue here, which were extinguished long before the tolling period commenced.

The SEC commenced this action on September 27, 2021. After adding the six-month tolling period to its claims, any claims that accrued before March 27, 2016, were time-barred and extinguished under the tolling agreements. ***All*** the EB-5 visa investors in the EMMCO, EMMCO NQMC, EMMCO Tower, and EEGH offerings invested ***before*** March 27, 2016, In addition, 41 of the investors in the EEGH II offering invested their money ***before*** March 27, 2016.[24] Only 84 investors in EEGH II invested after that date. Thus, the SEC's claims for all the investors in

---

[22] The tolling agreements literally refer to a tolling period "beginning on September 10, 2019, through March 19, *2019*," but obviously meant ending on March 19, *2020*. Defendants do not need to take advantage of the SEC's obvious and immaterial clerical mistake.

[23] The SEC does not argue otherwise in its reply brief. *See* ECF No. 132.

[24] Though not relevant, Defendants note that one of those 41 early investors withdrew his $500,000 investment in April, 2019, leaving only a total of 125 investors in EEGH II.

EMMCO, EMMCO NQMC, EMMCO Tower, and EEGH, and for all but those 84 investors in EEGH II, are time-barred.

The SEC's stale claims are not saved by any extension of the statute of limitations. The National Defense Authorization Act, 15 U.S.C. § 78u(d)(8)(A), which became effective on January 1, 2021, provides for a 10-year statute of limitations on the SEC's claims in this case. However, that statute, likewise, does *not* revive claims which were previously extinguished. Defendants are unaware of any court applying 15 U.S.C. § 78u(d)(8)(A) retroactively.[25] The Constitution "flatly prohibits retroactive application of penal legislation," *Landgraf*, 511 U.S. at 266, and "[r]etroactivity is not favored in the [civil] law." *Bowen*, 488 U.S. at 208.

In *Landgraf,* the Supreme Court established a two-part test to determine whether a statute applies retroactively. Under the first part of the test, if Congress "expressly prescribed" that the statute applies retroactively, "the inquiry ends . . . and the court enforces the statute as it is written." *Enterprise*, 391 F.3d at 405-06 (quoting *Landgraf*). Congress did not provide that 15 U.S.C. § 78u(d)(8)(A) would apply retroactively. Under the second part of the test, when, as here, a statute "is ambiguous or contains no express command," the Court "must determine whether applying the statute to antecedent conduct would create presumptively impermissible retroactive effects." *Weingarten*, 865 F.3d at 55 (citing *Enterprise*, 391 F.3d at 406).

Applying 15 U.S.C. § 78u(d)(8)(A) retroactively after the existing five-year statute of limitations already expired in this case would create presumptively impermissible retroactive effects. In *Enterprise*, the Second Circuit held that "the **resurrection** of previously time-barred

---

[25] In *SEC v. Drexel Burnham Lambert, Inc.*, 837 F. Supp. 587, 613-14 (S.D.N.Y. 1993), the Second Circuit held that only the officer and director bar provision of 15 U.S.C. § 78u(8)(A) could be applied retroactively. Congress explicitly provided that the statute's monetary penalty provisions could *not* be applied retroactively.

claims has an ***impermissible retroactive effect***." 391 F.3d at 410 (emphasis added). Citing

*Landgraf*, the Second Circuit explained:

> Extending the statute of limitations retroactively "increase[s] [a defendant's] liability for past conduct" . . . by increasing the period of time during which a defendant can be sued. This effect is particularly prevalent in the context of claims that have already expired. Resurrection of such claims puts defendants back at risk at a point when defendants reasonably believe they are immune from litigation, stripping them of a complete affirmative defense they previously possessed and may have reasonably relied upon.

*Id*. (citations omitted).[26]

When Congress enacted 15 U.S.C. § 78u(d)(8)(A) in 2021, the original five-year statute of

limitations on the SEC's claims already had expired and Defendants' statute of limitations defense

had vested. For four of the five EB-5 loans, the statutes of limitations expired more than four or

five years before the new limitations period was established. Even accounting for the six-month

tolling period, the five-year statute of limitations on the SEC's claims as to those four loans expired

nearly a year before 15 U.S.C. § 78u(d)(8)(A) was enacted. Defendants' statute of limitations

defense as to those four series of EB-5 loans had vested and could not be set aside by the passage

of 15 U.S.C. § 78u(d)(8)(A). Those time-barred claims were extinguished and could not be

revived.

In *Ahmed*, 2018 U.S. Dist. LEXIS 242717, at *6, the district court modified an asset freeze

based upon the five-year statute of limitations "to remove disgorgement associated with fraud

executed more than five years prior to the filing of the related claims." The SEC should have

excluded all the untimely claims from its request for civil penalties, and hence from its request for

an asset freeze. *See id.* at *6 & n.3.

---

[26] Courts routinely recognize a difference between merely extending a filing period for live claims and revoking an already-vested statute of limitations defense. *Weingarten*, 865 F.3d at 57-58 (collecting cases). This case falls in the latter category.

The asset freeze should have been no greater than an amount necessary to cover Defendants' potential liability to the 84 EEGH II investors after March 27, 2016, – the only timely claims in the SEC's action against them. As discussed above, at $500,000 each, those 84 EB-5 visa investors together "invested" $42 million in the Eastern Emerald project. Even accounting for the modest 2% gross interest on their loans, and after deducting their annual $7,500 management fees (leaving apart their proportionate share of the construction expenses), their total return would be no more than $43.9 million upon maturity of their loans in 2025. And, after accounting for their proportionate share of the partnership's operating expenses (just those expenses incurred to date), their total net return would be *less than the amounts they invested*.

The current Asset Freezing Order is *five times greater* than Defendants' potential disgorgement liability to the 84 EEGH II EB-5 visa investors after March 27, 2016. *See Unifund*, 910 F.2d at 1042 (freeze order must be proportional to "relief of the same character as that which may be granted finally") (internal quotation omitted); *Callahan*, 2015 U.S. Dist. LEXIS 178114, at *7 (amount that may be frozen must take into account the amount defendant may be required to disgorge).[27] It must be reduced to reflect that potential liability.

## CONCLUSION

For all the foregoing reasons, the Court should vacate or modify the Asset Freezing Order after giving Defendants credit for their reasonable business expenses as required under *Liu*. In any event, the Asset Freezing Order should be no greater than the SEC's timely disgorgement claims.

---

[27] The asset freeze cannot impose unfair financial hardships upon Defendants or prevent them from paying for their living expenses, business expenses, and attorney's fees. *See Unifund*, 910 F.2d at 1042. Though not addressed directly in this motion because the relief sought will obviate the need for such relief, if the Court denies the motion to vacate or modify the Asset Freezing Order and also declines to give Defendants access to their assets in excess of $229 million, Defendants and Yue will promptly move for an order permitting payment of their living expenses, business expenses, and attorneys' fees.

In the alternative, at a bare minimum, the Court should give Defendants immediate access to all their assets in excess of the $229 million cap in the Asset Freezing Order.

Dated: August 15, 2022

MEYER, SUOZZI, ENGLISH
& KLEIN, P.C.

By:   s/ Randall T. Eng
Randall T. Eng
900 Stewart Avenue
Suite 300
Garden City, NY  11530
(516) 741-6565
reng@msek.com

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By:   s/ Mark C. Rifkin
Mark C. Rifkin
Benjamin Y. Kaufman
Robert Y. Altchiler
270 Madison Avenue
9th Floor
New York, NY  10016
(212) 545-4600
rifkin@whafh.com
kaufman@whafh.com
altchiler@whafh.com

*Attorneys for Defendants and
Relief Defendant Yue*