**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **21-cv-05350-PKC-RER** |
| **-against-** | |
| **RICHARD XIA, a/k/a YI XIA, and FLEET NEW YORK METROPOLITAN REGIONAL CENTER, LLC, f/k/a FEDERAL NEW YORK METROPOLITAN REGIONAL CENTER, LLC,** | |
| **Defendants,** | |
| **-and-** | |
| **JULIA YUE, a/k/a JIQING YUE; XI VERFENSTEIN; and XINMING YU,** | |
| **Relief Defendants.** | |

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY ASSET FREEZING ORDER

Kevin P. McGrath
David Stoelting
Kim Han
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-053 (McGrath)
mcgrathk@sec.gov

September 9, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………………ii

PRELIMINARY STATEMENT………………………………………………………………1

RELEVANT PROCEDURAL HISTORY…………………………………………………2

ARGUMENT……………………………………………………………………………..3

    I.      Applicable Standard for Motion to Modify or Vacate an Asset Freeze…………........3

    II.     The Freeze Order Should Not Be Reduced By Claimed "Business Expenses."……...5

    III.    Even If Business Expenses Were Deductible for Purposes of the Freeze, Defendants' Claim of $318 Million in "Reasonable Business Expenses" Should Be Given No Weight……………………………………………………………………………6

    IV.    The Freeze Order Should Not Be Reduced Due to the Statute of Limitations...………11

    V.     Given Xia's Potential Liabilities to Other Creditors and Defendants' Lack of Liquid Assets, the SEC Is Not "Oversecured."………………………………………………..17

    VI.    The Freeze Order Should Not Be Modified In Any Respect, If At All, Until Xia Fully Discloses All Relevant Financial Information……………………………….........23

CONCLUSION……………………………………………………………………..25

## TABLE OF AUTHORITIES

**Cases**

*In re Enterprise Mort. Acceptance Co. Sec Litig.*, 391 F.3d 401 (2d Cir. 2004)......................... 13

*In re Grand Jury Subpoena Served Upon John Doe*, 781 F.2d 238 (2d Cir.1986) ................... 17n

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994)................................................. 12

*Martin v. Hadix*, 527 U.S. 343 (1999) ................................................................ 12

*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995)................................................ 13

*SEC v. Ahmed*, 15-cv-675, 2021 WL 2471526 (D. Conn. June 16, 2021) ................................... 9n

*SEC v. Fiore,* 416 F. Supp. 3d 306 (S.D.N.Y. 2019)................................................... 15

*SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450 (2d Cir. 1996) ..................................... 18

*SEC v. Fowler,* 6 F.4th 255 (2d Cir. 2021) ..................................................... 14, 10n

*SEC v. Gallison, __* F. Supp. 3d __, 2022 WL 604258 (S.D.N.Y. Mar. 1, 2022)........................ 14

*SEC v. Gentile*, 939 F.3d 549 (3d Cir. 2019)........................................................ 7n

*SEC v. Grossman*, 887 F. Supp. 649 (S.D.N.Y. 1995) ................................................. 4

*SEC v. Haligiannis*, 470 F. Supp. 2d 373 (S.D.N.Y. 2007).......................................... 18

*SEC v. Hallam,* 42 F.4th 316 (5th Cir. 2022) ..................................................... 14

*SEC v. Jafar*, 13-cv-4645, 2015 WL 3604228 (S.D.N.Y. June 8, 2015)................................... 4

*SEC v. Kellen*, 20-cv-3861, 2021 WL 4907238 (C.D. Cal. Sept. 14, 2021)........................... 14, 8n

*SEC v. Koenig*, 557 F.3d 736 (7th Cir. 2009) ...................................................... 17

*SEC v. Lauer,* 478 F. Appx 550 (11th Cir. 2012) .................................................. 18

*SEC v. Liu*, 140 S. Ct. 1936 (2020)............................................................. 1, 5, 8n

*SEC v. Liu*, 851 F. Appx. 665 (9th Cir. 2021) ................................................... 6, 24

*SEC v. Maillard*, 13–cv-5299, 2014 WL 1660024 (S.D.N.Y. Apr. 23, 2014) ......................... 4, 18

*SEC v. McGinn, Smith & Co.*, 10-cv-457, 2013 WL 12141501 (N.D.N.Y. Sept. 11, 2013).......... 5

*SEC v. Navellier & Assoc., Inc.,* 17-cv-11633, 2021 WL 5072975 (D. Mass. Sept. 19, 2021) ... 14

*SEC v. PlexCorps*, 17-cv-7007, 2018 WL 3038500 (E.D.N.Y. June 19, 2018) .......................... 18

*SEC v. Schiffer*, 97-cv-5853, 1998 WL 307375 (S.D.N.Y. June 11, 1998).................................... 4

*SEC v. Sharp,* __ F. Supp. 3d__, 2022 WL 4085676 (D. Mass. Sept. 6, 2022) ... 11, 12, 13, 14, 15

*SEC v. Spartan Sec. Group, Inc.,* 19-cv-448, 2022 WL 3224008 (M.D. Fla. Aug. 10, 2022) ..... 14

*SEC v. Spongetech Delivery Sys., Inc.*, 10-cv-2031, 2011 WL 887940 (E.D.N.Y. Mar. 14, 2011) ................................................................................................................................................ 18, 16n

*SEC v. Stein*, 07-cv-3125, 2009 WL 1181061 (S.D.N.Y. Apr. 30, 2009) ............................... 5, 24

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) ................................................................ 4, 18

*SEC v. Voight,* No. 15-cv-2218, 2021 WL 5181062 (S.D. Tex. June 28, 2021) ......................... 5

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011)................................................................................... 4

## Rules and Regulations

15 U.S.C. § 77t(d) ....................................................................................................................... 18

15 U.S.C. § 78u(d)(3) .................................................................................................................. 18

15 U.S.C. § 78u(d)(3)(A)(ii) ....................................................................................................... 16

15 U.S.C. § 78u(d)(8)(A)(ii) .................................................................................................. 12, 16

15 U.S.C. § 78u(d)(8)(B) ............................................................................................................ 12

National Defense Authorization Act § 6501(a)(3) ...................................................................... 12

National Defense Authorization Act § 6501(b) .......................................................................... 12

National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283 ...................... 11

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this memorandum of law in opposition to the motion, by defendants Richard Xia ("Xia") and Fleet New York Metropolitan Regional Center ("Fleet," and with Xia, "Defendants"), to vacate or modify the Court's asset freeze order issued on September 27, 2021 (the "Freeze Order").

## PRELIMINARY STATEMENT

Nearly one year after the Court imposed the Freeze Order, Defendants not only seek to modify the Freeze Order but argue that the SEC is not entitled to any disgorgement at all and that none of Xia's assets should be frozen. This unwarranted result would leave the victims of Xia's fraud without any recovery. The Freeze Order should not be modified, for the reasons set forth below.

First, Defendants' claim that the assets subject to the freeze should be reduced by $318 million in "business expenses" is not supported by any case law. Defendants rely solely on the Supreme Court's decision in *SEC v. Liu*, 140 S. Ct. 1936 (2020), but that case addressed only the measure of disgorgement after liability has been determined and does not limit the Court's ability to tailor an equitable asset freeze during the initial stages of a case.

Second, because *Liu* does not impact the Court's equitable authority to impose a prejudgment asset freeze, the material submitted by Defendants to support their "business expenses" argument is irrelevant. Moreover, the material is unsupported, self-contradictory, and disproved by the SEC's compelling evidence at the preliminary injunction hearing that investor funds were essentially the only funding source for the Eastern Mirage and Eastern Emerald Projects, with Xia misappropriating substantial portions of those funds as well. Thus, claimed "business expenses" are not appropriately deductible at this stage from the amount subject to the Freeze Order.

Third, Defendants rehash arguments from their May 2022 preliminary injunction brief regarding the statute of limitations and whether the limited partnership interests are securities; those same arguments were rebutted in SEC's May 2022 briefs and fail for the reasons further set forth herein.

Fourth, Defendants' argument that the SEC is "oversecured" is meritless. The Freeze Order should be sufficient to cover Defendants' maximum potential liability, which includes disgorgement, prejudgment interest and civil penalties, and the frozen assets, including the rental properties, are not sufficient to cover that amount, particularly after taking into account Defendants' potentially large liabilities as to other creditors. Accordingly, the rental properties should not be released from the Freeze Order.

Finally, Defendants have failed to fully disclose their financial information. The Freeze Order should not be modified absent full disclosure, if at all.

## RELEVANT PROCEDURAL HISTORY

**Complaint and Emergency Application**.  On September 27, 2021, the SEC filed a Complaint and an *ex parte* application for temporary emergency relief, including an asset freeze, expedited discovery and the appointment of a Monitor. That same day, based on its review of the evidence, the Court granted the SEC's application and issued an Order freezing the "assets, funds or other property" of the Defendants and Relief Defendant Julia Yue ("Yue"). DE 95-1. The Freeze Order—which applies to all assets of the Defendants and Relief Defendant Yue—has remained in place since then.[1]

---

[1] Although the "Whereas" clauses in the Freeze Order recite that the SEC was seeking a freeze of "up to the amount of $229 million" of Defendants' assets, and "up to the amount of $9.7 million" of Yue's assets, *see* DE 95-1 at 1-2, Part II of the Freeze Order—which contains the actual freeze language—contains no limit or cap on the amount of Defendants' and Yue's assets subject to the Freeze Order. *Id*. at 6.

**The Preliminary Injunction Hearing**. On February 14, 15 and 16, 2022, the Court conducted an evidentiary hearing on the SEC's motion for a preliminary injunction. At the conclusion of the hearing, the Court stated that the "asset freeze continues" until the Court rules on the SEC's pending preliminary injunction motion. Tr. at 673. The parties have completed post-hearing briefing on the SEC's preliminary injunction motion. DE 103, 124, 132.

**The Amended Complaint and Motion for Freeze**. On April 6, 2022, the SEC filed an Amended Complaint alleging that, in 2021, Xia misappropriated approximately $30 million in investor funds to purchase three Long Island mansions, which were put in the names of Yue, Xi Verfenstein ("Verfenstein"), and Verfenstein's mother, Xinming Yu ("Yu"). DE 98. On that day, the SEC also filed a motion to expand the asset freeze. DE 99. The parties have fully briefed the SEC's motion to extend the asset freeze over the three mansions. DE 100, 120, 127, 128.[2]

**Case Status.** All Defendants and Relief Defendants—except Yue—have filed Answers, DE 145, 150, and the Court issued a Scheduling Order on June 7, 2022. DE 147.

**Defendants' motion to modify or vacate the Freeze Order**. On July 8, 2022, counsel for Defendants advised the Court of his intent "to promptly file a motion seeking all appropriate relief" with regard to the Freeze Order, DE 166, and on August 15, 2022, the motion papers were served on the SEC.

## ARGUMENT

### I.   Applicable Standard for Motion to Modify or Vacate an Asset Freeze

In SEC enforcement actions, federal courts have the authority to impose asset freezes as

---

[2] During the pendency of the SEC's motion to expand the asset freeze, Verfenstein and Yu agreed to "maintain the status quo related to the properties at issue in the SEC's Motion" and to not "impair the properties in any way, including by mortgage, lien, or sale, until the Court decides the SEC's motion." DE 108.

ancillary relief that, "like an attachment," ensures that "any funds that may become due can be collected." *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990). In *Unifund Sal*, the Second Circuit held that it is appropriate for an asset freeze order to "freeze[ ] funds in an amount sufficient to cover not just the profits that might have to be disgorged but the civil penalty" as well, reasoning that the purpose of an asset freeze order is to allow the SEC to "preserve its opportunity to collect funds that may yet be ordered disgorged" after a trial on the merits, which includes both illicit profits and a civil penalty. *See also SEC v. Maillard,* 2014 WL 1660024, at *4 (S.D.N.Y. Apr. 23, 2014) ("[T]he SEC is entitled upon an adequate showing ... to an asset freeze sufficient to preserve its disgorgement remedy as well as assets necessary to pay civil monetary penalties."); *SEC v. Schiffer*, 1998 WL 307375, at *7 (S.D.N.Y. June 11, 1998) ("A court has the authority to freeze assets at an amount that will cover the maximum civil penalty available under applicable law should securities law violations be proven at trial"); *SEC v. Grossman*, 887 F. Supp. 649, 661 (S.D.N.Y. 1995) ("It is irrelevant whether the funds affected by the Asset Freeze are traceable to the illegal activity.").

The SEC's burden of proof in connection with an asset freeze application is substantially lower than on an application for a traditional preliminary injunction. *Unifund Sal*, 910 F.2d at 1040-41. To obtain an asset freeze at this stage, the SEC need only show that an inference can be drawn that the party has violated the federal securities laws. *Id.* (freeze order warranted where "there is a basis to infer that" defendants violated the law); *see also Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011); *SEC v. Jafar*, 2015 WL 3604228, *7 (S.D.N.Y. June 8, 2015).

 "To persuade a court to unfreeze assets, the defendant must establish that the funds he seeks to release are untainted and that there are sufficient funds to satisfy any disgorgement remedy that might be ordered in the event a violation is established at trial. The touchstone of the

inquiry is equity." *SEC v. Stein*, 2009 WL 1181061, at *1 (S.D.N.Y. Apr. 30, 2009) (denying request to modify asset freeze) (citation omitted). "In considering whether to modify an asset freeze, 'the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such relief.'" *SEC v. McGinn, Smith & Co*., 2013 WL 12141501, at *7 (N.D.N.Y. Sept. 11, 2013) (quoting *SEC v. Manor Nursing Ctrs., Inc*., 458 F.2d 1082, 1106 (2d Cir. 1972)); *accord Stein*, 2009 WL 1181061, at *1.

## II.    The Freeze Order Should Not Be Reduced By Claimed "Business Expenses."

Citing *Liu*, 140 S. Ct. 1936, Defendants argue that the assets subject to the Freeze Order should be reduced by $318 million in "reasonable business expenses" they claim were incurred by Xia. Def. Br. at 10.[3] They claim that once they are given credit for these expenses, which Defendants contend is required by *Liu*, then "the SEC is not entitled to *any* asset freeze at all" and "no disgorgement" can be ordered. Def. Br. at 2, 15 (emphasis in original).

Defendants are wrong. *Liu* says nothing about the scope of an asset freeze, and no court has ever held that it does, to the SEC's knowledge. *Liu*'s holding—that a disgorgement award is equitable relief and should not "exceed a wrongdoer's net profits"—focused on the determination of disgorgement *after* a liability finding and did not purport to address the scope of an asset freeze imposed at the beginning of a litigation. *See, e.g., SEC v. Voight,* 2021 WL 5181062, at *4 (S.D. Tex. June 28, 2021) (in responding to a *Liu* argument, the court noted that "[t]he Supreme Court did not address, much less prohibit, asset freezes").

---

[3] This brief uses the following conventions: "Def. Br." means Defendants' Memorandum of Law in Support of Their Motion to Vacate or Modify Asset Freezing Order dated Aug. 15, 2022; "Rifkin Decl." means the Declaration of Mark Rifkin dated Aug. 15, 2022; "Amideo Decl." means the Declaration of Michael Amideo dated Aug. 15, 2022; "Amideo Rep." means the report attached as Ex. A to the Amideo Decl.; "Decl." means the Declaration of David Stoelting dated Sept. 9, 2022; "PX" means the SEC exhibits admitted into evidence during the Feb. 2022 show-cause hearing; and "DE" means Docket Entry.

The subsequent proceedings in the *Liu* case itself make clear that business expenses should not be deducted in determining the amount subject to an asset freeze and that this Court has the authority to impose an asset freeze over all of Defendants' assets. After the Supreme Court's decision in *Liu*, the case was remanded to the district court, which continued the asset freeze over all the defendant's assets pending a decision on the proper amount of disgorgement. The defendant challenged the renewed asset freeze in the Ninth Circuit, 851 F. Appx. 665, 667 (9th Cir. 2021), and argued—like the Defendants here—that the district court should have deducted his net profits before entering the asset freeze.

The Ninth Circuit rejected this argument and held that a finding of the specific amount of equitable relief "would be premature at this stage of the proceedings" because a district court is not required "to make a finding as to the amount of equitable remedies prior to final judgment." *Id*. at 668-69. Responding to the argument that the asset freeze improperly froze all the defendant's assets, not just net profits, the Ninth Circuit noted that district courts enjoy broad latitude when determining the scope of an injunction. *Id*. at 669. Given that disgorgement had not yet been determined, "it would be impossible to tailor this injunction solely to those assets that are net profits from the use of investor funds." *Id*.

The same reasoning supports denial of Defendants' motion to vacate or modify the Freeze Order. Neither liability nor disgorgement has been determined at this time, and discovery is just getting underway. Thus, the asset freeze should not be limited by any claimed net profit theory.

**III.   Even If Business Expenses Were Deductible for Purposes of the Freeze, Defendants' Claim of $318 Million in "Reasonable Business Expenses" Should Be Given No Weight.**

Defendants' claim that purported business expenses should be deducted from the amount

6

to be frozen to satisfy a potential judgment is without merit, as discussed above. But even if the Court were to conclude that business expenses could theoretically be deducted from the amount frozen, the $318 million in purported business expenses that Defendants claim should be subtracted from the amount frozen (Def. Br. at 10-17) is both factually and legally baseless.

Defendants first claim that the $318 million "includes $48 million in cash which they contributed to both Projects and $97.4 million in deferred rent, fees and other compensation to which they are contractually entitled," Def. Br. at 12, but they fail to explain where the additional $172.6 million figure comes from. Elsewhere, they claim that the $318 million figure consists of costs of "$162 million for the Eastern Mirage Project and $156.7 million for the Eastern Emerald Project" Def. Br. at 14, but they again fail to explain the source of these numbers.

Defendants' "financial planner and advisor,"[4] Michael Amideo, a non-practicing certified public accountant, refers to "Total Hard and Soft Project Costs" of $284,222,168, consisting of $16,710,618 (Land) plus $91,341,269 (Construction and Development) plus $53,901,250 (Deferred Ground Lease), minus $16,710,618 in land contributed, totaling $145,242,519 for Eastern Mirage; and $17,000,000 (Land), plus $104,472,774 (Site Improvement) plus $17,506,875 (Deferred Management Fees EEGH and EEGH II), totaling $138,979,649 for Eastern Emerald. *See* Amideo Rep., § 2, table 2. Defendants fail to explain the discrepancy between their claimed $318 million in "business expenses" and Amideo's $284,222,168 in "Total Hard and Soft Construction Costs." Nevertheless, even putting aside these discrepancies, for the following are reasons, none of Defendants' claimed categories of "business expenses" should be deducted from the scope of the Freeze Order.

First, the $318 million figure appears to include "Developer Fees" of approximately

---

[4] Amideo appears to have no background or experience in the construction industry or in construction accounting practices.

$16.7 million for the Eastern Mirage Project and approximately $9.5 million for the Eastern Emerald Project. Def. Br. at 12; Amideo Rep. § 2 fn. **. Defendants provide no evidence to support these fees. Indeed, even Amideo states in his Declaration and Report that he was "unable to find any documentation of the developer fees." Amideo Decl. ¶ 6; Amideo Rep., § 2. These deferred "Developer Fees," which Defendants have claimed for the first time in their motion, are unsupported by any evidence and should not be deducted from the amount Defendants owe investors.

Second, the $318 million figure appears to include $53,901,250 in deferred rent that Fleet Financial Group, Inc. ("FFG") purportedly owes to X&Y Development, Inc. ("X&Y"), Xia's company, for leasing the land on which the Eastern Mirage Project is located. Def. Br. at 5, fns. 2 and 4, Amideo Rep. at § II, table 2. This "deferred rent," however, is alleged in the Amended Complaint to have been part of Xia's scheme to enrich himself *(see* Am. Compl. ¶¶ 151-156). There is no basis to deduct from disgorgement deferred rents that Xia is charging his own company, co-defendant Fleet, especially where that rent is based on land Xia purchased using fraudulently raised investor money (*see* below discussion at 9).

Third, the $318 million figure appears to include $17,506,875 in deferred Management Fees. *See* Amideo Rep., § II, table 2.  However, there is no basis to deduct this or any amount in deferred Management Fees from the amount of ill-gotten gains necessary to make investor victims whole. First, the Offering Memoranda for EEGH and EEGH II state that the management fee "shall be paid from the cash flow of the Partnership and shall not be deducted from capital investment amounts."[5] PX 4-15; PX 6-16 (referring to "revenue" instead of "cash flow"). The cash flow of the Partnerships is the interest earned on the investment of investor funds, totaling

---

[5] The management fee is owed to Fleet as the General Partner.

approximately $3.2 million from December 2011 through May 2019. PX 140. Thus, Defendants'

entitlement to management fees would be capped at $3.2 million. Moreover, that amount should

not be deducted from amount frozen by the Court, given that the deferred management fees have

not been paid and should not be paid to Xia-controlled entities, given that the fees were part of

Defendants' fraudulent scheme.

Fourth, the $318 million figure appears to include the $16,710,618 purchase price for the

Eastern Mirage land and the $17,000,000 purchase price for the Eastern Emerald land. Amideo

Rep., § I, table 1; § II, table 2. However, bank records show that Xia purchased the Eastern

Mirage land in 2010 using a loan from HSBC, and that Xia paid off the loan in 2015 using

investor funds. Decl. ¶ 11. As Raymond Dookhie, the SEC's expert witness who was qualified as

an accounting expert in the construction industry (PI Hrg. Tr. 516) established, Xia also paid for

the Eastern Emerald land by misappropriating at least $17 million from the Eastern Mirage

investors. Decl. ¶ 10; PX 96. Thus, Defendants are not entitled to subtract the $17 million in

investor funds they misappropriated to purchase the Eastern Emerald land, and the at least $8

million of investor funds they misappropriated from investors to pay off the HSBC mortgage on

the Eastern Mirage land. Decl. ¶¶ 10-11.

Fifth, the $318 million figure appears to include $91,341,269 in purported "Construction

and Development" costs for the Eastern Mirage Project and $104,472,774 in purported "Site

Improvement" costs for the Eastern Emerald Project cited by Amideo in his Report. Amideo

Rep. at § 2, table 2.  However, Amideo fails to explain where he obtained these numbers from.

They appear similar to numbers cited in an appraisal done by Colliers International Valuation

and Advisory Services ("Colliers"). For example, the Colliers appraisal for the Eastern Mirage

Project, refers to $93,428,958 in "hard costs," which is close to the $91,341,269 in "Construction

and Development" costs cited by Amideo. Amideo Rep. § 2, table 2. And the Colliers Eastern

Emerald appraisal (Rifkin Decl., Ex. B "Emerald Appraisal") at 227, refers to $104,472,774

"expended in "construction costs, which included site remediation, demolition and foundation

construction" for the Eastern Emerald Project. However, Colliers took these numbers from Xia,

without any apparent independent verification or review.  *See, e.g.,* Mirage Appraisal at 21

(stating that "Construction Budget; Pro Forma Income/Expenses Statements; Plans and

Specifications; Third Party Reports" all obtained from "Developer," i.e., Xia; Emerald Appraisal

at 227) ("According to a budget submitted by the developer, approximately $104,472,774 has

been expended….").  *See also* Mirage Appraisal at 260; Emerald Appraisal at 236 ("This

analysis assumes that the financial analysis provided for this appraisal, including rent rolls and

historical  income and expense statements; *(sic)* accurately reflect the current and historical

operations of the subject property.").

 Sixth and finally, Amideo states that Xia invested $31.6 million in cash into the Projects,

citing to Xia's summary charts with attached bank records. However, it is not clear what, if any,

independent review and analysis Amideo performed on Xia's claimed cash expenditures to

determine if any of these funds came from investors.[6] As Exhibits 1and 2 to the Amideo Report

(that Xia prepared) shows, a substantial amount of the funds that Xia claims as a personal

contribution occurred after EB-5 funds were received. More importantly, Amideo fails to take

into account Raymond Dookhie's testimony at the preliminary injunction hearing debunking

Xia's claims that he contributed significant personal funds to the Eastern Emerald and Easter

---

[6] As noted above, Defendants claim they contributed $48.6 million in cash but never explain how
they arrived at that figure. This number also conflicts with their claim, also unsupported, that "Defendants
have contributed more than $65.4 million of their own cash to both Projects," Def. Br. at 2, and their
claim that, "[b]efore the Asset Freeze Order was entered, **Defendants had already contributed more
than $31.6 million of their own cash to both Projects.**" Def. Br. at 4 (emphasis in original) (citing
Amideo Report, § 1).

Mirage Projects. Dookhie analyzed the flow of investor funds in Xia's EB-5 offerings through nearly 100 bank accounts from December 2011 through January 2019, and concluded that only $3.5 million was from sources other than investors. PX 91, 95.

Thus, there is no basis to deduct any of the claimed $318 million in purported "business expenses" from any ultimate disgorgement award, far less from the amount frozen.

## IV.   The Freeze Order Should Not Be Reduced Due to the Statute of Limitations.

Defendants argue that all claims except those based on the EEGH II offering are barred by a five-year statute of limitations. Def. Br. at 17-24. Defendants made essentially the same argument in their post-hearing brief filed on May 11, 2022 (DE 124 at 12-16) and the SEC rebutted this argument in its post-hearing reply brief filed on May 18, 2022 (DE 132 at 4-8). *See also* DE 133 at 2-4 (SEC reply brief responding to identical statute of limitations argument raised by Verfenstein and Yu).  Defendants' arguments fail because, as every court to have considered the question has held, the limitations period that Defendants invoke has been superseded by statute and a ten-year period governs where, as here, the SEC alleges claims for which scienter must be established. And a recent, comprehensive opinion rejected precisely the argument that defendants raise here. *See SEC v. Sharp*, ___ F. Supp. 3d ___, 2022 WL 4085676, at *7-*16 (D. Mass. Sept. 6, 2022).

None of the SEC's claims are time-barred because a ten-year statute of limitations applies to each claim and the statutory period began to run less than ten years before the filing of the SEC's Complaint. Accordingly, Defendants' argument that the SEC is over-secured because it can only seek disgorgement of funds obtained from investors in the EEGH II Offering (Def. Br. at 16, 24) is meritless.

Congress enacted a ten-year statute of limitations pursuant to the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283 ("NDAA") on January 1, 2021.

11

The NDAA amended § 21(d) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa, by establishing a ten-year statute of limitations for SEC disgorgement claims based on certain securities law violations, including claims under Exchange Act § 10(b) [15 U.S.C. § 78j(b)], Securities Act § 17(a)(1) [15 U.S.C. § 77q(a)(1)], and "any other provision of the securities laws for which scienter must be established." NDAA, § 6501(a)(3), codified at 15 U.S.C. § 78u(d)(8)(A)(ii) (Exchange Act § 21(d)(8)(A)(ii)).   The NDAA also established a ten-year statute of limitations for SEC claims for other equitable relief such as injunctions and bars. *Id.*, codified at 15 U.S.C. § 78u(d)(8)(B) (Exchange Act § 21(d)(8)(B)). The NDAA specifically provides that its provisions "shall apply with respect to any action or proceeding that is pending on, or commenced on or after, the date of enactment of this Act." NDAA, § 6501(b).

The Supreme Court has stated that such language constitutes an "explicit retroactivity command." *Landgraf v. USI Film Products*, 511 U.S. 244, 255-56 & n.8 (1994)*; see also Martin v. Hadix*, 527 U.S. 343, 354 (1999) (describing the sentence "'[t]he new provisions shall apply to all proceedings pending on or commenced after the date of enactment" as "unambiguously address[ing] the temporal reach of the statute" (quoting *Landgraf*, 511 U.S. at 260)).   Because the Complaint was filed after the January 2021 enactment of the NDAA, the ten-year statute of limitations applies to this case.

Defendants argue that "[t]he NDAA cannot be given retroactive effect to resurrect already extinguished claims," and cite *In re Enterprise Mort. Acceptance Co. Sec Litig.*, 391 F.3d 401, 405-06 (2d Cir. 2004) (Def. Br. at 19). However, as *Sharp* thoroughly explains, 2022 WL 4085676, at *13, *Enterprise*, which concerned the retroactivity of § 804 of the Sarbanes-Oxley Act ("SOX") that extended the statute of limitations for private securities fraud cases, is distinguishable. Section 804 stated that the new statute of limitations applied to all proceedings

12

"that are commenced on or after the date of enactment of this Act," which *Enterprise* held "contains none of the unambiguous language that the Supreme Court [in *Landgraf*] has asserted would amount to an express retroactivity command." 391 F.3d at 407. The NDAA, of course, contains the "explicit retroactivity command" identified in *Landgraf*: the language of the NDAA ("shall apply with respect to any action or proceeding that is pending on, or commenced on or after, the date of enactment"), which mirrors the "unambiguous" language cited in *Landgraf,* unambiguously states that its provision should be made retroactive. Moreover, the Supreme Court has recognized that "a statute of limitations … can be extended … after the cause of action arose and even after the statute itself has expired." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 229 (1995).

Defendants argue that the NDAA phrase "pending on … the date of enactment" is "virtually identical to" the SOX language phrase "commenced on or after the date of enactment of this Act" because an action that is "commenced 'on … the date of enactment' is 'pending on … the date of enactment.'" Def. Br. at 20.  They then argue that because the Second Circuit in *Enterprise* held that that phrase in SOX meant that Congress did not intend that Act to be retroactive, the NDAA was not intended to be made retroactive. *Id.* As noted, *SEC v. Sharp*, 2022 WL 4085676, at *7-16 rejected this very argument, and no court has accepted Defendants' position.

There are numerous additional flaws in Defendants' argument. Most importantly, Defendants misleadingly quote the NDAA. The NDAA states that its provisions "shall apply with respect to any action or proceeding that is pending on, or commenced on or after, the date of enactment of this Act," not merely "pending on … the date of enactment," as Defendants misleadingly quote it. Thus, the NDAA by its express terms applies to actions "pending on" the

date of the NDAA's enactment, as well as actions "commenced on or after" the date of enactment. This is materially different from the SOX provision in *Enterprise*, which only applied to actions "commenced on or after the date of enactment of this Act," and not to actions "pending on" the enactment date.

There would be no reason for Congress to include both the phrases "pending on" and "commenced on" in the NDAA if they meant the same thing, and indeed they do not. Even if, as Defendants argue, an action commenced on a particular date can be considered pending on that date, an action that is pending on a particular date is not limited to actions commenced on that date, but also includes actions commenced at any time prior to enactment and still ongoing.

Defendants also ignore the fact that—as the *Sharp* court catalogued, 2022 WL 4085676, at *11—the Second Circuit and, to the SEC's knowledge, every other court that has considered the question, has held that Congress expressly provided that the NDAA is retroactive. *See, e.g., SEC v. Fowler,* 6 F.4th 255, 260 n.5 (2d Cir. 2021) (NDAA "retroactively imposed a new, ten-year statute of limitations" for disgorgement and injunctive relief); *SEC v. Hallam,* 42 F.4th 316, 335 & n.76 (5th Cir. 2022) (holding that the NDAA's language "makes clear that [the statute] is retroactive" (quoting *Plaut,* 514 U.S. at 226)); *SEC v. Gallison,* __ F. Supp. 3d __, 2022 WL 604258, at *6 (S.D.N.Y. Mar. 1, 2022) ("pursuant to the NDAA, Congress has explicitly decided that a ten-year statute of limitations applies"); *SEC v. Spartan Sec. Group, Inc.,* 2022 WL 3224008, at *10 (M.D. Fla. Aug. 10, 2022) (applying 10-year statute of limitations to SEC disgorgement claim in pending case); *SEC v. Navellier & Assoc., Inc.,* 2021 WL 5072975 at *4 (D. Mass. Sept. 19, 2021) (same); *SEC v. Kellen,* 2021 WL 4907238, at *4-5 (C.D. Cal. Sept. 14, 2021) ("ten-year statute of limitations as applied here is properly considered retroactive civil legislation"). Although *Fowler* and *Gallison* were both cited in the SEC's PI Reply (DE 132 at

5), Defendants fail to acknowledge or rebut this contrary authority.

Defendants further fail to recognize the difference between reviving a "cause of action"—which the NDAA does not do—and extending the statute of limitations. Defendants argue that "the SEC *admits* that "Section 6501(b) does ***not*** revive a 'time-barred' cause of action." Def. Br. at 20 (emphasis in original) (citing SEC Reply Br. (DE 132) at 6). Defendants then contend it is "odd[ ]" and "inconsistent" for the SEC to argue that the NDAA expands the scope of disgorgement remedies. Def. Br. at 20. There is no such inconsistency. The NDAA does not revive causes of action; it simply expands the period during the equitable certain remedy of disgorgement can be obtained.[7] *See, e.g., SEC v. Fiore,* 416 F. Supp. 3d 306, 332 (S.D.N.Y. 2019) ("disgorgement is an equitable remedy rather than a cause of action").[8] And the *Sharp* court expressly rejected the "revival" argument.  2022 WL 4085676, at *13-14.

Defendants' suggestion, Def. Br. at 20 n.21, that the NDAA's 10-year statute of limitations does not apply here because this action was not "pending on" the date of the NDAA's enactment is also baseless. The NDAA applies to actions "pending on, or commencing on or after" the date of enactment of the NDAA; as a result, it applies to this action which was filed nearly ten months after enactment.[9]

---

[7] Indeed, while Defendants claim that the statute of limitations expired by December 21, 2016, for the first three offerings, at that time, prior to *Kokesh v. SEC*, 137 U.S. 1635 (2017), it was well established that no limitations period applied to the disgorgement remedy, so no claim could have expired. And until the NDAA, no statute of limitations applied to the SEC's injunctive claims, so Defendants would not have been immune from liability for any of the conduct charged in the Complaint. *See SEC v. Gentile*, 939 F.3d 549, 566 (3d Cir. 2019).

[8] Defendants' reliance upon *SEC v. Drexel Burnham Lambert, Inc.,* 837 F. Supp. 587, 613-14 (S.D.N.Y. 1993) (Def. Br. at 22 n.25) is also inapposite, as disgorgement is not a "penalty." *Liu*, 140 S. Ct. at 1942-46 (disgorgement is not a "punitive sanction"); *Kellen*, 2021 WL 4907238, at *4 (NDAA is "civil legislation," not a penal enactment).

[9] Defendants misleadingly rely on *SEC v. Ahmed,* 15-cv-675, 2018 WL 11294677, at *6 (D. Conn. Mar. 26, 2018), Def. Br. at 23, for the proposition that disgorgement does not apply to fraud committed more than five years before a complaint is filed. That decision, however, was issued prior to

Defendants also incorrectly argue that the statute of limitations for purposes of disgorgement commences on the date contained on the Offering Memoranda. Def. Br. at 18. That argument is contradicted by the plain language of 15 U.S.C. § 78u(d)(8)(A)(ii), which provides that: "The Commission may bring a claim for disgorgement under paragraph (7) –…(ii) not later than 10 years *after the latest date of the violation* … [of scienter-based securities provisions]." (emphasis added). The Amended Complaint charges Defendants with a scheme to defraud investors in violation of Securities Act § 17(a)(1) and (3) and Exchange Act § 10(b) and Rule 10b-5 thereunder, by, among other means, obtaining investors' money through fraudulent offering documents.[10] Ten years before the SEC commenced this action on September 27, 2021 is October 27, 2011, and a six-month tolling agreement pushes the statute of limitations back to March 27, 2011. All but seven investors made their investments after March 27, 2011. *See* DE 46 at 29, 52 (Ribaudo Report). Because the SEC alleges that the Defendants obtained each of these investors' funds through their scheme to defraud, the "latest date of the violations" for purposes of these claims is at least the date the Defendants received the investors' funds—which for all but seven investors occurred after March 27, 2011. Additionally, because Defendants could not have misappropriated investor funds until after they received them (generally after March 27, 2011), all of the misappropriations fall within the ten-year statute of limitations. This is consistent with Congress's description of disgorgement as a remedy against the "recei[pt]" of "unjust enrichment" as a result of a violation. 15 U.S.C. § 78u(d)(3)(A)(ii). For all these reasons,

---

the NDAA. After the NDAA became law, the same district court ordered disgorgement award under the NDAA's ten-year statute of limitations. *Ahmed*, 2021 WL 2471526, at *4.

[10] Defendants' reliance on 28 U.S.C. § 2462, Def. Br. at 18, which deals with civil fines, penalties and forfeitures, is misplaced. The SEC's claims for disgorgement are governed by Exchange Act § 21(d), not § 2462. *See, e.g., Fowler*, 6 F.4th at 260 n.5 ("A recent amendment to the Exchange Act took the SEC's claims for disgorgement and injunctive relief outside of the ambit of § 2462.").

Defendants' claim that disgorgement should be "no greater than the amount necessary to cover Defendants' potential liability to the 84 EEGH II investors after March 27, 2016," Def. Br. at 24, should be rejected. [11]

**V.     Given Xia's Potential Liabilities to Other Creditors and Defendants' Lack of Liquid Assets, the SEC Is Not "Oversecured."**

The Freeze Order should freeze assets sufficient to cover Defendants' and Relief Defendants' maximum liability. As the Freeze Order itself states (DE 95-1 at 4), one purpose of the freeze is to prevent Defendants and Relief Defendants from dissipating or transferring funds or other assets "that could be subject to an order of disgorgement or an order imposing civil penalties." The Complaint and Amended Complaint both assert claims for disgorgement, prejudgment interest and civil penalties. And, in a brief filed on May 18, 2022, the SEC made clear that the asset freeze "should be sufficient to cover not just disgorgement but also prejudgment interest and a civil penalty" and that "the interest and penalty should be substantial." DE 133 at 4-5. Regardless of what amount is deemed frozen pursuant to the Freeze Order, however, the question now before the Court is what amount should be frozen pursuant to the PI Order yet to be issued.

The PI Order should be sufficient to cover the Defendants' potential disgorgement, including prejudgment interest, as well as civil penalties. In this case, where the investors have been deprived of their funds for many years as a result of Defendants' fraud, an award of prejudgment interest is appropriate. Prejudgment interest represents the amount of money the wrongdoer made or could have made by investing monies wrongfully obtained. *See, e.g., SEC v. Koenig*, 557 F.3d 736, 745 (7th Cir. 2009). An award of prejudgment interest is not a punitive

---

[11] Defendants also argue that limited partnership interests are not securities. Def. Br. at 13. The SEC already addressed this argument in its post-hearing briefs, and it should be rejected for the reasons set forth in those briefs. DE 103 at 13-14; 132 at 1-4.

award but rather is equitable in nature. *SEC v. Lauer,* 478 F. Appx 550, 557 (11th Cir. 2012).

"The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion, and will not be overturned on appeal absent an abuse of that discretion." *SEC v. First Jersey Secs., Inc*., 101 F.3d 1450, 1476 (2d Cir. 1996) (affirming prejudgment interest of $52 million); *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 385 (S.D.N.Y. 2007) (purpose of prejudgment interest is to deprive individuals who have had the use of ill-gotten gains of "what amounts to an interest-free loan.").

Many courts have held that the scope of an asset freeze order should be an approximation of defendant's "maximum liability," which necessarily includes "penalties and interest." *SEC v. Spongetech Delivery Sys., Inc*., 2011 WL 887940, at *11 (E.D.N.Y. Mar. 14, 2011); *see also Unifund SAL*, 910 F.2d at 1042 (order "freezes funds in an amount sufficient to cover not just the profits that might have to be disgorged but the civil penalty, equal to three times the profits"); *SEC v. PlexCorps*, 2018 WL 3038500, at *1 (E.D.N.Y. June 19, 2018) (freeze order "necessary 'to preserve the status quo and to protect the Court's ability to award relief in the form of disgorgement of ill-gotten gains, prejudgment interest and civil penalties.'"); *SEC v. Maillard*, 2014 WL 1660024, at *4 (S.D.N.Y. 2014) ("SEC is entitled . . . to an asset freeze sufficient to preserve its disgorgement remedy as well as assets necessary to pay civil monetary penalties"). Prejudgment interest on a $229 million disgorgement award is approximately $68 million. Decl. Ex. 1.

Defendants will also be subject to potential civil penalties pursuant to Securities Act § 20(d) [15 U.S.C. § 77t(d)] and Exchange Act § 21(d)(3) [15 U.S.C. § 78u(d)(3)], which contain

three penalty tiers.[12] In cases involving fraud or deceit and a "significant risk of a substantial losses to other persons," the maximum penalty for violations occurring between March 6, 2013, and November 2, 2015 is $160,000 per violation for persons, and $775,000 per violation for entities. For third-tier violations occurring after November 2, 2015, the maximum penalty for a person is $207,183 per violation and $1,035,909 per violation for entities.

There are different ways to count each "violation" for penalty purposes. For example, each misrepresentation or misappropriation; each defrauded investor; each fraudulent offering; or each statute violated could all be considered separate violations. The Amended Complaint alleges that Defendants committed securities law violations from 2010 through the date of the Complaint. Considering each month in which Defendants obtained investor funds through their fraudulent scheme to be one violation results in the following potential violations: EEGH – 7 violations before November 2015; 2 violations after Nov. 2015; EEGH II – 2 violations before 1 Nov. 2015; 19 violations after Nov. 2015. As a result, the totals are 9 violations before Nov. 2015, and 21 violations after Nov. 2015. *See* PX 48 at 19-22, 29-31(list of investors and dates of investments). This results in the following penalty amounts:

|  | Before Nov. 2015 | After Nov. 2015 | TOTALS |
|---|---|---|---|
| Xia | 160K x 9 = 1,440,000 | 2017,183 x 21 = 4,350,843 | $5,790,843 |
| Fleet | 775K x 9 = 6,975,000 | 1,035,909 x 21 = 21,754,089 | $28,729,089 |
|  |  |  | $34,519,932 |

Adding Fleet's potential penalty of $28,729,089 to the potential disgorgement amount of $229,000,000 and estimated prejudgment interest of $68,000,000 would result in Fleet being subject to $623,250,000 in disgorgement, prejudgment interest and penalties of $325,729,089.

---

[12] The statute of limitations for penalties is five years. Given that the Complaint was filed on September 27, 2021, five years prior to that date, minus the six month tolling agreement, results in a penalty period commencing on March 27, 2015.

19

Adding Xia's potential penalty of $5,790,843 to that amount (disgorgement and prejudgment interest can be imposed jointly and severally on Defendants) results in a combined potential exposure for Defendants of $331,519,932.[13]

Defendants offer appraisals of the two illiquid Properties as evidence the SEC is oversecured as to any potential judgment. However, given that Xia remains adamant that the Properties not be sold, these appraisals are of little relevance. Moreover, Defendants avoid addressing the key question: *if* at some future time the two Projects were sold, how much could be realized for investors in view of all liabilities and creditors?

There are other reasons to discount the Colliers appraisals. They are significantly higher than prior appraisals done in 2019 and 2021. Decl. Ex. 8.  Indeed, the material differences among the appraisals —as much as $100 million—casts doubt on their utility. All appraisals, moreover, are tainted because they rely to a large extent on information provided by Xia, whose has serious credibility issues. *See* PI Hrg. Tr. 663 (Court's statement that "I found so much of Mr. Xia's testimony unbelievable and incredible and proven demonstrably false by records and other testimony."). For example, the "Extraordinary Assumption" in the Colliers appraisal for Eastern Emerald assume that "[t]he estimated development/construction costs provided by the developer are a true representation of the total and remaining costs to develop the property." Emerald Appraisal at (pdf) 4. Given the record in this case, the appraisals are of little value since they derive from information Xia provided. *See also* DE 53 at 17-19 (Monitor's report on appraisals).

The relevant question in the context of an asset freeze is what the property is worth if it is

---

[13] If each defrauded investor is considered a violation, then during the statute of limitations period (155 EEGH investors from March 27, 2015 through December 9, 2015 and 126 EEGH II investors from October 30, 2015 through October 12, 2017, PX 48) would result in substantially higher penalties. For example, even applying the lower pre-November 2015 penalty maximums results in penalties of $44,960,000 for Xia (281 investors x $160,000) and $217,775,000 for Fleet (281 investors x $775,000).

sold to satisfy a judgment. Yet Colliers declined to address this very question with respect to Eastern Mirage, stating that it would not present a Sales Comparison Approach: "Due to unique characteristics of the interest being appraised or lack of market transactions of like substitute comparable properties, insufficient sales data is available to provide a credible value opinion by the Sales Comparison Approach." Rifkin Decl. Ex. A, at 123.

Instead, Colliers provided valuations using the Income Approach and the Cost Approach. The Income Approach, however, is of little value because it is based on what the Eastern Mirage Project will be worth once it is fully developed and in operation—a scenario that may never occur given the lack of sufficient funding in the Eastern Mirage bank accounts to cover the costs of completion. The Income Approach is also unreliable given that it is heavily dependent on numerous assumptions based on information provided by Xia as to the cost to complete the project, site plans and specifications, unit counts, project design and size. *See* Mirage Appraisal (Colliers Letter of Transmittal, Extraordinary Assumptions). It is also based on numerous speculative assumptions as to future occupancy rates for the proposed hotel, garage and medical center, future expenses, and future income to be generated by those components. Mirage Appraisal at 125-236. And the Cost Approach should also be given little weight because the cost to replace the Project has no bearing on what value will be generated if the Project is sold to satisfy a judgment—the relevant question for purposes of an asset freeze.

Colliers' valuation of the Eastern Emerald Project is also flawed. Colliers provides an "as is" valuation of $270,200,000 for the Eastern Emerald land. However, that figure is based on its estimated underlying land value of $101,750,000 based on a comparable sales analysis, plus $104,472,733 in construction costs to date (based entirely on Xia's representations), and the discounted present value of $63,973,806 in remaining Brownfield credits. Emerald Appraisal, at

226-228.  However, the alleged approximately $104.5 million in construction costs to date are suspect because they are based entirely on Xia's representations and questionable records and the purported construction costs are not readily convertible into realizable market value.[14]  In addition, the Brownfield tax credits should not be included.[15]

Moreover, the Eastern Mirage and Eastern Emerald Projects are highly illiquid assets. There can be no assurance that, at the conclusion of this case, likely several years in the future, they will have the same value or that there will be willing buyers for them at the estimated appraised value. Furthermore, absent appointment of a Receiver with the authority to sell the Eastern Mirage and Eastern Emerald Projects, satisfying a judgment through these frozen assets will be further complicated by the fact that Xia will still own the properties.  This makes the inclusion in the asset freeze of the rental properties all the more important to ensure that any money judgment can be satisfied.

---

[14] Colliers also provides a valuation of the Eastern Emerald Project based on the Income Approach. Emerald Appraisal at 110-210. However, that valuation is based on the highly unlikely assumption that the Eastern Emerald Project will be fully built out, given that the Eastern Emerald Project is currently vacant land and given the lack of sufficient funds to complete construction. That valuation approach is therefore not only speculative but also irrelevant to the question of what the Eastern Emerald land is worth if it is sold "as is" to satisfy a judgment.

[15] Defendants mistakenly claim that the amount currently frozen should also take into account $84 million in Brownfield remediation tax credits. Def. Br. at 1; 6, fn. 7. However, as Amideo acknowledges, it appears only $14,861,028 in credits have been realized to date, consisting of a $10,968,786 payment and a $3,892,242 "held check." Amideo Rep. § 5. The remaining potential tax credits are $69,194,067. *Id.* at § 6. However, as noted in the Monitor's Report, DE 53 at 16, and taking into account the money Defendants received from the state last month, $33,948,357 of the remaining potential tax credits consists of potential Site Preparation credits for the tax years 2016 through 2018, which are under audit, and for tax years 2019 and 2020, for which tax returns have not yet been filed. The remainder, which is capped at $35 million, consists of a Tangible Property credit, which requires that the Eastern Emerald Project be completed and put to "commercial or residential use" by 2025, an unlikely prospect given current circumstances, including the lack of any viable financing plan advanced by Defendants. Given the uncertainty whether any portion of the approximately $69 million in non-issued Brownfield tax credits will be issued, they should not be included in calculating the amount of assets currently frozen or added to the value of the Eastern Emerald land, as the Colliers appraisal erroneously does.

The asset freeze should also take into account potential claims against the frozen assets, including present and future creditors, as Xia and his affiliated entities are subject to considerable liabilities apart from the SEC action. For example, Xia is responsible for paying nearly $30 million in mortgages and liens that he incurred by misappropriating investor funds to purchase the three Long Island mansions. There are also nearly thirty pending lawsuits against Xia and his entities, and he faces significant exposure from these actions. Decl. Ex. 6 (listing more than two dozen pending actions against Xia). Xia has also failed to secure Builder's Risk insurance on the Eastern Mirage property, which exposes that site to potential catastrophic losses. DE 115 at 2-3, 170 at 11 (Monitor's reports on Builder's Risk insurance). There are also property taxes on both properties, mechanics liens (PX47), unpaid building violations, Monitor fees, and other expenses that must be paid. These expenses could well deplete a significant portion of the remaining cash.

For all the foregoing reasons, the rental properties are necessary to ensure that sufficient assets are frozen and available to satisfy a potential disgorgement order of up to $229 million, plus approximately $68 million in prejudgment interest and a civil money penalty.[16]

## VI. The Freeze Order Should Not Be Modified In Any Respect, If At All, Until Xia Fully Discloses All Relevant Financial Information.

Xia has consistently failed to adequately and fully disclose his financial assets. The sworn accounting he provided in October 2021 contained a disclaimer stating that it had "not been prepared, substantiated, authenticated, verified or vetted, in whole or in part, by any accountant,

---

[16] The 15 rental properties (Decl. Ex. 2) are properly within the scope of the Freeze Order as an asset of Xia's, regardless of whether he obtained them before or during the fraud. "[T]he SEC need not demonstrate that the frozen assets are traceable to the fraud, it must show that the amount is an approximation of defendant's maximum liability." *Spongetech*, 2011 WL 887940, at *11. The value of the rental properties is also uncertain: Defendants' claim they have "a combined value of approximately $11 million," but they provide no justification for this estimate. Def. Br. at 8.

lawyer or other professional-service provider." DE 19. In addition, Xia has refused to disclose

how much money he has received from the 15 rental properties, although the SEC has served

discovery requests seeking such information in November 2021 and March 2022. It is also

unclear how Xia is paying for his day-to-day expenses, as he has never asked for a carve-out for

living expenses. Xia also appears to have access to funds, as payments of $440,000 to the Sills

Cummis law firm, and $250,000 to the WilmerHale law firm, were made on Xia's behalf. Decl.

Ex. 7.[17] In addition, Xia violated the Freeze Order two days after it went into effect by

transferring $200,000 to an account in Yue's name. DE 101-29 at 1, 8. And public records show

that Xia apparently is seeking to sell at least three of the rental properties, which would violate

the Freeze Order: 133-54 Avery Ave, Flushing, NY; 63-98 Wetherole St; and 140-22 Beech

Ave, unit 9C. Decl. Exs. 3, 4, 5.

      Xia's conduct throughout this action demonstrates that the equities do not favor any

modification of the freeze. At a minimum, the motion should be denied at least until after Xia

has fully documented his current income, expenses, and assets, including a full accounting of all

income received from the rental properties, and the disposition of all such funds, including a full

disclosure of information regarding the sources and amounts of payments for Xia's legal fees.

*See Liu*, 851 F. Appx. at 669 (declining to modify freeze covering all defendant's assets due to

his "refusal to provide an accounting—or any other information—that would allow the district

court to tailor a narrower freeze"); *Stein*, 2009 WL 1181061, at *2 (denying defendant's motion

---

[17] In July 2022, the SEC served document subpoenas on the current lawyers for the Defendants, Verfenstein and Yu, seeking documents relating to payments to them by or on behalf of Xia. The subpoenas did not seek any privileged documents. *See In re Grand Jury Subpoena Served Upon John Doe*, 781 F.2d 238, 247 (2d Cir.1986) (*en banc*) ("We consistently have held that. . .client identity and fee information are not privileged."). No responsive documents have been produced yet, however, and the parties are engaged in a meet-and-confer process.

to modify asset freeze "without prejudice to its renewal upon a comprehensive accounting of all of [defendant's] assets and liabilities").

## CONCLUSION

For the reasons set forth above, the SEC respectfully requests that the Court deny the Defendants' motion to vacate or modify the asset freeze.

Dated:  New York, New York
        September 9, 2022

                              Respectfully submitted,

                              /s/ *Kevin P. McGrath*
                              /s/ *David Stoelting*
                              /s *Kim Han*

                              _____
                              Kevin P. McGrath
                              David Stoelting
                              Kim Han
                              Attorneys for Plaintiff
                              SECURITIES AND EXCHANGE COMMISSION
                              New York Regional Office
                              100 Pearl Street, Suite 20-100
                              New York, New York 10004
                              (212) 336-0533 (McGrath)
                              mcgrathk@sec.gov