# EXHIBIT A

# LOAN AGREEMENT

## in the amount of up to $15,000,000.00

### By and Among

**X&Y DEVELOPMENT GROUP, LLC, a New York limited liability company, as Borrower,**

**EMERALD CREEK CAPITAL 3, LLC, a New York limited liability company, as Administrative Agent**

### and

### THE LENDERS HERETO

### Dated as of: August  30, 2021

| Premises: | Address: | 42-31 UNION STREET, QUEENS, NEW YORK 10013 |
|---|---|---|
| | County: | QUEENS |

## LOAN AGREEMENT

THIS LOAN AGREEMENT (this "**Agreement**") dated as of August 30, 2021, between **X&Y DEVELOPMENT GROUP, LLC**, a New York limited liability company, having an address at c/o 42-31 UNION STREET, QUEENS, NEW YORK 11355 ("**Borrower**"), and **EMERALD CREEK CAPITAL 3, LLC**, a New York limited liability company, having an address of 575 Lexington Avenue, Suite 3120, New York, New York 10022, as administrative agent and collateral agent for the Lenders (as defined herein) (in such capacity, and together with its successors and assigns, "**Administrative Agent**").

WHEREAS, subject to and upon the terms and conditions hereinafter set forth, Borrower wishes to borrow from the Lenders, and the Lenders are willing to lend to Borrower up to FIFTEEN MILLION AND NO/100 DOLLARS ($15,000,000.00) (the "**Loan**").

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Administrative Agent, the Lenders and Borrower hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Use of or reference to the following terms herein shall be construed as indicated:

1.1     Affiliate: As to any Person, any other Person that, directly or indirectly, owns more than ten percent (10%) of, is in control of, is controlled by or is under common ownership or control with such Person.  As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

1.2     Assignment of Leases and Rents: The Assignment of Leases and Rents dated the date hereof, executed by Borrower in favor of Administrative Agent, as the same may be amended, restated, modified, increased or supplemented from time to time in accordance with the terms hereof.

1.3     Book Entry Agent: As defined in Section 7.20 hereof.

1.4     Business Day: Any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Legal Requirements to close.

1.5     Closing Advance:  The disbursement of the Loan on the date hereof by Administrative Agent pursuant to the terms hereof.

1.6     Environmental Indemnity Agreement: The Environmental Indemnity Agreement dated on or about the date hereof, given by Borrower and Guarantor, as the same may be amended, restated, modified, increased or supplemented from time to time in accordance with the terms hereof.

1

1.7     Environmental Report: That certain Phase I Environmental Site Assessment prepared by Gabriel Environmental Group, dated July 29, 2021.

1.8     Event of Default: Shall have the meaning ascribed to such term in Section 5.1 hereof.

1.9     Foreclosure Action: Shall have the meaning ascribed to such term in Section 5.1(f) hereof.

1.10    Guaranty: That certain Nonrecourse Carve-Out Guaranty dated on or about the date hereof, given by Guarantor, as the same may be amended, restated, modified, increased or supplemented from time to time in accordance with the terms hereof.

1.11    Guarantor:  RICHARD XIA, an individual resident of the State of New York, having an address of 42-55 SAULL STREET, QUEENS, NEW YORK 10013.

1.12    Indemnified Parties: Collectively and severally, Administrative Agent and the Lenders, together with their respective members, directors, officers, shareholders, agents, employees, participants, successors and assigns, and shall also include any purchasers who are Affiliates of Administrative Agent and/or any of the Lenders of all or any portion of the Property at any foreclosure sale or any affiliated transferee designated by Administrative Agent as "grantee" on any conveyance of the Property recorded in lieu of foreclosure of the Property.

1.13    Insurance Escrow: $0.

1.14    Interest Reserve: $ 1,680,000.00.

1.15    Lender(s):  Individually and collectively, any Person that either (a) is listed on the signature pages hereof as a "Lender" or (b) from time to time becomes a party hereto in each case together with its successors and/or permitted assigns.

1.16    Legal Requirements:  All laws, statutes, treaties, codes, permits, decrees, ordinances, orders, rules, regulations, determinations, or requirements of any governmental authority, arbiter or court, including, without limitation, any environmental laws, any building, use, zoning and land use laws or regulations (including set back requirements), and any applicable covenants and restrictions pursuant thereto.

1.17    Loan:  The Loan shall have the meaning ascribed to such term in the WHEREAS clause of this Agreement.

1.18    Loan Documents:   This Agreement, the Note, the Mortgage, the Assignment of Leases and Rents and any Uniform Commercial Code financing statements filed in connection with the Property, the Environmental Indemnity Agreement, the Guaranty and any and all other agreements, documents, certificates and instruments now or hereafter executed by Borrower, Guarantor or any other Person or party in connection with the Loan, together with any and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, extensions and supplements hereof and thereof.

2

1.19    <u>Maturity Date</u>: The Maturity Date shall mean the Maturity Date as defined in the Note.

1.20    <u>Mechanic's Lien Default</u>:  Any mechanic's or other lien filed against the Property or Borrower, and with respect to which judgment shall be rendered against Borrower or the Property and Borrower (x) shall not discharge the same or cause it to be discharged within thirty (30) days from the date of entry thereof, or (y) shall not appeal therefrom or from the order, decree or process upon which or pursuant to which such judgment was granted, based or entered and secure a stay of execution pending such appeal.

1.21    <u>Mortgage</u>:  That certain Mortgage, Assignment of Leases and Rents and Security Agreement dated the date hereof, that has been executed and delivered by Borrower to Administrative Agent, which encumbers the Property and secures, among other things, Borrower's obligations under the Note and under this Agreement, as the same may be amended, restated, modified, increased or supplemented from time to time in accordance with the terms thereof.

1.22    <u>Newly Structured Loan</u>:  As defined in <u>Section 7.23(b)</u> hereof.

1.23    <u>Note</u>: That certain Note in the maximum principal amount of the Loan, dated the date hereof, that has been executed and delivered by Borrower in favor of Administrative Agent and which evidences the Loan, as the same may be amended, restated, modified, increased or supplemented from time to time in accordance with the terms thereof.

1.24    <u>Origination Fee</u>:  As defined in <u>Section 7.18</u> hereof.

1.25    <u>Person</u>: Any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department, authority, public corporation, or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

1.26    <u>Intentionally Omitted</u>.

1.27    <u>Intentionally Omitted</u>.

1.28    <u>Property</u>:  The premises located at 42-31 UNION STREET, QUEENS, NEW YORK 10013 (BLOCK 5181, LOT 15), as more particularly described on **<u>Schedule A</u>** attached hereto and made a part hereof.

1.29    <u>Register</u>: As defined in <u>Section 7.20</u>.

1.30    <u>Reserve Account</u>:  As defined in <u>Section 2.5</u>.

1.31    <u>Reserve Funds</u>:  Collectively, the funds on deposit in the Reserve Account, which shall include the Interest Reserve, the Tax Escrow and the Insurance Escrow.

1.32    <u>Servicing Fee</u>:  As defined in <u>Section 7.18</u> hereof.

1.33    <u>Tax Escrow</u>: $ 1,170,000.00.

3

1.34    Title Company: AMTRUST TITLE INSURANCE COMPANY, or any other title insurance company acceptable to Administrative Agent.

1.35    Title Policy:    An ALTA mortgagee title insurance policy in a form acceptable to Administrative Agent issued with respect to the Property and insuring the lien of the Mortgage.

## ARTICLE II
## CLOSING ADVANCE; RESERVES

2.1    Agreement to Lend.  Subject to the terms and conditions of this Agreement and Borrower's compliance with all the provisions hereof, and relying on Borrower's representations set forth herein, the Lenders agree to lend to Borrower, and Borrower agrees to borrow from the Lenders, the Loan, or so much thereof as is advanced under this Agreement.

2.2    Closing Advance.  The Closing Advance shall fund the Reserve Account and an amount sufficient to cover the closing costs, including but not limited to the Origination Fee, Servicing Fee, mortgage title insurance premiums, brokerage, mortgage recording taxes, transfer taxes, recording fees, and reasonable attorneys' fees (after first applying the $10,000 deposit paid by Borrower prior to the date hereof with respect to Lender's counsel's attorneys' fees).  The remainder of the Closing Advance shall be made to or on behalf of Borrower.

2.3    Certain Conditions Precedent to Administrative Agent's Obligation to Make the Closing Advance: Administrative Agent shall not be obligated to make the Closing Advance unless all of the following conditions shall be satisfied as of the date hereof (it being understood that, by execution hereof, Administrative Agent hereby confirms that all of such conditions shall be satisfied as of the date hereof):

(a)    Administrative Agent shall have received each of the Loan Documents, all in form and substance satisfactory to Administrative Agent in its sole discretion.

(b)    Administrative Agent shall have received a legal opinion from legal counsel to Borrower, Guarantor and Pledgor, which counsel shall be satisfactory to Administrative Agent, addressing corporate, partnership and limited liability company organization, authority and good standing, the enforceability of the Loan Documents, perfection of the liens created by the Loan Documents, and such other matters as Administrative Agent may reasonably require.

(c)    At Borrower's sole cost and expense, Administrative Agent shall have received the Title Policy.

(d)    Administrative Agent shall have received evidence satisfactory to Administrative Agent that there are no conditional sales contracts, chattel mortgages, leases of personalty, financing statements or title retention agreements affecting the Property.

(e)    Each of the representations and warranties contained in this Agreement shall be true and correct in all material respects as of the date hereof.

4

(f)     No Event of Default shall have occurred and be continuing and no default that with the passage of time or notice, or both, would constitute an Event of Default shall have occurred and be continuing.

(g)     Borrower shall have paid all fees and expenses required to be paid by Borrower under this Agreement (including without limitation, the Origination Fee and the Servicing Fee).

2.4     <u>Intentionally Omitted</u>.

2.5     <u>Reserves</u>.

(a)     <u>Interest Reserve</u>.  On the Closing Date, the Interest Reserve shall be advanced into the Reserve Account and shall be reserved for disbursements to cover interest payments as same accrue and become due and payable on the Loan.  So long as there is no Event of Default, Administrative Agent will make monthly disbursements from the Interest Reserve to pay interest on the Loan as and when due under the Note. Borrower's obligations with respect to the payment of interest on the Loan shall be deemed satisfied to the extent a sufficient amount is in the Reserve Account to satisfy such obligations on the dates each such payment is required and such amount is required to be so applied by Administrative Agent, regardless of whether any of such amount is actually so applied by Administrative Agent.  Administrative Agent shall not be required to disburse the Interest Reserve for any purpose other than the payment of interest on the Loan. Borrower hereby authorizes Administrative Agent to, and Administrative Agent hereby agrees to, release the Interest Reserve in accordance with this <u>Section 2.5</u>.  If and to the extent the funds available in the Interest Reserve are insufficient or are otherwise unavailable for disbursement (as the result of the continuance of an Event of Default or pursuant to the other terms and conditions of this Agreement), then Borrower shall pay from Borrower's own funds the interest on the Loan then due and payable.  In the event the Loan is repaid prior to the disbursement of the full amount of the Interest Reserve, any undisbursed portion shall be refunded to Borrower upon repayment of the Loan.

(b)     <u>Tax Escrow</u>.  On the Closing Date, the Tax Escrow shall be advanced into the Reserve Account and shall be reserved for disbursements to cover the Taxes and Other Charges (as such terms are defined in the Mortgage) as they become due and payable.  Administrative Agent shall not be required to disburse the Tax Escrow for any purpose other than the payment of Taxes and Other Charges in connection with the Property; it being expressly understood that, if required herein, Administrative Agent shall be required to disburse the Tax Escrow for the payment of Taxes and Other Charges in connection with the Property to the appropriate taxing authority and/or recipient of such Taxes and Other Charges on or before the date such Taxes and Other Charges become due and payable.  Borrower hereby authorizes Administrative Agent to, and Administrative Agent hereby agrees to, release the Tax Escrow as needed to cover any such payments as they become due with respect to the Property.  Subject to the conditions set forth in this Agreement and so long as no Event of Default shall have occurred and be continuing, Administrative Agent will release funds from the Tax Escrow to pay Taxes and Other Charges as needed to cover any such payments as they become due with respect to the

Property.   If the Tax Escrow is not sufficient to make the required payments, Administrative Agent shall notify Borrower of same, and thereafter Borrower will make such payments from its own funds.   Any portion of the Tax Escrow remaining after the Loan has been paid in full shall be returned to Borrower upon repayment of the Loan.

(c)     Insurance Escrow.   On the Closing Date, the Insurance Escrow shall be advanced into the Reserve Account and shall be reserved for disbursements to cover the Insurance Premiums (as such term is defined in the Mortgage) as they become due and payable.   Administrative Agent shall not be required to disburse the Insurance Escrow for any purpose other than the payment of Insurance Premiums in connection with the Property; it being expressly understood that, if required herein, Administrative Agent shall be required to disburse the Insurance Escrow for the payment of Insurance Premiums in connection with the Property to the recipient of such Insurance Premiums on or before the date such Insurance Premiums become due and payable.   Borrower hereby authorizes Administrative Agent to, and Administrative Agent hereby agrees to, release the Insurance Escrow as needed to cover any such payments as they become due with respect to the Property.   Borrower shall submit written evidence satisfactory to Administrative Agent in its reasonable discretion (no less than five (5) days in advance of such request for release), requesting Administrative Agent to release funds out of the Insurance Escrow to pay the Insurance Premiums when due.   Subject to the conditions set forth in this Agreement and so long as no Event of Default shall have occurred and be continuing, Administrative Agent will release funds from the Insurance Escrow to pay Insurance Premiums as needed to cover any such payments as they become due with respect to the Property.   If the Insurance Escrow is not sufficient to make the required payments, Borrower will make such payments from its own funds.   Any portion of the Insurance Escrow remaining after the Loan has been paid in full shall be returned to Borrower upon repayment of the Loan.

(d)     Reserve Funds, Generally.

(A)     Borrower grants to Administrative Agent a first-priority perfected security interest, pursuant to Section 9-104(a)(3) of the New York Uniform Commercial Code, in the Reserve Funds, the Reserve Account and any and all monies now or hereafter deposited in the Reserve Account as additional security for payment of the indebtedness secured by the Mortgage.   Until expended or applied in accordance herewith, the Reserve Funds and the Reserve Account shall constitute additional security for the Loan.   The Reserve Funds shall be utilized during the term of the Loan in accordance with the terms and provisions of the Loan Documents.

(B)     Notwithstanding anything to the contrary contained herein, Administrative Agent shall not be required to disburse any Reserve Funds if an Event of Default shall have occurred and is continuing.   Upon the occurrence of an Event of Default, Administrative Agent may, in addition to any and all other rights and remedies available to Administrative Agent, apply any sums then present in any or all of the Reserve Funds to the payment of the indebtedness secured by the Mortgage in any order in its sole discretion (and without any notice).

(C)     The Reserve Funds shall not constitute trust funds and may be commingled with other monies held by Administrative Agent or an Affiliate and/or subsidiary of Administrative Agent.

(D)     The Reserve Funds shall be held in an account by Administrative Agent or an Affiliate and/or subsidiary of Administrative Agent (the "**Reserve Account**") for the benefit of Borrower.  No interest on the Reserve Funds, if any, shall be paid by Administrative Agent to Borrower.

(E)     Borrower hereby consents to Administrative Agent's placement of the Reserve Funds into the Reserve Account maintained and held in the name of Administrative Agent or an Affiliate and/or subsidiary of Administrative Agent for the benefit of Borrower.

(F)     Administrative Agent or a designated representative or an Affiliate or subsidiary of Administrative Agent shall have the sole right to make withdrawals from the Reserve Account.

(G)     The insufficiency of any balance in Reserve Funds shall not relieve Borrower from its obligation to fulfill all of its covenants and obligations as set forth in the Loan Documents.

(H)     Borrower shall not, without obtaining the prior written consent of Administrative Agent, further pledge, assign or grant any security interest in any Reserve Fund or the Reserve Account or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Administrative Agent as the secured party, to be filed with respect thereto.

(I)     Borrower shall indemnify the Indemnified Parties, and hold the Indemnified Parties harmless from and against any and all actions, suits, claims, demands, liabilities, actual losses, damages, obligations and third-party costs and expenses (including litigation costs and reasonable attorneys' fees and expenses) arising from or in any way connected with the Reserve Funds or the Reserve Account or the performance of the obligations for which the Reserve Funds or the Reserve Account were established, except to the extent arising from the gross negligence or willful misconduct of Administrative Agent, a designated representative or an Affiliate or subsidiary of Administrative Agent (in which case, the applicable liability shall extend only to Administrative Agent, and in no event whatsoever shall any liability extend to any of the Lenders).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

3.1     <u>Representations and Warranties</u>:  Borrower represents and warrants to Administrative Agent and the Lenders as of the date hereof, knowing that Administrative Agent and the Lenders will rely on such representations and warranties as incentive to make the Loan, that:

7

(a)　　Borrower is a New York limited liability company duly organized and validly existing under the Legal Requirements of the State of New York and has the authority to do business in the State of New York.  Borrower has, and will continue to have, the full power and authority and legal rights to own the Property, to carry on its business as now conducted and to perform its obligations under this Agreement.  Borrower conducts no business directly or indirectly except owning and operating the Property.  Notwithstanding anything to the contrary, and without limiting the foregoing, (1) besides Guarantor, no other individual and/or entity has any ownership and/or other interest in the Property, including without limitation, FEDERAL NEW YORK METROPOLITAN REGIONAL CENTER LLC, EMMCO NQMC, L.P., EMMCO, L.P., EMMCO Tower, L.P., FLEET FINANCIAL GROUP, INC. and/or any investor in the EB-5 Immigrant Investor Program ("**EB-5 Program**"), and (2) by execution hereof, each of FEDERAL NEW YORK METROPOLITAN REGIONAL CENTER LLC, EMMCO NQMC, L.P., EMMCO, L.P., EMMCO Tower, L.P. and Fleet Financial Group, Inc. (collectively, the "**EB-5 Entities**") represents, warrants and confirms to Administrative Agent and the Lenders as of the date hereof that (i) none of the EB-5 Entities has any ownership and/or other interest in the Property, (ii) none of the EB-5 Entities is in default of any obligation with respect to the EB-5 Program that could reasonably be expected to affect Borrower's ability to repay the Loan and/or Guarantor's ability to guaranty such repayment pursuant to the Guaranty, (iii) Borrower is not is in default of any obligation with respect to the EB-5 Program, (iv) there are no investments and/or loans under the EB-5 Program with respect to the Property other than as set forth on **Schedule B-2** and (v) each of the EB-5 Entities releases Borrower, Guarantor, Administrative Agent and the Lenders and all of their affiliates, shareholders, members, partners, predecessors, employees, officers, directors, attorneys, parent corporations, subsidiaries, agents, participants, assignees, servicers and receivers (collectively, the "**Released Parties**"), from any and all known and unknown actions, causes of action, counterclaims, suits, debts, dues, accounts, contracts, agreements, questions, sums of money, reckonings, bonds, bills, covenants, controversies, promises, variances, liabilities trespasses, damages, obligations, judgments, extents, executions, claims, disputes, demands and differences of any and every nature whatsoever, whether in law or equity, or otherwise, against Released Parties, that any of the EB-5 Entities ever had, now has, or hereafter can, shall, or may have, for, upon, or by reason of, any matter, cause or thing whatsoever from the beginning of the world to the day of this Agreement, including, without limitation, arising from, based upon, or related in any way to, the Loan, any of the Loan Documents or any other agreement, understanding, action or inaction whatsoever with regard to the Property, the Loan, or any transaction or matter related to either thereof, including, without limitation, the origination and servicing of the Loan and the enforcement or attempted enforcement of any rights or remedies for default or asserted default under the Loan Documents.

(b)　　Borrower has the authority and legal right to execute and deliver this Agreement.  No consent, approval, authorization, exemption, notice, report, registration, filing or declaration that has not been obtained or made is required to be obtained or made with respect to the execution and delivery by Borrower of this Agreement.

(c)　　Borrower has furnished Administrative Agent with true, correct and complete copies of its organizational documents.

(d)      Neither Borrower nor Guarantor are in violation of any agreement the violation of which might reasonably be expected to have a material adverse effect on Borrower's or Guarantor's ability to perform its or their obligations under the Loan Documents.

(e)      Neither this Agreement nor the performance, fulfillment of or compliance with the terms and provisions hereof, nor the consummation of the transactions contemplated hereby, conflicts or will conflict with, or will result in a breach of, the terms, conditions or provisions of, or otherwise constitute a default under, or result in the creation of any lien (other than the lien of any of the Loan Documents) upon the Property under any agreement, instrument, arbitration award, order, judgment, decree, statute, law, ordinance, franchise, certificate, permit, rule, regulation or the like to which Borrower or any Guarantor is subject.

(f)      The Loan is solely for the business purpose of Borrower and its affiliated entities.

(g)      No litigation, investigation or administrative proceeding of or before any court, arbitrator or governmental authority is pending or, to Borrower's knowledge, threatened in writing against Borrower, Guarantor or any assets thereof that, (i) might have a material adverse effect on Borrower's ability to perform its obligations under this Agreement in accordance with the terms hereof, or Guarantor's ability to perform Guarantor's obligations under the Guaranty, as applicable, (ii) might materially adversely affect the financial condition of Borrower or Guarantor, (iii) might materially impair the value of the Property, or (iv) might question the validity of this Agreement, in all instances that has not been disclosed to Administrative Agent by Borrower in writing in connection with the closing of the Loan.

(h)      Borrower has not received any written notice of the commencement of a condemnation or taking by eminent domain of any portion of the Property, or affecting any roadways or utilities abutting the Property, or access to the Property therefrom, and Borrower has no knowledge that a condemnation or taking by eminent domain is threatened or contemplated by any governmental authority.

(i)      (x) there are no management, leasing, marketing, engineering, architectural, construction and/or maintenance contracts, relating to the Property to which Borrower or any Affiliate of Borrower is a party other than as set forth on **Schedule B-1**, and (y) there are no EB-5 Program investments and/or loans with respect to the Property other than as set forth on **Schedule B-2**.

(j)      Borrower has not sold, conveyed, assigned, leased or otherwise transferred, or agreed to sell, convey, assign, lease or otherwise transfer, any development, air or floor area-ratio rights with respect to the Property.

(k)      Other than in the Environmental Report, Borrower has no knowledge of any Hazardous Substances (as defined in the Mortgage) located or disposed of on the Property.

(l)      All financial statements of Borrower and Guarantor heretofore given and hereafter to be given to Administrative Agent, are true and complete in all material respects as of their respective dates, fairly represent the financial conditions of the businesses or Persons to

9

which they pertain, and no materially adverse change has occurred in the financial conditions reflected therein since the respective dates thereof.

(m)     All documents furnished to Administrative Agent by or on behalf of Borrower, as part of or in support of the Loan application or pursuant to this Agreement or otherwise in connection with the Loan or the Loan Documents, are, in all material respects, true, correct, complete and accurately represent, in all material respects, the matters to which they pertain.

(n)     As of the date of this Agreement, Borrower and Guarantor are solvent.

(o)     Borrower as of the date hereof is in compliance with the Single Purpose Entity Requirements (as defined in the Mortgage).

(p)     (x) the Property is not subject to any Leases (as defined in the Mortgage), and (y) no person other than Borrower has any possessory interest in the Property or right to occupy the same.

(q)     Other than any violations reflected in the title report delivered to Administrative Agent and/or Lenders in connection with the making of the Loan, the Property complies with all applicable Federal, State, County and City Legal Requirements.

3.2     <u>Continuing Effectiveness.</u>   All representations and warranties contained herein shall be deemed continuing and in effect at all times while Borrower remains indebted to Administrative Agent.

**ARTICLE IV**
**COVENANTS OF BORROWER**

4.1     <u>Covenants.</u>  Borrower covenants and agrees as follows:

(a)     Borrower shall endeavor to keep the Property free from liens and encumbrances, shall endeavor pay promptly all Persons or entities supplying work or materials with respect to the Property (unless disputed or otherwise being contested) and shall promptly discharge by bond or otherwise, or make other arrangements acceptable to Administrative Agent with respect to, any mechanic's or other lien filed against the Property that is the subject of a Mechanic's Lien Default.

(b)     Subject to Administrative Agent's obligations in respect of the Tax Escrow, Borrower shall pay promptly when due and before the accrual of penalties thereon all taxes including all real and personal property taxes and assessments levied or assessed against Borrower or the Property and all utility fees and charges in connection with the Property, subject to Section 28 of the Mortgage, and to provide Administrative Agent with receipted bills therefor if requested by Administrative Agent except to the extent Borrower is contesting such taxes in good faith pursuant to said Section 28 of the Mortgage.

10

(c)     Borrower shall maintain in effect at all times while Borrower is indebted to Administrative Agent the insurance policies required by the Mortgage and shall notify Administrative Agent of any change in the status of such insurance within ten (10) days of Borrower's receipt of notice of any such change.

(d)     In connection with the making of the Loan (which, by execution hereof, Administrative Agent hereby confirms shall have been paid as of the date hereof), and after the date hereof upon the occurrence and during the continuance of an Event of Default, Borrower shall pay all fees and expenses of and/or incurred by Administrative Agent and required to be paid by Borrower pursuant to the terms of the Loan Documents (including without limitation, expenses incurred by Administrative Agent for title searches, title updates and endorsements, tax and judgment lien searches, litigation searches and UCC searches, and reasonable attorneys' fees for mortgage satisfaction or assignment), and all expenses involved in perfecting the lien status or priority provided by the Loan Documents and all other expenses of Administrative Agent directly related to the Loan, to the extent required to be paid by Borrower pursuant to the terms of the Loan Documents, the protection and preservation of the Property or the enforcement of any provision of this Agreement or of the Loan Documents, including, without limitation, recording fees and taxes, tax, title and lien search charges, title insurance charges, architects, engineers and reasonable attorneys' fees (including fees for appellate proceedings), real property taxes, personal property taxes and insurance premiums.  In addition to the foregoing, notwithstanding anything to the contrary, Borrower agrees, within ten (10) days after Administrative Agent's written demand, to reimburse Administrative Agent for all expenses incurred by Administrative Agent (up to $250 per calendar quarter) in periodically verifying the security and priority of the Mortgage, including, without limitation, reasonable expenses incurred by Administrative Agent for title searches, title updates and endorsements, tax and judgment lien searches, litigation searches and UCC searches.

(e)     Borrower shall notify Administrative Agent promptly of any matters which could be expected to have a material adverse effect on Borrower's ability to perform its obligations under this Agreement, including without limitation, (A) any litigation instituted or threatened in writing, of which Borrower has knowledge, against Borrower, (B) any deficiencies asserted or liens filed by the Internal Revenue Service against Borrower or the Property (or any portion thereof), (C) any audits of any Federal or State tax return of Borrower, and the results of any such audit, (D) any condemnation or similar proceedings with respect to any of the Property (or any portion thereof) and (E) any other matters which could be expected to materially and adversely affect Borrower's ability to perform its obligations under this Agreement.

(f)     Borrower shall maintain complete and accurate account, books and records with respect to the Loan, which books and records shall reflect the consistent application of accepted accounting principles, and Borrower shall make such books and records available at reasonable times and upon not less than forty-eight (48) hours' prior written notice for inspection and copying by Administrative Agent or its agent.

(g)     Borrower shall permit Administrative Agent and/or any of the Lenders, without any further and/or prior approval whatsoever of Borrower, to publicize Administrative Agent's and/or any of the Lenders' role in the Loan, including without limitation, by issuing any advertisement, press release or otherwise making any public statements with respect to Administrative Agent's and/or any of the Lenders' role in the Loan (provided, however,

11

notwithstanding anything to the contrary, in no event whatsoever shall Administrative Agent and/or any of the Lenders publicize the name and/or identity of Guarantor and/or any economic terms of the Loan other than the amount of the Loan).

(h)     Borrower shall, at Administrative Agent's request, execute and deliver to Administrative Agent all further documents and perform all other acts which Administrative Agent reasonably deems necessary or appropriate to perfect or protect its security for the Loan.

(i)     Borrower shall not engage in any business other than operating, developing and owning the Property.

(j)     Borrower shall duly perform and observe, or shall cause to be performed and observed, all of the covenants, agreements and conditions on its part to be performed and observed under the Note, the Loan Documents, and by this reference all of such covenants, agreements and conditions are hereby made a part of this Agreement to the same extent as if fully set forth herein.

(k)     Borrower shall endeavor to give notice to Administrative Agent within fifteen (15) Business Days after Borrower becomes aware that any representation or warranty of Borrower contained herein is no longer true and correct in any material respect.

(l)     Borrower shall maintain its existence and shall be in good standing at all times.

(m)     Borrower shall at all times be in compliance with the Single Purpose Entity Requirements.  Borrower shall not directly or indirectly make any change, amendment or modification to its organizational documents, or otherwise take any action which could result in Borrower not being in compliance with the Single Purpose Entity Requirements.  Notwithstanding anything to the contrary, in the event of any conflict between this Section 4.1 hereof on the one hand, and the Single Purpose Entity Requirements on the other hand, the Single Purpose Entity Requirements shall control.

4.2     Condominium Conversion.  Administrative Agent agrees that Borrower, on notice to Administrative Agent together with copies of any plans, shall have the right to submit the Property to condominium ownership, provided, however, that (i) following the foregoing, in addition to any other applicable requirements set forth in the Loan Documents, the provisions of Section 5.1(b) shall be applicable with respect to any individual condominium unit within the condominium, (ii) Borrower shall cooperate with any reasonable requests of Administrative Agent for any conditional assignment and/or resignation with respect to any such condominium association and/or position within the condominium, and (iii) Borrower shall retain KRAMER LEVIN NAFTALIS & FRANKEL LLP, GANFER SHORE LEEDS & ZAUDERER, LLP or such other counsel as may be reasonably approved by Administrative Agent in connection with the submission for condominium ownership.

## ARTICLE V
## <u>EVENTS OF DEFAULT</u>

5.1     <u>Events of Default</u>.  The occurrence of any of the events listed in this Article shall constitute an event of default ("**Event of Default**") under this Agreement:

(a)     If an "*Event of Default*" (as such term is defined in the Mortgage) shall occur under the Mortgage or any of the Loan Documents.

(b)     The assignment or attempted assignment by Borrower of this Agreement, any rights hereunder, or the conveyance, lease, mortgage, or any other alienation or encumbrance of the Property or any part thereof, or any estate or right therein, without the prior written consent of Administrative Agent, except as explicitly permitted herein or by the Loan Documents.

(c)     (x) if any certificate, statement, representation, warranty or audit heretofore or hereafter furnished by or on behalf of Borrower, pursuant to or in connection with this Agreement or any of the other Loan Documents (including, without limitation, representations and warranties contained herein) (i) proves to have been false or misleading in any material respect at the time as of which the facts therein set forth were stated or certified, (ii) proves to have omitted a material fact that would render any certificate, statement, representation, warranty or audit previously furnished by or on behalf of Borrower false or misleading, or (iii) proves to have omitted any substantial contingent or unliquidated liability or claim against either Borrower or any Guarantor, or (y) if on the date of execution of this Agreement there shall have been any materially adverse changes in any of the facts previously disclosed by any such certificate, statement, representation, warranty or audit, which change shall not have been disclosed to Administrative Agent at or prior to the time of such execution, and in all such cases in either (x) or (y) there occurs a material adverse effect on Borrower's ability to perform its obligations under this Agreement; provided, however, that such breach shall not constitute an Event of Default if (1) the same was not intentional, (2) the same is curable, and (3) Borrower shall cure such breach within (i) five (5) Business Days after receipt of written notice from Administrative Agent, in the case of any such breach which can be cured by the payment of a sum of money or (ii) thirty (30) days after receipt of written notice from Administrative Agent, in the case of any other breach.

(d)     Except if such default shall otherwise constitute an Event of Default (in which event, notwithstanding anything to the contrary, there shall have automatically occurred an Event of Default), if Borrower fails to cure a default under any other term, covenant or provision of this Loan Agreement and/or the Loan Documents, within thirty (30) days after the happening of such default, <u>provided</u>, <u>however</u>, in the event that Borrower, as reasonably determined by Administrative Agent, has commenced efforts to remedy the underlying breach within such initial thirty (30) day period and has continued to diligently act to cure such breach, the initial thirty (30) day period shall be extended as reasonably necessary to permit Borrower to cure such breach (up to a maximum of sixty (60) days beyond the initial thirty (30) day period).  If any representation or warranty contained in this Agreement shall not have been true and correct in all material respects when made.

13

(e)      The institution by any lienor, other than Administrative Agent, of a foreclosure action against the Property or any part thereof (a "**Foreclosure Action**") (i) with respect to which Borrower fails to initiate and diligently prosecute a motion or to dismiss any such Foreclosure Action (a "**Contest Action**") within ten (10) days following the filing of any such Foreclosure Action (the "**Contest Period**") and (ii) provided that Borrower commences a Contest Action within the Contest Period and continues to diligently prosecute the same, that is not dismissed within thirty (30) days of the filing of such Foreclosure Action.

## ARTICLE VI
## REMEDIES UPON DEFAULT

6.1    <u>Remedies</u>.    (a)    If any Event of Default shall have occurred and be continuing, all obligations of Administrative Agent under this Agreement shall, at the option of Administrative Agent, cease and terminate, and Administrative Agent may immediately exercise any or all rights, remedies and recourse available to it at law or in equity or under any of the Loan Documents, including, without limitation, the right to accelerate the Loan and foreclose any and all liens and security interests securing the repayment of the Loan under any of the Loan Documents including, without limitation, the Mortgage.  In addition to, and without limiting the foregoing, if any Event of Default shall have occurred and be continuing, Administrative Agent may take immediate possession of the Property as well as all other property to which title is held by Borrower and in which Administrative Agent has a lien as is necessary to do anything in its sole judgment to fulfill the obligations of Borrower hereunder, including availing itself of and procuring performance of existing contracts, or entering into new contracts with the same contractors or others and employment of watchmen to protect the Property from injury.  Without restricting the generality of the foregoing and for the purposes aforesaid, and upon the occurrence and during the continuance of an Event of Default, Borrower hereby appoints and constitutes Administrative Agent its lawful attorney-in-fact with full power of substitution in the premises to pay all taxes and assessments on the Property not paid by Borrower when due and to add the amounts of any such payments to the amount of indebtedness secured by the Mortgage; and to do any act which Borrower might do in its own behalf relating to the Property, it being understood and agreed that this power of attorney shall be a power coupled with an interest and cannot be revoked.  Notwithstanding anything to the contrary contained herein, Administrative Agent and/or the Lenders shall not be obligated to attempt to use, operate, occupy or manage the Property or any part thereof, or perform any of the terms, conditions and agreements herein or in any other document on the part of Borrower to be performed, and Administrative Agent and/or the Lenders shall have no liability to Borrower, Guarantor or any other Person or entity for failing, attempting to perform, or ceasing to perform the same, or for the manner of by performing or attempting to perform the same, or any part thereof.

(b)      In addition to the foregoing, if any Event of Default shall have occurred and be continuing, all obligations of Administrative Agent under this Agreement, shall, at the option of Administrative Agent, cease and terminate, and Administrative Agent may immediately exercise any or all rights, remedies and recourse available to it at law or in equity or under the Note or any of the Loan Documents, including, without limitation, the right to accelerate the Loan and foreclose any and all interests securing the repayment of the Loan.

(c)     Notwithstanding anything to the contrary, in the event of a Mechanic's Lien Default, Borrower hereby acknowledges and agrees that Administrative Agent may discharge and/or payoff the applicable mechanic's or other lien that is the subject of the Mechanic's Lien Default, and the amount required for discharge and/or payoff, together with all costs and expenses of Administrative Agent in exercising its rights and remedies under this <u>clause (c)</u> (including, without limitation, reasonable attorneys' fees and disbursements to the extent permitted by law), shall be paid by Borrower immediately upon notice from Administrative Agent, with interest at the Default Rate for the period after notice from Administrative Agent and such among, costs and expenses shall constitute a portion of the indebtedness secured by the Mortgage.

## ARTICLE VII
## MISCELLANEOUS; FEES

7.1     Entire Agreement; Modification, Etc.  This Agreement (together with the Loan Documents and any certificates delivered simultaneously herewith) embody and constitute the entire understanding between the parties with respect to the transaction contemplated by this Agreement, and all prior agreements, understandings, representations and statements, oral and written, with respect to the transaction that is the subject of this Agreement are merged into this Agreement.  Neither this Agreement nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

7.2     Exclusivity.   ALL CONDITIONS TO THE OBLIGATIONS OF ADMINISTRATIVE AGENT TO MAKE THE CLOSING ADVANCE HEREUNDER ARE IMPOSED SOLELY AND EXCLUSIVELY FOR THE BENEFIT OF ADMINISTRATIVE AGENT AND ADMINISTRATIVE AGENT'S SUCCESSORS AND ASSIGNS AND NO OTHER PERSON OR ENTITY SHALL HAVE STANDING TO REQUIRE SATISFACTION OF SUCH CONDITIONS IN ACCORDANCE WITH THEIR TERMS OR BE ENTITLED TO ASSUME THAT ADMINISTRATIVE AGENT WILL REFUSE TO MAKE THE CLOSING ADVANCE IN THE ABSENCE OF STRICT COMPLIANCE WITH ANY OR ALL THEREOF AND NO OTHER PERSON OR ENTITY SHALL, UNDER ANY CIRCUMSTANCES, BE DEEMED TO BE BENEFICIARY OF SUCH CONDITIONS, ANY OR ALL OF WHICH MAY BE FREELY WAIVED IN WHOLE OR IN PART BY ADMINISTRATIVE AGENT ANY TIME IF IN ITS SOLE DISCRETION IT DEEMS IT ADVISABLE TO DO SO.

7.3     Notices.  Except as may otherwise be expressly provided in this Agreement, any notice, request, demand, instruction or other communication pursuant to this Agreement shall be in writing and shall be given in the manner provided in the Mortgage.

7.4     Governing Law; Jurisdiction.   This Agreement, the Note, the Loan Documents and all other documents or instruments relating to the Loan, and the rights and obligations of the parties thereto, shall be construed and interpreted in accordance with the Legal Requirements of the State of New York.  Administrative Agent, Lenders and Borrower each hereby waives and renounces any right to a jury trial in any action, suit or proceeding in connection with this Agreement, the Note or any other Loan Document.

15

7.5     <u>Headings</u>.    All descriptive headings of articles and sections in this Agreement are inserted for convenience only, and shall not affect the construction or interpretation hereof.

7.6     <u>Severability</u>.  If any provision of this Agreement shall be held to be invalid, illegal, void or unenforceable in any respect, (a) such provision shall be given force to the fullest possible extent that it is valid, legal and enforceable, (b) such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, and (c) this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained in this Agreement.

7.7     <u>No Agency, Partnership or Joint Venture</u>.  Administrative Agent is not the agent or representative of Borrower, and Borrower is not the agent or representative of Administrative Agent.  Borrower and Administrative Agent intend and agree that the relationship between them shall be solely that of creditor and debtor.  Neither any provision in any of this Agreement nor any act or omission of Administrative Agent or Borrower shall be construed to create a partnership or joint venture between Borrower and Administrative Agent.  This Agreement shall not make Administrative Agent liable to materialmen, contractors, craftsmen, laborers or others for goods delivered to or services performed by them upon the Property, or for debts or claims accruing to such parties against Borrower and there is no contractual relationship, either expressed or implied, between Administrative Agent and any materialmen, subcontractors, craftsmen, laborers, or any other Person supplying any work, labor or materials for the Property.

7.8     <u>Waiver; Successive Remedies</u>.    Any failure (or series of failures) by Administrative Agent to insist (or election, or series of elections, by Administrative Agent not to insist) upon the strict performance of any of the terms, provisions and conditions of this Agreement or any of the other Loan Documents shall not be deemed to be a waiver of the same or any other term, provision or condition hereof or thereof and Administrative Agent shall have the right at any time thereafter to insist upon strict performance of any and all of the same.  If Administrative Agent makes any advance in the absence of strict compliance with any or all of the conditions of Administrative Agent's obligations to make such advance, the same shall be deemed to have been made in pursuance of this Agreement and not in modification hereof.  No course of dealing and no delay or omission by Administrative Agent in exercising any right or remedy hereunder or with respect to any indebtedness of Borrower to Administrative Agent shall operate as a waiver thereof or of any other right or remedy and no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any other right or remedy.  Administrative Agent may remedy any default by Borrower to Administrative Agent or any other Person, firm or corporation in any reasonable manner without waiving the default remedied and without waiving any other prior or subsequent default by Borrower and shall be reimbursed for its reasonable out-of-pocket expenses actually incurred in so remedying such default.  All rights and remedies of Administrative Agent hereunder are cumulative.

7.9     <u>Assignability</u>.    Neither this Agreement nor any right or obligation hereunder, nor any advance to be made hereunder is assignable by Borrower.  The rights of Administrative Agent under this Agreement are assignable in part or wholly and any assignee of Administrative Agent shall succeed to and possess the rights of Administrative Agent hereunder to the extent of the assignment made.

7.10    Inconsistencies with Other Loan Documents.  In the event of any conflict between this Agreement and the provisions of any of the Loan Documents, the provisions of this Agreement shall control; provided, however, that any provision of any Loan Document that imposes additional burdens on Borrower or restricts the rights of Borrower or gives Administrative Agent additional rights or remedies shall not be deemed to be in conflict or inconsistent with this Agreement and shall be given full force and effect.

7.11    Survival.    All of the representations, warranties, terms, covenants, agreements and conditions contained in this Agreement shall specifically survive the execution and delivery of this Agreement and shall, unless otherwise expressly provided, continue in full force and effect until the indebtedness evidenced by the Note and any other amounts payable to Administrative Agent hereunder, or under any of the Loan Documents, shall have been paid in full.

7.12    Negotiated Document.  Borrower acknowledges that the provisions and the language of this Agreement and the Loan Documents have been negotiated, and are reasonable in light of all circumstances attendant to the execution hereof and thereof, and agrees that no provision of this Agreement or any Loan Document shall be construed against either Administrative Agent or Borrower by reason of either Administrative Agent or Borrower having drafted such provision, this Agreement or any Loan Document.

7.13    Exhibits.  All exhibits referred to herein are by such reference incorporated into this Agreement as if fully set forth herein.

7.14    Note; Mortgage.  The Loan shall be evidenced by and repaid in accordance with the Note.  The performance of Borrower's obligations under the Note and this Agreement shall be secured by the Mortgage and the other Loan Documents.

7.15    Set off.  Borrower agrees that, in addition to (and without limitation of) any right of setoff, bankers' lien or counterclaim Administrative Agent may otherwise have, Administrative Agent shall be entitled, at its option, to offset balances (general or special, time or demand, provisional or final) held by it for the account of Borrower at any of Administrative Agent's offices against any amount payable by Borrower to Administrative Agent hereunder or under any other Loan Document which is not paid when due (regardless of whether such balances are then due to Borrower), in which case it shall promptly notify Borrower thereof; provided that Administrative Agent's failure to give such notice shall not affect the validity thereof.  Payments by Borrower hereunder or under the other Loan Documents shall be made without setoff or counterclaim.

7.16    Intentionally Omitted.

7.17    Indemnification.  Borrower agrees to defend (with counsel reasonably satisfactory to Administrative Agent (but in all events counsel provided by Borrower's insurance company shall be acceptable)), indemnify the Indemnified Parties, and hold the Indemnified Parties harmless from and against all claims, actions, suits, proceedings, costs, expenses, brokerage or other fees, losses, damages and liabilities of any kind including in tort, penalties and interest, which Administrative Agent may incur in any manner other than as a result of the willful

17

misconduct or gross negligence of the Indemnified Parties (in which case, the applicable liability shall extend only to Administrative Agent, and in no event whatsoever shall any liability extend to any of the Lenders), by reason of any matter relating, directly or indirectly, to the Loan, the Property, the Mortgage or the ownership, condition, development, construction, sale, rental or financing of the Property or any part thereof.  This indemnification shall continue in effect whether or not the Loan is partially or fully advanced and shall survive the repayment of the Loan. Notwithstanding the foregoing or anything to the contrary contained herein or in any other Loan Document, (i) Borrower shall not be required to indemnify for any Losses resulting from the fraud, gross negligence or intentional misconduct of any Indemnified Party, and (ii) Borrower shall not be liable for any claim based on events or circumstances first occurring after a transfer of the Property in connection with a judicial or non-judicial foreclosure or the acceptance by Administrative Agent of deed in lieu thereof or as a result of the affirmative actions or omissions of a receiver that has been appointed by Administrative Agent with respect to the Property unless the claim in question arose because of any act or omission of Borrower, Guarantor or any Affiliate of either of the foregoing.

       7.18   <u>Origination Fee; Servicing Fee</u>.   In consideration of the Loan (and in addition to all other amounts payable under this Agreement and the other Loan Documents), (x) Borrower shall pay to EMERALD CREEK ADVISORS LLC a one-time origination fee in an amount equal to $150,000.00 (the "**Origination Fee**"), which Origination Fee shall be due and payable in full and deemed fully earned on the date hereof.  In addition to all other amounts payable under this Agreement and the other Loan Documents, Borrower shall pay to EMERALD CREEK ADVISORS LLC a one-time servicing fee in an amount equal to $2,500.00 (the "**Servicing Fee**") for its own account, which Servicing Fee shall be due and payable in full and deemed fully earned on the date hereof.

       7.19   <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

       7.20   <u>Book Entry Agent</u>.  Borrower appoints Administrative Agent as its agent (the "**Book Entry Agent**") to maintain a book-entry register (the "**Register**") that satisfies the requirements of Treasury Regulation Section 5f.103-1(c).  The Book Entry Agent shall maintain the Register and shall record therein the name and address of each Person that is entitled to payments of principal and/or interest under the Loan (including, without limitation, each Person that acquires such entitlement by way of participation in the Loan or otherwise).  Any payments due under the Loan will only be paid to the Person entitled thereto as reflected on the Register and the right to any payments due under the Loan may be transferred only through the Register.  No transfer or assignment of any interest in the Loan shall be valid unless and until such transfer or assignment has been properly recorded in the Register (it being understood that, notwithstanding anything to the contrary, in no event whatsoever shall the foregoing provide Borrower with any right to consent to any transfer or assignment of the Loan).  The Book Entry Agent has the power to implement any other measures in the administration of the Loan that it deems necessary, appropriate, prudent or desirable to satisfy the book-entry system requirements of Treasury Regulation Section 5f.103-1(c).  The Loan may not be converted into an obligation that is not in "registered form" for purposes of New York Uniform Commercial Code Sections 871(h)(2)(B)(i) and 881(c)(2)(B).

7.21    Administrative Agent's Discretion.    Except as otherwise provided, whenever pursuant to this Agreement, Administrative Agent exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Administrative Agent, the decision of Administrative Agent to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Administrative Agent and shall be final and conclusive.

7.22    Certain Additional Rights of Administrative Agent.    Notwithstanding anything to the contrary contained herein, for so long as the Loan is outstanding, Administrative Agent shall have:

(a)    the right, in accordance with the terms of this Agreement, to visit and inspect the Property (subject to the rights of tenants under leases approved by Administrative Agent and occupants of the Property) and its subsidiaries and examine (and request copies of) the books and records of Borrower relating to the Property during reasonable business hours upon not less than forty-eight (48) hours' prior written notice and to request monthly rent rolls, leasing schedules and reports, operating statements and other leasing information;

(b)    the right, without restricting any other right of Administrative Agent under this Agreement (including any similar right), to restrict, upon the occurrence of an Event of Default, Borrower's payments of management consulting, director or similar fees to Affiliates of Borrower (or their personnel);

(c)    the right, without restricting any other rights of Administrative Agent under this Agreement (including any similar right), in the event of certain Events of Default, to vote the owners' interests in Borrower pursuant to irrevocable proxies granted, at the request of Administrative Agent in advance for this purpose; and

(d)    the rights described above may be exercised by any entity which owns and controls, directly or indirectly, substantially all of the interests in Administrative Agent.

7.23    Restructuring of the Loan.

(a)    Notwithstanding the foregoing or anything to the contrary, Administrative Agent, without in any way limiting Administrative Agent's other rights hereunder, in its sole and absolute discretion, at no expense to Borrower (and without increasing any obligations and/or decreasing any rights of Borrower) shall have the right at any time to require Borrower to restructure the Loan into additional multiple notes (which may include one or more new component notes or a modified note to reflect such components, pari passu notes and/or senior and junior notes), which restructuring shall be for the purpose of re-allocating principal among component notes and/or senior and junior notes and/or to create participation interests in the Loan. Administrative Agent shall promptly reimburse Borrower for any reasonable fees or reasonable expenses actually incurred by Borrower in connection with the rights afforded to Administrative Agent in this Section 7.23.  Such restructuring may include the restructuring of different interest rates and debt service payments for the Loan, and the Newly Structured Loan (as defined herein), and the payment of the Loan and the Newly Structured Loan in such order of priority as may be designated by Administrative Agent; provided that (i) the total principal amounts of the Newly

19

Structured Loan shall equal the total principal amount of the Loan immediately prior to the restructuring, (ii) except in the case of the occurrence of an Event of Default or a default beyond all notice and cure periods under the Newly Structured Loan, or of casualty or condemnation that results in the payment of principal under the Loan and/or the Newly Structured Loan, the weighted average interest rate of the Loan and the Newly Structured Loan, if any, shall, in the aggregate, equal the Interest Rate (as defined in the Note), and (iii) except in the case of the occurrence of an Event of Default and/or a default beyond all notice and cure periods under the Newly Structured Loan, or of casualty or condemnation that results in the payment of principal under the Loan and/or the Newly Structured Loan, the aggregate debt service payments on the Loan and the Newly Structured Loan shall equal the aggregate debt service payments which would have been payable under the Loan had the restructuring not occurred.

(b)    Borrower shall cooperate with all requests of Administrative Agent in order to restructure the Note and/or the Loan (each as described above and individually and collectively herein, a "**Newly Structured Loan**"), and shall, upon ten (10) Business Days' written notice from Administrative Agent, which notice shall include the forms of documents for which Administrative Agent is requesting execution and delivery, (i) execute and deliver such documents to originate, evidence, or otherwise document the Newly Structured Loan, (ii) cause Borrower's counsel to deliver such legal opinions, and (iii) create such a bankruptcy remote borrower under the Newly Structured Loan as, in each of the cases of clauses (i), (ii) and (iii) above, shall be required by Administrative Agent in connection therewith, all in form and substance reasonably satisfactory to Administrative Agent, including, without limitation, the severance of this Agreement, the Mortgage and the other Loan Documents if requested; provided, however, any such amendments required by Administrative Agent shall not result in any economic or other adverse change in the transaction contemplated by this Agreement or the other Loan Documents, provided all costs for any of the foregoing (including the costs of Borrower's counsel) shall be paid by the Administrative Agent.

[SIGNATURES ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement.

**BORROWER:**

**X&Y DEVELOPMENT GROUP, LLC,**
a New York limited liability company

By: _____

    Name:  Richard Xia

    Title:  Member Manager

**ADMINISTRATIVE AGENT:**

**EMERALD CREEK CAPITAL 3, LLC,**
a New York limited liability company

By: _____

    Name: Mark Penna

    Title: Managing Member

**LENDER:**

**EMERALD CREEK CAPITAL 3, LLC**
a New York limited liability company

By: _____

    Name: Mark Penna

    Title: Managing Member

*[Emerald Creek Capital – 42-31 Union Street – Signature Page to Loan Agreement]*

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement.

**BORROWER:**

**X&Y DEVELOPMENT GROUP LLC**, a New
York limited liability company

By: _____
    Name:
    Title:

**ADMINISTRATIVE AGENT:**

**EMERALD CREEK CAPITAL 3, LLC,**
a New York limited liability company

By: _____
    Name: Mark Penna
    Title: Managing Member

**LENDER:**

**EMERALD CREEK CAPITAL 3, LLC**
a New York limited liability company

By: _____
    Name: Mark Penna
    Title: Managing Member

*[Emerald Creek Capital – 42-31 Union Street – Signature Page to Loan Agreement]*

FOR PURPOSES ONLY OF SECTION 4.1(B)

**EB-5 ENTITES**:

FEDERAL NEW YORK METROPOLITAN
REGIONAL CENTER LLC

By: _____
    Name:
    Title:

EMMCO NQMC, L.P.

By: _____
    Name:
    Title:

EMMCO, L.P.

By: _____
    Name:
    Title:

EMMCO Tower, L.P.

By: _____
    Name:
    Title:

FLEET FINANCIAL GROUP, INC.

By: _____
    Name:
    Title:

**SCHEDULE A**

American Land Title Association

**Loan Policy**
**Adopted 06-17-06**
**With New York Coverage Endorsement Appended**

## AmTrust Title Insurance Company

**File No.** FN-42854-NY

**Policy No.** PROFORMA

## EXHIBIT A

## DESCRIPTION

ALL that certain piece, plot, parcel of land, situate, lying and being in the City of New York, State of New York, Borough of Queens, bounded and described as follows:

BEGINNING at a point on the easterly side of Union Street, distant 213 feet southerly from the corner formed by the intersection of the southerly side of Sanford Avenue and the easterly side of Union Street;

RUNNING THENCE southerly along the easterly side of Union Street, 126.04 feet to a point;

THENCE northeasterly along a line drawn at right angles to the easterly side of Union Street 227. 75 feet;

THENCE southeasterly along a line drawn at a right angle to the last mentioned course, 15.08 feet to a point;

THENCE northeasterly along a line drawn at a right angle to the last mentioned course, 78.95 feet to a point;

THENCE northwesterly along a line drawn at a right angle to the last mentioned course, 50 feet per survey and tax map (41.93 feet per deed not insured) to a point;

THENCE northeasterly (along a line drawn at an exterior angle of 93 degrees 04 minutes 45 seconds with the last mentioned course, 150.22 feet to the westerly side of Bowne Street, per deed not insured) on exterior 90 degree angle 150 feet to the westerly side of Bowne Street, per survey and tax map;

THENCE northwesterly along the westerly side of Bowne Street, 6.83 feet (7.33 feet survey & tax map);

THENCE southwesterly along a line drawn at a right angle to the westerly side of Bowne Street, 131.70 feet to a point;

THENCE continuing southwesterly along a line drawn at an exterior angle of 180 degrees 50 minutes 09 seconds to the last mentioned course, 49. 06 feet to a point;

THENCE westerly along a line drawn at an exterior angle of 128 degrees 45 minutes 20 seconds with the last mentioned course, 56.11 feet to a point;

THENCE northerly along a line drawn at an exterior angle of 116 degrees 56 minutes 20 seconds with the last mentioned course, 7.20 feet to a point;

THENCE southwesterly along a line drawn at an interior angle of 66 degrees 00 minutes 38 seconds (39 seconds survey) with the last mentioned course, 109.33 feet to a point;

THENCE continuing southwesterly along a line drawn at an interior angle of 125 degrees 48 minutes 48 seconds with the last mentioned course, 0.71 feet;

THENCE northerly along land formerly of Charles Willets 30.84 feet (125 degrees 16 minutes 30.12 feet survey);

THENCE westerly along said land of Bjornsen 145.86 feet (69 degrees 59 minutes 59 seconds, 145.96 feet survey) to the

**American Land Title Association**

**Loan Policy**
**Adopted 06-17-06**
**With New York Coverage Endorsement Appended**

### AmTrust Title Insurance Company

easterly side of Union Street, the point or place of BEGINNING.

## **SCHEDULE B-1**

Hotel Management Agreement by and between Borrower and FLEET HOSPITALITY MANAGEMENT, INC., dated as of January 11, 2017

### SCHEDULE B-2

1. That certain loan from EMMCO, L.P. (as lender) to FLEET FINANCIAL GROUP, INC. (as borrower), made pursuant to a Loan Agreement dated as of July 14, 2010, in the principal amount of $8,000,000.00.

2. That certain loan from EMMCO Tower, L.P. (as lender) to FLEET FINANCIAL GROUP, INC. (as borrower), made pursuant to a Loan Agreement dated as of December 8, 2014, in the principal amount of $12,500,000.00.

3. That certain loan from EMMCO NQMC, L.P. (as lender) to FLEET FINANCIAL GROUP, INC. (as borrower), made pursuant to a Loan Agreement dated as of June 26, 2013, in the principal amount of $35,500,000.00.