**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | No. 21-cv-05350-PKC-RER |
| RICHARD XIA, a/k/a YI XIA, et al., | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| JULIA YUE, a/k/a JIQUING YUE, et al., | |
| Relief Defendants. | |

**DEFENDANTS' AND RELIEF DEFENDANT YUE'S**
**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S**
**MOTION TO APPOINT A LIQUIDATING RECEIVER**

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF CITATIONS .................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

LEGAL ARGUMENT ........................................................................................................ 3

I.      THE SEC DOES NOT MEET THE LEGAL STANDARDS FOR RECEIVERSHIP ...... 3

   A.   The SEC's Proposed Liquidating Receivership Does  Not Meet the Second Circuit's Rigorous Standards ....................................................................................................... 3

   B.   A Liquidating Receivership is Strongly Disfavored ................................................. 4

   C.   The SEC is Not Seeking a Liquidating Receivership to Protect Investors ........................ 7

   D.   The SEC's Financial Interest is Exceedingly Small and is Fully Protected by the Existing Asset Freeze ................................................................................................... 9

   E.   A Liquidating Receivership is Clearly Unnecessary to Protect the  SEC's Limited Property Interests ....................................................................................................... 12

   F.   The SEC Refuses to Give Mr. Xia Proper Credit for His Accomplishments ................... 14

   G.   Defendants Have Not Jeopardized the Investors by  Violating the Asset Freeze ............. 15

   H.   A Liquidating Receivership is Not Clearly Necessary for the SEC To Obtain Information ................................................................................................... 20

   I.   The SEC's Undefined "Claims and Distribution Process" Will be Cumbersome, Time-Consuming, Costly, and Ineffective ............................................... 21

   J.   The Receivership and Liquidation Will Deprive Respondents Of their Constitutional Rights ............................................................................................... 22

   K.   The Monitor is Unfit to be Appointed as Receiver ......................................................... 24

   L.   Any Receiver Should Not be Immunized and Should be Required To Post a Bond ................................................................................................................. 30

CONCLUSION ................................................................................................................... 30

## TABLE OF CITATIONS

**CASES**                                                                                  **Page(s)**

*Bmo Harris Bank, N.A. v. Principis Capital LLC*,
   20 Civ. 6355 (LGS),
   2020 U.S. Dist. LEXIS 251948 (S.D.N.Y. Oct. 8, 2020) ............................................................3

*Cedar Point Nursery v. Hassid*,
   141 S. Ct. 2063 (2021) ..........................................................................................................24

*Eberhard v. Marcu*,
   530 F.3d 122 (2d Cir. 2008) ..................................................................................................5

*Esbitt v. Dutch-American Mercantile Corp.*,
   335 F.2d 141 (2d Cir. 1964) ..................................................................................................5

*Heng Ren Silk Rd. Invs., LLC v. Sino Agro Food, Inc.*,
   No. 19-CV-2680 (JMF),
   2022 U.S. Dist. LEXIS 69965 (S.D.N.Y. Apr. 15, 2022) ........................................................3

*Jarkesy v. SEC*,
   34 F.4th 446 (5th Cir. 2022) ..................................................................................................8

*Liu v. SEC*,
   140 S. Ct. 1936 (2020) ................................................................................................9, 12, 23

*Rosen v. Siegel*,
   106 F.3d 28 (2d Cir. 2007) ....................................................................................................3

*SEC v. Am. Bd. of Trade, Inc.*,
   830 F.2d 431 (2d Cir. 1987) ..................................................................................................4

*SEC v. Amerindo Inv. Advisors, Inc.*,
   No. 05-cv-5231 (RJS),
   2017 U.S. Dist. LEXIS 110407 (S.D.N.Y. July 14, 2017) ......................................................4

*SEC v. Malek*,
   397 F. App'x 711 (2d Cir. 2010) ............................................................................................4

*Soundview Assocs. v. Town of Riverhead*,
   725 F. Supp. 2d 320 (E.D.N.Y. 2010) ..................................................................................22

*Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency*,
   535 U.S. 302 (2002) ..............................................................................................................24

*Thaler v. Estate of Arbore (In re Poseidon Pool & Spa Rec., Inc.)*,
  443 B.R. 271 (E.D.N.Y. 2010) ...................................................................................5

*Yang v. Kosinski*,
  960 F.3d 119 (2d Cir. 2020)......................................................................................23

## STATUTES & RULES

The Sarbanes-Oxley Act § 308 .....................................................................................24

U.S. Const. amend. V....................................................................................................22

**INTRODUCTION**

A receivership is an extraordinary remedy to be imposed only when clearly necessary to protect the plaintiff's interests in the property in question. The SEC's only financial interest in this civil enforcement action are its claims for disgorgement and civil money penalties, which have limited value. At most, it has an indirect interest in ensuring that investors in both EB-5 Immigrant Investor Programs are repaid, which Defendants, Richard Xia and Fleet New York Metropolitan Regional Center, LLC, and Relief Defendant Julia Yue ("Respondents") have repeatedly offered to do. Yet the SEC insists a receivership and liquidation of all the Defendants' and Relief Defendants' business and personal assets – worth several hundred million dollars – is necessary to "protect the interests of the investors and other [unspecified] stakeholders." ECF No. 235-1 at 3. It is *not* clearly necessary to do so.

The SEC's disgorgement claim is virtually worthless and its claim for civil money penalties is capped at just a small fraction of the total value of the assets over which it seeks a liquidating receivership. Because Defendants have *spent more* in land acquisition and hard construction costs on both projects than the total invested by the EB-5 investors – a fact the SEC has never actually refuted – they have no "net profits" from either Project. In addition, this Court has determined that the *maximum* civil money penalties the SEC may seek is $18,646,380. ECF No. 216 at 65. Because the SEC's disgorgement claim is of little or no value and its claim for civil money penalties is capped, a liquidating receivership is not clearly necessary here given that the amount of assets available dwarfs the Defendants' potential liability.

Under Second Circuit authority, a receivership should *not* be used, as the SEC proposes here, "*to effect the liquidation of a defendant firm*" in civil proceedings such as this. Nor should a receivership be used to deprive Respondents of their ability to defend themselves or their constitutional right to a jury trial on these important claims.

1

The SEC's receivership motion offers no reason why the Second Circuit's strong reservations against receivership liquidations do not apply, and runs rough-shod over Respondents' due process rights. The SEC has not shown what reason or authority it has, given the small amount it may recover as disgorgement and civil money penalties, to use the receivership to force a complete liquidation of **hundreds of millions dollars** of business and personal assets to protect either the EB-5 visa investors or the many unnamed "other stakeholders" whose interests the SEC invokes. This Court and the SEC have many other tools at their disposal short of a comprehensive liquidating receivership to protect the SEC and the EB-5 visa investors – including allowing Defendants to refinance the properties or to seek protection under the Bankruptcy Code[1] – even assuming the SEC is entirely successful in proving its case at trial.

The SEC is **not** acting to protect the EB-5 visa investors. It already has rejected a written settlement offer in which Defendants proposed **far more than the SEC could possibly recover if it took this case to trial**: (i) to repay all the EB-5 visa investors **in full**; plus (ii) to pay a negotiated civil money penalty; plus (iii) a permanent injunction barring Mr. Xia from future violations of the federal securities laws; plus (iv) a bar order prohibiting Mr. Xia from ever participating in any future EB-5 projects; and (v) to sell or refinance any or all of Defendants' business and personal assets now, including their home in King's Point, Great Neck, New York, as may be necessary or required by the Commission to resolve the civil enforcement action. When the SEC rejected Defendants' settlement offer – in reality, an offer of surrender – it did **not** act in the EB-5 visa investors' best interests. They would be far better off by allowing Defendants to repay them **in full now** than they will be under the SEC's proposed liquidating receivership.

---

[1] *See* Defendants' and Mrs. Yue's Cross-Motion for Relief from Preliminary Injunction to Repay Investors or File for Bankruptcy Protection ("Cross-Motion"), filed concurrently herewith.

Moreover, the asset freeze already has caused substantial injury to the two construction projects. A liquidating receivership will cause even more devastating harm to the value of the properties– and to the EB-5 visa investors' interests. It will further delay completion of the Eastern Mirage Project, thus depriving the Project of revenue, and will take many years to administer and cost tens of millions of dollars in fees and expenses, while adding greatly to the uncertainty of any proposed sale or refinance of either property.

## **LEGAL ARGUMENT**

**I.     THE SEC DOES NOT MEET THE LEGAL STANDARDS FOR RECEIVERSHIP**

**A.     The SEC's Proposed Liquidating Receivership Does
        Not Meet the Second Circuit's Rigorous Standards**

A receivership is an extraordinary remedy to be imposed "'***only when clearly necessary to protect plaintiff's interests in the property***.'" *Bmo Harris Bank, N.A. v. Principis Capital LLC*, 20 Civ. 6355 (LGS), 2020 U.S. Dist. LEXIS 251948, at *5-9 (S.D.N.Y. Oct. 8, 2020) (emphasis added) (quoting *Rosen v. Siegel*, 106 F.3d 28, 34 (2d Cir. 1997)). Because appointment of a receiver "results in the taking and withholding of possession of property from a party without an adjudication on the merits, the courts have required the party seeking the remedy to make a ***clear showing that the appointment is necessary to prevent irreparable injury to the property interests at stake***." *Heng Ren Silk Rd. Invs., LLC v. Sino Agro Food, Inc*., No. 19-CV-2680 (JMF), 2022 U.S. Dist. LEXIS 69965, at *8 (S.D.N.Y. Apr. 15, 2022) (emphasis added) (quoting *Altissima Ltd. v. One Niagara*, LLC, No. 08-CV-756 (JTC), 2009 U.S. Dist. LEXIS 39472, 2009 WL 1322319, at *1 (W.D.N.Y. May 8, 2009)). *Bmo Harris Bank,* 2020 U.S. Dist. LEXIS 251948, at *5-9. Receivership "'should be employed cautiously and granted ***only when clearly necessary to protect plaintiff's interests in the property***.'" *Id*. (emphasis added) (quoting *Rosen*, 106 F.3d at 34). That demanding standard is not met here.

3

As the Court has recognized, its equity power to freeze assets or appoint a receiver in an SEC civil enforcement action such as this "*exist[s] for the benefit of investors*." *See* Dkt. Orders dated Aug. 30, 2022 (quoting 15 U.S.C. § 78u(d)(5)), and Jan. 30, 2023 (emphasis added). The Court recognized that its equity powers under the federal securities laws are limited and *do not* exist to protect creditors who are *not* investors. *See* Dkt. Order Jan. 30, 2023. Liquidating the Defendants' and Relief Defendants' assets to distribute proceeds to *all* their creditors, including dozens of unidentified and unrelated claimants, after a lengthy and costly receivership is *not clearly necessary* to protect the interests of the EB-5 visa investors. A receivership should not be used to protect anyone other than those investors. Those other claims should not be leveraged to gain the appointment of a receiver.

Moreover, the EB-5 visa investors are far better served by permitting Defendants to repay them now, as Defendants repeatedly have offered to do. The Court should not appoint a receiver unless it is convinced that the extraordinary and dramatic remedy of a liquidating receivership is, in fact, both clearly necessary and the best way to protect the interests of those investors. It is no better than Defendants' offer to *pay the investors in full now*.

### B.    A Liquidating Receivership is Strongly Disfavored

Even when the party seeking a receivership shows it is clearly necessary, the "primary purpose" for appointing a receiver must be "to 'conserve the existing estate' so as 'to preserve the status quo,' 'prevent the dissipation of [the] defendant's assets pending further action by the court,' and 'obtain an accurate picture of what transpired' in a fraud." *SEC v. Amerindo Inv. Advisors, Inc.*, No. 05-cv-5231 (RJS), 2017 U.S. Dist. LEXIS 110407, at *21-22 (S.D.N.Y. July 14, 2017). Importantly, as the Second Circuit has long held, "receiverships *should not be used to effect the liquidation of defendants* in actions brought under the securities laws." *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431 (2d Cir. 1987) (emphasis added); *see also SEC v. Malek,* 397 F. App'x. 711,

*714 (2d Cir. 2010) ("this Court has consistently expressed a preference against the liquidation of defendant corporations through the mechanism of federal securities receiverships, as opposed to through the bankruptcy courts"); *Eberhard v. Marcu*, 530 F.3d 122, 132 (2d Cir. 2008) (expressing "***strong reservations***" against using a receivership to liquidate a defendant's estate) (emphasis added); *Esbitt v. Dutch-American Mercantile Corp.*, 335 F.2d 141, 143 (2d Cir. 1964) ("We see no reason why violation of the Securities Act should result in the liquidation of an insolvent corporation via an equity receivership instead of the normal bankruptcy procedures, which are much better designed to protect the rights of interested parties.").[2]

The SEC does not seek a receiver to preserve the *status quo*, conserve the existing estate, or prevent the dissipation of assets while its disgorgement and civil money penalty claims are litigated. Those purposes are readily served by the existing Preliminary Injunction, which freezes all of Defendants' assets worth ***hundreds of millions of dollars*** more than can ever be recovered by the SEC in this action. The SEC proposes to ***permanently change*** the *status quo* by liquidating the entire estate, and by depriving Defendants and Mrs. Yue of the right to defend themselves while their assets are being liquidated. If the SEC genuinely believes that Defendants or the Relief Defendants are not complying with the Preliminary Injunction (or that they failed to comply with the prior Asset Freezing Order), the proper remedy is to seek to compel them to comply with the orders, not to place ***all*** their business and personal assets in the hands of a receiver to be liquidated and the proceeds distributed to all their creditors.

The SEC proposes to have the receiver submit an undefined "Liquidation Plan" within 90

---

[2] That logic applies even more strongly here, where Defendants' assets greatly exceed their total amount of their liabilities, but they are unable to pay their debts only because their assets are frozen. Insolvency under Bankruptcy Code does not require that liabilities exceed assets. *Thaler v. Estate of Arbore (In re Poseidon Pool & Spa Rec., Inc.)*, 443 B.R. 271, 280 (E.D.N.Y. 2010) (insolvency "means inability to pay debts in the ordinary course of business").

days after appointment. Among other things, the "Liquidation Plan" must set a "bar date for the filing of claims in the Receivership Estate" by *all claimants other than the EB-5 visa investors*; and propose "a claim review and reconciliation process" and a "dispute resolution process for resolving any disputes concerning claims or proposed distributions." ECF No. 235-20 at 10 (emphasis added). The SEC also proposes to have the receiver "conduct an orderly liquidation of the Receivership Assets" to satisfy not only the claims of the EB-5 visa investors but also of all those *other* claimants who submit claims against the Receivership Estate by the bar date. *Id*. at 6.

The Court's equity authority to freeze assets "for the benefit of investors" does not extend to other creditors. Dkt. Order Jan. 30, 2023 (regarding CTBC). Just as the Court lacks authority to freeze assets to protect other creditors, it has no authority to impose a receivership – which is a far more drastic provisional remedy than an asset freeze– to protect those other creditors. However, in seeking a liquidating receivership, the SEC invokes the interests of those *other* claimants (such as CTBC) and proposes to have the receiver submit a plan to aggregate their claims with the investors' claims and resolve them all together. The SEC justifies the liquidating receivership, in part, by referring to all those *other* claims. Doing so is plainly improper and does not make a liquidating receivership clearly necessary to protect the *investors'* interests. To the contrary, a receivership would be unnecessary if the SEC and the Court would allow Defendants to repay the EB-5 investors now instead of after a multi-year comprehensive liquidating receivership.

As explained in the Cross-Motion, the SEC seeks the functional equivalent of a liquidation under Chapter 7 of the Bankruptcy Code, but without the constitutional authority of the Bankruptcy Code and without the protections given to both debtors and creditors under the Bankruptcy Code. The SEC's ill-conceived and poorly defined *ad hoc* bankruptcy lacks the established and well-known structures of bankruptcy and raises far more questions than it provides answers, such as:

(1) which creditors may submit claims against the estate to be liquidated; (ii) under what authority outside of bankruptcy may the Court assume jurisdiction over those other creditors and claims; (iii) by what means are the claims of those creditors who submit their claims to the receiver to be evaluated, and how will this Court review the receiver's decisions; (iv) how are creditors to know the procedures and standards for resolving their claims before they must decide whether to submit their claims to the receiver; (v) what will be the timing for submitting claims, for resolving claims, and for creditors to pursue their appeal rights; (vi) and what will happen to the claims of creditors who do not submit them to the receiver, and what continuing liability will Defendants and the Relief Defendants face to those creditors after all their business and personal assets are liquidated. The only certainty is that the receivership will take several years to complete and will cost tens of millions of dollars to administer.

The Court should not permit the SEC to conduct an *ad hoc* bankruptcy liquidation without the constitutional authority of the Bankruptcy Code or the protections given to debtors and creditors under the Bankruptcy Code.

### C.      The SEC is Not Seeking a Liquidating Receivership to Protect Investors

The SEC argues that a liquidating receivership will "maximize the likelihood of compensating the defrauded investors." ECF No. 235-1 at 3. Surely, it will not do so. Had the SEC genuinely wanted to maximize the likelihood of compensating the allegedly defrauded investors, it would have accepted any one of Defendants' settlement offers to ***repay the investors in full now***. Alternatively, it would agree to permit Defendants to sell or refinance whatever assets are required to ***repay the investors in full now***. Either alternative maximizes the likelihood of compensating the investors far sooner and at much less cost than the SEC's proposed liquidating receivership.[3]

---

[3] Recently, the Court noted the SEC's seemingly changing position on whether Defendants' rental properties that were acquired before January 1, 2010, and pre-date any alleged fraud, should

Under the Second Circuit's demanding standards, a receivership should not be used to deprive Defendants of their ability to defend themselves or of their constitutional right to a jury trial on the highly fact-specific questions raised by the SEC's claims.[4] But that is precisely what the liquidating receivership would do. The SEC proposes to empower the receiver to assume control of the litigation for Defendant Fleet. The receiver – who has been hand-picked by the SEC for this highly lucrative appointment – will likely abandon any defense to the SEC's claims and allow judgment to be entered against Fleet on liability (and perhaps on both the amount of disgorgement and the civil money penalties as well). The judgment – in effect a consent judgment – against Fleet will deprive Mr. Xia of the ability to defend himself, or at least substantially impede his ability to do so. In any event, the SEC hopes never to have to prove its case on the merits, with very little to recover in disgorgement and civil money penalties, and prefers to use the appointment of a receiver to liquidate Defendants' and Mrs. Yue's assets while avoiding the consequences of *Liu* and ***without ever proving its case***.

By stripping Defendants of control over their defense, depriving them of their constitutional right to a jury trial, and sweeping the SEC's claims in with dozens of other claims in the undefined "claims and distribution" process envisioned by its liquidating receivership

---

remain frozen under the Preliminary Injunction Order for the benefit of the EB-5 visa investors. The Court referred to the SEC's change in position as "inexplicable." Dkt. Order (1/30/23). The SEC's explanation that it abandoned those properties because they have lost value during the asset freeze (ECF No. 259) rings hollow. A more credible explanation for the SEC's about-face is that it seeks a liquidating receivership to ***punish the Defendants, not to protect the investors***. Another explanation is that the SEC seeks the receivership to ***avoid having to take this case to trial***, risk losing on the merits or on appeal, and then, even if it succeeds on the merits, risk recovering little or nothing in disgorgement under *Liu* and only a fraction of the pre-judgment interest and civil money penalties it seeks.

[4] The SEC demanded a trial by jury. *See* ECF Nos. 1 (at 42), 1-1, and 98 (at 52). Recently, in *Jarkesy v. SEC*, 34 F.4th 446, 451 (5th Cir. 2022), the Fifth Circuit upheld a defendant's constitutional right to a jury trial in an SEC civil enforcement action.

motion, the SEC avoids not only the risk of a defeat but also the risk of winning a pyrrhic victory. These are not proper purposes for a receivership recognized by the Second Circuit.

### D. The SEC's Financial Interest is Exceedingly Small and is Fully Protected by the Existing Asset Freeze

Under the Supreme Court's controlling decision in *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020), the SEC may only recover Defendants' "***net profits***" as disgorgement in a civil enforcement action such as this. "[C]ourts must deduct legitimate expenses before ordering disgorgement." 140 S. Ct. 1950. The SEC has an exceedingly small interest in Defendants' and the Relief Defendants' property because its disgorgement claim is likely worthless; it is worth no more than $16.5 million at most. And its claim for civil money penalties is capped at $18.7 million. ECF No. 216 at 65. But even if the SEC had a greater interest in Respondents' property in order to protect the interests of the EB-5 visa investors – which is limited to the total sum of $228.5 million they invested in both projects – the value of all the assets already frozen by the Court's Preliminary Injunction vastly exceeds that amount ***by hundreds of millions of dollars***. Thus, the extraordinary remedy of a receivership is ***clearly unnecessary*** to prevent dissipation of any assets.

In its Preliminary Injunction Decision, the Court found it was not bound by *Liu* – or by the fact that the SEC's disgorgement claim is virtually worthless – in setting the amount of the asset freeze. ECF No. 216 at 63-64.[5] The Court can no longer postpone applying *Liu*. However, to determine the value of the SEC's claim in the "claims and distribution process" to be proposed by the receiver, every claim – including the SEC's disgorgement and civil money penalty claims – must be quantified for the *pro rata* calculations required by the anticipated liquidation plan.

Even if the SEC prevails on the merits, the SEC will have no recoverable disgorgement

---

[5] That decision is currently on appeal to the Second Circuit. ECF No. 219.

because Defendants already have incurred reasonable business expenses *far above* the total amount contributed by all the EB-5 visa investors in both projects. This fundamental flaw in the SEC's case will have to be resolved in any "claims and distribution process." Defendants and the other (yet unnamed) creditors will demand that the SEC be given no special treatment.

Defendants itemized those legitimate business expenses in detailed declarations previously filed with the Court. *See* ECF Nos. 180-1 through 15, 181, and 184. They have not been seriously disputed. Taking into consideration only the documented land acquisition and hard construction costs incurred before this action was commenced, *Defendants have spent more than they took in. And they have put in more than they may have taken out*.

The EB-5 visa investors contributed $228.5 million to both Projects. Defendants paid $16.7 million in 2007 to acquire the land on Union Street for the Eastern Mirage Project and $17 million in 2013 to acquire the land on Northern Boulevard for the Eastern Emerald Project. The SEC has never challenged the land acquisition costs. Before this action was commenced and work on both Projects was halted, Defendants also spent $195 million in hard construction costs on both Projects. They spent *more than $91 million in hard costs* to build the nearly-complete 20-story building on Union Street. And they spent *nearly $104 million in hard costs* for the massive site decontamination and excavation work on Northern Boulevard which is deteriorating daily because the asset freeze prevents Defendants from maintaining it or starting construction.[6]

---

[6] When it opposed Defendants' motion to vacate the Asset Freezing Order, the SEC extensively criticized Mr. Amideo's work and his conclusions. *See* ECF No. 182 at 7-10. However, despite serving more than 35 subpoenas on non-parties, the SEC has not bothered to take Mr. Amideo's deposition to try to substantiate any of its unfounded criticisms. Supplemental Declaration of Michael Amideo ("Amideo Supp. Decl."), ¶ 37, submitted herewith. And, as importantly, the SEC has not tried to quantify the construction costs itself. The SEC certainly has provided no evidence of its own estimate of the construction costs, as though the work was done at no cost.

Those hard construction costs for both Projects were verified against the supporting detailed payment records, including vendor invoices, canceled checks, and wire transfer confirmations

The total of $228.7 million in costs is ***more than the total amount contributed*** by all the EB-5 visa investors, and the recoverable disgorgement is ***zero***. Even if the acquisition cost for the land on Union Street (which is not owned by the Eastern Mirage Project), is excluded, the total of $212 million in costs is ***only $16.5 million less than the full amount contributed*** by the investors. Likewise, even if the disgorgement could include the processing fees of $28.5 million paid by all the investors, the total amount of disgorgement is just a fraction of the total amount they invested.

The SEC does not seriously dispute these hard land acquisition costs and construction costs, and it certainly offers no evidence of its own to refute them.[7] The SEC has not offered any contrary analysis of the land acquisition costs or the hard construction costs incurred on both projects prior to the asset freeze on September 27, 2021. It has not explained – or even tried to explain – how there was $45 million ***more*** cash in the bank than the math says should have been

---

showing not only that the payments were made but also that they were made to the vendors who did the construction work. They were meticulously verified in accordance with accepted AICPA standards, as explained in detail in Mr. Amideo's supplemental declaration. *See id.*, ¶¶ 15-36, submitted herewith.

[7] The Court says the SEC has implied "in effect . . . that some of the business expenses Defendants seek to exempt from the asset freeze are not legitimate, but merely incidental means to fuel the ongoing fraudulent scheme." ECF No. 216 at 63. It is indisputable that land acquisition costs, site remediation and excavation costs, and other hard construction costs are "***legitimate*** business expenses" for a real estate development project: they are the ***core expenses*** of the business. There is no explanation for all the money Defendants spent to buy the land for both Projects, build the 20-story building at Union Street, and remediate the Brownfield site and excavate the foundation at Northern Boulevard other than that they were ***legitimately*** incurred for both Projects. Indeed, those legitimate business expenses have made the projects currently worth, as is, $585 million (not including the $84 million Mr. Xia has earned in Brownfield tax credits).

For example, Defendants spent $99.1 million for the massive site decontamination effort on the Brownfield site at Northern Boulevard, which costs have been ***audited by the State of New York*** and for which Mr. Xia has earned $84 million in Brownfield tax credits. ECF No. 184 at 5. It would strain credibility past the breaking point if the SEC were to dispute that those ***audited*** costs were "legitimate business expenses." The cost of the massive Brownfield site decontamination alone accounts for almost two-thirds of the funds received from the Eastern Emerald investors and nearly half of the total amount received from all the EB-5 visa investors. And, of course, the SEC has frozen the Brownfield tax credits – which Mr. Xia has contributed to both projects – earned by that expenditure.

there.[8] The SEC has never denied that ***both Projects have no net profits*** to date. The SEC has not even tried to address the fundamental damages problem with its disgorgement case.

### E.     A Liquidating Receivership is Clearly Unnecessary to Protect the SEC's Limited Property Interests

The SEC argues that the liquidating receivership is needed to prevent the dissipation of Defendants' and the Relief Defendants' assets. EFC No. 235-1 at 10-16. Given the SEC's exceedingly modest financial interest in this case, the Preliminary Injunction more than adequately protects the properties. Even if the total amount paid by the EB-5 investors in both Projects were considered – which the SEC cannot recover as disgorgement under *Liu* – the enormous value of the assets currently subject to the Preliminary Injunction greatly exceeds that amount as well.

Under the Preliminary Injunction, which freezes ***all*** of Defendants' business and personal assets, the SEC is now secured by ***nearly $774 million in frozen assets*** – including approximately $75 million in cash still on hand, $585 million in real property on Union Street and Northern Boulevard, $84 million in earned tax credits, approximately $11 million in Defendants' two pre-EB-5 income-producing properties, and more than $18 million in Mr. Xia's and Mrs. Yue's personal real estate. The SEC has not offered any evidence – and none exists – that any of those assets have been spent or dissipated, or even that Defendants attempted to spend or dissipate them,

---

[8] After deducting only the land acquisition ($33.4 million) and hard construction ($195 million) costs from the amount invested (ignoring all the other expenses of running both Projects for the past decade), there should have been $33.5 million in the bank when the SEC filed suit and froze Defendants' assets. However, there was $80.9 million on hand (*see* ECF No. 53 at 14), which is ***$47.4 million more than should have been in the bank***. If this were the giant swindle the SEC says it is, then at least ***some*** investor money would be missing. If the SEC's claims had any merit, there would be ***less*** money in the bank, not more of it. Contrary to what the SEC says, Defendants actually spent investor funds to pay for the enormous amount of work already performed on both Projects, ***exactly as they were supposed to***. In fact, they spent more money than they took in: they contributed tens of millions of dollars ***of their own money*** to the Projects. That is why there was $45 million ***more*** in the bank when the SEC swooped in than the math says should be there.

since the Preliminary Injunction was entered.

The real estate for both Projects recently was appraised by Colliers International Valuation & Advisory Services ("Colliers"). *See* ECF No. 180-1 through 15. Colliers is a highly respected international commercial real estate and investment advisor. *Id*. Colliers determined the "as-is" value, the "as completed" value, and the "stabilized" value for the projects. The "as-is" values – the lowest of the three values – are $314,600,000 for Eastern Mirage and $270,200,200 for Eastern Emerald.[9] *Id*. It did so ***independently***, not merely by accepting information provided to it by Mr. Xia. The appraisals were prepared for a sophisticated commercial lender prepared to invest hundreds of millions of dollars in both Projects. They were not prepared by or for Defendants; nor were they prepared in connection with any litigation. The SEC disputed these valuations; in fact, the SEC disputes putting ***any*** value on the real property.

Whatever value the properties have, it is not helped by the appointment of a receiver. To the contrary, a receivership substantially impedes the value of the properties and deprives the Eastern Mirage Project of potential rental income. *See* Affidavit of Lei Zhu ("Zhu Aff."), ¶¶ 19-24, submitted herewith. And whatever value they have, the proceeds from a sale of the either property will be available for payment to the EB-5 investors far sooner if Defendants are permitted to sell or refinance them now rather than by the appointment of a liquidating receiver (and the cumbersome and time-consuming process the liquidating receivership would entail). And the proceeds will not be diminished by the enormous fees a receiver would be paid to sell the

---

[9] The Colliers appraisals reflect the enormous value added to both Projects by Defendants' hard work: $298 million has been added to the Eastern Mirage property value and nearly $253 million has been added to the Eastern Emerald property value since they were acquired. Whether the enormous appreciation in value is the result of Mr. Xia's prudent real estate investments or the result of his hard work over more than a decade, they both speak volumes to his ability to manage and control these projects. *See* Section F below.

properties.

**F.      The SEC Refuses to Give Mr. Xia Proper Credit for His Accomplishments**

The SEC argues that Mr. Xia is unfit to continue in any position of responsibility or control over the available assets. ECF No. 235-1 at 2. The SEC's counter-factual argument refuses to acknowledge Mr. Xia's impressive accomplishments before this action was commenced.

As discussed above, Mr. Xia purchased the two properties for a total of $33.7 million. He has been the designer, developer, architect, engineer, and driving force behind both Projects. *See* ECF No. 185, ¶¶ 2-7 & 9-19 and Exhibits 1.1 through 11.4 thereto. Mr. Xia used his considerable talent and has worked tirelessly for more than a decade to complete them, putting hundreds of construction workers to work in the process. When the Projects are finished, Mr. Xia's efforts will have created hundreds more jobs for the residents of Queens and the buildings will contribute to the revitalization of the neighborhoods and add greatly to nearby property values.

Most impressively – and most importantly for this motion – ***Mr. Xia's efforts have added hundreds of millions of dollars to the value of both properties***. Currently, the Eastern Mirage Project, which the SEC dismissed as a mere "glass shell," stands more than 80% complete and has an "as is" value of $314.6 million, nearly ***19 times higher*** than the purchase price of $16.7 million. Similarly, the Eastern Emerald Project, which the SEC derisively called a "hole in the ground," has undergone massive decontamination, remediation and excavation efforts and currently has an "as is" value of $270.2 million, nearly ***16 times higher*** than the purchase price of $17 million.[10]

---

[10] In particular, the SEC called the $104.5 million in remediation and site preparation work for the Northern Boulevard property "suspect" because the expenses were provided by Mr. Xia and were based on his "questionable" business records. The SEC has never offered any estimate of what it considers to be the "real" value of the work performed on Northern Boulevard; it simply refuses to believe Mr. Xia. The Court need not take Mr. Xia's word for the cost of the massive remediation and site preparation work. Approximately $67 million of those costs already have been ***extensively audited by the New York State Tax Department*** as part of the Brownfield program. The audits reviewed the contracts, invoices, and proof of payment of ***all*** those expenses. *See* Declaration of

The combined appreciation of $550 million during Mr. Xia's ownership and control of the two Projects did not happen magically. It happened in part because Mr. Xia made excellent real estate investments and in much greater measure because of the massive, skillful, and diligent efforts he has devoted to the two construction projects over many years.  The Court is again urged to make a comprehensive tour of the sites to see for itself the substantial value added by Mr. Xia.

Before the SEC commenced this action, the 20-story, state-of-the-art commercial building on Union Street was nearly complete, and every one of the 112 EB-5 visa investors in the Eastern Mirage Project earned permanent residence – exactly as provided for in the offering memoranda for those partnerships. The site on Northern Boulevard was fully decontaminated and excavated, ready for construction work to begin. Both projects were abruptly stopped by the Asset Freezing Order. Any harm to the properties has been caused by the SEC's demand for an asset freeze, under which both projects have languished and suffered, and by the Monitor's endless stonewalling and foot-dragging, *see* Section K below, not by Mr. Xia.

Whether due to Mr. Xia's excellent investment judgment or his architectural, engineering, design, and development expertise, the enormous $550 million in appreciation on both properties speaks volumes as to his fitness to own and control these assets – far more than enough to drown out the SEC's feeble criticism of his "suitability" to own or oversee the properties.

### G. Defendants Have Not Jeopardized the Investors by Violating the Asset Freeze

The SEC argues that a receivership and complete liquidation of all the Defendants' and

---

Joseph N. Endres, ¶ 8, ECF No. 184. The State completed audits for 2015 through 2018, **approved** 99.994% of those costs (totaling $67,004,466),[10] and issued $14.9 million in tax credits based on those costs. *See id*. at ¶¶ 18-22. The **audited and approved costs** tie directly to the itemized schedule of payments on the Eastern Emerald Project for the corresponding years. *See* ECF No. 187, ¶¶ 22-41 and Exhibits A-D thereto,. When the State completes its audits for 2019 and 2020, there is no reason to expect it will not approve the balance of the expenses on Northern Boulevard.

Relief Defendants' business and personal assets is necessary because Defendants have violated the prior Asset Freezing Order. Importantly, the SEC does *not* allege that Defendants or Mrs. Yue have violated the current Preliminary Injunction in any respect.

*First*, the SEC notes that Defendants encumbered nine rental units in properties acquired prior to January 1, 2010, with two mortgages. The first mortgage, in the amount of $1,750,000, was given on eight of those units on June 3, 2022. ECF No. 235-3 (Stoelting Ex. 1). The second mortgage, in the amount of $550,000, was given on November 9, 2022, on another unit. ECF No. 235-4 (Stoelting Ex. 2). At the time, only $229 million in assets were frozen by the Asset Freezing Order, and Mr. Xia knew the value of the two projects (worth nearly $585 million) plus the $79 million in cash that was frozen, dwarfed the cap in the Asset Freezing Order. Supplemental Affidavit of Richard Xia in Opposition to Liquidating Receivership and in Support of Cross-Motion for Relief from Preliminary Injunction ("Xia Supp. Aff."), ¶ 3-4, submitted herewith.

In addition, Mr. Xia reasonably believed the Asset Freezing Order did not apply to the pre-EB-5 investment properties that he mortgaged. Xia Supp. Aff. at ¶ 5. The Asset Freezing Order only required Defendants and the Relief Defendants to account for money, properties, and other assets acquired *after January 1, 2010*. ECF No. 95-1 at §§ IV(1), (3), and (4). When the mortgages were given, Mr. Xia reasonably believed the pre-EB-5 investment properties were not at all encumbered by the Asset Freezing Order because he was not required to account for them.

Most importantly, before encumbering the nine rental properties with mortgages, Mr. Xia's then-counsel, Kameli Associates, engaged in lengthy discussions with the Monitor regarding the mortgages to be placed on those few pre-EB-5 assets and the plan to use the proceeds to invest in both Projects during the asset freeze and to retain Meyer Suozzi as counsel. Xia Supp. Aff., ¶ 7. The Monitor never objected to the mortgages and never objected to using those proceeds for the

Projects or to pay Meyer Suozzi's retainer. *Id*.

Regardless of whether Mr. Xia's belief was reasonable, the SEC has not addressed how he used the proceeds of the mortgage loans. Most of the loan proceeds, approximately $1.5 million in total, was ***spent on the two construction projects***. Xia Supp. Aff., ¶ 6. Those expenses were reasonably incurred to protect both Projects and, indirectly, the investors' interests in them. They were not spent on "mansions" or any other personal expenses.[11]

Meyer Suozzi. As the SEC notes, the remaining $850,000 from the two mortgage loans was paid to Meyer Suozzi. Meyer Suozzi represents Defendants in this case and in "more than two dozen other pending actions" directly related to the Projects. ECF No. 235-1 at 13. The work diligently performed by Meyer Suozzi is unquestionably necessary to protect the Projects from multiple claimants and, indirectly, to protect the investors' interests in them. The SEC does not dispute that the work has been necessary and beneficial – in fact, it does not mention the work at all – focusing only on the fact that Meyer Suozzi has been paid.

The same is true of the other payments to Meyer Suozzi, totaling $40,000. Mr. Xia charged $20,000 to his American Express card and Mr. Xia's father, Guangyu Xia, paid $20,000 to Meyer Suozzi as a loan to his son. The payments were made to retain Meyer Suozzi to protect the Projects by defending Defendants from those other claims as well as to defend them in this action. The

---

[11] The SEC refers to an exchange during the Court-supervised mediation on June 28, 2022, as proof that Mr. Xia knew his pre-EB-5 assets were subject to the Asset Freezing Order. According to the SEC, Defendants' counsel asked the SEC to consent to release the properties from the asset freeze. ECF No. 235-1 at 10. Defendants' counsel have a different recollection of the exchange. Rather than asking the SEC to consent to release the properties from the asset freeze, Defendants' counsel asked the SEC to agree that they were not subject to the Asset Freezing Order. *See* Rifkin Decl., ¶ 124. Defendants' counsel also recalls that the Court expressed its own uncertainty about whether the pre-EB-5 investment properties were subject to the Asset Freezing Order at all. *Id*. at ¶ 125. Whatever may have been said by counsel for the parties or by the Court during the mediation on June 28, 2022, Mr. Xia had sufficient reason to understand that the Asset Freezing Order did not apply to the pre-EB-5 investment properties.

legal work is necessary to protect the Projects from multiple claimants and to protect the investors' interests in them. In addition, Mr. Xia's father is **not** subject to any asset freeze.

Wolf Haldenstein. The SEC questions $200,000 paid to Wolf Haldenstein by non-parties who were **never** subject to any asset freeze. The first payment of $100,000 came from Jingting Han, who (as the SEC knows) is Mr. Xia's mother. The SEC questions the payment because she lives in one of the pre-EB-5 rental apartments.[12] The proceeds came from savings that were to be used to provide cancer treatments for Mr. Xia's sister-in-law and had nothing to do with where Mrs. Han lives. The second payment of $100,000 came from Qiuxing Xia, who (as the SEC also knows) is Mr. Xia's sister. The SEC does not say why it believes that payment violated the Asset Freezing Order. Those proceeds also came from her savings for cancer treatments.[13]

WilmerHale. The SEC questions a $250,000 wire transfer from Sherry Chen to WilmerHale on October 19, 2021. The SEC says nothing of Ms. Chen, but notes that her husband, Wenfeng Kevin Zhao, was paid $2,452 by Fleet for engineering work he performed on the Eastern Mirage Project in 2015 and his company, Sky Brookside Investment LLC, was paid $125,000 from Fleet in 2015. It offers no explanation why those payments to Ms. Chen's husband and his business **six years earlier** subjected her to the Asset Freezing Order. The payment came as a loan from Ms. Chen from the proceeds of the sale of an investment property in 2021.[14]

Kameli Associates. The SEC questions two $100,000 payments by non-parties to Kameli Associates in January and February 2022, when only $229 million in assets were frozen. The first payment, allegedly made on January 1, 2022, was from Jin Jing, a personal friend of Mr. Xia. That

---

[12] *See* Declaration of Jingting Han, ¶ 3, submitted herewith.

[13] *See* Declaration of Qiuxing Xia, ¶ 4, submitted herewith.

[14] *See* Declaration of Sherry Chen, ¶ 4, submitted herewith.

payment was made as a loan from Ms. Jin using her personal savings.[15] The SEC says nothing about the payment other than it did not know the source of the funds used. The second payment, made on February 4, 2022, was a personal loan to Mr. Kameli from Relief Defendant Xinming Yu, who (as the SEC knows) is Xi Verfenstein's mother. The loan was made from Mrs. Yu's personal savings.[16] At the time, Mrs. Yu was ***not*** a relief defendant, and her assets were ***not*** frozen.

    <u>Sills Cummis</u>. The SEC questions $440,000 paid to Sills Cummis from non-party Ellen Young on October 26, 2021, simply because Ms. Young performed consulting work for Fleet in 2012 and 2013. Mrs. Young used her own savings to make the payment as a loan to Mr. Xia.[17] That Ms. Young performed consulting services for Fleet ***eight or nine years earlier*** and was paid by Fleet for those services did not make her subject to the Asset Freezing Order.

    If the SEC had any questions about the source or legitimacy of the payments to Defendants' counsel from Mr. Xia's family or friends, none of whom are or were subject to any asset freeze when the payments were made, it could and would have subpoenaed them and determined whether there was any genuine basis to dispute the payments. It never did so, preferring to base its doubts

---

[15] *See* Xia Supp. Aff., ¶ 21 and Exhibit A.

[16] *See* Affidavit of Xinming Yu, ¶ 4, submitted herewith. It was ***not*** paid for legal fees. At the time, but ***unbeknownst to Mr. Xia or Mrs. Yue***, Mr. Kameli was under investigation by the SEC in an administrative proceeding, which led to his disbarment from appearing in SEC enforcement actions. *See* Xia Supp. Aff., ¶¶ 22-23. He had recently agreed to pay $1.5 million to settle a related civil enforcement action alleging securities law violations. Under the settlement, Mr. Kameli owed a payment of $160,000 by late January or early February, 2022. He pleaded with Mr. Xia to find someone to lend the money to him so he could make the installment payment, but never disclosed the purpose for the loan. Unaware of the real reason for Mr. Kameli's plea, Mr. Xia imposed upon Mrs. Yu, Xi Verfenstein's mother, to use her personal savings to lend the money to Mr. Kameli. *Id*. at ¶¶ 24-27. Defendants intend to make a motion addressing various issues raised by Mr. Kameli's failure to disclose his blatant conflict of interest (as well as the SEC's failure to disclose to this Court its concurrent proceedings against Mr. Kameli) and its impact on these proceedings in due course.

[17] *See* Declaration of Ellen Young, ¶ 4, submitted herewith.

on suspicion and innuendo rather than facts.

Finally, the SEC challenges a post-asset freeze transfer of $200,000 by Mr. Xia to Ms. Yue on September 29, 2021, just two days after the original Asset Freezing Order was entered. ECF No. 235-1 at 16. At the time, Mr. Xia knew the value of the two projects and plus the $79 million cash that was frozen greatly exceeded the cap $229 million cap in the Asset Freezing Order. Xia Supp. Aff., ¶¶ 4-5. More importantly, when the $200,000 was withdrawn, Mr. Xia understood the account from which it was withdrawn was ***not*** subject to the asset freeze because ***it was not listed*** on the schedule of accounts in the Asset Freezing Order. *Id*., ¶ 10. After the $200,000 withdrawal was made, $673,000 remained in that account. *Id*., ¶ 11. Had Mr. Xia intended to violate or circumvent the Asset Freezing Order, he would have withdrawn the entire balance in the account.

### H.    A Liquidating Receivership is Not Clearly Necessary for the SEC To Obtain Information

The SEC also claims it needs a liquidating receivership to obtain an accurate picture of what transpired during the alleged fraud. ECF No. 235-1 at 16. The extraordinary remedy of a liquidating receivership is obviously not clearly necessary for the SEC or the Monitor to obtain any pertinent information, and what transpired during the alleged fraud is immaterial if the SEC intends for the receiver to liquidate Respondents' assets.

After conducting a three-year investigation, the SEC already has received extensive discovery from Defendants, from the Relief Defendants, and from dozens of non-parties through the civil enforcement action. It already has amassed more than a million pages of documents through its investigation and in discovery, and it still has many additional non-party subpoenas outstanding. The discovery process has provided the SEC with all the documents and information it may need to gain an accurate picture of what transpired during the alleged fraud.

To the extent the SEC means that a receivership is necessary for it to obtain discovery of

Defendants' or the Relief Defendants' assets, pursuant to the Asset Freezing Order entered on September 27, 2021 (ECF No. 11), Defendant Xia and Mrs. Yue each submitted a sworn accounting, under oath, of all their assets to the Monitor on October 18, 2021. ECF Nos. 19 & 20. Although the SEC and the Monitor have complained that the accounting appears incomplete to them, they have not identified what they believe was missing when they were filed on October 18, 2021.[18] On February 21, 2022, Mr. Xia and Mrs. Yue submitted additional detailed information and documents to the Monitor regarding their assets and liabilities. *See* Rifkin Decl., ¶¶ 89-90.

In any event, the SEC has failed to explain how subjecting hundreds of millions of dollars of business and personal property to a ***liquidating*** receivership – in which all of their business and personal property will be sold – is clearly necessary for the SEC to obtain more ***information***.

### I.      The SEC's Undefined "Claims and Distribution Process" Will be Cumbersome, Time-Consuming, Costly, and Ineffective

As part of the entirely undefined "claims and distribution process," the SEC proposes that all claimants against Defendants and the Relief Defendants – some of whom already have existing litigation pending in various New York State courts as well as in this Court – submit their claims to this Court for summary adjudications and *pro rata* allocations from the proceeds of the receiver's liquidation. The Monitor has identified more than two dozen actions by or against Defendants and the Relief Defendants pending in at least four different state and federal jurisdictions. The SEC proposes that those claimants and any other claimants – many of whom are

---

[18] Despite their repeated complaints and ample opportunity to do so, the SEC and the Monitor have not provided ***any*** evidence to substantiate their suspicions that the sworn accounting actually ***was*** incomplete when it was given, such as a missing property or a missing bank account that was not included on the schedules provided by Mr. Xia and Ms. Yue. At most, the SEC and the Monitor appear to believe the sworn accounting ***must have been*** incomplete because Mr. Xia and Ms. Yue have paid their living expenses and their attorneys without seeking relief from the asset freeze. Of course, they know that the Asset Freeze Order only applied to $229 million under the Court's December 8, 2022 decision on the preliminary injunction motion.

likely unaware of these proceedings – be enjoined from continuing their existing litigations or from commencing new litigation until that claims and distribution process can be completed.

To say the least, it will be an enormous undertaking for the receiver and for the Court to evaluate all those claims, many of which are hotly contested and involve significant factual and legal disputes, to determine their relative merits, and to assign appropriate values to each of them. That process – which the SEC has not described in even the most general terms – must be **completed** for all known and presently unknown claims before the *pro rata* share of each claimant can be determined. No doubt, once the Court determines the *pro rata* share for all those claimants, some of those claimants – all of whom who would be forced to accept a share of a liquidated estate – would appeal the Court's *pro rata* determination. Because each claimant's *pro rata* distribution depends not only on the total amount of cash available after the complete liquidation of Defendants' and the Relief Defendants' assets, but also on the amount assigned to each claim – including the SEC's disgorgement and civil money penalty claims (*see* Section D above) – and the claimant's percentage share of the total amount allocated to all such claims, **all** the claims will have to be determined before **any** of the liquidation proceeds can be disbursed to **any** claimants including the EB-5 investors the SEC purports to protect in this proceeding. It will take years, and cost tens of millions of dollars, to do so.

## J.     The Receivership and Liquidation Will Deprive Respondents Of their Constitutional Rights

The Fifth Amendment prohibits the government from depriving any citizen of his, her, or its property "without due process of law." U.S. Const. amend. V. Defendants and the Relief Defendants have valuable property rights under the Fifth Amendment. A taking occurs when government action deprives the owner of "all economically viable uses of the subject property." *See Soundview Assocs. v. Town of Riverhead*, 725 F. Supp. 2d 320, 333 (E.D.N.Y. 2010) (citations

22

omitted). Here, the receivership and liquidation of all those business and personal assets unquestionably will deprive Defendants and the Relief Defendants of all economically viable uses of their property; it will deprive them of all uses of their property whatsoever.

The liquidating receivership will deprive Defendants and Mrs. Yue of their valuable property without due process. Specifically, by placing control of the litigation in the hands of the receiver, the liquidating receivership denies Defendants and Mrs. Yue of their right to defend themselves against the SEC's disgorgement and civil money penalty claims, their right to a trial by jury on the merits of those claims, and their right to pursue their appeal from the Court's December 8, 2023, decision currently on appeal in the Second Circuit. The vast power the SEC proposes to confer on the receiver is, for all practical purposes, a final determination of its claim against Defendants and the Relief Defendants. When "the movant is seeking to modify the status quo by virtue of a mandatory preliminary injunction (as opposed to seeking a prohibitory preliminary injunction to maintain the status quo), or where the injunction being sought will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits, the movant must also: (1) make a strong showing of irreparable harm, and (2) demonstrate a clear or substantial likelihood of success on the merits." *Yang v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020). Given the current value of the assets the SEC seeks to liquidate and the limitations on disgorgement imposed by *Liu*, it has not even come close to meeting its burden. The sweepingly broad receivership threatens to give the receiver control over all other litigation, and even unfiled claims, against Respondents, similarly depriving them of their due process right to defend themselves in those cases and against those claims as well.

To the extent the SEC seeks a receiver and liquidation of assets to protect its claim to a civil money penalty, the appointment of a liquidating receiver is a taking without just

compensation. A "taking" occurs whenever the government appropriates and makes public use of private property. *See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021). "[I]n the case of real property, such an appropriation is a *per se* taking that requires just compensation." *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency*, 535 U.S. 302, 358 (2002) (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426-35 (1982)). Governmental appropriations of personal property for public use also constitute *per se* takings. *Id*. at 360. *See also Cedar Point Nursery*, 141 S. Ct. at 2071 ("the government commits a physical taking" when it "takes possession of property without acquiring title to it"). Even a temporary taking by the government can give rise to liability. *Id*. at 2074.

The SEC has not proposed that the civil money penalties be treated as a "fair funds" recovery under Section 308 of the Sarbanes-Oxley Act and added to whatever disgorgement it may collect to pay to the EB-5 investors. Thus, the civil money penalty will be retained by the SEC and contributed to the United States Treasury; *i.e.*, a public use. Therefore, the proposed receivership and liquidation is an appropriation of private property for public use. Doing so requires just compensation to the owners of that property and the SEC proposes none.

## K.    The Monitor is Unfit to be Appointed as Receiver

Even if the Court decides to impose a liquidating receivership over Defendants' and the Relief Defendants' business and personal assets, it should not appoint the Monitor as receiver. Since his appointment as a Monitor on September 27, 2021, the Monitor has demonstrated a shocking indifference to maintaining the safety, security, and value of both Projects or else a stunning inability to do so. Over 15 months, the Monitor only acted to protect either property when compelled to do so by Mr. Xia and his counsel or when absolutely necessary to protect the projects from disaster.  Though the Monitor's indifference or lack of ability have manifested themselves

many ways, four examples highlight the dangers to which the properties have been exposed.[19]

*First*, despite dozens of pleas from Defendants to secure the construction site on Union Street, the Monitor paid little more than lip service to the need for security – repeatedly promising to take action but failing to do so – until Defendants filed their own motion to hire a security guard and shamed the Monitor to act.  When construction at Union Street was brought to a complete halt by the Asset Freezing Order, no effort was made to secure the property from trespassers and vandals. *See* Rifkin Decl., ¶¶ 17, 26, & 43-46. No fencing was installed at the site, which left it open and accessible to the public. *Id.,* ¶¶ 19, 40, & 41. Defendants presented the Monitor with an avalanche of evidence of repeated unlawful entry into the premises, including hundreds of photos and videos showing trespassers skateboarding in unprotected areas, having sex in the completed hotel rooms, and entering areas where millions of dollars of valuable electronic equipment had been stored. *Id.,* ¶ 40. They explained that, while the trespassers presented risk of damage and loss to the construction site and the material stored there, they posed a far greater risk of injuring themselves while in dangerous and unprotected areas of the abandoned construction site. *Id.,* ¶¶ 24, 26, 27, 39.

Mr. Xia and Defendants' counsel then met with the Monitor and members of his staff at the Union Street site to show the Monitor evidence of the repeated intrusions in person and the risks to the safety of the trespassers. *Id.,* ¶ 41. The Monitor fully agreed that fencing and a security guard were needed, yet each time Defendants proposed a plan to install fencing or hire a security guard, the Monitor found some fault with the proposals but offered no proposals of his own to

---

[19] The SEC seeks to place the blame for the "deteriorating conditions" at both Projects on Mr. Xia, and argues that a receivership "is needed to right the ship." ECF No. 235-1 at 6. Nothing could be farther from the truth. As shown below, the Monitor is the person most responsible for the deteriorating conditions at both Projects and should not be given even greater responsibility for overseeing them.

secure the site. *Id.,* ¶¶ 41-42. Finally, on November 4, 2022, having grown tired of the Monitor's procrastination, Defendants moved to hire a security guard. ECF No. 197. Only then did the Monitor come forward with his own motion to appoint a different security guard, which Defendants immediately accepted to avoid any continued delay in providing minimal protection against the constant intrusion into the premises.[20]

*Second*, despite repeated pleas from Defendants to protect the construction site on Union Street from the elements, the Monitor has failed to take any action to do so. When construction was stopped on September 27, 2021, the nearly-completed building was left unprotected from the elements. Left unprotected, the building suffered significant damage over the winter of 2021-2022. Defendants showed the Monitor a pile of photographic evidence of the damage caused by water and freezing temperatures, including several large glass panes on the building's exterior and interior that exploded from the freezing winter temperatures, water damage to the building's already finished interior, damage to materials and fixtures stored on site awaiting installation, and mold growth from exposure to both water and heat. *Id.,* ¶ 47.

Just as he had agreed with the need for security, during the first site visit, the Monitor fully agreed that protection from the elements was necessary to protect the building and stored materials from further harm. Over the course of several months, Defendants and their counsel offered multiple proposals to the Monitor for enclosing the building on a temporary basis, but the Monitor dismissed all of them – never once offering a proposal of his own. Yet the Monitor did nothing to protect the building from the elements. *Id.,* ¶ 48.

Finally, with another winter fast approaching, Mr. Xia and Defendants' counsel again met

---

[20] The Monitor's choice of a security guard has been poor, to say the least. The security guard was absent at times and at times has failed to conduct the routine perimeter patrols required by the service contract.

with the Monitor and members of his staff at the construction site. *Id.,* ¶ 33. During that second meeting, the Monitor again agreed that protection from the elements was needed. *Id.,* ¶ 48. Over the following weeks, Mr. Xia met with an engineer hired by the Monitor and the two engineers agreed that the best way to protect the building was to complete the building façade, which also would help Defendants to market the building and allow Defendants to lease at least a part of the building – *i.e.*, the SEC's "empty glass shell" – to rent-paying tenants. Xia Supp. Aff., ¶ 31; Zhu Aff., ¶¶ 26-28. Defendants then made several proposals to the Monitor for completing the façade. Xia Supp. Aff., ¶ 31. The Monitor never responded to any of those proposals, and never produced a counter-proposal of his own. *Id.* The building remains unprotected and continues to deteriorate daily from exposure to the elements. Rifkin Decl., ¶ 40.

*Third*, the City of New York has threatened to order the enormous foundation on Northern Boulevard (two entire city blocks) to be re-filled – which would waste more than $100 million in decontamination and excavation work – if the excavation is not maintained while construction is prohibited by the asset freeze. Rifkin Decl., ¶ 53. Defendants and their counsel have repeatedly informed the Monitor of back-fill warnings from the City. *Id.*, ¶ 54. At first, the Monitor refused to agree that berm maintenance was necessary. *Id.* And then the Monitor refused to agree to any of Defendants' proposals for the required periodic berm maintenance at the site even though the Monitor Order gives the Monitor no oversight over that work. *See id.* ¶ 55; ECF No. 268 at 2. After months of repeated urging from Defendants, the Monitor finally addressed the urgent need for ongoing berm maintenance. ECF No. 267.

Even worse than that, the Monitor refuses to seek payment for Perini Construction Co. for the periodic berm maintenance work it has performed ***at its own expense*** during the asset freeze to stop the City from ordering the foundation to be back-filled. Defendants have requested the

Monitor's approval for bills from Perini for the work, but the Monitor refuses to approve the bills. The Monitor is simply exploiting the fact that the necessary berm maintenance work has been done at Perini's expense. Predictably, Perini refused to do any more berm maintenance work unless it was paid for the work it already has done. ECF No. 268 at 2.

And *fourth*, the Monitor unreasonably procrastinated over repairing or replacing the fence and barricade around the Northern Boulevard construction site. *Id*., ¶¶ 23, 24, 27, 51, & 52. The enormous foundation, which is 50 or 55 feet deep in sections, presents a significant public safety risk. *Id*., ¶ 49. The site fronts along Northern Boulevard at a crowded bus stop near 114th Street. *Id*., ¶¶ 30 & 56. Sections of the perimeter fence and road barricade that surrounds the entire construction site deteriorated after the Asset Freezing Order was entered on September 27, 2021, and needed to be repaired or replaced. *Id.*, ¶¶ 19, 23, 24, 27 & 51. Mr. Xia and Defendants' counsel communicated with the Monitor in early 2022 about the need to repair or replace large portions of the perimeter fence and road barricade. Defendants' counsel and a member of the Monitor's staff met on multiple occasions at the Northern Boulevard site. *Id.,* ¶ 52. Mr. Xia and an engineer hired by the Monitor were present for at least two inspections there. *Id*. They agreed that replacing both the fence and the barricade were the most cost-efficient solution to the problem. Xia Supp. Aff., ¶ 35. Defendants then proposed two contractors to perform the work. *Id*. The Monitor refused the proposals, but put forth none of his own. *Id*. Because of the Monitor's persistent foot-dragging, none of the needed work was done. Rifkin Decl., ¶¶ 23, 24, 27, 51-52.

During a windstorm on Sunday, January 15, 2023, a 125-foot-long section of perimeter fencing by the sidewalk along Northern Boulevard near 114th Street collapsed onto the bus stop. *Id.,* ¶ 56. Fortunately, no one was injured when the fence collapsed. *Id.* The fence collapse left little or no protection between the sidewalk and huge construction pit. *Id.*  The windstorm also

caused several 20-foot-tall steel poles holding a 100-foot-long sign behind the fence along Northern Boulevard to break loose from their concrete anchors, threatening to topple onto the bus stop and Northern Boulevard. *Id.* Mr. Xia and Defendants' counsel, along with a member of the Monitor's, came to the site and spent several hours there in the middle of the night until Mr. Xia was able to locate and hire a contractor to perform temporary emergency repairs overnight. *Id.,* ¶¶ 57-60. All this could and would have been avoided had the Monitor timely addressed the fence and barricade problem at Northern Boulevard.

Just last week, another windstorm caused massive damage to the fence along 112th Street. *Id.,* ¶ 62. The fence remained unrepaired because the contractor hired by the Monitor refused to perform the work as required by Mr. Xia on behalf of the owner of the property and prevented Mr. Xia, a licensed engineer, from agreeing on the fence design with the engineer retained by the Monitor to prepare the fence design. *Id*.

These four examples alone have caused massive damage to both Projects. The damage to the Eastern Mirage building will cost millions of dollars to repair and will add immeasurably to the construction cost.  The risk of catastrophic personal injury from the Monitor's refusal to allow fence and barricade work to be done is unconscionable. Together, they show that the Monitor is unqualified – either because he is indifferent to the projects or simply lacks the experience and knowledge to manage them – to assume oversight of these two construction projects. Far from protecting the investors' interests, the Monitor has caused more harm to them than anyone else.

If the Court decides to impose a liquidating receivership, it should appoint Mr. Casey to serve as the receiver.[21]

---

[21]  Importantly, Mr. Casey is prepared to serve in this capacity on an hourly basis. If a receiver expects a significant percentage of the value of the assets to oversee a short-term transaction to fund the settlement, the savings will be enormous. Even if the receiver expects an hourly fee, Mr.

**L.     Any Receiver Should Not be Immunized and Should be Required To Post a Bond**

The SEC proposes that the receiver not be required to post a bond or any other undertaking, be immune from any and all liability, and be "defended, indemnified, and held harmless by each of the Receivership Entities and the Receivership Estate." ECF No. 235-20, ¶¶ 35 & 38-39. These extraordinary protections are unwarranted given the size and complexity of the assets over which the receivership is sought and the extensive authority and responsibilities to be given to the receiver. If the Monitor is to be appointed as receiver, the extraordinary protections the SEC has proposed are unjustified in light of his repeated failures to act responsibly toward the two commercial construction projects to date, as discussed above.

If a liquidating receivership is imposed on hundreds of millions of dollars of business and personal assets, and if the receiver is given enormous powers over those assets, the receiver should be required to post a bond in an amount equal to the value of the assets over which he or she is to be given complete control, as is typical required of such receivers. And the receiver should be held liable for his or her acts and omissions under the same ordinary standards of care that any third-party in possession of another person's assets must meet. Lastly, it is entirely unreasonable to require the "Receivership Entities" – who will lose all their assets in the planned liquidation – to defend, indemnify, or hold harmless the receiver or expect that they would have any ability to do so after their assets are stripped and sold.

## CONCLUSION

For all the foregoing reasons, the Court should deny the SEC's motion for a liquidating receivership in its entirety. If the Court decides to appoint a receiver, the Court should not appoint

---

Casey is likely to bill far less than a court-appointed receiver, especially if the Court appoints the Monitor as the receiver, given the Monitor's billing history in this case.

the Monitor to serve as receiver because the Monitor has neither the ability nor the intent to act to protect the valuable properties over which a receivership is sought. Regardless of who is appointed as a receiver, given the size of the estate and the complexity of the properties over which a receivership is sought, the receiver should be required to post a bond and should not be immunized from potential liability for his or her acts or omissions as receiver.

Dated:  March 17, 2023

MEYER, SUOZZI, ENGLISH
& KLEIN, P.C.

By:     s/ Randall T. Eng
Randall T. Eng
900 Stewart Avenue
Suite 300
Garden City, NY  11530
(516) 741-6565
reng@msek.com

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By:    s/ Mark C. Rifkin
Mark C. Rifkin
Benjamin Y. Kaufman
270 Madison Avenue
9th Floor
New York, NY  10016
(212) 545-4600
rifkin@whafh.com
kaufman@whafh.com

*Attorneys for Defendants and
Relief Defendant Yue*