**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE
COMMISSION,

    *Plaintiff,*

  v.

RICHARD XIA ET AL.,

    *Defendants,*

  and

JULIA YUE ET AL.,

    *Relief Defendants.*

Case No.: 1:21-cv-05350-PKC-JAM

Honorable Pamela K. Chen

**SUPPLEMENTAL BRIEF REGARDING THE IMPACT**
**OF *SEC V. GOVIL* ON THIS ACTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

ARGUMENT ....................................................................................................................3

I.  The Second Circuit's *Govil* Decision Represents an Intervening Change in
    Controlling Law that Substantially Restricts the Disgorgement Amount the SEC
    May Seek in this Action....................................................................................................3

    A.  *Govil*'s Impact on Prior Disgorgement Law. ...................................................4

    B.  The SEC May Not Seek Disgorgement of All $229 Million Invested Because
        the Investors Did Not Suffer Pecuniary Harm as a Result of the Alleged
        Misappropriation. ............................................................................................8

II. The Asset Freeze Contained in the Preliminary Injunction Must Be Modified
    Because It Exceeds the SEC's Equitable Powers Granted by Congress under 15
    U.S.C. § 78u(d)(5). ...........................................................................................10

    A.  The SEC's Ability to Seek and the Court's Authority to Grant a Prejudgment
        Asset Freeze Is Restricted by Equitable Limitations Imposed by 15 U.S.C.
        § 78u(d)(5).....................................................................................................11

    B.  The SEC Is Not Entitled to an Asset Freeze, or Alternatively, the Asset Freeze
        Must Be Limited to a Reasonable Approximation of the Alleged
        Misappropriation, Not the Full Value of the Investments.............................13

    C.  Proposed Civil Money Penalties Are Not Equitable and May Not Be Factored
        into an Asset Freeze. ......................................................................................14

III. A Receivership Is Not an Appropriate Remedy and Would Harm Investors. .....................15

    A.  The Proposed Receivership Cannot Exceed the SEC's Equitable Authority
        under 15 U.S.C. § 78u(d)(5)...........................................................................15

    B.  Placing Hundreds of Millions of Dollars in Assets into Receivership Will Harm
        Investors and the Projects...............................................................................17

REQUESTED RELIEF......................................................................................................18

CERTIFICATE OF SERVICE .........................................................................................20

## <u>INTRODUCTION</u>

On December 8, 2022, this Court issued a Memorandum & Order granting the SEC's request for a preliminary injunction, including an asset freeze. *See* Mem. & Ord. [ECF No. 216]. The Court correctly concluded that its authority to order the freeze was grounded in statute, rather than in the Court's inherent equitable authority. *See id.* at 23–24. And the Court also correctly recognized that the scope of the freeze should be calibrated to a reasonable approximation of disgorgement the SEC would be able to obtain as final relief if it were to prevail at trial. *See id.* at 62–69.

As to the amount of potential disgorgement, the Court relied on then-existing precedent and found "convincing the SEC's assessment of disgorgement based on the total amount that Defendants raised from investors as $229 million, and prejudgment interest of approximately $68 million." *Id.* at 65. The Court noted that "the SEC might be able to recover a disgorgement amount far exceeding the $229 million that EB-5 investors paid and encompassing income earned on the proceeds of the fraud" and that "the Second Circuit has developed a more expansive view of disgorgement, one not tied to the underlying loss investors suffered." *Id.* (citation omitted). The Court also found that Defendants may incur civil money penalties of $18,646,380. *See id.* The Court froze assets based on these findings.

On October 31, 2023, the Second Circuit issued its decision in *SEC v. Govil*, No. 22-1658, 2023 WL 7137291 (2d Cir. Oct. 31, 2023). Building on the Supreme Court's decision in *Liu v. SEC*, 140 S. Ct. 1936 (2020), the Second Circuit in *Govil* held that "a 'victim' for purposes of [disgorgement under] § 78u(d)(5) is one who suffers pecuniary harm from the securities fraud." *Id.* at *9. "Whether an investor has suffered pecuniary harm—bringing the investor into the category of victims—is a different issue from how to quantify the ill-gotten gains." *Id*. at

*11. In other words, for disgorgement to be "'[e]quitable relief,'" it must "be 'awarded for victims,' and that in turn requires a finding of pecuniary harm." *Id.* at *12 (quoting *Liu*, 140 S. Ct. at 1940).

The *Govil* court rejected the districts court's finding that an individual who invests in a company "to help that company" but whose investment "is then used to pay for unrelated expenses" is a "victim," reasoning that such an individual is not a "victim" under the securities laws absent an additional finding of pecuniary harm. *Id.* at *10. Specifically, the *Govil* court found:

> The district court concluded that the defrauded investors were victims because "[t]hey were promised that the proceeds of the offerings would be used for various corporate purposes," but this promise was a "lie." It explained that "[i]t can hardly be said that an individual who invests in a company because he believes his investments are being used to help that company, but whose investment is then used to pay for unrelated expenses, is not the victim of said scheme."

> On the contrary, we think it can be said.

*Id.* (citations omitted). In making its finding, the Second Circuit extended the Supreme Court's recent decision rejecting a "right-to-control" theory of wire fraud, *Ciminelli v. United States*, 598 U.S. 306 (2023), to securities fraud, concluding "the right to make informed decisions about the dispositions of one's assets is not a property interest and offending that right does not result in pecuniary harm." *Govil*, 2023 WL 7137291, at *11.

On November 3, 2023, the Court directed the parties here "to file supplemental briefs regarding the impact, if any, of the Second Circuit's decision in *Govil* on this action--including any impact on the parties' settlement discussions in this matter and Plaintiff's pending . . . Motion to Appoint Receiver--on or before **November 17, 2023**." For the reasons below, *Govil* drastically affects this action. *See Govil*, 2023 WL 7137291, at *1 n.1 (citing *Garcia v. Garland*,

64 F.4th 62, 69 (2d Cir. 2023), for the proposition that "[t]he controlling interpretation of federal law . . . must be given full retroactive effect in all cases still open on direct review"). Mr. Xia respectfully requests that the Court revisit its preliminary injunction ruling and modify the existing asset freeze and deny the SEC's Motion to Appoint Receiver, or at minimum hold that motion in abeyance as productive settlement negotiations continue. *Govil* has substantially altered those negotiations, but they remain ongoing, and Mr. Xia anticipates that a resolution is within reach.[1]

## ARGUMENT

**I.** **The Second Circuit's *Govil* Decision Represents an Intervening Change in Controlling Law that Substantially Restricts the Disgorgement Amount the SEC May Seek in this Action.**

Section 21(d)(5) of the Securities Exchange Act of 1934 confers on the SEC statutory authority to seek equitable relief in connection with its enforcement of the securities laws. The statute provides in full:

> **(5) Equitable relief**
>
> In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors.

15 U.S.C. § 78u(d)(5).

In *Liu v. SEC*, the Supreme Court held that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)." 140 S. Ct. 1936, 1940 (2020). Prior to *Govil* and *Liu*, circuit precedent permitted the SEC to seek disgorgement far in excess of any economic harm suffered by investors. *Liu*

---

[1] Contemporaneous with the filing with this supplemental brief, Mr. Xia is filing under seal with the Court a letter providing a more detailed update on settlement discussions with the SEC.

signaled a shift from that position, emphasizing that to qualify as equitable relief disgorgement must be "awarded for victims" and that "the wrongdoer should not be punished by paying more than a fair compensation to the person wronged." 140 S. Ct. at 1943. And *Govil* further clarified that a "victim" in the context of disgorgement must have suffered "pecuniary harm." *Govil*, 2023 WL 7137291, at *11.

Here, the Court's preliminary injunction, including the asset freeze, was predicated on the notion that disgorgement is not tied to investor loss, and the Court did not make an express finding of "pecuniary harm" to the investors in support of the amount of disgorgement it found the SEC might be entitled to recover. The SEC has neither alleged nor shown the investors have suffered any such harm. In fact, notwithstanding the alleged misconduct of Mr. Xia, according to the Monitor's Report, the Monitor expects that the Projects sold "as is" "could []generate approximately $30.1 million in *surplus* fund" and "it is possible that even greater surplus funds would be possible." [Monitor Report, ECF 53 pg. 34 (emphasis added)].

## A.    *Govil*'s Impact on Prior Disgorgement Law.

Prior to the *Govil* decision, it was universally understood in this circuit that "the remedy of disgorgement aims to 'force a defendant to give up the amount by which he was unjustly enriched.'" *Govil*, 2023 WL 7137291, at *12 (quoting *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014)). As a function of this principle, prior to *Govil*, courts routinely awarded disgorgement in excess of the pecuniary harm actually suffered by investors, so as "to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws." *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996) (affirming award of $27 million in disgorgement representing "unlawful profits" in excess of $5 million already paid pursuant to a private settlement agreement with investors because "[i]t is well within the court's discretion to

give defendants credit for the $5 million paid out to reimburse victims of their frauds and to require defendants to disgorge the rest of those profits"). Such awards of disgorgement were considered well within a district court's "broad equitable power." *Id.*

But, as the Second Circuit emphasized in *Govil*, "[d]espite its roots in the equity power, . . . the disgorgement remedy as it developed in the courts prior to *Liu* 'cross[ed] the bounds of traditional equity practice.'" *Govil*, 2023 WL 7137291, at *6 (citation omitted). "So disgorgement prior to *Liu* was not an entirely equitable remedy, even if it had originated as one." *Id.* (citation omitted). After a unanimous Court in *Kokesh* in 2017 cast doubt on the continued viability of disgorgement unmoored from any statutory grant of authority, the SEC in *Liu* latched onto 15 U.S.C. § 78u(d)(5), enacted in 2002, as its basis to seek disgorgement.

The *Liu* Court upheld the SEC's authority to seek disgorgement under § 78u(d)(5). *See SEC v. Ahmed*, 72 F.4th 379, 392 (2d Cir. 2023) ("Although the Exchange Act did not explicitly authorize a 'disgorgement' remedy, *Liu* held that disgorgement is a form of 'equitable relief' authorized under 15 U.S.C. § 78u(d)(5)—answering the question left open by *Kokesh*." (quoting *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020))).[2] But in doing so, the *Liu* Court made clear that disgorgement must be subject to equitable limitations that were often transgressed in pre-*Liu* cases.

The Second Circuit's recent decisions in *Ahmed* and *Govil* aim to bring this circuit's disgorgement jurisprudence in line with *Liu* and the equitable principles identified in that decision. One of those principles is that "a wrongdoer 'should not profit by his own wrong' but also 'should not be punished by paying *more* than a fair compensation to the person wronged.'"

_____

[2] Under *Ahmed* and *Govil*, there is no distinction in this circuit between disgorgement sought under § 78u(d)(5) or § 78u(d)(3) & (d)(7). *See Ahmed*, 72 F.4th at 396 ("[W]e conclude that disgorgement under § 78u(d)(7) must comport with traditional equitable limitations as recognized in *Liu*."); *Govil*, 2023 WL 7137291, at *7 ("Based on our precedent, disgorgement under both § 78u(d)(5) and § 78u(d)(7) are constrained by *Liu*.").

*Govil*, 2023 WL 7137291, at \*13 (quoting *Liu*, 140 S. Ct. at 1943). As *Kokesh* put it, if disgorgement goes "beyond compensation," it is punitive not equitable. *Kokesh v. SEC*, 581 U.S. 455, 467 (2017).

In that respect, *Govil* gives content to *Liu*'s command that "disgorgement must be 'awarded for victims.'" *Govil*, 2023 WL 7137291, at \*5 (quoting *Liu*, 140 S. Ct. at 1940). More specifically, *Govil* mandates a finding that the SEC demonstrate investors have suffered "pecuniary harm" prior to an award of disgorgement because disgorged proceeds must be returned to investors and "[a]n investor who suffered no pecuniary harm as a result of the fraud is not a victim." *Id.*; *see also id.* at \*9 n.14 ("When disgorgement is awarded to an investor who suffered no pecuniary harm, the remedy does not aim to restore the status quo at all."). In reaching this conclusion, the Second Circuit *expressly* rejected the SEC's argument that investors "need not have suffered pecuniary harm." *Id.* at \*11–12.

As further support for its ruling, the Second Circuit in *Govil* also invoked the Supreme Court's recent decision in *Ciminelli v. United States*, 598 U.S. 306 (2023), which rejected the Second Circuit's "right-to-control" theory of wire fraud, finding "the right to make informed decisions about the dispositions of one's assets is not a property interest and offending that right does not result in pecuniary harm." *See Govil*, 2023 7137291, at \*11. The Second Circuit observed that "the district court's argument for concluding that the investors were victims is not far from the theory rejected in *Ciminelli*." *Id.*

The SEC had alleged in *Govil* that founder and entrepreneur Aron Govil engaged "in three fraudulent securities offerings." 2023 WL 7137291, at \*1. "In those offerings, Govil represented to investors that the Company would use the proceeds from the transactions to

satisfy outstanding debts and for general corporate purposes. Instead, he diverted over $7.3 million of the offering proceeds to his own private accounts." *Id.*

Here, parallel to *Govil*, the SEC's central allegations against Defendants arise from alleged misappropriation of Project funds lent by limited partnerships in which the investors had invested $500,000 each with the expectation of obtaining residency and a return of the full $500,000 investment after every investor in that project obtained status. *See, e.g.*, Am. Compl. ¶¶ 1–4 [ECF No. 98]. Critically, the *Govil* decision left open the question whether, in misappropriation cases, the entity from which funds were misappropriated may "qualif[y] as a victim" for purposes of awarding disgorgement where an investor has not suffered pecuniary harm. *Id.* at *5 n.8. The answer should be "no," as Congress has granted the SEC no such corporate governance authority; this exceeds the SEC's purpose. Such claims fall squarely within the realm of private derivative actions. *See, e.g.*, N.Y. P'ship Law § 121-1002 ("Limited partners' derivative action"); 6 Del. C. § 15-405 ("Actions by partnerships and partners; derivative actions").[3] Indeed, if the SEC's misappropriation allegations were brought in a private action as opposed to one brought by the SEC, it could only be pursued as a derivative lawsuit.[4]

---

[3] *Govil's* prohibition on awarding disgorgement to investors who did not suffer pecuniary harm, however, does not strip the SEC of its function of protecting investors as the SEC may still pursue cease and desist orders, injunctive relief, and civil money penalties against individuals alleged to have violated 10b-5, including in the instant action.

[4] The Second Circuit has embraced the *Tooley* standard for determining whether claims against a company must be asserted directly or derivatively. *See, e.g.*, *F5 Cap. v. Pappas*, 856 F.3d 61, 72 (2d Cir. 2017); *AHW Inv. P'ship v. Citigroup, Inc.*, 806 F.3d 694, 700 (2d Cir. 2015). Under *Tooley*, such analysis is guided by two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

**B. The SEC May Not Seek Disgorgement of All $229 Million Invested Because the Investors Did Not Suffer Pecuniary Harm as a Result of the Alleged Misappropriation.**

Based on the new restrictions on disgorgement identified in *Liu* and specified in *Govil*, the SEC may not seek disgorgement of the $229 million invested in the limited partnership lending entities. The SEC has not alleged (nor could it) that the investors suffered pecuniary harm. In fact, the SEC's complaint alleges *only* misappropriation of funds lent by the limited partnerships to the Projects. *See, e.g.*, Am Compl. ¶ 78 ("The Defendants engaged in a scheme to solicit funds from investors and to misappropriate and misuse those funds . . . ."); *id.* ¶ 90 ("On multiple occasions, Defendants misappropriated or misused investor funds[.]"). The Court need not look beyond (1) the limited partnership agreements and the private offering memoranda of the five lending limited partnerships ("Operative Documents") and (2) the Monitor Reports to conclude that the SEC has brought a misappropriation case without allegations of direct pecuniary harm to investors.

As the Court is aware, in exchange for a $500,000 investment, the Operative Documents offer investors the opportunity to obtain residency and a return of the $500,000 plus a percentage of profit *made from loans* to the Projects at either the time of the repayment of the loans or when each investor in the Project has obtained residency. As the Court found, the Defendants raised $229 million from investors for five limited partnerships that provided loans to the Projects. *See* Mem. & Ord. at 65 [ECF No. 216]. The Funds were then lent to the Projects, resulting in a nearly completed high rise building in Flushing and substantial site excavation, remediation, and foundation construction for a second building in Corona. *See* A Report to the Court at 5 (Jan. 28, 2022) [ECF No. 53].

According to the Monitor Report, as of September 27, 2021, the value of the Projects *exceeded* the value of the loans provided by the limited partnerships—the $229 million in investor funds. Specifically, the Monitor determined that assets available to satisfy repayment to the lending limited partnerships for eventual distribution to limited partners (the investors) include $79.9 million in frozen assets, potential tax credits of $72.8 million, and "as is" values for Eastern Mirage of between $140 million to $177 million and Eastern Emerald of $51.3 million to $59 million.[5] *See id.* [ECF No. 53]. That is, according to the Monitor, at the time of the SEC's action, the Projects retained value between *at least* $344 million and $388 million. Of the frozen funds, $73,663,703.52 is in accounts affiliated with Emerald with the majority of tax credits applicable to Emerald as well. *Id.* at 27. These assets are sufficient to pay back the loans to the limited partnership entities and distribute funds to the investors far in excess of what investors contributed *whether aggregated or distributed as two separate projects*. As the Monitor Report acknowledged when discussing the value of the Projects "as is," "[t]his 'low' scenario could also generate approximately $30.1 million in surplus" and "it is possible that even greater surplus funds would be available." *Id.* at 30.

While the SEC may have adequately demonstrated at the preliminary injunction hearing a likelihood of proving 10b-5 violations and misappropriation, the *investors* stand to receive the benefit of the bargain: they had provided funds to a lending entity that lent money to Projects with collateral *far exceeding* the value of the investments in the lending entity.

*Govil* altered the way courts must analyze scenarios such as this, holding: "If we were to understand 'victim' as including defrauded investors who suffered no pecuniary harm—and thus

---

[5] Curiously, the Monitor Report acknowledges an appraiser's "as is" appraisal value of Eastern Emerald at $156 million based on the "site excavation," "wall installation" and preparation tax credits, but inexplicably disregards this more than $100 million in additional value.

to allow those investors to receive the proceeds of disgorgement—we would not be restoring the status quo for those investors. We would be conferring a windfall on those who received the benefit of the bargain." *Govil*, 2023 WL 7137291, at *9.

The SEC may not obtain disgorgement of the full value of the investments based on allegations of misappropriation and the SEC lacks authority to obtain rescission on behalf of investors. No basis exists for a disgorgement award of $229 million after the *Govil* decision and any disgorgement award based on misappropriation from the Projects requires a finding that the limited partnership entities who lent funds may constitute "victims" eligible for disgorgement under 15 U.S.C. § 78u(d)(5). *See Govil*, 2023 WL 7137291, at *5 n.8 ("The district court may also consider whether [the corporation] qualifies as a victim on remand.").

## II. The Asset Freeze Contained in the Preliminary Injunction Must Be Modified Because It Exceeds the SEC's Equitable Powers Granted by Congress under 15 U.S.C. § 78u(d)(5).

Here, the asset freeze sought by the SEC and entered by the Court is "ancillary relief to facilitate enforcement of any disgorgement remedy that might be ordered in the event a violation is established at trial." *See SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990); SEC Mot. for TRO at 25 (citing *Unifund*) [ECF No. 2-2]. The power to order such ancillary relief cannot exceed the scope of the power to order the ultimate remedy, but instead is circumscribed by it. *Cf. Smith v. SEC*, 653 F.3d 121, 127 (2d Cir. 2011) ("The purpose of such an asset freeze is to ensure 'that any funds that may become due can be collected.'" (quoting *Unifund SAL*, 910 F.2d at 1041)).

In other words, the prospect of a disgorgement award is a necessary predicate for the asset freeze entered here. In concluding, prior to *Govil*, that the asset freeze was appropriate, this Court explained that it found "convincing the SEC's assessment of disgorgement based on the

total amount that Defendants raised from investors as $229 million, and prejudgment interest of approximately $68 million." Mem. & Ord. 65 [ECF No. 216]. But the Court's prior decision made no express finding of "pecuniary harm" to investors—or a likelihood that the SEC would be able to show "pecuniary harm" at a later date—a required element for disgorgement after *Govil*. After *Govil*, it is doubtful the SEC will be able to make the required showing of "pecuniary harm" to investors such that it is entitled to disgorgement at all. At a minimum, it is clear the current asset freeze far exceeds the amount of money that can be disgorged after *Govil*.

**A.**  **The SEC's Ability to Seek and the Court's Authority to Grant a Prejudgment Asset Freeze Is Restricted by Equitable Limitations Imposed by 15 U.S.C. § 78u(d)(5).**

In explaining what the SEC must show to secure an asset freeze, the Second Circuit in *Unifund* relied on *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982), which considered a similar question concerning the Federal Trade Commission's authority to freeze assets before judgment. *See Unifund*, 910 F.2d at 1041. The Ninth Circuit's reasoning in *H.N. Singer* is instructive. There, the FTC alleged violations of its "Franchise Rule" arising from "the sale of franchises for 'Hot Box Products.'" *H.N. Singer*, 668 F.2d at 1109. "Franchisees were to distribute frozen pizzas and ovens to retail outlets. They paid substantial amounts for the franchises." *Id.*

The court of appeals considered whether the asset freeze ordered by the district court was permissible under the FTC's authority in Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), as provisional injunctive relief to preserve the FTC's ability *to rescind* the franchise agreements, a remedy expressly provided for in Section 19, 15 U.S.C. § 57b(a). *See H.N. Singer*, 668 F.2d at 1109. The Ninth Circuit reasoned: "Because the authority to issue a preliminary injunction rests upon the authority to give final relief, the authority to freeze assets

by a preliminary injunction must rest upon the authority to give a form of final relief to which the asset freeze is an appropriate provisional remedy." *Id.* at 1112. Accordingly, because Section 19 includes rescission of franchise contracts as a possible remedy—that is, the contracts could be undone, and the full amounts returned—it was appropriate for the FTC to seek an asset freeze for *the full amounts paid* to preserve that remedy. *See id.* at 1112 ("The [FTC] says that the preliminary injunction is necessary to preserve the possibility of rescission of contracts and restitution of money obtained by fraud. Rescission is a possible remedy for violation of the Franchise Rule under § 19. Hence, there is a basis for the order freezing assets.").

The Second Circuit's modification of the freeze order in *Unifund* flows from a similar principle that courts should tread carefully when granting "ancillary relief" that exceeds what is necessary to preserve the final relief it is intended to preserve. The court of appeals took issue with the fact that "the freeze order obliges appellants not merely to maintain in their accounts funds sufficient to pay the amounts that might eventually be due but also to refrain from any trading in the accounts without the [SEC's] approval." *Unifund*, 910 F.2d at 1042. Accordingly, the Second Circuit loosened the freeze of trading accounts in part so that the SEC maintained "substantial security without unduly burdening the appellants by denying them the opportunity to invest as they see fit." *Id.*; *see also SEC v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc.*, 296 F.R.D. 241 (S.D.N.Y. 2013) (clarifying the asset freeze and chastising the SEC for failing to "provid[e] the Court with any information" about the amount that should be subject to the asset freeze, "or any other basis for calculating the proceeds from the trades at issue").

As this Court correctly observed in its December 8, 2022 Memorandum & Order granting the asset freeze, the injunctive relief sought here is a "creature[] of statute," specifically 15

U.S.C. § 78u(d)(5), which permits disgorgement for the benefit of investors but that does not authorize the SEC to rescind contracts between private parties. Mem. & Ord. at 23 (quoting *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975)); *see id.* at 24 ("The Court . . . rejects the facial challenge to its authority to issue the statutory asset freeze requested by the SEC."). Disgorgement must satisfy § 78u(d)(5), as interpreted by *Liu* and *Govil*, so as not to run afoul of equitable principles. It follows that any ancillary relief designed to preserve the prospect of a later disgorgement award must also comply with the same limitations. *See H.N. Singer*, 668 F.2d at 1112.

B. **The SEC Is Not Entitled to an Asset Freeze, or Alternatively, the Asset Freeze Must Be Limited to a Reasonable Approximation of the Alleged Misappropriation, Not the Full Value of the Investments.**

For the reasons explained in Part I.B, *supra*, the SEC has not shown any pecuniary harm to investors. Absent such a showing, disgorgement is not authorized under *Liu* and the Second Circuit's recent decision in *Govil*. *See* 2023 WL 7137291, at *9 ("*Liu* does not authorize disgorgement on these facts . . . . [where] the district court did not find that [the] investors suffered pecuniary harm."). Because the sole purpose of the asset freeze is to preserve funds that may be awarded as disgorgement and the frozen assets exceed any obtainable disgorgement award, there is no basis to keep the asset freeze in place. Assuming *arguendo* the Court is persuaded the SEC can show pecuniary harm to investors in the limited partnerships by proving misappropriation from the Projects to which the limited partnerships lent funds, a reasonable approximation of that disgorgement amount would be far less than the full value of the investments (and the current asset freeze).

Finally, at a minimum, the asset freeze should be modified to permit a carve-out for reasonable legal fees and expenses, including responding to the Court's request for supplemental

briefing. The Court's invitation on this point is well taken, *see* Mem. & Ord. at 69, and amply supported by case law, *see, e.g.*, *SEC v. I-Cubed Domains, LLC*, 664 F. App'x 53, 57 (2d Cir. 2016) (unpublished) (summary order) (affirming preliminary injunction where district court granted "substantial carve-outs from the freeze for . . . legal and living expenses"); *SEC v. Duclaud Gonzalez de Castilla*, 170 F. Supp. 2d 427, 430 (S.D.N.Y. 2001) ("Both J. Duclaud and Banrise have incurred substantial expenses as a consequence of this action. Under these circumstances, it is appropriate to modify the freeze as to both J. Duclaud and Banrise to permit the payment of legal fees and disbursements." (citing *SEC v. Schiffer*, No. 97 Civ. 5853, 1998 WL 307375 (S.D.N.Y. June 11, 1998); *SEC v. Int'l Loan Network, Inc.*, 770 F. Supp. 678 (D.D.C. 1991))).

**C.      Proposed Civil Money Penalties Are Not Equitable and May Not Be Factored into an Asset Freeze.**

While the Court may have correctly concluded at the time the preliminary injunction issued that it may award a prejudgment freeze of assets based on civil money penalties sought by the SEC, *Govil* makes clear that such a practice is no longer permissible. *Compare SEC v. Collector's Coffee, Inc.*, No. 19CIV4355VMGWG, 2023 WL 6453709, at *22 (S.D.N.Y. Oct. 4, 2023) ("As to the penalty portion, the SEC is entitled to an asset freeze 'sufficient to preserve its disgorgement remedy as well as assets necessary to pay civil monetary penalties.'"), *with Govil*, 2023 WL 7137291, at *9 (noting that § 78u(d)(5) authorizes only "equitable relief"). Because the SEC's authority to seek a prejudgment asset freeze derives from § 78u(d)(5) ("Equitable Relief") it may not freeze assets for penalties sought under § 78(u)(d)(3)(B). To the extent courts in the past have purported to rely on the equity powers granted by § 78u(d)(5) to implement prejudgment asset freezes of potential penalties under § 78(u)(d)(3)(B), such cases are no longer good law. *Cf. Kokesh*, 581 U.S. at 466 ("A civil sanction that cannot fairly be said *solely* to serve

a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.") (emphasis original).

### III.  A Receivership Is Not an Appropriate Remedy and Would Harm Investors.

The *Govil* decision, although focused specifically on disgorgement, nevertheless also affects the analysis of whether a receivership would be appropriate in this case. That is because, as the SEC acknowledges, a receivership is a form of "equitable relief" available under § 78u(d)(5), the statute at issue in *Liu* and *Govil*. As such, any receivership must comport with that statute and be "appropriate or necessary for the benefit of investors."

#### A.  The Proposed Receivership Cannot Exceed the SEC's Equitable Authority under 15 U.S.C. § 78u(d)(5).

In support of its Motion for the Appointment of a Receiver filed on January 17, 2023, the SEC argued that the Court's "statutory authority to appoint a Receiver arises from Exchange Act § 21(d)(5) [15 U.S.C. § 78u(d)(5)]." SEC Mot. Appoint. Rec. at 5 [ECF No. 235-1]. The SEC reiterated in its Reply that "the Court is empowered under Section 21(d)(5) . . . to grant 'any equitable relief that may be appropriate or necessary for the benefit of investors,' which includes the power to appoint a Receiver over property." SEC Reply Mot. Appoint. Rec. at 4 [ECF No. 294]. Mr. Xia does not dispute that the Court's authority to appoint a receiver must be grounded in § 78u(d)(5). *Cf.* Mem. & Ord. ("Unlike private actions, which are rooted wholly in the equity jurisdiction of the federal court, SEC suits for injunctions are creatures of statute." (quoting *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975)).[6]

---

[6] The SEC also maintained in its Motion for Appointment of a Receiver that the Court could act pursuant to its "inherent equitable authority," SEC Mot. Appoint. Rec. at 5, but did not reference any such authority in its Reply. To the extent some inherent equitable authority exists for the Court to appoint a receiver that is untethered from § 78u(d)(5), the fact that the relief is undisputedly "equitable" indicates that the limitations imposed by *Liu* still apply with full force.

But the SEC's Reply reveals a misunderstanding of *Liu*—which carefully interpreted § 78u(d)(5)—and includes citations to pre-*Liu* case law that has been even more clearly abrogated in light of *Govil*. More specifically, the SEC previously contended that the size of a potential disgorgement award should have no bearing on the decision whether to impose a receivership. That is so, according to the SEC, because a receivership's "primary purpose is not to protect a potential disgorgement award but to gather and protect assets and return money that is owed to the victims." SEC Mot. Appoint. Reply at 2. The SEC observes later that "disgorgement's primary purpose is not to compensate investors," *id.* at 5–6 (citing *SEC v. Amerindo Inv. Advisors Inc.*, No. 05-CV-5231 (RJS), 2017 WL 3017504, at *4–5 (S.D.N.Y. July 14, 2017), and "[i]n contrast, . . . the goal of [an] equity receivership is to *compensate* the Allowed Investors," *id.* at 6 (quoting *Amerindo*, 2017 WL 3017504, at *5).

This was already an incorrect statement of disgorgement law after *Liu*, decided in 2020, where the Supreme Court explained:

> The Government maintains . . . that the primary function of depriving wrongdoers of profits is to deny them the fruits of their ill-gotten gains, not to return the funds to victims as a kind of restitution. Under the Government's theory, the very fact that it conducted an enforcement action satisfies the requirement that it is "appropriate or necessary for the benefit of investors." But the SEC's equitable, profits-based remedy must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains. To hold otherwise would render meaningless the latter part of § 78u(d)(5).

*Liu*, 140 S. Ct. at 1948 (citations omitted); *see also SEC v. Lemelson*, 596 F. Supp. 3d 227, 237 (D. Mass. 2022) ("The [*Liu*] Court rejected the Government's position that the 'primary function of depriving wrongdoers of profits is to deny them the fruits of their ill-gotten gains, not to return the funds to victims as a kind of restitution.'" (citation omitted)), *aff'd on other grounds*, 57 F.4th 17 (1st Cir. 2023).

Further demonstrating that the point of disgorgement is to return funds to harmed investors but that a showing of pecuniary harm is required, the Second Circuit in *Govil* elaborated on the meaning of "victim" as used in *Liu*, explaining: "If we were to understand 'victim' as including defrauded investors who suffered no pecuniary harm—and thus to allow those investors to receive the proceeds of disgorgement—we would not be restoring the status quo for those investors. We would be conferring a windfall on those who received the benefit of the bargain." *Govil*, 2023 WL 7137291, at *9 (footnote omitted). "That is why," according to the Second Circuit, "the *Liu* Court emphasized that such an equitable remedy [that is, disgorgement] is about '*return[ing]* the funds to victims.'" *Id.* at *10 (quoting *Liu*, 140 S. Ct. at 1948).

In short, the SEC is correct that the Court's authority to appoint a receiver derives from § 78u(d)(5). But the SEC fails to appreciate that § 78u(d)(5) is the same authority that governs its ability to seek disgorgement and that these two remedies also seek the same goal, spelled out in the statute: "equitable relief" that is "appropriate or necessary *for the benefit of investors*." Accordingly, both seek to return funds to investors who have suffered pecuniary harm and neither should be used as a vehicle to punish an alleged wrongdoer by forcing him to "pay[] more than a fair compensation to the person wronged." *See Liu*, 140 S. Ct. at 1943 (quoting *Tilghman v. Proctor*, 125 U.S. 136, 145–146 (1888)). In that regard, it would defy the statutory command of § 78u(d)(5) that relief is "for the benefit of investors" if appointing a receiver would depreciate the relevant assets and reduce the potential recovery for any harmed investors.

### B. Placing Hundreds of Millions of Dollars in Assets into Receivership Will Harm Investors and the Projects.

As set forth in Mr. Xia's brief in opposition to the receivership, appointment of a receiver would likely harm rather than benefit investors, especially compared to the prospect of settlement. *See* Defs.' Opp. to SEC's Mot. Appoint Rec. at 7–9 [ECF No. 274]. As Defendants

have already demonstrated, instead of preserving funds for any harmed investors, the appointment of a receiver would most likely diminish the value of the properties, derail the Projects, and increase the difficulty of securing any potential disgorgement award. *See id.* at 13–14. A receivership would thus be neither "appropriate" nor "necessary" "for the benefit of investors." *See* 15 U.S.C. § 78u(d)(5). The "appropriate" and "necessary" relief in this regard is already in place: the Court-appointed Monitor. *See, e.g.*, Quarterly Status Report to the Court at 2 (May 3, 2023) ("Since his last report, the Monitor continued to focus on the most significant, time sensitive, and urgent needs of [the Projects] and the investors while working diligently to minimize costs.") [ECF No. 317].

Finally, as explained in the separate letter filed today under seal with the Court, the parties are engaged in productive settlement negotiations that will hopefully culminate soon in a resolution that protects investors and the value of the Projects. Appointing a receiver now—when the parties are poised to settle—would derail the settlement negotiations, in addition to jeopardizing any recovery for investors, causing unintended immigration consequences.

## REQUESTED RELIEF

For all the foregoing reasons, the Second Circuit's recent decision in *Govil* has materially limited the SEC's authority to seek disgorgement, especially here, where the SEC has not shown that investors suffered pecuniary harm. Because the authority to impose an asset freeze by the Court derives from and is predicated on a potential later award of disgorgement that requires such a showing, the asset freeze should be revisited and modified accordingly to comport with 15 U.S.C. § 78u(d)(5). In a similar vein, appointing a receiver in this case would likely have the opposite effect of providing a benefit to investors, a key consideration that informs what equitable relief the SEC may seek under § 78u(d)(5), as interpreted by *Liu* and *Govil*. Finally,

Mr. Xia reiterates that settlement discussions with the SEC are ongoing and he is hopeful that a final resolution can be reached that protects investors and preserves the value of the project.

As specified in the separate letter filed herewith, Mr. Xia respectfully requests oral argument on these issues.

Dated: November 17, 2023                Respectfully submitted,

FORD O'BRIEN LANDY LLP

By: _____
Matthew A. Ford
Adam C. Ford
Renée L. Jarusinsky
Stephen R. Halpin III
275 Madison Avenue, 24th Floor
New York, NY 100016
Tel.: (212) 858-0040 (main)
Fax: (212) 256-1047
mford@fordobrien.com
aford@fordobrien.com
rjarusinsky@fordobrien.com
shalpin@fordobrien.com

*Attorneys for Defendant Richard Xia*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served on all counsel of record via the Court's CM/ECF system.

Dated: November 17, 2023

                                 */s/ Matthew A. Ford*
                                 Matthew A. Ford