UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,                  **MEMORANDUM & ORDER**
                                                21-CV-5350 (PKC) (JAM)

       - against -

RICHARD XIA, a/k/a YI XIA; and FLEET
NEW YORK METROPOLITAN REGIONAL
CENTER, LLC, f/k/a FEDERAL NEW YORK
METROPOLITAN REGIONAL CENTER,
LLC,

                  Defendants,

       - and -

JULIA YUE, a/k/a JIQING YUE; XI
VERFENSTEIN; and XINMING YU,

              Relief Defendants.
----------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

      In this civil securities fraud action, Plaintiff Securities and Exchange Commission (the

"SEC") alleges that Defendants Richard Xia ("Xia") and Fleet New York Metropolitan Regional

Center, LLC (together, "Defendants") engaged in a decade-long fraudulent scheme that defrauded

at least 450 foreign investors who participated in the EB-5 Immigrant Investor Program out of

more than $229 million, in violation of various federal securities laws, and that unjustly enriched

Relief Defendants Julia Yue ("Relief Defendant Yue"), Xi Verfenstein, and Xinming Yu

(collectively, "Relief Defendants").[1]

      Presently before the Court is a motion by non-party CTBC Bank Corp. (USA) ("CTBC")—

---

[1] The Court refers to the SEC, Defendants, and Relief Defendants collectively as the
"Parties."

one of Xia's main creditors—to intervene in this SEC enforcement action, pursuant to Federal Rule of Civil Procedure ("Rule") 24, for the limited purpose of seeking (1) the release of certain real property and assets from the asset-freezing preliminary injunction (the "Preliminary Injunction") currently in place, and (2) the appointment of a receiver to protect its security interests.  For the reasons stated herein, the Court grants CTBC's motion.[2]

## BACKGROUND[3]

### I.    The Instant Action and the Preliminary Injunction

On September 27, 2021, the SEC commenced this enforcement action alleging various violations of federal securities law by Defendants.  (*See generally* Compl., Dkt. 1.)  The SEC alleges that, between early 2010 and late 2017, Defendants fraudulently raised more than $229 million by offering and selling limited partnership interests to over 450 foreign nationals who participated in the EB-5 Immigrant Investor Program administered by the United States Citizenship and Immigration Services, and then misappropriated those funds for their personal purposes.  (*See* Am. Compl., Dkt. 98, ¶¶ 1–2, 4, 78–100.)  The SEC alleges that Defendants' actions, which amounted to investor fraud, violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77q(a), and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b)

---

[2] By this Memorandum and Order, the Court solely rules on CTBC's motion to intervene. The Court does not rule on the ultimate merits of CTBC's proposed relief to modify the Preliminary Injunction and appoint a receiver, for which CTBC intends to file a separate motion following its intervention.  *See infra* Background Part V.A.  The Court will consider CTBC's requests for relief once its motion is filed.

[3] The procedural history and factual background of this litigation has been detailed extensively in various opinions by the Court, including the Court's December 8, 2022 Memorandum and Order issuing the Preliminary Injunction.  *See, e.g.*, *SEC v. Xia*, No. 21-CV-5350 (PKC) (RER), 2022 WL 17539124, at *1–10 (E.D.N.Y. Dec. 8, 2022), *appeal filed*, No. 22-3137 (2d Cir.).  Therefore, the Court assumes the Parties' familiarity with the facts and recites only the background relevant to CTBC's motion to intervene.

and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.  (*Id.* ¶¶ 191–96.)  The SEC also alleges that as part of the scheme, Defendants improperly diverted for the benefit of Relief Defendants more than $30 million of investor funds, which were used to, *inter alia*, purchase three mansions in New York[4] that are held in the names of Relief Defendants.  (*See id.* ¶¶ 12, 23–26, 197–99.)

Along with its September 27, 2021 Complaint, the SEC moved for an emergency temporary restraining order ("TRO"), *inter alia*, freezing Defendants' and Relief Defendant Yue's assets and appointing a Monitor, and for a preliminary injunction continuing the same asset-freeze throughout the pendency of this action in order to preserve the status quo and ensure that sufficient assets are available to compensate the defrauded investors.  (*See* Dkts. 2–8; Dkt. 2, at 2; *see also* Dkt. 103, at 25.)  On the same day, this Court granted the SEC's motion for a TRO, appointed Mr. M. Scott Peeler as Monitor (the "Monitorship"), and scheduled a show-cause hearing regarding the SEC's pending motion for a preliminary injunction.  (*See* Dkt. 11.)  Subsequently, on April 6, 2022, the SEC moved to expand the scope of the existing asset-freeze and its requested preliminary injunction as to Relief Defendants.  (*See* Dkts. 99–102.)  On December 8, 2022, after carefully considering the evidence on the record and the three-day show-cause hearing (*see* 2/14/2022, 2/15/2022 & 2/16/2022 Minute Entries), this Court issued the Preliminary Injunction,[5] which covers all of Defendants' assets and Relief Defendants' residential properties, for the duration of two years.[6]  *See Xia*, 2022 WL 17539124, at *31; *SEC v. Xia*, No. 21-CV-5350 (PKC) (RER), 2022 WL 20543271, at *1–2 (E.D.N.Y. Dec. 8, 2022), *appeal filed*, No. 22-3137 (2d Cir.).

---

[4] These three mansions are located on Kings Point Road in Kings Point, Middle Neck Road in Sands Point, and Vanderbilt Drive in Sands Point.  (*Id.* ¶ 165.)

[5] In light of the Parties' settlement-in-principle, the Court, at the Parties' joint request, extended the Preliminary Injunction for 60 days.  (*See* Dkts. 388, 389; 1/24/2024 Docket Order.)

[6] On December 14, 2022, Defendants and Relief Defendant Yue filed an interlocutory appeal as to the Preliminary Injunction and the Court's contemporaneously filed Memorandum

## II.     The Putative Intervenor CTBC and Its Loans to Xia-Controlled Entities

Between April and August 2021, CTBC[7]—a non-party in this case—extended five loans totaling $21,035,750 to several entities owned and controlled by Xia.  (Mem. of Law in Supp. of Party in Interest CTBC's Mot. to Intervene ("CTBC Br."), Dkt. 238-1, at 3.)  These five loans together make CTBC "one of the largest creditors of [Xia]."  (Dkt. 152, at 1.)  Xia subsequently used these loans to purchase two[8] of the three mansions held in the names of Relief Defendants. (*See* Am. Compl., Dkt. 98, ¶¶ 96, 170–71, 173–74, 183; *see also* Dkt. 259, at 2 n.2.)

Of the five loans, three are mortgage loans[9] collectively worth $6,535,750, and as collateral, CTBC holds perfected, first-priority security interests in eleven residential and commercial condominium units located in Flushing, New York (the "Secured Units")[10] and an Assignment of Leases and Rents Agreements (the "ALR Agreements") from Xia, which includes

---

and Order issuing the Preliminary Injunction.  (*See* Dkt. 219.)  To date, the appeal remains pending. (*See* Dkts. 262, 326, 372, 373, 397); *see also SEC v. Xia*, No. 22-3137, Dkts. 104, 106, 108, 114 (2d Cir.).

[7] CTBC is "a California state-chartered, FDIC-insured commercial bank, with branch offices" nationwide.  (*See* Decl. of Stan Sarwar ("Sarwar Decl."), Dkt. 238-5, ¶ 3.)  It was CTBC's Flushing branch office in New York that extended the five loans at issue in this case.  (*Id.* ¶ 4.)

[8] These two mansions are the Kings Point Road mansion held under Relief Defendant Yue's name and the Vanderbilt Drive mansion held under Relief Defendant Xinming Yu's name. (*See* Am. Compl., Dkt. 98, ¶¶ 167, 183.)

[9] On August 12, 2021, CTBC extended these three loans to three separate Xia-controlled entities: Manekineko Group LLC ("Manekineko"), Shangri-La 9F Inc. ("Shangri-La 9F"), and Shangri-La Green Inc. ("Shangri-La Green").  (CTBC Br., Dkt. 238-1, at 3; Sarwar Decl., Dkt. 238-5, ¶ 5; *see also* Manekineko Mortg. Note, Ex. 1, Dkt. 238-6; Shangri-La 9F Am. & Restated Mortg. Note, Ex. 5, Dkt. 238-10; Shangri-La Green Am. & Restated Mortg. Note, Ex. 9, Dkt. 238-14.)

[10] These Secured Units, located at 140-22 Beech Avenue in Flushing, include units SCA, SCB, 1A, 1B, 1C, 1D, 1E, 1F, 9C, 9D, and 9F.  (CTBC Br., Dkt. 238-1, at 1.)

"a present assignment of all leases and rents generated on the Secured Units."[11]  (CTBC Br., Dkt. 238-1, at 3.)  While Xia has a license to collect such rents, that license is automatically revoked if a default occurs.  (*Id.*)  As additional collateral, Xia has personally guaranteed these loans.[12]  (*Id.*)  The other two CTBC loans are business loans extended to two Xia-controlled entities[13] in the amount of $14.5 million, which are secured by two time certificates of deposits (the "TCDs") that Xia provided as loan collateral.[14]  (*Id.*)  Similarly, CTBC holds "a perfected interest and priority over the TCDs,"[15] and in the event of a default, CTBC is entitled to withdraw the funds under the TCDs.  (*Id.* at 3–4.)

---

[11] CTBC claims that it perfected its security interests in the Secured Units "by taking possession of each of the mortgage notes and recording each mortgage and ALR Agreement with the Office of City Register of the County of Queens" in September 2021.  (CTBC Br., Dkt. 238-1, at 3; *see also* Sarwar Decl., Dkt. 238-5, ¶¶ 10–12, 18–20, 27–29; Manekineko Mortg. & Sec. Agreement, Ex. 2, Dkt. 238-7; Manekineko Collateral Assignment of Leases & Rents, Ex. 3, Dkt. 238-8; Shangri-La 9F Gap Mortg. & Consolidation, Modification & Extension Agreement, Ex. 6, Dkt. 238-11; Shangri-La 9F Collateral Assignment of Leases & Rents, Ex. 7, Dkt. 238-12; Shangri-La Green Gap Mortg. & Consolidation, Modification & Extension Agreement, Ex. 10, Dkt. 238-15; Shangri-La Green Collateral Assignment of Leases & Rents, Ex. 11, Dkt. 238-16.)

[12] Xia personally executed guaranties for each of the three loans.  (*See* Sarwar Decl., Dkt. 238-5, ¶¶ 13, 21, 30; *see also* Gen. & Continuing Guar. of Yi Xia A/K/A Richard Xia, Ex. 4, Dkt. 238-9; Gen. & Continuing Guar. of Yi Xia A/K/A Richard Xia, Ex. 8, Dkt. 238-13; Gen. & Continuing Guar. of Yi Xia A/K/A Richard Xia, Ex. 12, Dkt. 238-17.)

[13] On April 9 and August 9, 2021, CTBC extended these two business loans to Eastern Emerald Group LLC ("Eastern Emerald Group") and Fleet General Insurance Group, Inc. ("Fleet General Insurance Group"), respectively.  (CTBC Br., Dkt. 238-1, at 3; Sarwar Decl., Dkt. 238-5, ¶¶ 32–33; *see also* Eastern Emerald Group Bus. Loan Agreement, Ex. 13, Dkt. 238-18; Fleet General Insurance Group Bus. Loan Agreement, Ex. 16, Dkt. 238-21.)

[14] One TCD is under the name of Eastern Emerald Group with a 0.60% Annual Percentage Yield ("APY") and a maturity date on April 8, 2022.  (*See* Eastern Emerald Assignment of Deposit Acct., Ex. 15, Dkt. 238-20, at 1.)  The other TCD is under the name of Fleet General Insurance Group with a 0.55% APY and a maturity date on August 9, 2022.  (*See* Fleet General Insurance Group Assignment of Deposit Acct., Ex. 18, Dkt. 238-23, at 1.)

[15] CTBC claims that its perfected interest and priority over the TCDs is based upon "[Defendants'] assignment of the TCDs to CTBC, and CTBC's possession and control of the same."  (CTBC Br., Dkt. 238-1, at 3–4; Sarwar Decl., Dkt. 238-5, ¶¶ 32–33; *see also* Eastern

### III.   Xia's Default on CTBC's Loans and the Deteriorating Condition of CTBC's Collateral

Since September 2021, Xia-controlled entities and Xia himself, as the personal guarantor, have failed to service each of the five loans with CTBC, all of which are in default.[16]   (*Id.* at 4.) Specifically, with respect to the three mortgage loans, CTBC alleges that neither Xia-controlled entity nor Xia has made any payment since CTBC extended these loans.  (*Id.*)  Meanwhile, due to Xia's mismanagement, the Secured Units that serve as collateral for the loans have accumulated

---

Emerald Assignment of Deposit Acct., Ex. 15, Dkt. 238-20; Fleet General Insurance Group Assignment of Deposit Acct., Ex. 18, Dkt. 238-23.)

[16] Each of the mortgage notes for the three mortgage loans defines an event of default as follows:

> DEFAULT.  Borrower will be in default if any of the following events occur: (a) Borrower fails to make any payment within fifteen (15) days of the due date thereof; (b) Borrower breaks any promises Borrower has made to Lender, or fails to perform promptly at the time and strictly in the manner provided in this Note or any agreement related to this Note, or in any other agreement or loan Borrower has with Lender or with other lenders; (c) Any representation or statement made or furnished to Lender by Borrower or on its behalf is false or misleading in any material respect; (d) Borrower becomes insolvent, a receiver is appointed for any part of its properties, makes an assignment for the benefit of creditors, or any proceeding is commenced either by or against Borrower under any bankruptcy or insolvency laws; (e) Borrower incurs additional debt that is not first disclosed to or consented by Lender; (f) Any creditor trying to take any of Borrower's properties on or in which Lender has a lien or security interest, including a garnishment of any of Borrower's accounts with Lender; (g) Any of the events described in this paragraph occurs with respect to any guarantor of this Note[.]

(Manekineko Mortg. Note, Ex. 1, Dkt. 238-6, at 3; Shangri-La 9F Am. & Restated Mortg. Note, Ex. 5, Dkt. 238-10, at 3; Shangri-La Green Am. & Restated Mortg. Note, Ex. 9, Dkt. 238-14, at 3.)

With respect to the two business loans, the loan agreement with Eastern Emerald Group states that "[d]efault will occur if payment of the Indebtedness in full is not made immediately upon demand."  (Eastern Emerald Group Bus. Loan Agreement, Ex. 13, Dkt. 238-18, at 3.)  The loan agreement with Fleet General Insurance Group lists multiple situations when an event of default can occur, including when "Borrower fails to make any payment when due[.]"  (Fleet General Insurance Group Bus. Loan Agreement, Ex. 16, Dkt. 238-21, at 4.)

significant liabilities during the pendency of the current action and, as a result, have significantly depreciated in value.  (*Id.* at 5–6.)  Based on two recently issued appraisal reports, the appraised value of the Secured Units has dropped from $10,055,000 in 2021 to $7,575,000 in 2022, a diminution in value of approximately $2.5 million in just one year.  (*Id.* at 5.  *Compare* Appraisal Rep., Ex. 24, Dkt. 238-29, at ECF[17] 4 *and* Appraisal Rep., Ex. 25, Dkt. 238-30, at ECF 4, *with* Appraisal Rep., Ex. 26, Dkt. 238-31, at ECF 4 *and* Appraisal Rep., Ex. 27, Dkt 238-32, at ECF 10.)

Regarding the two business loans, CTBC asserts that Xia made several interest payments before the Preliminary Injunction was issued but has failed to remit monthly interest payments since then.  (*See* CTBC Br., Dkt. 238-1, at 4–5.)  Because both loans have maturity dates one calendar year from the loan origination dates, the principal amount of these loans became due on April 8, 2022 and August 9, 2022, respectively, which Xia has also failed to repay.  (*Id.* at 1–3.) To date, in addition to interest, various fees and penalties continue to accrue on these two matured and unpaid loans.  (*Id.* at 2.)

Notably, the eleven Secured Units and the two TCDs that serve as collateral for the five loans are currently frozen under the Preliminary Injunction.  *See Xia*, 2022 WL 17539124, at *29–31; *Xia*, 2022 WL 20543271, at *1–2.

## IV.    The SEC's Motion to Appoint a Receiver[18]

---

[17] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[18] After the SEC's receivership motion was filed, the Parties engaged in numerous settlement negotiations, and have reached a settlement-in-principle.  (*See, e.g.*, Dkt. 388.)  In light of these developments, the Court has deferred ruling on the SEC's receivership motion and now holds in abeyance its consideration of the motion pending the five-member Commission's review and acceptance of the Parties' settlement.  (*See infra* Background Part VI; Dkt. 389; 1/24/2024 Docket Order.)  As a result, the SEC's receivership motion remains pending before the Court.  For

On January 17, 2023, the SEC filed a motion to appoint a receiver for the assets frozen under the Preliminary Injunction.  (*See generally* Dkts. 235, 237.)  Specifically, in light of Xia's repeated violations of the TRO and obstruction of the Monitorship, the SEC requests that the Court terminate the Monitorship, remove Xia "from any position of authority over the frozen assets," and place the assets under the authority of a receiver to "ensure that the available assets are properly marshalled, independently controlled[,] and preserved."  (Dkt. 235-1, at 1, 3.)

Regarding the scope of the proposed receivership, the SEC specifically excludes the eleven Secured Units that Xia pledged as collateral for CTBC's mortgage loans (*see id.* at 7 n.6; *see also* Proposed Order Appointing Receiver, Dkt. 235-20, at 29 n.1), because these properties "have diminished in value such that [they] would likely provide little to no benefit to the investors and, moreover, would drain assets that could otherwise be used to benefit investors," (*see* Dkt. 259, at 1).  The SEC also notes that CTBC "intends to move this Court for the appointment of a separate [r]eceivership that would be limited to those specific units."  (Dkt. 235-1, at 7 n.6.)

## V.    CTBC's Present Motion to Intervene

After conferring with the SEC and counsel for Xia, on January 18, 2023—approximately the same time as the SEC's receivership motion was filed—CTBC submitted the present motion to intervene as a matter of right under Rule 24(a)(2), or in the alternative, to intervene permissively under Rule 24(b).  (*See* CTBC Br., Dkt. 238-1, at 6, 7–13.)  CTBC expressly limits the purpose of its intervention to appointing a separate receiver to manage, and if necessary, commence foreclosure proceedings on, the Secured Units, and to releasing the two TCDs currently frozen under the Preliminary Injunction.  (*Id.* at 2; *see also* Proposed Mem. of Law in Supp. of CTBC's

---

more information on the procedural history regarding the Parties' settlement negotiations and the current status of the action, see *infra* Background Part VI.

Mot. to Modify Prelim. Inj. & Appoint a Receiver ("CTBC Proposed Mem."), Dkt. 238-3, at 2–3.)  CTBC also proposes that any surplus funds from the foreclosures on the Secured Units or from the TCDs will remain subject to the Preliminary Injunction and be available to the injured investors and other shareholders in this action.  (CTBC Proposed Mem., Dkt. 238-3, at 2, 10, 11.)

### A.   CTBC's Position

In support of its motion, CTBC argues that its intervention in this action is "necessary to prevent further waste and deterioration of the Secured Units" that are currently subject to the Preliminary Injunction.  (CTBC Br., Dkt. 238-1, at 2.)  CTBC also notes that if the Court grants its motion to intervene, it intends to file a separate motion to modify the Preliminary Injunction, unfreeze the real property and assets that Xia pledged as collateral for the loans, and appoint its own receiver.  (*Id.* at 2 n.1.)

### B.   The SEC's and Defendants' Positions

The SEC does not contest CTBC's intervention "for the limited purpose of exercising its rights as a secured creditor with respect to [the Secured Units.]"  (Dkt. 259, at 1.)  As such, the SEC—after consulting with the Monitor—submits that "CTBC should be permitted to intervene for this limited purpose," because its intervention will help maximize the assets available for compensating the injured investors and thus "is in the best interests of the investors."  (*Id.* at 1–2, 4.)  The SEC, however, opposes CTBC's proposed relief to unfreeze the TCDs if CTBC's intervention motion is granted, contending that "[the TCDs'] value can be maintained and CTBC's claim can be resolved in the context of the proposed SEC receivership."  (*Id.* at 2.)

To date, Defendants and Relief Defendants have not responded to CTBC's motion, and therefore have taken no position on CTBC's intervention in this action.

## VI.   The Relevant Post-CTBC Motion Developments and the Current Status of the Action

Since CTBC's motion was filed in January 2023, the Parties have engaged in intermittent settlement negotiations in resolving the matter.  (*See, e.g.*, 4/17/2023 Docket Order; 5/12/2023 Minute Entry; Dkts. 324–25; 6/5/2023 Docket Order; Dkt. 337; 8/10/2023 Docket Order; Dkt. 338; 8/30/2023 Docket Order; 9/8/2023 Minute Entry; Dkt. 349; 10/12/2023 Docket Order; Dkt. 351; 10/20/2023 Docket Order; Dkt. 353; 11/3/2023 Docket Order; Dkts. 375–76; 12/1/2023 Docket Order.)  On January 23, 2024, Defendants and Relief Defendant Yue delivered to the SEC "a signed and notarized consent to judgment reflecting the [P]arties' agreement in principle." (Dkt. 388, at 1.)  In light of the Parties' settlement-in-principle, the Court, at the Parties' joint request, agreed to adjourn the current action, hold in abeyance the Court's consideration of the SEC's pending receivership motion, and extend the Preliminary Injunction for 60 days.  (*See* Dkt. 389; 1/24/2024 Docket Order.)  Meanwhile, the SEC will "begin the process of seeking [the five-member] Commission['s] approval for the settlement[.]"[19]  (Dkt. 388, at 1.)  If the settlement is accepted by the Commission, that would "resolve the SEC's claims in this action against Defendants and [Relief Defendant] Yue, including monetary and equitable relief."  (*Id.* at 1.)

### DISCUSSION

Rule 24 allows a non-party to intervene in ongoing litigation as of right or by permission of the court.  Fed. R. Civ. P. 24.  To intervene, a putative intervenor bears the burden of demonstrating that it meets the requirements for intervention.  *See U.S. Postal Serv. v. Brennan*, 579 F.2d 188, 191 (2d Cir. 1978).  Generally, in considering a motion to intervene, "the court accepts as true the [putative intervenor's] well-pleaded, non-conclusory allegations and supporting material." *Floyd v. City of N.Y.*, 302 F.R.D. 69, 83 (S.D.N.Y. 2014).  Importantly, "[m]otions to

---

[19] The Parties noted that this process typically takes six to eight weeks.  (Dkt. 388, at 1.)

intervene are highly fact-specific and tend to resist comparison to prior cases." *Id.* "Because 'prior decisions are not always reliable guides,' courts are guided by practical and equitable considerations in an effort to balance 'efficiently administrating legal disputes by resolving all related issues in one lawsuit, on the one hand, and keeping a single lawsuit from becoming unnecessarily complex, unwieldy or prolonged, on the other hand.'" *Id.* (quoting *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 69 (2d Cir. 1994)).  In addition, "an application to intervene cannot be resolved by reference to the ultimate merits of the claims which the intervenor wishes to assert following intervention[.]"  *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 129 (2d Cir. 2001) (quoting *Oneida Indian Nation v. New York*, 732 F.2d 261, 265 (2d Cir. 1984)).  For the reasons set forth below, the Court finds that CTBC has satisfied the Rule 24 requirements to intervene as of right.[20]

## I.    Intervention as of Right—Legal Standard

Rule 24(a) sets forth the standards for intervention as of right, which, as relevant here, provides that a court "must" permit intervention by anyone who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  Fed. R. Civ. P. 24(a)(2).  In other words, in

---

[20] Because the Court makes this finding, it need not, and does not, decide whether CTBC has satisfied the standard for permissive intervention under Rule 24(b)(1)(B).  *See* Fed. R. Civ. P. 24(b)(1)(B) (stating that a court may, upon a timely motion, grant permissive intervention when the putative intervenor "has a claim or defense that shares with the main action a common question of law or fact"); *U.S. Postal Serv.*, 579 F.2d at 191 ("Permissive intervention is wholly discretionary with the trial court."); *see also St. John's Univ. v. Bolton*, 450 Fed. App'x 81, 84 (2d Cir. 2011) (summary order) ("A district court has broad discretion under Rule 24(b) to determine whether to permit intervention[.]"); *Floyd*, 302 F.R.D. at 84 (explaining that in exercising its discretion under Rule 24(b), the district court "may consider the same factors under Rule 24(b) permissive intervention as with intervention as of right under Rule 24(a)." (citing *R Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.*, 467 F.3d 238, 240 (2d Cir. 2006))).

order to establish a right to intervene under Rule 24(a)(2), a putative intervenor must "(1) file a timely motion; (2) claim an interest relating to the property or transaction that is the subject of the action; (3) be so situated that without intervention the disposition of the action may impair that interest; and (4) show that the interest is not already adequately represented by existing parties." *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 176 (2d Cir. 2001). "[This] test is a flexible and discretionary one, and courts generally look at all four factors as a whole rather than focusing narrowly on any one of the criteria." *Tachiona ex rel. Tachiona v. Mugabe*, 186 F. Supp. 2d 383, 394 (S.D.N.Y. 2002) (citing *United States v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 983 (2d Cir. 1984)). However, "[f]ailure to meet any one of these requirements suffices for a denial of [an intervention application]." *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 197–98 (2d Cir. 2000).

Importantly, "[i]n applying the Rule, courts must be cognizant that its various components . . . are not bright lines, but ranges—not all interests are of equal rank, not all impairments are of the same degree, representation by existing parties may be more or less adequate, and there is no litmus paper test for timeliness." *Floyd*, 302 F.R.D. at 83–84 (alterations in original) (internal quotation marks omitted) (quoting *Hooker Chems. & Plastics Corp.*, 749 F.2d at 983). "[A]lthough the Rule does not say so in terms, common sense demands that consideration also be given to matters that shape a particular action or particular type of action." *Id.* at 84.

## II. Application

In support of its motion to intervene as of right, CTBC claims, *inter alia*, that (1) its motion is timely filed; (2) it has significant interests in the real property and assets at issue in this motion; (3) its interests will be impaired if its motion is denied; and (4) the existing parties are inadequate representatives of its interests, given that their goals and interests are not aligned with those of CTBC. (*See* CTBC Br., Dkt. 238-1, at 7–12.) Upon balancing all the Rule 24(a)(2) factors and

12

considering the unique circumstances in this case, the Court finds that there are sufficient grounds to grant CTBC's motion to intervene as of right.

### A.    Timeliness of the Motion

Under Rule 24(a)(2), the threshold inquiry is whether a motion for intervention is timely and "the decision is one entrusted to the district judge's sound discretion." *United States v. Yonkers Bd. of Educ.*, 801 F.2d 593, 594–95 (2d Cir. 1986). "A trial court's broad discretion in assessing the timeliness . . . is not a subject that easily lends itself to a precise definition." *Butler*, 250 F.3d at 182. Rather, "[a]n application's timeliness must be evaluated against the totality of the circumstances before the court." *Farmland Dairies v. Comm'r of N.Y. State Dep't of Agric. & Mkts.*, 847 F.2d 1038, 1044 (2d Cir. 1988) (first citing *NAACP v. New York*, 413 U.S. 345, 366 (1973), then citing *Yonkers Bd. of Educ.*, 801 F.2d at 595). Specifically, "[t]he timeliness decision is based on a set of flexible criteria," *Authors Guild v. Google, Inc.*, No. 05-CV-8136 (DC), 2009 WL 3617732, at *2 (S.D.N.Y. Nov. 4, 2009), which includes, *inter alia*, "(a) the length of time the applicant knew or should have known of his interest before making the motion; (b) prejudice to existing parties resulting from the applicant's delay; (c) prejudice to applicant if the motion is denied; and (d) presence of unusual circumstances militating for or against a finding of timeliness." *United States v. State of N.Y.*, 820 F.2d 554, 557 (2d Cir. 1987). In particular, "[w]hether a motion to intervene is 'timely' is determined in large part by analyzing whether the parties to the case would be prejudiced by intervention, and whether the proposed intervenor will be prejudiced by being kept out of the litigation." *CIFI Latam, S.A. v. Tauch*, No. 19-CV-5607 (LTS) (SN), 2020 WL 1164687, at *2 (S.D.N.Y. Mar. 11, 2020).

Applying this flexible standard, the Court finds that these factors weigh in favor of a finding that CTBC's motion is timely.

13

1.      Length of Time

In examining the interval between CTBC's knowledge of its interests and its motion to intervene, the Court notes that the instant action was initiated in September 2021, but CTBC did not seek to intervene until almost 16 months later, in January 2023.  (*Compare* Compl., Dkt. 1, *with* CTBC Mot. to Intervene, Dkt. 238.)  "There is no specific length of time that has been deemed to be the appropriate time period in which to file a motion to intervene."  *Syracuse v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 20-CV-6885 (GHW), 2021 WL 1051625, at *4 (S.D.N.Y. Mar. 19, 2021).  Some courts in this Circuit have found requests for intervention filed over one year after notice of interest to be timely, *see, e.g.*, *Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 782 F. Supp. 870, 874 (S.D.N.Y. 1991) (finding motion to intervene timely when filed almost two years after notice of interest because the proposed intervenors filed the motion only after interest became direct), while other courts have found similar delays to be untimely, *see, e.g.*, *State of N.Y.*, 820 F.2d at 557 (denying motion to intervene where 15 months elapsed after the applicant knew or should have known of the unrepresented interest); *SEC v. Callahan*, 2 F. Supp. 3d 427, 438 (E.D.N.Y. 2014) (holding a motion to intervene to be untimely because the proposed intervenor waited 17 months to seek to intervene since notice of interest).

Here, the record shows that CTBC has been involved, both directly and indirectly, in this action since the commencement of the lawsuit.  As CTBC acknowledges, since September 2021, it has not only cooperated with the SEC's investigation in this case and produced documents in response to the SEC's non-party subpoenas (*see* CTBC Br., Dkt. 238-1, at 8; Decl. of John F. Libby ("Libby Decl."), Dkt. 238-2, ¶ 3), but also has engaged in discussions with the SEC and the Monitor seeking a modification of the TRO to take protective measures regarding its collateral, as well as attempted to participate in a settlement conference between the Parties as a secured

14

creditor,[21] (*see* Dkt. 152, at 1–2; 6/15/2022 Docket Order).  Therefore, the Court finds that CTBC

has been aware of its interests in the litigation since the day the action was filed.

However, CTBC claims that "[i]t was only recently, based upon the [two] reappraisal

reports [that were issued in June and October 2022, respectively], that [it] discovered the

significant diminution of property value [in the Secured Units] and [Defendants'] property tax

delinquencies."  (CTBC Br., Dkt. 238-1, at 8.)  Even assuming, *arguendo*, that it did not otherwise

realize the extent of the impairment of its interests shortly after the action was filed, CTBC should

have known no later than October 2022—when it made this discovery based on the reports—that

its interests might not be adequately represented in this litigation.   Yet, CTBC waited

approximately another three months to file its motion to intervene.

Nevertheless, although CTBC waited more than a year to intervene in the action, this delay

does not automatically foreclose its intervention.  *See Floyd*, 302 F.R.D. at 98 ("Although notice

of an applicant's unrepresented interest is important, it is not dispositive.") (citing *NAACP*, 413

U.S. at 365–66).  Given that the mere lapse of time is "only one of several factors to be considered

when deciding timeliness," "it is incorrect to adopt a *per se* rule focused solely on that factor."  *See*

*State of N.Y.*, 820 F.2d at 557.  "Instead, because timeliness is to be determined on a case by case

basis, the court's determination will be based upon all of the circumstances of this case."  *Pike*

*Co., Inc. v. Universal Concrete Prods., Inc.*, 284 F. Supp. 3d 376, 395 (W.D.N.Y. 2018) (internal

---

[21] The record shows that CTBC first entered an appearance, as a non-party, in this matter
on June 14, 2022.  (*See* Dkt. 152.)  On the same day, CTBC filed a letter requesting to attend and
participate in the June 28, 2022 Settlement Conference between the Parties as "first-lien holder on
various assets owned by entities controlled by [Xia]" because "CTBC would be beneficial to the
Court as it considers any potential settlement."  (*Id.* at 1–2.)  The Court denied CTBC's request on
the ground that CTBC is not a party to this case and therefore its "attendance and participation in
the Settlement Conference would not aid the Court and the [P]arties' discussion."  (6/15/2022
Docket Order.)

quotation marks and brackets omitted).  The Court therefore turns to the other factors to determine whether CTBC's motion is timely.

2.  <u>Prejudice to Existing Parties if Intervention is Allowed</u>

"The second and most important consideration in determining whether a motion to intervene is timely is whether there is any prejudice to the existing parties resulting from the delay."  *Long Island Trucking, Inc. v. Brooks Pharmacy*, 219 F.R.D. 53, 55 (E.D.N.Y. 2003).  "Delay alone . . . is insufficient to establish prejudice[.]"  *Rsch. Found. for State Univ. of N.Y. v. Telluric Labs, LLC*, No. 21-CV-1898 (JS) (SIL), 2023 WL 8472911, at *8 (E.D.N.Y. Sept. 18, 2023) (citing *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 98 (2d Cir. 1993)), *R. & R. adopted*, 2023 WL 7919972 (E.D.N.Y. Nov. 16, 2023).  "[T]his factor encompasses the basic fairness notion that intervention should not work a last[-]minute disruption of painstaking work by the parties and the court."  *Application of Akron Beacon J.*, No. 94-CV-1402 (CSH), 1995 WL 234710, at *7 (S.D.N.Y. Apr. 20, 1995) (internal quotation marks omitted).  "Thus, if intervention 'relates to an ancillary issue and will not disrupt the resolution of the underlying merits, untimely intervention is much less likely to prejudice the parties.'"  *Id.* (citation omitted).

In the present case, CTBC contends that the existing parties will suffer no prejudice because CTBC's intervention "will in no way impact the disposition of this case" as CTBC "seeks discrete relief unrelated to that of the SEC."  (CTBC Br., Dkt. 238-1, at 9.)  The Court agrees and finds that the prejudice that would result from CTBC's intervention in this case as to the Parties is negligible, if not non-existent.

First, CTBC's intervention will not disrupt the resolution of the action, as it will not derail the agreement already reached between the Parties.  As noted earlier, the Parties have reached a settlement-in-principle for which the SEC will begin the process of seeking the five-member Commission's review and approval.  (*See* Dkt. 388, at 1.)  While courts in this Circuit have denied

16

motions to intervene where the intervening party seeks to challenge a settlement agreement reached between the original parties, *see, e.g.*, *Pitney Bowes*, 25 F.3d at 72 (affirming a denial of a motion to intervene, where the proposed intervenor opposed the proposed consent decree, on the ground that intervention would delay the agreed-upon cleanup effort and require parties "to begin negotiations again from scratch"), here, CTBC does not intend to seek to reopen, renegotiate, or oppose the Parties' settlement if permitted to intervene.[22]   Rather, CTBC seeks to intervene only for the limited purpose of exercising its rights as a secured creditor to preserve the value of its collateral that is currently subject to the Preliminary Injunction—a "discrete and ancillary issue" that will not "wast[e] the fruits of [the Parties'] lengthy negotiations that [have] culminated in agreement."  *Application of Akron Beacon J.*, 1995 WL 234710, at *7; *Pitney Bowes*, 25 F.3d at 72; *see also Sackman v. Liggett Grp., Inc.*, 167 F.R.D. 6, 10, 20 (E.D.N.Y. 1996) (finding that plaintiffs would not be prejudiced by the intervention because it was for the limited purpose of challenging a discovery order); *cf. In re Holocaust Victim Assets Litig.*, 225 F.3d at 194, 199 (holding that intervention for the purpose of objecting to the Settlement Class "at this late stage would prejudice the existing parties by destroying their Settlement and sending them back to the drawing board").

Furthermore, CTBC's intervention at this stage will not unduly complicate or delay the proceedings.  First, the current action was stayed intermittently between May and October 2023 to accommodate the Parties' continued settlement negotiations and now is stayed pending the five-member Commission's review and approval of the settlement.  (*See, e.g.*, 5/12/2023 Minute Entry; 5/31/2023 Docket Order; 6/5/2023 Docket Order; 8/10/2023 Docket Order; 8/30/2023 Docket

---

[22] In fact, the Parties reached the settlement-in-principle more than one year later after CTBC's motion was filed.  (*Compare* CTBC Mot. to Intervene, Dkt. 238, *with* Dkt. 388.)

Order; 10/12/2023 Docket Order; 10/20/2023 Docket Order; 1/24/2024 Docket Order.)  Therefore, CTBC's intervention will not delay the course of the instant litigation, and the Parties will suffer no prejudice as a result of the timing of CTBC's intervention.  *See Commack Self-Serv. Kosher Meats, Inc. v. Rubin*, 170 F.R.D. 93, 100 (E.D.N.Y. 1996) ("All discovery has been stayed pending a decision on the State's motions for abstention and to dismiss the complaint, and there is no prejudice as a result of the timing of [the intervention] application.").  In addition, because of the numerous stays, the Court has not yet made any decision on the merits of the SEC's receivership motion, which the Court has deferred ruling on due to the Parties' settlement negotiations and their recently reached agreement-in-principle.  (*See, e.g.*, 10/3/2023 Docket Order; 12/1/2023 Docket Order; 1/24/2024 Docket Order.)  Following CTBC's intervention, the Court could, if necessary, consider CTBC's anticipated motion to modify the Preliminary Injunction and appoint a receiver in tandem with the SEC's receivership motion.  As such, CTBC's intervention will not complicate the adjudication of the pending motions.  Moreover, as explained above, CTBC has already been involved in this litigation both directly and indirectly since the commencement of the case.  (*See* Libby Decl., Dkt. 238-2, ¶ 3; Dkt. 152, at 1–2; 6/15/2022 Docket Order).  Given CTBC's involvement throughout the course of this litigation, the Court finds that its intervention is unlikely to necessitate repetitive discovery or undue delay.  *See Dorchester Fin. Holdings Corp. v. Banco BRJ, S.A.*, No. 11-CV-1529 (KMW), 2016 WL 845333, at *2 (S.D.N.Y. Mar. 2, 2016) (finding no prejudice when intervention "should necessitate minimal discovery or additional briefing" and will not delay adjudication of the pending motions while waiting for any briefing).  Even if additional discovery or briefing is required, any prejudice can be minimized through attentive case management.  *See Int'l Design Concepts, LLC v. Saks Inc.*, 486 F. Supp. 2d 229, 235 (S.D.N.Y

2007).  In sum, given these procedural considerations, CTBC's intervention will not "interfere with the [Court's] orderly process[.]"  *LaRouche v. FBI*, 677 F.2d 256, 257 (2d Cir. 1982).

Lastly, "[a]ny prejudice to the [P]arties is further belied by the absence of objections to [CTBC's] motion."  *See Republic of the Phil. v. Abaya*, 312 F.R.D. 119, 123 (S.D.N.Y. 2015); *see also Mortg. Lenders Network, Inc. v. Rosenblum*, 218 F.R.D. 381, 384 (E.D.N.Y. 2003) ("With respect to prejudice to existing parties, it is significant that there has been no opposition to [the] motion to intervene."); *Stutts v. De Dietrich Grp.*, No. 03-CV-4058 (ILG) (MDG), 2005 WL 3158038, at *1 (E.D.N.Y. Nov. 28, 2005) (finding no prejudice where the motion to intervene was unopposed).

Because granting CTBC's intervention will not disrupt the Parties' settlement or unduly complicate or delay the proceedings, the Court finds that CTBC's intervention will not result in any prejudice of substance to the existing parties, and therefore this second factor weighs in favor of finding CTBC's motion timely.

### 3.   Prejudice to CTBC if Intervention is Denied

More importantly, the third factor—the extent to which CTBC will be prejudiced if intervention is denied—strongly militates in favor of permitting intervention.  As discussed more fully below, CTBC will be severely prejudiced if its motion is denied, at a minimum because of the continued impairment of its interests in the Secured Units—all of which have diminished, and continue to diminish, in value since this action began—and the inadequate representation of CTBC's interests by the existing parties.  *See infra* Discussion Parts II.C–D.

### 4.   Unusual Circumstances

Apart from the aspects addressed above, this case presents unusual circumstances that support a finding of timeliness.  Here, denying CTBC's intervention will not only prejudice CTBC, but will also burden the proposed SEC receivership, if granted, and harm the interests of the injured

19

investors.  As noted above, the Secured Units and TCDs that serve as CTBC's loan collateral have accumulated significant liabilities during the pendency of this action, and in particular, the Secured Units have depreciated and continue to depreciate in value, which in turn will drain the proposed SEC receivership and reduce the funds available for compensating the investors.  Therefore, as the SEC acknowledges, permitting CTBC to intervene will in fact serve, rather than hinder, the interest of the injured investors, as it will limit the further decrease in assets and funds available for distribution to benefit the investors.  (Dkt. 259, at 4.)  Furthermore, any protective measures taken by CTBC regarding its collateral following its intervention will not further reduce the funds available for distribution to investors, because CTBC only wishes to pursue its rights in and to the collateral under its loan agreements with Xia, and if this collateral is not sufficient, CTBC will not seek to collect other assets under the Preliminary Injunction.  (*Id.* at 3–4.)  CTBC will also bear any cost arising from its actions.  (*Id.* at 3.)  Rather than reducing the funds available to investors, if the Court were to grant CTBC's request to initiate foreclosure proceedings on the Secured Units and unfreeze the two TCDs following CTBC's intervention,[23] any excess funds from the foreclosures or the TCDs will remain frozen under the Preliminary Injunction and be available to repay the defrauded investors.  (CTBC Proposed Mem., Dkt. 238-3, at 2, 10, 11.)

Thus, based on various "practical and equitable considerations," *Floyd*, 302 F.R.D. at 83, allowing CTBC to intervene in this action appears to the Court to be the best way to serve the interests of all the parties.

*       *       *

---

[23] To the extent that the SEC contests CTBC's proposed relief to unfreeze the TCDs, the Court does not address that issue for the purpose of considering the present motion, and will decide later whether the TCDs should be released from the Preliminary Injunction after CTBC's anticipated motion on the issue is filed following its intervention.

Therefore, notwithstanding CTBC's delay in seeking to intervene in this action, having considered each of the relevant factors discussed above and the totality of the circumstances of the case—including the lack of prejudice to the existing parties, the substantial prejudice to CTBC if intervention is denied, and the fact that CTBC's intervention will serve the investors' interest—the Court concludes that the timeliness factor weighs in favor of CTBC's intervention at this stage.

### B.   Interest Relating to the Property or Transaction in the Action

As stated above, the second factor in determining whether a motion to intervene as of right should be granted is whether the proposed intervenor can claim "an interest relating to the property or transaction that is the subject of the action." Fed. R. Civ. P. 24(a)(2). Under Rule 24(a)(2), this interest must be "direct, substantial, and legally protectable." *Brennan*, 260 F.3d at 129 (quoting *Wash. Elec. Coop., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 922 F.2d 92, 97 (2d Cir. 1990)). "An interest that is remote from the subject matter of the proceeding, or that is contingent upon the occurrence of a sequence of events before it becomes colorable, will not satisfy the [R]ule." *Wash. Elec.*, 922 F.2d at 97.

Here, the Court finds that CTBC has demonstrated an undeniable interest in this action. As the record shows, CTBC holds perfected, first-priority security interests in the Secured Units and TCDs that serve as collateral for the loans CTBC made to the Xia entities that are presently frozen under the Preliminary Injunction. (*See* CTBC Br., Dkt. 238-1, at 3–4); *see also supra* Background Part II. As such, CTBC unquestionably has a "direct, substantial, and legally protectable" interest here in ensuring that its first-position liens on these assets are respected. *See Lawsky v. Condor Cap. Corp.*, No. 14-CV-2863 (CM), 2014 WL 2109923, at *6–7 (S.D.N.Y. May 13, 2014) (holding that the proposed intervenors, who were secured lenders, had sufficient interest in the litigation). Given this interest, CTBC has a strong stake in the outcome of this action. "If the [SEC] is successful in prosecuting this case, or in reaching settlement with [Defendants], the funds held

[under the Preliminary Injunction] will be set aside to compensate [investors] for their injuries. [Therefore, the] resolution of this litigation will affect [CTBC's] property rights to the funds owed them by [Defendants]." *See FTC v. First Cap. Consumer Membership Servs., Inc.*, 206 F.R.D. 358, 363 (W.D.N.Y. 2001); *see also U.S. v. Lauer*, 242 F.R.D. 184, 187 (D. Conn. 2007) (holding that the proposed intervenor had "a strong interest, as holder of the property and trustee of the proceeds," in the resolution of the action).

Because CTBC has established a cognizable interest in the instant action and the Parties do not contest CTBC's interest, the Court finds that CTBC has satisfied the second requirement.

### C.    Impairment of Interests by Disposition of the Action

The third element of the intervention-as-of-right standard concerns whether the putative intervenor can demonstrate that, absent intervention, the disposition of the action may, as a practical matter, impair or impede its interests. *Pitney Bowes*, 25 F.3d at 69–70. Specifically, "[i]mpair refers to a diminution in strength, value, quality, or quantity." *First Cap. Consumer Membership Servs., Inc.*, 206 F.R.D. at 363 (emphasis omitted).

CTBC argues that its interests in the Secured Units and TCDs are at stake in the instant action and would be further impaired by a denial of intervention. (CTBC Br., Dkt. 238-1, at 11.) The Court agrees. As noted above, each of the five loans that CTBC extended are already in default. (*Id.* at 4; Sarwar Decl., Dkt. 238-5, ¶¶ 35–45.) As of early 2023, the total amount that remains outstanding under the three mortgage loans is $7,478,221.64 (including unpaid principal of $6,535,750, interest payments of $347,892.51, late charges of $22,701, and default interest payments of $571,878.13), and $16,055,249.10 under the two business loans (including unpaid principal of $14,500,000, total interest payments of $299,277.75, late charges of $6,957.46, and default interest payments of $1,249,013.89). (Sarwar Decl., Dkt. 238-5, ¶¶ 39, 44.) However, due to the Preliminary Injunction, CTBC is unable to exercise its right under the ALR Agreements to

"collect any and all deposits, rents, revenues, or other income generated from each of the Secured Units"[24] or to withdraw the funds assigned to it under the TCDs after the default has occurred. (*See* CTBC Br., Dkt. 238-1, at 2, 11.)  As such, CTBC's interests will be substantially impaired if its motion to intervene is denied.  *Cf. Callahan*, 2 F. Supp. 3d at 433, 438 (denying a secured lender's motion to intervene because it was being timely paid on its loans despite an asset freeze was imposed in the action).

Meanwhile, the condition of the Secured Units has deteriorated due to Xia's mismanagement, and as a result, the value of the properties has significantly depreciated during the pendency of the litigation.  The record reveals that Xia has failed to timely renew the insurance coverage or pay the outstanding property taxes due on the units;[25] tenants in several commercial units have vacated prior to their lease expiration dates;[26] and certain units are listed for rent well-below market rates[27] and are being marketed for sale in violation of the loan terms.[28]  (Sarwar

---

[24] According to CTBC, in light of Xia's default on the mortgage loans, it "exercised its right under each of the [ALR Agreements] and wrote to each of the tenants directing them to pay to CTBC all past due and future rent payments under the lease."  (Sarwar Decl., Dkt. 238-5, ¶ 54; *see also* Rent Direction Letter, Ex. 21, Dkt. 238-26.)  However, CTBC has not received any response or rent from the tenants.  (Sarwar Decl., Dkt. 238-5, ¶ 54.)

[25] As of October 18, 2022, property taxes have not been paid on all but one unit, which has resulted in $20,791.63 of property taxes currently being due.  (Sarwar Decl., Dkt. 238-5, ¶¶ 68–69.)

[26] According to CTBC, at the time of loan origination, "all of the . . . units were occupied by tenants paying market rents, with leases expiring between 2022 and 2025."  (Sarwar Decl., Dkt. 238-5, ¶ 46.)  Currently, however, only one tenant occupies any of the commercial units, and at least five units have become vacant since the mortgages were executed.  (*Id.* ¶ 48.)

[27] Specifically, as of the time when the present motion was filed, two units were "listed for rent online for a combined rental rate of $4500/month, representing a 46% decrease from the prior rental rate of $8400/month."  (Sarwar Decl., Dkt. 238-5, ¶ 56; *see also* Rental Listing, Ex. 23, Dkt. 238-28, at ECF 2.)

[28] As of the time when the present motion was filed, Unit 9C was listed for sale at the price of $1,060,000, which violates the terms under the Shangri-La 9F Gap Mortgage and Consolidation,

Decl., Dkt. 238-5, ¶¶ 46, 48, 55–56, 65, 68–69.)  Xia, however, has failed to provide "CTBC with

any notice—let alone written notice—regarding the status of" the units.  (*Id.* ¶ 48.)  Due to Xia's

mismanagement and CTBC's incapability to take protective measures, the Secured Units have

significantly depreciated in value.  The most recent appraisal reports reflect a stark decline in

property value of approximately $2.5 million, from $10,055,000 in 2021 to $7,575,000 in 2022.

(*Id.* ¶¶ 58–60.  *Compare* Appraisal Rep., Ex. 24, Dkt. 238-29, at ECF 4 *and* Appraisal Rep., Ex.

25, Dkt. 238-30, at ECF 4, *with* Appraisal Rep., Ex. 26, Dkt. 238-31, at ECF 4 *and* Appraisal Rep.,

Ex. 27, Dkt. 238-32, at ECF 10.)   In turn, this substantial diminution in appraisal value "has

resulted in higher [loan-to-value] ratios . . . under each of the [m]ortgages," approximately from

75% to 85%, which means that "CTBC's loans are no longer adequately secured by the real-

property collateral."  (Sarwar Decl., Dkt. 238-5, ¶¶ 59, 62–63.)  However, the property value is

expected to continue to drop while interest, penalties, late charges, and risks of potential tax

foreclosures are accumulating.  (*See* CTBC Br., Dkt. 238-1, at 11.)

Despite the deteriorating condition of its collateral, as a non-party, CTBC's ability to

participate in this litigation and protect its interests from further dissipation is limited.  Therefore,

CTBC stands to suffer a practical impairment of its interests and clear prejudice if intervention is

not granted.  This fact is sufficient to satisfy this third factor.

### D.      Lack of Adequate Representation of Interests by the Parties

Importantly, CTBC's interests are not adequately represented by either Xia or the SEC.

Under Rule 24(a)(2), the putative intervenor's burden of demonstrating "inadequacy of

representation is generally speaking 'minimal[.]'"  *Butler*, 250 F.3d at 179 (quoting *Trbovich v.*

---

Modification, and Extension Agreement.  (*See* Sarwar Decl., Dkt. 238-5, ¶ 55; *see also* Sale
Listing, Ex. 22, Dkt. 238-27, at ECF 2; Shangri-La 9F Gap Mortg. & Consolidation, Modification
& Extension Agreement, Ex. 6, Dkt. 238-11.)

*United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)).  "The requirement of [Rule 24(a)(2)]
is satisfied if the applicant shows that representation of his interest 'may be' inadequate[.]"
*Trbovich*, 404 U.S. at 538 n.10.

Here, critical to the resolution of the instant motion, no party in this case has an incentive
to ensure that CTBC's interests are adequately protected.  CTBC's primary interests lie in
safeguarding its rights to protect its collateral presently subject to the asset freeze.  Xia, however,
has little incentive in protecting CTBC's interests.  Because Xia has assigned to CTBC all leases
and rents generated on the Secured Units and the funds under the TCDs, he has minimal, if any,
interest in preserving the value of the real property and the assets.  *See Mortg. Lenders Network*,
218 F.R.D. at 384 (finding that the putative intervenor would be prejudiced by the denial of its
motion because the plaintiff had minimal interest in pursuing any recovery regarding the loans at
issue); *Long Island Trucking*, 219 F.R.D. at 56 (same).  In fact, as discussed earlier, Xia's
continuing mismanagement of the Secured Units has significantly impaired CTBC's interests.  *See
supra* Discussion Part II.C.

Furthermore, the SEC's interests in this action are not coextensive with those of CTBC
either.  While their interests converge to some extent, the SEC's primary focus is on "enforcing
the securities laws, protecting the public from frauds, and ensuring that [the injured investors] as
a whole recover their due."  *SEC v. Credit Bancorp., Ltd.*, 194 F.R.D. 457, 467 (S.D.N.Y. 2000).
For purposes of the instant motion, in particular, the SEC's interests "deviate in an important and
predictable way."  *Lawsky*, 2014 WL 2109923, at *10.  Here, the SEC is "committed to preserving
as many assets as reasonably possible to ensure the investors are made whole" (Dkt. 259, at 5);
however, significant liabilities have accrued and continue to accrue on CTBC's collateral.  Thus,
the SEC does not have an incentive to advance the interests of CTBC—one secured creditor—at

the expense of all injured investors, or might even "take positions hostile to those of [CTBC]." *Credit Bancorp., Ltd.*, 194 F.R.D. at 467.  In fact, the SEC has specifically carved out the Secured Units from the SEC's proposed receivership because the Secured Units—which now "have little to no value"[29]—would drain the SEC receivership assets that could otherwise be available to compensate the investors.  (Dkt. 259, at 1–2.)  If the Court were to grant the SEC's proposed receivership but deny CTBC's intervention, an SEC receiver would assume full control of Defendants' assets other than CTBC's collateral.  In that event, CTBC's interests would not be represented at all and thus remain entirely unprotected.

As a result, the Court concludes that CTBC has made a sufficient showing that its interests would not be adequately represented by the existing parties in this lawsuit.

*       *       *

In sum, considering the facts of this case—the timing of CTBC's motion, CTBC's priority creditor status and substantial interests in the action, the fact that CTBC's interests have diminished and continue to diminish, and the lack of adequate representation of CTBC's interests by the Parties—the Court finds that CTBC has satisfied the criteria for intervention as of right under Rule 24(a)(2).

## CONCLUSION

For the foregoing reasons, CTBC's motion to intervene is granted.  Furthermore, given the Court's delay in ruling on this motion and what appears to be the escalating deterioration of CTBC's collateral, the Court will expedite consideration of CTBC's anticipated motion to release the Secured Units and TCDs from the Preliminary Injunction and for the appointment of a receiver

---

[29] This is because the appraised value of the Secured Units ($7,575,000) is only a little more than the outstanding balance for the mortgage loans ($7,478,221.64).  (*See* Dkt. 259, at 6.)

to protect CTBC's security interests.  CTBC shall file its motion by April 3, 2024; the Parties shall respond by May 3, 2024; and any reply shall be filed by May 17, 2024.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated:  March 4, 2024
       Brooklyn, New York

27