UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE
COMMISSION,

                   Plaintiff,

     -against-

RICHARD XIA, a/k/a YI XIA, and
FLEET NEW YORK METROPOLITAN
REGIONAL CENTER, LLC, f/k/a FEDERAL
NEW YORK METROPOLITAN
REGIONAL CENTER, LLC,

                Defendants,

     -and-

JULIA YUE, a/k/a JIQING YUE, XI
VERFENSTEIN, AND XINMING YU,

            Relief Defendants.

Case No.: 1:21-cv-05350 (PKC) (JAM)

---

**MEMORANDUM OF LAW IN SUPPORT OF
INTERVENOR CTBC BANK CORP. (USA)'S MOTION TO MODIFY
THE ASSET FREEZE ORDER AND APPOINT A RECEIVER**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT .................................................................................................. 1

RELEVANT BACKGROUND .................................................................................................... 3

    A.    The Mortgage and Business Loans ...................................................................... 3

    B.    Defendant Xia and the Xia Entities' Defaults Under the Mortgage and
Business Loans...................................................................................................... 4

    C.    The Continued Diminution of the Secured Unit's Property Value...................... 5

    D.    Defendant Xia and the Xia Mortgage Borrowers' Mismanagement of the
Secured Units....................................................................................................... 7

    E.    CTBC's Motion to Intervene .............................................................................. 8

ARGUMENT .............................................................................................................................. 9

II.    RELIEF FROM THE FREEZE ORDER IS WARRANTED........................................... 9

    A.    Modifying the Freeze Order to Allow CTBC to Preserve the Value of its
Secured Real Property Is Warranted.................................................................... 9

    B.    Modifying the Freeze Order to Release the TCDs Is Warranted........................ 12

III.    APPOINTMENT OF A RECEIVER TO OVERSEE AND MANAGE THE
SECURED REAL PROPERTY  IS WARRANTED ...................................................... 14

CONCLUSION.......................................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Apponline.com, Inc.*,
   285 B.R. 805 (Bankr. E.D.N.Y. 2002)......................................................................12

*Provident Bank v. Cmty. Home Mortg. Corp.*,
   498 F. Supp. 2d 558 (E.D.N.Y. 2007) ....................................................................12

*SEC v. Byers*,
   637 F.Supp.2d 166 (S.D.N.Y. 2009).......................................................................13

*SEC v. DuClaud Gonzalez de Castilla*,
   170 F. Supp. 2d 427 (S.D.N.Y. 2001).......................................................................9

*SEC v. Founding Partners Cap. Mgmt.*,
   No. 09-cv-229, 2010 WL 11474439 (M.D. Fla. Sept. 13, 2010)............................10

*SEC v. Haligiannis*,
   608 F. Supp. 2d 444 (S.D.N.Y. 2009).....................................................................12

*SEC v. Haligiannis*,
   No. 04-cv-6488, (ECF No. 53) (S.D.N.Y. Dec. 1, 2006) ......................................10

*SEC v. LADP Acquisition, Inc.*,
   10-cv-06835, 2015 WL 13593622 (C.D. Cal. June 17, 2015)................................10

*SEC v. Lauer*,
   No. 03-cv-80612, 2006 WL 2660752 (S.D. Fla. Aug. 2, 2006) ............................10

*SEC v. Management Solutions, Inc.*,
   No. 11-cv-1165, 2013 WL 594738 (E.D.N.Y. Feb. 15, 2013) ...............................13

*SEC v. Manor Nursing Centers, Inc.*,
   458 F.2d 1082 (2d Cir. 1972)............................................................................9, 11

*SEC v. One or More Unknown Traders in Securities of Onyx Pharmaceuticals, Inc.*,
   296 F.R.D. 241 (S.D.N.Y. 2013) .......................................................................9, 11

*SEC v. Spongetech Delivery Sys., Inc.*,
   98 F.Supp.3d 530 (E.D.N.Y. 2015) ........................................................................13

*Smith v. SEC*,
   653 F.3d 121 (2d Cir. 2011)....................................................................................9

*U.S. Bank Nat. Ass'n v. Nesbitt Bellevue Property LLC*,
   866 F. Supp. 2d 247 (S.D.N.Y. 2012).....................................................................14

*Wachovia Bank Nat'l Ass'n v. Encap Golf Holdings, LLC*,
   690 F. Supp. 2d 311 (S.D.N.Y. 2010).....................................................................12

*Wilmington Trust Nat'l Ass'n v. Winta Asset Mgmt. LLC*,
   No. 20-cv-5309, 2020 WL 5802365 (S.D.N.Y. Sept. 28, 2020) ...............14, 15, 17

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

**STATUTES**

N.Y. U.C.C. § 9-312(b)(1)............................................................................................12

N.Y. U.C.C. § 9-314(b)................................................................................................12

**OTHER AUTHORITIES**

79 N.Y. Jur.2d Mortgages and Deeds of Trust § 822 (2003)........................................12

**RULES**

Fed. R. Civ. P. 66.................................................................................................1, 14

Intervenor CTBC Bank Corp. (USA) ("CTBC"), by and through its attorneys, Manatt, Phelps & Phillips, LLP, respectfully submits this memorandum of law in support of its motion to modify the prevailing asset freeze order and to appoint a receiver, pursuant to Federal Rule of Civil Procedure 66.

## PRELIMINARY STATEMENT

CTBC, a secured creditor, brings the present motion to protect its secured interests in real property and other pledged assets that are currently subject to the asset freeze order issued in this action. CTBC holds first position mortgages on and security interests in certain real property and assets owned by Defendant Richard Xia, and companies that he controls (the "Xia Entities"). As collateral for three mortgage loans extended to Defendant Xia on August 12, 2021 (the "Mortgage Loans"), CTBC has a secured interest on real property located at 140-22 Beech Avenue, Flushing, New York—specifically, units SCA, SCB, 1A, 1B, 1C, 1D, 1E, 1F, 9C, 9D, and 9F (collectively, the "Secured Units"). And, as collateral for two business loans extended to Defendant Xia, CTBC has a secured interest in two time certificates of deposit ("TCD") for the loan amounts (the "Business Loans" and, together with the Mortgage Loans, the "Loan Agreements").

Defendant Xia and certain Xia Entities—specifically, Manekineko Group LLC, Shangri-La 9F Inc., and Shangri-La Green Inc. (collectively, the "Xia Mortgage Borrowers")—have failed to make a single payment of principal or interest on the Mortgage Loans. Defendant Xia and the Xia Mortgage Borrowers are, and have been, in default under each of the three Mortgage Loans with CTBC. Similarly, Defendant Xia and two entities that he controls (Eastern Emerald Group LLC ("Eastern Emerald") and Fleet General Insurance Group Inc. ("Fleet")) are in default under the two Business Loans with CTBC. Since the Business Loans were extended, Defendant Xia, Eastern Emerald, and Fleet have failed to remit monthly interest payments when due, with

-1-

no interest payments made after September 2021, and have failed to repay the principal amounts at loan maturity.  However, because the collateral securing each of these loans remain subject to the Court's December 8, 2022 Asset-Freezing Preliminary Injunction (ECF No. 217 (the "Freeze Order")), CTBC is effectively barred from enforcing its rights under the Loan Agreements.

The Secured Units have significantly depreciated in value due to Defendant Xia and the Xia Mortgage Borrowers' mismanagement of the properties.  In less than three years, the Secured Units' appraised value has depreciated by more than $3.6 million (almost a 36.4% depreciation in value).  Because Defendant Xia and the Xia Mortgage Borrowers have failed to provide CTBC with updated rent rolls, CTBC is left to speculate as to the rental status of each residential unit and, at a recent site visit, CTBC confirmed that only one tenant occupies commercial units.  Rent has not been collected and provided to CTBC, and property taxes continue to be due and owing.  Defendant Xia and the Xia Mortgage Borrowers also allowed insurance coverage on these units to lapse for almost three months until CTBC raised this issue with Defendant Xia and his entities.  These factors underscore the need for the appointment of a receiver, in order to preserve the value of the Secured Units.

Because CTBC is a secured creditor, neither the SEC nor any defrauded investor can claim prejudice in the foreclosure of the Secured Units, or the withdrawal of funds pledged to CTBC under the Business Loans.  In fact, the law requires that CTBC's right to its security interests (the Secured Units and TCDs) be protected.  And, to the extent there are any surplus funds after the foreclosure sales, CTBC acknowledges that such funds will be subject to the Freeze Order.  At bottom, CTBC, as a secured creditor, simply seeks relief under the Freeze Order so that it may collect from its own collateral—an approach that the SEC has expressly acknowledged is consistent with similar receivership matters.

Accordingly, and for the reasons set forth below, it is respectfully submitted that the Freeze Order be modified to release CTBC's collateral under the Mortgage Loans and the Business Loans, including the Secured Units and TCDs, so that CTBC is permitted to take the appropriate steps to preserve the value of its collateral and avail itself of other remedies available under the applicable loan documents, and that a receiver be appointed to manage and oversee the Secured Units and take all necessary action to ensure that the Secured Units are properly and prudently managed and to protect against further diminution in value.

## RELEVANT BACKGROUND

### A.  <u>The Mortgage and Business Loans</u>

Between April and August 2021, CTBC extended five loans to entities owned and controlled by Defendant Xia, totaling $21,035,750.  (Declaration of Stan Sarwar, dated April 3, 2024 ("Sarwar Decl.") at ¶¶ 5, 31.)  CTBC extended mortgage loans to Manekineko Group LLC, Shangri-La 9F Inc., and Shangri-La Green Inc., collectively worth $6,535,750.  (*Id.*, at ¶ 5.)  All three notes were secured by real property—specifically, residential and commercial condominium units—located at 140-22 Beech Avenue, Flushing, New York and personal guaranties by Defendant Xia.  (*Id.*, at ¶¶ 5, 6, 10, 13, 14, 18, 21, 22, 27, 30; Exs. 2, 4, 6, 8, 10, 12.)  As additional collateral security, CTBC and Defendant Xia executed Assignment of Leases and Rents Agreements (the "ALR Agreements") for each of the Secured Units, which provide CTBC with a present assignment of all leases and rents generated on the Secured Units, with a license back to Defendant Xia and the Xia Mortgage Borrowers to collect such rents, which is automatically revoked upon a loan default.  (*Id.*, at ¶¶ 11, 19, 28; Exs. 3, 7, 11.)

CTBC holds a first position priority on the Secured Units.  CTBC perfected its security interest in the Secured Units by taking possession of each of the mortgage notes and recording

each mortgage and ALR Agreement with the Office of City Register of the County of Queens, in September 2021.  (*Id.*, at ¶¶ 10-12, 18-20, 27-29.)

On April 9, 2021 and August 9, 2021, CTBC extended business loans to entities controlled by Defendant Xia—Eastern Emerald and Fleet—totaling $14.5 million.  (*Id.*, at ¶¶ 31-34; Exs. 13, 16.)  As collateral, both loan agreements require Defendant Xia to maintain TCDs for the amounts loaned by CTBC, the funds of which CTBC is entitled to withdraw from in the event of a default.  (*Id.*, at ¶¶ 32-34.)  Both loans have maturity dates one calendar year from loan origination and have matured—thereby requiring the immediate repayment in full.  (*Id.*, at ¶¶ 32-33.)  Like the Secured Units, CTBC has a perfected interest and priority over the TCDs, based upon Defendant Xia's assignment of the TCDs to CTBC, and CTBC's possession and control of the same.  (*Id.*)  And, under both TCDs, CTBC has the right, in the event of a default to "take directly all funds in the [TCD] Account and apply them to the indebtedness."  (*Id.*, at ¶ 34; Ex. 15 at 2, Ex. 18 at 2.)

    **B.**    **Defendant Xia and the Xia Entities' Defaults Under the Mortgage and Business Loans**

On September 27, 2021—over a month after CTBC extended its loans to Defendant Xia and only weeks after it perfected its security interests—the SEC initiated this action against Defendant Xia and others for various violations of federal securities law.  (ECF No. 1.)  As part of its pleadings, the SEC also filed an order to show cause seeking, among other things, an order freezing Defendant Xia's assets and appointing a monitor.  (ECF No. 2-2.)  That same day, the Court granted the SEC's application and issued an order freezing Defendant Xia's assets pending final judgment, and appointed a monitor to oversee Defendant Xia's assets and assess the state of Defendant Xia's real estate projects.  (ECF No. 11.)  On December 8, 2022, in connection with the SEC's motion for preliminary injunction, the Court issued an Asset-Freezing Preliminary

-4-

Injunction. (ECF No. 217.)  The Secured Units and TCDs that serve as collateral for the loans extended by CTBC are currently subject to the prevailing Freeze Order.

Since the Court issued the temporary asset freeze order (ECF No. 11), Defendant Xia and the Xia Entities have defaulted on each of their loans with CTBC.  (Sarwar Decl., at ¶¶ 35-45.) Both Business Loans have matured and are required to be promptly paid in full; yet, no interest payments were made after September 2021, and the principal amounts remain unpaid.  (*Id.*, at ¶¶ 41, 43-44.)  Similarly, with respect to the Mortgage Loans, CTBC has not received a single payment since their issuance.  (*Id.*, at ¶ 35.)  Accordingly, on June 7, 2022, CTBC served a default notice upon Defendant Xia and the Xia Mortgage Borrowers, notifying them of their failure to remit monthly payments as required under the Loan Agreements and providing them with the amount then due and owing.  (*Id.*, at ¶ 37; Ex. 19.)  On November 30, 2022, CTBC served a second default notice on Defendant Xia and the Xia Mortgage Borrowers, based upon, among other things, their failure to pay property taxes on the Secured Units and to provide CTBC with an updated rent roll.  (*Id.*, at ¶ 38; Ex. 20.)  Defendant Xia and the Xia Mortgage Borrowers have not responded to either notice, nor have they cured their defaults.  (*Id.*, at ¶ 40.) In addition, based upon Defendant Xia and the Xia Mortgage Borrowers' defaults and in accordance with the ALRs, CTBC revoked their licenses to collect rent and served rent direction letters to each of the tenants of the Secured Units, directing them to pay CTBC for all past due and future rent payments under their respective leases.  (*Id.*, at ¶ 57; Ex. 21.) However, none of the tenants responded to the letters, and no rent has been received.  (*Id.*)

### C.      The Continued Diminution of the Secured Unit's Property Value

In an effort to assess the current condition of its collateral, CTBC has had the Secured Units re-appraised twice since issuing loans in 2021.  (*Id.*, at ¶ 63-64.)  The reappraisal reports confirm that the Secured Units have significantly depreciated in value and are not being

adequately managed.  (*Id.*, at ¶¶ 61-69; Exs. 26-30.)  For instance, when these properties were first appraised in 2021, they held a total appraised value of $10,055,000.  (*Id.*, at ¶ 62; Exs. 24, 25.)  A year later, they were reappraised at $7,575,000—reflecting a diminution in property value of almost $2.5 million.  (*Id.*, at ¶¶ 63; Exs. 26-27.)  Worse yet, based on the recent reappraisal reports from November 2023, these units have continued to depreciate in value and were recently reappraised at $6,393,500—a $3.6 million depreciation from the initial appraisal value in less than three years' time.  (*Id.*, at ¶ 64; Exs. 28-31.)  These figures are damning and, with loan-to-value ratios between 93.13% and 107.84%, confirm that the Mortgage Loans are underwater—leaving CTBC with inadequate collateral to secure the value of the loans issued.[1]  (*Id.*, at ¶ 65.)

Furthermore, when these loans were extended, each of the Secured Units had active tenants, with leases expiring between 2022 and 2025.  (*Id.*, at ¶¶ 15, 23, 46.)  However, based upon site visits by CTBC's credit officers, only one of the three commercial tenants—Honeypot Day Care Center ("Honeypot")—remains an occupant.  (*Id.*, at ¶¶ 52-53.)  And, more importantly, CTBC discovered that Honeypot is no longer occupying the premises it had leased and is instead now occupying units that were leased to another commercial tenant.  (*Id.*, at ¶¶ 48, 52.)  Despite this, CTBC has not received a new or modified lease from Defendant Xia and the Xia Mortgage Borrowers, to confirm Honeypot's right to lease these new units and that rent is being paid, let alone any rent payments.  (*Id.*, at ¶ 52.)

---

[1] Under Section 48 of the Mortgages, Defendant Xia and the Mortgage Borrowers are required to maintain an LTV ratio no greater than 70% (for Manekineko and Shangri-La) and 75% (for Shangri-La 9F).  (Sarwar Decl., ¶ 62; Exs. 2 at § 48, 6 at § 48, and 10 at § 48.)

-6-

**D.    Defendant Xia and the Xia Mortgage Borrowers' Mismanagement of the Secured Units**

Defendant Xia and the Xia Mortgage Borrowers have also violated the loan terms by failing to notify CTBC of unit vacancies, to market vacant units at market rates, to maintain active insurance coverage, to obtain CTBC's consent to modify leases or sign new leases, and to provide CTBC with an updated rent roll. (*Id.*, at ¶¶ 47-51, 55-56, 67-69.)  In the Fall of 2022, CTBC discovered that Defendant Xia and the Xia Mortgage Borrowers listed certain Secured Units for rent well-below the prior rental rate and another Secured Unit for sale, without first receiving CTBC's consent. (*Id.*, at ¶¶ 58-60.)  Specifically, Unit 9C was listed for sale for $1,060,000 and Units SCA and SCB were listed online for a combined rental rate of $4500/month. (*Id.*, at ¶¶ 58-59;  Exs. 22, 23.)  And, at the latest site visit, on March 21, 2024, a "For Rent" sign was posted at the entrance for the first floor units, which indicated that individual and combined units were available for rent. (*Id.*, at ¶ 53.)  Again, at no point did Defendant Xia or any of the Xia Mortgage Borrowers, inform CTBC of this latest rental posting—let alone receive CTBC's approval of the same. (*Id.*, at ¶¶ 53, 60.)

Finally, since obtaining the Mortgage Loans, Defendant Xia and the Xia Mortgage Borrowers have failed to timely pay the property taxes due on each of the Secured Units. (*Id.*, at ¶ 71.)  Based upon the New York Property Tax Public Access portal, property taxes were not paid on (i) Units 1B, 1C, 1D, 1F for a period of six months—between October 2022 and April 2023; (ii) Units 1A and 9C for a period of fourteen months—between August 2022 and October 2023; (iii) Units 9D and 9F for a period of seventeen months—between August 2022 and January 2024; and (iv) the SCA and SCB Units *for over two years*—between July 2021 and October 2023. (*Id.*, at ¶ 72.)  In fact, Shangri-La Green is, again, delinquent on the property taxes for Units SCA, SCB, and 1B. (*Id.*, at ¶ 73.)  To avoid further interest and penalties, as well

-7-

as the risk of a potential tax foreclosure, CTBC will be paying these property taxes if Defendant

Xia and Shangri-La Green fail to do so immediately.  (*Id.*, at ¶ 74.)

      **E.**    <u>**CTBC's Motion to Intervene**</u>

      On January 18, 2023, CTBC filed its motion to intervene.  (ECF No. 238.)  Neither the

SEC nor Defendant Xia opposed CTBC's motion.  In a text order dated January 30, 2023, the

Court ordered the SEC submit an explanation "to clarify its position regarding the appropriate

scope of the asset-freeze" and "reconcile its position regarding the rental properties."  In

response, the SEC explained that, given the "little equity," "including the Secured Units in the

proposed SEC Receivership estate would unnecessarily burden the estate."  (ECF No. 259, at 3.)

In addition, the SEC acknowledged that CTBC's proposed relief—"seeking to collect from its

own collateral, and will not look to other assets if this collateral is not sufficient"—is consistent

with how secured creditors have been treated in similar SEC receivership matters.  (*Id.* at 3-4

(collecting cases).)  However, the SEC opposed CTBC's motion to the extent it sought the

release of the TCDs.  (*Id.* at 4.)  According to the SEC,

> The CDs are not wasting assets and, although the unpaid loans which they secure
> continue to accrue interest and penalty fees, the SEC submits that a determination
> on how to deal with CTBC's claims as to the CDs are more appropriately dealt
> with as part of the proposed SEC Receivership.

(*Id.*)  Apparently, during the pendency of CTBC's motion to intervene, the SEC and Defendant

Xia reached a settlement-in-principle that is currently pending approval by the SEC.  (ECF No.

389.)  It is unclear whether the TCDs will be included as part of any final settlement.[2]  On March

3, 2024, the Court granted CTBC's motion to intervene and, given "escalating deterioration of

---

[2] On March 13, 2024, counsel for CTBC met-and-conferred with the SEC regarding the present motion.
(Declaration of Matthew F. Bruno, Dated April 3, 2024, ("Bruno Decl."), ¶¶ 3-4.)  Based on this discussion, CTBC
understands that the Secured Units are not a part of the settlement-in-principle.  (*Id.*, ¶ 4.)

the CTBC's collateral," indicated that it would "expedite consideration" of the present motion. (ECF No. 398, at 26-27.)

**ARGUMENT**

**II.    RELIEF FROM THE FREEZE ORDER IS WARRANTED**

It is well settled that "[t]he decision to freeze assets, or to modify an asset freeze, is committed to the district court's discretion." *SEC v. One or More Unknown Traders in Secs. of Onyx Pharms., Inc.*, 296 F.R.D. 241, 255 (S.D.N.Y. 2013) (citing *Smith v. SEC*, 653 F.3d 121, 127 (2d Cir. 2011)); *see also SEC v. DuClaud Gonzalez de Castilla*, 170 F. Supp. 2d 427, 429 (S.D.N.Y. 2001) ("It is well settled that this Court has authority to freeze personal assets temporarily and the corollary authority to release frozen personal assets, or lower the amount frozen").  In determining whether to freeze personal assets or whether to modify the freeze to release assets or reduce the scope of the freeze, the Court must weigh "the disadvantages and possible deleterious effect of a freeze" against "considerations indicating the  need for such relief."  *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972);  *DuClaud*, 170 F. Supp. 2d at 429.  Here, the balance of interests weighs in favor of modifying the Freeze Order to release CTBC's secured collateral under the Mortgage Loans and Business Loans, and to allow CTBC to exercise its rights under the applicable loan documents.

**A.    Modifying the Freeze Order to Allow CTBC to Preserve the Value of its Secured Real Property Is Warranted.**

CTBC's loan documents establish that it has valid and duly perfected security interests in the Secured Units—no party can contest this.  What is more, Defendant Xia and the Xia Mortgage Borrowers are in substantial default under each of the Mortgage Loans.  Since funds were extended by CTBC on August 12, 2021, Defendant Xia and the Xia Mortgage Borrowers have not made a single payment.  As of April 3, 2024, total arrearages of $656,979.02 in interest

-9-

payments under the Mortgage Loans and $45,402.00 in late charges remain outstanding, as well as an additional $1,148,839.61 in default interest.  (Sarwar Decl., at ¶ 39.)  And, the total principal balance of the mortgage loans, $6,535,750.00, remains outstanding.  (*Id.*)  These amounts do not include CTBC's enforcement costs and protective advances (e.g., for real estate taxes), which are also secured under the Mortgage Loans.

Courts routinely modify freeze orders to allow secured creditors to exercise remedies related to pledged collateral.  Indeed, such relief has been provided in similar matters involving SEC enforcement.  For instance, in *SEC v. Lauer*, the borrower/defendant was in default of his mortgage loan, under which the lender had accelerated the indebtedness and initiated foreclosure proceedings on the real property.  No. 03-cv-80612, 2006 WL 2660752, at *2 (S.D. Fla. Aug. 2, 2006).  However, the property was subject to an asset freeze order, which prevented the foreclosure from proceeding.  *Id.*  The Court granted the lender's motion for relief of the asset freeze order, thereby permitting the lender to continue with the foreclosure proceedings.  *Id.* at *6.  Other courts have provided similar relief—modifying asset freeze orders, to enable the non-party banks to initiate foreclosure proceedings against the properties at issue. *See SEC v. Haligiannis*, No. 04-cv-6488, (ECF No. 53) (S.D.N.Y. Dec. 1, 2006) (modifying asset freeze order to allow bank to foreclose on debtor's home); *SEC v. Founding Partners Cap. Mgmt.*, No. 09-cv-229, 2010 WL 11474439, at *1 (M.D. Fla. Sept. 13, 2010) (granting non-party bank's motion to clarify and/or modify asset freeze order to permit the initiation of foreclosure proceedings on secured property); *SEC v. LADP Acquisition, Inc.*, 10-cv-06835, 2015 WL 13593622, at *2-4 (C.D. Cal. June 17, 2015) (granting non-party bank's motion to intervene for purposes of modifying asset freeze order, so that bank could begin foreclosure proceedings on secured property).

Maintaining the Freeze Order against the Secured Units will lead to further waste and the depreciation of their current value—an outcome Courts seek to avoid. *See Manor*, 458 F.2d at 1106 ("the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such relief."). The SEC, itself, has recognized as much, explaining that because the Secured Units have "little equity," it "would unnecessarily burden the estate" to include them as part of the SEC Receivership. (ECF No. 259, at 3.) And this position was taken based on the 2022 reappraisal reports.

Indeed, and as further discussed below, the deleterious effect of the Freeze Order has already manifested—the appraised value of the Secured Units, the primary collateral securing CTBC's mortgage loans, has depreciated by more than $3.6 million (a 36% depreciation in value) since CTBC extended the loans to Defendant Xia and the Xia Mortgage Borrowers in August 2021. (Sarwar Decl., at ¶¶ 64-65.) The Freeze Order has effectively inhibited CTBC from exercising its contractual and equitable rights under the mortgage loans to ensure its interests are protected. Appointing a receiver and initiating foreclosure proceedings, if necessary, are the only viable remedies available to CTBC. However, based upon the most recent appraisal reports of the Secured Units (as further discussed below), unless a receiver is appointed to protect from further value depreciation, there is growing concern as to whether the proceeds of their sale would be sufficient to pay off the principal debt owed to CTBC, let alone the accruing interest, fees, and other costs secured by the collateral. In fact, at its current value, the Secured Units would not even cover the loans that CTBC issued. (*Id.*, at ¶¶ 64-66.)

Finally, the relief sought by CTBC herein will not prejudice any other party or defrauded investor, since no unliened property will be lost as a result. *See Onyx Pharms., Inc.*, 296 F.R.D. at 254 (recognizing that "[a]n asset freeze is intended to preserve funds that a defendant may be

-11-

ordered to pay if he is held liable.").  As discussed above, CTBC has first position priority on each of the Secured Units, having maintained possession of the loan notes and mortgage, and recording the same with the Office of City Register of the County of Queens.  *See Provident Bank v. Cmty. Home Mortg. Corp.*, 498 F. Supp. 2d 558, 570 (E.D.N.Y. 2007) (possession of the note perfects the assignee's security interest); *In re Apponline.com, Inc.*, 285 B.R. 805, 820 (Bankr. E.D.N.Y. 2002) ("It is undisputed that [creditors] had possession of the notes in question and therefore had perfected security interests in the mortgages in question.").  As a secured creditor, CTBC has priority over the proceeds from any foreclosure sale of the Secured Units. What is more, any surplus funds from the foreclosures would still be subject to the Freeze Order and remain available to the subordinate creditors and/or defrauded investors, should the SEC prevail on its claims.  *See SEC v. Haligiannis*, 608 F. Supp. 2d 444, 449 (S.D.N.Y. 2009) ("Following a foreclosure sale, '[t]he parties who had estates or interests in the land sold . . . are entitled to be paid out of the surplus moneys the equivalent of their respective interests, in the order of priority as between each other, as far as it will go.'" (quoting 79 N.Y. Jur.2d Mortgages and Deeds of Trust § 822, at 162 (2003)).

**B.**     **Modifying the Freeze Order to Release the TCDs Is Warranted.**

For similar reasons discussed above, modifying the Freeze Order to release the TCDs is also warranted.  It cannot be disputed that, like the Secured Units, CTBC holds a perfected security interest in both TCDs, based upon its control and maintenance of the same.  The law is clear on this point.  *See Wachovia Bank Nat'l Ass'n v. Encap Golf Holdings, LLC*, 690 F. Supp. 2d 311, 334 n.6 (S.D.N.Y. 2010) ("Assuming BNY's security interest is in the Deposit Account, it is perfected because BNY has control over the Deposit Account."); *see also* N.Y. U.C.C. § 9-312(b)(1) ("a security interest in a deposit account may be perfected only by control"); § 9-314(b) ("[a] security interest in deposit accounts . . . is perfected by control . . . when the secured

-12-

party obtains control and remains perfected by control only while the secured party retains control.").

It is well-settled that the Court's equitable authority must yield to a party's property rights. *See SEC v. Spongetech Delivery Sys., Inc.*, 98 F.Supp.3d 530, 537 (E.D.N.Y. 2015) ("the Court's equitable authority . . . does not extend to abrogating property rights created by state law and protected by due process; equity follows the law"); *see also SEC v. Mgmt. Sols., Inc.*, No. 11-cv-1165, 2013 WL 594738, at *3 n.10 (D. Utah Feb. 15, 2013) (recognizing that "[m]ost courts are hesitant to ignore the rights of secured creditors."). It follows that, as a secured creditor, CTBC's rights to the TCDs cannot be ignored and must be protected. *See Spongetech*, 98 F.Supp.3d at 537; *see also Mgmt. Sols., Inc.*, 2013 WL 594738, at *3 ("The rights of secured creditors to their security interests are among those protected by law."); *see also SEC v. Byers*, 637 F.Supp.2d 166, 171 (S.D.N.Y. 2009) (recognizing that "secured creditors have recourse against specific collateral, and must be paid out of the proceeds of that collateral.").

Allowing the Freeze Order to continue to cover the TCD accounts will result in additional accrued interest, fees, and penalties. Since September 2021, no interest payments have been made under the Business Loans and both loans have matured, requiring repayment of the loans in full. As of April 3, 2024, total interest payments of $555,283.31, late charges of $6,957.46, and default interest payments of $2,529,041.67 remain outstanding, and the total principal balance of $14.5 million remains unpaid. (Sarwar Decl., at ¶ 44.) Under each of the Business Loans, CTBC is also entitled to accruing interest, fees, and penalties. There is simply no reason for the TCDs to continue to languish under Freeze Order—especially when considering CTBC's established interest in the same.

Simply put, as a secured creditor, CTBC has a priority interest in the TCDs that the law requires be honored.  And, because CTBC seeks only to collect from its own collateral, it is respectfully submitted that the release of these assets is warranted and consistent with similar SEC enforcement actions.[3]

## III.   APPOINTMENT OF A RECEIVER TO OVERSEE AND MANAGE THE SECURED REAL PROPERTY  IS WARRANTED

"The appointment of a receiver in a federal diversity action is governed by federal law." *U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*, 866 F. Supp. 2d 247, 254 (S.D.N.Y. 2012); *see also* Fed. R. Civ. P. 66  ("These rules govern an action in which appointment of a receiver is sought").  "It is entirely appropriate for a mortgage holder to seek the appointment of a receiver where . . . the mortgagee has repeatedly defaulted on conditions of the mortgage which constitute one or more events of default."  *Nesbitt Bellevue*, 866 F. Supp. 2d at 254. In determining whether the appointment of a receiver is warranted, federal courts consider*, inter alia*, the following factors:

> Fraudulent conduct on the part of defendant; the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and, in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

*Nesbitt Bellevue*, 866 F. Supp. 2d at 249-50 (granting motion to appoint receiver); *accord Wilmington Tr. Nat'l Ass'n v. Winta Asset Mgmt. LLC*, No. 20-cv-5309, 2020 WL 5802365, at *1 (S.D.N.Y. Sept. 28, 2020).  A critical factor in this analysis is whether there is "imminent danger of the diminution of the value of the propert[y]."  *Nesbitt Bellevue*, 866 F. Supp. 2d at

---

[3] In its February 2023 letter, the SEC took no issue with this approach (as it related to the Secured Units), stating, "CTBC seeks to collect from its own collateral, and will not look to other assets if this collateral is not sufficient. This approach is consistent with the treatment of secured creditors' claims in other SEC receiverships."  (ECF No. 249, at 3-4 (collecting cases)).

250.  "Fraudulent conduct, on the other hand, is not a prerequisite."  *Wilmington Tr.*, 2020 WL 5802365, at *1.  These factors counsel in favor of appointing a receiver.

*First*, it is beyond dispute that Defendant Xia and the Xia Mortgage Borrowers are in default under each of their respective mortgage loans with CTBC.  (Sarwar Decl., at ¶¶ 35-40.) To begin with, not a single payment of principal or interest has been remitted to CTBC since the loans were extended in August 2021.  (*Id.*, at ¶ 35.)  Even after serving rent direction letters to the current tenants of each Secured Unit in July 2022, CTBC did not receive a response from any tenant and has not received any rent.  (*Id.*, at ¶ 57.)  And despite receiving two default notices, Defendant Xia and the Xia Mortgage Borrowers have failed to take any necessary corrective steps to cure their defaults.  (*Id.*, at ¶¶ 37-40.)  As such, an Event of Default has occurred, and continues to occur, under each Mortgage Loan based upon Defendant Xia and the Xia Mortgage Borrowers' failure to, among other things, (i) remit the monthly payments that remain outstanding (as well as each subsequent monthly payment thereafter that has gone unpaid); (ii) timely pay property taxes; and (iii) provide updated rent rolls.  (*Id.*, at ¶¶ 40, 50-51, 55-57, 70-73.) This, alone, supports the appointment of a receiver.  *See Wilmington Tr.*, 2020 WL 5802365, at *1 (holding that the defendants' defaults under a loan agreement form "a strong basis for an appointment of a receiver because they show a high likelihood of success on the merits.").

*Second*, CTBC has presented clear evidence demonstrating that the value of the Secured Units has substantially diminished.  When these units were appraised in 2021, they were collectively valued at $10,055,000.  ( Sarwar Decl., at ¶ 62.)  A year later, despite real estate values in properties similar to the Secured Units generally increasing in New York City over this time period (especially in the residential sector), these units were re-appraised in 2022 at $7,575,000—a depreciation of almost $2.5 million.  (*Id.*, at ¶ 63.)  CTBC's most recent appraisal

reports reflect an even greater depreciation in value: $6,393,500 (a depreciation of $3.6 million in less than three years).  (*Id.*, at ¶ 64.)  This stark decline in appraisal value has directly impacted the acceptable LTV thresholds contemplated by the loan documents, which now collectively exceed 100%.  (*Id.*, at ¶ 65.)  This not only illustrates the downward trend in the value of these properties, but, more importantly, that CTBC's loans are no longer adequately secured.  That aside, Defendant Xia and the Xia Mortgage Borrowers have also proven themselves incapable of managing the Secured Units—having allowed their insurance coverage to lapse for a period of several months, failing to pay property taxes on the units, and marketing vacant units at well below prior rental values and current market rent (and without CTBC's prior consent and approval).  (*Id.*, at ¶¶ 59-60, 67-73.)

*Third*, with the exception of Units 1A, 1B, and 1C (which are apparently now occupied by Honeypot), the remaining commercial units are currently vacant.  (*Id.*, at ¶ 48, 52.)  And, because Defendant Xia and the Xia Mortgage Borrowers have never provided CTBC with updated rent rolls or provided any information about vacancies as required by the Mortgage Loan Agreements, it is unclear how long each of the remaining units have been vacant.  (*Id.*, at ¶ 56.)  The same is true with respect to the three residential units—Units 9C, 9D, and 9F.  (*Id.*, at ¶ 54.)  CTBC has been left completely in the dark and can only speculate as to the rental status of these units.  (*Id.*, at ¶¶ 54, 56.)  Indeed, since these loans were extended, CTBC has not received rent from any of the purported tenants of these units.  (*Id.* at ¶ 57.)  Even worse, and unbeknownst to CTBC, Unit 9C was listed for sale for $1,060,000, Units SCA and SCB were listed for a combined rental rate of $4500/month and, more recently, units on the building's first floor were posted for rent.  (*Id.*, at ¶¶ 58-60.)  Taken together—the vacancies and absence of rental income—these impairments have negatively impacted the value of the Secured Units and further

-16-

illustrate the need for a receiver. *See Wilmington Tr.*, 2020 WL 5802365, at *1 ("the elimination of rental income is a direct impairment of the plaintiff's collateral that, in part, consists of the rental income from the property.  This impairment is above and beyond a mere 'danger of diminution of the property,' that the plaintiffs are required to show.").

***Finally***, absent appointment of a receiver, CTBC lacks adequate legal remedies based upon Defendant Xia and the Xia Mortgage Borrowers' breaches.  CTBC's primary source of recovery based upon their defaults is the Secured Units.  As discussed above, however, the Secured Units continue to depreciate in value because they are not adequately managed by Defendant Xia and the Xia Mortgage Borrowers.  Accordingly, to prevent further waste, dissipation, and the diminution of CTBC's secured collateral, the immediate appointment of a receiver is necessary to take possession of and manage the Secured Units.

Based upon the foregoing, the relevant factors for considering receivership weigh heavily in CTBC's favor.  Accordingly, CTBC respectfully recommends the appointment of Mr. Ian Lagowitz, Managing Partner of Trigild IVL, as the receiver for the Secured Units.  Mr. Lagowitz manages a real estate company and has significant experience serving as a court-appointed receiver for real properties, such as the Secured Units at issue here.  (*See* Bruno Decl., Ex. 1.) Based on Mr. Lagowitz's experience, he and his firm are uniquely qualified to take possession of the Secured Units, preserve their value, and avoid further harm to CTBC's collateral.

## CONCLUSION

For all of the foregoing reasons, CTBC respectfully requests that the Court (i) grant

CTBC's motion to modify the Freeze Order to release the secured collateral under the Mortgage

Loans and the Business Loans and to allow CTBC to exercise its rights at law or under the

applicable loan documents against secured collateral without further leave from the court; (ii)

grant CTBC's motion to appoint Mr. Lagowitz as a receiver to the Secured Units; and (iii) award

such further relief as the Court deems proper.


Dated: New York, NY
       April 3, 2024

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP

By:   */s/ Matthew F. Bruno*
      Matthew F. Bruno
      Richard S. Hartunian
      7 Times Square
      New York, New York 10036
      E-Mail: mbruno@manatt.com
              rhartunian@manatt.com
      Phone: 212.790.4500
      *Attorneys for CTBC Bank Corp.*
      *(USA)*