UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,

                        Plaintiff,

           - against -

RICHARD XIA, a/k/a YI XIA; and FLEET
NEW YORK METROPOLITAN REGIONAL
CENTER, LLC, f/k/a FEDERAL NEW YORK
METROPOLITAN REGIONAL CENTER,
LLC,

                     Defendants,

        - and -

JULIA YUE, a/k/a JIQING YUE; XI
VERFENSTEIN; and XINMING YU,

                Relief Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
21-CV-5350 (PKC) (JAM)

PAMELA K. CHEN, United States District Judge:

Plaintiff Securities and Exchange Commission (the "SEC") commenced this action on

September 27, 2021 against Defendants Richard Xia ("Xia") and Fleet New York Metropolitan

Regional Center, LLC (together, "Defendants") for violations of various federal securities laws,

and against Relief Defendants Julia Yue ("Relief Defendant Yue"), Xi Verfenstein, and Xinming

Yu (collectively, "Relief Defendants") for unjust enrichment as a result of the alleged violations

of the securities laws by Defendants.[1]  The SEC alleges that, between 2010 and 2017, Defendants

fraudulently solicited more than $229 million in investments by offering and selling limited

partnership interests to over 450 foreign nationals who participated in the EB-5 Immigrant Investor

---

[1] The Court refers to the SEC, Defendants, and Relief Defendants collectively as the
"Parties."

Program administered by the United States Citizenship and Immigration Services, and then misappropriated and misused those funds for personal purposes, which unjustly enriched Relief Defendants.

Presently before the Court is an unopposed motion by Intervenor CTBC Bank Corp. (USA) ("CTBC"), seeking (1) a modification of the asset-freezing preliminary injunction (the "Preliminary Injunction") currently in place to release certain real properties and assets, and (2) the appointment of a receiver pursuant to Federal Rule of Civil Procedure ("Rule") 66 to oversee and manage the real properties at issue during the pendency of this litigation.  For the reasons set forth below, the Court grants CTBC's motion and adopts its proposed order.

## BACKGROUND

The general background of this case is set forth in the Court's previous opinions.[2] Therefore, the Court assumes the Parties' familiarity with the facts and recites only the background relevant to the instant motion.

## I.   CTBC's Loans, and Xia and Xia-Controlled Entities' Defaults

Prior to the initiation of this action by the SEC, CTBC extended five loans totaling $21,035,750 to several entities owned and controlled by Xia between April and August 2021. (Mem. of Law in Supp. of Intervenor CTBC's Mot. to Modify the Asset Freeze & Appoint a Receiver, Dkt. 406 ("CTBC Br."), at 3.)  Xia subsequently used these loans to purchase two of the

---

[2] The procedural history and factual background of this litigation has been detailed extensively in various opinions by the Court, including the Court's December 8, 2022 Memorandum & Order issuing the Preliminary Injunction and the Court's March 4, 2024 Memorandum & Order granting CTBC's motion to intervene in this action. *See, e.g.*, *SEC v. Xia*, No. 21-CV-5350 (PKC) (RER), 2022 WL 17539124, at *1–10 (E.D.N.Y. Dec. 8, 2022), *appeal filed*, No. 22-3137 (2d Cir.); *SEC v. Xia*, No. 21-CV-5350 (PKC) (JAM), 2024 WL 964676, at *1–5 (E.D.N.Y. Mar. 4, 2024).

three mansions held in the names of Relief Defendants.[3]  (*See* Am. Compl., Dkt. 98, ¶¶ 96, 170–71, 173–74, 183; *see also* Dkt. 259, at 2 n.2.)  Of the five loans, three are mortgage loans, collectively worth $6,535,750, extended to Manekineko Group LLC, Shangri-La 9F Inc., and Shangri-La Green Inc.  (CTBC Br., at 3.)  As collateral, CTBC holds perfected, first-priority security interests in certain real properties—specifically, eleven residential and commercial condominium units located at 140-22 Beech Avenue, Flushing, New York (the "Secured Units")[4]—and an Assignment of Leases and Rents Agreements from Xia, which includes "a present assignment of all leases and rents generated on the Secured Units."  (*Id.* at 3–4.)  While Xia has a license to collect such rents, that license is automatically revoked if a default occurs.  (*Id.* at 3.)  As additional collateral, Xia has personally guaranteed these loans.  (*Id.*)

The other two CTBC loans are business loans extended to Eastern Emerald Group LLC and Fleet General Insurance Group Inc. in the amount of $14.5 million, which are secured by two time certificates of deposits (the "TCDs") that Xia pledged as collateral.  (*Id.* at 1, 4.)  Like the Secured Units, CTBC holds "a perfected interest and priority over the TCDs," and in the event of a default, CTBC is entitled to withdraw the funds under the TCDs.  (*Id.* at 4.)

Since September 2021, Xia-controlled entities and Xia himself, as the personal guarantor, have failed to service each of the five loans, all of which are in default.  (*Id.* at 5.)  Specifically, regarding the three mortgage loans, CTBC claims that Xia and his entities have failed to pay the monthly amount due on the principal of the loans since CTBC extended these loans or to turn over

---

[3] These two mansions are the Kings Point Road mansion held under Relief Defendant Yue's name and the Vanderbilt Drive mansion held under Relief Defendant Xinming Yu's name. (*See* Am. Compl., Dkt. 98, ¶¶ 167, 183.)

[4] These Secured Units include units SCA, SCB, 1A, 1B, 1C, 1D, 1E, 1F, 9C, 9D, and 9F. (CTBC Br., at 1.)

the rents generated by the Secured Units after the default has occurred.  (*Id.*)  Meanwhile, the Secured Units that serve as collateral for the mortgage loans have been inadequately managed by Xia and, as a result, have accumulated significant liabilities and significantly depreciated in value during the pendency of this action.  (*Id.* at 5–8.)  With respect to the two business loans, CTBC states that both loans have matured but Xia has failed to remit monthly interest payments since September 2021 or pay the principal amounts.  (*Id.* at 5.)  To date, various fees and penalties remain outstanding and continue to accrue on the two loans.  (*Id.* at 13.)

## II.     The Asset-Freezing Preliminary Injunction

In this enforcement action, the SEC seeks a final judgment, *inter alia*, ordering Defendants and Relief Defendants to disgorge all ill-gotten gains they received as a result of the alleged violations and to pay prejudgment interest pursuant to 15 U.S.C. § 78u(d)(5), (7).  (*See* Am. Compl., Dkt. 98, at 51.)  The SEC's requested judgment would also order Defendants to pay civil money penalties pursuant to 15 U.S.C. § 77t(d) and 15 U.S.C. § 78u(d)(3).  (*Id.*)  To preserve assets sufficient for Defendants and Relief Defendants to pay disgorgement, prejudgment interest, and civil money penalties, the SEC sought an emergency temporary restraining order ("TRO"), *inter alia*, freezing Defendants' and Relief Defendant Yue's assets and appointing a monitor, and for a preliminary injunction continuing the same asset freeze pending resolution of this litigation. (*See* Dkts. 2–8; Dkt. 2, at 2; *see also* Dkt. 103, at 25.)  On September 27, 2021, the Court granted the SEC's motion for a TRO, appointed a monitor, and scheduled a show-cause hearing regarding the SEC's motion for a preliminary injunction.  (*See* Dkt. 11.)  Subsequently, on April 6, 2022, the SEC moved to expand the scope of the existing asset freeze and its requested preliminary injunction as to Relief Defendants.  (*See* Dkts. 99–102.)

On December 8, 2022, after considering the Parties' extensive evidentiary submissions and holding a three-day show-cause hearing (*see* 2/14/2022, 2/15/2022 & 2/16/2022 Min. Entries), the Court issued the Preliminary Injunction that, among other things, institutes a complete asset freeze subject to certain carve-outs covering all of Defendants' assets and Relief Defendants' residential properties for the duration of two years.[5] *See SEC v. Xia*, No. 21-CV-5350 (PKC) (RER), 2022 WL 17539124, at *31 (E.D.N.Y. Dec. 8, 2022), *appeal filed*, No. 22-3137 (2d Cir.); *see also generally SEC v. Xia*, No. 21-CV-5350 (PKC) (RER), 2022 WL 20543271 (E.D.N.Y. Dec. 8, 2022), *appeal filed*, No. 22-3137 (2d Cir.).  As the Court noted in the Preliminary Injunction, the purpose of the asset freeze is to "preserve the *status quo* and to protect this Court's ability to award equitable relief in the form of disgorgement of illegal profits from fraud and civil penalties[.]" *Xia*, 2022 WL 20543271, at *1.

In particular, in the Memorandum & Order granting the Preliminary Injunction, the Court, after carefully evaluating several factors, concluded that "it is still necessary, in order to ensure full recovery in this matter and to prevent the dissipation of Defendants' assets that can be applied toward satisfying any judgment, not to release [Xia's 15 rental properties[6]] from the freeze at this time." *Xia*, 2022 WL 17539124, at *30; *see also id.* at *31 ("In light of Xia's apparent disregard for the existing TRO, it is clear to the Court that releasing the rental properties and the resulting income from the asset freeze would almost certainly lead to their permanent dissipation, thereby depriving investors of relief and the SEC of a fair opportunity to recover, which must be protected

---

[5] In light of the Parties' settlement-in-principle, the Court, at the Parties' joint request, extended the expiration date of the Preliminary Injunction to March 20, 2025.  (*See* Dkt. 415, at 1; Dkt. 416, at 2.)

[6] In or about 2008, Xia became the registered owner of these 15 rental properties across New York. *Xia*, 2022 WL 17539124, at *2.

under this Circuit's precedent."). As relevant here, the 15 rental properties that are currently frozen under the Preliminary Injunction include the Secured Units that Xia pledged as collateral for CTBC's mortgage loans. (*See* Dkt. 183-2.) In addition, the two TCDs that serve as CTBC's collateral for the business loans are similarly subject to the asset freeze. *See Xia*, 2022 WL 17539124, at *31 ("The Court issues an asset-freezing preliminary injunction, for the duration of two years, that covers all of Defendants' assets and Relief Defendants' residential properties.").

Notably, pursuant to the Preliminary Injunction, "no person or entity, including [] Defendants, [] Relief Defendants, or any creditor or claimant against [] Defendants or any of [] Relief Defendants, or any person acting on behalf of such creditor or claimant, shall take any action to interfere with the asset freeze, including, but not limited to, the filing of any lawsuits, liens, or encumbrances, or bankruptcy cases to impact the property and assets subject to" the asset freeze. *Xia*, 2022 WL 20543271, at *2. Nevertheless, the Preliminary Injunction also provides that "any party or non-party may seek leave from [the asset freeze] upon a proper showing[.]" *Id.*

### III.     Defendants and Relief Defendant Yue's Interlocutory Appeal of the Preliminary Injunction

Subsequent to the issuance of the asset freeze, on December 14, 2022, Defendants and Relief Defendant Yue filed a notice of interlocutory appeal to the Second Circuit from the Court's Preliminary Injunction and its contemporaneously issued Memorandum & Order. (*See* Dkt. 219); *SEC v. Xia*, No. 22-3137 (2d Cir.). That appeal remains pending. (*See* Dkts. 262, 326, 372, 373, 397); *see also generally Xia*, No. 22-3137.[7]

---

[7] In light of the five-member Commission's recent approval of the settlement, this appeal is currently held in abeyance pending the complete resolution of this action in the district court. (*See* Dkt. 445); *see also generally Xia*, No. 22-3137, Dkts. 141, 142.

### A.      Defendants' Arguments on Appeal

On appeal, Defendants ask that the Preliminary Injunction be vacated and remanded for a number of reasons.  *See* Appellant's Opening Br., at 32–51, *SEC v. Xia*, No. 22-3137, Dkt. 98 (2d Cir. Dec. 15, 2023) ("Appellant's Opening Br.").  Principally, Defendants argue that a complete asset freeze granted by this Court is not justified because it is "predicated on a flawed understanding of 'disgorgement' law" that conflicts with the Second Circuit's now controlling law as set forth in *SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023).  *Id.* at 36.  The *Govil* decision was issued after the Preliminary Injunction had been granted, and therefore represents, as Defendants contend, an intervening change in the Second Circuit's controlling precedent on disgorgement.  *Id.*  More specifically, according to Defendants, *Govil*—which builds on the Supreme Court's decision in *Liu v. SEC*, 591 U.S. 71 (2020)[8]—held that "a 'victim' for purposes of [disgorgement under 15 U.S.C.] § 78u(d)(5) is one who suffers pecuniary harm from the securities fraud."  *Id.*  Based on this definition, Defendants assert that *Govil* substantially restricts the SEC's authority to seek disgorgement because a disgorgement "may only be awarded if the SEC demonstrates—and a district court finds—'pecuniary harm' to investors[.]"  *Id.* at 41.  Defendants contend the reasoning of *Govil* is directly applicable to this litigation, where a preliminary injunction was issued, because the purpose of the Preliminary Injunction—an ancillary relief—is to preserve the prospect of a

---

[8] According to Defendants, in *Liu*, "the Supreme Court lamented that the SEC's practices over the last few decades, specifically in the field of 'disgorgement,' have 'test[ed] the bounds of equity practice[,]'" and accordingly "sought to curtail the punitive aspects of the SEC's disgorgement practices and bring the remedy back within equitable limitations." Appellant's Opening Br., at 23 (citing *Liu*, 591 U.S. at 85).  Defendants further argue that in doing so "the Supreme Court made clear in *Liu* that 'disgorgement' as a remedy under [15 U.S.C.] § 78u(d)(5) is permissible only if it does not contravene traditional equitable principles" which were "often transgressed in pre-*Liu* cases," and thus held that "'a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under [15 U.S.C.] § 78u(d)(5).'"  *Id.* at 24, 39 (quoting *Liu*, 591 U.S. at 75).

later disgorgement award.  *Id.* at 26, 41.  Given that the SEC made no showing, and this Court made no finding, of pecuniary harm as required under *Govil* when the Preliminary Injunction was granted, Defendants conclude that the Preliminary Injunction conflicts with *Govil* and thus should be vacated and the matter remanded for further proceedings.  *Id.* at 42.

Second, Defendants contend that even if the SEC can show that the investors suffered pecuniary harm, after *Govil*, the proper amount that the district court had authority to freeze for a potential later disgorgement award should not simply be the entire amount of money that Defendants raised from the investors but should be "a reasonable approximation of the alleged misappropriation."  *Id.* at 49–51.

Lastly, Defendants assert that this Court erroneously considered the SEC's claims for civil penalties in assessing the propriety of the asset freeze.  *Id.* at 32–36.  More specifically, Defendants contend that an asset freeze in an SEC enforcement action is supposed to preserve funds for an equitable remedy of disgorgement and not to facilitate punishment.  *Id.* at 33.  Thus, Defendants argue that because civil money penalties are not equitable but instead constitute punishment, this Court erroneously granted the asset freeze predicated on civil money penalties.  *Id.*

## B.    The SEC's Counterarguments on Appeal

First, on appeal the SEC counterargues that Defendants' reliance on *Govil* in the instant action is misplaced, because it is premature to require a district court to apply *Govil* to make determinations about the ultimate disgorgement award at the asset-freeze stage and thus to find facts showing pecuniary harm to investors.  *See* Appellee's Opening Br., at 31–35, *SEC v. Xia*, No. 22-3137, Dkt. 118 (2d Cir. Mar. 15, 2024).  The SEC further contends that even if *Govil* applies at this stage, the investors in this action did suffer pecuniary harm from Defendants' alleged fraud and thus *Govil* is satisfied.  *Id.* at 36–40.

In addition, the SEC claims that contrary to Defendants' assertion that "their ultimate disgorgement liability is limited to the purportedly lesser amounts that Defendants misappropriated," this Court, after a finding of liability, would have discretion to conclude that the entire investment amount that Defendants raised from the EB-5 investors is a reasonable approximation of Defendants' profits connected to their fraud, and thus disgorgement should not be limited to specific funds that Defendants allegedly misappropriated. *Id.* at 26–27.

Finally, the SEC rebuts Defendants' argument that this Court erroneously took civil penalties into account when determining the scope of the asset freeze, contending that the controlling precedent of this Circuit authorizes a district court to freeze sufficient funds to cover not only disgorgement but also civil penalties. *Id.* at 27–28.

## IV.    CTBC's Intervention in This Action and the Instant Motion

While the appeal remained pending, CTBC sought to intervene in this action, seeking to modify the Preliminary Injunction to release its collateral from the asset freeze and to appoint a receiver to manage the Secured Units. (*See* Mem. of Law in Supp. of Party in Interest CTBC's Mot. to Intervene, Dkt. 238-1, at 2.) On March 4, 2024, the Court granted CTBC's unopposed[9] motion to intervene, and in light of the "escalating deterioration of CTBC's collateral," set an expedited briefing schedule for CTBC's motion to modify the Preliminary Injunction and to appoint a receiver. *SEC v. Xia*, No. 21-CV-5350 (PKC) (JAM), 2024 WL 964676, at *13 (E.D.N.Y. Mar. 4, 2024).

On April 3, 2024, CTBC filed the instant motion. (*See* Dkt. 405; *see also* Dkts. 406–410, 413.) In a nutshell, CTBC explains that the Secured Units have been inadequately managed by

---

[9] The SEC did not oppose CTBC's intervention "for the limited purpose of exercising its rights as a secured creditor with respect to [the Secured Units,]" but contested CTBC's proposed relief to unfreeze the TCDs if CTBC's intervention motion was granted. (*See* Dkt. 259, at 1–2.)

Xia, which are withstanding waste and a dissipation or diminution in value (*see* CTBC Br., at 5–8), and that the asset freeze prevents it from exercising its rights to the Secured Units and the TCDs, (*id.* at 2).   CTBC also notes that because of its status as a secured creditor, "neither the SEC nor any defrauded investor can claim prejudice in the foreclosure of the Secured Units, or the withdrawal of funds [under the TCDs] pledged to CTBC[.]"  (*Id.*)  Accordingly, CTBC requests that the Court modify the Preliminary Injunction to release its collateral and appoint a receiver to preserve the value of the Secured Units, which it claims is "an approach that the SEC has expressly acknowledged is consistent with similar receivership matters."  (*Id.*)  CTBC also acknowledges that any surplus funds from the foreclosure proceedings against the Secured Units will remain subject to the Preliminary Injunction and be available to the injured investors and other shareholders in this action.  (*Id.* at 2, 12.)

On May 2, 2024, the SEC responded to CTBC's motion, noting that it "takes no position" on CTBC's request.  (*See* Dkt. 422.)  Accordingly, the Court interprets the SEC, contrary to its prior position, as not opposing CTBC's request to release the TCDs from the asset freeze.  *See supra* note 9; (*see also* Dkt. 259, at 1–2).  To date, Defendants and Relief Defendants have not responded to, and thus have taken no position on, CTBC's motion.

## DISCUSSION

## I.  The Court's Jurisdiction to Decide the Instant Motion Pending Appeal

In light of Defendants and Relief Defendant Yue's interlocutory appeal of the Preliminary Injunction, the Court first addresses the limit of its jurisdiction to entertain CTBC's motion before considering the merits of the motion.[10]  The Court finds that it retains jurisdiction to resolve

---

[10] CTBC's brief does not discuss the effect of Defendants and Relief Defendant Yue's interlocutory appeal on this Court's jurisdiction to consider the instant motion.

CTBC's motion to modify the Preliminary Injunction because the proposed modification preserves the status quo pursuant to Rule 62(d) in light of the deteriorating condition of CTBC's collateral pending appeal.

### A.   Legal Standard

As a general rule, "the filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). However, this "divestiture of jurisdiction rule is . . . not a *per se* rule." *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996). "[R]ooted in the interest of judicial economy," this rule is "judicially crafted," and therefore, "its application is guided by concerns of efficiency and is not automatic." *Id.* (citing *Webb v. GAF Corp.*, 78 F.3d 53, 55 (2d Cir. 1996); *United States v. Salerno*, 868 F.2d 524, 539–40 (2d Cir. 1989)). In fact, the filing of a notice of appeal does not completely divest a district court of jurisdiction to modify its interlocutory rulings, because "[a] trial court has a long established right to make orders appropriate to preserve the *status quo* while a case is pending on appeal." *Abdi v. Nielsen*, 287 F. Supp. 3d 327, 332 (W.D.N.Y. 2018) (quoting *Barringer v. Griffes*, 810 F. Supp. 119, 120 (D. Vt. 1992)); *see also Newton v. Consol. Gas Co. of New York*, 258 U.S. 165, 177 (1922) ("Undoubtedly, after appeal the trial court may, if the purposes of [j]ustice require, preserve the status quo until decision by the appellate court."); *Sys. Fed'n No. 91, Ry. Emps.' Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961) ("There is also no dispute but that a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen. The source of the power to modify is of course the fact that an injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on

11

behalf of the party who obtained that equitable relief."). This long established power of a district court to modify an injunction during the pendency of an appeal is codified in Rule 62(d) as follows:

> While an appeal is pending from an interlocutory order . . . that grants . . . an injunction, the court may . . . modify . . . an injunction on terms for bond or other terms that secure the opposing party's rights.

Fed. R. Civ. P. 62(d)[11]; *see also Flatiron Health, Inc. v. Carson*, 602 F. Supp. 3d 482, 486 (S.D.N.Y. 2020) ("Rule 62(d) 'codifies the inherent power of courts to make whatever order is deemed necessary to preserve the status quo and to ensure the effectiveness of the eventual judgment.'" (quoting 11 Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. § 2904 (3d ed. 2019))).

Consistent with Rule 62(d), the Second Circuit recognizes that district courts may "modif[y] . . . injunction orders during the pendency of an appeal . . . to preserve the status quo where, in its sound discretion, the court deems the circumstances to justify."[12]  *Ideal Toy Corp. v.*

---

[11] Prior to the 2018 amendments to Rule 62, which went into effect December 1, 2018, the text that currently comprises subdivision (d) of the Rule was located at subdivision (c). *See* Fed. R. Civ. P. 62 Advisory Comm.'s Notes to 2018 Amends.  The Advisory Committee's notes state that the 2018 amendments "reorganized" the subdivisions but "[t]here is no change in meaning." *Id.*  Accordingly, the Court has considered caselaw analyzing Rule 62(d) as originally numbered and as currently re-numbered.

[12] The Second Circuit's position is consistent with those of several other circuits, which have held that a district court may modify an injunction to maintain the status quo pending an appeal. *See, e.g.*, *Coastal Corp. v. Texas E. Corp.*, 869 F.2d 817, 820 (5th Cir. 1989) ("Having reviewed the existing case law throughout the circuits and paying proper respect to Rule [62(d)], we are persuaded that the powers of the district court over an injunction pending appeal should be limited to maintaining the status quo[.]"); *Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001) ("The district court retains jurisdiction during the pendency of an appeal to act to preserve the status quo."); *FemHealth USA, Inc. v. Williams*, 83 F.4th 551, 556 (6th Cir. 2023) ("When a court issues an injunction, it does so based on its assessment of the circumstances that bear on the need for prospective relief.  Preliminary injunctions require courts to make that assessment at an early stage of the litigation so as to maintain the status quo pending determination of an action on its merits.  But as a case progresses, subsequent changes in the law or facts may threaten to convert a previously proper injunction into an instrument of wrong[.]  For that reason, district courts retain the power to modify or dissolve preliminary injunctions to account for

*Sayco Doll Corp.*, 302 F.2d 623, 625 (2d Cir. 1962) (internal quotation marks and citations omitted); *see also Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. E. Air Lines, Inc.*, 847 F.2d 1014, 1018 (2d Cir. 1988) ("[Rule 62(d)] has been narrowly interpreted to allow district courts to grant only such relief as may be necessary to preserve the status quo pending an appeal where the consent of the court of appeals has not been obtained.").

For the purposes of Rule 62(d), courts have held that effectuating the underlying purpose of a preliminary injunction is one way of "preserving the status quo." *See, e.g.*, *Nat. Res. Def. Council, Inc.*, 242 F.3d at 1166–67 (holding that the trial court's modifications to the injunction preserved the status quo because the modifications "effectuated the underlying purposes of the original requirements" of the injunction during the pendency of an appeal); *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 503 (5th Cir. 1980) (holding that a district court may modify a preliminary injunction to preserve the status quo "when the original purposes of the injunction are not being fulfilled in any material respect" (internal quotation marks and citations omitted)); *Vasile v. Dean Witter Reynolds, Inc.*, No. 99-7297, 2000 WL 236473, at *2 (2d Cir. Feb. 14, 2000) (summary order) (affirming the district court's authority in amending the original injunction pending appeal to effectuate the purpose of the original injunction in enjoining the plaintiff from initiating new civil actions against certain defendants); *Hoffman v. Beer Drivers & Salesmen's Local Union No. 888*, 536 F.2d 1268, 1276 (9th Cir. 1976) (holding that in cases "where the court supervises a continuing course of conduct" pursuant to an injunction and new facts develop that require the court's additional supervisory action, an appeal from the original order "does not divest the district court of jurisdiction to continue its supervision, even though in

---

significant intervening changes in the law or facts[.]" (internal quotation marks and citations omitted)).

the course of that supervision the court acts upon or modifies the order from which the appeal is taken"); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 578–79 (5th Cir. 1996) ("[P]art of the 'status quo' of this action is that the court's injunction has ongoing effect, and that effect was subject to change depending upon subsequent developments.  The court did not exceed its authority in stepping in to supervise this change through an amendment of its original order.  Accordingly, we hold that the district court had jurisdiction under Rule [62(d)] to amend its original order with respect to the injunction.").

In addition, courts have interpreted "preserving the status quo" as requiring that any modifications to the preliminary injunction would not materially alter the posture of the case on appeal.  *See Flatiron Health, Inc.*, 602 F. Supp. 3d at 486 ("[W]hen [modifying] injunctions while an appeal is pending, district courts must ensure that any [modifications] are 'consistent with the spirit' of the court's original injunction such that they do not materially alter the status of the case on appeal." (quoting *United States v. Spectrum Brands, Inc.*, No. 15-CV-371 (WMC), 2018 WL 502736, at *1, 3 (W.D. Wis. Jan 19, 2018))).  As such, a controversy will still exist once the appeal is heard or the core questions on appeal will remain unchanged by a district court's modification. *See, e.g.*, *Broker Genius Inc. v. Seat Scouts LLC*, No. 17-CV-8627 (SHS), 2019 WL 452050, at *3 (S.D.N.Y. Feb. 5, 2019) ("[M]aintaining the status quo means that a controversy will still exist once the appeal is heard, [so] any action on the district court's part which has the effect of divesting the court of appeals of its jurisdiction over the matter, by eliminating the controversy prior to the hearing of the appeal, is inappropriate." (quoting 12 Moore's Fed. Prac. § 62.06 (2018))); *Nat. Res. Def. Council*, 242 F.3d at 1167 (upholding the district court's modifications to the preliminary injunction because they "left unchanged the core questions before the appellate panel deciding the consolidated appeal"); *Armstrong v. Brown*, 732 F.3d 955, 959 n.6 (affirming the district court's

14

modification to the injunction to preserve the status quo because the questions before the court of appeal remained unchanged and thus the status of the case on appeal remained unaltered by the modification).

**B.     The Court Retains Jurisdiction to Modify the Preliminary Injunction**

In considering CTBC's motion, the Court is mindful of the limitations on its jurisdiction while Defendants and Relief Defendant Yue's appeal of the Preliminary Injunction remains pending.  The Court finds that it retains jurisdiction to modify the Preliminary Injunction pursuant to Rule 62(d) because the modification sought by CTBC is essential to preserve the status quo pending a decision by the Second Circuit, in that it: (1) effectuates the underlying purpose of the Preliminary Injunction at the time the appeal was filed, and (2) does not materially alter the posture of the case on appeal.

1.     The Proposed Modification Effectuates the Underlying Purpose of the Preliminary Injunction

In evaluating CTBC's modification motion, the Court finds *FTC v. Noland*, a Federal Trade Commission (the "FTC") enforcement action that presents similar circumstances as this case, instructive.  *See* No. 20-CV-47 (PHX) (DWL), 2023 WL 8530069 (D. Ariz. Dec. 8, 2023).  In *Noland*, as here, the district court issued a preliminary injunction that, among other things, instituted an asset freeze as to the defendants.  *See generally Noland*, No. 20-CV-47 (PHX) (DWL), Dkt. 109.  The frozen assets included certain real and personal properties that served as collateral for several third-party secured creditors of the defendants.  *See id.*, Dkt. 598, at 2. Pursuant to the preliminary injunction, those third-party creditors were prohibited from selling or otherwise disposing of the defendants' assets in which the creditors had security interests.  *See id.*, Dkt. 109, at 6–7 (ordering that any third-party business entity or person with actual notice of the preliminary injunction who held, controlled, or maintained any asset owned or controlled by any

defendant was required to "prohibit the withdrawal, removal, alteration . . . , or other disposal of any such [frozen a]sset . . . except by further order of this [c]ourt").  After the court granted the preliminary injunction, the FTC filed a motion asking the court to modify the asset freeze to allow those secured creditors to exercise their rights to monetize the defendants' real and personal property assets that were subject to the freeze.[13]  *See id. generally*, Dkt. 598.  The defendants thereafter filed a notice of appeal, challenging, *inter alia*, the court's preliminary injunction, including the provisions prohibiting the third-party creditors from disposing of their collateral that was subject to the freeze.  *See id.*, Dkt. 601, at 2; *see also generally FTC v. Noland*, No. 23-3757 (9th Cir.).

Mindful of the jurisdictional constraints imposed by the defendants' interlocutory appeal, the *Noland* court found that it had continued jurisdiction under Rule 62(d), because the requested modification "would not materially alter the status of the case on appeal and would maintain the status quo among the parties."  *Noland*, 2023 WL 8530069, at *3.  In particular, as the court explained, the proposed modification was "fully consistent with overarching purpose of the asset freeze" at issue in that case—which was to "prevent the improper dissipation of the [defendants'] assets," to "protect the FTC's ability to collect on a future judgment," and thus to "preserve funds to be returned to [d]efendants' victims[.]"  *Id.* at *2, 3.  In addition, the court noted that the preliminary injunction already set forth a process under which the court could allow the secured creditors to enforce their rights to the defendants' frozen assets.  *Id.* (explaining that the preliminary injunction prohibited disposal of any frozen assets "except by further order of this [c]ourt" (citation omitted)).  Accordingly, after finding that it had retained jurisdiction, the court

---

[13] The FTC also noted that because its "unsecured judgment interest [could not] trump creditors' secured interests perfected before the initiation of this action, the asset freeze also prevent[ed] the FTC from collecting on its judgment."  *See id.*, Dkt. 598, at 2.

modified the preliminary injunction to (1) allow the secured creditors to exercise their rights as to the frozen assets at issue, and (2) order that "the asset freeze . . . remain in place for any net proceeds that otherwise would be due [to the defendants] from the sale of [the defendants'] real property and personal property until [the defendants] satisf[ied] the [j]udgment" in that case.  *Id.* at *3–4.

The Court agrees with the reasoning of *Noland* and finds that it similarly retains jurisdiction to modify the Preliminary Injunction in this action.  Here, the modification proposed by CTBC to the Preliminary Injunction is similar to the one approved in *Noland*.  Like *Noland*, the Preliminary Injunction in this case exists to preserve the assets owned and controlled by Defendants and Relief Defendants, to protect the SEC's right to recover its judgment against Defendants, and ultimately to provide redress to the injured investors.  Currently, the Preliminary Injunction prevents Defendants, Relief Defendants, and anyone with an interest in those assets, including CTBC, from disposing of the frozen assets, including the Secured Units and TCDs.  However, since the Preliminary Injunction was issued and the notice of appeal was filed in December 2022, the circumstances surrounding CTBC's loans and collateral have significantly changed.  When the Preliminary Injunction was issued, the total amount that remained outstanding under the CTBC mortgage loans was approximately $7,478,221.64, consisting of $6,535,750 in unpaid principal, $347,892.51 in outstanding interest, $22,701 in late charges, and $571,878.13 in default interest. *Xia*, 2024 WL 964676, at *11.  As of April 3, 2024, however, that number has reached $8,386,970.63, including the total principal balance of $6,535,750, unpaid interest of $656,979.02, late charges of $45,402, and default interest of $1,148,839.61.[14]  (*See* CTBC Br., at 9–10.)  In the

---

[14] According to CTBC, these amounts do not even include CTBC's enforcement costs and protective advances (e.g., for real estate taxes), which are also secured under the mortgage loans. (*Id.* at 10.)

meantime, the Secured Units—the primary collateral securing CTBC's mortgage loans—have been inadequately managed by Xia: Xia has failed to timely renew the insurance policies or to pay the property taxes due on the properties; Xia has failed to notify CTBC when most of the commercial units become vacant; and Xia marketed certain vacant units for rent at well-below market rates and for sale in violation of the loan terms.  (*See id.* at 7–8.)  As a result of this mismanagement, the condition of the Secured Units has deteriorated and the property value has significantly declined and continued to depreciate since the Preliminary Injunction was issued, while interest, penalties, late charges, and significant property tax arrearages continue to accrue.  When the properties were appraised in mid-to-late 2022, they held a total appraised value of $7,575,000.  (*Id.* at 6; *see also* Sarwar Decl., Dkt. 408, at 17.)  However, the most recent reappraisal reports from November 2023 value these units at $6,393,500—a diminution of approximately $1.18 million in just one year.[15]  (*Id.* at 6; *see also* Sarwar Decl., Dkt. 408, at 17.)  In fact, as CTBC has pointed out, at their current value, the Secured Units are inadequate to secure the CTBC mortgage loans.  (*See* CTBC Br., at 6, 11.)

The two TCDs, CTBC's collateral for the two business loans, are in a similar situation: interest, various fees, and penalties continue to accrue on the two matured and unpaid loans.  (*Id.* at 13.)  At the time when the Preliminary Injunction was issued, the total arrearage that remained outstanding under the two loans was $16,055,249.10, including unpaid principal of $14,500,000, outstanding interest of $299,277.75, late charges of $6,957.46, and default interest of $1,249,013.89.  *Xia*, 2024 WL 964676, at *11.  However, as of April 3, 2024, the total arrearage

---

[15] When the Secured Units were initially appraised in 2021, they held a total appraised value of $10,055,000.  (CTBC Br., at 6; *see also* Sarwar Decl., Dkt. 408, at 16.)  Thus, the assessed value of the properties has depreciated by more than $3.6 million—a 36% depreciation in value—since CTBC extended the loans in August 2021.  (CTBC Br., at 6, 11.)

was $17,591,282.44, including the total principal balance of $14,500,000, unpaid interest of $555,283.31, late charges of $6,957.46, and default interest of $2,529,041.67. (CTBC Br., at 13.)

The continued dissipation of CTBC's collateral will not only impair CTBC's interests but will also harm the SEC and the defrauded investors by reducing the funds available for compensating the investors. Therefore, modifying the Preliminary Injunction to release CTBC's collateral and to allow it to manage the assets will protect against further diminution in value of the assets and thus limit the further decrease in funds available for distribution to the investors. This is wholly consistent with the underlying purpose and the spirit of the Preliminary Injunction and thus preserves the status quo. By contrast, denying CTBC's modification request would inevitably lead to further waste and dissipation of its collateral, and thus would significantly reduce the amount of money that could be realized from the collateral for the benefit of investors, which would be contrary to the overarching purpose of the Preliminary Injunction.

Furthermore, as in *Noland*, the Preliminary Injunction here sets forth a process under which "any party or non-party[, including creditors,] may seek leave from [the Preliminary Injunction] upon a proper showing[.]" *Xia*, 2022 WL 20543271, at *2. Again, as in *Noland*, because CTBC is a secured creditor, releasing its collateral from the asset freeze does not diminish the amount of assets or money that can be subject to disgorgement in this case. At the same time, because any excess fund from the foreclosure sale of the Secured Units remains frozen under the Preliminary Injunction, releasing that collateral to CTBC could increase the amount of money available for disgorgement to compensate the injured investors.

2.      The Proposed Modification Would Not Materially Alter the Posture of the Case on Appeal

The proposed modification to the Preliminary Injunction also would not alter the posture of the appeal, as the core questions presented to the Second Circuit would remain unaffected by the modification and the controversy on appeal would still exist.

The core issues on appeal are: (1) whether the Second Circuit's decision in *Govil*, issued after the Preliminary Injunction had been entered, and specifically the "pecuniary harm" requirement set forth in *Govil*, are applicable to the asset freeze at issue in this action; (2) whether the proper amount that this Court had authority to freeze for a potential later disgorgement award should be the entire investment amount that Defendants raised from the EB-5 investors, or should be limited to the specific funds that Defendants allegedly misappropriated; and (3) whether this Court had the discretion to take into account civil penalties when determining the scope of the asset freeze. CTBC's proposed modification to the Preliminary Injunction, which seeks to prevent the further diminution in the value of CTBC's collateral, does not touch upon any of these core issues and thus would not eliminate the controversy on appeal. Thus, releasing CTBC's collateral from the asset freeze maintains the status quo.

\*      \*      \*

Accordingly, pursuant to Rule 62(d), the Court concludes that it retains jurisdiction over this matter to rule on CTBC's motion to modify the Preliminary Injunction to preserve the status quo during the pendency of the appeal.[16] In the alternative, should this Court lack the authority to

---

[16] This conclusion is consistent with this Circuit's precedent that a district court has authority to supplement its orders "in aid of the appeal" while an appeal is pending. *See, e.g.*, *United States v. Gonzalez-Reyes*, No. 20-2303, 2022 WL 963771, at \*2 n.2 (2d Cir. Mar. 31, 2022) (recognizing that, even after an appeal is noticed, "a district court may still clarify its findings 'in aid of the appeal'" (citation omitted)); *United States v. Nichols*, 56 F.3d 403, 411 (2d Cir. 1995) (holding that the district court's "supplemental finding was a permissible act in aid of this appeal").

consider CTBC's motion, this Memorandum & Order shall also serve as the Court's indicative ruling pursuant to Rule 62.1 that the Court would grant the motion to modify the Preliminary Injunction if the Second Circuit remands this case for that purpose. *See* Fed. R. Civ. P. 62.1(a) (providing that if a party brings a motion "that the court lacks authority to grant because . . . an appeal . . . is pending, the court may . . . state [] that it would grant the motion if the court of appeals remands for that purpose"); *see also Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 159 n.4 (2d Cir. 2014) ("Rule 62.1 . . . authorizes a district court whose jurisdiction has been divested by an appeal to 'state . . . that it would grant the motion if the court of appeals remands for that purpose[.]'" (quoting Fed. R. Civ. P. 62.1(a)(3))).

## II.    CTBC's Motion to Modify the Preliminary Injunction

Having addressed the jurisdictional issue, the Court now turns to the substance of the modification that CTBC seeks.  Here, CTBC requests that the Court modify the Preliminary Injunction to release the Secured Units and TCDs from the asset freeze, and allow CTBC to take protective measures to preserve the value of those assets.  Largely for the reasons already discussed, the Court finds that CTBC has proffered uncontested evidence of changed circumstances that warrants modifying the Preliminary Injunction to release the Secured Units and the TCDs from the asset freeze.

---

In fact, previously the Court—based on the voluminous record in this action—supplemented its order to aid the Second Circuit while the appeal of that order was pending.  (*See* 2/27/2023 Suppl. Order (supplementing "the Court's concise []2/16/2023 Order" denying Relief Defendant Xi Verfenstein a hearing with respect to the asset freeze to "aid the appeal process and clarify the factual and legal bases" for the 2/16/2023 Order, particularly in light of "the voluminous nature of the record—consisting of thousands of pages of exhibits and briefs").)  The Court now finds that a supplemental finding would similarly aid the appeal process by clarifying the changing factual circumstances underlying the Preliminary Injunction.

A.      **Legal Standard for Modifying a Preliminary Injunction**

In deciding whether to modify a preliminary injunction, "a court is charged with the exercise of the same discretion it exercised in granting or denying injunctive relief in the first place."[17] *Sierra Club v. U.S. Army Corps of Engineers*, 732 F.2d 253, 256 (2d Cir. 1984); *see also Dist. Att'y of New York Cty. v. Republic of Philippines*, 681 F. App'x 37, 41 (2d Cir. 2016) (summary order) (explaining that "[t]he same standard applies to modification of an injunction" as to the initial granting of a preliminary injunction (citation omitted)).  A party seeking to modify a preliminary injunction bears the burden to show that the modification is justified.  *See SEC v. CKB168 Holdings, Ltd.*, No. 13-CV-5584 (RRM) (RLM), 2017 WL 4465726, at *4 (E.D.N.Y. June 20, 2017) (citation omitted), *R&R adopted*, 2017 WL 4358749 (E.D.N.Y. Sept. 27, 2017). While in the Second Circuit "the burden on a party seeking to modify a preliminary injunction is not entirely clear[,]" *Lawsky v. Condor Cap. Corp.*, No. 14-CV-2863 (CM), 2014 WL 3858496, at *5 (S.D.N.Y. Aug. 1, 2014), *appeal withdrawn*, No. 14-3116 (2d Cir. Dec. 8, 2014), a number of district courts in this Circuit have required a moving party to demonstrate that there has been a "significant change in facts or law" that justifies the modification.  *See, e.g.*, *Ideavillage Prods. Corp. v. Bling Boutique Store*, No. 16-CV-9039 (KMW), 2017 WL 1435748, at *3 (S.D.N.Y. Apr. 21, 2017) (holding that a district court may modify a preliminary injunction only when it is "justified by a significant change in facts or law" (internal quotation marks and citations omitted)); *CKB168 Holdings, Ltd.*, 2017 WL 4465726, at *4 ("[A]n applicant for modification of a

---

[17] "A party seeking a preliminary injunction must ordinarily establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks omitted).

preliminary injunction must furnish credible evidence of a significant change in facts or law, or bring forward factual matters, that had the Court considered them, might have reasonably altered the result." (internal quotation marks and brackets omitted)); *Lawsky*, 2014 WL 3858496, at *5 (same); *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 427 F. Supp. 2d 491, 501 (S.D.N.Y. 2006), *aff'd*, 246 F. App'x 73 (2d Cir. 2007) (summary order) ("A preliminary injunction may be modified if the moving party demonstrates that a material change in circumstances justifies the alteration."); *SEC v. Illarramendi*, No. 11-CV-78 (JBA), 2014 WL 545720, at *3 (D. Conn. Feb. 10, 2014) ("A party seeking relief bears the burden of establishing that there has been a change of circumstances that warrants relief."); *Superb Motors Inc. v. Deo*, No. 23-CV-6188 (JMW), 2024 WL 2079928, at *5, 6 (E.D.N.Y. May 8, 2024) (same).

Other circuits have applied a similar standard. *See, e.g.*, *Ahmad v. City of St. Louis*, 995 F.3d 635, 640 (8th Cir. 2021) ("Modifying . . . a preliminary injunction is proper only when there has been a change of circumstances . . . that would render the continuance of the injunction in its original form inequitable." (internal quotation marks and citation omitted)); *Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 414 (6th Cir. 2012) ("To obtain modification . . . of an injunction, a movant must demonstrate significant changes in fact, law, or circumstance since the previous ruling." (internal quotation marks and citation omitted)); *A & M Recs., Inc. v. Napster*, 284 F.3d 1091, 1098 (9th Cir. 2002) ("A district court has inherent authority to modify a preliminary injunction in consideration of new facts."); *Favia v. Indiana Univ. of Pa.*, 7 F.3d 332, 340 (3d Cir. 1993) ("In order to prevail on a motion to modify, the movant must establish a change in circumstances that would make the original preliminary injunction inequitable[.]"); *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, No. 94-2569, 1995 WL 406612, at

*2 (4th Cir. July 11, 1995) (noting that "modification of a preliminary injunction requires changed circumstances").

In deciding whether to modify an asset freeze in securities fraud proceedings, the court must weight "the disadvantages and possible deleterious effect of a freeze" against "the considerations indicating the need for such relief." *S.E.C. v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972), *abrogated on other grounds by SEC v. Ahmed*, 72 F.4th 379 (2d Cir. 2023). In particular, the court must consider whether the requested modification would be "in the best interests of the defrauded investors." *S.E.C. v. McGinn, Smith & Co., Inc.*, No. 10-CV-457 (GLS) (CFH), 2014 WL 675611, at *3 (N.D.N.Y. Feb. 21, 2014).

## B.    Modification of the Preliminary Injunction is Warranted

Here, CTBC has shown a significant change in factual circumstances surrounding its collateral since the Court issued the asset freeze that warrants a modification of the Preliminary Injunction. As previously discussed, when the Court first considered the SEC's motion for a preliminary injunction in 2022, the Court inquired into, among other things, whether Xia's 15 rental properties, including the Secured Units, should be released from the scope of the asset freeze. *See Xia*, 2022 WL 17539124, at *29–30. After considering several factors—including the number of lawsuits currently pending against Defendants all seeking to obtain the same frozen assets, the high illiquidity of Defendants' main assets, Defendants' apparent disregard for the TRO, and the possibility that the rental properties would dissipate if left unfrozen and unmonitored—the Court concluded that "it would be ill-advised to release the rental properties from the scope of the asset freeze at this stage." *Id.* at *31. Accordingly, based on this evaluation, the Court ordered that the Secured Units remain frozen under the Preliminary Injunction to "ensure full recovery in this matter and to prevent the dissipation of Defendants' assets that can be applied toward satisfying any judgment[.]" *Id.* at *30.

However, CTBC's recent submissions show that the circumstances surrounding its collateral have significantly changed since the entry of the Preliminary Injunction. As discussed *supra*, the Secured Units and the TCDs have continued to deteriorate and have substantially depreciated in value during the pendency of this action while significant liabilities continue to accumulate. *See* discussion *supra* Section I.B.1. Given the dramatic change in circumstances surrounding CTBC's collateral, it is clear that maintaining the asset freeze against the Secured Units and the TCDs would result in the further deterioration and devaluation of those assets, which would harm not only CTBC's interests, but those of the investors—an outcome that undermines the central purpose of the Preliminary Injunction. At this stage, unfreezing CTBC's collateral is the only way to prevent further diminution in the value of those assets and to potentially enable full recovery of the value of those assets. The Court therefore finds that the changed circumstances relating to CTBC's collateral justify the requested modification to the Preliminary Injunction to unfreeze those assets.

## III.     CTBC's Motion to Appoint a Receiver

CTBC also requests that the Court appoint a receiver and specifically recommends the appointment of Ian Lagowitz as the receiver to oversee and manage the Secured Units in order to prevent further dissipation and diminution of the Secured Units. (*See* CTBC Br., at 14–17.) For the reasons explained below, the Court finds that the circumstances warrant the immediate appointment of Mr. Lagowitz as the receiver for the Secured Units.

### A.     Legal Standard for Appointing a Receiver

"A federal court has the power in equity to appoint a receiver in order to protect a party's interest in property." *Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 365 (S.D.N.Y. 2000) (citing Fed. R. Civ. P. 66); *see also e.g.*, *SEC v. Byers*, 609 F.3d 87, 92 (2d Cir. 2010) ("There is no question that district courts may appoint receivers as part of their broad power to remedy violations

25

of federal securities laws."); *U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*, 866 F. Supp. 2d 247, 257 (S.D.N.Y. 2012) ("The Court's equitable power to appoint a receiver extends to situations where a plaintiff who is a secured creditor seeks the appointment of a receiver to avoid a substantial and preventable decline in the value of its collateral[.]").  In securities litigation, "courts have appointed receivers for several valid purposes, including 'marshal[ing] the assets of the defendant[s],' 'prevent[ing] the dissipation of [the defendants'] assets pending further action by the court,' and 'investigat[ing] the defendant[s'] transactions.'" *SEC v. Amerindo Inv. Advisors, Inc.*, No. 05-CV-5231 (RJS), 2013 WL 1385013, at *13 (S.D.N.Y. Mar. 11, 2013) (quoting *Eberhard v. Marcu*, 530 F.3d 122, 131 (2d Cir. 2008)), *aff'd*, 639 F. App'x 752 (2d Cir. 2016) (summary order).

The appointment of a receiver is considered to be a "drastic remedy" that should be imposed "only where no lesser relief will be effective.  *Ferguson v. Tabah*, 288 F.2d 665, 674 (2d Cir. 1961).  Even so, "[a] decision to appoint or not to appoint a receiver is committed to the sound discretion of the trial court." *Varsames*, 96 F. Supp. 2d at 365 (citing *Rosen v. Siegel*, 106 F.3d 28, 34 (2d Cir. 1997)).  In determining whether to appoint a receiver, courts in this Circuit generally consider the following factors (the "Wright and Miller factors"):

1)  [any f]raudulent conduct on the part of [the] defendant;

2)  the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered;

3)  the inadequacy of the available legal remedies;

4)  the probability that harm to [the] plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and,

5)  in more general terms, [the] plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

*Id.* (citing 12 Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. § 2983 (1999)); *see also e.g.*, *Kleeberg v. Eber*, 665 F. Supp. 3d 543, 606 n.293 (S.D.N.Y. 2023) (quoting the Wright and Miller factors); *U.S. Bank Nat'l Ass'n*, 866 F. Supp. 2d at 249–50 (same).  None of the individual Wright and Miller factors is dispositive.  *SEC v. GPB Cap. Holdings, LLC*, No. 21-CV-583 (MKB) (VMS), 2023 WL 8468467, at *14 (E.D.N.Y. Dec. 7, 2023); *see also Amerindo Inv. Advisors, Inc.*, 2013 WL 1385013, at *13 (appointing a receiver based on evidence of only three of the five Wright and Miller factors).  "The dispositive issue is whether the appointment of a receiver is clearly necessary to protect [a party's] interests in the property."  *U.S. Bank Nat'l Ass'n*, 866 F. Supp. 2d at 254 (internal quotation marks and citation omitted).  A party seeking the appointment of a receiver bears the burden to make an "adequate showing" of need for the appointment.  *See id.* at 250.

### B. The Appointment of a Receiver is Warranted

The Court finds that the majority of the Wright and Miller factors as well as the Second Circuit caselaw favor the immediate appointment of Mr. Lagowitz as the receiver for the Secured Units.

As an initial matter, the Court notes that CTBC does not seek to justify receivership on the basis of the first factor, fraud.  Nevertheless, courts have "appointed receivers even where there was no evidence of fraud."  *D.B. Zwirn Special Opportunities Fund, L.P. v. Tama Broad., Inc.*, 550 F. Supp. 2d 481, 491 & n.64 (S.D.N.Y. 2008).  The Court finds that all of the other Wright and Miller factors weigh in favor of appointing a receiver.

First, the Court finds that CTBC has met its burden of showing that the Secured Units are in imminent and serious danger of suffering further waste and diminution in value.  "[T]he existence of any imminent danger of the diminution of the value of the propert[y] . . . is a critical factor in the analysis of whether to appoint a receiver."  *U.S. Bank Nat. Ass'n*, 866 F. Supp. 2d at

27

250.  As previously discussed, the rental units at issue here have been inadequately managed by Xia since the commencement of this action, and as a result, have deteriorated during the pendency of this action.  *See* discussion *supra* Section I.B.1; (*see also* CTBC Br., at 7–8.)  Xia's mismanagement has presented the Secured Units with a significant danger of loss or waste.  As noted above, the most recent appraisal report indicates that, as of November 2023, the value of the Secured Units has depreciated by more than $3.6 million, or 36%, in less than two and a half years since CTBC extended the loans in August 2021.  (CTBC Br., at 6, 15–16.)  Because of this stark decline in value, CTBC represents that the proceeds from the foreclosure of the properties may be insufficient to cover the principal debt owed to CTBC, let alone the accruing interest, fees, and other costs secured by the collateral.  (*Id.* at 11.)  The Court accordingly finds that the "ongoing deterioration of the value [] of the [Secured Units] coupled with [Xia's] inability to manage the [rental units] are enough to show the existence of an imminent danger of the diminution of value of the property[.]"  *Neli Int'l Inc. v. Premier Rest. Grp., LLC*, No. 23-CV-2725 (ALC), 2023 WL 3412771, at *5 (S.D.N.Y. May 12, 2023); *see also Kairos Credit Strategies Operating P'ship, LP v. Friars Nat'l Ass'n, Inc.*, No. 23-CV-2960 (JPO), 2023 WL 3675921, at *2–3 (S.D.N.Y. May 26, 2023) (finding that imminent danger established based on evidence showing, *inter alia*, lack of adequate insurance coverage and vacancy of the property); *cf. JDP Mortg. LLC v. Gosman*, No. 19-CV-5968 (JS) (SIL), 2020 WL 8082390, at *3 (E.D.N.Y. Dec. 21, 2020) (finding no imminent danger of the diminution of the value of the property because the plaintiff failed to submit any reliable documentation regarding the current value of the property or the amount by which the value of the property had been diminished), *R&R adopted*, 2021 WL 66290 (E.D.N.Y. Jan. 7, 2021).

Second, based on the Court's finding of imminent danger, the Court further finds that CTBC has shown the possibility of irreparable injury to its interests as a result of the imminent danger of further diminishment faced by the Secured Units. *See Neil Int'l Inc.*, 2023 WL 3412771, at *5 (finding that the "ongoing threats of deterioration of the value and assets of the businesses coupled with [the defendant's] alleged inability to manage the business" sufficiently demonstrated "the existence of an imminent danger of the diminution of value of the property and that [the p]laintiff [would] suffer irreparable injury").

Furthermore, CTBC has demonstrated that less drastic legal remedies are unavailable or inadequate. Here, CTBC's "only available legal remedy in this case is to foreclose on the [Secured Units[,]" because the properties and "the rents collected on them are the sole collateral for the [mortgage loans] and the only assets on which [CTBC] may recover given [Xia and his entities' defaults]." *Wilmington Trust v. 31 Prince St., LLC*, No. 22-CV-5855 (JGK), 2023 WL 414249, at *4 (S.D.N.Y. Jan. 25, 2023). While Xia pledged to personally guarantee the loans, that guarantee does not appear to be available or adequate given Xia's default on the loans and mismanagement of the properties. Therefore, although receivership is a "drastic remedy," no lesser relief will be effective at preventing further damage to the Secured Units and irreparable injury to CTBC's property interests pending resolution of this litigation.

Moreover, a comparison of the probability of harm to CTBC and to Xia further militates in favor of appointing a receiver. Here, CTBC claims significant risks of further harm stemming from inadequate management of the Secured Units. By contrast, Xia has not even contested or otherwise taken any position as to the appointment of a receiver, and therefore, the potential for injury to Xia if a receiver were appointed remains unclear. Given the evidence presented of the diminishing value of CTBC's collateral and Xia's default on his CTBC loans, as well as Xia's

failure to respond to CTBC's motion or contest any of CTBC's factual representations, the Court finds that this factor supports the appointment of a receiver.

Finally, the Court concludes that Mr. Lagowitz is qualified to serve as the receiver during the pendency of this action or until further order of the Court.  Mr. Lagowitz is a managing partner with Trigild, President of IVL Group, LLC, and President and Broker of Record of Alman Realty Group, LLC.  (*See* Bruno Decl., Dkt. 407-1, Ex. 1, at ECF 2.)  He has over 30 years of experience in asset and property management, asset recovery and disposition, and asset receiverships, and has specialized experience serving as a court-appointed receiver for real properties in New York.  (*See id.* at ECF 2–3; CTBC Br., at 17.)  As such, Mr. Lagowitz is familiar with the duties and responsibilities of a receiver in a situation such as this.  Further, as noted, neither the SEC, Defendants, nor Relief Defendants has submitted any opposition to Mr. Lagowitz's appointment.

Therefore, after carefully weighing the equities—including the imminent risk that the value of the Secured Units will irreversibly dissipate, the inadequacy of available legal remedies to CTBC, the possibility of irreparable injury to CTBC, and the comparison of the probability of harm to CTBC and to Xia—and considering the qualifications of the recommended receiver, the Court finds it appropriate to exercise its equitable power to appoint Mr. Lagowitz as receiver to oversee and manage the Secured Units.

## CONCLUSION

For the foregoing reasons, CTBC's motion to modify the Preliminary Injunction and to appoint a receiver is granted.  The Court will enter CTBC's proposed order.  All other provisions of the original Preliminary Injunction remain in full effect.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen

30

United States District Judge

Dated: July 9, 2024
      Brooklyn, New York