Memorandum

TO:            Robert J. Hartman
FROM:          Daniel B. Lundy, Chiesa Shahinian & Giantomasi PC
DATE:          February 11, 2025
RE:            Securities Exchange Commission v. Xia, et al. U.S. Dist. Ct., Dkt. No. 21- Civ-
               5350 (PKC)(JAM)  Immigration Overview


Dear Mr. Hartman:

I am providing this memorandum at the request of John Leo to help describe the guiding immigration principles governing the investors' green card processes, and the specific issues relevant to the investors' continued pursuit of a green card through their investments in the related entities.

Please note that although I have extensive experience with both EB-5 and restructuring troubled projects, the EB-5 statutes and regulations leave many gaps to fill, and USCIS policy is not always clear or consistent with regards to the issues.  While I believe that there is a strong chance that investors who wish to remain invested in the project can successfully complete the immigration process,  assuming the correct steps are taken to address the issues below, I can never guarantee the outcome of any particular application or petition.


**Background on the EB-5 Program**

The EB-5 program allows an investor who makes a qualifying investment in a new commercial enterprise ("NCE") in the U.S. that results in the creation of at least 10 new jobs for U.S. workers to apply for a green card under the EB-5 program.

In order to become a lawful permanent resident ("LPR") of the United States through the regional center program, a foreign national must initially file with USCIS a Form I-526, Immigrant Petition by Alien Entrepreneur, which, if approved, makes the foreign national eligible to receive an EB-5 immigrant visa. See generally 8 U.S.C. §1153(b)(5). Upon approval of the I-526 Petition, the foreign national must file a Form I-485, Application to Register Permanent Residence or Adjust Status  (if he or she is located in the United States), or a Form DS-260, Application for Immigrant Visa and Alien Registration (if he or she is located outside the United States). See generally 8 U.S.C. §1201 (provisions relating to the issuance of entry documents); 8 U.S.C. §1255 (provisions relating to adjustment of status).  Upon adjustment of status or admission on an EB-5 immigrant visa, the foreign national is granted two years of conditional permanent resident status, provided that the foreign national is not otherwise ineligible for admission into the United States. See generally 8 U.S.C. §1182 (provisions relating to excludable aliens). Finally, in the 90 day period immediately preceding the second anniversary of the investor being granted conditional resident status, the foreign national must file a Form I-829, Petition by Entrepreneur to Remove Conditions on Permanent Resident Status. If the foreign national has fulfilled the EB-5 requirements—i.e. has invested, sustained the investment

at risk, and the investment has resulted in the creation of at least ten jobs for U.S. workers—then the conditions will be removed and the foreign national will become an unconditional lawful permanent resident. See generally 8 U.S.C. § 1186b.

To have an I-526 petition approved, an investor must show that he or she invested $500,000 (or other applicable minimum amount) into the NCE, the investment is at risk, the investment was or will be fully deployed to the job creating activity, and the investment will result in the creatin of 10 jobs for U.S. workers.  To make a qualifying at-risk investment, the money must be placed at risk for the purposed of making a profit.  100% of the money must be deployed to the job creating activity, whether that takes place at the NCE itself or at a separate job creating entity ("JCE").

To have an I-829 petition approved, an investor must show that the investment was placed at risk, fully used in the job creating activity, sustained at risk until the end of the two-year conditional period, and that the investment created at least 10 jobs.

The EB-5 regional center program allows us to use an economic model to show job creation rather than relying only on W-2 employees of the NCE.  The model is called an input/output model.  The inputs that are typically used are qualifying construction expenditures and revenues.  For every million dollars of input, the model calculates a certain number of jobs.  Input/output models such as RIMS II, IMPLAN, and REDYN (the latter two not strictly input output models) have been accepted as reasonable methodologies by USCIS since the beginning of the regional center program in 1993.

## "Invest"

USCIS policy and applicable precedent decisions define "invest" as not only the act of investing into the NCE but having 100% the money invested into the NCE made available to the entities most closely responsible for job creation, without any deduction for administrative or other expenses.  "Made available to" the JCE usually means "transferred to" the JCE and spent in furtherance of the job-creating project, although there have been circumstances in which the money was used directly to pay project costs without first being transferred to the JCE bank account.  Although this seems to easily meet the definition of being "made available" to the job-creating activity, USCIS has almost universally questioned cases in which the money was not deposited into the JCE bank account first (such as where the money went from the NCE to a title company escrow to be used upon closing to pay project costs), and has been known to deny some of these cases (though others have been approved).  A failure to have 100% of the money deployed to the JCE can be fatal to the green card process.

## "Sustainment"

It is not enough for the investor to make an investment.  The investment must be sustained, at risk, for the entire two-year conditional residence period.  An investor who receives any return of capital prior to the end of the two-year period has not sustained his or her investment and would not qualify for a permanent green card.  Early repayment is fatal to the immigration process.

There are some nuances to USCIS policy here. In order to be an "investment," the money must be fully deployed to the job-creating activity. An investor can fail the sustainment requirement (or the investment requirement) if some or all the funds are diverted away from the job creating activity. This includes cases of misuse by the JCE, but can also include well-meaning diversions such as taking the money out of the JCE for the sake of protecting investor capital and paying the costs of a receiver or other professionals from the EB-5 investment.

## Material Change

In addition to the statutory and regulatory requirements, USCIS has developed a material change policy. This policy derives from the fact that the filing of an immigrant petition (or labor certification in the employment based immigration context) establishes an intending immigrant's place in line for a visa. Because there are more applicants than visas, a petition must be approvable when filed. A petition cannot be approved on a materially different set of facts that existed when the petition was filed (because this would give someone an earlier priority date than her or she deserved based on the facts at the time the petition was filed).

USCIS has, wrongly in our opinion, expanded this concept to include changes in EB-5 projects or business plans. Major deviations from the business plan filed with the I-526 petition may be found to be a material change, and USCIS will deny or revoke an I-526 petition when it finds there has been a material change.

This prevents an investor from investing in one NCE and EB-5 project, and then switching the investment to another project if the first one doesn't work out. Thus, once the investor picks an NCE or project, the investor has to stick it out with that project or give up the present application and start over. Starting over, in this case, would mean investing a higher amount ($800,000 instead of $500,000) and getting a new priority date with an unknown wait time for a visa.

Note, USCIS takes the position that a material change prior to an investor becoming a conditional resident is fatal to the process, but a material change after an investor becomes a conditional resident may not be as long as all the other requirements continue to be met.

Note also that the termination of a regional center or change of regional center (from one to another, not a change in ownership or management of the existing regional center) is a material change. Thus, investors are not only stuck with their NCE and their project, they are stuck with the regional center as well.

Some changes are not material. Budget or schedule changes within a reasonable range, a change in square footage or number of rooms, or similar changes that are simply the result of the JCE adapting to business conditions are not likely to be material changes. There is, unfortunately, no bright line test.

## Current Status of Investors

Our understanding is that all but one investor in the Eastern Mirage project have permanent green cards, and the last investor has passed the end of the two-year conditional residence period.

For the Eastern Emerald project, none of the investors have permanent green cards.  It appears that of the 346 total investors, only 40 have filed I-829 petitions.  11 have not had I-526 approval, and as many as 292 have not yet become conditional residents.  As such, all the investors need to sustain their investments if they wish to continue the green card process, and all but 40 are subject to the material change doctrine.

For these investors, the path to a green card requires restoring their full investments to the NCE, deploying them to the JCE, and using them, to the extend possible, in the originally contemplated project.

Using EB-5 money to pay a monitor, fines, penalties, or other administrative costs would be very problematic to the investors who still need to sustain their investments and have them fully deployed to the job-creating activity.

USCIS has historically shown little flexibility in cases where the SEC has been involved, and helping get the investors through the process has been extraordinarily challenging.

**Options for Investors**

There are always competing interests in EB-5.  USCIS administers the program in such a manner that the more prudent investment or business decisions are less prudent in terms of meeting the immigration requirements.  Should investors refine the business plan to adapt to business realities and face a material change, or proceed with a less advantageous strategy in order to facilitate the green card process, even though it might hurt their prospects for a return?  EB-5 investments typically pay investors less than they could currently earn in an FDIC insured savings account.  So why take the risk for such little profit?  The answer is always the value of a green card to the investor or his or her family.  EB-5 investors always have to weigh their investment interests against their immigration interests, and choose which is most important for them.  Only the investor and his or her family can decide which interest is more important, or how much risk is worth taking.

In making the decision, the investors need to be fully informed of the risks on both sides.

In this particular case, it appears as if the project itself continues to be viable.  Money could be deployed to the project and create the necessary jobs.  If investors take a return of capital- and even a partial return of capital- they cease to qualify for a green card, and they have essentially abandoned the process after waiting many years.  To some, getting any money back will be more important than continuing the process.  To others, a risk of loss of the money will be small in comparison to having to start the process over.  Either way, the investors should get to make an informed choice.