UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                      Plaintiff,<br><br>    -against-<br><br>RICHARD XIA, a/k/a YI XIA, and<br>FLEET NEW YORK METROPOLITAN REGIONAL CENTER, LLC, f/k/a FEDERAL NEW YORK METROPOLITAN REGIONAL CENTER, LLC,<br><br>                      Defendants,<br><br>    -and-<br><br>JULIA YUE, a/k/a JIQING YUE,<br>XI VERFENSTEIN, and XINMING YU,<br><br>                      Relief Defendants. | 21-cv-05350-PKC-JAM |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S CONSOLIDATED RESPONSE AND OPPOSITION TO NON-PARTY JOHN LEO'S LETTER AND DEFENDANTS' MOTION TO MODIFY THE FINAL JUDGMENT**

 

Christopher M. Colorado
David Stoelting
Kim Han

*Attorneys for Plaintiff*

March 26, 2025

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................... 1

RELEVANT BACKGROUND ...................................................................................................... 3

    I.       The Parties' Settlement and the Final Judgment .................................................................. 3

    II.      The Turnover Order and Defendants' Failure to Comply with the Final Judgment ............ 6

    III.     Leo's Letter ........................................................................................................................... 7

    IV.    Defendants' Motion .............................................................................................................. 8

LEGAL STANDARD ................................................................................................................... 10

ARGUMENT ................................................................................................................................ 11

    I.       The Court Should Not Transfer $42.5 Million Out of the CRIS ....................................... 12

    II.      The Court Should Not Modify the Final Judgment to Permit Defendants an Additional Eight Months to Satisfy Their Monetary Obligations ...................................... 14

    III.     The Court Should Not Carve Out More than $700,000 From the Asset Freeze ................ 16

    IV.    Court Relief Is Unnecessary for Defendants to Seek Funds for Legitimate Expenses ............................................................................................................................. 17

CONCLUSION ............................................................................................................................. 17

## TABLE OF AUTHORITIES

**Cases**

*Congregation Mischknois Lavier Yakov, Inc. v. Board of Trustees for the Village of Airmont*,
   301 F. App'x 14 (2d Cir. 2008) ..................................................................................... 14-15

*Dieujuste v. Sin*,
   734 F. Supp. 3d 232 (E.D.N.Y. 2024)..............................................................................11, 13

*Federman v. Artz*,
   339 F. App'x 31 (2d Cir. 2009)...............................................................................................12

*Powell v. Omnicomm.*,
   467 F.3d 124 (2d Cir. 2007) ............................................................................................. 10-11

*Sanchez v. Hyper Structure Corp.*,
   No. 19-cv-4524 (KAM) (PK), 2022 WL 4635224 (E.D.N.Y. Mar. 21, 2022) .......... 10-11, 14

*SEC v. Alexander*,
   No. 06-cv-3844 (NGG), 2013 WL 5774152 (E.D.N.Y. Oct. 24, 2013)............................10, 13

*SEC v. Conradt*,
   309 F.R.D. 186 (S.D.N.Y. 2015)...............................................................................................10

*SEC v. Liu*,
   591 U.S. 71 (2020) ....................................................................................................................13

*SEC v. NIR Group., LLC*,
   No. 11-cv-4723 (JMA) (AYS), 2022 WL 900660 (E.D.N.Y. Mar. 28, 2022).......................10

*SEC v. Rosenberger*,
   No. 22-cv-4736 (DLC), 2024 WL 1313825 (S.D.N.Y. Mar. 26, 2024)..................................11

*SEC v. Tadrus*,
   No. 23-cv-5708 (FB) (JRC), 2023 WL 7222705 (E.D.N.Y. Nov. 2, 2023)...........................11

*Smith v. CS Albany, LLC*,
   No. 20-4000, 2022 WL 3022526 (2d Cir. Aug. 1, 2022).......................................................10

*United States v. ITT Continental Baking Co.*,
   420 U.S. 223 (1975) ................................................................................................................10

**Rules**

Federal Rule of Civil Procedure 60(b) ........................................................................ 10-11, 13, 14

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this consolidated response and opposition to the letter from non-party John Leo ("Leo"), dated March 13, 2025 ("Leo Letter," ECF No. 561-2), and the motion to modify the Final Judgment by defendants Fleet New York Metropolitan Regional Center LLC ("Fleet") and Richard Xia ("Xia," together with Fleet, "Defendants"), dated March 14, 2025 ("Defendants' Motion," ECF No. 562).

## PRELIMINARY STATEMENT

Leo and Defendants ask the Court to fundamentally change the parties' negotiated settlement and the terms of the Final Judgment, and ask to use for their own purposes assets that are being preserved for defrauded investors. These requests lack merit and should be denied.

Leo, a non-party and potential purchaser of Fleet, asks the Court to (1) undo the parties' negotiated settlement by modifying the terms of the Final Judgment (ECF No. 460, "Final Judgment") that govern Defendants' payment of $228.5 million in disgorgement; (2) reconsider the Court's Order, dated August 28, 2024 (ECF No. 477, "Turnover Order"), which directed three financial institutions to transfer $42.5 million to the Court Investment Registry System ("CRIS") in partial satisfaction of the disgorgement that Defendants owe; and (3) modify the SEC's Proposed Order Regarding the Transfer of Ownership of Defendant Fleet (ECF No. 557-1, "Proposed Fleet Transfer Order") to add a provision that would release more than $700,000 from the current asset freeze and transfer those funds to Leo for his potential acquisition of Fleet. Defendants ask the Court to (1) change the parties' negotiated settlement and modify the Final Judgment to delay by eight months the date for Defendants' payment of the more than $230 million in disgorgement, pre- and post-judgment interest, and civil penalties that Defendants still owe; and (2) "authorize the Defendants to apply for" carve outs from the asset freeze to pay for construction on one of Xia's projects, Eastern Mirage.

Leo is not a party in this litigation and he lacks standing to challenge the settlement between the SEC and Defendants and the Final Judgment. Nor may Leo seek reconsideration of the Court's Turnover Order (which was issued seven months ago) by speculating that the parties' settlement, the Final Judgment, and the Turnover Order might have collateral effects on some EB-5 investors. The SEC and Defendants already considered, weighed, and addressed those potential collateral effects when crafting and agreeing to the settlement. Those issues cannot be raised now, by a non-party, to undo the parties' settlement or the Turnover Order. Finally, Leo's request for a carve-out of more than $700,000 from frozen assets fails to meet the Court's well-established requirements for a carve-out request.

Likewise, Defendants' first request—to unilaterally change the parties' settlement terms and modify a Final Judgment entered on their consent, based on speculation that they will obtain financing in eight months (something they have repeatedly promised for years, but which has not happened)—should be denied. Instead, the appropriate next step is for the SEC to exercise its senior security interests in Xia's real properties, which exist under mortgages that Xia previously conveyed to the SEC to secure against Defendants' failure to pay the full money judgment, and to cause the sale of the frozen real properties, including the Kings Point mansion, Eastern Emerald, and Eastern Mirage, via a Court-appointed liquidation agent or receiver. Defendants' second request—for permission to request a carve-out of funds from the frozen assets—does not require relief because the Preliminary Injunction Freezing Assets (ECF No. 227, "Preliminary Injunction") and the Final Judgment already provide a mechanism for making such a request.

For these reasons, and as discussed below, the Court should deny Leo's request to transfer $42.5 million out of the CRIS and for a carve-out of more than $700,000 from the asset freeze, and should also deny Defendants' motion to modify the Final Judgment.

## RELEVANT BACKGROUND

**I.   The Parties' Settlement and the Final Judgment**

For more than a year before July 2024 and with the Court's aid in several settlement conferences, SEC counsel and multiple sets of Defendants' counsel engaged in extensive discussions to resolve the SEC's claims that Defendants had violated the antifraud provisions of the federal securities laws by, among other things, misappropriating and misusing funds from EB-5 investors. Defendants' years of alleged fraudulent conduct had already put at serious risk the eligibility of any investor to obtain citizenship benefits through the EB-5 program operated by the U.S. Citizenship and Immigration Services ("USCIS"). Nonetheless, the parties' counsel attempted to craft a settlement that was both agreeable to the parties and would maintain the possibility, if practicable, that the EB-5 investors might be eligible to continue to seek citizenship benefits through the EB-5 program. As part of negotiating and crafting a settlement, SEC counsel consulted with USCIS and Defendants consulted with their EB-5 counsel. The parties ultimately agreed to a settlement that includes monetary, injunctive, and other relief. That settlement was authorized by the SEC's then-five-member Commission, approved by the Court, and entered as a Final Judgment on July 26, 2024.

With respect to the monetary relief, the Final Judgment requires Fleet and Xia (1) to pay $228.5 million in disgorgement and $25 million in pre-judgment interest, for which they are jointly and severally liable, and (2) to pay, respectively, $15.3 million and $3.1 million in civil penalties. (Final Judgment at 4-5 (Part IV).)[1] The Final Judgment also sets forth how the monetary relief will be paid: $42.5 million of the disgorgement shall be paid from funds held by

---

[1] Relief defendant Julie Yue is also a party to the settlement and jointly and severally liable for portions of the monetary relief. The other two relief defendants, Xi Verfenstein and Xinming Yu, have not settled.

3

Xia or Xia-owned entities that the Court had previously frozen, and Defendants shall then pay the remaining approximately $229.6 million in disgorgement, pre-judgment interest, and civil penalties within 245 days of the Final Judgment, *i.e.*, by March 28, 2025, plus any statutory post-judgment interest. (*Id.* at 5-6 (Part V).) To date, Defendants have incurred statutory post-judgment interest of approximately $6.3 million. *See* 28 U.S.C. § 1961.[2]

The process for and timing of Defendants' payments were the result of the parties' negotiation and served specific purposes. For example, the SEC required that any settlement include a substantial upfront payment of disgorgement to secure funds for harmed investors. The parties thus agreed that, after the Court entered the Final Judgment, the SEC would seek a turnover order transferring $42.5 million from Xia-owned accounts to the CRIS. (Final Judgment at 5-6 (Part V(a)).) The parties also negotiated and agreed to the timing of Defendants' payment of the remaining approximately $236 million (inclusive of post-judgment interest currently owed). (*Id.* at 6-7 (Part V(b)).) The timing of that payment was a compromise. On the one hand, the SEC sought to have Defendants pay that amount immediately after the Court entered the Final Judgment. On the other hand, Xia sought to delay that payment to avoid the interest expense he would incur to finance it, while he took steps to learn if Fleet would be permitted to continue as a regional center in the EB-5 program and to manage EB-5 investor funds to develop Eastern Mirage and Eastern Emerald.

The potential for Fleet to continue as a regional center in the EB-5 program faced (and continues to face) significant hurdles. To start, the SEC required that Xia transfer control and ownership of Fleet to a new owner, which requires USCIS review and approval. (*Id.* at 9 (Part VII).) Additionally, because the Final Judgment imposes an injunction on Defendants related to

---

[2] A calculation of the post-judgment interest is attached hereto as Exhibit A.

4

a securities offering (*id.* at 2-3 (Parts I and II)), USCIS can terminate Fleet from the EB-5 program altogether, *see* 8 U.S.C. § 1153(b)(5)(I)(iv) (vesting the Department of Homeland Security with the power to suspend or terminate a regional center if it or any associated person is subject to a court injunction related to a securities offering). The parties thus agreed that, before Fleet (and any new owner) might serve as a fiduciary for any EB-5 investor and before any investor funds might be sent to an investment partnership related to Fleet, USCIS must first re-review Fleet, approve or reject its new owner, and determine if Fleet may continue as a regional center. (*See* Order Appointing Distribution Administrator, ECF No. 461 ("Distribution Administrator Order"), ¶ 8.)

Because USCIS review of Fleet was estimated to take at least eight months—and because Xia wanted to avoid incurring interest expense to finance a full payment of the monetary relief during that review—Defendants sought in settlement negotiations to delay paying their full monetary obligation, beyond the initial transfer of $42.5 million in frozen funds to the CRIS.[3] The SEC refused to delay that payment for an extended period, such as one year or longer, but compromised by agreeing to allow Defendants to make that payment within 245 days of the entry of the Final Judgment, *i.e.*, by March 28, 2025. (Final Judgment at 6 (Part V(b)).)

The parties' settlement made clear the consequences of any failure by Defendants to timely make full payment: the SEC would then seek to satisfy the money judgment and recoup funds for investors, through the sale of Xia's frozen assets, including the Kings Point mansion, Eastern Mirage project, and Eastern Emerald project. Indeed, Xia executed and delivered mortgages to the SEC that give it senior security interests in those three properties—rights that arise upon Defendants' failure to pay the full amount owed within 245 days of entry of the Final

---

[3] Because Fleet has not filed its Form I-956, USCIS has not yet begun this review.

5

Judgment—for that exact purpose. (*See* ECF No. 450-2, ¶ 3(a) (Defendants' Consent to Judgment).)

The parties' settlement also includes a process that may allow EB-5 investors, if they choose and if practicable, to continue in the EB-5 program. Each investor will be given the choice to elect to either (1) be paid their *pro rata* share of disgorgement and pre-judgment interest and exit the EB-5 program, or (2) direct that their *pro rata* share of disgorgement and pre-judgment interest be sent to a new EB-5 project or—if Defendants first meet certain preconditions (which they have not met), including Xia's transferring ownership of Fleet by September 26, 2024, and USCIS's reviewing and recertifying Fleet as a regional center in the EB-5 program—to investment partnerships for which Fleet is the general partner. (*See* Distribution Administrator Order, ¶ 8.) The parties' settlement thus contemplates that, even if USCIS terminates Fleet from the EB-5 program, EB-5 investors may be able to remain in the EB-5 program and seek citizenship benefits through another regional center, subject to the laws governing the EB-5 program. (*Id.* ¶ 9.) The parties further agreed, and the Court ordered, that the Defendants' payments (or transfer of their assets) to satisfy their monetary obligations shall be held in the CRIS until the EB-5 investors elect how to distribute their *pro rata* shares. (*Id.* ¶ 2; Final Judgment at 5.)

II.     **The Turnover Order and Defendants' Failure to Comply with the Final Judgment**

As contemplated by Part V(b) of the Final Judgment, the Court entered the Turnover Order on August 28, 2024, and directed three financial institutions to transfer a total of $42.5 million held in the name of LaGuardia Performance LLC ("LaGuardia Performance"), one of Xia's entities, to the CRIS, in partial satisfaction of the disgorgement owed by Fleet and Xia. (*See* Turnover Order.) Those financial institutions subsequently transferred those funds to the CRIS. (*See, e.g.*, ECF Nos. 480, 482 (Notices of Payment).) Yet, Xia has failed to comply with

6

his obligations under Parts VIII or IX of the Final Judgment because he has not transferred Fleet to a new owner or certified the fact of that transfer. (Final Judgment at 10-11.) Nor have Defendants met the preconditions necessary for investors to elect that their *pro rata* share of disgorgement and pre-judgment interest be sent to any investment partnerships associated with Fleet (Distribution Administrator Order, ¶ 8): Xia has not relinquished ownership of Fleet, Fleet has not sought USCIS's approval of new ownership or its ability to continue as a regional center in the EB-5 program, and USCIS has not approved any such application by Fleet.

### III. Leo's Letter

Leo is a non-party and potential purchaser of Fleet. Leo previously informed the Court that he will acquire Fleet only if he first receives assurances that he will not be liable for Defendants' prior misconduct. After multiple Court conferences that included Leo, the Court instructed the SEC to propose language that might accomplish such a limitation of liability and offered Leo an opportunity to respond to that proposal. (ECF Text Order, dated Feb. 12, 2025.) On February 26, 2025, the SEC filed a Proposed Order setting forth its proposal. (ECF No. 557.) In response, Leo submitted the Letter. (*See* Leo Letter.)

Leo's Letter, however, goes far beyond a limitation of liability related to Leo's acquisition of Fleet or the SEC's proposal. Instead, it focuses on Leo's request that the Court change an important term of the parties' settlement and the Final Judgment by reconsidering the Turnover Order and by transferring $42.5 million out of the CRIS and back to Xia or a Xia-owned entity. (*Id.*) Notably, this request directly contradicts the parties' negotiated settlement agreement and the Final Judgment, each of which require that those funds be transferred to and held in the CRIS. The Letter also asks the Court to carve out more than $700,000 from the asset freeze and transfer those funds to an entity Leo created, and Leo says he will use those funds to pay some unspecified expenses related to Fleet. (*Id.*)

7

## IV. **Defendants' Motion**

Defendants' Motion concedes that they will not timely meet their monetary obligations under the Final Judgment to pay the more than $230 million in disgorgement, penalties, and pre- and post-judgment interest they still owe. (*See* Defendants' Motion.) Instead, Defendants' suggest that they may be able to pay that amount eight months from now and ask the Court to modify the Final Judgment to delay their final payment due date by eight months. That suggestion is premised on a speculative chain of events, including that: (1) a general contracting firm, which appears to have been formed recently, will bid to complete work on Eastern Mirage; (2) the contracting firm will complete all work on Eastern Mirage by July 2025 (even though the firm has not bid on the work or secured vendors, and almost no work has been done on the site in years); (3) Eastern Mirage will then quickly obtain a Certificate of Occupancy (a process that can take many months or longer); and (4) then, "after about 120 days," a financial firm may refinance Eastern Mirage and secure sufficient funds from some, unspecified sources to pay Defendants' money judgment in full. (ECF Nos. 562-1, 562-2.)

In support of Defendants' claims as to the general contracting firm, Defendants' Motion attaches a four-paragraph letter purportedly from the general contractor, "Nexus NYC Construction," ("Nexus") which says that the company has "been in the field for, [sic] 13 years." (ECF No. 562-3.) Contrary to that claim, however, the "Nexus" entities at the address stated in the letter were only formed in May 2024, according to the New York State Corporation and Business Database. (*See* Exhibit B, filed herewith, at 2-8 (entity information for three Nexus entities with same address as in Nexus letter).) Moreover, according to the New York City Department of Buildings General Contractor License Database, the general contractor license number for Nexus stated in the letter does not belong to Nexus. (*Id.* at 1 (showing that license number 619584 belongs to an entity called "Efin Management Corp.").) Still further, Nexus's

8

website appears to have also been created recently. (*Id.* at 9 (stating creation date for website in March 2024).) These discrepancies, along with the lack of detail in the letter, raise serious questions.[4]

In support of Defendants' claim that they may obtain more than $230 million in financing eight months from now, they offer a declaration from an attorney who does not attest to any firsthand knowledge of efforts to obtain financing for Defendants or offer details of any lenders who will provide the financing. (ECF No. 562-1.) Meanwhile, over the past three years, Defendants have repeatedly promised that they had secured or were near securing financing to repay harmed investors, but none of that financing ever materialized. (*See, e.g.*, ECF No. 117 (claiming that Defendants are near a plan to "provide permanent financing to replace the EB-5 financing that gives rise to this lawsuit"); ECF No. 124 (claiming that "Defendants have nearly completed plans to obtain the necessary financing to finish that construction work and to repay those EB-5 applicants"); ECF No. 142 (claiming that Defendants have "interviewed and coordinated with three separate lenders to provide $367 million in financing for both projects"); ECF No. 144 (noting that "the SEC and the Monitor have received several funding proposals from the various lawyers representing Defendants that fell through shortly after initial questions were raised by the SEC and/or the Monitor"); ECF No. 286 at 1 ("[Defendants] have received a bona fide commitment to lend Defendants $250,000,000 to repay all the EB-5 visa investors in full, to satisfy the SEC's disgorgement and civil money penalties in full, and to repay CTBC in full."); ECF No. 301 (purporting to be a term sheet from a potential lender).)

---

[4] This potential misrepresentation and/or overstatement of the general contracting firm's bona fides is similar to certain of the SEC's fraud allegations against Defendants, who repeatedly misrepresented their experience and qualifications to the EB-5 investors. (*See, e.g.*, ECF No. 98, ¶¶ 8, 84, 85, 122-28 (Amended Complaint).)

9

## LEGAL STANDARD

Though neither Leo nor Defendants style their application as one made under Federal Rule of Civil Procedure 60(b), that rule governs requests or motions like theirs for relief from or modification of a final judgment. Under Rule 60(b), a "party" may "seek relief from a final judgment . . . under a limited set of circumstances including fraud, mistake, and newly discovered evidence." *SEC v. Alexander*, No. 06-cv-3844 (NGG), 2013 WL 5774152, at *2 (E.D.N.Y. Oct. 24, 2013). Such requests are "generally not favored, and are properly granted only upon a showing of exceptional circumstances." *Id.* (internal quotations omitted).

Moreover, where a party "wishes to disturb a consent judgment," the already-high Rule 60(b) standard is "even harder to reach." *SEC v. NIR Grp., LLC*, No. 11-cv-4723 (JMA) (AYS), 2022 WL 900660, at *2 (E.D.N.Y. Mar. 28, 2022) (quoting *Alexander*, 2013 WL 5774152, at *2). This is because a consent judgment is construed and interpreted as a contract between the settling parties. *See United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975); *see also SEC v. Conradt*, 309 F.R.D. 186, 188 (S.D.N.Y. 2015) ("When it comes to civil settlements, a deal is a deal, absent far more compelling circumstances than are here presented [on defendants' Rule 60(b) motion]."). A contract to settle litigated claims is "binding and conclusive," and "'a court cannot relieve a party of her choice to settle simply because her assessment of the consequences was incorrect[.]'" *Smith v. CVS Albany, LLC*, No. 20-4000, 2022 WL 3022526, at *1 (2d Cir. Aug 1, 2022) (summary order) (cleaned up) (quoting *Powell v. Omnicom*, 467 F.3d 124, 128 (2d Cir. 2007)). In addition, Rule 60(b) ensures that a party is not improperly denied the ability to litigate the merits of a claim, but, where a party voluntarily agrees to a settlement, courts presume that the party has not been improperly denied that opportunity. *See Sanchez v. Hyper Structure Corp.*, No. 19-cv-4524 (KAM) (PK), 2022 WL 4636224, at *4 (E.D.N.Y. Mar. 21, 2022) ("A movant's burden is even more formidable where the movant has made a deliberate

choice to enter into a settlement agreement as opposed to having litigated the case on the merits and lost.").

To the extent Leo's application is viewed as one for "reconsideration" of the Turnover Order (Leo Letter at 1), it is governed by the standard for motions for reconsideration, which is a high bar similar to that applicable to Rule 60(b) motions. *See, e.g.*, *Dieujuste v. Sin*, 734 F. Supp. 3d 232, 233-34 (E.D.N.Y. 2024) (stating that motion for reconsideration requires "exceptional circumstances" like "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice") (internal quotations omitted). Additionally, a motion for reconsideration is not a vehicle for making new arguments and a movant seeking reconsideration of an order is limited to arguments that were made in connection with a court's issuance of that order. *See SEC v. Rosenberger*, No. 22-cv-4736 (DLC), 2024 WL 1313825, at *1-2 (S.D.N.Y. Mar. 26, 2024).

Finally, an application to carve out assets from an asset freeze, which Leo also requests, must demonstrate that "[1] that the funds he seeks to release are untainted [by the alleged fraud] and [2] that there are sufficient funds to satisfy any disgorgement[.]" *SEC v. Tadrus*, No. 23-cv-5708 (FB) (JRC), 2023 WL 7222705, at *2 (E.D.N.Y. Nov. 2, 2023). The application must also comply with the additional requirements set forth in the Preliminary Injunction in this case, including detail regarding the expenses to be paid and a showing that Defendants have provided a full accounting to the Monitor. (Preliminary Injunction at 5-6.)

## ARGUMENT

The Court should not modify the parties' consent settlement or Final Judgment, and should not vacate the Turnover Order, either to undo the transfer of $42.5 million to the CRIS or to extend Defendants' date to pay monetary relief. Nor should the Court grant any other relief sought in the Leo Letter or Defendants' Motion. Rather, the next appropriate step should be the

11

SEC's filing of a motion to appoint a liquidation agent (or other similarly situated person or entity) to exercise the SEC's senior security interests and sell one or more of the Kings Point mansion, Eastern Mirage project, and Eastern Emerald project to recoup funds for harmed investors.

**I.      The Court Should Not Transfer $42.5 Million Out of the CRIS.**

Leo asks the Court to transfer $42.5 million from the CRIS back to Xia and his entity LaGuardia Performance. (Leo Letter at 1-3.) These funds are a portion of Xia's and Fleet's ill-gotten gains and await distribution to or for the benefit of harmed investors. Leo speculates, without citation, that holding funds transferred from LaGuardia Performance in the CRIS account until EB-5 investors elect how to distribute them "may potentially disqualify" certain EB-5 investors from obtaining citizenship benefits because USCIS may determine that those funds are not "at risk" as required under the EB-5 program. (*Id*. at 1.) The relief Leo seeks, under the guise of modifying the proposed limitation of liability in the SEC's Proposed Fleet Transfer Order, would require undoing the parties' carefully negotiated settlement, modifying the Final Judgment, and vacating the Turnover Order—all of which require the transfer of the $42.5 million to the CRIS—and should be denied for several reasons.[5]

First, Leo's request is unsupported by law. He is a non-party who lacks standing to seek to modify the Final Judgment or to vacate the Turnover Order. *See Federman v. Artz*, 339 F. App'x 31, 33 (2d Cir. 2009) (summary order) (affirming denials of motion for relief from a final judgment where "[n]one of the movants was a party to an underlying lawsuit in which he or it

---

[5] A redline comparison of the SEC's Proposed Fleet Transfer Order and Leo's proposed modifications is filed herewith as Exhibit C. For the reasons discussed herein, the SEC opposes the addition of subpart (c) to paragraph 4 but does not oppose Leo's other modifications to the Proposed Fleet Transfer Order, which are largely ministerial.

12

filed such a motion"). In any event, a request to modify a final judgment must meet a high burden that the Leo Letter fails to meet. *See Alexander*, 2013 WL 5774152, at *2. Leo's Letter offers no grounds to modify a final judgment recognized by Rule 60(b)—like fraud, mistake, or newly considered evidence—and cites no exceptional circumstances justifying modification. *Id.* Leo's request for reconsideration of or to vacate the Turnover Order fails for similar reasons. *See Dieujuste*, 734 F. Supp. 3d at 233-34.[6]

Additionally, Leo's Letter fails to recognize that during the parties' settlement discussions, they specifically considered the potential risks to the EB-5 investors' immigration status created by Xia's and Fleet's misconduct and misuse of investor funds, as well as the potential impact of a resolution of the SEC's claims against Xia and Fleet on that immigration status. This included consideration of the "at risk" issue that Leo's Letter describes. Thus, before agreeing to settlement terms, SEC counsel consulted with USCIS (including discussing the "at risk" issue)[7] and Xia consulted with his EB-5 counsel, and the parties discussed and negotiated several potential settlement structures. The parties then determined that the present structure, set forth in the Final Judgment and Distribution Administrator Order, appropriately balanced the many competing interests at issue, like the need to address Xia's and Fleet's fraud, and ensure that they disgorged their ill-gotten gains and that investors were repaid; the need to permanently enjoin Xia from any relationship with current or future EB-5 investors; the need to

---

[6] The Leo Letter's citation to *SEC v. Liu*, 591 U.S. 71 (2020), is misplaced. (Leo Letter at 2.) The Distribution Administrator Order contemplates that disgorgement obtained from Fleet and Xia will be distributed for the benefit of investors.

[7] This included, among other things, whether EB-5 investors might meet the "at risk" requirement if the parties' settlement gave each investor the option to elect to receive their *pro rata* share of disgorgement and pre-judgment interest and to exit the program and also whether the parties' settlement required Defendants paid disgorgement and pre-judgment interest into an escrow account maintained in the CRIS—each of which might be viewed as inconsistent with the EB-5 investors' investment remaining "at risk."

13

deter fraud in the EB-5 markets and ensure those markets operate fairly; and potential collateral effects on the EB-5 investors here, some of whom want to be paid back what they invested and others who may wish to continue to invest in the EB-5 program.

A non-party, like Leo, should not be permitted to unwind a carefully negotiated settlement, long after that settlement is consummated and a final judgment entered, based on his speculation about issues the parties already considered and for which they have accounted.

## II. The Court Should Not Modify the Final Judgment to Permit Defendants an Additional Eight Months to Satisfy Their Monetary Obligations.

The Court should also reject Defendants' Motion to modify the Final Judgment to extend for eight months their time to pay the more than $236 million in disgorgement, pre- and post-judgment interest, and civil penalties they currently owe. As noted above, Defendants' request to change the payment terms of the parties' settlement and Final Judgment is based on nothing more than speculation about some future construction and financing. That falls far short of meeting their high burden for modifying a final judgment. Indeed, Defendants have had nearly eight months since entry of the Final Judgment to seek to restart work on the Eastern Mirage project but have done nothing, and Defendants have repeatedly promised that financing was forthcoming but have obtained none.

None of the first five subparts of Rule 60(b), which contemplate relief from a final judgment for fraud, mistake, or newly considered evidence, offers any basis to modify the Final Judgment. Defendants therefore appear to rely on the catch-all provision in Rule 60(b)(6), which allows for modification of a judgment only if the movant can demonstrate that "an extreme and unexpected hardship would occur" absent modification. *See Sanchez*, 2022 WL 4636224, at *6 (citation omitted). Where a party negotiates and agrees to a settlement agreement, requiring that party to comply with the agreement's terms is not an "unexpected hardship." *See Congregation*

14

*Mischknois Lavier Yakov, Inc. v. Bd. of Trs. for the Vill. of Airmont*, 301 F. App'x 14, 16 (2d Cir. 2008) (summary order).

  The consequences of Defendants' failure to timely pay their money judgment are not unexpected; rather, the parties anticipated these consequences in their settlement.  First, Xia provided the SEC with mortgages, under which the SEC obtains senior security interests in real property—Kings Point, Eastern Mirage, and Eastern Emerald—if Defendants fail to pay the full amount owed under the Final Judgment within 245 days of its entry.  The parties agreed on these terms so that the SEC could monetize those properties to satisfy the amount Defendants owe if they did not timely pay.  Further, the parties agreed to provisions in the Distribution Administrator Order that contemplate that Fleet will not continue as a regional center in the EB-5 program and, instead, that EB-5 investors will seek to participate in the EB-5 program through a regional center other than Fleet.  Rather than unilaterally modifying the parties' settlement, as Defendants suggest and for which there is no legal or factual basis, Defendants must abide by the Final Judgment.

  For these reasons, the SEC believes the appropriate next step is for it to seek the appointment of a liquidation agent (or other similar person or entity) to sell one or more of Kings Point, Eastern Mirage, and Eastern Emerald, consistent with the SEC's senior security interest in those properties, until sufficient funds have been raised to pay what Defendants owe under the Final Judgment.  The SEC also anticipates that, to the extent EB-5 investors wish to stay invested in the EB-5 program, the Distribution Administrator will give them the option to elect to send their share of disgorgement and pre-judgment interest only to EB-5 project(s) associated with EB-5 regional centers other than Fleet, subject to the laws applicable to the EB-5 program, as contemplated by the Distribution Administrator Order.

**III.     The Court Should Not Carve Out More than $700,000 From the Asset Freeze.**

Leo also asks the Court to carve out $717,940.40, held by one of Xia's former law firms, from the asset freeze and to transfer those funds to a new entity created by Leo to pay for him to run Fleet (which Leo has not yet acquired). (Leo Letter at 1.) The SEC previously demonstrated that these funds are subject to the asset freeze. (ECF No. 235-1 at 13-15.) These funds have also been the subject of multiple filings by Xia or his current or former attorneys. (*See, e.g.*, ECF Nos. 420, 424, 464, 467, 559, 564.) The Court has not carved out those funds from the asset freeze previously (*see, e.g.*, ECF No. 425) and should not do so now.

A request to release Xia's assets from the asset freeze for the benefit of Fleet should be made by Xia, not by a non-party who says, without proof, that Xia "approved" his request. (Leo Letter at 1.) Moreover, as the Court has said repeatedly in denying prior requests for asset freeze carve-outs, any such request must comply with the Preliminary Injunction, including a showing that the funds being sought are "not derived from or associated with any alleged fraud," that "a full accounting of [Defendants'] assets and liabilities [has been made] to the Monitor," and that the requesting party has provided "appropriate documentation of the[ ] expenses [for which it seeks frozen funds] to the Court, and the Court finds them legitimate, proper, and not excessive." (*See, e.g.*, *id.*; ECF Text Order, dated Feb. 2, 2024 (describing requirements for asset freeze carve-out and denying carve-out request).) Leo has not met these requirements. Finally, given Defendants' concession that they do not intend to timely meet their monetary obligation under the Final Judgment (ECF No. 562), Leo's carve-out request should be denied for the additional reason that all available assets must be preserved to maximize funds available for distribution to harmed investors.

**IV.    Court Relief Is Unnecessary for Defendants to Seek Funds for Legitimate Expenses.**

Defendants' also ask the Court to "[a]uthorize Defendants to apply for payment from the Frozen Assets" (Defendants' Motion at 6-7), but a process already exists for such applications. Under the Final Judgment, Defendants consented to the continuation of the Preliminary Injunction freezing their assets until they satisfy their monetary obligations. (*See* ECF No. 460 at 7-8 (Part V).) The Preliminary Injunction permits Defendants to request that funds be carved out from the asset freeze and sets forth the requirements for such a request, which the Court has addressed repeatedly. (*See, e.g.*, Text Order dated Feb. 2, 2024.) A further Court order restating these requirements is unnecessary.

## CONCLUSION

For these reasons, the SEC respectfully requests that the Court deny Leo's application, including the addition of subparagraph (c) to Paragraph 4 of the Proposed Fleet Transfer Order, and deny Defendants' Motion.[8]

Dated: New York, NY
       March 26, 2025

/s/ Christopher M. Colorado
Christopher M. Colorado
David Stoelting
Kim Han
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
212-336-9143 (Colorado)

*Attorneys for Plaintiff*

---

[8] As noted above, note 5, the SEC does not object to Leo's proposed modifications to the Proposed Fleet Transfer Order in paragraphs other than Paragraph 4(c).

17