UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
SECURITIES AND EXCHANGE COMMISSION,

                        Plaintiff,

       -against-

RICHARD XIA, a/k/a/ YI XIA, and FLEET
NEW YORK METROPOLITAN REGIONAL
CENTER, LLC, f/k/a FEDERAL NEW YORK
METROPOLITAN REGIONAL CENTER, LLC,

                     Defendants,

JULIA YUE, a/k/a JIQING YUE; XI
VERFENSTEIN, and XINMING YU,

               Relief Defendants.

-------------------------------------------------------

**Civil Action No. 21-cv-05350-PKC-JAM**

**Hon. Pamela K. Chen, U.S.D.C.**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO MODIFY JUDGMENT

     Pursuant to Federal Rule of Civil Procedure 60(b), Defendants Richard Xia, a/k/a Yi Xia, and Fleet New York Metropolitan Regional Center, LLC, f/k/a Federal New York Metropolitan Regional Center, LLC ("Xia" and "Fleet," respectively) move to modify the Final Judgment (ECF No. 460) under "just terms" that restore the import (including implications) of the Parties' Consent Judgment, as existing at the time of execution, on which the Final Judgment was based (*see* ECF Nos. 415-416, 459). Alternatively, Defendants move to modify the Final Judgment pursuant to Federal Rule of Civil Procedure 60(a) to comport with the parties' terms and reasonable expectations existing at the time of entering into the executed Consent Judgment.

Defendants' inability to continue to strictly comply with the Final Judgment's current payment schedule, after already satisfying the first of two total payments thereunder (i.e., $42.5 million by December 8, 2022), has been caused by the intervening acts of third parties that were not and could not have been reasonably contemplated by the parties at the time of entering into the executed Consent Judgment. Due to the third party intervening acts discussed herein, the Final Judgment should be modified on "just terms" consistent with the true import of the executed Written Consent, as the changed circumstances make the prospective application of the Final Judgment substantially more onerous, unworkable, and unjust under Rule 60(b).

Federal Rule of Civil Procedure 60(b) was *meant* to address situations like this, where Judgments, Orders and Proceedings may be modified, or even vacated, on "just terms." *See infra* Section I–III. This Court entered its Final Judgment against Defendants *because* Defendants had agreed to and signed the Consent Judgment. *See* ECF Nos. 458-460, 415-416. But such *intervening acts since* Defendants first signed the Consent Judgment—*not* contemplated by the parties at the time of signing—have materially impaired and indeed *prevented* Defendants from fully performing under the current payment schedule prescribed by the Final Judgment. *See, e.g.*, Decl. ¶4; *see infra* Section I. This included, most notably, the release of approximately $15M in cash to outside third-party creditor, CTBC Bank Corp., for *non*-EB-5 loans (even pre-dating the EB-5 program at issue), further disposition of approximately $10M in personal assets, forced loss of captive insurance policy due to released funds needed to maintain it, and other acts outside of Defendants' control that cumulatively, materially slowed the progress of the completion of the two EB-5 buildings at issue, and effectively precluded timely access to necessary capital. *See, e.g.*, Decl. ¶5.

These intervening acts vitiated Defendants' reasonable expectation of *timely* securing financing, by removing the conditions for which relevant lenders look. *See, e.g.*, Decl. ¶6. Financing was expressly contemplated by the Consent Judgment (e.g., ECF No. 459 ¶ 2(h)) to make up the difference between the already large, all-encompassing asset freeze[1]—and the even larger payment obligations under the Judgment.[2] The need to finance this delta was and is understood by the Court and parties to be important here, including when Defendants raised this issue at the hearing ultimately leading to the currently signed Consent Judgment—where the Court had instructed Defendants to sign the SEC's post-signature changes to the "settlement" within one day of the hearing—or "this will not go well" for Defendant, including an "unleash[ing]" of all available "processes," such as receivership. *See* Exhibit 1, April 11, 2024 Hearing Tr. at 26; *infra* Section I.

Indeed, had those released assets to the outside creditor (previously earmarked for payment of Judgment under the payment schedule, subject to Defendants' reasonable withdrawal requests for certain purposes), been instead released from the frozen accounts to complete even the first of two EB-5 buildings (which is nearing completion)—as could have been authorized under the Consent Judgment—Defendants would and could have complied with the remaining Final Judgment payment;[3] *e.g.*, due to increased capital from anticipated lenders (which are highly construction-dependent, and consider factors such as lower insurance costs from "captive insurance"), ongoing proceeds from sources like renters (from a completed building), and

---

[1] *See* ECF No. 217 (Preliminary Injunction Order freezing all Defendants' and Relief Defendants' Assets irrespective of whether tied to the EB-5 program or not—based on purported "good cause" to believe "at least some" (i.e., *not* all) of these funds involving "ill-gotten gains" were deposited into accounts "controlled" by them).

[2] Purportedly for disgorgement, prejudgment interest, and penalties. *See* ECF Nos. 459 and 460.

[3] Or, at a minimum, had a reasonable and substantial likelihood of strictly complying the such payment schedule. Decl. ¶8.

reduced costs (associated with an incomplete and otherwise slowed construction). *See, e.g.*, Decl. ¶7.

Concretely, by the very intervening Order in which the Court authorized the release of millions to the outside creditor for loans involving Defendants that entirely predate the EB-5 program at issue—from accounts purportedly frozen for the protection of EB-5 investors' funds and interests—the court's *explicit modification* to its "Preliminary Injunction" asset freeze Order *necessarily* changed the meaning and implications of that term as used in the parties' *previously* executed Consent Judgment. *See* Decl. ¶9; ECF Nos. 452, 216.[4] This Order further added ongoing, mounting costs via a Receiver, in addition to the prior Monitor Order. *See id.*

Prior to bringing this Motion, Defendants made several good faith attempts to account for the changed circumstances as described herein, while balancing the EB-5 investors' explicit primary objective of completing its permanent U.S. residency program (via construction completion)—including but not limited to, a narrower request to modify the Judgment to permit an extended payment schedule, and other means to secure necessary funding (see, e.g., ECF Nos. 562, 574)—but those attempts were rejected. *See infra* Section I. Now, the need for Rule 60 relief is particularly compelling—due to the SEC's recent request for the appointment of a liquidator to forever change the rights, duties and circumstances for all involved (which Defendants have opposed, which run counter to the expressed interests of the actual EB-5 investors allegedly harmed, and which would frustrate appeal efforts and post-judgment challenges—irrespective of the ultimate success of those arguments). *See infra* Section I.

Consequently, Defendants respectfully request Rule 60 relief to modify the Final Judgment to comport with the true import of the executed Consent Judgment. At a minimum, in the

---

[4] *See infra* Section I at p. 12 (discussing purported "unopposed" motion and circumstances surrounding same).

alternative, the Court should modify the Final Judgment's payment schedule provisions to reasonably account for the changed circumstances discussed herein. *Cf.* ECF 459 and 460. Ultimately, Defendants' ability to make the remaining payments under the Judgment is not a matter of "if" but "when." *See, e.g.*, Decl. ¶11; *see infra* Section I. The SEC's recent request to appoint a liquidator and barrel forward with liquidation because the remaining payments cannot be paid on time creates a forced and *avoidable* "lose-lose" scenario for all involved, including the EB-5 investors allegedly harmed whose "green cards" are at stake and have made their views known in this action. *See, e.g.*, ECF Nos. 78 and 86 (informing court of EB-5 investors' opposition to asset freeze and priority concern to complete EB-5 construction to receive permanent US residency).

## I.     RELEVANT PROCEDURAL AND BACKGROUND AND FACTS

On September 27, 2021, the SEC initiated alleged investor fraud charges against Xia and Fleet alleging they violated 5 U.S.C. §§ 77q(a), 78j(b) and 17 C.F.R. § 240.10b-5.  "In substance, the SEC alleges that . . . Defendants have defrauded the immigration authorities and over 450 prospective immigrants to raise more than $229 million in investor funds, and then diverted or misused these funds for their personal needs."  *See* ECF No. 216, at 2.  These prospective immigrants invested in two "Projects" as part of the U.S EB-5 Immigrant Investor Program (the "EB-5 Program" or the "Program"): Defendants' (as applicable) "Eastern Mirage" and "Eastern Emerald" real estate projects (the "Projects")—which upon completion of the "qualifying" projects would confer the opportunity for these foreign investors (and their eligible family members: spouse and unmarried children under 21) to obtain a green card for permanent U.S. residency.[5] *See id.;* https://www.uscis.gov/working-in-the-united-states/permanent-workers/eb-

---

[5]  *I.e.*, their qualifying investment in a qualifying project in the U.S. that creates U.S. jobs.

5-immigrant-investor-program (publicly available government website, last accessed April 29, 2025); Decl. ¶13. In furtherance of these efforts, Defendant Richard Xia also *personally* invested approximately $65.4 million of his personal money and assets, resources, as well as more than a decade of his time in his own services and expertise, including but not limited to the development, design, architectural, and professional engineering services performed for the Projects. His substantial personal services were based on his expertise as licensed professional engineer in the State of New York, licensed NYC Dept. of Buildings Concrete Safety Manager in the State of New York, Construction Site Fire Safety Manager certified by the New York City Fire Department, and licensed NYC Dept. of Buildings Site Safety Manager. *See, e.g.*, Decl. ¶¶ 12-14.

On September 27, 2021, the SEC moved for, and the Court granted the same date, a Temporary Restraining Order ("TRO"), *inter alia*, freezing Defendants' and Relief Defendant Yue's assets and appointing a Monitor (with attendance costs beginning to accrue). *See* ECF Nos. 2-8, 11, 103. SEC also wanted a preliminary injunction continuing the same asset freeze thereafter. *See id.* Defendants would later proffer a letter detailing various evidentiary infirmities, ignored evidence, and failures to disclose material information, including among others things, a highly relevant and known appraisal, by the SEC that impacted the evidentiary record on which the the TRO was based, which later, as indicated below, turned into a preliminary injunction. See ECF No. 52 (Jan. 2022).

In response to the SEC's alleged enforcement suit and case activity, approximately 85 of the foreign investors at issue hired their own attorney and informed the Court that their priority was to complete the Eastern Mirage and Eastern Emerald projects so that, pursuant to the EB-5 program, they (and any qualifying family members) could receive their green cards; they opposed

relief that compromised this primary objective. *See, e.g.*, ECF No. 78, ECF No. 86; Decl. ¶15. They made it expressly known that their priority was to complete the buildings to avoid jeopardizing their EB-5 eligibility.  Decl. ¶16.  As the court is aware, no foreign investors ever came forward in favor of any other view.  Decl. ¶17.

On April 6, 2022, the SEC moved to expand the scope of the existing asset freeze and requested a preliminary injunction, including as to Relief Defendants.  ECF Nos. 216. Defendants Xia and Fleet opposed, asserting, among other things, that the asset freeze was over-inclusive because the freeze included blanket assets clearly outside the scope of the EB-5 program – including personal assets – effectively preventing Defendants Xia and Fleet from accessing necessary monies for basic ongoing needs, such as reasonable monies for fees and costs and other operational expenses. *See, e.g., id.*; *also* Decl. ¶19 (asset freeze over all of Defendants' assets, irrespective of link to EB-5 program at issue; further declaring personal funds, outside of investments, Defendant Richard Xia contributed in substantial amounts; *see also* declaration and adduced exhibits regarding documents supporting ~$36M non EB-5 source for mansion purchase); c*f.* ECF No. 216 (preliminary injunction "covers *all* of Defendants' assets and Relief Defendants' residential properties"). On December 8, 2022, the Court issued the "asset-freezing preliminary injunction, for the duration of two years, that covers all of Defendants' assets and Relief Defendants' residential properties" (the "Preliminary Injunction").  ECF No. 216*.* This comprehensive freeze was true despite the Preliminary Injunction Order asset freeze merely finding "good cause" to believe "at least some" *(i.e., not all)* of these funds involving "ill-gotten gains" were deposited into accounts "controlled" by them. *See* ECF No. 217. The Preliminary Injunction Order also conferred the reasonable expectation that Defendants and Relief Defendants could access their assets, funds, or other property "for reasonable payments of legal

fees or living expenses, or other good reasons" by expressing inviting their ability to "seek to use" them upon request within the Order, ECF No. 217. However, as the public docket now long reflects, such reasonable requests have consistently and *repeatedly* been denied—resulting in *frequent* attorney withdrawals and turnover, threats of withdrawal and forgone arguments. *See also* Decl. ¶21; see also infra supra discussion.

On Dec. 14, 2022 Defendants first filed their Notice of Interlocutory Appeal in Second Circuit over the scope of the court's preliminary injunction order, and the appeal was briefed, worked up, before it was later held in abeyance in light of case activity that culminated in 2024 in the executed Consent Judgment and Final Judgment at issue herein. See bulleted timeline cited below. This included, among other things, Defendants and Relief Defendants enjoined from certain acts, an expansive "senior security interest" in Defendants' assets, and a joint and several obligation to make payments of $228.5 million in disgorgement, pre-judgment interest in the amount of $25 million, civil monetary penalties of $3,101,745 from Defendant Xia and $15,538,635 from Defendant Fleet—with a "two-step procedure for effectuating" such payments. *See* ECF Nos. 458–460. $42.5 million of such payments were to come from previously frozen funds by December 8, 2022; with the approximately remaining $229.6 million due by a specified date, "plus any post-judgment interest thereon." *Id.* The Consent Judgment also contemplated that, *after* the first $42.5 million payment, Xia and Fleet could request funds to continue the Eastern Mirage and Eastern Emerald project. *See id.* It is undisputed that Xia and Fleet timely made that $42.5 million payment in compliance with the Consent Judgment and Final Judgment. See, e.g., Decl. ¶22. But for reasons detailed herein, Defendants have now faced difficulty strictly complying with the payment deadline for the second remaining payment.

A detailed case timeline for the relevant context and intervening change in conditions since Defendants' first signed the Consent Judgment (January 2024, as modified April 12, 2024), to the later Final Judgment (July 26, 2024) on which it was based, is summarized below:

### *Background Leading to Executed Consent Judgment*

- **September 27, 2021** – SEC moved for, and the Court granted the same date, a Temporary Restraining Order ("TRO"), *inter alia*, freezing Defendants' and Relief Defendant Yue's assets and appointing a Monitor (with attendance costs beginning to accrue). SEC also wanted a preliminary injunction continuing the same asset freeze thereafter. *See* ECF Nos. 2-8, 11, 103.

- **April 6, 2022** – SEC moved to expand the scope of the existing asset freeze and requested preliminary injunction as to Relief Defendants. *See* ECF Nos. 2-8, 11, 103, 216.

- **December 8, 2022** – Court issued the Preliminary Injunction that, among other things, instituted a complete asset freeze subject to certain minimal carve-outs for a period of two years.[6]

- **December 14, 2022** – Defendants filed Notice of Interlocutory Appeal in Second Circuit of the court's preliminary injunction order, *e.g*., over the scope of the appeal. *See SEC v. Xia et al*., Second Circuit Docket No. 21-cv-5350, ECF No. 1-1.

---

[6] Which was later ostensibly extended by Consent.

- **February 14, 2022** – Defendants filed Notice of Interlocutory Appeal in Second Circuit of the court's preliminary injunction order, e.g., over the scope of the appeal. See *id*.

- **January 2024** – Defendants' originally signed settlement in principle. *See* ECF No. 388; 2/4/2024 Docket Entry Order (recognizing two weeks ago, "signed and notarized consent to judgment reflecting the Parties' agreement in principle").

- **February 1, 2024** – Commissioner first moved to hold appeal in abeyance in light of signed consent judgment, and parties agreement to extend the preliminary injunction subject to the appeal; subsequently court held in abeyance and SEC kept apprised pending performance of Final Judgment. *See SEC v. Xia et al*., Second Circuit Docket No. 21-cv-5350, ECF No. 104 et al.; *see also* ECF No. 452 at 6 n.7 (in light of approved settlement, "this appeal is currently held in abeyance pending the complete resolution of this action in the district court").

- **April 11, 2024** – Hearing where Defendants expressed concern over the SEC's "post-signature changes" to the Defendants' settlement, particularly concerning the appointment of administrator overseeing the process, and had remaining questions and uncertainty over fully comprehending the language and consequences in the proposed distribution plan—yet the court informed him, if he did not sign the new Consent Judgment "by 6:00 p.m. tomorrow," "this will not go well" for him and she will "unleash" the potential processes available, including regarding a "receiver"; Court and parties also discuss financing needs related to anticipated Consent Judgment. *See* Exhibit 1, April 11, 2024 Hearing Transcript at 33-39, 28-30; see also 4/11/2024 Docket Minute Entry.

*The Signed Consent Judgment*

- **April 12, 2024 -** Parties execute Consent Judgment. *See* ECF Nos. 415-416, 459.

- **May 4, 2024 -** Court grants CTBC's motion to intervene in action. *See, e.g*., ECF No. 452 at Footnote 2.

- **June 25, 2024 –** Court denying or otherwise reserving decision on Defendants' motion for reconsideration and to remove the Monitor for "Gross failures and conflicts of interest" and release of funds from payment of insurance coverage. June 25, 2024 ECF Entry.

- **July 5, 2024 –** SEC Files "Notice of Motion to Approve Consent Judgment, Enter Final Judgment as to Defendants Xia and Fleet and Relief Defendant Yue, and Appoint Distribution Administrator" by SEC – with SEC proposing the distribution administrator. ECF No. 450.

- **July 8, 2024** – Defendants' Letter regarding Urgent Issue arising from USCIS by Richard Xia. ECF No. 451.

*An Intervening Act*

- **July 9, 2024** - Memorandum & Order granting motion by Intervenor CTBC Bank Corp. (USA) ("CTBC"); outside creditor on certain loans unrelated to the EB-5 program—which expressly modified the asset-freezing preliminary injunction; and which appointed a "Receiver" to oversee and manage the properties and payments (with Receiver's services resulting in yet additional releases of previously frozen monies). ECF No. 452; s*ee also* Decl. ¶24.

  - Although the Court's Memorandum & Order characterized CTBC's Motion as "unopposed," the motion did "not discuss the effect of Defendants' and

Relief Defendant Yue's interlocutory appeal on this Court jurisdiction"; the
SEC had indeed "contested CTBC's proposed relief to unfreeze the TCDs
if CTBC's intervention motion was granted"; and Defendants' lack of
formal Opposition briefing was caused by: their inability to reasonably
access funds based on the over-inclusive asset freeze (inclusive of
Defendants' personal and affiliated assets)[7]—and thus need to narrowly
conserve resources for central issues in defense—their reasonable
expectation that the outside third party creditor's request would be flatly
denied given—the nature of the outside creditor's request based on
unrelated loans in an action revolving around EB-5 *investors'* funds, the
court's past denials of withdrawal requests and restrictions purportedly to
preserve the "status quo," the prior letters from the EB-5 investors opposing
the freeze and expressing concern over the completion of the EB-5 buildings
and program—as well as the pending appeal of the preliminary injunction
order that the creditor's motion failed to materially address. *See, e.g.,* ECF
No. 452 at Footnotes 9-10; Decl. ¶25; *see also* ECF Nos. 78 and 86.

### *The Final Judgment at Issue*

- **July 26, 2024 –** Court enters Final Judgment at issue because of previously signed,
  agreed to Consent Judgment. *See* ECF Nos. 458-460. Memorandum & Order

---

[7] *See also* Decl. ¶¶5-9, 13 (asset freeze over all of Defendants' assets, irrespective of link to EB-5 program at issue;
further declaring personal funds, outside of investments, Defendant Richard Xia contributed in substantial amounts;
see also Declaration and adduced exhibits regarding documents supporting ~$36M non EB-5 source for mansion
purchase).

granted SEC's Motion for Final Judgment and SEC's proposed appointment of distribution administrator—based on the parties purported "settlement in principle to resolve the SEC's action" and "executed . . . consent to the entry of a final judgment in this matter." *Id.*

***Other Attempts to Accommodate Changed Circumstances Rebuffed***

- **March 14, 2025 –** Defendants request narrow motion to modify final judgment to obtain more time to pay and obtain financing because issue. ECF No. 562.

- **April 2, 2025 –** Order denying Defendants' motion to modify final judgment and for extension of time, with "written order detailing the Court's reasoning for denying those motions *will follow*." April 2, 2025 ECF Minute Order (emphasis added). To date - No such written order has followed.

- **April 10, 2025** – Defendants inform Court of potential lender to satisfy Final Judgment, but SEC's prior refusal to meet with him without substantial conditions, i.e., withdrawing pending appeal and pre-authorize appointment of liquidation agent. ECF No. 574.

- **April 25, 2025** – Status Reports indicating most recent update and dispute over liquidator and forecasting motion practice. *See* ECF Nos. 582, 583.

## II.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 60(b), on "motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for [*any* of] the following reasons":

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; *or applying it prospectively is no longer equitable*; *or*

(6) *any other reason that justifies relief.*

Fed. R. Civ. P. 60(b) (emphasis added). "Properly applied Rule 60(b) strikes a balance between serving the ends of justice and preserving the finality of judgments." *Sanchez v. Hyper Structure Corp*, No. 19CV4524KAMPK, 2022 WL 4636224, at *3–5 (E.D.N.Y. Mar. 31, 2022). "A motion under Rule 60(b) is addressed to the sound discretion of the trial court. *E.g.*, *Matter of Emergency Beacon Corp.*, 666 F.2d 754, 760 (2d Cir. 1981).

Under Rule 60(b)(6)'s "any other reason that justifies relief," "this discretion is especially broad . . . because relief under it is to be granted when appropriate to accomplish justice." *E.g.*, *Matter of Emergency Beacon Corp.*, 666 F.2d 754, 760 (2d Cir. 1981). Rule 60(b)(6) is a "broadly drafted umbrella provision" that covers any other reason that does not fall strictly within the preceding five Rule 60(b) grounds. *E.g., In re Genger*, No. 19-13895 (JLG), 2025 WL 922179, at *35 (Bankr. S.D.N.Y. Mar. 25, 2025).

The Second Circuit, as well as this Court, have described Rule 60(b)(6) as a "grand reservoir of equitable power (that should be) liberally applied." *Dunlop v. Pan Am. World Airways, Inc.*, 672 F.2d 1044, 1051–53 (2d Cir. 1982) (reversing district court with directions on remand to grant motion to amend stipulation of dismissal based on "arguably defective" stipulation of dismissal); *Winslow v. Portuondo*, 599 F. Supp. 2d 337, 341 (E.D.N.Y. 2009)

14

(granting Rule 60(b)(6) relief where circumstances arguably warranted evidentiary hearing and certain issues were "ambiguous"; "Even if the factual inquiry to be addressed through an evidentiary hearing is limited, the present circumstances suggest that such a hearing will not be burdensome and will satisfy any concerns of the court, the public, and the petitioner that full due process was granted."); *see also Stefanopoulos v. City of New York*, 299 F. App'x 49, 50 (2d Cir. 2008) (recognizing Rule 60(b)(6) relief has been granted even when circumstances caused by party or counsel neglecting case).

A showing of "extraordinary circumstances" or the judgment working an "extreme hardship" warrants Rule 60(b)(6) relief from a judgment. *E.g., Consumer Fin. Prot. Bureau v. Sprint Corp.*, 320 F.R.D. 358, 364–65 (S.D.N.Y. 2017); *Sanchez v. Hyper Structure Corp*, No. 19CV4524KAMPK, 2022 WL 4636224, at *3–5 (E.D.N.Y. Mar. 31, 2022). This requires a "fact-specific inquiry" to determine whether the case presented such circumstances. *E.g., Winslow v. Portuondo*, 599 F. Supp. 2d 337, 341 (E.D.N.Y. 2009).

Additionally – Under Rule 60(b)(5), where "applying [the judgment] prospectively is no longer equitable," "a movant must show, first, that the challenged order is prospective in nature, and second, that it would be inequitable to permit the order to remain in place." *Sec. & Exch. Comm'n v. Bronson*, 602 F. Supp. 3d 599, 615–16 (S.D.N.Y. 2022), *aff'd sub nom. United States Sec. & Exch. Comm'n v. Bronson*, No. 22-1045-CV, 2022 WL 5237474 (2d Cir. Oct. 6, 2022). This includes "judgments involving injunctions," including consent judgments. *See id.*; *see also United States v. Sec'y of Hous. & Urb. Dev.*, 239 F.3d 211, 216–17 (2d Cir. 2001) (consent decrees are injunctions).

"To determine whether a modification or termination is equitable, the movant must . . . show 'either a significant change ... in factual conditions or in law.'" *Sec. & Exch. Comm'n v.*

*Musk*, No. 22-1291, 2023 WL 3451402, at *1 (2d Cir. May 15, 2023), *cert. denied*, 144 S. Ct. 1457 (2024). "Significant changes in factual conditions may warrant equitable relief where (1) 'changed factual conditions make compliance with the decree substantially more onerous'; (2) 'a decree [or the like] proves to be unworkable because of unforeseen obstacles'; or (3) 'enforcement of the decree [or the like] without modification would be detrimental to the public interest.'" *Id.* "'Once a moving party has met its burden of establishing either a change in law or in fact warranting modification of a consent decree,' the district court must then 'determine whether the proposed modification is suitably tailored to the changed circumstance.'" *Id.* (cleaned up). A court analyzing a request for Rule 60(b)(5) relief should carefully evaluate the changes and make up-to-date factual findings upon proper examination of the factual and legal changes asserted that may warrant the granting of relief from the judgment. *Horne*, 557 U.S. at 456–60 (finding lower court decision required remand for such "proper examination" under Rule 60(b)(5)).

Courts construing this provision have recognized that Rule 60(b) allows relief from a judgment, order or proceeding—such as to modify or vacate a judgment—where, among other things, the party shows the judgment, order or proceeding became unworkable because of unforeseen obstacles *or* when enforcement would be detrimental to the public interest. *United States v. Sec'y of Hous. & Urb. Dev.*, 239 F.3d 211 (2d Cir. 2001) (showing that city was not serving priority long-term public housing residents and was not moving assisted housing tenants in manner promoting integrated housing, supported district court's modification of consent decree arising out of housing discrimination complaint to provide that credits toward mandated housing goals would only be awarded for moves of tenants into areas with specified ethnic composition); *see also Matter of Emergency Beacon Corp.*, 666 F.2d 754, 761 (2d Cir. 1981) (affirming lower

court's decision to modify Order and vacate portion of order was "appropriate exercise of discretion to accomplish justice" based on change in circumstances).  Even the U.S. Supreme Court has recognized the "emphasized . . . need for flexibility to modify" an order or judgment "if the circumstances, whether of law or fact, have changed or new ones have arisen." *See, e.g., Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 368, 112 S. Ct. 748, 752, 116 L. Ed. 2d 867 (1992); *Horne v. Flores*, 557 U.S. 433, 455–56, 129 S. Ct. 2579, 2597–98, 174 L. Ed. 2d 406 (2009); *see also United States v. Sec'y of Hous. & Urb. Dev*., 239 F.3d 211, 216–17 (2d Cir. 2001) ("[T]he past decade has seen a significant relaxation of the restrictions imposed on District Courts seeking to modify consent decrees."). This is true *irrespective* of whether the party satisfied the original order or judgment. *Horne*, 557 U.S. at 454 (analyzing Rule 60(b)(5)).

Additionally, pursuant to Rule 60(a), a party may obtain relief from a judgment for corrections based on clerical mistakes, "oversights and omissions," and the like. *See* Fed. R. Civ. P. 60(a); *Consumer Fin. Prot. Bureau v. Sprint Corp*., 320 F.R.D. 358, 363–64 (S.D.N.Y. 2017) (providing overview of Rule 60(a)).

## III.  **ARGUMENT**

Applying the Final Judgment prospectively is no longer equitable and it should be modified to comport with the import and implications present at the time of the executed Consent Judgment under Rule 60(b)(5); modifying the Final Judgment accordingly would be "appropriate to accomplish justice" under Rule 60(b)(6); and the requested relief is further warranted under Rule 60(a) to restore the true import of the agreed to, executed Consent Judgment on which the Final Judgment was ostensibly based.

**A.  Third party intervening acts, including a modified preliminary injunction asset freeze order and release of millions to an intervening non-EB-5 creditor, constitutes the changed "conditions" warranting Rule 60(b)(5) relief; prospective application of Final Judgment no longer "equitable."**

Due to the third party intervening acts discussed herein, the Final Judgment should be modified on "just terms" consistent with the true import of the executed Written Consent, as the changed circumstances make the prospective application of the Final Judgment substantially more onerous, unworkable, and unjust under Rule 60(b). *Cf. supra* Section I–II. When Defendants entered the Consent Judgment, all parties and the Court reasonably understood, consistent with the Consent Judgment, that Defendants securing of additional financing was likely required to cover the difference between the already comprehensive asset freeze of Defendants, and the even larger payment obligations under the Judgment. *See id.* Had those released assets to the outside creditor (which were earmarked for payment of the Judgment, subject to Defendants' reasonable withdrawal requests for certain purposes), been instead released from the frozen accounts to complete even the first of two EB-5 buildings (which is nearing completion)—as could have been authorized under the Consent Judgment—Defendants could have complied with the remaining Final Judgment payment schedule;[8] *e.g.*, due to increased capital from anticipated lenders (which are highly construction-dependent, and consider factors such as lower insurance costs from "captive insurance"), ongoing proceeds from sources like renters (from a completed building), and reduced costs (associated with an incomplete and otherwise slowed construction). *See, e.g.*, Decl. ¶¶26-28; *supra* Section I. In order to obtain the additional money necessary to complete the payments, Defendants reasonably anticipated that they could access sufficient funds to finish the EB-5 buildings (and certainly at least the first of two), which would have caused recurring cash flow and attract the financing needed. *See, e.g.*, Decl. ¶28; *supra* Section I.[9]

---

[8] Or, at a minimum, had a reasonable and substantial likelihood of strictly complying the such payment schedule. Decl. ¶8.

[9] Notably, pursuant to the Consent Judgment, when Defendants made the first payment of $42.5 million, as they did, they were permitted to request funds for a number of specified purposes to maintain the EB-5 interests and program, including to facilitate the completion of the Eastern Mirage and Eastern Emerald buildings. Xia and Fleet made that $42.5 million payment payments to the Court's CRIS account. *See, e.g.*, Decl. ¶22; ECF Nos. 480, 482. However, on

Ultimately, a series of unforeseen obstacles occurred that were not and could not have been reasonably contemplated at the time Defendants entered into the Consent Judgment and that made compliance with the Consent Judgment unworkable—as detailed above. *See Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*, 665 F. Supp. 3d 1347 (Ct. Int'l Trade 2023) (applying that judgment prospectively was no longer equitable, as imports of producers' lumber products were currently subject to cash deposits of estimated CVDs and, potentially, liquidation at those rates); *see supra* Section I. Because Defendants' inability to meet the remaining payment deadline in the Final Judgment was caused by intervening acts outside their control, the Final Judgment should be modified to comport with the terms and reasonable expectations present at the time of executing the Consent Judgment to Fed. R. Civ. P. 60(b)(5).

Moreover, by the SEC now attempting to enforce the Final Judgment through a liquidation process (which Defendants' have opposed on various grounds), this would be further detrimental to the "public interest." In particular, the SEC, who purportedly brought the underlying action to protect the investors, is ignoring the unique nature of these investments: these are EB-5 investments. Approximately 85 of the investors at issue hired their own counsel to inform the Court via letter that their primary concern was to complete the buildings and, through the EB-5 program, receive their green cards. *See infra* Section I; ECF Nos. 78 and 86; *see also* Decl. ¶33. They would rather this than receive a return of their investment. *Id.* This letter from the "victims" of the alleged wrongdoing should not be ignored. The EB-5 program sets forth a very specific legal process. EB-5 investors cannot merely move to another "project," as this would constitute changed

---

several occasions reflected in the docket, the Court has consistently denied their request to access reasonably necessary funds. *See, e.g.*, Decl. ¶30. This, combined with the Court's unexpected granting of CTBC's request to release funds that included cash designated for the EB-5 projects, prevented Xia and Fleet from obtaining the money they needed to timely pay the full remaining amount under the Judgment. Similarly, the Court denied Xia and Fleet's motion to unfreeze funds to pay legal expenses, despite the preliminary injunction and orders reasonably contemplating this request—as would obviously be needed to continue to appear in defense of this case and comply with all aspects of the Judgment. Decl. ¶31.

conditions, rendering them ineligible for the EB-5 program and thus for green cards despite waiting many years for the program to complete. And indeed a lot of the children will have aged out of the program if attempting to switch to a new "project." In order to salvage this large and complicated project that has been ongoing for years, and fulfill the EB-5 program requirements, Defendants should, at a minimum, be permitted an extension to reasonably accommodate the changed conditions to be obtain final funding and complete the EB-5 program. This furthers the public interest of allowing the investor, the "harmed" parties, their desired relief.

Moreover, there is also a relevant change or clarification in governing law that compounds the surrounding equitable circumstances even further. Specifically, Defendants had detailed in a supplemental Second Circuit brief (within the parties' currently paused interlocutory appeal of the relevant injunction), prior to Final Judgment[10]—a change and/or clarification in governing law, under *SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023)—which substantially restricted the legally permissible disgorgement amount the SEC could seek and imposed additional burdens of proof on the SEC related thereto. *See SEC v. Xia et al*., Second Circuit Appeal Docket no. 21-cv-5350, ECF 98, at 36-49. The SEC in opposition argued that this change in law under *Govil* was "misplaced" and "premature" as applied to this case because *Govil* was relevant to a "final judgment" award of disgorgement—and at the time, only a preliminary injunction order had issued in this case. *See SEC v. Xia et al*., Second Circuit Appeal Docket no. 21-cv-5350, ECF 118 at 31-35. Thus, taking *arguendo* the SEC's own position before the Second Circuit as true, now that a Final Judgment has issued (see ECF No. 460), and the SEC even seeks liquidation in purported enforcement thereof, the *Govil* case should be considered again closely regarding the permissible scope and

---

[10] This has been forecasted to this Court previously.

restrictions involved—which have given rise or substantially contributed to the current inequitable circumstances of the Final Judgment. See *generally supra* Section I.

**B. Alternatively, modification of the Final Judgment should be granted under Rule 60(b)(6) based on the surrounding "extraordinary circumstances" presented.**

Even if *arguendo* the Court found the Rule 60(b)(5) grounds unavailing, the requested relief would be appropriate under the separate, more "broadly drafted umbrella provision" of Rule 60(b)(6): "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). The Second Circuit instructs that Rule 60(b)(6) is a "grand reservoir of equitable power (that should be) liberally applied." *E.g., Dunlop*, 672 F.2d at 1051–53; *see also Winslow*, 599 F. Supp. 2d at 341. On the detailed record as adduced herein, including the many case filings and accompanying sworn declaration, the highly factual inquiry of "extraordinary circumstances" is patently shown here, and extreme hardship would follow if the relief to modify the Judgment on "just terms" were not granted. *See supra* Section I–III; *see also Sanchez v. Hyper Structure Corp*, No. 19CV4524KAMPK, 2022 WL 4636224, at *6–9 (E.D.N.Y. Mar. 31, 2022) (recognizing *Keeling* case where Rule 60(b)(6) relief granted based on frustration of settlement agreement by specific outside acts). Ultimately, the outside acts described herein have materially interfered with Defendants' strictly compliant continued performance of the executed Consent Judgment, and the mere adjustment requested related to the Judgment's payment schedule provisions would help avoid the "lose-lose" scenario that the SEC now peddles via a liquidator, which needlessly risks the substantial rights and remedies for all involved, as post-judgment arguments and appeal issues remain. *See supra* Section I–III.[11]

---

[11] Arguably, Rule 60(b)(4) is also invoked based on the continued denials of defense costs, resulting in *repeated* attorney withdrawals and threats of withdrawal, constant attorney turnover, disorganization and forgone arguments, while disparately disbursing payments to others. Compare Decl. 21, *with Sec. & Exch. Comm'n v. Bronson*, 602 F. Supp. 3d 599, 613–14 (S.D.N.Y. 2022), *aff'd sub nom. United States Sec. & Exch. Comm'n v. Bronson*, No. 22-1045-CV, 2022 WL 5237474 (2d Cir. Oct. 6, 2022) (recognizing Rule 60(b)(4) relief may be warranted where due process concerns are invoked).

**C.    Alternatively, modification of the Final Judgment should be granted under Rule 60(a) to restore the true import of the executed Consent Judgment (with its attendant implications flowing therefrom).**

Alternatively, Defendants move under Rule 60(a), "corrections based on clerical mistakes, oversights and omissions"—as the Final Judgment was transmuted from the Consent Judgment, which was executed before the intervening acts that are the subject of this motion. *Compare* Decl., *with* Fed. R. Civ. P. 60(a), *and Consumer Fin. Prot. Bureau*, 320 F.R.D. at 363–64 (providing overview of Rule 60(a)). Because the Consent Judgment's operative provisions referenced the same "Preliminary Injunction" asset freeze order as did the Final Judgment—but the Final Judgment's reference thereto had different meaning, implications, and changed circumstances based on, *e.g.*, the intervening order materially modifying such preliminary injunction asset freeze order and releasing millions to outside third party creditor and appointment of a costly Receiver [12] —*after* Defendants had already agreed to the Consent Judgment, Rule 60(a) relief is warranted.  *Compare* ECF No. 459, *with* ECF Nos. 460 *and* 452; *Consumer Fin. Prot. Bureau v. Sprint Corp.*, 320 F.R.D. 358, 363–64 (S.D.N.Y. 2017) (providing overview of Rule 60(a); Decl. ¶¶34-35. This changed import frustrated Defendants ability to timely complete the EB-5 projects and payments under the Final Judgment's payment schedule. *See* Decl. ¶35; *see also* ECF 459 (Consent Judgment referencing the Preliminary Injunction asset freezing Order throughout the different operative provisions and procedures, including, *e.g.*, agreeing it "remain in full force and effect until the monetary obligation" under the Consent Judgment was satisfied, and that monies specified would come from asset freezing accounts and potential other sources of financing to pay the judgment based on the specified time schedule).

---

[12] Depleting rather than preserving funds for timely payment of the Judgment and distributions in furtherance of the EB-5 investor's interests as discussed herein. This is in addition to other intervening acts that resulted in further depletion of available funds, and further impairment to the ability to access capital for payment of the Judgment, such as release of money needed to keep the license on "captive insurance" to keep insurance costs down. *See* Decl. ¶36.

Had the intervening act occurred prior to entering into the Consent Judgment, or had Defendants known or reasonably known that the intervening act would have occurred to alter the import and implications of the Consent Judgment, Defendants would not have entered into the Consent Judgment. *See* Decl. ¶37. Therefore, the Final Judgment should be modified under Rule 60(a) consistent with the terms and reasonable expectations of the parties at the time of executing the Consent Judgment.

## IV.    CONCLUSION

**WHEREFORE**: for these reasons, Defendants respectfully request that the Court issue an Order to: (1) modify the Final Judgment, under "just terms" that restore the import of the Parties' Consent Judgment, as existing at the time of execution, on which the Final Judgment was based; or (2) alternatively, at a minimum, to modify the Final Judgment's payment schedule to reasonably account for the changed circumstances discussed herein, as well as reasonable consideration to the Final Judgment's provisions regarding EB-5's interests; and (3) cease further enforcement of the Final Judgment, in its present form, including any steps toward appointment of a liquidator; and (4) grant further relief in Defendants' favor that the Court deems just and proper.


Dated: New York, NY

    May 5, 2025


                Respectfully submitted,

                /s/ Robert J. Hantman
                Robert J. Hantman, Esq.
                HANTMAN & ASSOCIATES
                www.hantmanlaw.com
                1120 Avenue of the Americas
                4th Floor

New York, NY 10036
Tel: (212) 684-3933
Fax: (646) 380-3299
rhantman@hantmanlaw.com

*Attorneys for Defendants Richard Xia, a/k/a Yi Xia, and Fleet New York Metropolitan Regional Center, LLC, f/k/a Federal New York Metropolitan Regional Center, LLC*

**<u>Certification of Counsel</u>**

Pursuant to Local Civil Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York, I hereby certify that this memorandum of law contains 6,728 words, excluding the caption, table of contents, table of authorities, signature block, and any certificates of service or compliance.

<u>/s/ Robert J. Hantman</u>
Robert J. Hantman, Esq.
