UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,

                  Plaintiff,                  **MEMORANDUM & ORDER**
                                                        21-CV-5350 (PKC) (JAM)

              - against -

RICHARD XIA, a/k/a YI XIA; *et al.*,

                  Defendants,

              - and -

JULIA YUE, a/k/a JIQING YUE, *et al.*,

                  Relief Defendants.
----------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

       Plaintiff Securities and Exchange Commission (the "SEC") commenced this action on September 27, 2021 against Defendants Richard Xia ("Xia") and Fleet New York Metropolitan Regional Center, LLC ("Fleet") (together, "Defendants") for violations of various federal securities laws, and against Relief Defendants Julia Yue ("Relief Defendant Yue"), Xi Verfenstein, and Xinming Yu (collectively, "Relief Defendants") for unjust enrichment as a result of Defendants' alleged violations of securities laws.[1]

       On March 13, 2025, Defendants submitted a request from non-party John Leo ("Leo") to allow funds held by Xia's former counsel Meyer Suozzi in an escrow account to be transferred to Leo, and for the Court to reconsider its approval of the Defendants' payment of $42.5 million into the Court Registry Investment System ("CRIS") as part of the Final Judgment. (Dkt. 561-2.) On

---

[1] The Court refers to the SEC, Defendants, and Relief Defendant Yue collectively as "the parties."

March 14, 2025, Defendants filed a motion seeking an extension of time to make the final payment of approximately $229 million required by Defendants' and Relief Defendant Yue's Consent[2] and the Final Judgment in this case.  (Dkt. 562.)  On April 2, 2025, the Court held a status conference and, following argument by the parties, orally denied Defendants' and Leo's motions.  (*See* 4/2/2025 Dkt. Order.)  At the conference, the Court stated that it would issue a written order further explaining its reasoning in denying the motions.  (*Id.*)  The Court now provides that additional explanation of its April 2, 2025 ruling.

## BACKGROUND

The general background of this case is set forth in the Court's previous opinions.[3]  Defendants and Relief Defendant Yue executed a Consent with the SEC on July 26, 2024.  (Consent, Dkt. 459.)  The Court then entered the proposed Final Judgment the same day.  (Final J., Dkt. 461.)  Pursuant to Part V(b) of the Final Judgment, the Court entered a Turnover Order on August 28, 2024, directing three financial institutions to transfer a total of $42.5 million held in the name of LaGuardia Performance LLC ("LaGuardia Performance"), one of Defendant Xia's entities, to the CRIS, in partial satisfaction of the disgorgement owed by Defendants.  (*See* Turnover Order, Dkt. 477.)  The Consent and Final Judgment also require Defendants to pay into the CRIS an additional $229,640,380 (plus any post-judgment interest) "no later than 245 days

---

[2] The Consent does not include Relief Defendants Verfenstein and Yu or the SEC's claims against them.  However, the SEC has represented that "if Defendants and [Relief Defendant] Yue pay the final judgment in full, then the SEC intends to voluntarily dismiss its claims against those two relief defendants."  (SEC's Mem. of Law in Support of Approval of the Proposed Settlement with Defendants Xi and Fleet and Relief Defendant Yue, Dkt. 450-1, at 5 n.3.)

[3] *See, e.g., SEC v. Xia*, No. 21-CV-5350 (PKC) (RER), 2022 WL 17539124, at *1–10 (E.D.N.Y. Dec. 8, 2022), *appeal filed*, No. 22-3137 (2d Cir.); *SEC v. Xia*, No. 21-CV-5350 (PKC) (JAM), 2024 WL 964676, at *1–5 (E.D.N.Y. Mar. 4, 2024); *SEC v. Xia*, No. 21-CV-5350 (PKC) (JAM), 2024 WL 3447849, at *1–5 (E.D.N.Y. July 9, 2024).

from the entry of Final Judgment [("Second Payment Date")]." (Final J., Dkt. 460 at 6.) The "Second Payment" was thus due by March 28, 2025. Lastly, the Consent and Final Judgment require, *inter alia*, that Xia relinquish all direct and indirect control and ownership of Fleet within 60 days of the entry of the Final Judgment, or September 24, 2024. (*See generally* Consent, Dkt. 459, at 7; Final J., Dkt. 460, at 9.)

## DISCUSSION

### I. Leo's Request to Obtain Funds from the Meyer Suozzi Escrow Account

The Court first recapitulates the relevant facts, which were discussed at the April 2, 2025 status conference. John Leo is a non-party who has been identified by Xia as an individual willing and able to take ownership of Fleet, provided that Xia indemnify Leo as to any claims concerning Fleet, including any liabilities associated with the two Fleet infrastructure projects—the Eastern Mirage and Eastern Emerald Projects. (*See, e.g.*, Dkt. 525.) Toward that end, on February 12, 2025, the Court directed the SEC to submit proposed language for "(1) an objection period for EB-5 investors to object to the sale of Fleet and (2) a release for Mr. Leo." (2/12/2025 Min. Entry.) The SEC submitted a proposed order on February 26, 2025. (SEC Proposed Order Transfer Fleet ("SEC Proposed Order"), Dkt. 557.) Leo responded to the SEC Proposed Order with his own modifications on March 31, 2025. (Leo Resp. SEC Proposed Order, Dkt. 560-1.) Leo's proposed modifications included the Court ordering the transfer of $717,940 held by Xia's former counsel Meyer Suozzi in an escrow account so that Leo could use those funds for "daily operations of the regional centers and defending any action filed against the Leo Entities." (*Id.*; *see also* Hantman Ltr., Dkt. 420 (explaining that Meyer Souzzi is a law firm that used to represent Defendants but no longer does and is holding $717,940.40 as the balance of a retainer Xia paid to the firm).) The SEC filed a letter objecting to, *inter alia*, Leo's modifications to the SEC Proposed Order on the

3

grounds that the carve-out request was not made by Xia and it does not meet the terms of the Preliminary Injunction. (SEC Opp'n Mem., Dkt. 567, at 16.)

The parties do not dispute that the funds held in the escrow account are subject to the Preliminary Injunction's asset-freeze. (5/7/2024 Order & Dkt. 425 at 3–4 (holding that "any remaining amount of the legal retainer currently being held by Meyer Suozzi in its escrow account is subject to the [Preliminary Injunction] Order").) Therefore, any carveouts from the asset-freeze must comply with the conditions set forth in the Court's Preliminary Injunction. Part IV of the Preliminary Injunction provides that as long as the asset-freeze remains active, "no person or entity, including . . . any creditor or claimant against Defendants . . . shall take any action to interfere with the asset freeze, including, but not limited to, the filing of any lawsuits, liens, or encumbrances, or bankruptcy cases to impact the property and assets subject to this Order." (Prelim. Inj., Dkt. 217, at 5.) At the same time, however, the Preliminary Injunction provides that "any party or non-party may seek leave from this Order upon a proper showing." (*Id.*) Modification of a preliminary injunction requires a moving party to demonstrate that there has been a "significant change in facts or law" that justifies the modification. *See, e.g.*, *Ideavillage Prods. Corp. v. Bling Boutique Store*, No. 16-CV-9039 (KMW), 2017 WL 1435748, at *3 (S.D.N.Y. Apr. 21, 2017) (holding that a district court may modify a preliminary injunction only when it is "justified by a significant change in facts or law" (internal quotation marks and citations omitted)). In deciding whether to modify an asset freeze in securities fraud proceedings, the court must weigh "the disadvantages and possible deleterious effect of a freeze" against "the considerations indicating the need for such relief." *S.E.C. v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972), *abrogated on other grounds by SEC v. Ahmed*, 72 F.4th 379 (2d Cir. 2023). In particular, the court must consider whether the requested modification would be "in the

best interests of the defrauded investors." *S.E.C. v. McGinn, Smith & Co., Inc.*, No. 10-CV-457 (GLS) (CFH), 2014 WL 675611, at *3 (N.D.N.Y. Feb. 21, 2014).

Here, Leo's statement that he intended to use the escrow account funds for "daily operations of the regional centers and defending any action filed against the Leo Entities," without more, does not satisfy the high burden for modifying a preliminary injunction. (Leo Resp. SEC Proposed Order, Dkt. 560-1, ¶ 4.) The proffered reason for unfreezing over $700,000 does not reflect a "significant change in facts or law" from when the Preliminary Injunction was issued. *See Ideavillage Prods. Corp.*, 2017 WL 1435748, at *3. Although Leo might have been unwilling to take over Fleet's operation without these funds, that fact does not change the circumstances that justified imposition of the asset freeze, namely, the need to preserve Defendants' assets to pay a final judgment in this case, including disgorgement and civil penalties, and to compensate investors. (*See generally* Prelim. Inj. Mem. & Order, Dkt. 216.) Similarly, neither Leo nor Defendants demonstrated that releasing over $700,000 of frozen funds would be "in the best interests of the defrauded investors[,]" *McGinn, Smith & Co., Inc.*, 2014 WL 675611, at *3, especially since the Fleet EB-5 investors have the option of moving their investment to another regional center if Fleet is terminated from the EB-5 program. *See* 8 U.S.C. § 1153(b)(5)(M)(ii). Thus, as the Court ruled on April 2, 2025, Leo's request to modify the Preliminary Injunction to release $717,940 of frozen funds is denied.

## II.     Motions to Reconsider the Consent and Final Judgment

As discussed at the April 2, 2025 status conference, the Court has construed the remaining motions as ones to modify or reconsider the terms of the Consent and Final Judgment, which are properly brought under Federal Rule of Civil Procedure ("Rule") 60(b).

5

      **A.     Leo's Request for the Court to Reconsider Defendants' and Relief Defendant Yue's Payment of $42.5 Million**

The Court again begins by summarizing the relevant facts, which were discussed at the April 2, 2025 status conference. On March 13, 2025, Defendants submitted a letter from Leo to the Court, asking the Court, *inter alia*, to "re-examine" whether the $42.5 million that was transferred from Defendants' operating account to the CRIS as part of the Consent and Final Judgment was "warranted." (Leo Ltr., Dkt. 561-2, at 1.) The letter stated that based on advice from his immigration counsel, Leo believed that transferring this amount "directly conflict[ed] with EB-5 regulations and undermine[d] the investors' ability to fulfill the program's requirements to obtain a Green Card." (*Id.*)

In response, the SEC argued, and the Court agrees, that Leo is a non-party with no standing to request that the Court transfer $42.5 million from the CRIS back to Xia. (SEC Opp'n Mem., Dkt. 567.) Generally, relief under Rule 60(b) is unavailable to non-parties and the Second Circuit has only found non-party standing on Rule 60(b) motions in "sufficiently extraordinary" situations. *Irvin v. Harris*, 944 F.3d 63, 70 (2d Cir. 2019); *Federman v. Artzt*, 339 F. App'x 31, 33 (2d Cir. 2009) (summary order). Here, there has been no such showing made and the Court therefore may reject Leo's request on this ground alone.

That said, even if the Court were to consider Leo's request on the merits, the Court is persuaded by the SEC's assertion that Leo's concern about compliance with EB-5 regulations is one that the parties were aware of, and negotiated over, before entering into the Consent. Specifically, the SEC stated in its written opposition:

> [B]efore agreeing to settlement terms, SEC counsel consulted with USCIS (including discussing the "at risk" issue)[4] and Xia consulted with his EB-5 counsel,

---

[4] EB-5 regulations require the immigrant investor to not only create jobs through their investment, but also "place[] the required amount of capital at risk for the purpose of generating a

> and the parties discussed and negotiated several potential settlement structures. The parties then determined that the present structure, set forth in the Final Judgment and Distribution Administrator Order, appropriately balanced the many competing interests at issue, like the need to address Xia's and Fleet's fraud, and ensure that they disgorged their ill-gotten gains and that investors were repaid; the need to permanently enjoin Xia from any relationship with current or future EB-5 investors; the need to deter fraud in the EB-5 markets and ensure those markets operate fairly; and potential collateral effects on the EB-5 investors here, some of whom want to be paid back what they invested and others who may wish to continue to invest in the EB-5 program.

(SEC Opp'n Mem., Dkt. 567, at 13.) In a footnote, the SEC further explained that they considered multiple angles for "whether EB-5 investors might meet the 'at risk' requirement if the parties' settlement gave each investor the option to elect to receive their *pro rata* share of disgorgement and pre-judgment interest and to exit the program and also whether the parties' settlement required Defendants [to pay] disgorgement and pre-judgment interest into an escrow account maintained in the CRIS—each of which might be viewed as inconsistent with the EB-5 investors' investment remaining 'at risk.'" (*Id.*)

"Where a [party] 'wishes to disturb a consent judgment,' [the already-high Rule 60(b)] standard is 'even harder to reach.'" *SEC v. NIR Grp., LLC*, No. 11-CV-4723 (JMA) (AYS), 2022 WL 900660, at *1 (E.D.N.Y. Mar. 28, 2022) (quoting *SEC v. Alexander*, No. 06-CV-3844 (NGG) (RER), 2013 WL 5774152, at *2 (E.D.N.Y. Oct. 24, 2013)). Moreover, "[w]hen a party invokes [Rule 60(b)] to seek alteration of a judgment that has been entered upon consent, that party must establish that 'a significant change in circumstances warrants the modification.'" *SEC v. Longfin Corp.*, No. 18-CV-2977 (DLC), 2020 WL 4194484, at *2 (S.D.N.Y. July 21, 2020), *aff'd sub nom.*,

---

return on the capital placed at risk." *Chapter 2—Immigrant Petition Eligibility Requirements*, USCIS, https://www.uscis.gov/policy-manual/volume-6-part-g-chapter-2 (last visited Apr. 1, 2025). "For the capital to be at risk, there must be a risk of loss and a chance for gain." *Id.* This is called the EB-5 program's "at risk" requirement.

7

*SEC v. Altahawi*, 849 F. App'x 323 (2d Cir. 2021) (summary order), *cert. denied*, 142 S. Ct. 594 (2021). Leo has not met the requisite burden of showing that there have been significant changes in circumstances that warrant modification of the Consent, including the possibility that the payment of $42.5 million into the CRIS might conflict with the "at risk" requirement of the EB-5 program—an issue the parties considered in negotiating the Consent. As the Court orally ruled on April 2, 2025, Leo's request that the Court reconsider its approval of the transfer of $42.5 million made by Defendants to the CRIS is denied.

      **B.**     **Defendants' Motion to Extend the Final Payment Date**

Again, the Court restates the facts that were considered at the April 2, 2025 status conference. On March 14, 2025, Defendants filed a motion asking for an extension of the deadline to transfer the remaining $229 million owed under the Consent and Final Judgment. (Defs.' Mot. Extend, Dkt. 562.) In their motion, Defendants said that they have been "unable to secure lenders or investors who are willing to commit the funds necessary to satisfy the Final Payment amount ($229,640,380)" because "completion of the Eastern Mirage building . . . remains in its final stages." (*Id.* at 3.) They further stated that "it is expected that the efforts of USCP [the capital firm Defendants are using to garner investment interest] will result in a successful raise of capital sufficient to satisfy the final payment obligation" and that the firm can refinance the building after about 120 days of its completion. (*Id.* at 4.) Moreover, a general contractor Nexus NYC Construction ("Nexus") "has offered to complete each [project], with assurances of appropriate sub-contracting, permitting and the resolution of any prior violations. They will engage in a transparent bidding process for each area of concern." (*Id.*) Overall, Defendants requested (1) an extension of the Second Payment Date of around eight additional months, i.e., from March 28, 2025, to November 26, 2025, because this additional time is needed to restart the building project

and secure a lender; and (2) use of the frozen funds for payments of the "contracting and related costs and expenses necessary to complete the Eastern Mirage building." (*Id.* at 4–5.)

In opposition, the SEC argued that Defendants' motion is "based on nothing more than speculation about some future construction and financing." (SEC Opp'n Mem., Dkt 567, at 14.) The SEC proposed that the Court simply take the actions laid out in the Final Judgment and Consent, i.e., seek the appointment of a liquidation agent to sell one or more of Defendants' properties until sufficient funds are raised to pay what is owed under the Final Judgment. (*Id.* at 15; *see also* Consent, Dkt. 459, ¶ 3(a) (explaining that Xia shall grant and assign "as security for Defendants' payment and performance of their obligations under Paragraph 2(d)(ii) of this Consent [to make the payment of approximately $229 million], a senior security interest in all of Defendants' rights, directly and indirectly, in and to the assets [specified in Appendix C]."); *id.* at ECF[5] 22 (stating that Xia shall grant the SEC senior security interest in the Kings Point property, the Eastern Mirage Project, and the Eastern Emerald Project); Final J., Dkt. 460, at 4–5 (explaining that the SEC "may enforce the Court's judgment for disgorgement and prejudgment interest [as well as penalties] by using all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 *et seq.*, and moving for civil contempt").) The SEC also stated that the Distribution Administrator will give those EB-5 investors who wish to remain in the EB-5 program "the option to elect to send their share of disgorgement and pre-judgment interest only to EB-5 project(s) associated with EB-5 regional centers other than Fleet, subject to the laws applicable to the EB-5 program, as contemplated by the Distribution Administrator Order." (SEC Opp'n Mem., Dkt 567, at 14.)

---

[5] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

The SEC is correct that the Final Judgment and Consent contemplate this situation, and the Court finds that allowing the SEC to exercise their security interest is the best way to ensure that the EB-5 investors are able recoup their investments. The Court also agrees with the SEC that Defendants' latest assertions about promises to complete the Eastern Emerald and Eastern Mirage Projects are speculative, at best, and follow on a long line of similar proposals that have never come to fruition. (*See*, *e.g.*, Letter of defense counsel Mark Rikfin, dated 5/27/2022, Dkt. 142, at 1 ("[W]e were instructed by our clients to develop and implement a plan to promptly resolve the litigation that will pay all the Eastern Mirage EB-5 applicants in full, provide sufficient funds to complete the Mirage project, pay in full all those Eastern Emerald EB-5 applicants who wish to leave that project, provide sufficient funds to complete the Emerald project, and pay off CTBC and satisfy all other outstanding financial obligations on both projects."); 6/28/2022 Min. Entry for Settlement Conference; 4/24/2023 Supp. Scheduling Order (directing Defendants to send proposed financing options); 5/12/2023 Min. Entry for Settlement Conference; 3/20/2023 Scheduling Order (describing Defendants' plan to "enter into a loan arrangement, whereby Defendants would pay $200,000 in return for "for $260,000,000.00 in financing to be used to repay the EB-5 [] investors, the SEC, and CTBC in full").) Furthermore, Defendants' history of non-compliance with the terms of the Final Judgment—including, most notably, Defendant Xia's failure to relinquish control of Fleet, which he was supposed to have done within 60 days of the Final Judgment being entered, i.e., September 24, 2024—is a strong reason not to grant their request for an extension of eight additional months. As the SEC notes, "Defendants . . . appear to rely on the catch-all provision in Rule 60(b)(6), which allows for modification of a judgment only if the movant can demonstrate that 'an extreme and unexpected hardship would occur' absent modification." (SEC Opp'n Mem. at 14 (quoting *Sanchez v. Hyper Structure Corp.*,

No. 19-CV-4524 (KAM) (PK), 2022 WL 4636224 (E.D.N.Y. Mar. 21, 2022).) But "[a] failure to properly estimate the loss or gain from entering a settlement agreement is not an extraordinary circumstance that justifies relief under Rule 60(b)(6)." *Tolkin v. Pergament*, No. 11-CV-3467 (SJF), 2012 WL 1132475, at *9 (E.D.N.Y. Mar. 31, 2012) (quoting *United States v. Bank of N.Y.*, 14 F.3d 756, 760 (2d Cir.1994)). Thus, as the Court orally ruled on April 2, 2025, Defendants' motion to extend the time to make the second payment is denied.

## CONCLUSION

For the foregoing reasons and as explained at the April 2, 2025 status conference, the Court has denied Defendants' motion for an extension of time to make the final payment of $229,640,380 due under the Consent and Final Judgment. The Court has also denied both requests made by non-party John Leo in his March 13, 2025 letter to the Court, seeking to transfer funds held by Meyer Suozzi and asking the Court to reconsider its approval of Defendants' payment of $42.5 million into the CRIS as part of the Consent and Final Judgment. As noted on the docket, by June 23, 2025, the parties shall brief the SEC's request to enforce the Final Judgment. (4/30/2025 Dkt. Order.)

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: May 7, 2025
      Brooklyn, New York

11