UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

- against -

RICHARD XIA, a/k/a YI XIA; *et al.*,

                Defendants,

- and -

JULIA YUE, a/k/a JIQING YUE; *et al.*,

                Relief Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
21-CV-5350 (PKC) (CHK)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Securities and Exchange Commission (the "SEC") commenced this action on September 27, 2021 against Defendants Richard Xia ("Xia") and Fleet New York Metropolitan Regional Center, LLC ("Fleet") (together, "Defendants") for violations of various federal securities laws, and against Relief Defendants Julia Yue ("Yue"), Xi Verfenstein, and Xinming Yu (collectively, "Relief Defendants") for unjust enrichment as a result of Defendants' alleged violations of securities laws.   On July 16, 2024, the Court entered a Final Judgment against Defendants and Relief Defendant Yue.  (Final J., Dkt. 460.)  Before the Court is the SEC's motion to enforce the Final Judgment, (Pl.'s Ltr., Dkt. 582)[1], and Defendants' motion to stay such enforcement, (Mot. to Stay Final J. ("Mot. to Stay"), Dkt. 586).  For the reasons described herein,

---

[1] In this Memorandum & Order and throughout this litigation, the Court construes the SEC's letter requesting the enforcement of the Final Judgment as a motion.  (*See also* 05/28/2025 Dkt. Order (describing that docket entry as a "motion to enforce the Final Judgment").)

Defendants' motion is denied and the SEC's motion to enforce the Final Judgment is granted in part and denied in part.

## BACKGROUND

### I.    Final Judgment

The Court assumes the parties' familiarity with the extensive factual and procedural history of this case,[2] and therefore only sets forth those facts relevant to this Memorandum and Order.  On July 5, 2024, Defendants and Relief Defendant Yue entered their consent (the "Consent") to the entry of a proposed Final Judgment, which would impose a series of restraints and obligations on them.  (*See* Proposed Consent of Defs. and Relief Def., Dkt. 450-2; Proposed Final J., Dkt. 450-3.)  On July 26, 2024, the Court approved the Consent, (Consent of Defs. and Relief Def. ("Consent"), Dkt. 459), and entered the Final Judgment as proposed by the parties, (Final J., Dkt. 460).[3]

Under the Final Judgment, Defendants and Relief Defendant Yue were required to, among other things, pay "the total disgorgement, prejudgment interest, and penalty . . . of $272,140,380" in installments to be completed by March 28, 2025.  (*See id.* at 5–6.)  Defendants do not contest the SEC's assertions that "Defendants have failed to meet this obligation" and that "[t]o date, only $42.5 million has been paid toward disgorgement."  (Pl.'s Mem. in Supp. Mot. to Enforce Final J. ("Pl.'s Mem."), Dkt. 600, at 1–3.)  Defendants also do not contest the SEC's assertion that "the

---

[2] *See, e.g.*, *SEC v. Xia*, No. 21-CV-5350 (PKC) (RER), 2022 WL 17539124, at *1–10 (E.D.N.Y. Dec. 8, 2022); *SEC v. Xia*, No. 21-CV-5350 (PKC) (JAM), 2024 WL 964676, at *1–5 (E.D.N.Y. Mar. 4, 2024); *SEC v. Xia*, No. 21-CV-5350 (PKC) (JAM), 2024 WL 3447849, at *2 (E.D.N.Y. July 9, 2024).

[3] The Final Judgment explicitly incorporates the Consent "with the same force and effect as if fully set forth [t]herein" and provides that "Defendant Xia shall comply with all of the undertakings and agreements set forth therein."  (Final J., Dkt. 460, at 10.)

Final Judgment required Xia to transfer ownership of Fleet by September 28, 2024, but he has not done so." (*Id.* at 3 (internal citations omitted).)

As part of the Consent and the Final Judgment, the SEC acquired senior security interests in three assets (the "Assets") controlled by Defendants as security in the event of Defendants' non-payment of the $272,140,380 due under the Final Judgment. (*See* Consent, Dkt. 459, ¶ 3(a); Pl.'s Mem., Dkt. 600, at 1, 3–4.) The Assets include the "Eastern Mirage Project," located at 42-31 Union Street; the "Eastern Emerald Project," located at 112-51 Northern Boulevard; and the "Kings Point Property," located at 144 Kings Point Drive, Kings Point, Town of West Hempstead, New York 11024. (Consent Appx. C, Dkt. 459, at ECF[4] 22.) The SEC maintains, and Defendants do not contest, that Defendant Xia controls the Eastern Mirage Project and the Eastern Emerald Project (collectively, the "Projects") via his entities X&Y Development Group, LLC ("X&Y") and Eastern Emerald Group, LLC ("EEG"), respectively, and that the Kings Point Property is nominally owned by Relief Defendant Yue.[5] (Pl.'s Mem., Dkt. 600, at 3.)

The security interests conveyed by Yue, X&Y, and EEG to the SEC are formalized in three mortgages (the "Mortgages"), all of which provide that if Defendants fail to meet the Final Judgment's payment obligations, the Mortgages will be in default.[6] (*See id.* at 4; Mortgage and

---

[4] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[5] The Kings Point Property is one of the residences Defendant Xia and his spouse (Relief Defendant Yue) own. (*See* Han Decl., Dkt. 600-1, ¶ 4); *Xia*, 2022 WL 17539124, at *2, *9.

[6] The Court understands that there is at least one action in which another party seeks to, *inter alia*, invalidate part of the Mortgages. *See* O.S.C., *Mushkudiani v. Racanelli Constr. Grp., Inc.*, 25-CV-5474 (PKC) (CHK) (E.D.N.Y. Sep. 30, 2025), Dkt. 1-1. That action, like this one, seeks the same relief: the appointment of a receiver in order to liquidate one or more of the Assets. Accordingly, and because the Court does not rely exclusively on the Mortgages, the Court does not find that that action precludes the decision herein.

Assignment of Leases and Rents ("X&Y Mortgage"), Dkt. 600-2, ¶¶ 2, 7, 22; Mortgage and Assignment of Leases and Rents ("EEG Mortgage"), Dkt. 600-3, ¶¶ 2, 7, 22; Mortgage and Assignment of Leases and Rents ("Yue Mortgage"), Dkt. 600-4, ¶¶ 2, 7, 20.)  The Mortgages further provide that the SEC "shall have any rights provided by law or equity" to recover the amounts owed under the Final Judgment.  (X&Y Mortgage, Dkt. 600-2, ¶ 24; EEG Mortgage, Dkt. 600-3, ¶ 24; *see also* Yue Mortgage, Dkt. 600-4, ¶ 22 (providing the SEC with the right to have a receiver take control of the Kings Point Property).)

Notably, the investors whose interests the SEC represents were part of the "EB-5 Immigrant Investor Program" (the "EB-5 Program"), which "permits noncitizens to apply for permanent residence in the United States by investing in . . . commercial enterprises that are based on 'proposals for promoting economic growth'" and are approved by the United States Citizenship and Immigration Services ("USCIS").  *Liu v. SEC*, 591 U.S. 71, 77 (2020) (citation omitted); *Xia*, 2022 WL 17539124, at *2 n.6; *see also SEC v. Hui Feng*, 935 F.3d 721, 731 (9th Cir. 2019) ("The EB-5 program by design links the success of the investment to the investor's success in obtaining a visa.").  The construction of the Projects has been part of the EB-5 Program.  (*See* Xia Decl., Dkt. 586-2, ¶ 18.)

## II.    Relevant Procedural History

On April 25, 2025, the SEC filed a request to enforce the Final Judgment and reported that it was "explor[ing] steps to enforce the Final Judgment by seeking a Court-appointed agent to market and sell [the three Assets]." (Pl.'s Ltr., Dkt. 582.)  The same day, Defendants filed a letter opposing those efforts.  (Dkt. 583.)  Thus, on April 30, 2025, the Court ordered the SEC to file "a

memorandum of law explaining the SEC's legal authority to appoint a liquidation agent."[7] (04/30/2025 Dkt. Order.)  On May 5, 2025, Defendants filed a motion seeking "to stay enforcement of the [F]inal [J]udgment."  (Mot. to Stay, Dkt. 586, at ECF 1.)  On May 23, 2025, the SEC filed the court-ordered memorandum of law in support of its original request and, in the same filing, opposed Defendants' motion for a stay.  (Pl.'s Mem., Dkt. 600.)  "[I]n the spirit of compromise," the SEC also proposed that the Court find the appointment of a sales agent "necessary and appropriate" and direct the parties to confer and agree on a sales agent for the Court to appoint. (Dkt. 599.)  On June 30, 2025, Defendants filed their opposition to Plaintiff's enforcement motion, (Defs.' Mem. in Opp'n to Pl.'s Mot. to Enforce Final J. ("Defs.' Opp'n"), Dkt. 619), and on July 7, 2025, Plaintiff filed its reply, (Pl.'s Reply in Supp. Mot. to Enforce Final J. ("Pl.'s Reply"), Dkt. 634.)

## DISCUSSION

### I.    The SEC's Motion to Enforce the Final Judgment

The SEC seeks to enforce the Final Judgment by selling the three Assets and asks that the Court appoint a sales agent for that purpose.  While the SEC argues that it has "at least four avenues to pursue the appointment of a sales agent," (Pl.'s Mem., Dkt. 600, at 1–2)[8], the Court focuses on the equitable powers and the equitable relief available under Section 21(d)(5) of the Securities Exchange Act of 1934 ("Section 21(d)(5)").  Defendants counter that federal equitable relief is inapplicable here because the Court may only liquidate assets for the satisfaction of a money

---

[7] The Court and the relevant case law use the terms "liquidation agent," "sales agent," and "liquidation receiver" interchangeably.

[8] The SEC claims that it could (1) seek equitable relief; (2) request to sell the Assets as a remedy to Defendants' contempt; (3) pursue enforcement under Federal Rule of Civil Procedure ("Rule") 69 and New York law; or (4) foreclose on the Mortgages based on their terms and seek a receiver to act as a sales agent.  (*See* Pl.'s Mem., Dkt. 600, at 2.)

judgment through New York's Real Property Actions and Proceedings Law.  (*See* Defs.' Opp'n, Dkt. 619, at 10–12.)

## A.    The Court's Equitable Powers

The SEC contends that the Court has "broad equitable powers to protect investors" and that federal district courts "often grant" the appointment of a receiver or sales agent to sell real property as relief.  (Pl.'s Mem., Dkt. 600, at 7–8 (collecting cases and quoting 15 U.S.C. § 78u(d)(5)).)  The SEC maintains that these equitable powers are "even broader and more flexible" where "the government is the plaintiff and the broader public interest is at stake."  (*Id.* at 8–9 (collecting cases).)  The SEC offers three reasons why the Court should exercise its equitable powers to appoint a receiver or sales agent to sell the Assets: (1) "[t]he SEC has alleged fraudulent conduct by Defendants"; (2) "the value of the [Assets] . . . is deteriorating"; and (3) "Defendants would not be injured by the appointment because a sales agent would only monetize the [Assets] for fair market value."  (*Id.* at 9–10.)

The Court agrees with the SEC that Section 21(d)(5) authorizes the Court to grant the equitable relief the SEC seeks and that there is just cause to do so in this case.

### 1.    The Court may appoint a liquidation receiver.

Section 21(d)(5) provides that "[i]n any action or proceeding brought or instituted by the [SEC] under any provision of the securities laws, the [SEC] may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C. § 78u(d)(5); *see SEC v. GPB Cap. Holdings*, No. 23-8010, 2024 WL 4945247, at *3 (2d Cir. Dec. 3, 2024) (summary order) (characterizing Section 21(d)(5) as a "broad[]" provision).  Such equitable relief includes the power to appoint a receiver.  *See GPB Cap. Holdings*, 2024 WL 4945247, at *3 (compiling cases).  Additionally, "[a] receiver appointed in any civil action or proceeding involving property, real, personal or mixed . . . shall . . . be vested with complete

jurisdiction and control of all such property with the right to take possession thereof."  28 U.S.C. § 754.

Even prior to the enactment of Section 21(d)(5), and "in the absence of explicit statutory authority," the Second Circuit has "upheld the appointment of . . . receivers to effectuate the purposes of the federal securities laws."  *GPB Cap. Holdings*, 2024 WL 4945247, at *3 (quoting *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972), *abrogated on other grounds by SEC v. Ahmed*, 72 F.4th 379 (2d Cir. 2023)); *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987) ("Although neither the Securities Act of 1933 nor the Securities Exchange Act of 1934 explicitly vests district courts with the power to appoint trustees or receivers, courts have consistently held that such power exists . . . .").  As the Second Circuit has summed up, "[t]here is no question that district courts may appoint receivers as part of their broad power to remedy violations of federal securities laws."  *SEC v. Byers*, 609 F.3d 87, 92 (2d Cir. 2010); *see Eberhard v. Marcu*, 530 F.3d 122, 131 (2d Cir. 2008) (noting that "[d]istrict courts possess broad power to remedy violations of federal securities laws" such as appointing receivers (citing *Manor Nursing Ctrs.*, 458 F.2d at 1103)); *see also SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996) (noting that a Court has "broad equitable power to fashion appropriate remedies"); *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984) ("The sweeping mandate manifest in the securities laws would be all but meaningless were it not for the broad investigatory and enforcement powers created under the statutory scheme. . . . [O]nce the equity jurisdiction of the district court properly has been invoked, the court has power to order all equitable relief necessary under the circumstances." (citing *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 390 (2d Cir. 1973))).

Defendants maintain that "[w]hile courts may appoint receivers to manage fraudulently obtained or ill-gotten assets," this power is circumscribed by a requirement that liquidation of assets for the satisfaction of a money judgment must accord with "the legal process historically recognized at equity." (Defs.' Opp'n, Dkt. 619, at 10.) Defendants cite to *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319–20, 333 (1999), in which "the Supreme Court held that a preliminary injunction [freezing assets] issued under Fed. R. Civ. P. 65 had to be within the district court's equitable authority under the Judiciary Act of 1789." *Adelphia Bus. Sols., Inc. v. Abnos*, 482 F.3d 602, 606–07 (2d Cir. 2007) (citing *Grupo*, 527 U.S. at 318–19).

However, as the Court has previously found, "*Grupo* is irrelevant to this matter." *See Xia*, 2022 WL 17539124, at *11. As discussed then, and as the Second Circuit has confirmed, "in concluding that a court does not have authority to freeze assets to preserve them to satisfy a potential award of money damages, the Supreme Court in *Grupo Mexicano* 'distinguished those cases where the ultimate relief sought is equitable.'" *SEC v. Kontilai*, No. 23-7537, 2025 WL 615190, at *5 (2d Cir. Feb. 26, 2025) (summary order) (quoting *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005)); *see also Liu*, 591 U.S. at 85 (noting that Congress "incorporat[ed] . . . longstanding equitable principles into §78u(d)(5)"). The relief sought here is equitable, and *Grupo* does not control.

To be sure, the Second Circuit has "in the past criticized the use of receivers to effect the liquidation of a defendant . . . in litigation under the Securities Act or Securities Exchange Act." *Am. Bd. of Trade*, 830 F.2d at 436; *see e.g.*, *Lankenau v. Coggeshall & Hicks*, 350 F.2d 61, 63 (2d Cir. 1965) (recommending, but not requiring, bankruptcy court as the forum for liquidation in SEC action against brokers or broker-dealers in a case involving insolvency). But criticism has been the extent of it and largely cabined to the bankruptcy context. The Circuit has "never vacated or

modified a receivership order on the ground that a district court improperly attempted to effect a liquidation." *SEC v. Malek*, 397 F. App'x 711, 715 (2d Cir. 2010) (summary order) (quoting *Am. Bd. of Trade, Inc.*, 830 F.2d at 437). As the SEC points out, (*see* Pl.'s Mem., Dkt. 600, at 9), courts in this Circuit have regularly appointed liquidation agents or receivers in enforcing securities actions.[9]

Accordingly, the Court concludes that it has the equitable powers to both appoint a receiver and, if appropriate, to task that receiver with liquidating the Assets.

> 2.    Equitable principles favor appointment of a liquidation receiver.

The Court now turns to whether the exercise of its equitable power to appoint a liquidation receiver here is appropriate. "Appointment of a receiver . . . is a 'drastic remedy usually imposed only where no lesser relief will be effective.'" *SEC v. Amerindo Inv. Advisors, Inc.*, No. 05-CV-5231 (RJS), 2013 WL 1385013, at *13 (S.D.N.Y. Mar. 11, 2013) (quoting *Ferguson v. Tabah*, 288 F.2d 665, 674 (2d Cir. 1961)), *modified on reconsideration*, 2014 WL 405339 (S.D.N.Y. Feb. 3, 2014). Section 21(d)(5) requires that equitable relief be "appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). In determining whether a receiver should be appointed, the Court considers, *inter alia*:

---

[9] *See, e.g.*, *SEC v. GPB Cap. Holdings, LLC*, No. 21-CV-583 (MKB) (VMS), 2023 WL 8468467, at *15 (E.D.N.Y. Dec. 7, 2023) ("[T]he Court finds it appropriate to exercise its statutory and equitable power to convert the monitorship to a receivership."), *aff'd*, 2024 WL 4945247; Order, *SEC v. Borland*, No. 18-CV-4352 (PKC) (S.D.N.Y. May 9, 2024), Dkt. 63 (appointing a liquidation agent); *SEC v. Ahmed*, No. 3:15-CV-0675 (JBA), 2022 WL 122269, at *5 (D. Conn. Jan. 11, 2022) (approving liquidation plan); *Malek*, 397 F. App'x at 714–15 (affirming district court's approval of a receiver's distribution plan that included "effective liquidation" of defendant's estate); *see also* *CFTC v. Alexandre*, No. 22-CV-3822 (VEC), 2025 WL 252435, at *3 (S.D.N.Y. Jan. 21, 2025) ("[A] district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad." (citing *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986)).

[F]raudulent conduct on the part of defendant[s]; the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and, in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

*GPB Cap. Holdings*, 2023 WL 8468467, at *12 (citations omitted).

The SEC argues that Defendants have engaged in fraudulent conduct with respect to the handling of EB-5 investors' funds and the Assets, as supported by the Court's preliminary findings in a December 2022 order freezing Defendants' assets.  (Pl.'s Mem., Dkt. 600, at 9–10); *see Xia*, 2022 WL 17539124 at *4–5, *23–28 (determining that the SEC had proven a sufficient likelihood of success in its unjust enrichment claims and Section 10(b) of the Securities Exchange Act and 17 C.F.R. § 240.10b-5 misrepresentation claims).  The SEC also argues that the value of the Projects is deteriorating and that "Defendants would not be injured by the appointment because a sales agent would only monetize the [Assets] for fair market value."  (Pl.'s Mem., Dkt. 600, at 10.)

In response, Defendants do not contest the SEC's allegations that Defendants have engaged in fraudulent conduct with respect to their handling of EB-5 investor funds and the Assets. Defendants do, however, contest the SEC's arguments that the Assets are deteriorating and that no harm would result from selling the Assets, arguing that the proposed enforcement would "undermine [the investors'] immigration status [and] could trigger irrevocable consequences under USCIS regulations."  (Defs.' Opp'n, Dkt. 619, at 12, 16–17.)

The Court finds that the equitable factors favor appointing a receiver, at least as to the Eastern Mirage and Eastern Emerald Projects.  In addition to the clear evidence of fraud by Defendants, upon which the Court based its initial freezing of Defendants' assets, *see Xia*, 2022 WL 17539124 at *23–28, the Court also finds that there is sufficient evidence to support the SEC's claims that at least two of the Assets are deteriorating and "diminish[ing] in value," *GPB Cap.*

*Holdings*, 2023 WL 8468467, at *12.   Defendants' own past filings explicitly admit the deterioration of the Projects.  (*See* Dkt. 124, at 3 (stating that the Eastern Mirage Project "sits fallow and deteriorates day by day"); *id.* at 23 ("Conditions at the site have deteriorated . . . since Defendants' assets were frozen and the Monitor was appointed."); *id.* at 2 (reporting "deteriorating conditions"); Dkt. 207, ¶ 50 ("[T]he site conditions [of both construction sites] have deteriorated substantially since the Asset Freezing Order was entered on September 27, 2021."); Dkt. 274, at 10, 25 n.19.)  The SEC also offers as additional evidence its communications with a non-party who is allegedly an interested investor who examined the buildings' prospects.  (Han Decl., Dkt. 600-1, ¶¶ 2–5; Dkt. 600-5.)  Defendants provide no credible evidence to the contrary.

The Court also concludes that that neither Defendants nor the EB-5 investors have a credible threat of prejudice from the sales of the Assets.  The Court agrees with the SEC that, at least as to the Eastern Mirage and Eastern Emerald Projects, "Defendants would not be injured by the appointment because a sales agent would only monetize [these Projects] for fair market value, with the proceeds of that sale to be held pending a further Court order directing, if appropriate, that the proceeds be applied to what Defendants owe under the Final Judgment."  (Pl.'s Mot., Dkt. 600, at 10.)  While Defendants are correct that the relief sought must specifically benefit the investors, at least under the Securities Exchange Act, *see Liu*, 591 U.S. at 89 (concluding that relief under Section 21(d)(5) "must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains" to give effect to language in Section 21(d)(5), the Court is not persuaded that more effective alternatives to the appointment of a receivership exist at this time to benefit investors, especially given the protracted and fraught history of this case and the fact that Defendants have paid only approximately 15% of the more than $272 million owed under the Consent in the 18 months since its execution.

11

In arguing that appointing a receiver would harm investors, Defendants point to filings early in this case to support the statement that the EB-5 investors' "primary objective [is] project completion." (Defs.' Opp'n, Dkt. 619, at 16–17 (citing Dkts. 78; 86).) Not so. First, even assuming these filings—filed nearly four years ago, ahead of the Court's show cause hearing, and two years prior to the Final Judgment—are still accurate representations of the EB-5 investors' interests, the filings describe the investors' "ultimate objective" as "obtain[ing] permanent resident status in the United States through the EB-5 program." (Dkt. 78, at 3; *see also* Dkt. 86, at 2 (stating investors also "wish to receive . . . repayments of capital").) The investors' representatives favorably discussed the possibility that the investors' green card applications could be maintained within a receivership where the projects they had invested in were "sold to an unrelated third-party developer in a 'restructuring transaction' that included specified conditions designed to preserve the investors' ability to maintain their EB-5 petitions." (Dkt. 78, at 4.) Indeed, the Distribution Plan approved as part of the Consent allows the EB-5 investors to move their investments into other EB-5 projects, thus allowing them to preserve their EB-5 applications. (*See* Distribution Plan, Dkt. 500-3, ¶ 76; 11/05/2024 Dkt. Order (adopting the Distribution Plan).) In sum, even assuming the benefit that the EB-5 investors care most about is obtaining their immigration status, the completion of the Projects is not essential for the investors to achieve that goal.

In fact, Defendants' proposed course of action—preventing the sales of the Projects—would achieve the opposite of what investors are seeking. To the extent the EB-5 investors might wish to keep their investments in the Projects, their immigration benefits require the Projects' success and profitability. *See Xia*, 2022 WL 17539124, at *21 ("[T]he success of any investor's visa application hinge[s] on the ability of the EB-5-funded Projects to turn a profit, be sustainable, and create jobs." (citing *Hui Feng*, 935 F.3d at 731)). But, as the Distribution Plan states, and

consistent with the Final Judgment and the Consent, the EB-5 investors are only able to maintain their investments in the Projects if Defendants meet certain requirements in the Final Judgment with respect to control over the Projects. (Distribution Plan, Dkt. 500-3, ¶¶ 79–80; *see* Final J., Dkt. 460, at 9; Consent, Dkt. 459-2, ¶ 3(c).) These requirements have not been met and, as such, they directly conflict with and prevent the "project completion" as envisioned by Defendants. *See SEC v. Xia*, No. 21-CV-5350 (PKC) (JAM), 2025 WL 1332018, at *5 (E.D.N.Y. May 7, 2025) (documenting "Defendants' history of non-compliance with the terms of the Final Judgment—including, most notably, Defendant Xia's failure to relinquish control of Fleet"). Second, even assuming that the EB-5 investors could maintain their investments in the projects as they are, Defendants have been uncooperative with investors' efforts to advance their immigration documents. At least two investors have sought the Court's intervention, complaining of a lack of responsiveness by Defendants. (*See* Ltr. of EB-5 Investor Yongxiang Pan ("Pan Ltr."), Dkt. 616, at 1 (stating an investor was "unable to obtain the documentation necessary" to support their immigration process "because [Defendant Fleet] controls these records and has shown no indication it will provide them"); Ltr. of EB-5 Investor Chen Li ("Li Ltr."), Dkt. 714, at 1 (similarly describing a failure to respond to "repeated written requests" for "materials in Fleet's exclusive possession" necessary to immigration processes).) Third, as the Court has noted before, Defendants' "promises to complete the Eastern Emerald and Eastern Mirage Projects are speculative, at best, and [have formed] a long line of similar proposals that have never come to fruition." *Xia*, 2025 WL 1332018, at *5.

Accordingly, the Court finds that appointment of a receiver to sell the Eastern Mirage and the Eastern Emerald Projects is warranted to preserve the EB-5 investors' interests and satisfy the Final Judgment under Section 21(d)(5) of the Securities Exchange Act of 1934.

The Court denies as currently unnecessary the appointment of a receiver to sell the Kings Point Property, which the SEC has not shown to be in deterioration or necessary to support the EB-5 investors' interests.  Furthermore, at this time, the Court cannot determine whether the additional funds that might be gained through a sale of the Kings Point Property is needed to satisfy the monetary sums still owed under the Final Judgment.  As the SEC notes, this ruling is limited to disgorgement and prejudgment interest, but not the civil penalty.  (Pl.'s Mem., Dkt. 600, at 9 n.5.)  The Court will revisit this decision with respect to the Kings Point Property and the other grounds for effectuating the Final Judgment should it prove necessary.

### B.    Applicability of Foreclosure Requirements

Defendants oppose enforcement of the Final Judgment by claiming that, "[a]s a matter of law, the SEC cannot bypass New York's Real Property Actions and Proceedings Law, which mandates that all mortgage foreclosures . . . proceed through a separate judicial action."  (Defs.' Opp'n, Dkt. 619, at 3.)  Even if New York law does not impose this barrier, Defendants maintain, "the plain language of the [Mortgages] . . . reflects the parties' intent for New York's mortgage and foreclosure laws, rights, and substantive procedures to apply."  (*Id.*)  Defendants argue that New York law requires the SEC to file a separate action to foreclose on its Mortgages and to meet the law's procedural and substantive requirements.  (*Id.* at 5.)  Meanwhile, the SEC replies that "the Mortgages, the Final Judgment, and all applicable law make clear . . . [that] the SEC need not proceed by mortgage foreclosure."  (Pl.'s Reply, Dkt. 634, at 3.)  The Court finds that neither New York law, nor the terms of the Mortgages, nor any of the parties' agreements preclude the enforcement of the Final Judgment in this action.

### 1.    Applicability of New York Real Property Actions and Proceedings Law

The parties' dispute regarding the effect of New York law on this matter starts with the applicability of New York Real Property Actions and Proceedings Law's ("N.Y. RPAPL") Article

13, which Defendants claim requires a separate action for mortgage debt, among other non-waivable procedural requirements. (*See* Defs.' Opp'n, Dkt. 619, at 4–8.) Although the SEC also argued that it could proceed on the basis of enforcing the mortgage's terms alone—and even assuming, without deciding, that Defendants' are correct about the procedural requirements for that avenue of relief—that is not how the Court is proceeding at this juncture. Rather than a mortgage foreclosure action, which Article 13 might govern, this decision grants "equitable relief" that is "appropriate or necessary for the benefit of investors" as provided by federal statute. 15 U.S.C. § 78u(d)(5).[10] This distinction separates this matter from all of the decisions cited by Defendants.[11] Defendants themselves note that foreclosure is not the only way a debtor may

_____

[10] New York caselaw confirms that Article 13 does not apply where a decision does not concern a mortgage foreclosure. *See Hoge v. Chautauqua Cnty.*, 104 N.Y.S.3d 813, 815 (4th Dep't 2019) (finding that Article 13 of the RPAPL "does not apply" to a sale of property that is not a "mortgage foreclosure[]"); *In re Foreclosure of Tax Liens by Proc. in Rem Pursuant to Article 11 of Real Prop. Tax L. by Cnty. of Niagara*, 103 N.Y.S.3d 334, 335 (4th Dep't 2019) (same); *Wang v. Hon*, No. 12353/17, 2018 WL 5309874, at *6 (N.Y. Sup. Ct. Oct. 23, 2018) (finding Article 13 of the RPAPL "has no relevance" where a judgment lien "was not obtained by a mortgage in a foreclosure action"); *see also Citibank, N.A. v. Yanling Wu*, 154 N.Y.S.3d 327, 330 (2d Dep't 2021) ("[A]rticle 13, which governs mortgage foreclosure actions, distinguishes between an action to recover any part of the mortgage debt and an action to foreclose the mortgage. 'An action to foreclose a mortgage is not an action to recover the mortgage debt from the mortgagor personally, but to collect it out of the land by enforcing the lien of the mortgage.'" (quoting *Jamaica Sav. Bank v. M. S. Investing Co.*, 274 N.Y. 215, 219 (1937))); *Ivy Hill Commodities Corp. v. Beekharry*, 967 N.Y.S.2d 75, 77 (2d Dep't 2013) (finding that certain procedural requirements under New York law did not apply, based on the distinction between a judgment based on a "mortgage debt" and one based on "fail[ure] to make payments due under the stipulation of settlement").

[11] *Leonia Bank v. Kouri* concerned only the distinction between a common mortgage and a deed issued as a security; it did not concern N.Y. RPAPL's Article 13. 772 N.Y.S.2d 251, 254 (2004); *see also In re First Union Baptist Church of Bronx*, No. 17-CV-7184 (KBF), 2018 WL 770401, at *5–6 (S.D.N.Y. Feb. 7, 2018) (addressing the same issue). In *In re Soho 25 Retail, LLC*, "the parties agree[d] that New York law applie[d] to the . . . dispute," and the decision centered around a debtor's security interest in rents from the property in question and did not concern N.Y. RPAPL. No. ADV. 11-1286 (SHL), 2011 WL 1333084, at *5 (Bankr. S.D.N.Y. Mar. 31, 2011). *SEC v. Levine*, 881 F.2d 1165, 1178–79 (2d Cir. 1989), and *Audiovisual Publishers, Inc. v. Cenco Inc.*, 964 F. Supp. 861, 875–76 (S.D.N.Y. 1997), support only the statement that Consents are construed as contracts, and not that any mortgage foreclosure requirements apply. *Wyo. Cnty. Bank & Tr. Co. v. Kiley* did not include the language quoted by

recover with respect to a note holder secured by mortgage, (*see* Defs.' Opp'n, Dkt. 619, at 5 (noting that a "secured party" may "either . . . foreclose on the mortgage or . . . recover on the note" (citation omitted))), but nonetheless address only the requirements as to foreclosure proceedings.

    2.    The Terms of the Final Judgment, the Consent, and the Mortgages

Defendants maintain that foreclosure requirements must apply because "[n]either the [Consent] nor the Final Judgment or related mortgage documents authorize appointment of a liquidation agent by motion outside New York's foreclosure framework."  (Defs.' Opp'n, Dkt. 619, at 8–9.)  The Court reads the Consent, the Final Judgment, and the Mortgages differently.

"[C]onsent judgments should be interpreted in a way that gives effect to what the parties have agreed to, as reflected in the judgment itself or in documents incorporated in it by reference." *Levine*, 881 F.2d at 1179; *see Allen v. Cnty. of Nassau*, No. 22-CV-1572 (HG) (JMW), 2022 WL 4468173, at *2 (E.D.N.Y. Sep. 26, 2022) ("For purposes of enforcement, 'a Consent should be construed and interpreted as a contract.'" (citation omitted)).  Likewise, "a mortgage document should be interpreted like any contract."  *Secured Asset Mgmt., LLC v. Dushinsky*, No. 17-CV-5588 (DLI) (CLP), 2023 WL 2429689, at *3 (E.D.N.Y. Mar. 9, 2023).

The plain terms of the Final Judgment specifically provide that "[t]he [SEC] may enforce the Court's judgment for disgorgement and prejudgment interest by using all collection procedures authorized by law."  (Final J., Dkt. 460, at 5; *see id.* (likewise providing that "[t]he [SEC] may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law").)  The Final Judgment includes no indication that the SEC must proceed by enforcing the mortgages or by bringing an action in New York court.  Neither does the Consent, which provides

---

Defendants, (*see* Defs.' Opp'n, Dkt. 619, at 4), focused primarily on the express terms of N.Y. CPLR § 5206, and specifically addressed the requirements for other ways a creditor may recover with respect to a note secured by mortgage.  *See* 430 N.Y.S.2d 900, 902–03 (1980).

only that Defendant Xia would "undertake[] to . . . grant and assign to the [SEC], in a form agreeable to the [SEC], as security for Defendants' payment and performance of their obligations under . . . this Consent, a senior security interest in all of Defendants' rights, directly and indirectly, in and to the assets[,]" including the Eastern Mirage and the Eastern Emerald Projects. (Consent, Dkt. 459-2, ¶ 3(a).) Likewise, each of the Mortgages for the Projects provide that "[t]he [SEC]'s rights in th[is] Action with respect to Xia, Fleet, Yue, the Final Judgment, or the Debt, including, but not limited to, the [SEC's] rights to seek Court intervention to satisfy monies owed by Xia, Fleet, or Yue, are not limited by this Mortgage." (X&Y Mortgage, Dkt. 600-2, ¶ 30; EEG Mortgage, Dkt. 600-3, ¶ 30.)

Thus, the Court finds that none of the terms of the Consent, the Final Judgment, or the Mortgages preclude the Court's ruling here.

\* \* \*

Accordingly, the Court finds that neither N.Y. RPAPL nor the terms of the agreements between the parties precludes the appointment of a receiver in this action towards selling the Eastern Mirage and the Eastern Emerald Projects.

## II.    Defendants' Request for a Stay

Defendants seek a stay "of any further proceedings in this case in furtherance of enforcement of the Final Judgment." (Defs.' Mem. in Supp. of Mot. to Stay ("Defs.' Mem"), Dkt. 586-1, at 2.) Defendants request the stay "as 'matter of right' pursuant to Federal Rule of Civil Procedure 62," or, in the alternative, "based on the exercise of sound judgment." (*Id.* at 3.)

### A.    Stay Pending Post-Judgment Motions and Appeals

Defendants first request that the Court stay enforcement of the Final Judgment "pending resolution of post-judgment motions in trial court, including but not limited to the[ir] contemporaneously filed Motion to Modify [the Final Judgment] and issues on appeal." (*Id.* at 8.)

As a starting point, Defendants' Motion to Modify the Final Judgment, (Dkt. 585), has since been denied by the Court, (05/07/2025 Dkt. Order), and there are no other unresolved post-judgment motions concerning the enforcement of the Final Judgment. Although Defendant Xia has appealed the Court's denial of the Motion to Modify, (*see* Notice of Appeal, Dkts. 620, 635)[12], and that appeal is currently pending, *see SEC v. Xia*, 25-1683 (2d Cir. Jan. 8, 2026) (pending appeal over denial of Defendants' motion to modify the Final Judgment), the Court has already found that the pending appeal does not deprive the Court of jurisdiction or authority to rule on the SEC's Motion to Enforce the Final Judgment.[13]    (07/28/2025 Dkt. Order (determining judgment remains operative unless a stay is granted by the district court or Court of Appeals, neither of which has occurred).)

The SEC argues that the appeal should not factor into consideration of a stay, as it claims Defendants, through the Final Judgment, "expressly waive[d] [their] right to appeal that judgment." (Pl.'s Mem., Dkt. 600, at 17; *see also* Final J., Dkt. 460, at 1 (noting that the parties "waived findings of fact and conclusions of law; and waived any right to appeal from this Final Judgment").) Defendants request another opportunity to brief this issue. (Defs.' Opp'n, Dkt. 619,

---

[12] Dkt. 620 and Dkt. 635 are two entries of the same notice of appeal.

[13] Defendant Xia has another two appeals currently pending, which do not concern the liquidation at issue here. *See SEC v. Xia*, 25-2039 (2d Cir. Jan. 8, 2026) (pending appeal over denial of Defendant Xia's motion for release of funds); (*see also* Dkt. 652 (notice of appeal for the same); Dkt. 727 (notice of appeal over order denying release of funds and directing Defendants to assist investor with access to certain documents)). Although a Second Circuit mandate filed in this case referenced the notice of appeal in Dkt. 652, (*see* Dkt. 677), the Second Circuit case number in the mandate reveals that it concerned an earlier appeal in this action, and therefore that appeal is still pending. Defendants' other appeals have been dismissed. *See* Order, *SEC v. Xia*, 22-3137 (2d Cir. Aug. 15, 2022), Dkt. 222 (dismissing appeal over asset-freezing preliminary injunction); (*see also* Dkt. 219 (notice of appeal)); Order, *SEC v. Xia*, 23-0231 (2d Cir. Feb. 22, 2024), Dkt. 115 (dismissing appeal over denial of a motion hearing under Rule 65); (*see also* Dkt. 262 (notice of appeal)).

at 19–20.)  The Court finds that it need not decide whether the waiver covered Defendants' Motion to Modify, because Defendants have failed to meet the other requirements of the stay.

### B.    Stay Pursuant to Federal Rule of Civil Procedure 62

Federal Rule of Civil Procedure ("Rule") 62(b) provides that, "[a]t any time after judgment is entered, a party may obtain a stay by providing a bond or other security" and that "[t]he stay takes effect when the court approves the bond or other security and remains in effect for the time specified in the bond or other security."  Rule 62(d) also provides that "[w]hile an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights."

Although both Rule 62(b) and Rule 62(d) would require a bond, Defendants assert that the bond requirement can and should be waived as unnecessary.  (*See* Defs.' Mem., Dkt. 586-1 at 3–4.)  "A district court . . . may, in its discretion, waive the bond requirement 'if the appellant provides an acceptable alternative means of securing the judgment.'"  *In re Nassau Cnty. Strip Search Cases*, 783 F.3d 414, 417 (2d Cir. 2015) (per curiam) (citation omitted).  In deciding whether to forego the bond requirement, courts consider what are often referred to as the "*Nassau* factors":

> (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position.

*Id.* at 417–18 (citation omitted).  "The *Nassau* factors are designed to accomplish the 'primary purpose' of Rule 62(b): 'to ensure recovery for a party who ultimately prevails on appeal, and to

protect the judgment debtor from the risk of losing the money if the decision is reversed.'" *Tatas v. Ali Baba's Terrace, Inc.*, No. 19-CV-10595 (ER), 2025 WL 1190806, at *3 (S.D.N.Y. Apr. 22, 2025) (quoting *In re Nassau Cnty.*, 783 F.3d at 418); *see also id.* ("The vast majority of courts in [the Southern District of New York] applying [the *Nassau*] factors have denied a motion to stay enforcement without a supersedeas bond." (citation omitted)).

Defendants claim that the *Nassau* factors favor waiving the bond requirement, focusing on the extant preliminary injunction freezing Defendants' assets and the Mortgages for the Eastern Mirage and Eastern Emerald Projects. (Defs.' Mem., Dkt. 586-1, at 9–10.) Defendants claim that these projects are worth far more than the amount owed under the Final Judgment and that Defendants "will be reasonably likely to secure the necessary funding to fulfill the remaining Final Judgment payment obligations in the relatively near future if the SEC is reasonably cooperative." (*Id.* at 9 n.12.)

But as discussed *supra*, the Court has found that the Eastern Mirage and Eastern Emerald Projects are deteriorating. The Court also expects that the liquidation of the Projects would be complex, as both involve millions of dollars and are backed by hundreds of EB-5 investors with immigration concerns. As the Court has previously noted, these Projects "are highly illiquid and might never be sold," and the value of expert reports purportedly showing that the Projects are worth substantially more than what is owed under the Final Judgment is "almost nil." *Xia*, 2022 WL 17539124, at *31. Defendants' present projections that "the combined fair market value of the collagenized properties exceeds $600 million," (Defs.' Mem., Dkt. 586-1, at 10), like those expert reports, are based on Xia's self-serving and unsupported affirmations, and the Court accordingly finds these assertions to be of little probative value, *see Xia*, 2022 WL 17539124, at *31 (noting Xia's lack of credibility).

Likewise, there is insufficient reliable evidence to support Defendants' claims that they are reasonably likely to secure funding via new creditors for the amounts still owed under the Final Judgment in the relatively near future. First, Defendants provide no specific evidence to that effect—only an affirmation by Defendant Xia, which deserves little weight. *See id.* Second, as the SEC points out, Defendants have argued elsewhere that they have been "unable to secure lenders or investors who are willing to commit the funds necessary" under the Final Judgment. (Pl.'s Mem., Dkt. 600, at 18–19 (quoting Dkt. 562, at 3).) Third, Defendants have made similar claims multiple times over the course of this case, yet none have "come to fruition." *Xia*, 2025 WL 1332018, at *5 (noting "long line" of proposals and "promises to complete the Eastern Emerald and Eastern Mirage Projects . . . that have never come to fruition"). Fourth, in the ten months that have passed since Defendants filed their enforcement motion, there has been no indication that Defendants might be able to secure additional funds to meet the Final Judgment's obligations or complete the Projects.

On the record before it, the Court, in its discretion, finds under the *Nassau* factors that Defendants have not shown their ability to pay the amount owed under the Final Judgment "without substantial delay or other difficulty." *In re Nassau Cnty.*, 783 F.3d at 418 (citation omitted). Accordingly, Defendants' motion for a stay pursuant to Rule 62 is denied.

### C.    Discretionary Stay

Finally, Defendants argue that a stay is the proper exercise of the Court's discretion. (*See* Defs.' Mem., Dkt. 586-1, at 5–7, 12–17.) "It is well settled that district courts have the inherent power, in the exercise of discretion, to issue a stay when the interests of justice require such action." *Vista Food Exch., Inc. v. Law*, No. 21-CV-4689 (ALC), 2023 WL 2760965, at *1 (S.D.N.Y. Mar. 31, 2023) (citation omitted); *see also Kashi v. Gratsos*, 790 F.2d 1050, 1057 (2d Cir. 1986) ("[A] court may decide in its discretion to stay civil proceedings . . . when the interests

of justice seem . . . to require such action.") (internal citations and quotations omitted).  Defendants

carry the burden to establish "a clear case of hardship or inequity in being required to go forward."

*Est. of Henkin v. Kuveyt Turk Katilim Bankasi A.S.*, No. 19-CV-5394 (BMC), 2025 WL 622546,

at *2 (E.D.N.Y. Feb. 26, 2025) (citation omitted).  "Courts take into account '(1) the private

interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against

the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants;

(3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5)

the public interest' in deciding whether to stay a case."  *Id.* (citation omitted).  Under these

standards, the Court finds that a stay is not warranted.

Defendants' request primarily relies on three arguments.  First, Defendants argue that

staying enforcement of the Final Judgment "will help resolve, or at least greatly simpl[ify] the

issues . . . and provide guidance that would allow this litigation to conclude thereafter on a

reasonable and efficient basis."  (Defs.' Mem., Dkt. 586-1, at 13.)  Second, Defendants argue that

they have a "compelling interest in pursuing their post-judgment motion practice and appeal

without the danger of enforcement of the judgment vitiating or otherwise impairing their assets

and rights."  (*Id.* at 14.)  Third, Defendants argue that a stay "serves the public interest . . . given

the EB-5 interests and complex financial-related issues at stake."  (*Id.*)  The Court finds no merit

in any of these arguments.

First, the purported "simplification" does not justify a stay here.  Defendants' argument

relies entirely on their likelihood of success in challenging the Court's denial of Defendant Xia's

Motion to Modify the Final Judgment.[14]  In "summarily den[ying]" that motion, the Court found

---

[14] As noted *supra* n.13, Defendants only have one appeal that could affect the Court's decision herein.  Defendant Xia had sought to modify the Consent and Final Judgment under "just terms," or in the alternative, "to modify the Final Judgment's payment schedule . . . and . . . cease

that Defendant Xia's arguments sought to "improperly relitigate issues that the Court ha[d] already resolved" and "border[ed] on frivolous." (05/07/2025 Dkt. Order.) Now, in the context of Defendants' request to stay, the Court reiterates and relies on its prior finding that Defendant Xia's appeal is frivolous and, as such, a stay until the resolution of Defendant Xia's appeals would not serve the interests of the courts, the interest of persons not parties to the civil litigation, or the public interest.[15] *See also Maltese v. Delta Airlines Corp.*, No. 24-CV-4311 (RPK) (LB), 2024 WL 4389282, at *1 (E.D.N.Y. Oct. 3, 2024) ("While a district court must ordinarily stay its proceedings while an interlocutory appeal is pending, 'district courts may certify an interlocutory appeal as frivolous and retain jurisdiction of the case despite the ongoing appeal.'" (collecting cases)); *Motorola Credit Corp. v. Uzan*, No. 02-CV-0666 (JSR), 2002 WL 31426202, at *1 (S.D.N.Y. Oct. 29, 2002) ("[A] district court "retains discretion to deny . . . a stay in at least those

---

further enforcement of the Final Judgment, . . . including any steps toward appointment of a liquidator." (Dkt. 585-1, at 23.)

[15] The Court has considered the fact that, if granted, Defendant Xia's appeal could result in modification of the Final Judgment. The Court reiterates that "the vitality of [a] judgment is undiminished by pendency of the appeal" and "[u]nless a stay is granted either by the court rendering the judgment or by the court to which the appeal is taken, the judgment remains operative." (07/28/2025 Dkt. Order (quoting *In re Gorsoan Ltd.*, No. 18-MC-0431 (RA) (KNF), 2020 WL 3264159, at *2 (S.D.N.Y. June 17, 2020))); *see Coleman v. Tollefson*, 575 U.S. 532, 539 (2015) ("Unless a court issues a stay, a trial court's judgment . . . normally takes effect despite a pending appeal."); *see also C.H. Sanders Co. v. BHAP Hous. Dev. Fund Co.*, 750 F. Supp. 67, 69 (E.D.N.Y. 1990) ("[T]he district Court has jurisdiction to act to enforce its judgment so long as the judgment has not been stayed or superseded." (alteration in original) (quoting *N.L.R.B. v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 588 (6th Cir. 1987))); *In re Hornbeam Corp.*, No. 14-MC-0424 (Part 1), 2017 WL 3491962, at *2 (S.D.N.Y. Aug. 14, 2017) (noting that "a Court may enforce its orders while review of those orders is pending on appeal," even if "a Court does not retain jurisdiction over 'the expansion and amendment of orders and judgments'" (quoting *In re Gushlak*, No. 11-MC-218 (NGG), 2012 WL 1514824, at *4 & n.5 (E.D.N.Y. Apr. 30, 2012))). Accordingly, the Court reiterates its earlier ruling that "the notices of interlocutory appeal [do not] preclude the Court from considering and deciding the SEC's . . . motion to enforce judgment against Defendants." (07/28/2025 Dkt. Order.)

circumstances where the appeal is patently frivolous or taken for an obviously improper purpose." (quoting *Cendant Corp. v. Forbes*, 72 F.Supp.2d 341, 343 (S.D.N.Y. 1999))).

Defendants' alternative arguments are equally unavailing and would support the contrary conclusion. As discussed *supra*, the Court does not find that the EB-5 investors would benefit from Defendants' continued ownership of the Projects given the Final Judgment and the Consent's requirement that Defendants entirely divest their control over the EB-5 projects involving the Eastern Mirage and Eastern Emerald Projects, (*see* Distribution Plan, Dkt. 500-3, ¶¶ 79–80; Final J., Dkt. 460, at 9; Consent, Dkt. 459-2, ¶ 3(c)), and the complaints the Court has received from these investors about Defendants' cooperation with their immigration processes, (*see* Pan Ltr., Dkt. 616, at 1; Li Ltr., Dkt. 714, at 1). Furthermore, to the extent Defendants are prejudiced by having to address any post-judgment motions and the SEC's motion for liquidation at the same time, the same is true for the SEC, or any other litigant seeking a post-judgment stay for that matter.

Finally, Defendants ignore the harm that the SEC and the EB-5 investors would suffer if the Court issued the requested stay. As previously discussed, all the credible evidence in this matter, and even some of Defendants' own statements, point to the conclusion that the Projects are depreciating in value and that a stay or any other delay will only exacerbate that loss in value. This would, in turn, harm the EB-5 investors both financially and in their immigration processing as well as the SEC with respect to their enforcement efforts. *See supra*, Part I.B.2. On the other hand, to the extent Defendants claim that denying the stay will hinder their efforts to secure additional funding to continue the Projects, the Court finds, as discussed *supra*, that the likelihood of such funding materializing, especially given that Defendants are required to fully divest control over the Projects under the Final Judgment, is wholly speculative and unsupported by any credible evidence. *See id.*; *supra*, Part II.B.

Accordingly, Defendants' request for a discretionary stay is denied.

## CONCLUSION

For the reasons stated above, the SEC's motion to enforce the Final Judgment is granted in part and denied in part, and Defendants' motion for a stay of the enforcement of the Final Judgment is denied in full.  The Court finds that, pursuant to its equitable powers under the Securities Exchange Act, appointment of a receiver to liquidate the Eastern Mirage and Eastern Emerald Projects is warranted, but the Court defers at this time on whether to order liquidation of the Kings Point Property.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 6, 2026
       Brooklyn, New York