UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------x

21-CV-5350(PKC)

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

United States Courthouse
Brooklyn, New York.

-versus-

April 20, 2026
3:30 p.m.

RICHARD XIA, ET AL.

Defendants.

-------------------------------x

TRANSCRIPT OF CIVIL CAUSE FOR PROCEEDINGS
BEFORE THE HONORABLE PAMELA K. CHEN
UNITED STATES DISTRICT JUDGE

APPEARANCES

For the Plaintiff: SECURITIES AND EXCHANGE COMMISSION
BY: CHRISTOPHER COLORADO, ESQ.
KIM HAN, ESQ.
DAVID STOELTING, ESQ.

For the Defendant: PRO SE
BY: RICHARD XIA

Also Present: SCOTT PEELER, ESQ
Court-Appointed Monitor

GLOBAL LAW GROUP
LINDA WONG, ESQ.
HELYN LAU, ESQ.

Court Reporter: Rivka Teich, CSR, RPR, RMR, FCRR
Phone: 718-613-2268
Email: RivkaTeich@gmail.com

Proceedings recorded by mechanical stenography. Transcript produced by computer-aided transcription.

(Video Conference via Zoom.)

THE COURTROOM DEPUTY: Civil cause for status conference, docket, 21-CV-5350, Securities and Exchange Commission vs. Xia, et al.

Will the parties please state their appearances for the record, starting with plaintiff.

MR. COLORADO: Good afternoon, Your Honor. This is Chris Colorado, on behalf of plaintiff, Securities and Exchange Commission, along with my colleagues, Kim Hahn and David Stoelting.

THE COURT: Good afternoon.

Mr. Xia, why don't you go ahead and state your appearance. You're muted.

MR. XIA: This is Richard Xia, pro se defendant.

THE COURT: And then how about, we have Mr. Peeler, go ahead and state your appearance.

MR. PEELER: Good afternoon, Your Honor. Scott Peeler, P-E-E-L-E-R, the court-appointed monitor.

THE COURT: Okay, good afternoon. Good to see you again.

And then, Ms Wong, why don't you go ahead and state your appearance?

MS. WONG: Good morning, Your Honor. This is Linda Wong of Global Law Group. And next to me is Helyn Lau, our senior attorney, who also worked on the matter as ordered by

the court.

THE COURT: Good afternoon to both of you. And now I'm actually going to direct a question to my law court.

Pedro, do we ask for Mr. Seiden to appear as well? I can't remember. Pedro, can you hear me?

THE LAW CLERK: Judge, no, the scheduling order did not direct. Mr. Seiden, to attend.

THE COURT: That's fine. I'm not necessarily saying you needs to be here. I just wanted to make sure I wasn't missing anyone. And unfortunately, the only person who's missing at the moment is Mr. Hantman, who represents Fleet. We'll put in a call or an email to his office again.

Mr. Xia, obviously you spoke to Mr. Hantman, because he submitted this letter on your behalf earlier on Friday. Do you know if he was planning to attend this conference?

MR. XIA: No, I don't know. I don't know that.

THE COURT: Well, we have a number of things to address, so let me just start with the most immediate one, which is your letter, Mr. Xia, that you had Mr. Hantman file for you, which I'll address in a separate docket order because I don't want Mr. Hantman to continue to file things on your behalf. He's not your lawyer. You should file things, as you have been doing directly as a pro se. But you asked me to adjourn this conference to allow you to get counsel; or rather, you wanted me to seek pro bono counsel for you, which

I'm not going to do. You're not entitled to counsel, Mr. Xia. And there's no reason I would do that in this case, in general, but certainly not at this point in the case. We are going to go forward with this conference, because I need to find out what the status of the immigration applications are for the various EB-5 investors. So we are going to proceed today.

I am denying your request for an adjournment. I'm denying your request for the court to find you pro bono counsel. And with respect to any release of funds, I'm not going to make a ruling because I don't know what the basis is for doing so.

And so that resolves, I think, a letter that was filed -- that you filed, Mr. Xia, via Mr. Hantman. Mr. Hantman doesn't appear docket order, explaining that he should not be filing things on your behalf, because he's not your lawyer. Mr. Xia, you need to follow those directly, which you have the ability to do and have done in the past.

MR. XIA: Can we file something like after our hearing here today within 14 days? That's one of my alternative relief, I'm seeking to see if that can be permitted.

THE COURT: What do you want to file within 14 days? You don't specify anything in particular or the 14 day period. What is it you want to file?

MR. XIA: No, I'm just trying to see, because you know like arguments in such a situation is obviously not something I am comfortable doing that. So I want to read the transcript to compliment supplemental some points which can be considered equivalent to the argument in the hearing.

THE COURT: You're talking about the conference that we have yet to start?

MR. XIA: Yeah, after the conference.

THE COURT: Okay, well, why don't we wait to see what happens and then you can let me know if you want to file something in connection with this conference, since obviously we haven't even discussed anything just yet. So save that request for the conclusion of our conference.

Okay, let's go to the second point. I guess I want to clarify what is going on here with the processing of the I-829, or RFEs.

I did see the letter from Global Law in which it explains, among other things, that the $85,000 that I had released before for this purpose, and to be used by Global Law has been used to process I-829 packages for 26 investors. And so the cost, I guess, per package is low, or the payment I guess, to Global Law per package was lower than originally estimated, 6000 versus $3,269.

My first question is, are there other IE29 or RFEs that need to be processed or handled in some way? And let me

direct that to Ms. Wong and Ms. Lau.

MS. WONG: Regarding the questions of additional 829s, there will be many, many 829s that needs to be handled with documents showing job creation. So right now, as far as I know, the first project, only 75 got filed. I don't know how many got filed for the second one. Because our job is to, exactly like what the order specified, that we have to compile and organize and collect. But we do not collect the specific documents from the vendors. So we go to the region center and say we need all you can give us. Then once we get this ginormous pile of documents, we have to go through it and see what will qualify under the immigration requirements.

And we have to be very mindful, because every one we need to allocate 10 jobs. So for those who are pressing deadline, like the 26, we have to make sure we give it to them, otherwise they won't be able to get their case filed and they will get denied.

So if somebody else come, not, I mean not to me, maybe, maybe, however, and say I need job documentation for 40 investors, I don't know what sequence they are. If they take it all, then the first 26 will lose all those job. I don't get involved.

I just give everything to Fleet after I get everything. And they go by the order of the filing. And then the most urgent one, they will get those files first. And

then, provided there is construction utilities, will keep working on those cases. So that's how the process works.

THE COURT: Okay, so let's back up for a minute for my benefit.

Do you know what the universe numerically is of EB-5 investors relating to the Fleet project who need to have some kind of immigration papers processed?

MS. LAU: Your Honor, I can answer that.

THE COURT: Okay, go ahead, Ms. Lau.

MS. LAU: We don't know the exact number. We were told a couple years ago, when they stopped subscribing, that there were approximately 220 investors in the first EEGH project, and I believe it was somewhere near 125 for the second EEGH II project. Now, whether or not the investors are continuing through the I-829 stage, which is removing conditions on their green card, which is what this package would do, we don't know if they are moving forward or when their green cards expire, because we are not in direct contact with the investors.

THE COURT: And so how do you then get the request to assist with the removal of the condition process? From the investors directly, or through Mr. Xia or Fleet or somebody else?

MS. WONG: We get requests from the regional center. Because they contact the regional center and say, my deadline

is December 15, I must have this. And so they in turn say, we have five investor with deadline coming up in three months or two months, and then we just deal with the immediate like deadlines, and that was 26 by the end of November.

THE COURT: Okay, so maybe you could define the timeframe. How many of the immigration packages have processed in general related to the removal conditions, those are the I-829, for some period of time just so I have an idea.

MS. WONG: Sure, like the other ones that we did.

MS. LAU: Overall, we have helped Fleet to prepare 75 for the first project, and I believe up to 14 for the second project.

THE COURT: Okay. And for the court reporter's sake. Rivka, they were referring to EEGH, which is the name of the projects themselves, and there's a 1 and a 2, so EGH1 and 2. I think that's the nomenclature we're using, right?

MS. LAU: Yes.

THE COURT: Okay, so for the first project, you processed 75, and for the second one, you said, was it 14?

MS. LAU: Yes, 14, one-four.

THE COURT: And do you know over what period of time

MS. LAU: It's been a couple years, but the last update we did was in, I believe, the end of November 2025.

THE COURT: Okay. And now the 26 that we talked about, that's part of this group of 89.

MS. LAU: The 26 was a combination of the two projects.

MS. WONG: So 15 went to project one, and 11 went to project two. And they are part of the 75 and part of the.

THE COURT: Okay, all right.

MR. COLORADO: Your Honor, could I clarify one point, I want to make sure that the record is clear. I think that they're referring to EEGHLP and EEGH2LP as two separate projects, and those are two components of the Eastern Emerald Projects. There are five limited partnerships in total. These two don't concern Eastern Mirage, which is a separate project.

So just to make sure that when we're speaking of two projects, in the context of this case we are often talking about Eastern Emerald and Eastern Mirage, but I want to make clear that that's just two parts of Eastern Emerald.

THE COURT: That's a great clarification.

Now, Ms. Wong and Ms. Lau, have you worked on any I826s relating to the Eastern Mirage project.

MS. LAU: Yes.

THE COURT: And how many have you processed for that project?

MS. LAU: I don't have the number off the top of my head. But we did the majority of the packages. We did the majority of the packages, 48.

MR. XIA: 105.

THE COURT: Okay, so you're saying, Mr. Xia, 105 in total for the Eastern Mirage. Okay. So what number, does anyone, know remains to be processed, first for the Eastern Emerald project, and I don't care if it's one or two, but how many more are left to be processed? Does anyone know, Mr. Xia? Someone?

MR. XIA: Yeah, we have roughly 374 investors, I think, for EEGH and EEGH II.

THE COURT: 374?

MR. XIA: Yeah, investors.

THE COURT: Okay.

MR. XIA: The other investors obviously get their temporary green card. And they have been spending more than probably, like, 10 years here in the United States. And all of them, I assume, unless some very special scenario, we don't know, but the majority of them, you know, just really trying to get their 829 to be able to file.

But right now, the issue is, we're running out of job. We only have a very limited job left to qualify them, because the project has been stopped for such a long time. And also their funding has been directing to non-job creation activities. And that part, I think your Honor understand that.

THE COURT: Right. Their money is not at risk, is required because of all that, you're saying.

MR. XIA: That's right.

THE COURT: Okay. And then, just turning to the Mirage for a second. How many investors there in total?

MR. XIA: I remember it's, you know, more -- it's roughly like 109 or 108. I don't remember. But several of them, either, you know -- I think one investor passed away, and some other, you know, one or two investor, they discontinued. But majority of them got permanent green card successfully.

THE COURT: And sorry, the number again was 109.

MR. XIA: Yes. I don't remember exactly the number over there. I remember it's roughly the number.

THE COURT: And they all got their green card. But again, might they not also need to have the conditions on the green card removed through the I-829 process?

MR. XIA: No. I think 105, if I remember correctly, all get the permanent green card.

THE COURT: Oh, I see. Okay, so we're more concerned then with the Emerald investors, and we don't really need to worry about the Mirage investors. Is that fair to say?

MR. XIA: Yes.

THE COURT: Okay. I was just trying to get an overall sense of how much more work needs to be done. Because one of the questions is if additional funds need to be released.

Now I know, Ms. Wong, Ms. Law that you acknowledge

that there was some miscommunication with respect to one of the EB-5 investors who complained I think about not getting her package, and that was Ms. Lee, right?

MS. WONG: May I, Your Honor. That is the attorney for 40 investors. So what she was asking is like documents related to 40 investors. And I just let the project handle, let Fleet handle it. Because if 40 investors documentation were given out, then we have 26 that are without documentation. But I'm not in the middle of that, so I just let them sort it out.

THE COURT: Okay. Now those 40 individuals again, at some point, it sounds like they may need also to have the IE29 processed and they're not part of the group that has been processed already for the Emerald project.

MS. LAU: I believe it's unclear because we don't know exactly who are her immigration clients. And we also don't exactly know which investors Fleet gave EB-5 packages to, the 26. So it could have included some of her investors, but we are unclear.

MR. XIA: Not every single investor can file the I-829 based on their own like preference. They have to wait until, I think, like, a few months before the temporary green card expire, then they are eligible to submit that. So I believe Carolyn Lee, the investor client, they are still, I think, like, not up to the time they're eligible to file an

829, the form.

And also she's basically trying to organize that 40 investor by telling them, look, there's no hope, no chance for you to have a qualified job. So she's actually organizing them to invest into a different project. So that part of the reasons she's inquiring all these documents from us.

THE COURT: Okay. But they're entitled to do that under the consent decree in this case, or the consent order. They can move to another project, because as you point out, Mr. Xia, you're going to have some problem qualifying for the EB-5 benefits if the project is no longer producing income, or producing jobs, or viable.

But just to go back for a minute to the process, so I understand where if at all additional monies needs to go to or how to make sure that the process is running as it should.

What I understood you'd say, Ms. Wong and Ms. Lau, is that typically the regional center will contact you about the need for the filing of an I-829 for one of the Emerald investors. Or, I guess, randomly, sometimes an investor will complain either to me, or somehow they get to you otherwise, perhaps through someone like Ms. Lee, who represents a number of investors. Is that right?

MS. WONG: Correct. You are absolutely right.

THE COURT: And then you prepare the I-829 paperwork and then you send it to Fleet, or you send it to immigration?

MS. WONG: We send it to Fleet most -- I mean most. and The reason is because the sequence of the filing, because if all the investor or the counsel come to me, I don't know who's first, who's last, and then we will be foregoing the ones that have the most urgent deadlines. So I am not in a position to know the sequence of the investor. In fact, I don't know all the 3300-plus investor. So just make the process fair to these investor, so the earlier ones get filed with the pressing deadline, then they get the package through fleets.

THE COURT: So you need to send the I-829, to Fleet to provide information necessary for those applications to be complete, is that right?

MS. WONG: Our package is already completed. So that's why it's called like pull and pull (ph) template.

But just to let everybody know, including the immigration counsel or the investor, this is the standard package. So don't change it. Don't take anything out. That's why we use the template like pretty loosely. And then we will just give it to Fleet. And then they look at everybody's orders of filing, and they decide who gets it. And if there's anything missing, they contact us. We'll just try to supplement whatever needed in the package.

And meanwhile, we get things like not at the same time. So sometimes we have a lot of documents that are

unrelated. And sometimes we might get it in week one and week two is different, and sometimes we see inconsistent information. So our job is like, really, comb through everything, page by page, to make sure that all the evidence will qualify. Because we don't want one investor not able to have their condition removed, especially they waited, what, eight, ten years. So that's our job.

THE COURT: And who do you send it to when you say, Fleet? Is it Robert Hantman, the lawyer, or somebody else?

MS. WONG: I think we send it to Richard.

THE COURT: Mr. Xia.

MS. WONG: Yeah.

THE COURT: Okay, all right. Now, Mr. Xia, what do you do with those when you get them?

MR. XIA: When we get them, once the investors time is, you know, they're ready to submit their 829, they contact us. And then, you know, we have to give to our Chinese counsel to communicating with them, talk to them, prepare the individual documents that needs to be attached. It's general template, then give to their own Immigration counsel for fighting.

THE COURT: I'm not quite sure I understood it. Do you send it, did you say, to another lawyer?

MR. XIA: Yeah, another lawyer in China.

THE COURT: Not Mr. Hantman.

MR. XIA: No.

THE COURT: So who is that lawyer?

MR. XIA: This lawyer, Mr. Cheung in China.

THE COURT: Mr. Cheung China. You send it to a lawyer in China? How come?

MR. XIA: Yeah, because all the Chinese investors, it's much easier for them to communicate. Because they have tons of question and many other documents, many concerns given the situation we have here. So that's a lot of work need to be done.

THE COURT: Okay, and then Mr. Cheung provides whatever additional information is needed or gets it from the investors. And then what happens?

MR. XIA: Then give it to their own immigration attorney. Each individual investor also have their own immigration attorney. And those attorney also need to prepare their individual form and the individual documents they need from us. And then they can submit the whole package. So like last year in July, that's investor 10. He didn't go through that process. He is trying to not to contact the Chinese lawyer. He's actually, I think, a boss of general company from other investor and submitted. Then the USCIS came back. Number one, they are like, what's the sequence. You know, who's this investor? Why regional center didn't certify the order of the sequence.

And number two is, where's the individual document that need to be accompanied in the general package.

So that's part of the reason, you know, I think that in my (inaudible) to the court for that.

THE COURT: Right now, though, in terms of what the need is, or anticipated need -- and let me just, I guess, start with you, Mr. Xia. How many more I829s, do you anticipate need to be processed relating to the Emerald project, because I think that's the only one that right now needs it.

MR. XIA: I don't know. I have no idea. We are basically in a passive stage. Whenever the investor is there, and they reach out to us, either through their counsel or directly come to us. And then we have someone contact them short of their requirements. Then we contact Linda. Like, recently, we need, you know, like, I think formal investor, and they are in in the stage they need to submit next month. So again, we need Linda's help to prepare update the package, and we haven't started process yet. But their timing is almost there. Next month is the time they need to file their I-829 package.

MS. WONG: Your Honor, may I answer your question?

THE COURT: Yes.

MS. WONG: Earlier we said that the total investors 376, and then the completed I-829, so we are still short of

439 right?

MR. COLORADO: Your Honor, if I could clarify a point here. I think that we understood from Mr. Seiden and Mr. Seiden's counsel that a substantial number of the Eastern Emerald investors have requested their money back and don't want to proceed. And so maybe what Ms Wong is providing is a ceiling on how many applications there could be. But I don't think it's necessarily accurate with respect to the individual intentions.

The other thing that's just not clear to me from this discussion is, Mr. Xia initially came to the Court to request sufficient funds to create 14 applications. It appears that the GLG has created 26 templates that they then passed on to Fleet. It's not clear to me whether or not those were actually used for investors, or whether they're still sitting with Fleet. Whether Fleet has, you know, passed them on to any subsequent recipient.

I think it would be useful, even if not on this call, for Mr. Xia to provide the names of the investors for whom, or some details as to whom these packages have been provided and confirm that they in fact, were used for investors.

MR. XIA: All of them, except two in the EEGH II, all of them have been used, submitted already. That's they we need in the office to help to update EEGH package, because we

have former investor. It's very urgent right now, need to submit their package next month. We only have, you know, very short time period to prepare their document.

MS. WONG: May I.

THE COURT: Go ahead.

MS. WONG: May I just supplement the answer? And thank you, Mr. Colorado, you are absolutely right that I'm sure there are many, many investors decided to pull out. It would be, I guess from our end, may it be 259, which is the ceiling for the maximum number, or maybe 100. Our problem is that the voluminous document is getting less and less because there's no construction activities. I don't know whether -- I mean, we can help even 100 investors. I mean even these four, I don't know whether there's sufficient construction activities. And if these four can use the two, but I don't know whether it is the LP1 or LP2.

Our biggest problem is that the client doesn't have enough materials for us. And we'll be happy to do whatever number of cases. And we are not asking for like fees or anything. We are just telling everybody that even you give me fees, I might not be able to do it.

THE COURT: When you say they don't have enough information, what are they missing?

MS. WONG: They're missing construction expenditure, which is required.

You want to add to that?

MS. LAU: Sure. In the EB-5 context, as you may or may not know, each investor needs to show ten jobs created using their investment. One way to do that is to show that construction expenditures have been spent. So for every let's say a million dollars that the project may spend, it could -- I'm going to estimate -- ten jobs.

And so if in our packages that we have created we've used all of the construction expenditures that were given to us and but we were limited to 26 packages, so about 260 jobs across the two partnerships.

And so what Ms. Wong is trying to say is if we don't have any more construction expenditures to sift through and analyze and to show what jobs have been created, it will be difficult for us to continue to prepare packages, even if we were paid.

MR. XIA: Those packages, including the very moment the money hit into our account, then has been used for the construction. So, right now $70 million of those money has been either sent to the, you know, the court (inaudible) account, or third party account. So that fundamentally violates USS requirement.

That's why (inaudible) is talking about there's no money that can be, you know, actually to show that there's, you know -- either they chose to go to a different project or

they chose to stay in the project. And that's, you know, that's because immigration law is a lot more strict about tracing those expenditures and the money moving from initial investment into the final construction.

THE COURT: The fundamental problem, Mr. Xia, is that you were supposed to have relinquished ownership and control of Fleet. And Fleet was supposed to have continued, in theory, as a potential regional center or vehicle that the EB-5 investors could use. And the fact that the construction has come to a halt and no activity is happening to justify or show 10 jobs being created, is because you haven't done what you were supposed to do under the agreement.

So now we have this collision course happening with some of the EB-5 investors needing to demonstrate, that the 10 jobs were created and whatever else the criteria are, no activity with respect to Fleet because it's not an ongoing concern at the moment.

MR. XIA: That's not the case.

Remember when John Leo through his counsel allow me to file that letter. Even, you know, because that's one of the conditions for them to accept the transfer regional center. Investor fund has been used for other purpose. Exactly the same allocation I've been alleged, now extra money has been used for other purpose. So even they become regional center. There's no investment fund they can prove to the USCIS

investment fund has been used for the job creation.

So that's the fundamental issue for all this EB-5 investor and for the potential transfer of this regional center.

MR. COLORADO: Your Honor, I think this is, if I may. I mean, this is the fifth or sixth time we've heard this argument over the past year. I mean, Mr. Xia is using this affidavit-related conference to sort of do another collateral attack on the final judgment. And obviously, we strenuously dispute the characterization of USCIS law. And also this was the bargain that Mr Xia struck that he's now spent 18 months trying to undo. And I think as your Honor recognizes, the reason we are in this position is because he did not make a payment over a year ago to satisfy the final judgment and allow everyone to move forward.

Most recently, Your honor has ordered the liquidation of the properties and immediately Mr.Xia appealed that order. He's done nothing but delay to, it seems, the detriment of the EB-5 investors.

And so I don't think this USCIS argument is well taken. Particularly when USCIS was consulted in connection with drafting the contours of the settlement.

THE COURT: I agree. So we don't need to rehash the history here or how we arrived at this point.

What I do want to ensure though is that the EB-5

investors aren't harmed for their process delay because of the problem with having someone responsible for getting their packages prepared and there being money for that purpose.

I just want to go back for 1 minute, though, Mr Xia and just one other question for you. At some point it was suggested that you were charging some of the EB-5 investors to get the documentation they need. Are you doing that?

MR. XIA: No. Mr. Cheung in China, that attorney is charging each investor to pay his fee.

THE COURT: So the chinese attorney is charging the EB-5 investors in China to get information from where? From them or from the project?

MR. XIA: It's a coordination. You know, every time when you order someone to work, they have to get paid. And we really have trouble to get payment release for anybody, except this $85,000. If you look at the whole thing, we already submit 89 investor for the, you know, the EEGH and the EEGH II in the last four and a half years. So we have actually been working diligently to submit and prepare the document visa the counsel and the visa assistance of investor to submit that. For the work they have done, there's a lot of coordination work, communication, talking, prepare. And you know, for me it's I'm owner of the regional center, but I'm also conducting the work without any payment, any fee. So that's something I think, fundamentally since day one beginning of this case, I'm

not being recognized as a professional that can actually perform like 7 services for really like, you know, elder market price.

THE COURT: Let me just stop you. I just want to understand something very basic. What additional information, and maybe Ms. Wong and Ms. Law you can answer this, what additional information is needed after you send the application to Mr Xia? Is it about the project? Or is it about the people, the investors themselves, in China?

I just don't understand why this lawyer in China has to get involved. Because it sounds like what is needed is some documentation about the construction expenditures or the viability or activity of the actual regional center of the projects themselves.

MR. XIA: Number one, you need somebody to contact them and to communicate with them to explain to them what's the situation, and that you need to spend time. If you're talking about a 100 investors, there's a lot of time.

Number two, the general package from Linda is talking about the general project for the 26 people. But each individual people need to be allocated to special speakers, sequential numbers. And the plants they need to have a matching invoice attached into the package. And also, they need a financial accounting firm, and many other things that need to be prepared. Then send to their counsel review. And

their counsel might need some other documents that need to be provided to them. So all this work you need to have somebody to do it. It cannot be automatically happen.

THE COURT: Are you getting any of the money that Mr. Cheung is getting when he charges the investors for this?

MR. XIA: Yes, if we need to provide all the financial documents and other documents, we're also asking for the payment directly, you know, from them and sent to the other parties.

THE COURT: This is problematic, Mr. Xia.

All right. Let me ask what is needed.

I'm sorry Mr. Peeler that I asked you here, because I need to get a handle on the overall project. What moneys, if any, are needed from your perspective, Ms. Wong, Ms. Lau, in this moment in time to ensure that the EB-5 investors get the packages they need at least from your perspective or based on your efforts? Is there anything right now that's outstanding?

MS. WONG: No, there's nothing outstanding, except that I don't know when will we be in a position to ask for fees if there's no construction activities. I mean, it's just like, you know, doing a food kitchen and ask me to cook. I can cook, but there's no ingredients. There's no, no vegetable, no rice, no nothing. That's what we're dealing with.

So we are not in a position to ask for any money and

we don't want to ask for any money.

THE COURT: All right. Does anyone have a sense -- Mr. Colorado, you said that most or substantial number of the investors have simply withdrawn their investments and walked away from this. But we're still talking about a potential, maximum number of about 259 or 265 Emerald EB-5 investors. I mean, unless over 200 have withdrawn their investment, their application, we still have a lot of people to worry about, it seems to me.

MR. COLORADO: Think of that's correct. I mean, I don't think it's disputed that there is going to be some substantial number of persons who are going to proceed with the process and need documentation.

I think the fundamental issue that Ms. Wong is pointing to is, and I think consistent with the orders that are previously set forth in this case, the job creation or the construction on these projects stopped about 5 years ago. And so whatever jobs were created up to that point is the number of jobs that there are available to apportion out to the various investors.

And so my understanding what Ms. Wang is saying is that they are near the bottom of the barrel of the number of jobs there are to assign to investors in support of their applications. And that they anticipate that in the near future, whether it's two months from now or a year from now,

investors will come and want to complete their documentation, but there will be no jobs to assign to them because job creation stopped about 5 years ago when the initial asset freeze was put into place and Mr. Xia has never made an appropriate request for funds to do something otherwise.

MR. XIA: I have been asking for the allocation of money and the --

THE COURT: Hold on a second. I just want to hear from Mr. Colorado until the end. Because I'm trying to figure out what if anything I need to do in terms of releasing funds, or something to get a handle on this to make sure that we're not leaving any EB-5 investors out in the cold.

MR. COLORADO: I think what we need to know is how many jobs created have not yet been assigned to investors from Fleet. How many do they have in reserve that are left? I think the second thing that would be useful would be to know for Mr. Seiden more precise numbers around how many of the EEG investors have removed themselves from the process. And I think the third thing that we could endeavor to find out is, of the remaining investors, when are the next relevant deadlines for them from USCIS. Meaning, are there 10 investors that will come due in 2026, or are there 50? I think those data points are probably necessary to determine, well, you know, if there are so many jobs left and there are so many investors that will come due shortly, then that would

seem to give you the universe of applications that should be prepared at this time.

But as you know, I think ultimately, some of these investors are going to have to pour over to a different project, to give sufficient job creation.

THE COURT: Right. And that's the other number. Do we have a sense of how many switched to a different project?

MR. COLORADO: We can inquire with Mr. Seiden as to what the current claims are And update your Honor.

THE COURT: Okay. Mr. Peeler, I realize that maybe we didn't necessarily need you here. But is there anything you wanted to add based on your vantage point. I mean, obviously you're sort of just making sure that the projects don't deteriorate to a point that they're not --

MR. PEELER: No, but thank you, your honor. I think Mr. Colorado's suggestions about the next steps make a lot of sense. And your honor already noted the concern about some of the fees coming back to Mr. Xia, that might be worthy of review.

THE COURT: I'm troubled by this. But I guess the conundrum is I'm not quite sure who you can provide the information about what -- well, let me ask that. In terms of who can answer these questions, obviously Mr. Seiden can answer the question of how many investors have withdrawn their investments entirely and opted out of the program, and how

many have switched to a different regional center or investment vehicle.

But then the other questions about how many jobs created are left to assign to the investors --

MS. WONG: Nothing.

MR. XIA: Yeah, nothing.

MS. WONG: I think by now at least Helyn and I know there's really very few jobs left because the construction paused for 5 years.

In addition, I appreciate what Mr. Colorado is requesting, I'm just wondering if they move on to another project or they've withdrawn, I mean, did they get their money back? Probably not. So how do we know the number? Because they are represented by themselves or other counsel, and whatever the number Mr. Xia would get, I'm curious how accurate would that be? Because I represent a lot of projects, a lot of this, they don't tell the regional center a lot of times what they decided to do. But doesn't mean Mr. Xia should not produce it.

I just wonder, what's the next step after we produce that, most likely no jobs, most likely not 259, maybe he will come up with a figure of 100. And then what makes -- we are still cooks at the food kitchen with nothing to cook.

THE COURT: Right. I think Mr. Seiden will certainly know who of the investors, I think, have withdrawn their

investments and who have switched to other projects to the extent that people report that to him. Because he's overseeing the administration of this entire plan. Because, you obviously only see a piece of this, but there's a much bigger plan that was agreed to by the parties -- fully followed through with. And the EB-5 investors do have the option to salvage their applications by switching to another project, leaving somewhere else, which logically makes sense if Fleet is not producing any jobs at this point.

And when you say very few, is it fair to say that no other I-829 could be processed given how few jobs are left?

MS. WONG: We don't know. But we're talking about maybe two investors, four investors, not a 100 investors.

And also, I'm so sorry, I'm not in the loop of everything. Even if they move on to other projects, don't they need a $500,000 back in their hand before they can move to another project, which is totally, I mean reasonable for each investor. And it just seems like some of the investor might not want to take the risk of going to another project and go through another 5, 7 years. I am not saying Mr. Xia's project is perfect.

I just don't understand. Maybe this recent -- they linger on, they just keep lingering on and keep booking the regional center. The regional center keep booking us and say we need to get this, we need to get that done for this

deadline. So basically, that's what's going on.

THE COURT: Well, let me ask you a question. You mentioned that you find out about investors who need to submit the I-829 directly from the regional center.

MS. WONG: Right.

THE COURT: Is it possible that you don't send any of those to Mr. Xia, and that you could just send them back to the investor's lawyers immediately? As opposed to -- is it necessary always to go to Mr. Xia and then obviously always end up that these folks get charged money by Mr. Cheung and Mr. Xia. Can that be bypassed entirely?

MS. WONG: The problem is that we have no way to know whose deadline. But in addition, we understand that just like Mr. Xia shared earlier, they borrow from each other and then they will share with like 5 other investors, 10 other investors. Then, all of a sudden, a 100 job is gone to somebody else.

So it's a matter of fairness to the investor. I'm sure if there's a third party involved, not necessarily Mr. Cheung in China, not necessarily Mr. Xia can make this fair and equitable, but I don't know who that is.

THE COURT: You feel like you need to send it to someone and you can't just do it all yourselves based on whatever information you have? That's what I'm --

MS. WONG: We just don't have the manpower and

capacity to handle, what, 259 more investor trying to figure out what's going on. And even if we figure out, I just feel that we cannot help them to accomplish their goals After this 10, 12 years. And it's just a process we can help.

I don't have the answer. I just don't know how they would not be deported. It's not saying that they for sure they will get their green card if they move on to another project. There's a fear of this family, that kids have been here for so long, and to uproot them is really challenging. But I'm not saying they should stay at the project, I really don't know what's going on, because you guys did a lot of work before.

THE COURT: Mr. Xia, let me ask you another question. You had referenced an accounting firm, also. What exactly are they doing with respect to these EB-5 applications?

MR. XIA: Number one, each year each individual investor they are part of the LP members, so they need a K1. They need tax rate 10 to be filed in order to find individual partnership. And that three clients has been sent to Mr. Peeler since 2021, and it's never been brought into the court, never been filed into the court.

So we have to find the money, and sometimes that's your professional, you know like, good face to tell them just eventually you can get paid rent or just produce that.

So every single year, including today, I have a mass in the group which, you know, Mr. Seiden's associate in that group too. They're asking, you know what happened to the K1, what happened to the tax return? Because everybody's living here under the temporary green card, they need -- (inaudible) -- they need K1, they need a lot about the information. It's an active regional center, these almost like 500 investors here. It's lots of coordination work. We're doing that for the last four and half years for free.

THE COURT: Mr. Peeler,, I don't know if this is something you're aware of, but it sounds like what you're saying, Mr. Xia, is that the accounting firm is providing K1 forms for the investors so that the investors can fill out their own tax returns. Is that what you're saying?

MR. XIA: Yes.

THE COURT: And these K1 forms, what do they indicate?

MR. XIA: They're part of the partnership of that LP. So each individual partner need to show to their accountant they money invest into the US project. And also by the time they need to send me their permanent green card, they need also that K1 form to show that their money has been stay in the project.

So right now, in this year, we cannot even show that. Because all the money is gone. We cannot even provide

that K1 -- even if we provide K1 to show zero so that disqualified the potential application immediately because their money is no longer in the project they've been invest. And so that's why John Leo send the letter before. Before they can accept transfer from regional center, they need those money to be returned, at least so we can show them the money is still there.

THE COURT: Mr. Peeler, did you want to say anything?

MR. PEELER: Other than the fact that I have asked multiple of Mr. Xia's attorneys over the years for invoices and for the simplest of information to verify the services provided, and those who have not been provided to us. And Mr. Xia, as he knows, has been able to and through his counsel and on his own to file any motions he wishes, and has done so repeatedly. So I take exception to characterization.

MR. XIA: Mr. Peeler, I have an email I think in October and November 2021. I sent to my counsel, forward to you, the invoice proposal for five LP each year, accounting services and everything. I think you should remember.

MR. PEELER: If I remember it, we followed up with some questions that were never -- again, your Honor, I'm happy to engage with anything you'd wish. We have repeatedly tried on --

THE COURT: Mr. Xia, wait.

MR. PEELER: I'll just simply make the record that we have repeatedly attempted to, for any legitimate services, get information that the K1s were issued, to provide information that we needed to simply verify that professional services were provided.

It's not that there weren't communications, Mr. Xia. It was simply that they were never successful for the barest of information.

THE COURT: Thanks again. I think I end where I began, which is that this is a largely self-inflicted problem, Mr. Xia. I think if you had followed through with the terms of the deal, we would not find ourselves in this morass, this situation where there are some 85 investors, some identified, fairly large number, who are having all sorts of issues with respect to their own taxes and their immigration status because of this situation that exists.

It seems to me that I should at least have communicated with Mr. Seiden. Not only do I need to know what the numbers are, in terms of how many EB-5 investors have completely walked away from the program, and how many have switched to a different project, as far as he knows. But I feel that perhaps he's the right person to send a message to the EB-5 investors, with whom he can't communicate or their lawyers, that they need to do something to mitigate the potential damage that is coming. Because the report we're all

getting is that there aren't any jobs really left to assign to the vast majority of any of the remaining EB-5 investors. There will not be in the foreseeable future. So there's really no point in them staying with this project or continuing to invest.

At some point they ought to be counseled. And I don't know if it's appropriate and I'm happy to hear other people's opinion, but counseled perhaps by Mr. Seiden at least that this is the situation.

We don't know exactly when their deadline is coming up, but we can assume it's going to be relatively soon since the investors are all from I think the same period of time, roughly, with the deadline that, or an end date, or a last investor date, that is going to make their deadline come due soon with respect to the I-829.

So my suggestion, and this is what I want to hear from folks on, is for me to communicate with Mr Seiden, or perhaps the SEC can do that, to say we should put out a notice to the EB-5 investors who still haven't submitted their I-829. They ought to think about their options because it's pretty clear, they're not going to be able to meet the criteria for job creation.

Am I missing something here?

MR. COLORADO: Your Honor, we're in principle fine with that, and we're fine with communicating with Mr. Seiden.

It may be useful for him to propose language to the Court, just so there's no confusion around that.

I did want to make one point clear. So again there isn't any confusion, that what the investors at this point can do is file a claim with Mr. Seiden that says when there is a distribution, they either will receive back their investment; or if eligible, they will use their what we've referred to as Section M rights to move to a new project. The conditions precedent to that Section M right coming into being is Fleet being terminated from USCIS and from the EB-5 program. We understand that that has not happened yet. I don't know that I know if and when it will happen. But that condition precedent has not yet occurred. And so to the extent that they are choosing to move to a new project, that is just a claim with the distribution administrator at this point. None of those have choices have been affected practically. And obviously, there hasn't been a distribution yet because we've received only partial payment. And I think that the liquidation of the assets are going to be necessary in order to provide sufficient funds to make distribution.

THE COURT: Let me ask you one question. If someone asks, if an investor opts to receive back their investment, how does that affect their immigration status?

MR. COLORADO: Well, that would effectively be withdrawing from the program.

THE COURT: But I mean, at that moment in time do they lose any immigration rights? What is their immigration status at that time?

MR. COLORADO: Yes. If they choose to get the money returned to them, then they are effectively withdrawing from the EB-5 program in its entirety.

And so, as an example, if someone invested but they remained in China And they never came to the United States and have ultimately determined, as we've been informed in some cases, that they just don't want to participate in the program, they've changed their mind about what their intentions are, that they would receive payment back. And so that would disqualify them, or you know they'd otherwise be withdrawn from the program.

MR. XIA: For the investor who is willing to stay in the project for whatever the reason, we should at least allow them to gather money back they put into the project. Because after they four and a half years, everybody is pretty clear about our allegation and everything there.

You know, we basically take their money away, terminate the project, and the creditor kind of situation which fully against house investors wish to get their permanent green card be processed, I don't know if there is something we can think about, there's any like remedy we can help them.

THE COURT: I'm not inclined to go that direction, because the delay is not in their best interest. They have an option in which they can try to preserve their EB-5 status by switching to a different regional center. But obviously, that can only happen after Fleet is -- maybe I'm using the wrong term -- is decertified, de-designated. But I am not going to suggest that somehow they reinvest -- I think it's what you're suggesting -- in Fleet. Because at this point I don't see a path forward for Fleet to produce the jobs that are needed, because everything right now is a standstill and a stalemate, largely because you keep appealing the judgment, which was to facilitate this whole process moving forward. And quite frankly, would have allowed you to stay in control of Fleet, I believe, so long as, and I corrected what I said earlier, I think you could stay involved in Fleet, maybe not in control of it if another company came along.

But everything has been mired down in delay because you are not accepting the reality that you entered into this consent. And you haven't complied with what you need to. So you're experiencing -- I mean everyone involved in the case and sadly the investors are experiencing just massive delay without them being able to realize the benefit of their EB-5 investment so far. That's where we are.

So I'm not going to have Mr. Seiden suggest that they figure out a way to reinvest in Fleet, if that's what

you're suggesting.

MR. XIA: It's not my suggestion, your honor. Is something -- like Mr. Colorado just talk to you, if the regional center is not terminated and then if the EB-5 investor this cannot exercise their Section M right, that means at this moment we're basically giving them and no choice. They cannot take money go to a different project.

THE COURT: I think he's frozen.

MR. XIA: I'm not frozen.

THE COURT: That may be so, but that's the reality. There's no option for them to keep their money invested in Fleet and be able to get their I-829 paperwork, because there are no jobs being created, which they --

MR. XIA: -- (inaudible) in the construction, no problem.

THE COURT: I'm sorry?

MR. XIA: If their any investment, if we could assess free limited and we can go back to this construction tomorrow, we don't have to wait for --

THE COURT: You're living in a fantasy world. We are so past that point. You have to deal with the reality that we're in. Okay. This case has been going on for a very long time.

You entered into a consent agreement, where you were supposed to do certain things. One of them was to make a

second payment, that you haven't made, that would allow some of the money to go back to the investors. And then you were supposed to also relinquish, and I forget if it's completely control or ownership, but you could have stayed involved in the project if you could have found another buyer for that.

You mentioned Mr. Leo but that he walked away from it. That's the reality.

MR. XIA: He's still there. He just want to make sure that if we become the new owner of the regional center, he can continue to make those investors get their permanent green card. If all their money has been sent to third party and sent to the SEC, there's no way for him to be the new owner of that regional center.

THE COURT: But this has been almost two years now, I think since we talked to Mr. Leo, or at least over a year. And there have been applications processed. There has been some -- there has been enough job creation to process all those applications that exist right now. And nothing has happened.

Mr. Leo has not stepped back in. So I don't know what he's waiting for, but I am not going to put the investors in a predicament by not letting them know that if they don't do something, there will not be a possibility of an I-829 for them because there are no jobs being created, and there haven't been for a long time. And maybe a few more investors

who might be able to get their condition removed. They have to make an informed decision. So I have to tell them. That is the situation.

If you think for some reason that you can get the project moving again, obviously, you can figure that on your own, but it has not happened for over a year. And I've heard these promises or projections or proposals, one after the other, for years now. And they just have not come to fruition. And so we're not waiting any longer for that to happen without my having Mr. Seiden inform the investors of the reality of the current situation.

MS. WONG: Your Honor, may I ask a clarifying question? I am still thinking about this 200-plus or 100-plus investors. So if they move on to another project, and given with my limited knowledge, there's only so little left. So maybe the 500,000 they might get 200,000 or 300,000, they will never get their green card transfer.

THE COURT: Ms. Wong, let's hold your thought for a minute. Our court reporter needs a break. So everyone take 15 minutes, roughly. We'll reconvene at 5:00. Okay, because I just got a note about that. So she's the most important person right now. So let's let Rivka take a break.

Thank you, everyone.

(Brief recess.)

THE COURTROOM DEPUTY: All rise. Back on the

record.

THE COURT: When we broke, Ms. Wong, you were saying something that I interrupted. Why don't you tell me your concerns.

MS. WONG: Okay. I am concerned about investors. And sometimes we give hope to the investors, such as employment and your money will be transferred to another projects; but immigration officers may not be able to understand the background. So even with withdrawal, I just wonder since, Mr. Colorado, that you have been in consultation with your USCIS, I wonder whether their 829 can still be filed but put in abeyance until there is something concrete coming about, instead of send them to removal and deportation proceedings. Because they are dealings with hundreds of thousands of cases, how would they know.

Meanwhile, you have parents and kids go through deportation when the family are sorting things out. And I just wonder how can we protect them. Instead of saying go ahead and go to another project, go ahead just withdrawal; but it's important if they can have the case in abeyance for five years, ten years, as long as they don't terminate the status.

I know it's beyond the scope of this case, I'm just making a suggestion for request.

THE COURT: Let me respond, unless you want to Mr. Colorado. Because as I mentioned before, Ms. Wong, there

was a negotiated settlement this case that provided for a process by which all of the EB-5 investors in this project, the Mirage and Emerald, could excise their rights and get whatever they needed to preserve and safeguard their immigration status and processing. A lot of that has gotten upended because, I said this before and I'm not going to belabor it, Mr. Xia did not follow-up on his end of the day. As a result, now everything has gotten bogged down longer than expected. It was anticipated that those projects wouldn't; namely, Mirage and Emerald projects, wouldn't be in the holding pattern for as long as they have been. That has unfortunately brought consequences that were not intended under the broader settlement.

That's why at this point I'd like to figure out how, consistent with what you're saying, we can ensure that the EB-5 investors' rights are protected through the processes that we have set up, which is why I want to suggest that I have Mr. Seiden do a few things.

One of them is to report back on how many investors have left the program or indicated that they want to just get their money returned and leave the program. How many of the investors have excised or indicated that they want to excise their Section Ten rights and chose a different program, so they can remain in the EB-5 investor program.

And at some point, Mr. Colorado, I want you to

clarify for me whether they can do that, whether they can indicate that intention or exercise that option within the structure of this settlement before it has been decertified.

The last thing I want Mr. Seiden to do is come up with some language to advise all the EB-5 investors who have yet to process their I879, and still have conditional green card -- 829 -- conditional green cards. And this is where I'm not quite sure what we should say, but I want Mr. Seiden to propose something that would advise them that it may be difficult for them to get their I-829 and convert or get out of the conditional green card status if they stay with Fleet. Because right now, as you explained, Ms. Wong, there may be only jobs enough for two to four more applications. Right, two to four more I829s.

MR. XIA: The job creation is essentially the job progress. So as long as job is progressing, the job can be created.

So here, as you mentioned, the core essence of the settlement agreement is for the purpose of the protection of the investor. And I believe for the SEC initially they start the whole investigation and file the case, it is also for the protection of the investors.

Here, right now, after this four and five years is all these allegations with everything, US approve every single I-829 and 526 application. And also, we're trying -- if we're

trying to protect them, right now it's basically -- I understand it is difficult, but the difficult portion is part of the settlement agreement and also part of the money has been sent into third-parties and accounts.

During the break I called Mr. John Leo, he told me, I'm fully ready to come back as long as the funding is there. They are fully ready to take over regional center and continue the project for the EB-5 investor. So here there is --

THE COURT: I'm going to stop you. We're not going to have this discussion yet again. I've heard this way too many times.

Remember, the other core purpose of the agreement was to separate you from these projects because you have mismanaged and misused the EB-5 investor funds, millions of dollars worth. That's why we are here. That is the fundamental reason we're here.

And the purpose of the agreement was to separate you from the regional center, to not allow you to be the owner of it. That was a core condition, and you have yet to relinquish the control over it. At the same time protecting the investors, of course.

But you are eliding, you're skipping, over the real reason we have to have this case and this settlement, which is that you have mismanaged the money in a way that amounts to fraud. And, therefore, you cannot be in charge of the Fleet

project, you cannot be the owner or controller.

That has not happened because you not --

MR. XIA: -- (inaudible) approved --

THE COURT: Excuse me?

MR. XIA: That's part of the settlement agreement that you approved --

THE COURT: You didn't follow through. There was a deadline for that over a year ago, I'm sure. Then also you were supposed to pay a sum of money that you have not paid. And that was supposed to have come from the, I gather, from you negotiating the sale of the project to Mr. Leo, and before him there were a succession of different potential owners. None has come to fruition. Nobody prevented --

(Talking over each other.)

THE COURT: We're not at this point going to leave the investors potentially holding the bag. And somehow backing me into letting you run the projects again when you have not actually done what you were supposed to have done. And then not following through with the agreement.

We're not revisiting all of this. It's been way too many years and you've not done what you're supposed to do, that's why the investors are in the situation they are.

I agree with Ms. Wong and Ms. Lau is that what we need to do is focus on them at this moment to ensure that they don't lose rights that they ought be to able to exercise.

That's why I wanted them to know what the situation is.

And I'm not, to be clear, we're not going to discuss this again. I'm not letting you take over the project again start it again with Mr. Leo. That's just not happening.

You can talk to the SEC. If for some reason they seem to believe this will get us out of the box or if he wants to buy the property, I guess when we go through the receivership, the sale, the dissolution -- what is the word I'm looking for?

MR. COLORADO: Liquidation.

THE COURT: Liquidation. Thank you.

He can do that. I'm not going to let you start the projects again. It's simply not happening. We're way past of that possibility.

MR. XIA: According to the settlement agreement and the final judgment, I'm still the owner of the project.

THE COURT: You are not supposed to be, that's the problem. The problem is you were supposed to have relinquished your ownership. There was a deadline for that. Mr. Colorado can remind when it was, but that did not happen.

MR. XIA: That's a regional center. Regional center doesn't own the projects.

MR. COLORADO: To be clear --

THE COURT: I'm not having the conversation with you any more. I'm not.

What I'm telling you all is that I would like Mr. Seiden to come up with notice for the EB-5 investors that he has contact to apprise them of the situation. I'm going to ask the SEC to work with Mr. Seiden and propose something because I want them to understand what their options are in light of the fact that there are perhaps maybe four potential I829s that can be processed at this point based on what think the job creation number is and what jobs are left to be attributed to any EB-5 investors.

MS. WONG: May I, your Honor?

THE COURT: Yes.

MS. WONG: May I ask a clarifying question. I'm still thinking about investor, just like you.

Because even with withdrawal, even with a transfer the I-829 can still be in the pipeline, it's not automatic that you lose your status that day. So I just wonder whether we can protect these investors. Let them be in the pipeline until they sort things out, could be six months, could be a year, could be two years. Because once the adjudication happen, they will get notice to appear. They have to convince the removal judge what is going on, and nobody can explain what is going on.

So that's why regarding, I guess the notice to investor, if you would allow me I will provide some language for consideration for USCIS to really allow them to leave the

application pending which we have done before with a lot of the situation. Then at least they can carry on their life and move on to new project or do whatever, and maybe there be liquidation, a sale, and Mr. Leo come back -- we don't know, and I don't know anything. I just want to protect the investors.

THE COURT: Let's do this. Mr. Colorado, will you confer with Ms. Wong and Mr. Seiden, because Ms. Wong and Ms. Lau are the experts on the process, the immigration processing. So it would be helpful for them to inform you of what the consequences are or what the options are for these EB-5 investors who still haven't processed their I-829.

I thank you for that, Ms. Wong.

The other thing I want to direct you in particular, you and your company to do, is to apply directly to me if you want any more funds for processing the applications. I don't want Mr. Xia to be the go-between. I will release frozen funds directly to your firm if you have more I829s to process.

So you can make that application directly by, I guess maybe submitting it, someone has to file for you, you can mail it in then we'll file it in our case.

MS. WONG: One last question. We do need the K-1 and the tax returns. So I don't know who's paying what and who is doing what. So I am not the accountant so, I mean --

THE COURT: Have you --

MS. WONG: -- for anybody. But should the CPA ask for money on that so I can finish my filing for the next ones and the following one?

THE COURT: That's fine. What we can do, I still want to go through you, if they ask you for a fee, include that i the money I release to you, you can pay that to them.

MS. WONG: I got it.

THE COURT: I take it, some of it is the money you need to prepare to applications, then X amount to pay the accountants for the K-1.

MS. WONG: Understood. Thank you very much.

THE COURT: The bottom line is, Mr. Xia, I'm removing you as the middle person. It seems to me you're charging or you're taking some --

MR. XIA: No problem. I don't charge nothing.

I just want all the investors to get their permanent green card. So far we are very successful. Almost 200 investors got their permanent green card. Hundreds of USCIS freeze for four and-a-half years, that I can tell the Court. We have been doing this since -- super successful for all the investors.

THE COURT: The other thing is, Ms. Wong, I want you then not to send the I-829 to Mr. Xia to decide on the priority of who should file. Just as soon as you process those, send them to CIS like you would any other client. Do

not send it back to Mr. Xia or Fleet.

At this point I want to cut out this middle person. It seems like everybody who is collecting, what sounds like the same personalized documents, you can collect all of them, you can send me the bill for whatever it is. In other words, if you need the money just let me know what it is and we'll send that to you.

MS. WONG: Thank you very much.

And may I just propose something. If we send the packages without attaching these order of deadline and without the name of the investor, USCIS will be clueless what we are doing. If you are asking me to take over and figure out the sequence and figure out who should get whatever, I can do that. And they can contact me if they want to. Because my fee is paid by you and not anybody else. And I'd be happy to do it. I don't know whether there is a viable solution for all the parties involved.

THE COURT: I know that Mr. Xia will not like that, but it's fine by me. If that's something you might normally do for any client, that's fine. Just itemize whatever you spend the money on and I'll release the funds so we can process the remaining I829s that are viable.

Or, if you all come up with some other solution that requires you to also assist, you'll let me know and obviously I'll confirm with the SEC.

MS. WONG: Thank you.

Thank you, Mr. Colorado. I understand you are one the key persons to make sure these investor are in good hands. Thank you.

THE COURT: The last thing I want to say is that, Mr. Xia, if for some reason these K-1s that the investors need for their tax returns, if you have to keep hiring the accountant for that purpose then you can submit a bill to Mr. Peeler. But you have to comply with whatever documentation or other requirements. I don't want to hear --

MR. XIA: I don't think so --

THE COURT: Hang on. I don't want to hear more complaints he's not goings to pay. If they are legitimate fees to be paid to the accountant directly, not to you but to the accountant directly, to provide the K-1s, then I'll ask Mr. Peeler to consider those and pay them if it seems like that is the purpose, if it seems like a legitimate purpose.

But it's not going to go through you, Mr. Xia. I don't want --

(Talking over each other.)

THE COURT: -- the middle person for all these payments, and somehow you're getting money out of it. So I'm going to alleviate the burden that you claim you have borne all this time doing all this work for free. Let the accountants do it. Let Ms. Wong and her staff handle the

immigration paperwork.

MR. XIA: That's a perfect solution. Thank you, your Honor.

THE COURT: Let's put a deadline Mr. Colorado and Ms. Wong on you working with Mr. Seiden. And I'll put this in the docket order to Mr. Seiden directing him to get us the information as well as to come up with some language to advise the EB-5 investors.

Would 30 days be enough? I don't want to leave it out there too long.

MR. COLORADO: That's more than enough, your Honor.

MS. WONG: Yes.

THE COURT: We'll make the outside date for Mr. Seiden to submit the proposed language 30 days, then in the meantime I'll trust that you'll move quickly on it with Mr. Seiden. Thank you, Ms. Wong. And thank you, Mr. Colorado.

All right. That's all I wanted to cover. Is there anything else that anyone feels we need to discuss right now?

Start with Mr. Peeler, anything from you?

MR. PEELER: No, but thank you.

THE COURT: Mr. Colorado and team?

MR. COLORADO: No, your Honor. Thank you.

THE COURT: Ms. Wong, anything else?

MS. WONG: No, thank you.

THE COURT: Mr. Xia?

MR. XIA: I want to file 14-day statement.

THE COURT: I'm not sure what you want to say. You're going to object to something? Is that what you want to do?

MR. XIA: Yes. I think there is a misunderstanding about the EB-5, the immigration process, and what is the consequence potentially of the EB-5 investor.

THE COURT: Mr. Xia, I'm not going to tell you not to file anything, but I can't imagine it's going to be relevant to me, but file whatever you want in 14 days. But make it no longer than ten pages, you have a habit of filing extraordinarily long submissions. Limit it to ten pages whatever you think.

MR. XIA: How quickly I can get the transcript?

THE COURT: It depends on how much money you're willing to pay.

Rivka, you can talk to Mr. Xia afterwards.

If you want immediate delivery it gets quite expensive.

(Continued on next page.)

MR. XIA: I need to review the transcript and file a reply.

THE COURT: Rivka, can you discuss Mr. Xia afterwards to see what he wants to pay?

Thank you for participating.

(Whereupon, the matter was concluded.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Rivka Teich*
Rivka Teich, CSR RPR RMR FCRR
Official Court Reporter
Eastern District of New York